No. 14-15781

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

CHINATOWN NEIGHBORHOOD ASSOCIATION, a nonprofit corporation and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT, a political action committee,

Plaintiffs-Appellants,

v.

KAMALA HARRIS, Attorney General of the State of California; *et al*.,

Defendants-Appellees,

THE HUMANE SOCIETY OF THE UNITED STATES; *et al*.,

Intervenors-Defendants-Appellees.

---

On Appeal from the United States District Court
For the Northern District of California
Case No. 12-cv-03759 WHO
The Honorable William H. Orrick, District Judge.

---

OPENING BRIEF OF PLAINTIFFS-APPELLANTS

---

Joseph M. Breall
BREALL & BREALL LLP
1550 Bryant Street, Suite 575
San Francisco, California 94103
(415) 345-0545

Counsel for Plaintiffs-Appellants CHINATOWN NEIGHBORHOOD ASSOCIATION and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT.

## CORPORATE DISCLOSURE STATEMENT (FRAP 26.1)

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellant CHINATOWN

NEIGHBORHOOD ASSOCIATION, a nonprofit corporation, states that there is

no parent corporation or publicly held corporation that owns ten percent or more of

its stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .......................................... i

TABLE OF AUTHORITIES ................................................. iv

INTRODUCTION ................................................................1

STATEMENT OF JURISDICTION.................................................4

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................4

STATEMENT OF ADDENDUM OF PRIMARY AUTHORITIES ......................5

STATEMENT OF THE CASE....................................................5

    I.     California's Shark Fin Law ........................................5

    II.    The Chinese Tradition Of Shark Fin Soup.................................7

    III.   Shark Fins In The Stream Of Commerce ................................8

    IV.   Federal Fisheries Law ..............................................9

    V.    The Purported Goals Of The Shark Fin Law ...........................11

    VI.   Notice Of Proposed Rulemaking .....................................16

    VII.  Procedural History ................................................17

    VIII. Rulings Presented For Review.......................................19

SUMMARY OF THE ARGUMENT ........................................19

ARGUMENT ....................................................................21

    I.     Standard Of Review ...............................................21

    II.    The Pleading Requirements Under Federal Rule Of Civil Procedure 8(a) Are Not Onerous...................................................21

    III.   Plaintiffs Allege Sufficient Facts In The FAC To Plausibly State A Claim That The Shark Fin Law Violates The Supremacy Clause ................................23

    IV.   Plaintiffs Allege Sufficient Facts In The FAC To Plausibly State A Claim That The Shark Fin Law Violates The Equal Protection Clause ......................34

        A. *The Shark Fin Law Is Facially Discriminatory Because Banning Shark Fin Is A Proxy For Discriminating Against Chinese Californians* ...............34

        B. *The District Court Erroneously Applied The Law Of The Case Doctrine To Determine That The Shark Fin Law Is Facially Neutral* ........................36

        C. *Plaintiffs Sufficiently Plead That A Discriminatory Purpose Underlay The Enactment Of The Shark Fin Law* .........................................38

ii

D. *The Shark Fin Law Is Unjust As Applied To Chinese Californians* ........45

E. *The Shark Fin Law Cannot Survive Strict Scrutiny* .................................47

V. Plaintiffs Allege Sufficient Facts In The FAC To Plausibly State A Claim That The Shark Fin Law Violates The Commerce Clause ................................50

A. *Plaintiffs State A Claim That The Shark Fin Law Regulates Extraterritorially* ..................................................................................................50

B. *Plaintiffs State A Claim That The Shark Fin Law Fails The Pike Balancing Test* ........................................................................................52

VI. The District Court Erred In Dismissing Plaintiffs' § 1983 Claim ..........56

VII. Conclusion ..................................................................................................58

STATEMENT OF RELATED CASES .................................................................58

CERTIFICATE OF COMPLIANCE .....................................................................60

# TABLE OF AUTHORITIES

## CASES

*Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977 (9th Cir. 1991) --- 53, 54

*Ariz. v. U.S.*, 132 S. Ct. 2492 (2012)------------------------------------ 24, 27, 28, 29

*Ariz. Dream Act Coal. v. Brewer*, 2014 U.S. App. LEXIS 12746 (9th Cir. July 7, 2014)------------------------------------------------------------------------26

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) -------------------------------------------22

*Bateman v. Gardner*, 716 F. Supp. 595 (S.D. Fla.1989), *aff'd* 922 F.2d 847 (11th Cir. 1990)--------------------------------------------------------------------------26

*Batson v. Ky.*, 476 U.S. 79 (1986)------------------------------------------- 38, 39

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ------------------------------- 22, 23

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986) ----------------------------------------------------------------------------- 51

*Chavez v. Blue Sky Natural Beverage Co.*, 340 F. App'x 359 (9th Cir. 2009)-----23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ------------------------------------------------------------------------- passim

*Citicorp Servs., Inc. v. Gillespie*, 712 F. Supp. 749 (9th Cir. 1989) -----------------55

*City of Charleston v. A Fisherman's Best, Inc.*, 310 F.3d 155 (4th Cir. 2002) --- 24, 25, 30, 33

*Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690 (9th Cir. 2009) ----------------------------------------------------------------------39

*Cooley v. Bd. of Wardens*, 12 How. 299 (1852) -------------------------------------50

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) -------------24, 25, 33

*Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2012) ----------- 37

*Daily Herald Co. v. Munro*, 838 F.2d 380 (1988) ------------------------------- 57

*Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511 (9th Cir. 2011) ------------ 40

*Doe v. U.S.*, 58 F.3d 494 (9th Cir. 1995) ------------------------------------ 32

*Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2007) ----------------------------- 24

*Edgar v. MITE Corp.*, 457 U.S. 624 (1982) ---------------------------------- 51

*El-Hakem v. BJY, Inc.*, 415 F.3d 1068 (9th Cir. 2005) ----------------------- 35

*Erickson v. Pardus*, 551 U.S. 89 (2007) ------------------------------------ 22

*Fouke Co. v. Mandel*, 386 F. Supp.1341 (D. Md. 1974) ----------------------- 27

*Greater L.A. Agency on Deafness, Inc. v. CNN, Inc.*, 742 F.3d 414 (9th Cir. 2014)
------------------------------------------------------------------------- 50, 51

*Healy v. Beer Inst.*, 491 U.S. 324 (1989) ------------------------------- 51, 52

*Hernandez v. N.Y.*, 500 U.S. 352 (1991) ------------------------------------ 35

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ----------------------------------- 24

*Hughes v. Okla.*, 441 U.S. 322 (1979) --------------------------------- 53, 55, 56

*Hunter v. Regents of the Univ. of Cal.*, 190 F.3d 1061 (9th Cir. 1999) ------------ 47

*Hunter v. Underwood*, 471 U.S. 222 (1985) --------------------------------- 43

*Kassel v. Consol. Freightways Corp.*, 450 U.S. 662 (1981) ------------------- 54

*Kleppe v. N.M.*, 426 U.S. 529 (1976) -------------------------------------- 56

*Lacoste v. La. Dept. of Conservation*, 263 U.S. 545 (1924) ------------------- 53

*Loving v. Va.*, 388 U.S. 1 (1967) ----------------------------------------- 36

*Martin v. Int'l Olympic Comm.*, 740 F.2d 670 (9th Cir. 1984) ----------------------- 47

*Md. v. La.*, 451 U.S. 725 (1981) --------------------------------------------------- 24

*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008) --------- 23

*Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) --------------------------- 54

*Mitchum v. Foster*, 407 U.S. 225 (1972) ------------------------------------------ 57

*Motor Coach Emps. v. Lockridge*, 403 U.S. 274 (1971) ---------------------------- 28

*Mut. Pharm Co. v. Bartlett*, 133 S. Ct. 2466 (2013) ---------------------------- 32

*OSU Student Alliance v. Ray*, 699 F.3d 1053 (9th Cir. 2012) ----------------------- 21

*Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142 (9th Cir. 2013) ------------------------------------------------------------------------- 35, 40, 41

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ----------------------- 20, 52, 53, 56

*Pinnacle Armor, Inc. v. U S.*, 648 F.3d 708 (9th Cir. 2011) ------------------------- 22

*P.R. Dep't of Consumer Affairs v. Isla Petrol. Corp.*, 485 U.S. 495 (1988) -------- 29

*Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548 (3rd Cir. 2002) ------------ 41

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 499 F.3d 1108 (9th Cir. 2007) ------------------------------------------------------ 37, 38

*Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429 (1978) ---------------- 50, 53, 55

*S. Or. Barter Fair v. Jackson Cnty.*, 372 F.3d 1128 (9th Cir. 2003) -------- 34, 37, 38

*Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406 (9th Cir. 1996) ------------------ 41

*Se. Fisheries Ass'n v. Mosbacher*, 773 F. Supp. 435 (D.D.C. 1991) ----------- 30, 31

*Se. Fisheries Ass'n v. Chiles*, 979 F.2d 1504 (11th Cir. 1992) ----------------- 30, 31

*Silva v. Di Vittorio*, 658 F.3d 1090 (9th Cir. 2011) ----------------------------------- 32

*Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005 (9th Cir. 2012) ------------- 21

*Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750 (9th Cir. 1982) -------- 37

*Starr v. Baca*, 625 F.3d 1202 (9th Cir. 2011)---------------------------------- 21, 43, 44

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)------------------------------- 22, 44

*UFO Chuting of Haw. Inc. v. Smith*, 508 F.3d 1189 (9th Cir. 2007) ---------------- 53

*U.S. v. Ala.*, 691 F.3d 1269 (11th Cir. 2012)---------------------------------------- 26

*U.S. v. Tex. Educ. Agency*, 564 F.2d 162 (5th Cir. 1977) ----------------------------- 43

*Usher v. L.A.*, 828 F.2d 556 (9th Cir. 1987) ------------------------------------------ 21

*Valladolid v. Nat'l City*, 976 F.2d 1293 (9th Cir. 1992) ------------------------------ 40

*Valley Bank of Nev. v. Plus Sys., Inc.*, 914 F.2d 1186 (9th Cir. 1990) --------- 50, 51

*Vietnamese Fishermen Ass'n v. Cal. Dep't. of Fish & Game*, 816 F. Supp. 1468
 (N.D. Cal. 1993) ---------------------------------------------------------- 25, 30, 31

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)
 ----------------------------------------------------------------------------------- passim

*Washington v. Davis*, 426 U.S. 229 (1976) ------------------------------------- 38, 39, 40

*Wis. Dep't of Indust. v. Gould, Inc.*, 475 U.S. 282 (1986) --------------------------- 25

*Yakima Valley Mem. Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919 (9th Cir.
 2011) -------------------------------------------------------------------------------- 52

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ----------------------------------------- 45, 46

## CONSTITUTIONAL PROVISIONS

U.S. Const., amend. XIV, § 1 ("Equal Protection Clause")-------------------- passim
U.S. Const., art. I § 8, cl. 3 ("Commerce Clause")----------------------------- passim
U.S. Const., art. VI, cl. 2 ("Supremacy Clause")------------------------------- passim

## STATUTES AND REGULATIONS

Magnuson-Stevens Fisheries Management Act ("MSA")---------------------- passim
  16 U.S.C. §§ 1801-1884 ----------------------------------------------------10
  16 U.S.C. § 1801(a)(3) ------------------------------------------------------11
  16 U.S.C. § 1801(b)(1), (3), (4) ------------------------------------------10
  16 U.S.C. § 1802(4) ------------------------------------------------------26
  16 U.S.C. § 1802(11)-------------------------------------------------------- 9
  16 U.S.C. § 1802(33)-----------------------------------------------------11, 26, 27
  16 U.S.C. § 1811------------------------------------------------------------- 9
  16 U.S.C. § 1851(a)(1) --------------------------------------------------- 11, 26
  16 U.S.C. § 1851(a)(1), (4), (5) ------------------------------------------10
  16 U.S.C. § 1852(a)-(b) ---------------------------------------------------11
  16 U.S.C. § 1853(a)--------------------------------------------------- 10, 11
  16 U.S.C. § 1853(b)(3) ---------------------------------------------------10
  16 U.S.C. § 1854(b) ------------------------------------------------------10
  16 U.S.C. § 1856(a)(1) ---------------------------------------------------10
  16 U.S.C. § 1856(a)(1)-(2) ----------------------------------------------- 9
  Finning Prohibition Act ------------------------------------------------- passim
    16 U.S.C. § 1857(1)(P)----------------------------------------------- 12, 13
  Act of Jan. 4, 2011, Pub. L. No. 111-348, § 103(b), 124 Stat. 3668------------ 13
  50 C.F.R. § 600.310(e)(3) ------------------------------------------------11
  50 C.F.R. § 600.310(e)(3)(iii)(A) --------------------------------------- 11, 26
  50 C.F.R. § 600.1200-1204 (2002) --------------------------------------10
  50 C.F.R. § 600.1201(c) --------------------------------------------------17
28 U.S.C. § 1291 ----------------------------------------------------------- 4
28 U.S.C. § 1331 ----------------------------------------------------------- 4
28 U.S.C. § 1343(a)(3)------------------------------------------------------ 4
42 U.S.C. § 1983 -------------------------------------------------------- passim
Submerged Lands Act, 43 U.S.C. § 1301 et seq.-------------------------------- 9

Cal Fish & Game Code § 2021 ---------------------------------------------5, 16

Cal Fish & Game Code § 2021(b)----------------------------------------- 5

Cal Fish & Game Code § 2021(c)----------------------------------------- 6

Cal Fish & Game Code § 2021(d)----------------------------------------- 6

Cal Fish & Game Code § 2021(e)----------------------------------------- 6

Cal Fish & Game Code § 2021.5----------------------------------------- 5, 6

Cal Fish & Game Code § 2021.5(b)(1)---------------------------------------6, 48

Cal. Fish & Game Code § 7704(c) -------------------------------------------12

Cal. Fish & Game Code § 12000--------------------------------------------- 7

Or. Rev. Stat. § 509.160------------------------------------------------48

## RULES

Fed. R. App. P. 4(a)(1)(A) ----------------------------------------------- 4

Fed. R. Civ. P. 8(a)------------------------------------------------ 21, 22

Fed. R. Civ. P. 8(a)(2) ------------------------------------------------21

Fed. R. Civ. P. 12(b)(6)------------------------------------------------ passim

Fed. R. Civ. P. 15(a)(2)------------------------------------------------32

Ninth Circuit Rule 28-2.7 ----------------------------------------------- 5

## LEGISLATIVE MATERIALS

146 Cong. Rec. H 11570, 11571 (Oct. 30, 2000) -------------------------------- 13, 30

156 Cong. Reg. H8790 (Dec. 21, 2010) ----------------------------------- 13, 14

A.B. 376, 2011 Leg. (Ca. 2011) ------------------------------------------ 5

   AB 376 § 1------------------------------------------------ 12, 14

   AB 376 § 1(d) ------------------------------------------------12

   AB 376 § 1(f)------------------------------------------------ 12, 42

A.B. 853, 2011 Leg. (Ca. 2011) ------------------------------------------ 5

H.R. 5461, 106th Cong. (2000) (enacted)----------------------------------------29

## OTHER AUTHORITIES

Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 10, 1983) ----------------------- 9

78 Fed. Reg. 25,685 (May 2, 2013) ----------------------------------------- 16, 17

ix

78 Fed. Reg. 40,687 (July 8, 2013) -------------------------------------------------- 17

Council Regulation No. 1185/2003, 2003 O.J. (L 167) 1 (EC) (EU ban) ------ 14, 47

5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §
    1356, p. 354 (3d ed. 2004) ----------------------------------------------------- 23

NOAA FISHWATCH.GOV, ATLANTIC SPINY DOGFISH,
    http://www.fishwatch.gov/seafood_profiles/species/dogfish/species_pages/atl_sp
    iny_dogfish.htm (last visited Aug. 20, 2014) --------------------------------------- 48

NOAA FISHWATCH.GOV, PACIFIC SPINY DOGFISH,
    http://www.fishwatch.gov/seafood_profiles/species/dogfish/species_pages/pac_s
    piny_dogfish.htm (last visited Aug. 19, 2014) ------------------------------- 45, 48

NOAA FISHERIES, SHARK MYTHBUSTERS,
    http://www.nmfs.noaa.gov/stories/2012/08/08_13_12shark_mythbusters.html
    (last visited June 26, 2014) -------------------------------------------------------14

NOAA FISHERIES, A CLOSER LOOK AT SHARK CONSERVATION,
    http://www.nmfs.noaa.gov/stories/2012/08/08_13_12new_shark_week_splash_p
    age.html (last visited June 26, 2014) ----------------------------- 15, 27, 31, 43

ENVIRONMENTAL PROTECTION AGENCY, MERCURY STUDY REPORT TO CONGRESS
    (1997), available at http://www.epa.gov/mercury/report.htm ------------- 16, 49, 55

## INTRODUCTION

This action presents a challenge to the legitimacy and constitutionality of California's law banning the possession, sale, offer for sale, trade and distribution of shark fins ("Shark Fin Law" or "Law"). Plaintiffs-Appellants Chinatown Neighborhood Association and Asian Americans for Political Advancement ("Plaintiffs") contend that the United States District Court, Northern District of California ("district court") erroneously dismissed the claims in Plaintiffs' First Amended Complaint. Through this appeal, Plaintiffs ask the Court to find that they sufficiently allege their constitutional and statutory claims and reverse the district court's decision.

The Shark Fin Law discriminates against Plaintiffs' members, Chinese Californians, by directly targeting and suppressing the uniquely Chinese cultural and ceremonial tradition of shark fin soup, an ancient custom dating back to 1400 A.D. The Law is unnecessarily restrictive and evidences California officials and lawmakers' enmity towards a Chinese practice that they considered distasteful and irrelevant.

The Shark Fin Law was ostensibly enacted to prevent the act of shark finning, protect threatened shark species, and further the public health, all of which are goals that are supported by Plaintiffs and furthered by other federal and state laws. Yet the Shark Fin Law is replete with contradictions and restrictions that do

1

not advance the achievement of the purported objectives. If the goal of the Law is to end shark finning, why ban possession and trade of fins from sharks caught in highly regulated United States waters in which shark finning is already illegal? Why does the Shark Fin Law make no allowance for shark fins obtained through sustainable and humane fishing practices from shark species that are not threatened? Why ban shark fins, but continue to permit free trade and possession of the remainder of the same lawfully-fished sharks? Why ban shark fins based on public health concerns when the Environmental Protection Agency has specifically stated that the typical U.S. consumer is not in danger of consuming harmful levels of methylmercury from fish? To protect the public from exposure to methylmercury, why ban shark fins but fail to restrict consumption of meat from the same shark and consumption of other apex predators also containing methylmercury?

Plaintiffs contend that there are no acceptable answers to these questions. Instead of drafting and promoting rational policy, California lawmakers attacked the cultural traditions of Chinese Californians via a blanket shark fin ban and violated Plaintiffs' constitutional right to the equal protection of the laws. The district court failed to recognize this violation and improperly dismissed Plaintiffs' discrimination claim.

Plaintiffs adequately plead that the Shark Fin Law is an unconstitutional restriction on interstate commerce. The Law's purported goal is to regulate fishing practices and trade outside of California's borders, resulting in an unlawful extraterritorial reach. The substantial burden on interstate and foreign commerce that results from a blanket ban on shark fins also outweighs any asserted local benefits.

The United States has jurisdiction over federal waters. Federal laws, regulations, and plans including, but not limited to, the Magnuson-Stevens Fisheries Conservation and Management Act ("MSA"), are intended to protect natural resources while promoting the fishing economy and achieving optimum yield from fisheries. The federal Finning Prohibition Act prohibits the act of shark finning but does not prevent United States fishermen from harvesting sharks, bringing them to shore and then using the fins or other parts of the shark.

The MSA generally does not preempt a state's laws applicable to its fishers in state waters. However, as an overbroad blanket ban that regulates federal shark fisheries by restricting commerce, the Shark Fin Law stands as an unconstitutional obstacle to federal objectives. The district court erred in dismissing Plaintiffs' claim that the Shark Fin Law is preempted by federal laws, regulations and plans.

In analyzing the allegations in the First Amended Complaint, the district court failed to draw all reasonable inferences in favor of Plaintiffs. When construed

3

in the light most favorable to Plaintiffs, Plaintiffs' constitutional claims are sufficient to survive the motions to dismiss. In the First Amended Complaint, Plaintiffs also adequately plead their claim that enforcement of the unconstitutional Shark Fin Law deprives Plaintiffs of their civil rights in violation of 42 U.S.C. § 1983.

## STATEMENT OF JURISDICTION

Plaintiffs appeal from the United States District Court, Northern District of California's Order Granting Motions to Dismiss and entry of final judgment. The district court had jurisdiction under 28 U.S.C. § 1343(a)(3) and under 28 U.S.C. § 1331 because Plaintiffs raised questions under the United States Constitution and under 42 U.S.C. § 1983.

The district court issued its order and entered judgment disposing of all claims on March 25, 2014. The Notice of Appeal was filed on April 24, 2014. The appeal is timely under Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the district court erred in dismissing Plaintiffs' claim that the Shark Fin Law violates U.S. Const., art. VI, cl. 2 ("Supremacy Clause").

2.      Whether the district court erred in dismissing Plaintiffs' claim that the Shark Fin Law violates U.S. Const., amend. XIV, § 1 ("Equal Protection Clause").

4

3.     Whether the district court erred in dismissing Plaintiffs' claim that the Shark Fin Law violates U.S. Const., art. I § 8, cl. 3 ("Commerce Clause").

4.     Whether the district court erred in dismissing Plaintiffs' claim that the Shark Fin Law deprives Plaintiffs of their rights in violation of 42 U.S.C. § 1983 ("§ 1983").

## STATEMENT OF ADDENDUM OF PRIMARY AUTHORITIES

Pursuant to Ninth Circuit Rule 28-2.7, the primary authorities that are pertinent to this case are contained in the Addendum to Plaintiffs-Appellants' Opening Brief.

## STATEMENT OF THE CASE

### I.     California's Shark Fin Law

On October 7, 2011, California State Assembly Bills 376 and 853 were signed into law and the main provisions took effect on January 1, 2012, with full implementation after an eighteen-month period. These bills amended the California Fish and Game Code by adding §§ 2021 and 2021.5. *See* A.B. 376, 2011 Leg. (Ca. 2011); A.B. 853, 2011 Leg. (Ca. 2011).

Section 2021(b) of the California Fish and Game Code generally makes it "unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin" in California. Section 2021 of the California Fish and Game Code enumerates three exceptions to the general prohibitions which allow shark fin possession by

5

"[a]ny person who holds a license or permit pursuant to Section 1002 [possession for scientific, education or propagation purposes] consistent with that license or permit," allow shark fin possession by "any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes consistent with that permit," and provides a limited exception for restaurants that expired on January 1, 2013. Cal. Fish & Game Code § 2021(c)-(e).

California Fish and Game Code § 2021.5 enumerates further limited exceptions providing that "[a]ny person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess…or may donate to a person licensed or permitted pursuant to Section 1002, a shark fin or fins consistent with that license or permit," "any person may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that person, as of January 1, 2012" before July 1, 2013, and that the Shark Fin Law does not "prohibit[ ] the sale or possession of a shark carcass, skin, or fin for taxidermy purposes pursuant to Section 3087." Cal. Fish & Game Code § 2021.5(a). This section also includes a reporting requirement directing the Ocean Protection Council ("OPC") to "submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood…including chain of custody standards." Cal. Fish & Game Code § 2021.5(b)(1).

6

Violation of the Shark Fin Law is a misdemeanor offense, subject to a one thousand dollar fine and six months imprisonment. Cal. Fish & Game Code § 12000.

## II.  The Chinese Tradition Of Shark Fin Soup

Shark fins, as a fisheries product, have no significant end use other than Chinese shark fin soup. ER 047. The consumption of shark fin soup is an ancient culinary tradition that is unique to Chinese culture and dates back to China's Ming Dynasty circa 1400 A.D. ER 046. Shark fin soup is a key traditional dish for Chinese ceremonial banquets, special events, and holiday festivals. *Id.* Shark fin ("chì") is one of "The Big 4" precious foods in Chinese culture, a group which also includes abalone, sea cucumber and fish maw, all of which are symbolic foods for special occasions. *Id.*

Shark fin soup is served at Chinese holiday and festival banquets to celebrate the Chinese New Year, the Mid-Autumn Festival and the Winter Festival. ER 047. Shark fin soup is also an important cultural delicacy at traditional Chinese weddings. ER 046. It is customary to serve eight dishes at Chinese wedding banquets, one of which is shark fin soup, because the word "eight" in Chinese sounds similar to the word for "good luck." *Id.* Shark fin soup symbolizes prosperity and is an offering that indicates honor, generosity and respect for one's guests. *Id.* The traditional dish is also used to honor elders. In Chinese culture,

7

shark fins have long been regarded as a cure-all, an aphrodisiac, and a weapon in the battle against aging. ER 047

By criminalizing shark fins, the Shark Fin Law suppresses centuries-old Chinese cultural practices involving shark fin soup. ER 052. Chinese Californians can no longer serve this symbolic dish at weddings and festivals. Proponents of the Shark Fin Law have stated that the Law's intent was to target and end the Chinese practice of consuming shark fins. ER 051. When questioned about the implications of the Law on Chinese culture, California Assemblyman Paul Fong, one of the Law's legislative sponsors, replied, "the Chinese culture used to promote foot binding on women." *Id.* Assemblyman Fong also stated that "[j]ust like it was unhealthy to bind women's feet, this practice [of consuming shark fin soup] needs to end." *Id*. At an official press conference held on May 6, 2011 and attended by Assemblyman Fong and other Shark Fin Law supporters, Peter Knights, Executive Director of WildAid, a nonprofit organization that promoted the Law, stated:

> It's very difficult to regulate something that's going out [sic] on a boat in Indonesia in the middle of the ocean. It's very easy to regulate if something is happening in Chinatown here. Very easy to go 'round to restaurants and find out who's having what.

ER 051-52.

## III.  <u>Shark Fins In The Stream Of Commerce</u>

Prior to the enactment of the Shark Fin Law, shark fins that were possessed,

8

sold, offered for sale, traded and distributed in, to and from California were from sharks that were legally caught by fishers in California and in the waters of other states and jurisdictions, including in federal waters. ER 047. A significant number of shark fins formerly possessed, sold, offered for sale, traded and distributed in California originated from sharks fished off of the United States Atlantic Coast. *Id*. Shark fins also formerly moved through the State of California from one extraterritorial destination en route to another. *Id*. Under the Law, shark fins can no longer pass through California to be sold or traded in other states or abroad, restricting shark fin commerce outside of California. ER 052.

## IV. <u>Federal Fisheries Law</u>

The federal government retains "sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone [("EEZ")]." 16 U.S.C. § 1811; *see also* ER 049. The EEZ extends from the seaward boundary of the States to a boundary 200 nautical miles from the baseline from which the breadth of the territorial sea is measured. *See* 16 U.S.C. § 1802(11); Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 10, 1983); ER 049. States generally have authority over fishing within the boundaries of the state, which for most states extend three miles seaward of the coastline.16 U.S.C. § 1856(a)(1)-(2); *see also* Submerged Lands Act, 43 U.S.C. § 1301 et seq.

Federal statutes, regulations and plans, including, but not limited to, the MSA, strictly regulate fishing, including shark fishing. *See e.g.* 16 U.S.C. §§ 1801-1884; 50 C.F.R. § 600.1200-1204 (2002); ER 049-50. The MSA provides the federal government with authority to regulate not only the harvesting of fish, but also the possession, landing, and sale of fish catch. *See* 16 U.S.C. § 1853(b)(3); ER 049. Fisheries Management Plans ("FMPs"), including FMPs for shark species, that are established pursuant to the MSA must "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry," minimize adverse economic impacts on fishing communities, consider efficiency in the utilization of fishery resources, and comply with other substantive and procedural requirements. *See* 16 U.S.C. § 1851(a)(1), (4), (5) (National Standards); *id.* § 1853(a) (Plan Required Provisions); *id.* § 1854(e) (Rebuilding Overfished Fisheries); *see also* ER 049. Apart from exceptions not relevant here, "nothing in [the MSA] shall be construed as extending or diminishing the jurisdiction of any State within its boundaries." 16 U.S.C. § 1856(a)(1).

The MSA was enacted to "conserve and manage . . . fishery resources," "promote domestic commercial and recreational fishing under sound conservation and management principles," and "achieve and maintain, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1801(b)(1), (3), (4). Federal law

10

has the stated objective of "maintaining an economically viable fishery together with its attendant contributions to the national, regional, and local economies." 50 C.F.R. § 600.310(e)(3)(iii)(A); 16 U.S.C. § 1851(a)(1). The MSA defines "optimum" yield as the amount of fish that "will provide the greatest overall benefit to the Nation," based in part on the "maximum sustainable yield from the fishery." 16 U.S.C. § 1802(33); see also 50 C.F.R. § 600.310(e)(3), In promoting sustainable commercial fishing, the MSA recognizes that "commercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation." 16 U.S.C. § 1801(a)(3); ER 050.

Federal shark fisheries are managed under FMPs that are developed by eight regional Fishery Management Councils ("Councils") or the Secretary of Commerce. Council voting members include National Marine Fisheries Service ("NMFS") regional directors, state officials with marine fishery management responsibilities, and individuals who are knowledgeable about conservation and management of fishery resources.16 U.S.C. § 1852(a)-(b). Councils develop FMPs for fish stocks requiring conservation and management. Among other objectives, FMPs must "prevent overfishing and rebuild overfished stocks." *Id.* § 1853(a); *see* 50 C.F.R. § 600.10.

## V.    The Purported Goals Of The Shark Fin Law

The Shark Fin Law was ostensibly enacted to address three main issues: (1)

11

the practice of shark finning; (2) the sustainability of shark populations; and (3) public health concerns about methylmercury in shark fins. AB 376 § 1; *see* ER 050-51. According to AB 376 § 1(f), the objective of the Law is to "impact[ ] the demand for shark fins" in California. Proponents and sponsors of the Shark Fin Law repeatedly stated that by targeting and suppressing the California market for shark fins, they could further the Law's purported goals. *See* ER 051.

Shark finning refers to a practice by which the fin is removed from a live shark and then the shark is released back into the ocean to die. *See* AB 376 § 1(d); ER 050. Shark finning is widely recognized in the United States and abroad as inhumane and environmentally wasteful. Although it purports to prevent shark finning, the Shark Fin Law does not place explicit restrictions on finning, presumably because this practice was already illegal under existing federal and California law. *See* ER 048-49, 050. Pursuant to Cal. Fish & Game Code § 7704(c):

> Except as permitted by this code or by regulation of the commission, it is unlawful to sell, purchase, deliver for commercial purposes, or possess on any commercial fishing vessel registered pursuant to Section 7881 any shark fin or shark tail or portion thereof that has been removed from the carcass…

The MSA, as amended by the Shark Finning Prohibition Act of 2000, Pub. L. 106-557, and the Shark Conservation Act of 2010, Pub. L. 111-348 (collectively, the "Finning Prohibition Act"), makes it unlawful for any person:

    i. to remove any of the fins of a shark (including the tail) at sea;

   ii. to have custody, control, or possession of any such fin aboard a fishing vessel unless it is naturally attached to the corresponding carcass;

  iii. to transfer any such fin from one vessel to another vessel at sea, or to receive any such fin in such transfer, without the fin naturally attached to the corresponding carcass; or

  iv. to land any such fin that is not naturally attached to the corresponding carcass, or to land any shark carcass without such fins naturally attached.

16 U.S.C. § 1857(1)(P).[1]

The Finning Prohibition Act thereby seeks to "end the wasteful and abusive practice of shark finning." 156 Cong. Reg. H8790 (Dec. 21, 2010) (Statement of Rep. Madeleine Bordallo); ER 050. The Finning Prohibition Act does not prohibit the possession, sale, offer for sale, trade or distribution of a shark fin from a shark landed in compliance with federal law. *Cf.* 146 Cong. Rec. H 11570, 11571 (Oct. 30, 2000) (Statement of Rep. George Miller) ("The Shark Finning Prohibition Act will not prevent United States fishermen from harvesting sharks, bringing them to shore, and then using the fins or any other part of the shark. Instead, it would simply prevent the cutting off of the fins and the disposal of the carcass at sea, or the transport or landing of fins harvested in this manner by another fishing

---

[1] The requirement that sharks be landed with fins attached does not apply to commercial fishing for smooth dogfish off the Atlantic coast. Act of Jan. 4, 2011, Pub. L. No. 111-348, § 103(b), 124 Stat. 3668, 3670; ER 050.

vessel."); ER 050. An underlying objective of the Finning Prohibition Act is to prevent waste.156 Cong. Reg. H8790. Yet the Shark Fin Law requires fishers to waste fins from legally fished sharks since there are no commercial uses for the fins in California.[2]

The laws of many foreign jurisdictions also ban shark finning. *See* Council Regulation No. 1185/2003, 2003 O.J. (L 167) 1 (EC) (European Union ban); ER 051. Although shark finning is illegal in U.S. waters and in the waters of many other countries, the Shark Fin Law does not distinguish between fins from sharks that are harvested in accordance with state, federal, and foreign anti-finning regulations and fins from sharks that were obtained from unregulated waters. ER 051.

Supporters of the Shark Fin Law assert that the Law is necessary to ensure the sustainability of shark populations. ER 051; *see also* AB 376 § 1. Sustainability concerns are relevant only to certain shark species. ER 051. According to the National Oceanic and Atmospheric Administration ("NOAA") Fisheries Service, the assertion that "[s]harks are an endangered species" is a "MYTH."[3] *Id.* NOAA

---

[2] At the preliminary injunction stage of the proceedings, Plaintiffs submitted declarations from fishers stating that the vast majority of shark fins will be disposed of as waste as a result of the prohibitions of the Shark Fin Law.

[3] NOAA FISHERIES, SHARK MYTHBUSTERS, http://www.nmfs.noaa.gov/stories/2012/08/08_13_12shark_mythbusters.html (last visited June 26, 2014).

14

states that "[t]here are currently no shark species listed under the Endangered

Species Act."[4]

NOAA works to ensure sustainable shark fishing is practiced in the United

States. ER 051. "For nearly two decades the United States has been a leader in

managing sustainable shark fisheries and currently has some of the strongest shark

management measures worldwide." SHARK CONSERVATION, *supra* note 4. NOAA

oversees management plans for United States shark fisheries:

> NOAA Fisheries manages the commercial and
> recreational shark fishing in the Atlantic Ocean and
> works with three regional fishery management councils
> to conserve and sustainably manage sharks in the Pacific
> Ocean…By conducting research, assessing stocks,
> working with U.S. fisherman, and implementing
> restrictions when necessary, NOAA Fisheries
> successfully manages shark populations to maintain
> productive and sustainable fisheries.

*Id*.; *see also* ER 051.

Because of these strict management measures, NOAA states that

"[c]ommercial shark fishermen can then sell both the meat and fins, which benefits

their business and provides consumers with additional seafood alternatives."

SHARK CONSERVATION, *supra* note 4. The Shark Fin Law makes no allowance for

fins from non-threatened sharks or for fins from sustainably-fished sharks. ER 051

---

[4] NOAA FISHERIES, A CLOSER LOOK AT SHARK CONSERVATION,
http://www.nmfs.noaa.gov/stories/2012/08/08_13_12new_shark_week_splash_pag
e.html (last visited June 26, 2014).

Aside from criminalizing the fin, the Shark Fin Law does not place further restrictions on shark fisheries or on other parts of the shark. ER 051, 054. The use of approximately ninety-five percent of a shark remains legal in California, including use for shark steaks, products made from shark oil, and goods crafted from sharkskin. ER 051. However, pursuant to the Law, the fin of the very same shark - roughly five percent of the total shark - cannot be possessed, sold, offered for sale, traded or distributed in California. *See* Cal. Fish & Game Code § 2021.

Methylmercury is found in many apex predators including swordfish and tuna. *See* ER 051. The Environmental Protection Agency ("EPA") indicated in the Mercury Study Report to Congress (U.S. EPA, 1997) that the typical U.S. consumer was not in danger of consuming harmful levels of methylmercury from fish and was not advised to limit fish consumption on the basis of mercury content.[5] Although the Shark Fin Law purports to address health concerns about methylmercury, it does not restrict the consumption of other apex predators or other parts of the shark to prevent methylmercury exposure. ER 051.

## VI.    Notice Of Proposed Rulemaking

On May 2, 2013, NMFS issued a notice of proposed rulemaking to implement the Shark Conservation Act of 2010 and clarify the relationship between federal and state shark finning laws. 78 Fed. Reg. 25,685 (May 2, 2013).

---

[5] ENVIRONMENTAL PROTECTION AGENCY, MERCURY STUDY REPORT TO CONGRESS (1997), available at http://www.epa.gov/mercury/report.htm

The public comment period for the proposed rule closed on July 31, 2013. 78 Fed. Reg. 40,687 (July 8, 2013) (comment period extension). The notice explains that section 600.1201(c) of the current regulations "affirm[s] that the [federal] regulations would not infringe on a state's jurisdiction or authority." 78 Fed. Reg. at 25,687. However, "[n]either the [Shark Finning Prohibition Act of 2000] nor the [Shark Conservation Act of 2010] suggest[s] that Congress intended to amend the [MSA] to prohibit the possession or sale of shark fins." *Id*. at 25,686.

NMFS further explains that "[s]tate or territorial shark fins laws are preempted if they are inconsistent with the [MSA] as amended by the [Finning Prohibition Act], implementing regulations for the statutes, or applicable fishery management plans or regulations." 78 Fed. Reg. at 25,687. "If sharks are lawfully caught in federal waters, state laws that prohibit the possession and landing of those sharks with fins naturally attached or that prohibit the sale, transfer or possession of fins from those sharks unduly interfere with achievement of [MSA] purposes and objectives" and would be preempted. *Id.* However, "if a state law prohibiting the possession, landing, or sale of shark fins is interpreted not to apply to sharks legally harvested in federal waters, the law would not be preempted." *Id.*

## VII.  **Procedural History**

On July 13, 2012, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief against Defendants Edmund Brown, Governor of the State of

17

California, Kamala Harris, Attorney General of the State of California, and Charles H. Bonham, Director, California Department of Fish and Game alleging that the Shark Fin Law violates Section 1 of the Fourteenth Amendment to the U.S. Constitution, violates Article 1, Section 8, Clause 3 of the U.S. Constitution, violates Article VI, Clause 2 of the U.S. Constitution, and violates 42 U.S.C. § 1983. On August 9, 2012, Plaintiffs filed their Motion for Preliminary Injunction. On September 14, 2012, Intervenors-Defendants the Humane Society of the United States, the Asian Pacific American Ocean Harmony Alliance and the Monterey Bay Aquarium Foundation were granted leave to intervene. On January 2, 2013, the Honorable Phyllis J. Hamilton, United States District Judge issued her Order Denying Motion for Preliminary Injunction. Plaintiffs appealed to this Court and this Court affirmed on August 27, 2013.

On December 9, 2013, Plaintiffs filed their First Amended Complaint ("FAC") for Declaratory and Injunctive Relief against Defendants Kamala Harris, Attorney General of the State of California, and Charles H. Bonham, Director, California Department of Fish and Wildlife ("Government Defendants")[6] and Intervenors-Defendants the Humane Society of the United States, the Asian Pacific American Ocean Harmony Alliance and the Monterey Bay Aquarium Foundation ("Intervenors-Defendants" and collectively with Government Defendants,

---

[6] Governor Brown was not named as a defendant in the FAC.

18

"Defendants") alleging that the Shark Fin Law violates Section 1 of the Fourteenth Amendment to the U.S. Constitution, violates Article 1, Section 8, Clause 3 of the U.S. Constitution, violates Article VI, Clause 2 of the U.S. Constitution, and violates 42 U.S.C. § 1983. On January 6, 2014, Government Defendants filed their Motion to Dismiss Plaintiffs' First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Intervenors-Defendants filed their Motion to Dismiss Plaintiffs' Amended Complaint. On March 25, 2014, the Honorable William H. Orrick, United States District Judge issued his Order Granting Motions to Dismiss and entered final judgment.

## VIII.    Rulings Presented For Review

Plaintiffs respectfully request review of the district court's Order Granting Motions to Dismiss filed on March 25, 2014 and the district court's final judgment in this action entered on March 25, 2014.

## SUMMARY OF THE ARGUMENT

The district court's decision dismissing the FAC improperly draws inferences in favor of the Defendants rather than Plaintiffs, sets the bar too high for pleading, and undermines the notion that the filing of a complaint is the starting point for notice pleading that relies on discovery rules and summary judgment motions to define the issues and dispose of unmeritorious claims. The district court's decision should be reversed.

Plaintiffs sufficiently plead their individual claims in the FAC and the district court erred in determining otherwise:

*First*, the district court erred in determining that Plaintiffs do not state a claim that the Shark Fin Law violates the Supremacy Clause and that the Shark Fin Law is preempted by federal laws, regulations and plans, including, but not limited to, the MSA. Plaintiffs sufficiently allege that the Shark Fin Law infringes upon federal authority to regulate fishing in the EEZ and conflicts with federal law by presenting an obstacle to the achievement of federal objectives.

*Second*, the district court failed to recognize that banning shark fin soup is a proxy for banning a Chinese tradition and the district court erroneously applied the law of the case doctrine to determine that the Shark Fin Law is facially neutral. Plaintiffs sufficiently allege that a discriminatory purpose underlay the enactment of the Shark Fin Law, sufficiently allege that strict judicial scrutiny should apply, and sufficiently allege that the Shark Fin Law violates the Equal Protection Clause. The district court erred in dismissing Plaintiffs' Equal Protection claim.

*Third*, the district court erred in dismissing Plaintiffs Commerce Clause claim because Plaintiffs sufficiently allege that the Shark Fin Law regulates commerce extraterritorially. The district court also erred in failing to fully analyze Plaintiffs' Commerce Clause claim pursuant to the standard articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Plaintiffs sufficiently allege that the

20

Shark Fin Law burdens interstate commerce and that this burden outweighs the Law's putative local benefits.

*Fourth*, the district court committed reversible error in dismissing Plaintiffs' § 1983 claim. Plaintiffs sufficiently allege that, by enforcing an unconstitutional statute, Government Defendants have violated, and continue to violate, Plaintiffs' rights under § 1983.

## ARGUMENT

### I.   Standard Of Review

This Court "review[s] de novo a district court's dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim." *Starr v. Baca*, 625 F.3d 1202, 1205 (9th Cir. 2011). In doing so, the Court accepts "all factual allegations in the complaint as true and constru[es] them in the light most favorable to the nonmoving party." *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012); *see also OSU Student Alliance v. Ray*, 699 F.3d 1053, 1058 (9th Cir. 2012). The Court must "draw all reasonable inferences in favor of the nonmoving party." *Usher v. L.A.*, 828 F.2d 556, 561 (9th Cir. 1987).

### II.   The Pleading Requirements Under Federal Rule Of Civil Procedure 8(a) Are Not Onerous

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." If a complaint alleges enough facts to state a claim for relief that is

21

plausible on its face, the complaint may not be dismissed for failing to allege additional facts that the plaintiff would need to prevail at trial. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (plaintiff need not allege specific facts, the facts alleged must be accepted as true, and the facts need only give defendant "'fair notice of what the…claim is and the grounds upon which it rests'" (quoting *Twombly*, 550 U.S. at 555)). A plaintiff "is not required to 'demonstrate' anything in order to survive a Rule 12(b)(6) motion to dismiss. Rather, it only needs to ***allege*** 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Pinnacle Armor, Inc. v. U.S.*, 648 F.3d 708, 721 (9th Cir. 2011) (emphasis in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

At the same time, "a claim just shy of plausible entitlement to relief" cannot be saved by the discovery process and case management. *Twombly*, 550 U.S. at 559; see also *Iqbal*, 556 U.S. at 684-85 ("The question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls placed on the discovery process."). But where the requirements of Rule 8(a) are satisfied, "claims lacking merit may be dealt with through summary judgment." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). In this regard, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of

those facts is improbable, and that a recovery is very remote and unlikely."

*Twombly*, 550 U.S. at 556.

This Court has noted that "the motion to dismiss is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." *Chavez v. Blue Sky Natural Beverage Co.*, 340 F. App'x 359, 360 (9th Cir. 2009) (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, p. 354 (3d ed. 2004)). Instead, "dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008); *see also Shroyer* v. *New Cingular Wireless Servs., Inc*., 622 F.3d 1035, 1041 (9th Cir. 2010). The issue here is whether Plaintiffs state in the FAC claims on which relief can be granted under cognizable legal theories, and should have the opportunity to present evidence in support of their allegations, regardless of the likelihood that they will ultimately prevail.

## III.  Plaintiffs Allege Sufficient Facts In The FAC To Plausibly State A Claim That The Shark Fin Law Violates The Supremacy Clause

Plaintiffs sufficiently plead their claim that the Shark Fin Law violates the Supremacy Clause and the district court erred in determining otherwise. It is well established by application of the Supremacy Clause that where a state law conflicts

with treaties or federal laws, the state law is preempted and void. The U.S.

Constitution states:

> This Constitution, and the Laws of the United States
> which shall be made in Pursuance thereof; and all
> Treaties made, or which shall be made, under the
> Authority of the United States, shall be the supreme Law
> of the Land; and the Judges in every State shall be bound
> thereby, any Thing in the Constitution or Laws of any
> State to the Contrary notwithstanding.

U.S. Const., art. VI, cl. 2. "Federal preemption may be express or implied." *Donell*

*v. Kowell*, 533 F.3d 762, 775 (9th Cir. 2007); *see also City of Charleston v. A*

*Fisherman's Best, Inc.*, 310 F.3d 155, 169 (4th Cir. 2002). "Implied preemption

occurs where Congress, through the structure or objectives of federal law, has

impliedly precluded state regulation in the area." *Charleston*, 310 F.3d at 169.

A state statute is preempted when it "produce[s] a result inconsistent with

the objective of the federal statute…to the extent it conflicts with a federal

statute…or where the law 'stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress.'" *Md. v. La.*, 451 U.S.

725, 747 (1981) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also*

*Ariz. v. U.S.*, 132 S. Ct. 2492, 2501 (2012) (state law pertaining to unlawful aliens

conflict-preempted by federal regulation). To determine if preemption exists, a

court must examine the "purpose and intended effects" of federal law. *Crosby v.*

*Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). "'Conflict is imminent

24

when two separate remedies are brought to bear on the same activity.'" *Id.* at 380

(quoting *Wis. Dep't of Indust. v. Gould, Inc.*, 475 U.S. 282, 286 (1986)).

The Shark Fin Law is preempted by federal laws, regulations and plans

because it undermines the federal government's authority over EEZ fisheries by

categorically prohibiting the sale, offer for sale, trade and distribution of shark fins

from sharks caught in the EEZ, even when such acts are allowed under federal law.

*See Vietnamese Fishermen Ass'n v. Cal. Dep't. of Fish & Game*, 816 F. Supp.

1468 (N.D. Cal. 1993) (California statute prohibiting use of gill and trammel nets

to take rockfish preempted in EEZ because MSA/an FMP permitted use by silence

on such a ban). Specifically, while a fisher may land a shark caught in the EEZ in

California, the Law bans the federally legal acts of selling, offering for sale,

trading and distributing a part of the shark that has significant economic value. The

Law bears on the same activity as federal law - regulation of federal fisheries - and

is in "actual conflict with precise and sufficiently narrow objectives that underlie

the federal enactments," including the MSA's mandate to manage federal fisheries.

*Charleston*, 310 F.3d at 169. The district court was incorrect in determining that

there is "no conflict between the Shark Fin Law and the MSA generally." ER 025.

The Shark Fin Law attempts to directly regulate a fisher's ability to place

fish caught in the EEZ into the stream of commerce and "stands as an obstacle,"

*Crosby*, 530 U.S. at 372, to the MSA's purpose of achieving optimum yield from

25

federal fisheries and "maintaining an economically viable fishery together with its attendant contributions to the national, regional, and local economies." *See* 50 C.F.R. § 600.310(e)(3)(iii)(A); 16 U.S.C. § 1851(a)(1). The Law also impedes NMFS management of federal shark fisheries to maximize yield under sound conservation and management principles. *Cf. Bateman v. Gardner*, 716 F. Supp. 595 (S.D. Fla.1989), *aff'd* 922 F.2d 847 (11th Cir. 1990) (state shrimp fishing regulation that stood as obstacle to federal goal of promoting fishing preempted by the Shrimp Fishery Management Plan, managed by the Gulf of Mexico Fishery Management Council). In short, the Shark Fin Law impermissibly affects a central component of commercial fishing - the ability to possess and place into commerce fish caught in federal waters.[7] *See* 16 U.S.C. § 1802(4) (defining commercial fishing as "fishing in which the fish harvested, either in whole or in part, are intended to enter commerce or enter commerce through sale, barter or trade").

According to the district court, the stated federal goal of achieving "maximum sustainable yield" from a fishery "as reduced by any social, economic,

---

[7] It is true that fishers may move a whole shark with attached fins out of California and then remove the fins for sale and distribution in another state. Yet as a practical matter, storing a whole shark and transporting it out of state is extremely difficult, expensive, and a departure from the normal commercial practice. Indeed, the actual effect of the Shark Fin Law is to prevent fishers from selling, offering for sale, trading and distributing a highly commercially viable part of the shark. *See generally Ariz. Dream Act Coal. v. Brewer*, 2014 U.S. App. LEXIS 12746, at *18-19 (9th Cir. July 7, 2014) ("'Preemption analysis must contemplate the practical result of the state law, not just the means that a state utilizes to accomplish the goal.'" (quoting *U.S. v. Ala.*, 691 F.3d 1269, 1296 (11th Cir. 2012))).

and ecological factors," 16 U.S.C. § 1802(33), "does not suggest congressional intent to maximize fishing or the sale of fish." ER 025. While it is correct that the MSA and other federal laws, regulations and plans do not promote the maximization of all fishing at any cost, their stated objective of maximizing sustainable, socially- and ecologically-conscious fishing is clear. In fact, regarding federal management, NOAA states, "NOAA Fisheries and the related fishery management councils sustainably manage the shark population, which is good for fishermen, seafood consumers, and sharks." SHARK CONSERVATION, *supra* note 4. Accepting as true Plaintiffs' allegations in the FAC regarding sustainable and humane shark fishing in the United States, it logically follows that a categorical ban on shark fins conflicts with the MSA's objective of balancing the goal of yield maximization with sustainability and social and ecological concerns. *C.f. Ariz.*, 132 S. Ct. at 2505 (state law preempted because it interfered with Congressional goal of striking careful balance with respect to unauthorized employment of aliens); *Fouke Co. v. Mandel*, 386 F. Supp.1341 (D. Md. 1974) (federal treaty and wildlife protection statute preempted Maryland criminal statutes prohibiting the importation of seal skins into Maryland).

Despite the district court's determination to the contrary, the Shark Fin Law may be preempted even if certain federal objectives are in harmony with the stated objectives of the Law. *See Ariz.*, 132 S. Ct. at 2505 (state law that shared common

goal with federal law - deterring unlawful employment - nonetheless preempted because it conflicted in method of enforcement). "The [Supreme] Court has recognized that a '[c]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy.'" *Id.* (quoting *Motor Coach Emps. v. Lockridge*, 403 U.S. 274, 287 (1971)). Assuming both federal law and the Shark Fin Law are intended to prevent the practice of finning and promote species sustainability, there is a crucial difference in method of enforcement between the Shark Fin Law, an indiscriminate blanket ban, and federal laws, regulations, and plans that directly target the practice of finning and protect threatened species.[8]

While it is true that the MSA, as amended by the Finning Prohibition Act, seeks to halt the practice of shark finning, that is not the sole objective of the MSA. As discussed above, the MSA requires that FMPs consider the social and economic needs of fishing communities in prescribing measures to achieve optimum yield from each fishery for the U.S. fishing industry on a continuing basis. Congress chose a circumscribed approach to addressing the practice of shark finning that did not include a total ban on the possession, sale, and trade of fins from sharks that

---

[8] In its order dismissing Plaintiffs' claims, the district court devoted a portion of its analysis to explaining the consistency in purpose of the Shark Fin Law and federal anti-finning laws. ER 024-25. Plaintiffs do not dispute that both federal anti-finning laws and the Shark Fin Law have a consistent stated purpose of eliminating the practice of finning. Instead, Plaintiffs argue that the Shark Fin Law is preempted because federal laws, regulations and plans permit full use of legally and humanely fished sharks and promote the underlying federal objective of promoting optimum yield from fisheries.

were legally harvested in federal waters. California's law conflicts with this Congressional judgment.

The Shark Fin Law also conflicts with the MSA to the extent that the MSA promotes elimination of wasteful practices. An underlying goal of federal anti-finning law is to "eliminate the wasteful and unsportsmanlike practice of shark finning." H.R. 5461, 106th Cong. (2000) (enacted). Yet the Shark Fin Law prohibits commercial use of shark fins, the practical result of which is to encourage fishers to dispose of fins from legally fished sharks. The Law is preempted because it presents an obstacle to the federal objective of preventing waste.

According to the district court, Plaintiffs' preemption claim fails because federal law does not explicitly regulate shark fins on land, nor does the MSA direct the states to permit trade in shark fins. *See* ER 024; 026-27. Yet federal law need not expressly permit possession and commerce involving shark fins for a conflict with the Shark Fin Law to arise. "Where a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, then the pre-emptive inference can be drawn - not from federal inaction alone, but from inaction joined with action." *P.R. Dep't of Consumer Affairs v. Isla Petrol. Corp.*, 485 U.S. 495, 503 (1988); *see also Ariz.*, 132 S. Ct.at 2505. The federal government intentionally refrained from placing controls on the possession, sale, offer for sale, trade and distribution of shark fins from legally fished sharks in

29

accordance with the objectives of the MSA. *See* 146 Cong. Rec. H 11570, 11571 (Oct. 30, 2000) (Statement of Rep. George Miller) ("The Shark Finning Prohibition Act will not prevent United States fishermen from harvesting sharks, bringing them to shore, and then using the fins or any other part of the shark.");[9] ER 050. The Shark Fin Law obstructs the realization of this balance.

As to EEZ fisheries specifically, federal law's silence on the activity prohibited by state law is enough to create a conflict. *Vietnamese Fishermen*, 816 F. Supp. at 1475 (state law banning activity on which federal law is silent may create conflict); *cf. Se. Fisheries Ass'n v. Mosbacher*, 773 F. Supp. 435, 440, n.11 (D.D.C. 1991) (federal General Counsel's interpretation of MSA stated "a properly promulgated regulation will supersede conflicting state regulation – **direct or indirect** – of [EEZ] fishing" (emphasis added)). It is also well-settled that, where federal law permits obtainment of a fish in the EEZ, state law may not interfere with a fisher's ability to dock or possess the fish or to place that fish into the stream of commerce. *See e.g. Charleston*, 310 F.3d at 177 (states forbidden from preventing docking of fish lawfully caught in federal waters); *See Se. Fisheries Ass'n v. Chiles*, 979 F.2d 1504, 1510 (11th Cir. 1992) (state law imposing daily

---

[9] The district court faulted Plaintiffs for supposedly failing to provide legislative history or allege facts "demonstrating that Congress' decision not to prohibit the possession or trade of shark fin is one that Congress specifically rejected or would have sanctioned." ER 027. Yet Rep. Miller's statement speaks to the contrary. Viewed in the light most favorable to Plaintiffs, the district court's position is untenable.

landing limit on mackerel preempted because federal FMP had only annual quota);
*Mosbacher*, 773 F. Supp. at 440 (federal regulation permitting redfish harvest
preempted state law banning redfish landing, possession, or sale because "in effect,
[state law] told commercial fishermen that they may catch the fish, but that they
may not land them," creating impermissible conflict with MSA). In sum, explicit
federal law permitting the activities that the Shark Fin Law bans is not necessary to
create a conflict and trigger the preemption doctrine.

The district court distinguished prior decisions finding preemption of state
regulation of EEZ fisheries on the basis that Plaintiffs did not plead the existence
of a shark FMP or other law pertaining to the harvesting of shark fins. ER 026. As
explained above, explicit state laws regarding shark fin harvesting are not
necessary to create a conflict. *See Vietnamese Fishermen*, 816 F. Supp. at 1475. As
also discussed above, shark fisheries are managed by NOAA and regional councils
pursuant to federal FMPs with the goal of maintaining "productive and sustainable
fisheries." SHARK CONSERVATION, *supra* note 4. These federal sustainable
management plans were created so that "fishermen can harvest sharks, providing
benefits to both the U.S. fishing industry and seafood consumers." *Id.*

In the FAC, Plaintiffs discuss the existence of FMPs and FMP's underlying
objectives. ER 049. They also plead that "[f]ederal laws, regulations and plans
allow fishers to catch sharks in the EEZ and possess and sell all parts of the shark,

31

including the fin" and explicitly allege that the Shark Fin Law improperly conflicts with federal FMPs and other laws and regulations which promote sustainability and productivity. ER 052, 055-56. These allegations, viewed in the light most favorable to Plaintiffs, are sufficient to state a claim that the Shark Fin Law conflicts with federal laws, regulations and plans and is preempted.[10] The district court incorrectly dismissed Plaintiffs Supremacy Clause claim on the basis of supposed pleading deficiencies.

The district court noted that Plaintiffs "do not adequately allege that it is impossible to comply with both state and federal law..." ER 024. However, it is no answer to the obstacle preemption question that compliance with both sets of laws may theoretically be possible. *See Mut. Pharm Co. v. Bartlett*, 133 S. Ct. 2466, 2473, 2477, n.3 (2013) (finding that a state drug labeling law is preempted and rejecting the argument that the drug manufacturer could comply with both state and federal law by not doing business in the relevant state). Here, the Shark Fin Law goes too far by banning all commerce involving shark fins from sharks caught

---

[10] Even assuming *arguendo* the insufficiency of the pleadings as to shark FMPs and federal laws and regulations, Plaintiffs contend that the district court should have granted them leave to amend instead of dismissing Plaintiffs' Supremacy Clause claim with prejudice. Pursuant to Federal Rule of Civil Procedure 15(a)(2), a "court should freely give leave to amend when justice so requires; *see also Silva v. Di Vittorio*, 658 F.3d 1090, 1105 (9th Cir. 2011) ("Indeed, 'a district court should grant leave to amend unless it determines that the pleading could not possibly be cured by the allegation of other facts.'") (quoting *Doe v. U.S.*, 58 F.3d 494, 497 (9th Cir. 1995))).

in federal waters, when federal law allows for commerce, provided that the shark is landed in compliance with federal law. *Cf. Crosby*, 530 U.S. at 380 (finding state law prohibiting trade with Burma preempted, noting that "the fact that some companies may be able to comply with both sets of sanctions does not mean that the state Act is not at odds with achievement of the federal decision about the right degree of pressure to employ" against Burma).

By banning commercial transactions involving fins altogether, the Shark Fin Law infringes upon federal authority over EEZ fisheries and creates an obstacle to federal goals of ensuring species sustainability while permitting lawful trade and promoting optimum yield from fisheries. This creates an impermissible conflict between the Law and federal statutes, regulations and plans. Federal law must prevail.[11] *See Charleston*, 310 F.3d at 177. Plaintiffs sufficiently allege as such in

---

[11] The United States filed an amicus curiae brief in this Court in support of Plaintiffs' Supremacy Clause claim on appeal of the denial of preliminary injunction. In eleventh hour correspondence between Eileen Sobeck, Assistant Administrator for Fisheries, NOAA and Defendant Bonham (sent after Plaintiffs filed their opposition to the motions to dismiss), Ms. Sobeck stated that NOAA's new position was that the Shark Fin Law was not preempted by federal law. *See* ER 22-24. Plaintiffs contend that Ms. Sobeck failed to articulate any valid legal basis for the change in NOAA's position. Plaintiffs also take issue with the fact that the district court admitted the correspondence submitted with Government Defendants' reply in support of their motion to dismiss without giving Plaintiffs the opportunity to respond.

the FAC and the district court's dismissal of Plaintiffs' Supremacy Clause claim should be reversed.[12]

## IV.   Plaintiffs Allege Sufficient Facts In The FAC To Plausibly State A Claim That The Shark Fin Law Violates The Equal Protection Clause

In dismissing Plaintiffs' Equal Protection challenge to the Shark Fin Law for failure to state a claim, the district court found that 1) the Shark Fin Law is facially neutral; 2) Plaintiffs did not sufficiently plead a discriminatory purpose; and 3) the Law survives rational basis scrutiny. ER 010-15. Drawing all reasonable inferences in favor of Plaintiffs, the FAC alleges sufficient facts to state a plausible claim that the Shark Fin Law discriminates against Californians of Chinese national origin in violation of the Equal Protection Clause. The district court's decision should be reversed.

### A. *The Shark Fin Law Is Facially Discriminatory Because Banning Shark Fin Is A Proxy For Discriminating Against Chinese Californians*

The Shark Fin Law is facially discriminatory because it places a direct prohibition on a uniquely Chinese cultural practice. For purposes of a

---

[12] To the extent that the district court relied on the determination made at the preliminary injunction phase that the Shark Fin Law is not preempted by federal law, this was improper. *See e.g. S. Or. Barter Fair v. Jackson Cnty.*, 372 F.3d 1128, 1136 (9th Cir. 2003); Section IV(B), *infra*. Plaintiffs contend that the preliminary injunction ruling on the Supremacy Clause was based on faulty reasoning, a position also taken by the United States in their amicus brief, and that the preliminary injunction decision has no weight at this stage of the proceedings.

34

discrimination analysis, ancestry or ethnic characteristics are much broader than physical traits and include integral concepts such as language and names. *El-Hakem v. BJY, Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005); *see also Hernandez v. N.Y.*, 500 U.S. 352, 371 (1991) ("It may well be, for certain ethnic groups and in some communities, proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis."). Cultural practices that are inextricably linked to race or national origin, including the ancient ceremonial Chinese tradition of shark fin soup, are similar concepts.

This Court has determined that:

> Proxy discrimination is facial discrimination that arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group.

*Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 (9th Cir. 2013). Shark fin soup is the only significant end market for shark fins in California, and its consumption is a cultural tradition unique to the Chinese. The Shark Fin Law essentially singles out and bans a distinctly Chinese tradition and the Law is constructively a proxy for outlawing a practice that legislators considered distasteful. *See id.; c.f. Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993) (use of non-specific words such as "sacrifice"

35

and "ritual" did not obscure purpose of ordinance to target Santeria religion). Chinese Californians are also treated differently "on the basis of seemingly neutral criteria" in that shark products other than fins are still legal, yet the use of fins from the same exact sharks is illegal. *Pac. Shores Props., LLC* 730 F.3d at 1160.

Plaintiffs allege sufficient facts supporting their facial discrimination claim in the FAC, warranting the application of strict scrutiny to evaluate the constitutionality of the Shark Fin Law. *See e.g. Loving v. Va.*, 388 U.S. 1, 11 (1967) (statutes that discriminate based on national origin or race subject to strict scrutiny analysis dictating that challenged discrimination "must be necessary to the accomplishment of some permissible state objective."). The district court failed to recognize that the Shark Fin Law is a facially discriminatory statute and erroneously applied the rational basis test, warranting reversal by this Court. *See* Section III(E), *infra*.

**B.** ***The District Court Erroneously Applied The Law Of The Case Doctrine To Determine That The Shark Fin Law Is Facially Neutral***

Invoking the "law of the case" doctrine, the district court deferred to a determination made during the preliminary injunction phase of this case that the Shark Fin Law is facially neutral. ER 010. According to the district court, the finding of facial neutrality was a pure issue of law, rendering application of the law of the case doctrine appropriate. *Id.* Plaintiffs respectfully disagree.

As the district court correctly recognized, the law of the case doctrine should not be applied in deference to preliminary injunction phase determinations, *see* ER 009-10, which are often made quickly and without the evaluation of a full record. *S. Or. Barter Fair*, 372 F.3d at 1136; *see also Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2012) (rulings on "'preliminary injunctions may provide little guidance as to the appropriate disposition on the merits'") (quoting *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982))). While it is true that the district court is bound by previously-decided pure issues of law, "[t]he district court must apply this law to the facts anew with consideration of the evidence presented in the merits phase." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 499 F.3d 1108, 1114 (9th Cir. 2007). Even when a facial challenge to a statute "involves primarily issues of law," this Court has determined that there is no reason to deviate from "the general rule that decisions on preliminary injunctions are not binding at trial on the merits and do not constitute the law of the case." *S. Or. Barter Fair*, 372 F.3d at 1136.

Plaintiffs' facial challenge to the Shark Fin Law is a mixed question of law and fact, rendering inappropriate the district court's reliance on the law of the case doctrine. Plaintiffs argue that, in all practical effect, the sole end-user impact of banning shark fin is equivalent to banning a Chinese cultural tradition, and the Law

37

is discriminatory on its face. Any analysis of the facial neutrality of the Shark Fin Law necessarily requires an examination of the facts, and it was improper for the district court to defer to the preliminary injunction determination, even if the issue was primarily one of law. *See S. Or. Barter Fair*, 372 F.3d at 1136.

Assuming that the question of the Shark Fin Law's facial neutrality is one of pure law, the district court was nevertheless required to "apply the law to the facts anew." *See Ranchers*, 499 F.3d at 1114. Plaintiffs contend that, when considered in light of the facts, the Shark Fin Law is a proxy for discrimination against Chinese Californians. The district court might have recognized this after an independent analysis, but instead it improperly applied the law of the case doctrine to summarily dispense of Plaintiffs' claim that the Shark Fin Law is facially discriminatory.[13] ER 010. This constitutes reversible error.

### C. *Plaintiffs Sufficiently Plead That A Discriminatory Purpose Underlay The Enactment Of The Shark Fin Law*

Laws that appear facially neutral are nonetheless subject to strict legal scrutiny if there is an underlying invidious discriminatory purpose. *Washington v. Davis*, 426 U.S. 229, 241-42 (1976). Courts employ a "totality of the relevant facts" analysis to determine if such a purpose exists. *Id.*; *see also Batson v. Ky.*,

---

[13] Although the district court stated that it "independently" agreed with the preliminary injunction finding that the Shark Fin Law was facially neutral, ER 010, it conducted no further analysis of the Law's facial neutrality in light of the facts of the case.

476 U.S. 79, 94 (1986) (prima facie case of purposeful discrimination

demonstrated when "the totality of the relevant facts gives rise to an inference of

discriminatory purpose."). The disparate impact on a protected class is a

significant, and sometimes determinative, factor in the discriminatory purpose

analysis. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.

252, 266 (1977) ("Determining whether invidious discriminatory purpose was a

motivating factor demands a sensitive inquiry into such circumstantial and direct

evidence of intent as may be available. The impact of the official action - whether

it 'bears more heavily on one race than another,' - may provide an important

starting point.") (quoting *Davis*, 426 U.S at 242)).

The Shark Fin Law has an irrefutable overwhelming disparate impact on

Chinese Californians. The district court acknowledged this impact in its order

dismissing the FAC. ER 012 ("People of Chinese culture or origin undoubtedly

overwhelmingly comprise the market for shark fin."). While a discriminatory

purpose analysis does not necessarily end at a finding of discriminatory impact,

*Arlington Heights*, 429 U.S. at 266, such impact "may for all practical purposes

demonstrate unconstitutionality." *Davis*, 426 U.S at 242; *see also Comm.

Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703-05 (9th Cir.

2009) (reversing grant of summary judgment on equal protection claim that tax

sharing plan discriminated against Latino communities because discriminatory

39

intent inferred from evidence of discriminatory impact). This is particularly true when the disparate impact is overwhelming, as is the case with the Shark Fin Law. *See Arlington Heights,* 429 U.S. at 266.

In addition to disparate impact, the existence of underlying discriminatory intent also factors into a discriminatory purpose analysis. *Davis*, 426 U.S. at 242. "Discriminatory intent need not be proved by direct evidence." *Valladolid v. Nat'l City*, 976 F.2d 1293, 1298 (9th Cir. 1992); *see also Lukumi*, 508 U.S. at 534 (discriminatory intent established by both direct and circumstantial evidence)**.** Courts may look to the factors articulated by the Supreme Court in *Arlington Heights* for evidence of discriminatory intent which include: "(1) statistics demonstrating a 'clear pattern unexplainable on grounds other than' discriminatory ones, (2) '[t]he historical background of the decision,' (3) '[t]he specific sequence of events leading up to the challenged decision,' (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant 'legislative or administrative history.'" *Pac. Shores*, 730 F.3d at1158-59 (quoting *Arlington Heights*, 429 U.S. at 267-68); *see also Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 522-23 (9th Cir. 2011) (without direct evidence, plaintiff can show discriminatory intent by disparate impact, historical background, procedural irregularities, or legislative history including lawmakers' contemporaneous statements).

In the FAC, Plaintiffs allege evidence of discriminatory intent sufficient to state a claim for discrimination. *See generally Pac. Shores*, 730 F.3d at 1159 (plaintiffs relying on *Arlington Heights* factors "'need provide very little such evidence . . . to raise a genuine issue of fact . . .; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder.'" (quoting *Schnidrig v. Columbia Mach., Inc*., 80 F.3d 1406, 1409 (9th Cir. 1996))). The public statements made by the proponents and sponsors of the Shark Fin Law regarding foot binding and regulating Chinatown made it clear that the Law was intended to target a custom unique to Chinese Californians. ER 051-52; *see also Arlington Heights*, 429 U.S. at 268 ("contemporaneous statements by members of the decisionmaking body" highly relevant to show discriminatory intent). To the extent that Defendants disagree with the meaning of these statements, dismissal is nonetheless inappropriate at this stage; instead, this issue can be addressed through summary judgment. *See Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 563 (3rd Cir. 2002) ("Owing perhaps to the principle that questions of intent and state of mind are ordinarily not amenable to summary adjudication,…courts have only reluctantly upheld the Rule 12(b)(6) dismissal of a claim alleging unlawful discrimination in the adoption of an otherwise facially neutral policy.").

41

The Shark Fin Law's sponsors and proponents, as well as the text of AB 376, also emphasized that the purpose of the Law was to target the shark fin market in California. AB 376 § 1(f); ER 051-52. The only significant end product for shark fins is Chinese shark fin soup and any assertion that the "market" for shark fins does not refer to a Chinese cultural tradition is disingenuous. Viewed from this perspective, the relevant background and history of the Law's promotion and enactment reveals intent to discriminate against Chinese Californians, *see Arlington Heights*, 429 U.S. at 267-68, and the district court committed reversible error in finding otherwise at this stage of the litigation.

California lawmakers passed the Shark Fin Law despite ample evidence that it was partially founded on myths and misunderstandings, a fact also disregarded by the district court. The Law was supposedly enacted to prevent shark finning, yet lawmakers knew that shark finning is illegal under California law, federal law, and the laws of many foreign jurisdictions, rendering a blanket shark fin ban unnecessary. Lawmakers were also aware that many shark species are not threatened and sustainability is not a concern for many shark populations. The Shark Fin Law was enacted despite this knowledge,[14] demonstrating a departure from the usual procedure of crafting well-reasoned policy and further evidencing

---

[14] Plaintiffs' members presented evidence regarding the illegality of shark finning and the sustainability of shark populations to California lawmakers prior to the enactment of the Shark Fin Law.

discriminatory intent.[15] *See Arlington Heights*, 429 U.S. at 267 ("Substantive departures too may be relevant [to show discriminatory intent], particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.").

The district court improperly accepted the legislative finding regarding the necessity of the Shark Fin Law to prevent shark finning, despite the fact that Plaintiffs allege in the FAC that shark finning is illegal in the United States and thus is not a current practice. The district court also accepted the finding that the population health of sharks is generally threatened, even though Plaintiffs allege that, according to NOAA, this is a MYTH. ER 051; *see also* SHARK CONSERVATION, *supra* note 4 ("There are currently no shark species listed under the Endangered Species Act, and for overfished shark species stocks, NOAA

---

[15] Plaintiffs do not contend that the Shark Fin Law was solely intended to discriminate against Chinese Californians. But the existence of a concurrent legitimate motive alongside a discriminatory purpose does not render a law constitutional. *See Hunter v. Underwood*, 471 U.S. 222, 232 (1985); *see also Lukumi*, 508 U.S. at 535 (ordinance implicating multiple legitimate concerns nonetheless unconstitutional); *U.S. v. Tex. Educ. Agency*, 564 F.2d 162, 174 (5th Cir. 1977) (discriminatory intent may exist even if actions prompted by benign motive). The discriminatory purpose need not even be the "dominant" or "primary" factor motivating a law's enactment. *Arlington Heights*, 429 U.S. at 266. Even assuming the validity of the environmental and public health goals accepted by the district court, ER 014, strict scrutiny is nonetheless warranted if Plaintiffs demonstrate any coexistent discriminatory purpose. *See Arlington Heights*, 429 U.S. at 265-66 (no judicial deference to legislative decisions if discriminatory purpose was motivating factor).

fisheries applies management measures to rebuild the stock to a sustainable level."). In ignoring Plaintiffs' factual allegations, the district court failed to recognize that legislators enacted the Shark Fin Law even though they were aware that the Law was based on false information and untruths, evidencing intent to discriminate against Chinese Californians.

In evaluating whether Plaintiffs presented sufficient evidence of discriminatory intent, the district court held Plaintiffs to an unreasonably high standard. Instead of accepting the evidence pleaded in the FAC as true, the district court requested further evidence from Plaintiffs to "bolster" and demonstrate their Equal Protection Claim, *see* ER 038-39, an evidentiary expectation reasonable on summary judgment but not at the motion to dismiss stage. *See e.g. Swierkiewicz*, 534 U.S. at 514. The district court also failed to construe the allegations of discriminatory intent in the FAC in the light most favorable to Plaintiffs. Instead, it accepted Defendants' construction of the meaning of statements from sponsors and supporters of the Shark Fin Law. ER 012. This is improper on a 12(b)(6) motion to dismiss:

> If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)…The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable. The factual allegations of the complaint need only plausibly suggest an entitlement to relief.

*Starr*, 652 F.3d at 1216-17.

### D. *The Shark Fin Law Is Unjust As Applied To Chinese Californians*

A facially neutral law may violate the Equal Protection Clause when its unequal and unjust application disproportionately affects one group. *See Yick Wo*, 118 U.S. at 373-74 (facially neutral ordinance imposing arbitrary restrictions on wooden laundries only affecting Chinese laundry owners was unconstitutional). The Shark Fin Law, when viewed in the larger context of regulations on shark products and shark fisheries, is an unequal and arbitrary application of the law. Invoking sustainability concerns, the Law prohibits Chinese Californians from using fins from lawfully fished sharks but has no regulatory impact on use of the other parts of the *exact same* sharks. It is the height of discriminatory application of the law to criminalize the use of the fin from legally caught sharks which are only important to Chinese Californians, while the remaining approximately ninety-five percent of the shark may be legally used for shark oil, shark meat, sharkskin, and other products used by people of many national origins.[16]

---

[16] As an example, California spiny dogfish have long been used by Europeans as an inexpensive food source, particularly to make fish and chips. NOAA FISHWATCH.GOV, PACIFIC SPINY DOGFISH, http://www.fishwatch.gov/seafood_profiles/species/dogfish/species_pages/pac_spiny_dogfish.htm (last visited Aug. 19, 2014). California permits the sale of spiny dogfish meat to Europeans but bans the sale of fins from the very same sharks to people of Chinese national origin.

The Shark Fin Law also permits California fishers to possess and consume shark fins, but forbids Chinese Californians from using the same fins in traditional shark fin soup. This constitutes an unequal application of the Law and a denial of equal justice for Chinese Californians. *Yick Wo*, 118 U.S. at 373-74 (law is discriminatory "if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances"). Aside from distaste for a Chinese cultural practice, there is no explanation for prohibiting Chinese Californians from possessing shark fins obtained from lawfully and sustainably fished sharks while affording fishers this privilege.

It is also an unequal application of the law to ban shark fins because of concerns about methylmercury content without placing similar restrictions on the remainder of the shark and on other more widely consumed apex predators such as swordfish or tuna. There is no valid nondiscriminatory basis for banning shark fins but continuing to allow consumption of other types of seafood that also contain methylmercury, as well as consumption of other parts of the exact same sharks. *See Yick Wo*, 118 U.S. at 374 (If no reason for discrimination shown, "the conclusion cannot be resisted, that no reason exists for it except hostility to the race and nationality to which the petitioners belong, and which in the eye of the law is not justified.").

### E. *The Shark Fin Law Cannot Survive Strict Scrutiny*

Plaintiffs sufficiently plead that the Shark Fin Law discriminates against Chinese Californians and the district court erred in failing to apply strict judicial scrutiny to determine the Law's constitutionality. Strict scrutiny requires Defendants to demonstrate that the Law is narrowly tailored to further compelling societal interests. *See e.g. Hunter v. Regents of the Univ. of Cal.*, 190 F.3d 1061, 1063 (9th Cir. 1999); *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 677 (9th Cir. 1984). Defendants cannot meet this burden; most significantly because the Shark Fin Law is grossly overbroad as to the interests it purports to advance. As to the goal of finning prevention, sharks fished in the United States are already fully protected from this practice under state and federal laws, including, but not limited to, the MSA and the California Fish & Game Code. The same is true for sharks fished in the waters of many foreign nations, including the nations of the European Union. *See e.g.* Council Regulation No. 1185/2003, 2003 O.J. (L 167) 1 (EC), ER 235. Concerns about fins imported from countries that do not ban finning could be easily and properly addressed by a more narrowly tailored ban on imports from these countries.

The Shark Fin Law is similarly not narrowly tailored to address concerns about overfishing of sharks. The Law makes no allowance for fins from

47

sustainably fished shark species with healthy populations.[17] The Shark Fin Law

could have excluded non-threatened sustainably fished species from the blanket

prohibitions on shark fins, similar to the Oregon shark fin law that exempted spiny

dogfish fins.[18] *See* Or. Rev. Stat. § 509.160(3)(a).

In an analogous decision regarding the constitutionality of a facially neutral

city ordinance that burdened petitioner's religious practices, the Supreme Court

stated:

> The legitimate governmental interests in protecting the
> public health and preventing cruelty to animals could be
> addressed by restrictions stopping far short of a flat
> prohibition of all Santeria sacrificial practice. If improper
> disposal, not the sacrifice itself, is the harm to be
> prevented, the city could have imposed a general
> regulation on the disposal of organic garbage…Under
> similar analysis, narrower regulation would achieve the
> city's interest in preventing cruelty to animals…If the
> city has a real concern that other methods [of slaughter]
> are less humane, however, the subject of the regulation

---

[17] As an example, all Atlantic spiny dogfish are from a fishery that NOAA
Fisheries deems "sustainable." NOAA FISHWATCH.GOV, ATLANTIC SPINY
DOGFISH,
http://www.fishwatch.gov/seafood_profiles/species/dogfish/species_pages/atl_spin
y_dogfish.htm (last visited Aug. 20, 2014). NOAA further states that "spiny
dogfish stocks off both U.S. coasts are currently abundant." PACIFIC SPINY
DOGFISH, *supra* note 16.

[18] Through its provision requiring the OPC to submit an annual report listing
certified sustainable shark species, the Shark Fin Law acknowledges the existence
of sustainable shark fishing. *See* Cal. Fish & Game Code § 2021.5(b)(1). Yet the
Law does not contemplate an exception for fins of species listed in the OPC report.

> should be the method of slaughter itself, not a religious
> classification that is said to bear some general relation…

*Lukumi*, 508 U.S. at 538-39. The same reasoning applies to the Shark Fin Law. California lawmakers could have, and should have, passed a narrowly tailored law to address the concerns asserted by the Law's supporters, while still allowing the Chinese to continue their cultural practices with shark fins from humane and sustainable fishing sources. Instead they enacted an overbroad discriminatory ban that cannot survive strict scrutiny.

It is also highly questionable whether the asserted interests underlying the Shark Fin Law are truly "compelling" for the purposes of strict scrutiny given the misinformation on which the Law was based. Finning is not a concern in many countries, sustainability is not a concern for many shark populations and, as the EPA has stated, MERCURY STUDY REPORT, *supra* note 5, the methylmercury content of fish is not a concern for most U.S. consumers. The Law also presents contradictions that call into question the "compelling" nature of its stated objectives. To truly further the purported compelling interests, the Law should have criminalized possession of all shark parts in California, banned shark fishing entirely, and criminalized consumption of other parts of the shark and other apex predators containing methylmercury.

49

Plaintiffs adequately plead that the Shark Fin Law discriminates against Chinese Californians and cannot survive a strict scrutiny analysis. The Court should reverse the district court's dismissal of Plaintiffs' Equal Protection claim.

**V. Plaintiffs Allege Sufficient Facts In The FAC To Plausibly State A Claim That The Shark Fin Law Violates The Commerce Clause**

In the FAC, Plaintiffs sufficiently state a claim that the Shark Fin Law violates the Commerce Clause. The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. Art. 1, § 8, cl. 3. In its negative form, the dormant "Commerce Clause prevents the States from erecting barriers to the free flow of interstate commerce." *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 440 (1978) (citing *Cooley v. Bd. of Wardens*, 12 How. 299 (1852)). As an explicit prohibition on all domestic and foreign trade of shark fins involving the state of California, the Shark Fin Law directly regulates interstate and foreign commerce and erects significant barriers to the commercial flow of shark fins.

**A. *Plaintiffs State A Claim That The Shark Fin Law Regulates Extraterritorially***

In addition to restricting all shark fin commerce in or with California, the Shark Fin Law also affects extraterritorial sales, offers for sale, trade and commercial distribution of shark fins. The dormant Commerce Clause prohibits states from "direct regulation of interstate commerce [which] 'occurs when a

50

state law directly affects transactions that take place across state lines or entirely outside of the state's borders.'" *Greater L.A. Agency on Deafness, Inc. v. CNN, Inc.*, 742 F.3d 414, 432 (9th Cir. 2014) (quoting *Valley Bank of Nev. v. Plus Sys., Inc.*, 914 F.2d 1186, 1189-90 (9th Cir. 1990)). Indeed, a state law regulating extraterritorial commerce is invalid "'whether or not the commerce has effects within the state.'" *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624 642-43 (1982) (plurality opinion). "Such a statute is invalid per se, regardless of whether the state intended to inhibit interstate commerce." *Valley Bank*, 914 F.2d at 1190.

The Law prohibits shark fins from passing through California in the stream of commerce to be sold, offered for sale, traded or distributed in other states or countries, the practical effect of which is to regulate commercial transactions between extraterritorial entities that are consummated beyond California's borders. *See L.A. Agency*, 742 F.3d at 433 (determination of whether statute directly regulates interstate commerce focuses on practical effect of statute). As a result, the Law is a per se violation of the Commerce Clause. *See Valley Bank*, 914 F.2d 1190. The Shark Fin Law was also purportedly enacted to target shark fishing commerce outside of California's jurisdiction by suppressing the in-state market for fins. The district court failed to recognize that this extraterritorial regulatory reach is impermissible under the Commerce Clause. *See Brown-Forman Distillers*

51

*Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 582 (1986) (liquor law that effectively regulated out of state transactions violated Commerce Clause); *Healy*, 491 U.S. at 336.

### B. *Plaintiffs State A Claim That The Shark Fin Law Fails The Pike Balancing Test*

The district court further erred in finding that Plaintiffs did not state a Commerce Clause claim under the balancing test articulated in *Pike*, 397 U.S. at 142. This test requires an analysis of "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.*; *see also Yakima Valley Mem. Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 933 (9th Cir. 2011) ("Although the dormant Commerce Clause primarily targets discrimination against out-of-state economic activity, under *Pike* it prohibits all unjustifiable burdens on interstate commerce.").

According to the district court, Plaintiffs did not show a substantial burden on interstate commerce because their only allegation pertaining to the requisite *Pike* burden was that shark fins may not be sold in California. ER 019. This is inaccurate; the pleadings clearly state that the Shark Fin Law burdens interstate commerce by preventing all commercial transactions between "California entities and out-of-state and foreign entities." ER 052. The FAC also alleges that "[a] significant number of shark fins formerly possessed, sold, offered for sale, traded and distributed in California originated from sharks fished off the United States

52

Atlantic Coast." ER 047. Plaintiffs further contend that the Law bans shark fins from moving through California from one extraterritorial destination to another, thus burdening interstate commerce. *See* ER 052, 054-55. Construed in the light most favorable to Plaintiffs, the FAC sufficiently alleges that the Shark Fin Law places the substantial burden on interstate commerce contemplated by *Pike*.

If a state law substantially burdens interstate commerce, the *Pike* test mandates a balancing of the statute's putative local benefits with this burden. *Pike*, 397 U.S. at 142. "When considering the purpose of a challenged statute, this Court is not bound by '[the] name, description or characterization given it by the legislature or the courts of the State,' but will determine for itself the practical impact of the law." *See Hughes v. Okla.*, 441 U.S. 322, 336 (1979) (quoting *Lacoste v. La. Dept. of Conservation*, 263 U.S. 545, 550 (1924)). The benefits of the challenged statute must not be merely speculative or so marginally furthered as to be illusory. *Raymond*, 434 U.S. at 447-48 (speculative highway safety interests in regulating truck size did not outweigh substantial burden on commerce); *see also UFO Chuting of Haw. Inc. v. Smith*, 508 F.3d 1189, 1196 (9th Cir. 2007) ("A statute is unreasonable or irrational when 'the asserted benefits of the statute are in fact illusory…'") (quoting *Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 983 (9th Cir. 1991))). A statute may also fail the *Pike* test if "the particular

means chosen to achieve its goals were irrational, arbitrary or unrelated to those goals." *Alaska Airlines*, 951 F.2d at 984.

The district court summarily identified "protection of public health and wildlife" as the "legitimate state interests" advanced by the Shark Fin Law and questioned how Plaintiffs could "seriously dispute this." ER 020. Plaintiffs do not dispute the legitimacy of these interests, but contend that these benefits are not per se valid as the district court's cursory analysis assumes. *See Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 670 (1981) ("[T]he incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack."); *cf. Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 (1981) ("When legislating in areas of legitimate local concern, such as environmental protection and resource conservation, States are nonetheless limited by the Commerce Clause."). While the putative benefits articulated by the district court are legitimate in theory, these benefits are illusory in the context of the Shark Fin Law. Because the Law is replete with exceptions and contradictions, it only marginally furthers the protection of public health. *See Kassel*, 450 U.S. at 670 ("Regulations designed for that salutary purpose [of promoting public health and safety] nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause.").

54

As previously noted, exposure to methylmercury is not a risk for typical U.S. consumers, rendering the goal of protecting the public health illusory. MERCURY STUDY REPORT, *supra* note 5. The facts that California fishers may still eat shark fins and that the Law does not restrict the consumption of the remainder of the shark or of other apex predators also call into question the legitimacy of the goal of preventing public exposure to methylmercury. *See Raymond*, 434 U.S. at 444-45 (highway safety justifications undercut by numerous exceptions to oversized truck statute); *Citicorp Servs., Inc. v. Gillespie*, 712 F. Supp. 749, 754 (9th Cir. 1989) (statute regulating disbursement of checks in escrow accounts that did not regulate ninety-five percent of checks in escrow did not further purported interest of eliminating risk).

The putative benefits of shark conservation and eradicating global shark finning are also illusory when viewed in terms of "practical implications." *See Hughes*, 441 U.S. at 336. In the FAC, Plaintiffs plead that pre-existing anti-finning laws, NOAA statements regarding the non-endangered status of sharks, and the existence of sustainable shark fishing in the United States all are facts that raise questions about a blanket ban's furtherance of these environmental goals. ER 049-51; 055. Protecting sharks outside of California waters from population decline and finning are also not *local* benefits for the purposes of a Commerce Clause analysis. Although, states have a right to regulate wildlife within their borders, *see Hughes*,

441 U.S. at 337, the goal putatively advanced by the Law - protection of sharks in foreign waters - is an improper attempt to regulate wildlife outside of California's borders. *See Kleppe v. N.M.*, 426 U.S. 529, 545-46 (1976) (no state power over wildlife outside state's jurisdiction).

The district court erred in failing to conduct a burden to benefit analysis to evaluate Plaintiffs' Commerce Clause challenge. ER 019 ("In any event, there is no need to apply the balancing test in *Pike*."); *see also Pike*, 397 U.S. at 142. Construed in the light most favorable to Plaintiffs, the Shark Fin Law is an excessively burdensome prohibition on all shark fin commerce that disregards the species of shark and method and location of the catch. The goals of ending unsustainable and inhumane shark fishing practices and the goal of furthering the public health could have been promoted by the enactment of a more precise law with a lesser impact on interstate and foreign commerce. The Shark Fin Law cannot pass *Pike* test muster.

The FAC sufficiently states a claim upon which relief may be granted that the Shark Fin Law violates the Commerce Clause and the Court should reverse the district court's dismissal of this claim.

## VI.    The District Court Erred In Dismissing Plaintiffs' § 1983 Claim

Pursuant to § 1983:

> [e]very person who under color of any statute … of any
> State … subjects or causes to be subjected, any citizen of

56

> the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…

This section was enacted "to protect the people from unconstitutional action under color of state law." *Mitchum v. Foster*, 407 U.S. 225, 240 (1972). The district court summarily dismissed Plaintiffs' § 1983 claim on the grounds that Plaintiffs failed to adequately plead underlying constitutional violations. ER 027-28. As demonstrated above, when construed in the light most favorable to Plaintiffs, the allegations of the FAC sufficiently state a claim that the Shark Fin Law infringes upon Plaintiffs' constitutional rights in violation of the Equal Protection Clause, the Commerce Clause and the Supremacy Clause.

Because Government Defendants, under color of state law, enforce the Shark Fin Law to deprive Plaintiffs of their constitutional rights, the district court erred in dismissing Plaintiffs' § 1983 claim. In fact, the Law is the exact type of unconstitutional legislative action implemented by a government official that § 1983 was enacted to remedy. *See Mitchum*, 407 U.S. at 240; *Daily Herald Co. v. Munro*, 838 F.2d 380 (1988) (government officials' enforcement of unconstitutional statute was violation of § 1983). Plaintiffs adequately plead underlying violations and the Court should reverse the district court's dismissal of Plaintiffs' § 1983 claim.

## VII. <u>Conclusion</u>

For the foregoing reasons, the judgment of the district court should be reversed and the case remanded for further proceedings.

Dated:  August 29, 2014

Respectfully submitted,

BREALL & BREALL LLP
Joseph M. Breall

By:  <u>s/ Joseph M. Breall</u>
     Joseph M. Breall

Attorney for Plaintiffs-Appellants

58

## **<u>STATEMENT OF RELATED CASES</u>**

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiffs-Appellants confirm that they are not aware of any related cases pending in this Court.

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that the attached opening brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it has 13,914 words, exclusive of the matters that may be omitted under Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman.

Dated: August 29, 2014                    By:  s/ Joseph M. Breall
                                                Joseph M. Breall

                                          Attorney for Plaintiffs-Appellants

9th Circuit Case Number(s) | 14-15781

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

**********************************************************************

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) 8/29/2014 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Joseph M. Breall

**********************************************************************

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |

No. 14-15781

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

CHINATOWN NEIGHBORHOOD ASSOCIATION, a nonprofit corporation and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT, a political action committee,

Plaintiffs-Appellants,

v.

KAMALA HARRIS, Attorney General of the State of California; *et al*.,

Defendants-Appellees,

THE HUMANE SOCIETY OF THE UNITED STATES; *et al*.,

Intervenors-Defendants-Appellees.

---

On Appeal from the United States District Court
For the Northern District of California
Case No. 12-cv-03759 WHO
The Honorable William H. Orrick, District Judge.

---

ADDENDUM TO PLAINTIFFS-APPELLANTS' OPENING BRIEF

---

Joseph M. Breall
BREALL & BREALL, LLP
1550 Bryant Street, Suite 575
San Francisco, California 94103
(415) 345-0545

Counsel for Plaintiffs-Appellants CHINATOWN NEIGHBORHOOD ASSOCIATION and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT.

# **TABLE OF CONTENTS**

Key Provisions of the United States Constitution ....................................................1

    U.S. CONST. amend. XIV, § 1. ......................................................................1

    U.S. CONST. art.1, § 8, cl. 3. ..........................................................................2

    U.S. CONST. art.VI, cl. 2. ..............................................................................3

Key Provisions of Federal Statutes ........................................................................4

    42 U.S.C. § 1983 ............................................................................................4

Magnuson-Stevens Fisheries Conservation and Management Act ..........................5

    16 U.S.C. § 1801 ............................................................................................5

    16 U.S.C. § 1802 ..........................................................................................10

    16 U.S.C. § 1811 ..........................................................................................11

    16 U.S.C. § 1851 ..........................................................................................12

    16 U.S.C. § 1852 ..........................................................................................14

    16 U.S.C. § 1853 ..........................................................................................19

    16 U.S.C. § 1854 ..........................................................................................26

    16 U.S.C. § 1856 ..........................................................................................29

    16 U.S.C. § 1857 ..........................................................................................31

    Act of Jan. 4, 2011, Pub. L. No. 111-348, § 103(b), 124 Stat. 3668..........33

    50 C.F.R. § 600.310......................................................................................34

    50 C.F.R. § 600.1201....................................................................................38

    50 C.F.R. § 600.1202....................................................................................38

    50 C.F.R. § 600.1203....................................................................................40

    50 C.F.R. § 600.1204....................................................................................42

Submerged Lands Act............................................................................................44

    43 U.S.C.A. § 1301.......................................................................................44

United States Congress Resolution .......................................................................46

    H.R. 5461, 106th Cong. (2000) (enacted) ...................................................46

Key Provisions of Federal Rules............................................................................47

Fed. R. Civ. P. 8……………………………………………………………..47

Fed. R. Civ. P. 12……………………………………………………………48

Fed. R. Civ. P. 15…………………………………………………....…49

Provisions of California Fish & Game Code ...........................................................50

California Fish & Game Code § 2021 ...................................................50

California Fish & Game Code § 2021.5 ................................................51

California Fish & Game Code § 7704 ...................................................52

California Fish & Game Code § 12000 .................................................53

Provisions of California Assembly Bills .................................................54

A.B. 376, 2011 Leg. (Ca. 2011) .................................................54

A.B. 853, 2011 Leg. (Ca. 2011) .................................................56

Provisions of Oregon State Statute ...........................................................58

Or. Rev. Stat. § 509.160 ...................................................58

European Union Council Regulation ...................................................59

Council Regulation No. 1185/2003, 2003 O.J. (L 167) 1 (EC) (EU ban) ..59

**Key Provisions of the United States Constitution**

**"Equal Protection Clause"**

**U.S. CONST. amend. XIV, § 1.**

Section. 1. All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Key Provisions of the United States Constitution**

**"Commerce Clause"**

**U.S. CONST. art.1, § 8, cl. 3.**

In Pertinent Part:

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

To borrow Money on the credit of the United States;

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.

**Key Provisions of the United States Constitution**

**"Supremacy Clause"**

**U.S. CONST. art.VI, cl. 2.**

This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

**Key Provisions of Federal Statutes**

**42 U.S.C. § 1983**

Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**16 U.S.C. § 1801**

Findings, purposes and policy

(a) Findings

The Congress finds and declares the following:

(1) The fish off the coasts of the United States, the highly migratory species of the high seas, the species which dwell on or in the Continental Shelf appertaining to the United States, and the anadromous species which spawn in United States rivers or estuaries, constitute valuable and renewable natural resources. These fishery resources contribute to the food supply, economy, and health of the Nation and provide recreational opportunities.

(2) Certain stocks of fish have declined to the point where their survival is threatened, and other stocks of fish have been so substantially reduced in number that they could become similarly threatened as a consequence of

(A) increased fishing pressure,

(B) the inadequacy of fishery resource conservation and management practices and controls, or

(C) direct and indirect habitat losses which have resulted in a diminished capacity to support existing fishing levels.

(3) Commercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation. Many coastal areas are dependent upon fishing and related activities, and their economies have been badly damaged by the overfishing of fishery resources at an ever-increasing rate over the past decade. The activities of massive foreign fishing fleets in waters adjacent to such coastal areas have contributed to such damage, interfered with domestic fishing efforts, and caused destruction of the fishing gear of United States fishermen.

(4) International fishery agreements have not been effective in preventing or terminating the overfishing of these valuable fishery resources. There is danger

5

that irreversible effects from overfishing will take place before an effective international agreement on fishery management jurisdiction can be negotiated, signed, ratified, and implemented.

(5) Fishery resources are finite but renewable. If placed under sound management before overfishing has caused irreversible effects, the fisheries can be conserved and maintained so as to provide optimum yields on a continuing basis.

(6) A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources.

(7) A national program for the development of fisheries which are underutilized or not utilized by the United States fishing industry, including bottom fish off Alaska, is necessary to assure that our citizens benefit from the employment, food supply, and revenue which could be generated thereby.

(8) The collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States.

(9) One of the greatest long-term threats to the viability of commercial and recreational fisheries is the continuing loss of marine, estuarine, and other aquatic habitats. Habitat considerations should receive increased attention for the conservation and management of fishery resources of the United States.

(10) Pacific Insular Areas contain unique historical, cultural, legal, political, and geographical circumstances which make fisheries resources important in sustaining their economic growth.

(11) A number of the Fishery Management Councils have demonstrated significant progress in integrating ecosystem considerations in fisheries management using the existing authorities provided under this chapter.

(12) International cooperation is necessary to address illegal, unreported, and unregulated fishing and other fishing practices which may harm the sustainability of living marine resources and disadvantage the United States fishing industry.

6

(b) Purposes

It is therefore declared to be the purposes of the Congress in this chapter—

(1) to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the anadromous species and Continental Shelf fishery resources of the United States, by exercising

(A) sovereign rights for the purposes of exploring, exploiting, conserving, and managing all fish, within the exclusive economic zone established by Presidential Proclamation 5030, dated March 10, 1983, and

(B) exclusive fishery management authority beyond the exclusive economic zone over such anadromous species and Continental Shelf fishery resources;

(2) to support and encourage the implementation and enforcement of international fishery agreements for the conservation and management of highly migratory species, and to encourage the negotiation and implementation of additional such agreements as necessary;

(3) to promote domestic commercial and recreational fishing under sound conservation and management principles, including the promotion of catch and release programs in recreational fishing;

(4) to provide for the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery;

(5) to establish Regional Fishery Management Councils to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of such plans under circumstances

(A) which will enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of such plans, and

(B) which take into account the social and economic needs of the States;

(6) to encourage the development by the United States fishing industry of fisheries which are currently underutilized or not utilized by United States fishermen,

7

including bottom fish off Alaska, and to that end, to ensure that optimum yield determinations promote such development in a non-wasteful manner; and

(7) to promote the protection of essential fish habitat in the review of projects conducted under Federal permits, licenses, or other authorities that affect or have the potential to affect such habitat.

(c) Policy

It is further declared to be the policy of the Congress in this chapter—

(1) to maintain without change the existing territorial or other ocean jurisdiction of the United States for all purposes other than the conservation and management of fishery resources, as provided for in this chapter;

(2) to authorize no impediment to, or interference with, recognized legitimate uses of the high seas, except as necessary for the conservation and management of fishery resources, as provided for in this chapter;

(3) to assure that the national fishery conservation and management program utilizes, and is based upon, the best scientific information available; involves, and is responsive to the needs of, interested and affected States and citizens; considers efficiency; draws upon Federal, State, and academic capabilities in carrying out research, administration, management, and enforcement; considers the effects of fishing on immature fish and encourages development of practical measures that minimize bycatch and avoid unnecessary waste of fish; and is workable and effective;

(4) to permit foreign fishing consistent with the provisions of this chapter;

(5) to support and encourage active United States efforts to obtain internationally acceptable agreements which provide for effective conservation and management of fishery resources, and to secure agreements to regulate fishing by vessels or persons beyond the exclusive economic zones of any nation;

(6) to foster and maintain the diversity of fisheries in the United States; and

(7) to ensure that the fishery resources adjacent to a Pacific Insular Area, including resident or migratory stocks within the exclusive economic zone adjacent to such

areas, be explored, developed, conserved, and managed for the benefit of the people of such area and of the United States.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**16 U.S.C. § 1802**

In Pertinent Part:

As used in this chapter, unless the context otherwise requires--

(4) The term "commercial fishing" means fishing in which the fish harvested, either in whole or in part, are intended to enter commerce or enter commerce through sale, barter or trade.

(11) The term "exclusive economic zone" means the zone established by Proclamation Numbered 5030, dated March 10, 1983. For purposes of applying this chapter, the inner boundary of that zone is a line coterminous with the seaward boundary of each of the coastal States.

(33) The term "optimum", with respect to the yield from a fishery, means the amount of fish which--

(A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems;

(B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and

(C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**16 U.S.C. § 1811**

In Pertinent Part:

United States sovereign rights to fish and fishery management authority

(a) In the exclusive economic zone

Except as provided in section 1812 of this title, the United States claims, and will exercise in the manner provided for in this chapter, sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**16 U.S.C. § 1851**

In Pertinent Part:

National standards for fishery conservation and management

(a) In general

Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be

(A) fair and equitable to all such fishermen;

(B) reasonably calculated to promote conservation; and

(C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to

(A) provide for the sustained participation of such communities, and

(B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable,

(A) minimize bycatch and

(B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

13

**Magnuson-Stevens Fisheries Conservation and Management Act**

**16 U.S.C. § 1852**

In Pertinent Part:

(a) Establishment

(1) There shall be established, within 120 days after April 13, 1976, eight Regional Fishery Management Councils, as follows:

(A) New England Council

The New England Fishery Management Council shall consist of the States of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut and shall have authority over the fisheries in the Atlantic Ocean seaward of such States (except as provided in paragraph (3)). The New England Council shall have 18 voting members, including 12 appointed by the Secretary in accordance with subsection (b)(2) of this section (at least one of whom shall be appointed from each such State).

(B) Mid-Atlantic Council

The Mid-Atlantic Fishery Management Council shall consist of the States of New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, and North Carolina and shall have authority over the fisheries in the Atlantic Ocean seaward of such States (except North Carolina, and as provided in paragraph (3)). The Mid-Atlantic Council shall have 21 voting members, including 13 appointed by the Secretary in accordance with subsection (b)(2) of this section (at least one of whom shall be appointed from each such State).

(C) South Atlantic Council

The South Atlantic Fishery Management Council shall consist of the States of North Carolina, South Carolina, Georgia, and Florida and shall have authority over the fisheries in the Atlantic Ocean seaward of such States (except as provided in paragraph (3)). The South Atlantic Council shall have 13 voting members, including 8 appointed by the Secretary in accordance with subsection (b)(2) of this section (at least one of whom shall be appointed from each such State).

14

(D) Caribbean Council

The Caribbean Fishery Management Council shall consist of the Virgin Islands and the Commonwealth of Puerto Rico and shall have authority over the fisheries in the Caribbean Sea and Atlantic Ocean seaward of such States and of commonwealths, territories, and possessions of the United States in the Caribbean Sea (except as provided in paragraph (3)). The Caribbean Council shall have 7 voting members, including 4 appointed by the Secretary in accordance with subsection (b)(2) of this section (at least one of whom shall be appointed from each such State).

(E) Gulf Council

The Gulf of Mexico Fishery Management Council shall consist of the States of Texas, Louisiana, Mississippi, Alabama, and Florida and shall have authority over the fisheries in the Gulf of Mexico seaward of such States (except as provided in paragraph (3)). The Gulf Council shall have 17 voting members, including 11 appointed by the Secretary in accordance with subsection (b)(2) of this section (at least one of whom shall be appointed from each such State).

(F) Pacific Council

The Pacific Fishery Management Council shall consist of the States of California, Oregon, Washington, and Idaho and shall have authority over the fisheries in the Pacific Ocean seaward of such States. The Pacific Council shall have 14 voting members, including 8 appointed by the Secretary in accordance with subsection (b)(2) of this section (at least one of whom shall be appointed from each such State), and including one appointed from an Indian tribe with Federally1 recognized fishing rights from California, Oregon, Washington, or Idaho in accordance with subsection (b)(5) of this section.

(G) North Pacific Council

The North Pacific Fishery Management Council shall consist of the States of Alaska, Washington, and Oregon and shall have authority over the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska. The North Pacific Council shall have 11 voting members, including 7 appointed by the Secretary in accordance with subsection (b) (2) of this section (5 of whom shall be appointed from the State of Alaska and 2 of whom shall be appointed from the State of Washington).
(H) Western Pacific Council

15

The Western Pacific Fishery Management Council shall consist of the States of Hawaii, American Samoa, Guam, and the Northern Mariana Islands and shall have authority over the fisheries in the Pacific Ocean seaward of such States and of the Commonwealths, territories, and possessions of the United States in the Pacific Ocean area. The Western Pacific Council shall have 13 voting members, including 8 appointed by the Secretary in accordance with subsection (b)(2) of this section (at least one of whom shall be appointed from each of the following States: Hawaii, American Samoa, Guam, and the Northern Mariana Islands).

(2) Each Council shall reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority.

(3) The Secretary shall have authority over any highly migratory species fishery that is within the geographical area of authority of more than one of the following Councils: New England Council, Mid-Atlantic Council, South Atlantic Council, Gulf Council, and Caribbean Council.

(b) Voting members

(1) The voting members of each Council shall be:

(A) The principal State official with marine fishery management responsibility and expertise in each constituent State, who is designated as such by the Governor of the State, so long as the official continues to hold such position, or the designee of such official.

(B) The regional director of the National Marine Fisheries Service for the geographic area concerned, or his designee, except that if two such directors are within such geographical area, the Secretary shall designate which of such directors shall be the voting member.

(C) The members required to be appointed by the Secretary in accordance with paragraphs (2) and (5).

(2)(A) The members of each Council required to be appointed by the Secretary must be individuals who, by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned. Within nine months after November 28, 1990, the

16

Secretary shall, by regulation, prescribe criteria for determining whether an individual satisfies the requirements of this subparagraph.

(B) The Secretary, in making appointments under this section, shall, to the extent practicable, ensure a fair and balanced apportionment, on a rotating or other basis, of the active participants (or their representatives) in the commercial and recreational fisheries under the jurisdiction of the Council. On January 31, 1991, and each year thereafter, the Secretary shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives a report on the actions taken by the Secretary to ensure that such fair and balanced apportionment is achieved. The report shall--

(i) list the fisheries under the jurisdiction of each Council, outlining for each fishery the type and quantity of fish harvested, fishing and processing methods employed, the number of participants, the duration and range of the fishery, and other distinguishing characteristics;

(ii) assess the membership of each Council in terms of the apportionment of the active participants in each such fishery; and

(iii) state the Secretary's plans and schedule for actions to achieve a fair and balanced apportionment on the Council for the active participants in any such fishery.

(C) The Secretary shall appoint the members of each Council from a list of individuals submitted by the Governor of each applicable constituent State. A Governor may not submit the names of individuals to the Secretary for appointment unless the Governor has determined that each such individual is qualified under the requirements of subparagraph (A) and unless the Governor has, to the extent practicable, first consulted with representatives of the commercial and recreational fishing interests of the State regarding those individuals. Each such list shall include the names and pertinent biographical data of not less than three individuals for each applicable vacancy and shall be accompanied by a statement by the Governor explaining how each such individual meets the requirements of subparagraph (A). The Secretary shall review each list submitted by a Governor to ascertain if the individuals on the list are qualified for the vacancy on the basis of such requirements. If the Secretary determines that any individual is not qualified, the Secretary shall notify the appropriate Governor of that determination. The Governor shall then submit a revised list or resubmit the original list with an

17

additional explanation of the qualifications of the individual in question. An individual is not eligible for appointment by the Secretary until that individual complies with the applicable financial disclosure requirements under subsection (k)2 of this section.

(D)(i) The Governor of a State submitting a list of names of individuals for appointment by the Secretary of Commerce to the Gulf of Mexico Fisheries Management Council under subparagraph (C) shall include--

(I) at least 1 nominee each from the commercial, recreational, and charter fishing sectors; and

(II) at least 1 other individual who is knowledgeable regarding the conservation and management of fisheries resources in the jurisdiction of the Council.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**16 U.S.C. § 1853**

In Pertinent Part:

Contents of fishery management plans

(a) Required provisions
Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, shall—

(1) contain the conservation and management measures, applicable to foreign fishing and fishing by vessels of the United States, which are—

(A) necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery;

(B) described in this subsection or subsection (b) of this section, or both; and

(C) consistent with the national standards, the other provisions of this chapter, regulations implementing recommendations by international organizations in which the United States participates (including but not limited to closed areas, quotas, and size limits), and any other applicable law;

(2) contain a description of the fishery, including, but not limited to, the number of vessels involved, the type and quantity of fishing gear used, the species of fish involved and their location, the cost likely to be incurred in management, actual and potential revenues from the fishery, any recreational interests in the fishery, and the nature and extent of foreign fishing and Indian treaty fishing rights, if any;

(3) assess and specify the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery, and include a summary of the information utilized in making such specification;

(4) assess and specify—

(A) the capacity and the extent to which fishing vessels of the United States, on an annual basis, will harvest the optimum yield specified under paragraph (3),

19

(B) the portion of such optimum yield which, on an annual basis, will not be harvested by fishing vessels of the United States and can be made available for foreign fishing, and

(C) the capacity and extent to which United States fish processors, on an annual basis, will process that portion of such optimum yield that will be harvested by fishing vessels of the United States;

(5) specify the pertinent data which shall be submitted to the Secretary with respect to commercial, recreational, [1] charter fishing, and fish processing in the fishery, including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof, areas in which fishing was engaged in, time of fishing, number of hauls, economic information necessary to meet the requirements of this chapter, and the estimated processing capacity of, and the actual processing capacity utilized by, United States fish processors, [2]

(6) consider and provide for temporary adjustments, after consultation with the Coast Guard and persons utilizing the fishery, regarding access to the fishery for vessels otherwise prevented from harvesting because of weather or other ocean conditions affecting the safe conduct of the fishery; except that the adjustment shall not adversely affect conservation efforts in other fisheries or discriminate among participants in the affected fishery;

(7) describe and identify essential fish habitat for the fishery based on the guidelines established by the Secretary under section 1855 (b)(1)(A) of this title, minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat;

(8) in the case of a fishery management plan that, after January 1, 1991, is submitted to the Secretary for review under section 1854 (a) of this title (including any plan for which an amendment is submitted to the Secretary for such review) or is prepared by the Secretary, assess and specify the nature and extent of scientific data which is needed for effective implementation of the plan;

(9) include a fishery impact statement for the plan or amendment (in the case of a plan or amendment thereto submitted to or prepared by the Secretary after October 1, 1990) which shall assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the

20

conservation and management measures on, and possible mitigation measures for—

(A) participants in the fisheries and fishing communities affected by the plan or amendment;

(B) participants in the fisheries conducted in adjacent areas under the authority of another Council, after consultation with such Council and representatives of those participants; and

(C) the safety of human life at sea, including whether and to what extent such measures may affect the safety of participants in the fishery;

(10) specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery) and, in the case of a fishery which the Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery;

(11) establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority—

(A) minimize bycatch; and

(B) minimize the mortality of bycatch which cannot be avoided;

(12) assess the type and amount of fish caught and released alive during recreational fishing under catch and release fishery management programs and the mortality of such fish, and include conservation and management measures that, to the extent practicable, minimize mortality and ensure the extended survival of such fish;

(13) include a description of the commercial, recreational, and charter fishing sectors which participate in the fishery, including its economic impact, and, to the extent practicable, quantify trends in landings of the managed fishery resource by the commercial, recreational, and charter fishing sectors;

(14) to the extent that rebuilding plans or other conservation and management measures which reduce the overall harvest in a fishery are necessary, allocate, taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector, any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery and;  [3]

(15) establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability.

(b) Discretionary provisions

Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may--

(1) require a permit to be obtained from, and fees to be paid to, the Secretary, with respect to--

(A) any fishing vessel of the United States fishing, or wishing to fish, in the exclusive economic zone or for anadromous species or Continental Shelf fishery resources beyond such zone;

(B) the operator of any such vessel; or

(C) any United States fish processor who first receives fish that are subject to the plan;

(2)(A) designate zones where, and periods when, fishing shall be limited, or shall not be permitted, or shall be permitted only by specified types of fishing vessels or with specified types and quantities of fishing gear;

(B) designate such zones in areas where deep sea corals are identified under section 1884 of this title, to protect deep sea corals from physical damage from fishing gear or to prevent loss or damage to such fishing gear from interactions with deep sea corals, after considering long-term sustainable uses of fishery resources in such areas; and

(C) with respect to any closure of an area under this chapter that prohibits all fishing, ensure that such closure--

(i) is based on the best scientific information available;

(ii) includes criteria to assess the conservation benefit of the closed area;

(iii) establishes a timetable for review of the closed area's performance that is consistent with the purposes of the closed area; and

(iv) is based on an assessment of the benefits and impacts of the closure, including its size, in relation to other management measures (either alone or in combination with such measures), including the benefits and impacts of limiting access to: users of the area, overall fishing activity, fishery science, and fishery and marine conservation;

(3) establish specified limitations which are necessary and appropriate for the conservation and management of the fishery on the--

(A) catch of fish (based on area, species, size, number, weight, sex, bycatch, total biomass, or other factors);

(B) sale of fish caught during commercial, recreational, or charter fishing, consistent with any applicable Federal and State safety and quality requirements; and

(C) transshipment or transportation of fish or fish products under permits issued pursuant to section 1824 of this title;

(4) prohibit, limit, condition, or require the use of specified types and quantities of fishing gear, fishing vessels, or equipment for such vessels, including devices which may be required to facilitate enforcement of the provisions of this chapter;

(5) incorporate (consistent with the national standards, the other provisions of this chapter, and any other applicable law) the relevant fishery conservation and management measures of the coastal States nearest to the fishery and take into account the different circumstances affecting fisheries from different States and ports, including distances to fishing grounds and proximity to time and area closures;

23

(6) establish a limited access system for the fishery in order to achieve optimum yield if, in developing such system, the Council and the Secretary take into account--

(A) present participation in the fishery;

(B) historical fishing practices in, and dependence on, the fishery;

(C) the economics of the fishery;

(D) the capability of fishing vessels used in the fishery to engage in other fisheries;

(E) the cultural and social framework relevant to the fishery and any affected fishing communities;

(F) the fair and equitable distribution of access privileges in the fishery; and

(G) any other relevant considerations;

(7) require fish processors who first receive fish that are subject to the plan to submit data which are necessary for the conservation and management of the fishery;

(8) require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery; except that such a vessel shall not be required to carry an observer on board if the facilities of the vessel for the quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized;

(9) assess and specify the effect which the conservation and management measures of the plan will have on the stocks of naturally spawning anadromous fish in the region;

(10) include, consistent with the other provisions of this chapter, conservation and management measures that provide harvest incentives for participants within each gear group to employ fishing practices that result in lower levels of bycatch or in lower levels of the mortality of bycatch;

(11) reserve a portion of the allowable biological catch of the fishery for use in scientific research;

(12) include management measures in the plan to conserve target and non-target species and habitats, considering the variety of ecological factors affecting fishery populations; and

(14) prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**16 U.S.C. § 1854**

In Pertinent Part:

Action by Secretary

(e) Rebuilding overfished fisheries

(1) The Secretary shall report annually to the Congress and the Councils on the status of fisheries within each Council's geographical area of authority and identify those fisheries that are overfished or are approaching a condition of being overfished. For those fisheries managed under a fishery management plan or international agreement, the status shall be determined using the criteria for overfishing specified in such plan or agreement. A fishery shall be classified as approaching a condition of being overfished if, based on trends in fishing effort, fishery resource size, and other appropriate factors, the Secretary estimates that the fishery will become overfished within two years.

(2) If the Secretary determines at any time that a fishery is overfished, the Secretary shall immediately notify the appropriate Council and request that action be taken to end overfishing in the fishery and to implement conservation and management measures to rebuild affected stocks of fish. The Secretary shall publish each notice under this paragraph in the Federal Register.

(3) Within 2 years after an identification under paragraph (1) or notification under paragraphs (2) or (7), the appropriate Council (or the Secretary, for fisheries under section 1852 (a)(3) of this title) shall prepare and implement a fishery management plan, plan amendment, or proposed regulations for the fishery to which the identification or notice applies—

(A) to end overfishing immediately in the fishery and to rebuild affected stocks of fish; or

(B) to prevent overfishing from occurring in the fishery whenever such fishery is identified as approaching an overfished condition.

26

(4) For a fishery that is overfished, any fishery management plan, amendment, or proposed regulations prepared pursuant to paragraph (3) or paragraph (5) for such fishery shall—

(A) specify a time period for rebuilding the fishery that shall—

(i) be as short as possible, taking into account the status and biology of any overfished stocks of fish, the needs of fishing communities, recommendations by international organizations in which the United States participates, and the interaction of the overfished stock of fish within the marine ecosystem; and (ii) not exceed 10 years, except in cases where the biology of the stock of fish, other environmental conditions, or management measures under an international agreement in which the United States participates dictate otherwise;

(B) allocate both overfishing restrictions and recovery benefits fairly and equitably among sectors of the fishery; and

(C) for fisheries managed under an international agreement, reflect traditional participation in the fishery, relative to other nations, by fishermen of the United States.

(5) If, within the 2-year period beginning on the date of identification or notification that a fishery is overfished, the Council does not submit to the Secretary a fishery management plan, plan amendment, or proposed regulations required by paragraph (3)(A), the Secretary shall prepare a fishery management plan or plan amendment and any accompanying regulations to stop overfishing and rebuild affected stocks of fish within 9 months under subsection (c) of this section.

(6) During the development of a fishery management plan, a plan amendment, or proposed regulations required by this subsection, the Council may request the Secretary to implement interim measures to reduce overfishing under section 1855 (c) of this title until such measures can be replaced by such plan, amendment, or regulations. Such measures, if otherwise in compliance with the provisions of this chapter, may be implemented even though they are not sufficient by themselves to stop overfishing of a fishery.

(7) The Secretary shall review any fishery management plan, plan amendment, or regulations required by this subsection at routine intervals that may not exceed two years. If the Secretary finds as a result of the review that such plan, amendment, or

regulations have not resulted in adequate progress toward ending overfishing and rebuilding affected fish stocks, the Secretary shall—

(A) in the case of a fishery to which section 1852 (a)(3) of this title applies, immediately make revisions necessary to achieve adequate progress; or

(B) for all other fisheries, immediately notify the appropriate Council. Such notification shall recommend further conservation and management measures which the Council should consider under paragraph (3) to achieve adequate progress.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**16 U.S.C. § 1856**

In Pertinent Part:

(a) In general

(1) Except as provided in subsection (b) of this section, nothing in this chapter shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries.

(2) For the purposes of this chapter, except as provided in subsection (b) of this section, the jurisdiction and authority of a State shall extend—

(A) to any pocket of waters that is adjacent to the State and totally enclosed by lines delimiting the territorial sea of the United States pursuant to the Geneva Convention on the Territorial Sea and Contiguous Zone or any successor convention to which the United States is a party;

(B) with respect to the body of water commonly known as Nantucket Sound, to the pocket of water west of the seventieth meridian west of Greenwich; and

(C) to the waters of southeastern Alaska (for the purpose of regulating fishing for other than any species of crab) that are—

(i) north of the line representing the international boundary at Dixon Entrance and the westward extension of that line; east of 138 degrees west longitude; and not more than three nautical miles seaward from the coast, from the lines extending from headland to headland across all bays, inlets, straits, passes, sounds, and entrances, and from any island or group of islands, including the islands of the Alexander Archipelago (except Forrester Island); or

(ii) between the islands referred to in clause (i) (except Forrester Island) and the mainland.

(3) A State may regulate a fishing vessel outside the boundaries of the State in the following circumstances:

(A) The fishing vessel is registered under the law of that State, and

(i) there is no fishery management plan or other applicable Federal fishing regulations for the fishery in which the vessel is operating; or

(ii) the State's laws and regulations are consistent with the fishery management plan and applicable Federal fishing regulations for the fishery in which the vessel is operating.

(B) The fishery management plan for the fishery in which the fishing vessel is operating delegates management of the fishery to a State and the State's laws and regulations are consistent with such fishery management plan. If at any time the Secretary determines that a State law or regulation applicable to a fishing vessel under this circumstance is not consistent with the fishery management plan, the Secretary shall promptly notify the State and the appropriate Council of such determination and provide an opportunity for the State to correct any inconsistencies identified in the notification. If, after notice and opportunity for corrective action, the State does not correct the inconsistencies identified by the Secretary, the authority granted to the State under this subparagraph shall not apply until the Secretary and the appropriate Council find that the State has corrected the inconsistencies. For a fishery for which there was a fishery management plan in place on August 1, 1996 that did not delegate management of the fishery to a State as of that date, the authority provided by this subparagraph applies only if the Council approves the delegation of management of the fishery to the State by a three-quarters majority vote of the voting members of the Council.

(C) The fishing vessel is not registered under the law of the State of Alaska and is operating in a fishery in the exclusive economic zone off Alaska for which there was no fishery management plan in place on August 1, 1996, and the Secretary and the North Pacific Council find that there is a legitimate interest of the State of Alaska in the conservation and management of such fishery. The authority provided under this subparagraph shall terminate when a fishery management plan under this chapter is approved and implemented for such fishery.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**16 U.S.C. § 1857**

In Pertinent Part:

It is unlawful—

(1) for any person--

(A) to violate any provision of this chapter or any regulation or permit issued pursuant to this chapter;

(B) to use any fishing vessel to engage in fishing after the revocation, or during the period of suspension, of an applicable permit issued pursuant to this chapter;

(C) to violate any provision of, or regulation under, an applicable governing international fishery agreement entered into pursuant to section 1821(c) of this title;

(D) to refuse to permit any officer authorized to enforce the provisions of this chapter (as provided for in section 1861 of this title) to board a fishing vessel subject to such person's control for purposes of conducting any search or inspection in connection with the enforcement of this chapter or any regulation, permit, or agreement referred to in subparagraph (A) or (C);

(E) to forcibly assault, resist, oppose, impede, intimidate, or interfere with any such authorized officer in the conduct of any search or inspection described in subparagraph (D);

(F) to resist a lawful arrest for any act prohibited by this section;

(G) to ship, transport, offer for sale, sell, purchase, import, export, or have custody, control, or possession of, any fish taken or retained in violation of this chapter or any regulation, permit, or agreement referred to in subparagraph (A) or (C);

(H) to interfere with, delay, or prevent, by any means, the apprehension or arrest of another person, knowing that such other person has committed any act prohibited by this section;

31

(I) to knowingly and willfully submit to a Council, the Secretary, or the Governor of a State false information (including, but not limited to, false information regarding the capacity and extent to which a United States fish processor, on an annual basis, will process a portion of the optimum yield of a fishery that will be harvested by fishing vessels of the United States) regarding any matter that the Council, Secretary, or Governor is considering in the course of carrying out this chapter;…

…(P)(i) to remove any of the fins of a shark (including the tail) at sea;

(ii) to have custody, control, or possession of any such fin aboard a fishing vessel unless it is naturally attached to the corresponding carcass;

(iii) to transfer any such fin from one vessel to another vessel at sea, or to receive any such fin in such transfer, without the fin naturally attached to the corresponding carcass; or

(iv) to land any such fin that is not naturally attached to the corresponding carcass, or to land any shark carcass without such fins naturally attached;

(Q) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any fish taken, possessed, transported, or sold in violation of any foreign law or regulation; or

(R) to use any fishing vessel to engage in fishing in Federal or State waters, or on the high seas or in the waters of another country, after the Secretary has made a payment to the owner of that fishing vessel under section 1861a(b)(2) of this title. For purposes of subparagraph (P), there shall be a rebuttable presumption that if any shark fin (including the tail) is found aboard a vessel, other than a fishing vessel, without being naturally attached to the corresponding carcass, such fin was transferred in violation of subparagraph (P)(iii) or that if, after landing, the total weight of shark fins (including the tail) landed from any vessel exceeds five percent of the total weight of shark carcasses landed, such fins were taken, held, or landed in violation of subparagraph (P). In such subparagraph, the term "naturally attached", with respect to a shark fin, means attached to the corresponding shark carcass through some portion of uncut skin.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**Act of Jan. 4, 2011, Pub. L. No. 111-348, § 103(b), 124 Stat. 3668, 3670**

In Pertinent Part:

SEC. 103. AMENDMENT OF MAGNUSON-STEVENS FISHERY
CONSERVATION AND MANAGEMENT ACT.

(b) <<NOTE: 16 USC 1857 note.>>  Savings Clause.—

(1) In general.--The amendments made by subsection (a) do not apply to an
individual engaged in commercial fishing for smooth dogfish (Mustelus canis) in
that area of the waters of the United States located shoreward of a line drawn in
such a manner that each point on it is 50 nautical miles from the baseline of a State
from which the territorial sea is measured, if the individual holds a valid State
commercial fishing license, unless the total weight of smooth dogfish fins landed
or found on board a vessel to which this subsection applies exceeds 12 percent of
the total weight of smooth dogfish carcasses landed or found on board.

(2) Definitions.--In this subsection:

(A) Commercial fishing.--The term "commercial fishing'' has the meaning given
that term in section 3 of the Magnuson-Stevens Fishery Conservation and
Management Act (16 U.S.C. 1802).

(B) State.--The term "State'' has the meaning given that term in section 803 of
Public Law 103-206 (16 U.S.C. 5102).

33

**Magnuson-Stevens Fisheries Conservation and Management Act**

**50 C.F.R. § 600.310**

In Pertinent Part:

(a) Standard 1. Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield (OY) from each fishery for the U.S. fishing industry.

(b) General.

(1) The guidelines set forth in this section describe fishery management approaches to meet the objectives of National Standard 1 (NS1), and include guidance on:

(i) Specifying maximum sustainable yield (MSY) and OY;

(ii) Specifying status determination criteria (SDC) so that overfishing and overfished determinations can be made for stocks and stock complexes that are part of a fishery;

(iii) Preventing overfishing and achieving OY, incorporation of scientific and management uncertainty in control rules, and adaptive management using annual catch limits (ACL) and measures to ensure accountability (AM); and

(iv) Rebuilding stocks and stock complexes.

(2) Overview of Magnuson–Stevens Act concepts and provisions related to NS1--

(i) MSY. The Magnuson–Stevens Act establishes MSY as the basis for fishery management and requires that: The fishing mortality rate does not jeopardize the capacity of a stock or stock complex to produce MSY; the abundance of an overfished stock or stock complex be rebuilt to a level that is capable of producing MSY; and OY not exceed MSY.

(ii) OY. The determination of OY is a decisional mechanism for resolving the Magnuson–Stevens Act's conservation and management objectives, achieving a fishery management plan's (FMP) objectives, and balancing the various interests that comprise the greatest overall benefits to the Nation. OY is based on MSY as reduced under paragraphs (e)(3)(iii) and (iv) of this section. The most important

34

limitation on the specification of OY is that the choice of OY and the conservation and management measures proposed to achieve it must prevent overfishing….

…(1) MSY. Each FMP must include an estimate of MSY for the stocks and stock complexes in the fishery, as described in paragraph (d)(2) of this section).

(i) Definitions.

(A) MSY is the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions and fishery technological characteristics (e.g., gear selectivity), and the distribution of catch among fleets….

…(3) Optimum yield--

(i) Definitions--

(A) Optimum yield (OY). Magnuson–Stevens Act section (3)(33) defines "optimum," with respect to the yield from a fishery, as the amount of fish that will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities and taking into account the protection of marine ecosystems; that is prescribed on the basis of the MSY from the fishery, as reduced by any relevant economic, social, or ecological factor; and, in the case of an overfished fishery, that provides for rebuilding to a level consistent with producing the MSY in such fishery. OY may be established at the stock or stock complex level, or at the fishery level.

(B) In NS1, use of the phrase "achieving, on a continuing basis, the optimum yield from each fishery" means producing, from each stock, stock complex, or fishery: a long-term series of catches such that the average catch is equal to the OY, overfishing is prevented, the long term average biomass is near or above Bmsy, and overfished stocks and stock complexes are rebuilt consistent with timing and other requirements of section 304(e)(4) of the Magnuson–Stevens Act and paragraph (j) of this section.

(ii) General. OY is a long-term average amount of desired yield from a stock, stock complex, or fishery. An FMP must contain conservation and management measures, including ACLs and AMs, to achieve OY on a continuing basis, and provisions for information collection that are designed to determine the degree to which OY is achieved. These measures should allow for practical and effective

35

implementation and enforcement of the management regime. The Secretary has an obligation to implement and enforce the FMP. If management measures prove unenforceable--or too restrictive, or not rigorous enough to prevent overfishing while achieving OY--they should be modified; an alternative is to reexamine the adequacy of the OY specification. Exceeding OY does not necessarily constitute overfishing. However, even if no overfishing resulted from exceeding OY, continual harvest at a level above OY would violate NS1, because OY was not achieved on a continuing basis. An FMP must contain an assessment and specification of OY, including a summary of information utilized in making such specification, consistent with requirements of section 303(a)(3) of the Magnuson–Stevens Act. A Council must identify those economic, social, and ecological factors relevant to management of a particular stock, stock complex, or fishery, and then evaluate them to determine the OY. The choice of a particular OY must be carefully documented to show that the OY selected will produce the greatest benefit to the Nation and prevent overfishing.

(iii) Determining the greatest benefit to the Nation. In determining the greatest benefit to the Nation, the values that should be weighed and receive serious attention when considering the economic, social, or ecological factors used in reducing MSY to obtain OY are:

(A) The benefits of food production are derived from providing seafood to consumers; maintaining an economically viable fishery together with its attendant contributions to the national, regional, and local economies; and utilizing the capacity of the Nation's fishery resources to meet nutritional needs.

(B) The benefits of recreational opportunities reflect the quality of both the recreational fishing experience and non-consumptive fishery uses such as ecotourism, fish watching, and recreational diving. Benefits also include the contribution of recreational fishing to the national, regional, and local economies and food supplies.

(C) The benefits of protection afforded to marine ecosystems are those resulting from maintaining viable populations (including those of unexploited species), maintaining adequate forage for all components of the ecosystem, maintaining evolutionary and ecological processes (e.g., disturbance regimes, hydrological processes, nutrient cycles), maintaining the evolutionary potential of species and ecosystems, and accommodating human use.

36

(iv) Factors to consider in OY specification. Because fisheries have limited capacities, any attempt to maximize the measures of benefits described in paragraph (e)(3)(iii) of this section will inevitably encounter practical constraints. OY cannot exceed MSY in any circumstance, and must take into account the need to prevent overfishing and rebuild overfished stocks and stock complexes. OY is prescribed on the basis of MSY as reduced by social, economic, and ecological factors. To the extent possible, the relevant social, economic, and ecological factors used to establish OY for a stock, stock complex, or fishery should be quantified and reviewed in historical, short-term, and long-term contexts. Even where quantification of social, economic, and ecological factors is not possible, the FMP still must address them in its OY specification. The following is a non-exhaustive list of potential considerations for each factor. An FMP must address each factor but not necessarily each example.

(A) Social factors. Examples are enjoyment gained from recreational fishing, avoidance of gear conflicts and resulting disputes, preservation of a way of life for fishermen and their families, and dependence of local communities on a fishery (e.g., involvement in fisheries and ability to adapt to change). Consideration may be given to fishery-related indicators (e.g., number of fishery permits, number of commercial fishing vessels, number of party and charter trips, landings, ex-vessel revenues etc.) and non-fishery related indicators (e.g., unemployment rates, percent of population below the poverty level, population density, etc.). Other factors that may be considered include the effects that past harvest levels have had on fishing communities, the cultural place of subsistence fishing, obligations under Indian treaties, proportions of affected minority and low-income groups, and worldwide nutritional needs.

(B) Economic factors. Examples are prudent consideration of the risk of overharvesting when a stock's size or reproductive potential is uncertain (see § 600.335(c)(2)(i)), satisfaction of consumer and recreational needs, and encouragement of domestic and export markets for U.S. harvested fish. Other factors that may be considered include: The value of fisheries, the level of capitalization, the decrease in cost per unit of catch afforded by an increase in stock size, the attendant increase in catch per unit of effort, alternate employment opportunities, and economic contribution to fishing communities, coastal areas, affected states, and the nation.

(C) Ecological factors. Examples include impacts on ecosystem component species, forage fish stocks, other fisheries, predator-prey or competitive interactions, marine mammals, threatened or endangered species, and birds.

37

**Magnuson-Stevens Fisheries Conservation and Management Act**

**50 C.F.R. § 600.1201**

Relation to other laws.

(a) The relation of this subpart to other laws is set forth in §§ 600.514 and 600.705 and in paragraphs (b) and (c) of this section.

(b) Regulations pertaining to shark conservation and management for certain shark fisheries are also set forth in this subpart and in parts 635 (for Federal Atlantic Ocean, Gulf of Mexico, and Caribbean shark fisheries), 648 (for spiny dogfish fisheries), and 660 (for fisheries off West Coast states and in the western Pacific) of this chapter governing those fisheries.

(c) Nothing in this regulation supersedes more restrictive state laws or regulations regarding shark finning in state waters.

(d) A person who owns or operates a vessel that has been issued an Atlantic Federal commercial shark limited access permit or a spiny dogfish permit is subject to the reporting and recordkeeping requirements found at parts 635 and 648 of this chapter, respectively.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**50 C.F.R. § 600.1202**

Definitions.

(a) In addition to the definitions in the Magnuson-Stevens Act and in § 600.10, the terms used in this subpart have the following meanings:

*Land or landing* means offloading fish, or causing fish to be offloaded, from a fishing vessel, either to another vessel or to a shoreside location or facility, or arriving in port, or at a dock, berth, beach, seawall, or ramp to begin offloading fish.

*Shark finning* means taking a shark, removing a fin or fins (whether or not including the tail), and returning the remainder of the shark to the sea.

(b) If there is any difference between a definition in this section and in § 600.10, the definition in this section is the operative definition for the purposes of this subpart.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**50 C.F.R. § 600.1203**

Prohibitions.

(a) In addition to the prohibitions in §§ 600.505 and 600.725, it is unlawful for any person to do, or attempt to do, any of the following:

(1) Engage in shark finning, as provided in § 600.1204(a) and (i).

(2) Possess shark fins without the corresponding carcasses while on board a U.S. fishing vessel, as provided in § 600.1204(b) and (j).

(3) Land shark fins without the corresponding carcasses, as provided in § 600.1204(c) and (k).

(4) Fail to have all shark fins and carcasses from a U.S. or foreign fishing vessel landed at one time and weighed at the time of the landing, as provided in § 600.1204(d).

(5) Possess, purchase, offer to sell, or sell shark fins taken, landed, or possessed in violation of this section, as provided in § 600.1204(e) and (l).

(6) When requested, fail to allow an authorized officer or any employee of NMFS designated by a Regional Administrator access to and/or inspection or copying of any records pertaining to the landing, sale, purchase, or other disposition of shark fins and/or shark carcasses, as provided in § 600.1204(f).

(7) Fail to have shark fins and carcasses recorded as specified in § 635.30(c)(3) of this chapter.

(8) Fail to have all shark carcasses and fins landed and weighed at the same time if landed in an Atlantic coastal port, and to have all weights recorded on the weighout slips specified in § 635.5(a)(2) of this chapter.

(9) Fail to maintain a shark in the form specified in §§ 600.1204(h) and 635.30(c) of this chapter.

(b) (1) For purposes of this section, it is a rebuttable presumption that shark fins landed by a U.S. or foreign fishing vessel were taken, held, or landed in violation of this section if the total weight of the shark fins landed exceeds 5 percent of the total dressed weight of shark carcasses on board or landed from the fishing vessel.

(2) For purposes of this section, it is a rebuttable presumption that shark fins possessed by a U.S. fishing vessel were taken and held in violation of this section if the total weight of the shark fins on board, or landed, exceeds 5 percent of the total dressed weight of shark carcasses on board or landed from the fishing vessel.

41

**Magnuson-Stevens Fisheries Conservation and Management Act**

**50 C.F.R. § 600.1204**

Shark finning; possession at sea and landing of shark fins

(a)(1) No person aboard a U.S. fishing vessel shall engage in shark finning in waters seaward of the inner boundary of the U.S. EEZ.

(2) No person aboard a foreign fishing vessel shall engage in shark finning in waters shoreward of the outer boundary of the U.S. EEZ.

(b) No person aboard a U.S. fishing vessel shall possess on board shark fins harvested seaward of the inner boundary of the U.S. EEZ without the corresponding carcass(es), as may be determined by the weight of the shark fins in accordance with § 600.1203(b)(2), except that sharks may be dressed at sea.

(c) No person aboard a U.S. or foreign fishing vessel (including any cargo vessel that received shark fins from a fishing vessel at sea) shall land shark fins harvested in waters seaward of the inner boundary of the U.S. EEZ without corresponding shark carcasses, as may be determined by the weight of the shark fins in accordance with § 600.1203(b)(1).

(d) Except as provided in paragraphs (g) and (h) of this section, a person who operates a U.S. or foreign fishing vessel and who lands shark fins harvested in waters seaward of the inner boundary of the U.S. EEZ shall land all fins and corresponding carcasses from the vessel at the same point of landing and shall have all fins and carcasses weighed at that time.

(e) A person may not purchase, offer to sell, or sell shark fins taken, landed, or possessed in violation of this section.

(f) Upon request, a person who owns or operates a vessel or a dealer shall allow an authorized officer or any employee of NMFS designated by a Regional Administrator access to, and/or inspection or copying of, any records pertaining to the landing, sale, purchase, or other disposition of shark fins and/or shark carcasses.

(g) A person who owns or operates a vessel that has been issued a Federal Atlantic commercial shark permit and who lands shark in an Atlantic coastal port must have

42

all fins weighed in conjunction with the weighing of the carcasses at the vessel's first point of landing. Such weights must be recorded on the "weighout slips" specified in § 635.5(a)(2) of this chapter.

(h) A person who owns or operates a vessel that has been issued a Federal Atlantic commercial shark permit and who lands shark in or from the U.S. EEZ in an Atlantic coastal port must comply with regulations found at § 635.30(c) of this chapter.

(i) No person aboard a vessel that has been issued a Federal Atlantic commercial shark permit shall engage in shark finning.

(j) No person aboard a vessel that has been issued a Federal Atlantic commercial shark permit shall possess on board shark fins without the fins being naturally attached to the corresponding carcass(es), although sharks may be dressed at sea.

(k) No person aboard a vessel that has been issued a Federal Atlantic commercial shark permit shall land shark fins without the fins being naturally attached to the corresponding carcass(es).

(l) A dealer may not purchase shark fins, from an owner or operator of a fishing vessel issued a Federal Atlantic commercial shark permit who lands shark in an Atlantic coastal port, unless such fins were naturally attached to the corresponding carcass at the time of landing and their combined wet weight is less than 5 percent of the dressed weight of the corresponding carcass(es).

**Submerged Lands Act**

**43 U.S.C.A. § 1301**

When used in this subchapter and subchapter II of this chapter--

(a) The term "lands beneath navigable waters" means--

(1) all lands within the boundaries of each of the respective States which are covered by nontidal waters that were navigable under the laws of the United States at the time such State became a member of the Union, or acquired sovereignty over such lands and waters thereafter, up to the ordinary high water mark as heretofore or hereafter modified by accretion, erosion, and reliction;

(2) all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line of each such State and to the boundary line of each such State where in any case such boundary as it existed at the time such State became a member of the Union, or as heretofore approved by Congress, extends seaward (or into the Gulf of Mexico) beyond three geographical miles,1 and

(3) all filled in, made, or reclaimed lands which formerly were lands beneath navigable waters, as hereinabove defined;

(b) The term "boundaries" includes the seaward boundaries of a State or its boundaries in the Gulf of Mexico or any of the Great Lakes as they existed at the time such State became a member of the Union, or as heretofore approved by the Congress, or as extended or confirmed pursuant to section 1312 of this title but in no event shall the term "boundaries" or the term "lands beneath navigable waters" be interpreted as extending from the coast line more than three geographical miles into the Atlantic Ocean or the Pacific Ocean, or more than three marine leagues into the Gulf of Mexico, except that any boundary between a State and the United States under this subchapter or subchapter II of this chapter which has been or is hereafter fixed by coordinates under a final decree of the United States Supreme Court shall remain immobilized at the coordinates provided under such decree and shall not be ambulatory;

(c) The term "coast line" means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters;

44

(d) The terms "grantees" and "lessees" include (without limiting the generality thereof) all political subdivisions, municipalities, public and private corporations, and other persons holding grants or leases from a State, or from its predecessor sovereign if legally validated, to lands beneath navigable waters if such grants or leases were issued in accordance with the constitution, statutes, and decisions of the courts of the State in which such lands are situated, or of its predecessor sovereign: Provided, however, That nothing herein shall be construed as conferring upon said grantees or lessees any greater rights or interests other than are described herein and in their respective grants from the State, or its predecessor sovereign;

(e) The term "natural resources" includes, without limiting the generality thereof, oil, gas, and all other minerals, and fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life but does not include water power, or the use of water for the production of power;

(f) The term "lands beneath navigable waters" does not include the beds of streams in lands now or heretofore constituting a part of the public lands of the United States if such streams were not meandered in connection with the public survey of such lands under the laws of the United States and if the title to the beds of such streams was lawfully patented or conveyed by the United States or any State to any person;

(g) The term "State" means any State of the Union;

(h) The term "person" includes, in addition to a natural person, an association, a State, a political subdivision of a State, or a private, public, or municipal corporation.

45

**United States Congress Resolution**

In Pertinent Part:

**H.R. 5461, 106th Cong. (2000) (enacted) SHARK FINNING PROHIBITION ACT 106th Congress**

An Act

To amend the Magnuson-Stevens Fishery Conservation and Management Act to eliminate the wasteful and unsportsmanlike practice of shark finning.

**Key Provisions of Federal Rules**

**Fed. R. Civ. P. 8**

In Pertinent Part:

(a) Claim for Relief. A pleading that states a claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

**Key Provisions of Federal Rules**

**Fed. R. Civ. P. 12**

In Pertinent Part:

(b) How to Present Defenses. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

(1) lack of subject-matter jurisdiction;

(2) lack of personal jurisdiction;

(3) improper venue;

(4) insufficient process;

(5) insufficient service of process;

(6) failure to state a claim upon which relief can be granted; and

(7) failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

**Key Provisions of Federal Rules**

**Fed. R. Civ. P. 15**

In Pertinent Part:

(a) Amendments Before Trial.

(1) Amending as a Matter of Course. A party may amend its pleading once as a matter of course within:

(A) 21 days after serving it, or

(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

(2) Other Amendments. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

(3) Time to Respond. Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

**Provisions of California Fish & Game Code**

**California Fish & Game Code § 2021**

(a) As used in this section "shark fin" means the raw, dried, or otherwise processed detached fin, or the raw, dried, or otherwise processed detached tail, of an elasmobranch.

(b) Except as otherwise provided in subdivisions (c), (d), and (e), it shall be unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin.

(c) Any person who holds a license or permit pursuant to Section 1002 may possess a shark fin or fins consistent with that license or permit.

(d) Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess a shark fin or fins consistent with that license or permit.

(e) Before January 1, 2013, any restaurant may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that restaurant, as of January 1, 2012, that is prepared for consumption.

**Provisions of California Fish & Game Code**

**California Fish & Game Code § 2021.5**

(a) Notwithstanding Section 2021, all of the following provisions apply:

(1) Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess, including for purposes of consumption or taxidermy, or may donate to a person licensed or permitted pursuant to Section 1002, a shark fin or fins consistent with that license or permit.

(2) Before July 1, 2013, any person may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that person, as of January 1, 2012.

(3) Nothing in Section 2021 prohibits the sale or possession of a shark carcass, skin, or fin for taxidermy purposes pursuant to Section 3087.

(b) (1) The Ocean Protection Council shall submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood, as defined in Section 35550 of the Public Resources Code, and adopted by the Ocean Protection Council pursuant to Section 35617 of the Public Resources Code, including chain of custody standards.

(2) A report to be submitted pursuant to paragraph (1) shall be submitted in compliance with Section 9795 of the Government Code.

**Provisions of California Fish & Game Code**

**California Fish & Game Code § 7704**

DIVISION 6. FISH, ARTICLE 2. General Provisions

(a) It is unlawful to cause or permit any deterioration or waste of any fish taken in the waters of this state, or brought into this state, or to take, receive or agree to receive more fish than can be used without deterioration, waste, or spoilage.

(b) Except as permitted by this code, it is unlawful to use any fish, or part thereof, except fish offal, in a reduction plant or by a reduction process.

(c) Except as permitted by this code or by regulation of the commission, it is unlawful to sell, purchase, deliver for commercial purposes, or possess on any commercial fishing vessel registered pursuant to Section 7881 any shark fin or shark tail or portion thereof that has been removed from the carcass. However, thresher shark tails and fins that have been removed from the carcass and whose original shape remain unaltered may be possessed on a registered commercial fishing vessel if the corresponding carcass is in possession for each tail and fin.

**Provisions of California Fish & Game Code**

**California Fish & Game Code § 12000**

(a)Except as expressly provided otherwise in this code, any violation of this code, or of any rule, regulation, or order made or adopted under this code, is a misdemeanor.

(b)Notwithstanding subdivision (a), any person who violates any of the following statutes or regulations is guilty of an infraction punishable by a fine of not less than one hundred dollars ($100), or more than one thousand dollars ($1,000), or of a misdemeanor:

(1)Subdivision (a) of Section 6596.

(2)Section 7149.8.

(3)Section 7360.

(4)Sections 1.14, 1.17, 1.18, 1.62, 1.63, and 1.74 of Title 14 of the California Code of Regulations.

(5)Sections 2.00 to 5.95, inclusive, and 7.00 to 8.00, inclusive, of Title 14 of the California Code of Regulations.

(6)Sections 27.56 to 30.10, inclusive, of Title 14 of the California Code of Regulations.

(7)Sections 40 to 43, inclusive, of Title 14 of the California Code of Regulations.

(8)Sections 307, 308, and 311 to 313, inclusive, of Title 14 of the California Code of Regulations.

(9)Sections 505, 507 to 510, inclusive, and 550 to 553, inclusive, of Title 14 of the California Code of Regulations.

(10)Sections 630 to 630.5, inclusive, of Title 14 of the California Code of Regulations.

**Provisions of California Assembly Bills**

**A.B. 376, 2011 Leg. (Ca. 2011)**

Shark fins.

Existing law makes it unlawful to possess any bird, mammal, fish, reptile, or amphibian, or parts thereof, taken in violation of any of the provisions of the Fish and Game Code, or of any regulation made under it.

This bill, except as specified, would make it unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin, as defined.

The bill, by creating a new crime, would impose a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

SECTION 1. The Legislature finds and declares all of the following:

(a) Sharks, or elasmobranchs, are critical to the health of the ocean ecosystem.

(b) Sharks are particularly susceptible to decline due to overfishing because they are slow to reach reproductive maturity and birth small litters, and cannot rebuild their populations quickly once they are overfished.

(c) Sharks occupy the top of the marine food chain. Their decline is an urgent problem that upsets the balance of species in ocean ecosystems and negatively affects other fisheries. It constitutes a serious threat to the ocean ecosystem and biodiversity.

(d) The practice of shark finning, where a shark is caught, its fins cut off, and the carcass dumped back into the water, causes tens of millions of sharks to die each

year. Sharks starve to death, may be slowly eaten by other fish, or drown because most sharks need to keep moving to force water through their gills for oxygen.

(e) Data from federal and international agencies show a decline in shark populations worldwide.

(f) California is a market for shark fin and this demand helps drive the practice of shark finning. The market also drives shark declines. By impacting the demand for shark fins, California can help ensure that sharks do not become extinct as a result of shark finning.

(g) Shark fin often contains high amounts of mercury, which has been proven dangerous to consumers' health.

SECTION 2. Section 2021 is added to the Fish and Game Code, to read:

2021. (a) As used in this section "shark fin" means the raw, dried, or otherwise processed detached fin, or the raw, dried, or otherwise processed detached tail, of an elasmobranch.

(b) Except as otherwise provided in subdivisions (c), (d), and (e), it shall be unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin.

(c) Any person who holds a license or permit pursuant to Section 1002 may possess a shark fin or fins consistent with that license or permit.

(d) Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess a shark fin or fins consistent with that license or permit.

(e) Before January 1, 2013, any restaurant may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that restaurant, as of January 1, 2012, that is prepared for consumption.

**Provisions of California Assembly Bills**

**A.B. 853, 2011 Leg. (Ca. 2011)**

An act to add Section 2021.5 to the Fish and Game Code, relating to sharks.

Sharks.
Existing law makes it unlawful to possess any bird, mammal, fish, reptile, or amphibian, or parts thereof, taken in violation of any of the provisions of the Fish and Game Code, or of any regulation made under it.

This bill would create exemptions from a shark fin prohibition proposed by AB 376. The bill would require the Ocean Protection Council to submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood, as provided. The provisions of the bill would become operative only if AB 376 is enacted and takes effect on or before January 1, 2012.

THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

SECTION 1.    Section 2021.5 is added to the Fish and Game Code, to read:

2021.5. (a) Notwithstanding Section 2021, all of the following provisions apply:

(1) Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess, including for purposes of consumption or taxidermy, or may donate to a person licensed or permitted pursuant to Section 1002, a shark fin or fins consistent with that license or permit.

(2) Before July 1, 2013, any person may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that person, as of January 1, 2012.

(3) Nothing in Section 2021 prohibits the sale or possession of a shark carcass, skin, or fin for taxidermy purposes pursuant to Section 3087.

(b) (1) The Ocean Protection Council shall submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood, as defined in Section 35550 of the Public Resources Code, and adopted by the Ocean Protection

56

Council pursuant to Section 35617 of the Public Resources Code, including chain of custody standards.

(2) A report to be submitted pursuant to paragraph (1) shall be submitted in compliance with Section 9795 of the Government Code.

SECTION 2.    This act shall become operative only if Assembly Bill 376 of the 2011-12 Regular Session is enacted and takes effect on or before January 1, 2012.

**Provisions of Oregon State Statute**

**Or. Rev. Stat. § 509.160**

Prohibition on possession, sale, trade or distribution of shark fins; exceptions.

(1) As used in this section:

(a) "Shark fin" means the raw or dried fin or tail of a shark.

(b) "Spiny dogfish" means a shark belonging to the family Squalidae in the order Squaliformes that has two spines, one anterior to each dorsal fin, and that does not have an anal fin.

(2) A person may not possess, sell or offer for sale, trade or distribute a shark fin in this state.

(3) This section does not apply to:

(a) A person who possesses, sells or offers for sale, trades or distributes a shark fin from a spiny dogfish that was legally taken or landed under rules adopted by the State Department of Fish and Wildlife and in accordance with federal regulations;

(b) A person who holds a license or permit issued by the State Department of Fish and Wildlife under the commercial fishing laws to take a shark and who possesses, sells or offers for sale, trades or distributes a shark fin consistent with the terms of that license or permit; and

(c) A fish processor who holds a license under the commercial fishing laws, who possesses and processes a shark obtained from a person described in paragraph (a) of this subsection and who sells or offers for sale, trades or distributes the shark fin consistent with the terms of the license of that fish processor.

58

**European Union Council Regulation**

**Council Regulation No. 1185/2003, 2003 O.J. (L 167) 1 (EC) (EU ban)**

In Pertinent Part:

Article 3

Prohibitions
1. It shall be prohibited to remove shark fins on board vessels, and to retain on board, tranship or land shark fins.

2. It shall be prohibited to purchase, offer for sale or sell shark fins which have been removed on board, retained on board, transhipped or landed in contravention of this Regulation.