14-15781

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**CHINATOWN NEIGHBORHOOD ASSOCIATION; et al.,**

Plaintiffs-Appellants,

**v.**

**KAMALA HARRIS, Attorney General of the State of California, in her official capacity; et al.,**

Defendants-Appellees,

**THE HUMANE SOCIETY OF THE UNITED STATES; et al.,**

Intervenors-Defendants-Appellees.

---

On Appeal from the United States District Court
for the Northern District of California

No. 12-cv-03759
The Honorable William H. Orrick, Judge

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
TAMAR PACHTER
Supervising Deputy Attorney General

ALEXANDRA ROBERT GORDON
State Bar No. 207650
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5509
  Fax:  (415) 703-5480
  Email:
  Alexandra.RobertGordon@doj.ca.gov
*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

JURISDICTIONAL STATEMENT ......................................... 3

STATEMENT OF ISSUES ..................................................... 3

STATEMENT OF THE CASE ................................................. 3

I. The Shark Fin Prohibition ....................................... 3

II. Relevant Background ................................................ 5

  A. Procedural History ......................................... 5

  B. The District Court Order ................................. 7

SUMMARY OF ARGUMENT ................................................ 11

ARGUMENT ........................................................................ 12

I. Standard of Review ................................................. 12

II. The District Court Properly Dismissed the First Amended Complaint Without Leave to Amend ..................................... 14

  A. The First Amended Complaint Fails to State a Claim Under the Supremacy Clause ........................... 16

    1. Plaintiffs cannot allege field preemption. ......... 18

    2. Plaintiffs cannot allege conflict preemption ....... 19

      a. There is no conflict between the Shark Fin Prohibition and the Magnusson-Stevens Act ........................... 20

      b. There is no conflict between the Shark Fin Prohibition and federal shark fin law ........................................ 29

        (1) It is entirely possible to comply with both federal and state law ...... 29

i

# TABLE OF CONTENTS
## (continued)

Page

(2) The Shark Fin Prohibition does not present an obstacle to any purpose, objective, or method of federal shark fin law. ................. 30

3. Plaintiffs cannot allege facts tending to show any conflict between federal law and the Shark Fin Prohibition. ......................... 34

B. The First Amended Complaint Fails to State a Claim Under the Equal Protection Clause. ................... 36

    1. The Shark Fin Prohibition is facially neutral and plaintiffs have not adequately alleged discriminatory purpose. ..................................... 38

    2. The Shark Fin Prohibition is rationally related to a legitimate governmental purpose ..................................................... 44

C. The First Amended Complaint Fails to State a Claim Under the Commerce Clause. ........................... 48

    1. The Shark Fin Prohibition does not regulate extraterritorially. ................................................. 51

    2. *Pike* balancing is not required, but even if it were, the Shark Fin Prohibition serves a legitimate local purpose and its benefits outweigh any burden on interstate commerce ............................................................ 53

D. The First Amended Complaint Fails to State a Claim under 42 U.S.C. section 1983. .......................... 58

CONCLUSION ........................................................................ 59

STATEMENT OF RELATED CASES ..................................... 60

APPENDIX ............................................................................. 64

ii

# TABLE OF AUTHORITIES

**Page**

## CASES

*Arizona Dream Act Coal. v. Brewer*
  757 F.3d 1053 (9th Cir. 2014) ........................................................... 31

*Arizona v. United States*
  132 S. Ct. 2492 (2012)...................................................................... 32

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009).................................................................. passim

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*
  729 F.3d 937 (9th Cir. 2013) ........................................................... 55

*Balistieri v. Pacifica Police Dep't*
  901 F.2d 696 (9th Cir. 1990) ........................................................... 13

*Barrientos v. 1801-1825 Morton LLC*
  583 F.3d 1197 (9th Cir. 2009) ......................................................... 33

*Bell Atl. Corp. v. Twombly*
  550 U.S. 544 (2007).................................................................. passim

*Blue Water Fisherman's Assoc. v. Mineta*
  122 F. Supp. 2d 150 (D.D.C. 2000)................................................. 23

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*
  476 U.S. 573 (1986)......................................................................... 49

*C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*
  511 U.S. 383 (1994)......................................................................... 48

*Casas-Castrillon v. Department of Homeland Security*
  535 F.3d 942 (9th Cir. 2008) ...................................................... 7, 35

*Cervantes v. Countrywide Home Loans, Inc.*
  656 F.3d 1034 (9th Cir. 2011) ................................................... 12, 13

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Chevron U.S.A., Inc. v. Hammond*
   726 F.2d 483 (9th Cir. 1984) ............................................................ 28

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*
   508 U.S. 520 (1993) ......................................................................... 40

*City of Charleston, S.C. v. A Fisherman's Best, Inc.*
   310 F.3d 155 (4th Cir. 2002) ............................................................ 28

*City of Cleburne v. Cleburne Living Center*
   473 U.S. 432 (1985) .................................................................. 36, 45

*Comm. Concerning Cmty. Improvement v. City of Modesto*
   583 F.3d 690 (9th Cir. 2009) ............................................................ 40

*Coto Settlement v. Eisenberg*
   593 F.3d 1031 (9th Cir. 2010) .......................................................... 13

*CTS Corp. v. Dynamics Corp. of America*
   481 U.S. 69 (1987) ........................................................................... 58

*Darensburg v. Metro. Transp. Comm'n*
   636 F.3d 511 (9th Cir. 2011) ............................................................ 42

*DeSoto v. Yellow Freight Sys., Inc.*
   957 F.2d 655 (9th Cir. 1992) ............................................................ 13

*El-Hakem v. BJY, Inc.*
   415 F.3d 1068 (9th Cir. 2005) .......................................................... 39

*FCC v. Beach Communications, Inc.*
   508 U.S. 307 (1993) ......................................................................... 47

*Fields v. Legacy Health Sys.*
   413 F.3d 943 (9th Cir. 2005) ...................................................... 37, 45

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Fla. Lime & Avocado Growers, Inc. v. Paul*
373 U.S. 132 (1963) ........................................................ 17, 29

*Fouke Co. v. Mandel*
386 F. Supp. 1341 (D. Md. 1974) ........................................ 31

*Freedom Holdings Inc. v. Spitzer*
357 F.3d 205 (2d Cir. 2004) ............................................. 52

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*
505 U.S. 88 (1992) ......................................................... 21

*Gerling Global Reinsurance Corp. of Am. v. Low*
240 F.3d 739 (9th Cir. 2001) ........................................... 52

*Giannini v. Real*
911 F.2d 354 (9th Cir. 1990) ........................................... 44

*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network*
742 F.3d 414 (9th Cir. 2014) ........................................... 52

*Grutter v. Bollinger*
539 U.S. 306 (2003) ....................................................... 37

*Healy v. Beer Inst.*
491 U.S. 324 (1989) .................................................. 48, 51

*Heller v. Doe*
509 U.S. 312 (1993) .............................................. 44, 45, 47

*In re Century Aluminum Co. Sec. Litig.*
729 F.3d 1104 (9th Cir. 2013) ..................................... 15, 44

*International Paper Co. v. Ouellette*
479 U.S. 481 (1987) ....................................................... 34

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Jones v. Rath Packing Co.*
  430 U.S. 519 (1977)...........................................................................17

*Kassel v. Consol Freightways Corp.*
  450 U.S. 662 (1981)....................................................................57, 58

*Lee v. City of Los Angeles*
  250 F.3d 668 (9th Cir. 2001) ....................................................passim

*Levin Metals Corp. v. Parr-Richmond Terminal Co.*
  817 F.2d 1448 (9th Cir. 1987) ...........................................................18

*Louisiana Seafood Mngt. Council, Inc. v. Foster*
  917 F. Supp. 439 (E.D. La. 1996)....................................................26

*Maine v. Taylor*
  477 U.S. 131 (1986)....................................................................48, 49

*Manzarek v. St. Paul Fire & Marine Ins. Co.*
  519 F.3d 1025 (9th Cir. 2008) ...........................................................12

*Massachusetts v. EPA*
  549 U.S. 497 (2007)...........................................................................58

*Merrifield v. Lockyer*
  547 F.3d 978 (9th Cir. 2008) ......................................................47, 57

*Minnesota v. Clover Leaf Creamery Co.*
  449 U.S. 456 (1981)...........................................................................52

*Moss v. U.S. Secret Service*
  572 F.3d 962 (9th Cir. 2009) ......................................................15, 42

*Mourning v. Family Publ'n Serv., Inc.*
  411 U.S. 356 (1973)...........................................................................47

vi

# TABLE OF AUTHORITIES
## (continued)

Page

*Mut. Pharm Co. v. Bartlett*
  133 S. Ct. 2473 (2013)........................................................ 31

*Nat'l Ass'n of Optometrists & Opticians v. Harris*
  682 F.3d 1144 (9th Cir. 2012) .................................... passim

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
  272 F.3d 104 (2d Cir. 2001) ............................................. 55

*Nat'l Paint Coatings Ass'n v. City of Chicago*
  45 F.3d 1124 (7th Cir. 1995) ........................................... 56

*NRDC v. Daley*
  209 F.3d 747 (D.C. Cir. 2000)......................................... 21

*O'Melveny & Myers v. FDIC*
  512 U.S. 79 (1994)........................................................... 31

*Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*
  511 U.S. 93 (1994)........................................................... 49

*P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*
  485 U.S. 495 (1988)................................................... 31, 33

*Pac. Gas & Electric Co. v. State Energy Res. Cons. & Dev. Comm.*
  461 U.S. 190 (1983)......................................................... 17

*Pac. Merchant Shipping Ass'n v. Goldstene*
  639 F.3d 1154 (9th Cir. 2011) ......................................... 58

*Pac. Shores Props., LLC v. City of Newport Beach*
  730 F.3d 1142 (9th Cir. 2013) ............................... 38, 39, 40

*Pacific Legal Foundation v. State Energy Resources Conservation & Development Comm.*
  659 F.2d 903 (9th Cir. 1981) ........................................... 34

# TABLE OF AUTHORITIES
## (continued)

Page

*Pacific Nw. Venison Producers v. Smitch*
  20 F.3d 1008 (9th Cir. 1994) ................................................. 47, 54, 57

*Perez v. Nidek Co., Ltd.*
  711 F.3d 1109 (9th Cir. 2013) .................................................... 16, 29

*Pers. Adm'r of Mass. v. Feeney*
  442 U.S. 256 (1979).................................................................. 40, 43

*Pharm. Research and Mfrs. of America v. Walsh*
  538 U.S. 644 (2003)......................................................................... 18

*Pharm. Research and Mfrs. of America v. County of Alameda*
  No. 13-16833, 2014 WL 4814407 (9th Cir. Sept. 30, 2014)............. 53

*Pike v. Bruce Church, Inc.*
  397 U.S. 137 (1970)................................................................... passim

*PMG Intern. Div. L.L.C. v. Rumsfeld*
  303 F.3d 1163 (9th Cir. 2002) ........................................................ 38

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am.*
  *v. U.S. Dep't of Agr.*
  499 F.3d 1108 (9th Cir. 2007) ........................................................ 38

*Raymond Motor Transp., Inc. v. Rice*
  424 U.S. 429 (1978)................................................................... 55, 56

*Reno v. American Civil Liberties Union*
  521 U.S. 844 (1997)......................................................................... 47

*Retail Clerks Int'l Ass'n v. Schermerhorn*
  375 U.S. 96 (1963)........................................................................... 17

*Reynolds v. Buchholzer*
  87 F.3d 827 (6th Cir. 1996) ............................................................ 55

# TABLE OF AUTHORITIES
## (continued)

Page

*Rice v. Santa Fe Elevator Corp.*
331 U.S. 218 (1947)..................................................................... 17, 19

*Ridge at Red Hawk, L.L.C. v. Schneider*
493 F.3d 1174 (10th Cir. 2007) ........................................ 15

*Rocky Mtn. Farmers Union v. Corey*
740 F.3d 507 (9th Cir. 2014) ............................................ 52

*Romer v. Evans*
517 U.S. 620 (1996)..................................................... 36, 37

*Sayles Hydro Assocs. v. Maughan*
985 F.2d 451 (9th Cir. 1993) ............................................ 18

*Shroyer v. New Cingular Wireless Services, Inc.*
622 F.3d 1035 (9th Cir. 2010) .......................................... 14

*Somers v. Apple, Inc.*
729 F.3d 953 (9th Cir. 2013) ............................................ 16

*Southeastern Fisheries Assoc., Inc. v. Chiles*
979 F.2d 1504 (11th Cir. 1992) ........................... 25, 26, 27

*Southeastern Fisheries Assoc., Inc. v. Mosbacher*
773 F. Supp. 435 (D.D.C. 1991)................................ 25, 27

*Sprewell v. Golden State Warriors*
266 F.3d 979 (9th Cir. 2001) ............................... 13, 33, 44

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*
537 U.S. 51 (2002)............................................................ 31

*Tart v. Commonwealth of Massachusetts*
949 F.2d 490 (1st Cir. 1991)....................................... 23, 24

ix

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Ting v. AT&T*
319 F.3d 1126 (9th Cir. 2003) ........................................................... 19

*UFO Chuting of Hawaii, Inc. v. Smith*
508 F.3d 1189 (9th Cir. 2007) .......................................................... 57

*United States v. Approximately 64,695 Pounds of Shark Fins*
520 F.3d 976 (9th Cir. 2008) ............................................................ 30

*United States v. Carolene Products Co.*
304 U.S. 144 (1938).......................................................................... 45

*Vietnamese Fishermen Ass'n v. Cal. Dep't of Fish & Game*
816 F. Supp. 1468 (N.D. Cal. 1993)...................................... 28, 29, 32

*Village of Arlington Heights v. Met. Housing Dev. Corp.*
429 U.S. 252 (1977)........................................................ 39, 40, 41, 42

*Viva! Intern. Voice for Animals v. Adidas Promotional Retail
Operations, Inc.*
41 Cal. 4th 929 (Cal. 2007) .............................................................. 24

*Von Saher v. Norton Simon Museum of Art at Pasadena*
592 F.3d 954 (9th Cir. 2009) ............................................................ 35

*Wyeth v. Levine*
555 U.S. 555 (2009)............................................................... 29, 33, 35

*Yakima Valley Mem'l Hosp. v. Washington State Dep't of Health*
731 F.3d 843 (9th Cir. 2013) ............................................................ 58

*Yick Wo v. Hopkins*
118 U.S. 356 (1886).................................................................... 40, 41

# TABLE OF AUTHORITIES
## (continued)

Page

**STATUTES**

California Fish & Game Code
  § 2021 ............................................................................. 4, 24, 51
  §§ 2021 & 2021.5 ("Shark Fin Prohibition") ............................ passim

California Stats., 2011, Chapter 524 (AB 376)
  § 1 ................................................................................ 3, 4, 43, 46

United States Code, Title 16
  § 1801 .................................................................................... 21
  § 1802 ................................................................................ 22, 25
  § 1811 .................................................................................... 24
  § 1853 ................................................................................ 24, 25
  § 1856 .................................................................................... 19
  §§ 1801-1882 .......................................................................... 29
  §§ 1801-1884 (Magnuson-Stevens Act)...................................... 6, 16

United States Code, Title 42
  § 1983 .............................................................................. passim

**CONSTITUTIONAL PROVISIONS**

United States Constitution
  Article I, Section 8, Clause 3 .................................................. passim
  Aricle VI, Clause 2 .............................................................. passim
  Fourteenth Amendment .......................................................... passim

**RULES**

Federal Rule of Civil Procedure
  rule 12 ............................................................................... 2, 12

Federal Rule of Evidence
  rule 201 .......................................................................... 7, 13, 35

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

OTHER AUTHORITIES

Code of Federal Regulations, Title 50
    § 100.10 ............................................................. 24
    § 600 .................................................................. 29
    § 600.1201 ........................................................ 19
    § 600.1202 ........................................................ 24
    § 600.1204 ........................................................ 29
    § 1203 ............................................................... 29

Pub. L. No. 106-557, 114 Stat. 2772 (2000) (Shark Finning
    Prohibition Act of 2000).......................................... passim

Pub. L. No. 111-348, 124 Stat. 3668 (2010) (Shark Conservation Act
    of 2010)................................................................ passim

Federal Register, Vol. 78, No. 25, 685 ................................ 35

146 Cong. Rec. S11744 (daily ed. Dec. 7, 2000) ................... 33

156 Cong. Rec. H8790 (daily ed. Dec. 21, 2010).................. 33

H.R. Rep. No. 104-171 (1995) ................................. 21

H.R. Rep. No. 106-650 (1999) ................................. 33

H.R. Rep. No. 94-445, 94th ................................... 21

S. Rep. No. 104-276 (1996)................................... 21

S. Rep. No. 109-229 (2006)................................... 21

S. Rep. No. 111-124 (2010)................................... 33

United States Code Congressional and Administrative News (1976)
    593 .................................................................. 21

xii

## INTRODUCTION

California Fish and Game Code sections 2021 and 2021.5 (the "Shark Fin Prohibition") outlaw the possession, sale, and trade of shark fins in California. By virtually eliminating the California market for shark fin, the Legislature intended to promote shark conservation, the health of the marine ecosystem, and the public health and safety. The Shark Fin Prohibition is based on evidence and legislative findings that the demand for shark fin causes the finning and death of tens of millions of sharks every year, and that the resultant decline of shark populations has devastating ecological consequences. It is also based on evidence and legislative findings that shark fin contains high levels of mercury and is therefore unsafe to eat.

This is the second time that this Court has considered a challenge to the Shark Fin Prohibition. Previously, the Court affirmed the district court's order denying plaintiffs' motion to preliminarily enjoin the Shark Fin Prohibition, finding that the law was facially neutral, there was no evidence of discriminatory purpose or of Congressional intent to preempt state law, and that plaintiffs had not shown a likelihood of success on their claims under the Equal Protection, Commerce, and Supremacy Clauses. Now before the Court is plaintiffs' appeal of the district court's order granting,

1

without leave to amend, a motion to dismiss the case in its entirety. This Court should again affirm.

The First Amended Complaint is comprised of little more than boilerplate legal conclusions that fail to satisfy the pleading burden under Federal Rule of Civil Procedure 12(b). Moreover, and of greater significance, because the Shark Fin Prohibition does not implicate the Equal Protection, Commerce, or Supremacy Clauses, let alone violate them, plaintiffs' claims must fail as a matter of law. The Shark Fin Prohibition is facially neutral, does not discriminate in favor of in-state interests or against out-of-state interests, does not regulate extraterritorially, does not conflict with federal law, and is rationally related to a legitimate governmental interest in protecting the public health and safety and the environment. Because plaintiffs cannot demonstrate that the Shark Fin Prohibition is unconstitutional, they cannot state a claim upon which relief can be granted. Accordingly, this Court should affirm the district court's dismissal of the First Amended Complaint with prejudice.

## JURISDICTIONAL STATEMENT

Defendants agree with plaintiffs' Jurisdictional Statement.

## STATEMENT OF ISSUES

1.     Did the district court err in dismissing the Complaint with prejudice for failure to allege a legally cognizable claim under the Equal Protection Clause?

2.     Did the district court err in dismissing the Complaint with prejudice for failure to allege a legally cognizable claim under the Dormant Commerce Clause?

3.     Did the district court err in dismissing the Complaint with prejudice for failure to allege a legally cognizable claim under the Supremacy Clause?

4.     Did the district court err in dismissing the Complaint with prejudice for failure to allege a legally cognizable claim under 42 U.S.C. section 1983?

## STATEMENT OF THE CASE

## I.     THE SHARK FIN PROHIBITION

The California Legislature has determined that the practice of shark finning causes tens of millions of sharks to die each year.  2011 Cal. Stat., ch. 524 (AB 376), § 1(d).  After being finned, sharks starve to death, are

3

slowly eaten by other fish, or drown. *Id.* Sharks occupy the top of the marine food chain, and their decline severely affects the balance of species in the marine ecosystem and marine biodiversity. *Id.* § 1(c). Studies by federal and international agencies indicate a decline in shark populations worldwide. *Id.* § 1(e). The Legislature found that California is a market for shark fin and "this demand helps drive the practice of finning. The market also drives shark declines." *Id.* § 1(f). Thus, by "impacting the demand for shark fins, California can help ensure that sharks do not become extinct as a result of shark finning." *Id.* The Legislature also found that shark fin often contains high amounts of mercury, which has been proven dangerous to people's health. *Id*. § 1(g).

In order to address these problems and promote the conservation of sharks and protect the public health by, inter alia, eliminating the California market for fins, California enacted Fish and Game Code sections 2021 and 2021.5. With certain exceptions not relevant here, section 2021 makes it "unlawful for any person to possess, sell, offer for trade, trade, or distribute a shark fin." Cal. Fish & Game Code § 2021(b). Section 2021.5 includes additional exemptions, and delayed the implementation of a portion of the Shark Fin Prohibition until July 2013, which otherwise became effective on January 1, 2012.

4

## II.  RELEVANT BACKGROUND

### A.  Procedural History

Plaintiffs California Neighborhood Association and Asian Americans for Political Advancement, a nonprofit corporation/voluntary association and a political action committee respectively, are comprised of members who are "Chinese Californians who, prior to the implementation of the Shark Fin Law, engaged in cultural and ceremonial traditions involving the use of shark fins and who possessed, sold, offered for sale, traded or distributed shark fins in California that moved through the channels of interstate and foreign commerce."  Plaintiffs-Appellants' Excerpts of Record (ER) 45-46. In July 2012, plaintiffs sued Attorney General Kamala D. Harris and Director Charlton H. Bonham[1] alleging that the Shark Fin Prohibition facially violates the Equal Protection, Commerce, and Supremacy Clauses of the U.S. Constitution as well as 42 U.S.C. section 1983, and seeking declaratory and injunctive relief.  ER 43-58.

Plaintiffs filed a motion for a preliminary injunction on August 9, 2012, which was denied.  ER 8.  Plaintiffs appealed and on August 27, 2013, this

---

[1] Plaintiffs' original complaint, filed in July 2012, also named Governor Edmund G. Brown Jr.  Dkt. No. 1.  Governor Brown is not named in plaintiffs' First Amended Complaint.

Court affirmed the order denying the preliminary injunction. This Court

held that the district court did not abuse its discretion in determining that

plaintiffs failed to establish a likelihood of success or a serious question on

their constitutional claims and failed to prove a likelihood of irreparable

harm. *See* ER 8; Defendant-Appellees' Supplemental Excerpts of Record

(SER) 53-56. In so doing, this Court determined that the Shark Fin

Prohibition "is facially neutral, and [plaintiffs] presented no persuasive

evidence indicating that the California legislature's real intent was to

discriminate against Chinese Americans rather than to accomplish the Law's

stated humanitarian, conservationist, and health goals." SER 55. It further

stated that the district court did not err in concluding that the Shark Fin

Prohibition does not substantially burden the interstate market. SER 56.

This Court also concluded that the Magnuson-Stevens Act, 16 U.S.C.

sections 1801-1884, does not expressly preempt state law or occupy the field

and that plaintiffs had presented no evidence of any conflict between the

Shark Fin Prohibition and any federal objective or policy. SER 56.

Following the issuance of the mandate on October 22, 2013, defendants

and defendant-intervenors moved to dismiss the Complaint. Dkt. No. 47.

On December 9, 2013, plaintiffs filed the First Amended Complaint (FAC),

which defendants and defendant-intervenors moved to dismiss. The district

6

court granted the motions and entered judgment for defendants on March 25, 2014.  ER 5-28.  Plaintiffs timely appealed.  ER 1-2.

### B.    The District Court Order

By order dated March 25, 2014, the district court granted defendants' and defendant-intervenors' motions to dismiss the FAC with prejudice.  ER 5-28.  In considering the motions to dismiss,[2] the district court first considered whether the legal issues decided by this Court in the preliminary injunction proceedings were binding as "law of the case."  ER 9-10.  The court noted that while as a "general rule," decisions on preliminary injunctions are not binding and do not constitute the law of the case, a "higher court's conclusions on pure issues of law are binding, even when . . . decided at the preliminary injunction stage."  ER 9-10 (citing *S. Or. Barter*

---

[2] The district court also granted in part defendants' request for judicial notice, pursuant to Federal Rule of Evidence 201, including notice of: (1) the January 2, 2013 order of the district court denying plaintiffs' preliminary injunction; (2) the August 27, 2013 Memorandum Decision of this Court affirming the district court's denial of the preliminary injunction; (3) the February 3, 2014 Letter from Director Charlton H. Bonham to Eileen Sobeck, Assistant Administrator for Fisheries, National Oceanic and Atmospheric Administration; and (4) the February 3, 2014 Letter from Eileen Sobeck to Director Charlton H. Bonham.  ER 8; SER 31-69.  Plaintiffs apparently do not appeal this portion of the district court's order, and it was proper for the court to consider these facts and documents, as they are "not subject to reasonable dispute."  *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *see also Casas-Castrillon v. Department of Homeland Security*, 535 F.3d 942, 952 (9th Cir. 2008).

*Fair v. Jackson Cnty., Or.*, 372 F.3d 1128, 1136 (9th Cir. 2004) and

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S.*

*Dep't of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007)).  The district court

concluded that it was bound by this Court's determination on two such pure

issues of law, with which it "independently agree[d]:" (1) the Shark Fin

Prohibition is facially neutral; and (2) the Magnuson-Stevens Act does not

expressly preempt or occupy the field.  ER 10 (citing *Chinatown*

*Neighborhood Ass'n v. Brown*, 539 F. App'x 761, 762-63 (9th Cir. 2013)),

SER 55-56.

The district court next considered plaintiffs' equal protection claim.

ER 10-15.  It rejected plaintiffs' contention that the Shark Fin Prohibition

facially violates the Equal Protection Clause.  ER 11.  The court stated that

"[n]othing in the Shark Fin Law's text discriminates on the basis of race,

ethnicity, cultural background, or national origin.  Rather, it is a broadly

applicable law that prohibits the sale of shark fin.  Every person in

California is subject to the law."  ER 11.  The court also determined that

plaintiffs failed to plead sufficient facts to show that the Shark Fin

Prohibition was enacted for the purpose of discriminating on account of race

or national origin.  ER 11.  The court noted that the FAC contains only

conclusory allegations and that the few allegations of discriminatory purpose

8

"do not go anywhere close to bringing [plaintiffs'] claims past the 'line between possibility and plausibility.'" ER 11-12, 14 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court concluded that the Shark Fin Prohibition is facially neutral, rationally related to the State's legitimate interests in protecting the public health and safety and the environment, and that plaintiffs had not met their burden to allege facts that would negate every conceivable basis supporting the law. ER 13-14. Because counsel for plaintiffs conceded at oral argument that he knew of no other facts to assert, the court dismissed the equal protection claim with prejudice. ER 15.

The district court next considered and dismissed plaintiffs' Commerce Clause claims. ER 16. Specifically, the district court determined as a matter of law that the Shark Fin Prohibition does not discriminate against interstate commerce and does not regulate extraterritorially as it regulates only the possession, trade, and distribution of shark fin within California. ER 16-17. Because the FAC contains no plausible allegation that the Shark Fin Prohibition imposes a substantial burden on interstate commerce, the court determined that it was not required to apply the balancing test articulated by the Supreme Court in *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970). ER 19-20. It stated that the protection of public health, wildlife, and of the ecosystem are legitimate state interests and that the Shark Fin Prohibition

9

thus carries "a strong presumption" of constitutional validity that the allegations in the FAC failed to rebut. ER 20. Accordingly, and "because plaintiffs have no unpleaded facts that would change [its] analysis," the court dismissed plaintiffs' dormant Commerce Clause claim without leave to amend. ER 5, 20.

The district court further held that the Shark Fin Prohibition is not preempted by federal law. ER 20-27. Because this Court held that as a matter of law neither express nor field preemption applies to the Shark Fin Prohibition, the court focused its analysis on whether the statute conflicts with the purposes and objectives of federal law. ER 21. It concluded that there is no conflict between the Shark Fin Prohibition and the Magnuson-Stevens Act, generally and as amended by the Shark Finning Prohibition Act of 2000, Pub. L. No. 106-557, 114 Stat. 2772 (2000), and the Shark Conservation Act of 2010, Pub. L. No. 111-348, 124 Stat. 3668 (2010). ER 22-27. In so doing, the court noted that it is the position of the federal government that state and federal law are consistent and that federal law does not preempt state law. ER 22-24. It also found that plaintiffs failed to allege that it is impossible to comply with both state and federal law or that the Shark Fin Prohibition "impedes Congress' intent." ER 24. The district court held that because the FAC contained no allegations demonstrating how

10

the Shark Fin Prohibition actually hinders any federal objective or conflicts with federal law, plaintiffs failed to state a claim under the Supremacy Clause. ER 27.

Finally, the district court determined that because plaintiffs had not successfully plead any violation of the constitutional rights of its members, its section 1983 claim failed. The court held that particularly in light of counsel's representations that there were no additional facts he could plead, amendment would be futile. ER 28. It thus dismissed the FAC with prejudice. ER 28.

## SUMMARY OF ARGUMENT

The district court properly determined that plaintiffs did not and cannot allege plausible claims for relief under the Supremacy, Equal Protection, or Commerce Clauses. With respect to the Supremacy Clause, not only is plaintiffs' claim based almost entirely on legal conclusions, but because the Shark Fin Prohibition is entirely consistent with federal law any claim under the Supremacy Clause must fail. Plaintiffs' Equal Protection claim fails because, as this Court has held, the Shark Fin Prohibition is facially neutral, SER 55, plaintiffs have not alleged sufficient facts to create a plausible inference that the Shark Fin Prohibition was adopted for the purpose of discriminating on account of national origin instead of the Legislature's

11

stated intent to promote shark conservation and consequently to protect the health of our oceans, and plaintiffs have not alleged, and cannot allege, facts to show that the Shark Fin Prohibition lacks any conceivable basis to support it. Similarly, plaintiffs' dormant Commerce Clause claim fails as the Shark Fin Prohibition neither discriminates against interstate commerce nor regulates extraterritorially and plaintiffs have failed to allege any cognizable burden on interstate commerce, and certainly not one that would clearly exceed the statutes' putative benefits. Accordingly, and because leave to amend would be futile, the district court properly dismissed the FAC with prejudice.

## ARGUMENT

### I.   STANDARD OF REVIEW

This Court reviews de novo an order dismissing a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030 (9th Cir. 2008). On appeal, this Court applies the same standards as the district court. *Id.* "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1040 (9th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). A plaintiff must allege "more than labels

12

and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Instead, the plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Id*. The appellate court must accept as true all factual allegations in the complaint. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Beyond the face of the complaint and any items attached thereto, the appellate court may also consider the following documents if part of the district court record: (a) documents identified in the complaint that were not attached but central to the plaintiff's claims, (b) court records and other public records, and (c) matters otherwise judicially noticeable under Federal Rule of Evidence 201. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

A district court's denial of leave to amend is reviewed for an abuse of discretion." *Cervantes*, 656 F.3d at 1041. The district court does not abuse its discretion in denying leave to amend where the deficiencies of the complaint cannot be cured by amendment. *DeSoto v. Yellow Freight Sys.*,

*Inc.*, 957 F.2d 655, 658 (9th Cir. 1992); *Balistieri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

## II.   THE DISTRICT COURT PROPERLY DISMISSED THE FIRST AMENDED COMPLAINT WITHOUT LEAVE TO AMEND

Plaintiffs brought a facial challenge to the Shark Fin Prohibition on the grounds that it violates the Equal Protection, Commerce, and Supremacy Clauses of the United States Constitution as well as 42 U.S.C. section 1983.[3] However, as the district court held, plaintiffs failed to allege sufficient facts to state a cause of action under these clauses. ER 5, 9, 15, 20, 24, 27.

As a threshold matter, plaintiffs' contention that the district court applied an overly exacting standard to their pleading is incorrect. AOB 19, 21-23, 44. The district court did not dismiss the FAC because plaintiffs failed to *prove* their case at the pleading stage, but because they did not meet their burden to *allege* enough facts to establish a plausible claim for relief. ER 5, 9, 14-15, 18-20, 24, 27, 28; *see Twombly*, 550 U.S. at 555-61. As plaintiffs acknowledge, dismissal is appropriate when a complaint either

---

[3] Although plaintiffs have suggested that they also have brought an as applied challenge to the Shark Fin Prohibition, *see* Dkt. No. 62, and on appeal they argue that the Shark Fin Prohibition "is unjust as applied to Chinese Californians," there is no allegation in the FAC, nor any indication in the record, that the law has been applied to any of plaintiffs' members. Opening Brief of Plaintiffs-Appellants (AOB) at 45-46; ER 43-58.

14

fails to allege a cognizable legal theory or fails to allege sufficient facts to support a cognizable legal theory. *See* AOB 23; *Shroyer v. New Cingular Wireless Services, Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). The FAC fails to do both. Although plaintiffs are correct that the pleading requirements are fairly liberal, *see* AOB 21-23, Federal Rule of Civil Procedure 8 does require them to set forth "factual content that allows the court to draw the reasonable inference that [] defendant[s] are liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). The FAC, which contains little more than legal conclusions, unwarranted deductions, and unreasonable inferences, falls well short of this standard. *See Moss*, 572 F.3d at 969; *see also Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) ("[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."). Accordingly, and particularly in light of counsel's repeated representations that plaintiffs had no additional facts to allege in support their claims, *see* ER 15, 36-37, 38-39, the district court properly dismissed the FAC with prejudice. *See Iqbal*, 556 U.S. at 678-79; *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d

1104, 1110 (9th Cir. 2013); *Perez v. Nidek Co., Ltd.*, 711 F.3d 1109, 1113 (9th Cir. 2013).[4]

### A. The First Amended Complaint Fails To State a Claim Under the Supremacy Clause.

Plaintiffs' Third Claim for Relief fails to adequately allege that the Shark Fin Prohibition is preempted by the Magnuson-Stevens Act, 16 U.S.C. §§ 1801-1884 ("MSA"), either generally or as amended by the Shark Finning Prohibition Act of 2000 and the Shark Conservation Act of 2010, as well as the implementing regulations and plans, such as Fishery Management Plans ("FMP"). ER 55-56. As the district court noted, plaintiffs' Supremacy Clause claim is based almost entirely on legal conclusions, *see* ER 55-56, and does not satisfy their pleading burden. *See Iqbal*, 556 U.S. at 680-81. Moreover, because Congress did not intend to preempt state laws on or relating to shark finning and the Shark Fin Prohibition is entirely consistent with federal law, any claim under the Supremacy Clause must fail.

---

[4]    Plaintiffs' suggestion that they should be permitted to take discovery to cure the vast deficiencies of their pleading through discovery is not well taken. Even after amendment and more than two years of litigation, plaintiffs have not alleged cognizable claims for relief. They are thus not entitled to discovery. *See Iqbal*, 556 U.S. at 686; *Somers v. Apple, Inc.*, 729 F.3d 953, 966 (9th Cir. 2013).

16

Federal law may preempt state law in one of three ways, none of which applies in this case. First, Congress may expressly state its intent to preempt state law in the direct language of a statute. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). Second, Congressional intent to preempt state law can be inferred when Congress "occupies the field" by passing a comprehensive legislative scheme that leaves "no room" for supplemental regulation. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Third, federal law may preempt state law to the extent that state law directly conflicts with federal law. *See Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141-43 (1963). Conflict preemption requires that "compliance with both federal and state regulations is a physical impossibility," *id.* at 142-43, or that state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pac. Gas & Electric Co. v. State Energy Res. Cons. & Dev. Comm.*, 461 U.S. 190, 204 (1983).

Preemption analysis "starts with the assumption that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Rice*, 331 U.S. at 230. However the preemption claim is cast, Congressional intent to preempt state law is the "ultimate touchstone." *Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96, 103 (1963). A court must presume that a state statute is not

17

preempted, and the moving party has the burden of overcoming that presumption. *Pharm. Research and Mfrs. of America v. Walsh*, 538 U.S. 644, 661-62 (2003). Plaintiffs did not and cannot meet this burden.

### 1. Plaintiffs cannot allege field preemption.

Because this Court held as a matter of law that the MSA "does not expressly preempt state law or occupy the entire field," SER 56, the district court confined its analysis to whether conflict preemption invalidates the Shark Fin Prohibition. ER 21. Although plaintiffs appear largely to have abandoned their field preemption arguments on appeal, they contend that the district court was not bound by this Court's determination in the preliminary injunction appeal that express and field preemption are inapplicable. AOB 34 n.12. However, a "higher court's conclusions on pure issues of law are binding, even when those issues were decided at the preliminary injunction stage." ER 9-10 (citing *S. Or. Barter Fair*, 372 F.3d at 1136, and *Ranchers Cattlemen*, 499 F.3d at 1114). Preemption is a "purely legal [issue] which do[es] not depend on the factual record developed below." *Levin Metals Corp. v. Parr-Richmond Terminal Co.*, 817 F.2d 1448, 1450 n.2 (9th Cir. 1987); *see also Sayles Hydro Assocs. v. Maughan*, 985 F.2d 451, 454 (9th

Cir. 1993). It was thus proper for the district court to rely on this Court's determination.

Moreover, even if this Court's previous preemption ruling were not law of the case and binding on the district court, plaintiffs claims would fail. Plaintiffs did not and could not allege facts tending to show that in adopting the MSA, and/or the Shark Finning Prohibition Act of 2000 and the Shark Conservation Act of 2010, Congress intended to create a comprehensive legislative scheme that leaves no room for the state regulation of finning. *See Rice*, 331 U.S. at 230. Plaintiffs could not allege such facts because the MSA permits concurrent regulation in federal waters, state law unquestionably can and does play a role in the regulation of sale and trade of fish and fish products, and federal law explicitly permits state regulation. *See* 16 U.S.C. § 1856(a)(1); 50 C.F.R. § 600.1201(c). Accordingly, "field preemption is not an issue." *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003).

### 2. Plaintiffs cannot allege conflict preemption.

Plaintiffs argue that the district court erred by failing to accept their (conclusory) allegations that the Shark Fin Prohibition "conflicts with federal law by presenting an obstacle to the achievement of federal

objectives." AOB 20. However, plaintiffs have not and cannot identify a legitimate federal objective that the Shark Fin Prohibition could theoretically obstruct and they failed to allege facts to show that the Shark Fin Prohibition actually does so. While this failure is not surprising given that the Shark Fin Prohibition, the MSA, and federal shark fin law are entirely consistent in purpose and regulate fundamentally different activities, it is fatal to plaintiffs' Supremacy Clause claim. As the district court correctly determined, "[w]ithout making any allegations demonstrating how the Shark Fin Law hinders federal objectives or actually conflicts with federal law, the plaintiffs fail to state a claim that the law is preempted." ER 27.

> **a.** **There is no conflict between the Shark Fin Prohibition and the Magnusson-Stevens Act.**

Plaintiffs posit that the Shark Fin Prohibition conflicts with the MSA's mandate to manage federal (shark) fisheries "to maximize yield under sound conservation and management principles." AOB 25-26. However, this argument mischaracterizes the purpose of the MSA and then overstates the scope of federal authority. The main objectives of the MSA are to preserve the nation's fishery resources and protect valuable species from overfishing. To this end, the MSA extends the exclusive fisheries zone of the United States from 12 to 200 miles and provides for management of fishing within

20

the 200-mile zone, known as the Exclusive Economic Zone (EEZ). *See generally*, H.R. Rep. No. 94-445, 94th Cong., 2nd Sess. 1976, 1976 U.S.C.C.A.N. 593, 614 -16; 16 U.S.C. § 1801(a), (b). The MSA has been amended several times, and each round of amendments has emphasized and strengthened its goal of conservation and sustainability. *See, e.g.*, S. Rep. No. 104-276 (1996); H.R. Rep. No. 104-171 (1995); S. Rep. No. 109-229 (2006). While it is true that one goal of the MSA is to minimize negative economic effects on commercial fishing, this is secondary to and confined by the MSA's central purpose of promoting conservation, something that is consistent with and furthered by the Shark Fin Prohibition. *See NRDC v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) (noting that conservation takes priority over the MSA's other purposes); 16 U.S.C. §§ 1801(b), 1851(a)(8) (goal of minimizing adverse impact on fishing communities need only be achieved "to the extent practicable"). Examining the MSA as a whole, the objective of safeguarding commercial fishing is ancillary to the statute's purpose and an insufficient basis for a claim of preemption. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992) (in determining Congress's intent, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law") (citation and alteration omitted).

21

Similarly, plaintiffs' notion that the Shark Fin Prohibition interferes with the achievement of "optimum yield," AOB 25-26, 28, is baseless. "Optimum yield" does not refer to the volume of sales of commercially caught fish, nor does it require a particular catch. *See* 16 U.S.C. § 1802(33). Rather, "optimum yield" is a one-way adjustment down from the maximum amount of stock that can be taken without risking depletion of a species. *See id.* It is a value that is calculated by surveying economic, social, and ecological factors, and accounting for them with *reductions* in catch if necessary. *See id.* Thus, as the district court recognized, the directive in the MSA regarding "optimum yield" does not "suggest congressional intent to maximize fishing or the sale of fish (since social, economic, and ecological factors also matter) such that prohibiting the sale of shark fin would go against an MSA policy." ER 25.[5] The MSA also does not require a state to

---

[5] Plaintiffs take issue with this conclusion and assert that the MSA's "objective of maximizing sustainable, socially- and ecologically-conscious fishing is clear." AOB 27. However, even this were true, plaintiffs miss the difference between a directive to maximize sustainability and evidence of Congressional intent to mandate the greatest amount of catch of every species at all times. *See* ER 25. Moreover, and as discussed more fully below, plaintiffs have not alleged any facts tending to show that the Shark Fin Prohibition actually interferes with sustainable shark fishing, and according to the National Marine Fisheries Service (NMFS), which administers the MSA, it does not. *See* ER 23; SER 65-66. Plaintiffs' related contention that accepting as true the allegations in the FAC regarding the
(continued…)

provide a market for fish products, particularly those prohibited pursuant to the State's power to protect its natural resources and the public health and safety. ER 25 ("Nothing in the MSA requires a state to allow the possession or trading of shark fin – even shark fin lawfully landed"); *cf. Tart v. Commonwealth of Massachusetts*, 949 F.2d 490, 500-01 (1st Cir. 1991); *Blue Water Fisherman's Assoc. v. Mineta*, 122 F. Supp. 2d 150, 161-63 (D.D.C. 2000). Accordingly, even if plaintiffs had alleged facts in support of their claim that the Shark Fin Prohibition has an effect on "optimum yield," and they have not done so, this still would not state a conflict preemption claim.

Plaintiffs' uncorroborated allegations that the Shark Fin Prohibition presents an obstacle to the exclusive authority of the federal government to manage federal fisheries and/or that the Shark Fin Prohibition "bears on the same activity as federal law – regulation of federal fisheries," are also insufficient. *See* AOB 25; *see also* ER 52, 56. While there is no dispute that Congress claimed "sovereign rights and exclusive fishery management

---

(…continued)
potential for sustainable shark fishing in the United States, "it logically follows" that the Shark Fin Prohibition conflicts with the objectives of the MSA, *see* AOB 27, thus fails, as neither logic, law, nor fact supports this conclusion.

authority over all fish" located within the EEZ, *see* 16 U.S.C. § 1811(a), the

Shark Fin Prohibition does not regulate any activity, such as the taking and

landing of sharks,[6] that occurs within the EEZ. ER 25. Instead, the Shark

Fin Prohibition prohibits the possession, sale, trade, and distribution of shark

fins *in California*. *See* Cal. Fish & Game Code §§ 2021 & 2021.5. While

the law does impact the ability to sell and trade shark fin within California,

this is not a matter of federal concern and does not run afoul of the MSA.

To the contrary, the regulation of sale and trade of products within state

borders (including animal parts and products) is a long-standing area of state

authority. *See*, *e.g.*, *Tart*, 949 F.2d at 501; *Viva! Intern. Voice for Animals v.

Adidas Promotional Retail Operations, Inc.*, 41 Cal. 4th 929, 952 (Cal.

2007).

        To the extent that plaintiffs assert that the Shark Fin Prohibition

interferes with the federal government's authority to regulate the sale of fish

catch, *see* AOB 26, this argument fails. The FAC identifies the source of

this purported federal authority as 16 U.S.C. section 1853(b)(3), which

---

[6] "Landing," "means to begin offloading fish, to offload fish, or to arrive in port or at a dock, berth, beach, seawall, or ramp." 50 C.F.R. § 100.10; *see also* 50 C.F.R. § 600.1202. The Shark Fin Prohibition places no restrictions on the ability to land sharks. *See* Cal. Fish & Game Code § 2021.

allows, but does not require, Fishery Management Councils to limit the sale of fish though an FMP.  However, the limited discretion provided by section 1853(b)(3) is not a freestanding grant to regulate any and all commerce relating to fish and fish parts originating in the EEZ.  Indeed, the ability to limit the sale of fish is explicitly circumscribed by the requirement to be consistent with state safety and quality laws, such as the Shark Fin Prohibition.  *See* 16 U.S.C. § 1853(b)(3)(B).[7]  Accordingly, 16 U.S.C. section 1853(b)(3) does not confer (exclusive) federal authority over the sale of federally-caught fish and fish parts (within California).

The cases plaintiffs cite are not to the contrary.  In support of their conflict preemption arguments, plaintiffs rely on a number of cases, including *Southeastern Fisheries Assoc., Inc. v. Chiles*, 979 F.2d 1504 (11th Cir. 1992), and *Southeastern Fisheries Assoc., Inc. v. Mosbacher*, 773 F. Supp. 435 (D.D.C. 1991), all of which are inapposite.  In *Chiles*, plaintiff challenged state fishing regulations that limited the number of pounds of Spanish mackerel a commercial vessel could bring into a state port on any given day.  The court found that there was likely a direct conflict between

---

[7] On appeal, plaintiffs mistakenly rely upon 16 U.S.C. section 1802(4) to argue that the federal government has authority over sales.  *See* AOB 26.  Section 1802(4) sets forth the definition of "commercial fishing."  It does not constitute a grant of authority over the sale and trade of fish.

25

the state regulation and the federal FMP, and that it could be "impossible for plaintiffs to land their catch in compliance with both state and federal law." 979 F.2d at 1510; *see also id.* at 1508 ("Under the FMP, [plaintiff] may take Spanish Mackerel up to 2.99 million pounds in the Gulf of Mexico and 3.14 million pounds in the Atlantic, while under the Florida regulation he may not."). The court further determined that "Congress must have intended to occupy the field of fishery management *within the EEZ*," and that the state statute was an improper attempt to regulate within the EEZ. *Id.* at 1509-10 (emphasis added). However, because there was an insufficient record on which to evaluate the preemption claim, the court vacated the district court's order and remanded for further factual findings, including how the state regulation was enforced and whether there was any coordination between the state and federal governments. *Id.* at 1510.

At most, *Chiles* establishes that a state law may be preempted if it (1) directly regulates conduct within the EEZ; and/or (2) is in direct conflict with federal law, such as state laws that establish inconsistent catch limits. *Chiles* does not support the notion that state law may not interfere with a commercial fisher's ability to place a fish product lawfully caught in the EEZ into the stream of commerce, nor does it suggest that a state law that restricts the ability to sell such a fish product is invalid. *See, e.g.*, *Louisiana*

26

*Seafood Mngt. Council, Inc. v. Foster*, 917 F. Supp. 439, 443-44 (E.D. La. 1996) (distinguishing *Chiles* and holding that MSA did not preempt statute that "only attempts to regulate activity and possession of finfish in the state").

*Mosbacher* is also inapt. The court in *Mosbacher* determined that an amendment to an FMP for redfish, which closed various areas for fishing and established quotas in the EEZ, but which expressly provided for the application of state landing and possession laws to redfish, created a conflict, and such laws could not "coexist in the federal scheme." 773 F. Supp. at 441. Although the court in *Mosbacher* did mention that some of the state laws in question involved the sale of fish caught in the EEZ, its conflict analysis focused solely on the state's restriction of landing activities. *See id.* It reasoned that the officials, in effect, had told commercial fishers that they could catch the fish, but that they might not land them. *Id.* "This makes no sense, and creates a conflict that is impermissible." *Id.* There is a significant difference, however, between regulations, such as those at issue in *Mosbacher*, which prohibit a fisher from landing a lawfully caught fish and the Shark Fin Prohibition, which allows the fisher to land, possess, and sell the fish, but prohibits the sale of one fish part, a detached fin. The former creates a fairly obvious obstruction to a federal scheme: federal law

27

allows you to catch a fish in the EEZ, but state law tells you that you cannot bring it to shore and unload it. The latter has no necessary effect on fishing in the EEZ, and thus cannot be assumed to create a conflict or obstacle supporting preemption. *See Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 495-96 (9th Cir. 1984).

Plaintiffs' reliance on *City of Charleston, S.C. v. A Fisherman's Best, Inc.*, 310 F.3d 155 (4th Cir. 2002), and *Vietnamese Fishermen Ass'n v. Cal. Dep't of Fish & Game*, 816 F. Supp. 1468 (N.D. Cal. 1993), is similarly misplaced. In *City of Charleston*, the city adopted a resolution prohibiting the docking at its Maritime Center of longline vessels that fished in federal waters. *See* 310 F.3d at 159. The court, noting that there were no other adequate docking facilities for longline vessels within 100 miles, concluded that the city's resolution would effectively prohibit the use of longline gear in direct contravention of federal law, which designated longline as the authorized gear for catching Atlantic swordfish. *Id.* at 170-174, 177. Here, no similar conflict exists. Similarly, in *Vietnamese Fishermen Assn.*, the court struck a state law that prohibited the use of gill or trammel nets to harvest rockfish in federal waters off of California's coast because it determined that compliance with both state and federal regulations was a

28

physical impossibility. *See* 816 F. Supp. at 1485-86. That is not the case here.[8]

### b. There is no conflict between the Shark Fin Prohibition and federal shark fin law.

#### (1) It is entirely possible to comply with both federal and state law.

"Impossibility preemption is a demanding defense." *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). As noted above, in order for it to apply, "compliance with both federal and state regulations [must be] a physical impossibility." *Fla. Lime*, 373 U.S. at 142-43. The impossibility must be clear and immediate; it is not enough that a speculative future event could create impossibility. *Wyeth*, 555 U.S. at 568-73. It is not physically impossible to comply with the Shark Finning Prohibition Act of 2000 and the Shark Conservation Act of 2010 while complying with the Shark Fin Prohibition, as these statutes predominantly regulate different activities. *See*

---

[8] The fact that "in the FAC, Plaintiffs discuss the existence of FMPs and FMP's underlying objectives" and allege that the Shark Fin Prohibition conflicts with them, AOB 31-32, is by itself insufficient. *See* ER 26-27; *see also Iqbal*, 556 U.S. at 678-79; *Perez*, 711 F.3d at 1113. Unlike cases involving the MSA on which plaintiffs rely, the FAC does not allege that there is an FMP, or any other federal law or regulation, that authorizes or requires states to permit the sale of detached shark fins. *See* ER 26; 50 C.F.R. §§ 600.1203, 600.1204.

ER 24; *compare* 16 U.S.C. §§ 1801-1882 *and* Cal. Fish & Game Code §§ 2021 & 2021.5.

> **(2)  The Shark Fin Prohibition does not present an obstacle to any purpose, objective, or method of federal shark fin law.**

The purpose of the Shark Finning Prohibition Act of 2000 and the Shark Conservation Act of 2010 is "eliminat[ing] shark finning."  *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 982 (9th Cir. 2008) (citing Pub. L. 106-557, 114 Stat. 2772 (2000)).  While the Shark Fin Prohibition is wholly consistent with this purpose, plaintiffs claim that "there is a crucial difference in method of enforcement" between federal and state law, and thus that the Shark Fin Prohibition is preempted.  AOB 28.  This argument amounts to the assertion, at odds with basic principles of preemption analysis, that if Congress chooses not to regulate the market for shark fin, neither may the states.  Specifically, plaintiffs argue that "Congress chose a circumscribed approach to addressing the practice of shark finning that did not include a total ban on the possession, sale and trade of fins from sharks that were legally harvested in federal waters," and that the Shark Fin Prohibition conflicts with this judgment.  AOB 28-29.  They allege that federal laws and regulations allow fishers to possess and

sell shark fin (obtained in compliance with federal law), but the Shark Fin Prohibition "prevents these same fishers from placing the same shark fin into the stream of commerce in California, creating an impermissible conflict." ER 52.

However, in general, the "decision not to adopt a regulation" simply means there is no federal regulation; it is not treated as "the functional equivalent of a regulation prohibiting all States and their political subdivisions from adopting such a regulation." *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51, 65 (2002); *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994) ("matters left unaddressed in [a federal] scheme are presumably left subject to the disposition provided by state law"). Although plaintiffs repeatedly assert that conflict preemption can be established merely by congressional inaction or silence, *see, e.g.*, AOB 29-31, this is incorrect.[9] *Cf. P.R. Dep't of Consumer Affairs v. Isla*

---

[9] The cases plaintiffs cite do not support this argument because they address instances where it is impossible to comply with federal and state law and/or there is an explicit federal goal or purpose with which state law conflicts or interferes. *See Arizona Dream Act Coal. v. Brewer,* 757 F.3d 1053 (9th Cir. 2014) (state policy of denying driver's licenses to federal Dream Act recipients, in a state where 87 percent of the workforce commutes to work by car, *could* have practical effect of interfering with federal directive that Dream Act recipients be able to work and exclusive federal authority over immigration and employment of aliens); *Fouke Co. v.*

(continued…)

*Petroleum Corp.*, 485 U.S. 495, 503 (1988) (noting that in conflict

preemption cases, "there is no federal preemption *in vacuo*, without a

constitutional text or federal statute to assert it").  Rather, in order to

establish conflict preemption, plaintiffs must allege facts to demonstrate that

the choice to prohibit the possession, sale, and trade of shark fins is one that

Congress specifically rejected or would not have sanctioned.  *See, e.g.*,

*Arizona v. United States*, 132 S. Ct. 2492, 2504 (2012) (striking down

provisions of Arizona immigration law where it would have created a

penalty for aliens seeking unauthorized employment that Congress has

clearly and intentionally left out).

    Plaintiffs did not and cannot make this showing.  Plaintiffs point only

to a statement by Congressman George Miller that "[t]he Shark Finning

Prohibition Act will not prevent United States fishermen from harvesting

sharks, bringing them to shore, and then using the fins or any other part of

the shark.  Instead, it would simply prevent the cutting off of the fins and the

---

(…continued)
*Mandel*, 386 F. Supp. 1341 (D. Md. 1974) (state statute prohibiting the
importation of seal skins found to be invalid because Congress had occupied
the relevant field and because it frustrated the objectives of an international
treaty and two federal laws); *see also Mut. Pharm Co. v. Bartlett*, 133 S. Ct.
2473 (2013); *Vietnamese Fishermen Ass'n v. Cal. Dep't of Fish & Game*,
816 F. Supp. 1468.

disposal of the carcass at sea, or the transport or landing of fins harvested in this manner by another fishing vessel." ER 50 (quoting146 Cong. Rec. H11570, H11571 (daily ed. Oct. 30, 2000)). This statement, even read in the light most favorable to the plaintiffs, merely describes how federal law will function; it is not a rejection of a policy choice. *See Sprewell*, 266 F.3d at 988. Moreover, the statement of one legislator is insufficient to establish Congressional intent to preclude states from regulating. *See*, *e.g*., *P.R. Dep't of Consumer Affairs*, 485 U.S. at 503.

In fact, the text and the legislative history of federal shark fin law offer no support for the notion that Congress specifically considered and/or rejected a prohibition on possession and trade in shark fin. Similarly, the text and the legislative history of federal shark fin law do not indicate that Congress chose not to prohibit possession and trade in shark fin in an effort to balance competing goals of conservation and shark utilization. Rather, Congress enacted federal shark fin law for the singular purpose of conserving and protecting shark populations by eliminating finning. *See, e.g.*, 156 Cong. Rec. H8790 (daily ed. Dec. 21, 2010); S. Rep. No. 111-124 (2010); 146 Cong. Rec. S11744 (daily ed. Dec. 7, 2000); H.R. Rep. No. 106-650 (1999). There is also no evidence that Congress intended federal shark fin law to be comprehensive and/or to provide both a "floor" and a "ceiling"

33

for regulation of finning. *See Wyeth*, 555 U.S. at 575; *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1210-11 (9th Cir. 2009). To the contrary, Congress apparently viewed the Shark Finning Prohibition Act of 2000 and the Shark Conservation Act of 2010 as an initial effort to address the problem of shark population decline. Accordingly, there is no conflict between the Shark Fin Prohibition, which provides additional measures to stop the pernicious practice of finning, and federal law. *See, e.g.*, *Wyeth*, 555 U.S. at 575-76.

> **3. Plaintiffs cannot allege facts tending to show any conflict between federal law and the Shark Fin Prohibition.**

Even if plaintiffs could establish a legitimate federal purpose, objective, or method that the Shark Fin Prohibition could theoretically obstruct, they failed to allege that the Shark Fin Prohibition actually does so. A state law is preempted to the extent it actually interferes with the "methods by which the federal statute was designed to reach [its] goal." *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). In the absence of facts and thus any meaningful analysis about the interrelationship of federal and state law, a determination regarding preemption is unwarranted. *See Pacific Legal Foundation v. State Energy Resources Conservation & Development Comm.*, 659 F.2d 903, 925 n.35 (9th Cir. 1981). Moreover, in this case,

plaintiffs will not be able to show any actual interference or conflict between the Shark Fin Prohibition and the MSA. As indicated above, after consultation with the State of California regarding the relationship between the Shark Fin Prohibition and federal law, NMFS has concluded that California law and federal law are consistent, that the Shark Fin Prohibition will have minimal impact on shark fishing, and that there is no basis for finding California's law to be preempted. *See* ER 22-24; SER 62-63; *see also Wyeth*, 576-77.[10] Thus, because plaintiffs did not and cannot state a

---

[10] Before the district court, plaintiffs relied on and sought judicial notice of NMFS's Proposed Rulemaking, *see* 78 Fed. Reg. 25, 685, and the United States' amicus brief in *Chinatown Neighborhood Association et al., v. Brown, et. al.*, Ninth Circuit Case No. 13-15188. Defendants objected to the latter, as a request for judicial notice is not a proper vehicle for legal argument. *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 560 (9th Cir. 2009). With respect to the former, in order to show that the federal government's position on preemption had changed, Defendants requested judicial notice of two letters between NMFS and the California Department of Fish & Wildlife. These letters, which followed months of consultation about the relationship between the Shark Fin Prohibition and federal law, were properly considered by the district court. *See* ER 22-24; *Wyeth v. Levine*, 555 U.S. at 576-77; *Casas-Castrillon*, 535 F.3d at 952. While plaintiffs apparently concede that these letters are judicially noticeable under Federal Rule of Evidence 201, they "take issue" with the district court's admission of this correspondence "without giving Plaintiffs the opportunity to respond." AOB 33 n.11. However, the letters, which were exchanged on February 3, 2014, were submitted to the district court on February 6, 2014 along with Defendants' reply brief. Dkt. No. 63. Plaintiffs had almost six weeks before the March 19 hearing on the motion to dismiss in which to file a response or an objection. Plaintiffs chose to do

(continued…)

preemption claim as a matter of law, the district court properly dismissed plaintiffs claim under the Supremacy Clause.

### B.    The First Amended Complaint Fails To State a Claim Under the Equal Protection Clause.

Plaintiffs' First Claim for Relief fails to allege a viable claim that the Shark Fin Prohibition facially discriminates on the basis of national origin in violation of the Equal Protection Clause.  ER 53-54.  The Equal Protection Clause of the Fourteenth Amendment "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  Legislative provisions that arbitrarily or irrationally create discrete classes cannot withstand constitutional scrutiny under the Equal Protection Clause.  *Romer v. Evans*, 517 U.S. 620, 623 (1996).  However, courts must balance this principle with the "practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons."  *Id*. at 631 (citations omitted).  In an attempt to reconcile the promise of equal protection with the reality of lawmaking, courts apply

---

(…continued)
neither.  Plaintiffs did, however, address the letters at the hearing.  SER 12-15; 19-20.

the most searching constitutional scrutiny to those laws that burden a
fundamental right or target a suspect class, such as those based on race,
national origin, or religion. *Id.* With respect to protected classifications, the
government is required to demonstrate that the classification is narrowly
tailored to further compelling government interests. *See Grutter v. Bollinger*,
539 U.S. 306, 326 (2003). Laws that do not burden a protected class or
infringe on a constitutionally protected fundamental right are subject to
rational basis review. *Romer*, 517 U.S. at 631. Under the deferential
rational basis test, statutes are generally "presumed valid" and upheld if the
classification drawn by the statute is rationally related to a legitimate state
interest. *Fields v. Legacy Health Sys.*, 413 F.3d 943, 955 (9th Cir. 2005).
Such statutes must be "wholly irrational" to violate the Equal Protection
Clause. *Id.* Here, as the district court held, because the Shark Fin
Prohibition is neutral, generally applicable, and rationally related to the
State's legitimate "humanitarian, conservationist, and health goals," it is
valid. ER 14 (quoting *Chinatown Neighborhood Ass'n*, 539 F. App'x at
762). Thus, not only did plaintiffs fail to plausibly allege the lack of any
rational basis for the Shark Fin Prohibition, they cannot do so.

### 1. The Shark Fin Prohibition is facially neutral and plaintiffs have not adequately alleged discriminatory purpose.

As this Court has held, the Shark Fin Prohibition is facially neutral. ER 10, 11; SER 55. Although plaintiffs contend that the district court erred in relying on this Court's determination, AOB 36-38, the statutes' neutrality is a question of law and the district court was bound by it. *See Ranchers Cattlemen*, 499 F.3d at 1114. Moreover, and as the district court independently determined, *see* ER 10, 32, the Shark Fin Prohibition uniformly prohibits all persons, regardless of race, national origin, or any other protected classification, from possessing, selling, or trading shark fins in California, and is thus facially neutral. *See* ER 11; *PMG Intern. Div. L.L.C. v. Rumsfeld*, 303 F.3d 1163, 1172-73 (9th Cir. 2002).

On appeal, plaintiffs argue that the Shark Fin Prohibition is a "proxy" for discrimination against persons of Chinese national origin, is therefore subject to strict scrutiny, and is ultimately unconstitutional. AOB 34-36. However, even accepting as true plaintiffs' claim that the tradition of serving and eating shark fin soup is a characteristic exclusively and inextricably linked to Chinese national origin, plaintiffs have not alleged facts to show that the consumption of shark fin soup is "so closely associated" with Chinese Californians that it rises to the level of a "proxy," like language,

38

skin color, or names.  *See Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142 (9th Cir. 2013).[11]  Moreover, allegations that a neutral, generally applicable law has an effect, or even a disproportionate effect, on members of a protected class do not state a claim for discrimination within the meaning of the Equal Protection Clause.  A statute is "not unconstitutional solely because it results in a racially disparate impact." *Village of Arlington Heights v. Met. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)); *see also* ER 12-13.  Without alleging that the law was enacted with a discriminatory purpose or applied in a discriminatory manner, plaintiffs cannot state an equal protection claim.  *Id*. at 265.  The "mere fact" that a facially neutral statute has "a foreseeably disproportionate impact on an identifiable group does not mean that [it] violate[s] the Equal Protection Clause."  *Lee*, 250

---

[11] Plaintiffs note that this Court has stated as dicta in a footnote in *Pac. Shores Props., LLC*, 730 F.3d 1142, that "proxy discrimination" is a form of facial discrimination where "seemingly neutral criteria are so closely associated with the disfavored group that discrimination on the basis of such criteria" can be constructive discrimination against the disfavored group. AOB 35 (quoting *Pac. Shores*, 730 F.3d at 1160 n.23).  However, and as discussed above, unlike the relationship between gray hair and age, *see* 730 F.3d at 1160 n.23, the FAC does not support the plausible inference that the "fit between" shark fin and Chinese Californians is "sufficiently close" to establish facial discrimination.  *Pac. Shores*, 730 F.3d at 1160 n.23. Plaintiffs reliance on cases such as *El-Hakem v. BJY, Inc.*, 415 F.3d 1068 (9th Cir. 2005), fails for similar reasons.

F.3d at 687. Rather, plaintiffs must allege facts to show that the law was enacted "'because of,' not merely 'in spite of'" its disparate impact on an identifiable group. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *see also Iqbal*, 556 U.S. at 676-77.

This is not, as plaintiffs suggest, the "rare case" where they are excused from alleging a plausible claim of discriminatory purpose because a "clear pattern unexplainable on grounds other than race [or other protected status], emerges from the effect of the state action." *Arlington Heights*, 429 U.S at 266. Accordingly, plaintiffs' reliance on *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) is misplaced.[12] In *Yick Wo*, the city of San Francisco passed an ordinance that made it unlawful for any person to maintain a laundry in

---

[12] *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993), on which plaintiffs rely, is also inapposite. Not only was the challenged statute in *Lukumi* not generally applicable, but the amount of direct and circumstantial evidence of discriminatory animus was overwhelming. *See id*. at 542-46. Plaintiffs' reliance on cases such as *Pac. Shores*, 730 F.3d 1142, and *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690 (9th Cir. 2009), fails for similar reasons. *See Pac. Shores*, 730 F.3d at 1147-50, 1155-56 (setting forth "large amount" of direct and circumstantial evidence of escalating hostility and discriminatory intent); *City of Modesto*, 583 F.3d at 705 (determining that evidence of "gross statistical disparities," combined with other evidence created a sufficient inference that animus against protected group was significant factor in position taken by municipal decision-makers to survive summary judgment on Fair Housing Act claim).

wooden structures and then issued variances to almost every white applicant while denying variances to every Chinese applicant. *Id.* at 368, 373. The Supreme Court held that such a stark pattern of disparate enforcement established a denial of equal protection. *Id.* at 374. The Supreme Court subsequently stated that "such cases are rare" and that "[a]bsent a pattern as stark as that in . . . *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence." *Arlington Heights*, 429 U.S at 266. Here, there is no allegation that the Shark Fin Prohibition is being enforced in a discriminatory manner. On appeal, plaintiffs contend that "it is the height of discriminatory application" to prohibit shark fins, "which are only important to Chinese Californians" while allowing the rest of the shark to be used "by people of many national origins." AOB 45-46. However, plaintiffs are confusing disparate *impact* with disparate or discriminatory *application* or *enforcement*. As noted above, there is no allegation that the Shark Fin Prohibition has been applied to or enforced against plaintiffs or, and of particular significance, that it has not been enforced against non-Chinese Californians who are illegally possessing, selling, or distributing shark fin.

Ultimately, as the district court concluded, plaintiffs have not alleged any, let alone sufficient, facts to create a plausible inference that the Shark Fin Prohibition was adopted for the purpose of discriminating on account of

41

national origin. *See* ER 11-13; *Iqbal*, 556 U.S. at 676-77; *Twombly*, 550 U.S. at 570; *Moss*, 572 F.3d at 969. The FAC alleges that (1) that "lawmakers and proponents of the Shark Fin [Prohibition] have clearly and repeatedly articulated that the intent of the Law was to target the Chinese market for shark fins and to end the Chinese tradition of consuming shark fins," ER 51; and (2) the "intent to discriminate against people of Chinese national origin via the Shark Fin [Prohibition] is evident from the pattern of discrimination which is the inevitable effect of the legislation, as well as from the historical, social and legislative background of the Shark Fin [Prohibition]," ER 53. Such conclusory allegations "do not suffice" to state an equal protection claim based on discriminatory intent. *Iqbal*, 556 U.S. at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679; *see also Arlington Heights*, 429 U.S at 267-68 (setting forth permissible evidence of discriminatory intent, such as a law's historical background or irregularities in its passage); *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 522-23 (9th Cir. 2011).

Plaintiffs have failed to offer any such factual support. The few facts that plaintiffs do allege, specifically two out-of-context statements by Assemblyman Paul Fong and Peter Knights, the Executive Director of

42

WildAid, ER 51-52, do not "nudge their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Even read in the light most favorable to plaintiffs, Assemblyman Fong's statement, which compares finning to foot binding, and Mr. Knights' statement, that it is easier to regulate commerce occurring in Chinatown than activities taking place in the middle of the ocean, do not indicate a desire to harm Chinese Californians on the basis of national origin. *See Feeney*, 442 U.S. at 279; ER 12 ("these stray comments of one legislator and one supporter of the legislation are hardly sufficient to plausibly allege intent to discriminate").

Moreover, plaintiffs' allegations are belied entirely by the legislative findings and history of the Shark Fin Prohibition. *See* 2011 Cal. Stat., ch. 524 (AB 376), § 1. Although plaintiffs would like to disregard the clear expression of the Legislature's intent to promote shark conservation and consequently to protect the health of our oceans, this "obvious alternative explanation" mandates dismissal of their equal protection claim:

> When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are "merely consistent with" their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*.

43

*In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1108 (citations omitted).

In stark contrast to the Legislature's findings, plaintiffs' allegations of

discriminatory animus are barely "possible," and certainly not plausible. *See*

*id*.; *see also Iqbal*, 556 U.S. at 681-82 (when the Court must choose

"between that 'obvious alternative explanation'" "and the purposeful,

invidious discrimination [plaintiff] asks us to infer, discrimination is not a

plausible conclusion") (citations omitted); *cf. Sprewell*, 266 F.3d at 988

(court need not accept as true allegations that contradict judicially noticeable

facts).

> **2. The Shark Fin Prohibition is rationally related to a legitimate governmental purpose.**

Because it is facially neutral and plaintiffs failed to adequately allege

discriminatory intent, the Shark Fin Prohibition is subject to rational basis

review.[13] *See Lee*, 250 F.3d at 686-87. Challenged legislation survives

rational basis review as long as, in enacting legislation, the legislature is

acting in pursuit of a permissible government interest that bears a rational

---

[13] To be clear, given that the State has compelling interests in protecting the environment and the public health and safety and that the Shark Fin Prohibition is narrowly drawn to serve those interests, it could pass any level of scrutiny. However, because no suspect class or fundamental right is implicated by the Shark Fin Prohibition, only rational basis review applies. *See Giannini v. Real*, 911 F.2d 354, 358 (9th Cir. 1990).

relationship to the means chosen to achieve that interest. *Heller v. Doe*, 509 U.S. 312, 319 (1993). Under rational basis review, when legislative judgment is called into question on equal protection grounds and the issue is debatable, the decision of the legislature must be upheld if "any state of facts either known or which could reasonably be assumed affords support for it." *United States v. Carolene Products Co.*, 304 U.S. 144, 154 (1938). "[T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it . . . ." *Heller*, 509 U.S. at 319 (internal quotation marks omitted).

Here, plaintiffs have not alleged facts sufficient to overcome the presumption of rationality that applies to duly enacted legislation *See City of Cleburne*, 473 U.S. at 440. Plaintiffs allege only that the Shark Fin Prohibition is duplicative of existing law, ER 48-50; that it fails to exempt shark fins from sustainably and legally fished sharks, ER 53-54; that it allows for consumption of all other parts of the shark besides the fin, ER 51, and that it is unnecessary in that U.S. fishers do not engage in finning, NOAA "successfully manages shark populations" and sharks are not really endangered, ER 50-51. Even assuming that all of these allegations are true, they are inadequate. Plaintiffs have not alleged facts that, if true, "negative every conceivable basis which might support" the Shark Fin Prohibition,

*Heller*, 509 U.S. at 319, nor facts demonstrating that the law is wholly irrational. *See Fields*, 413 F.3d at 955.

The Legislature, based on considerable scientific evidence, has determined both that there is a dangerous decline in the shark population due to finning, and that a prohibition on the possession, trade, sale, and distribution of shark fins is an effective way to combat this problem. *See* 2011 Cal. Stat., ch. 524 (AB 376). On appeal, plaintiffs repeat their arguments that the Shark Fin Prohibition is "based on myths and misunderstandings," is unnecessary, and is not the optimal way to achieve the State's interest in promoting shark conservation and protecting the public health and safety. *See* AOB 42-44, 46. As a matter of fact, plaintiffs' theories about how the Shark Fin Prohibition could be written in a less restrictive fashion and still serve its conservation and public health goals are incorrect. For example, plaintiffs' notion that the Shark Fin Prohibition is unnecessary because shark finning is illegal in the United States and many foreign countries is belied by the fact that under the preexisting regulatory regime, which did not address the market and trade of shark fins, tens of millions of sharks died from finning each year. *See* 2011 Cal. Stat., ch. 524 (AB 376), § 1(d). These suggested alternatives are not "as effective in achieving the legitimate purpose that the statute was enacted to serve." *Reno*

46

*v. American Civil Liberties Union*, 521 U.S. 844, 874 (1997). Moreover, as a matter of law, plaintiffs' views are irrelevant. "[E]qual protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications*, *Inc.*, 508 U.S. 307, 313 (1993); *see also Mourning v. Family Publ'n Serv., Inc*., 411 U.S. 356, 378, (1973) (rational basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question).

Not only have plaintiffs failed to allege facts to show that the Shark Fin Prohibition lacks any conceivable basis to support it, *Heller*, 509 U.S. at 319, but given that the Shark Fin Prohibition is rationally related to the State's interests in the protection of public health, wildlife, and the ecosystem, plaintiffs cannot state an equal protection claim as a matter of law. *See* ER 14; *Merrifield v. Lockyer*, 547 F.3d 978, 986 (9th Cir. 2008) ("[T]he first aspect of the rational basis test is easily satisfied by the government's interests in public health and safety and consumer protection."); *Pacific Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1013 (9th Cir. 1994). Accordingly, the district court properly dismissed plaintiffs' claim under the Equal Protection Clause. *See Lee*, 250 F.3d at 686-87.

### C.  The First Amended Complaint Fails To State a Claim Under the Commerce Clause.

The FAC also fails to state a cause of action for violation of the Commerce Clause. *See Twombly*, 550 U.S. at 557, 570; *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147-57 (9th Cir. 2012), *cert. denied*, 81 U.S.L.W. 3452 (U.S. Feb. 19, 2013) (No. 12-461).  The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States . . . ."  U.S. Const., art. I, § 8, cl. 3. The Commerce Clause includes an implied limitation on the states' authority to adopt legislation that affects commerce, which is often referred to as the negative or dormant Commerce Clause. *Healy v. Beer Inst*., 491 U.S. 324, 326 n.1 (1989).  The purpose of the dormant Commerce Clause is to "prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent."  *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994).  However, its restrictions are "by no means absolute" and "[s]tates retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected."  *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (citations and quotations omitted).  "As long as a State

48

does not needlessly obstruct interstate trade or attempt to place itself in a position of economic isolation, it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources." *Id*. at 151 (citations and quotations omitted).

Whether state legislation violates the dormant Commerce Clause is generally analyzed under a two-tiered approach. *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986). A statute is essentially per se invalid if it directly regulates or discriminates against interstate commerce or if its effect is to favor in-state economic interests over out-of-state interests. *Id*. at 579. On the other hand, when a statute is nondiscriminatory and "has only indirect effects on interstate commerce and regulates evenhandedly, [the Court has] examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id*. (citing *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970)).

Plaintiffs do not argue that the Shark Fin Prohibition, which treats all shark fins the same regardless of origin, discriminates within the meaning of the dormant Commerce Clause. *See Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994) (for purposes of the Commerce Clause, discrimination "simply means differential treatment of in-state and

49

out-of-state economic interests that benefits the former and burdens the latter"). Instead, they contend that the law is an impermissible extraterritorial regulation and that its putative benefits are outweighed by the substantial burden it places on interstate commerce. Both of these contentions fail.

The FAC alleges that the Shark Fin Prohibition (1) imposes a complete and absolute prohibition on the possession, sale, offer for sale, trade and distribution of legally obtained fins and thus entirely eliminates "trade in, with, and through California, ER 54-55; (2) "improperly regulates commerce extraterritorially," ER 55; and (3) is a "duplicative, overbroad and excessively burdensome means of achieving" the benefits of global shark conservation and public health, ER 55. However, plaintiffs allege no facts to support these conclusions, and thus do not state a plausible claim for relief. *Twombly*, 550 U.S. at 555. Moreover, as the district court determined, because the Shark Fin Prohibition does not regulate commerce wholly outside the State and because the *Pike* test does not apply and in any event would be satisfied, plaintiffs cannot state a viable dormant Commerce Clause claim. ER 16-20.

### 1. The Shark Fin Prohibition does not regulate extraterritorially.

Impermissible extraterritorial regulations, within the meaning of the dormant Commerce Clause, are those that control commerce taking place entirely outside the regulating jurisdiction, whether through direct application or practical effect. *Healy*, 491 U.S. at 336-37. The classic example of an extraterritorial regulation is one that controls prices in other jurisdictions. *See id.* (invalidating Connecticut law that controlled beer prices in Massachusetts). The concern in these rare cases is that a state has reached into another sovereign state to control commercial activity with no nexus to the regulating state. *Id.* at 336-37.

Plaintiffs cannot identify any commerce occurring *wholly outside* California that the Shark Fin Prohibition *controls*. Although plaintiffs argue on appeal that the "practical effect" of the law "is to regulate commercial transactions" taking place beyond California's borders, AOB 51, there are no facts alleged in the FAC to support this conclusion. Moreover, by its terms, the Shark Fin Prohibition only regulates conduct – specifically, the possession, sale, distribution, and trade of shark fins – within California. *See* Cal. Fish & Game Code § 2021(b). Although plaintiffs are correct that the Shark Fin Prohibition may have an effect on the markets of other states,

AOB 50, where, as here, a state has not "projected its regulatory regime" into other states, such effects do not violate the dormant Commerce Clause. *See, e.g.*, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 548 (1981) (holding that despite effects "up" the chain of commerce that extended into other states, Minnesota could regulate its own milk market). "The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids." *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 220-21 (2d Cir. 2004); *see also Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network*, 742 F.3d 414, 433 (9th Cir. 2014); *Gerling Global Reinsurance Corp. of Am. v. Low*, 240 F.3d 739, 746 (9th Cir. 2001). Contrary to plaintiffs' view, *see* AOB 51, the fact that California has regulated, in part, to address the practice of shark finning occurring outside its borders is also permissible under the dormant Commerce Clause. "While a state may not mandate compliance with its preferred policies in wholly out-of-state transactions, it may regulate commerce within its boundaries even if one of its goals is to influence the out-of-state choices of market participants." *Rocky Mtn. Farmers Union v. Corey*, 740 F.3d 507, 509 (9th Cir. 2014) (Gould, J., concurring in denial of rehearing en banc) (citing *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003)); *see*

*also Pharm. Research and Mfrs. of America v. County of Alameda*, No. 13-16833, 2014 WL 4814407, *4 (9th Cir. Sept. 30, 2014).

> **2.** ***Pike*** **balancing is not required, but even if it were, the Shark Fin Prohibition serves a legitimate local purpose and its benefits outweigh any burden on interstate commerce.**

Plaintiffs contend that the FAC adequately alleges a substantial burden on interstate commerce, and consequently a dormant Commerce Clause claim under *Pike v. Bruce Church, Inc.*, 397 U.S. at 142. AOB 52-56. That argument, however, is foreclosed by this Court's determination that application of the *Pike* test requires that a plaintiff first establish a substantial burden on interstate commerce. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148. A "state regulation does not become vulnerable to invalidation under the dormant Commerce Clause merely because it affects interstate commerce." *Id*. at 1148. Rather, "[a] critical requirement for proving a violation of the dormant Commerce Clause is that there must be a *substantial burden* on *interstate commerce*." *Id.* (emphasis in original). Such "significant burden[s]" generally involve "inconsistent regulation of activities that are inherently national or require a uniform system of regulation." *Id.* Burdens on commerce that result from regulations pursuant to the State's police power to protect the public health

and safety are generally not regarded as significant even if they involve some loss of trade. *See id.* (citing *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976)). Indeed, the Supreme Court "generally has supported the rights of states to 'impose even burdensome regulations in the interest of local health and safety.'" *Id.* (quoting *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949)).

The FAC does not plausibly allege that the Shark Fin Prohibition places a substantial burden on interstate commerce. ER 19-20. It does not allege that the regulation of shark fins is "inherently national" or that the shark fin trade requires a "uniform system of regulation." *Nat'l Ass'n of Optometrists*, 682 F.3d at 1148. Plaintiffs merely conclude that the Shark Fin Prohibition places an excessive burden on interstate commerce in relation to its purported benefits, ER 55, without either identifying the nature of that "burden,", or suggesting how it outweighs the putative benefits of the Shark Fin Prohibition. The few facts that plaintiffs do allege, such as that the Shark Fin Prohibition prevents shark fins "from moving through California in the stream of commerce," AOB 52, 54, do not constitute a substantial burden on interstate commerce. *See Nat'l Ass'n of Optometrists*, 682 F.3d at 1148-49; *Pacific Nw. Venison Producers*, 20 F.3d at 1012 (an "import ban that simply effectuates a complete ban on commerce in certain

54

items is not discriminatory, as long as the ban on commerce does not make distinctions based on the origin of the items"); *see also Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013), *cert. denied*, 2014 WL 1695153 (U.S. October 14, 2014) (No. 13-1313); *Reynolds v. Buchholzer*, 87 F.3d 827, 831 (6th Cir. 1996). Moreover, "[f]or a state statute to run afoul of the *Pike* standard, the statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 109 (2d Cir. 2001). Plaintiffs have not alleged any facts tending to show that the Shark Fin Prohibition, which regulates the intrastate market for shark fin, somehow imposes a greater burden on interstate than on intrastate commerce.

Plaintiffs mistakenly rely on *Raymond Motor Transp., Inc. v. Rice*, 424 U.S. 429 (1978) in support of their argument that the Shark Fin Prohibition is invalid because it "directly regulates interstate and foreign commerce and erects significant barriers to the commercial flow of shark fins." AOB 50. In that case, the Supreme Court found that the challenged state regulation placed a substantial burden on the interstate movement of goods and services and interfered with the speed of truck transportation by forcing longer trucks to drive around the State of Wisconsin to get to other states. The Court also

noted that the regulation contained a number of exceptions that discriminated in favor of in-state industries and that the State had failed to make even a colorable showing that the regulation contributed to highway safety. *Raymond*, 434 U.S. at 445-47. By contrast, the Shark Fin Prohibition does not involve an inherently national enterprise, such as transportation, and does not discriminate against out-of-state commerce. *Raymond* is thus inapposite.

Given that plaintiffs have not alleged any facts to establish a cognizable burden on interstate commerce, *Pike* balancing is not required and plaintiffs' Commerce Clause claim fails. *See* ER 19; *Nat'l Ass'n of Optometrists*, 682 F.3d at 1155-56; *see also Nat'l Paint Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995) ("[T]he ordinance affects interstate shipments, but it does not discriminate against interstate commerce in either terms or effect. No disparate treatment, no disparate impact, no problem under the dormant commerce clause."). However, and perhaps of greater significance, even if *Pike* balancing applied, plaintiffs could not demonstrate that whatever incidental burdens on interstate commerce the Shark Fin Prohibition might have would outweigh its profound benefits. "A facially neutral statute may violate the Commerce Clause if 'the burdens of the statute . . . so outweigh the putative benefits as to make the statute

56

unreasonable or irrational.'" *UFO Chuting of Hawaii, Inc. v. Smith*, 508 F.3d 1189, 1196 (9th Cir. 2007) (citation omitted). A statute is unreasonable or irrational when "the asserted benefits of the statute are in fact illusory or relate to goals that evidence an impermissible favoritism of in-state industry over out-of-state industry." *Id.* That is not the case here. As discussed above, and as plaintiffs concede, AOB 54, the protection of public health, wildlife, and of the ecosystem, are legitimate state interests, *Merrifield*, 547 F.3d at 986; *Pacific Nw. Venison Producers*, 20 F.3d at 1013. The Shark Fin Prohibition thus carries "a strong presumption" of constitutional validity that the allegations in the FAC have failed to rebut. *Kassel v. Consol Freightways Corp.*, 450 U.S. 662, 670 (1981); *see also Nat'l Ass'n of Optometrists*, 682 F.3d at 1156.

On appeal, plaintiffs argue that the putative benefits of the Shark Fin Prohibition are illusory because the law "only marginally furthers the protection of public health." AOB 54.[14] However, plaintiffs have not

---

[14] Plaintiffs also contend that benefits of the Shark Fin Prohibition are illusory because protecting sharks outside of California waters is not a "local" benefit for purposes of Commerce Clause analysis. AOB 55-56. It is certainly true that some of purposes and putative benefits of the Shark Fin Prohibition, such as protecting the health of the ocean, are not limited to California. However, plaintiffs cite no authority for the proposition that a benefit must be exclusively local to survive scrutiny under the Commerce

(continued…)

57

alleged, and cannot allege, any facts tending to show that the Shark Fin

Prohibition furthers the State's interests in the protection of public health,

wildlife, and the environment "so marginally" and that it "interfere[s] with

commerce so substantially," *Kassel*, 450 U.S. at 670, as to be "a fig leaf

masking discrimination," *Yakima Valley Mem'l Hosp. v. Washington State*

*Dep't of Health*, 731 F.3d 843, 849 (9th Cir. 2013). "In the absence of

discrimination or another substantial burden on interstate commerce, [the

Court] need not determine if the benefits of a statute are illusory." *National*

*Optometrists*, 682 F. 3d at 1156; *see also CTS Corp. v. Dynamics Corp. of*

*America*, 481 U.S. 69, 92 (1987).

### D. The First Amended Complaint Fails To State a Claim Under 42 U.S.C. Section 1983.

Plaintiffs allege that "[e]nforcement of the Shark Fin Ban violates 42

U.S.C. § 1983 because it deprives Plaintiffs' members of their rights,

privileges and immunities secured by the United States Constitution under

the Equal Protection Clause, the Commerce Clause and the Supremacy

_____

(…continued)

Clause. To the contrary, the courts have recognized the interests of states in
combating global threats to the environment and thus to the health and safety
of their citizens. *See Massachusetts v. EPA*, 549 U.S. 497, 519, 522 (2007);
*Pac. Merchant Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1180 -81 (9th
Cir. 2011).

Clause." ER 56. However, because plaintiffs have failed to adequately allege violations of any of these clauses for the reasons set forth above, the FAC necessarily fails to state a claim under section 1983 and was properly dismissed.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court affirm the decision of the district court.


Dated: October 22, 2014             Respectfully submitted,


                                    KAMALA D. HARRIS
                                    Attorney General of California
                                    DOUGLAS J. WOODS
                                    Senior Assistant Attorney General
                                    TAMAR PACHTER
                                    Supervising Deputy Attorney General

                                    */s/ Alexandra Robert Gordon*

                                    ALEXANDRA ROBERT GORDON
                                    Deputy Attorney General
                                    *Attorneys for Defendants-Appellees*

14-15781

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**CHINATOWN NEIGHBORHOOD ASSOCIATION; et al.,**

Plaintiffs-Appellants,

**v.**

**KAMALA HARRIS, Attorney General of the State of California, in her official capacity; et al.,**

Defendants-Appellees,

**THE HUMANE SOCIETY OF THE UNITED STATES; et al.,**

Intervenors-Defendants-Appellees

---

## STATEMENT OF RELATED CASES

To the best of our knowledge, there are no related cases.

Dated:  October 22, 2014       Respectfully Submitted,

K AMALA  D. H ARRIS
Attorney General of California
D OUGLAS  J. W OODS
Senior Assistant Attorney General
T AMAR  P ACHTER
Supervising Deputy Attorney General

*/s/ Alexandra Robert Gordon*

A LEXANDRA  R OBERT  G ORDON
Deputy Attorney General
*Attorneys for Attorneys for Defendants-Appellees*

61

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED.R.APP.P 32(a)(7)(C) AND CIRCUIT RULE 32-1
## FOR 14-15781

I certify that:  (check (x) appropriate option(s))

[X] 1.  Pursuant to Fed.R.App.P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached **opening/answering/reply/cross-appeal** brief is

[X] Proportionately spaced, has a typeface of 14 points or more and contains <u>13,402</u> words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words

or is

[ ] Monospaced, has 10.5 or fewer characters per inch and contains _____ words or ___ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

[ ] 2.  The attached brief is **not** subject to the type-volume limitations of Fed.R.App.P. 32(a7)(B) because

[ ] This brief complies with Fed.R.App.P 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages.

or

[ ] This brief complies with a page or size-volume limitation established by separate court order dated _____ and is

[ ] Proportionately spaced, has a typeface of 14 points or more and contains _____ words,

or is

[ ] Monospaced, has 10.5 or fewer characters per inch and contains __ pages or __ words or __ lines of text.

[ ] 3.  Briefs in **Capital Cases**.
This brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 32-4 and is

[ ] Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 21,000 words; reply briefs must not exceed 9,800 words).

or is

[ ] Monospaced, has 10.5 or fewer characters per inch and contains __ words or __ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 75 pages or 1,950 lines of text; reply briefs must not exceed 35 pages or 910 lines of text).

☐   4. **Amicus Briefs**.

☐   Pursuant to Fed.R.App.P 29(d) and 9th Cir.R. 32-1, the attached amicus brief is proportionally spaced, has a typeface of 14 points or more and contains 7,000 words or less,

or is

☐   Monospaced, has 10.5 or few characters per inch and contains not more than either 7,000 words or 650 lines of text,

or is

☐   Not subject to the type-volume limitations because it is an amicus brief of no more than 15 pages and complies with Fed.R.App.P. 32 (a)(1)(5).

| October 22, 2014 | /s/ Alexandra Robert Gordon |
|---|---|
| Dated | Alexandra Robert Gordon<br>Deputy Attorney General |

**APPENDIX**



**c**

**Effective: January 1, 2012**

West's Annotated California Codes Currentness
    Fish and Game Code (Refs & Annos)
        Division 3. Fish and Game Generally
            Chapter 1. Taking and Possessing in General (Refs & Annos)
            ➡➡ **§ 2021. Shark fins; unlawful possession, sale, offer for sale, trading, or distribution; exceptions**

(a) As used in this section "shark fin" means the raw, dried, or otherwise processed detached fin, or the raw, dried, or otherwise processed detached tail, of an elasmobranch.

(b) Except as otherwise provided in subdivisions (c), (d), and (e), it shall be unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin.

(c) Any person who holds a license or permit pursuant to Section 1002 may possess a shark fin or fins consistent with that license or permit.

(d) Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess a shark fin or fins consistent with that license or permit.

(e) Before January 1, 2013, any restaurant may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that restaurant, as of January 1, 2012, that is prepared for consumption.

CREDIT(S)

(Added by Stats.2011, c. 524 (A.B.376), § 2.)

HISTORICAL AND STATUTORY NOTES

2013 Electronic Pocket Part Update

2011 Legislation

Sections 1 and 3 of Stats.2011, c. 524 (A.B.376), provide:

"SECTION 1. The Legislature finds and declares all of the following:

"(a) Sharks, or elasmobranchs, are critical to the health of the ocean ecosystem.

"(b) Sharks are particularly susceptible to decline due to overfishing because they are slow to reach reproductive maturity and birth small litters, and cannot rebuild their populations quickly once they are overfished.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

"(c) Sharks occupy the top of the marine food chain. Their decline is an urgent problem that upsets the balance of species in ocean ecosystems and negatively affects other fisheries. It constitutes a serious threat to the ocean ecosystem and biodiversity.

"(d) The practice of shark finning, where a shark is caught, its fins cut off, and the carcass dumped back into the water, causes tens of millions of sharks to die each year. Sharks starve to death, may be slowly eaten by other fish, or drown because most sharks need to keep moving to force water through their gills for oxygen.

"(e) Data from federal and international agencies show a decline in shark populations worldwide.

"(f) California is a market for shark fin and this demand helps drive the practice of shark finning. The market also drives shark declines. By impacting the demand for shark fins, California can help ensure that sharks do not become extinct as a result of shark finning.

"(g) Shark fin often contains high amounts of mercury, which has been proven dangerous to consumers' health."

"SEC. 3. No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution."

CROSS REFERENCES

    Shark fins, sale or possession of shark carcass, skin, or fin for taxidermy purposes not prohibited by this section, see Fish and Game Code § 2021.5.

West's Ann. Cal. Fish & G. Code § 2021, CA FISH & G § 2021

Current with all 2012 Reg.Sess. laws, Gov.Reorg.Plan No. 2 of 2011-2012, and all propositions on 2012 ballots.

(C) 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT



C

**Effective: January 1, 2012**

West's Annotated California Codes Currentness
   Fish and Game Code (Refs & Annos)
      Division 3. Fish and Game Generally
         Chapter 1. Taking and Possessing in General (Refs & Annos)
         **➡➡ § 2021.5. Shark fins; possession or donation by persons holding license or permit to take or land sharks for recreational or commercial purposes; possession, sale, offer for sale, trade, or distribution of shark fins possessed as of Jan. 1, 2012; sale or possession for taxidermy purposes; annual report to Legislature**

(a) Notwithstanding Section 2021, all of the following provisions apply:

(1) Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess, including for purposes of consumption or taxidermy, or may donate to a person licensed or permitted pursuant to Section 1002, a shark fin or fins consistent with that license or permit.

(2) Before July 1, 2013, any person may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that person, as of January 1, 2012.

(3) Nothing in Section 2021 prohibits the sale or possession of a shark carcass, skin, or fin for taxidermy purposes pursuant to Section 3087.

(b)(1) The Ocean Protection Council shall submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood, as defined in Section 35550 of the Public Resources Code, and adopted by the Ocean Protection Council pursuant to Section 35617 of the Public Resources Code, including chain of custody standards.

(2) A report to be submitted pursuant to paragraph (1) shall be submitted in compliance with Section 9795 of the Government Code.

CREDIT(S)

(Added by Stats.2011, c. 525 (A.B.853), § 1.)

HISTORICAL AND STATUTORY NOTES

2013 Electronic Pocket Part Update

2011 Legislation

Section 2 of Stats.2011, c. 525 (A.B.853), provides:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

"SEC. 2. This act shall become operative only if Assembly Bill 376 [Stats.2011, c. 524] of the 2011-12 Regular Session is enacted and takes effect on or before January 1, 2012."

West's Ann. Cal. Fish & G. Code § 2021.5, CA FISH & G § 2021.5

Current with all 2012 Reg.Sess. laws, Gov.Reorg.Plan No. 2 of 2011-2012, and all propositions on 2012 ballots.

(C) 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Assembly Bill No. 376**

CHAPTER 524

An act to add Section 2021 to the Fish and Game Code, relating to sharks.

[Approved by Governor October 7, 2011. Filed with
Secretary of State October 7, 2011.]

LEGISLATIVE COUNSEL'S DIGEST

AB 376, Fong. Shark fins.

Existing law makes it unlawful to possess any bird, mammal, fish, reptile, or amphibian, or parts thereof, taken in violation of any of the provisions of the Fish and Game Code, or of any regulation made under it.

This bill, except as specified, would make it unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin, as defined.

The bill, by creating a new crime, would impose a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1. The Legislature finds and declares all of the following:

(a) Sharks, or elasmobranchs, are critical to the health of the ocean ecosystem.

(b) Sharks are particularly susceptible to decline due to overfishing because they are slow to reach reproductive maturity and birth small litters, and cannot rebuild their populations quickly once they are overfished.

(c) Sharks occupy the top of the marine food chain. Their decline is an urgent problem that upsets the balance of species in ocean ecosystems and negatively affects other fisheries. It constitutes a serious threat to the ocean ecosystem and biodiversity.

(d) The practice of shark finning, where a shark is caught, its fins cut off, and the carcass dumped back into the water, causes tens of millions of sharks to die each year. Sharks starve to death, may be slowly eaten by other fish, or drown because most sharks need to keep moving to force water through their gills for oxygen.

(e) Data from federal and international agencies show a decline in shark populations worldwide.

95

(f)  California is a market for shark fin and this demand helps drive the practice of shark finning. The market also drives shark declines. By impacting the demand for shark fins, California can help ensure that sharks do not become extinct as a result of shark finning.

(g)  Shark fin often contains high amounts of mercury, which has been proven dangerous to consumers' health.

SEC. 2.  Section 2021 is added to the Fish and Game Code, to read:

2021.  (a)  As used in this section "shark fin" means the raw, dried, or otherwise processed detached fin, or the raw, dried, or otherwise processed detached tail, of an elasmobranch.

(b)  Except as otherwise provided in subdivisions (c), (d), and (e), it shall be unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin.

(c)  Any person who holds a license or permit pursuant to Section 1002 may possess a shark fin or fins consistent with that license or permit.

(d)  Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess a shark fin or fins consistent with that license or permit.

(e)  Before January 1, 2013, any restaurant may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that restaurant, as of January 1, 2012, that is prepared for consumption.

SEC. 3.  No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

O

**Assembly Bill No. 853**

CHAPTER 525

An act to add Section 2021.5 to the Fish and Game Code, relating to sharks.

[Approved by Governor October 7, 2011. Filed with
Secretary of State October 7, 2011.]

LEGISLATIVE COUNSEL'S DIGEST

AB 853, Fong. Sharks.

Existing law makes it unlawful to possess any bird, mammal, fish, reptile, or amphibian, or parts thereof, taken in violation of any of the provisions of the Fish and Game Code, or of any regulation made under it.

This bill would create exemptions from a shark fin prohibition proposed by AB 376. The bill would require the Ocean Protection Council to submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood, as provided. The provisions of the bill would become operative only if AB 376 is enacted and takes effect on or before January 1, 2012.

*The people of the State of California do enact as follows:*

SECTION 1.  Section 2021.5 is added to the Fish and Game Code, to read:

2021.5.  (a)  Notwithstanding Section 2021, all of the following provisions apply:

(1)  Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess, including for purposes of consumption or taxidermy, or may donate to a person licensed or permitted pursuant to Section 1002, a shark fin or fins consistent with that license or permit.

(2)  Before July 1, 2013, any person may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that person, as of January 1, 2012.

(3)  Nothing in Section 2021 prohibits the sale or possession of a shark carcass, skin, or fin for taxidermy purposes pursuant to Section 3087.

(b)  (1)  The Ocean Protection Council shall submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood, as defined in Section 35550 of the Public Resources Code, and adopted by

93

the Ocean Protection Council pursuant to Section 35617 of the Public Resources Code, including chain of custody standards.

(2)  A report to be submitted pursuant to paragraph (1) shall be submitted in compliance with Section 9795 of the Government Code.

SEC. 2.  This act shall become operative only if Assembly Bill 376 of the 2011–12 Regular Session is enacted and takes effect on or before January 1, 2012.

O