14-15781

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**CHINATOWN NEIGHBORHOOD ASSOCIATION; et al.,**

Plaintiffs-Appellants,

v.

**KAMALA HARRIS, Attorney General of the State of California, in her official capacity; et al.,**

Defendants-Appellees,

**THE HUMANE SOCIETY OF THE UNITED STATES; et al.,**

Intervenors-Defendants-Appellees.

---

On Appeal from the United States District Court
for the Northern District of California

No. 12-cv-03759
The Honorable William H. Orrick, Judge

### DEFENDANTS-APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
TAMAR PACHTER
Supervising Deputy Attorney General

ALEXANDRA ROBERT GORDON
State Bar No. 207650
Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-5509
 Fax: (415) 703-5480
 Email:
 Alexandra.RobertGordon@doj.ca.gov
 *Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

**Doc. No.**                                                              **Page**

70       Transcript of Proceedings of the Official Electronic Sound Recording (March 19, 2014)......SER000001

48       Defendants' Request for Judicial Notice in Support of Motion to Dismiss; Declaration of Alexandra Robert Gordon ......................................SER000031

48-1       Exhibit A: January 2, 2013 Order Denying Motion for Preliminary Injunction..........................SER000036

48-2       Exhibit B: August 27, 2013 Memorandum Decision of the Ninth Circuit Court of Appeals .....SER000052

63-1       Defendants' Supplemental Request for Judicial Notice in Support of Motion to Dismiss; Declaration of Alexandra Robert Gordon...............SER000057

63-2       Exhibit D: Letter from Director Charlton H. Bonham to Eileen Sobeck, Assistant Administrator for Fisheries, National Oceanic and Atmospheric Administration...................................SER000061

63-3       Exhibit E: Letter from Eileen Sobeck to Director Charlton H. Bonham, California Department of Fish & Wildlife ......................................................SER000064

63-4       Exhibit F: E165 Congressional Record (February 5, 2014) ..................................................................SER000067

22-2       Declaration of Leila Monroe in Support of Motion for Leave to File Amicus Curiae ............................SER000070

22-3       Declaration of Dr. John E. McCosker in Support of Motion for Leave to File Brief as Amicus Curiae.................................................................SER000080

22-4       [Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction ......................................SER000120

i

1         UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3     BEFORE THE HONORABLE WILLIAM H. ORRICK, JUDGE

4

5

6  CHINATOWN NEIGHBORHOOD          )
   ASSOCIATION, ET AL.,            )
7                                  )   NO. CV-12-03759 WHO
                    PLAINTIFFS,    )
8                                  )   SAN FRANCISCO, CALIFORNIA
       VERSUS                      )
9                                  )
   EDMUND BROWN, ET AL.,           )   MARCH 19, 2014
10                                 )
                    DEFENDANTS.    )   PAGES 1 - 28
11 _____)

12

13

14    **TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC
                   SOUND RECORDING**

15

16

17

   A-P-P-E-A-R-A-N-C-E-S:
18

   **FOR THE PLAINTIFF:**     BREALL & BREALL LLP
19                            BY:  **JOSEPH BREALL, ESQ,**
                                   **JILL DIAMOND, ESQ.**
20                            1550 BRYANT STREET, STE 575
                              SAN FRANCISCO, CA  94103
21

   **FOR THE DEFENDANT:**     ATTORNEY GENERAL'S OFFICE
22                            BY:  **ALEXANDRA GORDON, ESQ.**
                              455 GOLDEN GATE AVENUE, STE 11000
23                            SAN FRANCISCO, CA  94102

24 (APPEARANCES CONTINUED ON NEXT PAGE.)

25 TRANSCRIBED BY:    GINA GALVAN COLIN, TRANSCRIBER

1

1     <u>APPEARANCES CONTD:</u>

2     **FOR THE INTERVENOR:**      SCHIFF HARDIN LLP
                                   BY:   **BRUCE WAGMAN, ESQ.**
3                                        **RALPH HENRY, ESQ.**
                                   ONE MARKET, SPEAR STREET TOWER
4                                  32ND FLOOR
                                   SAN FRANCISCO, CA  94105

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                        2

1    WEDNESDAY, MARCH 19, 2014                    2:09 P.M.

2                    P R O C E E D I N G S

3          THE CLERK:  CALLING CIVIL MATTER 12-3759, CHINATOWN

4    NEIGHBORHOOD ASSOCIATION, ET AL., VERSUS EDMUND BROWN, ET AL.

5          COUNSEL, PLEASE COME FORWARD AND STATE YOUR

6    APPEARANCE.

7          MR. BREALL:  GOOD AFTERNOON, YOUR HONOR.

8          JOSEPH BREALL AND JILL DIAMOND FOR THE PLAINTIFFS.

9          THE COURT:  MR. BREALL, MS. DIAMOND.

10         MS. GORDON:  GOOD AFTERNOON, YOUR HONOR.

11         ALEXANDRA ROBERT GORDON FOR DEFENDANTS, ATTORNEY

12   GENERAL HARRIS, AND DIRECTOR OF THE DEPARTMENT OF FISH AND

13   WILDLIFE BONHAM.

14         MR. WAGMAN:  GOOD AFTERNOON, YOUR HONOR.

15         BRUCE WAGMAN FOR THE INTERVENOR-DEFENDANTS,

16   MONTEREY BAY AQUARIUM, ASIAN PACIFIC AMERICAN OCEAN HARMONY

17   ALLIANCE, AND THE HUMANE SOCIETY OF THE UNITED STATES.

18         THE COURT:  EVERYONE.

19         MR. HENRY:  RALPH HENRY ALSO FOR

20   INTERVENOR-DEFENDANTS.  THANK YOU.

21         THE COURT:  GOOD AFTERNOON.

22         SO I CAN TELL YOU ALL THAT MR. BREALL AND I HAD

23   CHILDREN TOGETHER IN ELEMENTARY SCHOOL MANY, MANY YEARS AGO.

24   IT'S BEEN A WHILE SINCE I'VE SEEN YOU, BUT A PLEASURE TO SEE

25   YOU.

3

1        SO LET ME SET THE STAGE FOR THE ARGUMENT, IF I CAN.

2    AND THEN I THINK I'LL ASK MR. BREALL TO PROCEED FIRST.

3        SO THE CALIFORNIAN'S SHARK FIN LAW PROHIBITS THE

4    POSSESSION OR SALE OF A SHARK FIN. AND THERE ARE OFFICIAL

5    FINDINGS THAT SUPPORT THE LAW, INCLUDING THAT: SHARKS ARE

6    CRITICAL TO THE HEALTH OF THE OCEAN'S ECOSYSTEM; THAT SHARK

7    FINNING CAUSES TENS OF MILLIONS OF SHARKS TO DIE EACH YEAR;

8    THAT CALIFORNIA IS A MARKET FOR SHARK FINS; AND THAT THE FIN

9    CONTAINS DANGEROUS AMOUNTS OF MERCURY.

10        THE LAW IMPACTS CHINESE AMERICANS IN CALIFORNIA,

11    MORE THAN OTHERS, ARGUABLY BECAUSE AMONG OTHER REASONS OF

12    CULTURAL AND CEREMONIAL TRADITIONS. SO THE ISSUES ARE WHETHER

13    THE LAW VIOLATES THE EQUAL PROTECTION CLAUSE, THE DORMANT

14    COMMERCE CLAUSE, OR IS PREEMPTED IN SOME WAY.

15        I'M BOUND BY LEGAL CONCLUSIONS OF, FROM THE NINTH

16    CIRCUIT'S OPINION, I THINK, IN TWO WAYS. ONE, THE NINTH

17    CIRCUIT HELD THAT THE LAW IS FACIALLY NEUTRAL. IT IS ANYWAY

18    BUT I'M BOUND BY THAT. SECOND, THAT EXPRESS AND FIELD

19    PREEMPTION DON'T APPLY.

20        SO, IN ADDRESSING THE THREE ISSUES THAT I'M LOOKING

21    AT, I'LL TELL YOU HOW I'M LEANING. WITH RESPECT TO THE EQUAL

22    PROTECTION CLAUSE, BECAUSE THE LAW IS FACIALLY NEUTRAL, THE

23    PLAINTIFFS WOULD HAVE TO SHOW DISCRIMINATORY INTENT. AND I

24    DON'T THINK IT'S ESTABLISHED BY THE COMMENTS OF ASSEMBLYMAN

25    FONG OR THE EXECUTIVE DIRECTOR OF WILD AIDE.

4

1            AND ALTHOUGH THERE'S DISPROPORTIONATE IMPACT

2     ALLEGED, THAT'S NOT ENOUGH TO SHOW INTENT.  SO A REVIEW WOULD

3     BE ON RATIONAL BASIS GROUND.  AND I THINK THE LEGISLATIVE

4     FINDINGS SUPPORT THE RATIONAL BASIS.  SO THAT'S, THAT'S HOW I'M

5     THINKING ABOUT EQUAL PROTECTION.

6            WITH RESPECT TO THE DORMANT COMMERCE CLAUSE, THE

7     LAW SIMPLY REGULATES POSSESSION AND SALE WITHIN THE STATE.  I

8     DON'T THINK IT'S A BURDEN ON INTERSTATE COMMERCE, AND I DON'T

9     THINK PIKE APPLIES.

10           WITH RESPECT TO PREEMPTION, THERE'S NO CONFLICT

11    WITH THE FEDERAL LAW THAT I CAN SEE.  AND THE FEDERAL

12    GOVERNMENT HAS OBVIOUSLY CHANGED ITS PERSPECTIVE ON THAT ISSUE,

13    BUT THE LAWS SEEM CONSISTENT.

14           SO, MR. BREALL, THAT'S YOUR, YOUR BATTLE.

15           **MR. BREALL:**  I HAVE A DIFFICULT TASK, YOUR HONOR.

16    SO LET'S SEE WHAT I CAN DO HERE.

17           FIRST, I DO NOT BELIEVE THAT YOU'RE BOUND BY ANY

18    RULINGS OR FINDINGS IN THE NINTH CIRCUIT.  AND THE REASON I SAY

19    THAT IS WHAT THE NINTH CIRCUIT BASICALLY DID, IN IT'S NOT VERY

20    LENGTHY DECISION, WAS TO SAY THAT THE DECISION ON THE

21    PRELIMINARY INJUNCTION WOULD BE UPHELD.  AND THERE IS -- AND

22    IT'S CITED IN MY BRIEF -- SPECIFIC CASE LAW THAT BASICALLY SAYS

23    THAT DECISION, WHICH THE NINTH CIRCUIT SIMPLY SAID THERE WAS NO

24    ABUSE OF DISCRETION IN GRANTING THAT DECISION, CANNOT BE SORT

25    OF A LAW-OF-THE-CASE DECISION.

                                                              5

1      AND SO THEREFORE -- AND WHAT THE NINTH CIRCUIT

2  ACTUALLY SPECIFICALLY SAID WAS THAT DETERMINATION WE'RE NOT

3  GOING TO UNDO BECAUSE WE FEEL THAT JUDGE WHO MADE IT DID NOT

4  ABUSE HER DISCRETION IN FINDING IT.  THE NINTH CIRCUIT DIDN'T

5  SPECIFICALLY SAY WE HAVE REVIEWED THIS AND WE SPECIFICALLY FIND

6  THESE THINGS THAT WE'RE GOING TO DISCARD WHAT THE COURT SAID.

7  THAT'S NUMBER ONE.  AND THAT GOES TO THE, THE ISSUE OF FACIALLY

8  NEUTRAL LAW.  AND IT GOES ON TO A FEW OTHER THINGS DEALING WITH

9  EQUAL PROTECTION.

10      AS TO THE COMMERCE CLAUSE, IT ALSO DIDN'T MAKE A

11  DECISION ON THE COMMERCE CLAUSE.  IN FACT, IT SAID THAT THERE

12  WERE INTERESTING ISSUES THAT WERE BROUGHT UP IN THE NINTH

13  CIRCUIT IN AMICUS BRIEFS THAT REALLY WEREN'T EVEN DISCUSSED OR

14  CONSIDERED BY THE JUDGE IN THE PRELIMINARY INJUNCTION HEARING.

15  AND THE DISTRICT COURT -- WHICH IS YOU -- SHOULD CONSIDER THOSE

16  IF THEY'RE RAISED DOWN BELOW.  WHICH I BELIEVE THEY ARE RAISED,

17  IT'S IF THEY WERE ATTEMPTED TO BE RAISED IN THE FIRST AMENDED

18  COMPLAINT.

19      AGAIN, IN TERMS OF PREEMPTION, THE COURT SAID THAT

20  THE ISSUE OF CONFLICT PREEMPTION WAS NOT RAISED IN THE MOTION

21  FOR PRELIMINARY INJUNCTION.  THIS IS A DIFFERENT ISSUE.  IT'S A

22  NEW ISSUE.  AND ALTHOUGH THE COURT SEEMED TO THINK IT WAS AN

23  INTERESTING ISSUE, THEY SAID WE DON'T HAVE TO DECIDE THIS ISSUE

24  RIGHT NOW.

25      **THE COURT:**  RIGHT.  NO, I AGREE WITH YOU ON

6

1    CONFLICT PREEMPTION; THAT THAT'S SOMETHING THAT'S UP IN THE AIR

2    FOR YOU.

3                   **MR. BREALL:** THAT IT SHOULD GO BACK DOWN.

4             AND SO THAT LEAVES US TO GO BACK OVER THE SECOND

5    AMENDED COMPLAINT. AND I THINK TO DO THAT WE REALLY NEED TO

6    LOOK AT, YOU KNOW, WHY WE'RE HERE. AND WE'RE HERE FOR A MOTION

7    TO DISMISS. AND THE STANDARD ON A MOTION TO DISMISS IS THAT

8    THERE HAS TO BE EVIDENCE OF A REASONABLE INFERENCE, THAT THE

9    COURT CAN FIND A REASONABLE INFERENCE BASED ON THE EVIDENCE

10   ALLEGED TO ALLOW THE CASE TO GO FORWARD.

11            AND I THINK -- SO I WANT TO ADDRESS THE ISSUE FIRST

12   ON EQUAL PROTECTION, WHEN THE COURT SAYS, YOU KNOW, THAT THE

13   STATEMENTS OF THE ASSEMBLYMAN AND THE SPONSORS ARE NOT ENOUGH

14   EVIDENCE FOR A REASONABLE INFERENCE FOR THE COURT TO USE THAT.

15   AND I WOULD POINT THE COURT, YOU KNOW, SPECIFICALLY TO THE

16   CASES THAT WE CITED IN OUR BRIEF. INCLUDING THE CASE THAT

17   DEALT WITH THE HINDI, WITH THE HINDU TEXTBOOKS, WHICH IS THE

18   CAL. PARENTS CASE.

19            AND IN THE CAL. PARENTS CASE THERE WAS DISCUSSION

20   DURING DETERMINATION OF LANGUAGE THAT SHOULD GO BE IN THE

21   TEXTBOOK. AND THE DISCUSSION WAS DEROGATORY TOWARD HINDUS.

22   NOW, THERE WAS ALSO A LOT OF OTHER DISCUSSIONS, A LOT OF OTHER

23   REASONS, AND LEGITIMATE REASONS. AND THE COURT SAID, FOR A

24   MOTION TO DISMISS THAT IS ENOUGH EVIDENCE FOR THE COURT TO SAY

25   ITS MET ITS BURDEN.

                                                                    7

1        IS IT ENOUGH EVIDENCE TO WIN A CASE?  PROBABLY NOT,

2   OR MAYBE NOT THE COURT SAYS.  BUT THE COURT SAYS THAT REALLY

3   GOES TO THE WEIGHT OF THE EVIDENCE.  THAT'S MUCH LATER DOWN THE

4   ROAD.  THAT'S A SUMMARY JUDGMENT MOTION THAT WE DON'T HAVE

5   HERE.  AND THE COURT CAN'T SAY BECAUSE YOU DON'T HAVE ENOUGH

6   EVIDENCE, I AM GOING TO HAVE TO DISMISS THIS CASE.

7        AND, AS A MATTER OF FACT, EVEN IN THE MOTION FOR

8   INJUNCTIVE RELIEF THE COURT SAID, LET THE PLAINTIFFS HAVE

9   ANECDOTAL EVIDENCE.  AND IT LISTED A LOT OF THE ANECDOTAL

10  EVIDENCE.  AND WE PUT IN THE PAPERS ALL, ALL OF THE CASE LAW.

11  IT SAYS THE EVIDENCE DOESN'T HAVE TO BE DIRECT; IT CAN BE

12  INDIRECT EVIDENCE.  AND SO I WOULD ASK THE COURT REALLY TO

13  REVIEW THAT AGAIN.  BECAUSE I THINK THERE IS ENOUGH FOR THIS

14  STANDARD.  THERE'S CLEARLY EVIDENCE.

15        THE COURT HAS ACTUALLY IDENTIFIED IT, IN ITS

16  STATEMENT OF HOW IT WAS LEANING.  AND WHEN YOU LOOK AT THAT

17  STANDARD AND APPLY THAT, ESPECIALLY WHEN IT IS THE PLAINTIFF

18  THAT ALL INFERENCE ARE SUPPOSED TO BE GIVEN TO IN DETERMINING

19  THIS, I THINK THE COURT HAS TO RELOOK AT THAT AND SAY, YES, YOU

20  HAVE MAYBE ENOUGH TO MEET THIS BAR.  AND THE COURT MAY BE

21  SAYING YOU HAVE A VERY HIGH BAR LATER ON.  BUT FOR THIS HURDLE,

22  THIS LOW HURDLE, I THINK THAT THERE IS SUFFICIENT EVIDENCE.

23        **THE COURT:**  SO ON THE LOW HURDLE, DO YOU HAVE ANY

24  OTHER EVIDENCE?

25        **MR. BREALL:**  I BELIEVE THAT THE EVIDENCE THAT WE

8

SER000008

1   HAVE SUBMITTED DEALS WITH BOTH ALL THE SPONSOR STATEMENTS, AS

2   WELL AS THE ASSEMBLYMAN STATEMENTS.  I BELIEVE THAT THERE IS

3   ALSO EVIDENCE THAT WE PUT IN THAT INDICATED THAT THE ACTUAL

4   PURPOSES THAT THE COURT AND THE COURT IDENTIFIED THAT THERE'S

5   LEGITIMATE PURPOSES, AND IT LISTED THEM, THAT THOSE ACTUALLY

6   DON'T HAVE THE BASES EVEN TO MAKE THOSE.  THAT THE SHARKS ARE

7   ENDANGERED WHEN NOAA SAYS SHARKS ARE NOT ENDANGERED.  THAT, YOU

8   KNOW, SHARK FINNING IS A TERRIBLE PRACTICE, WHEN SHARK FINNING

9   IS NOT ALLOWED IN U.S. WATERS, OR IN CALIFORNIA WATERS.

10         SO BASED UPON THE FACT THAT THE UNDERLYING

11   PRINCIPLES THAT THE COURT ANNOUNCED THAT ARE PART OF THE LAW

12   WERE SUSPECT TO BEGIN WITH, BASED ON THE EVIDENCE, AND THAT IS

13   PLED IN THE COMPLAINT, AND THE EVIDENCE OF THE STATEMENT INTENT

14   OF THE SPONSORS, AND THERE ARE CASES, THE CHURCH OF LUKUMI

15   CASE, AND OTHERS WHERE IT SAYS, THAT'S REALLY ALL YOU NEED.  IF

16   THERE IS STATEMENTS BY SPONSORS OR LEGISLATORS WHO ARE CARRYING

17   THE BILL, THAT EVEN THOUGH THE BILL IS FACIALLY WRITTEN,

18   FACIALLY NEUTRAL, THAT THOSE STATEMENTS BY THOSE LEGISLATORS

19   SHOWING A DISCRIMINATORY INTENT ARE ENOUGH, CLEARLY AT THIS

20   STAGE, TO SAY, YOU'VE GOT TO LET THIS ONE PASS.

21         I'LL GO ON THEN TO THE COMMERCE CLAUSE.  AND I

22   THINK THE COMMERCE CLAUSE, AS IT IS PLED, AND AGAIN IT IS PLED

23   DIFFERENTLY THAN, THAN IT WAS ON, IN THE FIRST ALLITERATION OF

24   THE COMPLAINT THAT THE NINTH CIRCUIT DEALT WITH, WHICH IS WHY

25   THE NINTH CIRCUIT SAID IN AMICUS BRIEFS THAT WERE SUBMITTED

9

1     THERE'S BROADER ISSUES HERE, AND THOSE BROADER ISSUES NEED TO

2     BE LOOKED AT. AND HERE, THE ACTUAL INTENT OF THE LAW, THE

3     STATED PURPOSE OF THE LAW IS TO REGULATE EXTRATERRITORIALLY.

4                IT SAYS THAT SHARK FINNING IN FOREIGN NATIONS IS

5     OCCURRING; IT DOESN'T SAY IT'S OCCURRING HERE. AND THAT THAT

6     MARKET OF FINS ARE BROUGHT HERE. AND TO PREVENT THAT MARKET OF

7     FINS, TO STOP THE MARKET PLACE, THIS LAW IS NECESSARY. SO BY

8     ITS VERY DEFINITION IN NATURE IT IS TRYING TO LEGISLATE OUTSIDE

9     OF CALIFORNIA, TO STOP CONDUCT AND BEHAVIOR OUTSIDE OF

10    CALIFORNIA.

11               WHAT IT ALSO DOES IS IT PREVENTS COMMERCE. AND

12    THIS WAS THE POINT OF THE REVISION, BECAUSE OF THE POINT OF THE

13    AMICUS BRIEF IN THE NINTH CIRCUIT WHERE SUSTAINABLE FISHERY

14    ASSOCIATIONS ON THE EAST COAST CAME IN AND SAID YES, THIS IS

15    STOPPING COMMERCE, IT'S STOPPING US FROM SHIPPING OUR PRODUCT

16    THROUGH CALIFORNIA. OUR PRODUCT IS LEGAL WHERE WE CATCH IT IN

17    MAINE. AND IN OTHER PLACES IN BOSTON. WE'RE SUSTAINABLE, SO

18    THERE'S NOT ANY ISSUE. WE MEET THE FEDERAL RULES. WE HAVE A

19    SUSTAINABLE FISHERY SO THERE'S NO ISSUE WITH THE SPECIES

20    DECLINING, BUT WE, THIS CANNOT BE TRANSPORTED THROUGH

21    CALIFORNIA.

22               SO IT CLEARLY HAS AN EFFECT ON COMMERCE AND BECAUSE

23    OF THAT THE BROWN-FORMAN DISTILLERS CASE REALLY CONTROLS HERE.

24    WHERE IT SAYS IF YOU ARE TRULY, IF THE LAW IS TO REGULATE OUT

25    OF STATE BUSINESS -- AND HERE IT'S REGULATING

                                                          10

1    EXTRATERRITORIALLY OUT OF STATE BUSINESS; IT'S REGULATING OUT

2    OF STATE BUSINESS COMING THROUGH, I THINK, AGAIN, THE ISSUE

3    HERE IS THAT IS ENOUGH ON THIS STAGE.

4              NOW, ALSO, I HAVE TO SAY IF THAT IS ENOUGH THEN YOU

5    DO GET TO THE PIKE TEST BECAUSE THEN YOU HAVE TO LOOK AT THE

6    BENEFITS, THE LOCAL PUTATIVE BENEFITS VERSUS THE BURDENS.  NOW,

7    AND I THINK WHAT WE ESTABLISHED IS THERE'S BURDENS.

8              THEN YOU LOOK AT THE BENEFITS.  AND, AGAIN, THE

9    BENEFITS REALLY WE ESTABLISHED IN THE COMPLAINT.  AGAIN, THE

10   ALLEGATIONS OF THE COMPLAINT ARE WHAT CONTROL AT THIS STAGE.

11   AND THE ALLEGATIONS OF THE COMPLAINT, WHICH ARE FACTUAL AND I

12   BELIEVE ARE TRUE, IS THAT, AGAIN, YOU HAVE THE NOAA STATEMENTS.

13   AND THE STATEMENTS OF -- AND THE MAGNUSON ACT; AND ALL OF THESE

14   ACTS THAT SAY SHARK, THIS SHARK FIN LEGISLATION IS NOT

15   NECESSARY BECAUSE THERE IS NO SHARK FINNING HERE, SO YOU'RE NOT

16   REGULATING SOMETHING THAT'S NECESSARY IN THE UNITED STATES.

17              IT'S ALSO SAYING THAT THE VALUE OF STOPPING MERCURY

18   IS REALLY ILLUSORY, BECAUSE THERE REALLY ISN'T ANY EVIDENCE TO

19   SUGGEST THAT THERE'S A HEALTH HAZARD IN EATING THESE.  ALTHOUGH

20   THEY ARE ONE OF, ALTHOUGH SHARKS ARE ONE OF NUMEROUS APEX

21   PREDATORS THERE'S NO LAW OUTLAWING TUNA; THERE'S NO LAW

22   OUTLAWING SHARK -- OTHER PARTS OF THE SHARK.  SO YOU CAN EAT 99

23   PERCENT OF THE SHARK, AND HAVE ALL THE MERCURY YOU WANT.  BUT

24   HERE YOU CAN'T HAVE THE FINS.  AND I SAY THAT'S THE VALUE.

25              AND, YOU KNOW, THE PIKE TEST BASICALLY SAYS YOU

11

1    HAVE TO REALLY LOOK, EVEN IF THERE IS SOME BASIS FOR SUPPORTED

2    VALUE, YOU HAVE TO LOOK TO SEE IF THAT IS OUTWEIGHED BY THE

3    EFFECT ON COMMERCE.  AND AGAIN, AT THIS STAGE, I THINK THE

4    COURT SAYS, IS REQUIRED TO SAY I'VE LOOKED AT THE PLEADINGS,

5    AND THE PLEADINGS ONLY.  THAT'S WHAT I NEED TO DO HERE.  IS

6    THERE SUFFICIENT FACTS TO SUGGEST THAT COMMERCE IS BEING, YOU

7    KNOW, REGULATED EXTRATERRITORIALLY, AND IN OTHER STATES.  AND

8    THERE IS.

9          I MEAN, THERE'S THE FACTS THAT IT CAN'T COME

10   THROUGH.  THE FACT THAT IT'S INTENDED TO STOP THE MARKET, AND

11   THE MARKET IS EVEN OUTSIDE OF THE UNITED STATES.  BECAUSE WE

12   DON'T HAVE A FINNED MARKET IN THE UNITED STATES, BECAUSE THAT'S

13   ILLEGAL.  SO I THINK THERE'S ENOUGH THERE FOR THE COURT REALLY

14   TO RECONSIDER IT'S POTENTIAL TENTATIVE DECISION.  AND SAY FOR

15   THIS, I MEAN THERE ARE ENOUGH FACTS JUST ON THE PLEADING STAGE.

16         AND I, CLEARLY I UNDERSTAND WHAT THE COURT IS

17   SAYING, AND MAYBE WHAT ITS POTENTIAL VIEWS ARE.  BUT ON THIS

18   PARTICULAR MOTION I THINK THAT THE COURT HAS TO LOOK JUST AT

19   THE PLEADINGS AND SEE WHERE WE ARE.

20         FINALLY, IF WE CAN TURN TO THE SUPREMACY CLAUSE.

21   BECAUSE I THINK, I THINK -- FIRST, I THINK I NEED TO ADDRESS

22   THE NOAA LETTER BECAUSE I DIDN'T GET A CHANCE TO ADDRESS THE

23   NOAA LETTER.  BECAUSE THE NOAA LETTER DIDN'T SHOW UP UNTIL THE

24   REPLY, WHICH IS A LITTLE BIT OF AN ISSUE.  BUT LEAVING THAT

25   ASIDE, THE NOAA LETTER REALLY DOESN'T SAY ANYTHING.  THE NOAA

12

1    LETTER SAYS WE'VE CHANGED OUR MINDS.

2            IT DOESN'T HAVE ANY LEGAL ANALYSIS THAT SHOWS THAT,

3    THAT THE DOJ'S PRIOR LEGAL ANALYSIS IN ITS FILED NINTH CIRCUIT

4    AMICUS BRIEF WAS FAULTY.  IT DOESN'T GIVE A RENDERING OF CASE

5    LAW AND SAYS OH, MY GOD, WE LOOKED AT THIS STATUTE AND WE

6    APPLIED IT TO THE MOSBACHER CASE, AND WE APPLIED IT TO THE

7    CHILE'S DECISION, AND WE'VE DECIDED WE MADE AN ERROR.  IT

8    DOESN'T DO THAT AT ALL.

9            IT JUST SAYS WE TALKED TO THE HEAD OF FISH AND

10   GAME.  HE TOLD US THAT FISHERMEN CAN HOLD THE FINS.  I GUESS

11   THAT'S GOOD ENOUGH.  AND IT ISN'T GOOD ENOUGH.  AND THAT'S WHY

12   THERE IS, YOU KNOW, SPECIFIC CONFLICT PREEMPTION HERE.

13           OUR POSITION, REDRAFTED SECOND AMENDED COMPLAINT IS

14   TAKEN FROM THE EXACT ARGUMENT THAT NINTH CIRCUIT SAID REALLY

15   NEEDED TO BE EXPLORED.  AND THAT IS THE FACT THAT THE MAGNUSON

16   ACT AND THE FISHERIES THAT ARE CONTROLLED BY THE FEDERAL

17   GOVERNMENT EXCLUSIVELY IN THE EEZ STATE THAT THEIR, THEIR

18   PURPOSE IS TO CREATE MAXIMUM YIELD, MEANING THAT THE FISHERMEN

19   SHOULD BE, OR FISHERS AS THEY REFER TO THEM, SHOULD BE ABLE TO

20   SELL THE ENTIRE FISH.  AND SO THAT THIS LAW ACTUALLY HAS A

21   DIRECT, YOU KNOW, CONFLICT WITH THAT.  AND IT SAYS YOU CAN'T

22   SELL THE FIN.

23           AND THIS ARGUMENT, WELL THEY CAN POSSESS IT, AND

24   THEY CAN EAT IT; THEY CAN MOVE IT AROUND IF THEY WANTED TO, I

25   GUESS, DOESN'T ADDRESS THAT.  IT DOESN'T ADDRESS THEIR ABILITY,

13

1     AND TO BE HONEST WHEN WE WERE ARGUING IN THE NINTH CIRCUIT

2     THERE WAS THIS ISSUE AS TO WHETHER THIS ACTUALLY AFFECTED

3     COMMERCE AS WELL. BECAUSE ITS THEIR ABILITY TO PUT IT IN THE

4     COMMERCIAL STREAM OF BUSINESS. AND THE ANSWER IS NO. AND THAT

5     IS COMPLETELY OPPOSITE OF WHAT A PORTION OF THE MAGNUSON ACT IS

6     FOR AND CONTROLS.

7           AND, IN FACT, YOU KNOW, THE MOSBACHER CASE IS VERY,

8     VERY SIMILAR. AND THAT'S WHERE, UNDER THE FEDERAL LAW, YOU

9     COULD CATCH THE REDFISH, AND YOU COULD DO WHATEVER YOU WANT

10     WITH THE REDFISH, BUT YOU COULDN'T OFFLOAD IN THE STATE BECAUSE

11     THERE WAS A PREEMPTION AGAINST IT. AND THE COURT SAID THAT

12     DOESN'T WORK. IF YOU'RE ENTITLED TO CATCH THE FISH, AND UNDER

13     THE MAGNUSON ACT USE THE FISH, THEN THESE STATE PREEMPTIONS,

14     YOU KNOW, HAVE A CONFLICT. AND THEY HAVE TO GO.

15           AND SO I THINK FOR THE COURT TO ISSUE A DECISION

16     HERE ON THIS MOTION IT REALLY, IT CAN'T SIMPLY SAY HEY, NOAA

17     SAYS GO IN PEACE. BECAUSE THAT DOESN'T WORK. THERE REALLY HAS

18     TO BE AN ANALYSIS OF THE VIETNAMESE FISHERMEN CASE, AND THE

19     MOSBACHER CASE, AND THE CHILES CASE, AND THIS PREEMPTION ISSUE,

20     WHICH WE HAVE DONE IN OUR BRIEF. WHICH THE DOJ DID IN THEIR

21     AMICUS BRIEF; WHICH WE INDOPTED (SIC) INTO OUR FACTS, AND INTO

22     OUR CLAIMS IN THE SECOND AMENDED COMPLAINT.

23           AND AGAIN, USING THE STANDARD HERE, I THINK THE

24     COURT CAN SAY -- I MEAN, ACTUALLY, I'M NOT SURE THE COURT HAS

25     TO DO A DETAILED SUMMARY JUDGMENT ANALYSIS; SO LET ME BE CLEAR,

14

1    OF THE MOSBACHER, AND CHILES, AND THE VIETNAMESE FISHERMEN, AND

2    THE OTHER CASES WE CITE IN OUR BRIEF. BUT I THINK WHAT THE

3    COURT HAS TO SAY IS THERE IS AN ISSUE HERE. THERE IS AN ISSUE

4    HERE. THAT ALLEGATIONS ARE MADE ABOUT THESE FEDERAL LAWS, AND

5    THAT THERE'S FIELD PREEMPTION, OR CONFLICT, EXCUSE ME, CONFLICT

6    PREEMPTION IS PLED. THEY HAVE EVIDENCE OF IT. THERE'S CASE

7    LAW THAT DISCUSSES THIS, AND SUGGESTS THAT THIS IS A VIABLE

8    CLAIM.

9         WHAT THE COURT THEN MAY DO LATER ON A SUMMARY

10   JUDGEMENT MOTION, WHICH WAS MOSBACHER, AND WHICH WAS CHILES,

11   AND ITS ANALYSIS OF THIS FACTUAL SCENARIO AS THE RECORD IS THEN

12   EXPLORED VERSUS THOSE MAY BE, MAY BE DIFFERENT; MAY BE THE

13   SAME. I THINK IT'S THE SAME. BUT, AGAIN, FOR THIS STAGE, THIS

14   PLEADING STAGE, I THINK THAT THE COURT CAN'T SIMPLY SAY HEY,

15   NOAA CHANGED ITS MIND, I DON'T SEE ANYTHING HERE. I THINK IT

16   REALLY HAS TO GO BACK AND LOOK AT THAT.

17        THESE ARE ALL IN OUR BRIEF. THEY WERE DISCUSSED

18   EXPLICITLY IN THE AMICUS BRIEF WHICH WE ATTACHED. WHICH THE

19   NINTH CIRCUIT SAID I LIKE, BUT I'M NOT GOING TO RULE ON. AND

20   THEY ARE ALL PART OF OUR SECOND AMENDED COMPLAINT.

21        SO, I DON'T KNOW IF I GET TO RESERVE A REPLY, BUT I

22   THINK I'LL SIT DOWN NOW.

23        **THE COURT:** THAT WOULD BE GOOD TIMING FOR YOU.

24   AND, MY ASSUMPTION IN LOOKING OVER THIS IS THAT YOU HAVE THE,

25   YOU'VE GOT THE COMPLAINT WHERE YOU WANT IT. AM I CORRECT ABOUT

15

1  THAT?

2  **MR. BREALL:** YOU ARE CORRECT ABOUT THAT.

3  **THE COURT:** ALL RIGHT. MS. GORDON?

4  **MS. GORDON:** YOUR HONOR, I WILL TRY TO BE BRIEF. I

5  WILL PROBABLY FAIL. SO --

6  **THE COURT:** I'LL HELP YOU, IF YOU WANT ME TO.

7  **MS. GORDON:** THANK YOU. I APPRECIATE THAT.

8  SO PLAINTIFFS HAVE MADE A LOT OF THE FACT THAT THIS

9  CASE IS NOW BACK AT THE PLEADING STAGE. AND IT IS TRUE THAT AT

10  THE PLEADING STAGE WE NEED TO LOOK AT THE COMPLAINT IN THE

11  LIGHT MOST GENEROUS TO PLAINTIFFS. BUT IT IS NOT TRUE THAT WE

12  NEED TO LOOK AT THE COMPLAINT IN A VACUUM. WHICH IS WHAT

13  PLAINTIFFS SEEM TO BE SUGGESTING; THAT WE SIMPLY LOOK AT THE

14  COMPLAINT DIVORCED FROM COMMON SENSE, FROM LAW, FROM RULINGS ON

15  LEGAL CONCLUSIONS THAT HAVE ALREADY BEEN MADE, AND FROM

16  REALITY, INCLUDING THE LEGISLATIVE FINDINGS.

17  NO ONE IS ASKING PLAINTIFFS TO PROVE THEIR CASE AT

18  THE PLEADING STAGE. BUT WE ARE ASKING THAT THEY PLEAD IT

19  ADEQUATELY. THAT THEY SUGGEST THAT, EITHER THAT THEY IN FACT

20  PLEAD PLAUSIBLE CLAIMS FOR RELIEF UNDER THE EQUAL PROTECTION

21  COMMERCE AND SUPREMACY CLAUSES, OR IT -- THERE'S ANY SUGGESTION

22  THAT THEY COULD DO THAT. AND WE WOULD SAY THEY CAN'T; THEY

23  HAVE NOT; AND THEY CANNOT. AND SO WE ASK THAT THE COMPLAINT BE

24  DISMISSED WITH PREJUDICE.

25  TO BE SURE, THE NINTH CIRCUIT DID NOT DECIDE

16

1    EVERYTHING. NOT EVERYTHING WAS BEFORE IT. AND IT DID NOT LOOK

2    AT THE PLEADINGS. MOVING THOUGH AWAY FROM ITS LEGAL

3    CONCLUSIONS, OR EVEN IF WE DIDN'T RELY ON THE NINTH CIRCUIT

4    LEGAL CONCLUSIONS AS YOUR HONOR HAS POINTED OUT, THE LAW IS

5    FACIALLY NEUTRAL. THE LAW IS ENTITLED TO RATIONAL BASIS

6    REVIEW, AND IT EASILY PASSES IT. IT ENJOYS A PRESUMPTION OF

7    VALIDITY THAT NOTHING IN THE COMPLAINT OR ANYTHING ELSE IN THIS

8    LITIGATION, WHICH HAS BEEN GOING ON SINCE JULY OF 2012, HAS

9    EVER COME CLOSE TO DISPLACING.

10         IN TERMS OF EQUAL PROTECTION, THERE'S REALLY NOT

11   VERY MUCH TO SAY. IT IS RATIONAL BASIS. THERE IS NOTHING IN

12   THE COMPLAINT THAT SUGGESTS DISCRIMINATORY INTENT. THE CASES

13   RELIED UPON BY MR. BREALL, INCLUDING THE CALIFORNIA PARENTS

14   CASE, AND A NUMBER OF STATEMENTS, AS WELL AS A NUMBER OF

15   PROCEDURAL IRREGULARITIES THAT THE COURT FOUND RAISED A TRIABLE

16   ISSUE OF FACT, THAT'S VERY DIFFERENT THAN THE ONE STATEMENT,

17   WHICH IS QUITE BENIGN BY ASSEMBLYMAN FONG; AND THEN ONE FROM

18   SOMEONE'S WHO'S THE EXECUTIVE DIRECTOR OF WILD AIDE, WHO IS NOT

19   EVEN IN THE LEGISLATOR.

20         AND EVEN IF WE COULD POSSIBLY COME UP WITH AN

21   INFERENCE OF POSSIBLE DISCRIMINATORY INTENT FROM ASSEMBLYMAN

22   FONG'S STATEMENT, WHICH I DON'T THINK IS REALLY REASONABLE,

23   YOU'D HAVE TO WEIGH IT AGAINST THE LEGISLATIVE FINDINGS. AND

24   WE HAVE A VERY PLAUSIBLE ALTERNATIVE EXPLANATION THAT NOTHING

25   IN THE COMPLAINT CAN DISPLACE.

17

1          IT'S NOT THE CASE, AS MR. BREALL HAS SAID, THAT ALL

2     YOU HAVE TO DO IS SHOW STATEMENTS.  YOU HAVE TO SHOW STATEMENTS

3     THAT RAISE A REASONABLE INFERENCE, A PLAUSIBLE INFERENCE OF

4     DISCRIMINATORY INTENT.  THAT HAS NOT HAPPENED HERE.

5          WITH RESPECT TO THE COMMERCE CLAUSE, AGAIN, THERE'S

6     A PRESUMPTION OF VALIDITY.  THIS IS RATIONAL BASIS.  IT IS

7     SIMPLY INCORRECT -- FIRST OF ALL, THE NINTH CIRCUIT DID NOT

8     SUGGEST THAT THE COURT SHOULD LOOK AT IT, OR HAVE TO LOOK AT

9     IT, OR THAT THERE IS ANY MERIT TO THE ARGUMENTS RAISED BY

10    AMICUS; SIMPLY SAID THE COURT COULD LOOK AT IT IF IT WERE

11    RAISED.  IT'S BEEN RAISED, TO THE EXTENT THAT IT'S GOING TO BE,

12    IN THE COMPLAINT.

13

14          **THE COURT:**  I HAVE TO LOOK AT IT.

15          **MS. GORDON:**  RIGHT.  AND, YOU KNOW, IT SIMPLY DOES

16    NOT STATE A PLAUSIBLE COMMERCE CLAUSE CLAIM.  AN EFFECT ON

17    COMMERCE, IN AND OF ITSELF, IS NOT AN EXTRATERRITORIAL

18    REGULATION.  FOR THAT REASON, BROWN-FORMAN AND PRICE CONTROL

19    CASES ARE COMPLETELY INEPT.  AND BOTH THE SUPREME COURT AND THE

20    NINTH CIRCUIT HAVE SAID THAT THEY HAVE NO APPLICATION OUTSIDE

21    OF PRICE CONTROL CASES.

22          AN EXTRATERRITORIAL REGULATION IS ONE THAT CONTROLS

23    OR REGULATES COMMERCE IN OTHER STATES WITH NO NEXUS WHATSOEVER

24    TO THE REGULATING STATE.  ALL WE HAVE TO DO IS READ THE STATUTE

25    TO SEE THAT ALL WE'RE DOING IS REGULATING THE MARKET FOR SHARK

18

1    FIN WITHIN CALIFORNIA.  THAT MAY HAVE AN EFFECT ON OUT OF STATE

2    COMMERCE, THAT MAY HAVE BEEN ONE OF THE LEGISLATURE'S GOALS,

3    WAS TO INFLUENCE BEHAVIOR.  AND THAT MAKES NO DIFFERENCE.

4         IT ALSO, IN EFFECT, DOESN'T EQUAL SUBSTANTIAL

5    BURDEN.  AND BECAUSE IT DOESN'T, AND BECAUSE THERE'S NO

6    ALLEGATION OF DISCRIMINATION NOR COULD THERE BE, WE DON'T

7    REALLY NEED TO TALK ABOUT NOAA'S VIEWS ABOUT WHETHER OR NOT

8    SHARKS ARE ALL ENDANGERED OR WHETHER WE COULD HAVE SUSTAINABLE

9    FISHING.  WE DON'T NEED TO TALK ABOUT HOW THE LAW COULD BE

10   BETTER.  OR HOW WE MIGHT HAVE ALSO OUTLAWED TUNA OR THE REST OF

11   THE SHARK.

12        AND, IN FACT, THERE ARE VERY SOUND REASONS FOR NOT

13   OUTLAWING THE REST OF THE SHARK; PEOPLE DON'T TEND TO EAT IT.

14   WE DON'T NEED TO DISCUSS THAT BECAUSE WE DON'T LOOK AT WHETHER

15   OR NOT THE LAW, THE BENEFITS ARE ILLUSORY.  WE DON'T LOOK AT

16   THE PUTATIVE BENEFITS AT ALL.  WE DON'T DO PIKE BALANCING

17   BECAUSE NO SUBSTANTIAL BURDEN HAS BEEN ALLEGED.

18        FINALLY, WITH RESPECT TO THE SUPREMACY CLAUSE, I

19   APOLOGIZE IF THE TIMING OF THE NOAA LETTER IS PROBLEMATIC FOR

20   MR. BREALL.  IT'S REALLY A FUNCTION OF A FEDERAL GOVERNMENT AND

21   A STATE GOVERNMENT WORKING TOGETHER.  AND, YOU CAN IMAGINE,

22   EACH ONE IS VERY SLOW.  AND, PUT TOGETHER, THERE'S SYNERGISTIC

23   SLOWNESS.  AND THAT'S WHEN THE LETTER CAME IN.

24        IN FACT, REALLY, ALL THAT WE REALLY GET FROM THE

25   NOAA LETTER IS THAT, AS FAR AS I'M CONCERNED, THERE WAS NEVER

19

1    ANY REASON TO CONSIDER THEIR ORIGINAL BRIEF OR STATEMENT.  WE

2    DON'T REALLY NEED TO LOOK AT THIS ONE FOR ITS SUBSTANCE.  IT

3    BASICALLY TELLS US THEY'VE CHANGED THEIR MIND, TO THE EXTENT

4    THAT THERE WAS ANY TEMPTATION TO LOOK AT THEIR EARLIER

5    POSITION, THERE'S NO NEED TO DO THAT.  THEY'VE REFUDIATED IT.

6              MR. BREALL IS CORRECT, THE LEGAL ANALYSIS STILL

7    NEEDS TO HAPPEN ABOUT WHETHER OR NOT THE LAW IS PREEMPTED.  BUT

8    THE LEGAL ANALYSIS MAKES IT EXTREMELY CLEAR THAT THERE'S

9    NOTHING THAT THE FEDERAL GOVERNMENT HAS AUTHORITY OVER THAT

10   THIS STATE LAW IN ANY WAY IMPACTS.

11             THE CASES, SUCH AS MOSBACHER AND THE OTHER CASES

12   THAT ARE CITED BY PLAINTIFFS, ARE CASES THAT HAVE TO DO WITH

13   STATE REGULATION IN THE EEZ, THE EXCLUSIVE ECONOMIC ZONE.  AND

14   WE KNOW THAT THE FEDERAL GOVERNMENT HAS COMPLETE AUTH -- ALMOST

15   COMPLETE AUTHORITY THERE.  OR THEY HAVE TO DO WITH ATTEMPTS TO

16   INTERFERE WITH LANDING.  AND THERE'S OBVIOUS -- AND THE FEDERAL

17   GOVERNMENT DOES HAVE CONTROL OVER THE LANDING OF FISH.

18             AND IT'S A CLEAR CONFLICT IF THE FEDERAL GOVERNMENT

19   TELLS YOU, YOU CAN FISH FOR A SWORDFISH OR A SHARK BUT YOU

20   CAN'T LAND IT.  WE ALLOW THE LANDING OF SHARKS THAT ARE INTACT,

21   WHICH IS WHAT FEDERAL LAW REQUIRES.  AND YOU CAN KEEP THE FIN

22   FOR A, A COMMERCIAL FISHER CAN KEEP THE FIN FOR POSSESSION OR

23   FOR HIS OWN USE.  OR THEY CAN TRANSPORT THE ENTIRE SHARK OUT OF

24   CALIFORNIA.  BUT YOU MAY NOT HAVE A DETACHED FIN FOR SALE IN

25   CALIFORNIA.

                                                            20

1        THERE'S NOTHING IN FEDERAL LAW THAT HAS ANYTHING TO

2   DO, REALLY, WITH THE SALE OF FISH PRODUCT.  AND CERTAINLY THE

3   FEDERAL GOVERNMENT DOES NOT CONTROL A STATE'S ABILITY TO

4   REGULATE ITS OWN MARKET AND TO EXCLUDE AN ITEM THAT IT FINDS TO

5   BE OFFENSIVE.  AND THAT IT HAS DONE SO UNDER ITS POLICE POWER.

6        THERE IS, OF COURSE, A PRESUMPTION AGAINST

7   PREEMPTION.  AND HERE, EVEN IF THERE WEREN'T, THERE WOULD STILL

8   BE NO APPROPRIATE FINDING.

9        SO FOR ALL OF THESE REASONS, YOUR HONOR, AND FOR

10  THE REASONS STATED IN ALL OF OUR BRIEFS, WE WOULD ASK THAT THE

11  COURT DISMISS THE FIRST AMENDED COMPLAINT WITH PREJUDICE.

12        **THE COURT:**  OKAY.  DOES THE INTERVENOR HAVE

13  ANYTHING TO ADD?  NOT THAT I THINK THAT IT'S NECESSARY.  I'M

14  NOT INVITING IT NECESSARILY, BUT --

15        **UNIDENTIFIED VOICE:** (INAUDIBLE - OUT OF MICROPHONE

16  RANGE)

17        **THE COURT:**  GO AHEAD.

18        **UNIDENTIFIED SPEAKER:**  I THINK PERHAPS MOST

19  IMPORTANT HERE IS TO RECOGNIZE THAT IN THE CONTEXT OF OUR

20  REQUEST, THAT THE COMPLAINT, THE AMENDED COMPLAINT NOW, AND AS

21  MR. BREALL POINTED OUT, THIS IS THEIR BEST EFFORT, IT SHOULD BE

22  DISMISSED WITH PREJUDICE.

23        I WANT TO POINT TO THE COURT, THE COURT HAS OUR

24  BRIEFING AND ARGUMENTS FROM STATE'S COUNSEL THUS FAR, AS TO

25  STRICT SCRUTINY, AND THE APPLICATION OF STRICT SCRUTINY ON THE

21

1    LEGAL PROTECTION CLAUSE AND COMMERCE CLAUSE.  BUT I WANT TO

2    NOTE THAT PLAINTIFFS' SORT OF ONE CONSISTENT THEORY THAT WE

3    KEEP HEARING IS THIS IDEA THAT THE SHARK FIN LAW WON'T REALLY

4    HELP SHARKS.  AND I THINK THAT THERE IS PLENTY OF EVIDENCE

5    INCLUDED IN THE OFFICIAL FINDINGS AND COMMITTEE REPORTS THAT

6    ARE LEGISLATIVE HISTORY AND JUDICIALLY NOTICEABLE THAT INDICATE

7    THAT THIS IS A POLICY DEBATE THAT'S ALREADY BEEN HAD.  AND IT'S

8    NOT A DEBATE THE PLAINTIFFS ARE ALLOWED TO BRING TO THE COURTS

9    TO RE-ARGUE.

10            AND I THINK IN THE CONTEXT OF THE STANDARDS THAT

11   THE COURT NEEDS TO LOOK AT, IN TERMS OF WHETHER THE COMPLAINT

12   PRESENTS A LEGALLY COGNIZABLE CLAIM, IT'S IMPORTANT TO NOTE

13   THAT ONCE YOU GET PAST STRICT SCRUTINY IN THE EQUAL PROTECTION

14   CONTEXT, AND IN THE COMMERCE CLAUSE CONTEXT, ONCE YOU'RE ON TO

15   RATIONAL BASIS REVIEW, AND ONCE YOU'RE LOOKING AT THE PUTATIVE

16   BENEFITS OF THE LAW -- AND THE CASE LAW IS CLEAR THAT EVEN IN

17   THE CONTEXT OF PIKE BALANCING YOU'RE STILL LOOKING AT THE

18   PUTATIVE BENEFITS OF THE LAW -- THAT THE COURT IS NOT SUPPOSED

19   TO LOOK AT THE WISDOM OR LOGIC, OR PRUDENCE OF THE LEGISLATIVE

20   CHOICE.

21            AND I THINK THAT'S CLEAR BECAUSE I DON'T THINK IT'S

22   THE CASE THAT THE PLAINTIFFS HAVE IN THEIR AMENDED COMPLAINT.

23   AND I DON'T THINK IT'S THE CASE THAT THEY COULD, IF THEY WERE

24   GIVEN LEAVE TO AMEND AGAIN, PRESENT ANYTHING BUT A FURTHERANCE

25   OF THE POLICY DEBATE THAT THEY'VE ALREADY LOST.  AND THAT'S NOT

22

1  APPROPRIATE, I THINK, AT THIS STAGE AND IN THIS VENUE.

2              AS TO THE PARTICULAR CLAIMS ON EQUAL PROTECTION, I

3  WOULD JUST LIKE TO NOTE THAT IN THE SORT OF CHIEF CASES RELIED

4  ON BY THE PLAINTIFFS IN THEIR BRIEFING, AS WELL AS HERE, CAL.

5  PARENTS, CITY OF HIALEAH, THOSE CASES ARE NOTHING LIKE THE CASE

6  AT BAR.  THEY AREN'T CASES WHERE THERE ARE JUST TWO STATEMENTS

7  FROM INDIVIDUAL SUPPORTERS THAT CAN'T BE IMPUTED TO EVERYONE.

8  THEY'RE CASES WHERE, COUNSEL MENTIONED THE CAL. PARENTS CASE,

9  THE HINDU GROUP'S EDITS WERE SUBJECT TO REQUIREMENTS THAT NO

10  OTHER GROUPS WERE IN TERMS OF THE BOOKS THAT WERE PUT OUT

11  THERE.  THE STATE ONLY BROUGHT IN EXPERTS THAT WERE, HAD ANIMUS

12  TOWARDS HINDU RELIGION.  SO IF YOU READ THOSE CASES, AS I'M

13  SURE THE COURT WILL, THEY ARE NOT FACTUALLY OR LEGALLY ON

14  POINT.

15              **THE COURT:**  OR HAS.

16              **UNIDENTIFIED SPEAKER:**  HAS; OR HAS.

17              AND THE, ON PREEMPTION, I WON'T SAY ANY MORE THAN

18  THE, THAN THE STATE HAS OTHER THAN TO SAY THAT -- AND WE AGREE,

19  BY THE WAY, THAT THE COURT NEED NOT LOOK AT THE NOAA LETTER.

20  WE ONLY PUT IT IN THERE BECAUSE THE PLAINTIFFS RAISED A

21  PROPOSED RULE IN AN AMICUS BRIEF, AND NOAA IS CONSPICUOUSLY

22  ABSENT HERE.

23              BUT I WOULD ITERATE THAT FEDERAL AGENCIES AND THE

24  FEDERAL GOVERNMENT HAVE NO POLICE POWER, NO GENERAL POLICE

25  POWER.  THEY ARE LIMITED IN THEIR AUTHORITY.  AND IN THE MSA,

23

1    IF YOU LOOK TO THE MSA, THE ONLY AUTHORITY THAT THE FEDERAL

2    GOVERNMENT HAS TO REGULATE POST LANDING SALE IS LIMITED, AND

3    IT'S RESTRICTIVE.  IT ONLY ALLOWS THE NATIONAL MARINE FISHERY

4    SERVICE TO RESTRICT SALE OF FISH PARTS OR PRODUCTS AFTER

5    LANDING.  AND SO THERE WOULD BE NO INSTANCE WHERE THE FEDERAL

6    GOVERNMENT COULD REGULATE IN A WAY THAT WOULD CREATE A CONFLICT

7    BOTH IN TERMS OF IMPOSSIBILITY AND IN TERMS OF OBSTACLE.  AND I

8    THINK THAT'S ALL BRIEFED VERY WELL.

9                AND THEN, I WOULD JUST ALSO NOTE THAT COUNSEL FOR

10   THE PLAINTIFFS MENTIONED THE AMICUS BRIEF FROM THE FISHERIES IN

11   THE NINTH CIRCUIT.  I ACTUALLY DISAGREE WITH THE COURT THAT YOU

12   NEED TO LOOK AT THAT BRIEF.  I ACTUALLY THINK YOU SHOULD NOT.

13   BECAUSE IT WAS FILED THERE.  IT WAS INVITED TO BE FILED AGAIN

14   HERE.  AND CONSPICUOUSLY IT'S NOT.

15                **THE COURT:**  THANKS FOR YOUR ADVICE.  BUT IS THERE

16   ANYTHING ELSE THAT YOU WANT TO ADD TO THIS ARGUMENT?

17                **UNIDENTIFIED SPEAKER:**  OH, I'M SORRY.  BUT, I JUST

18   THINK IT'S CLEAR IN RESPONSE THAT THERE WAS NOTHING

19   INCORPORATED FROM THAT BRIEF OR IN THE PLAINTIFFS' COMPLAINT ON

20   THE COMMERCE CLAUSE SIDE WHERE THEY'VE DESCRIBED THE MARKET FOR

21   FINS.  AND I THINK THAT'S COMPLETELY FATAL.

22                AND, AGAIN, IN THE PIKE BALANCING, YOU'RE LOOKING

23   AT PUTATIVE BENEFITS VERSUS THE MARKET, THE IMPACT TO THE

24   MARKET, NOT IMPACT TO INDIVIDUAL PLAYERS, INDIVIDUAL BUSINESSES

25   WITHIN CALIFORNIA AND THEIR ECONOMIC HARMS.  AND I THINK THAT'S

24

1    WELL BRIEFED.  BUT I DON'T THINK THERE'S ANYTHING IN THE

2    COMPLAINT, NOR IN THAT AMICUS BRIEF THAT SAYS ANYTHING ABOUT

3    IMPACT TO THE MARKET.  THANK YOU.

4         **THE COURT:**  OKAY.  MR. BREALL, YOU HAVE A MINUTE.

5         **MR. BREALL:**  BRIEFLY, YOUR HONOR.  FIRST OFF, I

6    WANT TO CLARIFY SOMETHING; IT'S OUR SECOND AMENDED COMPLAINT,

7    SO THE RECORD IS CLEAR.  I MAY HAVE SAID FIRST AMENDED

8    COMPLAINT.

9         SECONDLY, IT IS OUR BEST EFFORT TO DATE, YOUR

10   HONOR.  AND I DO BELIEVE THE STANDARD IS THAT THE COURT HAS TO

11   FIND BEYOND DOUBT THAT THE PLAINTIFF CANNOT, PROVE NO SET OF

12   FACTS TO SUPPORT ITS CLAIM.  SO IT'S REALLY, I MEAN, IF THE

13   COURT SAYS, YOU KNOW, THIS STILL DOESN'T MAKE IT, BUT YOU GOT

14   SOMETHING.  BUT I DON'T THINK THERE'S --

15        **THE COURT:**  BUT WHAT IS IT THAT YOU CAN ADD TO THE,

16   TO YOUR COMPLAINT?  PARTICULARLY WITH RESPECT TO DISCRIMINATORY

17   INTENT, BECAUSE YOU ARE FACING A HUGE HURDLE WITH RESPECT TO

18   RATIONAL BASIS, AND I DON'T, IT'S, I JUST, I'M JUST NOT SEEING

19   IT.  BUT, IF YOU'VE GOT SOMETHING MORE, TELL ME WHAT IT IS.

20        **MR. BREALL:**  WELL, AND, YOUR HONOR, I GUESS -- AND

21   THAT'S MY WHOLE POINT AS TO WHERE WE ARE, OKAY.  BECAUSE, FIRST

22   OF ALL, THERE ARE CASES THERE, THERE ARE CASES THAT WE CITE

23   WHERE --

24        **THE COURT:**  NO, NO, NO, NO.  JUST GIVE ME THE

25   EVIDENCE.  YOU'VE MADE YOUR ARGUMENT.  BUT GIVE ME THE EVIDENCE

25

1     THAT YOU HAVEN'T PLED, THAT YOU WOULD PLEAD, THAT COULD BOLSTER

2     YOUR ARGUMENT WITH RESPECT TO THE EQUAL PROTECTION CLAUSE AND

3     DISCRIMINATORY INTENT.

4              **MR. BREALL:**  AND, YOUR HONOR, I'M NOT SAYING THAT I

5     HAVE ANY IN MY BACK POCKET RIGHT THIS MINUTE.  BUT I DO NEED TO

6     SAY THAT WHERE THE SPONSOR OF THE BILL COMPARES THE PRACTICE OF

7     EATING SHARK FIN SOUP TO FOOT BINDING, AND WHERE ONE OF THE

8     MAIN SPONSORS SAYS WE CAN'T POLICE THE OCEAN BUT WE CAN POLICE

9     CHINATOWN, THOSE STATEMENTS IN THEMSELVES, ALONG WITH WHAT THE

10    COURT ALREADY ACKNOWLEDGES THE DESPERATE INCOME FOR THIS, FOR

11    THIS STATION, I UNDERSTAND WHAT THE COURT IS SAYING, I MIGHT

12    NOT GO ANY FARTHER THAN THIS STATION, BUT FOR THIS STATION MY

13    TICKET SHOULD BE PUNCHED.

14              **THE COURT:**  NO, I UNDERSTAND THAT ARGUMENT.

15              **MR. BREALL:**  OKAY.

16              **THE COURT:**  AND YOU'VE MADE THAT NOW.

17              **MR. BREALL:**  NO, NO, I UNDERSTAND.

18              **THE COURT:**  AND I UNDERSTAND ALL OF THE ARGUMENTS

19    THAT YOU'VE MADE.  BUT UNLESS YOU HAVE SOMETHING NEW, I WANT

20    YOU TO FINISH.

21              **MR. BREALL:**  I, I DO.  THERE'S ONLY ONE THING.  I

22    JUST HAVE TWO OTHER POINTS THAT CAME UP.

23              THE PURPOSE OF THE MAGNUSON ACT AND THE FISHERIES

24    ACTS IS MAXIMUM AND YIELD.  I'M NOT UNDERSTANDING THIS ARGUMENT

25    THAT CAME UP HERE, IT SAYS WELL, THEY CAN'T STOP, YOU KNOW,

26

1    SELLING CERTAIN PARTS. AND WE CAN'T. THEIR PURPOSE IS MAXIMUM

2    YIELD, THE MAXIMUM SALE OF FISH. AND THAT WAS ABOVE UP, UP

3    ABOVE, AND DOWN NOW IN OUR COMPLAINT. AND THAT IS THE PURPOSE.

4    AND THAT'S WHY THERE IS THIS CONFLICT.

5           AND, YOU KNOW, AND THE ARGUMENT, WELL MOSBACHER AND

6    CHILES DEALS WITH LANDING, THE COURT IS VERY SPECIFIC, LANDING

7    AND SALE. THE WHOLE PURPOSE OF THE TO LAND IT IS TO SELL THE

8    FISH. AND IF YOU'RE NOT ALLOWED TO HAVE IT INTO THE STATE, YOU

9    CAN'T SELL IT. AS A MATTER OF FACT, HERE THERE'S NO

10    POSSESSION.

11           AND ONE LAST THING, IN TERMS OF THIS, YOU KNOW,

12    THEY SAID THAT THE MARKET -- I'M GOING NOW TO THE COMMERCE

13    CLAUSE, AND THAT THIS WAS ONLY THE MARKET IN CALIFORNIA. BUT

14    IT'S NOT. THE WHOLE PACT IS THAT YOU CAN'T PASS IT THROUGH

15    CALIFORNIA. SO EVEN IF A SUSTAINABLE FISHERY WANTS TO SEND IT

16    TO THE FAR EAST, AND HAS TO LAND IT IN CALIFORNIA TO CHANGE

17    PLANES, THEY HAVE VIOLATED THE LAW. THAT GETS, IT GETS

18    CONFISCATED BECAUSE OF THE SIZE; THAT'S A $25,000 OR $250,000

19    VIOLATION. SO TO SAY THIS ONLY DEALS WITH THAT IS NOT CORRECT.

20    AND I THINK THERE, IF IT DOES REGULATE EXTRATERRITORIALLY, I'M

21    NOT EVEN SURE YOU GO TO THE PIKE TEST.

22           AND ONE LAST THING, THE PIKE TEST DOES SAY YOU

23    CAN'T JUST RELY ON WHATEVER THE LEGISLATURE SAYS. IF YOU'RE

24    GOING TO LOOK AT IT, YOU NEED TO SAY, IF THEY HAVE FINDINGS

25    THOSE FINDINGS HAVE TO BE RIGHT. AND IF THERE IS CLEAR

27

1    EVIDENCE IN THE RECORD THAT THE FINDINGS THAT NOAA SAYS, THESE

2    FINDINGS DON'T MAKE SENSE, AND THAT THERE'S, YOU KNOW, THE U.S.

3    LAWS THAT SAY THESE FINDINGS DON'T MAKE SENSE FOR THE UNITED

4    STATES, THE COURT HAS TO BALANCE THAT. THAT'S THE WHOLE

5    PURPOSE OF IT.

6             AND WITH THAT, YOUR HONOR, I'LL SIT DOWN.

7             **THE COURT:** THANK YOU. ALL RIGHT, THANK YOU FOR

8    YOUR ARGUMENT. I'LL TRY AND GET AN ORDER OUT PRETTY QUICKLY.

9    THANK YOU.

10            (WHEREUPON, PROCEEDING CONCLUDED AT 2:48 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              28

1 **CERTIFICATE OF TRANSCRIBER**

2

3    I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

4 TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF

5 THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE

6 U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE

7 PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE

8 ABOVE MATTER.

9    I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED

10 TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH

11 THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT FINANCIALLY

12 NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

13

14

15

16                    /S/  *GINA GALVAN COLIN*

17                    GINA GALVAN COLIN, TRANSCRIBER

18

19                    FRIDAY, MAY 2, 2014

20

21

22

23

24

25

1                    **CERTIFICATE OF TRANSCRIBER**

2

3          I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

4     TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF

5     THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE

6     U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE

7     PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE

8     ABOVE MATTER.

9          I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED

10    TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH

11    THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT FINANCIALLY

12    NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

13

14

15

16

17    GINA GALVAN COLIN, TRANSCRIBER

18

19          FRIDAY, MAY 2, 2014

20

21

22

23

24

25

SER000030

1    KAMALA D. HARRIS
     Attorney General of California
2    TAMAR PACHTER
     Supervising Deputy Attorney General
3    REI R. ONISHI
     Deputy Attorney General
4    ALEXANDRA ROBERT GORDON
     Deputy Attorney General
5    State Bar No. 207650
       455 Golden Gate Avenue, Suite 11000
6      San Francisco, CA 94102-7004
       Telephone: (415) 703-5509
7      Fax: (415) 703-5480
       E-mail: Alexandra.RobertGordon@doj.ca.gov
8    *Attorneys for Defendants Governor Brown, Attorney
     General Harris and Director Bonham*

9

10                  IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13

14   | | |
     |---|---|
     | **CHINATOWN NEIGHBORHOOD ASSOCIATION, a nonprofit corporation, and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT, a political action committee,** | Case No. CV 12 3759 WHO **DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS; DECLARATION OF ALEXANDRA ROBERT GORDON** |

15   **CHINATOWN NEIGHBORHOOD
     ASSOCIATION, a nonprofit corporation,**        Case No. CV 12 3759 WHO
16   **and ASIAN AMERICANS FOR
     POLITICAL ADVANCEMENT, a political**           **DEFENDANTS' REQUEST FOR
     action committee,**                             JUDICIAL NOTICE IN SUPPORT OF
17                                                    MOTION TO DISMISS; DECLARATION
                                     Plaintiffs,      OF ALEXANDRA ROBERT GORDON**
18
                 v.                                   Date:        January 15, 2014
19                                                    Time:        2:00 p.m.
                                                      Courtroom:   2, 17th Floor
20   **EDMUND G. BROWN JR., Governor of the           Judge:       The Honorable William H.
     State of California, KAMALA HARRIS,**                         Orrick, Jr.
21   **Attorney General of the State of California,   Action Filed: July 18, 2012
     and CHARLTON H. BONHAM, Director,**
22   **California Department of Fish and Game,**

23                                   Defendants,

24   **THE HUMANE SOCIETY OF THE
     UNITED STATES; ASIAN PACIFIC**
25   **AMERICAN OCEAN HARMONY
     ALLIANCE; and MONTEREY BAY**
26   **AQUARIUM FOUNDATION,**

27
                              Intervenors-Defendants.
28

                                      1

SER000031

1    **REQUEST FOR JUDICIAL NOTICE**

2    Defendants Governor Edmund G. Brown Jr., Attorney General Kamala D. Harris, and

3    California Department of Fish & Wildlife (formerly Fish and Game) Director Charlton H.

4    Bonham respectfully request that this Court take judicial notice, pursuant to Federal Rule of

5    Evidence 201, of (1) this Court's January 2, 2013 Order Denying Motion for Preliminary

6    Injunction; (2) the August 27, 2013 Memorandum Decision of the Ninth Circuit Court of

7    Appeals; and (3) the November 5, 2013 Letter from Senator John D. Rockefeller IV, Chairman,

8    Senate Committee on Commerce, Science, and Transportation, to Kathryn D. Sullivan, Acting

9    Administrator, National Oceanic and Atmospheric Administration.

10   Federal Rule of Evidence 201(b) states that "[a] judicially noticed fact must be one not

11   subject to reasonable dispute that is either (1) generally known within the territorial jurisdiction of

12   the trial court or (2) capable of accurate and ready determination by resort to sources whose

13   accuracy cannot readily be questioned." Fed. R. Evid. 201(b). Judicial notice may be taken of

14   documents filed and orders or decisions entered in any federal or state court. *See Holder v.*

15   *Holder*, 305 F.3d 854, 866 (9th Cir. 2002). It is appropriate for a court to take judicial notice of

16   prior pleadings in the same case. *See Reyna v. Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741,

17   746 n.6 (9th Cir. 1996). The Court may also take notice of facts and documents that are "not

18   subject to reasonable dispute." *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

19   Sufficient notice of matters subject to judicial notice is provided by lodging a copy of the relevant

20   documents and records with the Court. Accordingly, Defendants respectfully request that this

21   Court take judicial notice of the exhibits to the accompanying declaration of counsel.

1    Dated:  November 18, 2013                    Respectfully submitted,

2                                                 KAMALA D. HARRIS
                                                  Attorney General of California
3                                                 TAMAR PACHTER
                                                  Supervising Deputy Attorney General
4                                                 REI R. ONISHI
                                                  Deputy Attorney General
5
                                                  /s/ Alexandra Robert Gordon
6
                                                  ALEXANDRA ROBERT GORDON
7                                                 Deputy Attorney General
                                                  *Attorneys for Defendants Governor Brown,*
8                                                 *Attorney General Harris and Director*
                                                  *Bonham*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        3

SER000033

## DECLARATION OF ALEXANDRA ROBERT GORDON

I, Alexandra Robert Gordon, declare as follows:

1.      I am a Deputy Attorney General at the California Department of Justice and serve as counsel to Defendants Governor Edmund G. Brown Jr., Attorney General Kamala D. Harris, and California Department of Fish & Wildlife (formerly Fish and Game) Director Charlton H. Bonham in the above-entitled matter.

2.      Except as otherwise stated, I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness I could testify competently as to those facts.

3.      A true and correct copy of this Court's January 2, 2013 Order Denying Motion for Preliminary Injunction is attached hereto as **Exhibit A**.

4.      A true and correct copy of the August 27, 2013 Memorandum Decision of the Ninth Circuit Court of Appeals is attached hereto as **Exhibit B**.

5.      A true and correct copy of the November 5, 2013 Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Kathryn D. Sullivan, Acting Administrator, National Oceanic and Atmospheric Administration is attached hereto as **Exhibit C**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 18, 2013 at San Francisco, California.

/s/ *Alexandra Robert Gordon*

ALEXANDRA ROBERT GORDON

4

# CERTIFICATE OF SERVICE

Case Name:  **Chinatown Neighborhood Association, et al.**     No.   **CV 12 3759 PJH**
                 **v. Brown, et al.**

I hereby certify that on <u>November 18, 2013</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS; DECLARATION OF ALEXANDRA ROBERT GORDON**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>November 18, 2013</u>, at San Francisco, California.

<table>
<tr><td>N. Newlin</td><td>/s/ N. Newlin</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

40822264.doc

# EXHIBIT A

SER000036

1
2
3
4
5
6                             UNITED STATES DISTRICT COURT
7                      NORTHERN DISTRICT OF CALIFORNIA
8
9
10
11
12 CHINATOWN NEIGHBORHOOD
13 ASSOCIATION, et al.,
14           Plaintiffs,                No. C 12-3759 PJH
15     v.                           **ORDER DENYING MOTION FOR**
16 EDMUND BROWN, et al.,              **PRELIMINARY INJUNCTION**
17           Defendants.
18 _____/
19      Plaintiffs' motion for a preliminary injunction came on for hearing before this court on
20 October 10, 2012. Plaintiffs appeared by their counsel Joseph Breall and Jill Diamond;
21 defendants appeared by their counsel Alexandra Gordon; and defendant-intervenors
22 appeared by their counsel Bruce Wagman. Having read the parties' papers and carefully
23 considered their arguments and the relevant legal authority, the court hereby DENIES the
24 motion.
25                             **BACKGROUND**
26      The California Legislature has determined that the practice of shark finning, where a
27 shark is caught, its fins cut off, and the carcass is dumped back into the water, causes tens
28 of millions of sharks to die each year. Stats. 2011, ch. 524 (A.B. 376), §1(d). Sharks

SER000037

United States District Court
For the Northern District of California

1  occupy the top of the marine food chain and their decline constitutes a serious threat to the

2  ocean ecosystem and biodiversity. Id., §1(c). The Legislature also found that shark fin

3  often contains high amounts of mercury, which has been proven dangerous to people's

4  health. Id., §1(g). In order to address these problems and promote the conservation of

5  sharks by, among other things, eliminating the California market for fins, the California

6  Legislature enacted Assembly Bills 376 and 853, codified as Fish and Game Code

7  §§ 2021 and 2021.5 ("the Shark Fin Law"), which became effective on January 1, 2012.

8       Plaintiffs Chinatown Neighborhood Association and Asian Americans for Political

9  Advancement filed this action on July 18, 2012, challenging the implementation of the

10  Shark Fin Law. Named as defendants are Edmund G. Brown, Governor of California;

11  Kamala D. Harris, Attorney General of California; and Charlton H. Bonhan, Director of the

12  California Department of Fish and Game.

13       According to the complaint, plaintiff Chinatown Neighborhood Association is a

14  "nonprofit corporation/voluntary association having its headquarters in San Francisco." Cplt

15  ¶ 6. Its members are "people of Chinese origin who are engaged in cultural practices

16  involving the use of shark fins and in business practices involving the buying and selling of

17  shark fins in interstate commerce." Id.

18      Plaintiff Asian Americans for Political Advancement ("AAPA") is "a political action

19  committee registered in the State of California and headquartered in Burlingame,

20  California." Cplt ¶ 7. Its members are "people of Chinese national origin who are engaged

21  in cultural practices involving the use of shark fins and in business practices involving the

22  buying and selling of shark fins in interstate commerce." Id. AAPA's website describes the

23  organization as a PAC and Lobbying Coalition "formed to create a political voice for Asian

24  Americans regarding political issues and candidates."

25      Plaintiffs contend that the history of the Shark Fin Law indicates that it was directed

26  at suppressing the practices and traditions of Californians of Chinese national origin. They

27  assert that shark fin soup is a key traditional dish at many Chinese banquets and special

28  events, such as weddings, birthdays of elders, and festivals, and that the use of shark fin

2

United States District Court
For the Northern District of California

1   soup dates back to the 14th century Ming Dynasty.

2        Plaintiffs argue that Assemblyman Paul Fong, one of the bill's sponsors, made it
3   clear that the Law was directed at changing a Chinese practice.  They contend that when
4   asked about the implications of the Shark Fin Law on Chinese culture, Assemblyman Fong
5   replied that "Chinese culture used to promote foot binding on women."  Plaintiffs assert that
6   this comparison between binding feet and eating shark fin soup shows that the intent of the
7   Legislature was to compel the Chinese to change their cultural practices.  They also note
8   that Assemblyman Jared Huffman, another sponsor of the bill, stated that the intent of the
9   Shark Fin Law was to "target the demand for these shark fins," which plaintiffs contend is
10  simply another way of saying that the Chinese people are being targeted, since they are
11  "the only people seeking fins."

12       Plaintiffs also note that at a press conference organized by proponents of the Shark
13  Fin Law, the Executive Director of WildAid (an organization that worked to promote the
14  passage of the Law) stated that while it is difficult to regulate shark finning on a boat in
15  Indonesia, it's "very easy to regulate if something is happening in Chinatown here" and
16  "very easy to go around to restaurants and find out who's having what."  Plaintiffs claim that
17  this comment is clear evidence of the pervasive discrimination against Chinese Californians
18  that underlies the Shark Fin Law.  Plaintiffs also point to a comment by an unnamed "San
19  Francisco chef" to the effect that while shark fin soup may be "deeply rooted in Chinese
20  culture, . . . some people are going to take a while to crack - that nut," which plaintiffs
21  assert reflects an opinion that the Chinese preference for shark fin soup is a hardheaded
22  tradition that needs to be broken.

23       Plaintiffs argue that while the Shark Fin Law was ostensibly passed to prevent the
24  practice of shark finning and to further the practice of shark conservation, in actuality it
25  does not and cannot accomplish those goals, because it includes no restrictions on the
26  practice of shark finning – only on the possession and selling of fins.  Moreover, plaintiffs
27  assert, because the practice of shark finning in U.S. waters is already illegal under state
28  and federal law, it is clear that the Shark Fin Law was "promoted under fear-mongering-

3

SER000039

United States District Court
For the Northern District of California

1    type false pretenses" and has no practical effect on the already outlawed practice of shark

2    finning.

3          With regard to any argument defendants might make that the Shark Fin Law

4    protects sharks by halting the import of shark fins from foreign countries that do not have

5    laws against shark-finning, plaintiffs respond that if that were the goal, the law could have

6    banned the importation of shark fins from countries without protective laws, instead of

7    enacting a blanket prohibition on all shark fin trade and possession.

8          Plaintiffs contend that the real effect of the law is to ban the possession and sale of

9    fins taken from legally caught sharks, and that since the trade and possession of those

10   legally-caught sharks is still legal in California, the result of the Shark Fin Law will be that

11   the fins of those legally caught sharks will have to be discarded, which will harm the

12   environment by unnecessary creation of significant amounts of "shark fishing waste."

13   Plaintiffs assert that despite defendants' claims that the Shark Fin Law will save sharks

14   from extinction, the fact is that the populations of many of the  approximately 400-500

15   species of sharks are healthy and not in danger of extinction – and that no country

16   considers sharks to be "globally endangered."

17          Finally, plaintiffs argue that due to the ban, the supply of lawfully possessed shark

18   fins (those obtained prior to January 1, 2012) is dwindling rapidly and will imminently be

19   exhausted, which in turn will greatly impact Chinese cultural practices involving shark fin

20   soup.  They assert that Californians of Chinese national origin will experience difficulty in

21   obtaining shark fins to use to make this traditional dish, which will take away their rights to

22   practice their cultural traditions.  Restaurants will also be impacted, as they will not be able

23   to satisfy their customers' requests for shark fin soup at banquets and other events.

24   Moreover, they assert, merchants will be affected, as the ban has already cost merchants

25   "millions of dollars and numerous jobs," and importers – particularly those who deal almost

26   exclusively in shark fins – will lose their livelihoods.

27          Plaintiffs have attached numerous declarations from restaurant owners, merchants,

28   and importers detailing sums of money lost in the past year due to lost sales of shark fin

4

1   soup and shark fins, and what they expect to lose in the years to come.  Plaintiffs claim that

2   Enterprise 1180, a Milbrae restaurant, has lost $40,000 this year, and stands to lose

3   $100,000 a year; that Far East Café has lost $50,000, and stands to lose $200,000 a year;

4   that Tai Wu Inc. in Daly City has lost $30,000, and stands to lose $100,000 a year; that Koi

5   Palace, a Daly City restaurant, expects to lose $850,000 per year.  As for merchants,

6   plaintiffs claim that Chung Chou City sells $341,390.24 worth of fins per year; and that Ho

7   Kee Market sells $30,000 per year.  As for importers, plaintiffs assert that A&B Seafood

8   has already lost $373,373.30, and will totally lose its business; that Tony Siu Nam Mak has

9   lost $500,000 since January 2012; and that Pacific Seafood Company sells $900,000 a

10   year.

11         In the complaint, plaintiffs allege violations of their rights under the Equal Protection

12   Clause of the Fourteenth Amendment; the Commerce Clause; the Supremacy Clause; and

13   42 U.S.C. § 1983.  Plaintiffs assert that the Shark Fin Law targets only the Chinese – some

14   of whom use the shark fins as an ingredient in shark fin soup, and others of whom make a

15   living from buying and selling shark fins – and constitutes cultural discrimination, thereby

16   violating the Equal Protection Clause and its guarantee of equal treatment.  Plaintiffs argue

17   that the Shark Fin Law also violates the Commerce Clause because it interferes with the

18   power of the United State to regulate commerce, and violates the Supremacy Clause

19   because it unlawfully preempts federal law, including the Magnusen Stevens Act, 16 U.S.C.

20   §§ 1801-1884, which implemented the Shark Finning Prohibition Act of 2000, and was

21   amended by the Shark Conservation Act of 2010 – all of which already prohibit shark

22   finning.

23         Plaintiffs seek judicial declarations that the Shark Fin Law violates the Equal

24   Protection Clause by discriminating against people of Chinese national origin; that it

25   unlawfully interferes with Congressional authority to regulate interstate commerce; that it

26   unlawfully preempts federal law that already regulates the sale of shark fins and the

27   permitted legal trade of fins obtained in compliance with federal standards; and that

28   enforcement of the Law will violate § 1983 because it will deprive plaintiffs and their

United States District Court
For the Northern District of California

5

SER000041

United States District Court
For the Northern District of California

1 | members of their rights, privileges, and immunities secured under the Equal Protection

2 | Clause, the Commerce Clause, and the Supremacy Clause.

3 | The court previously granted the motion of The Humane Society of the United

4 | States, the Asian Pacific American Ocean Harmony Alliance, and the Monterey Bay

5 | Aquarium Foundation to intervene in the case as defendant-intervenors, and also granted

6 | the request of the National Resources Defense Counsel for leave to file an amicus brief in

7 | connection with the motion. Plaintiffs now seek an order preliminarily enjoining the

8 | enforcement of the Shark Fin Law.

9 | **DISCUSSION**

10 | A. Legal Standard

11 | An injunction is a matter of equitable discretion and is "an extraordinary remedy that

12 | may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

13 | Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 22 (2008); see also Munaf

14 | v. Geren, 553 U.S. 674, 689-90 (2008). A preliminary injunction "should not be granted

15 | unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v.

16 | Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).

17 | A plaintiff seeking a preliminary injunction must establish that he is likely to succeed

18 | on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

19 | that the balance of equities tips in his favor, and that an injunction is in the public interest.

20 | Winter, 555 U.S. at 20.

21 | Alternatively, the plaintiff may demonstrate that the likelihood of success is such that

22 | "serious questions going to the merits were raised and that the balance of hardships tips

23 | sharply in the plaintiff's favor," so long as the other two elements of the Winter test are met.

24 | Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

25 | Showing "serious questions going to the merits" requires more than establishing that

26 | "success is more likely than not" – and it requires a plaintiff to demonstrate a "substantial

27 | case for relief on the merits." Leiva-Perez v. Holder, 640 F.3d 962, 967 (9th Cir. 2011).

28 | And even where success on the merits is likely or "serious questions" are raised an

6

United States District Court
For the Northern District of California

1  injunction "is not a remedy which issues as of course." Weinberger v. Romero-Barcelo,

2  456 U.S. 305, 311 (1982).

3  B.    Plaintiff's Motion

4        Plaintiffs argue that they can establish a likelihood of success on the merits of each

5  of the constitutional claims (or a combination of likelihood of success on the merits and that

6  serious questions are raised), and can also establish that they will suffer irreparable injury if

7  the enforcement of the Law is not enjoined.  Thus, they assert, a preliminary injunction is

8  warranted.

9        Plaintiffs contend that the Shark Fin Law discriminates against people of Chinese

10  national origin in California, because it "almost solely" affects people of Chinese national

11  origin – assertedly the only group that utilizes shark fins in "cultural practices."  Plaintiffs

12  contend that the comments of the supporters of the Shark Fin Law (Assemblymen Fong

13  and Huffman, the Executive Director of WildAid, and the unnamed "San Francisco chef")

14  demonstrate that the law was passed with the discriminatory purpose of targeting the

15  Chinese.  Plaintiffs also note that it is still legal to use sharks for food, or to make sharkskin

16  products, and argue that the fact that the possession of fins is no longer legal means that

17  the Law targets a uniquely Chinese practice.  Thus, plaintiffs argue, the statute must be

18  subjected to a strict scrutiny level of review by the court.

19        Further, plaintiffs contend that the ban on possession of shark fins is not necessary

20  to the accomplishment of a legitimate state interest or a compelling societal interest, and

21  that to the extent that defendants argue that the Shark Fin Law will protect sharks, plaintiffs

22  argue that the Law does nothing to secure the ethical treatment of sharks, as it is still legal

23  to kill them.  And, they assert, since shark finning in U.S. waters is already illegal, the Shark

24  Fin Law is not necessary to achieve the stated objectives of protecting sharks.

25        Second, plaintiffs argue that the Shark Fin Law  places an excessive burden on

26  interstate commerce in relation to any local benefits, which they claim is sufficient to show a

27  Commerce Clause violation.  They note that the Law places no further restrictions on shark

28  fishing, and that existing law already prohibits shark finning in U.S. waters, and argue that

7

1    while federal law permits the trade of humanely obtained fins, the Shark Fin Law

2    unnecessarily restricts the shark fin trade entirely – while still permitting the trade of other

3    products from the very same sharks – and therefore constitutes an excessive restriction on

4    interstate commerce.

5          Third, plaintiffs assert that because the Shark Fin Law render federal regulations

6    pertaining to shark fins moot, it "usurps and preempts" federal law.  Plaintiffs contend that

7    this is a violation of the Supremacy Clause, which provides that federal law takes

8    precedence over state law when there is a conflict between the two laws.  Here, plaintiffs

9    argue, there is a conflict between federal law permitting trade of legally obtained shark fins

10   and the Shark Fin Law which unwarrantedly prohibits such trade.

11         Finally, plaintiffs contend that they are likely to prevail on their § 1983 cause of

12   action because they have established the existence of serious questions on the merits as

13   to their three constitutional claims.

14         As for irreparable injury, plaintiffs contend that the mere fact of a constitutional injury

15   – particularly the denial of plaintiffs' equal protection rights and the "suppression of their

16   cultural practices" –  is a harm that cannot be remedied by an award of monetary damages,

17   and is therefore sufficient to establish irreparable injury.  They assert that Chinese people

18   have already been compelled to forego participating in the ancient tradition of serving shark

19   fin soup at banquets, and that they will be totally prevented from engaging in this cultural

20   practice in the future, and that the court should enjoin enforcement of the Law to prevent

21   current and future discrimination against the Chinese people.

22         Moreover, plaintiffs argue that while pure economic harm may not be sufficient to

23   constitute "irreparable harm," the fact that many merchants and importers will be driven out

24   of business if they can no longer buy and sell shark fins is sufficient to show irreparable

25   harm.

26         Finally, plaintiffs contend that a balancing of the equities tips in their favor, and that

27   an injunction is in the public interest, because it would serve to eliminate discrimination.

28         In opposition, defendants argue that plaintiffs' facial challenge fails because the

8

SER000044

United States District Court
For the Northern District of California

1  Shark Fin Law is race-neutral on its face; and that the Shark Fin Law does not violate the

2  Equal Protection Clause, does not violate the Commerce Clause, and is not preempted by

3  federal law.  The defendants also contend that plaintiffs have failed to demonstrate

4  irreparable injury, and that the balance of hardships and the public interest tip in favor of

5  denying the motion.

6       The court finds that plaintiffs' motion must be DENIED.  With regard to likelihood of

7  success, the court agrees with defendants that plaintiffs have not met their burden, whether

8  under the Winter formulation, or under the "serious questions" modification stated in

9  Cottrell.

10       First, the court finds that plaintiffs have not established a likelihood of success as to

11  the equal protection claim.  The Equal Protection Clause of the Fourteenth Amendment

12  provides that no state shall "deny to any person within its jurisdiction the equal protection of

13  the laws."  U.S. Const. amend XIV, § 1.  This is "essentially a direction that all persons

14  similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Center, 473

15  U.S. 432, 439 (1985); Thornton v. City of St. Helens, 425 F.3d 1158, 1168 (9th Cir. 2005).

16       Laws that facially discriminate on the basis of race are subject to strict scrutiny.

17  Shaw v. Reno, 509 U.S. 630, 642 (1993).  In order to succeed on a facial challenge, a

18  plaintiff "must establish that no set of circumstances exists under which the [statute] would

19  be valid."  United States v. Salerno, 481 U.S. 739, 745 (1987).  Where, as here, a law is

20  facially neutral, the plaintiff must prove that the intent and purpose of the law was to

21  discriminate against an identifiable class of persons on the basis of a protected

22  classification (e.g., race).  See Washington v. Davis, 426 U.S. 229, 239 (1976).

23       Here, plaintiffs have provided no evidence that the Law was enacted for the purpose

24  of discriminating against Chinese-Americans.  They cite to some anecdotal evidence that is

25  unconnected to the reasons the Legislature passed the law, but have made no showing

26  that any member of the Legislature intended to "target" Chinese-Americans.  Plaintiffs' own

27  evidence shows that only a small percentage of Chinese-Americans eat shark fin soup

28  regularly, and that approximately half of Chinese-Americans actually support the Shark Fin

9

1 | Law; and further, one of the Law's sponsors in the Legislature (Assemblyman Paul Fong) is

2 | Chinese-American, and enactment of the Law was supported by at least one Asian-

3 | American organization.

4 | The fact that the Law may end up having a disparate impact on a group of Chinese-

5 | Americans – those who want to consume shark fin soup, or those who make a living from

6 | selling shark fins to others who want to make or consume shark fin soup – is not sufficient

7 | to show that the Law was enacted because of its disparate impact on Chinese-Americans.

8 | Where a law is neutral on its face, and is also within the power of government to pursue, it

9 | is not invalid under the Equal Protection Clause simply because it affects people of one

10 | race more than people of another. See id. at 239-41; Village of Arlington Heights v.

11 | Metropolitan Housing Dev. Corp., 429 U.S. 252, 264-66 (1977).

12 | In light of the fact that the Shark Fin Law is not facially discriminatory and the fact

13 | that plaintiffs have failed to show discriminatory intent, a challenge to the Law is subject

14 | only to rational basis review, which requires a showing that the Law is "rationally related to

15 | legitimate legislative goals." See Lee v. City of Los Angeles, 250 F.3d 668, 686-87 (9th Cir.

16 | 2001) (quotation and citations omitted). The Shark Fin Law easily passes rational basis

17 | review.

18 | At the time the Law was enacted, the Legislature was acting in pursuit of a legitimate

19 | government interest that bears a rational relationship to the means chosen to achieve that

20 | interest. See Heller v. Doe, 509 U.S. 312, 319-21 (1993). The Law is based on legislative

21 | findings that sharks occupy the top of the marine food chain and their decline constitutes a

22 | serious threat to the ocean ecosystem and biodiversity; that the practice of shark finning

23 | causes the death of tens of millions of sharks every year; and that by eliminating an

24 | important end market (sales in California), and thereby impacting the demand for shark

25 | fins, California can help ensure that sharks do not become extinct. See Stats. 2011, ch.

26 | 524 (A.B. 376) § 1.

27 | The stated conservation and public health purposes are legitimate state interests,

28 | and prohibiting the possession, sale, and trade of shark fins is rationally related to that

United States District Court
For the Northern District of California

10

United States District Court
For the Northern District of California

1    purpose. Because the California Legislature has articulated a plainly legitimate purpose for

2    enacting the law, and because it is undisputed that the Shark Fin Law is facially neutral,

3    any facial challenge fails, because it essentially rests on the speculation that at some future

4    time the application of the statute will result in constitutional violations. See Washington

5    State Grange v. Washington State Republican Party, 552 U.S. 442, 450 (2008).

6         Nevertheless, regardless of the level of scrutiny, a plaintiff alleging denial of equal

7    protection under 42 U.S.C. § 1983 based on race or other suspect classification must

8    plead intentional unlawful discrimination or allege facts that are at least susceptible of an

9    inference of discriminatory intent. Monteiro v. Tempe Union High School Dist., 158 F.3d

10   1022, 1026 (9th Cir. 1998); see also City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope

11   Found., 538 U.S. 188, 193-94 (2003); Bingham v. Schreiber, 341 F.3d 939, 948-49 (9th

12   Cir. 2003). Here, plaintiffs have provided no evidence showing that the California

13   Legislature enacted the Shark Fin Law for the purpose of discriminating against Chinese-

14   Americans.

15        As for plaintiffs' claim that the Law does nothing to protect sharks, the evidence

16   provided by the defendant-intervenors and by amici provides strong support for

17   defendants' contention that the Law is intended to protect and conserve sharks and the

18   marine ecosystems dependent on them by means of regulating local market conditions,

19   which laws targeting the actual practice of shark finning in domestic waters alone do not

20   address.

21        In sum, because the Shark Fin Law neither discriminates on the basis of race, nor is

22   based on a discriminatory purpose, and because it is rationally related to a legitimate

23   government purpose, plaintiffs cannot meet their burden of showing a likelihood of success

24   on the merits of the equal protection claim.

25        The court finds further that plaintiffs have failed to establish a likelihood of success

26   as to the claim under the Commerce Clause. The Commerce Clause authorizes Congress

27   to "regulate Commerce with foreign Nations, and among the several States." U.S. Const.,

28   art. I § 8. It includes an implied limitation on the states' authority to adopt legislation that

SER000047

United States District Court
For the Northern District of California

1  affects commerce, which is referred to as the "negative" or "dormant" Commerce Clause.

2      The purpose of the dormant Commerce Clause is to "prohibit state or municipal laws

3  whose object is local economic protectionism, laws that would excite those jealousies and

4  retaliatory measures the Constitution was designed to prevent." C & A Carbone, Inc. v.

5  Town of Clarkstown, N.Y., 511 U.S. 383, 390 (1994). That is, its purpose is to prevent local

6  economic protectionism at the expense of out-of-state interests, not to protect the

7  economic interests of local businesses engaged in interstate commerce. See id.

8      A statute is considered per se invalid under the dormant Commerce Clause if it

9  directly regulates or discriminates against interstate commerce, or if its effect is to favor in-

10 state economic interests over out-of-state interests. Brown-Forman Distillers Corp. v. New

11 York State Liquor Auth., 476 U.S. 573, 578-79 (1986). If a statute does not regulate or

12 discriminate against interstate commerce, and has only indirect effects on interstate

13 commerce and regulates evenhandedly, the court need only consider whether the state's

14 interest is legitimate and whether the burden on interstate commerce, if any, clearly

15 exceeds the local benefits. Id. at 579 (citing Pike v. Bruce Church, Inc., 397 U.S. 137, 142

16 (1970)).

17     Here, given that the Shark Fin Law is facially neutral, and treats all shark fins the

18 same, regardless of their origin, plaintiffs have not shown (and cannot show) that the Shark

19 Fin Law either regulates extraterritorially, or discriminates in favor of in-state interests.

20 Thus, in order to prevail on this claim, plaintiffs will have to establish that any incidental

21 burdens on interstate commerce caused by the Shark Fin Law are clearly excessive in

22 relation to the putative local benefits.

23     For the reasons stated above, the court finds that the Shark Fin Law serves a

24 legitimate local purpose, which includes protection of public health, wildlife, and the

25 ecosystem. Plaintiffs have identified no cognizable burden on interstate commerce,

26 notwithstanding that they have asserted that the Law places an excess burden in relation to

27 any putative benefits because it is overbroad and duplicative of existing legislation.

28     Finally, the Shark Fin Law is not preempted by federal law, and therefore does not

SER000048

1   violate the Supremacy Clause.  Federal law may preempt state law where Congress

2   expressly states its intent to preempt state law; or where Congressional intent to preempt

3   state law can be inferred from the fact that Congress indicated an intent to occupy the field

4   by passing a comprehensive scheme that leaves no room for supplemental legislation; or

5   where state law directly conflicts with federal law.  Gonzales v. Arrow Fin. Servs., LLC, 660

6   F.3d 1055, 1066 (9th Cir. 2011) (citing English v. Gen. Elec. Co., 496 U.S. 72, 79-80

7   (1990)).

8          Here, there is no showing of any Congressional intent to preempt state regulation of

9   or relating to shark finning.  Moreover, the implementing federal regulations to the Federal

10  Shark Fin Law expressly provide that "[n]othing in this regulation supercedes more

11  restrictive state laws or regulations regarding shark finning in state waters."  50 C.F.R.

12  § 600.1201(c).  And as for federal management authority over fishing, the Magnuson

13  Stevens Act provides that states retain concurrent jurisdiction over their own waters and

14  limited concurrent authority over fishing in federal waters.  See, e.g., 16 U.S.C. § 1856(a).

15  Nor have plaintiffs established that it will be impossible to comply with both existing federal

16  law and California's Shark Fin Law.  Federal law primarily regulates shark finning and the

17  taking and landing of sharks within U.S. waters, while the Shark Fin Law prohibits the sale,

18  trade, or possession of shark fins in California.

19         Finally, plaintiffs have not established a likelihood of success on the § 1983 claim,

20  because they have not shown any discriminatory conduct by any government official – e.g.,

21  enforcing the Law against Chinese-Americans and not against other individuals whose

22  activities are regulated by the Law.  Indeed, plaintiffs have provided declarations from

23  fishermen who claim that the Shark Fin Law has caused them harm based on the fact that

24  they have engaged in shark fishing and the subsequent sale of fins – not because they are

25  Chinese.

26         As for irreparable harm, in general, loss of business revenue or monetary harm in

27  the form of damages is not sufficient to establish irreparable injury.  See Oakland Tribune,

28  Inc. v. Chronicle Pub. Co., Inc., 762 F.2d 1374, 1376 (9th Cir. 1985).  Plaintiffs have cited

13

1    no other type of economic harm, apart from unsupported claims by two declarants that if

2    the Shark Fin Law is not overturned, they will "lose [their] livelihood entirely."

3            While it is well-established that the deprivation of constitutional rights

4    "unquestionably constitutes irreparable injury," see Elrod v. Burns, 427 U.S. 347, 373

5    (1976); Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012), in this case, because

6    plaintiffs have not established a likelihood of success on their constitutional claims, the

7    presumption of irreparable harm does not arise.  Thus, the court need not consider whether

8    the harm plaintiffs claim (loss of profits and business) is in fact "irreparable."  Moreover, the

9    evidence presented by defendant-intervenor Asian Pacific American Ocean Harmony

10   Alliance shows that not all Chinese-Americans believe that a ban on buying and selling

11   shark fins violates the Chinese cultural tradition, as many adhere to a cultural belief that

12   preservation of the environment is of primary importance.

13           Similarly, with regard to public interest, while it is generally in the public interest to

14   prevent the violation of a party's constitutional rights, Sammartano v. First Judicial District

15   Court, 303 F.3d 959, 974 (9th Cir. 2002), this factor need not be addressed in the absence

16   of a showing of likelihood of success on the merits of the constitutional claims.  Plaintiffs

17   have not shown that the future inability to obtain shark fins by the relatively small

18   percentage of the population that actually wants to do so, or the loss of profits by a small

19   group of merchants, importers, or restauranteurs, outweighs the interests of the Legislature

20   in protecting the marine ecosystem by eliminating a product that drives the pernicious

21   practice of finning.

22           Finally, it is clear from the papers filed in opposition to plaintiffs' motion that there is

23   support for the Shark Fin Law within the Chinese community.  In addition, the evidence

24   shows strong public interest bases for the Law, including conservation (protection of

25   declining shark populations, including populations of shark species vulnerable to shark

26   finning), animal welfare (reducing the economic motivation for shark finning, which leaves

27   sharks unable to swim and causes death by starvation), and public health (bioaccumulation

28   of contaminants such as methylmercury in shark fins) interests.

United States District Court
For the Northern District of California

14

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

In accordance with the foregoing, plaintiffs' motion for a preliminary injunction is

DENIED.[1]

**IT IS SO ORDERED.**

Dated: January 2, 2013

_____
PHYLLIS J. HAMILTON
United States District Judge

---

[1] Defendants also argue in their opposition that Governor Brown and Attorney General Harris are immune from suit under the Eleventh Amendment. Defendants acknowledge that there is an exception under Ex parte Young, 209 U.S. 123 (1908), which allows for suits for prospective declaratory and injunctive relief against state officers, sued in their official capacities, to enjoin an alleged ongoing violation of federal law, but note that for an Ex parte Young exception to apply, the state officer must have a direct connection with the enforcement of the allegedly unconstitutional statute, and that there must be an actual "threat of enforcement." See Long v. Van Kamp, 961 F.2d 151, 152 (1992). Defendants contend that because the Legislature did not give the Governor or the Attorney General any special role in administering or enforcing the Shark Fin Law, the claims are barred by the Eleventh Amendment. Because plaintiffs have not established a likelihood of success on their claims, the court finds it unnecessary to address the Eleventh Amendment issue, which in any event would be more appropriately raised in a motion to dismiss.

15

SER000051

# EXHIBIT B

SER000052

FILED

**NOT FOR PUBLICATION**

AUG 27 2013

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

CHINATOWN NEIGHBORHOOD
ASSOCIATION, a nonprofit corporation;
ASIAN AMERICANS FOR POLITICAL
ADVANCEMENT, a political action
committee,

Plaintiffs - Appellants,

v.

EDMUND G. BROWN, Jr., Governor of
the State of California; KAMALA
HARRIS, Attorney General of the State of
California; CHARLTON H. BONHAM,
Director, California Department of Fish
and Game,

Defendants - Appellees,

THE HUMANE SOCIETY OF THE
UNITED STATES; MONTEREY BAY
AQUARIUM FOUNDATION; ASIAN
PACIFIC AMERICAN OCEAN
HARMONY ALLIANCE,

Intervenor-Defendants -
Appellees.

No. 13-15188

D.C. No. 4:12-cv-03759-PJH

MEMORANDUM[*]

---

[*]    This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3.

SER000053

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted August 14, 2013
San Francisco, California

Before: REINHARDT, NOONAN, and HURWITZ, Circuit Judges.

The Chinatown Neighborhood Association and Asian Americans for Political

Advancement (collectively "Chinatown") appeal the district court's denial of a

preliminary injunction against the enforcement of sections 2021 and 2021.5 of the

California Fish and Game Code (the "Shark Fin Law"). Subject to certain exceptions,

the Shark Fin Law makes it "unlawful for any person to possess, sell, offer for sale,

trade, or distribute a shark fin" in California. *Id.* § 2021(b).

We have appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) and review

the denial of a preliminary injunction for abuse of discretion. *Am. Trucking Ass'ns*

*v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). On the record before it, the

district court did not abuse its discretion, and we accordingly affirm.

    1.   The district court properly applied the *Winter* test in analyzing the

preliminary injunction application. *Winter v. Natural Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008). Contrary to Chinatown's protestations, the district court also

expressly found that Chinatown failed to meet its burden under the alternative "serious

2

SER000054

questions" test articulated in *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

2. The district court did not abuse its discretion in determining that Chinatown failed to prove a likelihood of irreparable harm. Chinatown offered only evidence suggesting that business owners would suffer some economic harm from operation of the Shark Fin Law. *See Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1376 (9th Cir. 1985).

3. Nor did the district court abuse its discretion in finding that Chinatown failed to show a likelihood of success on its Equal Protection Clause claim. The Shark Fin Law is facially neutral, and Chinatown presented no persuasive evidence indicating that the California legislature's real intent was to discriminate against Chinese Americans rather than to accomplish the Law's stated humanitarian, conservationist, and health goals. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

4. On the record before it, the district court did not abuse its discretion in concluding that Chinatown was unlikely to succeed on its dormant Commerce Clause claim. Chinatown asserted claims only on behalf of those who seek to buy and sell shark fins for end use in California. Chinatown's amici offered broader arguments on how the Shark Fin Law burdens interstate commerce for the first time on appeal. In the context of the preliminary injunction proceedings, the district court did not err in

3

concluding that the Shark Fin Law does not substantially burden the interstate market. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012). The district court can consider the broader dormant Commerce Clause arguments when deciding whether to issue a permanent injunction.

5. Similarly, on the evidence before it, the district court properly found that Chinatown did not show a likelihood of success on its Supremacy Clause claim. As the district court properly noted, the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801–1884, does not expressly preempt state law or occupy the entire field. And Chinatown presented no evidence indicating that by restricting the sale and possession of shark fins in California, the Shark Fin Law conflicts with the MSA's objectives. Although the federal government raised preemption concerns on the eve of oral argument before this court as a late-filing amicus, because these arguments were never before the district court, the district court did not abuse its discretion in failing to anticipate them. The government is, of course, not foreclosed from raising these arguments in the permanent injunction proceedings.

6. We have reviewed Chinatown's other claims of error and find none.

**AFFIRMED.**

4

1   KAMALA D. HARRIS
    Attorney General of California
2   TAMAR PACHTER
    Supervising Deputy Attorney General
3   ALEXANDRA ROBERT GORDON
    Deputy Attorney General
4   State Bar No. 207650
      455 Golden Gate Avenue, Suite 11000
5     San Francisco, CA  94102-7004
      Telephone:  (415) 703-5509
6     Fax:  (415) 703-5480
      E-mail:  Alexandra.RobertGordon@doj.ca.gov
7   *Attorneys for Defendants Attorney General Harris
    and Director Bonham*

8

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

| | |
|---|---|
| 13 **CHINATOWN NEIGHBORHOOD** | Case No. CV 12 3759 WHO |
| 14 **ASSOCIATION, a nonprofit corporation, and ASIAN AMERICANS FOR** | |
| 15 **POLITICAL ADVANCEMENT, a political action committee,** | **DEFENDANTS' SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS; DECLARATION OF ALEXANDRA** |
| 16 Plaintiffs, | **ROBERT GORDON** |
| 17 v. | Date:          March 19, 2014 |
| 18 | Time:          2:00 p.m. |
| 19 **KAMALA HARRIS, Attorney General of the State of California, and CHARLTON H.** | Courtroom:  2, 17th Floor |
| 20 **BONHAM, Director, California Department of Fish and Game,** | Judge:         The Honorable William H. Orrick, Jr. |
| 21 Defendants, | Action Filed:  July 18, 2012 |
| 22 | |
| 23 **THE HUMANE SOCIETY OF THE UNITED STATES; ASIAN PACIFIC** | |
| 24 **AMERICAN OCEAN HARMONY ALLIANCE; and MONTEREY BAY** | |
| 25 **AQUARIUM FOUNDATION,** | |
| 26 Intervenors-Defendants. | |

27

28

                                    1

Supp. Request for Judicial Notice; Declaration of Alexandra Robert Gordon  (CV 12 3759 WHO)

SER000037

**SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE**

Defendants Attorney General Kamala D. Harris, and California Department of Fish & Wildlife (formerly Fish and Game) Director Charlton H. Bonham respectfully request that this Court take judicial notice, pursuant to Federal Rule of Evidence 201, of (1) the February 3, 2014 Letter from Director Charlton H. Bonham to Eileen Sobeck, Assistant Administrator for Fisheries, National Oceanic and Atmospheric Administration; (2) the February 3, 2014 Letter from Eileen Sobeck to Director Charlton H. Bonham, California Department of Fish & Wildlife; and (3) the February 5, 2014 Congressional Record.

Federal Rule of Evidence 201(b) states that "[a] judicially noticed fact must be one not subject to reasonable dispute that is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot readily be questioned." Fed. R. Evid. 201(b). The Court may take judicial notice of matters of public record outside the pleadings on a motion to dismiss. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986). Judicial notice may be taken of agency action where the action is ascertainable and verifiable. *See Casas-Castrillon v. Department of Homeland Security*, 535 F.3d 942, 952 (9th Cir. 2008). Courts may also take judicial notice of information on a government website. *See Crawford v. Marion County Election Bd.*, 533 U.S. 181, 199 n.18 (2008). The Court may also take notice of facts and documents that are "not subject to reasonable dispute." *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Sufficient notice of matters subject to judicial notice is provided by lodging a copy of the relevant documents and records with the Court. Accordingly, Defendants respectfully request that this Court take judicial notice of the exhibits to the accompanying declaration of counsel.

2

SER000058

Dated:  February 6, 2014

Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
TAMAR PACHTER
Supervising Deputy Attorney General

/s/ Alexandra Robert Gordon

ALEXANDRA ROBERT GORDON
Deputy Attorney General
*Attorneys for Defendants Attorney General
Harris and Director Bonham*

3

Supp. Request for Judicial Notice; Declaration of Alexandra Robert Gordon  (CV 12 3759 WHO)

SER000059

## DECLARATION OF ALEXANDRA ROBERT GORDON

I, Alexandra Robert Gordon, declare as follows:

1.     I am a Deputy Attorney General at the California Department of Justice and serve as counsel to Defendants Attorney General Kamala D. Harris, and California Department of Fish & Wildlife (formerly Fish and Game) Director Charlton H. Bonham in the above-entitled matter.

2.     Except as otherwise stated, I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness I could testify competently as to those facts.

3.     A true and correct copy of the February 3, 2014 Letter from Director Charlton H. Bonham to Eileen Sobeck, Assistant Administrator for Fisheries, National Oceanic and Atmospheric Administration is attached hereto as **Exhibit D**.  This document is posted on the National Oceanic and Atmospheric Administration's website at http://www.nmfs.noaa.gov/stories/2014/02/docs/california.pdf.

4.     A true and correct copy of the February Letter from Eileen Sobeck to Director Charlton H. Bonham, California Department of Fish & Wildlife is attached hereto as **Exhibit E**. This document is posted on the National Oceanic and Atmospheric Administration's website at http://www.nmfs.noaa.gov/stories/2014/02/docs/california.pdf.

5.     A true and correct copy of E165 Congressional Record (February 5, 2014) is attached hereto as **Exhibit F**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 6, 2014 at San Francisco, California.


/s/ *Alexandra Robert Gordon*
ALEXANDRA ROBERT GORDON

4

SER000080

# EXHIBIT D

SER000061



State of California – Natural Resources Agency                    **EDMUND G. BROWN JR., Governor**
DEPARTMENT OF FISH AND WILDLIFE                          **CHARLTON H. BONHAM, Director**
Director's Office
1416 Ninth Street, 12th Floor
Sacramento, CA 95814
916.653.7667
www.wildlife.ca.gov

February 3, 2014

Eileen Sobeck
Assistant Administrator for Fisheries
National Oceanic and Atmospheric Administration
1315 East-West Highway
Silver Spring, Maryland 20910

*Eileen:*

Dear Ms. Sobeck:

We write to memorialize a series of conversations between our respective offices and legal counsel beginning on September 6, 2013, regarding the relationship between California's Shark Fin Prohibition, Cal. Fish & Game Code §§ 2021 & 2021.5, and the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1884, as amended by the Shark Finning Prohibition Act of 2000, Pub. L. No. 106-557, 114 Stat. 2772 (2000), and the Shark Conservation Act of 2010, Pub. L. No. 111-348, 124 Stat. 3668 (2010). We appreciate the opportunity to consult with you and believe that this process has been highly productive. This process was initiated after the United States filed an amicus brief in *Chinatown Neighborhood Association et al., v. Brown, et. al.*, Ninth Circuit Case No. 13-15188, and in that filing the United States observed that California's Shark Fin Prohibition may conflict with or obstruct federal law. However, in light of our discussions and the full information and analysis we have provided regarding the scope and effect of California's law, we now agree that California law and federal law are consistent and that there is no basis for finding California's Shark Fin Prohibition to be preempted by the Magnuson-Stevens Act, as amended.

The Magnuson-Stevens Act governs the management of federal fisheries, including shark fisheries. As we have discussed, the Shark Fin Prohibition and the Magnuson-Stevens Act, as amended, share a goal of promoting conservation and ending the practice of shark finning. To this end, the California Shark Fin Prohibition proscribes the possession, sale, trade, and distribution of detached shark fins in California. *See* Cal. Fish & Game Code §§ 2021(a)&(b). Of particular significance here, and unlike federal law, the California Shark Fin Prohibition does not regulate the act of finning or the taking and landing of sharks within the Exclusive Economic Zone (EEZ). Moreover, under California law, a federally-licensed fisher may land a shark in California with the fins attached, as required by the Shark Conservation Act of 2010. *See id.* § 2021(a) (defining "shark fin" as the "raw, dried, or otherwise processed *detached* fin, or the raw, dried, or otherwise processed *detached* tail, of an elasmobranch.") (emphases added).

With respect to your concern regarding the ability of fishers to possess fins (from sharks caught in the EEZ), pursuant to California Fish and Game Code sections 2021(d) and 2021.5(a)(1), properly-licensed fishers are exempt from the ban on possession. Because all fishers, including those who operate in federal waters pursuant to a federal

*Conserving California's Wildlife Since 1870*

SER000062

Eileen Sobeck
February 3, 2014
Page 2

license, are required to hold state licenses in order to land sharks in California, *see id.*
§§ 7850, 7881, this exemption applies equally to federal and state fishers.

Finally, California's Shark Fin Prohibition does not interfere with the management of
federal fisheries. As you are aware, and as set forth in our reply to your amicus brief,
we reject the notion that simply because a state ban might have an effect on fishing
within federal waters and consequently on the attainment of "optimum yield," that it
conflicts with and/or is preempted by the Magnuson-Stevens Act. While we may
continue to disagree on this point, as a practical matter, the California Shark Fin
Prohibition has no meaningful effect on fishing behavior or "optimum yield." Relatively
few sharks are landed in California. The California-based drift gillnet fleet and the
Hawaii-based pelagic longline fleet account for the majority of shark landings in
California from federally-managed fisheries. Both of these fleets target swordfish and
thus fishing behavior in these fleets is driven primarily by swordfish, and not by sharks.[1]
The relative importance of swordfish and sharks is apparent in both landings and
revenue. For example, in 2012, according to PacFIN data, shark landings in California
(from both federal and state waters) totaled 107.5 metric tons, and represented
$189,910 in revenue.[2] By comparison, 402.5 metric tons of swordfish were landed in
California in 2012, with an ex-vessel value of $2,092,050.[3] With respect to the relatively
small number of sharks that are landed in California, state law permits the sale of all of
the parts of a shark caught in federal waters and landed in California, excluding its
detached fin and tail. Accordingly, we do not expect an appreciable impact on income
to federally-licensed shark harvesters in California as a result of California's law.

For these reasons, we believe that California's Shark Fin Prohibition is consistent with
and does not conflict with the Magnuson-Stevens Act, as amended by the Shark
Finning Prohibition Act of 2000, and the Shark Conservation Act of 2010.

Please feel free to contact Thomas Gibson, General Counsel, at (916) 654-5295, if you
have further questions or concerns.

Sincerely,

Charlton H. Bonham

---

[1] The other federally-managed fishery with shark landings in California is the federal groundfish fishery,
managed under the Pacific Fishery Management Council's Groundfish Fishery Management Plan (FMP).
The federal groundfish FMP includes spiny dogfish and leopard shark. According to PacFIN data, in
2012, 0.9 metric tons of spiny dogfish were landed in California, with an ex-vessel value of $575, and 2.8
metric tons of leopard shark were landed, with an ex-vessel value of $5,869. *See* Pacific States Marine
Fisheries Commission, Pacific Fisheries Information Network (PacFIN) Report #308 (2012).
[2] *See id.*
[3] *Id.*

SER000063

# EXHIBIT E

UNITED STATES DEPARTMENT OF COMMERCE
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, Maryland 20910

THE DIRECTOR

FEB - 3 2014

Mr. Charlton Bonham
Director
California Department of Fish and Wildlife
1416 Ninth Street
12th Floor
Sacramento CA 95814

Dear Mr. Bonham:

Thank you for your February 3, 2014, letter regarding your assessment of the relationship between the Magnuson-Stevens Fishery Conservation and Management Act, as amended by the Shark Finning Prohibition Act of 2000 and the Shark Conservation Act of 2010, and the California Shark Fin Prohibition and the impact of California's law on federal shark harvesters.

NOAA Fisheries West Coast Region confirms that revenue from the sale of sharks harvested in federal waters off California derives mostly from the sale of the meat of the shark, not from the sale of fins sold after the shark is legally harvested and landed with fins naturally attached. Further, you confirm that all federal fishers who land sharks in California, including those who operate in federal waters pursuant to a federal license, are also required to hold state licenses and are therefore exempt from the ban on possession of shark fins. Based on the full information about the California law set forth in your letter, and the current facts specified there regarding the scale and nature of the federal shark fishery in California, we agree with your conclusion that California's Shark Fin Prohibition law will have minimal impact on federally licensed and permitted shark harvesters in California, and does not unlawfully burden their ability to achieve the benefits from federal fisheries provided under the Magnuson-Stevens Fishery Conservation and Management Act, as amended. Accordingly, it is our position, based on the information that you have provided, that California's Shark Fin Prohibition law is not preempted by the Magnuson-Stevens Act, as amended.

We agree that this has been a very productive process. Our consultations have addressed fully our initial concern, as expressed in the amicus brief of the United States *Chinatown Neighborhood Association et al., v. Brown, et al.,* Ninth Circuit Case No. 13-15188, that California's Shark Fin Prohibition might conflict with or obstruct the Magnuson-Stevens Act, as amended. In light of our present conclusion that California law does not conflict with or obstruct the purposes, goals, or methods of the Magnuson-Stevens Act, we do not intend to seek authorization from the Department of Justice to further participate in the case of *Chinatown Neighborhood Association, et al. v. Brown, et al.,* No. CV 12 3759 WHO (N.D. Cal.). We request that you contact us if there are significant changes to the facts described in your letter as this could necessitate further consultation.

THE ASSISTANT ADMINISTRATOR
FOR FISHERIES


Printed on Recycled Paper



We appreciate your willingness to work with us on this important matter and we hope this letter addresses your concerns.

Sincerely,

Eileen Sobeck
Assistant Administrator
for Fisheries

cc:     Alexandra Robert Gordon
        Deputy Attorney General, California
        Department of Justice

SER000066

# EXHIBIT F

SER000067

# EXTENSIONS OF REMARKS

## SSGT. SKY MOTE

### HON. TOM McCLINTOCK
#### OF CALIFORNIA
#### IN THE HOUSE OF REPRESENTATIVES
#### Wednesday, February 05, 2014

Mr. McCLINTOCK. Mr. Speaker, I rise today to honor Marine Staff Sergeant Sky Mote, a man who faithfully served and then made the ultimate sacrifice for our nation. He was recently awarded the Navy's second highest commendation for valor, the Navy Cross.

Growing up in El Dorado, California, Sky enjoyed 4–H, Civil Air Patrol, and loved camping with his family. At Union Mine High School, he lettered in track and cross country. From an early age, Sky was motivated to join the military by a deep desire serve his country. Upon graduation, he promptly enlisted in the Marine Corps.

Sky spent nine years serving his country in the United States Marine Corps, including a deployment to Iraq and two deployments to Afghanistan. To those who knew him, it is no surprise that Sky not only served, but served with gallantry and meritorious distinction. Sky was awarded the Navy Cross, a Purple Heart, the Navy-Marine Corps Commendation Medal, a Navy-Marine Corps Achievement Medal, two Combat Action Ribbons and three Good Conduct Medals.

On August 10, 2012, Sky was serving with the prestigious 1st Marine Special Operations Battalion as an Explosive Ordnance expert in Helmand Province of Afghanistan. During an attack inside the base perimeter by a rogue Afghan policeman, SSgt. Mote rushed into action rather than escaping to safety. Sky's courage and initiative in engaging the gunman, while exposing himself to mortal gunfire, halted the enemy assault and undoubtedly saved lives that day.

Sky Mote will be deeply and sorely missed. He leaves behind his mother and father, as well as four brothers. The United States is blessed to have young men of character and heroism to defend our freedoms.

Mr. Speaker, SSgt. Sky Mote lived and died as an embodiment of the virtues that built and continue to preserve our country and it is my privilege to rise to honor his memory today.

## HONORING ALEXANDER MILES BURNS

### HON. SAM GRAVES
#### OF MISSOURI
#### IN THE HOUSE OF REPRESENTATIVES
#### Wednesday, February 5, 2014

Mr. GRAVES of Missouri. Mr. Speaker, I proudly pause to recognize Alexander Miles Burns. Alexander is a very special young man who has exemplified the finest qualities of citizenship and leadership by taking an active part in the Boy Scouts of America, Troop 351, and earning the most prestigious award of Eagle Scout.

Alexander has been very active with his troop, participating in many scout activities. Over the many years Alexander has been involved with scouting, he has not only earned numerous merit badges, but also the respect of his family, peers, and community. Most notably, Alexander has contributed to his community through his Eagle Scout project.

Mr. Speaker, I proudly ask you to join me in commending Alexander Miles Burns for his accomplishments with the Boy Scouts of America and for his efforts put forth in achieving the highest distinction of Eagle Scout.

## SPORTSMEN'S HERITAGE AND RECREATIONAL ENHANCEMENT ACT OF 2013

#### SPEECH OF
### HON. CHRIS VAN HOLLEN
#### OF MARYLAND
#### IN THE HOUSE OF REPRESENTATIVES
#### Tuesday, February 4, 2014

The House in Committee of the Whole House on the state of the Union had under consideration the bill (H.R. 3590) to protect and enhance opportunities for recreational hunting, fishing, and shooting, and for other purposes:

Mr. VAN HOLLEN. Mr. Chairman, our nation's public lands have always required balanced management for a variety of uses for the American people. And while I am pleased to see a public lands bill on the Floor of this House that acknowledges uses beyond oil and gas drilling, I regret that it once again fails to meet the balance necessary to responsibly manage our lands for generations to come.

I don't think there is any disagreement in the House over the importance of outdoor recreation on public lands. More than 75 percent of federal lands are open to hunting, fishing, and recreational shooting. However, in order to ensure that these areas are available for the future, all uses must be balanced with conservation. And today's bill would override critical environmental protections while depriving hunters and fisherman from offering input on land use decisions.

The bill also replaces the only federal advisory committee with a voice for the hunting community with a new council, removing representation from hunting outreach and education groups and sportsmen and sportswomen at-large in favor of representatives from the firearms, ranching, and agriculture industries. Finally, it would allow for guns at certain Army Corps facilities, without exemption for public safety or national security concerns.

I have joined with Mr. Holt and members of the House Sustainable Energy and Environment Caucus to offer an amendment to this bill to clarify that the Secretary of Interior has the authority to plan for a changing climate, which poses a real threat to outdoor recreation through sea level rise, drought, and wildfire. It will also lead to changes in hunting seasons, migratory patterns, and invasive species populations. While we should be taking action here in Congress to address climate change and its impacts on recreational hunting and fishing, this amendment ensures that we don't limit the Secretary's ability to plan for these developments. I urge my colleagues to support it.

While there are parts of this bill that would get unanimous support from the House, it contains deeply flawed provisions that jeopardize the condition of public lands. I urge my colleagues to reject it and work on a consensus bill that guarantees recreational opportunities for generations of American sportsmen and women.

## RECOGNIZING THE AGREEMENT BETWEEN NOAA AND THE STATE OF CALIFORNIA ON IMPLEMENTATION OF THE SHARK CONSERVATION ACT OF 2010

### HON. JARED HUFFMAN
#### OF CALIFORNIA
#### IN THE HOUSE OF REPRESENTATIVES
#### Wednesday, February 5, 2014

Mr. HUFFMAN. Mr. Speaker, I'm pleased that NOAA has decided not to interfere with the progress California and other states have made in ending the cruel practice of shark finning. Federal preemption of state law should be extremely rare—the federal government should not stop states from raising the bar on environmental protection, and I'm glad NOAA has agreed to revise its position on our state's landmark shark fin law.

I submit an exchange of letters between the National Oceanic and Atmospheric Administration and the California Department of Fish and Wildlife.

U.S. DEPARTMENT OF COMMERCE,
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NATIONAL MARINE FISHERIES SERVICE,
*Silver Spring, MD, February 3, 2014.*
Mr. CHARLTON BONHAM,
*Director, California Department of Fish and Wildlife, Sacramento, CA.*

DEAR MR. BONHAM: Thank you for your February 3, 2014, letter regarding your assessment of the relationship between the Magnuson-Stevens Fishery Conservation and Management Act, as amended by the Shark Finning Prohibition Act of 2000 and the Shark Conservation Act of 2010, and the California Shark Fin Prohibition and the impact of California's law on federal shark harvesters.

NOAA Fisheries West Coast Region confirms that revenue from the sale of sharks harvested in federal waters off California derives mostly from the sale of the meat of the shark, not from the sale of fins sold after the shark is legally harvested and landed with fins naturally attached. Further, you confirm that all federal fishers who land sharks in California, including those who operate in federal waters pursuant to a federal license, are also required to hold state licenses and are therefore exempt from the ban on possession of shark fins. Based on the full information about the California law set forth in your letter, and the current facts specified

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate or the House on the floor.

Matter set in this typeface indicates words inserted or appended, rather than spoken, by a Member of the House on the floor.

there regarding the scale and nature of the federal shark fishery in California, we agree with your conclusion that California's Shark Fin Prohibition law will have minimal impact on federally licensed and permitted shark harvesters in California, and does not unlawfully burden their ability to achieve the benefits from federal fisheries provided under the Magnuson-Stevens Fishery Conservation and Management Act, as amended. Accordingly, it is our position, based on the information that you have provided, that California's Shark Fin Prohibition law is not preempted by the Magnuson-Stevens Act, as amended.

We agree that this has been a very productive process. Our consultations have addressed fully our initial concern, as expressed in the amicus brief of the United States Chinatown Neighborhood Association et al., v. Brown, et al., Ninth Circuit Case No. 13-15188, that California's Shark Fin Prohibition might conflict with or obstruct the Magnuson-Stevens Act, as amended. In light of our present conclusion that California law does not conflict with or obstruct the purposes, goals, or methods of the Magnuson-Stevens Act, we do not intend to seek authorization from the Department of Justice to further participate in the case of Chinatown Neighborhood Association, et al. v. Brown, et al., No. CV 12 3759 WHO (N.D. Cal.). We request that you contact us if there are significant changes to the facts described in your letter as this could necessitate further consultation.

We appreciate your willingness to work with us on this important matter and we hope this letter addresses your concerns.

Sincerely,

EILEEN SOBECK,
*Assistant Administrator for Fisheries.*

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY, DEPARTMENT OF FISH AND WILDLIFE,
*Sacramento, CA, February 3, 2014.*
EILEEN SOBECK,
*Assistant Administrator for Fisheries, National Oceanic and Atmospheric Administration, Silver Spring, MD.*

DEAR MS. SOBECK: We write to memorialize a series of conversations between our respective offices and legal counsel beginning on September 6, 2013, regarding the relationship between California's Shark Fin Prohibition, Cal. Fish & Game Code §§2021 & 2021.5, and the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§1801–1884, as amended by the Shark Finning Prohibition Act of 2000, Pub. L. No. 106–557, 114 Stat. 2772 (2000), and the Shark Conservation Act of 2010, Pub. L. No. 111–348, 124 Stat. 3668 (2010). We appreciate the opportunity to consult with you and believe that this process has been highly productive. This process was initiated after the United States filed an amicus brief in Chinatown Neighborhood Association et al., v. Brown, et. al., Ninth Circuit Case No. 13-15188, and in that filing the United States observed that California's Shark Fin Prohibition may conflict with or obstruct federal law. However, in light of our discussions and the full information and analysis we have provided regarding the scope and effect of California's law, we now agree that California law and federal law are consistent and that there is no basis for finding California's Shark Fin Prohibition to be preempted by the Magnuson-Stevens Act, as amended.

The Magnuson-Stevens Act governs the management of federal fisheries, including shark fisheries. As we have discussed, the Shark Fin Prohibition and the Magnuson-Stevens Act, as amended, share a goal of promoting conservation and ending the practice of shark finning. To this end, the California Shark Fin Prohibition proscribes the possession, sale, trade, and distribution of detached shark fins in California. See Cal. Fish & Game Code §§2021(a)&(b). Of particular significance here, and unlike federal law, the California Shark Fin Prohibition does not regulate the act of finning or the taking and landing of sharks within the Exclusive Economic Zone (EEZ). Moreover, under California law, a federally-licensed fisher may land a shark in California with the fins attached, as required by the Shark Conservation Act of 2010. See id. §2021(a) (defining "shark fin" as the "raw, dried, or otherwise processed detached fin, or the raw, dried, or otherwise processed detached tail, of an elasmobranch.")

With respect to your concern regarding the ability of fishers to possess fins (from sharks caught in the EEZ), pursuant to California Fish and Game Code sections 2021(d) and 2021.5(a)(1), properly-licensed fishers are exempt from the ban on possession. Because all fishers, including those who operate in federal waters pursuant to a federal license, are required to hold state licenses in order to land sharks in California, see id. §§7850, 7881, this exemption applies equally to federal and state fishers.

Finally, California's Shark Fin Prohibition does not interfere with the management of federal fisheries. As you are aware, and as set forth in our reply to your amicus brief, we reject the notion that simply because a state ban might have an effect on fishing within federal waters and consequently on the attainment of "optimum yield," that it conflicts with and/or is preempted by the Magnuson-Stevens Act. While we may continue to disagree on this point, as a practical matter, the California Shark Fin Prohibition has no meaningful effect on fishing behavior or "optimum yield." Relatively few sharks are landed in California. The California-based drift gillnet fleet and the Hawaii-based pelagic longline fleet account for the majority of shark landings in California from federally-managed fisheries. Both of these fleets target swordfish and thus fishing behavior in these fleets is driven primarily by swordfish, and not by sharks. The relative importance of swordfish and sharks is apparent in both landings and revenue. For example, in 2012, according to PacFIN data, shark landings in California (from both federal and state waters) totaled 107.5 metric tons, and represented $189,910 in revenue. By comparison, 402.5 metric tons of swordfish were landed in California in 2012, with an ex-vessel value of $2,092,050. With respect to the relatively small number of sharks that are landed in California, state law permits the sale of all of the parts of a shark caught in federal waters and landed in California, excluding its detached fin and tail. Accordingly, we do not expect an appreciable impact on income to federally-licensed shark harvesters in California as a result of California's law.

For these reasons, we believe that California's Shark Fin Prohibition is consistent with and does not conflict with the Magnuson-Stevens Act, as amended by the Shark Finning Prohibition Act of 2000, and the Shark Conservation Act of 2010.

Please feel free to contact Thomas Gibson, General Counsel, if you have further questions or concerns.

Sincerely,

CHARLTON H. BONHAM,
*Director.*

---

PERSONAL EXPLANATION

# HON. ADAM SMITH
OF WASHINGTON
IN THE HOUSE OF REPRESENTATIVES
*Wednesday, February 5, 2014*

Mr. SMITH of Washington. Mr. Speaker, on Monday, January 27, 2014, I was unable to be present for recorded votes. Had I been present, I would have voted: "yes" on rollcall vote No. 24 (on the motion to suspend the rules and pass H.R. 2166, as amended), and "yes" on rollcall vote No. 25 (on the motion to suspend the rules and pass H.R. 3008, as amended).

---

RECOGNIZING KATIE PORTA

# HON. ALAN GRAYSON
OF FLORIDA
IN THE HOUSE OF REPRESENTATIVES
*Wednesday, February 5, 2014*

Mr. GRAYSON. Mr. Speaker, I rise today to recognize Katie Porta. Katie has devoted her life to serving the Central Florida community. She is an amazing woman and a source of inspiration to us all.

Katie was born in Indiana as Mary Katherine Hartman. She spent much of her childhood shadowing her mom, a nurse who conducted in-home hearing tests for people with disabilities. The experience of visiting rural homes and serving her community remained with Katie into adulthood and drove her apply to Purdue University, where she eventually earned a degree in speech and hearing. Following graduation, Katie became a speech and hearing therapist initially serving the public school system, and later working with military families stationed in Japan through the Department of Defense. Katie's service was rewarded with a new position in Germany, where she supervised an initiative that assisted servicemen as they transitioned from the military back into society.

After her time in Germany, Katie accepted a job working with mentally disabled children at the Sunland Center in Tallahassee. She was shocked by the hospital conditions and immediately resolved herself to becoming a powerful advocate for the disabled. One of Katie's first opportunities to serve as that advocate came in form of legislation: a bill of rights for the developmentally disabled. Katie fought to secure these rights—rights that are now enshrined in Florida law. As Katie says, the developmentally disabled "have the same needs you and I have . . . People don't want to be treated down; they want to be treated up."

Katie later took over Life Concepts, Inc. a non-profit organization that operated group homes, sheltered apartments and vocational training for adults with developmental disabilities (who had previously lived in large state institutions). She spent time visiting state institutions to personally meet the individuals who would be discharged into their assigned community homes. Katie said she wanted to make sure that the settings Life Concepts provided would meet their individual needs. The nonprofit had few resources, so Katie worked hard to develop relationships with Florida legislators and stakeholders to ensure that her clients could count on quality care. Her quick wit, persistence, and passion for her clients earned her a reputation for getting things done.

SER000069

1   Seth Atkinson (CA Bar No. 270870)
    Natural Resources Defense Council
2   111 Sutter St., 20th Floor
    San Francisco, CA 94104
3   Tel.: (415) 875-6100
    Fax: (415) 875-6161
4   satkinson@nrdc.org
5
6   Attorney for Proposed Amicus Curiae
    NATURAL RESOURCES DEFENSE COUNCIL
7
8               UNITED STATES DISTRICT COURT
9              NORTHERN DISTRICT OF CALIFORNIA
10                  OAKLAND DIVISION
11
12  _____
                                            )
13  CHINATOWN NEIGHBORHOOD                  )    Case No. 4:12-cv-03759-PJH
    ASSOCIATION, a nonprofit corporation,   )
14  and ASIAN AMERICANS FOR POLITICAL       )    DECLARATION OF LEILA MONROE
    ADVANCEMENT, a political action committee, ) IN SUPPORT OF MOTION FOR
15                                          )    LEAVE TO FILE BRIEF AS AMICUS
                    Plaintiffs,             )    CURIAE
16                                          )
17          v.                              )
                                            )
18  EDMUND BROWN, Governor of the State of  )
    California, KAMALA HARRIS, Attorney     )
19  General of the State of California, and )
    CHARLTON H. BONHAM, Director of the     )
20  California Department of Fish and Game, )
                                            )
21                                          )
                    Defendants.             )
22  _____)
23
24
25
26
27
28

                              – 1 –

        Declaration of Leila Monroe in Support of Motion for Leave to File Brief as Amicus Curiae
                          Case No. 4:12-cv-03759-PJH

SER000070

I, Leila Monroe, declare as follows:

1.    I am a Staff Attorney at the Natural Resources Defense Council (NRDC).  I have personal knowledge of the facts set forth in this declaration.  The facts set forth are true to the best of my knowledge and recollection. If called, I could and would testify to these facts in a court of law.

2.    NRDC is an IRS Section 501(c)(3) nonprofit environmental organization headquartered in New York, NY, with over 1.3 million members and online activists, including over 250,000 members and activists in California.

3.    Many of NRDC's members participate in ocean business or recreational activities that are dependent on healthy marine ecosystems, such as fishing, diving, underwater photography, and wildlife viewing.  Some of these activities directly involve sharks, like underwater photography of sharks and other types of shark viewing.

4.    NRDC's mission is to safeguard the Earth, its people, its plants and animals, and the natural systems upon which all life depends.  As part of its mission, NRDC works to protect wildlife and habitat and has spent decades protecting fish, marine wildlife, and ocean habitats.

5.    NRDC and its staff have extensive experience in understanding and applying complex scientific information to legal, policy and natural resource management decisions and the legislative process.

6.    As standard procedure, prior to engaging in any campaign or advocacy, NRDC and its staff conduct a thorough assessment of the relevant science and law, as well as political factors, to determine whether a campaign or given action is needed, well-supported by science, and tailored to achieve a valuable conservation objective.

7.    Prior to contributing time and resources to drafting and advancing the passage of Assembly Bills 376 and 853 (collectively, the "Shark Fin Ban"), as a representative of NRDC, I reviewed scientific literature on the state of shark populations, the primary threats to shark populations, and the effectiveness of existing domestic and international laws and regulations to protect sharks.  In this scoping process I consulted with several scientists in the field, including Dr. John McCosker, who is known as one of the world's preeminent shark researchers.

– 2 –

8.  To help evaluate the feasibility of pursuing a shark fin ban in California, I analyzed the enactment of a similar measure in Hawaii, which banned fins in 2010. Throughout 2011, I also tracked similar legal measures as they were enacted in the Commonwealth of the Northern Mariana Islands, Guam, Tokelau, Washington, Oregon, Toronto and other Canadian cities.

9.  Beginning in the scoping process, and continuing through the Shark Fin Ban's passage, I consulted with a wide array of allies supporting shark conservation, including environmental groups, humane organizations, cultural heritage groups, community leaders, restaurants, and fisherman.

10.  Based on the research, consultations, and analysis noted above, NRDC concluded that existing laws and regulations were not sufficient to address the contribution of California's market to global shark fin demand, and we made a strategic decision to participate in the campaign to pass California's Shark Fin Ban. Particular facts that influenced our decision to support the Shark Fin Ban are described in the following paragraphs.

11.  Historically, many sharks had low commercial value and were not regularly recorded in fisheries statistics. *See* Francesco Ferretti et al., *Patterns and Ecosystem Consequences of Shark Declines in the Ocean*, 13 Ecology Letters 1055, 1057 (2010). In recent decades, however, the demand for shark fins has increased, such that the fins are now among the most expensive fish products in the world. *See* Stefanie Vannuccini, *Shark Utilization, Marketing and Trade*, FAO Fisheries Technical Paper No. 389 at 6.2 (1999), *available at* http://www.fao.org/docrep/005/x3690e/x3690e0p.htm. Wholesale prices reported in import-export records from the past decade generally fall in the $40-80/kg range. *See* Nat'l Marine Fisheries Serv., *2010 Shark Finning Report to Congress* 31, *available at* http://www.nmfs.noaa.gov/sfa/domes_fish /ReportsTo Congress/SharkFinningReport10.pdf. Retail prices reach well above $100/kg in some markets.

12.  According to the Food and Agriculture Organization (FAO) of the United Nations, Hong Kong is the largest importer and exporter of shark fins, and the number of shark fins sold worldwide has steadily increased in recent decades. The FAO states, "World exports of shark fins have grown from 2,670 tonnes worth US$13.0 million in 1976 to 6,300 tonnes (US$90.4 million) in 1997 . . . FAO data shows an increase in world imports of shark fins from 3,700 tonnes worth US$20.0 million in 1976 to 7,025 tonnes worth US$55.5 million in 1997." *Id.* at 6.2.8. Trade has continued to flourish in the last

– 3 –

SER000072

ten years. The National Marine Fisheries Service states, "Reported global imports of shark fins have fluctuated between 13,800 mt and 17,126 mt from 2004 to 2007, while the reported global exports of shark fins have fluctuated between 9,911 mt and 15,598 mt from 2004 to 2007." Nat'l Marine Fisheries Serv., *supra*, at 31. The growth in demand for shark fins is known to drive the increased exploitation of sharks, but despite the large trade numbers, there are many data gaps and global shark catch is considered to be underreported.

13.     As a result of global demand for shark fins, scientists estimate that 26-73 million sharks are killed every year. *See* Shelley C. Clarke et al., *Global Estimates of Shark Catches Using Trade Records from Commercial Markets,* 9 Ecology Letters 1115, 1119 (2006).

14.     These vast numbers of sharks killed each year, in turn, are causing steep population declines in many shark stocks. The International Union for Conservation of Nature (IUCN) estimates that approximately 30 percent of pelagic (open ocean) sharks are threatened with extinction. *See The Conservation Status of Pelagic Sharks and Rays: Report of the IUCN Shark Specialist Group Pelagic Shark Red List Workshop* 7-8 (Merry D. Camhi et al., eds., 2009), *available at* http://cmsdata.iucn. org/downloads/ ssg_pelagic_report_final.pdf.

15.     The IUCN defines shark finning as "the removal and retention of shark fins and the discard at sea of the rest of the carcass"; this practice utilizes only about 2-5% of a shark's biomass and the remainder of the shark is discarded, often alive. Sarah Fowler & John A. Musick, International Union for Conservation of Nature, *Shark Specialist Group Finning Statement*, *available at* http://www.flmnh.ufl.edu/fish/ organizations/ssg/ssgfinstatementfinal2june.pdf.

16.     Sharks play an important role in maintaining balance in marine ecosystems. Removal of apex predators such as sharks can cause negative trophic cascades with impacts that ripple through ecosystems. *See, e.g.*, *Loss of Large Predators Disrupting Multiple Plant, Animal and Human Ecosystems*, Science Daily, July 14, 2011, *available at* http://www.sciencedaily.com/releases/2011/07/ 110714142135.htm.

17.     Many shark species travel vast distances in their lifetimes, moving between multiple jurisdictions. Because of this highly migratory behavior, shark mortality in one area can affect populations and marine ecosystems elsewhere. In particular, shark mortality outside California waters

– 4 –

SER000073

can be expected to affect the numbers of sharks present in California waters, and the functioning of California's marine ecosystems.

18. Furthermore, it is documented that the demand for shark fins, and the high price they fetch, incentivizes illegal shark finning by poachers entering U.S. waters. *See, e.g.*, Karyl Brewster-Geisz & Mark Eytcheson, *Illegal Shark Fishing off the coast of Texas by Mexican Lanchas* (2005), *available at* http://www.sefsc.noaa.gov/sedar/download/LCS_DW_07_V2.pdf?id=DOCUMENT. Fins generated from such illegal activity enter the market and may eventually be sold in California.

19. Existing state and federal laws do not address the indiscriminate killing of shark species worldwide (which, as noted above, can be expected to affect California ecosystems), nor do they wholly prevent illegal shark fishing in the United States. The effect of the Shark Finning Prohibition Act, Pub. L. No. 106-557, 114 Stat. 2772 (2000), and the Shark Conservation Act, Pub. L. No. 111-348, 124 Stat. 3668 (2010), is to make the act of finning illegal in U.S. waters. Global over-exploitation and poaching in U.S. waters are driven by the market demand for shark fins—a factor wholly unaddressed by state and federal laws.

20. According to the National Ocean Economics Program, in 2009 alone California's ocean-related economic activity contributed $35.6 billion to the state's GDP. This economic activity included $15.6 billion in direct wages, nearly 413,000 jobs, and supported over 18,000 establishments. *See* National Ocean Economics Program: Market Data Search Tool, http://www.oceaneconomics.org/Market /ocean/oceanEcon.asp (last visited Sept. 19, 2012) (providing annual estimates of ocean-related economic activity by state, county, year, and various other classifications). California has the largest ocean economy in the nation. Judith Kildow & Charles S. Colgan, *California's Ocean Economy* 1 (2005), *available at* http://resources.ca.gov/press_documents/CA_Ocean_Econ_Report.pdf.

21. Some of California's ocean-related economic activity depends on sharks directly, such as shark diving, photography, and shark-viewing tourist operations. Estimates of these expenditures in other jurisdictions suggest that the value of shark-related economic activity can amount to millions of dollars per year per shark. *See, e.g.*, G.M.S. Vianna et. al, *Wanted Dead or Alive? The Relative Value of Reef Sharks as a Fishery and an Ecotourism Asset in Palau (2010), available at* http://www.pewtrusts

SER000074

.org/uploadedFiles/wwwpewtrustsorg/Reports/Protecting_ocean_life/Palau_economic_analysis_for_ sharks.pdf.

22.     Other ocean-related economic activities require vibrant marine ecosystems, such as diving, fishing, and wildlife viewing, and therefore depend on sharks for maintaining balance and contributing to ocean health.  *Cf.* Kildow & Colgan, *supra*, at 1 ("The natural resources of the coast and coastal ocean are a solid foundation for California's economy and these resources must be sustained to maintain the strength in the six sectors evaluated within the Ocean Economy and the much larger Coastal Economy.").

23.     In addition to these monetized values, healthy oceans create an immense amount of non-monetized value in the form of ecosystem services, biodiversity reserves, existence value, and other types of value.  These non-monetized values may equal or exceed the monetized value of California's marine resources.  *See* Judith T. Kildow et al., National Ocean Economics Program, *State of the U.S. Ocean and Coastal Economies 2009*, at 38-46 (noting the total non-market value of the nation's coasts and ocean is likely in the tens to hundreds of billions of dollars, and "may rival or even surpass the market value of the nation's ocean and coastal resources"), *available at* http://www.oceaneconomics .org/NationalReport.  By maintaining balance in marine ecosystems, sharks directly contribute to this value.

24.     For the above reasons, among others, NRDC determined that a Shark Fin Ban for California would represent an important step in safeguarding the state's marine ecosystems and ocean-dependent economy.  The following paragraphs discuss NRDC advocacy and the passage of the Shark Fin Ban.

25.     I and other NRDC staff worked directly with state legislators and a broad coalition of conservation groups, both to shape the law and to get it enacted.  During winter 2010, we worked with allies and the bill authors to draft the legislation.  In this process, NRDC and other organizations conducted extensive legal analysis of potential federal constitutional issues.  We also conducted outreach and education work to build the coalition of supporters for the Shark Fin Ban.

26.     In early 2011, working with Assembly Members Fong and Huffman, NRDC joined a coordinated launch of AB 376.  Other coalition members participating in the launch of the legislation

– 6 –

SER000075

1    included conservation groups, humane organizations, cultural heritage groups, community leaders,

2    restaurants, divers, and fisherman.

3         27.    Around the same time, the Asian Pacific American Ocean Harmony Alliance

4    (APAOHA), was created to give voice to and represent Asian Pacific Americans who support legislation

5    to ban the sale, trade and possession of shark fins. *See* About APAOHA, http://www.apaoha.org/

6    page2/page2.html (last visited Sept. 19, 2012). APAOHA and its supporters view banning shark fins as

7    a way of honoring ancient tenets of Asian philosophy that emphasize the importance of harmony

8    between nature and humanity.

9         28.    The coalition of Shark Fin Ban supporters deferred to APAOHA on all cultural matters,

10   as APAOHA represented a broad and highly respected set of Asian-Pacific American leaders from

11   around California.

12        29.    NRDC and its allies worked throughout 2011 to educate policymakers and the public on

13   the need for shark conservation, and the role of shark fins in contributing to the decline of sharks

14   worldwide, as well as the connection between the worldwide decline of sharks and the health of

15   California's ocean ecosystems.

16        30.    Support for the Shark Fin Ban built during summer 2011, bolstered by reports of the

17   value of live sharks to the tourism industry, and by the successful passage of similar measures in Oregon

18   and Washington and parts of Canada. The Shark Fin Ban gained broad support: a poll conducted by the

19   Monterey Bay Aquarium found that 76% of all Californians surveyed were in favor of AB 376,

20   including 70% of Chinese Californians surveyed. *See* SeaNotes: Californians "Heart" Sharks (May 6,

21   2011), http://montereybayaquarium.typepad.com/sea_notes/2011/05/californians-sharks.html.

22        31.    Advocates of the Shark Fin Ban clearly stated that its purpose was to promote shark

23   conservation and healthy ocean ecosystems. Like many other coalition advocates, I produced

24   educational materials documenting the need to reduce the demand for shark fins, which drives global

25   overfishing of sharks and poaching of shark fins in U.S. waters. *See* Switchboard: Over 50,000 Sharks

26   Poached in the U.S. Gulf, but Some Good News for Embattled Apex Predators (Mar. 17, 2011),

27   http://switchboard.nrdc.org/blogs/lmonroe/over_50000_sharks_poached_in_t.html.

28

– 7 –

32.     The California legislature understood and intended shark conservation to be the purpose of the Shark Fin Ban.  For example, the committee report from the Assembly Committee on Water, Parks and Wildlife offered a robust presentation of the need for the bill, explicitly stating shark conservation as the basis for the legislation.  *See* Comm. on Water, Parks & Wildlife, Bill Analysis: AB 376 at 2-4 (Mar. 14, 2011), *available at* http://www.leginfo.ca.gov/pub/11-12/bill/asm/ab_0351-0400/ab_376_cfa_20110321_134213_asm_comm.html.

33.     The commercial interests opposed to AB 376 received significant media coverage.  Some opponents of AB 376 argued that it was an attack on Asian culture.  More broadly, however, attitudes in the Asian-American community were supportive, while reflecting the complex nature of the issue and many diverse viewpoints.  *Compare* LA Times Greenspace Blog: California Shark Fin Ban Advances (Aug. 25, 2011), http://latimesblogs.latimes.com/greenspace/2011/08/california-shark-fin-ban-advances.html (quoting certain ban opponents as saying it represents "an unfair attack on Asian culture and cuisine"), *with* SFWeekly Blogs: Assemblymember Paul Fong Talks About the Shark's Fin Ban (May 26, 2011), http://blogs.sfweekly.com/foodie/2011/05/assemblymember_paul_fong_talks.php (interviewing an Asian-American legislator who supported the Shark Fin Ban for conservation reasons).

34.     Media coverage notwithstanding, relatively few Asian-Americans actually opposed the Shark Fin Ban.  The polling by the Monterey Bay Aquarium noted above found that among Chinese Americans, only 18 percent of voters opposed the ban, and 12 percent had no opinion.  SeaNotes, *supra*.  By contrast, numerous Asian Americans voiced support for the ban during its passage, and many prominent individuals in the Chinese-American community joined APAOHA in order to express their support for shark conservation.  *See* About APAOHA, *supra* (listing elected officials, celebrities, community leaders, and organizations that are members of APAOHA).

35.     Ultimately, the breadth of the coalition in favor of AB 376, combined with the strength of the arguments for the Shark Fin Ban, resulted in strong bipartisan support of the bill in the legislature and propelled the bill through committees and floor votes in the Assembly and Senate.  The Assembly voted 65-8 in favor of the ban on May 23, 2011, and the Senate voted 25-9 in favor of the ban on September 6, 2011.  Voting records reflect very strong bipartisan support, including support from Asian Pacific American legislators.  *See* Vote Information: Assembly Floor Vote, AB 376,

http://www.leginfo.ca.gov/pub/11-12/bill/asm/ab_0351-0400/ab_376_vote_20110523_0156PM
_asm_floor.html (last visited Sept. 19, 2012); Vote Information: Senate Floor Vote, AB 376,
http://www.leginfo.ca.gov/pub/11-12/bill/asm/ab_0351-0400/ab_376_vote_20110906_0402PM
_sen_floor.html (last visited Sept. 19, 2012).

36.     The bill's text confirms that legislators intended it as a shark conservation measure, as the findings discuss extensively the need for shark conservation and the importance of sharks to marine ecosystems.  *See* Assem. 376 § 1 (Cal. 2011).  Nowhere in the text does the Shark Fin Ban express an intent to harm Chinese-Americans or Asian culture.  *Id.*

37.     On signing the bill, Governor Brown re-affirmed that the purpose of the legislation was to protect sharks and ocean ecosystems:  "The practice of cutting the fins off of living sharks and dumping them back in the ocean is not only cruel, but it harms the health of our oceans. . . . Researchers estimate that some shark populations have declined by more than 90 percent, portending grave threats to our environment and commercial fishing. In the interest of future generations, I have signed this bill."  Press Release, California Governor's Office, Governor Brown Acts to Protect Oceans and Environment (Oct. 7, 2011), *available at* http://gov.ca.gov/news.php?id=17264.

38.     The enactment of California's Shark Fin Ban was an important success in NRDC's work to protect the health of ocean ecosystems, and represented progress toward our mission of safeguarding the Earth, its people, its plants and animals, and the natural systems upon which all life depends .

39.     After California's Shark Fin Ban was enacted, the State of Illinois passed similar legislation banning shark fins, as did the New York Assembly.  The New York bill was not passed by that state's senate, however, and did not become law.  Shark fin bans were introduced into state legislatures in Delaware, Maryland, Virginia, as well as into the federal legislature in Canada.  Private companies, including restaurants, hotel chains, and airlines, are also moving to eliminate the use of shark fins.  *See generally* Losing the Taste for Shark Fins: The Humane Society of the United States, http://www.humanesociety .org/issues/shark_finning/timelines/shark_fins.html (last visited Sept. 19, 2012) (providing a timeline of shark fin ban activity in various jurisdictions).

//

//

– 9 –

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge, information, and belief.

Executed this 19th day of September, 2012, in San Francisco, California.


_____

Leila Monroe

SER000079

1   Seth Atkinson (CA Bar No. 270870)
    Natural Resources Defense Council
2   111 Sutter St., 20th Floor
    San Francisco, CA 94104
3   Tel.: (415) 875-6100
    Fax:  (415) 875-6161
4   satkinson@nrdc.org
5
    Attorney for Proposed Amicus Curiae
6   NATURAL RESOURCES DEFENSE COUNCIL
7
8                  UNITED STATES DISTRICT COURT
9                 NORTHERN DISTRICT OF CALIFORNIA
10                        OAKLAND DIVISION
11
12  _____   )
13  CHINATOWN NEIGHBORHOOD                      )   Case No. 4:12-cv-03759-PJH
    ASSOCIATION, a nonprofit corporation,       )
14  and ASIAN AMERICANS FOR POLITICAL           )   DECLARATION OF DR. JOHN E.
    ADVANCEMENT, a political action committee,  )   MCCOSKER IN SUPPORT OF
15                                              )   MOTION FOR LEAVE TO FILE
                            Plaintiffs,         )   BRIEF AS AMICUS CURIAE
16                                              )
17                  v.                          )
                                                )
18  EDMUND BROWN, Governor of the State of      )
    California, KAMALA HARRIS, Attorney         )
19  General of the State of California, and     )
    CHARLTON H. BONHAM, Director of the         )
20  California Department of Fish and Game,     )
                                                )
21                                              )
                            Defendants.         )
22  _____   )
23
24
25
26
27
28

– 1 –

SER000080

I, Dr. John E. McCosker, declare as follows:

1.     I am a Senior Scientist and the Chair of the Department of Aquatic Biology at the California Academy of Sciences.  I have personal knowledge of the facts set forth in this declaration.  The facts set forth are true to the best of my knowledge and recollection.  If called, I could and would testify to these facts in a court of law.

2.     I received my Ph.D. in Marine Biology and Oceanography from the Scripps Institution of Oceanography in 1973, and my B.A. from Occidental College in 1967.

3.     I was employed as the Director of the Steinhart Aquarium of the California Academy of Sciences in San Francisco, California from 1973-1994, during which period I also fulfilled other executive roles at the California Academy of Sciences.  In 1995, the endowed McCosker Chair of Aquatic Biology was created at the California Academy of Sciences, and I was appointed as the first Chair and Senior Scientist.  I have held this position to the present day.

4.     I have studied shark biology and behavior since 1967 and have participated in numerous expeditions studying them throughout the world, including expeditions to Australia, Burma, California, eastern Canada, various Caribbean islands, Comoro Islands, Costa Rica, Ecuador, Fiji, Galápagos, Hawaii/Midway, Indochina, Indonesia, Israel, Line Islands, Melanesia, Micronesia, Mexico, New Zealand, Panama, Peru, Polynesia, Russia (northern Russia and Kamchatka), Sao Tome and Principe, Seychelles, and the Solomon Islands.

5.     I have participated in numerous shark documentaries produced by NOVA, BBC, PBS, the Disney Channel, ABC, and NBC, among others.

6.     I have written 264 books and technical and popular articles about marine fishes and related topics. I have written 37 books, technical and popular articles and editorials about sharks. A listing of their titles is included in Exhibit 1 to this Declaration.

7.     I have made more than 50 presentations about sharks during my career, at venues including but not limited to the California Academy of Sciences, the Smithsonian Institution, the Denver Museum of Natural History, the British Museum of Natural History, the Paris Museum of Natural History, the Academia Sinica of Taiwan, the National Museum of Natural History in Tokyo, and before the American Society of Ichthyology and Herpetology, and the American Elasmobranch Society.

– 2 –

SER000081

8.   There are 41-44 species of sharks known to occur off the coast of California.  None have been definitively assessed and the population status of most species are poorly known.

9.   Of these 41-44 species, none of the species are unique to California.  These species are wide-ranging, and many are worldwide in distribution.  More specifically, all of the shark species found off the coast of California can also be found in waters outside the U.S. Exclusive Economic Zone (waters up to 200 miles offshore of the Unites States), and the majority of the sharks found in California waters will go beyond the 200-mile limit at some point in their lives.

10.   Of the 41-44 shark species known to occur off the coast of California, the following trans-Pacific and worldwide species commonly appear in the shark finning markets:  common thresher shark (*Alopias vulpinus*), bigeye thresher shark (*Alopias superciliosus*), smooth hammerhead shark (*Sphyrna zygaena*), bonnethead shark (*Sphyrna tiburo*), scalloped hammerhead shark (*Sphyrna lewini*), basking shark (*Cetorhinus maximus*), whale shark (*Rhincodon typus*), white shark (*Carcharodon carcharias*), shortfin mako or bonito shark (*Isurus oxyrinchus*), salmon shark (*Lamna ditropis*), ragged-tooth shark (*Odontaspis ferox*), tiger shark (*Galeocerdo cuvier*), soupfin shark (*Galeorhinus galeus*), oceanic whitetip shark (*Carcharhinus longimanus*), blue shark (*Prionace glauca*), sharpnose shark (*Rhizoprionodon longurio*), dusky shark (*Carcharhinus obscurus*), and narrowtooth shark (*Carcharhinus brachyurus*).

11.   Shark species that are most commonly finned worldwide include sandbar shark (*Carcharhinus plumbeus*), bull shark (*Carcharhinus leucas*), hammerhead sharks (*Sphyrnidae* spp.), blacktip shark (*Carcharhinus limbatus*), porbeagle (*Lamna nasus*), mako sharks (*Isurus* spp.), thresher sharks (*Isurus* spp.), and blue shark (*Prionace glauca*).  White sharks (*Carcharodon carcharias*) are occasionally finned.

12.   Shark populations throughout the world's oceans have dramatically decreased in recent years.  One study estimates a decrease of 90% or more in shark populations, from their historical abundance.  *See* Heike K. Lotze & Boris Worm, *Historical Baselines for Large Marine Animals*, 24 Trends in Ecology & Evolution 254 (2009).

13.   The rate of population decline for sharks has become more rapid during the last decade, due to the increasing value of shark fins.  The IUCN Shark Specialist Group recently assessed the global

– 3 –

SER000082

conservation status of 64 species of open ocean (pelagic) sharks and rays, and found that 32 percent are threatened with extinction, primarily due to overfishing. *See The Conservation Status of Pelagic Sharks and Rays: Report of the IUCN Shark Specialist Group Pelagic Shark Red List Workshop* 7-8 (Merry D. Camhi et al., eds., 2009), *available at* http://cmsdata.iucn.org/downloads/ ssg_pelagic_report_final.pdf.

14.     The primary source of shark mortality during the 20th and 21st centuries is human fisheries—both in the form of directed fisheries for sharks, and shark bycatch in other fisheries. Between 26 and 73 million sharks are harvested each year worldwide. *See* Shelley C. Clarke et al., *Global Estimates of Shark Catches Using Trade Records from Commercial Markets*, 9 Ecology Letters 1115, 1119 (2006).

15.     On the IUCN Red List there are 39 species of elasmobranchs (sharks and rays) listed as threatened species (Critically Endangered, Endangered or Vulnerable). IUCN experts classify the great hammerhead (*Sphyrna mokarran*) and scalloped hammerhead (*Sphyrna lewini*) sharks as globally endangered. Smooth hammerheads (*Sphyrna zygaena*), great white (*Carcharodon carcharias*), basking (*Cetorhinus maximus*) and oceanic whitetip (*Carcharhinus longimanus*) sharks are classified as globally Vulnerable to extinction, along with two species of makos (*Isurus* spp.) and three species of threshers (*Alopias* spp.). *See The Conservation Status of Pelagic Sharks and Rays*, *supra*, at 7-8. All of these species are known to be found in California.

16.     Many shark species and populations are extremely vulnerable to exploitation due to their life history characteristics. In particular, sharks tend to be solitary, slow growing, and require a long time to become sexually mature. Other fish species, by contrast, tend to be smaller, faster-growing, and reproduce at a younger age, allowing them to withstand exploitation more easily. Sharks also produce very few young in each litter (often in the single digits or a few dozen), as a result of using live-birth or large egg reproductive strategies. By way of comparison, other fish species tend to have reproductive strategies that use high numbers of small eggs, wherein an adult female can produce thousands or even millions of eggs each reproductive cycle.

17.     Another reason sharks are vulnerable to exploitation is that fishing gear—including hook and line, gillnets, and trawls—primarily catches adult sharks, leaving only immature individuals alive.

– 4 –

SER000083

This can dramatically decrease reproduction in a population of sharks, as the sharks that remain alive must grow to maturity before contributing to the population's reproductive success.

18.     A further difficulty in shark conservation has emerged from recent genetic studies, which have discovered that some shark species that were historically thought to be wide-ranging are actually separate, non-interbreeding populations, or multiple distinct species.  This means that what were previously thought to be single species inhabiting a broad distribution are now known to be several distinct populations or species, making each of them more vulnerable to overexploitation.

19.     In the United States, state and federal laws exist to prohibit shark finning.  Some other countries also prohibit shark finning.  Enforcement varies widely, however, and some of the countries with laws against finning still experience significant amounts of illegal and unreported shark finning.  Many countries still allow shark finning in their Exclusive Economic Zones.

20.     Regional Fishery Management Organizations have enacted finning regulations for some international waters, but implementation of these regulations is widely varied, limiting their effectiveness.  As a practical matter, shark fishing and finning continues unabated in most areas of international waters.

21.     Because shark fins do not require refrigeration, many artisanal fishermen catch and kill sharks and dry their fins for future sale. The body is not saved because it has little value and requires refrigeration.  The same is true of commercial longline fisheries in many areas.

22.     Once sharks are caught and finned, most of the fins are sent to Hong Kong for processing.  Hong Kong handles at least 50% and possibly up to 80% of the world trade in shark fin, with major suppliers being Europe, Taiwan, Indonesia, Singapore, United Arab Emirates, Yemen, India, Japan, and Mexico.  *See* Sarah Fowler & John A. Musick, International Union for Conservation of Nature, *Shark Specialist Group Finning Statement*, *available at* http://www.flmnh.ufl.edu/fish/ organizations/ssg/ssgfinstatementfinal2june.pdf.  A third of all fins imported to Hong Kong come from Europe, within which Spain is by far the largest supplier, providing between 2,000 and 5,000 metric tons a year.

23.     After processing in Hong Kong, shark fins are exported to centers of consumption around the world.  *See generally* Nat'l Marine Fisheries Serv., *2011 Shark Finning Report to Congress* 27-34

– 5 –

SER000084

1  (providing tables of global shark fin imports and exports), *available at* http://www.nmfs.noaa.gov
2  /sfa/domes_fish/ReportsToCongress/SharkFinningReport 11.pdf.

3      24.    It is very difficult to identify a species of shark on the basis of a dried and processed fin.
4  DNA techniques are available for identifying some (but not all) species from which a shark fin came,
5  but those techniques are prohibitively expensive and slow, and therefore impractical for use in
6  identification of fins by authorities.  Accordingly, shark fins sold in California could easily come from
7  countries that have lax or no laws against shark finning, or from sharks caught and finned in
8  international waters.

9      25.    Recent studies have demonstrated that American consumers of shark fin soup are often
10  unknowingly consuming at-risk and endangered species.  *See, e.g.*, Press Release, Pew Charitable
11  Trusts, *New DNA Study Reveals Fins of Endangered Shark in U.S. Soups* (Aug. 9, 2012), *available at*
12  http://www.pewenvironment.org/news-room/press-releases/new-dna-study-reveals-fins-of-endangered-
13  shark-in-us-soups-85899409748.

14      26.    As apex predators, sharks play an important ecological role.  In particular, shark
15  predation keeps populations of prey species in check, maintaining balance in marine ecosystems.  When
16  large predatory sharks become less abundant, prey species experience lower mortality, and prey
17  populations increase.  Changes are also observed in the abundance, distribution, and behavior of lower
18  tropic-level predators, including small sharks, marine mammals, and sea turtles.  This type of cascading
19  ecosystem impact is created because sharks exert strong top-down forces on ocean ecosystems through
20  their predation.  Thus, as apex predators, sharks are strong shapers of marine communities.  *See*
21  Francesco Ferretti et al., *Patterns and Ecosystem Consequences of Shark Declines in the Ocean*,
22  13 Ecology Letters 1055, 1057 (2010).

23      27.    Trophic cascades due to shark removal are occurring in many locations.  For example,
24  one study showed that eleven populations of apex-predator sharks in the Northwest Atlantic  (*i.e.*, shark
25  species that consume rays, skates, and smaller sharks) have declined over the past three decades.  As a
26  consequence, populations of 12 of the 14 elasmobranch prey species associated with these sharks have
27  increased.  *See* Ransom A. Myers et al., *Cascading Effects of the Loss of Apex Predatory Sharks from a*
28  *Coastal Ocean*, 315 Science 1846 (2007).

– 6 –

SER000085

28.     Another example of the ecosystem effects of removing sharks is provided by a recent study of predator sharks and their prey, longheaded eagle rays (*Aetobatus flagellum*) in Japan.  That study found that a decrease in shark populations has resulted in a population increase for the rays.  The population increase in rays, in turn, has led to the decimation of wild stocks and cultured populations of several shellfish species, which are the rays' prey.  *See* Darlene Crist et al., *World Ocean Census: A Global Survey of Marine Life* (2009).

29.     Further examples of trophic cascades created by shark removal are provided by coral reef ecosystems.  Scientists recently explored a chain of islands in the Central Pacific Ocean that feature virtually pristine, undisturbed reefs, as well as reefs adjacent to populated islands that are subject to the effects of pollution and fishing.  They found that uninhabited Jarvis Island features a healthy, thriving reef ecosystem with a robust shark population.  Neighboring Kiritimati, or Christmas Island, however, with a population of 5,000 people and an active shark fishery, is absent of sharks and now features an ecosystem dominated by small fishes and overrun by algae.  *See* James A. Estes et al., *Trophic Downgrading of Planet Earth*, 333 Science 301 (2011).

30.     A shark species need not be extinct to have a significant impact on oceanic ecosystems.  Simple reductions in shark abundance have been shown to induce trophic cascades through changes in prey abundance and behavior, as well as replacement of the removed shark species by other predators.  Seventeen research studies in the eastern United States have shown that the decline of large sharks has resulted in increases of smaller sharks, skates and rays.  *See, e.g.*, Myers et al., *supra*.

//
//
//
//
//
//
//
//
//

– 7 –

SER000086

1    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United

2    States of America that the foregoing is true and correct, to the best of my knowledge, information, and

3    belief.

4

5    Executed this 19th day of September, 2012, in Island Park, Idaho.

6

7

8

9

10

11    Dr. John E. McCosker

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– 8 –

SER000087

EXHIBIT 1 TO ATTACHMENT A:

CURRICULUM VITAE AND BIBLIOGRAPHY OF DR. JOHN E. MCCOSKER

SER000088

**Curriculum Vitae**

**John Edward McCosker, PhD**

California Academy of Sciences
San Francisco, California  94118

(415) 379-5285  voice
(415) 379-5731  fax
jmccosker@calacademy.org

Date of Birth:  17 November 1945

Citizenship:  USA

Married to Pamela J. McCosker

Employment:

| | |
|---|---|
| 1995 - present | Senior Scientist and Chair of Aquatic Biology, California Academy of Sciences |
| 2004 - 2005 | Acting Director, Steinhart Aquarium |
| 1994 | Interim Executive Director, California Academy of Sciences |
| 1991 - 1992 | Acting Director of Business and Finance, California Academy of Sciences |
| 1988 - 1989 | Interim Executive Director, California Academy of Sciences |
| 1980 - 1983 | Director, Public Programs, CAS |
| 1976 - 1986 | Acting Director (during absences of Executive Director), CAS |
| 1976 - present | Adjunct Professor of Marine Biology, San Francisco State University |
| 1973 - 1995 | Director, Steinhart Aquarium |

SER000089

| 1973 | Lecturer in Marine Biology, University of California, San Diego |
|------|------|
| 1972 | Instructor in Biology, San Diego City College |
| 1970 – 1971 | Predoctoral Research Fellow, Smithsonian Tropical Research Institute |

Education:

| 1967 – 1973 | Ph.D., Scripps Institution of Oceanography |
|------|------|
| 1970 – 1971 | Predoctoral Research Fellow, Smithsonian Tropical Research Institute, Balboa, Panama, during one year leave from Scripps |
| 1963 – 1967 | B.A., Occidental College, Los Angeles, California |

Honors and Awards:

| 2009 | National Philanthropy Day, San Francisco Honoree |
|------|------|
| 2005 | Fellowship, Museum of New Zealand Te Papa |
| 2005 | Conservation and Research Award, Trout Unlimited |
| 2004 | Sponsorship of Northern California Coast exhibit at CAS, Evelyn and Walter Haas Jr. Fund |
| 2002 | Fellows Medal, California Academy of Sciences |
| 2001 | Fellowship, Muséum National d'Histoire Naturelle, Paris |
| 1996 | Fellowship, Australian Museum, Sydney |
| 1995 | Establishment of endowed McCosker Chair of Aquatic Biology at California Academy of Sciences |
| 1993 | Marin County Cultural Achievement Award |
| 1990 | ARCS Bay Area Scientist of the Decade Award (amongst other recipients) |

SER000090

1987    D.Sc., *honoris causa*, Occidental College

1980    Public Service Commendation, Department of Design and Industry, San Francisco State University

1976    Fellow, California Academy of Sciences

1971    Academic Achievement Award in Higher Education and Research, Smithsonian Institution

1967    Sigma Xi Honorary Award for Research in Biology

1967    Phi Beta Kappa, Occidental College

Research Interests:

Biology and conservation of anadromous fishes, particularly salmonids
Evolution and behavior of snake eels and moray eels
Aquarium and museum design
Evolution and community structure of eastern Pacific reef fish assemblages
Galápagos ichthyofauna and its management
Biology of the white shark Carhcharodon carcharias
Biology of the coelacanth Latimeria chalumnae
Appropriate technology applications to museums and aquariums

Teaching Experience:

1976 – present    Adjunct Professor in Zoology, San Francisco State University (SFSU)

1974 – present    Instructor in Docent Aquarium course, SFSU extension

1973    Lecturer in Marine Biology, University of California, San Diego

1972    Instructor in Biology, San Diego City College

1970    Teaching Assistant, Ichthyology, Scripps Institution of Oceanography

SER000091

```
      1966    Teaching Assistant, Comparative Vertebrate
              Anatomy, Occidental College

      1966    Teaching Assistant, Plant Anatomy and Taxonomy,
              Occidental College
```

Graduate students:

  Served on graduate student committee:

M. Eric Anderson, 1977, "Systematics and natural history of
      *Lycodapus mandibularis* in California waters", M.S., Moss
      Landing Marine Laboratory.

Candis L. Cooperrider, 1982, "Toxicity and sublethal effects on
      fish behavior of the antibiotic, Tylosin", M.S., San
      Francisco State University.

Carol A. Wolf, 1982, "Reproductive behavior of captive
      yellowhead jawfish, *Opistognathus aurifrons*", M.S., San
      Francisco State University.

David A. Ebert, 1984, "Aspects of the life history of
      California's two cowshark species, *Notorynchus cepedianus*
      and *Hexanchus griseus*", M.S., Moss Landing Marine
      Laboratory.

Leslie A. King, 1992, "Adult and fetal hemoglobins in the swell
      shark, *Cephaloscyllium ventriosum*", M.S., San Francisco
      State University.

Kenneth J. Goldman, 1996, "Thermal physiology and behavioral
      ecology of white sharks, *Carcharodon carcharias*", M.S., San
      Francisco State University.

  Project advisor but not a thesis committee member:

Gerald T. Todd, 1981, "Evolution and the problem of buoyancy in
      cartilaginous and bony fishes", Ph.D., UCLA.

Brooke S. Antrim, 1981, "Habitat and food resource utilization
      of three species of embiotocids in Elkhorn Slough, Monterey
      Bay, California", M.S., Moss Landing Marine Laboratory.

4

SER000092

Samuel M. Taylor, 1986, "Understanding processes of informal education: A naturalistic study of visitors to a public aquarium", Ph.D., UCB.

Cheryl R. Aday, 1993, "Environmental enrichment for dolphins and seals", M.S., San Francisco State University.

Gabrielle J. Goffinet, 1994, "Play behavior in the natural history of captive, black-footed penguins, *Spheniscus demersus*", M.S., San Francisco State University.

Outside reviewer of PhD theses:

Rachel Robbins, 2004, "Environmental factors affecting sexual and size segregation, and the effect of baiting on the natural behaviours of great white sharks, *Carcharodon carcharias*, at the Neptune Islands, South Australia." University of Technology, Sydney.

Monica Mwale, 2006, "The biology and systematics of South African pipefishes of the genus *Syngnathus*", Rhodes University, Grahamstown, South Africa.

Current and Previous Advisory Activities:

Phoenix Science Center, Trustee

Ocean Trust Foundation, Trustee

Bolinas Lagoon Foundation, Trustee

University High School, San Francisco, Trustee

Oceanic Society, San Francisco, Director

American Association of Ichthyologists and Herpetologists, Governor

American Association of Zoological Parks and Aquaria, Professional Fellow

Paul F. Romberg Tiburon Center for Environmental Studies, Governor

Marine and Freshwater Biomedical Research Center, Advisor

National Outdoor Leadership School, Trustee

SER000093

Society for the Protection of Old Fishes, Member and
   Conference Chairman

IUCN Genome Conservation Group, Scientific Advisor

IUCN Species Survival Commission, Shark Specialist Group

Science 81-84 Magazine, AAAS, Contributing Editor

Oceans Magazine, Contributing Editor

Pacific Discovery Magazine, Associate Editor

BBC Television, "The World About Us", Scientific Advisor

BBC Television, NOVA Television, "Jaws, the True
   Story", Writer and Presenter

Walt Disney Cable Network, "The Nature of Things",
   Scientific Advisor

Bay Area Skeptics, Advisory Board Member

California Shark Center and Aquarium, Ventura
   California, Advisor

Coastal Resource Center, Advisor

American Elasmobranch Society, Shark Conservation
   Commmittee

Fitzgerald Marine Reserve, Advisor

American Institute of Fishery Research Biologists, Fellow

Hastings Journal of Environmental Law and Policy, Advisor

Henry's Fork Foundation, Board Member

Bothin Foundation, Trustee

Seacology Foundation, Scientific Advisor

Gordon and Betty Moore Foundation, Senior Consultant on
   Aquatic Affairs

SER000094

Conservation International, Marine Advisory Board Member

Trout Unlimited, Coldwater Conservation Fund Board Member

Wild Salmon Center, Board Member

Field Experience:

Participated in or led research projects and expeditions in: Antarctica, Australia, Burma, California, eastern Canada, various Caribbean islands, Islands, Costa Rica, Ecuador, Fiji, Galápagos, Hawaii/Midway, Indochina, Indonesia, Israel, Line Islands, Melanesia, Micronesia, Mexico, New Zealand, Panama, Peru, Polynesia, Russia (northern Russia and Kamchatka), Sao Tome and Principe, Seychelles, and Solomon Islands.

SER000095

**BIBLIOGRAPHY: John E. McCosker**

Author of more than 260 technical and popular articles and monographs. Author, coauthor, or editor of six monographs and books.

**TECHNICAL PAPERS AND BOOKS**

Long, D.L., McCosker, J.E., Blum, S. and A. Klapfer. 2011. Tropical Eastern Pacific Records of the Prickly Shark, *Echinorhinus cookei* Pietschmann (Chondrichyes: Echinorhinidae). Pacific Science 65: 433–440. (258)

McCosker, J.E., K. Hatooka, N. Ohnishi & H. Endo. 2011. Redescription and Designation of a Neotype for *Aphthalmichthys kuro* Kuroda (1947), and its Placement in *Callechelys* (Anguilliformes: Ophichthidae). Ichthyological Research 58:272–277. (255)

McCosker, J.E. 2011. Two new Indo-Pacific species of the sand-eel genus *Yirrkala* (Anguilliformes: Ophichthidae). Smithiana Bulletin 13:45–50. (254)

McCosker, J.E. & R.H. Rosenblatt. 2010. The Fishes of the Galápagos Archipelago: An Update. Proceedings of the California Academy of Sciences 61, Supplement 2, no. 10:161–189. (253)

McCosker, J.E. 2010. Deepwater Indo-Pacific species of the snake-eel genus *Ophichthus* (Anguilliformes: Ophichthidae), with the description of nine new species. Zootaxa 2505:1–39. (252)

Poss, S.G., McCosker, J.E. and C.C. Baldwin. 2010. A new species of *Scorpaenodes* (Pisces: Scorpaenidae) from the Galápagos and Cocos Island with discussions on the limits of *Scorpaenodes* and *Thysanichthys*. Proceedings of the California Academy of Sciences 61(2):233–265. (250)

McCosker, J.E., W. Chen and H. Chen. 2009. Comments on the snake eel genus *Xyrias* (Anguilliformes: Ophichthidae) with the description of a new species. Zootaxa 2289:61–67. (249)

SER000096

Motomura, H. and J.E. McCosker. 2009. Second specimen of the Costa Rican scorpionfish, *Scorpaena cocosensis* (Scorpaenidae): the first record from the Galapagos Islands, with fresh color notes on the species. Biogeography 11:135–137. (248)

McCosker, J.E. 2009. Families Muraenidae, Synaphobranchidae, Ophichthidae, Nemichthyidae, Congridae, Nettastomatidae and Serrivomeridae. Pp. 76–89 In K. Nakaya, M. Yabe, H. Imamura, R. Carmena & M. Yoshida, eds. *Deep-Sea Fishes of Peru*. Japan Deep Sea Trawlers Association, Tokyo. (247)

McCosker, J.E. and J.E. Randall. 2008. *Gymnothorax davidsmithi*, a new moray eel (Anguilliformes: Muraenidae) from Indonesia. Proceedings of the California Academy of Sciences 59(16):715–717. (246)

McCosker, J.E. and P. Wirtz. 2008. Notes on *Brachysomophis atlanticus* from the Cape Verde Archipelago. Proceedings of the California Academy of Sciences 59(16):711–714. (245)

Smith, D.G. and J.E. McCosker. 2008. Family Ophichthidae Snake Eels, Worm Eels. In *Fishes of Australia's Southern Coast*, M. Gomon et al., eds. New Holland Pub., Sydney. Pp. 166–169. (243)

McCosker, J.E. 2008. *Trachyscorpia osheri* and *Idiastion hageyi*, Two New Species of Deepwater Scorpionfishes (Scorpaeniformes: Sebastidae, Scorpaenidae) from the Galápagos Islands. Proceedings of the California Academy of Sciences 59(3):113–123. (240)

Edgar, G.J., P.F. Langhammer, G. Allen, T.M. Brooks, J. Brodie, W. Crosse, N. De Silva, L.D.C. Fishpool, M.N. Foster, D.H. Knox, J.E. McCosker, R. McManus, A.J.K. Millar and R. Mugo. 2008 (published online, 23 April). Key Biodiversity Areas as globally significant target sites for the conservation of marine biological diversity. Aquatic Conservation: Marine and Freshwater Ecosystems. (239)

Glynn, P.W., I.C. Enochs, J.E. McCosker and A.N. Graefe. 2008. First record of a pearlfish, *Carapus mourlani*, inhabiting the aplysiid opisthobranch mollusc *Dollabella auricularia*. Pacific Science 62(4):593–601. (241)

McCosker, J.E. 2007. The history of research at the California Academy of Sciences' Steinhart Aquarium and Department of Aquatic Biology. Proceedings of the California Academy of Sciences 58(11):171–195. (235)

SER000097

McCosker, J.E. 2007. *Luthulenchelys heemstraorum*, a new genus and species of snake eel (Anguilliformes: Ophichthidae) from KwaZulu-Natal, with comments on *Ophichthus rutidoderma* (Bleeker, 1853) and its synonyms. Smithiana. Bulletin 7:3-7. (236)

McCosker, J.E. and J.E. Randall. 2007. A new genus and species of mud-dwelling moray eel (Anguilliformes: Muraenidae) from Indonesia. Proceedings of the California Academy of Sciences 58(22):469-476. (237)

McCosker, J.E. and S.W. Ross. 2007. A new deepwater species of the snake eel genus *Ophichthus* (Anguilliformes: Ophichthidae) from North Carolina. Copeia 2007(4):783-787. (238)

McCosker J.E., D. Boseto and A. Jenkins. 2007. Redescription of *Yirrkala gjellerupi* (Weber & de Beaufort, 1916), a poorly-known freshwater Indo-Pacific Snake Eel (Anguilliformes: Ophichthidae). Pacific Science 61(1):141-144. (232)

McCosker, J.E. 2006. A New Species of Deepwater Worm eel, *Scolecenchelys castlei* (Anguilliformes: Ophichthidae), from New Zealand and Australia, with comments on *S. breviceps* and *S. macroptera*. Journal of the Royal Society of New Zealand 36(1):17-26. (226)

McCosker, J.E. 2006. A New Species of Sand Eel, *Yirrkala moorei* (Anguilliformes: Ophichthidae), from the South Pacific. Proceedings of the California Academy of Sciences 57(1):335-339. (227)

McCosker, J.E. 2006. Symbiotic relationships. In *Ecology of Marine Fishes*. L. G. Allen et al., eds. University of California Press, Berkeley. Pp. 554-563. (228)

McCosker, J.E. and A.L. Stewart. 2006. Additions to the New Zealand eel fauna with the description of a new moray, *Anarchias supremus* (Teleostei: Muraenidae), and comments on the identity of *Gymnothorax griffini* Whitley and Phillips. Journal of the Royal Society of New Zealand 36(2):83-95. (229)

McCosker, J.E. and R.N. Lea. 2006. White Shark Attacks Upon Humans in California and Oregon, 1993-2003. Proceedings of the California Academy of Sciences 57(17):479-501. (230)

SER000098

McCosker, J.E. 2006. Notes and comments on some eastern Atlantic snake eels (Anguilliformes: Ophichthidae). Proceedings of the California Academy of Sciences 57(17):736–738. (231)

Allen, G.R., J.E. McCosker, N.J. Cross, D.J. Bray and D.F. Hoese. 2006. Muraenidae. Pp. 243–259, in D.F. Hoese et al. (eds.) *Zoological Catalogue of Australia*. *Volume 35 Pisces*. Australian Government Publishing Service, Canberra. (233)

McCosker, J.E., G.R. Allen, D.F. Hoese, J.E. Gates and D.J. Bray. 2006. Ophichthidae. Pp. 264–277, in D.F. Hoese et al. (eds.) Zoological Catalogue of Australia. Volume 35 Pisces. Australian Government Publishing Service, Canberra. (234)

McCosker, J.E. and J.E. Randall. 2005. Notes on the snake eels of the genera *Apterichtus* and *Ichthyapus* (Anguilliformes: Ophichthidae) of the Central and South Pacific, with the description of a new species. Zootaxa 800:1–11. (223)

McCosker, J.E. 2005. A New Species of Deepwater Snake Eel, *Ophichthus pullus* (Anguilliformes: Ophichthidae), from Angola and Guinea-Bissau. Proceedings of the California Academy of Sciences 56(36):669–674. (225)

Mincarone, M.M. and J.E. McCosker. 2004. *Eptatretus lakeside* sp. nov., a New Species of Five-Gilled Hagfish (Myxinidae) from the Galápagos Islands. Proceedings of the California Academy of Sciences 55(6):162–168. (215)

McCosker, J.E. 2004. A new species of finless snake eel (Anguilliformes: Ophichthidae) from Ascension Island, with comments on *Ichthyapus acutirostris*. Proceedings of the California Academy of Sciences 55(7):169–173. (216)

McCosker, J.E. and D. G. Smith. 2004. The Argus moray, *Muraena argus*, added to the California fauna. Proceedings of the California Academy of Sciences 55(7):246–247. (217)

McCosker, J.E., S. Anderson, J. Richards, and M. Love. 2004. First record of the Cape cigarfish, *Cubiceps capensis* (family Nomeidae), from California waters. Cal Fish and Game 90(3):157–159. (219)

Robertson, D.R., J.S. Grove and J.E. McCosker. 2004. Tropical transpacific shore fishes. Pacific Science 58(4):507–565. (220)

SER000099

Case 4:12-cv-03359 Document 22-3 Filed 09/21/12 Page 102 of 143

McCosker, J.E., J.S. Stephens and R.H. Rosenblatt. 2003. *Cottoclinus canops*, a new genus and species of blenny (Perciformes: Labrisomidae) from the Galápagos Islands. Proceedings of the California Academy of Sciences. 54(8):155–160. (208)

McCosker, J.E. 2003. Ophichthidae. In Carpenter, K. E. ed. *FAO species identification guide for fishery purposes. The living marine resources of the Western Central Atlantic*. FAO, Rome. Vol 2:724–733. (211)

Tighe, K.A. and J.E. McCosker. 2003. Two new species of the genus *Chlopsis* (Teleostei: Anguilliformes: Chlopsidae) from the Southwestern Pacific. *Zootaxa* 236:1–8. (212)

McCosker, J.E., R.H. Bustamante and G. M. Wellington. 2003. The freshwater eel, *Anguilla marmorata*, discovered in Galápagos. Noticias de Galápagos No. 62:2–6. (213)

McCosker, J.E. 2002. Notes on Hawaiian snake eels (Pisces: Ophichthidae), with comments on *Ophichthus bonaparti*. Pacific Science, 56(1):23–34. (204)

Randall, J.E. and J.E. McCosker. 2002. *Parapercis lata*, a new species of sandperch (Perciformes: Pinguipedidae) from the Central Pacific. Proceedings of the California Academy of Sciences. 53(8):87–93, 1 pl. (205)

McCosker, J.E. and J.E. Randall. 2002. *Ophichthys melanochir* Bleeker, 1865, A Junior Synonym of the Highfin Snake Eel *Ophichthus altipennis* (Kaup, 1856). Copeia 2002(3):798–799. (206)

Böhlke, E.B. and J.E. McCosker. 2001. The moray eels of Australia and New Zealand, with the description of two new species (Anguilliformes: Muraenidae). *Records of the Australian Museum* 53(1):71–102. (195)

McCosker, J.E. and J.E. Randall. 2001. A revision of the snake-eel genus *Brachysomophis* (Anguilliformes: Ophichthidae), with the description of two new species and comments on the species of *Mystriophis*. Indo-Pacific Fishes number 33. 32 pp. (196)

McCosker, J.E. and R.J. Lavenberg. 2001. *Gordiichthys combibus*, a new species of eastern Pacific sand-eel (Anguilliformes: Ophichthidae). Rev. Biol. Trop. 49 supl. 1:7–12. (199)

SER000100

McCosker, J.E. and D.R. Robertson. 2001. *Aplatophis zorro*, a new species of eastern Pacific snake-eel, with comments on New World ophichthid distributions (Anguilliformes: Ophichthidae). Rev. Biol. Trop. 49 supl. 1:13-19. (200)

Iwamoto, T. and J.E. McCosker. 2001. Notes on Galapagos grenadiers (Pisces, Gadiformes, Macrouridae), with the description of a new species of *Coryphaenoides*. Rev. Biol. Trop. 49 supl. 1:21-27. (201)

Baldwin, C.C. and J.E. McCosker. 2001. Wrasses of the Galapagos Islands, with the description of a new deepwater species of *Halichoeres* (Perciformes: Labridae). Rev. Biol. Trop. 49 supl. 1:89-100. (202)

Munroe, T.A. and J.E. McCosker. 2001. Redescription of Symphurus *diabolicus*, a poorly-known, deep-sea tonguefish (Pleuronectiformes: Cynoglossidae) from the Galapagos Archipelago. Rev. Biol. Trop. 49 supl. 1:185-191. (203)

McCosker, J.E. and Y.-Y. Chen. 2000. A new species of deepwater snake-eel, *Ophichthus aphotistos*, with comments on *Neenchelys retropinna* (Anguilliformes: Ophichthidae) from Taiwan. Ichthyological Research, 47(4):353-357. (191)

Böhlke, E.B. and J.E. McCosker. 2000. Family Muraenidae. Pp. 584-585 *in* A checklist of the fishes of the South China Sea. Randall, J.E. and K.K.P. Lim, eds. 2000. Supplement no. 8, Raffles Bull. Zool. (193)

McCosker, J.E. 2000. Family Ophichthidae. P. 586 *in* A checklist of the fishes of the South China Sea. Randall, J.E. and K.K.P. Lim, eds. 2000. Supplement no. 8, Raffles Bull. Zool. (194)

Claro, R., R. G. Gilmore, C. R. Robins and J.E. McCosker. 2000. Nuevos registros para la ictiofauna marina de Cuba. Avicennia 12/13:19-24. (207)

Bradbury, M.G., J.E. McCosker, and D.J. Long. 1999. Batfishes of the Galápagos Islands with descriptions of two new species of *Dibranchus* (Teleostei: Ogcocephali). Rev. Français Ich., 25(3-4):79-88. (179)

McCosker, J.E. 1999. Pisces Anguilliformes: Deepwater snake eels (Ophichthidae) from the New Caledonia region, Southwest Pacific Ocean. *In* A. Crosnier (ed.), Résultats des Campagnes MUSORSTOM, Vol. 20. Mém. Mus. natn. d'Hist. nat. 180:571-588. (181)

SER000101

Long, D.J. and J.E. McCosker. 1999. A new species of deepwater skate, *Rajella eisenhardti*, (Chondrichthyes: Rajidae), from the Galápagos Islands. Proceedings of the Biological Society of Washington. 112(1):45-51. (182)

Castle, P.H.J. and J.E. McCosker. 1999. A new genus and two new species of myrophine worm-eels, with comments on *Muraenichthys* and *Scolecenchelys* (Anguilliformes: Ophichthidae). Rec. Aust. Mus. 51(2):113-122. (184)

D.G. Smith and J.E. McCosker. 1999. Family Ophichthidae. Pp. 1662-1669 *in* Carpenter, K. E. and V. H. Niem (eds). FAO species identification guide for fishery purposes. The living marine resources of the Western Central Pacific. Vol. 3. Batoid fishes, chimaeras and bony fishes part 1 (Elopidae to Linophrynidae). Rome, FAO:1397-2066. (185)

Böhlke, E.B., J.E. McCosker, and D.G. Smith. 1999. Family Muraenidae. Pp. 1643-1657 in Carpenter, K.E. and V.H. Niem (eds). FAO species identification guide for fishery purposes. The living marine resources of the Western Central Pacific. Vol. 3. Batoid fishes, chimaeras and bony fishes part 1 (Elopidae to Linophrynidae). Rome, FAO:1397-2066. (186)

Long, D.J. and J.E. McCosker. 1998. A new species of the morid genus *Gadella* (Teleostei: Gadiformes) from the Galápagos Islands. Ichthyol. Res. 45(1):1-5. (169)

McCosker, J.E. 1998. A revision of the snake-eel genus *Callechelys* (Anguilliformes: Ophichthidae) with the description of two new Indo-Pacific species and a new callechelyin genus. Proceedings of the California Academy of Sciences. 50(7):185-215. (171)

McCosker, J.E. 1998. Snake-eels of the genus *Xyrias* (Anguilliformes: Ophichthidae). Cybium 22(1):7-13. (172)

Richards, W.J. and J.E. McCosker. 1998. A new species of genus *Bellator* (Pisces, Triglidae), with comments on the trigloids of the Galápagos Islands. Proceedings Biol. Soc. Wash. 111(4):936-941. (176)

McCosker, J.E. and R.H. Rosenblatt. 1998. A revision of the eastern Pacific snake-eel genus *Ophichthus* (Anguilliformes: Ophichthidae) with the description of six new species. Proceedings California Academy Sciences 50(19):397-432. (177)

14

Cohen, D.M. and J.E. McCosker. 1998. A new species of bythitid fish, genus *Lucifuga* from the Galápagos Islands. Bull. Mar. Science, 63(1):179-187. (180)

McCosker, J.E. and D.J. Long. 1997. A new species of the deepwater cardinalfish *Epigonus* (Perciformes: Epigonidae) from the Galápagos Islands. Ichthyological Research 44(2):125-129. (162)

McCosker, J.E. and D.G. Smith. 1997. Two new Indo-Pacific morays of the genus *Uropterygius* (Anguilliformes: Muraenidae). Bulletin of Marine Science 60(3):1005-1114. (165)

McCosker, J.E., G. Merlen, D.J. Long, R.G. Gilmore and C. Villon. 1997. Deepslope fishes collected during the 1995 eruption of Volcan Fernandina, Galápagos. Noticias de Galápagos no. 58:22-26. (166)

Böhlke, E.B. and J.E. McCosker. 1997. Review of the moray eel genus *Scuticaria* (Pisces: Anguilliformes: Muraenidae: Uropterygiinae). Proceedings Academy Natural Sciences Philadelphia, 148:1-6. (168)

McCosker, J.E. and P. Humann. 1996. New Records of Galápagos Fishes. Noticias de Galápagos, no. 56:18-22. (158)

Goldman, K.J., S. D. Anderson, J.E. McCosker and A.P. Klimley. 1996. Temperature, swimming depth, and diel movements of a white shark (*Carcharodon carcharias*) at the South Farallon Islands, central California, with comments on thermal physiology. Pp. 111-120 *In* Great white sharks: The biology of *Carcharodon carcharias*. Academic Press, ed. by A. P. Klimley and D. G. Ainley. 517 pp. (159)

McCosker, J.E. and R.N. Lea. 1996. White shark attacks in the eastern Pacific Ocean: an update and analysis. Pp. 419-434 *In* Great white sharks: The biology of *Carcharodon carcharias*. Academic Press, ed. by A. P. Klimley and D. G. Ainley. 517 pp. (160)

McCosker, J.E. and R.H. Rosenblatt. 1995. Muraenidae. In Fischer, W. et al., eds. *Guia FAO para la identificación de especies para los fines de la pesca. Pacifico centro-oriental*. FAO, Rome. Vol. II:1303-1314. (153)

SER000103

McCosker, J.E. and R.H. Rosenblatt. 1995. Ophichthidae. In Fischer, W. et al., eds. *Guia FAO para la identification de especies para los fines de la pesca. Pacifico centro-oriental.* FAO, Rome. Vol. II:1326-1341. (154)

McCosker, J.E. and N. Parin. 1995. A new species of deepwater worm-eel, *Muraenichthys profundorum* (Anguilliformes: Ophichthidae), from the Nazsca Ridge. Japanese J. Ichthyology 42(3/4):231-235. (156)

McCosker, J.E. and J.E. Randall. 1993. Finless snake-eels of the genus *Cirricaecula* (Anguilliformes: Ophichthidae), with the Description of C. *macdowelli* from Taiwan. Japanese J. Ichthyol 40(2):189-192. (142)

McCosker, J.E., A. Baranes and D. Golani. 1993. Description of the adult of *Leptocephalus echeloides* D'Ancona (1928), a deepwater snake eel, genus *Ophichthus* (Pisces: Ophichthidae), from the Gulf of Aqaba. Cybium 17(2):165-170. (143)

Randall, J.E. and J.E. McCosker. 1993. Social mimicry in fishes. Revue fr. Aquariol. 20(1):5-8. (144)

McCosker, J.E. and R.H. Rosenblatt. 1993. A revision of the snake eel genus *Myrichthys* (Anguilliformes: Ophichthidae) with the description of a new eastern Pacific species. Proceedings of the California Academy Sciences 48(8):153-169. (146)

Randall, J.E. and J.E. McCosker. 1992. Two new damselfishes of the genus *Chromis* from the south Pacific. Proceedings of the California Academy of Sciences 47(12):329-337. (135)

Howland, H.C., C.J. Murphy and J.E. McCosker. 1992. Detection of eyeshine by flashlight fishes of the family Anomalopidae. Vision Res. 32(4):765-769. (136)

Randall, J.E. and J.E. McCosker. 1992. Revision of the fish genus *Luzonichthys* (Perciformes: Serranidae: Anthiinae), with description of two new species. Indo-Pacific Fishes, no. 21. 21 pp. (138)

McCosker, J.E. 1989. Freshwater eels (Family Anguillidae) in California: Current conditions and future scenarios. California Fish and Game 75(1):4 10. (124)

16

SER000104

Randall, J.E. and J.E. McCosker. 1989. *Pseudochromis pylei* (Teleostei: Perciformes; Pseudochromidae) a New Dottyback from Indonesia. Revue Fr. Aquariol., 16(1):7 10. (125)

Böhlke, E.B., J.E. McCosker and J.E. Böhlke. 1989. Family Muraenidae. In Fishes of the Western North Atlantic, Part Nine, Vol. One: Orders Anguilliformes and Saccopharyngiformes. Sears Foundation for Marine Research, Yale Univ. Pages 104 206. (127)

McCosker, J.E., E.B. Böhlke and J.E. Böhlke. 1989. Family Ophichthidae. In Fishes of the Western North Atlantic, Part Nine, Vol. One: Orders Anguilliformes and Saccopharyngiformes. Sears Foundation for Marine Research, Yale Univ. Pages 254 412. (128)

Rosenblatt, R.H. and J.E. McCosker. 1988. A new species of *Acanthemblemaria* from Malpelo Island, with a key to the Pacific members of the genus (Pisces: Chaenopsidae). Proceedings of the California Academy of Sciences 45(7):103 110. (116)

McCosker, J.E. 1987. The white shark, *Carcharodon carcharias*, has a warm stomach. Copeia 1987(1):195 197. (107)

Auerbach, P.S., D.M. Yajko, P.S. Nassos, K.W. Kizer, J.E. McCosker, E.C. Geehr, and W.K. Hadley. 1987. Bacteriology of the Marine Environment: Implications for Clinical Therapy. Annals of Emergency Medicine 16(6):643 649. (108)

McCosker, J.E. 1987. The Fishes of the Galapagos Islands. Oceanus 30(2):28 32. (109)

LeBoeuf, B.J., J.E. McCosker, and J. Hewitt. 1987. Crater wounds on Northern Elephant Seals: the Cookiecutter Shark strikes again. Fishery Bulletin 85(2):387 392. (111)

McCosker, J.E. and R.H. Rosenblatt. 1987. Notes on the Biology, Taxonomy, and Distribution of Flashlight Fishes (Beryciformes: Anomalopidae). Japanese J. of Ichthyology 34(2):157 164. (112)

Nemtzov, S.C., J.E. McCosker and L.M. Albert Nemtzov. 1987. First record of the snake eel *Brachysomophis cirrhochilus* (Pisces: Ophichthidae) in the Red Sea. Israel Journal of Zoology 34:13 14. (115)

McCosker, J.E. 1986. A new snake eel, *Ophichthus bennettai*, (Pisces: Ophichthidae) from off western South Africa. Special Pub. JLB Smith Instit. Ichthyol., no. 39. 4 pp. (101)

17

SER000105

Castle, P.H.J. and J.E. McCosker. 1986. Family Muraenidae. Pp. 165 176. In, The Sea Fishes of Southern Africa, ed. by M. Smith and P. Heemstra. Macmillan Pub., Johannesburg. (102)

McCosker, J.E. and P.H.J. Castle. 1986. Family Ophichthidae. Pp. 176 186. In, The Sea Fishes of Southern Africa, ed. by M. Smith and P. Heemstra. Macmillan Pub., Johannesburg. (103)

McCosker, J.E. 1986. Family Anomalopidae. Pp. 413 414. In, The Sea Fishes of Southern Africa, ed. by M. Smith and P. Heemstra. Macmillan Pub., Johannesburg. (104)

McCosker, J.E. 1986. The Sausalito Hum. J. Acoust. Soc. Am. 80(6):1853 1854. (106)

Carey, F.G., J.G. Casey, H.L. Pratt, D. Urquhart and J.E. McCosker. 1985. Temperature, heat production and heat exchange in lamnid sharks. Mem. So. California Academy Sciences 9:92 108. (98)

McCosker, J.E. 1985. White shark attack behavior: observations of and speculations about predator and prey strategies. Mem. So. California Academy Sciences 9:123 135. (99)

McCosker, J.E. 1985. Two new genera and two new species of deepwater western Atlantic worm eels (Pisces: Ophichthidae). Proceedings California Academy Sciences 44(2):9 15. (100)

Nealson, K.H., M.G. Haygood, B.M. Tebo, M. Roman, E. Miller and J.E. McCosker. 1984. Contribution by symbiotically luminous fishes to the occurrence and bioluminescence of luminous bacteria in seawater. Microb. Ecol. 10:69 77. (91)

McCosker, J.E. and R.H. Rosenblatt. 1984. The inshore fish fauna of the Galapagos Islands. Pp. 133 144 in, *Key Environments, Galapagos*, R. Perry, ed. Oxford, Pergamon Press. (92)

Tricas, T.C. and J.E. McCosker. 1984. Predatory behavior of the white shark (*Carcharodon carcharias*), with notes on its biology. Proceedings California Academy Sciences 43(14):221 238. (93)

Egana, A.C. and J.E. McCosker. 1984. Attacks on divers by white sharks in Chile. California Fish and Game 70(3):173 179. (94)

McCosker, J.E. and E.B. Böhlke. 1984. Three new species of western Atlantic snake eels (Pisces: Ophichthidae) of the genus

SER000106

*Ophichthus*. Proceedings Academy Natural Sciences Philadelphia 136:24 31. (95)

McCosker, J.E. and J.E. Böhlke. 1984. A review of the snake eel genera *Gordiichthys* and *Ethadophis*, with descriptions of new species and comments on related Atlantic bascanichthyins (Pisces: Ophichthidae). Proceedings Academy Natural Sciences Philadelphia 136:32 44. (96)

McCosker, J.E., K. Hatooka, K. Sasaki and J.T. Moyer. 1984. Japanese Moray eels of the genus *Uropterygius*. Japanese J. Ichthyol. 31(3):261 267. (97)

Bennetta, W.J. and J.E. McCosker. 1984. An experimental repellent for large, deep sea eels. Chevron Corp., Offshore Technology and Planning Staff, San Francisco. 8 pp.

McCosker, J.E. and J.E. Randall. 1982. Synonymies of Indian Ocean eels, with the description of *Gymnothorax enigmaticus*, a moray previously known as *G. ruppeli*. Proceedings California Academy Sciences 43(2):17 24. (82)

McCosker, J.E. 1982. Discovery of *Kryptophanaron alfredi* (Pisces: Anomalopidae) at San Salvador, Bahamas, with notes on anomalopid light organs. Rev. Biol. Trop. 30(1):97 99. (83)

McCosker, J.E. 1982. A new genus and two new species of remarkable Pacific worm eels (Ophichthidae, Subfamily Myrophinae). Proceedings California Academy Sciences 43(5):59 66. (84)

Böhlke, E.B. and J.E. McCosker. 1982. *Monopenchelys*, a new genus of moray eels from the Atlantic and Indo Pacific oceans (Pisces: Muraenidae). Proceedings Academy Natural Sciences Philadelphia 134:127 134. (86)

McCosker, J.E. and E.B. Böhlke. 1982. Three new genera and two new species of deepwater western Atlantic snake eels (Pisces: Ophichthidae. Proceedings Academy Natural Sciences Philadelphia 134:113 121. (87)

McCosker, J.E. 1981. Great White Shark. Science 81, 2(6):42 51. (74)

Randall, J.E. and J.E. McCosker. 1981. Two new serranid fishes of the genus *Anthias* from the Central Pacific. J. of Aquariculture 2(3):59 69. (77)

19

SER000107

Clark, W. and J.E. McCosker, co principal investigators. 1980. Dispersed, decentralized and renewable energy sources: alternatives to national vulnerability and war. Project Report, Federal Emergency Management Agency, Washington D. C. 326 pp. (68)

McCosker, J.E. 1979. The snake eels (Pisces, Ophichthidae) of the Hawaiian Islands, with the description of two new species. Proceedings California Academy Sciences 42(2):57 67. (60)

McCosker, J.E. and P.C. Phillips. 1979. Occurrence of the heterenchelyid eel *Pythonichthys asodes* at Costa Rica and El Salvador. Bull. Mar. Sciences 29(4):599 600. (61)

McCosker, J.E. and M.D. Lagios. 1979. Editors of The Biology and Physiology of the Living Coelacanth. Occasional Papers of the California Academy Sciences, no. 134. 175 pp. (63)

Lagios, M.D. and J.E. McCosker. 1979. Introduction to The Biology and Physiology of the Living Coelacanth. Occasional Papers of the California Academy Sciences, no. 134:1 3. (64)

McCosker, J.E. 1979. Inferred natural history of the living coelacanth. In, The Biology and Physiology of the Living Coelacanth. Occ. Papers California Academy Sciences, no. 134:17 24. (65)

McCosker, J.E., L.R. Taylor, and R.R. Warner. 1978. Ichthyological studies at Galapagos. Noticias de Galapagos, no. 27:13 15. (51)

McCosker, J.E. 1978. Synonymy and distribution of *Calloplesiops* (Pisces:Plesiopidae). Copeia 1978:707 710. (54)

Klausewitz, W., J.E. McCosker, J.E. Randall, and H. Zetzsche. 1978. *Hoplolatilus chlupatyi* n. sp., un nouveau Poisson marin des Philippines. Rev. Franc. d'Aquariologie 5(2):41 48. (57)

McCosker, J.E. 1977. Fright posture of *Calloplesiops altivelis* (Pisces: Plesiopidae):a unique example of Batesian mimicry. Science 197:400 401. (38).

McCosker, J.E. 1977. The osteology, classification, and relationships of the eel family Ophichthidae. Proceedings of the California Academy Sciences ser. 4, 41(1):1 123. (40)

20

SER000108

Lagios, M.D. and J.E. McCosker. 1977. A cloacal excretory gland in the lungfish *Protopterus*. Copeia 1977:176 178. (41)

McCosker, J.E. and J.E. Randall. 1977. Three new species of Indo Pacific moray eels (Pisces: Muraenidae). Proceedings of the California Academy Sciences 41:161 168. (43)

McCosker, J.E., M.D. Lagios, and T. Tucker. 1976. Ultrastructure of lymphocystis virus in the quillback rockfish, *Sebastes maliger*, with records of infection in other aquarium held fishes. Trans. Amer. Fish. Soc. 105(2):333 337. (33)

Iwamoto, T., J.E. McCosker, and O. Barton. 1976. Alepocephalid fishes of the genera *Herwigia* and *Bathylaco*, with the first Pacific record of *H. kreffti*. Japanese J. Ichthyol. 23(1):55 59. (35)

McCosker, J.E. and M.E. Anderson. 1976. Aquarium maintenance of mesopelagic animals: a progress report. Bull. So. California Academy Sciences 75(2):211 219. (36)

Böhlke, J.E. and J.E. McCosker. 1975. The status of the ophichthid eel genera *Caecula* Vahl and *Sphagebranchus* Bloch, and the description of a new genus and species from fresh waters in Brazil. Proceedings Academy Natural Sciences Philadelphia 127:1 11. (23)

Randall, J.E. and J.E. McCosker. 1975. The eels of Easter Island with a description of a new moray. Los Angeles Co. Nat. Hist. Mus., Contrib. Sciences 264. 32 pp. (24)

McCosker, J.E. and R.H. Rosenblatt. 1975. Fishes collected at Malpelo Islands. Pp. 91 93, in, The biological investigations of Malpelo Island, Colombia. Ed., J. B. Graham. Smithsonian Contrib. Zool. 176. (25)

McCosker, J.E. and C.E. Dawson. 1975. Biotic passage through the Panama Canal with particular reference to fishes. Mar. Biol. 30:343 351. (26)

McCosker, J.E. 1975. Feeding behavior of Indo Australian Hydrophiidae. Pp. 217 232, in, The biology of sea snakes. Ed., W. A. Dunson, Univ. Park Press, Baltimore. (28)

McCosker, J.E. and R.H. Rosenblatt. 1975. The moray eels (Pisces: Muraenidae) of the Galapagos Islands, with new records

SER000109

and synonymies of extralimital species. Proceedings California Academy Sciences 40:417 427. (29)

McCosker, J.E. 1975. The eel genus *Phaenomonas* (Pisces, Ophichthidae). Pacific Sciences 29:361 363. (31)

McCosker, J.E. 1974. A revision of the ophichthid eel genus *Letharchus* Copeia 1974:619 629. (18)

Seymour, R.S. and J.E. McCosker. 1974. Oxygen consumption of the commensal fish, *Carapus homei*. Copeia 1974:971 972. (19)

McCosker, J.E. 1973. The osteology, classification, and relationships of the family Ophichthidae (Pisces, Anguilliformes). PhD Thesis, Univ. California, San Diego. 289 pp. (13)

Böhlke, J.E. and J.E. McCosker. 1973. Two additional west Atlantic gobies (genus *Gobiosoma* that remove ectoparasites from other fishes. Copeia 1973:609 610. (17)

McCosker, J.E. and R.H. Rosenblatt. 1972. Eastern Pacific snake eels of the genus *Callechelys* (Apodes: Ophichthidae). Trans. San Diego Soc. Nat. Hist. 17(2):15 24. (9)

McCosker, J.E. 1972. Two new genera and two new species of western Pacific snake eels (Apodes: Ophichthidae). Proceedings California Academy Sciences 39:111 120. (10)

Rosenblatt, R.H., J.E. McCosker and I. Rubinoff. 1972. Indo west Pacific fishes from the Gulf of Chiriqui, Panama. Los Angeles Co. Nat. Hist. Mus., Contrib. Sciences 18 pp. (11)

Glynn, P.W., R.H. Stewart and J.E. McCosker. 1972. Pacific coral reefs of Panama: structure, distribution, and predators. Geol. Rundschau 61:483 519. (12)

McCosker, J.E. 1971. A new species of *Parapercis* (Pisces: Mugiloididae) from the Juan Fernandez Islands. Copeia 1971:682 686. (7)

McCosker, J.E. and R.F. Nigrelli. 1971. New records of lymphocystis disease in four eastern Pacific fish species. J. Fish. Res. Bd. Canada 28:1809 1810. (8)

Rosenblatt, R.H. and J.E. McCosker. 1970. A key to the genera of the ophichthid eels, with descriptions of two new genera and

SER000110

three new species from the eastern Pacific. Pacific Sciences 24:494 505. (3)

McCosker, J.E. 1970. A review of the eel genera *Leptenchelys* and *Muraenichthys*, with the description of a new genus, *Schismorhynchus*, and a new species, *Muraenichthys chilensis*. Pacific Sciences 24:505 516. (4)

Stephens, J.S., Jr., R.K. Johnson, G.S. Key, and J.E. McCosker. 1970. The comparative ecology of three sympatric species of California blennies of the genus *Hypsoblennius* Gill (Teleostomi, Blenniidae). Ecol. Monogr. 40:213 233. (5)

McCosker, J.E. and N. Fotheringham. 1969. Preliminary recommendations for the ecology of Sea Lake, Laguna Niguel. Laguna Niguel Corp., Laguna Niguel, California. 20 pp. (2)

McCosker, J.E. 1969. A behavioral correlate for the passage of lymphocystis disease in three blennioid fishes. Copeia 1969:636 637. (1)


**INVITED BOOK REVIEWS, INTRODUCTIONS, FORWARDS, AND OBITUARIES**

McCosker, J.E. 2010. (Review of) *Eels at the Edge: Science, Status, and Conservation Concerns*. Edited by John M. Casselman and David K. Cairns. American Fisheries Society, Symposium 58, Bethesda, Maryland 2009. Quarterly Review of Biology 85:118. (251)

McCosker, J.E. 2008. (Review of) *Sharks of the open ocean: biology, fisheries, and conservation*. Edited by Merry D. Camhi, Ellen K. Pikitch, and Elizabeth A. Babcock. Blackwell Publishing, Oxford, UK. 2008. Quarterly Review of Biology 83:415. (244)

McCosker, J.E. 2005. (Review of) *Atlas of Pacific Salmon* by Xanthippe Augerot and Dana Foley. California Wild 59(1):35. (224)

McCosker, J.E. and D.B. Catania. 2004. (Review of) *Shorefishes of the tropical eastern Pacific/Peces costeros del Pacífico oriental tropical* by D. Ross Robertson and Gerald R. Allen. Copeia 2004(1):193–195. (214)

SER000111

Case 4:12-cv-03755-PJH Document 22-3 Filed 09/21/12 Page 34 of 43

McCosker, J.E. 2004. (Review of) *One fish, two fish, crawfish, bluefish. The Smithsonian Sustainable Seafood Cookbook*, by Carole C. Baldwin and Julie H. Mounts, with illustrations by Charlotte Knox. California Wild 57(3):51–52. (218)

McCosker, J.E. 2000. Obituary, Peter H. J. Castle. Copeia 2000(3):912–913. (187)

McCosker, J.E. 2000. (Review of) *Life in the slow lane: ecology and conservation of long-lived marine animals*. Musick J.E., editor. 1999. American Fisheries Society Symposium 23, Bethesda, Maryland. Conservation Biology 14(1):331. (188)

McCosker, J.E. 1998. (Review of) *The fishes of the Galápagos Islands* by J. S. Grove and R. J. Lavenberg, 1997, Stanford University Press. Copeia 1998(3):809–812. (173)

McCosker, J.E. 1997. (Introduction to) *The Nature Company Guides: Sharks & Rays*, by T. C. Tricas, et al. Time–Life Books. (163)

McCosker, J.E. 1997. Full fathom five. (Review of) *The Universe Below: Discovering the Secrets of the Deep Sea* by William J. Broad, Simon & Schuster, 1997. LA Weekly, August 22–28, p. 55. (167)

McCosker, J.E. 1997. A serving of oceanography light. (Review of) *Oceanography: An Introduction* by Dale Ingmanson and William J. Wallace, Wadsworth Publishing Company, 1995. The Textbook Letter 8(2):2–3. (168)

McCosker, J.E. 1994. (Forward to) *Beachcomber's guide to California Marine Life*, by T. M. Niesen, Gulf Publishing Co. 192 pp. (147)

McCosker, J.E. 1994. This text does a good job of covering the waterfront. (Review of) *Marine Biology: An Ecological Approach*, by J. Nybakken, 1993. The Textbook Letter 5(5):3–4. (151)

McCosker, J.E. 1993. (Review of) *The ecology of fishes on coral reefs*. Ed. by P. F. Sale. *In* Quarterly Rev. Biol. 68(1):127–128. (139)

McCosker, J.E. 1993. Piscine Elegance. (Reviews of) *Fish: an enthusiast's guide*, by P.B. Moyle, and A*quariums: windows to nature*, by L.R. Taylor. In Pacific Discovery 46(4):49. (145)

24

SER000112

McCosker, J.E. 1991. (Review of) *Living Fossil. The Story of the Coelacanth*, by K.S. Thomson. Science 252:1863–1864. (129)

McCosker, J.E. 1989. (Review of) *A field guide to the fishes of the Galapagos*, by Godfrey Merlen. Noticias de Galapagos, 47:27 28. (122)

McCosker, J.E. 1989. (Review of) *Sharks in Question: The Smithsonian Answer Book*, by V. G. Springer and J. P. Gold. Oceanus, 32(2):91. (123)

McCosker, J.E. 1982. (Review of) *Pacific Coast Inshore Fishes*, by D. Gotshall. Pacific Discovery 35(1):33. (78)

McCosker, J.E. 1981. (Review of) *Exploring the Deep Frontier*, by S.A. Earle and A. Giddings. Pacific Discovery 34(2):33.

McCosker, J.E. 1981. *Of Dolphins and Whales*. San Francisco Chronicle, Review Section. 20 Sept 1981, p. 5. (75)

McCosker, J.E. 1981. (Forward to) *Fishwatching in Hawaii*, by R. B. and B.C. Carpenter. Natural World Press, pp. 5 6. (76)

McCosker, J.E. 1979. (Review of) *Fishwatchers' guide to the inshore fishes of the Pacific coast*, by D. W. Gotshall. Pacific Discovery 32(1):33. (59)

McCosker, J.E. and W.N. Eschmeyer. 1978. (Review of) *Coastal Fishes of Southern Japan*, by Masuda, Araga, and Yoshino. Trans. Amer. Fisheries Soc. 107(6):874 875. (58)

McCosker, J.E. 1977. (Review of) *The Neon Gobies*, by Patrick I. Colin. Copeia 1977:195 196. (42)

McCosker, J.E. 1977. (Review of) *The Fresh and Saltwater Fishes of the World*, by E. Migdalski and G. Fichter. Oceans 10(3):70. (45)

McCosker, J.E. 1977. (Forward and scientific consultant to) *The Underwater Wilderness Life Around the Great Reefs*. Chanticleer Pres, NY. 319 pp. (47)

McCosker, J.E. 1975. (Forward to) *Marine Portfolio III*, by Edwin Janss. California Academy Sciences Special Pub. 4 pp., 16 pls. (22)

SER000113

McCosker, J.E. 1975. (Forward to) *Oddball fishes & other strange creatures of the deep*, by Braz Walker. Sterling Pub. Co., Inc., New York. (30)

McCosker, J.E. 1974. (Review of) *Pacific Fishes of Canada*, by J.L. Hart. Pacific Discovery 27(5):32. (20)

## POPULAR ARTICLES AND BOOKS

McCosker, J.E. 2008. A Brief History of the West's Oldest Scientific Institution. Pp. 8-23 in *California Academy of Sciences: Architecture In Harmony with Nature*, Ed. by S. Wells. Chronicle Books, San Francisco. 144 pp. (242)

Abadia, R., B. Day, N. Baron, N. Knowlton, J.E. McCosker, A. Katoppo, and H. Hough. 2004. Chapter 10. Defying Ocean's End through the power of communications. L. K. Glover and S. A. Earle, eds., *Defying Ocean's End*, Island Press, Washington. Pp. 183-196. (222)

McCosker, J.E. 2004. Monterey aces the great white shark ethics test. Opinion-Commentary. Los Angeles Times, 31 October 2004, p. M5 (221).

McCosker, J.E. 2003. I don't want to see any water: Earl Herald, aquarium pioneer and aquatic dynamo. California Wild 56(2):37-41. (210)

McCosker, J.E. 2003. Innovation: First in time and place. Pp. 22-31 in *18 Million real things:150 years of discovery at California Academy of Sciences*. California Academy of Sciences, San Francisco. (209)

McCosker, J.E. 2002. Good fish, bad fish: A catch to the catch of the day. California Wild 55(1):6-10, 53. (197)

McCosker, J.E. and T.N. Gosliner. 2000. Unnatural Selection. Open Forum, San Francisco Chronicle, December 10, 2000, p. A33. (192)

McCosker, J.E. 2000. Biopat: Immortality for sale. Whole Earth. Fall, 2000:46. (190)

McCosker, J.E. 2000. What's in an animal's name? Whole Earth. Fall, 2000:42. (189)

SER000114

McCosker, J.E. 1999. A letter from the field: Beneath Forbidden Seas, Marine Research in Cuba. California Wild 52(1):42-45. (178)

McCosker, J.E. 1999. *The history of Steinhart Aquarium: A very fishy tale*. The Donning Company, Virginia. 158 pp. (183)

McCosker, J.E. 1998. Identifying sharks. Pp. 86-123 in *Reader's Digest Explores Sharks*. Reader's Digest, New York. 160 pp. (170)

McCosker, J.E. 1998. Eels and Allies. Pp. 85-90 in *Encyclopedia of Fishes, Second Edition*, J. Paxton and W. N. Eschmeyer, eds., Weldon Owen Pubs., Sydney. (174)

McCosker, J.E. 1998. Wild lives: An ichthyological Easter egg hunt. California Wild 51(4):39. (175)

McCosker, J.E. 1997. A letter from the field: A half mile down. Pacific Discovery, 50(1):42-45. (161)

Tricas, T.C., K. Deacon, P. Last, J.E. McCosker, T.I. Walker and L. Taylor. 1997. *The Nature Company Guides: Sharks & Rays*, Time-Life Books. 288 pp. (164)

McCosker, J.E. 1995. El Steinhart Aquarium de San Francisco. Amigos del Acuario, April/June:32-34. (152)

McCosker, J.E. 1995. Introductory Remarks: Symposium on the San Francisco Bay/Sacramento-San Joaquin Delta. Hastings West-Northwest Journal of Environmental Law and Policy, 2(2):119-120.

McCosker, J.E. 1995. Introductory Remarks: Endangered Species Act. Hastings West-Northwest Journal of Environmental Law and Policy, 2(2):129-130.

McCosker, J.E. 1995. Ed Ricketts: A Role Model for Marine Biologists. The Steinbeck Newsletter, 9(1):12-14. (155)

McCosker, J.E. 1995. Aquarium display of bioluminescent fishes, with particular reference to anomalopid flashlight fishes. Proceedings of the Third International Aquarium Congress, Boston. Pages 237-246. (157)

McCosker, J.E. 1994. In the Beginning. Rodale's Scuba Diving, July:60-65. (148)

SER000115

McCosker, J.E. 1994. Eels and Allies. Pp. 85-90 in *Encyclopedia of Fishes*, J. Paxton and W.N. Eschmeyer, eds., Weldon Owen Pubs., Sydney. (149)

McCosker, J.E. 1994. Letter from the field: In Darwin's footsteps -- underwater. Pacific Discovery, 47(4):40-42, 51. (150)

McCosker, J.E. 1993. White shark plays critical role in maintaining food web balance. Between the Tides, 6(5):4-5. (140)

McCosker, J.E. 1993. Fish: Adaptation at its Best. Pp. 57-62 in *Oceans: The illustrated library of the Earth*, R. Stevenson and F. Talbot, eds., Rodale Press, Pennsylvania. (141)

McCosker, J.E. 1992. Flashlight Fish. Pacific Discovery 45(4):16-17. (137)

McCosker, J.E. 1991. Fish. Pp. 36 39. Sharks. Pp. 39 41 in The Encyclopedia of the Earth. Oceans and Islands. F.H. Talbot and R.E. Stevenson, eds. Smithmark Publishers, New York. (130)

Ellis, R. and J.E. McCosker. 1991. What fate awaits the great white shark? Audubon, 93(5):100 108. (131)

McCosker, J.E. 1991. When the shark bites. Pacific Discovery, 44(4):26 30. (132)

Ellis, R. and J.E. McCosker. 1991. *Great White Shark*. HarperCollins and Stanford Univ. Press, New York. 270 pp. (133)

McCosker, J.E. and Dominique Derian. 1991. Haro sur l'assassin. GEO, 153(12):58 70. (134)

McCosker, J.E. 1989. Reef report: The coral reef revisited. Pacific Discovery, 42(2):38 39. (121)

McCosker, J.E. 1989. Noises of Nature. The Commonwealth, 83(38):

McCosker, J.E. 1988. Sharks: Myths and Maneaters. Bohemian Club Library Notes. Number 56:9 12. (117)

McCosker, J.E. 1988. San Francisco's Living Coral Reef. Pacific Discovery 41(2):32 38. (118)

McCosker, J.E. and L.R. Taylor. 1988. A Reader's Guide to Coral Reefs. Pacific Discovery 41(2):39 41. (119)

SER000116

McCosker, J.E. 1988. Tod aus der Tiefe. Geo 1988(9):82 94. (120) 408 411. (126)

McCosker, J.E. 1987. A shark primer for San Mateo waters. Between the Tides, Friends of Fitzgerald Marine Life Refuge, 1(1):1 4.

McCosker, J.E. 1987. Building a Better Bruce. Los Angeles Times Magazine 3(29):16 19. (110)

McCosker, J.E. and E.E. Miller. 1987. The Steinhart Aquarium Fish Roundabout: a decade later. Int. Zoo Yb. 26:48 53. (113)

McCosker, J.E. 1987. The View From the Great Tidepool. Pacific Discovery 40(4):34 41. (114)

McCosker, J.E. 1986. In sum, it was some hum. Discover 7(6):66 71. (105).

Ellis, R. and J.E. McCosker. 1986. Speaking of sharks ... Oceans 19(3):24 29, 58 60.

McCosker, J.E. 1985. Associate Editor and Contributor to: The Encyclopedia of Aquatic Life, ed. by K. Banister and A. Cambell, Equinox (Oxford) Ltd., Oxford. 349 pp.

McCosker, J.E. 1985. Economic benefits of research collections: The bottom line. Testimony before the US House Committee on Science and Technology.  US Committee on Science and Technology, Science Policy Study    Hearings Volume 2:The Role of the Research Museums. Pp. 125 133.

McCosker, J.E. 1984. Ed Ricketts: role model for California biologists. Bohemian Club Library Notes, no. 45:4 10. (90)

McCosker, J.E. 1983. Penguins. San Francisco Mag. 25(6):98 104. (88)

McCosker, J.E. 1983. The biology of well dressed birds. Pacific Discovery 36(3):22 35. (89)

McCosker, J.E. 1982. The Academy changes directors. Pacific Discovery 35(2):19. (79)

McCosker, J.E. 1982. Better Housing for Hermit Crabs. Science '82, 3(3):80 81. (80)

SER000117

McCosker, J.E. and D.F. Dunn. 1982. Editorial: The Endangered Species Act. Pacific Discovery 35(3):33.

McCosker, J.E. and T. Tucker. 1982. Solar heating for Steinhart. Pacific Discovery 35(6):28 29. (85)

McCosker, J.E. 1981. Reflections of Sandy, the Great White Shark. Pacific Discovery 34(2):1 9. (69)

McCosker, J.E. 1981. The sun and the sea. Pp. 150 157 in, Fire of Life, The Smithsonian Book of the Sun. Smithsonian Exposition Books. (71)

McCosker, J.E. 1981. Serendipity of the Seas. Nature Company Naturalist Review 2(2):1 2. Reprinted in: Undercurrent 7(4):11 12, and in Museum Store Association, Spring 1982, pp. 23 25. (73)

McCosker, J.E. 1981. Steinhart Aquarium. In, Guidebook to the California Academy of Sciences, pp. 19 32.

McCosker, J.E. 1980. Academically Speaking: Gaudy Slugs of the Sea. Pacific Discovery 33(2):29 31. (66)

McCosker, J.E. 1980. Sandy, the Great White Shark. Animal Kingdom 83(6):11 13. (67)

McCosker, J.E. 1978. Galapagos Underwater. Pacific Discovery 30(2):1 7. (49)

McCosker, J.E. 1979. In utter darkness. Oceans 12(6):22 29. (62)

McCosker, J.E. and E.E. Miller. 1978. Luminous fish in the aquarium. Aquar. Digest Internatl. no. 18:20 21. (50)

McCosker, J.E. 1978. Fish that flash. Outside Mag., Sept/Oct:21 23. (52)

McCosker, J.E. 1978. Academically speaking: an ichthyological impostor. Pacific Discovery 31(5):28 31. (53)

McCosker, J.E. 1978. Ed Janss, an artist underwater. Pacific Discovery 31(6):10 11. (55)

McCosker, J.E. 1977. Flashlight Fishes. Scientific American 236(3):106 114. (39).

SER000118

McCosker, J.E. 1977. The Steinhart Aquarium Fish Roundabout. Pacific Discovery 30(3):1 6. (44)

McCosker, J.E. 1977. The Steinhart Aquarium. Sea World, Winter 1977/1978:3 5. (48)

McCosker, S. and J.E. McCosker. 1976. To the islands of the moon. Pacific Discovery 29(1):19 28. (32)

McCosker, J.E. 1976. The Steinhart Roundabout: an aquarium for fishes. Drum and Croaker 16(2):1 3. (37).

McCosker, J.E. and M.D. Lagios. 1975. Les petits Peugeots of Grande Comore. Pacific Discovery 28(5):1 6. (27)

McCosker, J.E. 1974. Garden eels in the Steinhart Aquarium. Aquar. Dig. Internatl. 2(4):17 19. (21)

### ELECTRONIC PUBLICATIONS

McCosker, J.E. 2000 (6 May). What's in a name? www.verde.com/wonder/72cbc4c431bff3951a40e670a019b30html

McCosker, J.E. 2000 (24 May). Immortality for sale. www.verde.com/wonder/349dfb456bff393108ac0fd032605d.html

### IN PRESS

McCosker, J.E. & R.H. Rosenblatt. In press. The Fishes of the Galápagos Archipelago: An Update. A chapter in a volume following the AAAS 2009 Galapagos Symposium, to be edited by A. Leviton and M. Ghiselin.

McCosker, J.E. Submitted 12 January 2006. Ophichthidae. In Carpenter, K.E. ed. *FAO species identification guide for fishery purposes. The living marine resources of the Eastern Central Atlantic.*

McCosker, J.E. Submitted 22 December 2009. Ophichthidae. In Heemstra, P. and W. Houter, eds. *The fishes of the western Indian Ocean.*

SER000119

Seth Atkinson (CA Bar No. 270870)
Natural Resources Defense Council
111 Sutter St., 20th Floor
San Francisco, CA 94104
Tel.: (415) 875-6100
Fax: (415) 875-6161
satkinson@nrdc.org

Attorney for Proposed Amicus Curiae
NATURAL RESOURCES DEFENSE COUNCIL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| CHINATOWN NEIGHBORHOOD ASSOCIATION, a nonprofit corporation, and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT, a political action committee, <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND BROWN, Governor of the State of California, KAMALA HARRIS, Attorney General of the State of California, and CHARLTON H. BONHAM, Director of the California Department of Fish and Game, <br><br> Defendants. | Case No. 4:12-cv-03759-PJH <br><br> [PROPOSED] BRIEF BY AMICUS CURIAE NATURAL RESOURCES DEFENSE COUNCIL ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

[Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction
Case No. 4:12-cv-03759-PJH

SER000120

# TABLE OF CONTENTS

I.      Introduction ...........................................................................................................1

II.     Factual Background ...............................................................................................1

        A.      The Role of Sharks in Maintaining Healthy Ecosystems ..........................1

        B.      The Importance of Healthy Marine Ecosystems to California's Economy .............2

        C.      The Status of Shark Populations in California Waters and Worldwide...................2

        D.      Shark Fishing, Finning, and the Global Trade in Shark Fins....................................4

        E.      Why Jurisdictions Are Increasingly Banning Shark Fins .........................................5

        F.      The Passage of California's Shark Fin Ban ...........................................................6

III.    Legal Standard ...................................................................................................8

IV.     Argument ............................................................................................................9

        A.      Plaintiffs Raise No Serious Questions on the Merits with Respect to

                Dormant Commerce Clause and Equal Protection ...................................9

                1.      Dormant Commerce Clause .........................................................9

                2.      Equal Protection.........................................................................14

V.      Conclusion .........................................................................................................18

– i –

SER000121

1

**TABLE OF AUTHORITIES**

2

3 **Cases** **Page**

4 *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .........................................................9

5 *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ......................................9

6 *S.D. Myers v. San Francisco*, 253 F.3d 461 (9th Cir. 2001) ...............................................9, 13

7 *Brown-Forman Distillers Corp.* v. New York State Liquor Auth., 476 U.S. 573 (1986) ..............9

8 *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154 (9th Cir. 2011)........................9, 13, 14

9 *Nat'l Optometrists & Opticians v. Harris*, 682 F. 3d 1144 (9th Cir. 2012) ................10, 11,12, 13

10 *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ...............................................................10, 13

11 *Healy v. Beer Inst.*, 491 U.S. 324 (1989).......................................................................................10

12 *Freedom Holdings v. Spitzer*, 357 F.3d 205 (2d Cir. 2004).........................................................10

13 *Bronco Wine v. Jolly*, 129 Cal. App. 4th 988 (2006)....................................................................10

14 *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366 (1976).........................................................11

15 *Bayside Fish Flour Co. v. Gentry*, 297 U.S. 422 (1936) ...............................................................14

16 *New York ex rel. Silz v. Hesterberg*, 211 U.S. 31 (1908)..............................................................14

17 *Adams v. Shannon*, 7 Cal. App. 3d 427 (1970)............................................................................14

18 *McLaughlin v. Florida*, 379 U.S. 184  (1964)..............................................................................14

19 *Washington v. Davis*, 426 U.S. 229 (1976)...................................................................................14

20 *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511 (9th Cir. 2011) ...............................15, 16

21 *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ................................................................16

22 *FCC v. Beach Comms., Inc.*, 508 U.S. 307 (1993) ..........................................................16, 17, 18

23 *Nordlinger v. Hahn*, 505 U.S. 1 (1992) .......................................................................................17

24 *UFO Chuting of Hawaii Inc. v. Smith*, 508 F.3d 1189 (9th Cir. 2007) .......................................17

25 *Seariver Mar. Fin. Holdings v. Mineta*, 309 F.3d 662, 679-80 (9th Cir. 2002) ...........................17

26

27

28

SER000122

**Statutes** **Page**

Cal. Fish & Game Code § 2021 ...............................................................................10, 14

**Bills** **Page**

Assem. 376 § 2(b) (Cal. 2011)...............................................................................7

Assem. 853 (Cal. 2011) ...............................................................................7

Assem. 376 § 1 (Cal. 2011) ...............................................................................8, 12, 16

– iii –

[Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction
Case No. 4:12-cv-03759-PJH

SER000123

## I. Introduction

Last year, the State of California took an important step in wildlife conservation by passing a law to ban the sale, possession, and trade of shark fins. Shark fins—like rhino horns, bear bile, elephant tusks, and tiger paws—are often derived from hunting practices that are extremely harmful to our natural environment. Millions of sharks worldwide are killed each year to feed the market for shark fins, with devastating ecological consequences. The California legislature recognized this problem, deliberated thoroughly, and passed a well-crafted law designed to end California's contribution to the global shark fin trade. The law regulates behavior only within California, carefully respecting the overlapping authority of the Federal Government and the limits of state jurisdiction. The law is also grounded firmly in conservation science, with a clear goal of protecting our oceanic ecosystems and a well-established causal nexus for achieving that goal.

Any act of environmental protection, however, generates pushback from those profiting under the status quo. Plaintiffs are a collection of individuals who trade in shark fins. These individuals deny the well-established science on shark conservation, and instead view California's law banning shark fins as a personal attack on themselves and their businesses. With essentially no evidence to support them, Plaintiffs have spun these beliefs into constitutional claims to challenge California's shark fin law.

## II. Factual Background

### A. The Role of Sharks in Maintaining Healthy Ecosystems

Most shark species are apex predators, meaning they occupy the highest position in the marine food chain. In this role, sharks exert a strong "top-down" effect on marine ecosystems: by preying on species lower in the food chain, they keep populations of lower trophic-level species in check, and thereby maintain balance in the ecosystem. McCosker Decl. ¶ 26. Because sharks are so high in the food chain, their prey species are often themselves predators, which makes the effects of shark predation ripple downward through the ecosystem, ultimately affecting even primary production such as marine plants and algae. *See, e.g.*, *id.* ¶ 29.

Scientific studies clearly establish that when populations of apex predators decline, ecosystems can be severely affected. For example, recent research found that declining shark populations in an area of the Pacific Ocean led to an increase in rays (a lower trophic-level predator), which in turn decimated

– 1 –

SER000124

several shellfish species (the rays' prey). *Id.* ¶ 28. This kind of "trophic cascade" can dramatically reshape marine communities. *Id.* ¶ 26. Importantly, these ecosystem impacts do not require complete extirpation of sharks; they are well-documented even in situations of reduced shark abundance. *Id.* ¶ 30.

### B.     The Importance of Healthy Marine Ecosystems to California's Economy

California has the largest ocean-related economy in the United States, contributing billions of dollars to the state GDP. Monroe Decl. ¶ 20. Many aspects of California's ocean economy depend on healthy marine ecosystems. *Id.* ¶ 21-22. For example, Californians spend significant amounts of money on tourism, diving, photography, commercial and recreational fishing, and wildlife viewing, among other things. *Id.* Some of these activities directly involve sharks, like shark diving and underwater photography. *Id.* ¶ 21. Others depend more broadly on vibrant marine ecosystems, which in turn rely on the ecological balance maintained by sharks. *Id.* ¶ 22.

California's oceans also create tremendous non-monetized value. Among other things, our oceans provide vital ecosystem services, biodiversity reserves, and existence value; the sum of these non-market values may rival or even exceed the market value of California's oceans. *Id.* ¶ 23. Once again, healthy ocean ecosystems—and the ecological balance maintained by sharks—are critical for creating this value. *Id.*

### C.     The Status of Shark Populations in California Waters and Worldwide

Between 41 and 44 species of shark are known to occur off the coast of California. McCosker Decl. ¶ 8. None of these species are unique to California, and many are worldwide in distribution. *Id.* ¶ 9. Furthermore, sharks are highly migratory, and the majority of sharks found off California's coast will travel outside the 200-mile limit of U.S. waters at some point in their lives. *Id.*

Due in part to these complex migrations and distribution patterns, the status of shark populations is not always known at the species level. None of the species off the coast of California have been definitively assessed, making species-level population estimates unavailable for many of these sharks. *See id.* ¶ 8. However, broader-level studies have established that shark populations are declining rapidly worldwide. *Id.* ¶ 12. This is an important distinction: even though many individual shark species are data-poor on an level, it is well-understood that sharks are declining worldwide. The declining trend is severe, with one recent study estimating that global shark populations have decreased by 90% from their

– 2 –

[Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction
Case No. 4:12-cv-03759-PJH

SER000125

historical abundance.  *Id.*  Moreover, the steepness of the decline appears to be increasing.  *Id.* ¶ 13.  The status of some individual species are known, and reflect the declining trend:  IUCN experts classify great hammerhead (*Sphyrna mokarran*) and scalloped hammerhead (*Sphyrna lewini*) sharks as globally endangered, and classify smooth hammerhead (*Sphyrna zygaena*), great white (*Carcharodon carcharias*), basking (*Cetorhinus maximus*) and oceanic whitetip (*Carcharhinus longimanus*) sharks, along with two species of mako shark (*Isurus* spp.) and three species of thresher shark (*Alopias* spp.), as vulnerable to extinction.  *Id.* ¶ 15.

Because the decline of sharks is a worldwide trend, however, individual shark populations can be expected to be in very different conditions depending on species and area.  Some populations may still be relatively intact, while others, like those listed by the IUCN, are severely depleted and at risk of extinction.  Even if the current global decline continues, it is not likely that all species of shark in superorder *Selachimorpha* will ultimately disappear.  Rather, the results would be heterogeneous across geographic areas and species types:  some of the more resilient shark species would remain alive while others go extinct, and some areas with fewer stressors would retain shark populations while others experience local or regional extirpation.  Indeed, this scenario is already underway, as the IUCN Shark Specialist Group recently assessed the global conservation status of 64 species of open ocean (pelagic) sharks and rays and found 32 percent to be threatened with extinction.  *Id.* ¶ 13.

To understand why sharks are declining rapidly around the world, it helps to understand certain features about shark biology and the fisheries that target them.  First, sharks tend to be large, solitary, slow-growing, and require a long time to reach sexual maturity.  Other fish species, by comparison, tend to be smaller, live in groups or schools, grow quickly, and reach sexual maturity more quickly.  This combination of characteristics makes shark species far less resilient to fishing pressure.  *Id.* ¶ 16.  Second, sharks produce relatively few young in each litter, using either live-birth or large egg reproductive strategies.  Other fish species, in contrast, tend to use reproductive strategies in which an adult female can produce thousands or even millions of eggs each reproductive cycle.  Sharks' high-investment reproductive strategies make them vulnerable to overfishing, as they cannot replenish their numbers nearly as quickly as other fish species.  *Id.* ¶ 16.  Third, fishing gears (hook and line, gillnets, and trawls) primarily target adult sharks, leaving only immature individuals alive.  This can dramatically

– 3 –

SER000126

decrease reproduction in a population of sharks, as the sharks that remain alive must grow to maturity before contributing to the population's reproductive success. *Id.* ¶ 17. Finally, the boundaries between distinct shark populations are not well-understood. Recent genetic studies have found separate, non-interbreeding populations, or multiple distinct species, where it was previously believed to be a single wide-ranging species. In these situations, heterogeneous fishing pressure can cause local extirpation much more easily than previously believed. *Id.* ¶ 18. Taken together, these features generally make sharks much more vulnerable to overfishing than other species of fish, and help to explain the dramatic decline of sharks worldwide in recent years.

### D.  Shark Fishing, Finning, and the Global Trade in Shark Fins

Between 26 and 73 million sharks are killed by humans each year. *Id.* ¶ 14. The total catch is not distributed evenly around the world, but instead represents high—and unsustainable—catch numbers in some areas, and lower catch numbers in other areas. As would be expected, industrialized countries with strong legal systems frequently have lower shark catches, while poorly-regulated jurisdictions like many developing countries and the high seas experience the highest catches. Indeed, due to a lack of legal infrastructure and enforcement, shark fishing remains essentially open-access in many countries as well as on the high seas. *See id.* ¶¶ 19-20.

Of the 26-73 million sharks killed per year, some are caught and landed for their meat, but far more are simply killed for their fins. In the extraordinary brutal process of "finning," a shark's fins are cut off, often while the animal is still alive, and then the shark is thrown back into the water to die. Monroe Decl. ¶ 15. Finning is prohibited in U.S. waters, and some other countries similarly prohibit finning in their waters. McCosker Decl. ¶ 19. Enforcement varies widely, however, and significant illegal and unreported shark finning occurs even in the waters of countries like the United States that have banned finning. *See id.*; Monroe Decl. ¶ 18. Moreover, many countries have not yet banned shark finning, and international waters lack effective regulations with respect to finning. McCosker Decl. ¶¶ 19-20.

The global slaughter of sharks is driven primarily by demand for shark fins. In Asia and other parts of the world, shark fins can be sold at a very high price, fetching upwards of $100/kg. Monroe Decl. ¶ 11. This makes shark fins an extremely valuable commodity and incentivizes fishermen to kill

– 4 –

[Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction
Case No. 4:12-cv-03759-PJH

SER000127

sharks for their fins—especially in the developing world, where the amount of money brought in by a cargo-hold full of shark fins can be wildly out of proportion with the amount of money brought in by a similar cargo-hold full of fish. Accordingly, many artisanal fishermen either actively target sharks and fin them, or simply cut the fins off any sharks that come in as bycatch, instead of releasing those sharks unharmed. *See* McCosker Decl. ¶ 21.

After landing at a port, shark fins are generally sent to Hong Kong for processing. *See id.* ¶ 22; Monroe Decl. ¶ 12. Hong Kong handles a majority of the world's shark fin processing, with raw fins flowing in from around the world, and processed fins flowing out to centers of consumption worldwide, where they are made into shark fin soup and other products. McCosker Decl. ¶¶ 22-23; Monroe Decl. ¶ 12. This global trade has the effect of laundering shark fins, as it can be nearly impossible to identify the species that a processed shark fin came from, much less the particular geographic area where the shark was caught. McCosker Decl. ¶ 24. Indeed, a recent study demonstrated that American consumers of shark fin soup are often unknowingly consuming at-risk and endangered species caught around the world. *Id.* ¶ 25.

### E. Why Jurisdictions Are Increasingly Banning Shark Fins

Global awareness of the need for shark conservation has increased in recent years. As more and more studies have found shark populations to be declining, news media and internet sources are increasingly covering the issue. Furthermore, ecosystem impacts from shark removal are already being experienced in some areas, including trophic cascades and altered marine communities. *Id.* ¶ 27. Astute observers also recognize that declining shark populations have implications for the entire world, not just people living in areas where sharks are disappearing. Due to the highly migratory nature of sharks, a population decline in one area can spread to other areas, or can act as a sink for healthier populations. For this reason, a shark killed in one place can affect the ecosystem in a wholly different location, and even jurisdictions that tightly regulate their own waters have cause for concern. *See* Monroe Decl. ¶ 17.

The problem of declining shark populations is difficult to address, however, due to the nature of the shark fin trade. With a high price of fins driving the global fishery, and shark finning taking place largely in poorly-regulated jurisdictions (or illegally in better-regulated jurisdictions), traditional regulatory measures have not been effective in arresting the decline of shark populations. *See id.* ¶¶ 18-

– 5 –

[Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction
Case No. 4:12-cv-03759-PJH

SER000128

19. The lack of fin traceability further complicates things, making it impossible to selectively regulate fins that come from depleted shark stocks.

In the face of these challenges, jurisdictions are increasingly turning to market solutions for shark conservation, and in particular, shark fin bans. *See id.* ¶¶ 8, 39. By closing off outlets for the sale of shark fins, a fin ban is able to reduce demand, and thereby help reduce both the volume of trading and price on the global shark fin market. Ultimately, lower demand leads to fewer sharks being killed for their fins, and an improved conservation outcome.

Each jurisdiction's fin ban may have only a small individual impact on the global market, but fin bans must be viewed in the context of a collective global effort. More and more jurisdictions are moving to ban shark fins, similar to the way international consensus gradually formed in the past to ban tiger products, rhino horns, and other such wildlife products. To date, several U.S. states have enacted shark fin bans, including California, Hawaii, Oregon, Washington, and Illinois. *Id.* ¶¶ 8, 39. The U.S. territories of Guam and the Northern Mariana Islands also banned shark fins. *Id.* ¶ 8. These island territories are important as both are situated in the Pacific Ocean, a center of shark finning. Various municipalities around the world have similarly instituted controls on shark fins, most recently Toronto and several other Canadian cities. *Id.* Private companies, including major hotel and restaurant chains, are increasingly taking similar measures, by removing shark fin products from their operations. *Id.* ¶ 39.

In addition to their indirect effect on global finning, shark fin bans also have the direct effect of discouraging illegal shark fishing and finning in the jurisdiction's own waters. Shark poaching is well-documented—even in U.S. water—and is driven by the high price of shark fins. *Id.* ¶ 18. Once the poached fins are landed, they enter the stream of commerce and it becomes impossible to identify them. *Id.*; *see also* McCosker Decl. ¶ 24. By prohibiting the possession and sale of shark fins, a ban makes illegal shark fishing or finning much more difficult, because the fins cannot be landed at the jurisdiction's own ports. Thus, fin bans reduce both the feasibility and profit generated from illegal shark fishing and finning activity.

### F. The Passage of California's Shark Fin Ban

On February 14, 2011, Assemblymembers Fong and Huffman introduced Assembly Bill 376, which proposed to make it "unlawful for any person to possess, sell, offer for trade, trade, or distribute a

– 6 –

[Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction
Case No. 4:12-cv-03759-PJH

SER000129

1  shark fin." Assem. 376 § 2(b) (Cal. 2011). This bill, together with a companion bill providing an
2  implementation period and safe harbor provisions,[1] is commonly referred to as the "Shark Fin Ban."
3      Even before its introduction, a broad coalition of stakeholders supported the Shark Fin Ban.
4  Monroe Decl. ¶¶ 25-26. The coalition of supporters included conservation groups, humane
5  organizations, cultural heritage groups, community leaders, restaurants, divers, and fisherman. *Id.* ¶ 26.
6  Supporters worked with legislators to draft the bill—including conducting legal analysis about potential
7  federal constitutional issues—and participated in a coordinated launch effort designed to move the
8  legislation forward. *Id.* ¶¶ 25-26.
9      The coalition of Shark Fin Ban supporters included numerous organizations and individuals from
10  the Asian-American community. In fact, an umbrella organization was formed explicitly to give voice
11  to and recognize Asian-American supporters of the fin ban. *Id.* ¶ 27. That organization, the Asian
12  Pacific American Ocean Harmony Alliance (APAOHA), includes many community leaders and elected
13  officials. *Id.* ¶¶ 28, 34. APAOHA and its supporters view banning shark fins as a way of honoring
14  ancient tenets of Asian philosophy that emphasize the importance of harmony between nature and
15  humanity. *Id.* ¶ 27. APAOHA was and remains part of the coalition of Shark Fin Ban supporters, and
16  during the passage of the Shark Fin ban, other members of the coalition deferred to APAOHA on
17  cultural issues and questions. *Id.* ¶ 28.
18      Throughout 2011, the coalition worked to educate policymakers and the public on the need for
19  shark conservation, the role of shark fins in contributing to the decline of sharks worldwide, and the
20  connection between the worldwide decline of sharks and the health of California's ocean ecosystems.
21  *Id.* ¶ 29. The Shark Fin Ban gathered broad support, with polls showing that 76% of all Californians
22  were in favor of the ban, including 70% of Chinese Californians surveyed. *Id.* ¶ 30.
23      Advocates of the Shark Fin Ban made clear that the bill's purpose was to promote shark
24  conservation and healthy ocean ecosystems. *Id.* ¶ 31. Legislators and staff, in turn, demonstrated that
25  they understood marine conservation to be the goal of the Shark Fin Ban. For example, the committee
26
27
28

---

[1]  The companion bill, Assembly Bill 853, provided several carve-outs and exceptions to the shark fin prohibition contained in AB 376, and was explicitly made contingent on the passage of AB 376. *See* Assem. 853 (Cal. 2011).

– 7 –

SER000130

report on AB 376 from the Assembly Committee on Water, Parks and Wildlife explicitly stated shark conservation as the basis for the legislation. *Id.* ¶ 32.

Certain commercial interests—those involved in the trading and sale of shark fins—were opposed to the Shark Fin Ban, and they received significant media coverage. *See id.* ¶ 33. Some opponents argued that the Shark Fin Ban was an attack on Asian culture. *Id.* Attitudes among the Asian-American community were generally positive, though, and polling showed that only 18% of Chinese-American voters surveyed opposed the Shark Fin Ban, while 12% had no opinion. *Id.* ¶ 34. Numerous Asian Americans spoke up in favor of the ban during its passage, and many prominent individuals in the Asian-American community joined APAOHA in order to express their support for shark conservation and the Shark Fin Ban. *Id.*

Ultimately, the bill was propelled through committees and floor votes in the Assembly and Senate by the breadth of the coalition supporting it, and the strength of the policy arguments for a shark fin ban. *Id.* ¶ 35. The Assembly voted 65-8 in favor of the ban on May 23, 2011, and the Senate voted 25-9 in favor on September 6, 2011. *Id.* The voting records reflect very strong bipartisan support, including support from Asian Pacific American legislators. *Id.*

The text of AB 376 as passed demonstrates the legislature's concern with shark conservation, as the findings section extensively discusses the need for shark conservation and the importance of sharks to marine ecosystems. *See* Assem. 376 § 1 (Cal. 2011). The bill contains no text suggesting an intent to harm Chinese-Americans or Asian culture. *Id.*

Governor Brown signed the bill on October 7, 2011, clearly recognizing that the purpose of the legislation was to protect sharks and ocean ecosystems. Governor Brown stated: "The practice of cutting the fins off of living sharks and dumping them back in the ocean is not only cruel, but it harms the health of our oceans. . . . Researchers estimate that some shark populations have declined by more than 90 percent, portending grave threats to our environment and commercial fishing. In the interest of future generations, I have signed this bill." Monroe Decl. ¶ 37.

## III. Legal Standard

Plaintiffs seek a preliminary injunction barring the State of California from enforcing the Shark Fin Ban. Under well-established law, they "must show (1) a strong likelihood of success on the merits,

– 8 –

[Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction
Case No. 4:12-cv-03759-PJH

SER000131

(2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, the likelihood of success factor can be weighed against the balance of hardships factor, creating a "sliding scale" in which the probability of success required decreases as the balance of hardships tilts more and more strongly in the plaintiff's favor. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011). All four factors from *Winter*, however, must always be met; the sliding scale approach simply allows the first and third factors to substitute for each other to a limited degree. *See id.* at 1134-35.

Thus, even when a plaintiff has made the most favorable factual showing possible—by demonstrating the balance of hardships tilts sharply in his or her favor—he or she must still have legal claims that rise to the level of "serious questions going to the merits," in order to receive a preliminary injunction. *Id.* at 1135.

## IV. Argument

### A. Plaintiffs Raise No Serious Questions on the Merits with Respect to Dormant Commerce Clause and Equal Protection

Plaintiffs fail to raise any serious questions on the merits of their dormant Commerce Clause and Equal Protection claims. It is unnecessary to argue about the balance of hardships and the sliding scale, because Plaintiffs cannot prevail even at the lowest threshold.

#### 1. Dormant Commerce Clause

The "central rationale" of dormant Commerce Clause jurisprudence is to avoid economic protectionism. *S.D. Myers v. San Francisco*, 253 F.3d 461, 466 (9th Cir. 2001). To that end, dormant Commerce Clause analysis starts by asking whether the law in question "directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests." *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986). If the law does discriminate, it is often held invalid. *Id.*; *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1177 (9th Cir. 2011).

In this case, the Shark Fin Ban clearly does not discriminate against interstate commerce, or favor in-state economic interests over out-of-state interests. The ban regulates even-handedly,

– 9 –

[Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction
Case No. 4:12-cv-03759-PJH

SER000132

prohibiting the sale and possession of shark fins anywhere in California, regardless of where the fins came from and who is selling them. *See* Cal. Fish & Game Code § 2021 (codifying the Shark Fin Ban).

Given that the Shark Fin Ban does not discriminate against out-of-state interests, dormant Commerce Clause analysis continues.[2] As stated by the Ninth Circuit, "[m]ost regulations that run afoul of the dormant Commerce Clause do so because of discrimination, but in a small number of dormant Commerce Clause cases courts also have invalidated statutes that imposed other significant burdens on interstate commerce." *Nat'l Optometrists & Opticians v. Harris*, 682 F. 3d 1144, 1148 (9th Cir. 2012). To screen for these rare cases, courts apply a test originating in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970):

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 142 (internal citation omitted). To apply the *Pike* test, courts generally examine two issues.

First, courts assess the burden on interstate commerce, attempting to gauge its magnitude and type. *See Nat'l Optometrists & Opticians*, 682 F.3d at 1150 ("The threshold issue . . . is whether

---

[2] A separate route for finding a law invalid under the dormant Commerce Clause, not discussed above, is to argue that it constitutes an extraterritorial regulation. *See Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989). Plaintiffs do not appear to make this argument, *see* Doc. 9 at 18, but even if they did, it would be meritless. The Shark Fin Ban by its own terms only applies to transactions within California. Although the ban is indeed intended to influence shark finning worldwide, it produces only a market-mediated effect—influencing behavior via the subtle drivers of price and demand—and this type of impact on conduct elsewhere has been upheld consistently by courts under dormant Commerce Clause extraterritoriality analysis. *See, e.g., Healy*, 491 U.S. at 345 (Scalia, J., concurring in part and concurring in the judgment) (noting that pricing effects alone are not a reason to invalidate a law under the dormant Commerce Clause, as "innumerable valid state laws affect pricing decisions in other States"); *Freedom Holdings v. Spitzer*, 357 F.3d 205, 220 (2d Cir. 2004) ("The extraterritorial effect described by appellants amounts to no more than the upstream pricing impact of a state regulation."); *Bronco Wine v. Jolly*, 129 Cal. App. 4th 988, 1019 (2006) ("While [the law] will undoubtedly affect interstate commerce because of its upstream impact on the price and volume of [product] ultimately shipped to out-of-state markets, it does not directly regulate those markets."). By contrast, the type of extraterritorial regulation typically invalidated under the dormant Commerce Clause either involves direct commands of action outside the state's boundaries, or regulations that virtually force actors outside the state to comply—like "[f]orcing a merchant to seek regulatory approval in one State before undertaking a transaction in another." *Brown-Forman Distillers Corp.*, 476 U.S. at 582. Thus, extraterritoriality is not a problem for the Shark Fin Ban.

– 10 –

[Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction
Case No. 4:12-cv-03759-PJH

SER000133

1   Plaintiffs have produced sufficient evidence that the challenged laws, though non-discriminatory,

2   impose a significant burden on interstate commerce.").  It is not enough for a plaintiff to merely claim

3   that some commerce will be lost; rather, the magnitude of the effect must be high.  The Ninth Circuit

4   states, "[A] state regulation does not become vulnerable to invalidation under the dormant Commerce

5   Clause merely because it affects interstate commerce.  A critical requirement for proving a violation of

6   the dormant Commerce Clause is that there must be a *substantial burden on interstate commerce*." *Id.* at

7   1148 (internal citation omitted) (emphasis in original).

8        In addition to having a significant magnitude, the burden on commerce generally must be of a

9   certain type—one that implicates national uniformity or broader systemic issues.  *See id.* ("[S]ignificant

10  burdens on interstate commerce generally result from inconsistent regulation of activities that are

11  inherently national or require a uniform system of regulation.").  Burdens on commerce resulting from

12  laws that deal with typical state issues like land use, or health and welfare, are generally not regarded as

13  significant even if they curtail business to some degree.  *See id.* (citing *Great Atl. & Pac. Tea Co. v.*

14  *Cottrell*, 424 U.S. 366, 371 (1976)).

15       In this case, the alleged burden on burden on interstate commerce cannot be called significant

16  under the dormant Commerce Clause.  Plaintiffs provide a handful of declarations describing potential

17  loss in trade and reduction in revenue for certain shark fin trading companies in California, *see* Docs.

18  9-2 to 9-6, but even reading these declarations to their full extent, the burden is not of the magnitude or

19  type that would make it significant under the dormant Commerce Clause.  Read generously, Plaintiffs'

20  declarations show no more than a few million dollars in lost revenues.  *See id.*  In the context of

21  California's nearly two-trillion-dollar economy, where environmental and health and safety regulations

22  routinely affect the flow of commerce to the tune of hundreds of millions of dollars—with no dormant

23  Commerce Clause problems—Plaintiffs' claimed losses cannot be called significant.  Furthermore, the

24  alleged burden does not implicate national uniformity or broader systemic issues, and therefore is not of

25  the type that courts find "significant" under the dormant Commerce Clause.  *See Nat'l Optometrists &*

26  *Opticians*, 682 F.3d at 1148.  Because the Shark Fin Ban creates a garden-variety loss of trade and does

27  not implicate national uniformity, and because the magnitude of its commercial impact is small, it does

28  not create a significant burden on interstate commerce.  *Id.* at 1148-49.

– 11 –

SER000134

1    The Court's dormant Commerce Clause analysis should stop here.  If no substantial burden on
2    interstate commerce is found, "it follows that there cannot be a burden on interstate commerce that is
3    'clearly excessive in relation to the putative local benefits' under *Pike*."  *Id.* at 1155 (quoting *Pike*, 397
4    U.S. at 142).  Therefore there is no reason to proceed further in the *Pike* balancing test, and the Shark
5    Fin Ban must be upheld.  *Id.* at 1156 ("Because the challenged laws are not discriminatory and do not
6    impose a significant burden on interstate commerce, it would be inappropriate for us to determine the
7    constitutionality of the challenged laws based on our assessment of the benefits of those laws and the
8    State's wisdom in adopting them.").

9    If the Court were to proceed for whatever reason, the second step in the *Pike* balancing test
10   would be to inquire about the putative local benefit produced by the law.  *See id.* at 1155.  Because the
11   *Pike* test analyzes "putative" benefits, it is not necessary for the State of California to provide evidence
12   of actual benefit.  *Id.* at 1155 ("*Pike* discusses whether the burden on interstate commerce is 'clearly
13   excessive in relation to the *putative* local benefits.'  It does not mention actual benefits as part of the test
14   for determining when a regulation violates the dormant Commerce Clause." (internal citation omitted)
15   (emphasis in original)).  In this case, however, the benefits of the Shark Fin Ban are well-established on
16   both putative and actual levels, so the distinction is not critical.

17   In banning shark fins, the State of California found that sharks, as apex predators, are crucial to
18   California's ocean ecosystems; that shark populations are vulnerable to overexploitation and are
19   declining; and that California's market for shark fins helps to drive global demand for sharks and
20   therefore overfishing of sharks.  *See* Assem. 376 § 1 (Cal. 2011) (listing legislative findings).  The
21   California legislature thus provided an articulate and persuasive statement of the issue it was addressing,
22   and the benefits it was aiming to produce, in passing the Shark Fin Ban.  Moreover, because the
23   legislative findings in the Shark Fin Ban are based on well-established science, they can be expected to
24   lead to actual benefits in the near future.  By banning shark fins, California is contributing to a reduction
25   in price and volume of trading on the international shark fin market, thereby helping reduce shark
26   fishing and finning worldwide.  Monroe Decl. ¶¶ 11-13; McCosker Decl. ¶¶ 13-14.  It is well-
27   established that sharks are in decline worldwide, and declining shark populations, due to sharks' role as
28   apex predators, lead to trophic cascades that alter ecosystem function and can dramatically reshape

– 12 –

SER000135

marine communities.  McCosker Decl. ¶¶ 12-13, 15-18, 26-30.  Furthermore, the transboundary nature of sharks means that a global reduction in shark populations will inevitably affect California's shark populations, and the health of California's ocean ecosystems.  McCosker Decl. ¶¶ 8-9, 26-30; Monroe Decl. ¶¶ 16-17, 19.  Not only does this represent a significant conservation concern, but it also places in jeopardy a vast amount of ocean-related economic activity.  Monroe Decl. ¶¶ 20-23.  The Shark Fin Ban also works on an actual level to protect California's natural environment and related economic activity by disincentivizing illegal shark finning and fishing in California waters.  Monroe Decl. ¶¶ 18; McCosker Decl. ¶ 19.  Thus, the local benefits gained from enacting the Shark Fin Ban—ecosystem protection and economic well-being—are clear and strong, both on a putative and actual level.[3]

The final step in the *Pike* analysis is to determine whether the law's burden on interstate commerce is significantly out of proportion with its putative local benefits.  As already noted, the Court should not reach this point in the analysis, because the type of burden created by the Shark Fin Ban is not suspect and its magnitude is small.  Thus the burden cannot be considered "substantial" under the dormant Commerce Clause, and the *Pike* test is finished.  *Nat'l Optometrists & Opticians*, 682 F.3d at 1128.  If, however, this Court were to proceed to the final *Pike* step of balancing, it should be clear by now that any burden created by the Shark Fin Ban is not out of proportion with its local benefits.

Case law establishes a few principles for conducting the *Pike* balancing.  First, the nature of the state's interest in passing the law will affect the level of burden that is tolerated.  *See, e.g.*, *Pac. Merch. Shipping Ass'n*, 639 F.3d at 1180-81.  The more compelling the interest is, the higher the burden on commerce that will be required to violate the dormant Commerce Clause.  *Id.*; *S.D. Myers, Inc.*, 253 F.3d at 471.  Second, there a strong presumption in favor of validity.  A plaintiff cannot prevail simply by showing the burden on commerce outweighs the local benefits.  Rather, he or she must show that the burden is "clearly excessive" in relation to the local benefit in order to overturn the law.  *Pike*, 397 U.S. at 142.

---

[3] Plaintiffs argue shark finning is already prohibited by federal law, and therefore the Shark Fin Ban produces no local benefits.  *See* Doc. 9 at 18.  This completely misses the point of the law.  As described above, the purpose of banning the sale, trade, and possession of shark fins in California is to reach conduct that is otherwise not affected by a prohibition on the act of finning.  By closing off California as a market for shark fins, the ban reaches, via the market, shark mortality around the world, as well as illegal finning in California waters.

– 13 –

[Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction
Case No. 4:12-cv-03759-PJH

SER000136

Here, the Shark Fin Ban rests on a valid and compelling state interest:  protecting the health of California's ocean ecosystems.  Protecting natural resources is long-established in the law as a valid state interest.  *See, e.g.*, *Bayside Fish Flour Co. v. Gentry*, 297 U.S. 422, 426 (1936); *New York ex rel. Silz v. Hesterberg*, 211 U.S. 31 (1908); *see also Adams v. Shannon*, 7 Cal. App. 3d 427, 432 (1970) ("A state may prohibit the importation, possession, transportation, or sale of fish or game taken outside the state when its legislature reasonably determines that the action is needed to protect the local ecology.  That action by a state does not violate the commerce clause of the United States Constitution and is a proper exercise of the police power of the state.").  Similarly, protecting the environment is a valid state interest.  *See Pac. Merch. Shipping Ass'n*, 639 F.3d at 1180-81.  The complex nature of the problem addressed by the Shark Fin Ban—with sharks declining worldwide, scattered hotspots of overfishing, a weak regulatory patchwork, and migration by sharks over long distances—makes it an even more compelling state interest.  *See id.* at 1181-82 (noting that "severe environmental problems" that are "unusual and even unprecedented" can add further weight to the state's interest in regulating the issue).

In light of the Shark Fin Ban's compelling state interest and well-documented local benefits, its burden on commerce is not "clearly excessive."  The law seeks to protect California's ocean ecosystems and associated economic activity, and is firmly grounded in conservation science.  The burden created is not cognizable under dormant Commerce Clause jurisprudence, either in magnitude or type.  Even if it were, the burden on commerce is simply not excessive, in relation to the Shark Fin Ban's local benefits.  Thus the law must be upheld.

## 2. Equal Protection

Under the Equal Protection Clause of the United States Constitution, a statute is subject to strict scrutiny if it facially discriminates on the basis of race.  *McLaughlin v. Florida*, 379 U.S. 184, 191 (1964).  The Shark Fin Ban does not facially discriminate on the basis of race.  It does not discriminate at all, nor does it ever mention race.  It simply prohibits all persons uniformly from possessing, selling, or trading shark fins in California.  *See* Cal. Fish & Game Code § 2021.

A facially neutral state law like the Shark Fin Ban can also be subject to strict scrutiny under the Equal Protection Clause, however, if it has a disparate impact on a protected class and was motivated by an intent to discriminate against that class.  *Washington v. Davis*, 426 U.S. 229, 239-243 (1976).

– 14 –

[Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction
Case No. 4:12-cv-03759-PJH

SER000137

Plaintiffs argue the Shark Fin Ban has a disparate impact on Chinese-Americans and was motivated by an invidious intent to discriminate against them, and therefore should be subject to strict scrutiny. Doc. 9 at 15-17. Regardless of whether the ban has a disparate impact on Chinese-Americans, Plaintiffs cannot prove an intent to discriminate—because none existed—and therefore they are not entitled to strict scrutiny review.

The Ninth Circuit recently summarized the different types of evidence a plaintiff can use to show discriminatory intent:

> [A] plaintiff may articulate discriminatory intent through evidence of (1) discriminatory impact; (2) [t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes; (3) irregularities in the passage of legislation such as departures from normal procedural sequence; and (4) legislative or administrative history such as contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 522-23 (9th Cir. 2011) (internal quotations omitted) (alterations in original).

Plaintiffs in this case offer only a few weak quotations taken out of context, to establish discriminatory intent. First, they point to statements by Assemblymember Paul Fong comparing shark fin soup to foot binding. *See* Doc. 9 at 16; Doc. 9-11 at 5-9. Assemblymember Fong's statements, however, in no way express an intent to harm Chinese-American people. Fong is himself Chinese-American, and his statements simply show that within the Chinese-American community, there are heterogeneous views about the value of shark fin soup. Indeed, polling during the law's passage showed that Fong's views were shared by a majority of Chinese-Americans—70% of those surveyed supported the Shark Fin Ban. Monroe Decl. ¶ 30. If anything, this undercuts Plaintiffs' effort to establish discriminatory intent, rather than helps it.

Second, Plaintiffs point to a statement made by Peter Knights of WildAid, a wildlife conservation group, in which Knights said, "[M]y profession has been investigating illegal wildlife trade. Seeing how people get [a]round the regulations. . . . [It's] very difficult to regulate something that's going [on] out on the boat in Indonesia in the middle of the ocean. It's very easy to regulate if something is happening in Chinatown here. Very easy, go around restaurants and find out who's having

– 15 –

SER000138

what." Doc. 9-11 at 17. According to Plaintiffs, this statement somehow implies an invidious intent to discriminate. It does no such thing. Rather, it just illustrates the rationale for using a California-based shark fin ban: the vast majority of shark mortality occurs outside of California waters and therefore outside the reach of California regulations, but by banning shark fins within the state, it is possible to affect the market, and ultimately reduce total shark mortality. Knights was simply explaining why it makes sense for concerned Californians to focus on their own state, rather than attempting to directly regulate or engage with fishermen abroad.

Third, Plaintiffs believe discriminatory intent can be imputed from a statement made by Assemblymember Huffman, where he said, "Sharks are the top predators in ocean ecosystems around the world. . . . Removing them by this senseless act of finning can seriously destabilize the food chain. To save them from extinction, our bill targets the demand for these shark fins by banning their sale and possession here in California." Doc. 9-11 at 28. It is not clear where Plaintiffs think discriminatory intent can be found in this statement. Huffman's words obviously express that conservation was the purpose behind the law.

None of Plaintiffs' proffered evidence comes close to establishing discriminatory intent. As the Ninth Circuit has noted, "Plaintiffs must present evidence based upon which any reasonable fact-finder could conclude [the defendants] acted 'at least in part *because of*, not merely in spite of, its adverse effects upon an identifiable group,'" *Darensburg*, 636 F.3d at 523 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (emphasis added). Several of the statements highlighted by Plaintiffs do show a recognition that shark fins are primarily consumed by Asian-Americans, and that a shark fin ban would therefore affect Chinese-Americans more than other people, but none of them demonstrate any intent to pass the Shark Fin Ban *because of* that fact. Rather, all of the statements show shark conservation and the protection of marine ecosystems as the driving factors behind the law.

Plaintiffs fail to show discriminatory intent for the simple reason that there was none. The conservation purpose of the law was clear throughout the process, *see* Monroe Decl. ¶¶ 25-37, and is well-documented in the statute itself, *see* Assem. 376 § 1 (Cal. 2011) (listing legislative findings). Lacking discriminatory intent, Plaintiffs are only entitled to rational basis review of the Shark Fin Ban under the Equal Protection Clause. *FCC v. Beach Comms., Inc.*, 508 U.S. 307, 314 (1993).

– 16 –

SER000139

Under rational basis review, a law is upheld so long as it is rationally related to a legitimate government interest. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Laws receive a "strong presumption of validity," *FCC*, 508 U.S. at 315, and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *id.* at 314. It is the job of those attacking the law "to negative every conceivable basis which might support it." *Id.* at 315 (internal quotation omitted).

The Shark Fin Ban was passed to further the government interests of environmental protection and wildlife conservation. These interests are core state regulatory goals, and constitute legitimate government interests for the purposes of Equal Protection analysis. *See, e.g.*, *UFO Chuting of Hawaii Inc. v. Smith*, 508 F.3d 1189 (9th Cir. 2007) (finding the protection of humpback whales to be a legitimate government interest under rational basis review); *Seariver Mar. Fin. Holdings v. Mineta*, 309 F.3d 662, 679-80 (9th Cir. 2002) (upholding legislation under Equal Protection rational basis review, where the law was based on the government interest of protecting the marine environment from oil spills).

Banning the sale, trade, and possession of shark fins is rationally related to the legitimate government interest of shark conservation for all the reasons discussed under the dormant Commerce Clause analysis above: sharks are apex predators and thereby help maintain a crucial balance in marine ecosystems; shark populations worldwide are declining due to overfishing; shark overfishing is driven by the demand for shark fins; many sharks are transboundary species, and shark population declines outside California waters can affect California ecosystems; by banning shark fins, California can contribute to a reduction in price and trading volume on the global shark fin market; reduced price and trading volume can be expected to lead to a reduction in finning; and by banning shark fins, California can directly reduce illegal shark fishing and finning in its waters. *See* McCosker Decl. ¶¶ 8-9, 12-19, 26-30; Monroe Decl. ¶¶ 11-13, 16-19.

Plaintiffs have offered nothing to dispute the connection between the Shark Fin Ban and the goal of wildlife conservation. Plaintiffs briefly criticize the ban as unnecessary in light of federal law (illustrating their failure to understand the ban and its purpose), as well as being overbroad (illustrating their lack of knowledge about shark fin traceability and laundering issues), but these are merely policy

– 17 –

SER000140

quibbles, and do not go to the core purpose of the law. *See FCC*, 508 U.S. at 314 ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.").  Because the Shark Fin Ban is rationally related to the legitimate government interest of wildlife conservation, Plaintiffs' Equal Protection claim raises no serious questions as to the merits.

**V.     Conclusion**

For the foregoing reasons, this Court should deny the Plaintiffs' motion for preliminary injunction with respect to their dormant Commerce Clause and Equal Protection claims.

Respectfully Submitted,

NATURAL RESOURCES DEFENSE COUNCIL

Date:    September 21, 2012

By:    _____
        Seth Atkinson

Attorney for Proposed Amicus Curiae
Natural Resources Defense Council

– 18 –

[Proposed] Brief by Amicus Curiae Natural Resources Defense Council on Plaintiffs' Motion for Preliminary Injunction
Case No. 4:12-cv-03759-PJH

SER000141