No. 14-15298

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

ROBIN ANTONICK, an Illinois Citizen,
Plaintiff-Appellant,

v.

ELECTRONIC ARTS INC., a California corporation,
Defendant-Appellee.

---

On Appeal from the United States District Court
for the Northern District of California
Case No. No. 3:11-cv-01543-CRB
Hon. Charles R. Breyer, Presiding

---

## BRIEF OF APPELLEE ELECTRONIC ARTS INC.

---

SUSAN J. HARRIMAN, #111703
STEVEN A. HIRSCH, #171825
ERIC H. MACMICHAEL, # 231697
R. ADAM LAURIDSEN, #243780
TIA A. SHERRINGHAM, #258507
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Defendant-Appellee
ELECTRONIC ARTS INC.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and to enable the Court to evaluate possible disqualification or recusal, appellees certify as follows: appellee, Electronic Arts Inc. is a publicly-traded corporation and has no parent corporation. No other publicly traded corporation owns 10% or more of Electronic Arts Inc.'s stock.

# TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ........................................................ 1

II.    STATEMENT OF JURISDICTION ................................. 2

III.   COUNTERSTATEMENT OF THE ISSUES ..................... 2

IV.  STATEMENT OF THE FACTS AND THE CASE ........................ 3

     A.    EA hired Antonick to write source code for a football videogame. ................................................ 3

     B.    EA and Antonick amended their Contract several times. .................................................... 7

     C.    EA hired Park Place to write source code for a new football videogame for the Sega Genesis. ................... 8

     D.    Twenty-one years later, Antonick sued EA. ...................... 12

          1.    Antonick's explanation for his 21-year delay. ................................................ 12

          2.    Pre-trial proceedings. ................................... 13

     E.    Trial. ................................................................ 16

          1.    Phase II pre-trial rulings. .......................... 17

          2.    The record evidence. .................................. 18

          3.    Testimony that the *Sega Madden and SNES Madden* games were created independently. .......................................... 19

          4.    Antonick's closing argument. ..................... 20

          5.    The Phase II jury verdict. ........................... 20

     F.    The JMOL Order. ........................................... 23

V.   SUMMARY OF ARGUMENT ..................................... 25

# TABLE OF CONTENTS
## (continued)

**Page(s)**

VI.  ARGUMENT ................................................................ 28

    A.  JMOL standard of review ..................................... 28

    B.  The district court correctly granted JMOL. ...................... 29

        1.  Antonick's failure to offer the works in evidence mandates JMOL under any test for copyright infringement. ......................... 29

        2.  Ninth Circuit law required both Questions 1 and 2 ................................................................ 30

        3.  The district court correctly held that there was no record evidence for the jury to compare the works as a whole. ................................. 34

            a.  The contents of the games were not in evidence. .......................................... 34

            b.  A source-code expert's testimony was no substitute for legally sufficient evidence. ............................................ 36

            c.  EA preserved its JMOL arguments ................. 38

        4.  The district court could have granted JMOL on Question 1 because there was no evidence for the jury to compare expression in source codes. ............................................ 40

            a.  Antonick failed to introduce evidence on Question 1 ........................................ 40

            b.  Barr created visual representations of unprotected play diagrams. ....................... 44

            c.  Antonick's failure of proof warranted JMOL on Question 1. ......................... 47

880883.01

**TABLE OF CONTENTS**
**(continued)**

**Page(s)**

    d.    Antonick's attacks on the district court's ruling as to Question 1 lack merit...................................................50

C.    The district court followed this Circuit's test for proving copyright infringement. ........................................54

    1.    Antonick offers no basis for overturning Circuit law. ..................................................55

    2.    The district court properly applied the virtual-identity standard in Question 2. ..................57

    3.    The district court correctly found "thin" protection. ..................................................60

        a.    The district court correctly held that Antonick owned a copyright only in the expression in the source code of plays, not in the plays themselves...................60

        b.    The district court correctly held that copyright law did not protect three other features of *Apple II Madden*. ..................63

        c.    The district court correctly held that Antonick did not own a copyright in the printed playbooks for *Apple II Madden*. ..........................................68

D.    The district court did not abuse its discretion by granting a conditional new trial under Rule 50(c). ..................................................................70

E.    The district court properly dismissed Antonick's claims to royalties from sales of *SNES Madden* games...................................................72

# TABLE OF CONTENTS
## (continued)

**Page(s)**

1. The SNES and Apple II microprocessors are not in the same "Microprocessor Family." ...................................... 72

2. Antonick's right-of-first-refusal claim does not save his claim to royalties from *SNES Madden* sales. ................................. 74

F. The district properly excluded evidence of Antonick's ancillary breach claim, for which he identified no damages. .......................... 77

G. The judgment can be affirmed on the alternative ground that Antonick's action is time-barred. .................. 80

   1. To avoid dismissal, Antonick told the court that the CNBC interview put him on notice. .......................................... 80

   2. At trial, Antonick took a position clearly inconsistent with his prior statements to the court. .................................... 82

   3. Antonick should be judicially estopped from arguing that the CNBC interview did not put him on notice. ................................. 84

   4. Antonick was on notice of his claims long before the statute-of-limitations cut-off. .................. 87

H. A new trial on the statute of limitations is warranted if there is a new trial. ....................... 89

VII. CONCLUSION ............................................. 89

STATUTORY ADDENDUM .............................. SA1

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Airframe Systems, Inc. v. L-3 Commc'n Corp.*
658 F.3d 100 (1st Cir. 2011) ................................................................29

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ..........................................................................28

*Apple Computer, Inc. v. Microsoft Corp.*
35 F.3d 1435 (9th Cir. 1994)......................................................*passim*

*Arthur Young & Co. v. U. S. Dist. Ct.*
549 F.2d 686 (9th Cir. 1977)................................................................89

*Benay v. Warner Bros. Entm't.*
607 F.3d 620 (9th Cir. 2010)................................................................31

*Bikram's Yoga Coll. of India v. Evolation Yoga*
No. 2:11-cv-05506-ODW 2012 WL 6548505 (C.D. Cal. Dec.
14, 2012) ................................................................................................61

*Brown Bag Software v. Symantec Corp.*
960 F.2d 1465 (9th Cir. 1992)....................................................*passim*

*Cavalier v. Random House, Inc.*
297 F.3d 815 (9th Cir. 2002)........................................................31, 33

*Chafin v. Chafin*
133 S. Ct. 1017 (2013)........................................................................57

*Computer Associates International v. Altai, Inc.*
797 F.2d 1222 (2d Cir. 1986) ............................................................56

*Conseco Fin. Servicing Corp. v N. Am. Mortgage Co.*
381 F3d 811 (8th Cir. 2004)................................................................40

*Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*
606 F.3d 612 (9th Cir. 2010)................................................................80

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Creations Unlimited, Inc. v. McCain*
   112 F.3d 814 (5th Cir. 1997) ................................................................29

*Dang v. Cross*
   422 F.3d 800 (9th Cir. 2005) ................................................................53

*Data East USA, Inc. v. Epyx, Inc.*
   862 F.2d 204 (9th Cir. 1988) ........................................62, 63, 65, 66, 67

*Design Data Corp. v. Unigate Enter., Inc.*
   12-CV-04131-WHO, 2014 WL 3868076 (N.D. Cal. Aug. 6,
   2014) ..................................................................................................47

*E.E.O.C. v. Go Daddy Software, Inc.*
   581 F.3d 951 (9th Cir. 2009) ..........................................................38, 39

*Erickson v. Blake*
   839 F. Supp. 2d 1132 (D. Or. 2012) .....................................................59

*Estate of Barabin v. AstenJohnson, Inc.*
   740 F.3d 457 (9th Cir. 2014) ................................................................50

*Ets-Hokin v. Skyy Spirits, Inc.*
   225 F.3d 1068 (9th Cir. 2000) ..............................................................68

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*
   762 F.3d 829 (9th Cir. 2014) ................................................................71

*Francisco Jose Rivero v. City & Cnty. of San Francisco*
   316 F.3d 857 (9th Cir. 2002) ................................................................80

*Freund v. Nycomed Amersham*
   347 F.3d 752 (9th Cir. 2003) ................................................................39

*Frybarger v. Int'l Bus. Machs. Corp.*
   812 F.2d 525 (9th Cir. 1987) ................................................................32

880883.01

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Fujitsu Ltd. v. Tellabs Operations, Inc.*
  No. 08 3379, 09 c 4530, 2013 WL 268607 (N.D. Ill. Jan. 24,
  2013) ................................................................................................ 39

*Funky Films, Inc. v. Time Warner Entm't Co.*
  462 F.3d 1072 (9th Cir. 2006) ...................................................... 31, 38

*Gantt v. City of Los Angeles*
  717 F.3d 702 (9th Cir. 2013) .............................................................. 53

*Gasoline Prods. Co. v. Champlin Ref. Co.*
  283 U.S. 494 (1931) ............................................................................ 89

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*
  9 F.3d 823 (10th Cir. 1993) .......................................................... 52, 64

*Gen. Universal Sys., Inc. v. Lee*
  379 F.3d 131 (5th Cir. 2004) .............................................................. 29

*Google Inc. v. Oracle America Inc.*
  2014 WL 5319724 (U.S. Oct. 6, 2014) .............................................. 66

*Granger v. Acme Abstract Co.*
  900 F. Supp. 2d 419 (D.N.J. 2012) .................................................... 29

*Hamilton v. Astrue*
  CV 12-1227 JCG, 2012 WL 5964516 (C.D. Cal. Nov. 29,
  2012) ................................................................................................ 41

*Harper & Row Publishers., Inc. v. Nation Enters.*
  471 U.S. 539 (1985) ............................................................................ 60

*Harper House, Inc. v. Thomas Nelson, Inc.*
  889 F.2d 197 (9th Cir. 1989) .............................................................. 52

*Hart v. Massanari*
  266 F.3d 1155 (9th Cir. 2001) ............................................................ 57

880883.01

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Helfand v. Gerson*
105 F.3d 530 (9th Cir. 1997)................................................84

*i4i Ltd. P'ship v. Microsoft Corp.*
598 F.3d 831 (Fed. Cir. 2010) ............................................40

*In re Hanford Nuclear Reservation Litig.*
534 F.3d 986 (9th Cir. 2008)...............................................65

*Incredible Techs., Inc. v. Virtual Techs., Inc.*
400 F.3d 1007 (7th Cir. 2005).......................................66, 67

*InDyne, Inc. v. Abacus Tech. Corp.*
876 F. Supp. 2d 1278 (M.D. Fla. 2012), *aff'd*, 513 F. Appx
858 (11th Cir. 2013) ...........................................................29

*Janes v. Wal-Mart Stores Inc.*
279 F.3d 883 (9th Cir. 2002)...............................................39

*Josephs v. Pac. Bell*
443 F.3d 1050 (9th Cir. 2006).............................................28

*Juneau Square Corp. v. First Wisconsin Nat'l Bank of
Milwaukee*
624 F.2d 798 (7th Cir. 1980).............................42, 50, 71, 85

*Kirsch v. Fleet St. Ltd.*
148 F.3d 149 (2d Cir. 1998) ...............................................40

*Kouf v. Walt Disney Pictures & Television*
16 F.3d 1042 (9th Cir. 1994)...............................................31

*Laborers' Pension Fund v. A&C Envtl., Inc.*
301 F.3d 768 (7th Cir. 2002)...............................................39

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*
387 F.3d 522 (6th Cir. 2004)...............................................67

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Lifshitz v. Walter Drake & Sons, Inc.*
806 F.2d 1426 (9th Cir. 1986)...............................................................39

*Lopez-Vasquez v. Holder*
706 F.3d 1072 (9th Cir. 2013).................................................53, 64, 68

*Lotus Dev. Corp. v. Borland Int'l, Inc.*
49 F.3d 807 (1st Cir. 1995), *aff'd by an equally divided
court*, 516 U.S. 233 (1996) .................................................................65

*Lucky Break Wishbone Corp. v. Sears Roebuck & Co.*
373 Fed Appx 752 (9th Cir. 2010) .......................................................59

*Mattel, Inc. v. MGA Entm't, Inc.*
616 F.3d 904 (9th Cir. 2010)..........................................................56, 67

*Matthew Bender & Co. v. West Publ'g. Co.*
158 F.3d 674 (2d Cir. 1998) .................................................................54

*Molina v. Astrue*
674 F.3d 1104 (9th Cir. 2012)..............................................................55

*National Basketball Ass'n v. Motorola, Inc.*
105 F.3d 841 (2d Cir. 1997) .................................................................62

*New Hampshire v. Maine*
532 U.S. 742 (2001) ........................................................................84, 85

*Oracle America, Inc. v. Google Inc.*
750 F.3d 1339 (Fed. Cir. 2014) ............................................................66

*Padgett v. Wright*
516 F. Appx 609 (9th Cir. 2013) ..........................................................40

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*
96 F.3d 1151 (9th Cir. 1996)................................................................79

*Pasillas v. McDonald's Corp.*
927 F.2d 440 (9th Cir. 1991)................................................................52

880883.01

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Reeves v. Sanderson Plumbing Prods., Inc.*
530 U.S. 133 (2000)........................................................28, 48

*Rice v. Fox Broad. Co.*
330 F.3d 1170 (9th Cir. 2003)..............................................31

*Rissetto v. Plumbers & Steamfitters Local 343*
94 F.3d 597 (9th Cir.1996)...................................................84

*Satava v. Lowry*
323 F.3d 805 (9th Cir. 2003)..............................53, 54, 60, 61

*Sega Enters. Ltd. v. Accolade, Inc.*
977 F.2d 1510 (9th Cir. 1992).........................................65, 18

*Seiler v. Lucasfilm, Ltd.*
808 F.2d 1316 (9th Cir. 1986)...............................................29

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*
562 F.2d 1157 (9th Cir. 1977).....................30, 36, 38, 54, 58

*Smith v. Jackson*
84 F.3d 1213 (9th Cir. 1996)...............................................37

*Stewart v. Wachowski*
574 F. Supp. 2d 1074 (C.D. Cal. 2005)...............................30

*Swirsky v. Carey*
376 F.3d 841 (9th Cir. 2004)..........................................31, 33

*Three Boys Music Corp. v. Bolton*
212 F.3d 477 (9th Cir. 2000)...............................................37

*Tolbert v. Queens Coll.*
242 F.3d 58 (2d Cir. 2001) ..................................................39

*U.S. v. Marolf*
173 F.3d 1213 (9th Cir. 1999)..............................................88

880883.01

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*
308 F.3d 1167 (Fed. Cir. 2002) ............................................................28

*Union Oil Co. v. Terrible Herbst, Inc.*
331 F.3d 735 (9th Cir. 2003)................................................................70

*United States v. Hamilton*
583 F.2d 448 (9th Cir. 1978)................................................................54

*Wagner v. Prof'l Eng'rs in Cal. Gov't*
354 F.3d 1036 (9th Cir. 2004)........................................................85, 87

*Weisgram v. Marley Co.*
528 U.S. 440 (2000).............................................................................50

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*
395 F.3d 416 (7th Cir. 2005)................................................................41

## State Cases

*Amelco Elec. v. City of Thousand Oaks*
27 Cal. 4th 228 (2002).........................................................................77

*Consol. World Invs., Inc. v. Lido Preferred Ltd.*
9 Cal. App. 4th 373 (1992) ..................................................................74

*Freeman & Mills, Inc. v. Belcher Oil Co.*
11 Cal. 4th 85 (1995)...........................................................................79

*Lance Camper Mfg. Corp. v. Republic Indem. Co. of Am.*
44 Cal. App. 4th 194 (1996) ................................................................79

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified School
Dist.*
34 Cal.4th 960 (2005)..........................................................................78

*Sargon Enters., Inc. v. Univ. of S. Cal.*
55 Cal. 4th 747 (2012).........................................................................75

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Shaw v. Superior Court*
  229 Cal. App. 4th 12 (2014) ..................................................................79

## Federal Constitutional Provisions

Seventh Amendment ...................................................................89

## Federal Statutes

17 U.S.C. §102(b) ...................................................................32, 64, 65, 66

## Federal Rules

Fed. R. Civ. P. 50 ...................................................................*passim*

Fed. R. Civ. P. 56 ...................................................................28

Fed. R. Civ. P. 59 ...................................................................22

Fed. R. Evid. 801(d)(2)(C) ...................................................................65

## Federal Regulations

37 C.F.R. § 202.1(a) ...................................................................68

77 Fed. Reg. 37605-01 (June 22, 2012) ...................................................................61

## State Statutes

Cal. Civ. Code § 3300 ...................................................................78

# I.   INTRODUCTION

Like any copyright-infringement suit,[1] this one hinged on the factfinder's side-by-side comparison of the allegedly infringed and infringing works. But plaintiff Robin Antonick did not present those works to the jury or submit them into evidence. The record contains neither the source code nor the contents of any videogame at issue. With no legally sufficient evidence, the district court correctly entered judgment for EA as a matter of law.

Antonick's appeal raises legal arguments that ignore his failure of proof. Distilled to their essence, those arguments ask this Court to overturn forty years of Ninth Circuit law. For example, Antonick asks this Court to abandon the Circuit's well-settled "extrinsic-intrinsic" test for proving copyright infringement and to reject the Circuit's long-standing requirement that a plaintiff must prove that the works are virtually identical when a paucity of protected elements mandates "thin" copyright protection. Even if Antonick had offered any justification to rewrite Ninth Circuit law (which he hasn't), this case

---

[1] Antonick's claim for breach of contract required proof that EA created an unauthorized derivative work under U.S. copyright law.

would not be an appropriate vehicle for doing so because, with no source code and no game contents in evidence, Antonick could not prove his case under any recognized legal standard.

The district court's judgment should be affirmed.

## II.   STATEMENT OF JURISDICTION

EA agrees with Antonick's jurisdictional statement.

## III.   COUNTERSTATEMENT OF THE ISSUES

1.   Whether the district court correctly granted JMOL, given Antonick's failure to submit the works in evidence.

2.   Whether this panel can and should depart from forty years of Circuit law by abrogating the extrinsic-intrinsic test of similarity and by rejecting the virtual-identity standard where the paucity of protectable elements mandates "thin" copyright protection.

4.   Whether the district court correctly concluded that, under the terms of the Contract, Antonick was not entitled to royalties on a Super Nintendo videogame.

5.   Whether the district court correctly dismissed Antonick's "Development Aids" claim after he conceded that the alleged breach of contract caused no damages.

6.     Whether this Court should affirm the judgment on the alternative ground that Antonick's claims are time-barred.

## IV.   STATEMENT OF THE FACTS AND THE CASE

### A.   EA hired Antonick to write source code for a football videogame.

Trip Hawkins founded EA in 1982.[2] Hawkins long envisioned creating a football-simulation videogame.[3] He grew up playing *Strat-o-Matic Football*, a statistics-oriented sports-simulation game played with cards and dice.[4] Hawkins sought to bring the *Strat-o-Matic*'s features— including its statistical accuracy and "the idea of annual editions of new players"—to the computer.[5]

To implement Hawkins's vision, EA hired Antonick in 1984 to write the source code for a videogame to be called "Football."[6] Antonick's only experience in videogames was writing code for a single educational videogame.[7] EA negotiated with sports broadcaster and former NFL

---

[2] SER 815:1-4.

[3] SER 459:7-460:6; SER 494:15-21.

[4] SER 495:18-496:14.

[5] SER 497:2-21.

[6] ER 689-717.

[7] SER 709:19-710:6.

3

coach John Madden to use his name, likeness, and football expertise, and to lend celebrity appeal to the game.[8] Madden's involvement led EA to redesign the game and to sign a new contract with Antonick in 1986 ("Contract").[9]

The Contract gave Antonick the opportunity to write source code for a videogame for the Apple II computer, to be called *John Madden Football* ("*Apple II Madden*").[10] The Contract called the game's software program the "Work."[11] The Contract also allowed Antonick to modify his *Apple II Madden* source code to develop versions of *John Madden Football* (generally, "*Madden*") for play on two other computers, the Commodore 64 and the IBM PC.[12] Under the original Contract, Antonick received a 7% royalty for games he coded and a 1% royalty for "Derivative Works by [EA]."[13] The Contract defined a "Derivative Work" as "any computer software program or electronic game which either (a) constitutes a derivative work of the Work *within the meaning of United*

---

[8] SER 934-949; SER 839:8-13.

[9] SER 507-594; SER 711:5-24; SER 686:11-17.

[10] SER 507-594.

[11] SER 507-508 at I&IV.

[12] SER 508-510 at IV.

[13] SER 511 at V.

4

*States copyright law* or (b) produces audiovisual effects which infringe the copyright in the audiovisual effects produced by the work."[14] The Contract stated that EA owned all intellectual-property rights and other proprietary rights in videogames for which Antonick wrote the source code, except for any copyright interest that Antonick might have in the software program he wrote.[15]

Antonick wrote the source code for *Apple II Madden*,[16] which was "formally redesigned 3 times, cancelled 2 times, refunded several times, and [] had 3 producers."[17] The game's release was delayed repeatedly because Hawkins was a perfectionist and because Antonick missed deadlines and wrote code riddled with bugs.[18]

To simulate professional football, Hawkins used a printed playbook from John Madden's days as head coach of the Oakland

---

[14] SER 513 (Ex. A, §1.03) (emphasis added). Antonick's claims arise solely under subsection (a) of this definition. *See* ER 1056; 467:14-468:2; ER 1212 at n.5; SER 44-45.

[15] SER 526 (Ex A, §8.04).

[16] SER 686:15-17.

[17] SER 606-607; SER 711:5-712:14.

[18] ER 984:2-ER 985:8; SER 738:18-23; SER 606-607.

880883.01

Raiders.[19] This Raiders playbook described "[n]omenclature, formations, motion, blocking, patterns, different types of blocking, pass patterns, and run motions," which Hawkins used to construct a series of offensive and defensive formations and plays that he diagrammed on paper.[20] Hawkins then gave those diagrams to Antonick to write source code for implementing the plays in *Apple II Madden*.[21] Hawkins's paper play diagrams were used to create the physical paper playbook that depicted the plays in the game. That paper playbook accompanied the packaging and manual sold along with *Apple II Madden*.[22]

In 1988, during *Apple II Madden*'s final development stages, Richard Hilleman joined the project as the fourth producer.[23] Hilleman played an operations role, finalizing the game and arranging its commercial release. [24] He "play tested" iterations of the game to ensure

---

[19] SER 650:14-651:6; SER 795:17-797:22; SER 816:23-817:2; SER 498:8-13.

[20] SER 796:20-23.

[21] SER 595-605; SER 611-615; SER 616-617; SER 818:7-820:16.

[22] SER 821:12-823:12.

[23] ER 893:2-20; 360:6-19.

[24] ER 893:2-20.

6

that game play matched the manual and made sense as a football game.[25]

EA released *Apple II Madden* in 1988, followed by Commodore 64 and IBM PC versions in 1989. [26]

## B. EA and Antonick amended their Contract several times.

Antonick and EA amended the Contract fifteen times due to *Apple II Madden*'s development delays. Two amendments are relevant here.

Under Amendment 1, in exchange for additional upfront consideration, Antonick gave up royalties from sales of Derivative Works by EA that used a microprocessor from a different "Microprocessor Family" than the Apple II's microprocessor.[27]

Amendment VIII, executed in October 1989, gave Antonick the opportunity to adapt his *Apple II Madden* source code for two new platforms, the Sega Genesis and the Nintendo Entertainment System ("NES").[28]

---

[25] SER 742:21-743:3.

[26] SER 687:5-10.

[27] ER 486-489.

[28] SER 582-583 at Amendment VIII.

In late 1989, two months after signing Amendment VIII, Antonick declined in writing to develop a Sega Genesis Derivative Work and "grant[ed] [EA] the unrestricted right to develop or have third parties develop such [Sega Genesis] Derivative Work and all derivatives thereof . . . ."[29] In 1991, Antonick executed a "Termination Amendment" that ended his limited work on NES, a game never commercially released.[30]

## C. EA hired Park Place to write source code for a new football videogame for the Sega Genesis.

Early in 1990, EA decided to develop a new and different football videogame to be played on the state-of-the-art Sega Genesis. While the Apple II computer ran on an 8-bit 6502 processor,[31] the Sega Genesis used a more powerful, 16-bit 68000 processor.[32] The increased processing speed meant that the Sega Genesis "had more sophisticated computer artificial intelligence" and "tremendous graphic capability compared to the old 8-bit computers."[33] The Apple II computer used a keyboard and joystick; but the Sega Genesis was a dedicated gaming

---

[29] SER 608.

[30] SER 609.

[31] SER 685:19-21; SER 714:19-22; ER 860:15-20.

[32] SER 839:14-15.

[33] SER 717:4-11; SER 719:4-10; SER 743:25-744:8.

8

console with its own controllers and was designed to be plugged into a television.[34]

For the advanced Sega Genesis, EA envisioned a football game fundamentally different from *Apple II Madden*. Whereas the game designed by Hawkins and coded by Antonick prioritized statistical accuracy over the visual elements of gameplay, the Sega Genesis game would be an "arcade" style game emphasizing fun, ease of play, and visual features to provide gamers with an experience more like watching football on TV.[35] For the Sega game, EA contracted with an independent videogame development company, Park Place Productions,[36] which had developed the industry's most successful football videogame to date, the "TV-oriented" *Monday Night Football*.[37] Park Place separately hired software engineer Jim Simmons, one of the "most remarkable programmers" of his day,[38] to write the source code

---

[34] SER 743:23-744:8; SER 656:2-7.

[35] SER 749:8-750:10.

[36] SER 737:1-3; SER 903-933.

[37] SER 638-643, SER 748:2-749:7.

[38] SER 741:2-6; SER 722:15-25.

and develop this game, which became *John Madden Football* for the Sega Genesis ("*Sega Madden 1990*").[39]

Simmons wrote the source code for *Sega Madden 1990*;[40] no one at EA had any role in writing that code.[41] EA provided Simmons with a design script (a loose guideline that laid out "high-level concepts about how the game would look" and "what [EA] was looking for"),[42] allowing Simmons to design the game from the ground up.[43] The only other materials that Simmons received from EA were faxed photocopies of some pages from the printed *Apple II Madden* playbooks that came packaged with that game.[44] No one from EA provided Antonick's source code to Simmons,[45] and no one from EA or Park Place spoke to Simmons about the Antonick-coded games.[46] In fact, when Simmons coded *Sega*

---

[39] SER 799:4-25.

[40] ER 977:20-24.

[41] ER 977:20-24.

[42] SER 716:8-11, SER 720:7-24; SER 800:10-28, SER 801:1-3.

[43] SER 800:2-25.

[44] SER 803:22-806:25; SER 824:19-825:10.

[45] SER 813:19-21.

[46] SER 814:4-9.

*Madden 1990*, he had never heard of Antonick; nor had he played any Antonick-coded game.[47]

In December 1990, roughly eight months after Simmons began coding *Sega Madden 1990*, EA commercially released the game to great success.[48]

In 1990, Antonick knew several things about *Sega Madden 1990*: he knew that EA had hired Park Place to develop the game;[49] that the game had been commercially released;[50] that it shared the same "Madden" name as the game he coded;[51] and that Hilleman was the game's producer.[52] Antonick said nothing to EA. Meanwhile, over the course of two years, Antonick adapted his *Apple II Madden* source code to develop another *Madden* game—*John Madden Football II* for the

---

[47] SER 802:2-7.

[48] SER 687:11-12; ER 864:10-11.

[49] SER 658:18-658:8.

[50] SER 675:24-676:3.

[51] SER 675:24-676:3

[52] SER 6701:22-671:5.

11

IBM PC.[53] Released in 1992, that game was not a commercial success, and it marked Antonick's final project with EA.[54]

It is undisputed that Antonick received all royalties for his work on the *Madden* games that he coded.[55]

Each year since 1990, EA has released a new *Madden* game—developed by dozens of different software developers—for play on over 20 different platforms.[56] EA's *Madden* franchise has grown to become one of the most successful videogame franchises in history.

## D. Twenty-one years later, Antonick sued EA.

In 2011, Antonick filed a complaint claiming that all of EA's *Madden* videogames for the past 21 years were Derivative Works of the source code that he wrote in the mid-1980s for *Apple II Madden*.

### 1. Antonick's explanation for his 21-year delay.

Antonick explained that he only learned of his potential claims in 2009 when he read an interview of Hawkins and saw publicity

---

[53] SER 838:17-19.

[54] ER 751:21-752:11.

[55] SER 839:3-7; ER 751:21-752:11. Antonick worked on one game for another game company in the mid-1990s, but hasn't worked in the industry for over a dozen years. SER 657:15-21; SER 664:24-666:7.

[56] *See* SER 501-506. Antonick knew this, *see* SER 676:4-7, and even played a *Madden* game. SER 666:9-667:4.

12

materials celebrating the 20th anniversary of the *Madden* franchise.[57] The interview and the publicity materials both referred to *Apple II Madden* as the beginning of the *Madden* franchise. Antonick and his counsel told the district court that this was Antonick's "aha moment"— the first time he thought he might have a claim against EA.[58] Based on that representation, the district court did not dismiss Antonick's claims as time-barred.[59]

### 2. Pre-trial proceedings.

At the close of discovery, many salient facts were undisputed: Antonick acknowledged that the source codes for *Apple II Madden* and for EA's accused games were 100% different;[60] Antonick did not allege that any EA accused game copied any line of code from *Apple II Madden*; and there was no percipient-witness testimony or contemporaneous document showing that EA had copied *Apple II Madden* source code.

---

[57] ER 1031-1032, ¶ 93; SER 388; SER 357-358, 364, 367.

[58] SER 405-406; SER 422:25-423:7; 436:1-16.

[59] SER 387:20-23; SER 388:12-24; SER 389:7-11.

[60] SER 465:20-466:3.

13

Antonick therefore turned to his source-code expert, Michael Barr, who identified (out of thousands of features in a football videogame) ten conceptual "similarities" between the game that Antonick coded and EA's accused games.[61] For example, Barr asserted that the games included similar football plays (e.g., Quarterback Sneak), the concept of instant replay, and the concept of in-game player ratings (e.g., a quarterback and defensive linemen have different attributes and ratings, such as "speed" or "strength," so that they move and perform differently in the game).[62] These concepts, found in other videogames of that period, focused on the game of football and on videogame development. Barr admitted he was not an expert in either field.[63]

On that record, EA moved for summary judgment, arguing that the ten elements that Barr had identified were ideas, methods, or systems; elements inherent in the game of football; or elements dictated by the videogame technology of the era—all of which are excluded from copyright protection as a matter of law.[64]

---

[61] *See generally,* ER 1071-1117; SER 835:24-836:15.

[62] ER 1048-1190.

[63] SER 768:13-770:9; SER 464:18-21.

[64] SER 290-326.

The district court largely agreed with EA.[65] Employing this Circuit's extrinsic test, the district court held that only two of the ten elements that Barr identified were potentially copyrightable: the expression in the source code of "field width" and the expression in the source code of "plays and formations."[66]

With respect to the expression in the source code of plays, the court noted that, "[a]s framed in Antonick's papers, this similarity does not pertain to the plays' names and formations, nor to their basic concepts—Antonick is not asserting a copyright interest in the Quarterback Sneak, for example, but in the *expression* of that and other plays in his game."[67] At trial, therefore, Antonick needed to prove similarity between his expression of plays in his source code and the expression of plays in the source code of EA's accused games.

The district court also confirmed that the Contract's definition of Derivative Works meant derivative works "within the meaning of United States Copyright law," rejecting Antonick's argument that he was unconstrained by the Contract's definition or by copyright law

---

[65] ER 1218.

[66] ER 1234-1235.

[67] ER 1234 (emphasis added).

880883.01

when proving that EA's accused games were "derivative works" of his work.[68]

As the case approached trial, Antonick advanced four new ancillary breach theories relating to different contract provisions. But Antonick and his damages expert both stated under oath that they had not calculated any damages allegedly caused by these ancillary breaches and that the only damages identified by Antonick were for allegedly unpaid royalties under the Derivative Works provision of the Contract.[69] The court therefore dismissed these ancillary claims before trial.[70]

**E.    Trial.**

The district court bifurcated the trial. Phase I covered EA's statute-of-limitations defense. Phase II addressed whether Antonick could prove that certain *Madden* games released before 1996 for the

---

[68] ER 1216.

[69] SER 449-456; SER 873 ¶¶1,2, and 883-885 ¶¶17-19.

[70] Antonick appeals the dismissal of only two of these ancillary contract claims. Br. at 55-61.

Sega Genesis and Super Nintendo Entertainment System ("SNES") were Derivative Works of *Apple II Madden*.[71]

In Phase I, the jury returned a verdict that Antonick's claims were not time-barred[72]—despite Antonick's testimony that he knew in 1990 the same facts that he claimed had given him notice of his claims in 2009.[73] The trial then proceeded to Phase II before the same jury.

### 1.    Phase II pre-trial rulings.

Before Phase II, the court held that "due to the narrow range of possible expression for a football videogame and the fact that only two of the ten similar elements are protectable, the Court concludes that Antonick's work is entitled to only thin protection."[74] The district court held that "the jury in this case will be asked whether an ordinary

---

[71] The Sega games at issue in Phase II were *Sega Madden 1990*, *John Madden Football 92*, *John Madden Football 93*, *John Madden Football 93: Championship Edition, John Madden Football 94*, *Madden NFL 95*, and *Madden NFL 96* (collectively, "*Sega Madden* games").

The SNES games at issue in Phase II were *John Madden Football*, *John Madden Football 93*, *John Madden Football 94*, *Madden NFL 95* and *Madden NFL* 96 (collectively, "*SNES Madden*" games).

[72] ER 356.

[73] *See* Part IV.G.4, below.

[74] SER 123.

reasonable observer would consider Antonick's work and the later [*Sega*] *Madden* version virtually identical when viewed as a whole."[75]

Before Phase II began, in response to a new argument raised by Antonick, the court also held that Antonick had no copyright interest in the printed playbooks that accompanied the packaging of *Apple II Madden*, emphasizing that "EA was entitled to use [them]"[76] and that Antonick had no copyright interest in the plays' names and formations, but only in the expression of the plays in the source code.[77]

## 2. The record evidence.

The record evidence contains no source code because Antonick never offered into evidence the source code from any game.[78] The record similarly contains no contents of any game because Antonick never offered into evidence the contents of any game or displayed the contents of any gameplay to the jury (for example, through screen shots or videos taken from those games).

---

[75] SER 124. That order also dismissed Antonick's fraud claim, which Antonick does not appeal.

[76] SER 699:13-16.

[77] SER 698:17-18.

[78] SER 774:20-24; SER 69-70.

18

### 3. Testimony that the *Sega Madden and SNES Madden* games were created independently.

All five witnesses who worked on *Sega Madden 1990* testified that they never used or copied *Apple II Madden* source code.[79] Simmons testified that he never saw that code and never talked about it with anyone.[80] He explained that he wrote his source code "from scratch"[81] and that the *Apple II Madden* source code would have been useless to him because it was written in a different computer language and for an "older generation processor."[82] Using *Apple II Madden* source code would have made no sense because EA and Park Place were "build[ing] a different game for a different audience."[83] And William Robinson—programmer of *Sega Madden 94*, *95*, and *96*, as well as the *SNES*

---

[79] SER 758:2-759:2, SER 758:25-759:1 (Hilleman); SER 718:24-720:3, SER 721:9-15 (Orr); SER 799:16-20, SER 803:22-812:22, SER 814:10-13, SER 813:19-1814:9 (Simmons); SER 826:9-14 (Brook); SER 834:17-19 (Cronce); SER 833:14-17 (Robinson).

[80] SER 813:19-21.

[81] SER 799:16-20.

[82] SER 813:19-814:13.

[83] SER 758:25:759:1.

19

*Madden* games—testified that he never discussed, saw, or used *Apple II Madden* source code.[84]

Antonick put on no evidence contrary to that of EA's witnesses.[85]

### 4. Antonick's closing argument.

During closing, Antonick's counsel did not compare the source code or the games themselves. Instead, he called upon the jurors to apply their "common sense" and their "experiences" in work and life to infer that a software engineer with a deadline naturally would have stolen "football information" (not source code) from *Apple II Madden*.[86] Antonick's closing urged the jury to go with their gut feelings about human nature.

### 5. The Phase II jury verdict.

At the close of Antonick's case, EA moved for JMOL under Rule 50(a) on the ground that "the evidence fails to support a finding that EA copied protectable expression of *either* of the two potentially copyrightable elements—the expression in the source code of field

---

[84] SER 832:1-2.

[85] Antonick did not develop *Sega Madden*, 660:6-662:8, nor did Antonick's only other lay witness, Michael Kawahara, SER 703:12-15.

[86] SER 854:7-19, SER 855:7-856:2; SER 857:12-864:16.

width, and of plays and formations."[87] EA argued that Antonick had failed to prove that the relevant source-code expressions in the games were "virtually identical."[88] The same day that EA filed its written motion, EA orally moved again under Rule 50(a).[89] The next day, the court provided jury instructions that changed the standard for comparing the expressions in source code from "virtual identity" to "substantial similarity" and that reiterated that the works as a whole would be compared for "virtual identity."[90] Consequently, the jury was asked two questions at the close of Phase II:

**Question 1**: As to each of the seven *Sega Madden* games, "has Plaintiff Robin Antonick proven that there are substantial similarities between Sega Madden and Apple II Madden with respect to either of the following elements? (1) the expression in the source code of field width or (2) the expression in the source code of plays and formations."[91]

---

[87] ER 338.

[88] ER 346-349.

[89] SER 798:14-21.

[90] SER 837:7-9, SER 840:3-19.

[91] ER 322.

21

**Question 2**: As to each of the seven *Sega Madden* games, "[h]as Plaintiff Robin Antonick proven that the Sega Madden game when considered as a whole is virtually identical to Apple II Madden when considered as a whole?"[92]

The jury returned a verdict in Antonick's favor on Phase II. On Question 1, the jury found that Antonick had not proved substantial similarities in the expression of the source code for field width, but that Antonick had proved substantial similarities between the expressions in source code for plays and formations—although no source code was in evidence.[93] On Question 2, the jury found that each of the seven *Sega Madden* games was virtually identical to *Apple II Madden* when viewed as a whole—although none of the games had been placed in evidence or displayed to the jury.[94]

Following the jury's verdict, EA filed a renewed motion for JMOL under Rule 50(b), or, alternatively, a motion for a new trial under Rule 59.[95]

---

[92] ER 323.

[93] ER 322.

[94] ER 323.

[95] SER 1-40.

**F.    The JMOL Order.**

The district court granted JMOL on the ground that "the record contains no evidence from which a reasonable juror could conclude"—as Question 2 had required—"that *Apple II Madden* and any of the seven *Sega Madden* games are virtually identical when compared as a whole."[96] With respect to *Sega Madden 1990*, the court wrote: "The jury had *no evidence* of Apple II Madden or Sega Madden [1990] as a whole to enable it to make this subjective comparison. By failing to offer any evidence to establish the content of the games in their entirety, Antonick's proof on Question 2 was insufficient."[97]

The court further held that there was no evidence that any other *Sega Madden* game was virtually identical to *Apple II Madden*. The court noted that the only testimony about subsequent games as a whole was Barr's opinion that each *Sega Madden* version changed "just a few things" each year,[98] and that Barr's opinion could not substitute for the

---

[96] ER 8-15.

[97] ER 11 (emphasis added).

[98] ER 13.

jury's own comparison of each of the seven *Sega Madden* games as a whole to *Apple II Madden* as a whole.[99]

The court also held that EA would be entitled to a new trial under Rule 50(c)(1) if JMOL were reversed on appeal. As to Question 1, the court held that "the jury's finding that there are substantial similarities between Sega Madden [1990] and Apple II Madden with respect to the expression in the source code of plays and formations is against the clear weight of the evidence."[100] The court observed that Barr had used two improper methods to opine that EA copied Antonick's protectable expression:

(1) Barr had reverse-engineered binary data to create and compare *visual representations* of the plays that appeared within *Apple II Madden* and *Sega Madden 1990* (i.e., the output of the source code), rather than comparing the expression of those plays in the source code itself. "Barr's opinion, based on generating a visual comparison of what the formations would look like and what the instructions to the players would look like, *is not evidence* of substantial similarity in the relevant

---

[99] ER 14.

[100] ER 16.

source code."[101] The court noted that, Barr's flawed testimony aside, Antonick had "offered no other source code comparison as to the expression of plays and formations" for any accused game.[102]

(2) Barr had relied on alleged similarities in a few unprotectable game elements to improperly suggest to the jury that this proved copying of protectable expression.[103]

Lastly, the court expounded on its ruling that Antonick had failed to state a claim for ancillary breaches of the Contract because he had not identified separate damages for those breaches.[104]

## V.   SUMMARY OF ARGUMENT

1.    The district court correctly granted JMOL because Antonick failed to offer the games' contents or source code into evidence. Under any recognized test for copyright infringement, the plaintiff's failure to prove the contents of the allegedly infringed and infringing works requires JMOL for the defendant.

---

[101] ER 18 (emphasis added) (internal citations omitted).

[102] ER 18.

[103] ER 16.

[104] ER 22.

2.    Question 2 implemented this Circuit's "intrinsic" test by asking the jurors to compare the allegedly infringed and infringing works as a whole. The district court correctly held that there was no legally sufficient evidence to support the jury's verdict on Question 2.

3.    Question 1 implemented the factfinding portion[105] of this Circuit's "extrinsic" test by asking the jurors to determine whether the games' expressions in source code of field width and of plays and formations were substantially similar. But Antonick failed to introduce source code from any game into evidence. Instead, his expert created visual representations of unprotected play diagrams—i.e., the *output of*, not the *expressions in*, that source code. The district court correctly held that the jury's verdict was against the weight of the evidence, warranting a conditional new trial under Rule 50(c)(1); but the court's findings mandated a grant of JMOL on Question 1. On appeal, this Court can and should grant JMOL on Question 1.

4.    Antonick urges this Court to ignore or overturn forty years of Ninth Circuit precedent in significant ways: by replacing the "intrinsic" test with a needlessly complex infringement test from another circuit;

---

[105] As explained in Part VI.B.2, below, the threshold "analytic dissection" aspect of the test is performed by the court.

by admitting expert testimony for purposes of the intrinsic test, even though that test adopts the view of the ordinary, reasonable *non*-expert; and by restricting the intrinsic test to a comparison of the works' protectable elements, thus rendering it indistinguishable from the extrinsic test.

5.     The district court correctly found that copyright protection for Antonick's work was "thin" because it contained few protectable elements, thus requiring use of the "virtual identity" standard in the extrinsic test embodied by Question 2.

6.     The district court properly dismissed Antonick's claim to royalties from sales of *SNES Madden* games because the SNES and Apple II microprocessors are not in the same "Microprocessor Family," as the Contract required.

7.     The district properly excluded evidence of Antonick's ancillary breach claims, for which he identified no damages.

8.     Judgment can be affirmed on the alternative ground that Antonick's action is time-barred.

880883.01

## VI.   ARGUMENT

### A.   JMOL standard of review.

Appellate courts "review a grant of JMOL de novo" by "reapplying the district court's JMOL standard anew." *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1185 (Fed. Cir. 2002); *see also Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).

The JMOL standard "mirrors the standard for [granting] summary judgment" under Rule 56, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135, 150 (2000), and "the inquiry under each is the same." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986). As on summary judgment, evidence that is legally irrelevant, inadmissible, or otherwise incompetent carries no weight in the Rule 50 analysis. "Rule 50 *requires* a court to render judgment as a matter of law when a party has been fully heard on an issue, and there is no *legally sufficient* evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves*, 530 U.S. at 135 (emphases added).

**B.    The district court correctly granted JMOL.**

**1.    Antonick's failure to offer the works in evidence mandates JMOL under any test for copyright infringement.**

A copyright plaintiff cannot establish that one work infringes another without proving the content of the two works so that they can be compared. As this Court has observed, "[t]here can be no proof of 'substantial similarity' and thus of copyright infringement unless [the plaintiff's] works are juxtaposed with [the defendant's] and their contents compared." *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986); *see also Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997) (per curiam). "Without providing [his] own source code for comparison, [the plaintiff does] not satisfy the requirement that the infringed and infringing work be compared side-by-side." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 146 (5th Cir. 2004).[106] Thus, a plaintiff's failure to offer into evidence the allegedly infringed and infringing works mandates judgment for the defendant as a matter of

---

[106] *See also Airframe Systems, Inc. v. L-3 Commc'n Corp.*, 658 F.3d 100, 106 (1st Cir. 2011); *InDyne, Inc. v. Abacus Tech. Corp.*, 876 F. Supp. 2d 1278, 1291 (M.D. Fla. 2012), *aff'd*, 513 F. Appx 858 (11th Cir. 2013); *Granger v. Acme Abstract Co.*, 900 F. Supp. 2d 419, 422-26 (D.N.J. 2012).

law, regardless of which legal test of infringement applies. *Cf. Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 1476 (9th Cir. 1992) (affirming summary judgment of noninfringement where no evidence demonstrating content of allegedly infringed and infringing programs was submitted in opposition); *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1103 (C.D. Cal. 2005) (granting summary judgment of noninfringement where neither party submitted accused works).

Here, Antonick alleged that EA copied his work; yet he did not introduce into evidence either the allegedly infringed work or the allegedly infringing works. He did not introduce into evidence the source code of any game at issue; he did not introduce the content of any game at issue; and he did not even display the contents of any game to the jury. In short, it was impossible for the jury to make the requisite comparisons, and the district court's order granting JMOL is unassailable.

## 2. Ninth Circuit law required both Questions 1 and 2.

For over forty years, the Ninth Circuit has required copyright plaintiffs, absent proof of direct copying, to prove similarity between the original and accused works under both an "extrinsic" *and* an "intrinsic"

analysis. *See generally Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164-65 (9th Cir. 1977); *Benay v. Warner Bros. Entm't.*, 607 F.3d 620, 624 (9th Cir. 2010).[107] "[A] 'jury may not find substantial similarity without *evidence* on both the extrinsic and intrinsic tests.'" *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004) (emphasis added); *see also Cavalier v. Random House, Inc.*, 297 F.3d 815, 824 (9th Cir. 2002) (same).

The extrinsic test—whose factfinding portion corresponds to Question 1—"is an objective comparison of specific expressive elements." *Benay*, 607 F.3d at 624 (alterations, citations, and quotations omitted). At the outset of the extrinsic test, the court conducts an "analytic dissection" to determine which parts, if any, of the allegedly infringed work contain protectable expression. *See, e.g., Swirsky*, 376 F.3d at 845; *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). Analytic dissection requires the court to apply certain "[w]ell-recognized precepts" that effectively police the boundary between protectable expressions and unprotectable ideas. *Apple*

---

[107] *See also Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003); *Brown Bag*, 960 F.2d at 1475.

31

*Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994). "First, when an idea and its expression are indistinguishable, or 'merged,' the expression will only be protected against nearly identical copying." *Id.* The doctrine of *scènes à faire* may be applied to deny protection where game features are "as a practical matter indispensable, or at least standard, in the treatment of a given idea." *Id.* (internal quotation marks omitted). "Originality is another doctrine which limits the scope of protection." *Id.* at 1445. Moreover, "protection extends only to those components of a work that are original to the author, although original selection and arrangement of otherwise uncopyrightable components may be protectable." *Id.* As part of analytic dissection, the court also applies section 102(b), which denies copyright protection to "any idea, [procedure, process, system, method of operation, concept, principle, or discovery,] regardless of the form in which it is described, explained, illustrated, or embodied in [the allegedly infringed] work." *See, e.g., Frybarger v. Int'l Bus. Machs. Corp.*, 812 F.2d 525, 529-30 (9th Cir. 1987) (citing 17 U.S.C. §102(b)).

The court often performs its analytic dissection on summary judgment. *See, e.g., Brown Bag*, 960 F.2d at 1476-77. If the court's

analytic dissection reveals that (1) the allegedly infringed work contains protectable elements and (2) reasonable jurors could disagree as to whether the accused work contains elements similar to the protected ones, the claim survives summary judgment as to those elements. In that event, the factfinder compares the works under both the extrinsic and intrinsic tests at trial. *See Swirsky*, 376 F.3d at 845; *Cavalier*, 297 F.3d at 824.

The intrinsic test—which corresponds to Question 2—"is a subjective comparison that focuses on whether the ordinary, reasonable audience would find the works substantially similar in the *total concept and feel* of the works"—a comparison not limited to protectable elements. *Cavalier,* 297 F.3d at 822 (emphasis added) (internal citation omitted). In effect, the intrinsic test asks "whether defendant took from plaintiff's works so much of what is pleasing" to the works' intended audience that the defendant "wrongfully appropriated something which belongs to the plaintiff." *Id.* at 1165 (citation and alterations omitted). "Because [it] is an intrinsic test, analytic dissection and expert testimony are not appropriate," *id*. at 1164, and the factfinder compares the works holistically—not element-by-element, which would "distract

880883.01

from subjectively comparing the works as a whole." *Apple Computer*, 35 F.3d at 1446.

In explaining below why the district court correctly granted JMOL in EA's favor, EA begins with Question 2 because Antonick's failure of proof on that question formed the basis for the district court's JMOL grant.

### 3. The district court correctly held that there was no record evidence for the jury to compare the works as a whole.

#### a. The contents of the games were not in evidence.

Question 2 required Antonick to prove, as to each of the seven different *Sega Madden* games, that the game "when considered as a whole [was] virtually identical to Apple II Madden when considered as a whole."[108]

The district court correctly held that Antonick failed to carry that burden. It observed that (1) the jury had "no evidence" of *Apple II Madden* or *Sega Madden 1990* as a whole to enable it to make the subjective comparison required by Question 2;[109] and (2) the record was "similarly devoid of evidence" supporting the jury's conclusion that the

---

[108] ER 323.

[109] ER 11:19-22.

six post-1990 *Sega Madden* games were virtually identical to *Apple II Madden* when viewed as a whole.[110]

The record did not contain the games or their contents (i.e., gameplay), making it impossible for the jury to compare any of EA's accused games to *Apple II Madden* or to determine whether they were "virtually identical" when considered as a whole. The district court pointed out this lack of evidence to the parties, stating: "I don't understand how a jury can do [a] game by game by game by game [comparison]. The evidence just isn't there for the jury to do it."[111]

If anything, the fragmentary record confirms that no reasonable jury could have found that the allegedly infringed and infringing games were substantially similar or virtually identical when viewed as a whole. Unlike *Apple II Madden*, *Sega Madden 1990* was designed to be an "arcade" game that replicated the experience of watching football on television, and less of a statistics-driven football simulation.[112] And *Sega Madden 1990* was designed for use on a dedicated gaming system with

---

[110] ER 13:4-5.

[111] SER 848:4-5.

[112] SER 739:1-740:5; SER 749:8-750:10; SER 751:25-752:7; SER 753:10-754:17; SER 755:3-757:23; SER 632-636; SER 618-630.

a three-button controller,[113] whereas *Apple II Madden* was played on a decade-old multi-use computer[114] with a keyboard or a two-button joystick.[115]

### b. A source-code expert's testimony was no substitute for legally sufficient evidence.

The only Antonick witness who ostensibly looked at the games was his source-code expert, Michael Barr. But as a matter of Ninth Circuit law, expert testimony is improper and irrelevant to the intrinsic test embodied in Question 2. Expert testimony cannot be used to meet the intrinsic test because that test examines "similarity in expressions . . . depending on the response of the ordinary reasonable person" and "does not depend on the type of external criteria and analysis which marks the extrinsic test." *Brown Bag*, 960 F.2d at 1475 (citation and internal quotation marks omitted; ellipses in original); *see also Sid & Marty Krofft*, 562 F.2d at 1164 (stating that expert testimony is inappropriate for the intrinsic test).

---

[113] SER 743:23-744:4; SER 745:19-747:1; SER 631.

[114] SER 718:24-719:13.

[115] SER 646:16-648:7.

In any event, Barr's testimony could not satisfy Antonick's burden, which required a comparison of the games as a whole. Barr admitted that he was not an expert in football or videogame development and that he has never played *Apple II Madden*.[116] He barely mentioned the later *Sega Madden* games in his testimony; and even then, he limited his testimony to the field width and the plays[117]— not enough to compare the games "as a whole."

Antonick wrongly asserts that he met his Question 2 burden under the "inverse-ratio rule," which "requir[es] a lower standard of proof of substantial similarity when a high degree of access is shown." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000). Br. 30. But the inverse-ratio rule does not apply to Question 2's intrinsic test. *See Smith v. Jackson*, 84 F.3d 1213, 1220-21 (9th Cir. 1996).

And even if it did, the rule could not benefit Antonick because the record contains neither the games nor source code. Even "'clear and convincing evidence of access will not avoid the necessity of also proving

---

[116] SER 768:13-770:9; SER 769:14-17

[117] ER 916:8-21, ER 944:25-ER 947:3, SER 786:19-787:3; SER 788:13-789:1.

substantial similarity since access without similarity cannot create an inference of copying.'" *Sid & Marty Krofft*, 562 F.2d at 1172 (citation and quotation marks omitted); *see also Funky Films, L.P.*, 462 F.3d at 1081.[118]

### c. EA preserved its JMOL arguments.

The district court correctly rejected Antonick's assertion that the court could not grant JMOL on Question 2 because EA's pre-verdict Rule 50(a) motion had not raised that issue with sufficient clarity.[119] In essence, Antonick argues that a copyright-infringement plaintiff needs the defendant to remind him to submit the allegedly infringed and infringing works in evidence—the plaintiff's most fundamental evidentiary obligation. The law holds otherwise. As long as the non-movant knows the movant's JMOL theory before the case is submitted to the jury, the requirement that JMOL issues first be raised in a pre-verdict motion "may be satisfied by an ambiguous or inartfully made motion' under Rule 50(a)." *E.E.O.C. v. Go Daddy Software, Inc.*, 581

---

[118] The district court effectively gave Antonick the benefit of the inverse-ratio rule by adopting substantial similarity for Question 1.

[119] ER 5 n.2.

F.3d 951, 961 (9th Cir. 2009) (citation omitted).[120] "Absent such a liberal interpretation, 'the rule [requiring JMOL grounds to be articulated pre-verdict] is a harsh one.'" *Id*.

EA's Rule 50(a) motion made it clear that Antonick needed to submit evidence of the source code and content of the games themselves. The motion stated that Antonick had "wholly failed to meet his burden of proving that the EA games are Derivative Works of Antonick's work" because the record did not contain the source code necessary for the jury to compare *Apple II Madden* with the *Sega Madden* games.[121] This was the *same cause of action* and the *same evidentiary deficiency* on which JMOL later was granted. This case, therefore, is unlike the ones Antonick cites in which no pre-verdict JMOL motion was made,[122] or in which the pre- and post-verdict motions did not address the same cause of action,[123] the same remedy,[124]

---

[120] *See also Fujitsu Ltd. v. Tellabs Operations, Inc.*, No. 08 3379, 09 c 4530, 2013 WL 268607, at *4 (N.D. Ill. Jan. 24, 2013); *Laborers' Pension Fund v. A&C Envtl., Inc.*, 301 F.3d 768, 777-78 (7th Cir. 2002).

[121] ER 338, 341-349.

[122] *See Freund v. Nycomed Amersham*, 347 F.3d 752, 760-62 (9th Cir. 2003); *Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 886 (9th Cir. 2002).

[123] *See Lifshitz v. Walter Drake & Sons, Inc.*, 806 F.2d 1426, 1428 (9th Cir. 1986).

39

or the same defense.[125] Nor is it like cases in which the theory advanced in the pre-verdict motion called for submission of different evidence than the theory advanced in the post-verdict motion.[126]

### 4. The district court could have granted JMOL on Question 1 because there was no evidence for the jury to compare expression in source codes.

#### a. Antonick failed to introduce evidence on Question 1.

Antonick does not challenge the application of the extrinsic test in Question 1. He acknowledges that he had to prove "substantial similarities between *Sega Madden* and *Apple II Madden* with respect to . . . *the expression in the source code of* plays and formations."[127] And he

---

[124] *See Tolbert v. Queens Coll.*, 242 F.3d 58, 77 (2d Cir. 2001).

[125] *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 845 (Fed. Cir. 2010).

[126] *See Conseco Fin. Servicing Corp. v N. Am. Mortgage Co.*, 381 F3d 811, 822 (8th Cir. 2004); *Kirsch v. Fleet St. Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998). Ultimately, this Court could apply plain-error review and grant JMOL for EA because there was not "any evidence to support" the verdict and failure to enter judgment in EA's favor would result in "a manifest miscarriage of justice." *Padgett v. Wright*, 516 F. Appx 609, 611 (9th Cir. 2013).

[127] ER 322; ER 1010:17-20 (emphasis added).

agrees that the jury was required to make substantial-similarity findings as to each of the seven *Sega Madden* games.[128]

Yet he did not offer the source code of any game into evidence. Without source code, Antonick could not prove substantial similarity of protected expression in the codes. Nor could the jury compare the codes to determine whether there were substantial similarities in protected expression. Instead of making the requisite showing, Antonick argued in closing that the jurors could rely on their "gut feelings" and "life experiences" (which is forbidden for factfinders and experts alike)[129] and on his source-code expert's testimony (which was irrelevant and misleading).

The district court correctly ruled that the testimony of Antonick's source-code expert, Michael Barr, was an insufficient substitute for the source-code evidence necessary to carry Question 1:[130]

---

[128] ER 322.

[129] *See, e.g., Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005) (expert cannot rely on "intuition" rather than "reliable principles and methods"); *Hamilton v. Astrue*, CV 12-1227 JCG, 2012 WL 5964516, at *2 (C.D. Cal. Nov. 29, 2012) (factfinder's reliance on his own intuition rather than objective evidence was erroneous).

[130] ER 13-15.

***First***, Barr did not testify about, and acknowledged that he had not reviewed, the final source code used in *Apple II Madde*n because Antonick could not find it. Barr only reviewed an early version.[131]

***Second***, Barr conceded that he had never reviewed the relevant expression in the source code of the plays in *Apple II Madden*. The only play-related source code that Barr reviewed and displayed to the jury was a snippet of numbers in a demonstrative exhibit, showing the coordinates where a virtual in-game player lines up at the *start* of a play.[132]

But Barr neither examined nor testified about (and Antonick never introduced into evidence) the rest of the source code that expresses each play—the code for everything that happens once the play begins, including the virtual players' movement, direction, angle, distance, speed, and interaction with other virtual players.[133] Instead of reviewing that source code, Barr examined a set of binary data files not written in assembly language—which he admitted is not source code.[134]

---

[131] SER 772:24-773:5.

[132] ER 922:22-ER 923:9.

[133] ER 922:22-ER 923:9.

[134] ER 922:22-ER923:3; ER 924:19-20.

880883.01

Barr explained: "We don't have assembly language code or code in any other programming language for those plays" in the *Apple II Madden* game.[135]

**Third**, Barr conceded that he had not compared the expression in the source code of the plays in *Apple II Madden* with the expression in the source code of the plays in any accused EA game. Specifically:

- **Sega Madden 1990**. Barr did not compare the expression in source code of plays from *Sega Madden 1990* with that of *Apple II Madden*.[136] As a result, he did not testify that the expression in those source codes was similar; he only testified that the *visual representation* of some "plays" looked similar.[137] And Barr admitted that he found no literal copying of *Apple II Madden* whatsoever; indeed, he acknowledged that the codes would be 100% different.[138]

- **Sega Madden 92 and Sega Madden 96.** Barr admitted that he did not review source code for *Sega Madden 92* or

---

[135] SER 775:10-11.

[136] SER 772:24-773:5; SER 774:20-782:28.

[137] SER 765:18-767:3.

[138] SER 783:22-25.

*Sega Madden 96* and that he did not "know how the plays are expressed in those games."[139] The record does not contain these games, their contents, their source codes, or any source-code comparison of them with *Apple II Madden*.

- **Remaining Sega Madden Games**.[140] Barr admitted that he had not compared the source code of *Apple II Madden* to these games. He testified only that the *visual representation* of some football "plays" looked similar.[141] But Barr never testified as to any similarities in the *source code* expressing those plays.

### b. Barr created visual representations of unprotected play diagrams.

Instead of comparing source code, Barr created his own visual representations of plays from *Apple II Madden* and from *Sega Madden 1990* to suggest that EA had copied the source code in *Apple II Madden*.

---

[139] SER 771:9-22; SER 784:22-786:18; SER 637.

[140] *John Madden Football 93*, *John Madden Football 93: Championship Edition, John Madden Football 94*, and *Madden NFL 95*.

[141] ER 942:18-ER 943:4

44

Those play diagrams were shown to the jury in Demonstrative Exhibit 476 ("DX 476").[142]

To create his diagrams, Barr wrote a software program that purported to "automate the process" of comparing *Apple II Madden* binary data (not source code) with *Sega Madden 1990* assembly-language source code. As Barr described it, his program "generated a *visual comparison* of what the formations would *look like* and what the instructions to the in-game virtual players (i.e., their changes in position) would *look like*."[143] In Barr's own words, he generated "*as best [he] could visual images comparing the two plays*," e.g., "where do each of the players appear relative to the line of scrimmage and what do they do after the formation?"[144]

Barr admitted that he manipulated his visual representations to achieve the appearance he wanted. He admitted that the "play data" was incomplete,[145] and that he therefore "fill[ed] the gap" in that data

---

[142] EA objected to Barr's testimony, unsuccessfully. *See, e.g.*, ER 930:13-15, ER 931:4-17, ER 936:2-4 & 18-24, ER 937:10-21, ER 940:1-4, ER 941:6-20.

[143] ER 925:16-ER 926:3 (emphases added).

[144] ER 926:1-3 (emphasis added).

[145] ER 927:13-17.

by "adjust[ing] these [play diagrams] visually to fit within . . . one-and-a-half by two-inch squares" so that they would look "presentable side-by-side" with play diagrams derived from *Sega Madden 1990* assembly-language source code.[146]

The end product was DX 476, which purportedly compared diagrams of *Apple II Madden* plays with diagrams of *Sega Madden 1990* plays. But the exhibit featured no source-code expressions, and its arrows indicating the player movements in *Apple II Madden* were conjecture by someone who admittedly knew little about football or videogame development.[147]

Based on DX 476, Barr told the jury that the *visual representation* of the plays (not their source code) looked similar.[148] The district court later explained why this testimony was improper: "By comparing the output [of the program that Barr and his staff wrote], rather than the source code that creates [that output], Barr impermissibly compared the plays themselves, which, as this Court has already held and the law

---

[146] ER 927:21-24; SER 950-953 (DX 476).

[147] SER 768:13-770:9; SER 464:18-21.

[148] ER 930:20-ER 931:3; ER 16-18.

makes clear, are not protectable."[149] The district court was right:
copyright protection for *output* from a software program "'exists only
because the output itself is a proper subject for copyright, not simply
because it was generated by a copyrightable software program.'" *Design
Data Corp. v. Unigate Enter., Inc.*, 12-CV-04131-WHO, 2014 WL
3868076, at *5 n.5 (N.D. Cal. Aug. 6, 2014) (citation omitted).

Because Barr compared the purported output of the code rather
than the code itself, his testimony was irrelevant to the jury's task. His
testimony also conflicted with the court's ruling that the plays
themselves are not protected by copyright[150]—a ruling from which
Antonick does not appeal.

### c. Antonick's failure of proof warranted JMOL on Question 1.

The district court correctly found that Antonick had failed to prove
his case on Question 1, noting that Barr "(1) used revers[e]-engineered
binary data to produce and compare visual representation[s] of the
plays in Apple II Madden and Sega Madden, rather than comparing the
source code itself, and (2) relied on similarities in unprotectable

---

[149] ER 17.

[150] SER 698:17-18.

elements to suggest copying of protectable expression."[151] The court added that "Antonick offered no other source code comparison as to the expression of plays and formations."[152] The court held: "[T]he jury's finding that there are substantial similarities between Sega Madden and Apple II Madden with respect to the expression in the source code of plays and formations [was] against the clear weight of the evidence."[153] Accordingly, the court granted a conditional new trial.

The district court should have gone further. "Rule 50 *requires* a court to render judgment as a matter of law when a party has been fully heard on an issue, and there is no *legally sufficient* evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves*, 530 U.S. at 135 (emphases added).

Here, the court credited Barr's testimony in full but held as a matter of law that his testimony was not legally sufficient evidence of substantial similarity. The court wrote:

- "Because the protected expression here was source code in Apple II Madden, a visual depiction of the result of that

---

[151] ER 16.

[152] ER 18.

[153] ER 16.

48

source code, versus its counterpart in Sega Madden, is *not evidence* of substantial similarity."[154]

- "Permitting Antonick to rely on the visual depiction resulting from his source code to show illicit copying would be tantamount to granting him ownership of the particular play itself. . . . [But] *Antonick's ownership is limited* to the expression of the plays and formations in his source code, not the plays and formations themselves."[155]

- "In light of this testimony, the Court finds that Barr relied on similarities in unprotectable elements to opine about the substantial similarity of the protectable elements. This approach is plainly *contrary to Ninth Circuit law*, and *not evidence* that would properly support the jury's finding."[156]

The district court's finding that Barr's testimony was legally insufficient warrants JMOL. On appeal, this Court may and should "instruct the district court to enter judgment against the jury-verdict winner," either because "the evidence is rendered insufficient by the

---

[154] ER 18 (emphasis added).

[155] ER 18 (emphasis added).

[156] ER 19 (emphases added).

removal of [Barr's] erroneously admitted testimony" or because "the evidence, without any deletion, is insufficient." *Weisgram v. Marley Co.*, 528 U.S. 440, 444 (2000); *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 467 (9th Cir. 2014) (en banc). No unfairness will result from that ruling. EA's numerous objections to Barr's testimony[157] put Antonick "on notice every step of the way that [EA] was challenging his expert[]"; yet Antonick "made no attempt to add or substitute other evidence. A litigant's failure to buttress its position because of confidence in the strength of that position is always indulged in at the litigant's own risk." *Weisgram*, 528 U.S. at 456 (citation and internal quotation marks omitted).

### d. Antonick's attacks on the district court's ruling as to Question 1 lack merit.[158]

Antonick challenges the district court's Question 1 holding on three grounds.

***First***, Antonick claims that EA failed to object to DX 476 at trial.[159] That is wrong. EA specifically objected to DX 476, noting that

---

[157] *See* Part VI.B.4.d, below (summarizing EA's objections).

[158] Antonick offers these arguments to challenge the district court's conditional grant of a new trial on Question 1. S*ee* Part VI.D below. But EA responds to them here to help explain why the district court should have granted JMOL on Question 1.

its visual play comparison was "not a comparison of plays that's expressed in the source code."[160] And EA's objection to DX 476 was just one instance in which it objected that, because no source code was submitted in evidence, there was no legally sufficient evidence that could enable the jury to determine whether there were "substantial similarities between Sega Madden and Apple II Madden with respect to . . . *the expression in the source code of* plays and formations."[161] EA raised that objection in a motion in limine to exclude Barr's testimony,[162] during Barr's direct examination,[163] and in its pre-verdict Rule 50(a) motion.[164]

**Second**, Antonick maintains that the district court's use of the term "reverse engineered" to describe how Barr generated images from the *Apple II Madden* "play data" shows that the court "misunderstood Barr's analysis and use of" DX 476.[165] But Barr himself testified that

---

[159] Br. 47-48.

[160] ER 926:6-9.

[161] SER 869:8-12.

[162] SER 243-248.

[163] ER 916-918, ER 946.

[164] ER 339 2:5-9, ER 342:12-13, ER 346:9-26, ER 348:1-ER 349:3.

[165] Br. 48; *see* ER 16:9-10, ER 17:1 & n.13.

creating the images in DX 476 "required . . . *reverse engineering* [the] format of Mr. Antonick's representation in the binary data and then, also, the source code from Mr. Simmons' [1990] game."[166] The district court understood how DX 476 was created—and its legal insufficiency.

***Third***, Antonick asserts that the district court erred in holding that he could not carry his Question 1 burden by having Barr rely on unprotectable game elements as his evidence that EA copied protectable elements.[167] But Antonick never disputes the basic precept that "the party claiming infringement may place 'no reliance upon any similarity in expression resulting from' unprotectable elements.'" *Apple Computer*, 35 F.3d at 1446 (citation omitted).[168] Instead, Antonick argues that he could use Barr's testimony to prove that EA appropriated a copyrightable "compilation" of otherwise unprotectable elements—i.e., "use of an oversize field width, bizarre spellings, idiosyncratic names of

---

[166] ER 926:20-21 (emphasis added).

[167] Br. 49-51.

[168] *See also Pasillas v. McDonald's Corp.,* 927 F.2d 440, 443 (9th Cir. 1991); *Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 207-08 (9th Cir. 1989); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823, 832-833 (10th Cir. 1993).

52

subroutines and plays, unusual character strings, and personal choices in play selection and arrangement."[169]

But the district court correctly rejected Antonick's request for a "compilation" jury instruction because the trial record did not support it[170]—a ruling not challenged in Antonick's opening brief and therefore not part of this appeal. *See Lopez-Vasquez v. Holder*, 706 F.3d 1072, 1080 (9th Cir. 2013). A party is entitled to an instruction about his theory of the case only if it is "supported by law and has foundation in the evidence." *Gantt v. City of Los Angeles*, 717 F.3d 702, 706 (9th Cir. 2013). "There must be a sufficient evidentiary foundation to support giving the instruction," and the district court's finding that no such foundation exists is reviewed for abuse of discretion. *Id*. at 706-07; *see also Dang v. Cross*, 422 F.3d 800, 804-05 (9th Cir. 2005).

No abuse of discretion occurred here because there was no evidentiary foundation for a compilation instruction. "[I]t is not true that any combination of unprotectable elements automatically qualifies for copyright protection." *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir.

---

[169] Br. 50-51.

[170] SER 841:6-844:25.

2003). Rather, such a combination is eligible for copyright protection "only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Id.* "Trivial elements of compilation and arrangement, of course, are not copyrightable since they fall below the threshold of originality." *United States v. Hamilton*, 583 F.2d 448, 451 (9th Cir. 1978*); see also Matthew Bender & Co. v. West Publ'g. Co.*, 158 F.3d 674, 682 (2d Cir. 1998) (copyright does not protect "obvious, garden-variety, or routine selections"). There is no evidentiary basis to hold that a handful of items, taken out of context, were "numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Satava*, 323 F.3d at 811.

## C. The district court followed this Circuit's test for proving copyright infringement.

The thrust of Antonick's appeal is that the district court committed reversible error by following 40 years of Ninth Circuit law. He claims that the district court erred in following *Krofft*, *Apple Computer*, *Brown Bag* and their progeny in requiring him to meet both

54

the extrinsic and intrinsic tests.[171] He also challenges the district court's use of the virtual-identity standard in Question 2.

Antonick's legal arguments fail because, without the games' source code or gameplay contents in evidence, he could not prove his case under any legal standard. *See* Part VI.B.1, above. The claimed legal errors therefore caused him no prejudice. *See Molina v. Astrue*, 674 F.3d 1104, 1118, 1119 n.11 (9th Cir. 2012). As discussed below, Antonick's legal arguments fail on other grounds as well.

### 1. Antonick offers no basis for overturning Circuit law.

Antonick cherry-picks one sentence from one footnote in one case for the proposition that, when there are "few protectable features," comparing those features for substantial similarity is "effectively the same" as determining whether the works are virtually identical overall. *See* Br. 33(citing *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 916 n.9 (9th Cir. 2010)). Antonick cites this sentence to argue that he should not have to meet both the extrinsic and intrinsic test.[172] He is mistaken.

---

[171] *See* Br. at 28-43; ER 329.

[172] Br. 33.

In *Mattel*, the Court *reaffirmed* the extrinsic and intrinsic tests as this Circuit's law, *id.* at 913, and explained that the two steps work in concert, not as alternatives to one another:

> The standard for infringement—substantially similar or virtually identical—determined at the "extrinsic" stage is applied at the "intrinsic" stage. There we ask, most often of juries, whether an ordinary reasonable observer would consider the copyrighted and challenged works substantially similar (or virtually identical). If the answer is yes, then the challenged work is infringing.

*Id.* at 914. Furthermore, the *Mattel* Court instructed the district court on remand to apply the virtual-identity standard and to review the works as a whole—which is precisely what the intrinsic test requires. *Id.* at 917.

Antonick asks this Court to ignore (or overturn) Ninth Circuit law in three significant respects: (1) by replacing the "intrinsic" test with the Second Circuit's complicated abstraction-filtration-comparison test in software cases;[173] (2) by admitting expert testimony for purposes of

---

[173] Br. at 39-43. About the Second Circuit's test, one commentator observes: "This is, without question, the most complicated copyright 'test' ever conceived, and while it was adopted in modified form by the Second Circuit in [*Computer Associates International v. Altai, Inc.*, 797 F.2d 1222 (2d Cir. 1986)] for software cases, it is telling that *Computer Associates* itself did not attempt to apply it; no one can, no matter how often the words of the test are chanted." 3 Patry on Copyright § 9:94, at

the intrinsic test,[174] even though that test is an "ordinary reasonable person" inquiry;[175] and (3) by restricting the intrinsic test to a comparison of the works' protectable elements, thus rendering it functionally indistinguishable from the extrinsic test.[176]

These arguments are foreclosed by several decades of Ninth Circuit law (*see* Part VI.B.2, above), which is binding unless and until that law is overruled by the Court itself sitting en banc, or by the Supreme Court. *See Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001). And even if this Court could rewrite forty years of Ninth Circuit law, this case would be an inappropriate vehicle for doing so because Antonick's failure of proof makes his proposed doctrinal changes irrelevant to the outcome. *Cf. Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013).

### 2. The district court properly applied the virtual-identity standard in Question 2.

Antonick also asserts that the district court erred by including the virtual-identity standard in Question 2. That argument fails first

---

9-253 to 9-254 (2012).

[174] Br. 30.

[175] *Brown Bag*, 960 F.2d at 1475 (citation omitted).

[176] Br. 39-41.

because, with no source code and no game content in the record, Antonick could not prove that the works as a whole were either substantially similar or virtually identical.

Antonick's attack on the virtual-identity standard also is legally wrong. When a court determines by analytic dissection that the vast majority of identifiable elements in a work are unprotectable, the work is granted only "thin" protection and the virtual-identity standard applies. *See Apple Computer*, 35 F.3d at 1447; *see also Sid & Marty Krofft*, 562 F.2d at 1167-68 (explaining why thin protection requires using the virtual-identity standard).

*Apple Computer* illustrates this linkage between thin protection and virtual identity. Apple asserted that a graphical user interface ("GUI") in Microsoft's Windows operating system exceeded the scope of Microsoft's license from Apple and therefore infringed Apple's copyright on its Macintosh GUI. 35 F.3d at 1438. On appeal from a grant of summary judgment for Microsoft, Apple challenged the district court's use of the virtual-identity standard. But the Ninth Circuit affirmed. *Id.* at 1446-48. It ruled that, "[h]aving correctly found [during analytic dissection] that almost all the similarities spr[a]ng either from the

58

license or from basic ideas and their obvious expression," the district court "correctly concluded that illicit copying could occur only if the works as a whole [were] virtually identical." *Id*. at 1447. In other words, "[t]he district court's conclusion that the works as a whole [were] entitled only to limited protection and should be compared for virtual identity follow[ed] from its analytic dissection." *Id*. at 1446.[177]

Here, too, the district court's adoption of the virtual-identity standard followed its analytic dissection. The district court explained: "Due to the narrow range of possible expression for a football video game and the fact that only two of the ten similar elements are protectable, . . . Antonick's work [was] entitled to only thin protection."[178] The court therefore concluded that Question 2 would require the jury to compare the works as a whole for virtual identity.

Using the virtual-identity standard in thin-protection cases serves as a bulwark against erosion of the idea-expression dichotomy—the fundamental principle of copyright law that ideas cannot be

---

[177] *See also Lucky Break Wishbone Corp. v. Sears Roebuck & Co*., 373 Fed Appx 752, 756 (9th Cir. 2010); *Erickson v. Blake*, 839 F. Supp. 2d 1132, 1138 (D. Or. 2012).

[178] ER 10 n.6.

copyrighted, only particular expressions of ideas. *See Harper & Row Publishers., Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985); *Satava*, 323 F.3d at 813. By employing the virtual-identity standard in Question 2, the district court properly policed that line between idea and expression.

### 3. The district court correctly found "thin" protection.

The district court employed the virtual-identity standard in Question 2 based on its conclusion that (1) the range of possible expression for a realistic football videogame was narrow and (2) only two allegedly similar game elements among thousands of game features were potentially protectable.[179]

Antonick attacks these findings to argue that virtual identity was the wrong standard.

### a. The district court correctly held that Antonick owned a copyright only in the expression in the source code of plays, not in the plays themselves.

Antonick argues that the district court's "thin protection" finding and consequent use of the virtual-identity standard were unjustified

---

[179] SER 122-124.

880883.01

because there is a wide range of plays and formations.[180] To support this theory, Antonick wrongly asserts that the district court "acknowledged that plays and formations constitute a protectable element of the game." *Id.* That is incorrect. The district court held the opposite, stating clearly—and even pointing to Antonick's own admissions—that the plays and formations themselves were not protected by copyright.[181] Instead, the court held that copyright protects only the *expressions* of plays and formations *in source code*.[182] That ruling was firmly grounded in law. The Copyright Office has ruled that "a selection, coordination, or arrangement of functional physical movements such as sports movements . . . alone do not represent the type of authorship intended to be protected under the copyright law as a choreographic work" under section 102(a). 77 Fed. Reg. 37605-01 (June 22, 2012).[183] And rightly so: "If the inventor of the T-formation in football had been able to copyright

---

[180] Br. 35.

[181] ER 1234.

[182] ER 1234.

[183] *See also* H.R. Rep. 94-1476 at 54 (1976) ("social dance steps and simple routines" are outside the scope of copyright categories); *Bikram's Yoga Coll. of India v. Evolation Yoga*, No. 2:11-cv-05506-ODW (SSx) 2012 WL 6548505, at *3-4 (C.D. Cal. Dec. 14, 2012) (holding that even complex yoga sequences are not copyrightable).

it, the sport might have come to an end instead of prospering." *National Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 846 (2d Cir. 1997). The plays themselves are an inherent aspect of football and therefore not protected by copyright.

*Data East* is instructive. In *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204 (9th Cir. 1988), the karate combat videogames at issue each had 14 moves, including forward and backward somersault and about-face, a squatting reverse punch, an upper-lunge punch, a back-foot sweep, a jumping sidekick, a low kick, and a walk-backwards position. *Id*. at 209. But this Court reversed the district court's finding of infringement, explaining that copyright protection cannot extend to "elements of expression that necessarily follow from an idea, or to '*scènes à faire*,' i.e., expressions that are 'as a practical matter, indispensable or at least standard in the treatment of a given idea.'" *Id.* at 208 (citation omitted); *see also Apple Computer*, 35 F.3d at 1444. The Court noted that certain "constraints" are "inherent in the sport of karate," which is "not susceptible of a wholly fanciful presentation." *Data East,* 862 F.2d at 209. The Court therefore found that the allegedly copied moves (and other features) "necessarily follow[ed] from

62

the idea of a martial arts karate combat game, or are inseparable from, indispensable to, or even standard treatment of the idea of the karate sport. As such, they are not protectable." *Id.*[184]

> **b. The district court correctly held that copyright law did not protect three other features of *Apple II Madden*.**

Out of the hundreds of thousands of lines of code and vast number of elements[185] in the videogames at issue, Antonick's expert identified only ten purported conceptual similarities between *Apple II Madden* and the *Sega Madden* games.[186] Of these, the district court found only two potentially protectable elements—the source-code expressions of (1) field width and (2) plays and formations. The court accordingly found "thin" copyright protection, requiring use of the virtual-identity standard.

---

[184] If Antonick means to make an indirect "compilation" argument here, it fails for all the reasons previously stated in Part VI.B.4.d above. It also fails for the additional reason that his claim does not include the audio-visual elements of the game—such as visual depictions of the plays themselves. *See* ER 1056; SER 467:14-468:2; ER 1212 at n.5; SER 44-45.

[185] There are some 40,000 unique elements in *Sega Madden*. SER 835:24-836:15.

[186] SER 836:8-11.

On appeal, Antonick argues that the district court should have found three additional game elements protectable.[187] The argument fails at the outset because Antonick never submitted the source-code expressions of those features. In any case, boosting the number of protectable elements from two to five (out of thousands) would not have changed the finding of thin protection and thus the use of the virtual-identity standard. Antonick cites no authority to the contrary, and there is none.

Antonick also fails to support his argument that the three additional elements were protectable. The district court correctly found two of those elements (the data-flow architecture and the direction-tracking system) were unprotectable, in part because Antonick's expert repeatedly admitted that they were, respectively, a "process" and a "system"—subject-matter categories that section 102(b) expressly excludes from copyright protection.[188] Barr's admissions bind Antonick.

---

[187] Br. 36-7. Antonick makes no specific arguments as to other game elements, and thus waives such arguments. *See Lopez-Vasquez*, 706 F.3d at 1080.

[188] ER 1228, ER 1235. *See Gates Rubber,* 9 F.3d at 837 (explaining that processes are uncopyrightable and most commonly found as part of the system architecture).

*See* Fed. R. Evid. 801(d)(2)(C); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1016 (9th Cir. 2008).[189]

Antonick argues that the court should have considered whether this process and this system were in some sense "expressive" and therefore protectable despite falling within section 102(b)'s copyright exclusions.[190] But section 102(b)'s language is unequivocal: "*In no case* does copyright protection for an original work of authorship extend to *any* . . . process [or] system . . . *regardless* of the form in which it is described, explained, illustrated, or embodied in [the] work."[191] The fact that an unprotectable process or system embodies expressive choices does not "magically change" that process or system into copyrightable subject matter. *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 815-

---

[189] The district court also found, based in part on the admissions of Antonick's expert, that the direction-tracking system was dictated by hardware constraints (i.e., the use of eight-direction controllers)—which means that the system is not copyrightable. *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1524 (9th Cir. 1992) (holding that computer-program elements are not copyrightable where "dictated by the function to be performed, by considerations of efficiency, or by external factors such as compatibility requirements and industry demands"); *Data East*, 862 F.2d at 209 (noting that videogame elements lacked protection in part due to constraints imposed by use of Commodore computer for a karate game for home consumption).

[190] Br. 36-37.

[191] 17 U.S.C § 102(b) (Emphases added).

18 (1st Cir. 1995), *aff'd by an equally divided court*, 516 U.S. 233

(1996).[192] And even if such a transformation were possible, Antonick

made no showing that these elements were expressive.

Antonick also challenges the district court's correct conclusion

that the *Apple II Madden* player-rating system is unprotectable as

"'*scènes à faire*,' i.e., expressions that are 'as a practical matter,

indispensable or at least standard in the treatment of a given idea.'"

*Data East*, 862 F.2d at 208 (citation omitted). The *scènes à faire*

doctrine holds that copyright protection does not extend to features that

"necessarily follow from the idea" of a realistic football videogame or

that are "inseparable from, indispensable to, or even standard

treatment of" that idea. *Id.* at 209 (applying *scènes à faire* to standard

elements of karate combat videogame); *see also Incredible Techs., Inc. v.

Virtual Techs., Inc.*, 400 F.3d 1007, 1014-15 (7th Cir. 2005) (applying

same principle to standard elements of realistic golf videogame).

---

[192] Antonick cites the Federal Circuit's recent ruling in *Oracle America, Inc. v. Google Inc.*, 750 F.3d 1339, 1366-67 (Fed. Cir. 2014), for the proposition that subject matter within the literal terms of section 102(b) nevertheless may be protectable if "expressive." The shortcomings of that holding are documented in Google's pending cert petition, *Google Inc. v. Oracle America Inc.*, 2014 WL 5319724 (U.S. Oct. 6, 2014) (No.14-1410); the decision is not binding on this Circuit; and no court within this Circuit has followed it.

Antonick fails to suggest any way in which his player-rating system rose above a "standard treatment" of that idea so as to merit copyright protection. *See Data East*, 862 F.2d at 209. As the district court observed, "any realistic football game will involve players who have differing levels of abilities at the various components of football: running, throwing, catching, tackling, etc."[193]

In response to the district court's sound reasoning, Antonick tries to narrow the *scènes à faire* doctrine to apply *only* where the element in question takes a "more or less stereotyped form."[194] That argument is inconsistent with well-settled authority from this Circuit and others.[195] Antonick also fails to address the additional and independent reasons that the district court gave for holding that the players-ratings system

---

[193] ER 1220.

[194] Br. 37-38.

[195] *See Data East*, 862 F.2d at 208 (copyright protection not afforded to "'scenes a faire,' i.e., expressions that are 'as a practical matter, indispensable or at least standard in the treatment of a given [idea]'") (internal citations omitted)*; Apple Computer*, 35 F.3d at 1444 (same); *Mattel,* 616 F.3d at 913 ("scenes a faire (standard features) and unoriginal components aren't protectable"); *Incredible Techs.,* 400 F.3d at 1014-15 (same); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 535 (6th Cir. 2004) (same).

67

was not protectable.[196] Any attack on those reasons is therefore not preserved on appeal. *See Lopez-Vasquez*, 706 F.3d at 1080.

    **c.**    **The district court correctly held that Antonick did not own a copyright in the printed playbooks for *Apple II Madden*.**

Antonick contends that the court should have granted him a copyright interest in the printed *Apple II Madden* playbooks because they supposedly qualified as "documentation and related items" that the Contract defined as part of the "Work."[197] Under this theory, first raised mid-trial,[198] Antonick claims that EA is liable for including in *Sega Madden 1990* the visual representation of plays (like Quarterback Sneak) shown in the printed playbooks—even if the code expressing those plays was completely different. The district court rejected this

---

[196] The district court observed that name of individual attributes (like "speed") are uncopyrightable under the short-names-and-phrases doctrine. ER 1219-1220; *see also Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1081 n.14 (9th Cir. 2000); 37 C.F.R. § 202.1(a). The district court also held that the respective ratings in the games were fundamentally different in their number of attributes and their ratings scales. ER 1221.

[197] Br. 38-39.

[198] Before trial, Antonick never asserted that he was entitled to royalties based on, or that he owned a copyright in, the *Apple II Madden* paper playbooks. *See* SER 276 ("[T]he 'work' here is a software program, not a football themed ballet."); SER 484-491.

novel interpretation as inconsistent with the Contract and as an attempt to "do[] indirectly what [the court] ruled you can't do directly"[199]—namely, claim copyright protection for the plays themselves.[200] The court was right.

Antonick contends that the printed playbooks are covered by the portion of the Contract's "Work" definition that referred to the program's "documentation and related items as more fully described in Exhibit B."[201] Exhibit B, in turn, required *Antonick to provide EA* with his documentation relating to his source code, including "instructions necessary for normal and competent operation of all game features and basic permutations."[202]

Exhibit B makes no reference whatsoever to printed playbooks or play diagrams. Undeterred, Antonick now insists that this "instructions" clause can be stretched to include "the book of plays available to the user."[203] That is not so. The paper playbooks have

---

[199] SER 845:16-847:4

[200] SER 847:1-4; SER 698:15-18.

[201] ER 560.

[202] ER 587.

[203] Br. 38.

nothing to do with the documentation described in Exhibit B, which concerns the source code that Antonick wrote and provided to EA. EA owns everything outside the scope of Antonick's copyright in the software program, and that includes the printed playbooks.[204] As further proof, it is undisputed that the printed playbooks were commissioned by EA, printed by EA, and included in the game packaging by EA. It is further undisputed that the packaging and accompanying manual both bore EA's copyright notice, while the playbooks bore no individual copyright notice.[205] If Antonick's argument were correct, then he would own a copyright in the manual (as an "instruction")—which he does not and never has claimed.

## D. The district court did not abuse its discretion by granting a conditional new trial under Rule 50(c).

A conditional grant of a new trial under Rule 50(c) is reviewed for an abuse of discretion. *See Union Oil Co. v. Terrible Herbst, Inc.*, 331 F.3d 735, 742 (9th Cir. 2003). Under that standard, this Court "must uphold the district court if any of its grounds for granting a new trial

---

[204] SER 525-526.

[205] SER 672:6-13; SER 674:12-21.

are reasonable." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 846 (9th Cir. 2014).

When ruling on a new-trial motion, the district court may determine that a combination of factors—erroneous admission of evidence, faulty jury instructions, juror confusion resulting in a verdict against the weight of the evidence—require a new trial in the interest of justice. *See, e.g., Juneau Square Corp. v. First Wisconsin Nat'l Bank of Milwaukee*, 624 F.2d 798, 806 (7th Cir. 1980); *Experience Hendrix,* 762 F.3d at 847.

Here, the jury's verdict on Question 1 reflected juror confusion and was contrary to the clear weight of the evidence. *See generally* Part VI.B.3-4 above. Antonick did not introduce the source code that the jury needed in order to compare the source-code expressions of field width and of plays and formations; nor did he introduce the game content necessary to compare the games as a whole. Instead, he confused the jurors with irrelevant expert testimony and a closing argument urging them to rely on speculation and gut instincts. If anything, JMOL on Question 1 was warranted.

71

**E.    The district court properly dismissed Antonick's claims to royalties from sales of *SNES Madden* games.**

**1.    The SNES and Apple II microprocessors are not in the same "Microprocessor Family."**

The district court dismissed Antonick's claim for royalties from sales of *SNES Madden* games because the Contract barred that claim.[206] In exchange for upfront consideration, Amendment 1 to the Contract provided that Antonick would receive no royalties on sales of "Derivative Works by [EA]" in a "Different Microprocessor Family" than the Apple II.[207] After listening to the testimony of Antonick's expert, Garry Kitchen, the court properly held that the microprocessor used in *SNES Madden* games was in a different "Microprocessor Family" from the Apple II.[208] The district court's ruling was correct under the language of the Contract and the undisputed trial evidence.

The Contract provided that two microprocessors were in the same "Microprocessor Family" only if three conditions were met: both

---

[206] ER 953-958.

[207] ER 487.

[208] ER 957:1-18.

880883.01

microprocessors must "[1] *utilize* the *same* instruction set and have the *same* [2] instruction [size] and [3] data word size."[209]

Antonick's expert, Gary Kitchen, admitted that the *SNES Madden* microprocessor is *different* in all three respects from that used in the Apple II. Kitchen conceded that the microprocessor in *SNES Madden* (1) used data word sizes of 16 bits, whereas the maximum word size used by *Apple II Madden* was 8 bits;[210] (2) had at least 92 instructions, whereas *Apple II Madden* had 56;[211] and (3) used instructions that were four bytes long, whereas the Apple II instructions were three bytes long.[212] Thus, the court correctly concluded that the Contract does not entitle Antonick to royalties from sales of *SNES Madden* games.

Moreover, the parties agreed that the Apple II family of computers excludes the Apple IIgs,[213] which Kitchen conceded at trial is "essentially identical" to the SNES.[214] That agreement provides

---

[209] SER 513 (emphases and bracketed alterations added).

[210] SER 723:14-16; SER 724:6-12.

[211] SER 725:17-726:14.

[212] SER 725:1-14.

[213] SER 564-570 at Amendment III (emphasis added).

[214] SER 727:2-728:6.

additional evidence of the parties' intent to exclude SNES from the Apple II microprocessor family.[215]

Antonick argues that the district court should have allowed this claim to go the jury despite the Contract's clear language and the undisputed evidence. He argues that the court failed to credit his expert's testimony about how people in the videogame industry (other than his expert) would interpret the term "Microprocessor Family" in the *absence* of a clear contractual definition. But a contracting party cannot manufacture ambiguity to avoid the plain import of a contract's terms. *See Consol. World Invs., Inc. v. Lido Preferred Ltd.*, 9 Cal. App. 4th 373, 379 (1992).

### 2. Antonick's right-of-first-refusal claim does not save his claim to royalties from *SNES Madden* sales.

Antonick alternatively argues that he is entitled to royalties from *SNES Madden* sales because EA failed to offer him a right of first refusal to develop a *Madden* game for the SNES platform. The district court correctly rejected that argument.

---

[215] Kitchen tried to divine some difference between "microprocessor family" and "family of computers," but conceded that his only basis for drawing this distinction was his own "reading [of] the contract." SER 728:21-731:13.

Antonick and his expert admitted that they never identified or calculated damages "separate and apart from those calculations based on unpaid royalties."[216] During trial, therefore, Antonick asked the court to allow him to use EA's actual *SNES Madden* revenues as a basis for calculating what Antonick would have earned *if* he had developed a different *Madden* game for SNES.[217] The district court properly rejected this attempt: "[N]ow that I've re-read [the damages report] several times I'm in agreement—that the expert didn't address the question of the damages that would flow from the failure of EA to give Mr. Antonick a right of first refusal on the development of the Super Nintendo."[218]

The court also rightly rejected as unduly speculative Antonick's attempt to collect royalties on a game that never existed. Loss of prospective profits "must be proven to be certain both as to their occurrence and their extent." *Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 774 (2012) (internal citations omitted). Here, Antonick never developed a SNES *Madden* game. Rather, he contends that (1) if

---

[216] SER 479:17-22; SER 442-448; SER 697:9-16.

[217] Br. 56.

[218] ER 959:2-7.

he had been offered the chance to develop a game, (2) he would have done so, (3) the game that he would have developed would have been wildly successful just like the actual game, and (4) therefore he is entitled to 7% of EA's revenues for games that EA developed with no help from him.[219] The district court observed: "[O]f course, [these damages] are speculative . . . it's a sort of speculation on a speculation."[220]

Finally, the court correctly dismissed this claim because the Contract bars Antonick from seeking this type of consequential damages.[221]

---

[219] Antonick attempts to bridge the obvious gaps in his chain of logic by arguing that he worked on a different game for a different platform, the Nintendo Entertainment System ("NES"). Br. 56. But the record establishes that NES was a completely different system from SNES. For example, SNES had a 16-bit 65816 processor while the Nintendo had an 8-bit 6502 processor, meaning that any NES code could *not* have been used to develop a *SNES Madden* game. SER 713:15-714:5.

[220] ER 960:3-7.

[221] *See* SER 529 ("Publisher will not be liable to Artist for incidental or consequential damages or the loss of anticipated profits arising from any breach of this Agreement by Publisher, even if Publisher is notified of the possibility of such damages.").

**F.    The district properly excluded evidence of Antonick's ancillary breach claim, for which he identified no damages.**

The district court properly dismissed Antonick's ancillary claim that EA breached Section 5.05 of the Contract by "misappropriating" an unspecified "Development Aid."[222] Again, the district court correctly held that Antonick had failed to prove his claim for this ancillary breach because he had not identified or calculated any separate damages.[223] "Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach." *Amelco Elec. v. City of Thousand Oaks*, 27 Cal. 4th 228, 244 (2002) (citation omitted). Antonick's failure to offer any evidence of damages stemming from this alleged breach foreclosed his claim.

The Contract contained an express procedure by which Antonick would be compensated if EA used a Development Aid. Specifically, the Contract provided: "[Antonick] further agrees to negotiate in good faith with [EA] on the terms and conditions for a license of any other rights

---

[222] SER 693:17-697:16; SER 125.

[223] SER 693-697.

in connection with any Artist's Development Aid."[224] It is undisputed that Antonick neither initiated this procedure nor introduced evidence of any damages from it. When the court asked Antonick to identify damages stemming from the alleged breach of this provision, he could not.[225] His damages expert admitted the same.[226]

Antonick responds that the district court should have allowed him to pursue the equitable remedy of disgorgement because "EA's profits are appropriate 'compensation' for Antonick's intellectual property, the benefit received by EA."[227] That is not so.

A plaintiff's damages for breach of contract are limited to the benefit of his contractual bargain. *See* Cal. Civ. Code § 3300; *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified School Dist.*, 34 Cal.4th 960, 967-68 (2005). "The injured party's damages cannot . . . exceed what it would have received if the contract had been fully performed on both sides," *id.*, because "[t]he purpose of contract damages [is] to compensate the injured party rather than punish the breaching party."

---

[224] SER 522 at § 5.05.

[225] SER 694:18-697:16.

[226] SER 472:2-28: 3;SER481:22-482:5.

[227] Br. at 59.

*Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 94 (1995). Disgorgement of profits is not a remedy for ordinary breach of contract. *See Shaw v. Superior Court*, 229 Cal. App. 4th 12, 24-25 (2014). And disgorgement is particularly inappropriate here because the Contract specified how to determine compensation for an alleged breach.[228] In any event, Antonick's damages expert admittedly offered no disgorgement calculation.[229]

Thus, the district court properly concluded that "[d]isgorgement of EA's profits on derivative works is not only unnecessary . . . but it would have provided a windfall by awarding him more than he would have collected absent the breach."[230]

---

[228] SER 522 at § 5.05. Antonick's disgorgement claim is effectively a claim for unjust enrichment, which does not lie when, as here, "there exists between the parties a valid express contract covering the same subject matter." *Lance Camper Mfg. Corp. v. Republic Indem. Co. of Am.*, 44 Cal. App. 4th 194, 203 (1996); *see also Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996).

[229] SER 481:22-482:5.

[230] ER 22.

**G. The judgment can be affirmed on the alternative ground that Antonick's action is time-barred.[231]**

**1. To avoid dismissal, Antonick told the court that the CNBC interview put him on notice.**

Until trial, Antonick maintained that the Hawkins interview and 20th-anniversary publicity materials, which traced the origin of the *Madden* franchise to *Apple II Madden*, was the "aha moment"[232] that put him on notice of his potential claims and sparked his investigation.

- Antonick's complaint alleged that "[w]hen an acquaintance told [him] about the Hawkins interview broadcast on CNBC on July 10, 2009 it was the *first time that [he] would have been put on notice* that Electronic Arts might have misappropriated his intellectual property and breached its contractual obligations."[233]

---

[231] This Court may affirm the judgment on any ground supported by record. *See Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 615 (9th Cir. 2010). EA's limitations defense is properly presented as an alternative ground for affirmance rather than as a cross-appeal. *See Francisco Jose Rivero v. City & Cnty. of San Francisco*, 316 F.3d 857, 862 (9th Cir. 2002).

[232] SER 669.

[233] ER 1031-1032 ¶ 93 (emphasis added).

- In opposing EA's motion to dismiss his claims as untimely, Antonick reiterated that he "*did not develop a suspicion that EA had misappropriated his intellectual property until he saw the 20th anniversary of Madden publicity materials, including the CNBC interview with Trip Hawkins in July 2009.*"[234]

- At the hearing on EA's motion to dismiss, Antonick's counsel argued that the CNBC interview put him on inquiry notice, stating that the interview was "*the moment that Mr. Antonick . . . had a suspicion that he should inquire further. It is the triggering of the inquiry notice obligation.*"[235]

- In opposing EA's motion for summary judgment on statute-of-limitations grounds, Antonick asserted that the CNBC interview triggered his investigation. Antonick argued that "*[t]he Hawkins interview seemed inconsistent with EA's earlier promises—and caused Antonick to do some additional research.*"[236]

---

[234] SER 405 (emphasis added).
[235] SER 422:25-423:7 (emphasis added).
[236] SER 358 (emphasis added).

880883.01

EA repeatedly pointed out that the CNBC interview contained nothing but information that Antonick already knew well before the statute ran on his claims.[237] But the court twice rejected EA's position, stating that Antonick's testimony created a factual dispute about when he was first put on notice of his claims.

### 2. At trial, Antonick took a position clearly inconsistent with his prior statements to the court.

At trial, Antonick directly contradicted his prior sworn testimony and statements to the district court. On direct examination, Antonick stated that he had learned nothing new from the CNBC interview.

> Q. And at that time, after viewing the video of Trip Hawkins, did you suspect that Sega Madden was not developed independently?
>
> A. *No.* There was nothing that I had uncovered up to that point that it was anything other than the idea that there was this John Madden name and that my game was the first game to have the name, and I didn't own the name. So there just really wasn't anything that I had seen up to that point.[238]

On re-direct, Antonick again testified that the CNBC interview and 20th anniversary materials did *not* put him on notice of his claims.

> Q. Mr. Antonick, the CNBC interview with Trip Hawkins,

---

[237] SER 432:20-433:3, 439:21-25; SER 333-339.

[238] SER 668:19-669:1 (emphasis added).

when you saw that—well, when did you see that?

A.  I saw that in, it was the second week of July, 2009.

Q.  And did that put you on notice that you had a claim against EA?

A.  *No.*

Q.  Why not?

A.  All that—all that article—all that interview told me was that Trip Hawkins was connecting the first four years of development to the line of—the Madden line. There is nothing in there that said that they actually used my intellectual property in that game. They just said that it had started and it was a continuation of the title, the name.[239]

At the end of cross-examination, Antonick admitted that he had known since 1990 all the facts disclosed by the CNBC interview and the 20th anniversary materials—exactly what EA had argued (unsuccessfully) to the court in its motion to dismiss and in its summary-judgment motion.[240]

To sum up: Before trial, Antonick alleged and argued that the CNBC interview was his "aha moment." At trial, he testified that the CNBC interview was not his aha moment, because the facts in that interview were old news to him. Instead, he said that the interview had

---

[239] SER 677:13-678:3 (emphasis added).

[240] SER 675:14-676:7.

caused him to do "additional research" that led him to discover the Park Place website.[241] He told the jury that it was that website that put him on notice to investigate his claim.[242] EA's motions argued unsuccessfully that there can only be *one* "aha moment" that triggers a duty to investigate.[243]

### 3. Antonick should be judicially estopped from arguing that the CNBC interview did not put him on notice.

"Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir.1996). It is an equitable doctrine that protects the integrity of the judicial process by preventing a litigant from "playing 'fast and loose with the courts'." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Judicial estoppel is not limited to factual assertions, but applies equally to statements of the parties' legal positions. *See Helfand v. Gerson*, 105 F.3d 530, 535 (9th Cir. 1997). The

---

[241] ER 759:4-760:13.

[242] SER 141-143; SER 104-112.

[243] SER 141-143; SER 104-112.

district court's refusal to apply judicial estoppel to the facts is reviewed for an abuse of discretion. *See Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1040, 1048-49 (9th Cir. 2004) (holding that district court abused its discretion by not finding judicial estoppel).

In applying judicial estoppel, the court considers three factors: whether the litigant's two positions are clearly inconsistent; whether a court accepted the earlier position; and whether the later assertion of the inconsistent position would unfairly advantage the party asserting it or disadvantage the other party. *See New Hampshire*, 532 U.S. at 750-51. Each factor favors applying the doctrine here.

***First***, at trial, Antonick disavowed his sworn testimony that the CNBC interview and publicity materials put him on inquiry notice of his claims, and he admitted that he knew by 1990 all of the facts that he originally claimed the CNBC interview disclosed.[244] But he had taken the exact opposite position in his Complaint, in deposition, and in arguments to the district court.[245]

---

[244] *See* SER 668:19-669:1, SER 675:13-676:7.

[245] ER 1031-1032 at ¶93; SER 422:25-423:7, 22:1-16; SER 357-358, SER 367, n. 14.

880883.01

**Second**, Antonick successfully persuaded the district court that the CNBC interview "contain[s] facts sufficient to make a 'reasonably prudent person suspicious.'"[246] Based on those representations, the district court denied EA's motion to dismiss Antonick's claims as time-barred.[247] Antonick argued the same point to defeat summary judgment.[248]

**Third**, it was manifestly unfair to permit Antonick to take inconsistent positions to EA's detriment. If Antonick had continued to claim at trial that the CNBC interview put him on notice of his claims, EA would have proved that no new facts were disclosed in that interview and that inquiry notice therefore was triggered in 1990. It is hard to envision a more unfair advantage for a plaintiff, or a more unfair detriment to a defendant, than letting the plaintiff make contradictory assertions designed to evade the statute of limitations at every stage—in the complaint, in opposition to dispositive motions, and at trial.

In response to EA's argument that judicial estoppel warranted

---

[246] SER 388:15-24.

[247] SER 389:7-11.

[248] SER 345-378.

JMOL in EA's favor, the district court recognized "the fact that the plaintiff clearly, on the stand took positions that were arguably inconsistent with positions that he had taken in pleadings, taken in his deposition, [and] taken in declarations . . . ."[249] Having identified Antonick's inconsistent positions, the district court should have held that Antonick was judicially estopped from asserting that anything other than the 2009 CNBC interview had placed him on inquiry notice of his claims. *See Wagner*, 354 F.3d at 1048-49. As discussed below, this would have led to the further conclusion that—because Antonick had admitted knowing the facts in the CNBC interview as far back as 1990—his claims were time-barred, and JMOL must be granted based on expiration of the statute of limitations.

### 4. Antonick was on notice of his claims long before the statute-of-limitations cut-off.

Antonick testified at trial that the *only* facts that put him on notice were those on the website of Park Place's co-founder.[250] But Antonick knew, back in 1990, the facts mentioned on that website. He

---

[249] SER 691:23-692:2.

[250] ER 759:4-760:13.

knew that Park Place developed *Sega Madden*,[251] that *Sega Madden* was developed in less than eleven months,[252] and that Rich Hilleman produced and worked on *Sega Madden* while producing Antonick's next "*John Madden Football*" game.[253]

It is illogical for Antonick to assert that viewing a website was the "aha moment" that led him to suspect EA. Anyone can find a new fact on the Internet after being put on inquiry notice; but something prior to that must have led him to search the Internet in the first place. Antonick testified under oath that it was the CNBC interview that led him to search the Internet—and he admitted having known the facts in that interview as far back as 1990. Antonick thus failed to prove that he did not discover his claims before 2005.[254]

---

[251] SER 658:18-659:8.

[252] Antonick declined to develop a football game for the Sega Genesis in December 1989 (SER 608), knew in August 1990 that Park Place was producing *Sega Madden* (SER 660), and knew that *Sega Madden* was released in November 1990—less than 11 months after he declined to develop a Sega game (SER 661-663).

[253] SER 670:22-671:5.

[254] Absent tolling, Antonick's claim is time-barred, SER 385-389 (citing Code Civ. Proc. § 337(1)), and Antonick bears the burden of showing that equitable tolling applies. *See U.S. v. Marolf*, 173 F.3d 1213, 1218 n.3 (9th Cir. 1999).

880883.01

**H.    A new trial on the statute of limitations is warranted if there is a new trial.**

If the Court reverses and remands for a new trial, the Seventh Amendment requires that the new jury retry EA's limitations defense along with Antonick's breach-of-contract claim under the Derivative Works provision of the Contract. Under the Seventh Amendment, a court cannot hold a partial retrial unless the issue to be retried is sufficiently distinct and separable from the issues decided by the first jury. *See Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931); *Arthur Young & Co. v. U. S. Dist. Ct.*, 549 F.2d 686, 693 (9th Cir. 1977). Declaring a new trial only as to whether EA breached the Contract 21 years ago without allowing the same jury to consider whether those claims are timely would violate EA's right to a fair trial.

## VII.  CONCLUSION

For all the reasons stated above, the district court's judgment should be affirmed. Alternatively, if this Court reverses the grant of JMOL on Question 2, it should remand to the district court with instructions to enter JMOL on Question 1. If (and only if) the Court finds neither of those results acceptable, it should remand to the district court for a new trial on Antonick's claim for royalties under the

Derivative Works provision of the Contract with respect to the two elements identified by the district court, and on all of EA's defenses.

Dated:  November 14, 2014       Respectfully submitted,

              *s/Steven A. Hirsch*
              Steven A. Hirsch
              KEKER & VAN NEST LLP

880883.01

## STATEMENT OF RELATED CASES

Appellee knows of no related cases in this Court.

Dated: November 14, 2014

<u>s/Steven A. Hirsch</u>
Steven A. Hirsch
Keker & Van Nest LLP

880883.01

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

# STATUTORY ADDENDUM

## FEDERAL CONSTITUTION

U.S. Const. amend. VII.............................................................................. 2

## FEDERAL STATUTES

17 U.S.C. §102....................................................................................... 3

## FEDERAL REGULATIONS

37 C.F.R. § 202.1................................................................................... 5

77 Fed. Reg. 37605-01.......................................................................... 6

## STATE STATUTES

Cal. Civ. Code § 3300...........................................................................12

**STATUTORY ADDENDUM 1**

C

United States Code Annotated Currentness
  Constitution of the United States
    Annotated
      Amendment VII. Civil Trials
        ➡➡ **Amendment VII. Civil Trials**

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

Current through P.L. 113-174 approved 9-26-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**STATUTORY ADDENDUM 2**

**C**

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 17. Copyrights (Refs & Annos)
    Chapter 1. Subject Matter and Scope of Copyright (Refs & Annos)
      → → **§ 102. Subject matter of copyright: In general**

**(a)** Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

  **(1)** literary works;

  **(2)** musical works, including any accompanying words;

  **(3)** dramatic works, including any accompanying music;

  **(4)** pantomimes and choreographic works;

  **(5)** pictorial, graphic, and sculptural works;

  **(6)** motion pictures and other audiovisual works;

  **(7)** sound recordings; and

  **(8)** architectural works.

**(b)** In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

CREDIT(S)

(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2544; Pub.L. 101-650, Title VII, § 703, Dec. 1, 1990, 104

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.
**STATUTORY ADDENDUM 3**

Stat. 5133.)

Current through P.L. 113-174 approved 9-26-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**STATUTORY ADDENDUM 4**

C

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
  Title 37. Patents, Trademarks, and Copyrights
    Chapter II. U.S. Copyright Office, Library of
    Congress (Refs & Annos)
      Subchapter A. Copyright Office and Pro-
      cedures (Refs & Annos)
        Part 202. Preregistration and Registra-
        tion of Claims to Copyright (Refs & An-
        nos)
      → § 202.1 Material not subject to
      copyright.

The following are examples of works not subject to
copyright and applications for registration of such
works cannot be entertained:

(a) Words and short phrases such as names, titles,
and slogans; familiar symbols or designs; mere
variations of typographic ornamentation, lettering
or coloring; mere listing of ingredients or contents;

(b) Ideas, plans, methods, systems, or devices, as
distinguished from the particular manner in which
they are expressed or described in a writing;

(c) Blank forms, such as time cards, graph paper,
account books, diaries, bank checks, scorecards, ad-
dress books, report forms, order forms and the like,
which are designed for recording information and
do not in themselves convey information;

(d) Works consisting entirely of information that is
common property containing no original author-
ship, such as, for example: Standard calendars,
height and weight charts, tape measures and rulers,
schedules of sporting events, and lists or tables
taken from public documents or other common

sources.

(e) Typeface as typeface.

[24 FR 4956, June 18, 1959, as amended at 38 FR
3045, Feb. 1, 1973; 57 FR 6202, Feb. 21, 1992]

SOURCE: 24 FR 4956, June 18, 1959; 50 FR
30172, July 24, 1985; 51 FR 6403, Feb. 24, 1986;
56 FR 7813, 7815, Feb. 26, 1991; 59 FR 23981,
May 9, 1994; 60 FR 34168, June 30, 1995; 60 FR
50422, Sept. 29, 1995; 66 FR 37149, July 17, 2001;
70 FR 61906, Oct. 27, 2005; 78 FR 42873, July 18,
2013; 79 FR 15918, March 24, 2014, unless other-
wise noted.

AUTHORITY: 17 U.S.C. 408(f), 702

37 C. F. R. § 202.1, 37 CFR § 202.1

Current through Nov. 6, 2014; 79 FR 66265.

© 2014 Thomson Reuters.
END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**STATUTORY ADDENDUM 5**

RULES and REGULATIONS

LIBRARY OF CONGRESS

Copyright Office

37 CFR Part 201

[Docket No. 2012-6]

Registration of Claims to Copyright

Friday, June 22, 2012

AGENCY: Copyright Office, Library of Congress.

**\*37605** ACTION: Statement of Policy; Registration of Compilations.

SUMMARY: The Copyright Office issues this statement of policy to clarify the practices relating to the examination of claims in compilations, and particularly in claims of copyrightable authorship in selection and arrangement of exercises or of other uncopyrightable matter. The statement also clarifies the Office's policies with respect to registration of choreographic works.

DATES: Effective June 22, 2012.

FOR FURTHER INFORMATION CONTACT: Robert Kasunic, Deputy General Counsel, Copyright GC/I&R, P.O. Box 70400, Washington, DC 20024-0400. Telephone (202) 707-8380; fax (202) 707-8366.

SUPPLEMENTARY INFORMATION: The Copyright Office is issuing a statement of policy to clarify its examination practices with respect to claims in "compilation authorship," or the selection, coordination, or arrangement of material that is otherwise separately uncopyrightable. The Office has long accepted claims of registration based on the selection, coordination, or arrangement of uncopyrightable elements, because the Copyright Act specifically states that copyrightable authorship includes compilations. 17 U.S.C. 103.

The term "compilation" is defined in the Copyright Act:

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

17 U.S.C. 101 ("compilation"). This definition's inclusion of the terms "preexisting material" or "data" suggest that individually uncopyrightable elements may be compiled into a copyrightable whole. The legislative history of the 1976 Act supports this interpretation, stating that a compilation "results from a process of selecting, bringing together, organizing, and arranging previously existing material of all kinds, regardless of whether the individual items in the material have been or ever could have been subject to copyright."H.R. Rep. 94-1476, at 57 (emphasis added).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**STATUTORY ADDENDUM 6**

Viewed in a vacuum, it might appear that any organization of preexisting material may be copyrightable. However, the Copyright Act, the legislative history and the Supreme Court's decision in Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 346 (U.S. 1991), lead to a different conclusion.

In Feist, interpreting the congressional language in the section 101 definition of "compilation," the Supreme Court found protectable compilations to be limited to "a work formed by the collection and assembling of preexisting material or data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."Feist at 356, quoting 17 U.S.C. 101 ("compilation") (emphasis by the Court). The Court stated:

The purpose of the statutory definition is to emphasize that collections of facts are not copyrightable per se. It conveys this message through its tripartite structure, as emphasized above by the italics. The statute identifies three distinct elements and requires each to be met for a work to qualify as a copyrightable compilation: (1) The collection and assembly of pre-existing material, facts, or data; (2) the selection, coordination, or arrangement of those materials; and (3) the creation, by virtue of the particular selection, coordination, or arrangement, of an "original" work of authorship * * *.

Not every selection, coordination, or arrangement will pass muster. This is plain from the statute. * * * [W]e conclude that the statute envisions that there will be some fact-based works in which the selection, coordination, and arrangement are not sufficiently original to trigger copyright protection.

Feist, 499 U.S. at 357-358 (U.S. 1991)

The Court's decision in Feist clarified that some selections, coordinations, or arrangements will not qualify as works of authorship under the statutory definition of "compilation" in section 101. However, a question that was not present in the facts of Feist and therefore not considered by the Court, is whether the selection, coordination, or arrangement of preexisting materials must relate to the section 102 categories of copyrightable subject matter.

In Feist, Rural Telephone's alphabetical directory was found deficient due to a lack of originality, i.e., **37606** of sufficient creativity. Had the items contained in the directory (names, addresses and telephone numbers) been selected, coordinated, or arranged in a sufficiently original manner, there is no question that the resulting compilation would have fit comfortably within the category of literary works—the first category of copyrightable authorship recognized by Congress in section 102. But what if an original selection, coordination, or arrangement of preexisting material did not fall within a category of section 102 authorship? For instance, is a selection and arrangement of a series of physical movements copyrightable, if the resulting work as a whole does not fit within the categories of pantomime and choreographic works or dramatic works, or any other category?

Although the Feist decision did not address this question, the Copyright Office concludes that the statute and relevant legislative history require that to be registrable, a compilation must fall within one or more of the categories of authorship listed in section 102. In other words, if a selection and arrangement of elements does not result in a compilation that is subject matter within one of the categories identified in section 102(a), the Copyright Office will refuse registration.

The Office arrives at this conclusion in accordance with the instruction of the Supreme Court in Feist: "the established principle that a court should give effect, if possible, to every clause and word of a statute," citing Moskal v. United States, 498 U.S. 103, 109-110 (1990). Applying this principle, the Office finds that in addition to the statutory definition of "compilation" in section 101, Congress also provided clarification about the copy-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**STATUTORY ADDENDUM 7**

rightable authorship in compilations in section 103(a) of the Copyright Act:

The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.

17 U.S.C. 103(a). (emphasis added).

Section 103 makes it clear that compilation authorship is a subset of the section 102(a) categories, not a separate and distinct category. Section 103 and the definition of "compilation" in Section 101 also mark a departure from the treatment of compilations under the 1909 Act, which listed composite works and compilations as falling within the class of "books." The 1976 Act significantly broadened the scope of compilation authorship to include certain selection, coordination, or arrangement that results in a work of authorship. But that expansion also makes it clear that not every selection, coordination, or arrangement of material is copyrightable. Only selection, coordination, or arrangement that falls within section 102 authorship is copyrightable, i.e., is selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. Moreover, section 103 provides that compilations fall within "[t]he subject matter of copyright as specified by section 102," and the legislative history of the 1976 Act confirms what this means: "Section 103 complements section 102: A compilation or derivative work is copyrightable if it represents an 'original work of authorship' and falls within one or more of the categories listed in section 102."H.R. Rep. 94-1476 at 57 (1976) (emphasis added).

This requirement indicates that compilation authorship is limited not only by the tripartite structure of the statutory definition of "compilation," but that in addition, a creative selection, coordination, or arrangement must also result in one or more congressionally recognized categories of authorship.

Although the statute together with the legislative history warrant this conclusion, it is far from obvious when the statutory definition of "compilation" is read in isolation. Moreover, other portions of the legislative history have obscured this interpretation.

The legislative history states that the term "works of authorship" is said to "include" the seven categories of authorship listed in section 102 (now eight with the addition of "architectural works"), but that the listing is "illustrative and not limitative." H.R. Rep 94-1476, at 53. If these categories of authorship are merely illustrative, may courts or the Copyright Office recognize new categories of copyrightable authorship? Given that Congress chose to include some categories of authorship in the statute, but not other categories, did Congress intend to authorize the courts or the Copyright Office to recognize authorship that Congress did not expressly include in the statute? For instance, the decision to include "pantomimes and choreographic works" as a new category of authorship that did not exist under the 1909 Act was the subject of much deliberation, including a commissioned study and hearings. Copyright Office Study for Congress. Study No. 28, "Copyright in Choreographic Works," by Borge Varmer; Copyright Law Revision, Part 2, Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, House Comm. on the Judiciary (February 1963) at 8-9. Similarly, the decision not to include typeface as copyrightable authorship was a deliberate decision. H.R. Rep 94-1476, at 55. Could Congress have intended the courts or the Office to second-guess such decisions, or accept forms of authorship never considered by Congress?

Again, the answer lies in the legislative history. First, the legislative history states that "In using the phrase 'original works of authorship,' rather than 'all the writings of an author,' the committee's purpose was to avoid

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**STATUTORY ADDENDUM 8**

Case: 14-15298, 11/14/2014, ID: 9314054, DktEntry: 28-2, Page 115 of 120

exhausting the constitutional power of Congress to legislate in this field, and to eliminate the uncertainties arising from the latter phrase."H.R. Rep 94-1476, at 51. Thus, one goal of the illustrative nature of the categories was to prevent foreclosing the congressional creation of new categories:

The history of copyright law has been one of gradual expansion in the types of works accorded protection, and the subject matter affected by this expansion has fallen into one of two categories. In the first, scientific discoveries and technological developments have made possible new forms of creative expression that never existed before. In some of these cases the new expressive forms—electronic music, filmstrips, and computer programs, for example—could be regarded as an extension of copyrightable subject matter Congress had already intended to protect, and were thus considered copyrightable from the outset without the need of new legislation. In other cases, such as photographs, sound recordings, and motion pictures, statutory enactment was deemed necessary to give them full recognition as copyrightable works.

Authors are continually finding new ways of expressing themselves, but it is impossible to foresee the forms that these new expressive methods will take. The bill does not intend either to freeze the scope of copyrightable technology or to allow unlimited expansion into areas completely outside the present congressional intent. Section 102 implies neither that that subject matter is unlimited nor that new forms of expression within that general area of subject matter would necessarily be unprotected.

The historic expansion of copyright has also applied to forms of expression which, although in existence for generations or centuries, have only gradually come to be recognized as creative and worthy of protection. The first copyright statute in this country, enacted in 1790, designated only "maps, charts, and books"; major forms of expression such as music, drama, and works of art achieved specific statutory recognition only in later enactments. Although the coverage of the present statute is very broad, and would be broadened further by explicit recognition of all forms of choreography, **\*37607** there are unquestionably other areas of existing subject matter that this bill does not propose to protect but that future Congresses may want to.

Id. (emphasis added.)

This passage suggests that Congress intended the statute to be flexible as to the scope of established categories, but also that Congress also intended to retain control of the designation of entirely new categories of authorship. The legislative history goes on to state that the illustrative nature of the section 102 categories of authorship was intended to provide "sufficient flexibility to free the courts from rigid or outmoded concepts of the scope of particular categories."Id. at 53 (emphasis added). The flexibility granted to the courts is limited to the scope of the categories designated by Congress in section 102(a). Congress did not delegate authority to the courts to create new categories of authorship. Congress reserved this option to itself.

If the federal courts do not have authority to establish new categories of subject matter, it necessarily follows that the Copyright Office also has no such authority in the absence of any clear delegation of authority to the Register of Copyrights.

Interpreting the Copyright Act as a whole, the Copyright Office issues this policy statement to announce that unless a compilation of materials results a work of authorship that falls within one or more of the eight categories of authorship listed in section 102(a) of title 17, the Office will refuse registration in such a claim.

Thus, the Office will not register a work in which the claim is in a "compilation of ideas," or a "selection and arrangement of handtools" or a "compilation of rocks." Neither ideas, handtools, nor rocks may be protected by

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**STATUTORY ADDENDUM 9**

copyright (although an expression of an idea, a drawing of a handtool or a photograph of rock may be copyrightable).

On the other hand, the Office would register a claim in an original compilation of the names of the author's 50 favorite restaurants. While neither a restaurant nor the name of a restaurant may be protected by copyright, a list of 50 restaurant names may constitute a literary work—a category of work specified in section 102(a)—based on the author's original selection and/or arrangement of the author's fifty favorite restaurants.

An example that has occupied the attention of the Copyright Office for quite some time involves the copyrightability of the selection and arrangement of preexisting exercises, such as yoga poses. Interpreting the statutory definition of "compilation" in isolation could lead to the conclusion that a sufficiently creative selection, coordination or arrangement of public domain yoga poses is copyrightable as a compilation of such poses or exercises. However, under the policy stated herein, a claim in a compilation of exercises or the selection and arrangement of yoga poses will be refused registration. Exercise is not a category of authorship in section 102 and thus a compilation of exercises would not be copyrightable subject matter. The Copyright Office would entertain a claim in the selection, coordination or arrangement of, for instance, photographs or drawings of exercises, but such compilation authorship would not extend to the selection, coordination or arrangement of the exercises themselves that are depicted in the photographs or drawings. Rather such a claim would be limited to selection, coordination, or arrangement of the photographs or drawings that fall within the congressionally-recognized category of authorship of pictorial, graphic and sculptural works.

As another example, Congress has stated that the subject matter of choreography does not include "social dance steps and simple routines."H.R. Rep. 94-1476 at 54 (1976). A compilation of simple routines, social dances, or even exercises would not be registrable unless it results in a category of copyrightable authorship. A mere compilation of physical movements does not rise to the level of choreographic authorship unless it contains sufficient attributes of a work of choreography. And although a choreographic work, such as a ballet or abstract modern dance, may incorporate simple routines, social dances, or even exercise routines as elements of the overall work, the mere selection and arrangement of physical movements does not in itself support a claim of choreographic authorship.

A claim in a choreographic work must contain at least a minimum amount of original choreographic authorship. Choreographic authorship is considered, for copyright purposes, to be the composition and arrangement of a related series of dance movements and patterns organized into an integrated, coherent, and expressive whole.

Simple dance routines do not represent enough original choreographic authorship to be copyrightable. Id. Moreover, the selection, coordination or arrangement of dance steps does not transform a compilation of dance steps into a choreographic work unless the resulting work amounts to an integrated and coherent compositional whole. The Copyright Office takes the position that a selection, coordination, or arrangement of functional physical movements such as sports movements, exercises, and other ordinary motor activities alone do not represent the type of authorship intended to be protected under the copyright law as a choreographic work.

In addition to the requirement that a compilation result in a section 102(a) category of authorship, the Copyright Office finds that section 102(b) precludes certain compilations that amount to an idea, procedure, process, system, method of operation, concept, principle or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work. In the view of the Copyright Office, a selection, coordination, or arrangement of exercise movements, such as a compilation of yoga poses, may be precluded from registration as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**STATUTORY ADDENDUM 10**

a functional system or process in cases where the particular movements and the order in which they are to be performed are said to result in improvements in one's health or physical or mental condition. See, e.g, Open Source Yoga Unity v. Choudhury, 2005 WL 756558, *4, 74 U.S.P.Q.2d 1434 (N.D. Cal. 2005) ("Here, Choudhury claims that he arranged the asanas in a manner that was both aesthetically pleasing and in a way that he believes is best designed to improve the practitioner's health.").[FN1] While such a functional system or process may be aesthetically appealing, it is nevertheless uncopyrightable subject matter. A film or description of such an exercise routine or simple dance routine may be copyrightable, as may a compilation of photographs of such movements. However, such a copyright will not extend to the movements themselves, either individually or in combination, but only to the expressive description, depiction, or illustration of the routine that falls within a section 102(a) category of authorship.

> FN1 The court in Open Source Yoga Unity did not address section 102(b). See also the discussion of Open Source Yoga Unity below.

The relationship between the definition of compilations in section 101 and the categories of authorship in section 102(a) has been overlooked even by the Copyright Office in the past. The Office has issued registration certificates that included "nature of authorship" statements such as "compilations of exercises" or "selection and arrangement of exercises." In retrospect, and in light of the Office's closer analysis of legislative intent, the *37608 Copyright Office finds that such registrations were issued in error.

The Office recognizes that in one unreported decision, a district court concluded, albeit with misgivings, that there were triable issues of fact whether a sufficient number of individual yoga asanas were arranged in a sufficiently creative manner to warrant copyright protection. See Open Source Yoga Unity, discussed above. However, that court did not consider whether section 102(a) or (b) would bar a copyright claim in such a compilation.

The Copyright Office concludes that the section 102(a) categories of copyrightable subject matter not only establish what is copyrightable, but also necessarily serve to limit copyrightable subject matter as well. Accordingly, when a compilation does not result in one or more congressionally-established categories of authorship, claims in compilation authorship will be refused.

Dated: June 18, 2012.

Maria A. Pallante,

Register of Copyrights.

[FR Doc. 2012-15235 Filed 6-21-12; 8:45 am]

BILLING CODE 1410-30-P

77 FR 37605-01, 2012 WL 2357179 (F.R.)
END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

STATUTORY ADDENDUM 11

**c**

**Effective:[See Text Amendments]**

West's Annotated California Codes Currentness
  Civil Code (Refs & Annos)
    Division 4. General Provisions (Refs & Annos)
      Part 1. Relief
        Title 2. Compensatory Relief
          Chapter 2. Measure of Damages
            Article 1. Damages for Breach of Contract (Refs & Annos)
              ➥➥ **§ 3300. Measure**

For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.

CREDIT(S)

(Enacted in 1872. Amended by Code Am.1873-74, c. 612, p. 265, § 276.)

Current with urgency legislation through Ch. 931 of 2014 Reg.Sess., Res. Ch. 1 of 2013-2014 2nd Ex.Sess., and all propositions on 2014 ballots

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Form 8.     Certificate of Compliance Pursuant to 9th Circuit Rules 28-4, 29-2(c)(2) and (3), 32-2 or 32-4[1] for Case Number** <u>14-15298</u>

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (check appropriate option):

☐ This brief complies with the enlargement of brief size permitted by Ninth Circuit Rule 28-4.  The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).  This brief is _____ words,_____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☐ This brief complies with the enlargement of brief size granted by court order dated _____.  The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).  This brief is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☒ This brief is accompanied by a motion for leave to file an oversize brief pursuant to Circuit Rule 32-2 and is 16,429 words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☐ This brief is accompanied by a motion for leave to file an oversize brief pursuant to Circuit Rule 29-2(c)(2) or (3) and is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.  The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

| Signature of Attorney or Unrepresented Litigant | s/Steven A. Hirsch |
|---|---|

("s/" plus typed name is acceptable for electronically-filed documents)

Date | 11/14/2014

_____

[1] If filing a brief that falls within the length limitations set forth at Fed. R. App. P. 32(a)(7)(B), use Form 6, Federal Rules of Appellate Procedure.

| 9th Circuit Case Number(s) | 14-15298 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# CERTIFICATE OF SERVICE

## When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Nov 14, 2014 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/Steven A. Hirsch

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# CERTIFICATE OF SERVICE

## When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |