**No. 15-55287**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

FLO & EDDIE, INC.,

*Plaintiff-Appellee*,

v.

PANDORA MEDIA, INC.,

*Defendant-Appellant*.

_____

On Appeal from the United States District Court for the Central District of
California, Case No. 2:14-cv-07648-PSG-RZ, Hon. Philip S. Gutierrez

_____

**BRIEF *AMICUS CURIAE* OF THE COMPUTER &
COMMUNICATIONS INDUSTRY ASSOCIATION IN SUPPORT OF
DEFENDANT-APPELLANT PANDORA MEDIA, INC.
URGING REVERSAL**
_____

Matt Schruers
Ali Sternburg
Computer & Communications
 Industry Association
900 17th Street NW, Suite 1100
Washington, D.C. 20006
(202) 783-0070
mschruers@ccianet.org
*Counsel for Amicus Curiae*

September 9, 2015

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* the Computer & Communications Industry Association states that it does not have a parent corporation and that no publicly held corporation has an ownership stake of 10% or more in it.

/s/ Matt Schruers

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .................................................... ii

TABLE OF CONTENTS ................................................................. iii

TABLE OF AUTHORITIES ............................................................. iv

INTEREST OF *AMICUS* ............................................................... 1

SUMMARY OF ARGUMENT ........................................................... 1

ARGUMENT ............................................................................ 3

I.    Copyright Limitations and Exceptions Are Essential to Industries
      Across the U.S. Economy ....................................................... 6

      A. The fair use doctrine is critical to all sectors of the U.S. economy ........... 8

      B. The first sale doctrine is crucial to the economy .................................... 12

      C. The DMCA safe harbors are preserved in international obligations,
         which the district court decision threatens to undermine ....................... 13

II.   Interpreting California Law to Override Federal Exceptions
      Threatens Interstate Commerce and Violates Constitutionally
      Guaranteed Rights ............................................................... 16

      A. A broad construction of state sound recording rights conflicts with
         the Commerce Clause ............................................................ 16

      B. A broad construction of state sound recording rights conflicts with
         the First Amendment ........................................................... 18

CONCLUSION .......................................................................... 19

CERTIFICATE OF COMPLIANCE ................................................... 20

CERTIFICATE OF SERVICE .......................................................... 21

## TABLE OF AUTHORITIES

*Cases*

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989) .................... 2

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932 (4th Cir. 2013) .......... 11-12

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ...................... 8

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) ...................................... 11

*Dowling v. United States*, 473 U.S. 207 (1985) ...................................... 5

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ............................... 19

*Faulkner Literary Rights v. Sony Pictures Classics*, 953 F. Supp. 2d 701
(N.D. Miss. 2013) .................................................... 11

*Field v. Google*, 412 F. Supp. 2d 1106 (D. Nev. 2006) ........................ 10

*Flo & Eddie, Inc. v. Pandora Media, Inc.*, No. 14-07648
(C.D. Cal. Feb. 23, 2015) ............................................... 3, 5

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2014 WL 4725382
(C.D. Cal. Sept. 22, 2014) ....................................... 3

*Golan v. Holder*, 132 S. Ct. 873 (2012) .................................... 19

*Kelly v. Arriba Soft*, 336 F.3d 811 (9th Cir. 2003) .................................... 9

*Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013) ............................. 17

*MGM Studios, Inc. v. Grokster Ltd.*, 545 U.S. 913 (2005) ...................... 5

*Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007) .................... 10

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) .......................... 18

*Recording Industry Ass'n of America v. Diamond Multimedia Sys., Inc.*,
180 F.3d 1072 (9th Cir. 1999) ................................................................ 10

*Seltzer v. Green Day, Inc.*, 725 F.3d 1170 (9th Cir. 2013) ..................................... 11

*SOFA Entertainment v. Dodger Productions*, 709 F.3d 1273 (9th Cir. 2013) ....... 11

*Sony Corp. of America v. Universal City Studios*, 464 U.S. 417 (1984) ............ 5, 10

*Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011) ............................................... 18

*Stewart v. Abend*, 495 U.S. 207 (1990) ................................................................. 11

*Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151 (1975) ............................... 5

*UMG Recordings, Inc. v. Shelter Capital Partners*,
718 F.3d 1006 (9th Cir. 2013) ................................................................ 13

### Statutory Materials

17 U.S.C. § 106A .................................................................................................... 4

17 U.S.C. §§ 107-122 ............................................................................................... 6

17 U.S.C. § 109 ...................................................................................................... 12

17 U.S.C. § 512 ................................................................................................. 13, 14

Cal. Civ. Code § 980(a)(2) ...................................................................................... 3

### Legislative History

H.R. Rep. No. 105-551, pt. 2 (1998) ........................................................................ 4

S. Rep. No. 105-190 (1998) ................................................................................... 13

## *Other Authorities*

Berne Convention for the Protection of Literary and Artistic Works,
as last revised July 24, 1971, amended Oct. 2, 1979, S. TREATY DOC. No. 99-27,
828 U.N.T.S. 221 ............................................................................................ 7

David Dean et al., *The Internet Economy in the G-20: The $4.2 Trillion
Growth Opportunity* (Boston Consulting Grp. 2012)............................................ 8

*EBay: 20 years of trading*, THE ECONOMIST, Sept. 3, 2015 .................................. 12

Nate Anderson, *100 Years of Big Content fearing technology—in its own words*,
ARS TECHNICA, Oct. 11, 2009................................................................................ 9

Register of Copyrights Maria Pallante, *Federal Copyright Protection for
Pre-1972 Sound Recordings*, U.S. Copyright Office (2011)................................. 17

ROBIN JEWELER, CONG. RESEARCH SERV., RL32692, ANTICIRCUMVENTION
UNDER THE DIGITAL MILLENNIUM COPYRIGHT ACT AND REVERSE ENGINEERING:
RECENT LEGAL DEVELOPMENTS (2004) .................................................................... 4

Stephen A. Merrill & William J. Raduchel, *Copyright in the Digital Era:
Building Evidence for Policy*, National Research Council (2013) .......................... 7

Steven Johnson, *The Creative Apocalypse that Wasn't*, N.Y. TIMES,
Aug. 19, 2015 ..................................................................................................... 9

*Study on the Right of Making Available*, 79 Fed. Reg. 10571 (Feb. 25, 2014) ........ 4

Thomas Rogers & Andrew Szamosszegi,
*Fair Use in the U.S. Economy* (2011).................................................................. 2, 8

United States-Chile Free Trade Agreement, June 6, 2003, 42 I.L.M. 1026 ..... 14, 15

United States-Dominican Republic-Central America Free Trade Agreement,
May 28, 2004, 43 I.L.M. 514.......................................................................... 14, 15

United States-Australia Free Trade Agreement, May 18, 2004, 43 I.L.M. 1248 ... 14

United States-Morocco Free Trade Agreement, June 15, 2004, 44 I.L.M. 544 ..... 14

United States-Bahrain Free Trade Agreement, Sept. 14, 2004,
44 I.L.M. 544 ............................................................................... 14, 15

United States-Peru Trade Promotion Agreement, Apr. 12, 2006,
http://www.ustr.gov/trade-agreements/free-tradeagreements/
peru-tpa/final-text ....................................................................... 14, 15

United States-Colombia Trade Promotion Agreement, Nov. 22, 2006,
http://www.ustr.gov/tradeagreements/free-trade-agreements/
colombia-fta/final-text ................................................................. 14, 15

United States-Singapore Free Trade Agreement, May 6, 2003, 42 I.L.M. 1026 ... 14

United States-Panama Trade Promotion Agreement, June 28, 2007,
http://www.ustr.gov/trade-agreements/free-trade-agreements/
panama-tpa/finaltext ..................................................................... 14, 15

United States-Korea Free Trade Agreement, June 30, 2007, 46 I.L.M. 642 .......... 14

United States-Oman Free Trade Agreement, Jan. 1, 2009,
http://www.ustr.gov/trade-agreements/free-trade-agreements/
oman-fta/finaltext .............................................................................. 14

WORLD INTELL. PROP. ORG., 1 RECORDS OF THE INTELLECTUAL PROPERTY
CONFERENCE OF STOCKHOLM: JUNE 11 TO JULY 14, 1967 (1971) ............................ 7

## INTEREST OF *AMICUS*[1]

The Computer & Communications Industry Association ("CCIA")
represents more than twenty large, medium-sized, and small companies in the high
technology products and services sectors, including computer hardware and
software, electronic commerce, telecommunications, and Internet products and
services—companies that collectively generate more than $465 billion in annual
revenues.[2]

## SUMMARY OF ARGUMENT

This case raises the question of whether a company doing business
nationally can depend on national uniformity in intellectual property regulation.
Copyright law consists of a mix of carefully delineated rights circumscribed by
specific limitations and exceptions, which incentivize creativity while also
permitting business activity to occur adjacent to that creation. For many years,
exclusive rights enabled industrial activity focused on content creation. In the 20th
century, industries began to develop which were enabled not by rights but by the
limitations and exceptions to copyrights. For example, various online services,

---

[1] No counsel for any party authored this brief in whole or part; no such party or
counsel made a monetary contribution intended to fund its preparation or
submission; and no person other than *amicus*, its members, and counsel made such
a contribution. Although Pandora is a member of CCIA, it took no part in the
preparation of this brief. Pandora consented to this filing; respondent Flo & Eddie
refused to consent.

[2] A complete list of CCIA members is available at
https://www.ccianet.org/members.

from search to cloud storage to social media, all would not exist without the fair use doctrine. Online (and offline) platforms facilitating secondary markets and used goods sales depend upon the first sale doctrine, and tens of thousands of online platforms depend upon the DMCA safe harbors limiting intermediary liability in their daily operations. In fact, industries that benefit from the various limitations and exceptions to copyright law today represent roughly one sixth of the U.S. economy. *See* Thomas Rogers & Andrew Szamosszegi, *Fair Use in the U.S. Economy* (2011), http://www.ccianet.org/wp-content/uploads/library/CCIA-FairUseintheUSEconomy-2011.pdf.

In holding that Flo & Eddie, Inc. possesses "all ownership rights that could attach to intellectual property", the district court's decision implies that states may maintain common law copyrights coterminous with federal copyrights, while omitting limitations and exceptions that exist on the national level. For nationwide enterprises that depend on these exceptions to do business throughout the Union, this is an untenable situation. *Cf. Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989) ("Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess.").

The result of the district court's conclusion that the California legislature enacted a sweeping digital right in an analog era is to permit information regulation

inconsistent with the Commerce Clause. At the same time, it runs roughshod over specific limitations and exceptions that the Supreme Court of the United States has previously held to be constitutionally mandated. For these reasons, the decision must be reversed.

**ARGUMENT**

The district court interpreted Section 980(a)(2)'s term 'exclusive ownership' to include not only conventional authors' rights like reproduction and distribution, but also the public performance of sound recordings by digital audio transmission. The court went further, stating in both *Sirius* and in its opinion below that California law extends not only to digital public performance but also "*all* ownership rights that *could* attach to intellectual property". *Flo & Eddie, Inc. v. Pandora Media, Inc.*, No. 14-07648, slip op. at 8-9 (C.D. Cal. Feb. 23, 2015) (emphasis supplied); *see also Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2014 WL 4725382 (C.D. Cal. Sept. 22, 2014), at *5. In so stating, the district court interpreted the California statute as a living servitude on not only intangible products but also previously sold goods, one which would grow over time as new rights evolved. For example, many European countries provide moral rights of attribution and integrity – non-economic rights more closely tied with the author's personality interests in the work. This entitlement fits poorly within the U.S. utilitarian, economic approach to copyright law, which only provides moral rights

3

to a narrow, specific class of works of visual art in 17 U.S.C. § 106A. These rights could and in fact do attach to some expressive works, however, and thus the district court's opinion implies they might exist under California law. In some jurisdictions the right to "make available" attaches to intellectual property, but it is not granted by the United States, which instead provides roughly equivalent protection via Sections 106(3)-(5). *See Study on the Right of Making Available*, 79 Fed. Reg. 10571 (Feb. 25, 2014). Because a making available right "could attach" to copyright (and indeed does in European law and elsewhere), the district court's opinion may be read to grant this protection as well. Similarly, so-called para-copyright protections such as those created by the Digital Millennium Copyright Act also "could attach" to state law rights.[3]

On its face, the district court's opinion suggests that moral rights, a right to make available, para-copyright protections, and untold other rights that could be enacted in the future can attach to California sound recordings. Because the district court offers no limiting principle for the potential ownership rights that might be claimed with respect to state sound recordings, these rights would seem to expand indefinitely over time.

---

[3] H.R. REP. NO. 105-551, pt. 2, at 24-25 (1998); ROBIN JEWELER, CONG. RESEARCH SERV., RL32692, ANTICIRCUMVENTION UNDER THE DIGITAL MILLENNIUM COPYRIGHT ACT AND REVERSE ENGINEERING: RECENT LEGAL DEVELOPMENTS 1 (2004).

The court also concluded that the plaintiff Flo & Eddie, Inc. could pursue theories of conversion and misappropriation because it "has property rights in its sound recordings that are violated when the recordings are publicly performed without authorization". Slip op. at 14-15. However, as the Supreme Court explained in *Sony Corp. of America v. Universal City Studios*, "[e]ven unauthorized uses of a copyrighted work are not necessarily infringing." 464 U.S. 417, 447 (1984). This is in part because "the definition of exclusive rights in § 106 of the present Act is prefaced by the words 'subject to sections 107 through 118.'" *Id.* Unlike rights to real property fixed by definitive boundaries, a copyright holder's temporary monopoly is "no ordinary chattel." *Dowling v. United States*, 473 U.S. 207, 216 (1985). Rather, the federal entitlement provided by the Copyright Act "comprises a series of carefully defined and carefully delimited interests to which the law affords correspondingly exact protections." *Id.*

These contours certainly reflect pragmatism, as well as a continual balancing of interests. "The limited scope of the copyright holder's statutory monopoly ... reflects a balance of competing claims upon the public interest…." *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156 (1975). More recently, the Court noted that "[t]he more artistic protection is favored, the more technological innovation may be discouraged; the administration of copyright law is an exercise in managing the trade-off." *MGM Studios, Inc. v. Grokster Ltd.*, 545 U.S. 913, 928

5

(2005). These balances – often manifesting in the form of limitations and exceptions to copyright, *see e.g.*, 17 U.S.C. §§ 107-122 – have enabled the development of world-class technology products and Internet services provided by member companies of *amicus* CCIA.

To be sure, one could argue that the California legislature's acts were simply not pragmatic, and made no effort to manage the trade-offs between the public interest and the desire to incentivize creative activity that so clearly characterizes *federal* copyright law. But even if California law is not bound by pragmatism, it must be bound by the U.S. Constitution, in at least two ways: (a) the First Amendment's prohibition against government restraints on speech, and (b) the Dormant Commerce Clause's prohibition against obstructions to interstate commerce. These constraints are relevant to Internet and technology firms such as the members of *amicus* CCIA because without them, many of the innovation and technological advances found in new technology – in particular, Internet services – would not be possible.

## I.    Copyright Limitations and Exceptions Are Essential to Industries Across the U.S. Economy.

In the span of only a few decades, the regulatory footprint of copyright has altered dramatically. For many years, the only economic activity associated with copyrights was content production. This slowly began to change in the latter half of the 20th century. When diplomats revising the 1886 Berne Convention in

6

Stockholm in the 1960s made clear that nations adhering to Berne were obligated to grant a right to quote from copyright-protected works, they noted that this exception was necessary for the press to accomplish its task "to guide its readers on the subject of current problems in the fields of politics, economics, religion, culture, and other questions which may form the subject of public discussion."[4] The association of the quotation right with the media's ability to accomplish its job was perhaps the first case where industrial activity was formally associated with a copyright *exception*, rather than a copyright protection. Today, there are many such cases. In fact, limitations and exceptions to the rights-holder's statutory monopoly – including fair use – are of considerable importance to the U.S. economy. Research commissioned by CCIA in 2011, later cited by the National Research Council of the National Academies,[5] concluded that industries depending upon fair use and related limitations to copyright generated revenue averaging $4.6 trillion, contributed $2.4 trillion in value-add to the U.S. economy (roughly one-

---

[4] WORLD INTELL. PROP. ORG., 1 RECORDS OF THE INTELLECTUAL PROPERTY CONFERENCE OF STOCKHOLM: JUNE 11 TO JULY 14, 1967 at 116 (1971). *See also* Berne Convention for the Protection of Literary and Artistic Works, as last revised July 24, 1971, amended Oct. 2, 1979, S. TREATY DOC. No. 99-27, 828 U.N.T.S. 221. As a result of Berne article 10(a), Berne signatories (and by extension, all members of the World Trade Organization) are compelled by international law to guarantee the right to make quotations of any length, provided the quotation is compatible with fair practice and its extent is not excessive.

[5] Stephen A. Merrill & William J. Raduchel, *Copyright in the Digital Era: Building Evidence for Policy*, National Research Council (2013), http://www.nap.edu/catalog.php?record_id=14686.

sixth of total U.S. current dollar GDP) and employ approximately 1 in 8 U.S. workers.[6] The value of the global Internet economy is projected to reach $4.2 trillion in a few years,[7] and much of that commerce is facilitated by products or services described above – the vast majority of which benefit from various limitations and exceptions to copyright. The conclusions reached by this study are borne out by the wide array of industries relying on fair use to create and innovate, often for commercial purposes.

A.    *The fair use doctrine is critical to all sectors of the U.S. economy.*

Pervasive copying underlies so much modern economic activity, including Internet functionality and digital technology, that it is no exaggeration to say that limitations and exceptions like fair use are fundamental to U.S. economic interests. For over 30 years, commercial entities have relied on the Supreme Court's *Sony* decision when engaging in fair use, or when providing products and services that enable fair use by consumers and users.[8] Nowhere is the fair use doctrine's importance to innovation more evident than in the tech industry. Since the *Sony*

---

[6] Thomas Rogers & Andrew Szamosszegi, *Fair Use in the U.S. Economy* (2011), at 26-27, http://www.ccianet.org/wp-content/uploads/library/CCIA-FairUseintheUSEconomy-2011.pdf.

[7] David Dean et al., *The Internet Economy in the G-20: The $4.2 Trillion Growth Opportunity* (Boston Consulting Grp. 2012), at 3, https://www.bcg.com/documents/file100409.pdf.

[8] As the Supreme Court reaffirmed ten years later in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 594 (1994), commerciality is not a bar to fair use.

decision, fair use has enabled innovators to bring to market numerous new technologies. Consumers have the *Sony* decision and its interpretation of the fair use doctrine to thank for a generation of technology products, from MP3 players to DVRs to smartphones, and a vast segment of online services, including search, social media, and cloud storage. Although copyright holders have long voiced grave concerns about new technologies, including piano roll players, VCRs, and MP3 players, these technologies have in fact created more opportunities for commercial exploitation by content producers, often substantially transforming the marketplace in the process.[9]

Search engines are one example of a critical service that would not exist without the fair use doctrine. Search engine software copies vast quantities of information from publicly accessible websites onto the search engine's database. Users then access the search engine's database for relevant information, retrieving links to the original site as well as to the "cache" copy of the website stored in the database. Courts, including this Court, have held that the main service provided by search engines is fair use. This Court in *Kelly v. Arriba Soft*, 336 F.3d 811 (9th Cir. 2003), found that the caching of reduced-sized images copied from websites,

---

[9] Nate Anderson, *100 Years of Big Content fearing technology—in its own words*, ARS TECHNICA, Oct. 11, 2009, http://arstechnica.com/tech-policy/2009/10/100-years-of-big-content-fearing-technologyin-its-own-words/; Steven Johnson, *The Creative Apocalypse that Wasn't*, N.Y. TIMES, Aug. 19, 2015, http://www.nytimes.com/2015/08/23/magazine/the-creative-apocalypse-that-wasnt.html.

9

and the display of these images in response to search queries, constituted a fair use. It reaffirmed that proposition in *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007). Similarly, *Field v. Google*, 412 F. Supp. 2d 1106 (D. Nev. 2006), excused Google's display of text cached in its search database as a fair use.

Other important economic activities made possible by fair use include software development, which in many cases requires the making of temporary copies of existing programs to facilitate the programming of interoperability, and web hosting. The fair use doctrine also permits end users of copyrighted material to make digital copies of programming for personal use. Due to these important legal principles, consumers can enjoy copyrighted programming at a later time ("time-shifting"), *Sony* at 423-24, transfer the material from one device to another ("space shifting"), *Recording Industry Ass'n of America v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999), and make temporary cache copies of websites on the random access memory of their computers, *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007). The utility derived from these activities has spawned consumer industries for a broad range of products such as digital video recorders and MP3 players, stimulating additional economic activity.

The benefits of commercial fair use are not confined to the technology sector, however. The value of fair use extends well beyond industries that contribute to the economy by bringing us new technological innovation. For

instance, content industries also regularly depend upon fair use in their commercial endeavors.  In recent years the fair use doctrine has come to the defense of various creative industry defendants – often in this Court – who have represented film, theatre, sports, and music interests.  A Broadway show's use of a 7-second clip of television was found to be fair use,[10] with the court characterizing the dispute as "a good example of why the 'fair use' doctrine exists," and accusing the litigation of "having a chilling effect on creativity."[11]  A well-known "appropriation" artist's collages of copyright-protected photographs were found to be transformative fair use.[12]  A movie studio prevailed with a fair use defense over piracy allegations arising from a film that paraphrasing nine words from William Faulkner.[13]  An unlicensed multimedia image used in a band's live performance was found to have no effect on "the value of the piece or of [the artist's] artwork in general", and was therefore non-infringing.[14]  The NFL and the Baltimore Ravens won a long-running copyright dispute, with the Fourth Circuit holding that "[a]ny other result would visit adverse consequences not only upon filmmaking but upon visual

---

[10] *SOFA Entertainment v. Dodger Productions*, 709 F.3d 1273 (9th Cir. 2013).

[11] *Id.* at 1280.  The Supreme Court has explained that fair use is an "'equitable rule of reason' which permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which the law is designed to foster."  *Stewart v. Abend*, 495 U.S. 207, 237 (1990).

[12] *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013).

[13] *Faulkner Literary Rights v. Sony Pictures Classics*, 953 F. Supp. 2d 701 (N.D. Miss. 2013).

[14] *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013).

depictions of all sorts."[15]  The court pointed to a brief by the motion picture industry and film-makers when explaining that "creation itself is a cumulative process; those who come after will inevitably make some modest use of the good labors of those who came before," noting that fair use "is crucial to the exchange of opinions and ideas."[16]  Underscoring the value of fair use across the economy, the court stated that "[s]ociety's interest in ensuring the creation of transformative works incidentally utilizing copyrighted material is legitimate no matter who the defendant may be."[17]

>    B.    *The first sale doctrine is crucial to the economy.*

Another limitation on copyright that enables commerce is the first sale doctrine, codified at 17 U.S.C. § 109, which allows the resale of copyrighted works, notwithstanding the author's right to restrict the distribution of his work. Resale markets contribute substantially to the U.S. economy.  In just two decades, "over $700 billion worth of goods (and enough cars to circle the moon four times) have been sold on eBay" alone,[18] and of course sites like Craigslist and various other platforms competing in the same market also facilitate large volumes of such transactions.

---

[15] *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 935 (4th Cir. 2013).

[16] *Id.* at 944.

[17] *Id.* at 945.

[18] *EBay: 20 years of trading*, The Economist, Sept. 3, 2015, http://www.economist.com/blogs/graphicdetail/2015/09/daily-chart-1?ebay20years.

If the district court's interpretation of California's statute is allowed to stand, it would open the door to states' laws restricting the sale of an untold number of goods lawfully purchased by consumers, which could gridlock national markets for the resale of personal property.

C.   *The DMCA safe harbors are preserved in international obligations, which the district court decision threatens to undermine.*

Safe harbors for online intermediaries are another limitation on copyright that provide extraordinarily important protections for the U.S. Internet economy and would be endangered by the district court's interpretation of California law.  In 1998, Congress responded to the liability risk that Internet service providers might face from third-party copyright infringement by enacting the limitations in Section 512 of the DMCA, 17 U.S.C. § 512.  Congress was "loath to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions," *UMG Recordings, Inc. v. Shelter Capital Partners*, 718 F.3d 1006, 1014 (9th Cir. 2013), and therefore provided liability limitations to "ensure[] that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand."  S. REP. NO. 105-190, at 8 (1998).  The DMCA safe harbors paved the way for the growth of the Internet as a platform for commerce and expression.  The Internet economy flourished in the United States due to Congress's prescient decision to provide a legal

environment that unambiguously encouraged innovation and investment in the Internet.

Interpreting state law rights in pre-1972 sound recordings to override these crucial federal exceptions would undermine international commitments of the United States. Due to the importance of online intermediaries in the domestic economy, limiting liability for online service providers has been a consistent element of U.S. international policy for over a decade. As a result, the United States has entered into trade agreements with roughly a dozen nations that compel contracting parties to provide copyright liability limitations similar to that which is found in 17 U.S.C. § 512.[19] These trade obligations do not permit a contracting party to exempt copyrights issued by political subdivisions, nor do these trade

---

[19] *See, e.g.*, United States-Chile Free Trade Agreement, art. 17.11(23), June 6, 2003, 42 I.L.M. 1026; United States-Dominican Republic-Central America Free Trade Agreement, art. 15.11(27), May 28, 2004, 43 I.L.M. 514; United States-Australia Free Trade Agreement, art. 17.11(29), May 18, 2004, 43 I.L.M. 1248; United States-Morocco Free Trade Agreement, art. 15.11(28), June 15, 2004, 44 I.L.M. 544; United States-Bahrain Free Trade Agreement, art. 14.10(29), Sept. 14, 2004, 44 I.L.M. 544; United States-Peru Trade Promotion Agreement, art. 16.11(29), Apr. 12, 2006, http://www.ustr.gov/trade-agreements/free-tradeagreements/peru-tpa/final-text; United States-Colombia Trade Promotion Agreement, art. 16.11(29), Nov. 22, 2006, http://www.ustr.gov/tradeagreements/free-trade-agreements/colombia-fta/final-text; United States-Singapore Free Trade Agreement, art. 16.9(22), May 6, 2003, 42 I.L.M. 1026; United States-Panama Trade Promotion Agreement, art. 15.11(27), June 28, 2007, http://www.ustr.gov/trade-agreements/free-trade-agreements/panama-tpa/finaltext; United States-Korea Free Trade Agreement, art. 18.10(30), June 30, 2007, 46 I.L.M. 642; United States-Oman Free Trade Agreement, art. 15.10(29), Jan. 1, 2009, http://www.ustr.gov/trade-agreements/free-trade-agreements/oman-fta/finaltext.

agreements suggest that the word "copyright" should be construed narrowly.  To the contrary, most agreements explicitly specify that liability limitations for service providers shall apply not only to "copyright," but must "also include related rights."[20]  If the district court's interpretation of California law is to be taken to its logical conclusion, however, these federal exceptions do not apply in the case of state copyrights – despite international obligations to the contrary.

This point applies with equal force to the United States' obligation to permit quotation under article 10(1) of the Berne Convention.  If state protection for pre-1972 sound recordings may be interpreted to override copyright limitations such as the quotation right or the Section 512 safe harbors, then the United States would be violating international obligations, which might invite reciprocal violations by our trading partners.  Independent of whether Flo & Eddie, Inc. is entitled to remuneration under California law, the district court's indication that the state laws protecting that right are not circumscribed by federal exceptions mandated by our international treaty obligations cannot stand.  Insofar as the United States has entered into international obligations with respect to copyright, state protections must give way.

*     *     *

---

[20] *See, e.g.*, CAFTA, art. 15.11(27) n.20; Bahrain, art. 14.10(29)(a) n.14; Chile, art. 17.11(23)(a) n.35; Colombia, art. 16.11(29)(a) n.28; Peru, art. 16.11(29)(a) n.27; Panama, art. 15.11(27) n.23.

The district court concludes that because the recordings were played "without authorization" that they cannot be lawful. But as discussed above, there are numerous ways that copyrighted works can be used "without authorization," including commercially, without running afoul of the author's right. Indeed, this Court has blessed many such uses. The district court's restrictive analysis is not only inconsistent with precedents of this Court and the Supreme Court, but also inconsistent with the expectations of a large component of the economy. Substantial economic activity is based on limitations and exceptions, such as those described above, which the district court has said California need not heed. These are federal, codified laws that demonstrably increase business activity, notably in the tech and content industries that are prominent in the state of California. As the data cited above indicates, the provisions put at risk by the district court's opinion represent critical protections for significant sectors of the economy.

## II. Interpreting California Law to Override Federal Exceptions Threatens Interstate Commerce and Violates Constitutionally Guaranteed Rights.

### A. A broad construction of state sound recording rights conflicts with the Commerce Clause.

The economic consequences that would result from allowing states' pre-1972 sound recording protections to override federal law are not merely policy concerns; they are also constitutional concerns. In particular, a broad interpretation

16

of California's state sound recording protection conflicts with both the Commerce Clause and the First Amendment.

Since it has long been understood that state sound recording laws generally do not recognize a public performance right, the possibility of state-law regulation of performances which cross state borders (such as via the Internet) has received limited consideration. *See* Register of Copyrights Maria Pallante, *Federal Copyright Protection for Pre-1972 Sound Recordings*, U.S. Copyright Office (2011), at 44 ("In general, state law does not appear to recognize a performance right in sound recordings."). If, however, California's statute is understood to prohibit quotations or other fair uses of sound recordings, then it invites a situation where a permitted use in one state (for example, quotation or excerpting from relevant songs in news media coverage about this very legal dispute) might occur in an interstate broadcast that may be received in California. As Pandora notes, Br. at 46, the district court similarly reads California's statute to leave no room for the first sale doctrine, *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013). Read in such a light, California's sound recording law would deprive lawful owners of pre-1972 sound recordings of the right to dispose of their own property, including by sale or donation. Such a result would impede significant interstate markets for the used works described above.

In fact, much of the commerce enabled by the various limitations and exceptions to federal copyright law will be interstate in nature. Even assuming that California may regulate the use of pre-1972 sound recordings *within* its own borders, it cannot regulate in such a manner that prohibits the use of such sound recordings elsewhere in the nation. In such circumstances, the burden on interstate commerce – including potential commerce involving members of *amicus* CCIA – would be "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

> B. *A broad construction of state sound recording rights conflicts with the First Amendment.*

In addition to raising Commerce Clause concerns, the prospect of California state law regulating expressive works beyond the bounds of federal copyright law raises clear First Amendment concerns. As the district court acknowledged, the performance of expressive works is an expressive act. It is well established "that the creation and dissemination of information are speech within the meaning of the First Amendment," including information far less expressive than music, *Sorrell v. IMS Health, Inc*., 131 S. Ct. 2653, 2667 (2011).

The Supreme Court has twice affirmed that it is only due to the structural constraints of copyright law, such as fair use and the idea/expression dichotomy, that the Copyright Act's inherent constraint of speech can be reconciled with the Constitution, and that altering these traditional contours will demand First

18

Amendment scrutiny. *See Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003); *Golan v. Holder*, 132 S. Ct. 873, 890-91 (2012). Wholesale repudiation of fair use unquestionably alters copyright's traditional contours, in a fashion that cannot survive First Amendment review. Accordingly, the district court's construction of California law should be reversed.

## CONCLUSION

For the foregoing reasons, the district court's holding should be reversed or, in the alternative, the relevant questions of California law should be certified to the California Supreme Court.

Respectfully submitted,

/s/ Matt Schruers
Matt Schruers
Ali Sternburg
Computer & Communications
  Industry Association
900 17th NW, Suite 1100
Washington, D.C. 20006
(202) 783-0070
mschruers@ccianet.org
*Counsel for Amicus Curiae*

September 9, 2015

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Fed. R. App. P.

32(a)(7)(B) because it contains 4,370 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the types style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word in 14

point Times New Roman.


/s/ Matt Schruers
Counsel for *Amicus Curiae*


September 9, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2015, I electronically filed the foregoing Brief *Amicus Curiae* of the Computer & Communications Industry Association with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<div style="margin-left:40%">

/s/ Matt Schruers
Matt Schruers
Computer & Communications
  Industry Association
900 17th NW, Suite 1100
Washington, D.C. 20006
(202) 783-0070
mschruers@ccianet.org
*Counsel for Amicus Curiae*

</div>

September 9, 2015