IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

ESPANOLA JACKSON, et al.,

Plaintiffs/Appellants,

vs.

CITY AND COUNTY OF SAN FRANCISCO, et al.

Defendants/Appellees.

No. 12-17803

U.S. District Court No. 3:09-cv-02143-RS

_____

**BRIEF OF APPELLEES
CITY AND COUNTY OF SAN FRANCISCO
AND ITS MAYOR AND CHIEF OF POLICE**
_____

On Appeal from the United States District Court
for the Northern District of California

The Honorable Richard Seeborg

DENNIS J. HERRERA, State Bar #139669
City Attorney
WAYNE SNODGRASS, State Bar #148137
CHRISTINE VAN AKEN, State Bar #241755
Deputy City Attorneys
1 Dr. Carlton B. Goodlett Place
City Hall, Room 234
San Francisco, California 94102-4682
Telephone:  (415) 554-4633
Facsimile:  (415) 554-4699
E-Mail:     christine.van.aken@sfgov.org

Attorneys for Defendants and Appellees
CITY AND COUNTY OF SAN
FRANCISCO, THE MAYOR OF SAN
FRANCISCO and THE CHIEF OF THE
SAN FRANCISCO POLICE
DEPARTMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... ii

INTRODUCTION ............................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................2

STATEMENT OF FACTS ................................................................3

SUMMARY OF ARGUMENT ..........................................................6

ARGUMENT ................................................................................7

    I.    Standard of Review for Preliminary Injunction Motions.....................7

    II.    San Francisco's Storage Ordinance Does Not Infringe Plaintiffs' Second Amendment Rights..................................................8

        A.    This Court should scrutinize firearms restrictions in proportion to the burdens they impose. ....................................9

        B.    The storage ordinance should be evaluated under rational basis review or intermediate scrutiny. ......................................15

        C.    The storage ordinance is constitutional under intermediate scrutiny..............................................................22

        D.    The NRA's admission about the constitutionality of other storage ordinances defeats its attack on San Francisco's. ........25

        E.    The Court should not apply categorical or strict scrutiny here.........................................................................................30

    III.    The District Court Did Not Abuse Its Discretion in Refusing to Enjoin the Ammunition Ordinance. ...................................................34

        A.    Plaintiffs lack standing to challenge the ammunition ordinance.................................................................................34

        B.    The ammunition ordinance does not infringe Plaintiffs' Second Amendment rights...................................................36

    IV.    Plaintiffs Do Not Satisfy the Remaining Preliminary Injunction Factors. .....................................................................................42

CONCLUSION .............................................................................44

STATEMENT OF RELATED CASES ..............................................45

CERTIFICATE OF COMPLIANCE..................................................45

# TABLE OF AUTHORITIES

**Federal Cases**

*Alliance for Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011)......................................................................8

*American Trucking Ass'ns, Inc. v. City of Los Angeles*
660 F.3d 384 (9th Cir. 2011)......................................................................39

*Bd. of Trustees of State Univ. of N.Y. v. Fox*
492 U.S. 469 (1989) ...................................................................................32

*Carey v. Population Servs., Int'l*
431 U.S. 678 (1977) ...................................................................................38

*Clingman v. Beaver*
544 U.S. 581 (2005) ...................................................................................32

*District of Columbia v. Heller*
554 U.S. 570 (2008) ........................................................................... *passim*

*Ezell v. City of Chicago*
651 F.3d 684 (7th Cir. 2011)............................................................... 12, 14

*GeorgiaCarry.Org, Inc. v. Georgia*
687 F.3d 1244 (11th Cir. 2012)..................................................................13

*Griswold v. Connecticut*
381 U.S. 479 (1965) ...................................................................................38

*Heller v. District of Columbia (Heller II)*
670 F.3d 1244 (D.C. Cir. 2011) ........................................................ *passim*

*Kachalsky v. County of Westchester*
701 F.3d 81 (2d Cir. 2012)................................................................. *passim*

*Lands Council v. McNair*
537 F.3d 981 (9th Cir. 2008)........................................................................8

*Lane v. Holder*
703 F.3d 668 (4th Cir. 2012)............................................................... 35, 36

*Lydo Enterprises, Inc. v. City of Las Vegas*
  745 F.2d 1211 (9th Cir. 1984) .................................................................43

*Madsen v. Women's Health Ctr., Inc.*
  512 U.S. 753 (1994) .............................................................................23

*McDonald v. City of Chicago*
  561 U.S. --, 130 S. Ct. 3020 (2010)...................................... 2, 10, 14, 31

*Moore v. Madigan*
  702 F.3d 933 (7th Cir. 2012) .................................................................12

*Muscarello v. United States*
  524 U.S. 125 (1998) .............................................................................15

*Nordyke v. King*
  644 F.3d 776,
  *vacated by* 664 F.3d 774 (9th Cir. 2011)..............................................13

*Nordyke v. King*
  681 F.3d 1041 (2012),
  *cert. denied*, 133 S. Ct. 840 (2013) .............................................. 10, 13

*NRA v. Bureau of Alcohol, Tobacco & Firearms*
  700 F.3d 185 (5th Cir. 2012)........................................................ *passim*

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*
  762 F.2d 1374 (9th Cir. 1985)..............................................................43

*Osterweil v. Bartlett*
  -- F.3d --, 2013 WL 322884 (2d Cir. Jan. 29, 2013)...................... 22, 44

*Parker v. Dist. of Columbia*
  478 F.3d 370 (D.C. Cir. 2007) .............................................................11

*Pharmacia Corp. v. Alcon Labs., Inc.*
  201 F.Supp.2d 335 (D.N.J.2002)..........................................................43

*Planned Parenthood of Southeastern Pennsylvania v. Casey*
  505 U.S. 833 (1992) .............................................................................38

*Reliable Consultants, Inc. v. Earle*
  517 F.3d 738 (5th Cir. 2008) ...............................................................38

*Sierra On-Line Inc. v. Phoenix Software, Inc.*
  739 F.2d 1415 (9th Cir. 1984) .............................................................43

*Snyder v. Phelps*
  -- U.S. --, 131 S. Ct. 1207 (2011) ......................................................27

*United States v. Bena*
  664 F.3d 1180 (8th Cir. 2011) .............................................................13

*United States v. Booker*
  644 F.3d 12 (1st Cir. 2011),
  *cert. denied*, 132 S. Ct. 1538 (2012) ................................ 12, 20, 21, 26

*United States v. Carter*
  669 F.3d 411 (4th Cir. 2012) ...............................................................23

*United States v. Chester*
  628 F.3d 673 (4th Cir. 2010)) ...................................................... 11, 21

*United States v. DeCastro*
  682 F.3d 160 (2d Cir. 2012) ...................................................... 13, 19, 40

*United States v. Dugan*
  657 F.3d 998 (9th Cir. 2011) ...................................................... 21, 22

*United States v. Greeno*
  679 F.3d 510 (6th Cir. 2012) ...............................................................13

*United States v. Marzzarella*
  614 F.3d 85 (3d Cir. 2010) ........................................................ 12, 13, 20, 25

*United States v. Masciandaro*
  638 F.3d 458 (4th Cir. 2011) ...................................................... 12, 19, 23, 44

*United States v. Miller*
  307 U.S. 174 (1939) ...........................................................................36

*United States v. Reese*
  627 F.3d 792 (10th Cir. 2010) .............................................................12

*United States v. Salerno*
481 U.S. 739 (1987) ...................................................................26

*United States v. Skoien*
614 F.3d 638 (7th Cir. 2010).............................. 12, 14, 20, 23

*United States v. Vongxay*
594 F.3d 1111 (9th Cir. 2010) .................................... 11, 32

*Vincenty v. Bloomberg*
476 F.3d 74 (2d Cir. 2007) ......................................... 38, 41

*Ward v. Rock Against Racism*
491 U.S. 781 (1989) ................................................... 33, 39

*Wash. State Grange v. Wash. State Repub. Party*
552 U.S. 442 (2008) ...................................................26

*Winter v. Natural Res. Defense Council*
555 U.S. 7 (2008) ....................................................8, 43

*Zablocki v. Redhail*
434 U.S. 374 (1978) ...................................................33

**State Cases**
*Commonwealth v. Cantelli*
982 N.E.2d 52 (Mass. App. Ct. 2013)................................34

*Commonwealth v. McGowan*
982 N.E.2d 495, 464 Mass. 232 (2013)..............................18

*Commonwealth v. Patterson*
946 N.E.2d 130 (Mass. App. Ct. 2011)......................... 19, 34

*Commonwealth v. Reyes*
982 N.E.2d 504, 464 Mass. 245 (2013)........................ 18, 23

*Commonwealth v. Runyan*
922 N.E.2d 794 (2010) ...............................................18

*Tessler v. City of New York*
952 N.Y.S.2d 703 (N.Y. Sup. Ct. 2012)...........................19

**Constitutional Provisions**

U.S. Const. amend. II ........................................................................*passim*

**Federal Statutes**

18 U.S.C. § 922 ........................................................................11, 12, 28

**State Statutes & Codes**

2009 Cal. Stats. ch. 628 ........................................................34

720 Ill. Comp. Stat. 5/24-9(a) ........................................................25

Act for Regulating and Disciplining the Militia
    1785 Va. Acts ch. 1, § 3 ........................................................37

Cal. Penal Code § 25100 ........................................................25

Fla. Stat. Ann. § 790.174(a) ........................................................ 25, 27

Haw. Rev. Stat. § 134-10.5 ........................................................ 25, 27

Iowa Code § 724.22(7) ........................................................25

Mass. Gen. Laws Ann. 140 § 131L ........................................................ 33, 34

Md. Code Ann. § 4-104(c) ........................................................ 25, 27

Minn. Stat. Ann. § 609.666(2) ........................................................ 25, 27

N.C. Gen. Stat. Ann. § 14-315.1(a) ........................................................25

N.H. Rev. Stat. § 650-C:1(III) ........................................................25

N.J. Stat. Ann. § 2C:58-15(a) ........................................................25

R.I. Gen. L. § 11-47-60.1(b) ........................................................25

Tex. Penal Code Ann. § 46.13 ........................................................25

**Municipal Statutes, Codes & Ordinances**

N.Y.C. Admin. Code § 10-312(a) ........................................................33

S.F. Police Code § 4511 ........................................................ *passim*

S.F. Police Code § 4512 ........................................................ 15, 33, 34

S.F. Police Code § 613.10....................................................................... 34, 35, 42

S.F. Police Code § 613.9.5.....................................................................34, 39, 41

**Other Authorities**

4 William Blackstone, Commentaries On
  The Laws Of England 148-49 (1769)...............................................................36

A. Quince, "*Boy accidentally shoots and kills 12 year old cousin,*"
  ABC3340, Jan. 9, 2013, http://www.abc3340.com/story
  /20545151/boy-accidentally-shoots-and-kills-12-year-old-cousin#.UO3JRd1-
  hSM.facebook......................................................................................29

C. McKinnon, "*3-Year-Old Boy in Guthrie Dies
  from Accidental Gunshot Wound,*" Dec. 15, 2012,
  http://m.news9.com/story.aspx?story=20353707&catId=112032 .......................30

C. Oberholtz & A. Barr, "*Boy, 12, dies after accidental shooting in Caldwell
  County,*" KCTV 5 News, Jan. 28, 2013, http://www.kctv5.com/story/20574105
  /boy12-dies-after-accidental-shooting-in-caldwell-
  county?utm_source=twitterfeed&utm_medium=twitter.....................................29

C. Vendel, "*Four-year-old KC girl dies
  after being shot by 6-year old boy,*" Kansas City Star, Jan. 22, 2013,
  http://www.kansascity.com/2013/01/22/4025115
  /4-year-old-kc-girl-dies-after.html ...............................................................29

J. Fraser, "*4-year-old killed himself with dad's gun in N. Houston,*"
  Houston Chronicle, Feb. 25, 2013, http://www.chron.com
  /news/houston-texas/houston/article/4-year-old-killed-by-gunfire-in-N-Houston-
  4304104.php .......................................................................................29

J. Rayburn, "*Boy, 10, dies after pellet gun shooting in Tollhouse,*" Fresno Bee, Jan.
  4, 2013, http://www.fresnobee.com/2013/01/04/3122349/10-year-old-wounded-
  by-pellet.html.......................................................................................30

J. Szerlag, "*State Police: Gun used by 3-year-old who accidentally shot and killed
  himself was not deputy's duty weapon,*" MLive.Com, Mar. 4, 2013,
  http://www.mlive.com/news/jackson/index.ssf/2013/03/deputies_4-year-
  old_son_who_ac.html............................................................................29

James Barron, "*Gunman Massacres 20 Children at School in Connecticut; 28 Dead, Including Killer*," N.Y. Times, Dec. 15, 2012 ....................................22

K. Nicholson, "*Harrison toddler dies from shooting,*" WRCBtv.com, Dec. 21, 2012," http://www.wrcbtv.com/story/20405078/harrison-toddler-dies-from-shooting#.UNT6qtIAIjM.twitter ..........................................................................30

K. Taylor, "*9-year-old dies from injuries in accidental shooting,*" Fox19.com, Feb. 26, 2013. http://www.fox19.com/story/21388316/sebastian-swartz-9-dies-from-injuries-in-accidental-shooting ............................................................................29

M. Schuster et al., "*Firearm Storage Patterns in U.S. Homes with Children,*" 90 Am. J. Pub. Health 588 (Apr. 2000), http://www.rand.org/content/dam/rand/pubs /reprints/2005/RAND_RP890.pdf....................................................................28

N. DeChant, "*Clevealnd [sic] Police are investigating the death of a 6 year old girl after she was shot in the face,*" newsnet5.com, Jan. 19, 2013, http://www.newsnet5.com/dpp/news/local_news/cleveland_metro/clevealnd-police-are-investigating-the-death-of-a-6-year-old-girl-after-she-was-shot-in-the-face.................................................................................................................29

News Staff, "*2-Year-Old Dies After Accidental Shooting,*" Baton Rouge, Louisiana News, Jan. 22, 2013, http://www.redsticknow.com/2013/01/baton-rouge-crime-news/2-year-old-in-critical-condition-after-accidental-shooting/.....................................................29

News Staff, "*4-year-old killed in accidental shooting identified,*" Fox 54 Augusta, Feb. 12, 2013, http://www.wfxg.com/story/21112300 /police-4-year-old-killed-playing-with-gun .......................................................29

News Staff, "*Child Fatally Shot in Head in Accidental Shooting,*" WLTX.com, Feb. 2, 2013, http://www.wltx.com/news/national/article/219657/2/Child-Fatally-Shot-in-Head-in-Accidental-Shooting......................................................29

News Staff, "Child shot, killed, Christmas afternoon," WMCTV.com, Dec. 25, 2012, http://www.wmctv.com/story/20422577/child-shot-and-transfered-to-le-bonheur ...............................................................................................................30

News Staff, "*Sheriff's office IDs girl killed at Bazine home,*" Hutchinson, Kansas News, Feb. 18, 2013, http://hutchnews.com/Localregional/Sheriff-identify-victim-of-Ness-Co-shooting ...................................................................................29

P. Trexler, "*Akron man charged in fatal shooting of son, 4,*" Akron Beacon Journal Online, Jan. 24, 2013, http://www.ohio.com/news/break-news/akron-man-charged-in-fatal-shooting-of-son-4-1.367287 ......................................................29

R. Naquin, "*Two-year-old child dies after Christmas night shooting,*" WPDE Newschannel 15, Dec. 26, 2012, http://www.carolinalive.com/news /story.aspx?id=841087#.UNtoCdevdkB ..............................................................30

Samuel Johnson, 1 Dictionary of the English Language (4th ed.) (reprinted 1978 .......................................................................................37

T. Faulkner, "*Man arrested after accidentally shooting, killing child,*" WPSD Local, Feb. 10, 2013, http://www.wpsdlocal6.com/news/ky-state-news /Man-arrested-after-accidentally-shooting-killing-3-year-old-child--190565981.html ....................................................................................................29

T. Tsiaperas, "*Police say fatal shooting of 3-year-old boy appears to be accidental,*" Dallasnews.com, Feb. 20, 2013, http://www.dallasnews.com/news/local-news/20130220-police-say-fatal-shooting-of-3-year-old-garland-boy-appears-to-be-accidental.ece......................29

WISQARS Injury Mortality Reports 1999-2007, at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html ...................................3

WISQARS Nonfatal Injury Reports 1999-2007, at http://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html; ...................................3

WISQARS Unintentional Firearm Deaths & Rates Per 100,000, at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html. ...................................3

# INTRODUCTION

The dangers of firearms in the hands of people who should not possess them—including people who are mentally ill, as well as criminals and children—have rarely been more apparent in this country than in recent months. Courts throughout the country have recognized that the rights protected by the Second Amendment are not unlimited, and they have trod with care in striking a balance between the fundamental right of an individual to bear arms, and society's need for protection from abuses of that right. The overwhelming majority of circuit courts to have considered the diverse gun regulations before them have struck that balance by applying intermediate scrutiny to all gun laws other than those that flatly prohibit the exercise of self-defense rights. This approach does not give the government a free pass, as it must show that its laws substantially further an important government interest, and are not unreasonably broad. But the intermediate scrutiny test also provides some leeway for regulation in an area where failing to prevent abuses can sometimes result in unspeakable tragedy.

Plaintiffs here—the National Rifle Association, an association of San Francisco police officers, and six San Francisco residents (collectively the NRA, or Plaintiffs)—would up-end this careful balance. They challenge local laws requiring handgun owners to lock any handguns kept in the home when the handguns are not being carried in hands or in a holster, and prohibiting the sale (but not the possession) of certain kinds of especially dangerous ammunition within city limits. But the NRA does not seriously contend that these laws are unconstitutional under the intermediate scrutiny approach that most circuits have adopted. Instead, to arrive at its claim that San Francisco's ordinances are unconstitutional, the NRA urges this Court to adopt interpretations of the Second Amendment that no court has found persuasive.

This Court should reject the NRA's invitation to stand alone among circuit courts in insisting that all gun laws lacking long historic pedigrees are categorically invalid, or alternatively that gun laws burdening self-defense in the home in any respect must fall under strict judicial scrutiny. When the Supreme Court decided *McDonald v. City of Chicago*, applying the Second Amendment to the States, it provided assurance that "state and local experimentation with reasonable firearms regulation will continue under the Second Amendment." 561 U.S. --, 130 S. Ct. 3020, 3046 (2010) (quotation marks omitted). The NRA's rigid standards of review would instead ensure the invalidation of all but a handful of firearms regulations. Consistent with the Supreme Court's guidance and the overwhelming consensus of the circuits, this Court should instead apply intermediate scrutiny or rational basis here, and hold that because San Francisco's ordinances comport with the Second Amendment, the district court did not abuse its discretion in refusing to enjoin them.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the district court abused its discretion in denying a preliminary injunction based on its determination that San Francisco's safe-storage ordinance, requiring handguns in the home to be stored locked when they are not being carried by an adult (in hand or in a holster), places at most a minimal and hypothetical burden on residents' ability to defend themselves using guns in the home.

2.     Whether Plaintiffs have standing to challenge San Francisco's ammunition ordinance, prohibiting local gun dealers from selling particularly lethal kinds of ammunition, where they allege no difficulty, burden, or expense in obtaining those kinds of ammunition.

3.     Whether the district court abused its discretion in denying a preliminary injunction based on its determination that Plaintiffs had not shown that the City's ammunition ordinance, prohibiting them from buying discrete kinds of ammunition from the single gun dealer located in San Francisco but permitting them to obtain other ammunition for self-defense purposes, substantially burdened their Second Amendment rights.

All applicable constitutional provisions, ordinances, and statutes are contained in the addendum to the NRA's opening brief or in the addendum to this brief.

## STATEMENT OF FACTS

Firearm injuries have an immense national and local public health impact. S.F. Police Code § 4511(1).  From 2000 through 2007, there were an average of 30,000 firearms deaths every year,[1] and reported unintentional gun injuries were nearly as high.[2]  Although the causes of this epidemic of violence remain disputed, social science and medical research have repeatedly shown that the rates of suicides, homicides, and accidental deaths all rise as guns are more readily available.  ER 63-79.  The presence of a gun in the *home* is particularly dangerous: It significantly elevates the risk of suicides and homicides.  *Id.* at 63-70.  The risk that a family member will die in an unintentional shooting is 3.7 times higher for

---

[1] S.F. Police Code § 4511(1)(a); U.S. Dep't of Hlth. & Human Servs., Centers for Disease Control & Prevention, Nat'l Ctr. for Injury Prevention & Control, Web-Based Injury Statistics Query & Reporting System ("WISQARS"), WISQARS Injury Mortality Reports 1999-2007, at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html.

[2] S.F. Police Code § 4511(c); WISQARS Nonfatal Injury Reports 1999-2007, at http://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html; WISQARS Unintentional Firearm Deaths & Rates Per 100,000, at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html.

residents in homes with a firearm than those without—and this risk is highest for children and teens.  ER 78-79.  Guns in the home also increase the risk of burglary, apparently because burglars view guns as attractive loot.  ER 86-88.

The ability to keep a gun in the home for lawful self-defense purposes is protected by the Second Amendment.  But guns are fired far more often at family members or acquaintances than home invaders.  In a recent study of homicides in or near residential dwellings where the relationship between victim and shooter was known, only four percent of the victims were strangers to the shooter, while 52% of the victims were murdered by a spouse, intimate partner, first-degree family member, or roommate of the perpetrator and 37% were shot by a friend or an acquaintance.  ER 71; *see also* S.F. Police Code § 4511(2); EpiCenter, California Injury Data Online, *Firearm Ownership & Storage* (2004), http://www.apps.cdph.ca.gov/epicdata/firearms/gunownstore.htm.

To reduce the risks of gun accidents and keep handguns away from thieves and people not authorized to use them, while also keeping them available for self-defense purposes, San Francisco adopted Police Code 4512.  This measure requires that any handgun kept in a residence must be carried on the person of an adult or stored either in a locked container or disabled with a trigger lock. S.F. Police Code § 4512(a), (c).  The storage ordinance does not impose any requirement that handguns be unloaded at any time, and it does not apply to long guns.

In support of its storage law, San Francisco made findings of fact about the need for the ordinance.  S.F. Police Code § 4511.  These findings—and the social science research they relied on—show that storing guns under lock and key can reduce the risk of self-inflicted and unintentional firearm injuries, particularly but not exclusively among children and youth.  ER 79-81, 84-86; *see also* S.F. Police Code § 4511(5)(b).  Indeed, there is a wide consensus that using trigger locks or

lockboxes to store guns promotes safety:  The International Association of Chiefs of Police, the American Academy of Pediatrics, and the NRA have all stated that locked storage can prevent unauthorized access to guns.  S.F. Police Code § 4511(6); ER 79.  Locking guns can also prevent the gun thefts that result in black market gun sales.  S.F. Police Code § 4511(2)(d); ER 86-88.

San Francisco also found that requiring locked storage for handguns that are not being carried would not compromise the ability of gun owners to defend themselves.  Indeed, there is no empirical research anywhere suggesting that storing guns locked makes household members less safe, or diminishes gun owners' ability to use their weapons for self-defense.  ER 88-89.  This is unsurprising in light of how quickly modern lockboxes can be opened—in just three or four seconds by pressing numbers on a keypad or scanning a fingerprint. ER 92-93.

In addition to addressing the problem of guns in the hands of unauthorized users, San Francisco took steps to reduce the lethality of accidental or criminal shootings—which, as noted above, are dramatically more frequent than self-defense shootings.  San Francisco already regulates the sale of firearms ammunition by licensing and inspecting ammunition dealers.  Through San Francisco Police Code § 613.10(g), San Francisco prohibits those dealers (and there is only one such dealer presently doing business in San Francisco) from selling "enhanced-lethality ammunition," which San Francisco defines as ammunition that

> "(1) Serves no sporting purpose;
>
> "(2) Is designed to expand upon impact and utilize the jacket, shot or materials embedded within the jacket or shot to project or disperse barbs or other objects that are intended to increase the damage to a human body or other target (including, but not limited to, Winchester Black Talon, Speer Gold Dot, Federal

> Hydra-Shok, Hornady XTP, Eldorado Starfire, Hollow Point Ammunition and Remington Golden Sabre ammunition; or
>
> "(3) Is designed to fragment upon impact . . . ."  S.F. Police Code § 613.10(g).

While prohibiting the single ammunition dealer in San Francisco from selling this ammunition, San Francisco does not prohibit residents from purchasing it elsewhere, including online for mail order, and carrying it into San Francisco.

In 2011, San Francisco adopted findings in support of its Ammunition Ordinance.  S.F. Police Code § 613.9.5.  The findings state that enhanced-lethality ammunition is more likely to seriously wound or kill a person who is hit by it than conventional ammunition.  *Id.* § 613.9.5(2).  San Francisco also found that enhanced-lethality ammunition has been prohibited in warfare by the Hague Convention since 1899.  *Id.* § 613.9.5(4).  Finally, San Francisco determined that enhanced-lethality ammunition is not necessary for self-defense, and that the right of self-defense can be fully exercised without employing this ammunition.  *Id*.

## SUMMARY OF ARGUMENT

*District of Columbia v. Heller* held that the Second Amendment guarantees and individual right to keep and bear arms for purposes of self-defense.  554 U.S. 570 (2008).  But the Supreme Court took care to make clear that the right to bear arms is not unlimited, and courts assessing Second Amendment cases since *Heller* have allowed reasonable government regulation of guns to continue by adopting flexible tests that take into account the degree of burden the government has placed on the right to bear arms in choosing a standard of scrutiny.  Where a law does not make armed self-defense impossible or extremely difficult, nearly all courts have analyzed that law under intermediate scrutiny, and some apply only rational basis scrutiny unless the law substantially burdens the right to keep and bear arms.

This Court should adopt rational basis or intermediate scrutiny here and uphold both of the laws that the NRA challenges. San Francisco's storage law bears a substantial relationship to the compelling government interest in public safety by helping prevent the misuse of guns by unauthorized people. Yet it places only a minimal burden on gun owners, allowing them to carry their handguns in their homes as often as they like, and requiring only that they lock their guns away when they are not carrying their guns. As the district court noted, this was precisely the right sought by Dick Heller in the Supreme Court case: the right to unlock his gun when he needed it for armed self-defense.

San Francisco's ammunition ordinance also passes muster. As a threshold matter, Plaintiffs lack standing to challenge it because they do not claim that they incur any difficulty, burden, or expense in obtaining enhanced-lethality ammunition from gun dealers other than the one located in San Francisco. But even if this Court finds that they have standing, the district court's factual determination that they have shown no burden either on their ability to obtain this ammunition or on their ability to defend themselves are not clearly erroneous. Because any burdens on Plaintiffs imposed by the ammunition ordinance are *de minimis*, the Court should either uphold the ordinance under rational basis scrutiny or find that it, too, substantially advances San Francisco's interest in reducing shooting fatalities. The district court did not abuse its discretion, and this Court should affirm its order denying the NRA a preliminary injunction.

## ARGUMENT

## I.     Standard of Review for Preliminary Injunction Motions.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 24 (2008). "A

plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Under this Circuit's sliding-scale test, where the plaintiff has shown a likelihood of irreparable harm and that an injunction is in the public interest, he may obtain an injunction upon a showing of "serious questions going to the merits . . . and [that] the balance of hardships tips sharply in plaintiff's favor." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).

A district court's decision to deny a preliminary injunction "is subject to limited and deferential review." *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc) (internal quotation marks omitted) (overruled in part on other grounds). A denial of a preliminary injunction is overturned only where the district court has abused its discretion by applying "an erroneous legal standard" or has made "clearly erroneous findings of fact." *Lands Council*, 537 F.3d at 986-87 (internal quotation marks omitted).

## II.     San Francisco's Storage Ordinance Does Not Infringe Plaintiffs' Second Amendment Rights.

The NRA invites this Court to be the first in the country to adopt a rigid, historical approach to the Second Amendment that invalidates all gun laws lacking direct Framing-era antecedents. The Court should reject the invitation and instead join the overwhelming majority of circuits recognizing that reasonable restrictions on the possession and use of guns, updated to fit current needs, are fully consistent with the right to keep and bear arms. Under the majority approach, courts consider the degree of burden a law imposes on the ability to possess guns and use them for

self-defense.  The greater the burden, and the more directly a law regulates the core of the Second Amendment right, the greater scrutiny the law must withstand. Applying that test, San Francisco's storage ordinance is constitutional.  It places no burden at all on San Franciscans who wish to *keep or bear* loaded handguns in their home, and requires only that San Franciscans lock their handguns while not carrying them (either in hand or holstered).  It is no more burdensome than laws of other jurisdictions—and even the NRA admits that locked storage is a burden the government can require at least some gun owners to bear.  Because San Francisco's storage requirement serves the compelling public safety interest of preventing handgun thefts and misuse, while leaving ample opportunity for San Franciscans to use their handguns for lawful purposes, it withstands any level of scrutiny this Court could plausibly apply.

### A.     This Court should scrutinize firearms restrictions in proportion to the burdens they impose.

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation."  554 U.S. 570, 592 (2008).  Accordingly, when confronted with a District of Columbia ordinance that "totally ban[ned] handgun possession in the home" and required "that firearms in the home be rendered and kept inoperable at all times," even in emergencies, the Court held that laws banning the use of firearms in self-defense are barred by the Second Amendment.  *Id.* at 628-30.  But it did not prescribe a level of scrutiny or method for analyzing gun control laws. *Id.* at 628, 634.  *Heller* also affirmed that "the right secured by the Second Amendment is not unlimited."  *Id.* at 625.  Indeed, *Heller* lists a host of regulations that withstand Second Amendment scrutiny, and it expressly cautions against

applying its reasoning to invalidate firearm storage laws. *Id.* at 626-27, 632. *Heller* also states that its analysis does not "suggest the invalidity of laws regulating the storage of firearms to prevent accidents" because such laws "do not remotely burden the right of self-defense as much as an absolute ban on handguns." *Id.* at 632.

In *McDonald v. City of Chicago*, the Supreme Court held that the Second Amendment is incorporated against States. 561 U.S. --, 130 S. Ct 3020, 3050 (2010) (plurality opinion); *id.* at 3059 (Thomas, J., concurring). *McDonald* reaffirmed that the Second Amendment right is subject to reasonable state and local regulations. *Id.* at 3047 (plurality) ("It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' . . . We repeat those assurances here.").

The Ninth Circuit has not yet issued a binding decision articulating the standard of review for analyzing Second Amendment challenges. But this Court, sitting en banc, has determined that a county ordinance "regulat[ing] the sale of firearms . . . *only minimally*, and only on County property" was constitutional under any applicable standard of review. *Nordyke v. King*, 681 F.3d 1041, 1044 (2012) (en banc), *cert. denied*, 133 S. Ct. 840 (2013) (emphasis added). This Court has also recognized that the Second Amendment must be interpreted in light of its prefatory clause, which states that the amendment's purpose is "to maintain 'the security of a free State,'" *United States v. Vongxay*, 594 F.3d 1111, 1117 (9th Cir. 2010)[3] (quoting U.S. Const. amend. II), and which refers to a "'well-regulated

---

[3] *Vongxay* held that a federal law prohibiting felons from possessing a firearm, 18 U.S.C. § 922(g)(1), does not violate the Second Amendment. 549 F.3d at 1118.

Militia,'" indicating that the Second Amendment tolerates "'[r]easonable restrictions'" on firearms. *Id*. (quoting U.S. Const. amend. II and *Parker v. Dist. of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), *aff'd sub nom*, *Heller*, 554 U.S. 570. Thus, the Ninth Circuit has already recognized both that the degree to which a law burdens the Second Amendment right matters to analyzing that law, and that allowing reasonable restrictions on firearms in the interest of public security comports with the amendment's text.

This Circuit's commonsense recognition that the Second Amendment brooks reasonable firearms restrictions is consistent with the overwhelming consensus among circuit courts. The circuits have adopted a two-step test, first asking whether the law implicates conduct within the Second Amendment's scope, as it has historically been understood. *See, e.g.*, *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) ("*Heller II*"). If the law in fact burdens Second Amendment rights, the circuits next employ a sliding-scale approach to consider what level of scrutiny is appropriate based on the severity of the burden imposed by the law and on whether the regulated conduct is at the core of the Second Amendment right. *Id.* at 1257 (degree of scrutiny "'depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right'") (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)). Employing this approach, every Court of Appeals to have considered a gun restriction falling short of a prohibition on armed self-defense has applied something less than strict scrutiny. *See, e.g.*, *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011) *cert. denied*, 132 S. Ct. 1538 (2012) (applying intermediate scrutiny to prohibition on gun ownership by domestic violence misdemeanants, 18 U.S.C. § 922(g)(9)) ; *Kachalsky v. County of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012) (applying intermediate scrutiny to ban on public carrying of firearms absent

proper cause); *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) (applying intermediate scrutiny to statute prohibiting possession of handgun with obliterated serial number); *United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011) (applying intermediate scrutiny to prohibition on loaded firearms in cars in national parks); *NRA v. Bureau of Alcohol, Tobacco & Firearms*, 700 F.3d 185, 205-07 (5th Cir. 2012) (applying intermediate scrutiny to prohibition on commercial handgun sales to people under 21); *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (en banc) (finding a "substantial relation" between the important government objective of "preventing armed mayhem" and 18 U.S.C. § 922(g)(9)); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny to prohibition on possession by persons subject to domestic violence protection order)*; Heller II*, 670 F.3d at 1257, 1261-62 (applying intermediate scrutiny to stringent firearms training requirements and prohibitions on possessing assault weapons or high-capacity magazines).

Indeed, of the circuits that have articulated a standard of scrutiny for Second Amendment claims since *Heller*, all of them except one have applied intermediate scrutiny or less in *every* post-*Heller* Second Amendment case they have decided.[4]

---

[4] The Seventh Circuit is the outlier.  In *Ezell*, the circuit applied "not quite strict scrutiny" to Chicago's prohibition on live-fire training ranges—in part because Chicago required residents to undergo such training to obtain a license to possess firearms at all.  651 F.3d 684, 704-05, 708(7th Cir. 2011).   The circuit also invalidated Illinois's total ban on any carrying of firearms in public, without articulating what standard of scrutiny it applied.  *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012).  As noted above, however, the en banc Seventh Circuit applied only intermediate scrutiny to the federal statute prohibiting gun possession by domestic violence misdemeanants.  *Skoien*, 614 F.3d at 642.

The Sixth, Eighth and Eleventh Circuits have not articulated a standard of scrutiny for Second Amendment claims.  *See United States v. Greeno*, 679 F.3d 510, 518, 520 n.2 (6th Cir. 2012) ; *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012); *United States v. Bena*, 664 F.3d 1180, 1182-84 (8th Cir. 2011).

In a now-vacated opinion in *Nordyke v. King*, a panel of this circuit embraced a variation of this sliding-scale approach, finding that only laws imposing a "substantial burden" on the right to keep and bear arms for self-defense incur any scrutiny at all; laws imposing less than a substantial burden garner no scrutiny at all.  644 F.3d 776, 784, *vacated by* 664 F.3d 774 (9th Cir. 2011).  The Second Circuit has adopted this approach.  *United States v. DeCastro*, 682 F.3d 160, 164 (2d Cir. 2012) ("We hold that heightened scrutiny is appropriate *only* as to those regulations that substantially burden the Second Amendment.") (emphasis added).  Moreover, under the Second Circuit's view, even regulations that "substantially burden" a Second Amendment right may be subject to intermediate rather than strict scrutiny.  *Kachalsky*, 701 F.3d at 93.[5]  The Second Circuit's test, although eschewing any review at all for restrictions that insubstantially burden Second Amendment rights, is more similar than dissimilar to the majority sliding-scale approach.  As *DeCastro* noted, the substantial-burdens test resembles the test adopted by other circuits in that it applies varying degrees of scrutiny to gun regulations based on the degree of burden, and other circuits have acknowledged that gun laws that do not "'meaningfully affect individual self-defense'" are not subject to heightened scrutiny.  682 F.3d at 166 (quoting *Heller II*, 670 F.3d at 1253, 1260, and citing *Marzzarella*, 614 F.3d at 94-95).

The majority approach to laws that regulate the use of guns rather than prohibit their use, applying a degree of scrutiny "proportionate to the severity of the burden that the law imposes," *NRA*, 700 F.3d at 198, is correct, and this Circuit should adopt it.  A flexible approach to the Second Amendment is consistent with

---

[5] Two judges of this Circuit have indicated they would also adopt this approach, combining the substantial burdens test with intermediate scrutiny. *Nordyke*, 681 F.3d at 1046 (Ikuta, J., concurring, joined by Callahan, J.).

the Supreme Court's guidance in *Heller* and *McDonald*. *Heller* applied a categorical approach to a law that banned any operable firearms in the home. But *Heller* recognized that the Second Amendment is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. Its list of "presumptively lawful" regulatory measures, *id.* at 627 n.26, is not merely a list of historically pedigreed gun restrictions, since some of the measures on its list are of recent vintage. *Skoien*, 614 F.3d at 640. Instead, this "passage signals 'that the legislative role did not end in 1791.'" *Id.* *McDonald*, too, indicates that governments retain flexibility in meeting modern challenges posed by firearms. "*McDonald* emphasized that the Second Amendment 'limits[,] but by no means eliminates,' governmental discretion to regulate activity falling within the scope of the right." *Ezell*, 651 F.3d at 703 (quoting *McDonald*, 13 S. Ct. at 3046 (plurality)) (brackets in original).

The flexible majority approach is also consistent with a historical understanding of the Second Amendment. "State regulation under the Second Amendment has always been more robust than of other enumerated rights." *Kachalsky*, 701 F.3d at 100. "For example, no law could prohibit felons or the mentally ill from speaking on a particular topic or exercising their religious freedom. . . . Not so with regard to the Second Amendment." *Id.* As the Fifth Circuit has explained:

> "The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding a variety of gun safety regulations were on the books; these included gun safety laws regulating the storage of gun powder, laws keeping track of who in the community had guns, laws . . . requiring militia members to attend 'musters,' public gatherings where officials would inspect and account for guns . . ., law prohibiting the use of firearms on certain occasions and in certain places, and laws disarming certain groups and restricting sales to certain groups." *NRA*, 700 F.3d at 200.

Indeed, so pervasive were historic gun regulations that the Fifth Circuit concluded, "[s]ince even before the Revolution, gun use and gun control have been *inextricably intertwined*." *Id.* (emphasis added). "It appears that when the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee." *Id.* Applying strict scrutiny to all gun laws cannot be squared with this expectation.

### B. The storage ordinance should be evaluated under rational basis review or intermediate scrutiny.

San Francisco's storage ordinance allows residents to carry their handguns in the home at all times, including in a holster,[6] and only requires locked storage when a handgun is not carried. S.F. Police Code § 4512. It allows residents to maintain their handguns loaded. And it does not affect residents' ability to keep their long guns unlocked, whether loaded or not. The district court aptly noted that the storage ordinance provides Plaintiffs here with "exactly the relief the *Heller* plaintiff sought and obtained, or even more": the right "'to render a firearm operable and carry it about his home in that condition only when necessary for self-defense.'" ER 3 & n.2 (quoting *Heller*, 554 U.S. at 576).[7] The district court noted that the *only* burden on self-defense that the NRA identified as caused by the storage ordinance was "the possibility that in a very narrow range of circumstances, the delay inherent in rendering a handgun operable or in retrieving

---

[6] San Francisco Police Code § 4512 does not mention holsters, but one can carry with a holster as well as with hands. *See Muscarello v. United States*, 524 U.S. 125 (1998).

[7] Indeed, if it were unlawful to require a gun to be locked except during a self-defense emergency, *Heller* would not have needed to reach the question whether the District of Columbia ordinance had a self-defense exception.

it from a locked container theoretically could impair a person's ability to employ it successfully in self-defense."  ER 7-8.

The evidence presented to the district court demonstrated that this possibility is very slight indeed.  The time needed to open a lockbox to obtain a loaded gun is minimal—a few seconds at most.  ER 92-93.[8]  There is no empirical study anywhere demonstrating that locked storage requirements impair self-defense or endanger gun owners, ER 89, yet many studies show these requirements save lives. ER 84-86.  And as San Francisco's ordinance notes, in some cases the locked-storage requirement could *increase* ready access to a loaded gun:  "Portable lockboxes can store loaded weapons such that they are always within easy reach on counters, tables or nightstands.  Such safely stored weapons are more quickly and easily retrieved for use in self-defense than unlocked guns that have been hidden away in seldom-used locations."  *Id.* at § 4511(7)(c).

Indeed, while the NRA makes vague claims that the storage ordinance burdens gun owners "at *all* times," NRA's Br. at 39 (emphasis in original), this is a wild exaggeration.  The only concrete example the NRA provides of when San Francisco's storage ordinance might interfere with the ability of a handgun owner to use a handgun for self-defense is at night, if the owner is asleep and must awaken and then unlock the gun from a bedside lockbox.  NRA's Br. at 30.  The NRA claims that this is the most common self-defense scenario.  But this is pure speculation based solely on one statistic about the rate of nighttime burglaries.[9]  By

---

[8] The City's evidence included results of a test with a biometric gun lockbox that opens instantly when the owner's fingerprints touch a scanner.  The operation of that very lockbox is demonstrated in a video available at http://www.youtube.com/watch?v=3sR9r_4VjmE (accessed Mar. 4, 2013), cited to the district court at ER 104.  The video's demonstration of the fast and simple fingerprint scan access process begins at minute 6.

[9] Moreover, the NRA's statistics are unpersuasive.  It speculates that nighttime armed self-defense is a common occurrence based on a single statistic

contrast, San Francisco presented evidence that there was no empirical support for the proposition that storing unlocked guns in homes makes occupants safer. ER 88-89. The district court therefore did not clearly err in arriving at the factual conclusion that San Francisco's storage ordinance could make armed self-defense marginally more difficult in only a narrow range of circumstances.

In fact, *Heller* itself makes clear that the burden imposed by gun-storage laws is modest and readily justified. *Heller* discusses Founding-era gunpowder storage laws, one of which prohibited loaded firearms in any building, including dwellings, and several of which prohibited the storage of gunpowder in buildings, presumably to reduce fires. 554 U.S. at 631-32. Although *Heller* rejected the contention that these laws justified the District of Columbia's broad prohibition on handguns and unlocked long guns, *Heller* nonetheless noted that storage laws "do not remotely burden the right to self-defense as much as an absolute ban on handguns." *Id.* at 632.[10] The Supreme Judicial Court of Massachusetts made the same point when it affirmed the constitutionality of Massachusetts's locked-storage law, notwithstanding allegations that the law delayed access to guns for self-defense. "Any law regulating the storage of firearms will delay to some

---

that nighttime burglaries are the most common burglaries of occupied homes. NRA's Br. at 33. But speculation to the contrary is equally plausible: Empirical research indicates that burglary rates are driven upwards in part by the availability of guns—because guns are "attractive loot" for criminals. ER 87. If burglars knew that guns in San Francisco were safely locked away at night, perhaps they would be less likely to break in to try to steal them.

The NRA also speculates that locking devices sometimes fail. But it presents no evidence that this happens with any regularity.

[10] The NRA claims that *Heller*'s statement about the presumptive validity of storage ordinances should be interpreted as applying only to *certain* storage laws, like those that impose retrospective liability on gun owners whose guns are obtained by children. NRA's Br. at 33 & n.8 Certainly *Heller* does not specify this. But in any event, the NRA's admission that those storage laws are constitutional fatally undermines its claim that San Francisco's is invalid, a point we discuss *infra* in Section II.D.

degree the ability of a firearm owner to retrieve and fire the firearm in self-defense. If such a brief period of delay were sufficient to render the law unconstitutional, the Supreme Court in *Heller* would not have declared that its analysis did not suggest the invalidity of firearm storage laws." *Commonwealth v. McGowan*, 982 N.E.2d 495, --, 464 Mass. 232, 233-34 (2013).[11]  Indeed, the Massachusetts high court found that modern locking devices allow much quicker access to firearms than Founding-era laws:

> "'[E]ven if a firearm were secured in the manner required by [the Massachusetts storage law], a gun owner threatened in his or her home today would be able to fire the weapon in self-defense at least as quickly as would a gun owner in 1791, when the Second Amendment was adopted.  At that time, laws were in effect requiring that gunpowder be stored separately from firearms, which meant that a law-abiding homeowner acting in self-defense would need time to load and fire a musket or flintlock pistol.  A skilled soldier of that time using specially prepared cartridges required a minimum of fifteen to twenty seconds to load and fire a musket; a less skilled solider could fire no more quickly than once per minute.  A gun owner today could remove a firearm from a locked container or release a trigger lock more quickly than that.'"

*Id.* at --, 234 n.8 (quoting *Commonwealth v. Runyan*, 922 N.E.2d 794, 799 n.8, internal citations omitted).

        In light of the modest burden that storage ordinances impose, every court to have evaluated their constitutionality after *Heller* has upheld them either on their face or as applied, without subjecting them to any degree of heightened scrutiny. *See McGowan*, 982 N.E.2d at --, 464 Mass. at 243-44 (Massachusetts storage law falls outside the scope of the Second Amendment because it imposes a minimal burden and prevents unauthorized users from accessing firearms); *Commonwealth*

---

[11]  Contrary to the NRA's assertions, Massachusetts's law is just as restrictive of handguns as San Francisco's storage law, and Massachusetts is more restrictive in applying its storage law outside the home and requiring locked storage of long guns.  *See infra* at 33-34.

*v. Reyes*, 982 N.E.2d 504, --, 464 Mass. 245, 257 (2013) (storage statute is constitutional as to firearms left in cars); *Commonwealth v. Patterson*, 946 N.E.2d 130, 133 (Mass. App. Ct. 2011) (storage statute constitutional as applied to a defendant in his home); *Tessler v. City of New York*, 952 N.Y.S.2d 703, 716 (N.Y. Sup. Ct. 2012) (New York City locked-storage ordinance was constitutional because a gun owner could easily unlock his handgun for "immediate use").

If this Court adopts the *DeCastro/Kachalsky* approach, it should affirm San Francisco's storage ordinance as well.  Under this approach, only gun laws that "substantial[ly] burden" the ability to use firearms for self-defense trigger heightened scrutiny, as opposed to laws that impose "marginal, incremental, or even appreciable restraint[s] on the right to keep and bear arms."  *DeCastro*, 682 F.3d at 166.  If "adequate alternatives remain for law abiding citizens" to use their firearms for self-defense, then there is no substantial burden.  *Id.* at 168.  Because San Francisco's ordinance creates no more than a "possibility that in a very narrow range of circumstances" immediate access to a gun could be delayed, ER 8, it does not impose a substantial burden and is constitutional under rational basis review.

Even if the Court does not embrace the Second Circuit's "substantial burdens" test but instead adopts the sliding-scale approach of the First, Third, Fourth, Fifth, Seventh, Tenth and D.C. Circuits, it should apply no more than intermediate scrutiny to San Francisco's storage ordinance in light of the minimal burdens it imposes.  *NRA*, 700 F.3d at 198 (degree of Second Amendment scrutiny must be "proportionate to the severity of the burden that the law imposes"); *Heller II,* 670 F.3d at 1253, 1260 ("we determine the appropriate standard of review by assessing how severely the prohibitions burden the Second Amendment right"); *Masciandaro,* 638 F.3d at 470 (to determine standard of review, "we would take into account the nature of a person's Second Amendment interest, the extent to

which those interests are burdened by government regulation, and the strength of the government's justifications for the regulation").

Where a law is "neither designed to nor has the effect of prohibiting the possession of any class of firearms, it is more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights" and subject only to intermediate scrutiny. *Marzzarella*, 614 F.3d at 97. This is true even where the law applies in the home. Laws that "make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home" receive only intermediate scrutiny under this approach, so long as they do not "prevent[] an individual from possessing a firearm in his home or elsewhere." *Heller II*, 670 F.3d at 1255, 1258 (evaluating ordinance requiring training and testing before permitting registration of firearms); *see also Marzzarella*, 614 F.3d at 94, 97 (applying intermediate scrutiny to uphold prohibition on handguns with obliterated serial numbers despite the fact that it "implicates [the possessor's] interest in the defense of hearth and home"); *NRA*, 700 F.3d at 206-07 (applying intermediate scrutiny to law that made it more difficult for young adults to obtain handguns by prohibiting commercial purchases). San Francisco's ordinance does not prohibit the possession of firearms, and it has, at most, only a modest effect on gun owners' ability to use handguns in the home. It should be subject to nothing more than intermediate scrutiny.

Indeed, even laws that disarm entire classes of people, based on legislative predictions that those people are more likely to misuse guns than others, are evaluated only under intermediate scrutiny in some circumstances. For instance, people convicted of domestic violence misdemeanors may be completely disarmed because the government's interest in preventing armed violence in the future is

reasonably related to such a prohibition. *Skoien*, 614 F.3d at 641-42; *Booker*, 644 F.3d at 25. This is so even though the domestic violence gun prohibition only dates to 1996 and is plainly not a "longstanding" or historic gun control, and even though the prohibition not merely impairs but entirely precludes armed self-defense in the home by affected individuals. *Id.* at 23-25. If the government's creation of a new class of misdemeanants to be completely disarmed is evaluated under intermediate scrutiny, then surely a law that impedes the use of a handgun for a few seconds at most must be evaluated under no more demanding a test.

The NRA will no doubt try to distinguish these broad prohibitions on gun possession on the grounds that they have historic antecedents, that disarming violent misdemeanants is similar to disarming violent felons. But the historical record is actually far more mixed. Scholars dispute whether or not governments in the Founding era disarmed felons or the mentally ill at all. *Chester*, 628 F.3d at 679 ("the historical evidence and scholarly writing on whether felons were protected by the Second Amendment at the time of its ratification [are] inconclusive"); *Booker*, 644 F.3d at 24 n.13. Even if disarming felons was the Founding-era rule, it is extremely improbable that the founders disarmed people who were merely "reckless" in causing harm to loved ones, yet reckless harm is all that is required to be disarmed as a domestic violence misdemeanant. *Booker*, 644 F.3d at 21. And the Ninth Circuit eschewed any discussion of history at all in approving a law disarming drug users, instead relying exclusively on policy concerns. *United States v. Dugan*, 657 F.3d 998, 999-1000 (9th Cir. 2011) ("Like our sister circuits, we see the same amount of danger in allowing habitual drug users to traffic in firearms as we see in allowing felons and mentally ill people to do so. . . . Because Congress may constitutionally deprive felons and mentally ill

people of the right to possess and carry weapons, we conclude that Congress may also prohibit illegal drug users from possessing firearms.").

Thus, it is unclear that history justifies classwide arms prohibitions at all. As this Court's discussion in *Dugan* suggests, an explanation that the Second Amendment allows legislatures to adopt commonsense gun restrictions to prevent harm is a far better fit for the results in these cases. But if it is history that justifies the complete disarmament of reckless domestic abusers or substance abusers, it only does so "[a]t a high level of generality," where the historic tradition is described not as the disarmament of the same people the Framers would have disarmed but instead as "a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety." *NRA*, 700 F.3d at 203. And if that is the level of generality that courts should use for historical analysis, then Framing-era laws requiring guns to be unloaded inside buildings, or requiring gunpowder to be stored separately from guns, *Heller*, 554 U.S. at 631, plainly support a modern requirement to lock up handguns when they are not in use, and justify applying no more than intermediate scrutiny to that requirement.

### C. The storage ordinance is constitutional under intermediate scrutiny.

Retired Justice O'Connor, in an opinion for the Second Circuit, recently noted that legislative judgments about access to guns "require a delicate balance between individual rights and the public interest." *Osterweil v. Bartlett*, No. 11-2420-CV, -- F.3d --, 2013 WL 322884, at *2 (2d Cir. Jan. 29, 2013). "The regulation of firearms is a paramount issue of public safety, and recent events in this circuit are a sad reminder that firearms are dangerous in the wrong hands. *See*

James Barron, *Gunman Massacres 20 Children at School in Connecticut; 28 Dead, Including Killer*, N.Y. Times, Dec. 15, 2012, at A1." *Id.*

Preventing access to handguns by unauthorized or dangerous users is precisely the public safety interest that San Francisco's storage ordinance serves. S.F. Police Code § 4511(5); *see also Reyes*, 982 N.E.2d at 250-51 (Massachusetts storage ordinance "was intended to prevent accidental injuries and deaths resulting from firearms falling into the hands of children and other unauthorized users"). There is no doubt that this is a strong government interest. *See, e.g., Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994).

Under the intermediate scrutiny test, the storage ordinance need only bear a substantial relationship to that important interest. *Skoien*, 614 F.3d at 642. "[I]ntermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question." *Masciandaro*, 638 F.3d at 474. Nor is San Francisco required to prove that its legislative judgments are empirically correct. Instead, courts defer to legislative judgments about whether a measure is substantially related to a compelling state goal. *Kachalsky*, 701 F.3d at 97; *see also United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012).

San Francisco's storage ordinance readily passes that test. While lawful handgun owners can quickly retrieve their guns in the event of an emergency using biometric scanners, electronic keypads, mechanical combination locks, or keys, a locked storage requirement prevents unauthorized users such as children, untrained or prohibited adults, visitors, and thieves from accessing and misusing guns. The NRA itself, and other groups such as the American Academy of Pediatrics, have recommended locked storage as a way to reduce access to guns by unauthorized users. ER 79. This commonsense intuition is confirmed by social science

research, which shows that reducing the immediate availability of guns to unauthorized users is likely to reduce gun deaths, ER 85-86, 89, and to reduce gun thefts and the number of guns flowing into the black market, ER 86-88.

Indeed, although the NRA claims that San Francisco's storage ordinance "cannot survive *any* heightened scrutiny," NRA's Br. at 39, it offers only the most tepid arguments that the measure fails intermediate scrutiny. It complains that requiring locked storage makes gun owners less safe because it hinders access to handguns when they are needed. Br. at 37. This is merely a disagreement with San Francisco's empirically-supported legislative judgment, not a reason to invalidate the ordinance.

Next, the NRA suggests that keeping firearms away from children and criminals may not serve any compelling governmental interest at all. NRA Br. at 37 ("*[e]ven assuming* the government interest in keeping firearms away from . . . unsupervised children or felons is sufficient," the storage ordinance is nonetheless unlawful) (emphasis added). This suggestion deserves no response and only demonstrates how extreme the NRA's position is in this case.

Finally, the NRA argues that the ordinance is not narrowly tailored enough because it applies even when children or unauthorized users are not present. But it is difficult to predict in advance which homes will be broken into and which unlocked guns will be stolen. A rule requiring locked storage when guns are not in use may help to make locking guns a habit and a norm, increasing the chances that residents will comply with the law. And while San Francisco could have confined its ordinance to homes where children are sometimes or often present, children are not the only unauthorized users of guns, or the only people who can cause harm with guns. In any event, the legislature's approach need not be either "'narrowly tailored' or the least restrictive available means," and the fit between means and

goals "need only be substantial, 'not perfect.'"  *Kachalsky*, 701 F.3d at 97 (quoting *Marzzarella*, 614 F.3d at 97).  Because the storage ordinance bears a substantial relationship to San Francisco's compelling public safety interests, it is constitutional under intermediate scrutiny.

>    **D.    The NRA's admission about the constitutionality of other storage ordinances defeats its attack on San Francisco's.**

Perhaps because *Heller* itself disavows any invalidation of safe-storage laws, 554 U.S. at 632, the NRA takes great pains to distinguish San Francisco's ordinance from a series of state gun-storage laws that it admits are constitutional. NRA Br. at 37.  Although they vary in their particulars, these laws create criminal liability where a person fails to secure a gun and he knows or should know a child may gain access to it.  Sometimes these laws create liability merely where a gun is unlocked and it is foreseeable that a child may obtain it.  *See* Fla. Stat. Ann. § 790.174(a); Haw. Rev. Stat. § 134-10.5; Md. Code Ann. § 4-104(c); Minn. Stat. Ann. § 609.666(2).  More often they require that some incident involving a child actually occur for liability to attach.  *See* Cal. Penal Code § 25100; 720 Ill. Comp. Stat. 5/24-9(a); Iowa Code § 724.22(7); N.C. Gen. Stat. Ann. § 14-315.1(a); N.H. Rev. Stat. § 650-C:1(III); N.J. Stat. Ann. § 2C:58-15(a); R.I. Gen. L. § 11-47-60.1(b); Tex. Penal Code Ann. § 46.13.[12]

The NRA's admission that these ordinances are constitutional eviscerates its claim to a preliminary injunction here.  This is so first because the NRA has admitted that at least some people—those who can or should foresee that a child will obtain their unlocked guns—can constitutionally be required to lock their

---

[12] The statutes cited in this paragraph are available in the addendum to the NRA's brief, and are cited as lawful at page 33, footnote 8 of that brief.

guns.  Because even the NRA admits that a locked-storage requirement has at least some constitutional applications, such a requirement cannot be invalidated in the facial challenge the NRA mounts here.  ER 554-55 (prayer for relief).  Instead, to successfully mount a facial challenge, "the challenger must establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  "[A] facial challenge must fail where the statute has a plainly legitimate sweep."  *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449 (2008) (internal quotation marks omitted).  Courts considering facial Second Amendment challenges have held plaintiffs to these standards.  *See, e.g., Booker*, 644 F.3d at 22.  Thus, because the NRA admits that a locked-storage requirement may lawfully apply to people who know or should know a child is likely to access their guns, its request to enjoin all enforcement of San Francisco's ordinance must fail.[13]

Second and more importantly, the NRA's admission demonstrates that it is permissible for the government to restrict the storage of guns to serve public safety ends.  This is apparent from consideration of the similarities and differences between San Francisco's ordinance and those statutes that the NRA admits are lawful.

The chief and critical similarity is that under both kinds of enactments, at least some people are required to store their guns locked when they are not using their guns.  For all of those people, the modest burden imposed by the law is the same.  While NRA-approved statutes regulate fewer people than San Francisco's ordinance, those who are regulated by either enactment are burdened in their

---

[13] Nor can Plaintiffs here obtain an injunction prohibiting enforcement of the storage law against they; they have submitted no evidence about whether children are sometimes or often present in their homes.  ER 161-86.

ability to use a gun for self-defense in the same way: they must secure their gun while not carrying it.  What this demonstrates is that—contrary to the NRA's assertion that any burden on the ability to defend oneself in the home is categorically intolerable under the Second Amendment—people can be required to lock their guns when not using them if the government has a good enough reason to impose that requirement.  In short, this right *can* be overcome by public safety interests.

As for differences between NRA-approved statutes and San Francisco's ordinance, there certainly are some, but they simply reflect different policy judgments of the kind that San Francisco is permitted to make.  The first difference is that many of these statutes attach liability only where a particular consequence occurs (such as a child misusing a gun), while San Francisco requires people to store their guns safely regardless of whether any particular consequence occurs from not doing so.  But this is not a significant difference.  The NRA has cited with approval some laws that do not require a child to actually obtain the gun for the gun owner to be liable, Fla. Stat. Ann. § 790.174(a); Haw. Rev. Stat. § 134-10.5; Md. Code Ann. § 4-104(c); Minn. Stat. Ann. § 609.666(2); and the law does not generally distinguish between restricting rights prospectively and imposing retroactive liability for particular consequences.  For example, in the First Amendment context, a law forbidding speech is treated the same as a law that imposes tort liability where speech harms someone.  *See Snyder v. Phelps*, -- U.S. --, 131 S. Ct. 1207, 1215 (2011).

The second difference is that the statutes the NRA admits are constitutional protect only against the danger of *children* accessing guns, while San Francisco has made the policy judgment that children are not the only unauthorized users in whose hands a gun is dangerous.  Surely this is not a controversial proposition.

The fact that federal law disarms the mentally ill, felons, domestic violence misdemeanants, substance abusers, and others, 18 U.S.C. § 922(g), makes plain that a complete list of unauthorized users goes beyond children. And San Francisco's ordinance protects against gun thefts, which in turn lead to guns in criminal hands, ER 86-88, in a way that the NRA-approved statutes do not. This, too, is a permissible policy judgment.

The final difference between the NRA-approved statutes and San Francisco's ordinance is that the former create liability for dangerous storage practices only where the gun owner knows or should know that a child is likely to access the gun, while the latter requires locked storage unless the gun is being carried, regardless of the foreseeability of access by an unauthorized user. But this, too, simply reflects a justifiable policy choice. In San Francisco's legislative judgment, plenty of harms from the misuse of guns, such as thefts, are impossible to foresee, and furthermore, people are not always very good judges of what kind of consequences are reasonably likely to occur when they keep their guns unlocked. In light of research showing that 2.6 million children in this country live in homes where guns are stored unlocked and either loaded or unloaded but with ready-at-hand ammunition,[14] San Francisco's determination that some gun owners do not always exercise sound judgment about gun storage is hardly capricious. It is hard to imagine a consequence worse for a gun owner than losing a child to a gun accident, and hard to believe that criminal liability would have any greater deterrent effect than the prospect of such a tragic event. But nonetheless millions of parents do not lock their guns, and children continue to die in preventable gun

---

[14] M. Schuster et al., "Firearm Storage Patterns in U.S. Homes with Children," 90 Am. J. Pub. Health 588, 590 (Apr. 2000) (http://www.rand.org/content/dam/rand/pubs/reprints/2005/RAND_RP890.pdf).

accidents.  Indeed, in the less than three months since the Newtown tragedy,

published reports indicate that at least 19 children have died in accidental

shootings.[15]  San Francisco does *not* claim that its ordinance would have prevented

_____

[15] J. Szerlag, "State Police: Gun used by 3-year-old who accidentally shot and killed himself was not deputy's duty weapon," MLive.Com, Mar. 4, 2013 (http://www.mlive.com/news/jackson/index.ssf/2013/03/deputies_4-year-old_son_who_ac.html) (accessed Mar. 5, 2013) ; K. Taylor, "9-year-old dies from injuries in accidental shooting," Feb. 26, 2013 (http://www.fox19.com/story/21388316/sebastian-swartz-9-dies-from-injuries-in-accidental-shooting) (accessed Mar. 5, 2013); J. Fraser, "4-year-old killed himself with dad's gun in N. Houston," Houston Chronicle, Feb. 25, 2013 (http://www.chron.com/news/houston-texas/houston/article/4-year-old-killed-by-gunfire-in-N-Houston-4304104.php) (accessed Mar. 5, 2013); T. Tsiaperas, "Police say fatal shooting of 3-year-old boy appears to be accidental," Feb. 20, 2013 (http://www.dallasnews.com/news/local-news/20130220-police-say-fatal-shooting-of-3-year-old-garland-boy-appears-to-be-accidental.ece) (accessed Mar. 5, 2013); "Sheriff's office IDs girl killed at Bazine home," Hutchinson, Kansas News, Feb. 18, 2013 (http://hutchnews.com/Localregional/Sheriff-identify-victim-of-Ness-Co-shooting) (accessed Mar. 5, 2013); "4-year-old killed in accidental shooting identified," Fox 54 Augusta, Feb. 12, 2013 (http://www.wfxg.com/story/21112300/police-4-year-old-killed-playing-with-gun) (accessed Mar. 5, 2013); T. Faulkner, "Man arrested after accidentally shooting, killing child," WPSD Local, Feb. 10, 2013 (http://www.wpsdlocal6.com/news/ky-state-news/Man-arrested-after-accidentally-shooting-killing-3-year-old-child--190565981.html) (accessed Mar. 5, 2013); "Child Fatally Shot in Head in Accidental Shooting," WLTX.com, Feb. 2, 2013 (http://www.wltx.com/news/national/article/219657/2/Child-Fatally-Shot-in-Head-in-Accidental-Shooting) (accessed Mar. 5, 2013); P. Trexler, "Akron man charged in fatal shooting of son, 4," Akron Beacon Journal Online, Jan. 24, 2013 (http://www.ohio.com/news/break-news/akron-man-charged-in-fatal-shooting-of-son-4-1.367287) (accessed Mar. 5, 2013); C. Vendel, "Four-year-old KC girl dies after being shot by 6-year old boy," Kansas City Star, Jan. 22, 2013 (http://www.kansascity.com/2013/01/22/4025115/4-year-old-kc-girl-dies-after.html) (accessed Mar. 5, 2013); "2-Year-Old Dies After Accidental Shooting," Baton Rouge, Louisiana News, Jan. 22, 2013 (http://www.redsticknow.com/story/2013/01/baton-rouge-crime-news/2-year-old-in-critical-condition-after-accidental-shooting/) (accessed Mar. 5, 2013); N. DeChant, "Clevealnd [*sic*] Police are investigating the death of a 6 year old girl after she was shot in the face," newsnet5.com, Jan. 19, 2013 (http://www.newsnet5.com/dpp/news/local_news/cleveland_metro/clevealnd-police-are-investigating-the-death-of-a-6-year-old-girl-after-she-was-shot-in-the-face) (accessed Mar. 5, 2013); C. Oberholtz & A. Barr, "Boy, 12, dies after accidental shooting in Caldwell County," KCTV 5 News, Jan. 28, 2013 (http://www.kctv5.com/story/20574105/boy12-dies-after-accidental-shooting-in-caldwell-county?utm_source=twitterfeed&utm_medium=twitter) (accessed Mar. 5, 2013); A. Quince, "Boy accidentally shoots and kills 12 year old cousin," ABC3340, Jan. 9, 2013 (http://www.abc3340.com/story/20545151/boy-accidentially-shoots-and-kills-12-year-old-cousin#.UO3JRd1-hSM.facebook)

these deaths, but it makes a permissible policy choice in deciding that it is better to try to prevent tragedies like these than to impose liability after they have occurred.

### E.   The Court should not apply categorical or strict scrutiny here.

If intermediate or rational-basis scrutiny is applied, San Francisco's storage ordinance is surely constitutional, and the NRA apparently realizes that. The NRA therefore devotes most of its brief to arguing that the Ninth Circuit should stand alone among circuits in adopting either a history-only approach to the Second Amendment, striking down any firearms law without a long historic pedigree, or in applying strict scrutiny to any law that burdens the use of firearms in the home, however slight the burden. This Court should decline the NRA's invitation.

The NRA first contends that the Court should look to history to determine whether a law affects conduct within the Second Amendment's scope, and then look to history again to approve only those firearms restrictions that accord with "a tradition of similar regulations and/or historical analogues." NRA's Br. at 34. The district court rejected this approach, noting that the Supreme Court in *Heller* primarily relied on history in the first part of its analysis, in determining the scope

---

(accessed Mar. 5, 2013); J. Rayburn, "Boy, 10, dies after pellet gun shooting in Tollhouse," Fresno Bee, Jan. 4, 2013 (http://www.fresnobee.com/2013/01/04/3122349/10-year-old-wounded-by-pellet.html) (accessed Mar. 5, 2013); R. Naquin, "Two-year-old child dies after Christmas night shooting," WPDE Newschannel 15, Dec. 26, 2012 (http://www.carolinalive.com/news/story.aspx?id=841087#.UNtoCdevdkB) (accessed Mar. 5, 2013); "Child shot, killed, Christmas afternoon," WMCTV.com, Dec. 25, 2012 (http://www.wmctv.com/story/20422577/child-shot-and-transfered-to-le-bonheur) (accessed Mar. 5, 2013); K. Nicholson, "Harrison toddler dies from shooting," WRCBtv.com, Dec. 21, 2012 (http://www.wrcbtv.com/story/20405078/harrison-toddler-dies-from-shooting#.UNT6qtIAIjM.twitter) (accessed Mar. 5, 2013); C. McKinnon, "3-Year-Old Boy in Guthrie Dies from Accidental Gunshot Wound," Dec. 15, 2012 (http://m.news9.com/story.aspx?story=20353707&catId=112032) (accessed Mar. 3, 2013).

of the Second Amendment.  ER 6.  After deciding the amendment protected an individual right, the Supreme Court's ultimate determination of the invalidity of the District of Columbia's law had only an "abbreviated" reference to historical precedents, indicating that history alone is not determinative of the second analytical step.  ER 6.  Moreover, "as proposed by plaintiffs, the second 'step' would be little more than a reiteration of the first, with the result that virtually no regulation of firearms other than those with long historical antecedents would ever be permissible."  *Id*.

The district court's rejection of this test was correct.  A strict history-only approach is irreconcilable with the Supreme Court's assurances that "[s]tate and local *experimentation* with reasonable firearms regulations will continue under the Second Amendment."  *McDonald*, 130 S. Ct. at 3046 (plurality) (quotation marks omitted, emphasis added).  And a rigid historical test could imperil firearms laws that are commonplace today—such as federal firearms licenses for gun dealers, background checks for purchasers, and prohibitions on gun possession by habitual substance abusers, all of which did not exist in the Founding era—and would prevent governments from responding to the challenges posed by firearms with destructive power far greater than the Framers knew.[16]

As an alternative, the NRA contends that if this Court is unwilling to hold the firearms of 2013 to the gun laws of 1791, then to follow *Heller* it must apply strict scrutiny to any law that regulates guns in the home, no matter how slight the

---

[16] Moreover, as discussed at pages 21-22, the historical test that some courts have adopted as part of (but not the entirety of) the second step of the Second Amendment analysis evaluates historic gun restrictions at a high level of generality, asking not whether a current gun law has direct historic analogs, but whether it is of the same general kind of restriction that the Framers would have recognized as valid.  In light of historic gunpowder storage restrictions that sought to prevent fires and accidents, San Francisco's ordinance meets this test.

burden imposed by the law. NRA's Br. at 22-26. The NRA bases this conclusion on three arguments, all of which are wrong.

First, the NRA claims that to apply intermediate scrutiny to *any* gun law is to engage in the kind of "interest-balancing test" proposed by Justice Breyer in *Heller*, 554 U.S. at 689 (Breyer, J., dissenting), which was rejected by the *Heller* majority, *id.* at 634. But this argument is squarely foreclosed by the Ninth Circuit's holding that "*Heller* did not establish that Second Amendment restrictions must be reviewed under strict scrutiny." *Vongxay*, 594 F.3d at 1118 n.5. Moreover, *Heller* itself identified the interest-balancing test as something other than a traditional tier of scrutiny. 554 U.S. at 634 (Justice Breyer "proposes . . . none of the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis) . . ."). Indeed, other courts have uniformly concluded that *Heller* does not rule out heightened scrutiny for Second Amendment claims. *See, e.g.*, *NRA*, 700 F.3d at 197 ("the Court's language [in *Heller*] suggests that intermediate and strict scrutiny are on the table"); *Heller II*, 670 F.3d at 1265 (if the Supreme Court had intended to rule out the traditional tiers of scrutiny, "then it surely would have said at least something to that effect").

Second, the NRA claims that because the right to keep and bear arms is fundamental, then incursions on the right can be evaluated under no standard less demanding than strict scrutiny. But circuits throughout the country have handily rejected that argument in light of the many contexts in which government restrictions on other fundamental rights are evaluated under standards other than strict scrutiny. *See, e.g.*, *Clingman v. Beaver*, 544 U.S. 581, 592 (2005) (in voting rights challenge, holding that "strict scrutiny is appropriate only if the burden is severe"); *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (applying intermediate scrutiny to commercial speech prohibition); *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 791 (1989) (applying intermediate scrutiny to content-neutral restrictions on speech); *Zablocki v. Redhail*, 434 U.S. 374, 386-87 (1978) ("reasonable regulations that do not significantly interfere with decisions" to marry are not subject to the same "rigorous scrutiny" as direct interference with marriage rights). "[E]ven with respect to a fundamental constitutional right, we can and should adjust the level of scrutiny according to the severity of the challenged regulation." *NRA*, 700 F.3d at 198.

Third, perhaps inspired by *Heller*'s statement that the District of Columbia's gun laws were the most extreme in the country, the NRA contends that San Francisco's storage ordinance is the most extreme in the nation, more similar to D.C.'s now-invalidated laws than to any other law in the country. NRA's Br. 35-36. This is false. San Francisco's ordinance allows residents to carry their handguns in the home at all times, including in a holster, and only requires locked storage when a handgun is not carried. S.F. Police Code § 4512(a), (c). And it does not restrict long guns at all. By contrast, the District of Columbia banned handguns altogether and required long guns in the home to be rendered inoperable at all times, with no exception for self-defense emergencies. *See Heller*, 554 U.S. at 630. San Francisco's law is truly a *storage* ordinance, not a prohibition masquerading as a storage ordinance, as the NRA contends.

Nor is San Francisco's ordinance an outlier among storage ordinances. Massachusetts and New York City both require locked storage of all guns, not just handguns, and apply inside and outside the home. Mass. Gen. Laws Ann. 140 § 131L(a) (NRA's Br. Addend. 13); N.Y.C. Admin. Code § 10-312(a) (S.F. Addend. A-3). These laws have exceptions only where a gun is carried or in the immediate control of the owner, a requirement that is equivalent to San Francisco's carry exception. *Id.*; *Commonwealth v. Cantelli*, 982 N.E.2d 52, 65 (Mass. App.

Ct. 2013) (Massachusetts law's "control" requirement means "immediate reach";
affirming conviction for unsafe storage where the gun was in a room adjacent to its
owner and the owner was the only person on the premises); *see also*
*Commonwealth v. Patterson*, 946 N.E.2d 130, 133 (Mass. App. Ct. 2011) (to be
under a defendant's "control," the gun "must be readily at hand").  Moreover, the
penalties for violating Massachusetts's storage law are much greater than for
violating San Francisco's: imprisonment for up to 10 years, a fine of up to $10,000,
or both.  Mass. Gen. Laws Ann. § 131L(b).  By contrast, the maximum penalty
under San Francisco's storage law is six months' confinement in the county jail, a
fine of up to $1000, or both.  S.F. Police Code § 4512(e).

## III.  The District Court Did Not Abuse Its Discretion in Refusing to Enjoin the Ammunition Ordinance.

### A.  Plaintiffs lack standing to challenge the ammunition ordinance.

San Francisco's ammunition ordinance prohibits licensed ammunition
dealers located in San Francisco from selling "enhanced lethality ammunition," or
ammunition designed to inflict greater injury on the human body than conventional
jacketed ammunition by expanding or mushrooming on impact, and often by
projecting sharp barbs or other objects into the body.  S.F. Police Code §§ 613.9.5,
613.10(g).  The ammunition ordinance does not, however, prohibit San Francisco
residents from obtaining this ammunition outside of San Francisco and using it in
their homes.  Nor does San Francisco's ordinance prohibit residents from ordering
ammunition from vendors outside of San Francisco and shipping it to their
homes.[17]

---

[17] California enacted a law in 2009 that would prohibit ammunition sales
that are not conducted face-to-face, 2009 Cal. Stats. ch. 628, but it has been
enjoined since January 2011.  http://michellawyers.com/wp-

In support of their preliminary injunction motion, five of the individual plaintiffs stated (in boilerplate recitations) that, but for the City's ammunition ordinance, they would purchase ammunition regulated by § 613.10(g) within San Francisco's city limits, and that they are irreparably harmed by their inability to do so. ER 162, 171, 175, 180 185-86. Yet other than identical, conclusory claims of irreparable harm, not one of the individual plaintiffs identified any burden or difficulty he had either in obtaining enhanced-lethality ammunition from a vendor outside San Francisco (such as at nearby Cow Palace or in neighboring jurisdictions, or by mail). Nor did either organizational plaintiff show that any of its members were burdened in any meaningful respect by the ammunition regulation. And Plaintiffs do not claim that if § 613.10(g) were enjoined, the sole firearms dealer in San Francisco would begin to stock and sell enhanced-lethality ammunition.

Under these circumstances, Plaintiffs lack standing to challenge the ammunition ordinance. In *Lane v. Holder*, plaintiffs, who resided in the District of Columbia, contended that they wished to purchase firearms from Virginia sellers but were prohibited from doing so by a combination of federal and state laws that required them to use a D.C. intermediary to complete their purchase. 703 F.3d 668, 670-71 (4th Cir. 2012). These restrictions prevented the plaintiffs from purchasing guns from the dealers they wished to do business with, but "the plaintiffs are not prevented from obtaining the handguns they desire. At worst, they are burdened by additional costs and logistical hurdles." *Id.* at 672-73. And the plaintiffs were not directly regulated by the laws they challenged. *Id.* at 672. On these facts, the Fourth Circuit held that the "minor inconveniences" the

---

content/uploads/2010/11/Order-of-Permanent-Injunction.pdf. The injunction is under appeal.

plaintiffs had alleged did not constitute an injury-in-fact sufficient to confer Article III jurisdiction. *Id.* at 673. Nor were the plaintiffs' injuries redressable by a favorable decision, since plaintiffs' difficulties in purchasing guns within the District of Columbia resulted in part from the business decisions of third parties. *Id.* at 673-74.

This case is on all fours with *Lane*. The plaintiffs allege nothing more than a desire to engage in a transaction prohibited by the law with a particular seller; they do not claim any burden, difficulty, or expense in purchasing enhanced-lethality ammunition. Indeed, they do not even allege a "minor inconvenience." And they are not directly regulated by the ammunition ordinance. Like the *Lane* plaintiffs, they have not alleged or shown injury-in-fact. Nor have they shown redressability, since they neither allege nor prove that, if San Francisco's ammunition ordinance were enjoined, the sole ammunition dealer in the city affected by the ordinance would begin to sell their preferred kind of ammunition. Plaintiffs therefore lack standing.

### B.    The ammunition ordinance does not infringe Plaintiffs' Second Amendment rights.

*Heller* invalidated a ban on handguns, a "class of 'arms' that is overwhelmingly chosen by American society" for the lawful purpose of self-defense." 554 U.S. at 628. The Court found that while there is a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *id.* at 627 (quoting 4 Blackstone 148-49 (1769)), the Second Amendment protects "the sorts of weapons . . . 'in common use at the time,'" *id.* (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939). The NRA's chief argument about the ammunition ordinance is essentially that the Court should transfer this analysis

wholesale from "arms" to "ammunition," and simply ask whether the ammunition San Francisco regulates is in common use. If it is, the NRA contends that the Court should apply *Heller*'s rule about weapons to ammunition, and strike San Francisco's ordinance with no further ado.

This is not a correct reading of *Heller*. Justice Scalia's majority opinion defines the word "arms" as precisely as one might expect from a textualist: it is "'weapons of offence, or armour of defence.'" 554 U.S. at 581 (quoting Samuel Johnson, 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)). "Thus, the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* at 582. This definition does not include ammunition as a textual matter. Indeed, the *Heller* majority opinion does not mention ammunition at all, and the word appears only in a dissenting opinion as something *different* from "arms": "The Virginia military law, for example, ordered that 'every one of the said officers . . . shall constantly keep the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for . . . .'" *Id.* at 650 (Stevens, J., dissenting) (quoting Act for Regulating and Disciplining the Militia, 1785 Va. Acts ch. 1, § 3, p. 2) (emphasis omitted).

This is not to say that ammunition is not protected at all under the Second Amendment. Plainly a prohibition on the sale of any ammunition, or any ammunition other than ineffectual rubber bullets, would substantially burden the amendment's core guarantee of the right to carry weapons in the home in case of a self-defense emergency. *Heller*, 554 U.S. at 592. But the NRA's claim that ammunition itself is protected by the Second Amendment, rather than merely as a necessary tool for the exercise of Second Amendment rights, finds no support in *Heller*.

Nor does it find support in cases construing other constitutional provisions that the NRA relies on for the proposition that banning commercial sales of a particular item related to a right must be evaluated the same way as a prohibition on the exercise of that right. *See* NRA's Br. 46-47. In some of these cases, a prohibition on a particular transaction was struck down because it had the effect of either prohibiting or severely burdening the exercise of the right itself. *See, e.g.*, *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 897-98 (1992) (spousal notification requirement of abortion struck down because, for at least some women, "a spousal notice requirement enables the husband to wield an effective veto over his wife's decision"); *Carey v. Population Servs., Int'l*, 431 U.S. 678, 688-89 (1977) (restriction on distribution of contraceptives must be narrowly drawn because access to contraception is "*essential* to exercise of the constitutionally protected right of decision in matters of childbearing") (emphasis added); *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965) (invalidating a ban on sales of contraceptives because prohibiting contraception will have "a maximum destructive impact upon [the marital] relationship," the right to which is fundamental); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 744 (5th Cir. 2008) (striking a ban on the sale of sex toys because it "heavily burden[ed]" the substantive due process right to private intimate conduct).

But, sensibly, where a law does not amount to "an effective veto" over exercise of a right, or deprive citizens of something "essential" to the exercise of that right, it is not treated as a deprivation of the right itself. This is demonstrated by another case the NRA cites, *Vincenty v. Bloomberg*, which applied only intermediate scrutiny to the City of New York's ban on the sale of spray paint to young adults to combat graffiti problems. 476 F.3d 74, 84 (2d Cir. 2007). *Vincenty* holds that this ban is a "content-neutral regulation that imposes only an

incidental burden on speech," and is therefore evaluated only under intermediate scrutiny. *Id.* Such a regulation passes muster if it does not "'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* (quoting *Ward*, 499 U.S. at 799) (emphasis omitted).

Applying these principles in the present case, this Court must first ask whether San Francisco's ammunition ordinance amounts to "an effective veto" over Plaintiffs' ability to engage in armed self-defense in the home. It does not. While Plaintiffs repeat over and over that they and others "prefer" to use hollow-point ammunition over other kinds of ammunition for self-defense, NRA's Br. at 8, 45, 51, 52, 59; *see also id.* at 45 (discussing expansion of ammunition as a "desired" characteristic), they offer no argument or evidence that the inability to use enhanced-lethality ammunition actually impairs their ability to defend themselves, contrary to the City's finding that guns equipped with fully jacketed ammunition are sufficient for self-defense. S.F. Police Code § 613.9.5.(4).[18] The district court made no findings on this point, but its finding that "plaintiffs simply have not shown that prohibiting sales of such ammunition within City limits imposes a substantial burden on their ability to acquire it" plainly implies the further finding that San Francisco's ammunition ordinance does not impair their ability to load their guns with effective ammunition. This finding is not clearly erroneous. *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 660 F.3d 384, 395 (9th Cir. 2011) (district court's factual findings only reversed if they are illogical, implausible, or lacking record support).

---

[18] Indeed, the most the NRA says about this is that San Franciscans will have to fire more shots of conventional ammunition to stop an attacker. NRA's Br. at 53.

Because the ammunition ordinance does not vitiate Plaintiffs' ability to use arms in self-defense, this Court should neither categorically invalidate it under *Heller*, nor apply strict scrutiny. Instead, in keeping with the consensus among circuit courts, *see supra* at , it should apply a level of scrutiny that is "proportionate" to the burdens on the right to armed self-defense imposed by the ordinance. *NRA*, 700 F.3d at 198. The district court found that no scrutiny was required because Plaintiffs never showed any "substantial burden" on their ability to acquire the regulated ammunition—much less on their ability to defend themselves. If this Court adopts the *DeCastro/Kachalsky* substantial-burden test, it should affirm both the district court's reasoning and its result.

Even under the more demanding intermediate scrutiny test adopted by *Heller II* and other cases, the Court should still take account of the modest burdens the ammunition ordinance imposes. In *Heller II* itself, the D.C. Circuit issued the only published opinion that San Francisco has located concerning an ammunition regulation (in that case, a prohibition on possession of high-capacity magazines containing more than ten rounds of ammunition). The court did *not* assess whether or why ammunition should receive any particular protection under the Second Amendment, but instead merely treated ammunition as if the "common use" standard for handguns applied equally to it. 670 F.3d at 1260-61. As San Francisco discusses above, there is no support in *Heller* for treating a prohibition on commonly used ammunition as tantamount to a handgun ban. But the D.C. Circuit nonetheless applied only intermediate scrutiny to the high-capacity magazine ban because of its determination that prohibiting such magazines "does not effectively disarm individuals or substantially affect their ability to defend themselves." *Id.* at 1262. The same is true here; the NRA has made no showing

that prohibiting one kind of particularly lethal ammunition impairs San Franciscans' ability to use guns to defend themselves.

Under the intermediate scrutiny test, on the record before this Court, the Court should affirm the district court's decision. San Francisco's ammunition ordinance is intended to serve the compelling governmental interest in public safety. Reducing the lethality of ammunition substantially advances that interest. As San Francisco noted in its factual findings, and as social science research demonstrates, guns kept in the home are far more often used against loved ones, friends or acquaintances in unjustifiable shootings than they are used for self-defense. S.F. Police Code § 613.9.5(5) ; ER 71. The NRA does not dispute this fact. Nor does the NRA dispute that even when guns are used for self-defense, they are far more often brandished than fired—indicating that the kind of bullet they contain matters little to self-defense in most cases. *Heller*, 554 U.S. at 701 (Breyer, J., dissenting) (describing finding by pro-gun researchers that only a quarter of defensive uses of guns actually involve firing them). And the NRA's claim that hollow-point ammunition is not more lethal than conventional ammunition is undermined by the facts that it is selected by mass killers as their ammunition of choice for rampages, S.F. Police Code § 613.9.5(3) , and the fact that the Hague Convention of 1899, Declaration III, "has for more than a century prohibited the use in warfare of bullets that easily expand or flatten in the body." *Id.* § 613.9.5.(4) . Because San Francisco's ammunition ordinance is substantially related to its interest in public safety, and because the ordinance "leave[s] open ample alternative channels," *Vincenty*, 476 F.3d at 82 (internal quotation marks omitted), for San Franciscans to purchase and use ammunition that is effective for self-defense, the district court did not abuse its discretion in denying the NRA's motion to enjoin the ordinance's enforcement.

Furthermore, even if this Court disagrees with the district court's determination, it should only enjoin the portion of the ordinance that prohibits San Francisco gun dealers from selling "Hollow Point Ammunition," and not ammunition that is "designed to expand upon impact and utilize the jacket, shot or materials embedded within the jacket or shot to project or disperse barbs or other objects that are intended to increase the damage to a human body or other target." S.F. Police Code § 613.10(g)(2) . The NRA makes no argument that ammunition "intended to increase the damage to a human body" by projecting barbs or objects into the body is in common use, or is desirable for self-defense. Its arguments and its evidence are devoted exclusively to hollow-point ammunition, not to exotic varieties of that ammunition that are designed for even greater lethality. The Police Code provisions governing ammunition dealers have a severability clause, 613.20 (S.F. Addend. A-4), and this Court should not enjoin severable portions of the ammunition ordinance that the NRA does not challenge.

## IV.     PLAINTIFFS DO NOT SATISFY THE REMAINING PRELIMINARY INJUNCTION FACTORS.

The NRA bases its claim to an injunction on the fact that deprivation of constitutional rights is typically presumed to be irreparable harm. But in this case, the NRA brought its preliminary injunction motion more than three years after filing suit. Under these circumstances, any claim of irreparable harm rings hollow.

Even in a case alleging deprivation of fundamental rights, "[a] delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief. . . . A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action."

*Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984) (considering First Amendment claim); *see also Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985); ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm"); *Pharmacia Corp. v. Alcon Labs., Inc.,* 201 F.Supp.2d 335, 383 (D.N.J.2002) (delay in seeking preliminary injunction "knocks the bottom out of any claim of immediate and irreparable harm").

The NRA filed the present lawsuit on May 15, 2009. Supplemental Excerpts of Record ("SER") 1. It took no immediate action to enjoin the City's ordinances; instead, on August 27, 2009, it moved to stay the lawsuit. SER 24. The NRA moved for relief from the stay on June 17, 2010. SER 30. But it took no action to obtain injunctive relief until the district court denied its motion for partial judgment on the pleadings on August 17, 2012, three and half years after it filed its complaint. ER 306. Indeed, the district court noted the NRA's candid acknowledgment that its preliminary injunction motion was "at least in part an attempt to obtain a legal ruling . . . that would permit appellate review." ER 3; *see also* ER 15:19-23. But the purpose of a preliminary injunction is not "to give litigants a preliminary opportunity to appeal their cases on the merits." *Sierra On-Line Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). Because the record here shows not irreparable harm but instead a bid for early appellate review, the NRA's preliminary injunction motion was properly denied. *See Winter*, 555 U.S. at 20 (likelihood of irreparable harm is a mandatory preliminary injunction factor).

Furthermore, the balance of the equities and the public interest both counsel against granting a preliminary injunction here. To argue otherwise, the NRA relies on case law from other contexts making the straightforward point that it is never in

the public interest for the government to violate constitutional rights. Of course that is generally true, but to pretend that there is no public interest in the sensible regulation of firearms is simply absurd. Instead, as the Fourth Circuit put it, "[t]his is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *Masciandaro*, 638 F.3d at 475. Because San Francisco's storage and ammunition ordinances strike "a delicate balance between individual rights and the public interest," *Osterweil*, 2013 WL 322884, at *2, this Court should defer to the findings of San Francisco's elected legislators that these laws serve the public interest.

## CONCLUSION

For the reasons offered above, the Court should affirm the district court's denial of the NRA's motion for a preliminary injunction.

Dated: March 7, 2013

DENNIS J. HERRERA
City Attorney
WAYNE SNODGRASS
CHRISTINE VAN AKEN
Deputy City Attorneys


By:   s/*Christine Van Aken*
CHRISTINE VAN AKEN

Attorneys for Defendants and Appellees
CITY AND COUNTY OF SAN
FRANCISCO, THE MAYOR OF SAN
FRANCISCO and THE CHIEF OF THE
SAN FRANCISCO POLICE
DEPARTMENT

## STATEMENT OF RELATED CASES

There are no related cases pending in this Court.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief has been prepared using proportionately double-spaced 14 point Times New Roman typeface. According to the "Word Count" feature in my Microsoft Word for Windows software, this brief contains 13,661 words up to and including the signature lines that follow the brief's conclusion.

I declare under penalty of perjury that this Certificate of Compliance is true and correct and that this declaration was executed on March 7, 2013.

DENNIS J. HERRERA
City Attorney
WAYNE SNODGRASS
CHRISTINE VAN AKEN
Deputy City Attorneys


By:   s/*Christine Van Aken*
CHRISTINE VAN AKEN

Attorneys for Defendants and Appellees
CITY AND COUNTY OF SAN
FRANCISCO, THE MAYOR OF SAN
FRANCISCO and THE CHIEF OF THE
SAN FRANCISCO POLICE
DEPARTMENT

# ADDENDUM

## TO

## BRIEF OF APPELLEES
## CITY AND COUNTY OF SAN FRANCISCO
## AND ITS MAYOR AND CHIEF OF POLICE

# INDEX TO ADDENDUM

| **DESCRIPTION** | **NOS.** |
| --- | --- |
| New York City, N.Y. Code § 10-311 | A-001 |
| New York City, N.Y. Code § 10-312 | A-003 |
| S.F. Police Code § 613.20 | A-004 |

New York City, N.Y., Code § 10-311
NEW YORK CITY CHARTER, CODE, AMENDMENTS & RULES
NEW YORK CITY ADMINISTRATIVE CODE
TITLE 10. PUBLIC SAFETY
CHAPTER 3. FIREARMS.

Currency up to Local Law 40 of 2012 and Chapters 1 - 447 of the Laws of the State of New York for 2012

Currency up to Local Law 40 of 2012 and Chapters 1 - 447 of the Laws of the State of New York for 2012

§ 10-311. Sale of weapons without safety locking device prohibited.

a. It shall be unlawful for any person or business enterprise to dispose of any weapon which does not contain a safety locking device. For the purposes of this section and section 10-312: (1) weapon shall mean a firearm, rifle, shotgun, or assault weapon, as such terms are defined in section 10-301; or a machine gun, as defined in the penal law; and (2) a safety locking device shall mean a design adaptation or attachable accessory that will prevent the use of the weapon by an unauthorized user, and includes, but is not limited to, a trigger lock, which prevents the pulling of the trigger without the use of a key, or a combination handle, which prevents the use of the weapon without the alignment of the combination tumblers.

b. It shall be unlawful for any licensed manufacturer, licensed importer, or licensed dealer to dispose of any weapon in the city of New York unless it is accompanied by the following warning, which shall appear in conspicuous and legible type in capital letters, and which shall be printed on a label affixed to the weapon and on a separate sheet of paper included within the packaging enclosing the weapon: "THE USE OF A LOCKING DEVICE OR SAFETY LOCK IS ONLY ONE ASPECT OF RESPONSIBLE WEAPON STORAGE. ALL WEAPONS SHOULD BE STORED UNLOADED AND LOCKED IN A LOCATION THAT IS BOTH SEPARATE FROM THEIR AMMUNITION AND INACCESSIBLE TO CHILDREN AND ANY OTHER UNAUTHORIZED PERSONS. NEW YORK CITY LAW PROHIBITS, WITH CERTAIN EXCEPTIONS, ANY PERSON FROM ACQUIRING MORE THAN ONE FIREARM, OR MORE THAN ONE RIFLE OR SHOTGUN, WITHIN A 90-DAY PERIOD."

c. Any person who applies for and obtains authorization to purchase a weapon or otherwise lawfully obtains a weapon pursuant to chapters one or three of title ten of this code shall be required to purchase or obtain a safety locking device at the time he or she purchases or obtains the weapon.

d. (1) The police commissioner is authorized to promulgate rules setting forth the types of safety locking devices which will comply with this section in accordance with subdivision a of this section. The city of New York and its agencies, officers or employees shall not be liable to any party by reason of any incident involving, or the use or misuse of, a safety locking device that may have been purchased in compliance with such rules promulgated by the commissioner.

(2) The police commissioner shall provide written notice of the requirements of this section and section 10-312 to all persons who receive an official authorization to purchase a weapon and all persons applying for renewal of a license or permit issued pursuant to chapters one or three of title ten, including any rules promulgated under this subdivision. All persons applying for a license or permit or applying for the renewal of a license or permit pursuant to chapters one or three of title ten of this code, shall receive from the commissioner information concerning the importance of using a safety locking device while a weapon is not in use, and a warning that weapons should be stored unloaded and locked in a location that is both separate from their ammunition and inaccessible to [their] children and any other unauthorized persons.

e. Any violation of subdivisions a or b of this section or any rule promulgated thereunder shall be a misdemeanor and triable by a judge of the criminal court of the city of New York and punishable by imprisonment of not more than thirty days or by a fine of not more than five hundred dollars, or both.

HISTORICAL NOTE

Section amended L.L. 65/1999 § 1, eff. Feb. 1, 2000.

Section added L.L. 21/1998 § 1, eff. Nov. 14, 1998.

Subd. b amended L.L. 31/2006 § 5, eff. Nov. 24, 2006. [See § 10-302.1

Note 2]

Copyright © 2012 by New York Legal Publishing

**End of Document**                              © 2013 Thomson Reuters. No claim to original U.S. Government Works.

New York City, N.Y., Code § 10-312
NEW YORK CITY CHARTER, CODE, AMENDMENTS & RULES
NEW YORK CITY ADMINISTRATIVE CODE
TITLE 10. PUBLIC SAFETY
CHAPTER 3. FIREARMS.

Currency up to Local Law 40 of 2012 and Chapters 1 - 447 of the Laws of the State of New York for 2012

Currency up to Local Law 40 of 2012 and Chapters 1 - 447 of the Laws of the State of New York for 2012

§ 10-312. Use of safety locking device required under certain circumstances.

  a. It shall be unlawful for any person who is the lawful owner or lawful custodian of a weapon, as that term is defined in section 10-311, to store or otherwise place or leave such weapon in such a manner or under circumstances that it is out of his or her immediate possession or control, without having rendered such weapon inoperable by employing a safety locking device. Any person who violates this subdivision shall be guilty of a violation, punishable by imprisonment of not more than ten days or by a fine of not more than two hundred fifty dollars, or both.

  b. Any person who violates subdivision a of this section having previously been found guilty of a violation of such subdivision, or under circumstances which create a substantial risk of physical injury to another person, shall be guilty of a misdemeanor punishable by imprisonment of not more than thirty days or by a fine of not more than one thousand dollars, or both.

  c. The provisions of this section shall not apply to weapons owned or lawfully possessed by a police officer, as such term is defined in section 1.20 of the criminal procedure law, or a federal law enforcement officer, as such term is defined in section 2.15 of the criminal procedure law.

HISTORICAL NOTE

Section added L.L. 65/1999 § 2, eff. Feb. 1, 2000.

Copyright © 2012 by New York Legal Publishing

**End of Document**                         © 2013 Thomson Reuters. No claim to original U.S. Government Works.

San Francisco Police Code

## SEC. 613.20.  SEVERABILITY.

If any section, subsection, paragraph, sentence or word of this Article is deemed to be invalid or beyond the authority of the City and County of San Francisco, either on its face or as applied, the invalidity of such provision shall not affect the other sections, subsections, paragraphs, sentences, or words of this Article, and the application thereof; and to that end the section, subsections, paragraphs, sentences and words of this Article shall be deemed severable.

(Added by Ord. 91-94, App. 2/25/94)

A-004

# CERTIFICATE OF SERVICE

I, Pamela Cheeseborough, hereby certify that I electronically filed the following document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECFsystem on March 7, 2013.

**BRIEF OF APPELLEES
CITY AND COUNTY OF SAN FRANCISCO
AND ITS MAYOR AND CHIEF OF POLICE**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed March 7, 2013, at San Francisco, California.

_s/Pamela Cheeseborough_
Pamela Cheeseborough