Nos. 14-16601 & 14-17068

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
*Defendant-Appellant*,
*v.*
EDWARD O'BANNON, OSCAR ROBERTSON, WILLIAM RUSSELL,
HARRY FLOURNOY, THAD JARACZ, DAVID LATTIN, BOB TALLENT,
ALEX GILBERT, ERIC RILEY, PATRICK MAYNOR, TYRONE PROTHRO,
SAM JACOBSON, DAMIEN RHODES, DANNY WIMPRINE, RAY ELLIS,
JAKE FISCHER, JAKE SMITH, DARIUS ROBINSON, MOSES ALIPATE, and
CHASE GARNHAM,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellees*

From Orders Denying Summary Judgment and Granting a Permanent Injunction
Entered By the United States District Court for the Northern District of California

The Honorable Claudia Wilken, Chief Judge
Case Nos. 09-cv-1967 CW & 09-cv-3329 CW

**PLAINTIFFS-APPELLEES' OPPOSITION BRIEF IN RESPONSE TO
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION'S OPENING
APPELLATE BRIEF**

Michael P. Lehmann
Bruce Wecker
HAUSFELD LLP
44 Montgomery St., Ste. 3400
San Francisco, CA 94104
Tel: (415) 633-1908

Michael D. Hausfeld
Hilary K. Scherrer
Sathya S. Gosselin
Swathi Bojedla
HAUSFELD LLP
1700 K St. NW, Ste. 650
Washington, DC 20006
Tel: (202) 540-7200

Jonathan Massey
MASSEY & GAIL LLP
1325 G St. NW, Ste. 500
Washington, DC 20005
Tel: (202) 652-4511

*Counsel for Plaintiffs-Appellees*

# **TABLE OF CONTENTS**

I.     STATEMENT OF THE ISSUE PRESENTED FOR REVIEW. ...................1

II.    STATEMENT OF THE STANDARDS OF REVIEW.................................1

III.   STATEMENT OF THE CASE. ....................................................................2

      A.    History Shows that the Concept of "Amateurism"
            Is Unfixed, Malleable, and Self-Serving..............................................4

      B.    The NCAA's Growth as a Huge Business Since *BoR*. ......................10

      C.    The NCAA's Recognition of the Erosion of
            "Amateurism." ....................................................................................12

      D.    The NCAA's Commercial Exploitation of Plaintiffs'
            NILs. ...................................................................................................14

      E.    The NCAA's Own Consideration of Proposals to
            Compensate Plaintiffs for NIL Use. ..................................................17

      F.    Procedural History of the Case............................................................19

IV.   SUMMARY OF ARGUMENT..................................................................22

V.    ARGUMENT.............................................................................................25

      A.    The NCAA Does Not Enjoy Antitrust Immunity
            Under *BoR*. ........................................................................................25

            1.    The NCAA Misreads *BoR*, Which Supports
                    Plaintiffs. ..................................................................................26

i

2.      The NCAA's Out-of-Circuit Precedent Is Not
        Persuasive..................................................................................32

B.      The Sherman Act Applies to the Challenged Restraint. ....................35

C.      Plaintiffs Have Antitrust Standing. ....................................................37

D.      The District Court Properly Found The Restraint
        Invalid Under the Rule of Reason.......................................................49

        1.      The District Court Properly Found
                Anticompetitive Effects. ...........................................................49

        2.      The District Court Properly Rejected Alleged
                Procompetitive Justifications...................................................51

        3.      The District Court's Consideration of Alternatives
                Was Proper................................................................................55

VI.   CONCLUSION................................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agnew v. NCAA*,
   683 F.3d 328 (7th Cir. 2012) ...................................................................*passim*

*Allied Artists Picture Corp. v. Rhodes*,
   496 F. Supp. 408 (S.D. Ohio 1980) ....................................................................48

*Am. Home Prods. Corp. v. Barr Labs., Inc.*,
   834 F.2d 368 (3d Cir. 1987) ..............................................................................51

*AmBrit, Inc. v. Kraft, Inc.*,
   812 F.2d 1531 (11th Cir. 1986) .........................................................................51

*American Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010).....................................................................................28, 29

*ASCAP v. MobiTV Inc.*,
   681 F.3d 76 (2d Cir. 2012) ................................................................................57

*ASCAP v. Showtime/The Movie Channel, Inc.*,
   912 F.2d 563 (2d Cir. 1990) ..............................................................................57

*Associated Film Distribution Corp. v. Thornburgh*,
   683 F.2d 808 (3d Cir. 1982) ..............................................................................48

*Banks v. NCAA*,
   977 F.2d 1081 (7th Cir. 1992) ......................................................................32, 33

*Bassett v. NCAA*,
   528 F.3d 426 (6th Cir. 2008) ........................................................................36, 37

*BMI v. DMX, Inc.*,
   683 F.3d 32 (2d Cir. 2012) ................................................................................56

*C.B.C. Distribution & Mktg., Inc. v. MLB Advanced Media, L.P.*,
   505 F.3d 818 (8th Cir. 2007) .............................................................................42

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999).........................................................................................29

*Cal. ex rel. Harris v. Safeway, Inc*.,
  651 F.3d 1118 (9th Cir. 2011) ..........................................................29

*Cargill, Inc. v. Monfort of Colo., Inc*.,
  479 U.S. 104 (1986)...........................................................................37

*Catalano, Inc. v. Target Sales, Inc*.,
  448 U.S. 643 (1980)...........................................................................49

*Clarett v. Nat'l Football League*,
  306 F. Supp. 2d 379 (S.D.N.Y.) ........................................................50

*Dryer v. Nat'l Football League*,
  No. CIV. 09-2182 PAM/FLN, 2014 WL 5106738 (D. Minn. Oct. 10,
  2014) ..................................................................................................42

*Easley v. Cromartie*,
  532 U.S. 234 (2001).............................................................................1

*Fortyune v. Am. Multi-Cinema, Inc*.,
  364 F.3d 1075 (9th Cir. 2004) .............................................................1

*Gionfriddo v. MLB*,
  114 Cal. Rptr. 2d 307 (Cal App. 2001)..............................................42

*Goldfarb v. Virginia State Bar*,
  421 U.S. 773 (1975)...........................................................................37

*Hairston v. Pacific 10 Conference*,
  101 F.3d 1315 (9th Cir. 1996) .....................................................30, 36

*Hennessey v. NCAA*,
  564 F.2d 1136 (5th Cir. 1977) ...........................................................37

*Husain v. Olympic Airways*,
  316 F.3d 829 (9th Cir. 2002) ...............................................................1

*In re Indep. Serv. Orgs. Antitrust Litig*.,
  203 F.3d 1322 (Fed. Cir. 2000) .........................................................48

*In re Innovatio IP Ventures Patent Litig*.,
  MDL Dkt. No. 2303, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) ....57

*In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig*.,
  No. 4:14-md-02541 CW (N. D. Cal. Oct. 10, 2013) .........................35

*In re NCAA I-A Walk-On Football Players Litig.*,
  398 F. Supp. 2d 1144 (W.D. Wash. 2005) ......................................34, 35, 50, 51

*In re NCAA Student-Athlete Name Image & Likeness Licensing Litig.*,
  724 F.3d 1268 (9th Cir. 2013) ....................................................................*passim*

*Jules Jordan Video, Inc. v. 144942 Canada Inc.*,
  617 F.3d 1146 (9th Cir. 2010) .............................................................................48

*Justice v. NCAA*,
  577 F. Supp. 356 (D. Ariz. 1983) ...................................................................32, 34

*Knevelbaard Dairies v. Kraft Foods, Inc*.,
  232 F.3d 979 (9th Cir. 2000) ...............................................................................50

*Law v. NCAA*,
  134 F.3d 1010 (10th Cir. 1998) ...........................................................................49

*Laws v. Sony Music Entm't, Inc.*,
  448 F.3d 1134 (9th Cir. 2006) .............................................................................48

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc*.,
  502 F.3d 504 (6th Cir. 2007) ...............................................................................51

*Locricchio v. Legal Servs. Corp*.,
  833 F.2d 1352 (9th Cir. 1987) .............................................................................33

*Los Angeles Mem'l Coliseum Comm'n v. NFL*,
  726 F.2d 1381 (9th Cir. 1984) ......................................................................55, 57

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co*.,
  334 U.S. 219 (1948)..............................................................................................50

*McCormack v. NCAA*,
  845 F.2d 1338 (5th Cir. 1988) .................................................................32, 34, 37

*Metro. Intercollegiate Basketball Ass'n v. NCAA*,
  339 F. Supp. 2d 545 (S.D.N.Y. 2004) .................................................................35

*Microsoft Corp. v. Motorola Co*.,
  No. C10-1823JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013)...............57

*Montana v. San Jose Mercury News, Inc*.,
  40 Cal. Rptr. 2d 639 (1995) .................................................................................42

*N. Am. Soccer League v. NFL,*
670 F.2d 1249 (2d Cir. 1982) ...............................................................57

*Nat'l Football League v. Alley, Inc.*,
624 F. Supp. 6 (S.D. Fla. 1983) ...........................................................42

*NCAA v. Bd. of Regents of the Univ. of Okla*.,
468 U.S. 85 (1984) .....................................................................*passim*

*Northwestern University & College Athletes Players Association (CAPA)*,
No. 13-RC-121359, 2014 NLRB LEXIS 221(Mar. 26, 2014) ...........53

*Oliver v. NCAA,*
920 N.E.2d 203 (Ct. Comm. Pleas Ohio 2009) ..................................58

*Polygram Holding, Inc. v. FTC,*
416 F.3d 29 (D.C. Cir. 2005) ...............................................................49

*Rabkin v. Or. Health Scis. Univ*.,
350 F.3d 967 (9th Cir. 2003) .................................................................1

*Red Lion Broadcasting Co. v. FCC*,
395 U.S. 367 (1969) ..............................................................................46

*Rock v. NCAA,*
No. 1:12-cv-1019 JMS DKL, 2013 WL 4479815 (S.D. Ind. Aug. 16, 2013) .....................................................................................................35

*Smith v. NCAA,*
139 F.3d 180 (3d Cir. 1998) ...........................................................34, 36

*Smith v. Pro-Football, Inc*.,
593 F.2d 1173 (D.C. Cir. 1978) ...........................................................57

*Storer Cable Commc'ns v. City of Montgomery*,
806 F. Supp. 1518 (M.D. Ala. 1992) ...................................................48

*Sullivan v. NFL,*
34 F.3d 1091 (1st Cir. 1994) ..........................................................55, 56

*Tanaka v. University of S. Calif.*,
252 F.3d 1059 (9th Cir. 2001) .......................................................30, 36

*Telecor Commc's Inc. v. Sw. Bell Tel. Co.,*
305 F.3d 1124 (10th Cir. 2002) ...........................................................50

*Ting v. AT&T,*
  319 F.3d 1126 (9th Cir. 2003) ...............................................................1

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.,*
  676 F.2d 1291 (9th Cir. 1982) .............................................................55

*United States v. Brown Univ.,*
  5 F.3d 658 (3d Cir. 1993) .....................................................................50

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001)...............................................................48

*United States v. Schiff,*
  379 F.3d 621 (9th Cir. 2004) .................................................................1

*Univ. of Denver v. Nemeth,*
  257 P.2d 423 (Colo. 1953).......................................................................6

*Ventress v. Japan Airlines,*
  747 F.3d 716 (9th Cir. 2014) ...............................................................44

*White v. NCAA,*
  Case No. 2:06-cv-999-VBF-MAN, 2006 Dist. LEXIS 101366 (C.D. Cal.
  Sept. 20, 2006) ......................................................................35, 50, 1

*Wilk v. Am. Med. Ass'n,*
  671 F. Supp. 1465 (N.D. Ill. 1987)......................................................57

*Wisconsin Interscholastic Athletic Ass'n v. Gannett Co.,*
  658 F.3d 614 (7th Cir. 2011) ...........................................23, 44, 45, 46

*Zacchini v. Scripps-Howard Broadcasting Co.,*
  433 U.S. 562 (1977).......................................................23, 44, 45, 46

## STATUTES

15 U.S.C. § 26..................................................................................37, 43

765 Ill. Comp. Stat. ..............................................................................42

Cal. Civil Code § 3344(d)......................................................................42

Fed R. Civ. P. 23(b)(3)......................................................................20, 21

Haw. Rev. Stat. § 482PP-7(b)(2) ...................................................................42

Nev. Rev. Stat. § 597.790(2)(c) ....................................................................42

Ohio Rev. Code Ann. § 2741.02(D)(1) .........................................................42

Okla. Stat. tit. 12, § 1449(D) ........................................................................42

Tenn. Code Ann. § 47-25-1107(a) ................................................................42

Wash. Rev. Code § 63.60.070(2)(b) .............................................................42

## OTHER AUTHORITIES

Philip Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2010) .......................27

Steve Berkowitz, "Oliver Luck brings own perspective to NCAA on
    O'Bannon name and likeness issue," USA Today (Jan. 16, 2015),
    *available at*
    http://www.usatoday.com/story/sports/college/2015/01/16/ncaa-
    convention-oliver-luck-obannon-name-and-likeness-court-
    case/21873331/. ...................................................................................25

John Cummins & Kirsten Hextrum, "The Management of Intercollegiate
    Athletics at UC Berkeley: Turning Points and Consequences," Research
    & Occasional Paper Series: SCHE.12.13 (Nov. 2013), *available at*
    http://www.cshe.berkeley.edu/sites/default/files/shared/publications/docs/
    ROPS.CSHE_.12.13.Cummins%26Hextrum.CalAthletics.1.6.2014.pdf ..........52

Marc Edelman, "A Short Treatise on Amateurism and Antitrust Law: Why
    the NCAA's No-Pay Rules Violate Section 1 of the Sherman Act," 64
    Case W. Reserve L. Rev. 61 (2013) .................................................30

Marc Edelman, "The Future of Amateurism After Antitrust Scrutiny: Why a
    Win for the Plaintiffs in the NCAA Student-Athlete Name & Likeness
    Licensing Litigation Will Not Lead to the Demise of College Sports," 92
    Or. L. Rev. 1019 (2014) .....................................................................31

Gabe Feldman, "A Modest Proposal for Taming the Antitrust Beast," 41
    Pepperdine L. Rev. 249 (2014) .........................................................31

Jeffrey Harrison & Casey Harrison, "The Law and Economics of the
    NCAA's Claim to Monopsony Rights" (2009) ...................................31

Daniel E. Lazaroff, "The NCAA in Its Second Century: Defender of Amateurism or Antitrust Recidivist?" 86 Or. L. Rev. 329 (2007) ....................31

Amy McCormick, "The Emperor's New Clothes: Lifting The NCAA's Veil of Amateurism," 45 San Diego L. Rev. 495 (2008)...........................33

Robert McCormick & Amy McCormick, "The Myth of the Student-Athlete" 81 Wash. L. Rev. 71 (2006)..............................................................53

Michael Marot, "NCAA Executive Backs Athlete Image Compensation," Associated Press (Dec. 18, 2014), *available at* http://www.pro32.ap.org/article/ncaa-executive-backs-athlete-image-compensation. ...................................................................................25

NCAA, "NCAA to Pay for Family Travel for CFP, Final Fours Under Pilot Program," NCAA.com (Jan. 6, 2015), *available at* http://www.ncaa.com/news/ncaa/article/2015-01-06/ncaa-pay-family-travel-cfp-final-fours-under-pilot-program...........................................7

Kenneth L. Wainstein, A. Joseph Jay III, & Colleen Depman Kukowski, *Investigation of Irregular Classes in the Department of African and Afro-American Studies at the University of North Carolina at Chapel Hill*, *available at* http://www.wralsportsfan.com/asset/colleges/unc/2014/10/22/14104501/148975-UNC-FINAL-REPORT.pdf .................................................52

Dan Wolken & Steve Berkowitz, "NCAA Removes Name-Likeness Release from Student-Athlete Forms," USA Today (July 18, 2014), *available at* http://www.usatoday.com/story/sports/college/2014/07/18/ncaa-name-and-likeness-release-student-athlete-statement-form/12840997/.......................32

## **GLOSSARY OF ABBREVIATIONS**

| | |
|---|---|
| ACE | American Council of Educators |
| CLC | Collegiate Licensing Corporation |
| DI | Division I |
| EA | Electronic Arts, Inc. |
| ER | Excerpts of Record |
| FBS | Football Bowl Series |
| GIA | Grants-in-aid |
| KC | Knight Commission on Intercollegiate Athletics |
| NCAA | National Collegiate Athletic Association |
| NIL | Names, images and likenesses |
| Pac 10 | Pacific-10 Conference |
| PTFFD | Presidential Task Force on the Future of DI Intercollegiate Athletics |
| RoP | Right of Publicity |
| SCIR | Second Century Imperatives Report |
| SEC | Southeastern Conference |
| SER | Supplemental Excerpts of Record |
| TFCA | Task Force on Commercial Activity |

## I.   STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Whether the district court abused its discretion or committed clear error in granting narrowly tailored permanent injunctive relief.

## II.   STATEMENT OF THE STANDARDS OF REVIEW

Appellant National Collegiate Athletic Association ("NCAA") has not fully articulated the applicable standard of review. The decision to grant a permanent injunction is reviewed for "abuse of discretion or application of erroneous legal principles." *See Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1079 (9th Cir. 2004). The same standard applies to claimed error concerning the scope of any injunction. *United States v. Schiff*, 379 F.3d 621, 625 (9th Cir. 2004). "Abuse of discretion" has been defined as "plain error," that is, "a judgment that is clearly against the logic and effect of the facts as are found." *Rabkin v. Or. Health Scis. Univ.*, 350 F.3d 967, 977 (9th Cir. 2003).

Fact-findings made by the district court as part of its injunctive order are reviewed under a clear error standard. *Ting v. AT&T*, 319 F.3d 1126, 1134-35 (9th Cir. 2003). Review for clear error is highly deferential; the appellate court must have a "definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 235 (2001). If the lower court's view of the evidence is plausible in light of the entire record, the appellate court should not reverse, even if it would have weighed the evidence differently. *See Husain v. Olympic Airways*,

316 F.3d 829, 835 (9th Cir. 2002), *aff'd* 124 S.Ct. 1221 (2004). Under the proper standard of review, the rulings of the district court should be upheld.

## III.   STATEMENT OF THE CASE

This case presents the issue of whether the district court properly held the NCAA liable under the federal antitrust laws for entering into an agreement restricting compensation to a class of present and former NCAA Division I ("DI") men's basketball and Football Bowl Series ("FBS") football players ("Plaintiffs") for the commercial use of their names, images, and likenesses ("NILs") in game broadcasts, game videoclips, and videogames. The court did so after hearing the testimony of 23 witnesses and considering 287 exhibits over the course of a 15-day bench trial that produced a transcript of 3,395 pages and a written decision of 99 pages.

The district court issued a limited and tailored injunction that does not require any school to pay any athlete. Rather, the court's remedy leaves that decision to individual educational institutions. The remedy allows the NCAA to adopt rules limiting an athlete's compensation to $5,000 for every year of academic eligibility, as well as rules ensuring that no school may offer to a recruit a greater share of licensing revenue than it offers to any other recruit in the same class on the same team. The remedy also allows schools to deposit compensation in trust for Plaintiffs, payable when they leave school or their eligibility expires. As

the district court noted, the NCAA's own witnesses stated that their interpretation of "amateurism" was consistent with such modest payments, which are comparable to the amounts that the NCAA already permits athletes to receive if they qualify for a Pell Grant and are half the $10,000 that tennis players currently may receive prior to enrollment. Excerpts of Record ("ER") 34. Thus, the relief does not displace or disrupt the NCAA's rules concerning "amateurism."

The district court's ruling is overwhelmingly supported by the extensive factual record in this case, which painstakingly documents: (a) the opacity of the NCAA's amateurism rules; (b) how DI men's basketball and FBS football became professionalized big business in the three decades since the United States Supreme Court's ruling in *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85 (1984) ("*BoR*"); (c) the NCAA's internal recognition that this professionalization undermines its concept of amateurism; (d) the NCAA's rampant commercial use of Plaintiffs' NILs; and (e) the internal recognition by some within the NCAA that DI men's basketball players and FBS football players should be accorded some portion of revenues derived from those sports. The NCAA's own "principle of amateurism" purportedly proscribes commercial exploitation of college athletes, but the trial record, which it ignores, is replete with evidence that the NCAA itself engages in precisely such exploitation.

A. **History Shows that the Concept of "Amateurism" Is Unfixed, Malleable, and Self-Serving.**

The district court found that the NCAA's definition of "amateurism" changed dramatically through the years. ER32-34. History confirms that the limited remedy granted by the district court even comports with the NCAA's self-serving interpretations of "amateurism."

The Intercollegiate Athletic Association, which changed its name in 1916 to the NCAA, issued its first bylaws in 1906 setting forth the "Principles of Amateur Sport," which forbade any direct or indirect financial consideration to play in intercollegiate sports. ER267. As the district court noted, these rules would have barred the athletic scholarships (also known as grants-in-aid ("GIAs")) offered today. ER33.

The NCAA's members widely violated these rules. ER267-68. In 1929, a Carnegie Foundation report found that of the 112 schools surveyed, 81 provided inducements to students ranging from open payrolls and disguised booster funds to no-show jobs at movie studios. ER268. Similar concerns were expressed by NCAA members in succeeding years. ER269.

In 1948, the NCAA enacted the "Sanity Code" to "alleviate the proliferation of exploitive practices in the recruitment of student-athletes." *Id*. Contrary to the present system, the Sanity Code required that financial aid be awarded without

- 4 -

consideration for athletic ability. In 1950, seven schools were found to be in violation of the code, and it was repealed a year later. *Id.*

In 1951, Judge Saul Streit of the New York Court of General Sessions mounted a probe into gambling on college athletics. ER269-70. Streit found that commercialism in football and basketball was "rampant," and they were "no longer amateur sports." Athletes were "bought and paid for." Scouting and recruiting violations were "almost universal." Academic standards were evaded through "trickery, devices, frauds, and forgery." Responsibility for these scandals, Judge Streit concluded, must be shared by the "college administrators, coaches and alumni groups who participate[d] in this evil system . . . ."

Thus, far from being a "revered tradition" (NCAA Br. 6), "amateurism," even as defined by the NCAA, was often contravened or ignored. And as Plaintiffs' economic expert, Dr. Roger Noll, pointed out, scandals involving payment of college athletes have not abated. Supplemental Excerpts of Record ("SER") 130-31, 712-13.

In 1951, Walter Byers became Executive Director of the NCAA. ER270. He adopted the term "student-athlete" to circumvent judicial decisions suggesting college athletes might be entitled to employment benefits. SER305-06, 413. For instance, in 1953 the Colorado Supreme Court upheld a determination that a football player at the University of Denver was an "employee" within the meaning

- 5 -

of the Colorado workers' compensation statute. *Univ. of Denver v. Nemeth*, 257 P.2d 423, 429-30 (Colo. 1953).

In 1956, the NCAA enacted a national standard governing athletic scholarships. This standard defined a full GIA as an award to a college athlete for "commonly accepted educational expenses," subsequently expanded to include tuition, fees, room, board, and books; later, athletic scholarships of up to four years were permitted. SER65-66, 203, 302-03, 308.

As the district court explained, what could be included in, subtracted from, or offered in addition to a GIA was often arbitrary and manipulated. *See* ER34. Incidental expenses are an example. In the 1950s, college athletes were given so-called "laundry money" to cover such expenses. SER202, 205-06. At the 1975 Economy Convention, the NCAA eliminated parts of the GIA that allows college athletes to receive reimbursement for course-related supplies. SER67. This reduction in benefits was purely an economizing move. SER68-70. Several years ago, some schools sought the ability to pay a $2,000 "stipend" to college athletes. That was provisionally enacted, but was later overridden in a vote by all schools. SER202-04.

In 2014, the five largest DI conferences sought to provide their full-scholarship college athletes with $5,000 stipends in addition to their GIAs—relief similar to that ultimately approved by the court. SER142-43. In August 2014, after

trial in this case, the NCAA allowed conferences to permit their schools to increase the maximum GIA. NCAA Br. 10 n.1.

Another example of the continuing redefinition of GIAs involved Pell Grants, which were created in 1965 for economically disadvantaged students. The NCAA initially required DI students receiving full athletic scholarships to turn over the full value of the grant to their respective schools. SER134. In 1984, however, the NCAA decided that such students should turn over only a portion of the Pell Grant money. *Id.* And finally, in 1995, the NCAA decided that DI students on full athletic scholarships could keep the full value of these grants. SER135.[1]

Additionally, a "Student Assistance Fund" was created for college athletes to draw upon for special needs (like a new suit or transportation costs to return home in the case of an emergency) without losing "amateur" status. SER304.[2]

---

[1] The NCAA contends that Pell Grants have nothing to do with "pay for play," (NCAA Br. 53), but if that were true, it would not have initially required that college athletes turn over the Pell Grant value to their respective schools and then reversed that position slowly over time. The treatment of Pell Grants reflects the malleable, *ad hoc* nature of what the NCAA defines as "pay."

[2] And a few weeks ago, the NCAA suddenly interpreted its rules to authorize payments of $3000 to cover travel expenses for the families of college athletes who play in the College Football Playoff championship and similar amounts for players in the semifinal and championship March Madness games. http://www.ncaa.com/news/ncaa/article/2015-01-06/ncaa-pay-family-travel-cfp-final-fours-under-pilot-program.

Dr. Daniel Rascher, one of Plaintiffs' economic experts, also testified that college athletes remain "amateurs" under NCAA rules despite receiving store credit cards with prepaid limits for playing in a bowl game. SER207-08.

The district court noted that the NCAA's amateurism rules also differ from sport to sport. ER34. Tennis players are allowed to receive $10,000 in prize money before starting college yet retain "amateur" status, whereas other DI recruits are barred from receiving anything above the actual incurred costs of competition. *See* SER737.[3]

The length and number of GIAs have also fluctuated over time. Prior to 1973, the NCAA had no limitation on the number of four-year athletic scholarships each school could provide. SER74. In 1973, the NCAA adopted Proposition No. 39, which mandated a one-year limit on athletic scholarships, requiring renewal on a year-to-year basis. SER74-75. Byers testified that this rule change was not necessary to promote either "amateurism" or competitive balance. SER75. In 2011, the NCAA removed the prohibition on multiyear scholarships, which colleges today are free to offer. The NCAA has also varied the number of available athletic scholarships over time. SER141, 149-51,196-97.

---

[3] The NCAA responds that this rule deals with payments before college. NCAA Br. 53. That misses the point. The example demonstrates that the NCAA applies the concept of "amateurism" to eligibility in disparate ways for different sports without rhyme or reason.

- 8 -

The NCAA's current version of "amateurism" is vague and manipulable. NCAA President Mark Emmert testified that an athlete's motivation in playing the game is irrelevant. SER322. He offered his subjective definition that "amateurism" means that "you don't get paid," but admitted that it is not stated in any rule. SER323. And he further testified that "amateurism" would permit payment above the current levels of GIAs up to the costs of attendance. SER321. This comports with Noll's observation that amateurism has a "very unclear meaning"; the term has no accepted economic definition. SER147-48.

Noll observed that the line between permissible and forbidden "pay" is whatever the NCAA says it should be on any given day. SER136. Another of Plaintiffs' experts, Dr. Ellen Staurowsky, cited NCAA DI bylaw 12.02.07, which reflects the same point. SER302-03; ER613. Thus, the difference between an "amateur" and "professional" is ever-changing, even under the NCAA's own interpretation. As Emmert conceded in a 2013 speech, "we have problems and challenges around things like the definition of amateurism and how we establish it and how we don't. It is not at all like it was not long ago." SER752. The NCAA acts as if it speaks with one voice on this topic, but history indicates that its members have different, and often conflicting, views.

- 9 -

### B. The NCAA's Growth as a Huge Business Since *BoR*.

It is undisputed that DI men's basketball and FBS football are big business.[4] ER275-79. The growth of that business has increased exponentially since *BoR* was decided three decades ago. That decision, which allowed NCAA member colleges to take control over the rights to the televising of their football games, combined with technological changes in how sports programming is delivered to consumers, transformed intercollegiate athletics.

Currently, each DI conference negotiates its own distinct broadcast agreement. Staurowsky estimated that the five largest conferences receive aggregate annual television revenue of $750 million. SER243-44. Some conferences, like the Big 12, include in their agreements with ESPN licenses for the rights to telecast football and men's basketball games on regional ESPN networks. Certain conferences, like the Big Ten, the Pac-12, and the Southeastern Conference ("SEC"), also have established their own networks to broadcast some regular season football and men's basketball games; sometimes this is done with external partners, such as Fox Broadcasting, which owns part of the Big Ten Network. Some conferences, like the SEC, also have agreements with digital media companies (like XOS) for the rebroadcast of football and men's basketball games and video clips. SER360-63, 596.

---

[4] *See* SER146, 152-53, 155-56, 182-189, 192-93, 215, 217-18, 241-42.

The DI FBS football postseason includes individual bowl games, and the entity that produces each of these bowl games or series negotiates its own broadcast agreements with a television network (or networks). The new DI FBS College Football Playoff, for example, directly negotiated a broadcast contract with ESPN that will yield approximately $600 million in annual revenue over the next 14 years. ER277.

Additionally, the NCAA has agreements with Turner Broadcasting and CBS to broadcast the DI men's basketball championships, known as "March Madness." In recent years, CBS and Turner Broadcasting paid the NCAA $700-$750 million annually for broadcast rights, and under an escalation clause that amount will increase over time. SER245.

Schools spend this substantial revenue on coaching salaries and lavish facilities.[5] Rascher estimated that from 2005-11, basketball coaching pay in NCAA DI schools increased by 11.4% (as opposed to 1.6% for the NBA). SER213-14. His comparable figure for NCAA DI FBS coaches was 9.7% (as opposed to 4.5% for NFL coaches). SER714. Coaches' salaries as a percentage of revenue for FBS football, NCAA basketball, the NFL and the NBA during the same period were, respectively, 3.5%, 11.1%, 1.5%, and 3.2%. SER213-14, 715.

---

[5] SER139-40, 154, 210-15, 221-22, 246-47, 249, 256-57, 260.

Between 1985-86 and 2009-10, salaries for full professors and presidents at 44 universities increased modestly, while coaching salaries increased by 650%. SER247-49. Sixteen of the 32 best-paid coaches in any sport, professional or otherwise, are DI basketball coaches. SER255-56. From 2006 to 2011, head football coaching salaries in major DI conferences grew from an average of $1.5 million to $2.5 million annually. SER250-51. Salaries for DI men's FBS football and basketball strength and conditioning coaches range from $125,000 to $325,000 and those for DI athletic directors average $500,000 annually. SER255. Staurowsky noted that since the mid-1990s, colleges have spent $15 billion on salaries of all types, with $6.4 billion of that (or almost 43%) devoted to football. SER256-57. From 2004-12, DI FBS recruiting expenditures increased by 55% overall and by 62% for the SEC. SER261-62, 716-17.

**C.    The NCAA's Recognition of the Erosion of "Amateurism."**

In light of these commercial realities, the NCAA was forced to adjust its outdated views of "amateurism." In his 2006 NCAA State of the Association speech, Dr. Myles Brand, former President of the NCAA, acknowledged amateurism had been romanticized as a "halcyon ideal that college sports can operate without commercial support and indifferent to the realities of a modern business model." SER438.

In 2006, the NCAA Presidential Task Force on the Future of DI Intercollegiate Athletics ("PTFFD") authored a report on "Second Century Imperatives" ("SCIR") noting "[t]he drift of the collegiate model toward the professional approach." SER490. Emmert, who became President of the NCAA in 2010, agreed with these concerns. SER327.

In a statement published on its website, the NCAA acknowledged that "[a]s the scale of both revenue generation and spending has increased over the last few decades, there is a general sense that 'big time' athletics is in conflict with the principle of amateurism. There is some critical mass of making and spending money above which, conventional wisdom holds, intercollegiate is no longer viewed as amateur sports." SER328. Emmert agreed with this concern. SER329.

David Berst, Vice President for the NCAA's DI, conducted a study of amateurism in the NCAA and in January 2008 concluded—contrary to the NCAA's current position—that it was "a definition that was not steeped in any sacred absolute principle that had to be preserved . . . and can be modified as views change . . . ." SER508.

Wallace Renfro, Senior Advisor to the NCAA's President, stated in November 2010:

> There is a general sense that intercollegiate athletics is as thoroughly commercialized as professional sports . . . . And the public would generally agreed [sic] that has all taken place at the expense of the student-athlete whose participation is exploited to make another buck

for a bigger stadium, the coaches, the administrators or for other teams who can't pay their own way. . . . [T]he notion that athletes are students is the great hypocrisy of intercollegiate athletics.

SER413-14. Renfro noted that the NCAA's "cradle-to-grave approach to amateurism" is based on anachronistic notions not found in the NCAA constitution and bylaws. SER414; *see also*, *e.g.*, SER535 ("the development of increased dollars acquired through corporate relationships does not square with the principle of amateurism, especially when images of student-athletes—even through the use of game video—are used in proximity to commercial products . . . .").

### D. The NCAA's Commercial Exploitation of Plaintiffs' NILs.

It was undisputed at trial that the NCAA and its members agree not to compensate college athletes for use of their NILs. ER133, 448-49; SER57, 61-63, 323-24. Yet the NCAA and its members routinely exploit Plaintiffs' NILs for commercial purposes.

In April 2008, the Presidential Task Force on Commercial Activity in DI Intercollegiate Athletics ("TFCA") produced a "Fact Sheet" on the NCAA's and its members' use of college athletes' NILs. *See* SER513-14. It noted that: (a) each school on average uses college athletes' NILs in 20 promotions annually, with many schools reporting 100 or more; (b) the NCAA does not police such uses by its media partners and corporate sponsors; (c) the amount of in-broadcast time (as distinct from commercial spots) "devoted to logos/branding of commercial entities can be substantial" (for example, 167 minutes in the 2007 Bowl Championship

Series championship game); and (d) college athletes are featured in many promotional efforts, including live and taped telecasts, "[h]ighlights on TV /radio/Internet/mobile," highlight videos and DVDs, screen savers and computer wallpaper, "[p]hotos for items purchased (framed, posters, calendars, books)," "[p]romotional materials (schedules, calendars, media guides)," "[t]une-in promos on TV/print/radio/Internet/mobile commercially sponsored features," "[c]ommercially sponsored contests or promotions (TV /radio/Internet/mobile)," "TV /radio/Internet/mobile ads," "[p]remiums with products purchased," "[p]roducts (*e.g.*, jerseys, bobble heads)," and videogames. *Id.*

Other internal NCAA documents refer to the use of college athletes' NILs or their use in NCAA-themed videogames produced by former Defendant Electronic Arts, Inc. ("EA"). The NCAA's bald assertion that it never allowed the use of Plaintiffs' NILs in videogames (NCAA Br. 42) is contradicted by the trial record.[6] *E.g*., SER417-18 (2005 NCAA e-mail stating that "[t]he jersey number along with the position and vital statistics is clearly an attempt to have the public make an association with the current student-athlete . . . And it appears to be working"; a representative from Princeton University questioned whether this violated the

---

[6] These are the same videogames that this Court has already addressed in *In re NCAA Student-Athlete Name Image & Likeness Licensing Litig.*, 724 F.3d 1268 (9th Cir. 2013) ("*Keller*") . Jeremy Strauser, a videogame producer at EA, testified that while it did not use the names of college athletes in its NCAA-themed videogames, it used all their individual attributes of performance, as well as height, weight, and skin tone. SER191-94; *accord*, SER49-55, 77-78.

NCAA's rules); SER466 (2005 internal e-mail by NCAA Associate Director of

Public Relations stating that "I don't think we have any argument as to student-

athletes with regard to these games as I even think there is sharp resemblance to

the SAs [student-athletes]"); SER523 (2009 e-mail by NCAA executive about EA

advertising for its NCAA Football '10 videogame stating that "I still worry about

the likenesses . . . it's pretty obvious to me"); SER506 (November 2007 e-mail

noting that the "presidents have been professing that they do not want [to] support

commercialism, most especially when student-athletes' images are involved. Of

course, the conferences and schools are already doing that—for example, the

Pontiac ads they complain about are already a staple of the fall football season,

which they control"); SER377 (September 2008 e-mail from Brand stating that

"[i]t is primarily because of the need for additional revenue that institutions—and

the National Office—are seeking ways to commercialize their rights, and those of

SAs").

      Byers testified that NCAA rules do not protect college athletes from

commercial exploitation. SER73. Emmert acknowledged numerous examples of

commercial exploitation, including: (a) a photograph of players in juxtaposition

with corporate sponsor logos at the Chick-Fil-A Bowl (SER320); (b) campus

athletic signage with corporate logos (SER319); (c) sales of jerseys through the

NCAA website that were searchable by the names of college athletes (ER475-76);

(d) similar portals on the websites of NCAA member schools (ER476-77; SER330-31, 338-39); (e) photographs of post-game conferences with prominent displays of corporate sponsor logos (SER325-26); (f) Georgia Tech University's sale of playing schedule cards that incorporated player images (SER332); and (g) EA's use of player likenesses in its videogames (SER336-37). Bernard Muir, Stanford University Athletic Director, was likewise shown his institution's web store where photographs of specific players were available for purchase in apparent violation of the NCAA's own bylaws. SER367.

### E.  The NCAA's Own Consideration of Proposals to Compensate Plaintiffs for NIL Use.

Internally, the NCAA understood that it was vulnerable for foreclosing compensation to college athletes for the commercial use of their NILs. Brand stated in a January 2008 e-mail that the TFCA should examine the issue of such compensation: "[t]he media and our critics (and Byers in his book) argue that student-athletes should receive a share of the royalties on jerseys and other goods sold with their number. Similarly, it should be possible to sell goods with their name on it and for the student-athletes to receive a share of the royalties." SER510.

In October 2008 TFCA minutes, one member stated "consideration should be given to redirecting funds from commercial activities that permissibl[y] involve student-athletes into a fund available for student-athletes. This standard should be

applied to institutions, conferences and the national office." SER518; *see also* SER310.

Other internal NCAA documents discuss the concept of a "student fund" or "trust fund" for compensating college athletes for use of their NILs. *E.g*., SER423 (2005 NCAA e-mail discussion of permitting EA to use college athlete NILs and "dedicating proceeds to a student-oriented fund"); SER380 (2008 comment by University of Oregon President that "[w]ith regard to use of student-athlete likenesses, he suggested putting some money into a trust fund for the benefit of student-athletes if they are involved in commercial activities"); SER352-54 (setting up a trust fund to provide additional funds to students was permissible as long as it fell within the collegiate model, even if the amount included in the fund was equal to the revenue a college athlete might obtain from licensing his NIL).

Indeed, in this case, the NCAA's own witnesses acknowledged that modest payments to athletes were consistent with the NCAA's interpretation of "amateurism." For example, Neal Pilson, a former president of CBS Sports, testified that "a million dollars would trouble me but $5000 wouldn't, but that's a pretty good range." SER180. Muir of Stanford thought that while payments of six or seven figures per athlete would be too high, some lesser sum would not undermine "amateurism." SER365.

### F.     Procedural History of the Case.

In July 2009, class representative Edward O'Bannon filed his initial antitrust complaint on behalf of the Plaintiffs against the NCAA and its independent licensing agent, Collegiate Licensing Corporation ("CLC"). Like subsequent complaints, the initial complaint alleged that the NCAA, its members, and their coconspirators had agreed to fix at zero the compensation for the commercial use of Plaintiffs' NILs. The district court found that O'Bannon stated a viable antitrust claim, but noted that this claim had to be tested under a Rule of Reason, not a *per se* rule of illegality. ER237-53.

O'Bannon and other class representatives filed various complaints and amended complaints in the original case and in related cases. EA, the maker of NCAA-themed football and basketball video games, was added as a Defendant. Defendants filed motions to dismiss that were largely unsuccessful. *E.g.*, ER196-219, 220-36.

Extensive discovery ensued. A total of 1,161,043 pages of documents were produced by Defendants and over 75 depositions were taken. After discovery was largely completed and after this Court in *Keller* ruled against EA on a First

Amendment defense with respect to separate right of publicity ("RoP") claims, EA and CLC settled all claims against them for $40 million.[7]

The district court declined to certify a Rule 23(b)(3) antitrust damages class on the basis of the manageability requirement. SER38. However, it did certify a class for injunctive relief. SER39. The court also denied the parties' cross-motions for summary judgment in all respects relevant here. ER185-87; SER6.

The subsequent bench trial consumed 15 court days and resulted in 3,395 pages of transcript. Twenty-three witnesses testified, giving the district court ample opportunity to assess their credibility; it often asked questions of its own. A total of 287 trial exhibits were admitted. After extensive post-trial briefing, the district court issued 99 pages of findings and conclusions on August 8, 2014. ER9-107.

Neither side prevailed on all of its arguments. The district court made extensive factual findings that the NCAA restrains trade in two related national markets, the "college education market" and the "group licensing market." ER15-26. The court further found that the NCAA exercises market power, fixes prices, and restrains competition in both markets. ER27-31. It then examined the NCAA's assertion that its rules are reasonable because they are necessary to preserve its tradition of "amateurism," maintain competitive balance among FBS football and

---

[7] The NCAA subsequently settled all claims brought separately by the *Keller* Plaintiffs for another $20 million.

DI basketball teams, promote the integration of academics and athletics, and increase the total output of its product. The court canvassed the record and found that the evidence disproved or undermined the NCAA's assertions. ER31-56.

However, the district court found no injury to competition in the licensing markets identified by Plaintiffs, found that aspects of two of the NCAA's claimed procompetitive justifications ("amateurism" and integration of athletics and academics) were marginally supported by enough evidence to require the court to consider if they could be achieved through less restrictive alternatives, and rejected one of the alternatives proposed by Plaintiffs. ER55-56, 77-80, 83-86, 97-98. Rather than adopting the broad-form injunction proposed by Plaintiffs,[8] the district court opined that the NCAA could enforce rules limiting payments for use of NILs to an annual amount of less than $5,000 and ensuring that schools do not offer a recruit a greater share of licensing revenue than they offer any other recruit in the same class on the same team. ER100. The court also made clear that schools were free to hold the licensing revenue in trust for their FBS football and DI basketball recruits, payable when they leave school or their eligibility expires. *Id*.

---

[8] The Plaintiffs also proposed narrower forms of injunction during trial that were closer to what the district court eventually adopted. ER7.

## IV.   SUMMARY OF ARGUMENT

After an extensive bench trial, the district court properly found that the NCAA and its members had violated the Sherman Act, and the court did not abuse its discretion or commit clear error in issuing a narrowly tailored injunction.

The NCAA seeks a categorical declaration that its challenged no-compensation-for-use-of-NILs rule is procompetitive as a matter of law on the basis of *dicta* in *BoR*. The NCAA misreads that case, which does not establish the antitrust immunity that the NCAA effectively seeks. To the contrary, the Supreme Court in *BoR* held that the NCAA had committed an antitrust *violation*, and it instructed lower courts to apply a "Rule of Reason" analysis, which is exactly what the district court did in this case. The district court compiled an exhaustive factual record that demonstrates in detail that the no-compensation rule is *anticompetitive*, not procompetitive. *BoR* provides no authority for disturbing that fact-bound determination on appeal, particularly where the NCAA failed to show that *any* of the district court's factual findings is clearly erroneous.

The NCAA asks this Court to find that the no-compensation rule is not subject to antitrust regulation because it is "noncommercial," despite its obvious economic effects. NCAA Br. 32-35. That is not the law in this Circuit, and in any event, the factual record in this case establishes the commercial nature of the NCAA's rule. The out-of-circuit cases on which the NCAA relies are inapposite.

The NCAA claims that Plaintiffs lack antitrust standing, relying on the First Amendment and the asserted absence of state-law claims for use of NIL rights with respect to televised public performances. The trial record belies this argument. The NCAA's current contracts with television and cable networks (under which it reaps hundreds of millions of dollars in revenue annually) contain express provisions assigning Plaintiffs' NIL rights. The NCAA's naked assertion that these contractual provisions are irrelevant surplusage hardly provides a basis for impeaching the district court's factual findings as clear error. And the NCAA's arguments are contrary to this Court's ruling in *Keller* and the Supreme Court's decision in *Zacchini v. Scripps-Howard Broadcasting Co*., 433 U.S. 562 (1977), as interpreted in *Wisconsin Interscholastic Athletic Ass'n v. Gannett Co.,* 658 F.3d 614 (7th Cir. 2011) ("*WIAA*").

The NCAA next contests the district court's Rule of Reason analysis. At trial, the NCAA alleged four procompetitive justifications for the challenged restraint, and the district court found marginal evidence with respect to two ("amateurism" and the integration of athletics and academics) that warranted considering, consistent with Ninth Circuit law, whether they could be served by less restrictive alternatives. There are no procedural or substantive infirmities with the district court's injunction, which gives the NCAA's members the option of deciding whether to provide any compensation for use of NILs at all, allows the

NCAA to place a reasonable cap on such compensation, and allows actual payment of such compensation to be deferred until after a Plaintiff's eligibility to play football or basketball expires. None of these rulings constitutes clear legal error or an abuse of discretion.

It is also important to recognize what this case is *not* about.

The NCAA asserts that this case is about "pay-for-play." NCAA Br. 3, 41. However, this case is not about paying Plaintiffs a salary for playing DI men's basketball or FBS football. Nor is it about treating Plaintiffs as some special class of employees. The question here is simple: May the NCAA and its members collude to depress to zero any compensation for use of Plaintiffs' NILs? The district court held that such collusion—when tested under the Sherman Act's Rule of Reason, using settled Ninth Circuit law—constituted an antitrust violation.

Nor is this a case where a court is refusing to "defer to the NCAA's judgment about how best to administer college sports." *Id*. at 58. The district court made it clear that the NCAA could maintain its other rules supporting "amateurism" and could develop new ones that would limit player access to deferred NIL compensation paid into a trust fund. ER54-55. There is no foundation for the NCAA's intemperate accusation that the district court committed "judicial micromanagement." NCAA Br. 5. The opposite is true. The district court left each educational institution to decide for itself whether to compensate Plaintiffs for the

use of their NILs. Oliver Luck, the new Executive Vice-President for Regulatory Affairs at the NCAA, announced in a December 17, 2014 press conference that many colleges are deciding to do so.[9]

Finally, the NCAA contends that this decision entails paying the Plaintiffs $30,000 over the course of their eligibility years. NCAA Br. 4, 55. That is untrue. The district court issued a prohibitory, not a mandatory, injunction. As it noted, "[s]chools that cannot afford to re-allocate any portion of their athletic budget for this purpose would not be forced to do so." ER97.

The judgment below should be affirmed.

## V. ARGUMENT

### A. The NCAA Does Not Enjoy Antitrust Immunity Under *BoR*.

The district court properly held that the NCAA has restrained trade with respect to the recruitment and retention of Plaintiffs in the college education market. Plaintiffs' expert Noll testified at length about the cartel and its adverse impact on competition. SER121-26. The NCAA's own expert witness, Dr. Daniel Rubinfeld, authored a textbook in microeconomics that has maintained, over numerous editions, that the NCAA is a cartel that restricts competition by, *inter alia*, reducing the bargaining power of college athletes through rules regarding

---

[9] *See* http://www.pro32.ap.org/article/ncaa-executive-backs-athlete-image-compensation; http://www.usatoday.com/story/sports/college/2015/01/16/ncaa-convention-oliver-luck-obannon-name-and-likeness-court-case/21873331/.

eligibility and terms of compensation. SER116-29, 375-76. The NCAA cartel creates what Noll called a "binding restraint," preventing schools that would otherwise do so from competing to recruit and retain Plaintiffs in this respect. SER132-33.

The unsuccessful attempt a few years ago to enact a rule that would permit schools generally to give college athletes a $2000 annual stipend in addition to their GIAs illustrates how the NCAA behaves like a classic cartel. The five power conferences succeeded in 2014 in getting a rule enacted that would permit them to supplement GIAs paid to current college athletes up to the cost of attendance, but only after repeated threats to form a separate division. One NCAA document generated during that struggle explained that the conferences "do not have the ability within the current NCAA structure, to control our own destiny, to adopt reforms that respond to . . . concerns [about exploitation of college athletes] . . . ." SER543. A letter from the Commissioner of the Pac-12 Conference underscored the process for change in DI was "vulnerable to inertia or attempts to override, disagreement over details, and incrementalism . . . ." SER708; *see also* SER539 (decrying NCAA's use of a "one size fits all" approach).

### 1. The NCAA Misreads *BoR*, Which Supports Plaintiffs.

The NCAA argues that its rules forbidding payment to Plaintiffs for use of their NILs are procompetitive as a matter of law under *BoR*. NCAA Br. 22-31. The

NCAA misinterprets *BoR*.

In *BoR*, the Supreme Court held that the NCAA's plan for televising college football games was a horizontal agreement in restraint of trade and invalid under the Sherman Act. The Court declined to apply a *per se* rule of invalidity to the agreement and instead opined that a Rule of Reason approach was required because "this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all." 468 U.S. at 101. The Court explained that its decision to apply Rule of Reason rather than *per se* invalidity was "not based . . . on the fact that the NCAA is organized as a nonprofit entity, or on our respect for the NCAA's historic role in the preservation and encouragement of intercollegiate amateur athletics." *Id*. at 100-01. Indeed, the Court observed that it is "well settled that good motives will not validate an otherwise anticompetitive practice" and cited a long line of venerable antitrust precedents condemning private self-regulation schemes under the Sherman Act, even when they purported to achieve a positive social outcome. *Id*. at 101 n.23; *see* 7 Philip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1506, at 421 (3d ed. 2010) ("good intent will not save conduct that we are otherwise prepared to judge unreasonably anticompetitive."). The Supreme Court further held that the plaintiff's failure to prove market power in the television market was not fatal because "no elaborate industry analysis is required to demonstrate the

anticompetitive character" of an agreement not to compete on price or output; "the rule of reason can sometimes be applied in the twinkling of an eye." 468 U.S. at 109 & n.39 (internal quotation marks and citation omitted).

In *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010), the Supreme Court reiterated that Rule of Reason analysis is applicable "[w]hen 'restraints on competition are essential if the product is to be available at all.'" *Id.* at 203 (quoting *BoR*, 468 U.S. at 101). The Court held that conduct relating to licensing of intellectual property was concerted action not categorically beyond Section 1's purview.

The NCAA erroneously contends that *BoR* and *American Needle* mean that its "amateurism" rules are "procompetitive as a matter of law" and may be upheld "'in the twinkling of an eye.'" NCAA Br. 21. This so-called "quick look" doctrine is intended to avoid the cost of a full-fledged Rule of Reason analysis. Here, the district court undertook the latter and found the challenged restraint unreasonable. There is no claimed clear error in its fact-findings, so the NCAA's argument is mooted.

The NCAA's argument also turns both *BoR* and *American Needle* on their heads. Both cases embraced the Rule of Reason, which the district court properly applied in this case. Neither case found any restraints "procompetitive as a matter of law." The Court in *BoR* found an antitrust violation; it stated that "the NCAA's

- 28 -

historic role in . . . amateur athletics" did *not* water down the applicable antitrust standard. *BoR*, 468 U. S. at 101. In *American Needle,* it reversed the grant of summary judgment for a professional sports league. The existence of a procompetitive justification merely advances the analysis under the Rule of Reason to weighing alleged procompetitive justifications and considering less restrictive alternatives; it creates no immunity.

The "twinkling of an eye" language cited by the NCAA was used in *BoR* in the context of *condemning* a restraint of trade, not upholding one. In fact, the Supreme Court has explained that the "quick look" doctrine may be used where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an *anticompetitive* effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999) ("*CDA*") (emphasis added).

This Court's precedent forecloses the NCAA's attempt to invoke the "quick look" doctrine. This Court has opined that "if an arrangement 'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition,' then a 'quick look' form of analysis is *inappropriate*." *Cal. ex rel. Harris v. Safeway, Inc*., 651 F.3d 1118, 1134 (9th Cir. 2011) (quoting *CDA*, 526 U.S. at 771) (emphasis added).

Thus, this Court has applied Rule of Reason analysis to: (a) the imposition of penalties by the Pacific-10 Conference ("Pac 10") on a college football program for recruitment violations (*Hairston v. Pacific 10 Conference*, 101 F.3d 1315 (9th Cir. 1996)) and (b) a Pac-10 rule that required a college athlete who transferred from one college to another to sit out the first year of eligibility after transfer and forfeit eligibility for another year as well (*Tanaka v. University of S. Calif.*, 252 F.3d 1059 (9th Cir. 2001)).

Another snippet from *BoR* on which the NCAA seizes—that "[i]n order to preserve the character and quality of the 'product,' athletes must not be paid"—ignores the rest of the sentence, which adds "*must be required to attend class*, and the like." *BoR*., 468 U.S. at 102 (emphasis added). This passage was part of the Supreme Court's explanation for applying Rule of Reason and not in support of some lesser degree of scrutiny. Furthermore, the Court in *BoR* was careful to convey that efforts to ensure the nonprofessional character of college sports "*can be viewed as procompetitive*" (468 U.S. at 102) (emphasis added)), not that they *must* be so viewed in every instance or that they will automatically qualify as procompetitive as a matter of law. The scholarly literature rejects the NCAA's overreading of *BoR*.[10]

---

[10] Marc Edelman, "A Short Treatise on Amateurism and Antitrust Law: Why the NCAA's No-Pay Rules Violate Section 1 of the Sherman Act," 64 Case W. Reserve L. Rev. 61, 76-78 (2013) (NCAA's no-compensation rule constitutes

Moreover, this case does not involve safeguards to ensure that student-athletes attend class and the like, which was the focus of the snippet on which the NCAA relies. Plaintiffs do not attack all rules on eligibility (such as salaries) and do not contend that restrictions on pure "pay for play" should be eliminated. Rather, each NCAA DI school should be free to compete for DI men's basketball and FBS football players by offering compensation for use of their NILs on a limited basis, subject to the NCAA's reasonable rules regulating such payments and subject to the requirement that any such compensation is held in trust and is payable only after a player's eligibility has expired. Plaintiffs' argument and the district court's findings are fully consistent with the NCAA's changing interpretation of "amateurism."[11]

---

illegal wage-fixing under settled law); Marc Edelman, "The Future of Amateurism After Antitrust Scrutiny: Why a Win for the Plaintiffs in the NCAA Student-Athlete Name & Likeness Licensing Litigation Will Not Lead to the Demise of College Sports," 92 Or. L. Rev. 1019, 1037-39, 1054-55 (2014) ("Edelman") (NCAA restrains trade and procompetitive justifications do not withstand scrutiny); Jeffrey Harrison & Casey Harrison, "The Law and Economics of the NCAA's Claim to Monopsony Rights," at 15-16 (2009) (*BoR*'s "amateurism" references do not create immunity for NCAA); Gabe Feldman, "A Modest Proposal for Taming the Antitrust Beast," 41 Pepperdine L. Rev. 249, 258 (2014) (decisions rejecting NCAA liability are "incoherent"); Daniel E. Lazaroff, "The NCAA in Its Second Century: Defender of Amateurism or Antitrust Recidivist?" 86 Or. L. Rev. 329, 353 (2007) (NCAA's position "has been criticized frequently and consistently by commentators with good reason").

[11] A development that occurred after briefing before the district court closed only underscores this point. One of the rules challenged here is NCAA Bylaw 12.5, which, *inter alia*, mandates that each year, a DI college athlete must sign an NCAA

## 2. The NCAA's Out-of-Circuit Precedent Is Not Persuasive.

The NCAA also relies on out-of-circuit precedent to argue that the district court should have treated the NCAA's no-compensation rule as "presumptively procompetitive" at the motion to dismiss stage. NCAA Br. 22 (quoting *Agnew v. NCAA*, 683 F.3d 328, 341 (7th Cir. 2012)).[12]

But none of the cases cited by the NCAA involves the restraint of trade at issue here: an agreement of no compensation for the use of NILs. And no case involves a factual record similar to that developed here. All of the NCAA's cited cases were decided at the dismissal stage or on motions for preliminary injunctions, when no meaningful discovery had been taken.[13] Indeed, *Agnew* turned essentially on a pleading error by the plaintiffs, and the Seventh Circuit made clear that in a different case the NCAA could face antitrust liability. *See Agnew*, 683 F.3d at 346 ("[t]he proper identification of a labor market for student-

---

release form relating to the use of his or her NIL, supposedly as a condition of eligibility. On July 18, 2014, it was revealed that the NCAA eliminated that form from the package given to such students. *See* http://www.usatoday.com/story/sports/college/2014/07/18/ncaa-name-and-likeness-release-student-athlete-statement-form/12840997/.

[12] *See Banks v. NCAA*, 977 F.2d 1081, 1089-90 (7th Cir. 1992); *McCormack v. NCAA*, 845 F.2d 1338, 1344-45 (5th Cir. 1988); *Justice v. NCAA*, 577 F. Supp. 356, 382 (D. Ariz. 1983).

[13] *See, e.g., Banks*, 977 F.2d at 1086-89; *McCormack*, 845 F.2d at 1343; *Justice*, 577 F. Supp. at 960.

athletes, on the other hand, would meet plaintiffs' burden of describing a cognizable market under the Sherman Act").

Here, the district court made extensive factual findings—based on years of discovery, exhaustive briefing, and a three week bench trial—documenting that the NCAA's restraint of trade was anticompetitive under the Rule of Reason. The NCAA's speculation about a *pretrial* presumption is moot, now that the district court has held a trial and made its findings of fact. *See Locricchio v. Legal Servs. Corp.*, 833 F.2d 1352, 1358-59 (9th Cir. 1987). The NCAA's argument is an improper attempt to displace the court's findings without actually engaging with them under the clear error standard.

Moreover, the business of intercollegiate DI men's basketball and FBS football is hardly the same as it was 30 years ago.[14] Nothing in *BoR* remotely suggests that a Rule of Reason analysis should be frozen as of 1984. The NCAA argues that DI men's basketball and FBS football were big business even then (NCAA Br. 28-31), but the record is replete with evidence of: (a) the NCAA's inconsistent applications of "amateurism," (b) its internal recognition that commercialism of DI men's basketball and FBS football has eroded and

---

[14] *See, e.g., Agnew*, 683 F.3d at 341; *Banks*, 977 F.2d at 1098-99 (Flaum, J., concurring in part and dissenting in part); ER93, 206; Edelman at 1030-32; Amy McCormick, "The Emperor's New Clothes: Lifting The NCAA's Veil of Amateurism," 45 San Diego L. Rev. 495, 505-44 (2008).

undermined the relationship between athletics and academics, and (c) the NCAA's recognition that modest NIL payments would be consistent with even the NCAA's interpretation of "amateurism." None of this evidence was before the Supreme Court in *BoR* and none of it was before the subsequent lower courts that deemed the NCAA's eligibility rules to be presumptively procompetitive.

The NCAA insists that "plaintiffs have never cited even one case in which a court subjected an amateurism rule to full rule-of-reason analysis." NCAA Br. 25. Yet the very cases cited by the NCAA have done exactly that, performing a full Rule of Reason analysis rather than just a "quick look." *See*, *e.g.*, *Smith v. NCAA*, 139 F.3d 180, 186 (3d Cir. 1998), *vacated on other grounds*, 525 U.S. 459 (1999); *McCormack*, 845 F.2d at 1333-34; *Justice*, 577 F. Supp. at 382-83. The courts also stressed that blanket immunity from antitrust law is disfavored. *See Agnew*, 683 F.3d at 338 (NCAA is not exempt from antitrust liability); *In re NCAA I-A Walk-On Football Players Litig.*, 398 F. Supp. 2d 1144, 1149 (W.D. Wash. 2005) (citing *BoR*, 468 U.S. at 98-100) ("the NCAA is not exempt from scrutiny under the Sherman Act").

The NCAA ignores numerous decisions entertaining properly pled antitrust challenges to agreements among colleges artificially to limit the number or

amounts of athletic scholarships.[15] Those cases may be fairly analogized to this one; certainly, the NCAA unsuccessfully argued that *BoR* was a complete bar to each. Hence, the district court's well reasoned decision in this case represents a proper application of settled antitrust principles.

### B.    The Sherman Act Applies to the Challenged Restraint.

The NCAA's fallback position is that the Sherman Act does not apply to a purportedly noncommercial restraint such as this one. NCAA Br. 32-34. It waived this argument below; as the district court noted, the NCAA did not dispute "that these rules affect interstate commerce." ER56.

Furthermore, the district court correctly held that the Sherman Act applied to the NCAA's commercial activities in this case. As noted above, there was substantial evidence that the NCAA is a multi-billion-dollar athletic business that commercially exploits Plaintiffs' NILs. The district court properly followed this Court's rulings that the Sherman Act's jurisdictional prerequisites were met in both

---

[15] *See, e.g., Agnew*, 683 F.3d at 344 (NCAA rules limiting sports scholarships to one year and the number of scholarships per team); *Walk-On*, 398 F. Supp. 2d at 1149 (NCAA rules dealing with GIAs); *Rock v. NCAA*, No. 1:12-cv-1019 JMS DKL, 2013 WL 4479815, at *15-16 (S.D. Ind. Aug. 16, 2013) (following *Agnew*); *White v. NCAA*, Case No. 2:06-cv-999-VBF-MAN, 2006 Dist. LEXIS 101366, at *10 (C.D. Cal. Sept. 20, 2006) ("*White*") (cap on GIAs); *In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig*., No. 4:14-md-02541 CW (N. D. Cal. Oct. 10, 2013) (Order Denying Motion To Dismiss) (same); *see also Metro. Intercollegiate Basketball Ass'n v. NCAA*, 339 F. Supp. 2d 545, 547-48 (S.D.N.Y. 2004) (NCAA postseason rules alleged to protect the connection between athletics and academics).

*Hairston* and *Tanaka*, which involved recruitment or eligibility rules. This Court gave no special dispensation to "educational" activities of the NCAA as "non-commercial."

The NCAA contends that the challenged rules are not commercial in nature, but it fails to confront the factual record of this case, and even its own authorities and *amici* do not support its view. In *Agnew*, the Seventh Circuit recognized that "the Sherman Act applies to commercial transactions, and the modern definition of commerce includes 'almost every activity from which [an] actor anticipates economic gain.' No knowledgeable observer could earnestly assert that big-time college football programs competing for highly sought-after high school football players do not anticipate economic gain from a successful recruiting program." *Agnew*, 683 F.3d at 340 (citation omitted).[16]

The NCAA relies on decisions from the Third and Sixth Circuits. *Smith*, 139 F.3d at 185-86 n.4; *Bassett v. NCAA*, 528 F.3d 426, 428-29, 433 (6th Cir. 2008). But those cases are inapposite because the eligibility rules in question were NCAA bylaws that prohibited a college athlete in graduate school from playing for a school that had not awarded his or her undergraduate degree (*Smith*, 139 F.3d at 184) or forbade improper inducements and academic fraud during recruiting of

---

[16] The NCAA's antitrust scholar *amici* also do not adopt the NCAA's view that the challenged restraint is procompetitive as a matter of law. Antitrust Scholars' Br. 5 n. 2.

high school students (*Bassett*, 528 F.3d at 429). The distinction between commercial and "non-commercial" activity is not applicable in this case. Here, the agreement not to compensate Plaintiffs for use of their NILs is a cost-saving device that ensures a cheap labor pool for the big business of DI men's basketball and FBS football. The district court correctly found that this is manifestly commercial conduct.

Even if the distinction were applicable, it has been called into question by the Fifth and Seventh Circuits. *See Agnew,* 683 F.3d at 339-41; *Hennessey v. NCAA*, 564 F.2d 1136, 1148-49 (5th Cir. 1977); *see also McCormack*, 845 F.2d at 1343. The Fifth Circuit in *Hennessey* relied on the United States Supreme Court's statement in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 787 (1975) that "[t]he nature of occupation, standing alone, does not provide sanctuary from the Sherman Act."

### C.     Plaintiffs Have Antitrust Standing.

The NCAA erroneously assumes that Plaintiffs' antitrust injury depends on their ability to assert right-of-publicity ("RoP") tort claims. That argument has no legal support, is belied by the trial record, and was therefore properly rejected by the district court.

**Antitrust Injury.** Injunctive relief under 15 U.S.C. § 26 requires merely the threat of "loss or damage" from an antitrust violation. *Cargill, Inc. v. Monfort of*

*Colo., Inc.*, 479 U.S. 104, 109-13 (1986). The NCAA insists that its rules could not

deprive Plaintiffs of a share of the revenue derived from their NILs because they

do not have an RoP in live broadcasts of their football and basketball

performances. NCAA Br. 36-41.[17] But Noll testified that even assuming *arguendo*

that this alleged deficiency exists, there is the requisite threat of loss or damage:

> regardless of what the legal status of the NIL rights are, the ex ante
> negotiation between a college and a student athlete, just like it is in
> other sports, would not have zero outcome in terms of the
> compensation of the player. The competition among the schools to
> get student athletes to come would produce a positive value for . . .
> all of the products that could be sold using the services of that
> student athlete. And they would pay them in part because of their
> ability to exploit their names, images and likenesses *regardless of
> what the law says about . . . the property right they have in the use of
> their own NILs*.

SER157-59 (emphasis added); *see also* SER160-62. The NCAA had no answer at

trial other than to speculate that any payments might not be traceable to particular

NIL usages, as it does again on appeal. NCAA Br. 41.

    Consistent with Noll's testimony, the district court found that "even if some

television networks believed that student-athletes lacked publicity rights in the use

of their names, images, and likenesses, they may have still sought to acquire these

---

[17] Elsewhere, the NCAA insists that its rules apply only to current college athletes
and therefore former college athletes lack antitrust injury. As the district court
recognized, however, the NCAA's rules foreclose any payment to college athletes
*at any time*, even decades later as their games continue to air. ER159-60.

rights as a precautionary measure. Businesses often negotiate licenses to acquire uncertain rights." ER76 (citing cases). Indeed, the record shows that numerous college sports broadcast agreements *already* transfer the very NIL rights the NCAA and the broadcasters insist are illusory. Based on this evidence, the district court correctly found that "the networks often seek to acquire the rights to use the names, images, and likenesses of the participating student-athletes during the telecast." ER21.[18]

The court credited the testimony of Plaintiffs' expert Edwin Desser, who spent 23 years negotiating television contracts as an NBA senior executive. He "confirmed that [NIL] provisions like these are common and that they have economic value to the television networks." ER23; *see* SER166-69, 173, 177-78. Desser also noted that these transfers are routine in sports broadcasting arrangements *irrespective of any particular state statute*. SER176; *see also* SER223-24, 420, 649, 650. Even Pilson, the NCAA's media expert, agreed that

---

[18] Among the many examples that the district court identified are the 1994 and 1999 March Madness college basketball broadcasting agreements between the NCAA and CBS, which even include a "Name & Likeness" provision granting CBS the unfettered "right" to exploit the NILs of game "participants." ER21-22; *see* SER382, 547, 564, 585, 617.

sports broadcast agreements "sometimes" identify NIL "rights" of athletes. ER23-24.[19]

This evidence is fatal to the NCAA's argument. The NCAA points to the absence in Desser's personal experience of specific verbal negotiations over NIL rights (NCAA Br. 37), but this hardly demonstrates "that broadcasters do not negotiate for NIL rights in *any* live broadcasts of team sporting events," as the NCAA sweepingly maintains. *Id*. 37-38 (emphasis in original). Certainly, the NCAA fails to show that the district court's factual findings are clearly erroneous. Indeed, as noted above, in December of 2014, NCAA executive Luck stated publicly that college athletes have a "fundamental right" to be compensated for use of their NILs.

Next, the NCAA asserts that any mention of NILs in broadcast agreements are merely "prophylactic" measures among "sophisticated parties"—and not grounds for inferring any particular RoP in any given state. NCAA Br. 38; *see also* Broadcasters' Br. 27. Yet that argument actually *supports* the court's findings that

---

[19] The trial record also demonstrated that "[p]rofessional athletes often sell group licenses to use their names, images, and likenesses in live game telecasts, videogames, game re-broadcasts, advertisements, and other archival footage." ER20. The district court's finding is supported by considerable evidence, including the testimony of Noll, Desser, Rascher, and Joel Linzner, the EA Senior Vice President of Legal and Business Affairs. SER137-38, 171-72, 223, 314, 316-17. The collective bargaining agreements of NFL and NBA players also provide direct evidence of such licensing. *See* SER372, 421.

these provisions are common and have economic value to the television networks regardless of state law.[20] At bottom, the NCAA's assertion that these "prophylactic" measures are obtained for "free" (NCAA Br. 41) is an implicit (and unsupported) challenge to the district court's considered fact-finding.

Likewise, the NCAA's position that Plaintiffs have no NIL rights to license is inconsistent with college release forms that purported to require an assignment of such rights as a condition of eligibility, as Emmert himself recognized. SER234, 333, 335, 344-45, 420.

The NCAA and its *amici* further argue that there is no injury to Plaintiffs' business or property because they have no NIL rights in game broadcasts and rebroadcasts. The NCAA faults the district court for not inventorying each state's RoP laws as to live-game broadcasts, but there is no such requirement. And it is noteworthy that the NCAA offers only a handful of authorities (concerning merely three states) to support its broad contention that *no state* recognizes a publicity right for athletes in live broadcasts. NCAA Br. 37.

In fact, a substantial majority of states recognize a broad RoP, whether by statute or under the common law. Of those states, only eight exempt sports

---

[20] The law and economics professors ("LEPs") who support the NCAA ignore this fundamental aspect of the district court's decision. They insist, with scant citations to the trial decision and the record, that the district court created a new property right, which ignores Plaintiffs' theory of injury and the district court's determination of threatened harm. LEP Br. 2-10.

broadcasts.[21] The number of states not exempting sports broadcasts is all the more significant given the NCAA's observation that "[t]eam sports have been broadcast *for almost a century*." NCAA Br. 36 (emphasis added).[22]

---

[21] *See* Cal. Civil Code § 3344(d); Haw. Rev. Stat. § 482PP-7(b)(2); 765 Ill. Comp. Stat. 1075/35(b)(2); Nev. Rev. Stat. § 597.790(2)(c); Ohio Rev. Code Ann. § 2741.02(D)(1); Okla. Stat. tit. 12, § 1449(D); Tenn. Code Ann. § 47-25-1107(a); Wash. Rev. Code § 63.60.070(2)(b).

[22] The Broadcasters acknowledge the absence of sports-broadcast exemptions in most state statutes and instead try to shoehorn sports broadcasts into "[p]ublic interest exemptions," which permit reporting or transmission of newsworthy information. Broadcasters' Br. 5. In support of this approach, the Broadcasters cite libel and defamation cases arising from *newspaper and magazine articles* that, at most, merely summarized athletic performances. *Id*. The only case that actually supports their interpretation—and even then only as to one state statute—is *Nat'l Football League v. Alley, Inc.*, 624 F. Supp. 6, 10 (S.D. Fla. 1983), which dispenses with the issue in a single sentence and provides no analysis whatsoever. In contrast, in *Dryer v. Nat'l Football League*, No. CIV. 09-2182 PAM/FLN, 2014 WL 5106738, at *12 (D. Minn. Oct. 10, 2014), the court provided a reasoned analysis, emphasizing the need for "newsworthiness" or "reporting" to satisfy state-law public-interest exemptions. The "clips of important plays" at issue there met those criteria and were regular source material for the evening news. *Id*. at *1. But full game broadcasts are another matter entirely. Compounding this misdirected argument, the Broadcasters cite various cases that considered an RoP claim where video clips, images, or descriptions were merely components of a larger work tantamount to news reporting. Again, however, documentaries (*id*.), highlight clips on Major League Baseball's web site (*Gionfriddo v. MLB*, 114 Cal. Rptr. 2d 307 (Cal App. 2001)), fantasy sports games that integrate player statistics (*C.B.C. Distribution & Mktg., Inc. v. MLB Advanced Media, L.P.*, 505 F.3d 818 (8th Cir. 2007)), and newspaper reproductions (*Montana v. San Jose Mercury News, Inc*., 40 Cal. Rptr. 2d 639 (1995)), are distinct from the broadcasts and rebroadcasts of entire college football and basketball games. Indeed, in *Keller* this Court recognized the very same distinction between "publishing or reporting factual data" and the "game[s]" themselves, albeit in the videogame setting. *Keller*, 724 F.3d at 1283. The district court in this case reached a similar conclusion in denying summary judgment. ER168-69.

Likewise inconsistent with the NCAA's position that "such rights simply do not exist" are the myriad broadcast contracts in evidence discussed above that explicitly convey "name, image, and likeness" rights. *See, e.g.,* SER382, 547, 564, 585, 617. The NCAA's argument is thus belied by the facts in the record.

The NCAA's claim that Plaintiffs lack antitrust injury also ignores the Plaintiffs' claims as to videogames. The NCAA acknowledges the numerous "jurisdictions that recognize a relevant publicity right" in videogames (NCAA Br. 41) and the absence of any First Amendment protection for those uses, given this Court's decision in *Keller*, 724 F.3d at 1276-82. Notwithstanding those concessions, the NCAA insists that there can be no threat of loss or damage under 15 U.S.C. § 26 because the NCAA and its schools decided just last year, as trial loomed and after nearly two decades, to discontinue its popular NCAA Football videogame series. That argument ignores the court's specific findings as to the likelihood of a future videogame. ER25. As the district court found, the evidence showed that the NCAA could resume licensing arrangements with videogame makers in the future, so the requested injunctive relief is by no means moot. ER25, 160 (citing cases). This Court should not accept the NCAA's self-serving assertion that "there is no realistic possibility of videogame makers paying schools to use student-athletes' NILs (and thus schools sharing that revenue with the student-athletes)." NCAA Br. 41.

- 43 -

The NCAA also raises the issue whether it has authorized the use of athletes' NILs in college-sports videogames—again without challenging the district court's contrary fact-finding as clearly erroneous. NCAA Br. 42. The court found that the NCAA repeatedly renewed its licensing agreement with EA, and "EA's NCAA-branded videogames featured playable avatars that could easily be identified as real student-athletes despite the NCAA's express prohibition on featuring student-athletes in videogames." ER25-26; *see also* SER377, 418, 466, 506, 524.[23]

**First Amendment.** The NCAA invokes the First Amendment to support its assertion that college athletes could not possibly receive a share of the revenues generated through the use of their NILs. The district court rejected this repackaged argument at least three times throughout the litigation, providing lengthy analyses that the NCAA simply ignores. ER148, 163, 196; SER1.

The NCAA's argument lacks merit under this Court's decision in *Keller*, the Supreme Court's decision in *Zacchini*, 433 U.S. 562, 574-75 (1977)—the only Supreme Court case ever to address the right of publicity—and the Seventh Circuit's application of *Zacchini* in *WIAA,* 658 F.3d 614 (7th Cir. 2011).

---

[23] The NCAA suggests that the Copyright Act might save its antitrust injury argument with respect to the videogames. But that argument is entirely undeveloped and hence need not be considered. *See, e.g., Ventress v. Japan Airlines*, 747 F.3d 716, 723 n.8 (9th Cir. 2014).

*Zacchini* concerned a television station's decision to broadcast, over the performer's protest, a recording of a "human cannonball" performance shot at a local fair. While the Supreme Court recognized the news station's First Amendment right to summarize or report "newsworthy facts" about the performance, the Court held that "we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent." *Zacchini*, 433 U.S. at 575.

Nearly 35 years later, the Seventh Circuit applied *Zacchini* to broadcasts of sporting events over the internet. In *WIAA*, the Seventh Circuit rejected a news organization's contention that it had an absolute First Amendment right to "cover" high-school sporting events, including by broadcasting them in their entirety online despite the high school's exclusive licensing arrangement with another broadcaster. *WIAA*, 658 F.3d at 624. The court explained:

> Interpreting the First Amendment to provide the media with a right to transmit an entire performance or to prohibit performers from charging fees would take us back centuries, to a time when artists or performers were unable to capture the economic value of a performance. Over the long run, this would harm, not help, the interests of free speech. The First Amendment requires no such folly.

*Id*.

This Court's decision in *Keller* holding that a videogame's use of the likenesses of college athletes was not protected by the First Amendment is to the same effect. *Keller*, 724 F.3d at 1276-83. The NCAA contends that broadcasts are

not the same as video games (NCAA Br. 39), but if anything, that distinction cuts the other way. *Keller* opined (in its opening sentence) that "[v]ideo games are entitled to the *full* protections of the First Amendment." *Keller*, 724 F.3d at 1270 (emphasis added). In contrast, broadcast television is still governed by *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969).

The NCAA's argument that *Zacchini* and *WIAA* protect only the "organizer[s]" of sporting events—not the performers[24] (NCAA Br. 38)—ignores the facts of *Zacchini* and its holding that referred expressly to "a *performer's*" act. *Zacchini*, 433 U.S. at 575 (emphasis added).[25] Zacchini was not the "organizer" or "producer" of the Geauga County Fair, where he performed; rather, his feat was one of many attractions, and "[m]embers of the public attending the fair were not charged a separate admission fee to observe his act." *Id*. Moreover, the Seventh Circuit in *WIAA* left no doubt that *Zacchini* applies to performers. *WIAA*, 658 F.3d at 628.

---

[24] The LEPs suggest that college athletes' willingness to take the field despite the anticompetitive restraint deprives them of the benefits of *Zacchini*. LEP Br. 9. That position is untenable because the Supreme Court has never cabined the reach of *Zacchini* to certain categories of performers.

[25] The word "organizer" appears nowhere in *Zacchini*, and the word "producer" appears only in a description of the offending news station's personnel. *Zacchini*, 433 U.S. at 564. The word "performer" appears 16 times. *Id*. at 562, 570, 572, 574-76, 579-82.

The NCAA's argument that the decision below might require a license from "anyone who is in a parade or simply walking down a public street" (NCAA Br. 40) is strained. There are obvious differences between those situations and specialized performances in controlled venues. The shoe is on the other foot; it is the NCAA's position that would set a dangerous precedent, by casting a grave shadow over the livelihoods of actors, musicians, and performers of all kinds, and giving carte blanche to anyone to steal their NILs under the guise of the First Amendment.

At bottom, the NCAA's First Amendment contentions, like those of the broadcasters, are far removed from the substance of this litigation, the bench trial, and the resulting injunction, which requires no action whatsoever on the part of broadcasters.[26] Antitrust injury is a modest hurdle, and the First Amendment provides no reason to ignore the substantial harm this anticompetitive restraint inflicts on Plaintiffs. Nor is the surrounding hyperbole about likely chaos in the broadcasting world warranted. Since the Court's summary judgment ruling in April of 2014, there has been no disruption in or chilling effect upon college sports broadcasting—and for good reason. The district court recognized the ability of the NCAA, the schools, and the conferences to gather valid consent for NIL usages from college athletes *as a condition of their athletic scholarships* or otherwise. The

---

[26] The NCAA and *amici* do not contend that the district court's *injunction* violates the First Amendment.

outcome of this litigation will not reshape college sports broadcast contracts, many of which already purport to license the NILs of college athletes.

**Copyright.** The NCAA also argues that any RoP claim concerning a television broadcast would be preempted by the Copyright Act, as if that too might bear on the question of antitrust injury here. But the Plaintiffs have never suggested that the right of publicity is a sword against otherwise valid transfers of copyright in a recording of a college football or basketball game. Instead, they contended that the settled law is that "[i]ntellectual property rights do not confer a privilege to violate the antitrust laws." *United States v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir. 2001).[27] Moreover, the district court explicitly acknowledged copyright preemption of certain right of publicity claims but rightly refused to dismiss Plaintiffs' action because their *antitrust* claims "are not preempted by the Copyright Act[.] . . . [T]hey are based principally on an injury to competition, not simply misappropriation." ER218.[28]

---

[27] *Accord, In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000); *Associated Film Distribution Corp. v. Thornburgh*, 683 F.2d 808, 816 (3d Cir. 1982); *Storer Cable Commc'ns v. City of Montgomery*, 806 F. Supp. 1518, 1535 (M.D. Ala. 1992); *Allied Artists Picture Corp. v. Rhodes*, 496 F. Supp. 408, 447 (S.D. Ohio 1980), *aff'd in part and remanded in part*, 679 F.2d 656 (6th Cir. 1982).

[28] Nor is the district court's reasoning in tension with *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134 (9th Cir. 2006), and *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (9th Cir. 2010). The district court recognized that these cases concern instances where a plaintiff repackages a copyright claim (in,

**D.    The District Court Properly Found The Restraint Invalid Under the Rule of Reason.**

The NCAA challenges the district court's application of the Rule of Reason but fails to show that any of the court's fact-findings were clearly erroneous. NCAA Br. 45-60. None of the NCAA's arguments has merit.

**1.    The District Court Properly Found Anticompetitive Effects.**

The NCAA asserts that its restraint of trade affected only one element of a bundled transaction and any adverse effects were "*de minimis*." NCAA Br. 47. That is incorrect, but, in any event, there is no *de minimis* exception for price fixing. Even a fix on just one component of a price can constitute an antitrust violation. *Catalano, Inc. v. Target Sales, Inc*., 448 U.S. 643 (1980). The NCAA contends that *Catalano* involved application of the *per se* rule of illegality (NCAA Br. 48-49), but this principle is applicable in Rule of Reason cases as well. *See Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 34-38 (D.C. Cir. 2005) (court applied quick look Rule of Reason to agreement to temporarily suspend discounting and promotion of certain record albums); *Law v. NCAA*, 134 F.3d 1010, 1017 (10th Cir. 1998) (rule limiting compensation paid to certain coaches "fixes the cost of

---

*e.g*., a recording of a song or an adult film) as an ROP claim, which necessarily shares the same "subject matter" under the Copyright Act. "In contrast," the district court observed, "the rights Plaintiffs seek to assert in the present case are fundamentally different from those protected by the Copyright Act. Plaintiffs here do not own copyrights in any of the game footage described in their complaint and, thus, do not seek to protect their copyrights in that footage." ER218.

one of the component items used by NCAA members to produce the product of Division I basketball").

The NCAA also argues that there was no effect on output. NCAA Br. 45-46. But the district court found substantial anticompetitive harm to athletes from the NCAA's restraint of trade. ER27-31. Moreover, the NCAA's legal premise that output reduction is critical to prove an antitrust violation in a monopsony case is wrong. The Supreme Court has imposed no such requirement. *See Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948). As noted in *Telecor Commc's Inc. v. Sw. Bell Tel. Co.,* 305 F.3d 1124, 1133-34 (10th Cir. 2002), "[t]he Supreme Court's treatment of monopsony cases strongly suggests that suppliers . . . are protected by antitrust laws even when the anti-competitive activity does not harm end-users."[29] In *Walk-On* and *White*, two cases involving college athletes, the courts found anticompetitive injury to the plaintiffs without

---

[29] *Accord, Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 988 (9th Cir. 2000) ("[w]hen horizontal price fixing causes buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs"); *United States v. Brown Univ.*, 5 F.3d 658, 668, 673-74 (3d Cir. 1993) (challenged restraint "anticompetitive 'on its face'" even though there was no argument that "[it] has caused or is even likely to cause any reduction of output"); *Clarett v. Nat'l Football League*, 306 F. Supp. 2d 379, 398 (S.D.N.Y.) ("[s]uch a rigid 'price or output' rule finds little support in the case law") (citing *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504 (9th Cir. 1989)), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004).

reference to output effects. *Walk-On*, 398 F. Supp. 2d at 1151; *White*, 2006 Dist. LEXIS 101366, at *9-10.

### 2. The District Court Properly Rejected Alleged Procompetitive Justifications.

The NCAA next argues that the district court failed to give appropriate weight to its claimed procompetitive justifications. NCAA Br. 49-54. However, the NCAA never discusses three of those asserted justifications—competitive balance, the integration of academics and athletics, and output. *Id*. 50. Instead, the NCAA focuses solely on the justification of "amateurism." *Id*. 52-53.

The NCAA ignores the district court's amply supported conclusion that the NCAA's interpretation of "amateurism" was vague and malleable. The court below carefully considered the historical record. ER32-35. It found that the inconsistencies in application belied any claim of a "revered tradition" tethered to an unchanging, idyllic notion of "amateurism."[30] The trial court's findings are bolstered by NCAA internal documents discussed above as well as by the testimony of Byers (former NCAA executive director) that the members of the

---

[30] The trial court properly gave little weight to the NCAA's survey evidence regarding amateurism. ER35-40. Methodological flaws may serve as a basis for a trial court to give survey results minimal probative value. *See*, *e.g.*, *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc*., 502 F.3d 504, 518-19 (6th Cir. 2007); *Am. Home Prods. Corp. v. Barr Labs., Inc*. 834 F.2d 368, 371 (3d Cir. 1987); *AmBrit, Inc. v. Kraft, Inc*., 812 F.2d 1531, 1544 (11th Cir. 1986).

NCAA "operate a monopoly business and as an exploitation of the young athlete[s] that are engaged in these [athletic] programs." SER72.

The American Council of Educators ("ACE") contends that the goal of schools is education, not sports, and that the educational character of intercollegiate athletics depends on "amateurism." ACE Br. 11-22. ACE cites to numerous extra-record sources, such as reports by the Knight Commission on Intercollegiate Athletics ("KC"). *Id*. at 8. Its arguments ignore the trial record and what entities like the KC actually concluded. The NCAA's most recent statistics show that only 47% of DI men's basketball players and 59% of FBS football players graduate within six years. SER746. The gap between graduation rates for college athletes and the regular student body is vast—31.5 percentage points lower for men's basketball players and 18 percentage points lower for FBS football players than for other full-time students. SER687, 697. Studies show that Plaintiffs are not receiving adequate college educations.[31]

Staurowsky testified that Plaintiffs spend an inordinate amount of time on their sports, recruitment is based on athletic performance, graduation rates (especially among African Americans) are lower than for the rest of the student

---

[31] *See* http://www.cshe.berkeley.edu/sites/default/files/shared/publications/docs/ROPS.CSHE_.12.13.Cummins%26Hextrum.CalAthletics.1.6.2014.pdf (UC Berkeley); http://www.wralsportsfan.com/asset/colleges/unc/2014/10/22/14104501/148975-UNC-FINAL-REPORT.pdf (University of North Carolina).

body, and they are often "clustered" in undemanding classes. SER265-67, 271-80, 283-94, 297-301. Other evidence corroborated this testimony. At trial, Plaintiffs testified that they understood their role as principally athletic.[32] O'Bannon called himself an "athlete masquerading as a student." SER114. Byers flatly disagreed with the notion that the NCAA's rules enable athletes to experience college as both athletes and students. SER71. Thus, in terms of the sports-related demands placed upon them, Plaintiffs are treated similarly to professional athletes.

Similarly, an NCAA survey of DI and I-A chancellors and presidents summarized their concerns that coaching staffs and schools "too often pull student-athletes away from academics and steer them toward undemanding programs of study that will not serve them well later in life, and perhaps most simply that not enough time is allowed or required for academics." SER678. Brand stated in 2005 that "[t]he bottom line is that too many student-athletes in these two sports are leaving before they earn a degree" and that there is "some evidence and considerable anecdote" that these college athletes are directed to easy classes and accommodating professors. SER652. As he noted, "[r]ecently, the football coach

---

[32] SER42-44, 46-47, 87-89, 96-107, 112-14, 164, 226-33, 235-36, 238-39. It is also supported by findings in *Northwestern University & College Athletes Players Association (CAPA)*, No. 13-RC-121359, 2014 NLRB LEXIS 221(Mar. 26, 2014); *see also* Robert McCormick & Amy McCormick, "The Myth of the Student-Athlete" 81 Wash. L. Rev. 71, 97-117 (2006).

of a major Division I-A program was quoted as saying, 'I was hired to win; I wasn't hired to graduate student-athletes.'" *Id*.

The NCAA's 2006 SCIR directly expressed concerns about lack of integration of academics and athletics. The chair of the PTFFD said that the "deeper problem is the danger of cultural isolation of student-athletes from the intellectual purposes and academic values of our universities." SER471. The SCIR noted the "educational value of athletic participation" playing a "secondary role to the win-loss column," the "erosion of the bond between athletics and academics," the "cultural isolation of student athletics" and the "islandization of athletics." *Id*. at 13, 36-37. It candidly admitted that rules supporting a level playing field "may not match the ideals of student-athlete well-being" and that college athletes can be "disadvantaged" by the "concern for competitive balance." *Id.* at 56.

These views were echoed by NCAA witnesses, such as Jim Delany, Commissioner of the Big Ten. He testified that college athletes are spending more time on their sports than in the past and that academically at-risk athletes may all lack time for studies. SER341-342. As he put it, "[o]ur efforts in controlling time demands has [*sic*] not been a good outcome." SER342. He bemoaned the fact that athletes may not have the opportunity for internships or a junior year abroad "because I don't think the training that we have allows for enough of those experiences"; he would "put a lock on the gym" after the playing season is over.

SER343, 348. He testified that too much emphasis is placed on sports and was hardly surprised that college athletes call themselves athletes first and students second. SER348-349;[33] *see also* SER312.

The district court's findings are not clearly erroneous.

### 3. The District Court's Consideration of Alternatives Was Proper.

The NCAA and scholar *amici* castigate the district court for supposedly adopting an improper "least restrictive alternative" analysis.[34] Those criticisms are unfounded. The determination of less restrictive alternatives is a question of fact. *Sullivan v. NFL*, 34 F.3d 1091, 1103 (1st Cir. 1994); *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1396 (9th Cir. 1984) ("*LAMCC*"). The district court followed Ninth Circuit precedent in considering the less-restrictive alternatives. ER98-99. It did not choose a least-restrictive alternative. Such an

---

[33] Likewise, Britton Banowsky, Commissioner of Conference USA, acknowledged the time demands on college athletes and said he wanted to see such athletes spend more time with other students and "do[] regular student things." SER355-57. He admitted that DI men's basketball and football players in Conference USA have graduation success rates far below those of the student body as a whole. SER357-58; *see* SER58-59 (athletes often not as prepared as rest of student body, not as focused on academics).

[34] This Circuit has left open the question whether a restraint should be judged under a "fairly necessary under the circumstances" test. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1305 (9th Cir. 1982). As in that case, the question need not be resolved here because the challenged restraint is not reasonably necessary to achieve the NCAA's desired goals.

alternative here would have been to prohibit the NCAA and its members from agreeing on *any* limitation on NIL payments. Instead, the district court enjoined them from agreeing to cap NIL payments below $5,000 annually. And the district court did not compel any school to make any NIL payments to any Plaintiff.

As noted above, this ruling was supported by the testimony of the NCAA's own witnesses. ER104-05.[35] Moreover, the top DI conferences voted in January 2015 to give additional modest stipends to athletes who receive GIAs. Likewise, the less restrictive alternative of placing NIL payments into a trust fund distributable only after a Plaintiff completes eligibility draws support from a number of internal NCAA documents discussed above and is being put into effect at schools, according to Luck.[36] The district court's remedy was proper.[37]

---

[35] As the district court also noted, its analysis was not contradicted by the survey evidence of J. Michael Dennis, the NCAA's survey expert, who found that the popularity of college sports would depend in part on the size of any payment given to college athletes. ER53-54. Dennis tested for payments of $20,000, $50,000, and $200,000 per year for each athlete. SER370. He did not test for payments of $5,000 a year.

[36] *See Sullivan*, 34 F.3d at 1108 (trier of fact could consider as less restrictive alternative rejected league proposal narrower than challenged restraint). The LEPs argue it was inappropriate for the district court to compare the existing market to an "unrestrained" market. LEP Br. at 22-34. But in fashioning the injunction, the district court considered a market that was constrained by other actual and potential rules more closely tailored to serve the goal of amateurism. Its analysis was similar to the Supreme Court's analysis in *BoR*. 468 U.S. at 119.

[37] The remedy is not unusual when compared with intellectual property consent decrees, *see*, *e.g.*, *BMI v. DMX, Inc.*, 683 F.3d 32, 40-42 (2d Cir. 2012) (adjustable

The NCAA's claim that it should have been left to its own devices in administering its "amateurism" regime is without basis. As a cartel, it unlawfully prevents schools from acting in their own self-interest. As a billion-dollar sports business, it supplants the decision-making authority of educators. The Sherman Act sets limits on what violators may and may not do. The less restrictive alternative analysis under the Rule of Reason necessarily involves an evaluation of available options a defendant did not utilize.[38] The injunction entered here was a measured and tailored response to the illegality found by the court, and it leaves in

---

fee blanket licenses); *ASCAP v. MobiTV Inc.*, 681 F.3d 76, 82 (2d Cir. 2012) (industry-wide royalty fees); *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 565 (2d Cir. 1990) (fee for blanket license to use copyrighted music), or the setting of fair, reasonable and non-discriminatory royalty rates for patent licensing. *See*, *e.g.*, *In re Innovatio IP Ventures Patent Litig.*, MDL Dkt. No. 2303, 2013 WL 5593609, at *45 (N.D. Ill. Oct. 3, 2013); *Microsoft Corp. v. Motorola Co.*, No. C10-1823JLR, 2013 WL 2111217, at *100-01 (W.D. Wash. Apr. 25, 2013).

[38] *See*, *e.g.*, *LAMCC*, 726 F.2d at 1385 (jury properly instructed on less restrictive alternatives in assessing rule that three-fourths of league owners needed to approve geographic relocation of member franchise, and it could consider lack of objective standards or durational limits in connection with voting requirement); *N. Am. Soccer League v. NFL*, 670 F.2d 1249, 1261 (2d Cir. 1982) (goals underlying NFL cross-ownership ban could be achieved through less restrictive means, such as by removing cross-owners from broadcast rights negotiating committee); *Smith v. Pro-Football, Inc.*, 593 F.2d 1173, 1187 (D.C. Cir. 1978) (district court properly considered alternative ways of conducting the NFL draft, such as allowing players to negotiate with teams of their choice, permitting player to be drafted by several teams, or having fewer rounds or allowing second draft); *Wilk v. Am. Med. Ass'n*, 671 F. Supp. 1465, 1483 (N.D. Ill. 1987), *aff'd*, 895 F.2d 352 (7th Cir. 1990) (considering a public relations campaign used successfully by association in other contexts as potential alternative to group boycott).

place other regulations protecting "amateurism." *See Oliver v. NCAA*, 920 N.E.2d 203, 208-10, 214-16 (Ct. Comm. Pleas Ohio 2009) (noting similar arguments by NCAA but rejecting them in enjoining eligibility bylaw prohibiting college athlete's attorney from participating in contract negotiations with professional league).

## VI.  CONCLUSION

For the foregoing reasons, the judgment below should be affirmed.

Respectfully submitted,

Dated:  January 21, 2015

*/s/ Michael P. Lehmann*
Michael P. Lehmann
Bruce Wecker
HAUSFELD LLP
44 Montgomery St., Ste. 3400
San Francisco, CA 94104
Telephone: (415) 633-1908

Michael D. Hausfeld
Hilary K. Scherrer
Sathya S. Gosselin
Swathi Bojedla
HAUSFELD LLP
1700 K St. NW, Ste. 650
Washington, DC 20006
Telephone:  (202) 540-7200

Jonathan Massey
MASSEY & GAIL LLP
1325 G St. NW, Ste. 500
Washington, DC 20005
Telephone: (202) 652-4511

*Counsel for Plaintiffs-Appellees*

## STATEMENT OF RELATED CASES

Plaintiffs-Appellees are not aware of any related cases other than the case identified in the NCAA's Statement of Related Cases.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B)(i) in that, according to the word-count feature of the word processing system in which the brief was prepared (Microsoft Word), the brief contains 13,999 words, excluding the portions exempted by Rule 32(a)(7)(B). The brief has been prepared in a proportionally-spaced typeface, 14-point Times New Roman.

*/s/ Michael P. Lehmann*_____


**CERTIFICATE OF SERVICE**

I certify that on this 21st day of January, 2015, I electronically filed the foregoing with the Court using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Michael P. Lehmann*_____