CASE NO. 13-15931

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————

RALPH COLEMAN; et al.,

*Plaintiffs–Appellees,*

v.

EDMUND G. BROWN, JR., Governor of the State of California; et al.

*Defendants–Appellants.*

————————

## PLAINTIFFS-APPELLEES' REQUEST FOR JUDICIAL NOTICE

————————

Appeal From The United States District Court,
Eastern District of California, Case No. 2:90-cv-00520-LKK-DAD,
Hon. Lawrence K. Karlton

————————

ROSEN BIEN
GALVAN & GRUNFELD LLP
Michael W. Bien – 096891
Ernest Galvan – 196065
Lisa Ells – 243657
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

*Attorneys for Plaintiffs–Appellees*

[1293325-1]

Pursuant to Federal Rule of Evidence 201, Plaintiffs-Appellees ("Plaintiffs") request that the Court take judicial notice of the following document, which was issued by the district court in this action subsequent to the filing of this appeal and after the completion of appellate briefing:

1.     April 10, 2014 Order (Dkt. No. 5131), a true and correct copy of which is attached hereto.

Rule 201 of the Federal Rules of Evidence allows a federal court to take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

Judicial notice is an appropriate mechanism for supplementing the record, and may be taken at any stage in the proceeding including on appeal.  Fed. R. Evid. 201(f).  Judicial notice of case developments subsequent to the filing of this appeal, including orders, motions, and filings, is appropriate because those developments "may affect [this Court's] consideration of the various issues presented."  *Bryant v. Carleson*, 444 F.2d 353, 357 (9th Cir. 1971); *see also Rothenberg v. Sec. Mgmt. Co., Inc.*, 667 F.2d 958, 961 & n.8 (11th Cir. 1982) ("We are, however, free to take judicial notice of subsequent developments in cases that are a matter of public record and are relevant to the appeal.").

1

The above-listed order was publicly filed by the district court in this case, and is directly relevant to the State's contention that conditions in California's prisons currently are constitutional, and that the district court's order concluding otherwise and denying termination was erroneous.  As such, Plaintiffs' request for judicial notice should be granted.


DATED: September 15, 2014    Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Lisa Ells*
       Lisa Ells

*Attorneys for Plaintiffs–Appellees*

2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. CIV. S-90-520 LKK/DAD (PC) |
| Plaintiffs, | |
| v. | **ORDER** |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |

In ongoing sequelae to defendants' January 7, 2013 motion to terminate this action (hereafter "termination motion")(ECF No. 4275), two additional motions brought by plaintiffs for enforcement of court orders and affirmative relief are before the court.[1]  On May 9, 2013, plaintiffs filed a motion related to housing and treatment of mentally ill inmates placed in segregation units in California's prison system (ECF No. 4580). On May 29, 2013, plaintiffs filed a motion related to use of force and disciplinary measures against members of the plaintiff

---

[1] A third motion related to inpatient mental health care (ECF No. 4543) was filed by plaintiffs on April 11, 2013 and resolved by orders filed July 11, 2013 (ECF No. 4688) and December 10, 2013 (ECF No. 4951).

1    class (ECF No. 4638).

2        The matters at bar were also tendered as grounds for denying

3    defendants' termination motion.  See Corr. Pls. Opp. To Defs.

4    Motion to Terminate, filed Mar. 19, 2013 (ECF No. 4422) at 58-65;

5    87-91.[2]  The court denied the termination motion by order filed

6    April 5, 2013, see Coleman v. Brown, 938 F.Supp.2d 955 (E.D.Cal.

7    2013), and separately set an evidentiary hearing on plaintiffs'

8    motions.  In relevant part, evidentiary hearing on plaintiffs'

9    motions commenced on October 1, 2013, continued over twenty-eight

10   court days and concluded on December 9, 2013.[3]  Following the

11   filing of closing briefs and responses thereto by the parties,

12   the matters were submitted for decision.[4]

13       Because the plaintiffs relied in part on the matters

14   considered in this order, the court holds that this order is a

15   further demonstration that the order denying the motion to

16   terminate was properly denied.

17       Plaintiffs' motions present two questions:  First, have

18   defendants sufficiently remedied Eighth Amendment violations in

19   use of force, disciplinary measures, and segregated housing

20   relative to class members, which were identified in the court's

21

22   [2] Throughout this order, all citations to page numbers of documents in the
     court's electronic case file (ECF) are to the ECF page number at the top of
     each page.

23

24   [3] Approximately five of those days were spent on testimony related to
     plaintiffs' motion concerning access to inpatient hospital care for inmates on
     death row (ECF No. 4543).  As noted in footnote 1, supra, that motion has been

25   resolved by separate order.

26   [4] By order filed March 6, 2014 (ECF No. 5095), proceedings on plaintiffs' May
     6, 2013 motion were reopened pending defendants' response to documents

27   submitted pursuant to a March 3, 2014 request for judicial notice by
     plaintiffs.  With the filing of defendants' response (ECF No. 5120),
     plaintiffs' May 6, 2013 motion was resubmitted.

28

                                        2

1    1995 decision on the merits of plaintiffs' Eighth Amendment

2    claims?  Second, if the answer to the first question is no, what

3    additional remedial measures are required to end ongoing Eighth

4    Amendment violations in these areas?

5        At the outset, the court wishes to recognize the overall

6    significant progress the defendants have made relative to

7    providing constitutionally required care to the plaintiffs'

8    class.  Indeed, though defendants' motion to terminate was

9    clearly premature, recognition of the progress made is important.

10   Nonetheless, for the reasons discussed below, the answer to the

11   first question is no.  The answer to the second question is

12   determined by what the Eighth Amendment requires when seriously

13   mentally ill individuals are incarcerated.

14       The very difficult questions presented by the motions at bar

15   are a consequence of the fact that California incarcerates tens

16   of thousands of seriously mentally individuals in its state

17   prison system.[5],[6]  As of September 2013, there were 33,259 inmates

18   _____

19   [5] California is not alone in what the sheriff of Cook County, Illinois has
     described as "'criminalizing mental illness.'"  Kristof, N., "'Inside a Mental
20   Hospital Called Jail", New York Times, February 10, 2014.  According to Mr.
     Kristof's article, "[n]ationwide in America, more than three times as many
     mentally ill people are housed in prisons and jails as in hospitals" and
21   "[s]ome 40 percent of people with serious mental illnesses have been arrested
     at some point in their lives."  Id.  What Sheriff Dart described about Cook
22   County is equally true of California:  "We've systematically shut down all the
     mental health facilities, so the mentally ill have nowhere else to go.  [The
23   prison system has] become the de facto mental health hospital."  Id.  Indeed,
     it is the court's view that many of the problems giving rise to this suit and
24   ongoing efforts at remediation arise from the inevitable tensions created by
     the distinct needs of custody supervision and the distinct need for mental
25   health care.

26   [6] The questions at bar also arise as a consequence of the severe overcrowding
     that has plagued California's prison system for more than a decade, leading
27   to, inter alia, insufficient space for differentiated housing programs, and
     delays in transfer to appropriate housing.  See Reply Expert Declaration of
     James Austin, filed August 23, 2013 (ECF No. 4762) at ¶¶ 39, 44.

28

3

1    identified in the California Department of Corrections and

2    Rehabilitation's (CDCR) outpatient mental health population. Pls.

3    Ex. 2303.[7]  The number of mentally ill inmates represents

4    approximately 28.25% of the inmate population housed in CDCR's

5    prison institutions.[8]  These inmates received mental health care

6    through the CDCR's Mental Health Services Delivery System

7    (MHSDS), which provides four levels of mental health care. An

8    understanding of the treatment criteria for each level of mental

9    health care is necessary to resolution of the motions at bar.[9]

10    _____

11    [7] This represents an increase from the 32,955 inmates in the mental health
outpatient population in June 2013.  See Pls. Ex. 2301.

12    [8] This is based on a total population of 120,162 inmates housed in
California's prison institutions, not including camps, as of September 18,
13    2013.  See Weekly Report of Population as of Midnight, September 18, 2013,
posted in the population reports at www.cdcr.ca.gov.

14    [9] In order to receive treatment in the MHSDS an inmate must meet at least one
15    of three general criteria listed in the Program Guide:
1. Treatment and monitoring are provided to any inmate who has current
16    symptoms and/or requires treatment for the current Diagnostic and Statistical
Manual diagnosed (may be provisional) Axis I serious mental disorders listed
17    below:
Schizophrenia (all subtypes)
18    Delusional Disorder
Schizophreniform Disorder
Schizoaffective Disorder
19    Brief Psychotic Disorder
Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)
20    Psychotic Disorder Due To A General Medical Condition
Psychotic Disorder Not Otherwise Specified
21    Major Depressive Disorders
Bipolar Disorders I and II
22    2. Medical Necessity Mental health treatment shall be provided as needed.
Treatment is continued as needed, after review by an IDTT, for all cases in
23    which:
Mental health intervention is necessary to protect life and/or treat
24    significant disability/dysfunction in an individual diagnosed with or
suspected of having a mental disorder. Treatment is continued for these cases
25    only upon reassessment and determination by the IDTT that the significant or
life threatening disability/dysfunction continues or regularly recurs.
26    3. Exhibitionism Treatment is required when an inmate has had at least one
episode of indecent exposure in the six-month period prior to the IDTT that
27    considers the need for exhibitionism treatment and the inmate patient is
either:
28    • Diagnosed with Exhibitionism, or
• Meets the alternate criteria. (Alternate Criteria: An inmate who meets all

1   All members of the plaintiff class suffer from serious

2   mental disorders.  The Correctional Clinical Case Management

3   System (CCCMS) provides mental health services to seriously

4   mentally ill inmates with "stable functioning in the general

5   population, Administrative Segregation Unit (ASU) or Security

6   Housing Unit (SHU)" whose mental health symptoms are under

7   control or in "partial remission as a result of treatment."  Pls.

8   Ex. 1200, MHSDS Program Guide, 2009 Revision, at 12-1-7.  In

9   September 2013, 28,360 mentally ill inmates were at the

10  Correctional Clinical Case Management (CCCMS) level of care.

11  Pls. Ex. 2303.

12      The remaining three levels of mental health care are for

13  seriously mentally ill inmates who, due to their mental illness,

14  are unable to function in the general prison population.  The

15  Enhanced Outpatient Program (EOP) is for inmates with "acute

16  onset or significant decompensation of a serious mental

17  disorder." Pls. Ex. 1200 at 12-1-7, 12-1-8.  EOP programs are

18  located in designated living units at "hub institution[s]."  Id.

19  at 12-1-8.  In September 2013, 4,538 mentally ill inmates were at

20  the Enhanced Outpatient Program (EOP) level of care.  Pls. Ex.

21  2303.

22      Mental Health Crisis Beds (MHCBs) are for mentally ill

23  inmates in psychiatric crisis or in need of stabilization pending

24  transfer either to an inpatient hospital setting or a lower level

25  ————————————————————————————————————————————————————————————
    criteria for the diagnosis of Exhibitionism, except that the victim was not an
26  "unsuspecting stranger" but was a staff member or inmate who did not consent
    to or encourage the behavior.)
27  (A diagnosis of Exhibitionism is not required for inmates who meet the
    alternate criteria.)
    Pls. Ex. 1200 at 12-1-5, 12-1-6.
28

1  of care.  Pls. Ex. 1200, Program Guide at 12-1-8.  MHCBs are

2  generally licensed inpatient units in correctional treatment

3  centers or other licensed facilities.  Id. at 12-1-9.  Stays in

4  MHCBs are limited to not more than ten days.  Id. at 12-5-1.[10]

5  Finally, several inpatient hospital programs are available for

6  class members.  With one exception[11] the inpatient programs are

7  operated by the Department of State Hospitals (DSH).  Id. at 12-

8  1-9.  Some of those programs are on the grounds of state prisons,

9  while others are in existing state hospitals.

10      In addition to the foregoing, resolution of the motions at

11  bar turns on understanding the nature of the inquiry before the

12  court.  In relevant part, in 1995 this court found that

13  "seriously mentally ill inmates [are] being treated with punitive

14  measures by the custody staff to control the inmates' behavior

15  without regard to the cause of the behavior, the efficacy of such

16  measures, or the impact of those measures on the inmates' mental

17  illnesses."  Coleman v. Wilson, 912 F.Supp. 1282, 1320 (E.D.Cal.

18  1995).  The court also found that "mentally ill inmates are

19  placed in administrative segregation and segregated housing

20  without any evaluation of their mental status, because such

21  placement will cause further decompensation, and because inmates

22  are denied access to necessary mental health care while they are

23  housed in administrative segregation and/or segregated housing."

24  Id. at 1320.  Finally, the court found that "weapons are used on

25

26  [10] Exceptions to the maximum length of stay in an MHCB must be approved by
    "[t]he Chief Psychiatrist or designee."  Id. at 12-5-1.

27  [11] The exception is a relatively new program for female inmates operated by
    CDCR at California Institution for Women (CIW).

28

1   inmates with serious mental disorders without regard to the

2   impact of those weapons on their psychiatric condition, and

3   without penological justification." Id. at 1323.[12]

4       In analyzing the merits of plaintiffs' claims, the court

5   applied the well-settled principle that "[a]n Eighth Amendment

6   violation is comprised of both an objective component and a

7   subjective component." Id. at 1298 (citing Wilson v. Seiter, 501

8   U.S. 294, 298 (1991)). The objective component turns on whether

9   the alleged deprivations are "sufficiently serious" to constitute

10  the "'unnecessary and wanton infliction of pain'" proscribed by

11  the Eighth Amendment. Wilson, 501 U.S. at 298 (quoting Rhodes v.

12  Chapman, 452 U.S. 337, 346 (1981)). The findings in the

13  preceding paragraph formed the objective component of the Eighth

14  Amendment violations at issue.

15      The subjective component of an Eighth Amendment violation

16  requires a finding that the defendants have a "sufficiently

17  culpable state of mind". Wilson, 501 U.S. at 298 (citing

18  Rhodes). This requires the court "to assess whether the conduct

19  at issue is 'wanton.'" Coleman v. Wilson, 912 F.Supp. at 1321

20  (quoting Jordan v. Gardner, 986 F.2d 1521, 1527 (9th Cir. 1993))

21          The "baseline" mental state for "wantonness"
22          is "deliberate indifference." Id. As a
            general rule, the deliberate indifference
23          standard applies where the claim is that

---

24  [12] At the underlying trial the use of force claims centered on the use of
25  tasers and 37mm guns. See Coleman, 912 F.Supp. at 1321-1323. The focus of
    the motion at bar is on the use of OC pepper spray and expandable batons
26  against class members. Plaintiffs' fundamental contention is the same: class
    members suffer from serious mental illnesses which are exacerbated by use of
    these weapons, use of the weapons causes serious harm, and defendants' current
27  policies, both in design and implementation, continue to demonstrate
    deliberate indifference to their mental illnesses and the harms caused by use
28  of the weapons.

1
2
3

      conditions of confinement cause unnecessary suffering. Id. In contrast, the "malicious and sadistic" standard applies to claims arising out of the use of force to maintain order. See id.

4

5  Coleman v. Wilson, 912 F.Supp. at 1321-22 (quoting Jordan, 986

6  F.2d at 1527-28).  The Eighth Amendment violations at bar were

7  all predicated on findings that defendants' policies and

8  practices governing the use of force, punitive measures,

9  administrative segregation and segregated housing constituted

10 deliberate indifference to class members' serious mental

11 illnesses and the serious and substantial harms to members of the

12 plaintiff class caused by use of such measures.  See Coleman v.

13 Wilson, 912 F.Supp. at 1319-1323.[13]

14     Defendants now oppose plaintiffs' motion concerning use of

15 force and disciplinary measures on the ground that there is no

16 pattern and practice of malicious and sadistic use of force

17 against mentally ill inmates.  See Defs.' Opp'n to Motion Related

18 to Use of Force and Disciplinary Measures, filed July 24, 2103

19 (ECF No. 4704) at 8.  To some extent, this aspect of defendants'

20 opposition may have been invited by some of the arguments

21 advanced by plaintiffs in their motion.[14]  Regardless, the

22    [13] The United States Court of Appeals for the Ninth Circuit has also applied

23 the deliberate indifference standard to constitutional claims that prison
   staff used force, "including pepper spray, on prisoners instead of employing
   appropriate mental health interventions" and that the prison's general

24 policies governing use of pepper spray were unconstitutional.  Hallett v.
   Morgan, 296 F.3d 732, 744-45, 747 (9th Cir. 2002).  In Hallett, the court of

25 appeals upheld the constitutionality of the challenged actions and policies
   based on findings that "use of pepper spray is carefully considered in advance

26 of its authorization, restricted and confined for limited purposes, and used
   only very sparingly", staff was properly trained in its use and could not use

27 it without being subjected to it.  Id. at 747.

28 [14] Plaintiffs' motion for additional orders concerning use of force proceeds
   from the contention that members of the plaintiff class "are regularly and

1  question of whether defendants' policies and practices prevent or

2  fail to prevent force applied maliciously and sadistically for

3  the very purpose of causing harm, see Whitley v. Albers, 475 U.S.

4  312, 320 (1986), is not before this court.[15]

5      First, application of that standard to the claims at bar was

6  rejected by the court in 1995.  While a different claim or

7  changed circumstance might justify application of that standard,

8  that appears not to be the case here.  Accordingly, the law of

9  the case doctrine applies to the instant motion.  See, e.g.

10 Arizona v. California, 460 U.S. 605, 618 (1983).

11      Second, as the court discussed in its order denying

12 defendants' motion to terminate this action, once an Eighth

13 Amendment violation is found and injunctive relief ordered, the

14 focus shifts to remediation of the serious deprivations that

15 formed the objective component of the identified Eighth Amendment

16 violation.  See Coleman v. Brown, 938 F.Supp.2d at 988.

17 Remediation can be accomplished by compliance with targeted

18 orders for relief or by establishing that the "violation has been

19

20 routinely subjected to unreasonable, unnecessary, and _excessive_ uses of force
   by correctional officers in California prisons" and that "[t]he State's
   persistent use of unreasonable force against CDCR prisoners with mental

21 illness causes grave harm to the _Coleman_ class."  Pls. Mot. for Enforcement of
   Court Orders and Affirmative Relief Related to Use of Force and Disciplinary

22 Measures, filed May 29, 2013 (ECF No. 4638) at 10-11 (emphasis added).
   Plaintiffs also contend, inter alia, that defendants' policies and practices

23 governing use of force are inadequate under every single criteria set forth by
   defendants' use of force expert's criteria for adequate systemic

24 administration of force in a correctional setting.  Id. at 11.

25 [15] Indeed, in the 1995 order on the merits of plaintiffs' claims the court
   specifically recognized that "[a]pplication of the deliberate indifference

26 standard to this conditions of confinement case in no way precludes
   application of the malicious and sadistic standard in the context of suits

27 brought by mentally ill inmates for physical or mental injuries sustained by
   virtue of the need to restore order in an emergency situation."  Coleman v.

28 Wilson, 912 F.Supp. at 1323 n.60.

1    remedied in another way." Id. To the extent the subjective

2    component of an Eighth Amendment violation remains a relevant

3    inquiry, it is coextensive with proof of ongoing objectively

4    unconstitutional conditions. Id. at 989.

5        Defendants also argue that an assessment of whether

6    defendants are subjectively deliberate indifferent should include

7    examination of whether the conduct or regulations at issue are

8    "without penological justification" and that the factors outlined

9    in Turner v. Safley, 482 U.S. 78 (1987) "may be instructive in

10   evaluating whether regulations challenged under the Eighth

11   Amendment have a legitimate penological purpose." Defendants'

12   Post-Evidentiary Hearing Brief, filed January 21, 2014 (ECF No.

13   4988) at 7. This argument misses the mark.

14       Violations of the Eighth Amendment are not excused by an

15   asserted "reasonable relationship" to a legitimate penological

16   goal. See Johnson v. California, 543 U.S. 499, 511 (2005); see

17   also Jordan v. Gardner, 986 F.2d 1521, 1530 (9th Cir. 1993) (en

18   banc). Turner applies where the constitutional right at issue is

19   "one which is enjoyed by all persons, but the exercise of which

20   may necessarily be limited due to the unique circumstances of

21   imprisonment. . . . Eight Amendment rights do not conflict with

22   incarceration; rather, they limit the hardships which may be

23   inflicted upon the incarcerated as 'punishment.'" Jordan, 986

24   F.2d at 1530 (citing Spain v. Procunier, 600 F.2d 189, 193-94 (9th

25   Cir. 1979)). "[T]he integrity of the criminal justice system

26   depends on full compliance with the Eighth Amendment." Johnson,

27   543 U.S. at 511.

28   ////

1

2

3

4

5

6

7

8

9

10

> Whatever rights one may lose at the prison gates, cf. <u>Jones v. North Carolina Prisoners Union</u>, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (prisoners have no right to unionize), the full protections of the eighth amendment most certainly remain in force. **The whole point of the amendment is to protect persons convicted of crimes. Eighth amendment protections are not forfeited by one's prior acts.** Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary. **The ultimate duty of the federal court to order that conditions of state confinement be altered where necessary to eliminate cruel and unusual punishments is well established.**

11 <u>Spain v. Procunier</u>, 600 F.2d at 193-94 (emphasis added).

12      "The existence of a legitimate penological justification

13 has, however, been used in considering whether adverse treatment

14 is sufficiently gratuitous to constitute punishment for Eighth

15 Amendment purposes." <u>Grenning v. Miller-Stout</u>, 739 F.3d 1235,

16 1240 (9th Cir. 2014) (citing <u>Rhodes v. Chapman</u>, 452 U.S. 337, 346

17 (1981))(in turn quoting <u>Gregg v. Georgia</u>, 428 U.S. 158, 183

18 (1976)).  Thus, the presence of a legitimate penological

19 justification for conditions of confinement challenged under the

20 Eighth Amendment may be considered in determining whether the

21 challenged condition constitutes punishment prohibited by the

22 Eighth Amendment.  See <u>Grenning</u>, 739 F.3d at 1240 (discussing

23 <u>Chappell v. Mandeville</u>, 706 F.3d 1052, 1058 (9th Cir. 2013) and

24 <u>Keenan v. Hall</u>, 83 F.3d 1083, 1090 (9th Cir. 1996)).  Nonetheless,

25 in this case such consideration is necessarily delimited by the

26 necessity of consideration of class members' mental status.  The

27 interrelationship of these two legitimate considerations is the

28 crux of the problem considered herein.

1    In sum, failure to properly consider the mental state of

2    class members requires the court to act.  If defendants fail to

3    meet their Eighth Amendment obligations, this court must enforce

4    compliance.  See Brown v. Plata, 131 S.Ct. at 1928 (citing Hutto

5    v. Finney, 437 U.S. 678, 687, n. 9, 98 S.Ct. 2565, 57 L.Ed.2d 522

6    (1978)).  "Courts may not allow constitutional violations to

7    continue simply because a remedy would involve intrusion into the

8    realm of prison administration."  Brown v. Plata, 131 S.Ct. at

9    1928-29.

10    Finally, defendants assert that plaintiffs have the burden

11    of proof on this motion.  Plaintiffs do not dispute this

12    assertion.

13    Given all the above, the court now turns to the motions at

14    bar.

15    I.   Use of Force/Disciplinary Measures

16      A.   Use of Force

17    The Eighth Amendment violation with respect to use of force

18    (hereafter "use of force" or "UOF") arises from policies and

19    practices that permit use of force against seriously mentally ill

20    prisoners without regard to (1) whether their behavior was caused

21    by mental illness and (2) the substantial and known psychiatric

22    harm and risks thereof caused by such applications of force.  See

23    Coleman v. Wilson, 912 F.Supp. at 1322.  The record showed then,

24    and still shows, that force can be and is used against seriously

25    mentally ill inmates in circumstances that permit reflection

26    prior to its application.  See id., 912 F.Supp. at 1321-23; see

27    also Ex. A to Declaration of Michael D. Stainer, filed March 12,

28

12

1   2014 (ECF No. 5111-1).[16]  Remediation of the identified Eighth

2   Amendment violation concerning use of force against California's

3   seriously mentally ill inmates requires at least three things:

4   (1) development of policies and procedures which provide

5   sufficient guidance and clarity to avoid the identified harm; (2)

6   adequate implementation of those policies and practices,

7   including but not limited to appropriate training of all staff;

8   and (3) adequate enforcement of those policies and procedures.

9   Whether the constitutional violation remains is a different

10  question from the nature of further relief, if any, that may be

11  required if the constitutional violation is ongoing.[17]

12       In addition to the legal principles set forth _supra_, two

13  other principles guide the court's consideration of the issues at

14  bar.  First, there appears to be general agreement among the

15  appellate courts that have considered the question that "'it is a

16  violation of the Eighth Amendment for prison officials to use

17  mace, tear gas or other chemical agents in quantities greater

18  than necessary. . . .'"  Williams v. Benjamin, 77 F.3d 756, 763

19  (4th Cir. 1996) (quoting Soto v. Dickey, 744 F.2d 1260, 1270 (7th

20  Cir. 1984)).  "This is because, even when properly used, such

21  weapons 'possess inherently dangerous characteristics capable of

22  causing serious and perhaps irreparable injury to the victim.'"

23

---

24  [16] Defendants have filed four declarations from Mr. Stainer, the Director of
    CDCR's Division of Adult Institutions in connection with these proceedings.
25  Each will be referred to by its ECF number.

26  [17] Put another way, the absence of a specific policy or practice requested by
    plaintiffs does not necessarily demonstrate that the constitutional violation
27  is ongoing.  On the other hand, one or more of the remedial orders requested
    by plaintiffs may be required if the constitutional violation has not yet been
    adequately remedied.
28

1   Williams, 77 F.3d at 763 (quoting Slakan v. Porter, 737 F.2d 368,

2   372 (4th Cir.1984), *cert. denied*, 470 U.S. 1035, 105 S.Ct. 1413,

3   84 L.Ed.2d 796 (1985)).  Second, at least one appellate court has

4   found that the Eighth Amendment is violated by use of pepper

5   spray on a mentally ill inmate who, because of mental illness, is

6   unable to comply with directives from prison officials and

7   nonetheless is subjected to pepper spray.  See Thomas v. Bryant,

8   614 F.3d 1288, 1310-11 (11th Cir. 2010) ("repeated non-spontaneous

9   use of chemical agents" on mentally ill inmate "constituted an

10  extreme deprivation sufficient to satisfy the objective prong" of

11  Eighth Amendment deliberate indifference claim where inmate's

12  "well-documented history of mental illness and psychotic episodes

13  rendered him unable to comply at the times he was sprayed such

14  that the policy was 'unnecessary' and 'without penological

15  justification in his specific case.")[18]

16       Taken together, the foregoing two lines of authority suggest

17  that the Eighth Amendment requires clear and adequate constraints

18  on the amount, if any, of pepper spray that may be used on

19  mentally ill inmates generally and more particularly when such

20  inmates are confined in a space such as a cell or a holding cage,

21  as well as significant  constraints, if not a total ban, on the

22  use of pepper spray on mentally ill inmates who because of their

23  mental illness are unable to comply with official directives.

24

25  ───────────────
    [18] The Williams court applied the Whitley standard to the subjective component
26  of the Eighth Amendment claim before that court, see Williams, 77 F.3d at 762,
    while the Thomas court applied the deliberate indifference standard.  See
27  Thomas, 614 F.3d at 1304-05.  The relevance of both decisions to the analysis
    at bar are their holdings concerning the objective component of an Eighth
    Amendment violation arising from the use of pepper spray.
28

1    The court now turns to the merits of plaintiffs' motion with

2    respect to use of force.

3    Defendants' written UOF policy is found in Title 15 of the

4    California Code of Regulations at §§ 3268-3268.3 and CDCR's

5    Department Operations Manual Chapter 5, Article 2-Use of Force

6    (DOM). Defs. Ex. J, Stainer Decl., filed July 24, 2013 (ECF No.

7    4708) at ¶ 5. The current provisions of Title 15 were revised in

8    August 2010 and implemented thereafter. Amended Declaration of

9    John R. Day, filed August 26, 2013 (ECF No. 4772-1) at ¶ 4.[19]

10    DOM provisions governing UOF have been revised twice since

11    the conclusion of the evidentiary hearing.[20] See Stainer Decls.

12    (ECF Nos. 4987, 5078, 5111-1). While defendants dispute

13    plaintiffs' characterization of the uses of force depicted on six

14    videotapes shown at the hearing, several of the DOM revisions

15    appear directly aimed at preventing such uses of force. At the

16    hearing, Michael Stainer, the Director of CDCR's Division of

17    ────────────────

18    [19] The current regulations were promulgated and implemented pursuant to a review process required by another federal class action lawsuit, Madrid v. Gomez, No. 90-3094 TEH (N.D.Cal.). Defendants contend, inter alia, that plaintiffs' motion is, in part, an improper effort to seek reconsideration of the Madrid court's order. See Defs.' Opp. to Motion Related to Use of Force and Disciplinary Measures, filed July 24, 2013 (ECF No. 4704) at 33 n.6. The motion at bar is focused on whether defendants' use of force policies and practices are sufficient to remedy the constitutional violation identified by this court in its 1995 order. That issue was not before the Madrid court.

22    [20] One of plaintiffs' objections to the revised DOM provisions is that the new procedures are only in the DOM and not in Title 15. Plaintiffs contend that state law requires "CDCR rules of general (statewide) application to prisoners be formally promulgated and added to Title 15" and they question whether DOM provisions only, without alterations to Title 15, are sufficient for a durable remedy. See Pls. Brf. on Defs. Proposed Revisions to Use of Force Policy, filed February 12, 2014 (ECF No. 5065) at 11 n.3. Although this question is not before the court, it appears that the state law requirement that agency rules of general application be promulgated in accordance with the requirements of California's Administrative Procedures Act does not mean that all CDCR rules of general application must be added by amendment to Title 15. See Morales v. California Department of Corrections and Rehabilitation, 168 Cal.App.4th 729, 735-36 (2008).

1   Adult Institutions testified that none of the uses of force

2   depicted in the six videotapes constituted excessive force "as

3   defined by [CDCR] policy."  Reporter's Transcript Re: Evidentiary

4   Hearing (RT) at 911:23-912:1.  He further testified that in his

5   view while none of the videos depicted excessive force "there

6   might have been better ways of doing things, but that is tactics.

7   . . . [W]e plan on addressing that with our policy revisions

8   which provide additional guidance."  RT at 912:2-7.

9        The court accepts Mr. Stainer's testimony that none of the

10  force depicted on the six videotapes was excessive under then-

11  existing guidelines in CDCR policy.  In combination with the

12  events depicted on the videotapes, that testimony is perhaps the

13  best evidence that the constitutional violation with respect to

14  use of force on seriously mentally ill inmates has not yet been

15  remedied.

16       The court cannot credit Mr. Stainer's testimony that what

17  was depicted on the six videos shown at the hearing depicted

18  acceptable "tactics."  Most of the videos were horrific; each was

19  illustrative of one or more of the objective components of the

20  underlying constitutional violation found in the court's 1995

21  order.  Defendants' expert, Steve Martin, testified that the fact

22  that the events depicted on the videotapes "occurred is bad

23  enough, and, hopefully, they're as few in number, as I believe

24  them to be, . . .  But what is so bothersome and disturbing is

25  that no – this sophisticated IERC (Institutional Executive Review

26  Committee) with all these ranking administrators experienced as

27  Director Stainer is, could read these reports and not at least

28  question the amount of spray or the tactics used. . . ."  RT at

16

1  1903:9-17.  Mr. Martin testified that without such questioning,

2  neither review nor corrective action occurs and the absence of

3  corrective action is "the path to institutionalizing a culture

4  that lends itself to harm, to institutionalized harm."  RT at

5  1903:22-1905:18.

6      Even if the incidents on the videotapes were, as Mr. Martin

7  testified, "isolated aberrations, anomalies, outliers" that "do

8  not . . . represent the vast majority of incidents" he reviewed,

9  RT at 1795:3-8, Mr. Stainer's testimony establishes that all of

10  the incidents fell within the purview of defendants' UOF policy.

11  Furthermore, both Mr. Martin and Mr. Stainer testified that none

12  resulted in further review beyond the IERC or, except for some

13  "trainings", corrective action independent of these proceedings.

14  RT at 954:6-17 (Stainer); RT at 1901:16-1903:12 (Martin). This,

15  in itself, demonstrates the constitutional inadequacy of either

16  the regulations or the review process.

17      In addition, plaintiffs' evidence suggests that force is

18  used against mentally ill inmates at a rate greatly

19  disproportionate to their presence in the overall inmate

20  population.  Plaintiffs' expert, Eldon Vail, reported that twelve

21  of California's prisons reported use of force incidents against

22  mentally ill inmates at a rate more than double their

23  representation in the prison population, three prisons reported

24  use of force incidents against mentally ill inmates at a rate

25  triple their representation in the prison population, and in

26  several, 87 to 94% of the use of force incidents were against

27  mentally ill inmates.  Expert Declaration of Eldon Vail, filed

28  May 29, 2013 (ECF No. 4638-1) at ¶¶ 9-11.  As Mr. Vail opined,

1    this is evidence, at least, of a systemic failure to understand

2    "what a mentally ill person might be experiencing before or

3    during a use of force incident, or of how mental illness may make

4    it difficult for an inmate to immediately conform his or her

5    behavior in response to an order." Id. at ¶ 12.

6         Mr. Stainer also testified to the need for revisions to the

7    policy to guide staff in making "appropriate" UOF decisions and

8    that the UOF guidelines would be "tighten[ed] down . . . quite a

9    bit."  RT at 826:16-25.  The policy revisions are a critical step

10   forward and, if fully implemented and enforced, will bring the

11   state closer to remediation of the identified Eighth Amendment

12   violation.  Without more, however, seriously mentally ill inmates

13   in California's prisons will remain subject to uses of force by

14   custody staff armed with OC pepper spray and expandable batons

15   "without regard to the impact of those weapons on their

16   psychiatric condition." Coleman v. Wilson, 912 F.Supp. at 1323.

17        Title 15 and the DOM divide use of force incidents into two

18   categories:  immediate and controlled.  "Immediate use of force"

19   is "[t]he force used to respond without delay to a situation or

20   circumstance that constitutes an imminent threat to the security

21   or the safety of persons."  15 C.C.R. § 3628(a)(4); see also DOM

22   § 51020.4.  "Controlled use of force" is defined as "[t]he force

23   used in an institution/facility setting when an inmate's presence

24   or conduct poses a threat to safety or security and the inmate is

25   located in an area that can be controlled or isolated."  15

26   C.C.R. § 3268(a)(5); see also DOM § 51020.4.  The DOM provisions

27   expand on the regulations by providing that immediate uses of

28   force may be used by employees without prior authorization, while

1    controlled uses of force require authorization and presence of
2    specific personnel.  See DOM § 51020.4.

3         The differences between these two categories are significant
4    to the remedy in this case.  "Immediate" uses of force are
5    applied without the reflection and intervention that can avoid or
6    prevent the serious harm suffered by members of the plaintiff
7    class when force is used.  See RT at 1967:6-12.  Thus, the
8    definition of immediate use of force must be adequate to exclude
9    uses of force in circumstances where "time, distance and delay"
10   can be taken before force is used.  See RT at 1966:17-1968:4
11   (testimony of Steven Martin that if an officer could have "waited
12   and taken time, distance and delay" instead of immediately using
13   force "the force obviously was not necessary.")

14        Plaintiffs' expert, Eldon Vail, testified that the
15   appropriate criteria for immediate use of force is already in
16   California's use of force policy, which on its face requires an
17   "imminent threat" to justify an immediate use of force.  RT at
18   436:7-8, 436:24-473:3; see also RT at 1935:11-14 (testimony of
19   defense expert Steven Martin that "immediate use of force is
20   supposed to be used only if there's some imminent harm that needs
21   to be stopped.")  Mr. Vail's principal critique of the written
22   policy was a then-existing exception in § 51020.11.2 of the DOM
23   which allowed immediate use of force against inmates who refused
24   to relinquish their food ports. See Ex. A to Stainer Decl. (ECF
25   No. 4708-1) at 5.  Mr. Vail testified that was a "really huge
26   flaw" in defendants' use of force policy.  RT at 553:5-554:4.
27   Newly amended § 51020.11.2 has removed that exception and no
28   longer authorizes immediate use of force when an inmate refuses

                                   19

1    to relinquish a food port.  Instead, "[i]n the event the inmate

2    does not relinquish control of the food port, the officer shall

3    back away from the cell and contact and advise the custody

4    supervisor of the situation.  Controlled force will be initiated

5    while custody staff continue to monitor the inmate."  Ex. A to

6    Stainer Decl. (ECF No. 5111-1) at 9.

7        Mr. Stainer averred that the revisions to the DOM concerning

8    the food ports were made "to emphasize CDCR's policy that the

9    immediate use of pepper spray is only authorized in response to

10   an emergent or imminent threat."  Stainer Decl. (ECF No. 5111-1)

11   at ¶ 3.  As revised, defendants' current written policy

12   concerning immediate use of force appears to be adequate on its

13   face.  However, testimony at the hearing and the nature of the

14   revisions to the DOM highlight both the importance of adequate

15   training in the revisions to the policy and the necessity of

16   monitoring immediate uses of force to ensure that they are

17   limited to "imminent threats."

18       The record before the court suggests that for an extended

19   period of time CDCR staff have been working with a broad

20   definition of "imminent threat."  In addition to the

21   food/security port exception, there was evidence at the hearing

22   that immediate use of force was authorized by policy when, even

23   without an imminent threat, inmates kicked their cell doors.  RT

24   at 436:5-9.  Defendants' expert Steve Martin testified that

25   "[t]here are substantially more use of force incidents [in CDCR]

26   that are immediate and not controlled."  RT at 1966:9-13.  He

27   testified concerning a high percentage of immediate use of force

28   incidents at Pelican Bay in the period from January to October

2012.  RT at 1935:18-1937:3.  He reviewed 180 incidents of use of force, 174 of which had been characterized as "'immediate applications of force.'"  RT at 1935:15-1936:9.  In reviewing those incidents, he "identified fairly quickly a number of incidents" categorized as "immediate" uses of force that evidence showed "could have been managed through 'controlled force.'  RT at 1936:17-19.  Those incidents evidenced unnecessary uses of force.  See RT at 1967:17-1968:4 ("immediate" use of force where "controlled use of force" was possible demonstrates unnecessary use of force "because if you could have waited and taken time, distance and delay, the force obviously was not necessary.")[21]

The foregoing suggests that heretofore immediate use of force has been used with far greater frequency than authorized by the written policy testified to by Mr. Stainer.  It will be necessary going forward for defendants to provide adequate staff training and to closely monitor all UOF incidents, particularly those classified as "immediate" uses of force, to ensure that these policy revisions are actually effected.

The issues with respect to controlled use of force are different.  They concern (1) whether defendants obtain the relevant information concerning an inmate's mental illness prior

---

[21] Subsequently, in response to a question about whether there is a "pattern and practice of systemic use of force at Pelican Bay," Mr. Martin testified that "probably, if memory serves . . ., I found three to five cases out of the immediate category case that I believed could have been calculated applications of force."  RT at 1968:10-15.  Given Mr. Martin's other testimony about that the "very high percentage" of immediate use of force incidents at Pelican Bay, and the fact that he brought this information to the attention of the current Secretary of Corrections, who was with him at Pelican Bay, the court places substantial weight on Mr. Martin's testimony that the disproportionate number of immediate use of force incidents at Pelican Bay was not de minimis and was cause for concern.

1  to application of force; and (2) what is done with the

2  information that is obtained.

3      Section 51020.4 of the DOM defines controlled use of force

4  as

5              the force used in an institution/facility
               setting, when an inmate's presence or conduct
6              poses a threat to safety or security and the
               inmate is located in an area that can be
7              controlled or isolated. These situations do
               not normally involve the immediate threat to
8              loss of life or immediate threat to
               institution security. All controlled use of
9              force situations require the authorization
               and the presence of a First or Second Level
10             Manager, or Administrative Officer of the Day
               (AOD) during non-business hours. Staff shall
11             make every effort to identify disabilities,
               to include mental health concerns, and note
12             any accommodations that may need to be
               considered.
13

14

15  Ex. A to Stainer Decl. (ECF No. 5111-1) at 6. In addition to the

16  definitional provision, several other DOM provisions are relevant

17  to the issues before the court.

18      The use of force options available to CDCR officers are set

19  forth in DOM § 51020.5.  That section provides:

20             Use of Force options do not have to be
               utilized in any particular sequence, but
21             should be the force option staff reasonably
               believes is sufficient.  Verbal persuasion or
22             orders should be issued prior to resorting to
               force and are required to be provided before
23             controlled force is used. . . .  Use of force
               options include but are not limited to:
24

25             • Chemical agents

26
               • Hand-held batons
27

28
                              22

- Physical strength and holds. A choke hold or any other physical restraint which prevents the person from swallowing or breathing shall not be used unless the use of deadly force would be authorized.

- Less-lethal weapons. A less lethal weapon is any weapon that is not likely to cause death. A 37mm or 40mm launcher and any other weapon used to fire less-lethal projectiles is a less lethal weapon.

- Lethal weapons. A firearm is a lethal weapon because it is used to fire lethal projectiles. A lethal weapon is any weapon that is likely to result in death.

Ex. A to Stainer Decl. (ECF No. 4708-1), at 3.

DOM section 51020.12 sets forth the general requirements for controlled use of force. Ex. A to Stainer Decl. (ECF No. 5111-1) at 9-10. It requires that mental health concerns "be taken into account prior to any controlled use of force." Id. at 10. It also requires that all controlled uses of force

be preceded by a cool down period of reasonable length to allow the inmate an opportunity to comply with staff orders. During the cool down period, clinical intervention by a licensed practitioner shall be attempted, regardless of the mental health status of the inmate. The length of the cool down period can vary depending upon the circumstances. In situations involving participants in the mental health program, Incident Commanders, on-site Managers, and licensed health care practitioner shall discuss concerns that may affect the length of the cool down period.

The First or Second Level Manager, or the AOD, shall determine the length of the cool

23

1
                    down period and communicate this to the
                    Incident Commander. . . .
2

3                   A controlled use of force shall not be
                    accomplished without the presence of a
4                   licensed health care practitioner.

5    Id. at 10.

6        Controlled uses of force must be video recorded.  See id.,

7    DOM § 51020.12.1.  DOM § 51020.12.1 vests the Incident Commander

8    with the responsibility for "determining what force options shall

9    be used and the order in which they will be applied."  Ex. A to

10   Stainer Decl. (ECF No. 5111-1) at 11.  The Incident Commander is

11   required to "consider", inter alia, the inmate's "apparent mental

12   state" when determining those force options.  Id.  The First or

13   Second Level Manager/AOD must "identify themselves on camera and

14   confirm they are authorizing the controlled use of force,

15   including the force options as stated by the Incident Commander."

16   Id.  The attempted clinical intervention, which is described as

17   "efforts made to verbally counsel the inmate and persuade the

18   inmate to voluntarily come out of the area without force" is to

19   be recounted on camera by the licensed health care practitioner

20   who attempted the intervention; the actual intervention is not

21   recorded.  Id.

22       DOM § 51020.12.2 contains specific provisions for controlled

23   uses of force involving seriously mentally inmates, as follows:

24                  When inmates are housed in departmental
                    hospitals, infirmaries, Correctional
25                  Treatment Centers (CTC), Enhanced Outpatient
                    Program Units (EOP), or Psychiatric Services
26                  Units (PSU), or has an EOP level of care
                    designation, or any inmate who is acting in a
27                  bizarre, unusual, uncharacteristic manner,

28

the controlled use of force shall occur as follows:

- A licensed health care practitioner designated by the Chief Executive Officer (CEO) shall be consulted prior to the use of chemical agents (see Chemical Agents Restrictions).

- Clinical intervention by a licensed practitioner shall be attempted. Clinical intervention shall also precede the extraction of any inmate who is being extracted upon the written order of a medical doctor, psychiatrist, or psychologist to facilitate a change in housing for treatment purposes.

- The clinician shall attempt to verbally counsel the inmate and persuade the inmate to voluntarily come out of the area without force. These efforts shall continue during the cool down period.

- Whenever circumstances permit, the clinician shall be a mental health provider; i.e., Psychiatric Technician, Licensed Clinical Social Worker, Psychologist, or Psychiatrist.

Id. at 12. Former DOM § 51020.12.2 was substantially similar; the amendment adds language extending its provisions to "any inmate who is acting in a bizarre, unusual, uncharacteristic manner." See Ex. A to Stainer Decl. (ECF No. 5078-1) at 8. The provisions of DOM § 51020.12.2 are "additional safeguards and requirements" to be followed for controlled UOF on mentally ill inmates; the other provisions of the UOF policy also continue to apply. RT at 806:17-807:24.

The amendments to the DOM change in significant ways the amount of pepper spray authorized in controlled UOF incidents. Amended DOM § 51020.15 lists the specific types of pepper spray

25

1  authorized for use, the number of applications, and the duration

2  of each application. Ex. A to Stainer Decl. (ECF No. 5111-1) at

3  14-15. Staff must wait a minimum of three minutes after an

4  application of pepper spray before applying another application,

5  and the Incident Commander and Response Supervisor must assess

6  the effectiveness of each application. Id. at 15. No more than

7  four applications of pepper spray are permitted, except that

8  "[i]n exigent or unusual circumstances it may be necessary to

9  exceed the 4 allowed applications." Id. Additional applications

10 must be specifically authorized by the First or Second Level

11 Manager/AOD, and each must be explained on the video recording.

12 Id. The Incident Commander and the Response Supervisor are

13 required to consult with each other and "consider the totality of

14 circumstances to determine the best course of action." Id.

15 Additional consultation is required for mentally ill inmates:

16      If the inmate is a participant in the mental
17      health program and has not responded to staff
        for an extended period of time, including
18      during the cool down period, laying
        motionless on bunk or floor, sitting on edge
19      of bunk head down, no eye contact, and it
        appears that the inmate does not present an
20      imminent physical threat, additional
        consideration and evaluation should occur
21      before the use of chemical agents is
        authorized. This additional evaluation should
22      include input from the assigned housing unit
        staff and licensed health care practitioners
23      regarding the inmates recent behavior, file
        review for recent history of violence,
24      previous cell extractions, etc. The rationale
        shall be explained on camera by the on-site
25      Manager.
26

27 Id.

28

                                26

1    Amended DOM § 51020.15.1 limits the OC products that can be

2    used in "one/two person celled housing, single person expanded

3    metal holding cells, showers, or any other small space." Ex. A

4    to Stainer Decl. (ECF No. 5111-1) at 16.  In addition, this

5    section contains specific language governing use of pepper spray

6    in controlled use of force incidents involving mentally ill

7    inmates at the EOP level of care or higher:

8         For controlled use of force incidents
          involving inmates housed in departmental
9         hospitals, infirmaries, CTCs, EOPs, and PSUs,
          or who have an EOP level of care designation,
10        a licensed health care employee designated by
          the Chief Executive Officer (CEO) shall be
11        consulted prior to the use of chemical
          agents:
12

13        • The licensed health care practitioners
            shall document his/her recommendation
14          regarding whether or not there is a
            contraindication for the use of chemical
15          agents on a Medical Chrono (CDC 128C).
            This document shall be included in the
16          incident package.

17

18        • If, during the consultation, the
            licensed health care practitioners
19          express concerns regarding the use of
            chemical agents, the First/Second Level
20          Manager authorizing the use of force and
            licensed health care practitioners shall
21          discuss the matter to determine the best
            course of action. The licensed health
22          care practitioner shall consider in
            providing their consultation, the
23          potential for injury during the use of
            physical force, as well as the medical
24          implication of exposure to chemical
            agents. After the consultation, the
25          decision to use chemical agents or
            physical force shall rest with the First
26          or Second Level Manager authorizing the
            use of force.
27

28

1
2
3
4
5
6
7
8

- If a decision is made to use chemical agents in spite of any contraindications, the decision shall be articulated and written justification provided. The written justification must include specific determinations and considerations to justify the need to over-ride the contraindications, beyond the statement of safety to staff or security of the institution. Consideration shall be given to the inmate's mental health status and current mental state.

Id. at 16. Unlike amended DOM § 51020.12.2, the provisions of this section do not extend to "any inmate who is acting in a bizarre, unusual, uncharacteristic manner." See id.

In addition, the amended provisions stand in contradistinction to DOM § 51020.14.1, which prohibits the use of less lethal weapons on seriously mentally ill inmates "housed in departmental hospitals, infirmaries, or other CDCR medical facilities, or who have an EOP level of care designation" in controlled use of force incidents unless authorized by the Institution Head, Chief Deputy Warden, or AOD and "[c]ircumstances [are] serious in nature calling for extreme measures to protect staff or inmates, i.e., the inmate may be armed with a deadly weapon." Ex. A to Stainer Decl. (ECF No. 4708-1) at 6.

Once again, the DOM revisions concerning controlled use of force evidence an effort to heighten consideration of the impact of UOF measures on mentally ill inmates. Nonetheless, it appears to the court that the measures do not meet Eighth Amendment standards.

////

1       First, defendants' policy concerning controlled use of force

2  on the seriously mentally ill inmate fails to require

3  consideration of the inmate's ability to conform his or her

4  conduct to the order or directive giving rise to the use of

5  force.  Defendants' expert, Steve Martin, testified that "without

6  qualification" the inmate's ability to comply with orders must be

7  considered if policy permits use of force for disobedience with

8  an order, and that it is not appropriate to use of pepper spray

9  to obtain compliance with orders a seriously mentally ill inmate

10  cannot and does not understand.  RT at 1871:14-25, 1872:6-24.

11  This factor must be considered.  Cf. Thomas v. Bryant, 614 F.3d

12  at 1311.

13       Second, the policy revisions do not vest mental health

14  clinicians with sufficient authority in decisions concerning use

15  of force.  In every instance, final decisionmaking responsibility

16  and authority for all uses of force rest with custodial staff.

17  While consultation with mental health staff is required, custody

18  staff is authorized to override clinical judgments without

19  sufficient guidance about which clinical judgments, if any, may

20  be overridden and under what circumstances.  Cf. Gates v. Gomez,

21  60 F.3d 525, 533 (9th Cir. 1995) (interpreting consent decree;

22  "since CMF is a prison health care facility, no custody decision

23  should be made that is medically contraindicated.")

24       Mr. Stainer is to be commended for the steps he has taken to

25  "tighten down" the use of force guidelines for use of force

26  against members of the plaintiff class.  The fact that additional

27  work remains does not take away from the court's recognition that

28  Mr. Stainer appears to have taken his responsibility in this area

1  seriously.  The court anticipates that with continued diligence,

2  full remediation can be achieved.

3       Defendants must complete the work begun by Mr. Stainer so

4  that their policies and practices relative to use of force on

5  seriously mentally ill inmates include (1) consideration of the

6  role of mental illness in an inmate's ability to comply with

7  staff directives; (2) adequate guidance concerning the role of

8  mental health clinical judgments in use of force on class members

9  and when, if ever, those judgments may be overridden by custody

10 staff; and (3) alternatives to use of force on seriously mentally

11 ill inmates where there is no imminent threat to life and force

12 is contraindicated by the inmate-patient's mental health.[22]

13      Plaintiffs also challenge the use of the expandable baton on

14 class members.  Both plaintiffs' expert, Mr. Vail, and

15 defendants' expert, Mr. Martin, agreed that the expandable baton

16 is an impact weapon whose primary function is self-defense.  See

17 Vail Decl. (ECF No. 4638-1) at ¶¶ 31-32; Ex. 1 to Declaration of

18 Lori E. Rifkin (ECF No. 4638-8) at 8.  At the time of the

19 hearing, the court heard testimony that the expandable baton is

20 worn by California correctional officers as "standard issue" on

21 their duty belts.  RT at 88:18-23 (Vail); RT at 1811:5-9.

22 Defendants' expert testified that there is not "sufficient

23 guidance in either the regs or training materials" concerning the

24 use of these batons.  RT at 1812:17-19.

25 ////

26

_____

27 [22] It appears to the court that the seeds of the solution to at least some of
the foregoing are in the Program Guide and those DOM provisions that provide
specific restrictions for use of force on inmate-patients at EOP and higher
28 levels of care.  See, e.g., DOM § 51020.14.1.

1    Although it is not clear, it appears that defendants'

2    revised use of force policy may have changed the practice of

3    standard issuance of expandable batons.  See Ex. A to Stainer

4    Decl. (ECF No. 5111-1) at 12 (DOM § 51020.12.3 including

5    expandable baton in list of extraction equipment to "be issued"

6    if extraction is necessary).  Defendants will be directed to

7    clarify this.

8        Defendants shall work under the guidance of the Special

9    Master to make the additional revisions to the use of force

10   policy and the clarifications and guidance concerning the use of

11   the expandable baton required by this order.  The Special Master,

12   shall provide expertise where necessary, and shall ensure that

13   plaintiffs are provided notice and an opportunity for input as

14   appropriate.  The revisions shall be completed within sixty days.

15       B. Disciplinary Measures

16       Plaintiffs also contend that further remedial orders are

17   required to remedy the identified constitutional violation in

18   defendants' use of disciplinary measures against mentally ill

19   inmates.  The constitutional violation was based in a finding

20   that seriously mentally ill inmates "'who act out are typically

21   treated with punitive measure without regard to their mental

22   status.'"  Coleman v. Wilson, 912 F.Supp. at 1320.  The court

23   found "substantial evidence in the record of seriously mentally

24   ill inmates being treated with punitive measure by the custody

25   staff to control the inmates' behavior without regard to the

26   cause of the behavior, the efficacy of such measures, or the

27   impact of those measures on the inmates' mental illnesses." Id.

28       In 1995, the violation was attributed in substantial part to

1   inadequate training of custody staff in the signs and symptoms of

2   mental illness. Id.  During the remedial phase of this action,

3   defendants have developed a mental health assessment process for

4   prison disciplinary proceedings involving most seriously mentally

5   ill inmates.  By September 2001, defendants had completed a final

6   draft of a policy that required a mental health assessment of all

7   EOP and MHCB inmates charged with rules violations "to determine

8   if the behavior of the inmate resulting in the rule violation was

9   influenced by a mental disorder."  Ex. 3 to Declaration of Jane

10   E. Kahn, filed May 29, 2013 (ECF No. 4640) at 34.

11       Formulation of policy for mental health assessment of CCCMS

12   inmates charged with rules violations has proceeded more slowly.

13   See Seventeenth Monitoring Report of the Special Master, Part B,

14   filed April 2, 2007 (ECF No. 2180-1) at 44-47; Twenty-Third Round

15   Monitoring Report of the Special Master, filed December 1, 2011

16   (ECF No. 4124) at 31-39.  The relevant history is set forth in

17   the Special Master's Twenty-Third Round Monitoring Report.  See

18   Twenty-Third Round Monitoring Report (ECF No. 4124) at 31-39; see

19   also Kahn Decl.(ECF No. 4640) at ¶¶ 19-20 (citing Twenty-Third

20   Round Monitoring Report).

21       In August 2007, defendants were ordered to develop and plan

22   "for identifying and developing changes necessary to broaden the

23   impact of the then-existing mental health assessment process in

24   CDCR prison disciplinary matters for 3CMS inmates."  Twenty-Third

25   Round Monitoring Report (ECF No. 4124) at 31-32.  Initially

26   defendants submitted a revised plan to the Special Master on May

27   1, 2008, with several representations, including completion of a

28   pilot by August 5, 2008, and a representation that by November 1,

1   2008 they would "develop an implementation plan that includes a

2   procedure for effective monitoring of the RVR process." Id. at

3   34. However, defendants submitted nothing further to the Special

4   Master for over three years after the May 2008 report. Id.

5        In June 2011, after repeated requests from the Special

6   Master, defendants produced a report on the pilot which showed

7   that key elements had never been implemented or piloted. Id. at

8   35-36. Moreover, the June 2011 report "concluded with a list of

9   five actions for statewide application that bore very little

10  resemblance to" the May 2008 plan and "signalled too much of a

11  retreat for the original assessment process of 1998, when a

12  mental health evaluation was required for every *Coleman* caseload

13  inmate who received an RVR." Id. The Special Master reported

14  that

15              [i]t appeared that defendants had lost sight
                of the original identified problem and the
16              goal of the pilot to resolve that problem.
                Given the limited character of what
17              defendants proposed as their plan,
                appropriate use of the mental health
18              assessments in the disciplinary process for
                3CMS inmates may well have ended up being
19              even more limited than it was before the plan
                was ordered.
20

21  Id. at 38.

22       On May 10, 2011, defendants circulated a new field

23  memorandum directing completion of mental health assessments for

24  3CMS inmates charged with the most serious disciplinary

25  infractions. Id. Thereafter, the Special Master and the parties

26  had a "handful of meetings in September and October 2011" which

27  resulted in an agreement between the parties and approved by the

28  Special Master for a newly revised policy for mental health

                              33

assessments for CCCMS inmates charged with rules violations.  Id.
at 38-39.  In October 2011, defendants distributed a training
plan.  Id.  At the time of the writing of the Twenty-Third Round
Monitoring Report, the parties and the Special Master had agreed
"that the training portion of the plan will be updated with
regard to the definition and extent of the penalty-mitigation
envisioned by the plan," that "CDCR staff will verify that the
training is consistent with existing applicable Program Guide
provisions," and that implementation and operation of the plan
would "then be reviewed in the course of regular *Coleman*
monitoring activities."  Id.

        At the hearing, plaintiff's expert Eldon Vail testified that
CDCR's prison disciplinary process does not "systematically
take[] into account the mental illness of inmates in their
system, and the result is that inmates are often punished for
their mental illness."  RT at 464:21-465:2.  Mr. Vail's opinion
in this regard is based on, inter alia, review of "more than 268
RVR reports," all of defendants' expert's file for the
termination proceedings, and CDCR's RVR policies and procedures.
Expert Declaration of Eldon Vail in Support of Reply Brief, filed
August 23, 2013 (ECF No. 4766-2) at ¶ 2.  Mr. Vail also testified
that although defendants have policies and procedures designed to
account for the role of mental illness in rules violations,
defendants do not capture sufficient "aggregate data" to assess
whether these policies and procedures are in fact working.  RT at
465:3-12.  He testified that during his review he "looked at lots
of examples, individual examples, granular examples" where they
were not working.  RT at 465:13-15.

1    The testimony of defendant's expert Steve Martin in this

2    regard was similar.  Mr. Martin testified that he reviewed over

3    400 rules violation reports issued to inmates who refused orders

4    to cuff up and were subsequently charged with obstructing or

5    disobeying a peace officer and, where they were completed, the

6    mental health assessment forms completed as part of the RVR

7    process.  RT at 1943:1-1944:19.  He found that sometimes

8    clinicians did a good job of explaining whether the inmate's

9    mental illness caused or contributed to the incident and

10   sometimes they did not.  RT at 1944:20-1945:4.  He also found

11   "varying levels of communication between the clinical staff and

12   custody as to how that mental health assessment process was

13   working," with R.J. Donovan standing alone in the quality of

14   communication between clinical and custodial staff in the rules

15   violation process.  RT at 1947:6-20.  He testified that it was

16   difficult to monitor what, if any, role the mental health

17   assessment plays in the rules violation process.  RT at 1948:2-

18   16.  He also testified that he rarely, if ever, found diversion

19   of mentally ill inmates from sanctions even though in his opinion

20   that "should happen" at least sometimes if the information on the

21   form is properly gathered and used.  RT at 1951:14-1952:8.[23]

22       Based on the foregoing, the issue relative to the

23   disciplinary process turns on the adequacy of defendants'

24

25   [23] The testimony at the evidentiary hearing was consistent with the uneven
     implementation of the RVR mental health assessment policy reported by the
26   Special Master in his Twenty-Fourth and Twenty-Fifth Round Monitoring Reports.
     See Twenty-Fourth Round Monitoring Report (ECF No. 4205) at 87, 98, 108, 120,
     142, 155, 164, 180-81, 197-98, 208, 220-221, 232; Twenty-Fifth Round
27   Monitoring Report (ECF No. 4298) at 98-99, 104, 114, 125, 128, 139-40, 145,
     159, 169, 193, 202, 219, 231, 242, 252, 267, 275, 288, 300, 310, 323-24, 336,
28   346, 357, 365, 376, 382, 386, 389, 393, 399, 414, 424.

1   implementation of the plan agreed to by the parties and approved

2   by the Special Master in 2011.  Accordingly, the court will

3   direct the Special Master to report to the court within six

4   months whether defendants have adequately implemented the RVR

5   policies and procedures agreed to in 2011.

6       At the hearing, the court also received evidence of a

7   practice referred to as "Management Status."  Director Stainer

8   testified that "management status" was then part of local

9   operating procedures at a majority of, but not all, prison

10  institutions.  RT at 887:7-12. He testified that it differed from

11  the rule violation process because it was not imposed as part of

12  the disciplinary process but is an alternative sanction imposed

13  as an "indirect response to a set of threatening behaviors to

14  stop those behaviors from continuing."  RT at 889:15-21.  He also

15  testified that his office had received local operational

16  procedures for management status from every prison that "has this

17  process in their local operating procedure" and was "in the

18  process of reviewing it for consistencies."   RT at 888:6-14.

19  His office was "going to come out with a formatted operational

20  procedure for each institution to, again, fill in only site

21  specific issues so we have a consistent application of those

22  processes, making sure that appropriate due processes are in

23  place for the inmates, and checks and balances for the

24  application for these precautions in the management cell status"

25  and to avoid "arbitrary placement of an individual on these type

26  of sanctions."  RT at 888:13-20, 891:2-3.[24]

27  ─────────────
    [24] During the proceedings on plaintiffs' motion concerning segregated housing,
    the court also heard testimony about the use of management cells in
28  administrative segregation units.  Plaintiffs' expert, Dr. Haney, described

1    Defendants will be directed to work with the Special Master

2    on a timeline for completion of the review process testified to

3    by Mr. Stainer so that defendants' use of management status can

4    be reviewed by the Special Master as part of his review of the

5    implementation of defendants' RVR policies and procedures.

6    IV.   Segregated Housing

7        By their May 6, 2013 motion, plaintiffs seek additional

8    remedial orders related to housing of seriously mentally ill

9    inmates in administrative segregation and segregated housing

10   units.   Serious issues concerning placement of class members in

11   administrative segregation and segregated housing units have

12   plagued this litigation since its inception.

13       In 1995, the court found that defendants were violating the

14   Eighth Amendment in housing mentally ill inmates in

15   "'administrative segregation and segregated housing at Pelican

16   Bay SHU and statewide . . . because mentally ill inmates are

17   placed in administrative segregation and segregated housing

18   without any evaluation of their mental status, because such

19   placement will cause further decompensation, and because inmates

20   are denied access to necessary mental health care while they are

21   housed in administrative segregation and/or segregated housing.'"

22   Coleman v. Wilson, 912 F.Supp. at 1380 (internal citation

23   omitted).

24       As recently as last year, it was evident that the

25   constitutional violation had not been remedied.   In the April

26   2013 order denying defendants' termination motion, the court

27   _____
     them as "punishment cells" and he testified that he interviewed class members
     inside these cells but could not find any standards for their use in Title 15.
28   RT at 2186:18-2187:25.

1    specifically identified the need to address "ongoing issues

2    related to placement of EOP (Enhanced Outpatient) inmates in

3    administrative segregation, particularly those housed in such

4    units for over 90 days" as a "'critically important' goal[] . . .

5    necessary to remedy the Eighth Amendment violation in this

6    action." Coleman v. Brown, 938 F.Supp. at 969 (internal citation

7    omitted).  Specifically, the court found this "critical goal"

8            centers on treatment of mentally ill inmates
             in administrative segregation, particularly
9            those whose stays in these units exceed
             ninety days and those who are placed in
10           administrative    segregation    for    non-
             disciplinary reasons. These inmates face
11           substantial risk of serious harm, including
             exacerbation of mental illness and potential
12           increase in suicide risk. See Twenty-Fifth
             Round (ECF No. 4298) at 36. The evidence
13           before    the    court    shows    that    a
             disproportionate number of inmate suicides
14           occur in administrative segregation units.
             Remedial efforts over the past six years have
15           focused on reducing the length of time EOP
             inmates remain in administrative segregation
16           and providing appropriate clinical care for
             EOP inmates housed in such units. See id. at
17           34–35.

18           In their motion, defendants contend that they
             have "developed and implemented procedures
19           for placing and retaining inmates with mental
             health    needs    in    any    administrative
20           segregation    or    security    housing    unit."
             Termination Motion (ECF No. 4275–1) at 29.
21           Defendants contend that while mentally ill
             inmates are in these units their mental
22           health needs are "being appropriately met"
             and that there is no evidence to the
23           contrary.    Id.    This contention is not
             supported by defendants' own experts.

24           Defendants' experts describe the "environment
             of administrative segregation" as "generally
25           non-therapeutic." Clinical Exp. Rpt. (ECF No.

26

27

28

                                   38

4275-5) at 20. They recommend that housing inmates with serious mental disorders be "as brief as possible and as rare as possible." Id. at 25.FN41 Defendants' experts noted the "statistical overrepresentation of completed suicides" in administrative segregation units when compared to other housing units, accordingly, recommend that "placement of inmates who require an EOP level of care be housed in Administrative Segregation Units only when absolutely necessary for the safety of staff or other inmates, and only for as long as it absolutely necessary." Id. at 23. They also reported finding, at two prisons, "some inmates waiting for EOP Special Needs Yard beds and reportedly housed in an Administrative Segregation Unit for their own protection; not because they posed a danger to others." Id. at 21.FN42 They recommended that such inmates be "placed in the front of any waiting list." Id.

FN41. They also "applaud CDCR's efforts to expedite the transfer of EOP inmates out of administrative segregation" but they don't describe what those efforts are. Id. at 20.

FN42. Defendants' experts describe a single case at California Medical Facility (CMF) as having "no systemic implications" but they reiterate their recommendation that such inmates be "moved to the top of the transfer list." Id. at 24.

In the Twenty-Fifth Round Report, the Special Master reported an ongoing need for improvement in treatment provided to inmates needing an Enhanced Outpatient (EOP) level of care who are placed into administrative segregation units. See Twenty-Fifth Round Report (ECF No. 4298) at 34-38. The Special Master reports an "elevated proportion of inmates in administrative segregation who are mentally ill" and describes a series of issues to be addressed, including

reduction of risks of decompensation and/or suicide, alternatives to use of administrative segregation placements

39

1          for non-disciplinary reasons, access to
2          treatment/mitigation of harshness of
           conditions in the administrative
3          segregation units, suicide prevention,
           and reduction of lengths of stay in
4          administrative segregation.

5          Id. at 38. The Special Master's findings
           identify remaining issues that are also
6          identified by defendants' experts. These
           issues, until remedied, mean that seriously
7          mentally ill inmates placed in administrative
           segregation units continued to face a
8          substantial risk of harm.

9

10  Id. at 979-980.[25]  The principal question before the court is

11  whether there have been sufficient changes in defendants' present

12  policies and practices over the past year to cure the identified

13  systemic constitutional violations and, if not, whether

14  additional remedies are necessary.[26]

15          Defendants oppose plaintiffs' motion in part by contesting

16  ─────────────────
    [25] Most of the issues at bar were the subject of a series of meetings convened
17  by the Special Master in October 2012. See Twenty-Fifth Round Monitoring
    Report (ECF No. 4298) at 34-38. Two meetings were held in 2012, and the
18  Special Master intended to continue with the meetings and report on progress
    in subsequent monitoring reports. Id. at 38. "Among the issues to be
19  addressed in upcoming meetings [we]re the elevated proportion of inmates in
    administrative segregation who are mentally ill, reduction of risks of
20  decompensation and/or suicide, alternatives to use of administrative
    segregation placements for non-disciplinary reasons, access to
21  treatment/mitigation of harshness of conditions in the administrative
    segregation units, suicide prevention, and reduction of lengths of stay in
22  administrative segregation." Id. It is apparent that defendants' termination
    motion and the ensuing litigation interrupted that process.

23  [26] Plaintiffs make a series of contentions and seek a variety of orders. The
    specific issues presented in the motion can be divided into six categories:
24  (1) whether certain class members should be excluded from segregated housing
    altogether; (2) whether class members are improperly housed in disciplinary
25  segregation units for non-disciplinary reasons; (3) whether class members are
    held in both administrative segregation and segregated housing units for
26  excessive periods of time; (4) whether the mental health treatment program for
    administrative segregation units is adequate; (5) whether defendants perform
27  adequate welfare checks on class members housed in segregation; and (6)
    whether security measures used in segregation units, including strip searches
28  and holding cages, violate the Eighth Amendment rights of class members.

40

1   the evidence and opinions of plaintiffs' expert, Dr. Craig Haney,

2   concerning the harmful effects of segregated housing on certain

3   mentally ill inmates. Defendants contend that "Dr. Haney's

4   opinions are derived from studies that do not stand up to modern

5   scientific scrutiny." Defs. Opp. to Pls.' Mot. Related to

6   Housing and Treatment of Mentally Ill Inmates in Segregation,

7   filed July 24, 2013 (ECF No. 4712), at 12. Defendants tendered

8   their own expert, Dr. Charles Scott, who summarized "various

9   longitudinal studies" and avers that those studies "indicate that

10   segregation does not cause the type and severity of psychological

11   harm previously described in descriptive studies." Declaration

12   of Charles Scott, M.D., filed July 24, 2013 (ECF No. 4715) at ¶

13   28. At the hearing, Dr. Scott testified concerning two of those

14   studies, the only two studies he relied on, the so-called Zinger

15   study published in the Canadian Journal of Criminology in January

16   2001 and the so-called O'Keefe study published in 2013 in the

17   Journal of the American Academy of Psychiatry Law. See Exs. 1

18   and 2 to Defs. Ex. WWW.

19      The court is not persuaded by the conclusions Dr. Scott

20   draws from those studies. First, both studies expressly reject

21   extrapolation of their findings to other jurisdictions. See Ex.

22   2 to Defs. Ex. WWW at 32-33 (Zinger study cautions that "it would

23   be ill advised to attempt to extrapolate the findings of this

24   study (a) beyond 60 days of administrative segregation, and (2)

25   to other jurisdictions. For example, the findings of this study

26   are somewhat irrelevant to current segregation practices in the

27   United States where prisoners can sometimes be segregated for

28   years for disciplinary infractions with virtually no

1    distractions, human contacts, services, or programs."); see also

2    Ex. 1 to Defs. Ex. WWW at 11-12 ("Although this study

3    incorporated several design features that improved on the

4    capacity of previous research to draw conclusions about the

5    effects of AS [Administrative Segregation], there are several

6    limitations that affect its generalizability to other settings .

7    . . . segregation conditions vary from state to state on a host of

8    variables, including average duration of AS, double-bunking,

9    televisions, exercise, selection criteria for AS, and quality and

10   quantity of mental health and medical services.  Thus, the

11   results of the study can be generalized only to other prisons

12   systems to the extent that their conditions of AS confinement are

13   similar to Colorado's[27].")[28]  Second, in response to a question

14   from the court, Dr. Scott agreed that there were studies he had

15   confidence in "which demonstrate that . . . going to ad seg has

16   no consequences for the mentally ill," "primarily the O'Keefe and

17   Metzner study . . . [b]ut the Zinger was sort of a precursor to

18   that."  RT at 3359:13-23.  The O'Keefe study specifically eschews

19   such confidence:

20           This study was not designed to address the
             question of whether segregation is an
21           appropriate confinement option for offenders,
             including those with serious and persistent
22

23   _____
     [27] Dr. Scott testified to what he understands to be some of the "similarities
24   and differences between the California ad seg and the Colorado ad seg."  RT at
     3344:14-16.  Because he has never visited a California segregation unit, he
25   compared descriptions in the O'Keefe article with provisions of the CDCR
     Mental Health Program Guide.  RT at 3344:14-3345:6.  He testified that he did
26   not know whether the prisons are conforming to the requirements of the Program
     Guide.  RT at 3344:2-3345:3.

27   [28] The O'Keefe study also cautioned that the conclusions of the Zinger study
     "must be interpreted cautiously" due to "high refusal and attrition rates."
28   Ex. 1 to Defs. Ex. WWW at 3.

1
2
3
4
5
6
7
8
9

> mental illness. We are unaware of any
> treatment guidelines that suggests that long-
> term confinement in an AS environment would
> be clinically helpful. . . . We do not
> claim, nor believe, that these data
> definitively answer the question of whether
> long-term segregation causes psychological
> harm. . . . Frankly, having seen individuals
> in psychological crisis in segregation, we
> were surprised that such effects did not
> appear in these data. We believe that this
> study moves us forward, but that future
> research will shed additional light on this
> crucial question.

10  Ex. 1 to Defs. Ex. WWW at 12.

11      Despite Dr. Scott's testimony, the court concludes that

12  confinement in California's administrative segregation units

13  presents significant risks for seriously mentally ill

14  individuals. As recently as last year, defendants' own experts

15  reported on the harsh, "generally non-therapeutic" environment of

16  California's administrative segregation units and recommended

17  that the lengths of stay in such units be minimized for seriously

18  mentally ill inmates. Coleman v. Brown, 938 F.Supp.2d at 979

19  (citing Clinical Exp. Rpt. (ECF No. 4275-5) at 20, 25). In

20  addition, a disproportionately high rate of inmate suicides occur

21  in these units. See Coleman v. Brown, 938 F.Supp.2d at 955. At

22  the hearing, both parties introduced evidence of the number of

23  inmate suicides in 2012 and 2013. Pls. Ex. 2781; Defs. Ex.

24  LLLL.[29] Defendants argue that the number of class member suicides

25
26
27
28

---

[29] The source of the data depicted in defendants' Ex. LLLL is not clear from
the exhibit itself. Dr. Belavich testified that his attorney worked with Dr.
Belavich's staff to prepare the chart. RT at 3704:24-3705:1. Dr. Belavich
testified, inter alia, that he "trusted" that his staff's numbers "agreed with
those" reported by the Special Master. RT at 3707:5-9. As it turns out, the
numbers are not in complete agreement. Defendants' Ex. LLLL shows 33 inmate
suicides in 2011. The Special Master reported 34 inmate suicides in 2011, a

1    in administrative segregation declined in 2013, and that "the

2    number of class members who have committed suicide within

3    segregation units, even considering those in Security Housing

4    Units and Psychiatric Units, is not disproportionate to those

5    outside the class."  Defs. Post-Evidentiary Hearing Brief (ECF

6    No. 4988) at 12.  This argument misses the mark.

7        The findings concerning disproportion in inmate suicides in

8    California's administrative segregation units are based on the

9    suicide rate in ASUs, PSUs, and SHUs,[30] as compared to the suicide

10   rate in non-segregated housing units.  <u>See</u> Report on Suicides

11   Completed in the California Department of Corrections and

12   Rehabilitation January 1, 2012-June 30, 2012 (First Half 2012

13   Suicide Report) (ECF No. 4376) at 16 (the most meaningful

14   measurement for assessing trends over time is "the number of

15   suicides per inmate and the rate of suicides (i.e. the number of

16   suicides per 100,000 inmates) *within* segregated housing units, as

17   compared to the incidence and rate of suicides in non-segregated

18   housing.")  The suicide rate is derived from the  total number of

19   inmate suicides in these units, not just those committed by

20   inmates who were at the time of their deaths identified at a

21   level of care in the mental health services delivery system.  <u>See</u>,

22   <u>e.g.</u>, First Half 2012 Suicide Report (ECF No. 4376) at 4, 43;

23   ───────────────────────────────────────────────────

24   fact vigorously disputed by defendants.  <u>See</u> Orders filed March 15, 2013 (ECF
     No. 4394) and March 22, 2013 (ECF No. 4435).  Ultimately this court overruled
25   defendants' objections and denied their motion to modify the number of inmate
     suicides reported by the Special Master for 2011.  <u>See</u> Order filed March 22,
     2013 (ECF No. 4435).

26   [30] Inmate suicides in California's condemned unit, while reported by the
     Special Master, have not been included in the raw number of segregation unit
27   suicides. <u>See</u>, <u>e.g.</u>, Report on Suicides Completed in the California Department
     of Corrections and Rehabilitation in Calendar Year 2011 (2011 Suicide Report)
28   (ECF No. 4308) at 6, 26.

                                    44

1   2011 Suicide Report (ECF No. 4308) at 6, 26.  Thirteen of the

2   thirty-two inmate suicides in CDCR prisons in 2012 were committed

3   in ASUs, PSUs, and SHUs.  Pls. Ex. 2781.  Through December 17,

4   2013, the same number – thirteen – of twenty-eight inmate

5   suicides were committed in ASUs, PSUs, and SHUs.  Id.  Thus, the

6   raw number of inmate suicides is unchanged and defendants'

7   exhibit does not reflect the suicide rate.

8        Defendants acknowledge disproportion in the number of inmate

9   suicides in administrative segregation.  See Annual Report of

10  Suicides in the CDCR During 2012, Ex. 2 to Declaration of Margot

11  Mendelsohn filed February 5, 2014 (ECF No. 5051-1) at 18-19.  The

12  disproportion is evidence of the high risk environment in

13  California's administrative segregation units, a risk faced by

14  all inmates housed in those units and particularly those with a

15  serious mental illness, a risk defendants have acknowledged.[31]

16  See id. at 18. ("CDCR continues to treat segregation units as

17  high-risk environments for vulnerable inmates, particularly

18  during the period soon after placement.")

19       Together with the court's original findings and its findings

20  on defendants' termination motion, the foregoing findings and the

21  overwhelming weight of evidence in the record is that placement

22  of seriously mentally ill inmates in California's segregated

23  housing units can and does cause serious psychological harm,

24

25  [31] The fact that in 2012, eleven of the thirteen were part of the mental health
    services delivery system at the time of their deaths, while only six of the
26  thirteen were so identified in 2013 may be as suggestive of additional
    problems in California's administrative segregation units, including
27  inadequate mental health assessments and suicide risk, or it might be of
    improvements that have reduced for one year the number of class member
28  suicides in administrative segregation.  That question is not before the court
    at this time.

1   including decompensation, exacerbation of mental illness,

2   inducement of psychosis, and increased risk of suicide. The

3   question before the court is whether defendants have made

4   progress since last year sufficient to remediate these serious

5   risks of harm, or whether additional orders are required.

6           A.  Administrative Segregation

7           State regulations require administrative segregation of

8   inmates whose safety is jeopardized in the general population as

9   well as inmates who pose threats to the safety of others or

10  "jeopardize[]the integrity of an investigation of an alleged

11  serious misconduct or criminal activity."  15 C.C.R. § 3335(a).[32]

12  Placement in administrative segregation may be for disciplinary

13  or non-disciplinary reasons. See 15 C.C.R. §§ 3335, 3338; see

14  also RT at 2898:2-2899:15; 2907:17-2908:19; Reply Austin Decl.

15  (ECF No. 4762) at ¶ 18.  "Administrative segregation may be

16  accomplished by confinement in a designated segregation unit or,

17  in an emergency, to any single cell unit capable of providing

18  secure segregation."  15 C.C.R. §3335(a).  Administrative

19  Segregation Units (ASUs) are distinguished from Segregated

20  Program Housing Units (Security Housing Units (SHUs) and

21  Psychiatric Services Units (PSUs) in that ASUs "are generally

22  temporary segregation housing units which, as the name implies,

23  are to administratively review the need for segregation, whereas

24  Segregated Program Housing [Units] . . . are designed for

25  [32] The regulation provides:  "When an inmate's presence in an institution's

26  general population presents an immediate threat to the safety of the inmate or
    others, endangers institution security or jeopardizes the integrity of an
    investigation of an alleged serious misconduct or criminal activity, the

27  inmate shall be immediately removed from general population and be placed in
    administrative segregation."  15 C.C.R. §3335(a).

28

46

1    extended term programming." Declaration of Kathleen Allison,

2    filed July 24, 2013 (ECF No. 4713) at ¶ 9.

3        Certain reasons for removal of an inmate from the general

4    population are not considered administrative segregation. See 15

5    C.C.R. § 3340.  Two of those exclusions are relevant to the

6    motion at bar:

        (a) Medical. When an inmate is involuntarily
        removed   from   general   inmate   status   for
        medical or psychiatric reasons by order of
        medical staff and the inmate's placement is
        in a hospital setting or in other housing as
        a medical quarantine, the inmate will not be
        deemed as segregated for the purpose of this
        article. When personnel other than medical
        staff   order   an   inmate   placed   in
        administrative   segregation   for   reasons
        related to apparent medical or psychiatric
        problems,    that    information    will    be
        immediately   brought   to   the   attention   of
        medical    staff.    The    appropriateness    of
        administrative segregation or the need for
        movement   to   a   hospital   setting   will   be
        determined by medical staff. When medical and
        psychiatric reasons are involved, but are not
        the primary reasons for an inmate's placement
        in administrative segregation, administrative
        segregation status will be continued if the
        inmate is moved to a hospital setting and the
        requirements of this article will apply.

        (b) Orientation and Lay-Over. Newly received
        inmates   and   inmates   in   transit   or   lay-over
        status may be restricted to assigned quarters
        for that purpose. Such restrictions should
        not be more confining than is required for
        institution   security   and   the   safety   of
        persons, nor for a period longer than the
        minimum time required to evaluate the safety
        and security factors and reassignment to more
        appropriate housing.

    15 C.C.R. § 3340(a), (b).

1    Prior to amendments discussed <u>infra</u>, all inmates assigned to

2    administrative segregation were placed in Privilege Group D.  <u>See</u>

3    Defs. Ex. OOO, Initial Statement of Reasons at 1.  Placement in

4    this highly restrictive group removes all family visits and

5    access to "recreational or entertainment activities" and limits

6    canteen draw, telephone calls, and personal property as follows:

7         (A) No family visits.

8         (B) One-fourth the maximum monthly canteen

9         draw as authorized by the secretary.

10        (C) Telephone calls on an emergency basis
          only as determined by institution/facility

11        staff.

12        (D)  Yard  access  limited  by  local
          institution/facility  security  needs.   No

13        access  to  any  other  recreational  or
          entertainment activities.

14

15        (E)  The  receipt  of  one  personal  property
          package, 30 pounds maximum weight, per year,

16        exclusive of special purchases as provided in
          Section 3190.  Inmates  shall  be  eligible  to

17        acquire  a  personal  property  package  after
          completion  of  one  year  of  Privilege  Group  D

18        assignment.

19   15 C.C.R. § 3044(g)(3).

20        1.  <u>Non-Disciplinary Segregation</u>

21        In late 2013, defendants created and began to implement a

22   new classification identified as nondisciplinary segregation

23   (NDS).  RT at 2904:12-2905:17; <u>see also</u> Defs. Ex. OOO.  Non-

24   Disciplinary Segregation is "Segregated housing placement for

25   administrative reasons to include, but not limited to:  ASU

26   placement for safety concerns, investigations not related to

27   misconduct or criminal activity, and/or being a relative or an

28

1    associate of a prison staff member." RT at 2908:6-16. The Non-

2    Disciplinary Segregation (NDS) classification is designed to

3    "afford inmates segregated in ASU for non-disciplinary reasons

4    privileges more consistent, but not identical, with their pre-

5    segregation privilege group." Defs. Ex. OOO, Initial Statement

6    of Reasons at 1.  Inmates placed in the NDS category are still

7    "limited to non-contact visits due to safety and security

8    concerns as well as assisting in the prevention of contraband

9    into the ASU." Id. at 2.  In addition, yard access for NDS

10   inmates is "limited by local institution/security needs and NDS

11   inmates may be permitted to participate and have access to

12   programs, services, and activities as can reasonably be provided

13   in the unit without endangering the security and safety of

14   persons, . . . ." Id.

15        At present, a "significant number" of Coleman class members

16   are placed in administrative segregation units for non-

17   disciplinary reasons, including safety concerns and lack of

18   appropriate bed space.  See RT at 2222:25-2227:6; RT at 2255:5-

19   2256:20.[33]  Defendants do not have separate housing units for

20   disciplinary administrative segregation and non-disciplinary

21

22   [33] The evidence concerning the number of class members in administrative
     segregation for non-disciplinary reasons was imprecise for a variety of
     reasons.  See, e.g., RT at 2428:1-25 (testimony of Craig Haney); RT at

23   3182:11-3186:18 (testimony of Kathleen Allison concerning differences between
     placement in administrative segregation for safety concerns versus non-

24   disciplinary segregation classification and percentages of inmates in
     administrative segregation).  While defendants offered evidence that only a

25   "small number" of class members had been classified in the non-disciplinary
     segregation category, see Defs. Ex. QQQ, it is evident that the process of

26   classifying inmates into the NDS category is ongoing and the number of inmates
     on Ex. QQQ does not represent the total number of class members housed in
     administrative segregation units for non-disciplinary reasons.  See

27   RT:2987:23-2988:6.  Moreover, Ms. Allison testified at her deposition that
     twenty to thirty percent of inmates in administrative segregation were there

28   for nondisciplinary reasons.  RT at 3185:11-3186:18.

1  segregation placements or for inmates housed in administrative

2  segregation pending transfer to an appropriate bed.  See Reply

3  Austin Decl. (ECF No. 4762) at ¶ 38.  Defendants' new regulations

4  say that "when practical and feasible" individual prison

5  institutions should try to "cluster" inmates with a non-

6  disciplinary segregation classification "into a specific section"

7  within an administrative segregation unit.  RT at 2964:23-

8  2965:12.  Dr. Haney testified that it is a "very unusual

9  phenomenon," a "bad mix," and a "questionable" correctional

10 practice to place inmates with safety concerns in the same

11 segregation unit as inmates placed there for disciplinary

12 reasons.  RT at 2254:7-21.

13      Between 2007 and 2012, roughly half of the suicides in

14 California's administrative segregation units were by inmates in

15 administrative segregation for non-disciplinary reasons. RT at

16 2242:15-23; Pls. Ex. 2048.  In January 2013, Dr. Robert Canning,

17 defendants' Suicide Prevention Coordinator, issued a report

18 analyzing CDCR suicides during this period.  Pls. Ex. 2049.  In

19 his report, he noted that

20          data collected by suicide evaluators found
           that many inmates who housed in ASU at the
21         time of their deaths are placed there not for
           disciplinary reasons, but for safety reasons.
22         Although there are many complexities
           surrounding these situations, it is worth
23         noting that placement in ASU of already
           fearful inmates may only serve to make them
24         even more fearful and anxious, which may
           precipitate a state of panicked desperation,
25         and the urge to die.

26

27 Id. at 2.  Plaintiffs' expert, Dr. Haney, agreed with this

28 opinion.  RT at 2244:11-25.

1    Because of the absence of separate housing units, even with

2    the new NDS classification class members in administrative

3    segregation for non-disciplinary reasons are still subject to

4    several significant restrictions placed on inmates housed in

5    administrative segregation for disciplinary reasons, including no

6    contact visits, significant limits on access to both exercise

7    yards and dayroom, eating all meals in their cells, and being

8    placed in handcuffs and restraints when being moved outside their

9    cells.  RT at 3200:1-19.  Class members in administrative

10   segregation for non-disciplinary reasons often receive mental

11   health treatment in confined spaces described by plaintiffs'

12   expert as "treatment cages." RT at 2167:20-23 (Haney).  They are

13   subjected to strip searches each time they leave their housing

14   unit for mental health treatment and each time they return.  RT

15   at 2173:20-2175:14.  Dr. Haney testified that in his opinion this

16   practice "serves as a disincentive" for mentally ill inmates to

17   go to treatment because the searches are "humiliating and

18   degrading."  RT at 2175:15-2176:6.

19       During the hearing, defendants presented the court with a

20   memorandum dated December 3, 2013 limiting to thirty and sixty

21   days respectively administrative segregation placements of EOP

22   and CCCMS inmates with an NDS classification.  Defs. Ex. RRR.[34]

23   The memorandum includes deadlines for presentation of these cases

24   to a classification staff representative (CSR) to "facilitate the

25

26   [34] The NDS classification designation must be made by an Institution
     Classification Committee (ICC) and it takes ten calendar days from the time an
     inmate arrives in administrative segregation to be seen by an ICC for
27   classification.  RT at 2989:1-11.  Thus, the total length of stay for NDS
     inmate-patients under the new policy would actually be forty days for EOP
28   inmates and seventy days for CCCMS inmates.

51

1    CSR referral, endorsement, and transfer process." Id. Finally,

2    it requires reporting of all such cases that exceed the deadline

3    to the relevant institution's Associate Director, who "shall

4    provide assistance and support when appropriate to the

5    institutions to remedying identified impediments to release or

6    transfer." Id. Given the significant mental health risks posted

7    by placement in these units, these times frames are too long.

8         Seriously mentally ill inmates in administrative segregation

9    for non-disciplinary reasons have done nothing to transgress the

10   rules of the institution.  They are generally in need of

11   protection or placement where they have access to necessary

12   mental health services.  The only explanation offered in the

13   record for California's failure to have separate units for

14   disciplinary and non-disciplinary segregation is the overcrowded

15   conditions that have plagued the prison system for at least a

16   decade.  See Reply Austin Decl. (ECF No. 4762) at ¶ 39.  The only

17   explanations tendered for defendants' failure to expedite

18   transfer of class members in administrative segregation for non-

19   disciplinary reasons, including safety concerns and lack of

20   appropriate bed space, are overcrowded prison conditions, an

21   insufficient number of buses to accomplish timely transfers, and

22   the length of time it takes to complete the administrative

23   processes required for transfer.  See id. at ¶¶ 39, 44; see also

24   RT at 2129:13-24; RT:3190:1-3191:24.[35]  None of these explanations

25

26   [35] Defendants have a separate transportation system for inmates who require
     transfer to Mental Health Crisis Beds.  See RT at 3462:17-3463:12.  Ms.
27   Allison testified that defendants have considered using this system "as an
     option" to expedite transfers of NDS EOP inmates from administrative
     segregation units.  RT at 3221:24-3222:3.
28

1  justify subjecting these class members to these conditions for

2  these periods of time.

3       Plaintiffs' expert, Dr. James Austin, testified that there

4  is "no reason" to hold class members in non-disciplinary

5  segregation for these period of time, and that in states he works

6  in, inmates who need to be transferred to an appropriate mental

7  health bed placement are transferred within twenty-four hours.

8  RT at 3021:8-3022:11.  CDCR's then Acting Statewide Director of

9  Mental Health, Dr. Timothy Belavich,[36] agrees that mentally ill

10 inmates in administrative segregation for non-disciplinary

11 reasons should be moved to an appropriate program "as quickly" as

12 possible.  RT at 3563:7-12, 3564:17-21.

13      Mentally ill inmates in administrative segregation for non-

14 disciplinary reasons "are treated, for obvious intents and

15 purposes, as if they are in an administrative segregation prison

16 there for disciplinary reasons even though they're not."  RT at

17 2167:20-2168:4; see also Reply Austin Decl. (ECF No. 4762) at ¶

18 45 (even with new NDS classification "'non-disciplinary'

19 prisoners will still be mixed with disciplinary or disruptive

20 prisoners in the same segregation units and be subject to the

21 same custodial restrictions, including very limited out-of-cell

22 time and no access to work, education, and other meaningful

23 programs.")  Dr. Haney testified that it is "utterly

24 inappropriate" to house these inmates in these units "on more

25 than a very short-term basis."  RT at 2224:11-12.

26             We're talking about mental patients who are
                now not only vulnerable because they're
27
   _____
28 [36] Dr. Belavich is now the Director of CDCR's Division of Health Care Services.

1
2
3
>           mental patients but vulnerable because they
>           have safety concerns, being placed in an
>           environment that we know is harmful to the
>           mental health of the mentally ill prisoners
>           who are placed there.

4
5
6
7
>           So they are doubly at risk.  They go in as
>           vulnerable mental health prisoner, . . . who
>           are now at risk and all the psychological
>           burden that carries with it, and they're
>           placed in an environment in which they're in
>           isolation and locked in their cells basically
>           23 hours a day.

8   RT at 2224:21-2225:7.  Dr. Haney also testified that although

9   such mixed placements "could be done on an expedient basis" if

10  there is nowhere else to put an inmate with safety concerns, that

11  should be accompanied by a sense of urgency to move the inmate

12  with safety concerns to a non-administrative or lockdown setting.

13  RT at 2254:22-2255:4.

14         In December 2012, defendants issued an operational plan for

15  disabled inmates covered by the Armstrong class action.[37]  The

16  operational plan covers Armstrong class members housed in

17  administrative segregation "due solely to a lack of appropriate

18  accessible General Population (GP) housing (including Sensitive

19  Needs GP)."  Ex. 9 to Declaration of Jane Kahn filed May 6, 2013

20  (ECF No. 4582) at 97.  The procedure set forth in the model plan

21  sets forth specific procedures for these inmates, requires that

22  they be moved out of administrative segregation within 48 hours,

23  and provides specific notice procedures for three business days

24  following initial placement of these inmates in administrative

25  segregation.  Id.  There is no apparent reason for the

26  distinction between Armstrong & Coleman class members.

27

28  _____
[37] Armstrong v. Brown, No. C94-2307 CW (N.D.Cal.)

1        For all of the foregoing reasons, the court finds that

2    placement of seriously mentally ill inmates in the harsh,

3    restrictive and non-therapeutic conditions of California's

4    administrative segregation units for non-disciplinary reasons for

5    more than a minimal period necessary to effect transfer to

6    protective housing or a housing assignment violates the Eighth

7    Amendment.[38]   The record suggests several options to remedy this

8    constitutional violation, including but not limited to creation

9    of separate units for disciplinary and non-disciplinary

10   segregation, or adoption of a policy modeled on the Armstrong

11   operational plan for Coleman class members.   Defendants will be

12   required, within thirty days, to present the court with a plan to

13   remedy this ongoing violation and they shall be prepared to

14   implement the plan within thirty days thereafter.   Defendants

15   shall commence forthwith to reduce the number of Coleman class

16   members housed for non-disciplinary reasons in any administrative

17   segregation unit that houses disciplinary segregation inmates.

18   Commencing sixty days from the date of this order, defendants

19   will be prohibited from placing any Coleman class member in any

20   administrative segregation unit that houses disciplinary

21   segregation inmates for a period of more than seventy-two hours

22   if the placement is for non-disciplinary reasons including but

23   not limited to safety concerns or lack of appropriate bed space.

24   ////

25

26   [38] It is settled that prison inmates have no liberty interest in remaining in
     the general prison population and that the due process clause is not violated
     by the transfer of prison inmates to more restrictive settings for non-
27   punitive reasons.   See, e.g., Anderson v. County of Kern, 45 F.3d 1310, 1315
     (9th Cir. 1995).   They do, however, retain the protections of the Eighth
28   Amendment in such settings.   See Sandin v. Conner, 515 U.S. 472, 487 n.11.

1       2.  <u>Placement/Retention/Return to Administrative Segregation</u>

2           Plaintiffs raise a number of issues related to placement of

3   at risk class members in administrative segregation, lengths of

4   stay in administrative segregation units, and adequacy of care

5   provided particularly to EOP inmate-patients.  At the core,

6   resolution of these issues turns on a common question:  what is

7   the proper role of mental health clinicians in the housing

8   decisions presented when seriously mentally ill inmates must be

9   removed from a prison's general population for disciplinary

10  reasons.[39]  As with the issues related to use of force and rules

11  violation reports already discussed, defendants have not yet

12  adequately incorporated necessary clinical judgments into these

13  decisions.

14          The evidence tendered at the hearing demonstrates that the

15  role of the mental health clinician is integral to placement

16  decisions in two separate but related ways.  In relevant part,

17  the Eighth Amendment prohibits placements of seriously mentally

18  ill inmates in conditions that pose a substantial risk of

19  exacerbation of mental illness, decompensation, or suicide.

20  These risks may arise from an individual inmate-patient's

21  particular mental state and/or history of mental illness, from

22  the adequacy of care available in the proposed housing placement,

23  or both.  Accurate and adequate assessment of these risks

24  requires the exercise of clinical judgment, and where that

25

26  [39] A separate issue arose at the hearing concerning the accuracy of defendants'
    data concerning, in particular, lengths of stay in administrative segregation
    and segregated housing units.  Going forward, defendants will be required to
27  provide to the Special Master accurate information that clearly demonstrates
    the total length of time that any <u>Coleman</u> class member spends in any
28  administrative segregation unit or segregated housing unit.

56

1  clinical judgment demonstrates existence of the risk that must be

2  avoided that judgment cannot be overridden by custodial

3  requirements.  Instead, in situations where clinical judgment

4  demonstrates an unacceptable level of risk alternative placements

5  must be made.[40]

6      The Program Guide contains a structure for delivery of

7  mental health services in administrative segregation, identified

8  as the Administrative Segregation Unit (ASU) Mental Health

9  Services (MHS) program.  Pls. Ex. 1200 at 12-7-1.  Responsibility

10  for the ASU MHS program at each institution rests jointly with

11  the Health Care manager and the Warden.  Id.  Operational

12  oversight for the ASU MHS lies with the Chief of Mental Health

13  for each institution.  Id.

14          Custodial responsibilities, including initial
           placement, disciplinary actions, correctional
15          counseling services, classification, inmate-
           patient movement, and daily management shall
16          rest with the Warden or designee.  The
           assigned psychiatrist or Primary Clinician
17          (PC) shall attend all Institutional
           Classification Committee (ICC) meetings to
18          provide mental health input.

19          Individual clinical case management,
20          including treatment planning, level of care
           determination and placement recommendations,
21          are performed by the assigned PC and approved
           by the institution Interdisciplinary
22          Treatment Team (IDTT).

23

24  _____
   [40] The record shows that there are programs in place in other jurisdictions
25  which separate seriously mentally ill inmates from general population for
   disciplinary reasons and impose conditions on release from these programs
26  without subjecting high-risk mentally ill inmates to the harsh conditions in
   California's segregation units.  See Reply Austin Decl. (ECF No. 4762) at
27  ¶¶35-37.  The court wishes to be clear, if rules violations occur which are
   not the result of an inmate's mental illness, the state may, of course, impose
28  appropriate sanctions.  What the state cannot do is impose sanctions, which by
   virtue of the inmate's mental status, risks further deterioration.

1  Id.  The Interdisciplinary Treatment Team must include, at a

2  minimum, the assigned primary clinician (PC), the assigned

3  psychiatrist, the licensed psychiatric technician (LPT) and the

4  assigned correctional counselor.  Id. at 12-7-13.

5      Most of the ASU MHS program objectives appear designed to

6  prevent the identified risks of harm.  See id. at 12-7-2.

7  Id. at 12-7-2.

8      The Program Guide requires a pre-placement mental health

9  screening of "all inmates" prior to placement in administrative

10  segregation.  Id. at 12-7-2.  This screening is "for possible

11  suicide risk, safety concerns, and mental health problems."  Id.

12  An inmate who "screens positive" is "referred for a mental health

13  evaluation on an Emergent, Urgent, or Routine basis."  Id.  The

14  Program Guide also requires review of "all inmates" placed in ASU

15  for "identification of current MHSDS treatment status," said

16  review to occur within one work day of placement in ASU.  Id. at

17  12-7-3.  Mental health staff are required to "ensure the

18  continuity of mental health care, including the delivery of

19  prescribed medications."  Id.

20      From the foregoing, it appears that, if adequately

21  implemented, the ASU MHS screening system is designed to capture

22  most, if not all, of the clinical information necessary to a

23  determination of whether a particular Coleman class member faces

24  a substantial risk of exacerbation of mental illness,

25  decompensation, or suicide from placement in administrative

26  segregation.[41]  The relevant information should be contained in

27  [41] The record shows that questions about the accuracy of the present screening
    instrument arose over three years ago.  See Ex. 45 to Confidential Declaration
28  of Jane Kahn, filed March 18, 2013 (ECF 4411-7 *SEALED*)(Minutes of November

1   the class member's unit health record and known to his or her

2   treating clinician at the time that ASU placement is considered.

3   See also RT at 3570:15-3571:21.   The final housing decision,

4   however, rests with the Institution Classification Committee, and

5   there are no guidelines for weight to be given clinical criteria

6   in the placement decisions.

7       Dr. Belavich testified that at present mental health staff

8   are not consulted about whether the mental health of class

9   members facing segregation is sufficiently stable to withstand

10  the mental health consequences of such placement.   RT at 3688:21-

11  3689:3.   He was of the view that clinicians should be so

12  consulted.   RT at 3689:4-9.   Dr. Belavich also testified that he

13  and his staff could work with custody staff to develop a plan for

14  additional mental health input into the segregation placement

15  process.[42]   RT at 3693:3-13.

16      The court concludes that defendants must develop a protocol

17  for placement decisions, including, as appropriate, a plan for

18  alternative housing, that will preclude placement of any Coleman

19  class member in existing administrative segregation units when

20  clinical information demonstrates substantial risk of

21  exacerbation of mental illness, decompensation, or suicide from

22  such placement.

23

24

25  8, 2010 Suicide Prevention and Response-Focused Improvement Team (SPR FIT), at
    74.   If they have not been, those must be resolved going forward.

26  [42] During Dr. Belavich's testimony, counsel for defendants offered to "suspend
    the proceedings to discuss these issues."   RT at 3692:22-24.   While the court
27  decided to complete the hearing, the court infers from testimony from Dr.
    Belavich as well as counsel's representation that defendants will bring due
28  diligence to the task required by this order.

1    Class members who can be placed in administrative

2 segregation without the foregoing substantial risks of harm must

3 have access to adequate mental health care during the placement.

4 The Program Guide includes mental health services in

5 administrative segregation units. The ASU MHS program is

6 designed to provide mental health services for CCCMS inmate-

7 patients in every administrative segregation unit at a level that

8 equals or exceeds the mental health services provided to CCCMS

9 patients in the general population. See Pls. Ex. 1200, Program

10 Guide at 12-3-8 to 12-3-10; 12-7-7; see also RT at 3467:17-

11 3468:3.

12    EOP services are only provided in EOP ASU "hubs."[43]   The

13 Program Guide has three options for inmate-patients placed in ASU

14 who require an EOP level of care:  (1) "Referral to an EOP

15 program for inmate-patients who are involved in non-violent

16 incidents and determined not to be a risk to others;" (2)

17 "Inmate-patients who are involved in serious rules violations and

18 whose propensity for threat to others and/or the security of the

19 institution is so high that no other alternative placement is

20 considered appropriate" are to be transferred to one the EOP ASU

21 hubs within thirty days; and (3) inmates who are serving

22 "established and endorsed SHU terms" are transferred to a

23

24 ─────────────────────────
[43] There are eleven EOP ASU hubs located at Central California Women's Facility
25 (CCWF), California Institution for Women (CIW), California Medical Facility
(CMF), California State Prison-Corcoran (COR), California State Prison-Los
26 Angeles County (CSP-LAC), Mule Creek State Prison (MCSP), R.J. Donovan (RJD),
California State Prison-Sacramento (SAC), San Quentin State Prison (SQ), and
Salinas Valley State Prison (SVSP). Defs. Ex. ZZZ. On October 25, 2013,
27 there were a total of 579 EOP inmate-patients in ASUs, 48 of whom were in non-
hub ASUs. Id. Systemwide, there were a total of 600 EOP ASU hub beds;
28 twenty-one were vacant. Id.

1  Psychiatric Services Units (PSU).[44]  Pls. Ex. 1200, Program Guide

2  at 12-7-8.

3      The specific treatment criteria for the EOP level of care

4  requires the presence of either acute onset of symptoms or

5  significant decompensation due to mental illness, an inability to

6  function in the general population, or both.  Id. at 12-4-3, 12-

7  4-4.[45]  The evidence shows that the risks of harm for these

8  inmate-patients can be significantly higher in administrative

9  segregation units.  Defendants' termination experts and

10  plaintiffs' experts both opined that placement of EOP inmates in

11  administrative segregation should be strictly limited, even where

12  an EOP level of care is provided.  See Defs. Ex. HHH (ECF No.

13  4275-5) at 23, 25; Expert Declaration of Craig Haney, filed May

14  6, 2013 (ECF No. 4581) at ¶ 29. Dr. Belavich also testified that

15  his "goal as a clinician" is to get EOP inmate-patients into a

16  PSU "as soon as I can."  RT at 3564:22-3565:8.

17

18  _____
[44] PSUs are at Pelican Bay, CIW, and SAC.

19  [45] Acute Onset or Significant Decompensation of a serious mental disorder
characterized by symptoms such as increased delusional thinking, hallucinatory
20  experiences, marked changes in affect, and vegetative signs with definitive
impairment of reality testing and/or judgment; and/or
21  Inability to Function in General Population Based Upon:
a. A demonstrated inability to program in work or educational assignments, or
22  other correctional activities such as religious services, self-help
programming, canteen, recreational activities, visiting, etc. as a consequence
23  of a serious mental disorder; or
b. The presence of dysfunctional or disruptive social interaction including
24  withdrawal, bizarre or disruptive behavior, extreme argumentativeness,
inability to respond to staff directions, provocative behavior toward others,
25  inappropriate sexual behavior, etc., as a consequence of a serious mental
disorder; or
26  c. An impairment in the activities of daily living including eating, grooming
and personal hygiene, maintenance of housing area, and ambulation, as a
27  consequence of a serious mental disorder.
These conditions usually result in Global Assessment Functioning (GAF) Scores
of less than 50.
28

1    "Remedial efforts over the past six years have focused on

2    reducing the length of time EOP inmates remain in administrative

3    segregation and providing appropriate clinical care for EOP

4    inmates housed in such units." Coleman v. Brown, 938 F.Supp.2d

5    at 979.  As already discussed, defendants' termination experts

6    reported that the environment in CDCR's administrative

7    segregation units "is not therapeutic" and that even where EOP

8    levels of care are provided "segregation is not a particularly

9    therapeutic environment to house inmates with serious mental

10   disorders." Defs. Ex. HHH (ECF No. 4275-5) at 23, 25.[46]  In his

11   Twenty-Fifth Round Monitoring Report, the Special Master reported

12   that "ten of the 11 [EOP-ASU] hubs failed to offer at least ten

13   hours per week of structured therapeutic activity per week. Only

14   CIW was able to meet that benchmark. Structured therapeutic

15   activity is a critical part of EOP care in general. This is

16   particularly true in segregation units, where the group dynamic

17   and interaction with others can help ameliorate the anti-

18   therapeutic effects of isolation on the mentally ill patient."

19   Twenty-Fifth Round Monitoring Report (ECF No. 4298) at 37.

20       Some evidence presented at the hearing suggested recent

21   improvements in the provision of care in certain EOP Ad Seg hubs.

22   See, e.g., Defs. Ex. DDDD (compiling compliance rate with certain

23   Program Guide requirements for the month of October 2013); Defs,

24   Ex. GGGG. (compiling data on group therapy in EOP ASUs, EOP PSUs,

25   and for CCCMS patients in ASU and two SHUs).  Overall review of

26   _____

[46] Taken together with the treatment criteria for the EOP level of care, which
27   requires significant impairment preventing functioning in a general population
     setting, the fact that defendants' own experts found the EOP-ASU hub
28   environment "not particularly therapeutic" continues to be of grave concern to
     this court.

1   the record suggests that the adequacy of care in individual EOP

2   ASU hubs varies based on several factors, including the physical

3   plant, available treatment space, and staffing levels.  See,

4   e.g., RT at 3495:2-13; Twenty-Fifth Round Monitoring Report (ECF

5   No. 4298) at 37.

6       As discussed above, the Program Guide contains specific

7   requirements for necessary care in general administrative

8   segregation units and EOP ASU hubs. Dr. Belavich testified that

9   he receives substantial data from his staff that he uses to

10  review quality of care issues in these units, and the court was

11  impressed by his apparent diligence.  Plainly, defendants cannot

12  house seriously mentally ill inmates in settings where defendants

13  know those inmates cannot receive the minimally adequate mental

14  health care required by the Program Guide.  Whether or not the

15  care provided in each EOP ASU hub meets Program Guide

16  requirements is, again, a clinical judgment and one that must be

17  exercised by Dr. Belavich and his staff.  Accordingly, defendants

18  will be required to provide monthly reports on whether each EOP

19  ASU hub meets Program Guide requirements for an EOP ASU level of

20  care and they will be prevented from admitting any Coleman class

21  member at the EOP level of care to any EOP ASU hub that does not

22  meet or exceed Program Guide requirements for a period of more

23  than two consecutive months.  Moreover, defendants will also be

24  prevented from placing any Coleman class member at the EOP level

25  of care in any administrative segregation unit during any period

26  in which there are an insufficient number of EOP Ad Seg Hub beds

27  available.

28      c.  Strip Searches

1    Plaintiffs seeks an order prohibiting defendants from

2  continuing their strip search policy in administrative

3  segregation units.  Dr. Belavich testified that he was concerned

4  that this policy inhibited treatment and was aware that it needed

5  to be revisited.  RT at 3503:18-3505:3.  Defendants will be

6  directed to provide a revised policy to the court within sixty

7  days.

8    d.  Suicide Prevention Measures

9    Plaintiffs seek a series of orders relative to suicide

10  prevention.  See Pls. Post-Trial Brief Re: Enforcement of Court

11  Orders, filed January 21, 2014 (ECF No. 4985) at 30-33.  By

12  minute order issued July 26, 2013, the court dropped

13  consideration of issues related to inmate suicide without

14  prejudice to their renewal, if appropriate, following a report

15  from the Suicide Prevention/Management Work Group.  That order

16  stands.

17  B.  Segregated Housing Units

18    In addition to numerous administrative segregation units,

19  California's prison system has three types of

20  "Segregated Program Housing Units."  15 C.C.R. §3341.5.

21  Protective Housing Units (PHUs) are for the protection of inmates

22  "whose safety would be endangered by general population

23  placement" and who meet specified criteria.  15 C.C.R. §

24  3341.5(a).  Security Housing Units (SHUs) are for inmates "whose

25  conduct endangers the safety of others or the security of the

26  institution."  15 C.C.R. §3341.5(c).  Psychiatric Services Units

27  (PSUs) are for seriously mentally ill inmates in the Enhanced

28

1 Outpatient Program (EOP) who require the equivalent of SHU
2 placement.  15 C.C.R. §3341.5(b).

3    In general, inmates may be placed in a SHU following
4 conviction of certain disciplinary offenses or after validation
5 as a member of a prison gang.  See 15 C.C.R. § 3341.5(c)(1),
6 (2)(A)(2).  SHU terms may be determinate or indeterminate.  15
7 C.C.R. § 3341.5(c)(2)(A), (B).  An inmate subject to an
8 indeterminate SHU term whose SHU term is suspended "based solely
9 on the need for inpatient medical or mental health treatment" may
10 have the term "reimposed without subsequent misbehavior if the
11 inmate continues to pose a threat to the safety of others or the
12 security of the institution."  15 C.C.R. § 3341.5(c)(A)(3).

13    With very limited exceptions, almost all seriously mentally
14 ill inmates are excluded from the Pelican Bay SHU.  See Pls. Ex.
15 1200 at 12-8-1 to 12-8-3.[47]  In addition, male inmates requiring

16

17 [47] Exclusion of seriously mentally ill inmates from the Pelican Bay SHU is the
result of a 1995 order in a separate class action lawsuit, Madrid v. Gomez,
No. C90-3094 TEH (N.D.Cal.). The Madrid court found, inter alia, Eighth
18 Amendment violations in SHU placement of "the already mentally ill, as well as
persons with borderline personality disorders, brain damage or mental
retardation, impulse-ridden personalities, or a history of prior psychiatric
19 problems or chronic depression" because these inmates were found to be "at a
particularly high risk for suffering very serious or severe injury to their
20 mental health, including overt paranoia, psychotic breaks with reality, or
massive exacerbations of existing mental illness as a result of conditions in
21 the SHU." Madrid v. Gomez, 889 F.Supp. 1146, 1265-66 (N.D.Cal. 1995).The
Madrid court determined that
22

23    subjecting individuals to conditions that are "very
likely" to render them psychotic or otherwise inflict
24 a serious mental illness or seriously exacerbate an
existing mental illness cannot be squared with
25 evolving standards of humanity or decency, especially
when certain aspects of those conditions appear to
26 bear little relation to security concerns. A risk this
grave—this shocking and indecent—simply has no place
27 in civilized society. It is surely not one "today's
society [would] choose[ ] to tolerate." . . . Indeed,
28 it is inconceivable that any representative portion of
our society would put its imprimatur on a plan to

65

1   an EOP level of care are not housed in any of the other three SHU

2   units for male inmates and are instead placed in PSUs.[48]  Pls. Ex.

3   1200 at 12-8-1.  There is no similar exclusion for female

4   inmates.  See id.  The Program Guide calls for provision of CCCMS

5   services in the three male SHUs other than Pelican Bay SHU.   Id.

6       Plaintiffs seek an order extending the Pelican Bay SHU

7   exclusion in the Program Guide to the other four segregated

8   housing units in California's prison system.[49]  Defendants oppose

9   the request, contending that (1) only inmates at the CCCMS level

10  of care are housed in SHU units; (2) appropriate mental health

11  services, consistent with Program Guide requirements, are

12  provided to inmates housed in SHUs; (3) the SHU units other than

13  Pelican Bay have natural light, less restrictive exercise yards,

14  and allow for electrical appliances, including televisions and

15  radios, in cells; and (4) "increasing data" suggests "that

16  segregation does not cause the type and severity of psychological

17  harm" described by plaintiffs' expert, Dr. Haney.  Defs. Opp'n

18  (ECF No. 4712) at 29.

19

20

            subject the mentally ill and other inmates described
21      above to the SHU, knowing that severe psychological
        consequences will most probably befall those inmates.
22      Thus, with respect to this limited population of the
        inmate class, plaintiffs have established that
23      continued confinement in the SHU, as it is currently
        constituted, deprives inmates of a minimal civilized
24      level of one of life's necessities.

    Id. at 1266 (quoting Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475, 2482
25  (1993)).

26  [48] In September 2013, 361 seriously mentally ill inmates were housed in a
    psychiatric services unit (PSU).  Pls. Ex. 2303.

27  [49] California Institution for Women (CIW); California Correctional Institution
    (CCI); California State Prison-Corcoran (COR); and California State Prison-
28  Sacramento (SAC).

                                66

1    First, both parties have tendered expert opinions and other

2    evidence concerning whether or not prolonged placement of

3    seriously mentally ill inmates in segregated housing units causes

4    psychological harm to those individuals.    The court has already

5    found that, for seriously mentally ill inmates, placement in

6    California's segregated housing units, including both

7    administrative segregation units and SHUs, can and does cause

8    serious psychological harm, including decompensation,

9    exacerbation of mental illness, inducement of psychosis, and

10   increased risk of suicide.    See Coleman v. Wilson, 912 F.Supp. at

11   1320-1321; see also Findings and Recommendations, filed June 6,

12   1994 (Dkt. 547) at 51-54.    Nothing in the evidence tendered on

13   the current motions requires revisiting those findings.[50]

14   _____

15   [50] The evidence tendered by the parties would certainly bear on an inquiry into
     whether housing seriously mentally ill inmates in segregation comports with
     contemporary values, a question not before this court at this stage of these
16   proceedings.    "[T]he Eighth Amendment's prohibition of cruel and unusual
     punishments "'draw[s] its meaning from the evolving standards of decency that
17   mark the progress of a maturing society,'". . . ." Hudson v. McMillian, 503
     U.S. 1, 8 (1992) (internal citations omitted).    To the extent possible, courts
18   look to "'objective indicia' derived from, inter alia, history, common law,
     and legislative action to determine whether particular punishments violate
     contemporary values.    Rhodes v. Chapman, 452 U.S. at 347 (internal citations
19   omitted).    Available evidence suggests that contemporary values are moving
     away from placement of seriously mentally ill prisoners in segregated housing,
20   particularly for periods as long as placements currently used in California.
     See Pls. Ex. 2054 (American Psychiatric Association (APA) December 2012
21   official policy on segregation of adult inmates with serious mental illness);
     Statement of Interest of the United States of America, filed August 9, 2013
22   (ECF No. 4736) (finding Eighth Amendment violations in the "manner in which
     the Pennsylvania Department of Corrections used solitary confinement on
23   prisoners with serious mental illness. . . .") ; Reply Austin Decl.(ECF No.
     4762) at ¶¶ 36, 50 (Mississippi, Georgia, New Mexico, Colorado and Oklahoma
24   all exclude "most or all prisoners with diagnosed mental illnesses" from their
     "punitive segregations units" and instead assign those inmates "to a
25   specialized mental health unit"; Ohio also requires prompt transfer of
     seriously mentally ill inmates out of segregated housing).    In addition, news
26   reports suggest that other jurisdictions, including the New York City
     Department of Correction, see
27   http://online.wsj.com/news/articles/SB1000142405270230461740457930284042591008
     8; and New York State, see http://www.npr.org/2014/02/23/281373188/n-y-
28   becomes-largest-prison-system-to-curb-solitary-confinement, are ending the
     placement of mentally ill inmates in solitary confinement.

1    Defendants also contend that measuring compliance with their

2    Revised Program Guide "is an appropriate way to assess whether

3    defendants are meeting their constitutional obligations."

4    Coleman v. Brown, 938 F.Supp.2d at 972 n.30.  Defendants' Revised

5    Program Guide is the "currently operative remedial plan" in this

6    action, and represents "'defendants' considered assessment, made

7    in consultation with the Special Master and his experts, and

8    approved by this court, of what is required to remedy the Eighth

9    Amendment violations identified in this action and to meet their

10   constitutional obligation to deliver adequate mental health care

11   to seriously mentally ill inmates.'"  Id. at 972 (internal

12   citation omitted.)  While the court has approved "[n]inety-five

13   percent of the provisions of the Revised Program Guide", id. at

14   972 & n.31, certain disputed issues were reserved for resolution

15   when the court gave that approval.  See Order filed March 3, 2006

16   (ECF No. 1773).  Whether the Pelican Bay SHU exclusions should be

17   extended to all SHUs was one of the disputed issues that remained

18   for resolution, as was the adequacy of mental health care

19   provided to class members housed in SHUs.  See Special Master's

20   Report and Recommendations on Defendants' Revised Program Guide,

21   filed February 3, 2006 (ECF No. 1749) at 8-9.  Thus, the

22   provisions of the Program Guide are not dispositive of the

23   question at bar.

24       Third, the fact that only CCCMS inmates are housed in SHU

25   units narrows the question but does not end the inquiry.  The

26   Pelican Bay SHU exclusion includes almost all of the treatment

27   categories for the CCCMS level of care.[51]  It is also broader than

28   _____
     [51]   Treatment criteria for CCCMS also include inmates diagnosed with

1   the CCCMS criteria.  In relevant part, treatment criteria for the

2   CCCMS level of care include *current* symptoms of specified Axis I

3   serious mental disorders, Pls. Ex. 1200 at 12-3-4, while the

4   Pelican Bay SHU exclusion extends to inmates who currently have

5   symptoms of those disorders or who have had such symptoms "within

6   the preceding three months."  Id. at 12-8-2.

7       Resolution of the question at bar turns, then, on two

8   disputed issues:  whether the conditions of confinement in other

9   SHU units are materially different from the conditions of

10  confinement in the Pelican Bay SHU, and whether the mental health

11  care provided in other SHU units is constitutionally sufficient.

12      As discussed above, the conditions of SHU confinement

13  include both the physical conditions of the housing units and the

14  exercise yards, and the restrictions that attach to

15  classification for SHU housing.  The restrictions are the same

16  for all SHU inmates; that is part of the classification process.

17  Thus, it is undisputed that the highly restrictive programming in

18  the Pelican Bay SHU is the same in all of California's SHU units.

19  All SHU inmates are confined to their cells for approximately

20  twenty-three hours per day.  Haney Decl. (ECF No. 4581) at ¶ 23.

21      The primary difference between the Pelican Bay SHU and the

22  other SHU units is that the cells in the Pelican Bay SHU "are

23  windowless and do not face other cells across the pod, and the

24  'yards' consist of concrete enclosed spaces rather than cages."

25  _____

26  exhibitionism, which is not included in the Pelican Bay exclusions.  See Pls.
    Ex. 1200 at 12-3-5, 12-8-1, 12-8-2.  However, SHU inmates who receive a rules
    violation report for "Indecent Exposure or Intentionally Sustained

27  Masturbation with Exposure" are referred for a mental health assessment which
    must "be completed within 24 hours to rule-out decompensation and/or

28  intoxication."  Id. at 12-8-6.

1  Haney Decl. (ECF No. 4581) at ¶ 18; see also Allison Decl. (ECF

2  No. 4713) at ¶ 26.[52]

3      Only CCCMS care is provided in SHU units.  Pls. Ex. 1200 at

4  12-8-1.  Male inmates requiring EOP level of care are referred to

5  a psychiatric services unit (PSU).  Id. at 12-8-1, 12-8-10.  The

6  Program Guide provides that "[f]emale inmate-patients [who

7  require an EOP level of care] will continue to be treated in SHU

8  . . . until a PSU for female inmate-patients is established."

9  Id. at 12-8-11, 12-8-12.  There is currently a 20 bed PSU for

10  female inmates at California Institution for Women (CIW).  See

11  Ex. A to Pls. March 3, 2014 Request for Judicial Notice (ECF No.

12  5093), at 14.

13      As discussed above, this question goes to the heart of the

14  tension between legitimate penological goals of prison

15  institutions, including the need for order and discipline, and

16  the requirements of the Eighth Amendment.  The record before the

17  court amply demonstrates that there are many seriously mentally

18  ill inmates at the CCCMS level of care who cannot be housed in

19  any SHU in California without running afoul of the Eighth

20  Amendment.  It is not clear that this is true for all inmates at

21  the CCCMS level of care.  For that reason, the court will not at

22  this time require the blanket exclusion requested by plaintiffs.

23  Instead, defendants will be prohibited from housing any seriously

24  mentally ill inmate at any SHU in California unless that inmate's

25

26  [52] There is minimal natural light in the Pelican Bay SHU:  "A skylight in each
    pod does allow some natural light to enter the tier area adjacent to the

27  cells. . . .  Inmates can spend years without ever seeing any aspect of the
    outside world except for a small patch of sky."  Madrid v. Gomez, 889 F.Supp.

28  1146, 1228, 1229 (N.D.Cal. 1995).

1   treating clinician certifies that (1) the inmate's behavior

2   leading to the SHU assignment was not the product of mental

3   illness and the inmate's mental illness did not preclude the

4   inmate from conforming his or her conduct to the relevant

5   institutional requirements; (2) the inmate's mental illness can

6   be safely and adequately managed in the SHU to which the inmate

7   will be assigned for the entire length of the SHU term; and (3)

8   the inmate does not face a substantial risk of exacerbation of

9   his or her mental illness or decompensation as a result of

10  confinement in a SHU.  In addition, defendants will be prohibited

11  from returning any seriously mentally ill inmate to any SHU unit

12  if said inmate has, following placement in a SHU, required a

13  higher level of mental health care.[53]

14      For all of the foregoing reasons, plaintiffs' motions will

15  be granted in part.

16  V.  <u>Standards for Injunctive Relief</u>

17      The court does, by this order, direct specific action by

18  defendants.  In this court's view, the orders contained herein

19  are in aid of the remedy required by the court's 1995 order.  To

20  the extent that the requirements of 18 U.S.C. §3626(a)(1) may

21  apply, this court finds that the orders contained herein are

22  narrowly drawn, extend no further than necessary to correct the

23  Eighth Amendment violations found at the trial of this matter and

24

25

26  [53] Plaintiffs have requested that defendants be ordered to develop treatment-
    based disciplinary programs for <u>Coleman</u> class members.  Given the necessity of
    the restrictions imposed by this order, defendants may want to seriously
27  consider voluntarily adopting such programs as this may provide a more
    straightforward means of planning for appropriate housing and treatment of
28  mentally ill offenders.

1    still ongoing, and are the least intrusive means to that end.

2    See 18 U.S.C. § 3626(a)(1)(A).

3         In accordance with the above, IT IS HEREBY ORDERED that:

4         1.  Plaintiffs' May 29, 2013 motion for enforcement of court

5    orders and affirmative relief related to use of force and

6    disciplinary measures (ECF No. 4638) is granted in part as

7    follows:

8              a.  Defendants shall work under the guidance of the

9    Special Master to revise their use of force policies and

10   procedures as required by this order. Said revisions shall be

11   completed within sixty days from the date of this order.

12             b.  The Special Master shall report to the court within

13   six months whether defendants have adequately implemented the RVR

14   policies and procedures agreed to in 2011.

15             c.  Defendants shall work with the Special Master on a

16   timeline for completion of their review of the use of management

17   status so that this practice can be reviewed by the Special

18   Master as part of his review of the implementation of defendants'

19   RVR policies and procedures.

20        2.  Plaintiffs' May 6, 2013 motion for enforcement of

21   judgment and affirmative orders related to segregated housing

22   (ECF No. 4580) is granted in part as follows:

23             a.  Within thirty days from the date of this order

24   defendants shall file a plan to limit or eliminate altogether

25   placement of class members removed from the general population

26   for non-disciplinary reasons in administrative segregations units

27   that house inmates removed from the general population for

28   disciplinary reasons.  Defendants shall be prepared to fully

                                    72

1    implement the plan within thirty days thereafter.  Defendants

2    shall commence forthwith to reduce the number of Coleman class

3    members housed for non-disciplinary reasons in any administrative

4    segregation unit that houses disciplinary segregation inmates.

5    Commencing sixty days from the date of this order, defendants

6    will be prohibited from placing any class members removed from

7    the general population for non-disciplinary reasons for more than

8    seventy-two hours in administrative segregations units that house

9    inmates removed from the general population for disciplinary

10   reasons.

11        b.   Defendants shall work under the guidance of the

12   Special Master to develop a protocol for administrative

13   segregation decisions, including, as appropriate, a plan for

14   alternative housing, that will preclude placement of any Coleman

15   class member in existing administrative segregation units when

16   clinical information demonstrates substantial risk of

17   exacerbation of mental illness, decompensation, or suicide from

18   such placement.

19        c.   Defendants shall forthwith provide to the court and

20   the Special Master monthly reports on whether each EOP ASU hub

21   meets Program Guide requirements for an EOP ASU level of care.

22   Commencing sixty days from the date of this order, defendants

23   shall not admit any Coleman class member at the EOP level of care

24   to any EOP ASU hub that has failed to meet or exceed Program

25   Guide requirements for a period of more than two consecutive

26   months.  Commencing sixty days from the date of this order,

27   defendants shall not place any class member at the EOP level of

28   care in any administrative segregation unit during any period in

1    which there are an insufficient number of EOP Ad Seg Hub beds

2    available unless failure to remove the inmate from the general

3    population presents an imminent threat to life or safety.

4         d.   Within sixty days from the date of this order

5    defendants shall file a revised policy concerning strip searches

6    in EOP ASU hubs.

7         e.   Defendants are prohibited from housing any class

8    member at any SHU in California unless that class member's

9    treating clinician certifies that (1) the behavior leading to the

10   SHU assignment was not the product of mental illness and the

11   inmate's mental illness did not preclude the inmate from

12   conforming his or her conduct to the relevant institutional

13   requirements; (2) the inmate's mental illness can be safely and

14   adequately managed in the SHU to which the inmate will be

15   assigned for the entire length of the SHU term; and (3) the

16   inmate does not face a substantial risk of exacerbation of his or

17   her mental illness or decompensation as a result of confinement

18   in a SHU.  In addition, defendants are prohibited from returning

19   any seriously mentally ill inmate to any SHU unit if said inmate

20   has at any time following placement in a SHU required a higher

21   level of mental health care.

22        DATED:  April 10, 2014.

23

24

25

26        LAWRENCE K. KARLTON
          SENIOR JUDGE
27        UNITED STATES DISTRICT COURT

28

                              74