No. 14-15298

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

―――――――――――――――――――――――――――――――

ROBIN ANTONICK

Plaintiff – Appellant,

v.

ELECTRONIC ARTS INC.

Defendant – Appellee.

―――――――――――――――――――――――――――――――

On Appeal from
United States District Court, Northern District of California
Honorable Charles R. Breyer
D.C. No. 3:11-CV-01543-CRB

―――――――――――――――――――――――――――――――

**APPELLANT'S REPLY BRIEF**

―――――――――――――――――――――――――――――――

David Nimmer
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 203-7079
Email: dnimmer@irell.com

Peter S. Menell
705 The Alameda
Berkeley, California 94707
Telephone: (510) 528-9886
Email: pmenell@law.berkeley.edu

Walter H. Sargent
WALTER H. SARGENT, P.C.
1632 N. Cascade Avenue
Colorado Springs, Colorado 80907
Telephone: (719) 577-4510
Email: wsargent@wsargent.com

Robert B. Carey
Leonard W. Aragon
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Email: rob@hbsslaw.com
Email: leonard@hbsslaw.com

[Additional Counsel on Signature Page]
*Counsel for Plaintiff – Appellant*

# TABLE OF CONTENTS

**Page**

REBUTTAL TO EA'S STATEMENT OF FACTS .................................................1

ARGUMENT...........................................................................................7

I. EA has waived its JMOL arguments by failing to specify them in its pre-verdict Rule 50(a) motion or otherwise object at trial. ........................................................................7

    A. Question Two (Virtual Identity of Games as a Whole)..............................................................................7

    B. Question One (Substantial Similarity of Plays and Formations). ...............................................................9

II. The jury's verdict should be reinstated.........................................11

    A. EA's games constituted Derivative Works. .......................14

        1. Copyright protects particularized videogame design and coding choices...........................................14

        2. *Altai* demonstrates that copyright protection subsists for design and coding choices....................20

    B. The "virtual identity" standard is inapplicable to sophisticated computer design and code. ..........................22

    C. The court erroneously granted JMOL based on alleged evidentiary deficiencies...........................................25

        1. Software code cases, like other translation cases, require expert translators. ...............................25

        2. The evidence amply supports the verdict...............30

D.     Notwithstanding the verdict in his favor, pretrial
       rulings improperly constrained the scope of
       Antonick's protectable expression, which must be
       admitted in any retrial.............................................33

III.   The Court erroneously dismissed SNES claims. .........................38

       A.     The SNES and Apple II chips were in the same
              "microprocessor family."......................................38

       B.     Even if the SNES chip was not in the Apple II
              microprocessor family, Antonick's Apple IIGS
              development revived his rights. ..........................40

IV.    Lost royalties or disgorgement of profits is a proper
       remedy for misappropriation of Development Aids.................42

V.     The jury correctly decided that Antonick's claims were not
       time-barred. ......................................................46

       A.     The court did not abuse its discretion by not applying
              judicial estoppel...........................................47

       B.     Substantial evidence supports the verdict. .......................48

       C.     New trial on statute of limitations is not warranted
              even if new trial on liability is granted. .............................49

CONCLUSION ..................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ajaxo Inc v. E\*Trade Grp., Inc.,*
    135 Cal. App. 4th 21 (2005) ...................................................44

*Apple Computer, Inc. v. Franklin Computer Corp.,*
    714 F.2d 1240 (3d Cir. 1983) ...............................................6, 16

*Apple Computer, Inc. v. Microsoft Corp.,*
    35 F.3d 1435 (9th Cir. 1994) ...............................................23, 27

*Charles W. Ross Builder, Inc. v. Olsen Fine Home Bldg., LLC,*
    827 F. Supp. 2d 607 (E.D. Va. 2011), *vacated*, 496
    Fed.Appx. 314 (4th Cir. 2012) ...............................................23

*City of Hope Nat. Med. Ctr. v. Genentech, Inc.,*
    43 Cal. 4th 375 (2008) .............................................................39

*Computer Associates Intern., Inc. v. Altai, Inc.,*
    775 F. Supp. 544 (E.D.N.Y. 1971).....................................20, 21

*Computer Associates Intern., Inc. v. Altai, Inc.,*
    982 F.2d 693 (2d Cir. 1992) ..........................................*passim*

*Data East USA, Inc. v. Epyx, Inc.,*
    862 F.2d 204 (9th Cir. 1988)...............................12, 23, 27, 34

*Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.,*
    16 Cal. App. 4th 202 (1993) ...................................................40

*E.E.O.C. v. Go Daddy Software, Inc.,*
    581 F.3d 951 (9th Cir. 2009) ....................................................8

*E.F. Johnson Co. v. Uniden Corp. of Am.,*
    623 F. Supp. 1485 (D. Minn. 1985) .......................................29

*Farley Transp. Co. v. Santa Fe Trail Transp. Co.,*
    786 F.2d 1342 (9th Cir. 1985).............................................7, 10

*Feist Publications v. Rural Telephone Service,*
499 U.S. 340 (1991).................................................................34

*Freeman & Mills, Inc. v. Belcher Oil Co.,*
11 Cal. 4th 85 (1995).............................................................45

*Gasoline Prods. Co. v. Champlin Ref. Co.,*
283 U.S. 494 (1931)...............................................................49

*Gates Rubber Co. v. Bando Chemical Industries, Ltd.*
9 F.3d 823 (10th Cir. 1993)..............................................24, 29

*Hagen v. City of Eugene,*
736 F.3d 1251 (9th Cir. 2013)...................................................1

*Harper House, Inc. v. Thomas Nelson, Inc.,*
889 F.2d 197 (9th Cir. 1989)...................................................23

*Image Technical Servs., Inc. v. Eastman Kodak Co.,*
125 F.3d 1195 (9th Cir. 1997)....................................................8

*Incredible Techs., Inc. v. Virtual Techs., Inc.,*
400 F.3d 1007 (7th Cir. 2005).............................................12, 23

*Intervest Constr., Inc. v. Canterbury Estate Homes, Inc.,*
554 F.3d 914 (11th Cir. 2008)..................................................23

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.,*
153 F.3d 82 (2d Cir. 1998).......................................................26

*Johnson Controls, Inc. v. Phoenix Control Sys., Inc.,*
886 F.2d 1173 (9th Cir. 1989)..................................................29

*Krechman v. Cnty. of Riverside,*
723 F.3d 1104 (9th Cir. 2013).....................................................1

*Lance Camper Mfg. Corp. v. Republic Indem. Co. of Am.,*
44 Cal App. 4th 194 (1996)......................................................45

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified School Dist.,*
34 Cal. 4th 960 (2005)............................................................45

*Lies v. Farrell Lines, Inc.*,
 641 F.2d 765 (9th Cir. 1981) ....................................................50

*Lucky Break Wishbone Corp. v. Sears Roebuck & Co.*,
 373 Fed.Appx. 752 (9th Cir. 2010) .........................................29

*Mattel, Inc. v. MGA Entm't, Inc.*,
 616 F.3d 904 (9th Cir. 2010) ...................................................23

*Mosesian v. Peat, Marwick, Mitchell & Co.*,
 727 F.2d 873 (9th Cir. 1984) ...................................................48

*Nelson v. Reisner*,
 51 Cal. 2d 161 (1958) .............................................................42

*Norris v. Sysco Corp.*,
 191 F.3d 1043 (9th Cir. 1999) .................................................47

*Oracle America, Inc. v. Google Inc.*,
 750 F.3d 1339 (Fed. Cir. 2014) ...............................................19

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
 96 F.3d 1151 (9th Cir. 1996) ...................................................45

*Parsons v. Bristol Development Co.*,
 62 Cal. 2d 861 (1965) .............................................................39

*Range Rd. Music, Inc. v. East Coast Foods, Inc.*,
 668 F.3d 1148 (9th Cir. 2012) .................................................27

*Sargon Enterprises, Inc. v. Univ. of S. Cal.*,
 55 Cal. 4th 747 (2012) ............................................................41

*Satava v. Lowry*,
 323 F.3d 805 (9th Cir. 2003) ...................................................23

*Sega Enterprises Ltd. v. Accolade, Inc.*,
 977 F.2d 1510 (9th Cir. 1992) .................................................17

*Shaw v. S.C. (THC-Orange County, Inc)*,
 No. S221530 (Cal. Nov. 12, 2014) ..........................................45

*Shaw v. Superior Court,*
   229 Cal. App. 4th 12 (2014) ..................................................................45

*Sony Computer Entm't, Inc. v. Connectix Corp.,*
   203 F.3d 596 (9th Cir. 2000) ................................................................11

*Stott v. Johnston,*
   36 Cal. 2d 864 (1951) ...........................................................................41

*Summers v. Delta Air Lines, Inc.,*
   508 F.3d 923 (9th Cir. 2007) ..................................................................8

*T G Plastics Trading Co. v. Toray Plastics (Am.), Inc.,*
   2014 WL 7266252 (1st Cir. Dec. 22, 2014) ...........................................9

*Tetris Holding, LLC v. Xio Interactive, Inc.,*
   863 F. Supp. 2d 394 (D.N.J. 2012) .......................................................35

*Three Boys Music Corp. v. Bolton,*
   212 F.3d 477 (9th Cir. 2000) ...........................................................4, 36

*Tortu v. Las Vegas Metro. Police Dep't,*
   556 F.3d 1075 (9th Cir. 2009) .................................................................7

*TransWestern Pub. Co. LP v. Multimedia Marketing Assocs.,
Inc.,*
   133 F.3d 773 (10th Cir. 1998) ...............................................................35

*Unruh-Haxton v. Regents of Univ. of California,*
   162 Cal. App. 4th 343 (2008) ...............................................................49

*Vault Corp. v. Quaid Software Ltd.,*
   847 F.2d 255 (5th Cir. 1988) ................................................................16

*Wallace v. City of San Diego,*
   479 F.3d 616 (9th Cir. 2007) ..................................................................8

*Williams v. Boeing Co.,*
   517 F.3d 1120 (9th Cir. 2008) ..............................................................47

<u>S</u>TATUTES

17 U.S.C. § 101.................................................................15, 26, 34

17 U.S.C. § 102(a) ..............................................................15, 17

17 U.S.C. § 102(b) ..............................................................17, 18

17 U.S.C. § 103.........................................................................33

Cal. Civ. Code § 3300 ...............................................................45

Computer Software Copyright Act of 1980 ...............................14

Copyright Act of 1976................................................................14

<u>O</u>THER <u>A</u>UTHORITIES

77 Fed. Reg. 37605 (Jun. 22, 2012) ..........................................34

CONTU Final Report (1978) ...............................................*passim*

CRC Rule 8.1105(a)(1) ..............................................................45

CRC Rule 8.115 .........................................................................45

Fed. R. Civ. P. 42(b)..................................................................50

Fed. R. Civ. P. 50...........................................................7, 8, 10

Fed. R. Civ. P. 50(a).....................................................7, 8, 9, 11

Fed. R. Civ. P. 50(b)..................................................................11

Fed. R. Civ. P. 59(a)..................................................................50

Fed. R. Civ. P. 59(a)(1) .............................................................49

H.R. Rep. No. 94-1476 (1976) ..................................................15

Peter S. Menell, *An Analysis of the Scope of Copyright Protection for
   Application Programs,* 41 STANFORD L. REV. 1045 (1989).....................15

## REBUTTAL TO EA'S STATEMENT OF FACTS

Judgment as a matter of law may be granted only where "the evidence, *construed in the light most favorable to the nonmoving party*, permits only one reasonable conclusion, which is contrary to the jury's verdict." *Hagen v. City of Eugene*, 736 F.3d 1251, 1256 (9th Cir. 2013) (emphasis added). The court "may not make credibility determinations, weigh the evidence, or substitute its own view of the evidence for the jury's." *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1110 (9th Cir. 2013).

On appeal, EA ignores this standard, presenting a story that the jury permissibly rejected. EA says Trip Hawkins had a "vision" of a football-simulation game, and "[t]o implement Hawkins's vision," EA hired Robin Antonick, "whose only experience in videogames was writing code for a single educational videogame." Br. 3. Antonick "wrote code riddled with bugs," causing delays. *Id*. at 5. After Antonick spent four years creating *Apple II Madden*, EA contracted with Park Place, producer of "the industry's most successful football videogame to date," *Monday Night Football*, to produce the Sega Genesis version of *Madden Football*. *Id*. at 9.

EA says Park Place hired Jim Simmons, "one of the 'most remarkable programmers' of his day," who independently created *Sega Madden*,

designing it "from the ground up" and writing all code "from scratch" in a few months without EA's help. *Id*. at 9-11, 19. EA says no one provided Antonick's source code to Simmons or spoke to him about *Apple II Madden*, and he received only "faxed photocopies of some pages from the printed *Apple II Madden* playbooks that came packaged with that game." *Id*. at 10. *Sega Madden* was released "to great success." *Id*. at 11. Now, the allegedly inexperienced and incompetent creator of *Apple II Madden* wants to be paid for the great programmer's work on *Sega Madden*, as well as for other people's work on products he didn't help to develop.

The jury, however, rejected that story, based on more credible evidence. First, Antonick was a highly experienced and successful software developer who, contrary to EA's assertion, *id*. at 3, developed several videogames before approaching EA with his own conception – a football videogame for the Apple II with a full complement of eleven players per side, far beyond the state of the art. (ER 746:6-749:16; SER 709:19-710:14.) EA was skeptical it could be done (ER 749:13-19), but after Antonick presented a working prototype (ER 749:20-25), EA quickly negotiated an independent contractor agreement (FER 14:2-15:3).

Antonick's code was not "riddled with bugs," causing delays. EA's Kawahara testified that Antonick's code did not have a particularly large number of bugs, and Antonick generally fixed them "immediately." (FER 34:3-15). "When Robin delivered code, I could count on it running." (FER 34:4-5).[1] The game took years to develop because it was an exceedingly difficult project – a collaborative work involving design changes; years of creating, selecting, arranging, coding, and testing thousands of plays, formations, player attributes, and player ratings; and extensive documentation of source code and game features needed for technical workers to understand the code and for users to play the game. (*E.g.,* ER 587; 610-634; 640; 646-647; 810:13-834:15; 984:21-985:2; 1042-1045; 1202-1203.)[2] And although EA now denigrates Antonick's work on *Apple II Madden* while describing *Monday Night Football* as "the industry's most successful football videogame to date," Br. 9, EA had previously – that is, before this litigation began – lauded *Apple II Madden* as an "overnight

---

[1] Kawahara and Richard Hilleman noted Antonick's code was well-structured and meticulously documented, "like a work of art." (FER 36:15-37:8).

[2] Antonick's and Kawahara's testimony rebutted EA's claims that Hawkins constructed and diagrammed plays and formations, giving the diagrams to Antonick for coding. (Br. 6; FER 35:12-15; 39:24-42:9).

success" that "went on to sell more copies than any other sports game of its time." (ER 452).

Finally, and most importantly, Simmons did not independently create *Sega Madden*. Proof of independent creation is a defense to copyright infringement claims, and the jury was instructed on this standard.[3] *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486 (9th Cir. 2000). The jury rejected EA's claim of independent creation, based on substantial evidence. For example:

***First***, substantial evidence showed that Simmons lacked experience and expertise to independently create *Sega Madden*. Although EA's Hilleman testified that Simmons was "one of the all-time best game play engineers ever" (FER 56:11-14), he was actually just a "high school buddy" of Park Place's president, Troy Lynden (FER 22:19), who hired him to develop *Sega Madden* despite little relevant experience beyond creating a mini-golf game (FER 197:9-15). Programming was Simmons's college "hobby" (FER 195:2-5), and his only football experience was watching it on television and playing videogames (ER 978:21-25). EA hired Park Place

---

[3] (ER 329.)

-4-

expecting game development by the *Monday Night Football* team, not Lynden's "high school buddy" (FER 52:21-22), and Hilleman later accused Park Place of "bait and switch" (FER 52:16-25).

**Second**, substantial evidence showed that, without relying on *Apple II Madden*, Simmons could not have completed *Sega Madden* by September 1990, when the software was rushed to manufacturing for mid-November release in time for holiday shopping. (FER 46:18-23) Although Simmons started in April, he had accomplished little by July, when EA's Michael Brook stopped by to review Simmons's progress. Brook testified there were "[n]o plays. Nothing." It "wasn't football," but "literally" just twenty-two guys "sort of running around" on a screen "without any logic" – "just running in circles." (FER 189:12-15, 190:21-25, FER 191:1-20). Brook began to prepare plays for Simmons using, among other things, the player manual for *Apple II Madden* (FER 192:19-193:5), and EA now admits that Brook also sent Simmons some pages from *Apple II Madden* playbooks, Br. 10. The jury reasonably rejected EA's story that Simmons completed *Sega Madden* by September without EA's help or *Apple II Madden*'s documentation or code.

*Third*, substantial evidence showed that Hilleman failed to honor assurances that *Sega Madden* would be produced in a "clean room" environment, so no one who worked on *Apple II Madden* would be involved and no code or documentation from *Apple II Madden* would be used. (ER 772:23-773:17.) Hilleman admitted that, after working extensively with Antonick on *Apple II Madden* and receiving Antonick's detailed documentation of source code and game features, he spent between 100 and 300 hours working with Simmons on *Sega Madden 1990*. (FER 53:9-54:14). The jury could reasonably conclude that Hilleman shared information about *Apple II Madden*, including code and documentation. Hilleman admitted that, after *Sega Madden 1990* was released, he "possibly" told others that it differed from *Apple II Madden* only in its "surface aesthetic." (ER 880:9-20.)

*Fourth*, substantial evidence showed that code in *Sega Madden 1990* contained literal copying of misspellings, idiosyncratic names and numbers of subroutines and plays, and unusual character strings from *Apple II Madden*'s code. (ER 910:16-938:12.) Even where such snippets of code, in isolation, are not sufficient to show copyright infringement, they constitute strong evidence against independent creation. *See, e.g., Apple Computer, Inc.*

*v. Franklin Computer Corp.*, 714 F.2d 1240, 1245 (3d Cir. 1983) (where programmer's name and the word "Applesoft" were embedded in plaintiff's code, their subsequent appearance in competitor's work was submitted as evidence that competitor's work was not "independently created").

The jury permissibly rejected EA's story. EA is not now free to present that story as fact, or even disputed narrative.

## ARGUMENT

### I. EA has waived its JMOL arguments by failing to specify them in its pre-verdict Rule 50(a) motion or otherwise object at trial.

#### A. Question Two (Virtual Identity of Games as a Whole).

EA does not dispute that its Rule 50(a) motion never addressed works as a whole or copyright's intrinsic test—it disregarded Question Two of the jury's verdict altogether. Question Two therefore provided no basis for JMOL.  This Court construes Rule 50 strictly, rejecting EA's proposed "subjective, case-by-case application" in favor of "uniform application." *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1346 (9th Cir. 1985); *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1082 (9th Cir. 2009). EA's reliance on Seventh Circuit precedent is

inapposite.[4] *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997) (rejecting Seventh Circuit's subjective approach to Rule 50).

The court held that, in contrast to the extrinsic test of Question One, the intrinsic test of Question Two could not be satisfied by expert testimony or comparison of works "element by element." (ER 12, 14). The court exceeded its authority when, *sua sponte*, it raised and ruled upon these arguments. *Experience Hendrix L.L.C.*, 762 F.3d at 844 n.13; *Summers v. Delta Air Lines, Inc.*, 508 F.3d 923, 927-28 (9th Cir. 2007) (a party "must have a meaningful opportunity to reply" to JMOL motion and "not be sandbagged by a decision on grounds not properly noticed").

EA claims no waiver occurred because, even if "ambiguous" or "inartfully made," its Rule 50(a) arguments addressed the same general cause of action and evidence. Br. 38. Rule 50 is not satisfied just because pre- and post-verdict motions relate to the same general topic. *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009); *Wallace v. City of San Diego*, 479 F.3d 616, 631 (9th Cir. 2007). A Rule 50(a) motion must raise

---

[4] Br. 39 n.120.

the argument "squarely and distinctly." *T G Plastics Trading Co. v. Toray Plastics (Am.), Inc.*, 2014 WL 7266252, at *6 (1st Cir. Dec. 22, 2014); *Experience Hendrix*, 762 F.3d at 843, 844 n.13.

EA also claims that Antonick "knew" its JMOL theory. Br. 38. Even if Antonick's knowledge were relevant, EA's Rule 50(a) brief never mentioned Question Two, let alone the argument that Antonick must prove "works as a whole" not with expert testimony, but by submitting *all* source code for the Apple II game, *each* infringing Sega game, and the "content of the games themselves." (Br. 36, 39; ER 342, 346 (Rule 50(a) Br. at 5, 9).) The day after filing its motion, EA conceded, and the court agreed, that there was enough evidence for the jury to find which "particular games constituted derivative work[s] and which do not." (FER 201:23-202:3, 202:11-12).

### B. Question One (Substantial Similarity of Plays and Formations).

EA also waived its argument that the court should have entered JMOL on Question One. ***First***, as discussed above, EA never argued in its Rule 50(a) motion that evidence of game content was deficient. EA conceded that sufficient evidence existed.

*Second*, EA waived any argument that Antonick failed to satisfy the substantial similarity standard. EA argued that Antonick failed to prove virtual identity of protectable elements. (ER 341-342, 345-346, 348-349). The court decided that Question One would be governed by the lesser standard of substantial similarity. (SER 837:7-9, 840:3-19). EA gave the impression it was abandoning any JMOL challenge under this less rigorous standard. *Cf. Farley Transp. Co.*, 786 F.2d at 1346.

*Third*, EA's Rule 50 motions never made any argument that Antonick's expert's testimony "was an insufficient substitute for the source-code evidence necessary to carry Question 1." Br. 41. The court could not and did not make any such ruling regarding Question One. (ER 14).

*Fourth*, EA waived any argument that Antonick's expert did not "review the final source code used in *Apple II Madden*." Br. 42. EA never raised this issue in any Rule 50 brief or by objecting at trial.

*Fifth*, EA disavowed its Rule 50 argument that Barr's testimony improperly relied upon binary data files. Br. 42-43. EA agreed to a jury instruction defining source code to include binary files. (ER 1009:19-20; 1022:17-18). Regardless, binary code constitutes protectable expression.

-10-

*Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir. 2000).

**Sixth**, EA failed to preserve arguments concerning DX 476. EA argues that DX 476 is a "visual representation" of "unprotected play diagrams" comparing "purported output of the code rather than the code itself." Br. 44-47. EA's Rule 50(a) motion never explicitly referred to DX 476, focusing instead on the expert's use of binary data instead of source code— an objection EA abandoned as shown above. (ER 348).

The district court correctly denied EA's Rule 50(b) motion on Question One.

## II.   The jury's verdict should be reinstated.

Antonick sued for breach of contract; one contract term incorporated by reference the Copyright Act's definition of "derivative works." On that basis, the court required Antonick to establish copyright infringement. Pretrial rulings excluded entirely appropriate bases for finding copyright infringement, straitjacketing Antonick's counsel. *See* § II(D), *infra*. The jury nonetheless vindicated Antonick's derivative work claims.

In its opposition, EA relies on a smokescreen of mischaracterizations of copyright law and the record. It contends that: (A) the hundreds of

granular expressive choices in designing and coding Madden Football are unprotectable because they fall within high-level conceptual categories (such as processes); (B) Madden Football is a mere "handful of items, taken out of context," hence ineligible for protection as a compilation; (C) sophisticated software design and code are subject to the virtual identity standard, an exception to normal principles that applies only to a narrow class of simple visual works; and (D) in order to find copyright infringement of sophisticated software programs, lay jurors must compare reams of computer source code and binary code without assistance of expert testimony. Copyright law does not operate that way and for good reason.

Before turning to those specifics, it is important to emphasize that this is not like past videogame cases, exemplified by *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204 (9th Cir. 1988), and *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007 (7th Cir. 2005). In those cases, competitors entered videogame marketplaces (for karate and golf) with independently developed games featuring high-level concepts in common with an incumbent firm's games. There was no evidence that the competitors had

source code, program design documentation, or access to incumbent company *insiders*.

Here, EA used Antonick's detailed program design, documentation, and source code. Programmers tasked with the mission of porting Antonick's breakthrough videogame to another computer operating system not only had full access to Antonick's design documents and code, but also received guidance and supervision from EA employees intimately familiar with Antonick's granular programming choices. Under impossibly tight time-to-market pressure, EA and its inexperienced programmer took shortcuts—copying substantial amounts of protectable design and coding elements—to complete in three months what Antonick's experienced team had taken four years to do. As the jury properly found, EA was caught with its hands in the protectable expression cookie jar. They did not merely take unprotectable ideas—they raided the jar.

Antonick agrees with EA that copyright law leaves ample room for competitors to develop competing videogames, denying protection to ideas, high-level conceptual elements, and interoperability features of computer programs. But here, EA created derivative works by translating Antonick's game design and detailed programming choices for

deployment on the Sega platform. Far from limiting itself to high-level unprotectable elements, EA copied the program's overall design and detailed programming choices at a granular level.

EA fails to acknowledge that copyright law affords the designer of the original, highly sophisticated Madden Football videogame protection for his numerous particular design and coding choices. That protection provided the *quid pro quo* motivating Antonick's creative expression. In an industry that jealously protects copyright in its programmers' game designs and coding, it is ironic that EA now denies the creator of the highly sophisticated videogame that launched the company's success the 1% royalty it agreed to pay for porting that game to other videogame platforms.

## A. EA's games constituted Derivative Works.

### 1. Copyright protects particularized videogame design and coding choices.

The legal framework that EA espouses, whereby almost every component of a football videogame lacks any legal protection, directly contradicts copyright law. As reflected in the Copyright Act of 1976 and reinforced by the Computer Software Copyright Act of 1980, Congress

extended copyright protection to computer software, notwithstanding its functional characteristics. *See* Peter S. Menell, *An Analysis of the Scope of Copyright Protection for Application Programs*, 41 STANFORD L. REV. 1045, 1046 (1989).

The 1976 Act protects "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). The Act includes "literary works" within the class of "works of authorship." The House Report explains that "[t]he term 'literary works' does not connote any criterion of literary merit or qualitative value: it includes catalogs, directories, and similar factual, reference, or instructional works and *compilations of data*. It also includes *computer data bases*, and *computer programs* to the extent that they incorporate authorship in the programmer's expression of original ideas, as distinguished from the ideas themselves." H.R. Rep. No. 94-1476, at 53-54 (1976) (emphases added). The Act defines a "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101.

The CONTU Final Report (1978), which courts treat as legislative history for the scope of copyright protection for computer software,[5] explains that while "one is always free to make a machine perform any conceivable process (in the absence of a patent), [] one is not free to take another's program," subject to copyright's limiting doctrines – originality and the idea/expression dichotomy. CONTU Final Report at 20.

Thus, while recognizing important limitations on copyright protection for computer software, Congress intended that software programmers would garner complete copyright protection for programming design and coding choices to the extent that the expression was separable from the underlying ideas. General programming ideas and unoriginal programming choices remain free for others to use while the creative effort in particularized programming choices and compilations, especially in complex programs, gains protection from copyists. Courts later interpreted copyright law to exclude protection for interoperability features, *see Computer Associates Intern., Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992), and intermediate copying incident to determining those

---

[5] See *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 260-61 (5th Cir. 1988); *Apple v. Franklin*, 714 F.2d at 1252.

features, *see Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992), but the core protection for the design and coding of sophisticated computer programs has remained to encourage software creativity.

EA defends the court's exclusion of numerous granular design and coding choices from protection against copying based on the unprotectability of "processes" and "systems" under 17 U.S.C. § 102(b) and the scenes a faire doctrine. Br. 63-68. EA is mistaken.

The CONTU report recognized widespread confusion about the distinction between copyrightable programs under section 102(a) and uncopyrightable processes and systems under section 102(b). The law "is often misconstrued as imposing a limit on the copyrightability of works which express ideas, systems, or processes." CONTU Final Report at 19. "Section 102(b) is intended, among other things, to make clear that *the expression adopted by the programmer is the copyrightable element in a computer program,* and that the actual processes or methods embodied in the program are not within the scope of the copyright law." *Id.* (citations omitted; emphasis supplied).

"Copyright, therefore, protects the program so long as it remains fixed in a tangible medium of expression but does not protect the

electromechanical functioning of a machine." *Id.* at 20. "The way copyright affects games and game-playing is closely analogous: one may not adopt and republish or redistribute copyrighted game rules, but the copyright owner has no power to prevent others from playing the game." *Id.*

If, as EA contends, processes or methods of operation were excluded from copyright protection at all levels of abstraction, then Congress's intention to afford copyright protection for computer software would be for naught. As courts have long recognized, however, section 102(b) excludes the general high-concept processes and methods of operation, but not particularized programming designs and coding unless there is but one or a limited number of ways to accomplish a task, such as where granular program expression is necessary for interoperability.

The district court erroneously held that, because elements like data tracking and data flow architecture can be characterized as processes or systems at a high level of abstraction, Antonick's expressive choices in designing and coding those elements were, "by definition," barred by section 102(b). (ER 1228, 1235 n.26.) CONTU directed otherwise: "That the words of a program are used ultimately in the implementation of a process should in no way affect their copyrightability." CONTU Final Report at 21.

"Classifying a work as a 'system' does not preclude copyright for the particular expression of that system," and "under Ninth Circuit law, an original work – even one that serves a function – is entitled to copyright protection as long as the author had multiple ways to express the underlying idea." *Oracle America, Inc. v. Google Inc.*, 750 F.3d 1339, 1366-67 (Fed. Cir. 2014). EA has offered no coherent argument to the contrary.[6]

Doctrines like scenes a faire likewise do not operate to categorically exclude sophisticated program structure and coding or compilations of multi-faceted design choices, even if many individual choices are unprotected. The court found Antonick's expression of player ratings and other design features unprotectable as "inherent elements of football." *E.g.,* ER 1219-1220. But the court confused the unprotected idea of a player rating system or other stock elements of a football game with the protected expressive choices (including, for example, coding that incorporates subjective ratings of all NFL players on a variety of attributes)

---

[6] EA acknowledges *Oracle's* repudiation of its view, but provides no contrary authority, stating only that *Oracle's* "shortcomings are documented" in a later filing by Google's attorneys. Br. 66 n.192. Google's filing focuses on the unprotectability of interoperable features, which is not an issue in this case.

implemented in a particular game. *See* Opening Br. 37-38. EA overlooks

this critical distinction. Br. 66-67.

### 2. *Altai* demonstrates that copyright protection subsists for design and coding choices.

One important Second Circuit case is illustrative. The defendant in

*Computer Assocs. v. Altai* unwittingly hired Arney, a programmer from

plaintiff Computer Associates ("CA") who was "intimately familiar" with

CA's job scheduling computer program, to work on a competing job

scheduling program for IBM mainframes. 982 F.2d at 699.

> In three months, Arney successfully completed the
> OSCAR/VSE project. In an additional month he developed an
> OSCAR/MVS version. When the dust finally settled, Arney
> had copied approximately 30% of OSCAR's code from CA's
> ADAPTER program.

*Id.* When Altai learned of the copying, it initiated a cleanroom rewrite of

the program. Altai accepted responsibility for copyright infringement

based on Arney's misdeeds and was ordered to pay $364,444 in damages.

*Id.* at 696. Altai did not even appeal that award, *id.* at 697, for it recognized

that copyright protection clearly covered the design and coding elements

that Arney had introduced into Altai's program, *see Computer Associates

Intern., Inc. v. Altai, Inc.*, 775 F. Supp. 544, 560-61 (E.D.N.Y. 1971) ("with

respect to OSCAR 3.4, Altai admits infringement"), even though those elements amounted to only 30% of the incumbent firm's program – far below "virtual identity," the focus of section II(B), *infra*.

The aspect of *Altai* typically cited today deals with a later point in time, after the OSCAR program rewrite had been completed. Altai was exceedingly careful to use programmers untainted by and insulated from CA's program code. 775 F. Supp. at 561-62. They employed only those code elements "dictated by external factors," such as interoperability with IBM mainframes. CA complained that even this cleanroomed version of OSCAR infringed its ADAPTER program. The court appropriately ruled that copyright protection did not extend to elements dictated by efficiency or external factors or taken from the public domain. *Id*. at 562; 982 F.2d at 702-11. CA's granular design and code base were thus protected against improper appropriation of protected expression while competition among independently developed programs prevailed.

This case resembles the first phase of *Altai*, in which the defendant had access to a competitor's expression and incorporated that material into its own product. EA had all of the golden nuggets of Antonick's design and

coding choices at its disposal and a license contract that allowed it to draw on this material, so long as it abided by the royalty provision.

Because it failed to honor that royalty obligation, EA argued to the jury it used a cleanroom procedure. Antonick proved otherwise. The jury returned a verdict that EA's later products constituted derivative works within the meaning of the parties' contract. That ruling must stand unless no reasonable juror could have so concluded. As detailed below, the evidence amply warranted that conclusion. *See* § II(C)(2), *infra*.

### B.   The "virtual identity" standard is inapplicable to sophisticated computer design and code.

By pretrial ruling, the court held that for EA's product to constitute a "derivative work" of Antonick's product within the meaning of copyright law and the parties' contract, the products had to be "virtually identical." That construction misapprehends copyright law and the contract.

The ruling rests on the proposition that Antonick's sophisticated videogame, as expressed in extensive documentation and implemented in hundreds of thousands of lines of computer code, ought to be analyzed within a narrow class of cases in which courts have applied a "virtual identity" infringement standard. Yet no published copyright decision has

previously applied that test to a case involving highly detailed software design and code. To do so effectively overrides Congress's decision to afford copyright protection to software programs. *See* § II(A)(1), *supra*.

The few cases applying this higher threshold all involve simple, narrowly protected elements, such as the visual layout of a day planner (comprising a calendar and ruled lines);[7] the audiovisual elements for a karate[8] and golf[9] videogame; largely unoriginal (and licensed) graphical office icons;[10] architectural works in which "nearly every design element of the two houses at issue" was dictated by external constraints for Colonial Williamsburg;[11] a jellyfish sculpture encased in a domed glass cylinder;[12] and a "sculpt" for human-based dolls.[13] Antonick's computer program falls

---

[7] *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197 (9th Cir. 1989).

[8] *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204 (9th Cir. 1988).

[9] *Incredible Technologies, Inc. v. Virtual Technologies, Inc.*, 400 F.3d 1007 (7th Cir. 2005).

[10] *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435 (9th Cir. 1994).

[11] *Charles W. Ross Builder, Inc. v. Olsen Fine Home Bldg., LLC*, 827 F. Supp. 2d 607, 611-12 (E.D. Va. 2011), *vacated*, 496 Fed.Appx. 314 (4th Cir. 2012); *see also Intervest Constr., Inc. v. Canterbury Estate Homes, Inc.*, 554 F.3d 914 (11th Cir. 2008).

[12] *Satava v. Lowry*, 323 F.3d 805 (9th Cir. 2003).

[13] *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904 (9th Cir. 2010).

well outside the "virtual identity" profile; it should be treated like other sophisticated code cases. *See, e.g., Altai*, 982 F.2d 693; *Gates Rubber Co. v. Bando Chemical Industries, Ltd.* 9 F.3d 823 (10th Cir. 1993).

Even on the fanciful supposition that Antonick's computer coding more resembled the high-level concept of a glass-encased jellyfish sculpture than the computer coding at issue in *Altai*, *Gates Rubber,* and other such cases, the "virtual identity" standard is untenable here for an additional reason: The contract itself manifests an unmistakable intent of the parties to apply a less restrictive standard than virtual identity:

> Derivative Works include, for example, significant enhancements of the Work to add additional features or improve performance and adaptations of the Work to operate on computers or operating systems other than those described in the Specifications.

ER 560 § 1.03. The parties thus agreed that significant enhancements as well as adaptations of the Work would be considered derivative works. Yet such changes would not be virtually identical. Tellingly, EA avoids responding to Antonick's argument on this point. *See* Opening Br. 33-34.

**C.    The court erroneously granted JMOL based on alleged evidentiary deficiencies.**

In granting JMOL, the court faulted Antonick for failing to introduce into evidence the hundreds of thousands of lines of source code and binary code constituting plaintiff's and defendant's works. Although a ruling requiring that the full works be tendered into evidence might make sense in music, visual, and audiovisual copyright infringement cases where jurors can directly perceive and evaluate the works in question, it makes no sense here. It presumes that the verdict would stand if only the jurors had taken with them into their deliberations thousands of sheets containing ones and zeroes, as well as page after page after page of arcane programming languages and data that have since become obsolete. It beggars the imagination to posit that, thus burdened with gobbledygook, the jury would have been empowered to return a lawful verdict in Antonick's favor, but their actual verdict must be rejected.

**1.    Software code cases, like other translation cases, require expert translators.**

A straightforward example illustrates why expert testimony is essential to some copyright infringement cases and does not displace the factfinder's role. Works written in languages other than English are plainly

subject to copyright protection under U.S. law. *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82 (2d Cir. 1998). One form of "derivative work" defined by statute is a translation. 17 U.S.C. § 101. Therefore, a translation into Farsi of a Japanese novel, sold to the expatriate Iranian population in the United States, can constitute copyright infringement. In that hypothetical, it would be fruitless to place both works in evidence for a lay jury to peruse—they would soon discover that the two share not even one letter in common, one being written in Kanji, the other in Arabic script. Even under the extravagant assumption that all the jurors read Japanese fluently, it would still avail them naught, unless they all also happened to read Farsi fluently.

The law handles such matters in a straightforward fashion. Rather than burdening the jury with incomprehensible materials, the law allows experts to testify about plot, characters, setting, sequence, mood, *etc.*, of the Japanese novel and the Farsi work. It is up to the jury to conclude, based on that expert testimony, whether the two works are substantially similar (more particularly, whether the latter is a translation of the former, and hence constitutes a derivative work). Indeed, this Court has previously approved of infringement rulings for plaintiffs whose works were adapted

when the sole evidence consisted of expert testimony rather than the works themselves.[14]

For the same reason, computer software code cases have always employed expert testimony to assist juries in evaluating infringement. This is not a simple visual copyright case like *Data East* or *Apple v. Microsoft*. It involves complex computer software code. Each of the software code-based copyright infringement cases of the past were built around extensive expert testimony enabling the factfinder to make the similarity comparison.

---

[14] *Range Rd. Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148 (9th Cir. 2012). More controversially, that case also ruled that there is no need to prove substantial similarity in cases where there is direct proof of copying, such as this one. See 668 F.3d at 1154 ("A showing of 'substantial similarity' is irrelevant in a case like this one, in which the Music Companies produced evidence that the public performances entailed direct copying of copyrighted works.") One need not go that far here. From the outset, Antonick has argued, *see, e.g.*, ER 1212-1213 (order on summary judgment, rejecting Antonick's argument), that he should only have to prove that EA's product met the definition of derivative work in the contract, which references the Copyright Act's definition of "derivative work" and expressly encompasses "significant enhancements" and "adaptations . . . to operate on [other] computers or operating systems." In this case alleging solely breach of contract (not copyright infringement), proof of "substantial similarity" should not have been required.

Here, the jury could not possibly have comprehended the source and

binary code at issue[15] without credible expert translation, explanation, and

context. Antonick's expert, Michael Barr, provided the jury with

straightforward and understandable testimony and demonstrative exhibits

derived directly from the code as well as other forensic tests based on the

code. His testimony is voluminous, consuming over two hundred pages of

the transcript. (ER 901-963; SER 769-789; FER 57, 59-71, 75-87, 116-135, 136,

137, 138-141, 142-154, 155, 156-162, 163-165, 166-173, 174-177, 178-180,

181-185). The extensive examples he offered, explaining his methodology at

every step of the way, is exactly the expert guidance that copyright law

contemplates.

Contrary to EA's assertion and the court's rulings, it would have

been fruitless to ask the jury itself to scroll through hundreds of thousands

of lines of source code and reams of binary code – even more senseless than

giving them books written in Japanese and Farsi.

Moreover, the JMOL ruling contradicts the court's own framing of

the case. Pre-trial rulings whittled Antonick's case down to two of ten

---

[15] EA agreed to a jury instruction defining source code to include binary files, so both properly informed their considerations. *See* § I(B), *supra*.

categories of elements, as discussed in section II(D), *infra*. It would have been manifestly impossible for the jury to isolate the affected lines of code that related only to those two sets of elements, and then to engage in a comparison. Furthermore, to assess "virtual identity," the jury would have had the impossible task of determining whether code written in two different languages was virtually identical. No previous published decision in a copyright infringement case involving sophisticated computer code case has so required.

The side-by-side comparison common in music and visual work cases does not make sense in software code cases and is not how courts in this or other circuits have proceeded. Experts appropriately play a vital role in enabling the factfinder to do its job. *See Altai*, 982 F.2d at 712 (citing numerous cases); *Gates Rubber*, 9 F.3d at 832 n.7; *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1175-76 (9th Cir. 1989); *E.F. Johnson Co. v. Uniden Corp. of Am.*, 623 F. Supp. 1485, 1493 (D. Minn. 1985) ("The fiction of the lay observer is thus abandoned in favor of an analysis of similarities and differences in the copyrighted and allegedly offending computer programs."); *cf. Lucky Break Wishbone Corp. v. Sears Roebuck & Co.*, 373 Fed.Appx. 752, 755-56 (9th Cir. 2010) (rejecting challenge to expert

witness testimony about intrinsic test: "Dr. Steadman's testimony about the differences between the Lucky Break production wishbone and natural turkey wishbones was relevant and helpful to the jury. Steadman's testimony whether the two plastic wishbones were 'virtually identical' aided the jury in understanding the significance of the features that Steadman identified and the extent to which they made the wishbones the same."). And that is precisely what happened here.

### 2. The evidence amply supports the verdict.

Even though its pretrial rulings improperly trimmed Antonick's derivative work claim, the court permitted Antonick to proceed in showing that the plays (and related play data) and formations – a substantial component of the overall videogame – were copied into the Sega games. The jury was presented with ample evidence to conclude that EA's appropriation of play data, play and formation expression, and selection and arrangement of plays and formations resulted in substantial similarity of protected expression. They were derivative works within the meaning of the contract.

In view of the different programming environments, applying the infringement standard required a combination of expert evidence to

illustrate and explain similarities and extensive testimony and other evidence removing any doubt that EA copied granular programming design and data. Michael Barr's testimony showed how EA slavishly copied Antonick's particular expressive choices and extensive play data.

It is important to emphasize that the data did not comprise antecedent facts from the real world that Antonick collected from other sources. Antonick generated the data through his own expressive choices in simulating football action within a particularized game environment (including non-standard field dimensions). That Antonick used algorithms to generate the data does not take the data out of copyright protection, as he chose the parameters that produced the data and tweaked the data to achieve particular results. He then designed various other program features to produce the game flow and other aspects of the user experience. As the CONTU Final Report explained, EA was free to produce the same results using its own independently developed software code and binary data of its own creation; it was not free to copy (or translate) Antonick's particular data and ways of achieving those results. *See* § II(A), *supra*. The trial showed that EA took the impermissible shortcut that copyright does not allow.

Reinforcing the forensic evidence unraveling EA's improper appropriation of protected expression, Antonick proved through testimony of percipient witnesses, contemporaneous written communication, and other evidence that EA engaged in illicit copying of substantial amounts of Antonick's code base and data. The jury heard evidence of the crises surrounding the development of the Sega games and the desperate measures chosen to get the project on track, including resort to Antonick's design, data, and code. The jury could see that EA was motivated by access, intimate insider knowledge, cost savings, and market exigencies to copy Antonick's videogame and had partaken of the granular Antonick design, data, and code – corroborating Barr's testimony. The jury thus concluded that EA had copied much of the play and formation data – which was clearly protectable as Antonick's expression of game plays – in order to complete the games on the tight schedule. This expressive work remained at the heart of the Sega games through multiple generations. *See* Opening Br. 19.

The evidence introduced at trial through expert testimony and otherwise amply supports the jury's verdict. It was error to enter JMOL.

**D.      Notwithstanding the verdict in his favor, pretrial rulings improperly constrained the scope of Antonick's protectable expression, which must be admitted in any retrial.**

Despite the pretrial rulings allowing only two aspects of his creative expression to be presented to the jury, Antonick prevailed. Had the full panoply of his expressive choices been admitted and argued, the verdict would have been all the more resounding.

As already noted, this case is not about high-level idea similarity or achieving interoperability; it is about taking impermissible shortcuts – appropriating granular design, data, and code. EA mistakenly contends that Antonick's design and implementation of Madden Football combines only a "handful of items, taken out of context," and were not "numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship," Br. 54 (quoting *Satava*, 323 F.3d at 811). Putting aside the absurdity of comparing Antonick's work to jellyfish encased in a domed glass cylinder, *see* § II(B), *supra*, EA's argument mischaracterizes copyright law.

Section 103 of the Copyright Act confers copyright protection on a "compilation," defined as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or

arranged in such a way that the resulting work as a whole constitutes an original work of authorship. . . ." 17 U.S.C. § 101. As the Supreme Court recognized in *Feist Publications v. Rural Telephone Service*, 499 U.S. 340, 344 (1991), although facts are not copyrightable, "compilations of facts generally are." The key issue is originality – are the facts or other unprotectable elements independently created, do they possess a "minimal degree of creativity, " or are they selected and arranged in an original way?

While a game featuring only high-level attributes of football – such as a standard field, eleven players per side, game rules – may lack sufficient originality, the highly detailed choices in Antonick's videogame design and code easily surpass copyright's low originality threshold. There are limitless ways of selecting, arranging, and coding plays, formations, player characteristics, and game flow. As the Copyright Office registration regulation notes, "the Office would register a claim in an original compilation of the names of the author's 50 favorite restaurants." Registration of Claims to Copyright, 77 Fed. Reg. 37605, 37607 (Jun. 22, 2012).

By emphasizing cases such as *Data East* and *Incredible Technologies*, EA erroneously characterizes this matter as a competitor case, contending

-34-

that Antonick should not be able to monopolize the videogame football genre. But this is a case about granular, highly detailed design and coding choices being ported to a game made by the same enterprise. It is not about Antonick blocking competitors.

The issue is not whether Antonick's complex compilation of design and coding choices is protectable, but rather the standard for protection—the thickness or thinness of protection. A simple factual compilation constrained by external considerations garners less protection than compilations involving many components and few design constraints. *See TransWestern Pub. Co. LP v. Multimedia Marketing Assocs., Inc.*, 133 F.3d 773, 776-77 (10th Cir. 1998). A videogame as complex as Madden Football, even though constrained by the rules of football and computer hardware, correspondingly merits higher protection. *See Tetris Holding, LLC v. Xio Interactive, Inc.*, 863 F. Supp. 2d 394, 406-07, 411 (D.N.J. 2012) ("In no case …did a court find that expression was unprotectible merely because it was related to a game rule or game function"; "To accept Xio's reasoning would give a copyright defendant free reign to copy another's expression, to pilfer another's creativity, merely by describing that expression in sufficient detail related to a rule or a function."). Indeed, the compilation of

elements reflected in the 60-page player manual and hundreds of thousands of lines of code in Madden Football are far more complex than the compilation of unprotectable elements that this court found sufficient in *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) (upholding jury verdict based on "a combination of five *unprotectible* elements: (1) the title hook phrase (including the lyric, rhythm, and pitch); (2) the shifted cadence; (3) the instrumental figures; (4) the verse/chorus relationship; and (5) the fade ending" (emphasis added)).

In addition, it made no sense for the court to bar Antonick from introducing the 60-page game manual and other documentary evidence of the program design. That literary and graphic work formed part of the program documentation and, as such, was part of the "Work" from which Derivative Works might be made. *See* Opening Br. 38-39. Just as a script, short story, or novel can be infringed by an unauthorized derivative work motion picture, a 60-page game manual can be infringed by a video game implementing its design. Antonick was entitled to use it as evidence of his claim. The court should also have permitted Antonick to argue copyright protection for the specific ways in which he designed and coded player ratings, decision points, ball carrier pursuit, order of offensive players on

roster, direction tracking system, method for flipping the view of the field upon change of possession, names of variables, subroutines, and plays, instant replay design, and data flow architecture. He was not claiming protection for high-level concepts or game elements dictated by interoperability constraints but rather particularized, expressive design and coding choices manifested in game documentation, manuals, and hundreds of thousands of lines of source code. As CONTU recognized, these granular choices garner copyright protection. The court's categorical exclusion of these entire design and code element classes improperly deprived Antonick of copyright protection for expressive design choices and hundreds of thousands of lines of code implementing these expressive videogame features.

Moreover, Antonick's claim should never have been limited to source code and binary code. The Work encompassed the full software design as well as the source/binary code. Copyright protection for a short story can be infringed through audiovisual works, sound recordings, and even videogames. Antonick's work was entitled to that range of protection, not merely virtual identity between source/binary code.

If this case is remanded for retrial, Antonick should be allowed to

present the full range of his creative choices for the jury to consider.

Regardless, the jury verdict in his favor—even based on a limited subset of

his expressive choices—should be reinstated. *See* §§ II(B)-(C), *supra*.

## III. The Court erroneously dismissed SNES claims.

### A. The SNES and Apple II chips were in the same "microprocessor family."

The parties agree that Antonick was entitled to a royalty on sales of

Derivative Works developed for microprocessors that "utilize the same

instruction set and have the same instruction and word data size" as the

Apple II chip. But EA wrongly asserts that Antonick's expert, Garry

Kitchen, admitted that the SNES microprocessor was "different in all three

respects." Br. 73. Kitchen testified that the SNES chip possesses an 8-bit

mode that utilizes the same instruction set and same instruction and word

data size as the Apple II chip. (ER 858:13-17; 859:23-860:6). It can remain in

this "emulation" mode or switch to a 16-bit mode with an expanded

instruction set and word size. (ER 860:7-10). Because the contract requires

that the SNES chip "utilize" (but not *exclusively* utilize) the same instruction

set and "have" (but not *exclusively* have) the same instruction and word

data size, the SNES chip meets the contractual definition.

EA incorrectly says that the contractual definition of "Apple II family of computers" reflects an intent to exclude processors such as SNES. Br. 73-74. Although that definition excludes the Apple IIGS, it also excludes the Apple III, which had the same microprocessor as the Apple II. (FER 48:14-15). But for the exclusion, the Apple IIGS would have been an "Apple II computer based on the 6502 8-bit microprocessor." The contract distinguishes between a "family of computers" and a "microprocessor family."

Even if the language were ambiguous, issues about the weight and import of industry practice must be resolved by the jury. *See Parsons v. Bristol Development Co.*, 62 Cal. 2d 861, 865 (1965); *City of Hope Nat. Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008). Antonick presented testimony that in the videogame industry, a chip (such as SNES) that is backward compatible with previous processors (such as Apple II) is in the same family as those processors.[16] Antonick also showed that the manufacturer referred to the SNES chip as an "8/16 bit microprocessor."[17]

---

[16] (ER 857:2-11).

[17] (ER 860:11-14).

### B. Even if the SNES chip was not in the Apple II microprocessor family, Antonick's Apple IIGS development revived his rights.

Under Amendment 1, Antonick's development of an Apple II GS game revived his first refusal rights for the SNES game. EA does not deny breaching this provision. Instead, EA argues that the court correctly dismissed these claims because Antonick's damages were too speculative and because he sought consequential damages barred by the Contract. Neither argument has merit.

To prove damages, plaintiff must establish "with reasonable probability the existence of some causal connection between [EA's] wrongful act and some loss of the anticipated revenue," here royalties. *Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.,* 16 Cal. App. 4th 202, 219 (1993). Once done, "the jury will be permitted to act upon probable and inferential proof" and make "a reasonable estimate of the damage based on relevant data." *Id.*

Antonick calculated damages under the contractual rate for the predecessor NES platform and EA's actual SNES sales. This method is not speculative. EA always compensated Antonick with royalties, and the rate for the predecessor NES platform is a reasonable proxy for the rate the

parties would have negotiated for the SNES. Antonick was *already* developing a game for the NES, (ER 764-775, 777-790), and contrary to EA's assertion, Br. 76 n.219, this NES code could have been used for the SNES game. (ER 862:20-863:20). Because the jury found later versions of *Madden* to be "virtually identical" to Antonick's Apple II version, it could easily infer that an SNES game developed by Antonick would have earned at least as much as EA's game. *Stott v. Johnston*, 36 Cal. 2d 864, 875 (1951).

Sargon Entertainment does not say otherwise—it acknowledges that lost profits can be proven by "evidence of the profits lost by similar businesses operating under similar conditions." *Sargon Enterprises, Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 774 (2012). *Sargon* found lost profits speculative because an expert assumed that the plaintiff's market share would have "increased spectacularly over time to levels far above anything it had ever reached" to match the shares of much larger competitors. *Id.* at 776-77. Here, Antonick conservatively calculated royalties using EA's actual SNES sales data from the *same* business operating in the *same* market selling the *same* product. *Sargon* permits this approach, and the court erred by holding otherwise.

The contractual bar on "incidental or consequential damages or the loss of anticipated profits" does not apply. Antonick seeks royalties at the contract rate based on EA's actual SNES revenues, not hypothetical "anticipated" profits. Nor are such damages incidental or consequential. Royalties are "part and parcel of the contract itself, entering into and constituting a portion of its very element" and they provided Antonick "the only inducement to the arrangement." *Nelson v. Reisner*, 51 Cal. 2d 161, 171 (1958). The "natural and direct consequence[]" of EA's breach was to deprive Antonick of royalties he otherwise would have earned. *Id*.

## IV. Lost royalties or disgorgement of profits is a proper remedy for misappropriation of Development Aids.

Contrary to EA's argument, the court was wrong to dismiss Antonick's claim for misappropriation of Development Aids and associated remedies. Br. 77-79.

*First*, EA states that Antonick claimed misappropriation of "an 'unspecified' Development Aid." Br. 77. Wrong. Antonick specified that misappropriated Development Aids included his player editor, play editor, team editor, playbook editor, and method for instant replay. Opening Br. 13 n.3 (citing ER 463-466).

*Second*, EA asserts that Section 5.05 of Exhibit A to the 1986 Contract "contained an express procedure by which Antonick would be compensated if EA used a Development Aid," and no damages were shown from its breach. Br. 77-78. Section 5.05 contained no such procedure or provision. Section V of the contract stated the royalty percentage owed on each class of Derivative Works (ER 558); Section 5.05 gave EA a license to use Antonick's Development Aids in developing Derivative Works (ER 569). Amendment 1 to the contract modified Section V to remove both any royalty and any license to use Antonick's development aids on "Derivative Works of Publisher [EA], Different Microprocessor Family." (ER 487-488.)

EA's license to use Antonick's Development Aids under Section 5.05 applied only to Derivative Works for which Antonick would receive a royalty under Section V. If EA wanted to use Antonick's Development Aids for other purposes, Antonick agreed only to "negotiate in good faith" on terms and conditions of a license. (ER 569.) EA suggests that Antonick should have "initiated this [negotiation] procedure,"[18] but Antonick was

---

[18] Br. 77-79 & n.228.

unaware that EA was misappropriating Development Aids without paying royalties. He could not "initiate" negotiations while unaware, and was not required to negotiate a license to steal.

*Third*, EA ignores Antonick's argument that royalties were an appropriate measure of damages. *See* Opening Br. 58-59. The royalty was the contractual consideration for EA's right to use Antonick's Development Aids as well as its right to copy portions of his work, so it was a reasonable measure of damages for both. Damages would not be duplicated, since a royalty for misappropriation of Development Aids would apply only to works for which Antonick was not otherwise awarded a royalty for unauthorized copying. EA argues that Antonick provided no damages calculations, but Antonick's expert calculated royalties on sales and licenses of each work. (SER 472-477.)

*Fourth*, as an alternative to damages measured by royalties, Antonick sought disgorgement of profits. Opening Br. 59-60. Contrary to EA's suggestions, Br. 78-79, contractual remedies are not limited to "benefit-of-the-bargain" damages. The equitable remedy of restitution is also available, and disgorgement of profits is especially appropriate for misappropriation of intellectual property. *See, e.g., Ajaxo Inc v. E\*Trade Grp., Inc.*, 135 Cal.

App. 4th 21, 55-57 (2005). To avoid a "windfall," disgorgement can be limited to amounts equal to contractual royalty rates. Opening Br. 60.

The six authorities cited by EA do not say otherwise. Three address only compensatory damages, not restitution. Cal. Civ. Code § 3300; *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified School Dist.*, 34 Cal. 4th 960, 967-68 (2005); *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 94 (1995). Two deal with quasi-contract claims of unjust enrichment, not equitable remedies for breach of express contract. *Lance Camper Mfg. Corp. v. Republic Indem. Co. of Am.*, 44 Cal App. 4th 194, 203 (1996); *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996). Finally, EA's lone authority that "[d]isgorgement of profits is not a remedy for ordinary breach of contract," *Shaw v. Superior Court*, 229 Cal. App. 4th 12, 24-25 (2014), says nothing like that, and lost all precedential value when the California Supreme Court granted review two days before EA filed its brief. *Shaw v. S.C. (THC-Orange County, Inc)*, No. S221530 (Cal. Nov. 12, 2014); CRC Rule 8.1105(a)(1) (unless otherwise ordered, "an opinion is no longer considered published if the Supreme Court grants review") & 8.115 (prohibiting citation of unpublished opinions).

## V. The jury correctly decided that Antonick's claims were not time-barred.

Antonick testified that a CNBC interview in 2009 piqued his interest, leading to further inquiry and discovery of facts indicating a possible contract claim. In the interview, Trip Hawkins traced the Madden franchise to Antonick's game. (ER 757:23-758:12). Discovering the website of Park Place founder Troy Lyndon, Antonick learned that the 1990 Sega game had not been produced in a clean room, as promised. Instead, EA's Richard Hilleman, intimately familiar with Antonick's games, had spent "countless hours" with Jim Simmons developing Sega Madden. (ER 758:14, 759:4-760:5; SER 638-643). This was "the big red flag that went off," causing Antonick to contact a lawyer. (ER 760:8-13).

The jury was instructed that Antonick's claims were timely if, before November 21, 2005, Antonick "did not discover, and "did not know of facts that would have caused a reasonable person to suspect," that EA had breached its contract. (FER 28:14-19; *see also* FER 4:6-18). The jury found Antonick's claims timely. (ER 356). The court upheld the verdict. (ER 7-8).

## A. The court did not abuse its discretion by not applying judicial estoppel.

Judicial estoppel determinations are reviewed for abuse of discretion. *Williams v. Boeing Co.*, 517 F.3d 1120, 1134 (9th Cir. 2008). Juries are "regularly called upon" to consider evidence of inconsistent statements. *Norris v. Sysco Corp.*, 191 F.3d 1043, 1049 (9th Cir. 1999). The court did not abuse its discretion by giving the issue to the jury.

Antonick's testimony was not "clearly inconsistent" with his pre-trial position. (ER 7.) Antonick stated both before and during trial that the CNBC interview caused him to "investigate further," "do some additional research," and "look a little bit deeper."[19] Antonick also stated, pre-trial, that viewing Lyndon's website led him to conclude that EA had developed the 1990 Sega game without a clean room and put him on notice of his claims.[20] In fact, before trial, Antonick was arguing that he was put on notice of his potential claims when he saw Lyndon's website. (SER 337).

---

[19] *Compare* SER 157:8-10, SER 358:5-6 *with* ER 758:14-18.

[20] *Compare* FER 242:4-8 ("the aha moment . . . is when Mr. Antonick figured out that Mr. Himmelman [sic] who is intimately involved with Mr. Antonick's code and intimately involved with the creation of the new code") *and* SER 358:10-13 (Lyndon website left Antonick "stunned" and "contradicted EA's assurances that [the Sega game] had been independently developed without any reference to Antonick's work") *with* ER 759:4-

Further, Antonick's testimony caused no prejudice. EA says it "would have proved that no new facts were disclosed in that [CNBC] interview and that inquiry notice was therefore triggered in 1990." Br. 86. But EA declined to submit the CNBC interview into evidence. (FER 203-240). The evidence showed that the interview disclosed previously unknown facts. (SER 388.)

**B.     Substantial evidence supports the verdict.**

Whether Antonick should have known about EA's wrongdoing before November 2005 "is particularly suited to a jury's determination." *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th Cir. 1984). The issue "may be decided as a matter of law only when uncontroverted evidence irrefutably demonstrates" that Antonick discovered the breaches or knew facts that would have put a reasonable person on notice of those breaches. *Id.* at 877. This standard is even "more exacting" on JMOL. *Id.* EA cannot satisfy it.

---

760:5 (Lyndon website was the "ah-hah [sic] moment" because "[t]hey were supposed to be in separate rooms, in the cleanroom, and this is the first time I'm seeing that they weren't separated").

Before 2009, Antonick never purchased or played, and saw no one else play, the 1990 Sega game. (SER 660:3-17). Antonick was repeatedly assured by EA that the Sega game was being developed independently. (ER 773:18-25, SER 662:20, SER 663:7-19, FER 19:19-20:7). The parties stipulated that a person could not, by viewing the game, "determine how a particular game element was expressed in source code." (FER 30:12-16).

EA failed to prove that Antonick had knowledge of any document putting him on notice. *Unruh-Haxton v. Regents of Univ. of California*, 162 Cal. App. 4th 343, 364 (2008) (limitations period begins when plaintiff, not the public, suspects wrongdoing). Hilleman's role as a producer of the 1990 Sega game did not arouse suspicion because Antonick understood the role "primarily deal[t] with publishing issues," so Hilleman "could very easily have been . . . outside of the cleanroom." (FER 24:8-17).

## C. New trial on statute of limitations is not warranted even if new trial on liability is granted.

Partial retrial on liability but not timeliness would not violate EA's rights because the issues are "distinct and separable." Fed. R. Civ. P. 59(a)(1); *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 499-500 (1931). The court already held separate trials on timeliness and liability, and EA

did not object. *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 774 (9th Cir. 1981) ("The power to grant a partial new trial under Rule 59(a) is comparable to the court's power under Rule 42(b) to separate issues and parties for original trial."). Timeliness depends on events putting Antonick on notice in 2009 and facts putting a reasonable person on notice before November 2005. Liability involves similarities between videogames. The triable issues are distinct.

## CONCLUSION

The district court's judgment should be reversed and the jury verdict upheld. The case should be remanded for further proceedings, with reinstatement of Antonick's claims for royalties on the SNES game and damages or disgorgement of profits for misappropriation of Antonick's Development Aids.

Dated:  March 6, 2015.  HAGENS BERMAN SOBOL SHAPIRO LLP

By  */s/ Robert B. Carey*  
   Robert B. Carey  
   Leonard W. Aragon  
   11 West Jefferson Street, Suite 1000  
   Phoenix, Arizona 85003  
   Telephone: (602) 840-5900  
   Facsimile: (602) 840-3012  
   Email:  rob@hbsslaw.com  
   Email:  leonard@hbsslaw.com

David Nimmer
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Telephone: (310) 203-7079
Facsimile: (310) 203-7199
Email: dnimmer@irell.com

Peter S. Menell
705 The Alameda
Berkeley, California 94707
Telephone: (510) 528-9886
Email: pmenell@law.berkeley.edu

Walter H. Sargent
WALTER H. SARGENT, P.C.
1632 N. Cascade Ave.
Colorado Springs, CO 80907
Telephone: (719) 577-4510
Facsimile: (719) 577-4696
Email: wsargent@wsargent.com

Stuart M. Paynter (226147)
Jennifer L. Murray
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
Email: stuart@smplegal.com
Email: jmurray@smplegal.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

*Attorneys for Robin Antonick, Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:

☑　　This brief contains 9749 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(iii), or

☐　　This brief uses a monospaced typeface and contains _____ lines

of text, excluding the parts of the brief exempted by Fed. R.

App. P. 32(a)(7)(B)(iii).

2.　　This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type style requirements of Fed. R. App.

P. 32(a)(6) because:

☑　　This brief has been prepared in a proportionally spaced

typeface using Microsoft Word Version 2010, in Book Antigua

14 point typeface, or

☐　　This brief has been prepared in a monospaced typeface using

(state name and version of word processing program) with

(state number of characters per inch and name of type style).

Dated:  March 6, 2015

HAGENS BERMAN SOBOL SHAPIRO LLP


By     /s/ Robert B. Carey
Robert B. Carey
Leonard W. Aragon
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email:  rob@hbsslaw.com
Email:  leonard@hbsslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 6, 2015.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

HAGENS BERMAN SOBOL SHAPIRO LLP

By      */s/ Robert B. Carey*
    Robert B. Carey
Leonard W. Aragon
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email:  rob@hbsslaw.com
Email:  leonard@hbsslaw.com