In the

# United States Court of Appeals
### For the Seventh Circuit

_____

No. 14-1128

LESLIE S. KLINGER,

                                                         *Plaintiff-Appellee*,

*v.*

CONAN DOYLE ESTATE, LTD.,

                                                         *Defendant-Appellant*.

_____

Motion for Award of Attorneys' Fees in an Appeal
from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 1226 — **Rubén Castillo**, *Chief Judge*.

_____

SUBMITTED JULY 15, 2014 — DECIDED AUGUST 4, 2014

_____

Before POSNER, FLAUM, and MANION, *Circuit Judges*.

POSNER, *Circuit Judge*. This opinion is a sequel to *Klinger v. Conan Doyle Estate, Ltd.*, 2014 WL 2726187 (7th Cir. June 16, 2014), where we held that Leslie Klinger was entitled to a declaratory judgment that he would not be infringing copyrights on fictional works published by Arthur Conan Doyle before 1923 by anthologizing stories written long after Doyle's death in 1930 that feature Sherlock Holmes and oth-

er characters depicted in Doyle's pre-1923 fiction. Even though the modern (post-Doyle) Sherlock Holmes stories copy copyrightable material in the pre-1923 fiction, the copyrights on that fiction, which cover copyrightable elements in it that include original depictions of characters (like Holmes and Dr. Watson), have expired. We rejected the Doyle estate's argument that because stories published by Doyle between 1923 and his death—and still under copyright—depicted those characters in a more "rounded form" than found in the pre-1923 fiction, the "flat" characters of the earlier stories were protected by the copyrights still in force on the "rounded" characters of the later stories.

Once the copyright on a work expires, the work becomes a part of the public domain and can be copied and sold without a license from the holder of the expired copyright. So when Klinger published his first anthology of modern Sherlock Holmes stories he didn't think he needed a license. But the Doyle estate told Random House, which had agreed to publish Klinger's book, that it would have to pay the estate $5,000 for a copyright license. Random House yielded to the demand, obtained the license, and published the book.

Klinger arranged for a sequel to the anthology to be published by Pegasus Books and distributed by W.W. Norton & Company to booksellers. When the Doyle estate learned of this project, it told Pegasus, as it had told Random House, that Pegasus would have to obtain a $5,000 license from the estate in order to be legally authorized to publish the new book. The estate didn't explicitly threaten to sue Pegasus for copyright infringement if the publisher didn't obtain a license, but did explicitly threaten to prevent distribution of the book. It did not mince words. It told Pegasus: "If you

Case: 13-55859    08/08/2014    ID: 9198348    DktEntry: 47-3    Page: 3 of 7
Case: 13-55859    08/08/2014    ID: 9198348    DktEntry: 47-3    Page: 3 of 7

proceed … to bring out [the sequel] unlicensed, do not expect to see it offered for sale by Amazon, Barnes & Noble, and similar retailers. We work with those compan[ies] routinely to weed out unlicensed uses of Sherlock Holmes from their offerings, and will not hesitate to do so with your book as well." There was also a latent threat to sue Pegasus for copyright infringement if it published Klinger's book without a license, and to sue Internet service providers who distributed it. See Digital Millennium Copyright Act, 17 U.S.C. § 512(i)(1)(A). Pegasus yielded to the threat, as Random House had done, and refused to publish the anthology until Klinger obtained a license from the Doyle estate.

Instead of obtaining a license Klinger sued the estate, seeking declaratory relief against being adjudged an infringer of any valid copyrights of the estate—and won, both in the district court and, on the estate's appeal, in this court. We could find no basis in statute or case law for extending a copyright beyond its expiration. When a story falls into the public domain, story elements—including characters covered by the expired copyright—become fair game for follow-on authors. There is no ground known to American law for extending copyright protection beyond the limits fixed by Congress. The estate's appeal bordered on the quixotic.

Now Klinger asks us to order the Doyle estate to reimburse the attorneys' fees he incurred in the appeal, amounting to $30,679.93. (He has filed a separate petition for fees and related costs incurred in his litigation in the district court, totaling $39,123.44. That petition is not before us.) The estate opposes Klinger's request on the same hopeless grounds that it had urged in its appeal, but does not ques-

tion the amount of fees as distinct from Klinger's entitlement to an award of *any* amount of fees in this case.

The Copyright Act authorizes the "award [of] a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. We said in *Assessment Technologies of Wisconsin, LLC v. WIREdata, Inc.*, 361 F.3d 434, 436–37 (7th Cir. 2004) (and reaffirmed in *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625–26 (7th Cir. 2013)) that the two most important considerations in deciding whether to award fees "are the strength of the prevailing party's case and the amount of damages or other relief the party obtained. If the case was a toss-up and the prevailing party obtained generous damages, or injunctive relief of substantial monetary value, there is no urgent need to add an award of attorneys' fees. But if at the other extreme the claim or defense was frivolous and the prevailing party obtained no relief at all, the case for awarding attorneys' fees is compelling" (citations omitted). We said that as a consequence of the successful defense of an infringement suit the defendant is entitled to a "very strong" presumption in favor of receiving attorneys' fees, in order to ensure that an infringement defendant does not abandon a meritorious defense in situations in which "the cost of vindication exceeds the private benefit to the party." 361 F.3d at 437. "For without the prospect of such an award, [an infringement defendant] might be forced into a nuisance settlement or deterred altogether from exercising [its] rights." *Id*.

We're not alone in expressing these concerns. See Michael J. Meurer, "Controlling Opportunistic and Anti–Competitive Intellectual Property Litigation," 44 *Boston College L. Rev.* 509, 521 (2003). See also Ben Depoorter & Robert

No. 14-1128 5

Kirk Walker, "Copyright False Positives," 89 *Notre Dame L. Rev.* 319, 343-45 (2013), where we read that many persons or firms accused of copyright infringement find that "it is more cost-effective to simply capitulate" than to fight, even when the alleged claim is of dubious merit. Copyright holders, the authors explain, have larger potential upsides and smaller downside risks to filing suit, since if they win they obtain damages but if they lose they don't have to pay damages (although a loss, especially if recorded in a published opinion as in this case, may make it more difficult for them to play their extortionate game in future cases). So copiers or alleged copiers may be "induced into licensing [that is, paying a fee for a license to reproduce] the underlying work, even if this license is unnecessary or conveys non-existent rights." *Id*. at 345. Depoorter and Walker (*id*. at 345 n. 172) give the example of the Summy-Brichard Company, a subsidiary of Warner Music Group, which "receives approximately $2 million per year in royalty payments for licenses to the song 'Happy Birthday to You,' despite the fact that the song is most likely in the public domain," as argued in Robert Brauneis, "Copyright and the World's Most Popular Song," 56 *J. Copyright Society U.S.A.* 335, 338–40 (2009).

This case illustrates the concerns expressed both in the articles we've just cited and in our opinions in *Assessment Technologies* and *DeliverMed Holdings*. Unless Klinger is awarded his attorneys' fees, he will have lost money—to be precise, $25,679.93 ($30,679.93 – $5,000)—in winning an appeal in which the defendant's only defense bordered on the frivolous: a Pyrrhic victory if ever there was one. It's irrelevant that in *Assessment Technologies* and *DeliverMed Holdings*, the alleged infringer was the defendant, and in this case it's the plaintiff; a declaratory-judgment plaintiff in a copyright

case is in effect a defendant permitted to precipitate the infringement suit.

The Doyle estate's business strategy is plain: charge a modest license fee for which there is no legal basis, in the hope that the "rational" writer or publisher asked for the fee will pay it rather than incur a greater cost, in legal expenses, in challenging the legality of the demand. The strategy had worked with Random House; Pegasus was ready to knuckle under; only Klinger (so far as we know) resisted. In effect he was a private attorney general, combating a disreputable business practice—a form of extortion—and he is seeking by the present motion not to obtain a reward but merely to avoid a loss. He has performed a public service—and with substantial risk to himself, for had he lost he would have been out of pocket for the $69,803.37 in fees and costs incurred at the trial and appellate levels ($30,679.93 + $39,123.44). The willingness of someone in Klinger's position to sue rather than pay Doyle's estate a modest license fee is important because it injects risk into the estate's business model. As a result of losing the suit, the estate has lost its claim to own copyrights in characters in the Sherlock Holmes stories published by Arthur Conan Doyle before 1923. For exposing the estate's unlawful business strategy, Klinger deserves a reward but asks only to break even.

We note finally that the estate was playing with fire in asking Amazon and other booksellers to cooperate with it in enforcing its nonexistent copyright claims against Klinger. For it was enlisting those sellers in a boycott of a competitor of the estate, and boycotts of competitors violate the antitrust laws. The usual boycott is of a purchaser by his suppliers, induced by a competitor of the purchaser in order to

eliminate competition from that purchaser, as in the leading case (old as it is) of *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600 (1914); see also *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 777–79 (7th Cir. 1999). This case is different, in its facts but not in economic substance or legal relevance, because the boycotters enlisted by the Doyle estate were buyers from the victim, rather than sellers to it. But functionally they *were* suppliers—suppliers of essential distribution services to Klinger.

It's time the estate, in its own self-interest, changed its business model.

Klinger's motion is granted and the Doyle estate ordered to pay him $30,679.93 for the legal fees that he incurred in his successful defense of the district court's judgment in his favor.