Nos. 13-15723, 13-15733, 13-15734, 13-15751, 13-15759

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

IN RE: NETFLIX PRIVACY LITIGATION

JEFF MILANS; PETER COMSTOCK, individually and
on behalf of all others similarly situated; THE SETTLEMENT CLASS;

Plaintiffs-Appellees,

GARY WILENS, MATTHEW D. TANNER, HUGH RAMSEY,
STEPHEN GRIFFIS, BRADLEY SCHULZ, and TRACEY KLINGE

Objectors-Appellants,

v.

NETFLIX, INC.,

Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of California,
Case No. 5:11-cv-379-EJD

PLAINTIFFS-APPELLEES' CONSOLIDATED RESPONSE BRIEF

Jay Edelson (jedelson@edelson.com)
EDELSON LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370

Facsimile: (312) 589-6378
*Additional Counsel Appear on Signature Page*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ....................................................................1

ISSUE PRESENTED FOR REVIEW ...............................................................2

STATEMENT OF THE CASE .........................................................................2

STATEMENT OF FACTS ...............................................................................5

SUMMARY OF THE ARGUMENT ...............................................................16

STANDARD OF REVIEW..............................................................................18

ARGUMENT ..................................................................................................19

I.    The District Court did not Abuse its Discretion by Approving a
       Settlement Certifying a Class of 62 Million Consumers with Similar
       Claims, Similar Defenses, and Similar Interests. ...............................21

       A.    The Settlement Class was not Inflated, Artificially or
             Otherwise, and the Objectors' Arguments to the Contrary
             Misunderstand the Pleadings and the Facts. ...........................23

       B.    The Named Plaintiffs Had the Same Interests as the Absent
             Class Members and More than Adequately Represented Each
             Class Member. ..........................................................................25

             1.    There is no conflict of interest between current and
                   former Netflix subscribers...............................................26

             2.    Plaintiffs more than adequately represented all absent
                   class members, including current subscribers. .................29

       C.    The Incentive Payments Approved Were Proper
             Compensation for the Class Representatives' and Named
             Plaintiffs' Sacrifices of Their Time, Reputation, and Privacy. ...33

II.   The Settlement's *Cy Pres* and Injunctive Relief Exceed the
       Standards Established by this Court.....................................................38

i

A.    *Cy Pres* Relief Was Not Only Appropriate, It Was the Only Method of Giving the Class Monetary Relief. ............................ 39

B.    The Nexus Between the *Cy Pres* Recipients and the Class's Claims Exceeds this Court's Standards, and the Process for Choosing the Recipients was Beyond Reproach. ........................ 41

C.    The Settlement Offers Strong Injunctive Relief that Will Substantially Improve Netflix's Privacy Practices, and the Relief Would Have Been Unobtainable Absent Settlement. ...... 49

III.    Both the Settlement and Final Approval Were Products of Sound Judgment Resulting from Extensive Informational Exchanges and Legal Argument. ..................................................................... 52

A.    Class Counsel Adequately Investigated the Claims and Went into Great Detail about the Factual Basis for the Claims, the Information Learned in the Case, and Counsel's Ultimate Valuation of the Case. .................................................................. 52

1.    Class counsel performed sufficient discovery and had more than adequate information to properly negotiate the settlement. .................................................................. 53

2.    Class counsel provided substantial facts, expert testimony, and experienced probability assessments sufficient to allow the district court to assess the settlement. ............................................................................ 57

B.    Class Members had Sufficient Time to Investigate the Proposed Settlement, and, in any Event, Objectors' Argument to the Contrary was Waived. ..................................................... 59

CONCLUSION ................................................................................. 61

# TABLE OF AUTHORITIES

## United States Supreme Court Cases

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)........................................................................26, 27

*Ortiz v. Fiberboard Corp.*,
    527 U.S. 815 (1999)........................................................................26, 27

## United States Court of Appeals Cases

*Bateman v. Am. Multi-Cinema, Inc.*,
    623 F.3d 708 (9th Cir. 2010) ...................................................22

*Cook v. Niedert*,
    142 F.3d 1004 (7th Cir. 1998) .................................................33

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1997) .................................................56

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012) ...........................................47, 48

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .............................12, 18, 19, 50

*In re Aqua Dots Prods. Liab. Litig.*,
    654 F.3d 748 (7th Cir. 2011) ...................................................22

*In re Dry Max Pampers Litig.*,
    No. 11-4156, 2013 WL 3957060 (6th Cir. Aug. 2, 2013) .........35

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ...........................................34, 55

*In re Mercury Interactive Corp. Sec. Litig.*,
    618 F.3d 988 (9th Cir. 2010) ...................................................60

*In re UnitedHealth Grp. Inc. Shareholder Derivative Litig.*,
    631 F.3d 913 (8th Cir. 2011) ...................................................................... 3

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) .......................................................... passim

*Linney v. Cellular Ak. P'ship*,
    151 F.3d 1234 (9th Cir. 1998) ...................................................................59

*Nachshin v. AOL, LLC*,
    663 F.3d 1104 (9th Cir. 2011) ................................................15, 22, 39, 42

*Officers for Civil Justice v. Civil Serv. Comm'n of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) ....................................................................18

*Palmer v. Nigaglioni*,
    508 F. App'x 658 (9th Cir. 2013) ............................................................34

*Radcliffe v. Experian Info. Solutions Inc.*,
    715 F.3d 1157 (9th Cir. 2013) ......................................................35, 36, 37

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) .......................................................... passim

*Shaffer v. Cont'l Cas. Co.*,
    362 F. App'x 627 (9th Cir. 2010) ............................................................34

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ......................................................33, 34, 35

*Synfuel Techs, Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ....................................................................32

*United States v. Oregon*,
    913 F.2d 576 (9th Cir. 1990) ....................................................................20

**Statutes & Federal Rules**

18 U.S.C. § 2510 ....................................................................22

18 U.S.C. § 2710 ........................................................... passim

18 U.S.C. § 2721 ....................................................................22

28 U.S.C. § 1291 .................................................................... 1

28 U.S.C. § 1331 .................................................................... 1

28 U.S.C. § 1367 .................................................................... 1

47 U.S.C. § 551 .....................................................................22

Fed. R. App. P. 4..................................................................... 1

**Other Authorities**

S. Rep. No. 100-599 (1988) ...............................................7, 42

Samuel Issacharoff & Richard A. Nagreda, *Class Settlements Under Attack*, 156 U. Pa. L. Rev. 1649 (2008) ..............................................26

Tom Vanderbilt, *The Science Behind the Netflix Algorithms That Decide What You'll Watch Next*, Wired (Aug. 7, 2013, 6:30 AM), http://www.wired.com/underwire/2013/08/qq_netflix-algorithm/. ........................................................................ 6

## <u>JURISDICTIONAL STATEMENT</u>

The district court had original jurisdiction over this case under 28 U.S.C. §§ 1331 and 1367 because Plaintiffs-Appellees ("Plaintiffs") alleged violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710, as well as state law claims that were related such that they formed part of the same case or controversy under Article III of the United States Constitution.

Objectors-Appellants appeal the district court's final approval of a class settlement in this case. That approval order is a final decision of the district court over which this Court has appellate jurisdiction under 28 U.S.C. § 1291.

The district court entered its approval order on March 18, 2013. (Dkts. 256-57.)[1] Between April 12 and 17, 2013, Objectors-Appellants filed notices of appeal with the district court. (Dkts. 258-60, 264, 267.) The notices were timely under Federal Rule of Appellate Procedure 4(a)(1)(A).

---

[1]     "Dkt." refers to the district court docket, a copy of which can be found, among other places, in Objector-Appellant Wilens's Excerpts of Record at Wilens ER 141-60. Throughout this brief, references to the various Objector-Appellant's Excerpts of Record will be in the form "[Objector Name] ER [page numbers]."

## ISSUE PRESENTED FOR REVIEW

Whether the district court clearly abused its discretion by approving a class action settlement that provided for injunctive relief requiring the defendant to adopt industry-leading privacy protections, and for *cy pres* distributions to twenty of the nation's leading privacy and technology non-profits in lieu of *de minimis* payments to class members, which would have been infeasible given the size of the class and distribution costs.

## STATEMENT OF THE CASE

This case involves alleged violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA") and related state laws. The VPPA prohibits companies that rent or sell audiovisual materials from disclosing their customers' viewing habits and from retaining records containing such information any longer than necessary. 18 U.S.C. §§ 2710(b), (e).

In January 2011, Plaintiff-Appellee Jeff Milans filed a class action complaint alleging that Defendant-Appellee Netflix, Inc.—an internet video subscription service provider—retained private video viewing histories of its former subscribers longer than necessary, in violation of the VPPA. (Dkt. 1, Tanner ER 118-32.) Following consolidation of related cases, Mr. Milans, along with Plaintiff-Appellee Peter Comstock, filed an

Amended Consolidated Class Action Complaint (the "Amended Complaint"). (Dkt. 59, 61.) In addition to alleging that Netflix unlawfully *retained* its former customers' private viewing histories, the Amended Complaint added allegations that Netflix unlawfully *disclosed* its former subscribers' private video viewing histories as well. (Wilens ER 124-40.)

After discovery and extensive negotiations, the parties were able to reach a settlement with the assistance of former District Judge Layn R. Phillips (ret.), resulting in substantial injunctive and monetary relief for the class's benefit. In July 2012, the district court certified a class of all current and former U.S. subscribers to Netflix and granted preliminary approval to the settlement. (SER 257-65.)[2] Objectors-Appellants Gary Wilens, Matthew D. Tanner, Hugh Ramsey, Stephen Griffis, Bradley Schulz, and Tracey Klinge (collectively the "Objectors"), among others, objected to the settlement.[3] On December 5, 2013, the district court held a three-hour final

---

[2] "SER" refers to Appellees' Joint Supplemental Excerpts of Record, filed concurrently herewith.

[3] Matthew D. Tanner's objection was untimely and improperly filed, and thus not properly before the district court. Consequently, he may not contest final approval of the settlement on appeal. *See, e.g., In re UnitedHealth Grp. Inc. Shareholder Derivative Litig.*, 631 F.3d 913, 917 (8th Cir. 2011). Plaintiffs-Appellees previously moved to dismiss Tanner's appeal on these grounds (Tanner App. (13-15733) Dkt. 7), which this Court denied

fairness hearing, at which none of the Objectors or their counsel appeared. (SER 1-121.)

During the fairness hearing, class counsel explained the claims against Netflix, their investigation into those claims, the settlement negotiations, and the settlement ultimately reached. Class counsel further explained the *cy pres* selection process and how they valued the monetary component of the settlement. Having read every letter or objection received from individual class members (SER 6-7), Judge Davila asked probing questions about the settlement, and individual class members were permitted to voice any concerns or objections they had.[4]

On March 18, 2013, the district court granted final approval, finding the settlement "fair, adequate, and reasonable," and that it "satisfies Federal Rule of Civil Procedure 23(e) and the fairness and adequacy factors

---

without prejudice to renewing such arguments in Appellees' response brief (Tanner App. Dkt. 10). Accordingly, Plaintiffs-Appellees request that the Court dismiss Tanner's Objection for the reasons stated in their motion to dismiss (Tanner App. Dkt. 7) and reply in support of that motion (Tanner App. Dkt. 9).

[4]    Of approximately 62 million class members, only three appeared at the hearing, either personally or through counsel. (SER 3, 10-11, 106.)

of this Circuit." (Final Approval Order, Dkt. 256 ("Order") at 23.)[5]

Objectors now appeal the district court's final approval order.[6]

## STATEMENT OF FACTS

Netflix delivers movies and television programs to millions of subscribers by mail and through online content streaming. (SER 267 ¶ 2.) Plaintiffs-Appellees Jeff Milans and Peter Comstock (collectively, "Plaintiffs") are former Netflix subscribers who filed a putative class action against Netflix for allegedly retaining and disclosing their private video viewing histories in violation of the VPPA. (Wilens ER 132 ¶¶ 42-43.)

The facts supporting Plaintiffs' allegations that Netflix unlawfully retained their video viewing histories (the "Retention Claims") were largely undisputed: Netflix admitted that it maintained subscribers' video viewing histories, even after they cancelled their Netflix subscriptions. (*See, e.g.*, SER 267 ¶ 5.) In contrast, the facts supporting Plaintiffs' allegations

---

[5]    The Order can be found at, among other places, Tanner ER 33-55. Throughout this brief, citations to pages of the Order will be to the original internal pagination.

[6]    Andrew Cesare, Katherine Strohlein, William Ford, Denis Bono, and Judith Mallory also appealed the district court's final approval order (Cesare App. (13-15754)), but did not file an opening brief. That appeal was dismissed for lack of prosecution. (Cesare App. Dkt. 48.)

that Netflix *disclosed* subscribers' private video viewing histories (the "Disclosure Claims") were less certain. Plaintiffs initially believed that Netflix unlawfully disclosed subscribers' viewing histories to third-party analytics companies in order to refine Netflix's movie-recommendation algorithm. (Wilens ER 69 ¶¶ 14-15.)[7] In order to obtain information regarding the Disclosure Claims, Plaintiffs propounded, and Netflix responded to, written discovery. (Wilens ER 69-70 ¶ 17.)

Plaintiffs obtained further information relevant to their Disclosure Claims at the parties' mediation before former District Judge Layn R. Phillips (ret.). (Wilens ER 70 ¶ 20.) The parties began the mediation with an extended discussion of the factual basis for Plaintiffs' claims, through which Plaintiffs learned that Netflix actually performs all of its data analytics needs in-house, and does not, in fact, unlawfully disclose subscribers' protected information to third-parties. (SER 15-24.)  The parties continued to exchange information during the mediation, and eventually Plaintiffs determined that their Disclosure Claims, while potentially

---

[7]    For a general background on Netflix's recommendation algorithm, *see* Tom Vanderbilt, *The Science Behind the Netflix Algorithms That Decide What You'll Watch Next*, Wired (Aug. 7, 2013, 6:30 AM), http://www.wired.com/underwire/2013/08/qq_netflix-algorithm/).

valuable if successful on a class-wide basis, stood only a small chance of success on the merits. By the end of the day, and with the help of Judge Phillips, the parties were able to agree on the principle terms of a settlement, which was finalized over the next three months. (Wilens ER 70-71 ¶¶ 22-23). The settlement provided relief to a class of all current and former U.S. Netflix subscribers. (Wilens ER 100 ¶¶ 1.38, 1.41.)

Under the settlement, Netflix agreed to improve its data retention practices such that within a year of a customer terminating their Netflix subscription, Netflix would "decouple" that customer's name, address (except for zip code), e-mail address, phone number, and payment method from their viewing history. (Wilens ER 101-02 § 2.1.) The injunctive relief, therefore, would prevent future intentional or unintentional disclosure of customers' entertainment choices, which was a primary goal of the lawsuit and precisely the danger the VPPA's retention provision was designed to address.[8] Netflix maintains that it is not required to make such changes to its data retention policy under the VPPA, but nevertheless agreed to do so

---

[8]     *See* S. Rep. No. 100-599, at *15 (1988) ("The purpose of [the VPPA's prohibition on retaining records longer than necessary] is to reduce the chances that an individual's privacy will be invaded, by requiring the destruction of information in an expeditious fashion . . . .").

to resolve Plaintiffs' claims, and despite the fact that it will require substantial engineering effort and expense. (SER 102-03, 183.)

In addition to the injunctive relief, the settlement also established a $9 million settlement fund. (Wilens ER 103-06 § 2.3.) Given the class size (approximately 62 million individuals), distributing the settlement fund would have resulted in a *de minimis*, and ultimately infeasible, distribution per class member. Accordingly, the parties agreed to a *cy pres* distribution. Specifically, the settlement provided that the $9 million fund would (following payment of administrative expenses, attorneys' fees, and incentive awards) be distributed to not-for-profit organizations that advance the protection of consumers' online privacy. (Wilens ER 103-06 §§ 2.3-2.4.) The settlement agreement further required the parties to solicit proposals from potential recipients containing, among other things, a description of the organization's programs and how those programs benefit the class. (Wilens ER 104-05 § 2.4.3.)

On Plaintiffs' motion, the district court granted preliminary approval, finding that the settlement "was a product of arm's length negotiation before a mediator and [did] not appear to benefit those who participated in the mediation at the expense of any other parties," and that it "appear[ed]

8

fair, non-collusive and within the range of possible final approval." (SER 260.)

Following the district court's certification of the class and preliminary approval of the settlement, (SER 257-65), notice of the settlement was disseminated to potential class members by direct e-mail and through advertising in both print and internet media. (Wilens ER 71 ¶ 26.) In addition, class counsel solicited proposals for the *cy pres* distributions by advertising on the internet and sending letters to organizations they thought would make good candidates to receive the funds. (SER 35.)  Class counsel spoke with, and responded to inquiries from, many organizations in an effort to obtain the best possible proposals for the *cy pres* distribution, knowing that better proposals would ultimately lead to better selections and better relief for the class. (Wilens ER 72 ¶ 29; SER 36, 41.)[9]

Additionally, class counsel fielded numerous calls from class members recommending potential *cy pres* recipients and, in each case, worked with the recommending class member to invite the potential

---

[9]    In the portion of the hearing cited here, Mr. Balabanian, one of Plaintiffs' attorneys, is misquoted as stating that Mr. Eggleton (counsel for Netflix) spoke with applicants for the *cy pres* distributions. Mr. Balabanian actually stated that it was Mr. Edelson, one of Plaintiffs' attorneys, who spoke with the applicants.

recipient to submit a proposal. (Wilens ER 32 ¶ 8.) Class counsel also considered and accommodated concerns expressed by various class members over certain political or religious organizations receiving *cy pres* distributions. (Wilens ER 32-33 ¶¶ 9-11.) Ultimately, class counsel received and reviewed over forty proposals, and, working with Netflix, selected the twenty organizations believed to be the most appropriate recipients of the *cy pres* distribution. (SER 36-37.)

On October 31, 2012, Plaintiffs filed their motion for final approval of the settlement (the "Final Approval Motion"), which included a list of the twenty proposed *cy pres* recipients and their intended uses of the *cy pres* distribution. (SER 219-22.) Additionally, class counsel filed a notice of proposed *cy pres* recipients with the district court and posted the list to a website established pursuant to the settlement. (Wilens ER 33 ¶ 13.) Objections to the proposed settlement were due two weeks later, on November 14, 2012. (Wilens ER 152 at Dkt. 191.) During that period, class counsel provided information regarding the *cy pres* selection process to anyone who requested it, returning phone calls and e-mails within 24 hours. (Wilens 33 ¶ 14.)

In addition to setting out the proposed *cy pres* distributions, the Final Approval Motion also contained a detailed explanation of how class counsel valued the claims against Netflix. Specifically, based on (1) the merits of the Retention and Disclosure Claims, (2) the likelihood of success on those claims (including the likelihood of adversarial class certification), and (3) the range of likely recoveries on those claims, class counsel calculated the net present value of the case to be approximately $6.4 million plus attorneys' fees and costs. (SER 209-17.)

On December 5, 2012, the district court held the final fairness hearing. (SER 1-121.) At the nearly three-hour long hearing (which none of the Objectors attended), the district court thoroughly inquired into the nature and origins of the case, the merit of the claims and the bases for class counsel's and Netflix's assessments of the merits, the mediation and negotiation process, the structure of the settlement, the *cy pres* relief and the feasibility of other settlement structures, and the objections raised. Indeed, Judge Davila stated that he had read every letter or objection received from individual class members, and further, allowed all class members in attendance to speak their piece. (SER 6-7, 106.)

At the hearing, class counsel and Netflix explained their valuations of the case (and bases thereof), as well as the concrete benefits the *cy pres* relief will provide the class, including investigation of companies' privacy practices and violations, enhancing consumer awareness, and lobbying state and federal governments to focus on such issues. (SER 35-43). Class counsel and Netflix also explained that while the objections largely were made in good faith and provided productive bases for analyzing the settlement and considering matters of public policy, none of the objections provided a legal basis for denying final approval. (*See*, *e.g.*, SER 19-20, 27-31, 74-79, 95-103, 113-116.)

On March 18, 2013, the district court agreed, granting final approval to the settlement, finding it "fair, adequate, and reasonable," and that it "satisfies Federal Rule of Civil Procedure 23(e) and the fairness and adequacy factors of this Circuit." (Order at 23.) In its 23-page opinion granting approval, the district court first found "that the settlement negotiations were conducted free of collusion, see Preliminary Approval Order at 4, and [that] the Objectors do not raise a viable challenge to this notion," (Order at 7), before thoroughly analyzing the settlement pursuant

to the factors outlined by this Court in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

First, the district court approved of class counsel's valuation of the class's claims, finding that they had an expected value of just under $6.4 million and that as a result of this valuation, the strength of Plaintiffs' case "weigh[ed] strongly in favor of approval." (Order at 9.) The district court also found that the substantial risks of further litigation—as illustrated by the lack of success faced by similar VPPA claims throughout the country—and the risks of maintaining class status weighed in favor of approval. (*Id.* at 9-10.)

Next, the district court analyzed the amount offered by the settlement and the method of distribution, finding that: (1) the amount recovered was plainly more than adequate as it "exceed[ed] Class Counsel's total valuation of the case in the absence of settlement, even after accounting for the requested fee awards," (*id.* at 10); (2) *cy pres* was a valid distribution method given that the settlement fund would likely be depleted by notice and distribution costs if a direct payment to class members were required, (*id.* at 12); and (3) the chosen *cy pres* recipients warranted approval because they "include[d] leading consumer and privacy advocacy groups and

13

academic institutions . . . located throughout the country so as to best benefit the far-reaching Class through outreach and education programs, litigation and public advocacy, development of privacy-protecting tools, and other methods" (*id.*).

Next, the district court examined the extent of discovery completed, finding that it weighed in favor of approval because "[w]hile formal discovery had not been completed, Class Counsel ha[d] established that they had sufficient information to make an informed decision about the valuation of the case, potential obstacles and pitfalls, and likelihood of success so [as to] effectively engage in settlement negotiations." (*Id.* at 13.)

The district court next found that the experience of counsel factor favored approval while governmental participation was a non-issue, *see id.*, before turning to its analysis of the class's reaction. Recognizing that although 110 individuals objected, such a number was dwarfed by the 62 million person class size, and the court concluded that the "relatively low numbers of objectors compared to the class size weigh[ed] in favor of settlement." (*Id.* at 15.)

The district court likewise approved of the notice plan and the requested attorneys' fees and incentive awards before considering, and

ultimately rejecting, each of the objections lodged. (*Id.* at 19-23.) The district court rejected all challenges to the use of a *cy pres* distribution generally as being foreclosed by this Court's opinions in *Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012), *reh'g en banc denied* 709 F.3d 791 (2013); and *Nachshin v. AOL, LLC*, 663 F.3d 1104 (9th Cir. 2011). In fact, the district court found that both the *cy pres* selection process and the result achieved went well beyond this Court's standards, noting that class counsel "set up an application system which included fielding input and suggestions from Class Members as to which organizations should be named as *cy pres* recipients"(Order at 21), and that the organizations selected were "leading consumer and privacy advocacy groups and academic institutions" (*id.* at 12).

In response to some objectors' contentions that in-kind relief would be preferable to *cy pres* relief, the district court found that the objectors had failed to establish that any of the proposed in-kind relief would be feasible. (*Id.* at 21.) Further, the district court found that such objections were merely suggestions of a "different or arguably better settlement" and that under this Court's decision in *Hanlon*, such suggestions cannot defeat approval. (*Id.* at 21-22.)

15

The district court found the same flaw with the challenges to the size of the settlement fund, and the objections to the attorneys' fees and injunctive relief. (*Id.* at 22-23.) Finally, the district court rejected all challenges to the settlement's injunctive relief, finding that it "seeks to prevent Netflix from engaging in precisely the activity which underlies this class action," and that "if it reversed the decoupling, Netflix would be violating the Court-approved Settlement Agreement." (*Id.* at 22-23.)

As a result, the district court concluded that "the Settlement Agreement including the Award of Attorneys' Fees, Expenses, and Incentive Award, is fair, adequate and reasonable; that it satisfies Federal Rule of Civil Procedure 23(e) and the fairness and adequacy factors of this Circuit; and that it should be approved and implemented as set out in [the district court's] Final Order and Judgment." (*Id.* at 23.)

## SUMMARY OF THE ARGUMENT

Under Federal Rule of Civil Procedure 23(e)(2), a court may approve a class settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Here, Judge Davila made such a finding, and indeed, the settlement is more than fair, reasonable, and adequate.

Obtaining relief in excess of what could reasonably be expected from trial, the settlement provides for substantial changes to Netflix's privacy practices and the creation of a $9 million settlement fund. The injunctive relief provides protection to class members, and the monetary relief acts as both a punishment for Netflix's past violations of class members' privacy rights and a deterrent to future violations by Netflix and other industry actors. And while the fund is not distributable to individual class members due to the sheer size of the class, the *cy pres* distribution to twenty leading non-profit organizations dedicated to promoting online privacy further benefits the interests of the class.

Judge Davila's finding that the settlement is fair, reasonable, and adequate is entitled to great deference, and Objectors have the burden of establishing that his approval of the settlement should be reversed. They fail to carry this burden, however, levying a scattershot of critiques at the various components of the settlement, attacking class cohesion and composition, Plaintiffs' adequacy as representatives, the *cy pres* and injunctive relief obtained, and the approval process. Each of these attacks is meritless.

17

First, the class has cohesive claims and interests, and Plaintiffs have at all times been adequate representatives. Second, the *cy pres* and injunctive relief were not only appropriate, but also the most beneficial ways of providing relief to the class, especially in light of the infeasibility of distributing the monetary recovery directly to class members. Third and finally, class counsel sufficiently explained and justified the settlement to the district court, and class members had sufficient opportunity to investigate the proposed settlement. Simply put, the district court properly approved the settlement, and none of the Objectors' arguments to the contrary call the district court's approval into question.

## STANDARD OF REVIEW

Appellate "review of [a] district court's decision to approve a class action settlement is extremely limited," *Hanlon*, 150 F.3d at 1026 (9th Cir. 1998), and approval will be set aside "only upon a strong showing that the district court's decision was a clear abuse of discretion." *Lane*, 696 F.3d at 818 (internal quotations omitted). In assessing the district court's decision, "it is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon*, 150 F.3d at 1026

(citing *Officers for Civil Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982)).

## **ARGUMENT**

In the face of a settlement providing for meaningful and substantial privacy practice changes, significant *cy pres* distributions that will have appreciable real-world effects on consumer privacy, and a substantial deterrent effect that will protect consumers' privacy rights more generally, the Objectors raise a series of confused challenges to the district court's lengthy and well-reasoned approval order. Not a single challenge, however, rises to the level necessary to overcome the broad deference given to the district court's determination that the settlement warranted final approval.

Under Federal Rule of Civil Procedure 23(e)(2), a court may approve a class settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Here, the district court held a three-hour hearing—at which none of the Objectors chose to appear—and subsequently issued a detailed opinion outlining how it ultimately determined that the settlement was indeed fair, reasonable, and adequate. (SER 1-121; Order.) Specifically, the district court evaluated the settlement

19

in light of this Court's eight factors for evaluating class settlements. (Order at 6-7 (citing *Hanlon*, 150 F.3d at 1026)). Ultimately, the district court found that seven of the eight *Hanlon* factors—the strength of plaintiffs' case, the risk of continuing litigation, the risk of maintaining class action status, the amount offered in settlement, the extent of discovery, the experience and views of counsel, and the reaction of class members—weighed in favor of approval. (*Id.* at 7-14.) The eighth *Hanlon* factor—presence of a government participant—was not an issue. (*Id.* at 14.)

The district court's approval of the settlement is well founded, given the substantial relief obtained for the class and the process through which it was obtained. In a case that experienced class counsel valued at approximately $6.4 million plus fees, the settlement establishes a $9 million fund and provides for significant injunctive relief directly protecting the class members' video privacy rights. And while the fund is ultimately not distributable directly to individual class members given the sheer size of the class, class counsel worked extremely hard to ensure that the funds would go to *cy pres* recipients that would provide the greatest benefit to the class with respect to the privacy concerns at issue in this litigation.

The district court's finding that the settlement was fair, reasonable, and adequate under Rule 23(e) is entitled to great deference, and Objectors have the burden of establishing that the settlement approval should be reversed. *Lane*, 696 F.3d at 818 (class settlement approval can be overturned only upon a "strong showing" of abuse of discretion); *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) ("In this circuit, we have usually imposed the burden on the party objecting to a class settlement."). As discussed below, the Objectors fail to make the requisite strong showing.

Objectors' criticisms of the settlement fall into three categories: (1) objections to the class composition and the named plaintiffs' ability to represent the entire class, (2) objections to the *cy pres* and injunctive relief obtained, and (3) objections to the approval process. None of these criticisms suggest, however (much less present the required "strong showing," *Lane*, 696 F.3d at 818) that the district court abused its discretion in approving the settlement.

## I.    The District Court did not Abuse its Discretion by Approving a Settlement Certifying a Class of 62 Million Consumers with Similar Claims, Similar Defenses, and Similar Interests.

Several Objectors challenge the class composition and the adequacy of representation. Specifically, they argue that: (1) the settlement class was

improperly "inflated" (Tanner Br. at 6-11); (2) plaintiffs were inadequate

class representatives because they were former, not current, Netflix

subscribers (Ramsey Br. at 9-12; Schulz Br. at 14); and (3) incentive

payments made to the named plaintiffs were improper, (Tanner Br. at 15-

18; Ramsey Br. at 12-14; Klinge Br. at 10-11). Each objection fails.[10]  The

class has cohesive interests and claims, it was never "inflated," and

---

[10]     One Objector also argues that the named plaintiffs were inadequate
class representatives because "in filing a class action that had no prospect
of a monetary recovery . . . [named plaintiffs] proved themselves to be
merely vehicles for class counsel's recovery of generous fees . . . ." (Ramsey
Br. at 11-12) (citing *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748 (7th Cir.
2011)). First, Objectors' point has already been implicitly rejected by this
Court, which has approved the use of *cy pres* distributions in similar, non-
distributable statutory damages cases. *See Lane*, 696 F.3d 811; *cf. Nachshin*,
663 F.3d 1034. Second, accepting Objectors' argument would render many
federal statutes—which presumptively make class relief available, *see
Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 717-18 (9th Cir. 2010), and
allow for recovery of statutory damages—effectively unenforceable. *See*,
*e.g.*, Wiretap Act, 18 U.S.C. § 2510 (damages of at least $1,000 per day or
$10,000 total); Driver's Privacy Protection Act, 18 U.S.C. § 2721 ($2,500 per
person); Cable Act, 47 U.S.C. § 551 ($1,000 per person). Third, Objectors'
citation to *Aqua Dots* exposes the weakness of their argument that Plaintiffs
were "merely vehicles" to obtain attorneys' fees. In *Aqua Dots*, the Seventh
Circuit refused to certify a class because plaintiffs sought relief that was
already being provided by defendant manufacturer, namely refunds. 654
F.3d at 752. Here, in contrast, named plaintiffs sought—and obtained—
injunctive and monetary concessions from Netflix that were not
forthcoming absent this litigation and settlement.

Plaintiffs more than adequately represented the absent class members, who were everyone with VPPA claims against Netflix.

### A. The Settlement Class was not Inflated, Artificially or Otherwise, and the Objectors' Arguments to the Contrary Misunderstand the Pleadings and the Facts.

Objector Tanner argues that the class size was improperly inflated, effectively diluting each member's individual recovery to a *de minimis* amount. Specifically, Tanner asserts that because the original complaint asserted only the Retention Claims, Plaintiffs' amendment to add the Disclosure Claims improperly expanded the class by 30 million members. (Tanner Br. at 6.) Tanner's challenge fails, however, because, it misunderstands the pleadings and the facts—specifically the effect that removing current or former subscribers from the class would actually have when it came to each class member's individual recovery.[11]

As an initial matter, an attempt at clarifying Tanner's somewhat confused argument is necessary. Contrary to Tanner's assertion, amending the complaint to add the Disclosure Claims did not change the class size;

---

[11] Tanner also asserts that the expansion of the settlement class was evidence of collusion between Netflix and class counsel. Tanner cites to no actual evidence of collusion, and his accusations find no support in the record. Indeed, Judge Davila twice specifically found the settlement here free from collusion. (SER 260 (Preliminary Approval Order); Order at 7.)

both the original and amended complaints included the same proposed

class definition: "All individuals and entities in the United States and its

territories that have cancelled their subscriptions to Netflix's services."

(*Tanner* ER 125 ¶ 36; *Wilens* ER 132 ¶ 45.) What *did* increase the size of the

class—and thus what Tanner may actually be complaining about—was the

inclusion of current subscribers in the settlement that was ultimately

approved by the district court. (*See* Wilens ER 100.) Thus, to the extent

Tanner's class size argument relies on the distinction between the

Retention Claims and the Disclosure Claims, the argument is nonsensical

and without merit.

    In any event, assuming that Tanner is actually complaining that

including current subscribers in the settlement class improperly diluted

each former subscribers' recovery to a *de minimis* amount, that argument is

likewise meritless.[12]

    The total settlement class size is approximately 62 million

individuals. (Order at 15.) Even assuming, as Tanner does, that current

Netflix subscribers number 30 million, that still leaves 32 million former

---

[12]    Presumably Tanner is only a former, not a current, Netflix subscriber, though neither his brief nor the record so indicates.

24

subscribers. And even if Netflix had been willing to settle just the 32 million former subscribers' claims for the same $9 million for which it settled the 62 million current *and* former subscribers' claims (an assumption that finds no support in the record or common sense), each former subscriber would still be entitled to only a *de minimis* twenty-eight cents (which would be exceeded by the cost of distributing that amount). Simply put, Tanner's argument that former subscribers' claims were improperly diluted fails because, given the number of former subscribers alone, a *de minimis* individual recovery per class member was inevitable.[13]

### B.    The Named Plaintiffs Had the Same Interests as the Absent Class Members and More than Adequately Represented Each Class Member.

Next, Objectors assert that a conflict of interest existed between current subscribers and former subscribers, and that Plaintiffs were inadequate class representatives because they were both former subscribers. (Ramsey Br. at 9-12; Schulz Br. at 14.) These challenges fail for two reasons. First, there is no conflict of interest between current and former subscribers. Second, given their similar claims and similar interests,

---

[13]    An expert asked to determine the actual damages incurred by class members calculated that class members suffered damages of approximately $0.15 per person. (SER 188 ¶ 6.)

Plaintiffs more than adequately represented absent class members,

including both current and former Netflix subscribers.

### 1. There is no conflict of interest between current and former Netflix subscribers.

While certification of a settlement class is certainly inappropriate

where class members have genuinely conflicting interests, not all

differences among class members create conflicts. *See, e.g.,* Samuel

Issacharoff & Richard A. Nagreda, *Class Settlements Under Attack*, 156 U. Pa.

L. Rev. 1649, 1683 (2008) ("No class action can account for all conceivable

differences among its members. Simply for the immediate purpose of

settlement negotiation, subclassing along every imaginable fissure within

the class would dissipate the very bargaining power that aggregate

procedure seeks to create."). Instead, under Supreme Court precedent,

genuine conflicts only exist where the differences "give rise to a significant

potential for negotiation on behalf of an undifferentiated class to skew in

some predictable way the design of the class-settlement terms in favor of

one or another subgroup for reasons unrelated to evaluation of the relevant

claims." *Id.* at 1684 (discussing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591

(1997) and *Ortiz v. Fiberboard Corp.*, 527 U.S. 815 (1999)).

Typically, such conflicts exist where two (or more) groups of individuals fall within a single class or subclass, and the enrichment of one group will come at the other's expense. For instance, in *Amchem* and *Ortiz*, the Supreme Court held that no named plaintiff could adequately represent a class of people exposed to asbestos because the class included both those actually suffering from asbestos-related diseases and those who were not yet suffering from—but may in the future manifest—an asbestos-related condition. *Amchem*, 521 U.S. at 626-28; *Ortiz*, 527 U.S. 855-59.

In those cases, the Court found an irreconcilable conflict between currently injured plaintiffs and future victims such that the settlement could skew in one group's favor depending on in which group the named plaintiffs fell. Specifically, exposed-but-not-yet-injured plaintiffs would want protection against inflation for distant recoveries, as well as claim provisions that kept pace with changing medicine and science. *Amchem*, 521 U.S. at 610-11. In contrast, currently injured plaintiffs would care little about such provisions and would rationally trade them for higher current payouts. *Id*. These goals "tug[ged]" at one another, making a settlement class containing both groups impossible. *Amchem*, 521 U.S. at 626, *Ortiz*, 527 U.S. 856.

No such conflict exists here. A better deal for current subscribers would not come at the expense of former subscribers, nor would a better deal for former subscribers come at current subscribers' expense. Both current and former subscriber class members have an interest in not having their Netflix viewing histories disclosed to third-parties without authorization. *See* 18 U.S.C. § 2710(b). Likewise, both current and former subscriber class members have an interest in the prompt deletion, decoupling, or anonymization of their viewing histories. *See* 18 U.S.C § 2710(e). Further, all class members have an interest in achieving the highest possible valuation of *both* Disclosure and Retention claims, as well as the inclusion of both current and former subscribers in the class. Finally, the class members have no conflict regarding the allocation of the funds, which are being distributed to *cy pres* organizations.

If the Disclosure Claims had been more valuable, the settlement fund and *cy pres* distribution would have been larger, to the benefit of all class members. The same goes for the Retention Claims; if they were more valuable, all would benefit. And the same even goes for inclusion of everyone in the class. By negotiating for a full, rather than piecemeal, release, Plaintiffs were able to obtain a larger settlement fund—and thus a

28

greater *cy pres* benefit to all class members—than if the settlement had included only current *or* former subscribers. *See Lane*, 696 F.3d at 824 (noting that settlement where some class members had potential, and valuable, VPPA claims and others did not, "does not cast doubt on the district court's conclusion as to the fairness and adequacy of the settlement amount as to the class *as a whole*") (emphasis added).

Accordingly, the Objectors' argument that Plaintiffs were inadequate class representatives because of a conflict between current and former subscriber class members fails in the first instance—there is no conflict within the class.

### 2. Plaintiffs more than adequately represented all absent class members, including current subscribers.

Objectors contend that as former subscribers, Plaintiffs are inadequate representatives for two reasons. First, unlike current subscribers, former subscribers supposedly have no interest in the benefits of Netflix's recommendation algorithm, which uses viewing histories to suggest movies to current subscribers. (Ramsey Br. at 9.) Second, Objectors argue that, as former subscribers, Plaintiffs had no interest in alternative forms of relief that potentially could have been negotiated such as free or

discounted video rentals to current subscribers. (Ramsey Br. at 9-10.) Neither argument holds water.

As to the first argument, even if it were true that only current subscribers have an interest in the integrity of Netflix's recommendation algorithm,[14] the settlement in no way interferes with Netflix's ability to use customer viewing histories in connection with the recommendation algorithm. Specifically, the settlement allows Netflix to continue to retain viewership information so long as it "decouples" that history from a customer's personal information within a year of that customer leaving Netflix. (Wilens ER 101-02 § 2.1.) There is no reason to believe that decoupling former customers' identifying information from their viewing history in any way affects the utility of Netflix's recommendation algorithm for current users.

The second attack—that current subscribers may have had an interest in obtaining different forms of relief than former class members—fails,

_____

[14]    Such an assertion is questionable given that current subscribers, content with their own selections, may be uninterested in the recommendation algorithm, and former subscribers may be interested in the recommendation algorithm to the extent they might someday re-subscribe to Netflix.

inasmuch as it fails to put forth any concrete and feasible form of relief that would only be available to one group of class members but not to others.

For example, Objectors contend that perhaps current subscribers, supposedly unlike former subscribers, may have preferred a free movie rental instead of a *cy pres* distribution. (Ramsey Br. at 10.) This assertion—like all others postulated by the Objectors—however, ignores the facts, and shouts "conflict" where none exists. That is, Netflix charges not per rental, but rather a monthly subscription fee for unlimited rentals. (SER 103-04 (counsel for Netflix explaining infeasibility of free rental suggestion).) Thus, a "free rental" makes no sense given Netflix's subscription model. Further still, even if a free rental were feasible, there's no reason to believe that such relief would be limited to current subscribers. To the extent Netflix would "credit" class members with free rentals, such a credit could be available to current and former subscribers alike.

For similar reasons, Objectors' assumption that current subscribers, but not former subscribers, may have preferred subscription discounts over *cy pres* distributions misses the point. First off, there is no factual support (in the record or elsewhere) for the proposition that a 28-cent discount (before accounting for administrative costs and attorneys' fees) could be

applied to class members' accounts without exhausting the fund.[15] (*See*

Order at 21 ("These Objections have many flaws[,] which include failing to

demonstrate the economic feasibility of such a form of relief or failing to

take into account class members who are no longer Netflix customers.").)

Second, and more importantly, any such discount—like any other

form of coupon relief—would be contingent on a given class member

remaining a Netflix subscriber for at least another month. *See Synfuel Techs,*

*Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006). Given this

reality, current and former subscribers alike are in the same position with

regard to a subscription discount: as far as the theoretically available in-

kind relief is concerned, all class members are potential future subscribers,

and therefore potential future claimants. As such, Objectors are simply

wrong that in-kind relief was available to current subscribers but not

former subscribers,[16] and Objectors are also incorrect in asserting that only

---

[15]    The Objectors may contend that any costs associated with applying a
discount would be borne by Netflix, rather than by the settlement fund.
Such a contention is fundamentally flawed, however, because Netflix
would surely incorporate such a cost into its negotiations, thereby
diminishing the ultimate fund size by the cost of applying the discount. *See*
*Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003) ("[A] defendant is
interested only in disposing of the total claim asserted against it.").

[16]    To the extent that Objectors contend that any subscription discount

current subscribers would be interested in such relief, as former subscribers can and often do re-subscribe to Netflix.

Thus, as explained above, there is no conflict between current and former Netflix subscribers, and Plaintiffs more than adequately represented all class members.

### C. The Incentive Payments Approved Were Proper Compensation for the Class Representatives' and Named Plaintiffs' Sacrifices of Their Time, Reputation, and Privacy.

The Objectors also challenge the incentive awards received by the class representatives and named plaintiffs. (Tanner Br. at 15-18; Ramsey Br. at 12-14; Klinge Br. at 10-11.) Here, the district court approved a total incentive award of $30,000 to be divided among the lead plaintiffs in the six consolidated actions (in individual amounts of either $3,000 or $6,000). (Order at 19.) Objectors contend that such payments were excessive, uncalled-for, and improper. These arguments ignore the fact that the incentive awards in this case are wholly justified, and that similar (and larger) incentive awards have been repeatedly upheld by this Court.

---

could be applied retroactively, rather than prospectively, such relief also would presumably be available to current and former subscribers alike.

Incentive awards are "fairly typical" in class actions. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009).

> Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit . . . In deciding whether such an award is warranted, relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.

*Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998); *see also Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (quoting *Cook*, 142 F.3d at 1016).

As the district court recognized, "[t]he Class Representatives and named Plaintiffs in this case assumed the responsibilities and burdens of acting as representatives in this lawsuit, including expending time participating in the litigation of the case with Class Counsel as well as facing public scrutiny of this high profile suit." (Order at 19.) Indeed, a simple Google search of "Jeff Milans" demonstrates the substantial reputational risks undertaken by the class representatives. In the face of such risks, and the substantial monetary and equitable relief obtained for the class, incentive awards are justified. Indeed, this Court has approved

34

similar and larger awards in cases involving less reputational risk and smaller results for the class. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 457, 463 (9th Cir. 2000) (approving $5,000 incentive awards to each of two class representatives in a $1.725 million settlement); *see also Shaffer v. Cont'l Cas. Co.*, 362 F. App'x 627, 631 (9th Cir. 2010) (affirming incentive awards ranging from $10,000 to $30,000 in non-cash settlement.); *Palmer v. Nigaglioni*, 508 F. App'x 658, 658-59 (9th Cir. 2013) (approving $17,500 incentive award in a $5.5 million settlement).

Objectors criticize the incentive awards, citing three prior decisions of this Court: *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009), and *Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157 (9th Cir. 2013). Each case is materially distinguishable, and none renders the awards improper.[17]

---

[17]    Objectors Ramsey & Griffis also rely on a Sixth Circuit opinion, *In re Dry Max Pampers Litig.*, No. 11-4156, 2013 WL 3957060 (6th Cir. Aug. 2, 2013), in support of their assertion that the incentive payments in this case were somehow improper. (Ramsey Br. at 12-13.) Citation to *Pampers* is not helpful to determining whether any particular incentive payments are appropriate or not, however, because, unlike this Court, the Sixth Circuit has never decided one way or the other whether incentive awards are even permissible as a general matter. *See Pampers*, 2013 WL 3957060 at * 8 ("Our court has never approved the practice of incentive payments to class representatives, though in fairness we have not disapproved the practice

In *Staton*, this Court reversed approval of a settlement calling for twenty-nine named plaintiffs to receive payments totaling $890,000, each up to $50,000 and at an average of more than $30,000. 327 F.3d at 977. In rejecting such awards, this Court noted that they were "orders of magnitude" greater than awards approved in other cases. *Id*. at 976-77 (citing *Mego* and other cases approving four- and low five-figure incentive awards). *Staton* expressly acknowledged that "named plaintiffs . . . are eligible for reasonable incentive payments"; it simply found that the payments there were unreasonable. *Id*. 977. Here, in contrast, the $30,000 total incentive award—split among the lead plaintiffs from each of the six consolidated actions—falls well within the range of awards affirmed in the cases cited approvingly in *Staton*.[18]

---

either.").

[18]    The settlement in *Staton* was also found to be problematic because, in addition to the named plaintiffs, individual awards were made to "a large group of non-named plaintiff class members." 327 F.3d at 977. Specifically, the settlement called for a group of over 200 "individually identified recipients" (including both named plaintiffs and other class members) to receive incentive awards totalling more than $3.7 million. *Id*. at 948. Here, no such complication exists, as only the six named plaintiffs in the consolidated suits were to receive part of the $30,000 incentive payment.

*Rodriguez* and *Radcliffe* are also distinguishable. In those cases, this Court drew a distinction between incentive *awards* and incentive *agreements*. While incentive *awards*—generally sought after a settlement or verdict to compensate named plaintiffs for work done on behalf of the class and for financial or reputational risk undertaken in bringing the action—are appropriate, incentive *agreements*—*ex ante* promises conditioning payments to a named plaintiff on certain outcomes—are not. *See Rodriguez*, 563 F.3d at 958-60; *Radcliffe*, 715 F.3d at 1165-67.

Thus, for example, in *Rodriguez*, this Court rejected an incentive agreement entered into between named plaintiffs and their counsel tying incentive payments to a sliding scale based on the amount recovered. 563 F.3d at 958-59 ("Incentive *awards* are fairly typical in class action cases . . . The incentive *agreements* entered into as part of the initial retention of counsel in this case, however, are quite different.") (emphasis in original). Likewise, in *Radcliffe*, this Court rejected incentive awards where they had been expressly conditioned on named plaintiffs' support of the settlement. 715 F.3d at 1165-66 ("Although incentive awards may be common, explicitly conditioning incentive awards to named representatives on their support for the settlement is not at all typical.") (internal citations omitted).

37

Here, in contrast to *Rodriguez* and *Radcliffe*, the Court is dealing with "run-of-the-mill incentive awards." *Id.* at 1166. There were no *ex ante* agreements or representations between named plaintiffs and counsel regarding incentive awards, (Wilens ER 85 ¶ 74), and, as the district court noted, the incentive payments were awarded to compensate named plaintiffs for "assum[ing] the responsibilities and burdens of acting as representatives in this lawsuit, including expending time participating in the litigation of the case with Class Counsel as well as facing public scrutiny through media coverage of this high profile suit." (Order at 19.)[19] In short, contrary to Objectors' assertions, the incentive awards to the named plaintiffs here were both proper and justified.

## II.  The Settlement's *Cy Pres* and Injunctive Relief Exceed the Standards Established by this Court.

The Objectors' second general critique of the settlement is of the relief it obtained. Specifically, Objectors argue that *cy pres* relief was inappropriate (Tanner Br. at 18-19; Schulz Br. at 9, 13); that there is no substantial nexus between plaintiffs' claims and the *cy pres* relief (Tanner Br. at 14-15; Schulz Br. at 12-13); and that the injunctive relief is deficient

---

[19]    Nor were incentive awards discussed with Netflix until after all relief for the class was established and settled. (Wilens ER 70-71 ¶ 22.)

(Tanner Br. at 11-14).[20] As with their other challenges, the Objectors' attacks

on the relief fail. The settlement goes above and beyond this Court's

standards for when and how to apply *cy pres* remedies, and the injunctive

relief remedies the very conduct that started the litigation in the first place.

Thus, the objections relating to the *cy pres* and injunctive relief are meritless

and do not establish that the district court abused its discretion in

approving the settlement.

### A.    *Cy Pres* Relief Was Not Only Appropriate, It Was the Only Method of Giving the Class Monetary Relief.

Some of the Objectors argue that the *cy pres* distributions were an

inappropriate form of relief. First, they contend that *cy pres* relief is

generally improper. Second, they contend that there was no need for a

---

[20]    Objector Klinge also asserts that the attorneys' fee award was excessive. (Klinge Br. at 11-17.) The portion of Klinge's brief on this issue, however, simply contains a rambling recitation of different points of law of varying relevance. To the extent it does present argument, it appears to contend that in *cy pres* settlements, attorneys' fees should be reduced, if awarded at all. (Klinge Br. at 13.) This Court, however, has never indicated that the 25% "benchmark" does not apply in *cy pres* settlements, *see Lane*, 696 F.3d at 824-25, and Klinge's brief does not contradict the record demonstrating the appropriateness of the fee award. (*See* SER 240-54.) As the district court explained, the attorneys' fee here was consistent with the 25% "benchmark" established by this Court and reasonable when compared to the lodestar. (Order at 17-18.)

purely *cy pres* distribution in this case. Each argument disregards this Court's prior and controlling decisions.

To the extent these objections are simply criticisms of *cy pres* relief generally, *see, e.g.,* (Tanner Br. at 18) ("Purely *cy pres* settlements eschewing any benefit to class members have been in disrepute at least since [1994] and have continued to draw heavy criticism from courts."); (Schulz Br. at 13 ("*Cy pres* distributions are disfavored in comparison to settlements that distribute benefits directly to members of the settlement class.")), such objections are squarely foreclosed by this Court's prior decisions approving of such relief. *See, e.g., Nachshin*, 663 F.3d 1104; *Lane*, 696 F.3d at 819.[21]

To the extent that the objections are not to *cy pres* relief generally, but to the use of *cy pres* relief *here*, they also fail. *Cy pres* is appropriate where the settlement fund is "non-distributable." *Lane*, 696 F.3d at 819. That was exactly the case here. Given that a $9 million fund divided among 62 million class members results in a *de minimis* (under $0.15) recovery to each class member, direct cash payments are simply infeasible. *Cf. id.* at 821

---

[21]    Objector Schultz cites this Court's opinion in *Rodriguez* for the proposition that *cy pres* relief is disfavored, yet in that case, this Court expressly "decline[d] to consider the propriety of *cy pres* at [that] time." *Rodriguez*, 563 F.3d at 966.

(undisputed that distribution of *de minimis* amounts to class was infeasible).[22]

Further, given that the cost of distributing payments to the class would have been at least $23 million (SER 123 ¶ 6), even if the settlement fund had *tripled* in size, payments would still be *de minimis* and *cy pres* relief would be appropriate. *See Lane*, 696 F.3d at 819 (noting that a settlement fund is "non-distributable" where distribution of the fund would be costly). Objectors offer no evidence or argument to establish that the settlement fund here was anything other than non-distributable.

Given that any distribution to class members here would be at best, *de minimis*, and if distribution costs are considered would likely be zero, the *cy pres* distribution approved by the district court was proper.

**B.    The Nexus Between the *Cy Pres* Recipients and the Class's Claims Exceeds this Court's Standards, and the Process for Choosing the Recipients was Beyond Reproach.**

Without challenging any specific *cy pres* recipient, Objectors next argue that no substantial nexus exists between the class's claims and the *cy*

---

[22]    None of the Objectors argue on appeal that $9 million was not a reasonable amount for the monetary component of the settlement, nor should they, given that this Court has recognized that similar *cy pres* recoveries are "substantial under most circumstances." *Lane*, 696 F.3d at 824.

*pres* awards. (Tanner Br. at 14-15; Schulz Br. at 12-13.)[23] To accept Objectors'

challenge, however, would not only reject controlling authority in this

Circuit, it would also effectively eliminate the availability of *cy pres*

remedies entirely, as it would impose a standard on *cy pres* distributions

that could never realistically be met.

As this Court has explained, any *cy pres* distribution must bear a

"substantial nexus" to the class's interests, meaning that it must "account

for the nature of the plaintiffs' lawsuit, the objectives of the underlying

statutes, and the interests of the silent class members, including their

---

[23]    Perplexingly, Tanner also attacks the *cy pres* selection process on the
ground that *cy pres* "applicants were required to hastily join well before the
period to object to the settlement had lapsed (clearly inviting objectors to
apply for grants rather than object)." (Tanner Br. at 4.) Tanner neglects to
mention that organizations passed over for funds had two weeks to object
to the settlement (either on its merit, for failure to provide them with funds,
or both), and yet none of the rejected applicants did so. Likewise, Tanner's
contention that the process was designed to "invit[e] objectors to apply for
grants rather than object" puts the cart before the horse, inasmuch as the
organizations applied rather than objected, and therefore are not
"objectors," and also ignores the class members' involvement in the
selection process and the fact that the organizations chosen "provide an
array of advocacy, protection, and education services in the field of online
privacy." (Order at 21.) Finally, Tanner ignores that class counsel's efforts
to work with the nation's leading privacy organizations ensured that the
best proposals possible were presented, and that the *cy pres* distribution
would provide the greatest benefit to the class. (SER 208, 219-22.)

geographic diversity." *Nachshin*, 663 F.3d at 1036. If the *cy pres* distribution here does not pass muster, it is difficult to imagine any that would.

The VPPA "follow[ed] a long line of statutes passed by Congress to extend privacy protection to records that contain information about individuals. In each instance, Congress has expanded and given meaning to the right of privacy." S. Rep. No. 100-599, at *2. Its stated purpose was "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Id.* at *1. The Act, in essence, reflected the "gut feeling that people ought to be able to . . . watch films without the whole world knowing." *Id.* at *7. Plaintiffs' suit, then, advanced these same goals, by seeking to curtail "the development and maintenance of digital dossiers on consumers by online companies," (Wilens ER 131 ¶ 37), and seeking to protect the video privacy rights conferred upon them and the class by Congress.

With that in mind, the *cy pres* distribution here plainly goes well beyond merely being adequate, as shown by the fact that on appeal, none of the Objectors challenge the propriety of selecting any of the *cy pres* recipients. The settlement will distribute "funds to various institutions and organizations for the purposes of furthering privacy research, protections,

43

and education efforts." (Order at 10.) These organizations "include[]
leading consumer and privacy advocacy groups and academic institutions
. . . located throughout the country so as to best benefit the far-reaching
Class through outreach and education programs, litigation and public
advocacy, development of privacy-protecting tools, and other methods."
(*Id.* at 12.)

The real-world effects of the *cy pres* distribution will be substantial.
For example, the Privacy Project at UC Hastings "intends to use the
distribution . . . to head off problems before they arise by (1) providing
implementable tools and education for companies to implement best
privacy practices, and (2) working with the Internet community to
continually develop and refine best privacy practices." (SER 221.) The
Center for Democracy and Technology, among other uses, "intends to use
its distribution to continue to file privacy complaints with the FTC," which
will help protect class members from further privacy intrusions. (SER 219-
20.) The International Association of Privacy Professionals, which
"educates professionals —across all sectors of American enterprise—[who]
work on the front lines of privacy, actually touch personally identifiable
information, and are charged with its proper handling, management, and

44

safekeeping," will use its distribution to, among other things, expand "a pro bono privacy initiative that helps charitable organizations provide better privacy." (SER 220.)

These organizations, along with seventeen others, will undoubtedly use the funds to educate and enable businesses and consumers alike to better protect consumers' privacy, and to use the courts and the legislatures to expand consumers' privacy rights. As such, it is difficult to imagine a more relevant and substantial nexus between the *cy pres* distribution and the class's interests underlying the lawsuit.

Indeed, the exemplary nature of *this cy pres* distribution is highlighted by comparison to another *cy pres* settlement recently upheld by this Court. In *Lane v. Facebook*, a case that also involved alleged violations of consumers' digital privacy rights (including rights under the VPPA), this Court approved a *cy pres* distribution to an entirely new charity—run, in part, by Defendant's employees, *see* 696 F.3d at 821—to "fund and sponsor," unnamed and to-be-determined "programs designed to educate users, regulators[,] and enterprises regarding critical issues relating to protection of identity and personal information online through user control, and the protection of users from online threats." *Id.* at 817.

45

Over objections that the distribution plan was vague and that the new charity had no proven track record, this Court held that "[t]he *cy pres* remedy the settling parties have devised bears a direct and substantial nexus to the interests of absent class members and thus properly provides for the 'next best distribution' to the class." *Id*. at 821. Given that the *cy pres* distribution here provides for substantial contributions to existing organizations with proven track records of improving consumer privacy, and will be used for specific and known purposes to strengthen consumers' rights, reduce the likelihood of their invasion, and improve their ability to vindicate them, if the *Lane* distribution was adequate, this distribution is exemplary.

The Objectors cling to the dissent from the denial of rehearing *en banc* in *Lane* to argue that no substantial nexus exists between the *cy pres* award here and the underlying claims. (Tanner Br. at 14-15) (citing *Lane*, 709 F.3d 791). Even if that dissent were binding, however, what the Objectors fail to grasp is the fact that the *cy pres* recipients here do not suffer from the same infirmities identified by the *Lane* dissenters.

Specifically, the *Lane* dissenters criticized the *cy pres* recipient there as a "bespoke creation" of the settlement with no record of service, making it

impossible to determine whether the *cy pres* award would advance the objectives of the underlying statute. 709 F.3d at 793-94. Here, as described above, the parties identified for the court twenty existing organizations who will share the *cy pres* award and how they intend to use the funds. (Order at 12; SER 219-22.) Even a cursory review of the *cy pres* recipients and their intended uses of the funds makes clear that the money will be used to advance the class's interests and the objectives of the underlying litigation, through both direct engagement with companies that maintain private consumer data,[24] and advocacy for consumer online privacy rights more generally.[25]

---

[24] *See, e.g.*, SER 219 ("The CDT has contributed to the development and implementation of robust protections for consumer privacy through . . . improved business practices . . . ."); *id*. at 220 ("The IAPP educates professionals—across all sectors of American enterprise—that work on the front lines of privacy, [who] actually touch personally identifiable information, and are charged with its proper handling, management, and safekeeping."); *id*. at 221 ("The ILI is devoted to the study of law, policy, and technology . . . with a primary focus on information privacy. The ILI regularly hosts events involving faculty, policy makers, public interest advocates, *and industry representatives* . . . .") (emphasis added).

[25] *See, e.g.,* SER 219 ("The CDD uses research, public outreach, and policy work to make little-known but critically important consumer privacy concerns viable, debated, and addressed."); *id*. at 219 ("The CDT intends to use its distribution to continue to file privacy complaints with the FTC [and] articulate a broadly applicable privacy framework through appellate *amicus* briefs, public workshops, white papers, and draft

Similarly, Objector Schulz's citation to *Dennis v. Kellogg Co.*, 697 F.3d

858 (9th Cir. 2012), fails to impugn the settlement. (*See* Schulz Br. at 13.) In

*Dennis*, a food company accused of false advertising agreed, as part of a

class settlement, to donate $5.5 million worth of food to charities that feed

the indigent. In striking down this *cy pres* award, this Court noted that

while feeding the indigent was a noble goal, it had nothing to do with the

purposes of the underlying lawsuit or the class of plaintiffs. *See* 697 F.3d at

866. Here, in contrast, funding organizations dedicated to reforming

current business practices on consumer privacy and engaging in consumer

privacy advocacy more generally is completely in line with the purpose of

the underlying lawsuit and the interests of the class.[26]

---

legislation."); *id*. at 221 ("The Samuelson Law Clinic will use its distribution
to give its students and faculty the opportunity to strengthen consumers'
voice on privacy and consumer protection policy debates, which will also
have the indirect benefit of better training law students to proactively
address privacy issues from emerging technologies.").

[26]     Another point of contrast between this case and *Dennis* is that in
*Dennis*, this Court noted that the parties failed to specifically identify who
the *cy pres* recipients were to be, making it difficult to truly engage in the
substantial nexus inquiry. 697 F.3d at 867 ("The difficulty here is that, by
failing to identify the *cy pres* recipients, the parties have restricted our
ability to undertake the searching inquiry that our precedent requires.").
Here, in contrast, the actual *cy pres* recipients and how they intend to use
the funds were identified and presented to the district court well in
advance of the objection deadline and final fairness hearing.

In short, a substantial nexus between the *cy pres* award and the underlying litigation exists, and Objectors argument on this point lacks merit.

### C. The Settlement Offers Strong Injunctive Relief that Will Substantially Improve Netflix's Privacy Practices, and the Relief Would Have Been Unobtainable Absent Settlement.

Objector Tanner complains that the injunctive component of the settlement—requiring Netflix to decouple customers' personal information from their viewing history within a year of their leaving Netflix—is inadequate because it does not require the decoupling of gender, birthdate, and residential zip code from viewing history. (Tanner Br. at 11-14.). This, Tanner contends, could allow Netflix or some malicious actor to successfully "re-couple" Class members' personal information with their video viewing histories. (*Id.* at 12-13.) Because the injunctive relief does not provide absolute data security, Tanner contends, the settlement is inadequate. (*Id.* at 13-14.) Tanner's challenge, however, fails for two reasons. First, as a factual matter, Tanner's concerns are a non-issue. Second, Tanner's challenge imposes a level of scrutiny far higher than permitted on review.

As to the facts, to the extent that Tanner argues that Netflix itself could re-couple class members' PII, such an argument ignores the obvious: "if it reversed the decoupling, Netflix would be violating the Court-approved Settlement Agreement." (Order at 22-23.)

To the extent Tanner is worried that some malicious third party will obtain access to class members' decoupled records—whether through hacking or some inadvertent disclosure or breach—and then re-couple them, such a scenario would require the following to occur: (1) Netflix to leave former subscribers' genders, birthdates, and zip codes relationally associated with their viewing histories, (2) Netflix to store such information in a way that it could be decrypted, (3) Netflix to disclose, leak, or fall victim to a hack in such a way that both the viewing history and the personal information (gender, birthdate, zip code) were disclosed or accessed together, and (4) the malicious actor to actually go through and successfully recouple all the video viewing information. Tanner has provided no evidence that such a scenario will likely occur.

Lacking any evidence of inadequacy, Tanner's objection is really nothing more than an argument that the settlement's injunctive measures could be more extreme. (*See* Order at 21.) Yet "the question" when

50

reviewing a settlement "is not whether the final product could be prettier, smarter, or snazzier, but whether it is fair, adequate, and free from collusion." *Hanlon*, 150 F.3d at 1027. Here, the injunctive relief is undoubtedly sufficient — as it "seeks to prevent Netflix from engaging in precisely the activity which underlies this class action," (Order at 22) — and, as the district court twice found, free from collusion (SER 260; Order at 7). Thus, Tanner's assertions that the injunction's privacy protections should be absolute (if such protection can even possibly exist), or as exacting as required under federal law for health care records, (Tanner Br. at 13), "merely suggest a different or arguably better settlement award rather than sufficiently calling into question the fairness or adequacy of the Agreement." (Order at 21-22 (citing *Hanlon*, 150 F.3d at 1027)).

Compared to the recently upheld *Lane* settlement, which allowed the defendant to continue the unlawful conduct (which it had already ceased) as long as it used a different name, *see Lane*, 696 F.3d at 828 (Kleinfeld, J., dissenting), then, the settlement's injunctive component is far beyond adequate, and deserving of both approval and affirmation.

51

### III.  Both the Settlement and Final Approval Were Products of Sound Judgment Resulting from Extensive Informational Exchanges and Legal Argument.

The final challenges raised by the Objectors are criticisms of the settlement and approval process. Specifically, Objector Wilens asserts that class counsel failed to fully investigate the claims against Netflix, and that the district court erred in approving the settlement without requiring class counsel to essentially "show his work." (Wilens Br. at 6-23.) Similarly, Objector Klinge complains that the district court provided insufficient time for class members to investigate the proposed settlement. (Klinge Br. at 16-17.) As explained below, however, not only did class counsel ensure that the named plaintiffs were fully informed of the operative facts going into settlement negotiations, but class counsel also went to great lengths to "show their work" to the district court in the final approval briefing, and the district court accepted their "work" in its factual findings.

### A.  Class Counsel Adequately Investigated the Claims and Went into Great Detail about the Factual Basis for the Claims, the Information Learned in the Case, and Counsel's Ultimate Valuation of the Case.

Wilens complains that "there was no evidence that sufficient discovery was conducted to justify abandonment of the [Disclosure

Claims]" and that class counsel must provide more evidence that the settlement is adequate. (Wilens Br. at 14.)[27] Wilens's argument, however, fails on two fronts. First, it ignores the facts: class counsel did "show their work," with precise valuations of the claims, including estimates of the theoretical recoveries at trial, the likelihood of certification, and the likelihood of success on the merits. (SER 209-17.) Plaintiffs even took the step of retaining two leading experts to evaluate both the damages caused to the class by Netflix's allegedly unlawful conduct (relevant for comparing the amount recovered to the harm suffered and the amount recoverable), (*id.* at 217), as well as Netflix's financial position and ability to satisfy a theoretical judgment against it (*id.* at 212-13). Second, Wilens's challenges fail because he is trying to impose a "bare minimum discovery" requirement that has been repeatedly rejected by this Court and others.

> **1.      Class counsel performed sufficient discovery and had more than adequate information to properly negotiate the settlement.**

Wilens contends that class counsel did not perform enough discovery to be able to adequately assess the value of the class's Disclosure Claims

---

[27]     Objector Wilens focuses his objection on the Disclosure Claims. He does not complain of Plaintiffs', class counsel's, or the district court's handling of the Retention Claims.

and negotiate for their resolution. (Wilens Br. at 14-23.) Wilens has no basis to make such a claim and, in fact, similar attempts to impose some minimum threshold of discovery, without which there can be no settlement, have repeatedly failed.

Throughout the approval process, class counsel clearly explained to the district court the investigation it had conducted into the Disclosure Claims, and why it valued them as it did for settlement purposes. For example, in seeking final approval, class counsel submitted a declaration explaining that while plaintiffs originally had a good faith basis for believing that Netflix had unlawfully disclosed customers' viewing histories to third-party analytic companies (Wilens ER at 69 ¶¶ 14-15), subsequent investigation revealed that Netflix in fact did not engage in such conduct (Wilens ER at 70 ¶ 19).

Specifically, class counsel submitted sworn testimony about how they subsequently learned that Netflix handled its data analytic needs in-house, which was confirmed by two Netflix executives during informal depositions after the mediation. (Wilens ER at 70 ¶ 19.) Further, at the fairness hearing, the district court asked probing questions about the manner and extent to which class counsel was able to confirm with Netflix

that it was not disclosing viewing histories to third parties. (SER 15-24.)
Illustrative of the district court's inquiry into, and class counsel's
explanation of, class counsel's investigation of the Disclosure Claims is the
following excerpt from the end of that colloquy:

> **The Court**: It sounds like [the mediation] was a
> meaningful exchange. In essence you, I guess what we used to
> call is opened your files and saying here's what our theory is
> and our case is and here's what we believe is happening, and
> these are the witnesses that we would call to prove this, and
> we're giving you the opportunity, defendant, to rebut it now as
> opposed to in front of 12 members of the community.

> **Mr. Edelson** [class counsel]: It was even more than that
> …. We were not interested in just giving a presentation. We
> were interested in interrogating them and saying here's what
> we found out and explain to us why we're wrong, and we don't
> think we're wrong.

> **The Court**: And the [mediator] allowed you to do that?

> **Mr. Edelson**: He called for that. We didn't ask to do that.
> And he said this is not going to settle because you guys have
> such different views…. Go ask them whatever you want, go
> after them and ask them.
> And they did it in an honest, good faith way. They
> weren't just giving us whatever answers they could. They were
> . . . thinking about it saying we don't know the answer to that.
> We don't know. We've got to look into it and that's how . . .
> half the day went . . . . Everyone had to understand the
> threshold question, do we have a disclosure case on our hands?
> So the fact that later on that they were able to verify it, to
> us there was no question that they were going to, because we
> were incredibly confident with the information that we got.

(SER 22-24.)[28]

Accordingly, class counsel's investigation into the Disclosure Claims—and explanation of that investigation to the district court—was more than adequate. *See, e.g., In re Mego*, 213 F.3d at 459 (finding district court did not err in approving settlement even though extensive formal discovery had not been completed, noting that "in the context of class action settlements, *formal discovery is not a necessary ticket to the bargaining table* where the parties have sufficient information to make an informed decision about settlement") (internal quotations omitted) (emphasis added); *see also Cotton v. Hinton*, 559 F.2d 1326, 1333 (5th Cir. 1997) (affirming settlement where discovery was conducted on an informal basis

---

[28]    Class counsel also explained to the district court that they had every motivation for Netflix to be wrong about it not disclosing viewing histories, but were subsequently able to confirm everything Netflix had told them. (SER 19-20 ("[R]emember, your Honor, we were very motivated for the answer to be different . . . . [T]he case is not hard to prove if there's a disclosure. It's a very clean case. That's the type of case that, frankly, makes the plaintiffs' attorneys very excited . . . . So we were very motivated for Netflix to be wrong . . . .")); (SER 17-18 (explaining how class counsel was able to confirm Netflix's explanation by looking at public documents or documents received in discovery)).

and the parties agreed that they had achieved "the desired quantum of information necessary to achieve a settlement").

### 2. Class counsel provided substantial facts, expert testimony, and experienced probability assessments sufficient to allow the district court to assess the settlement.

After asserting that class counsel "abandoned" the class's Disclosure Claims without due diligence, Objector Wilens contends that class counsel failed to provide the district court with sufficient information to evaluate the settlement's adequacy as to the Disclosure Claims.

In addition to providing the district court with a detailed explanation of their investigation into the Disclosure Claims, however, class counsel also clearly delineated their valuation of both the Disclosure and Retention Claims. Specifically, in the declaration submitted in support of final settlement approval, class counsel explained that, in light of their investigation into the Disclosure Claims, they estimated the likelihood of success on those claims at less than 5%. (Wilens ER 74-75 ¶ 39.) Further, class counsel explained that, while they saw no undue difficulties in certifying a class under a disclosure theory, given the always-present uncertainties of litigation, as well as lack of direct controlling authority on

point, they estimated the likelihood of achieving adversarial class

certification at 80%. (Wilens ER 75 ¶ 40.)

Finally, class counsel explained that, regardless of the

likelihood of certifying a class and prevailing on the merits of the

Disclosure Claims, given that Netflix's theoretical liability exceeded

$150 *billion*,[29] both constitutional and pragmatic concerns suggested

that no court would award such an amount, and, in class counsel's

opinion, a best-case recovery for those claims would be $3 million.[30]

(Wilens ER 75 ¶¶ 41-43.) Thus, class counsel explained to the district

court that they valued the Disclosure Claims for settlement purposes

at approximately $120,000 total ($3 million recovery x 5% chance of

---

[29]    The VPPA provides statutory damages of $2,500, 18 U.S.C.
§ 2710(c)(2)(A), which, multiplied by 62 million class members exceeds
$150 billion.

[30]    Class counsel further explained to the district court these
constitutional and pragmatic concerns in the Final Approval Motion,
including pointing out that a $150 billion verdict would be more than 685
times Netflix's 2011 net income, and that even a $150 *million* verdict could
threaten Netflix's existence. (SER 211-14.) *See also Rodriguez*, 563 F.3d at 965
("In reality, parties, counsel, mediators, and district judges naturally arrive
at a reasonable range for settlement by considering the likelihood of a
plaintiffs' or defense verdict, the potential recovery, *and the chances of
obtaining it* . . . .").

success on merits x 80% chance of success on class certification). (SER 213-14.)[31]

Based on the above, Wilens's argument that class counsel failed to "show his work" in valuing the Disclosure Claims (as opposed to the Retention Claims, of which Wilens does not complain) simply ignores the well-developed record in this case, *cf. Rodriguez*, 563 F.3d at 965 (noting that this Circuit has long deferred to parties' determination of settlement value), as well as the fact that Plaintiffs and class counsel ended up negotiating a settlement substantially more valuable than the claims themselves.

### B.    Class Members had Sufficient Time to Investigate the Proposed Settlement, and, in any Event, Objectors' Argument to the Contrary was Waived.

The Objectors' final procedural argument is that the class was given insufficient time to investigate the proposed settlement. Specifically, Objector Klinge complains that two weeks was insufficient time to

---

[31]    Class counsel went through the same process with the Retention Claims, ultimately placing the expected value of the Retention Claims at $7,161,000. (SER 216.) From there, class counsel combined the value of the Retention and Disclosure Claims and concluded that they had a net present value of $6,398,667, a number accepted and adopted by the district court, and not disputed by contrary evidence. (*Id.* at 217; Order at 8-9.)

investigate the twenty *cy pres* recipients. (Klinge Br. at 16-17.) Like the Objectors' other procedural arguments, this too is without merit.

First, it should be noted that Klinge never raised this issue before the district court—not in her objection, not at the fairness hearing and not through the filing of any motion seeking more time to investigate the potential *cy pres* recipients. Because she failed to raise this issue previously, Klinge has waived this argument. *See Linney v. Cellular Ak. P'ship*, 151 F.3d 1234, 1242 n. 5 (9th Cir. 1998) (finding argument that district court abused its discretion in denying class members opportunity to investigate settlement negotiations waived where request not made below).

In any event, even if Klinge had not waived it, she cites no authority to support her argument that over four months (the time between preliminary approval and the opt-out/exclusion deadline) is insufficient to investigate a proposed settlement, either as a general matter of law, or as a factual matter here. Nor does she explain why two weeks was not enough time to review the potential *cy pres* recipients, especially in light of the fact that she could have called class counsel to discuss and learn about the proposed *cy pres* recipients but chose not to. (*See* Wilens ER 32 ¶ 8).

The only authority Klinge cites is *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010), which does not support her position. In that case, involving an objection to attorneys' fees, this Court made the common sense ruling that the deadline for objections must fall *after* the fee request is filed. 618 F.3d at 993-94. There, the district court had required class members to file any objections two weeks *prior* to the time class counsel filed their fee request. *Id.* at 990-91. Here, in contrast, and consistent with this Court's guidance, objections were due two weeks *after* class counsel filed the motion for final approval of the settlement (which included their fee request). (SER 190-256.) Thus, *Mercury Interactive* provides no support for Klinge's position.

Given Klinge's failure to raise this issue below or to cite any authority in support, her contention that the approval order should be reversed because she supposedly did not have enough time to properly object — despite the fact that she ultimately succeeded in timely objecting — fails.

## CONCLUSION

Class counsel labored to obtain a favorable settlement of this class action providing substantial and significant benefits to the class, which the district court properly found was fair, reasonable, and adequate. The

district court's finding is entitled to great deference, and Objectors have the burden of establishing that the settlement approval should be reversed. Here, as discussed above, Objectors provide nothing to suggest (let alone make the required "strong showing") that the district court abused its discretion in approving this settlement. Consequently, the district court's order granting final approval of the class action settlement, approval of the *cy pres* awards, and award of attorneys' fees and expenses and incentive award should be affirmed.

Dated: October 23, 2013          Plaintiffs-Appellees Jeff Milans, Peter
                                 Comstock, and the Class


                                 By:   s/ Jay Edelson
                                 One of Plaintiffs-Appellees' attorneys

Jay Edelson (jedelson@edelson.com)
Rafey S. Balabanian (rbalabanian@edelson.com)
J. Dominick Larry (nlarry@edelson.com)
Roger Perlstadt (rperlstadt@edelson.com)
EDELSON LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: (312) 312-589-6370
Fax: (312) 589-6378

Sean P. Reis (sreis@edelson.com)
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Tel: (949) 459-2124

Fax: (949) 459-2123

**Statement of Related Cases**

All related cases known to Plaintiffs-Appellees were identified in Objector-Appellant GaryWilens's Statement of Related Cases.


**Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,164 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac 2011 in 14 point Book Antiqua font.

Dated:  October 23, 2012              __s/ Jay Edelson_____
                                                       *Attorney for Plaintiffs-Appellees*