Nos. 13-15723, 13-15733, 13-15734, 13-15751, 13-15759

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

IN RE: NETFLIX PRIVACY LITIGATION

JEFF MILANS; PETER COMSTOCK, individually and
on behalf of all others similarly situated; THE SETTLEMENT CLASS;

Plaintiffs-Appellees,

GARY WILENS, MATTHEW D. TANNER, HUGH RAMSEY,
STEPHEN GRIFFIS, BRADLEY SCHULZ, and TRACEY KLINGE

Objectors-Appellants,

v.

NETFLIX, INC.,

Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of California,
Case No. 5:11-cv-379-EJD

---

APPELLEES' JOINT SUPPLEMENTAL EXCERPTS OF RECORD

---

Jay Edelson
EDELSON LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378
*Counsel for Plaintiffs-Appellees*

Keith Edward Eggleton
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300
Facsimile: (650) 493-6811
*Counsel for Defendant-Appellee*

# TABLE OF CONTENTS

Transcript of Hearing on Final Approval of
Class Action Settlement (Dkt. 245)......................................SER 001 - 121

Affidavit of Tiffaney A.
Janowicz (Dkt. 226-6) [Excerpts]..........................................SER 122 - 124

Addendum to Affidavit of Tore Hodne (Dkt. 226-1).........SER 125 - 181

Netflix Inc.'s Response to Objections to
Class Action Settlement (Dkt. 225) [Excerpts]....................SER 182 - 184

Affidavit of Tore Hodne (Dkt. 191-5)...................................SER 185 - 186

Declaration of Dr. Serge
Egelman (Dkt. 191-2) [Excerpts] ...........................................SER 187 - 189

Plaintiffs' Motion for Final Approval of
Class Action Settlement (Dkt. 191)......................................SER 190 - 256

Order Granting Preliminary Approval of
Class Action Settlement (Dkt. 80)........................................SER 257 - 265

Netflix's Answer to Consolidated Class
Action Complaint (Dkt. 66) ..................................................SER 266 - 273

Order Granting Plaintiffs' Motion to Consolidate;
Appointing Interim Class Counsel (Dkt. 59) ....................SER 274 - 279

Netflix's Response to Motions to
Consolidate and to Appoint Interim
Lead Class Counsel (Dkt. 52) [Excerpts] ............................SER 280 - 282

Bernal and Rura Opposition to Motion to
Appoint Jay Edelson Interim Lead
Class Counsel (Dkt. 50) [Excerpts] ......................................SER 283 - 289

Motion to Appoint Jay Edelson Interim
Lead Class Counsel (Dkt. 47) [Excerpts] ............................SER 290 - 299

```
 1                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                          SAN JOSE DIVISION

 3

 4
                                    CASE NO.  CV-11-0379-EJD
 5      IN RE NETFLIX PRIVACY
        LITIGATION.                 SAN JOSE, CALIFORNIA
 6
                                    DECEMBER 5, 2012
 7
                                    PAGES 1 - 120
 8

 9

10                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
11                 UNITED STATES DISTRICT JUDGE

12
                      A-P-P-E-A-R-A-N-C-E-S
13

14      FOR THE PLAINTIFFS:   EDELSON MCGUIRE, LLC
                              BY:   JAY EDELSON
15                                  CHANDLER GIVENS
                                    RAFEY S. BALABANIAN
16                            350 NORTH LASALLE, SUITE 1300
                              CHICAGO, ILLINOIS 60654
17

18      FOR THE DEFENDANTS:   WILSON, SONSINI, GOODRICH & ROSATI
                              BY:   KEITH E. EGGLETON
19                                  RODNEY G. STRICKLAND, JR.
                                    DALE BISH
20                            650 PAGE MILL ROAD
                              PALO ALTO, CALIFORNIA 94304
21

22           (APPEARANCES CONTINUED ON THE NEXT PAGE.)

23      OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, CRR
                                   CERTIFICATE NUMBER 8074
24

25         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
        TRANSCRIPT PRODUCED WITH COMPUTER.
```

```
 1

 2      A P P E A R A N C E S: (CONT'D)

 3

        ALSO PRESENT FOR THE
 4      OBJECTORS:                    THE KATRIEL FIRM
                                      BY   ROY A  KATRIEL
 5                                    12707 HIGH BLUFF DRIVE, SUITE 200
                                      SAN DIEGO, CALIFORNIA 92130
 6
                                      KORNSTEIN, VEISZ, WEXLER &
 7                                    POLLARD
                                      BY:  PAUL D. WEXLER
 8                                    757 THIRD AVENUE
                                      NEW YORK, NEW YORK 10017
 9
                                      BITDEFENDER
10                                    BY:  GEORGE YUNAEV
                                      2880 LAKESIDE DRIVE, SUITE 237
11                                    SANTA CLARA, CALIFORNIA 95054

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SER 002

```
 1    SAN JOSE, CALIFORNIA                    DECEMBER 5, 2012

 2                  P R O C E E D I N G S

 3        (COURT CONVENED.)

 4            THE CLERK:  CALLING CASE 11-379, NETFLIX PRIVACY

 5    LITIGATION.  ON FOR MOTION FOR SETTLEMENT.

 6        COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

 7            MR. EDELSON:  GOOD MORNING, YOUR HONOR.  JAY EDELSON

 8    FOR THE CLASS.

 9            THE COURT:  THANK YOU.  GOOD MORNING.

10            MR. BALABANIAN:  GOOD MORNING, YOUR HONOR.  RAFEY

11    BALABANIAN FOR THE CLASS.

12            THE COURT:  THANK YOU.  GOOD MORNING.

13            MR. EGGLETON:  GOOD MORNING, YOUR HONOR.  KEITH

14    EGGLETON FOR NETFLIX ALONG WITH MY PARTNER, RODNEY STRICKLAND,

15    AND MY COLLEAGUE, DALE BISH.

16            THE COURT:  AND THANK YOU.  GOOD MORNING.

17            MR. KATRIEL:  GOOD MORNING, YOUR HONOR.  ROY KATRIEL

18    ON BEHALF OF OBJECTOR LISA KATRIEL.

19            THE COURT:  THANK YOU.  GOOD MORNING.  ANYONE ELSE

20    HERE?  LET ME ASK THIS GENTLEMEN, BEFORE WE GO FURTHER, ARE

21    THERE ANY NEW ADMITEES TO THE BAR PRESENT IN THIS COURTROOM

22    THIS MORNING?

23            MR. EGGLETON:  NOT ON OUR SIDE, YOUR HONOR.

24            THE COURT:  I'M LOOKING OVER AT YOUR COLLEAGUES

25    THERE.  IS THERE A NEW ADMITEE IN THIS BUILDING?
```

10:11AM   1          YEAH.  COULD YOU PLEASE STAND UP, MA'AM.  THANK YOU.

10:11AM   2     MAY I KNOW YOUR NAME, PLEASE.

10:11AM   3          MS. NEBUDA:  LUCY NEBUDA (PHONETIC).

10:11AM   4          THE COURT:  WHY DON'T YOU COME FORWARD.  COUNSEL,

10:11AM   5     I'M TAKING A MOMENT AND A PERSONAL PRIVILEGE HERE.  LAST NIGHT

10:11AM   6     ONE OF THE MANY THINGS THAT WE DO AS JUDGES, ENJOYABLE THINGS

10:11AM   7     WE DO AS JUDGES, NOT JUST TO WORK WITH EXPERIENCED COUNSEL ON

10:11AM   8     DIFFICULT CASES LIKE THIS, BUT ONE OF THE PERHAPS MORE

10:11AM   9     ENJOYABLE THINGS, PARDON ME, THAT WE DO AS JUDGES IN OUR

10:12AM  10     CAPACITY IS THE ABILITY TO SWEAR IN NEW MEMBERS OF THE BAR.

10:12AM  11          AND LAST NIGHT IT WAS MY PRIVILEGE TO ATTEND THE SWEARING

10:12AM  12     IN HOSTING BY THE SANTA CLARA BAR ASSOCIATION AND THE

10:12AM  13     UNIVERSITY OF SANTA CLARA.

10:12AM  14          AND I BELIEVE, COUNSEL, YOU RECEIVED THAT OATH FROM THE

10:12AM  15     PRESIDING JUDGE OF THE SUPERIOR COURT, RICK LOFTUS, RICHARD

10:12AM  16     LOFTUS, AND I THINK I WAS PRESENT AND I THINK I SWORE YOU INTO

10:12AM  17     THE BAR FOR THE NORTHERN DISTRICT OF CALIFORNIA.

10:12AM  18          AM I CORRECT, COUNSEL?

10:12AM  19          MS. NEBUDA:  YOU ARE CORRECT.

10:12AM  20          THE COURT:  THANK YOU, THANK YOU.  AND I THINK YOU

10:12AM  21     MAY HAVE MENTIONED SOMETHING IN PASSING, IN A DELICATE AND

10:12AM  22     TIMID VOICE WITH SOME TREPIDATION, "I THINK I'LL SEE YOU

10:12AM  23     TOMORROW, JUDGE."

10:12AM  24          SO PARDON ME FOR EMBARRASSING, COUNSEL, BUT I DID WANT TO

10:12AM  25     WELCOME YOU TO THE BAR AND IS THIS YOUR FIRST THEN, NOT A REAL

| | | |
|---|---|---|
| 10:13AM | 1 | COURT APPEARANCE, BUT YOUR FIRST TIME IN COURT AS A LAWYER? |
| 10:13AM | 2 | MS. NEBUDA:  YES. |
| 10:13AM | 3 | THE COURT:  WELL, IT'S ALL OF OUR PRIVILEGE TO SHARE |
| 10:13AM | 4 | THIS EXPERIENCE WITH YOU.  THANK YOU VERY MUCH.  ON BEHALF OF |
| 10:13AM | 5 | THESE GOOD LAWYERS HERE, ALL OF THEM, WE WELCOME YOU TO THE BAR |
| 10:13AM | 6 | AND WE WISH YOU YEARS OF SUCCESS IN YOUR PRACTICE. |
| 10:13AM | 7 | MS. NEBUDA:  THANK YOU SO MUCH. |
| 10:13AM | 8 | THE COURT:  AND THANK YOU FOR ALLOWING ME TO |
| 10:13AM | 9 | EMBARRASS YOU. |
| 10:13AM | 10 | LET'S GET TO THE BUSINESS AT HAND THEN, COUNSEL. |
| 10:13AM | 11 | SO WHAT I'D LIKE TO DO THIS MORNING IS TO, PERHAPS, HEAR |
| 10:13AM | 12 | AND PROVIDE AN OPPORTUNITY FOR COUNSEL HERE TO MAKE, AND I'LL |
| 10:13AM | 13 | CALL IT AN OPENING STATEMENT, BUT JUST YOUR OPENING REMARKS, |
| 10:13AM | 14 | YOUR OPENING REMARKS ABOUT COUNSEL AND YOUR THOUGHTS AS TO |
| 10:13AM | 15 | WHETHER OR NOT THE COURT SHOULD ACCEPT THIS SETTLEMENT HERE. |
| 10:13AM | 16 | I UNDERSTAND THERE ARE OBJECTORS HERE, AND I ALSO WANT TO |
| 10:13AM | 17 | GIVE EQUAL TIME TO THE OBJECTORS TO MAKE ANY STATEMENTS OR |
| 10:14AM | 18 | PROVIDE ME ANY INFORMATION THAT THEY BELIEVE WOULD BE HELPFUL |
| 10:14AM | 19 | IN THIS DECISION. |
| 10:14AM | 20 | MR. KATRIEL:  THANK YOU, YOUR HONOR. |
| 10:14AM | 21 | THE COURT:  ARE THERE ANY OTHER OBJECTORS |
| 10:14AM | 22 | REPRESENTED, OR NOT REPRESENTED, THAT WISH TO BE HEARD THIS |
| 10:14AM | 23 | MORNING?  ANY OTHER CLASS MEMBERS HERE?  I SEE OR HEAR NO |
| 10:14AM | 24 | RESPONSE. |
| 10:14AM | 25 | MR. EDELSON, WOULD YOU LIKE TO GO FIRST? |

**SER 005**

| 10:14AM | 1 | MR. EDELSON: THANK YOU, YOUR HONOR. FIRST I SHOULD |

10:14AM 1    MR. EDELSON: THANK YOU, YOUR HONOR. FIRST I SHOULD

10:14AM 2    ALSO INFORM THE COURT THAT WE HAVE NOT HEARD FROM ANY OTHER

10:14AM 3    OBJECTOR THAT THEY ARE INTENDING TO BE HERE, OTHER THAN IN

10:14AM 4    THEIR PAPERS, A FEW SAID THAT THEY WANTED TO SHOW UP BUT

10:14AM 5    APPARENTLY THEY DECIDED NOT TO.

10:14AM 6    YOUR HONOR, IF YOUR HONOR FINDS IT APPROPRIATE, WHAT I'D

10:14AM 7    LIKE TO DO IS FOCUS ON THREE ISSUES. WE HAVE GIVEN YOU

10:14AM 8    VOLUMINOUS PAPERS, I THINK OVER 110 PAGES, AND WE APPRECIATE

10:14AM 9    YOUR PATIENCE WITH THAT, AND I DON'T WANT TO REHASH THOSE.

10:14AM 10   WHAT I'D LIKE TO DO IS FOCUS ON THE FOLLOWING THREE

10:14AM 11   ISSUES:

10:14AM 12   FIRST, WHAT THE PATH TO OUR SETTLEMENT WAS TO GIVE YOU

10:15AM 13   SOME CONTEXT AND EXPLAIN HOW IT WAS NOT COLLUSIVE;

10:15AM 14   NUMBER TWO, I WANT TO TALK ABOUT HOW CLASS COUNSEL VALUED

10:15AM 15   THE CASE; AND,

10:15AM 16   NUMBER THREE, AND I'D LIKE MY COCOUNSEL, MR. BALABANIAN,

10:15AM 17   TO DISCUSS THIS, HOW WE ARRIVED AT THE CY PRES SETTLEMENT

10:15AM 18   FRAMEWORK AND WHY WE THINK A SUFFICIENT NEXUS BETWEEN THE

10:15AM 19   RECIPIENTS HAS BEEN DEMONSTRATED.

10:15AM 20   THE COURT: WELL, THANK YOU FOR THAT, BECAUSE AS YOU

10:15AM 21   KNOW THE COURT IS LOOKING TO DETERMINE WHETHER OR NOT THIS

10:15AM 22   SETTLEMENT AGREEMENT IS FAIR, REASONABLE, AND ADEQUATE AND IN

10:15AM 23   THE BEST INTEREST OF THE SETTLEMENT CLASS MEMBERS AND THOSE ARE

10:15AM 24   THE GUIDEPOSTS, I GUESS, THAT I'M LOOKING TOWARDS.

10:15AM 25   AND I DID -- IN READING THE OBJECTIONS FROM SOME PARTIES,

10:15AM  1      SOME OF THE LETTERS, AND I THINK THERE WERE OVER 100 OF THEM

10:15AM  2      RECEIVED, AND I HAVE READ ALL OF THOSE.  WE HAVE DOCUMENTED

10:15AM  3      THEM ON THE ECF FILES.

10:15AM  4          I HAVE JUST LOOKED AGAIN THIS MORNING AT THE FILE, AND

10:15AM  5      INCLUDING AN OBJECTION FROM I BELIEVE IT'S THE GOOD ATTORNEY

10:16AM  6      GENERAL'S OFFICE FROM THE STATE OF TEXAS.  COUNSEL MAYBE HAS

10:16AM  7      NOT SEEN THIS.  I SHOULD PASS THIS DOWN BECAUSE IT'S DATED

10:16AM  8      JULY 9TH.

10:16AM  9          I SEE TREPIDATION AT THE MENTION OF TEXAS.

10:16AM  10         MR. EGGLETON:  NOT TREPIDATION, JUST IGNORANCE, YOUR

10:16AM  11     HONOR, FRANKLY.  WE HAVE NOT SEEN IT.

10:16AM  12         THE COURT:  I SEE.  WELL, I'M HAPPY TO SHARE IT WITH

10:16AM  13     YOU.  I'M SORRY IT HAS NOT BEEN PROVIDED TO YOU.

10:16AM  14         THERE ARE SOME OTHER LETTERS ATTACHED TO THOSE.  PERHAPS

10:16AM  15     YOU HAVE NOT SEEN THOSE.

10:16AM  16         MR. EDELSON:  I HAVE MANAGED TO READ IT.

10:16AM  17         THE COURT:  OKAY.  SO I DID HAVE SOME QUESTIONS FOR

10:16AM  18     PLAINTIFF'S COUNSEL AS WELL AS THE OBJECTOR'S ATTORNEYS THAT IS

10:16AM  19     HERE, BUT I WANT TO HEAR YOUR COMMENTS AS WELL.

10:16AM  20         THERE ARE SOME THINGS THAT I LOOKED AT THAT WERE RAISED,

10:17AM  21     ISSUES RAISED, EXCUSE ME, NOT JUST BY THE OBJECTORS, BUT JUST

10:17AM  22     BY MY READING OF THE SETTLEMENT THAT I WON'T SAY NECESSARILY

10:17AM  23     RAISED FLAGS OR RED FLAGS OR ANY FLAGS AT ALL, BUT I THINK THAT

10:17AM  24     THERE ARE ISSUES THAT I WOULD LIKE TO HEAR SOME COMMENT ON.

10:17AM  25         IT LOOKS TO ME LIKE THIS CASE, PARDON ME, I'M JUST GOING

| | | |
|---|---|---|
| 10:17AM | 1 | TO GIVE YOU, ALL SIDES HERE, JUST A QUICK OVERVIEW. |
| 10:17AM | 2 | IT APPEARS THAT THE CLASS SIZE HERE IS HUGE.  IS IT 62 |
| 10:17AM | 3 | MILLION INDIVIDUALS? |
| 10:17AM | 4 | MR. EDELSON:  CORRECT, YOUR HONOR. |
| 10:17AM | 5 | THE COURT:  IS THAT RIGHT? |
| 10:17AM | 6 | AND IT'S A LARGE CLASS.  THE ISSUES ARE NOT TERRIFICALLY |
| 10:17AM | 7 | COMPLEX, IF YOU WILL, BUT IN LOOKING AT THE PLEADINGS HERE, |
| 10:17AM | 8 | IT'S INTERESTING TO NOTE THAT THIS CASE, FROM THE DATE OF |
| 10:17AM | 9 | FILING, TO THE DATE OF AT LEAST RESOLUTION, WAS 53 WEEKS, I |
| 10:17AM | 10 | BELIEVE.  I THINK I'M ACCURATE IN THAT. |
| 10:17AM | 11 | AND WHILE WE APPRECIATE EFFICIENT LITIGATION, OF COURSE, |
| 10:17AM | 12 | THE EYES OF THIS, THE SCRUTINY, IF YOU WILL, WHEN WE LOOK AT |
| 10:18AM | 13 | THE CASES, A HUGE CASE LIKE THIS CAN BE RESOLVED IN 53 SHORT |
| 10:18AM | 14 | WEEKS IS AMAZING. |
| 10:18AM | 15 | AND I SUPPOSE IT SHOULD BE A COMPLIMENT TO THE |
| 10:18AM | 16 | EFFECTIVENESS OF THE LAWYERS ON THE ONE HAND.  I BELIEVE IT |
| 10:18AM | 17 | SHOULD BE ALSO LOOKED AT WITH MAYBE SOME, MAYBE SCRUTINY IS NOT |
| 10:18AM | 18 | THE EXACT WORD, BUT SOME EXAMINATION OF HOW IT CAME TO PASS |
| 10:18AM | 19 | THAT A CASE THIS SIZE CAME ABOUT SETTLING SO QUICKLY. |
| 10:18AM | 20 | AND ONE OF THE THINGS I THINK THAT SOME OF THE OBJECTORS |
| 10:18AM | 21 | RAISED WAS, WELL, AS YOU SAID, SIR, WAS THERE COLLUSION?  COULD |
| 10:18AM | 22 | A CASE THIS SIZE, WITH THIS SIZE OF A SETTLEMENT, IS THAT THE |
| 10:18AM | 23 | RESULT OF COLLUSION?  AND THE THEORY, OF COURSE, AND I'M NOT |
| 10:18AM | 24 | SUGGESTING ANYTHING UNTOWARD, BUT PUBLIC AND OTHERS MIGHT LOOK |
| 10:18AM | 25 | AT THIS AND SAY, WELL, THE SETTLEMENT, I THINK IT'S $9 MILLION, |

| | | |
|---|---|---|
| 10:18AM | 1 | AND THAT SETTLEMENT ACHIEVED IN 53 WEEKS WHERE THERE'S NO |
| 10:19AM | 2 | PERSONAL RECOVERY TO ANY SPECIFIC INDIVIDUAL MEMBERS OF THE |
| 10:19AM | 3 | CLASS OUTSIDE OF THOSE NAMED, NAMED INDIVIDUALS, RECEIVE, I |
| 10:19AM | 4 | THINK IT'S $30,000, I THINK. |
| 10:19AM | 5 | MR. BALABANIAN:  COLLECTIVELY. |
| 10:19AM | 6 | THE COURT:  YES.  AND THEN, OF COURSE, THE CRITICISM |
| 10:19AM | 7 | OF THE ATTORNEY'S FEES, THE SIZE OF THE ATTORNEY'S FEES, |
| 10:19AM | 8 | RECEIVED VIS-A-VIS AND PUT THAT ON THE SCALE AND TO THE |
| 10:19AM | 9 | INDIVIDUAL RECOVERY.  AND I THINK THERE ARE SOME OBJECTIONS, |
| 10:19AM | 10 | MANY OBJECTIONS, ABOUT THAT. |
| 10:19AM | 11 | AND SO THAT GIVES RISE TO THE ISSUE OF ABOUT HOW DID THIS |
| 10:19AM | 12 | COME TO PASS?  HOW COULD THAT OCCUR? |
| 10:19AM | 13 | SOME OF THE CRITICISMS THAT I RAISED AND SOME OF THE |
| 10:19AM | 14 | OBJECTIONS WAS, WAS THERE REALLY SUFFICIENT INVESTIGATION |
| 10:19AM | 15 | ACCOMPLISHED TO DETERMINE WHETHER OR NOT THERE WAS AN ACTUAL |
| 10:19AM | 16 | VIOLATION OF THE VPAA, I THINK IT'S SECTION B, WHICH ALLOWS FOR |
| 10:20AM | 17 | THE STATUTORY, I THINK IT'S $2,500 AND, OF COURSE, IT'S |
| 10:20AM | 18 | DISCRETIONARY FOR THE COURT TO ASSESS SHOULD A VIOLATION BE |
| 10:20AM | 19 | FOUND AS TO THAT SECTION? |
| 10:20AM | 20 | AND THEN ON THE OTHER SIDE WHEN WE LOOK AT, WELL, PARDON |
| 10:20AM | 21 | ME, EVEN IF THAT EXISTS, THAT DID EXIST, THE CLASS SIZE OF 62 |
| 10:20AM | 22 | MILLION WOULD IN EFFECT, I THINK THE WORD THAT IS USED IN THE |
| 10:20AM | 23 | LITERATURE IS ANNIHILATE THE CORPORATION AND BUSINESS WHICH |
| 10:20AM | 24 | WOULD FRUSTRATE EVERYONE'S EFFORTS. |
| 10:20AM | 25 | SO THERE'S UNIQUE TENSIONS THAT ARE INVOLVED, I SUPPOSE, |

**SER 009**

10:20AM 1    IN THESE TYPES OF CASES AND HOW ONE BALANCES THOSE INTERESTS

10:20AM 2    IS, I SUPPOSE, WHAT WE'RE GOING TO PURSUE AND HOPEFULLY BRING

10:20AM 3    SOME CLARITY AND RESOLUTION ON THIS MORNING.

10:20AM 4        SO THANK YOU FOR LETTING ME SHARE WITH YOU THOSE THOUGHTS.

10:20AM 5        SO WITH THAT, AND THERE WILL BE OTHER QUESTIONS, TOO, THAT

10:20AM 6    I HAVE, PLEASE CONTINUE IF YOU WOULD, SIR?

10:20AM 7            MR. EDELSON:  YEAH, THANK YOU, YOUR HONOR.  AND I

10:20AM 8    WOULD INVITE YOUR HONOR TO INTERRUPT ME TO ASK QUESTIONS.  I

10:21AM 9    WANT TO BE HELPFUL AND DON'T HAVE ANY NEED TO JUST REHASH

10:21AM 10   THINGS IF IT'S NOT OF A CONCERN TO YOU OR IF YOU WANT TO FOCUS

10:21AM 11   ON DIFFERENT ISSUES.

10:21AM 12       YOUR HONOR'S COMMENTS DOVETAILS VERY NICELY WITH WHAT I

10:21AM 13   WAS PLANNING ON SPEAKING ABOUT.

10:21AM 14       I THINK THE FIRST THING TO TALK ABOUT IS THE CONTEXT OF

10:21AM 15   THIS CASE.  THIS ISN'T, IN OUR MIND, JUST ONE CASE.

10:21AM 16       WE FILED THE FIRST CASE AGAINST NETFLIX IN JANUARY OF

10:21AM 17   2011, BUT IT WAS PART OF A BROADER INVESTIGATION AMONG OTHER

10:21AM 18   ENTRY PLAYERS, BLOCKBUSTER, BEST BUY AND SONY AND OUR FIRM HAS

10:21AM 19   BEEN THE LEAD COUNSEL IN ALL OF THOSE OTHER SUITS THAT HAVE

10:21AM 20   BEEN LITIGATED THROUGHOUT THE COUNTRY.

10:21AM 21       SO AS WE TALKED ABOUT THE CASE DEVELOPING IN THIS COURT,

10:21AM 22   WE'RE ALSO SEEING THE FACTUAL AND LEGAL RECORDS DEVELOP IN

10:21AM 23   OTHER COURTS.

10:22AM 24           MR. WEXLER:  I'M SORRY I'M LATE.  MY NAME IS PAUL

10:22AM 25   WEXLER.  I'M COUNSEL FOR ONE OF THE OBJECTORS FOR TERI

| | | |
|---|---|---|
| 10:22AM | 1 | MICHIGAN, AND I WAS AFRAID THAT I LOGISTICALLY MESSED UP. |
| 10:22AM | 2 | THE COURT:  PAUL WEXLER? |
| 10:22AM | 3 | MR. WEXLER:  YES, W-E-X-L-E-R. |
| 10:22AM | 4 | THE COURT:  AND YOU'RE HERE FOR AN OBJECTOR? |
| 10:22AM | 5 | MR. WEXLER:  YES, I AM.  TERI MICHIGAN.  T-E-R-I, |
| 10:22AM | 6 | MICHIGAN LIKE THE STATE. |
| 10:22AM | 7 | THE COURT:  GREAT. |
| 10:22AM | 8 | MR. BALABANIAN:  YOUR HONOR, MAY I JUST GRAB A GLASS |
| 10:22AM | 9 | OF WATER? |
| 10:22AM | 10 | THE COURT:  OF COURSE. |
| 10:22AM | 11 | MR. EDELSON:  THAT WAS FOR ME.  THANK YOU, YOUR |
| 10:22AM | 12 | HONOR. |
| 10:22AM | 13 | I APOLOGIZE. |
| 10:22AM | 14 | THE COURT:  PLEASE CONTINUE. |
| 10:22AM | 15 | MR. EDELSON:  SO FROM OUR EXPERIENCE WE'RE LOOKING |
| 10:22AM | 16 | AT NOT JUST THE FACTUAL AND LEGAL RECORDS WE DEVELOPED IN THIS |
| 10:22AM | 17 | CASE BUT ALSO IN OTHER CASES.  SO, FOR EXAMPLE, WE HAVE A CASE |
| 10:22AM | 18 | GOING IN THE NORTHERN DISTRICT OF ILLINOIS WHERE WE WERE |
| 10:22AM | 19 | LITIGATING THE SAME ISSUES AND ONE OF THE KEY QUESTIONS WAS DO |
| 10:22AM | 20 | YOU GET STATUTORY DAMAGES FOR RETENTION CLAIMS, AND WHICH IS |
| 10:23AM | 21 | REALLY THE KEY ISSUE HERE? |
| 10:23AM | 22 | AND THE DISTRICT COURT SAID YES; AND THEN THE SEVENTH |
| 10:23AM | 23 | CIRCUIT SAID NO; AND THEN IT WENT BACK TO THE DISTRICT COURT |
| 10:23AM | 24 | AND THEY SAID YES AGAIN AND RECONSIDERED AND SAID OKAY THEN |
| 10:23AM | 25 | FILED WITH THE SEVENTH CIRCUIT. |

10:23AM 1          AT THE SAME TIME THERE WERE OTHER CASES GOING ON

10:23AM 2     THROUGHOUT THE COUNTRY, TOO, WHICH WERE LOOKING AT THAT

10:23AM 3     DECISION AND EVERYONE SO FAR HAS COALESCE AROUND THE SEVENTH

10:23AM 4     CIRCUIT DECISION.

10:23AM 5          BUT DURING -- THROUGH THE COURSE OF THOSE OTHER CASES,

10:23AM 6     WHICH WE'RE INTIMATELY INVOLVED WITH, WE'RE GETTING CONTEXT TO

10:23AM 7     WHAT WAS GOING ON.  SO YOUR HONOR UNDERSTANDS, WE'RE NOT JUST

10:23AM 8     LOOKING AT THIS CASE.

10:23AM 9          WHEN WE FILED THE CASE ABOUT TWO YEARS AGO IN

10:23AM 10    JANUARY 2011, WE HAD AN INITIAL TALK WITH NETFLIX'S ATTORNEYS.

10:23AM 11         I HAD NEVER MET WITH THEM BEFORE.  I THINK I BRIEFLY

10:23AM 12    OVERLAPPED WITH THEM ONCE BEFORE.

10:23AM 13         AND WE OFTEN SPEAK WITH DEFENSE COUNSEL TO ESTABLISH A

10:24AM 14    TONE IN THE CASE, JUST TO AT LEAST PUT A FACE TO A NAME AND TO

10:24AM 15    SEE IF THERE ARE ANY PROSPECTS OF RESOLUTION GOING DOWN THE

10:24AM 16    PATH.

10:24AM 17         I HAVE A LOT OF RESPECT FOR THEIR ATTORNEYS.  THEY'RE VERY

10:24AM 18    GENTLEMANLY AND PROFESSIONAL.  AND AT THE END OF THAT

10:24AM 19    CONVERSATION, I THINK IT WAS CLEAR TO EVERYBODY THAT WE VALUED

10:24AM 20    THE CASE VERY DIFFERENTLY.

10:24AM 21         WHEN WE FILED THE CASE AGAINST NETFLIX, WE WERE AWARE OF

10:24AM 22    NETFLIX'S REPUTATION.

10:24AM 23         THEY ARE WELL FUNDED AND THEY'RE SOPHISTICATED AND THEY'RE

10:24AM 24    HAPPY TO FIGHT.

10:24AM 25         THERE'S ANOTHER CLASS ACTION GOING ON AGAINST THEM WHICH

10:24AM  1       ALSO INVOLVES WAL-MART, WHO IS NOTORIOUS FOR NOT SETTLING ANY

10:24AM  2   CASE, AND IN THAT CASE WAL-MART SETTLED AND NETFLIX CONTINUED

10:24AM  3   THEIR CLAIM.

10:24AM  4       SO WE KNEW WHEN WE FILED THIS SUIT WE WERE LIKELY IN IT

10:24AM  5   FOR THE LONG HAUL.

10:24AM  6       THE LITIGATION KEPT ON.  THERE WAS A LEADERSHIP FIGHT, AND

10:24AM  7   THE COURT ENDED UP APPOINTING US LEAD AND DISCOVERY STARTED AND

10:24AM  8   THEN WE HAD THE COURT'S ADR CALL.

10:24AM  9       AT THAT POINT EVERYONE FILED THAT IN GOOD FAITH AND WE

10:25AM 10   DECIDED THAT WE WOULD GO WITH MEDIATION.  WE PICKED FORMER

10:25AM 11   JUDGE LAYN PHILLIPS.  HE'S A MEDIATOR.  I HAD NO EXPERIENCE

10:25AM 12   WITH HIM AT ALL.  I HAD NEVER MET HIM BEFORE.  I HAD HEARD

10:25AM 13   TERRIFIC THINGS ABOUT HIM BUT WE HAD NO RELATIONSHIP.

10:25AM 14       OUR VIEW GOING INTO THAT DAY WAS THAT WE WERE NOT GOING TO

10:25AM 15   GET A SETTLEMENT THAT DAY.  WE THOUGHT BASED ON JUST THE BODY

10:25AM 16   LANGUAGE IN THE CASE THAT THE PARTIES WERE TOO FAR APART.

10:25AM 17       BUT WE THOUGHT IT MADE SENSE TO SPEAK.  WE THOUGHT

10:25AM 18   MEDIATION WAS A GOOD OPPORTUNITY TO EXCHANGE OUR VIEWS ABOUT

10:25AM 19   THE CASE IN A WAY THAT WAS MORE PROTECTED AND PEOPLE COULD BE A

10:25AM 20   LITTLE BIT MORE HONEST.  SO WE WENT IN WITH GOOD FAITH BUT NO

10:25AM 21   EXPECTATIONS AT ALL.

10:25AM 22       THE DAY GOT OFF TO A VERY FOCUSSED START WHERE THERE WAS

10:25AM 23   AN INTIMATE EXCHANGE OF INFORMATION ABOUT THE FACTUAL AND LEGAL

10:26AM 24   ISSUES.

10:26AM 25       THE REAL ISSUES HERE, WHEN YOUR HONOR ASKED ABOUT OR

| | | |
|---|---|---|
| 10:26AM | 1 | SUGGESTED WHY DON'T YOU KNOW MORE ABOUT THE FACTUAL RECORD? |
| 10:26AM | 2 | THE FACTUAL RECORD IS NOT THAT COMPLICATED IN THIS CASE. |
| 10:26AM | 3 | THE RETENTION CLAIMS, WE KNOW THE FACTS.  THEY HELD ONTO |
| 10:26AM | 4 | PII.  THAT'S NOT IN DISPUTE.  THAT WAS NEVER IN DISPUTE. |
| 10:26AM | 5 | THE COURT:  I GUESS THE DISPUTE MIGHT BE WHETHER OR |
| 10:26AM | 6 | NOT THERE WAS THIRD PARTY USE. |
| 10:26AM | 7 | MR. EDELSON:  THERE ARE TWO DISPUTES, IF I MAY, YOUR |
| 10:26AM | 8 | HONOR. |
| 10:26AM | 9 | ONE DISPUTE IS THAT THEY CLAIM THAT THEY WERE HOLDING ON |
| 10:26AM | 10 | TO IT FOR PROPER PURPOSES. |
| 10:26AM | 11 | UNDER THE STATUTE THEY'RE ALLOWED TO HOLD IT IF THEY'RE |
| 10:26AM | 12 | USING IT FOR THE PURPOSES IT WAS COLLECTED.  AND IN ALL OF |
| 10:26AM | 13 | THESE CASES THE DEFENDANTS HAVE HAD VERY CREATIVE ARGUMENTS, |
| 10:26AM | 14 | THEY NEEDED TO KEEP IT FOR TAX REASONS, ACCOUNTING REASONS, |
| 10:26AM | 15 | CUSTOMER SERVICE.  THOSE WERE LEGAL ARGUMENTS THAT WE FELT THAT |
| 10:26AM | 16 | WE DIDN'T NEED THEIR HELP EXPLAINING TO US.  WE UNDERSTOOD THAT |
| 10:26AM | 17 | AND THOUGHT WE COULD EVALUATE IT. |
| 10:27AM | 18 | THE BIGGER ISSUE WAS DISCLOSURE.  TO US THAT WAS THE REAL |
| 10:27AM | 19 | VALUE OF THE CASE, AND THAT'S THE REAL VALUE OF ALL OF THESE |
| 10:27AM | 20 | CASES. |
| 10:27AM | 21 | THE SECOND THAT THE DEFENDANTS ARE DISCLOSING THE |
| 10:27AM | 22 | INFORMATION AND ESPECIALLY IF THEY'RE SELLING IT AND MAKING |
| 10:27AM | 23 | MONEY FROM IT, THAT'S WHEN WE THINK THE ARGUMENTS ABOUT GETTING |
| 10:27AM | 24 | STATUTORY DAMAGES AND GETTING LARGE SUMS OF MONEY FROM THE |
| 10:27AM | 25 | CLASS MAKE A LOT MORE SENSE, AND I'LL GET INTO THAT A LITTLE |

10:27AM 1    BIT MORE.

10:27AM 2         BUT THE SELLING OF A JURY OR A JUDGE ON THE FACT THAT A

10:27AM 3    COMPANY HELD ON TO INFORMATION BUT DIDN'T MONETIZE IT AND THEN

10:27AM 4    IS GOING TO HAVE TO PAY $100 BILLION IS A HARD SALE.

10:27AM 5         SAYING, WELL, LOOK, THIS IS HOW MUCH MONEY THEY MADE ON IT

10:27AM 6    AND THEY WEREN'T TELLING THEIR CUSTOMERS IS A MUCH EASIER SALE.

10:27AM 7    THAT WAS OUR FOCUS.

10:27AM 8         WE THOUGHT WE HAD SOME GOOD ARGUMENTS ABOUT HOW THEY WERE

10:27AM 9    DISCLOSING IT TO A THIRD PARTY SPECIFICALLY.

10:27AM 10        WE THOUGHT THAT THEY WERE -- NETFLIX'S WHOLE BUSINESS

10:27AM 11   MOTTO IS SET ON ITS ALGORITHM, THE FACT THAT THEY CAN RECOMMEND

10:28AM 12   -- NETFLIX DISAGREES AND I'M SURE THEY CAN REPRESENT THEIR OWN

10:28AM 13   BUSINESS MOTTO, BUT MY SENSE IS THAT THEY CAN RECOMMEND AND

10:28AM 14   THEY HAVE SPENT A LOT OF TIME TRYING TO DO STATISTICAL ANALYSIS

10:28AM 15   AND COME UP WITH THE BEST PREDICTORS.

10:28AM 16        WHAT WE THOUGHT AND WHAT WE WERE INFORMED AND BELIEVED IS

10:28AM 17   THAT THEY WERE GIVING THAT INFORMATION TO THIRD PARTIES WHO

10:28AM 18   WERE NOT EMPLOYED BY NETFLIX AND WE THOUGHT THAT THAT WAS THE

10:28AM 19   DISCLOSURE.

10:28AM 20        THAT WAS ONE OF OUR MAJOR FOCUSES AND WE WERE ABLE TO

10:28AM 21   GET -- THANK YOU.  AND WE WERE ABLE TO GET SPECIFIC INFORMATION

10:28AM 22   SHOWING THAT THAT WASN'T TRUE AND THEY DID IT IN HOUSE.

10:28AM 23             THE COURT:  SO THAT INFORMATION WAS THAT ONE OF THE

10:28AM 24   LETTERS I THINK I READ SUGGESTED THAT THERE WAS REFERENCE TO

10:28AM 25   SOMETHING CALLED AN INFORMAL DEPOSITION, WHICH WAS A NEW TERM

| | | |
|---|---|---|
| 10:28AM | 1 | TO ME.  I'M NOT SURE WHAT THAT MEANS. |
| 10:28AM | 2 | THE QUESTION WAS, I SUPPOSED RAISED IN THE LETTER, WAS |
| 10:29AM | 3 | RAISED UNDER OATH, WAS THIS UNDER PENALTY OF PERJURY OR |
| 10:29AM | 4 | SOMEBODY SWEAR AS TO THE PERIL OF THEIR SOUL TO TELL THE TRUTH. |
| 10:29AM | 5 | WHAT DOES THAT MEAN? |
| 10:29AM | 6 | MR. EDELSON:  WELL, WE DID IT A FEW DIFFERENT WAYS. |
| 10:29AM | 7 | THE DEPOSITION LATER ON WAS THE CONFIRMATORY/AFFIRMATORY |
| 10:29AM | 8 | DEPOSITION. |
| 10:29AM | 9 | THE FIRST THING WAS WE HAD QUESTIONS ABOUT WHAT WAS YOUR |
| 10:29AM | 10 | BASIS FOR THINKING AND IT WAS DONE OUTSIDE OF NETFLIX AND THEY |
| 10:29AM | 11 | WERE ABLE TO DEMONSTRATE THAT THAT WASN'T TRUE. |
| 10:29AM | 12 | IT'S NOT THE TYPE OF THING WHERE WE'RE ASKING IF SOMEBODY |
| 10:29AM | 13 | HAD VISITED A CERTAIN COUNTRY WHERE YOU WANT TO REALLY FIGURE |
| 10:29AM | 14 | OUT IF THEY'RE CREDIBLE OR NOT IF NETFLIX WAS USING A THIRD |
| 10:29AM | 15 | PARTY, WE DIDN'T HAVE THE SAME CONCERNS THAT THEY WERE HIDING |
| 10:29AM | 16 | THAT, ESPECIALLY WHEN THEY'RE ABLE TO EXPLAIN WHAT OUR FLAW WAS |
| 10:29AM | 17 | AND OUR REASONING. |
| 10:29AM | 18 | THE COURT:  SO IS THAT AN INFORMAL DEPOSITION? |
| 10:29AM | 19 | MR. EDELSON:  THE DEPOSITION WAS TO CONFIRM THAT. |
| 10:29AM | 20 | AFTER THEY SHOWED IT TO US, WE SAID WE STILL HAVE SOME OTHER |
| 10:29AM | 21 | QUESTIONS AND WE WANT TO MAKE SURE WE'RE COMFORTABLE WITH THAT |
| 10:30AM | 22 | AND THEY WERE ABLE TO GIVE THAT TO OUR SATISFACTION. |
| 10:30AM | 23 | THE COURT:  SO THAT INFORMATION WAS RECEIVED UNDER |
| 10:30AM | 24 | PENALTY OF PERJURY IN WHAT WE KNOW AS A DEPOSITION, IS THAT HOW |
| 10:30AM | 25 | THAT WAS RECEIVED OR WAS IT A -- I SUPPOSE IN LOOKING AT IT |

| | | |
|---|---|---|
| 10:30AM | 1 | THROUGH THE LOOKING GLASS OF AN OBJECTOR, ONE MIGHT SAY, WELL, |
| 10:30AM | 2 | THIS WAS A PHONE CALL?  AND THEY SAID, ARE YOU DOING THIS?  AND |
| 10:30AM | 3 | THEY SAID, NO, WE'RE NOT.  AND THEY SAID GREAT, THANKS. |
| 10:30AM | 4 | MR. EDELSON:  WELL, I UNDERSTAND THAT'S NOT HOW IT |
| 10:30AM | 5 | WENT.  IT WAS NOT UNDER PENALTY OF PERJURY.  IT WAS AN |
| 10:30AM | 6 | INTERVIEW AND IT WAS BECAUSE WE HAD A SET OF QUESTIONS WHICH |
| 10:30AM | 7 | THEY'D ANSWER.  WE DIDN'T JUST SAY CAN YOU TELL US WHETHER |
| 10:30AM | 8 | YOU'RE DOING THIS?  WE SAID EXPLAIN TO US WHAT YOUR OPERATION |
| 10:30AM | 9 | IS AND GIVE US PROOF, NAME, CHOICE, JOB TITLES, THAT TYPE OF |
| 10:30AM | 10 | THING.  SO IT WAS ALL STUFF THAT WE COULD VERIFY. |
| 10:30AM | 11 | THE COURT:  I SEE.  AND, AGAIN, LOOKING THROUGH THE |
| 10:30AM | 12 | LENS OF AN OBJECTOR, THEY MIGHT SAY, WELL, GEE, YOU KNOW, ONE |
| 10:30AM | 13 | OF THE HALLMARKS OF OUR JUSTICE SYSTEM IS PLACING PEOPLE UNDER |
| 10:31AM | 14 | OATH UNDER PENALTY OF PERJURY IS TO GET A GUARANTEE THAT WE CAN |
| 10:31AM | 15 | RECEIVE VERACITY IN THEIR TESTIMONY AND INFORMATION.  THAT'S, |
| 10:31AM | 16 | PERHAPS, THE HIGHEST FORM THAT WE CAN USE. |
| 10:31AM | 17 | MR. EDELSON:  YES, I UNDERSTAND -- NO, I UNDERSTAND. |
| 10:31AM | 18 | I MEAN, TO ME, SINCE THIS IS A BASIC FACT, IT'S AS IF I'M |
| 10:31AM | 19 | ASKING WHERE IS NETFLIX LOCATED?  AND THEY SAY WE ARE LOCATED |
| 10:31AM | 20 | IN CALIFORNIA AND YOU CAN LOOK AT OUR SECURITIES FILINGS TO |
| 10:31AM | 21 | SEE, AND THEN I'M ABLE TO VERIFY THAT. |
| 10:31AM | 22 | SO EVERYTHING THAT THEY WERE ABLE TO TELL ME, I COULD THEN |
| 10:31AM | 23 | INDEPENDENTLY VERIFY. |
| 10:31AM | 24 | THE COURT:  AND THAT'S WHAT YOU DID IN THIS CASE |
| 10:31AM | 25 | WITH THAT INFORMATION THAT WAS INDEPENDENT VERIFICATION -- |

10:31AM  1                    MR. EDELSON:  YES.

10:31AM  2                    THE COURT:  -- OF THE PROCESSES THAT WERE SUPPLIED

10:31AM  3        TO YOU BY NETFLIX?

10:31AM  4                    MR. EDELSON:  YES, THEY'RE A PUBLIC COMPANY.  SO

10:31AM  5        EVERYTHING THAT THEY DO WE'RE ABLE TO, IF WE'RE ABLE TO FOCUS

10:31AM  6        ON THE INFORMATION, WE CAN THEN FIND OUT AND THEY HAD ALREADY

10:31AM  7        GIVEN US SOME DISCOVERY.

10:31AM  8                    THE COURT:  BUT THE ISSUE HERE WAS THE THIRD

10:31AM  9        PARTY --

10:31AM 10                    MR. EDELSON:  WAS WHETHER THEY WERE OUTSOURCING US

10:32AM 11        OR WHETHER THEY WERE DOING IN IT INHOUSE.

10:32AM 12                    THE COURT:  RIGHT.  AND SO YOU HAD SUFFICIENT

10:32AM 13        INFORMATION WHERE YOU COULD DRILL DOWN TO DISCERN THAT IT

10:32AM 14        WASN'T BEING OUTSOURCED, IT WAS ONLY BEING USED INHOUSE?

10:32AM 15                    MR. EDELSON:  YES.  AND MY --

10:32AM 16                    MR. BALABANIAN:  AND JUST TO ADD TO THAT, NETFLIX

10:32AM 17        CONFIRMED AS MUCH ON THE RECORD WITH THEIR FILING JUST A FEW

10:32AM 18        DAYS AGO, YOUR HONOR.

10:32AM 19           THERE IS -- I DON'T BELIEVE THERE IS AT THIS POINT I DON'T

10:32AM 20        BELIEVE ANY FACTUAL DISPUTE WHATSOEVER THAT NETFLIX CONDUCTS

10:32AM 21        ITS DATA ANALYTICS INHOUSE AND THAT WAS ONE OF OUR THEORIES WAS

10:32AM 22        THAT THEY OUTSOURCED THAT.  SO THEY CONFIRMED ON THE RECORD

10:32AM 23        THAT THAT WAS THE CASE.

10:32AM 24                    THE COURT:  ALL RIGHT.  I APPRECIATE THAT.  THAT'S

10:32AM 25        SUBSEQUENT TO THE RESOLUTION, THE MEDIATION.

| | | |
|---|---|---|
| 10:32AM | 1 | MR. BALABANIAN:  SURE IT IS. |
| 10:32AM | 2 | THE COURT:  BUT I SUPPOSE FROM YOUR PERSPECTIVE IT'S |
| 10:32AM | 3 | CORROBORATION. |
| 10:32AM | 4 | MR. BALABANIAN:  IT IS. |
| 10:32AM | 5 | THE COURT:  OKAY. |
| 10:32AM | 6 | MR. EDELSON:  WE ALSO, I MEAN, HAD SOME FAITH IN THE |
| 10:32AM | 7 | LAWYERS THAT THEY WERE NOT GOING TO DEFRAUD US IN THE COURT AT |
| 10:32AM | 8 | THE SAME TIME.  AND WE, YOU KNOW, YOU SEE WHEN YOU SUE |
| 10:33AM | 9 | DEFENDANTS IN CLASS ACTIONS, YOU HAVE SOME SENSE OF THEM AND WE |
| 10:33AM | 10 | HAVE NEVER CLAIMED THAT NETFLIX IS A FRAUDULENT COMPANY OR |
| 10:33AM | 11 | DISHONEST AND EVERY TIME THEY GAVE US INFORMATION AND WE WERE |
| 10:33AM | 12 | ABLE TO VERIFY IT, IT WAS WHAT THEY SAID WAS TRUE.  SO WE HAD A |
| 10:33AM | 13 | CONFIDENCE LEVEL THERE. |
| 10:33AM | 14 | AND ALSO REMEMBER, YOUR HONOR, WE WERE VERY MOTIVATED FOR |
| 10:33AM | 15 | THE ANSWER TO BE DIFFERENT.  THE -- AND ONE THING THAT IS |
| 10:33AM | 16 | THROUGHOUT THE OBJECTOR'S BRIEFS IS AS IF WE HAVE SOME |
| 10:33AM | 17 | DIFFERENT TYPE OF MOTIVATION, WE WOULD MUCH RATHER HAVE A |
| 10:33AM | 18 | SMALLER, QUICKER CASE, AND THAT'S NOT TRUE. |
| 10:33AM | 19 | AND THE CASE IS NOT HARD TO PROVE IF THERE'S A DISCLOSURE. |
| 10:33AM | 20 | IT'S A VERY CLEAN CASE.  THAT'S THE TYPE OF CASE THAT, FRANKLY, |
| 10:33AM | 21 | MAKES THE PLAINTIFFS' ATTORNEYS VERY EXCITED BECAUSE WHAT IS |
| 10:33AM | 22 | THERE?  WE HAVE THE VPPA, THAT'S CLEAR.  ONCE WE SHOW |
| 10:33AM | 23 | DISCLOSURE, WE HAVE A GOOD ARGUMENT THAT WE WILL HAVE SOME |
| 10:33AM | 24 | STATUTORY DAMAGES AND NETFLIX IS IN OUR MIND MORE CULPABLE, |
| 10:33AM | 25 | WHICH WE THINK ALWAYS FACTORS INTO, YOU KNOW, THE ANALYSIS. |

**SER 019**

10:34AM 1        SO WE WERE VERY MOTIVATED FOR NETFLIX TO BE WRONG, AND I

10:34AM 2   THINK THAT ALSO SHOULD FACTOR IN AS WELL WHEN WE'RE -- YOU

10:34AM 3   KNOW, BECAUSE THE QUESTION IS, KIND OF COMES TO HOW MUCH CAN AN

10:34AM 4   OBJECTOR CHECK THE WORK OF CLASS COUNSEL?

10:34AM 5        AND I THINK THE CASE LAW IS CLEAR THAT IT'S NOT THEIR JOB

10:34AM 6   TO GET TO LOOK AT EVERY LITTLE DECISION WE MADE.

10:34AM 7            THE COURT:  YOU'RE NOT GOING TO PROVIDE THE WORK

10:34AM 8   PRODUCT?

10:34AM 9            MR. EDELSON:  NO, UNLESS THERE'S A REASON.  UNLESS

10:34AM 10  THEY CAN SHOW WE'RE NOT EXPERIENCED, WE DON'T DO THIS, BUT THIS

10:34AM 11  IS WHAT WE DO.

10:34AM 12       WE'RE THE ONES BRINGING THESE CASES THROUGHOUT THE

10:34AM 13  COUNTRY, WE'RE THE ONES APPOINTED LEAVE AND SETTLING OTHER

10:34AM 14  TYPES OF CASES AND GETTING THEM APPROVED.

10:34AM 15           THE COURT:  YOU TRY THESE CASES, TOO, DON'T YOU?

10:34AM 16           MR. EDELSON:  THESE CASES ARE ALL NEW SO NONE OF

10:34AM 17  THEM HAVE GONE TO TRIAL.

10:34AM 18           THE COURT:  I GUESS WHAT I'M SAYING IS THAT YOUR

10:34AM 19  FIRM TRIES CASES?

10:34AM 20           MR. EDELSON:  OF COURSE.

10:34AM 21           THE COURT:  YOU DON'T SETTLE EVERY CASE THAT COMES

10:34AM 22  IN THE DOOR?

10:34AM 23           MR. EDELSON:  WE LOSE AS WELL.  WE LOSE, WE GET

10:34AM 24  JUDGMENTS, WE SETTLE.

10:34AM 25           THE COURT:  GETTING BACK TO THE ISSUE OF THIS THIRD

| | | |
|---|---|---|
| 10:34AM | 1 | PARTY USAGE THAT YOU SUGGESTED THAT YOU'VE RELIED ON NETFLIX'S |
| 10:35AM | 2 | REPRESENTATIONS, THAT WAS THROUGH THEIR COUNSEL THEN, THROUGH |
| 10:35AM | 3 | THE LAWYERS? |
| 10:35AM | 4 | MR. EDELSON:  NO. |
| 10:35AM | 5 | THE COURT:  NETFLIX'S COUNSEL? |
| 10:35AM | 6 | MR. EDELSON:  NO, THE INTERVIEWS WERE WITH THEIR KEY |
| 10:35AM | 7 | PERSONNEL AND WE ALSO HEARD FROM THEIR LAWYERS BUT, NO, WE |
| 10:35AM | 8 | SPOKE DIRECTLY TO THE HORSE'S MOUTH. |
| 10:35AM | 9 | THE COURT:  SO THEY AGREED TO SPEAK WITH YOU WITH OR |
| 10:35AM | 10 | WITHOUT COUNSEL? |
| 10:35AM | 11 | MR. EDELSON:  COUNSEL WAS THERE. |
| 10:35AM | 12 | MR. BALABANIAN:  COUNSEL WAS THERE. |
| 10:35AM | 13 | THE COURT:  AND YOU RECEIVED THAT INFORMATION FROM |
| 10:35AM | 14 | NETFLIX WITH THEIR COUNSEL PRESENT? |
| 10:35AM | 15 | MR. EDELSON:  YEAH, WE RECEIVED INFORMATION -- I'M |
| 10:35AM | 16 | SORRY.  I DIDN'T MEAN TO INTERRUPT. |
| 10:35AM | 17 | THE COURT:  AND THEN YOU ALSO RECEIVED INFORMATION |
| 10:35AM | 18 | FROM COUNSEL, NETFLIX'S COUNSEL DIRECTLY? |
| 10:35AM | 19 | MR. EDELSON:  I MAY HAVE CONTRIBUTED TO SOME |
| 10:35AM | 20 | CONFUSION. |
| 10:35AM | 21 | THE COURT:  I'M JUST ASKING IF YOU DID.  I'M CURIOUS |
| 10:35AM | 22 | WHETHER OR NOT YOU HAD QUESTIONS FOR NETFLIX, ONCE THEY'RE |
| 10:35AM | 23 | REPRESENTED, YOU WENT THROUGH COUNSEL? |
| 10:35AM | 24 | MR. EDELSON:  AT THE MEDIATION, THEY WERE THERE, |
| 10:36AM | 25 | NETFLIX'S ATTORNEYS WERE THERE AND INHOUSE ATTORNEYS AND THERE |

**SER 021**

10:36AM  1    WAS AN OPEN FLOW OF COMMUNICATION WHERE WE WERE ALL IN THE ROOM

10:36AM  2    AND WE WERE ABLE TO INTERROGATE THEM AND SAY HERE ARE OUR

10:36AM  3    ARGUMENTS, HERE'S WHAT WE BELIEVE AND EXPLAIN WHY THIS IS NOT

10:36AM  4    TRUE.

10:36AM  5        AT THAT TIME WHAT THEY SAID WAS, THERE'S A COUPLE OF

10:36AM  6    THINGS THAT THEY SAID, HERE'S WHY YOU'RE WRONG AND A COUPLE OF

10:36AM  7    THINGS THAT THEY'VE SAID, WE HAVE TO LOOK INTO IT AND THEN WE

10:36AM  8    DID AND THAT'S WHAT A LOT OF THE DAY WAS.  THEY WERE CALLING

10:36AM  9    PEOPLE, WE WERE CALLING OUR EXPERTS.

10:36AM  10       AND THEY WERE SAYING, NO, THIS IS WHY IT DIDN'T WORK LIKE

10:36AM  11   THAT.  AND WE SAID, WELL, WHY IS IT THAT WE THINK THIS?  THIS

10:36AM  12   IS OUR EVIDENCE.  YOU KNOW, UNTIL WE HAD SOME UNDERSTANDING

10:36AM  13   THAT WE ALL COME TO THE RIGHT RESULT.

10:36AM  14       AFTER THAT, EVEN THOUGH WE HAD SOME UNCERTAINTY, WE STILL

10:36AM  15   SAID WE NEED TO ASK MORE QUESTIONS, GET US THE KEY PERSONNEL,

10:36AM  16   THE PEOPLE YOU'RE CALLING TO ASK THEM FOR INFORMATION SO WE CAN

10:36AM  17   ASK THEM THE SAME THINGS THAT YOU'RE ASKING JUST TO MAKE SURE

10:36AM  18   THAT WE'RE NOT MISSING SOMETHING.

10:36AM  19           THE COURT:  I SEE.  SO THAT SOUNDS LIKE THAT

10:36AM  20   MEETING -- WAS IT JUST ONE DAY?  WAS IT MULTIPLE DAYS?

10:37AM  21           MR. EDELSON:  YES.

10:37AM  22           THE COURT:  IT SOUNDS LIKE THAT MEETING WAS A

10:37AM  23   MEANINGFUL EXCHANGE.  IN ESSENCE YOU, I GUESS WHAT WE USED TO

10:37AM  24   CALL IS OPENED YOUR FILES AND SAYING HERE'S WHAT OUR THEORY IS

10:37AM  25   AND OUR CASE IS AND HERE'S WHAT WE BELIEVE IS HAPPENING, AND

10:37AM  1    THESE ARE THE WITNESSES THAT WE WOULD CALL TO PROVE THIS, AND

10:37AM  2    WE'RE GIVING YOU THE OPPORTUNITY, DEFENDANT, TO REBUT IT NOW AS

10:37AM  3    OPPOSED TO IN FRONT OF 12 MEMBERS OF THE COMMUNITY.

10:37AM  4              MR. EDELSON:  IT WAS EVEN MORE THAN THAT BECAUSE THE

10:37AM  5    WAY THAT THIS MEDIATOR WORKED, AND I HAVE TO SAY FOR THE

10:37AM  6    RECORD, HE WAS THE BEST MEDIATOR WE EVER HAD.  THIS CASE WOULD

10:37AM  7    NOT HAVE SETTLED WITHOUT HIM.

10:37AM  8         IT WASN'T US JUST PRESENTING OUR THEORIES.  IT WAS US

10:37AM  9    INTERROGATING THEM BECAUSE WE FELT GOING INTO THAT, THAT THIS

10:37AM  10   WAS A DISCLOSURE CASE AND WE THOUGHT THAT THAT --

10:37AM  11             THE COURT:  THAT WAS YOUR STRONGEST POINT GOING IN?

10:37AM  12             MR. EDELSON:  YEAH, THAT'S WHAT GAVE THE CASE THE

10:37AM  13   VALUE.  THAT WAS THE EXCITING PART.  UNDER THE RETENTION CASE,

10:37AM  14   THEY'RE VIOLATING THE LAW, WE NEED AN INJUNCTION, PEOPLE, YOU

10:38AM  15   KNOW, HAVE BEEN DAMAGED, ACCORDING TO OUR EXPERT, AND NOTHING

10:38AM  16   OUT OF POCKET AND -- BUT THE DISCLOSURE CASE WAS WHERE THE

10:38AM  17   RUBBER HITS THE ROAD.

10:38AM  18        SO WE WERE NOT INTERESTED IN JUST GIVING A PRESENTATION.

10:38AM  19   WE WERE INTERESTED IN INTERROGATING THEM AND SAYING HERE'S WHAT

10:38AM  20   WE FOUND OUT AND EXPLAIN TO US WHY WE'RE WRONG, AND WE DON'T

10:38AM  21   THINK WE'RE WRONG.

10:38AM  22             THE COURT:  AND THE GOOD RETIRED JUDGE ALLOWED YOU

10:38AM  23   TO DO THAT?

10:38AM  24             MR. EDELSON:  HE CALLED FOR THAT.  WE DIDN'T ASK TO

10:38AM  25   DO THAT.  AND HE SAID THIS IS NOT GOING TO SETTLE BECAUSE YOU

| | | |
|---|---|---|
| 10:38AM | 1 | GUYS HAVE SUCH DIFFERENT VIEWS.  THEY THINK YOU'RE WRONG AND WE |
| 10:38AM | 2 | ARE SURE YOU'RE RIGHT.  GO ASK THEM WHATEVER YOU WANT, GO AFTER |
| 10:38AM | 3 | THEM AND ASK THEM. |
| 10:38AM | 4 | AND THEY DID IT IN AN HONEST, GOOD FAITH WAY.  THEY |
| 10:38AM | 5 | WEREN'T JUST GIVING US WHATEVER ANSWERS THEY COULD.  THEY WERE, |
| 10:38AM | 6 | THEY WERE THINKING ABOUT IT SAYING WE DON'T KNOW THE ANSWER TO |
| 10:38AM | 7 | THAT.  WE DON'T KNOW.  WE'VE GOT TO LOOK INTO IT AND THAT'S |
| 10:38AM | 8 | HOW, HOW, YOU KNOW, HALF OF THE DAY WENT. |
| 10:38AM | 9 | AND NOBODY EVEN TALKED SETTLEMENT, ANY NUMBERS UNTIL THAT. |
| 10:38AM | 10 | EVERYONE HAD TO UNDERSTAND THE THRESHOLD QUESTION, DO WE |
| 10:39AM | 11 | HAVE A DISCLOSURE CASE ON OUR HANDS? |
| 10:39AM | 12 | SO THE FACT THAT LATER ON THAT THEY WERE ABLE TO VERIFY |
| 10:39AM | 13 | IT, TO US THERE WAS NO QUESTION THAT THEY WERE GOING TO, |
| 10:39AM | 14 | BECAUSE WE WERE INCREDIBLY CONFIDENT WITH THE INFORMATION THAT |
| 10:39AM | 15 | WE GOT. |
| 10:39AM | 16 | THE COURT:  OKAY.  THANK YOU. |
| 10:39AM | 17 | MR. EDELSON:  I WANT TO TALK A LITTLE BIT ABOUT -- |
| 10:39AM | 18 | I'VE KIND OF NOW TOUCHED ON THE ISSUES THAT I WANT TO TALK |
| 10:39AM | 19 | ABOUT. |
| 10:39AM | 20 | BUT I NOW WANT TO TALK ABOUT THE VALUE OF THE CASE.  SO |
| 10:39AM | 21 | NOW ONCE YOU'RE IN OUR MIND AND WE VIEW THIS AS MOSTLY A |
| 10:39AM | 22 | RETENTION CASE.  ANY CLAIMS ABOUT DISCLOSURE CAN BE VERY |
| 10:39AM | 23 | ATTENUATED, AND WE HAVE BEEN MAKING SIMILAR ARGUMENTS IN OTHER |
| 10:39AM | 24 | CASES AND COURTS HAVE NOT BEEN VERY RECEPTIVE TO THOSE. |
| 10:40AM | 25 | WHAT COURTS HAVE GENERALLY SAID IS THAT IF YOU HAVE A |

10:40AM 1   DISCLOSURE CASE, IT HAS TO BE A REAL DISCLOSURE.  SO AT THIS

10:40AM 2   POINT WE VIEW THIS AS A RETENTION CASE.

10:40AM 3       THEN THE QUESTION IS, WELL, WHAT IS A RETENTION CASE

10:40AM 4   WORTH?  AND HERE WE'RE NOT FILING IN THE DARK.  THERE HAS BEEN

10:40AM 5   A NUMBER OF CASES, OF PRIVACY CASES OF STATUTORY DAMAGES WHICH

10:40AM 6   ARE SEEN AS EITHER NO HARM CASES OR DE MINIMUS HARM CASES AND

10:40AM 7   THAT'S THE BEACON CASE AND THAT'S THE BUZZ CASE AS WELL.

10:40AM 8       OUR VIEW IS THAT ALTHOUGH THERE ARE STATUTORY DAMAGES, AND

10:40AM 9   NETFLIX CLAIMS THAT THE STATUTORY DAMAGES ARE THE MAXIMUM AND

10:40AM 10  THE COURT HAS DISCRETION, WE WOULD TAKE A DIFFERENT VIEW.  OUR

10:40AM 11  VIEW IS THAT THE STATUTORY DAMAGES ARE THE STATUTORY DAMAGES.

10:40AM 12      WE ALSO BELIEVE THAT CONSTITUTIONALLY THE CLASS CANNOT

10:40AM 13  ACTUALLY RECOVER THAT MUCH MONEY, THAT THIS HAS NOT BEEN

10:40AM 14  SOMETHING THAT ANY COURT HAS EVER DECIDED, EITHER WAY, AND IN A

10:41AM 15  CLEAR WAY.  THERE'S BEEN NO JUDGMENT EVER IN THE WORLD GIVING

10:41AM 16  THE STATUTORY DAMAGES IN A KIND OF A DE MINIMUS HARM KIND OF

10:41AM 17  PRIVACY CASE AND NO COURT WHICH HAS SAID, WELL, IT WOULD

10:41AM 18  VIOLATE DUE PROCESS.  SO WE'RE GUESSING HERE, I'LL ADMIT THAT.

10:41AM 19  BUT THAT'S WHAT YOU HAVE TO DO AS A LAWYER.  AND THE COURTS SAY

10:41AM 20  THAT'S OKAY.

10:41AM 21      WHAT WE THINK IS THAT IT'S A SIMILAR ANALYSIS AS WITH

10:41AM 22  PUNITIVE DAMAGES, THAT AT SOME POINT THERE'S A DUE PROCESS

10:41AM 23  VIOLATION IF YOU'RE GETTING TOO MUCH.

10:41AM 24      AND WHAT THE SUPREME COURT SAID FOR PUNITIVE DAMAGES IS

10:41AM 25  THAT IF YOU'RE GETTING TOO MUCH OF A MULTIPLE ACTUAL DAMAGES,

10:41AM  1        THAT'S WHEN WE'RE GOING TO STRIKE IT.  AND I THINK THEY SAID IT

10:41AM  2        HAS TO BE SINGLE DIGITS.  SO THAT'S KIND OF HOW WE THOUGHT

10:41AM  3        ABOUT THIS CASE.

10:41AM  4            THE FIRST STARTING POINT WAS WHAT ARE THE ACTUAL DAMAGES?

10:41AM  5        AND HERE SINCE ALL THAT WAS HAPPENING WAS THAT NETFLIX WAS

10:41AM  6        HOLDING ONTO INFORMATION, THEY WEREN'T MONETIZING IT, WE LOOKED

10:42AM  7        TO EXPERTS IN THE FIELD OF PRIVACY AND WE ATTACHED HIS EXPERT

10:42AM  8        REPORT.  AND HE TRIED TO LOOK AT HOW MUCH DO PEOPLE VALUE THEIR

10:42AM  9        PRIVATE INFORMATION ABOUT THEIR MOVIE RENTAL HISTORIES.  AND

10:42AM 10        BASED ON THE SURVEYS HE DID, HE SAID THAT IT WAS -- IT HAD SOME

10:42AM 11        VALUE, NOT AS MUCH AS I THINK SEX TOYS, WHICH NO ONE WANTED THE

10:42AM 12        WORLD TO KNOW ABOUT THAT.  IT WAS CLOSER TO LIKE OFFICE

10:42AM 13        EQUIPMENT, THAT PEOPLE VALUE IT BUT NOT THAT MUCH.

10:42AM 14            HE THOUGHT THE CLASS AS A WHOLE VALUED IT AT ABOUT $4.65

10:42AM 15        MILLION IF I'M CORRECT.

10:42AM 16                    MR. BALABANIAN:  YES.

10:42AM 17                    MR. EDELSON:  WE'VE GONE THROUGH THE MATH OF I THINK

10:42AM 18        PAGE 29 OF OUR FINAL BRIEF WHERE WE EXPLAIN THAT FROM THAT

10:42AM 19        NUMBER IF YOU THEN GIVE A MULTIPLE BASED ON THE FACT THAT WE

10:42AM 20        SHOULD BE ABLE TO RECOVER MORE THAN THAT UNDER THE DUE PROCESS

10:42AM 21        ANALYSIS, BUT THEN FACTOR IN THAT WE MIGHT LOSE, THAT A LOT OF

10:43AM 22        THESE ISSUES ARE UNTESTED OR TO THE EXTENT THAT THEY ARE

10:43AM 23        TESTED, THE PLAINTIFFS ARE LOSING.

10:43AM 24            EVERY COURT THAT HAS LOOKED AT IT HAS SAID THAT YOU HAVE

10:43AM 25        NO PRIVATE RIGHT OF ACTION FOR A RETENTION CLAIM.  EVERY SINGLE

10:43AM 1     COURT IN THE SAME CONTEXT, WHICH MEANS THAT THE CLASS WOULD GET

10:43AM 2     NOTHING.

10:43AM 3         WE ALSO, THOUGH, LOOKED AT A FEW OTHER OUTSIDE INDICATORS

10:43AM 4     TO SEE WHETHER OUR THINKING WAS DIFFERENT FROM WHAT OTHER

10:43AM 5     PEOPLE'S THINKING WAS.

10:43AM 6         THE FIRST THING WE LOOKED AT WAS WHAT ARE OTHER

10:43AM 7     SETTLEMENTS LIKE IN THIS CONTEXT?  EVERY OTHER SETTLEMENT IN

10:43AM 8     THIS -- IN THESE PRIVACY CASES HAVE BEEN ABOUT THE SAME, BEEN

10:43AM 9     ABOUT THE $10 MILLION LEVEL, I THINK 9.5 FOR BEACON, 8.5 FOR

10:43AM 10    BUZZ, WHICH MEANS THAT OTHER PLAINTIFF'S ATTORNEYS, WE WERE NOT

10:43AM 11    INVOLVED IN THOSE CASES, ARE VALUED THE SAME WAY.

10:43AM 12        AND THE WAY THE CLASS ACTIONS ARE SET UP IS CONGRESS WANTS

10:44AM 13    MOTIVATED ATTORNEYS WHO WANT TO GET THE LARGEST AWARD POSSIBLE.

10:44AM 14    SO THE OTHER ATTORNEYS WHO ARE MAKING SIMILAR DECISIONS SAYING

10:44AM 15    THAT THE TIME REQUIRED THEORY THAT YOU GOING TO GET BILLIONS OF

10:44AM 16    DOLLARS ARE NOT PRACTICABLE AND ARE NOT GOING TO HAPPEN.

10:44AM 17        OTHER THINGS THAT HAPPEN WHICH WAS WHAT WAS THE REACTION

10:44AM 18    OF THE PLAINTIFF WHEN WE FILED THIS SUIT?  THERE WAS NO RUSH TO

10:44AM 19    THE COURTHOUSE.  THERE WAS NOT A CASE WHERE THERE WERE 60 FIRMS

10:44AM 20    PILED ON FILING SEVERAL SUITS BECAUSE EVERYONE VIEWED THIS AS

10:44AM 21    THE TICKET TO RETIREMENT THAT WE'RE GOING TO END UP WITH A

10:44AM 22    $10 MILLION JUDGMENT.

10:44AM 23        NO.  WHAT HAPPENED WAS THE PEOPLE LOOKED AT IT AND SAID

10:44AM 24    IT'S A CUTE THEORY BUT IT'S A LIMITED THEORY.  SAME THING WITH

10:44AM 25    THESE OTHER VPPA CASES.  ALL OF THESE, THE OBJECTOR HAS BEEN

10:44AM  1    SAYING YOU HAVE A HUGE CASE ON YOUR HAND, THEY'RE NOT FILING

10:44AM  2    CASES AGAINST THE BEST BUY OF THE WORLD AND RED BOX AND TRYING

10:44AM  3    TO GET THOSE BILLION DOLLAR JUDGMENTS BECAUSE THEY DON'T VALUE

10:44AM  4    THEM IN THE SAME WAY.

10:45AM  5        THE OTHER THING WE ALSO LOOKED AT IS WHAT IS THE REACTION

10:45AM  6    OF OTHER JUDGES, MEDIATORS, AND OTHER DEFENDANTS?  THERE'S BEEN

10:45AM  7    NO RUSH FOR SETTLEMENT FROM OTHER DEFENDANTS.  IF OUR GOAL IS

10:45AM  8    TO JUST SETTLE EVERY CASE AND GET $9 MILLION FOR THE CLASS AND

10:45AM  9    TAKE OUR 25 PERCENT AND GO HOME, PRESUMABLY WE WOULD DO THAT IN

10:45AM  10   EVERY OTHER CASE, TOO, AND SINCE IT'S A HUNDRED BILLION DOLLAR

10:45AM  11   CASE, OTHER DEFENDANTS WOULD BE HAPPY TO PAY.  WELL, NONE OF

10:45AM  12   THEM ARE.  NONE OF THEM ARE PAYING AND SO FAR THEY'RE FIGHTING

10:45AM  13   AND SO FAR THEY'RE WINNING.

10:45AM  14       I THINK WE'RE GOING TO BE SUCCESSFUL ON THEM, WE BELIEVE

10:45AM  15   THAT, BUT WHEN WE'RE SUCCESSFUL, IT'S NOT GOING TO BE A HUNDRED

10:45AM  16   BILLION DOLLAR CASE.  THAT'S OUR VIEW.

10:45AM  17       AND THEN THE LAST THING IS HOW ABOUT THE ATTORNEYS WHO

10:45AM  18   HAVE LITIGATED THIS CASE?  IF YOUR HONOR REMEMBERS, THERE WAS A

10:45AM  19   PRETTY COMPETITIVE LEADERSHIP FIGHT, AND THIS WAS NOT SOMETHING

10:45AM  20   WHERE ALL OF THE ATTORNEYS WERE GETTING ALONG TOGETHER.  WHEN

10:45AM  21   WE PUT THE DEAL TOGETHER AND WE SPOKE TO EVERYBODY, EVERY

10:45AM  22   SINGLE ATTORNEY WHO WAS ACTUALLY INVOLVED, SPOKE TO THE

10:46AM  23   CLIENTS, LITIGATING ISSUES AND DRAFTING THE COMPLAINTS AND

10:46AM  24   RESEARCHING THE KEY ISSUES IN THE CASE, EVERY ATTORNEY

10:46AM  25   SUPPORTED IT.

| | | |
|---|---|---|
| 10:46AM | 1 | THE ONLY PEOPLE WHO ARE NOW COMPLAINING ARE PEOPLE WHO |
| 10:46AM | 2 | HAVE BEEN ON THE SIDELINES FROM THE BEGINNING. |
| 10:46AM | 3 | THE COURT:  I THINK ONE OF THE COMPLAINTS THAT I |
| 10:46AM | 4 | READ WAS THAT THERE SHOULD NOT BE BILLING FOR THE ATTORNEY |
| 10:46AM | 5 | FIGHT, THE LEAD COUNSEL FIGHT.  THAT'S NOT APPROPRIATE TO |
| 10:46AM | 6 | RECEIVE ATTORNEY'S FEES FROM THE CLASS FOR.  I GUESS THEIR |
| 10:46AM | 7 | POSITION IS WHY SHOULD WE PAY FOR THE ATTORNEYS IN FIGHTING? |
| 10:46AM | 8 | THAT DOESN'T SEEM APPROPRIATE. |
| 10:46AM | 9 | MR. EDELSON:  YEAH.  AND THAT'S MORE OF A |
| 10:46AM | 10 | PHILOSOPHICAL ARGUMENT BECAUSE THE CASE LAW IS CLEAR THAT THE |
| 10:46AM | 11 | TIME YOU PUT ON AND IS FOR THE BENEFIT OF THE CLASS.  AND IF I |
| 10:46AM | 12 | WANTED TO ARGUE THE PHILOSOPHY OF IT, I WOULD EXPLAIN THAT YOU |
| 10:46AM | 13 | WANT PEOPLE TO BE MOTIVATED TO WORK.  AND SO IF YOU SAY, WELL, |
| 10:46AM | 14 | THIS TYPE OF WORK IS NOT GOING TO BE COMPENSATED, PEOPLE ARE |
| 10:46AM | 15 | NOT GOING TO HAVE THE SAME MOTIVATIONS. |
| 10:47AM | 16 | DEFENSE COUNSEL GETS PAID FOR EVERYTHING THEY DO AND AS |
| 10:47AM | 17 | LONG AS WHAT WE'RE DOING IS FOR THE BENEFIT OF THE CLASS, WHICH |
| 10:47AM | 18 | IT WAS.  AT THE END OF THAT, WE WERE ABLE TO MANAGE THIS CASE |
| 10:47AM | 19 | IN AN INCREDIBLY EFFICIENT WAY. |
| 10:47AM | 20 | IF THERE WAS NO LEADERSHIP FIGHT, IT WOULD HAVE BEEN A |
| 10:47AM | 21 | MESS AND WE WOULD HAVE BEEN SPENDING A LOT MORE MONEY |
| 10:47AM | 22 | COLLECTIVELY, WHICH IS WHY COURTS SAY THAT'S AN APPROPRIATE |
| 10:47AM | 23 | TIME. |
| 10:47AM | 24 | ALTHOUGH OUR FIRST CUT OF THE FEE, OF COURSE, IS TO ASK |
| 10:47AM | 25 | FOR UNDER THE PERCENTAGE METHOD WHERE WE'RE NOT ASKING YOUR |

| | | |
|---|---|---|
| 10:47AM | 1 | HONOR TO LOOK AT EVERY TASK THAT WE DID AND SAY WHETHER YOU |
| 10:47AM | 2 | THINK THAT WE SPENT THE RIGHT AMOUNT OF TIME OR NOT. |
| 10:47AM | 3 | THE COURT:  I THINK THAT'S WHAT THE OBJECTORS, SOME |
| 10:47AM | 4 | OF THE OBJECTORS WOULD LIKE THE COURT TO DO. |
| 10:47AM | 5 | MR. EDELSON:  RIGHT.  AND MOST COURTS SAY, YOU KNOW, |
| 10:47AM | 6 | THAT'S NOT THE MOST FUN PROCESS. |
| 10:47AM | 7 | YOU KNOW, IT ALSO -- IT'S NOT -- I THINK THE THIRD CIRCUIT |
| 10:47AM | 8 | ACTUALLY DID A TASK FORCE WHERE THEY LOOKED AT THE DIFFERENCE |
| 10:47AM | 9 | BETWEEN ANALYZING LODESTAR VERSUS COMMON FUND PERCENTAGE, AND |
| 10:48AM | 10 | THEY SAID PERCENTAGE ACTUALLY PUTS THE INTEREST OF THE CLASS |
| 10:48AM | 11 | ALIGNED BETTER WITH THE ATTORNEYS SO THAT THE ATTORNEYS ARE NOT |
| 10:48AM | 12 | JUST FOCUSSED IN TURNING THE FILE. |
| 10:48AM | 13 | ANY TIME WE'RE DOING ANY WORK, WE THINK IT'S GOING BE THE |
| 10:48AM | 14 | MOST EFFICIENT WAY TO GET THE RESULT WE WANT. |
| 10:48AM | 15 | AND ALSO, AND I APOLOGIZE FOR THE PHRASE THEY USE IN THE |
| 10:48AM | 16 | THIRD CIRCUIT, THEY DON'T WANT TO REDUCE JUDGES TO BEAN |
| 10:48AM | 17 | COUNTERS.  AN IDEA OF HANDING OFF THE RECORD TO PEOPLE WHO HAVE |
| 10:48AM | 18 | HAD NO INVOLVEMENT IN THE CASE LOOKING AT IT AND SAYING, YOU |
| 10:48AM | 19 | KNOW, YOU WROTE THIS LETTER AND YOU SPENT 1.3 HOURS.  I'VE |
| 10:48AM | 20 | GOTTEN INTO THOSE FIGHTS.  YOU COULD HAVE DONE IT IN HALF THE |
| 10:48AM | 21 | TIME.  AND THE ANSWER IS, YOU KNOW, THAT IS A BIGGER TRIAL THAN |
| 10:48AM | 22 | WHAT THIS CASE WOULD BE IF, IF IT HAD NEVER SETTLED. |
| 10:48AM | 23 | THE COURT:  I THINK PERHAPS IT'S AN ISSUE HERE, AND |
| 10:48AM | 24 | A BIGGER ISSUE HERE BECAUSE, AS WE SAID IN THE PROPOSED |
| 10:48AM | 25 | SETTLEMENT AGREEMENT HERE, LEAVES THE CLASS WITH NO PERSONAL |

| | | |
|---|---|---|
| 10:49AM | 1 | GAIN AT ALL OTHER THAN THIS CY PRES AND I GUESS THERE ARE SOME |
| 10:49AM | 2 | OBJECTIONS TO THAT ALSO. |
| 10:49AM | 3 | MR. EDELSON:  AND THAT'S JUST THE QUESTION OF |
| 10:49AM | 4 | WHETHER YOU BELIEVE IN CY PRES AND THE NINTH CIRCUIT HAS SAID |
| 10:49AM | 5 | THAT IF YOU HAVE A SITUATION WHERE A DEFENDANT HAS HARMED A LOT |
| 10:49AM | 6 | OF PEOPLE, BUT NOT IN A SIGNIFICANT WAY, IN A SMALL WAY, BUT IN |
| 10:49AM | 7 | THE AGGREGATE IT MATTERS, YOU STILL BRING THE CLASS ACTION AND |
| 10:49AM | 8 | THAT'S WHAT CLASS ACTIONS ARE FOR. |
| 10:49AM | 9 | BUT IF YOU CAN'T DISTRIBUTE IT, LIKE IN THIS CASE, YOU |
| 10:49AM | 10 | CAN'T GIVE 60 MILLION PEOPLE SOME PIECE OF 9 MILLION.  I'M |
| 10:49AM | 11 | GETTING INTO MR. BALABANIAN'S TOPIC, BUT I ASSUME HE DOESN'T |
| 10:49AM | 12 | MIND.  THEN WHAT YOU'RE SUPPOSED TO DO IS NOT SAY, WELL, THE |
| 10:49AM | 13 | DEFENDANT IS OFF THE HOOK.  THEY'RE SUPPOSED TO DISGORGE THAT |
| 10:49AM | 14 | MONEY AND YOU'RE SUPPOSED TO GIVE IT TO THE NEXT BEST USE, |
| 10:49AM | 15 | WHICH IS TO CY PRES, AND TO SAY THAT THAT'S NOT MONEY FOR THE |
| 10:49AM | 16 | CLASS IS -- IT JUST SEEMS CONSISTENT WITH EVERY COURT THAT HAS |
| 10:49AM | 17 | LOOKED AT IT THAT SAYS CY PRES IS FOR THE CLASS AND IT MAY NOT |
| 10:50AM | 18 | BE THE MOST DIRECT THING, BUT IT'S THE SECOND BEST THING, AND |
| 10:50AM | 19 | IT DEFINITELY COUNTS.  IT'S TREATED, AS THE NINTH CIRCUIT SAYS, |
| 10:50AM | 20 | AS A COMMON FUND.  THAT'S THE POINT OF IT. |
| 10:50AM | 21 | THE COURT:  OKAY. |
| 10:50AM | 22 | MR. EDELSON:  YOU'VE BEEN INCREDIBLY PATIENT.  THE |
| 10:50AM | 23 | ONE THING THAT I'D LIKE TO HAVE MR. BALABANIAN TOUCH ON IS JUST |
| 10:50AM | 24 | THE NEXUS BETWEEN THE RECIPIENTS AND THE CONCERNS OF THE |
| 10:50AM | 25 | LAWSUIT IF YOUR HONOR WILL INDULGE US. |

10:50AM 1            THE COURT:  WELL, THAT'S WHERE THE SEGUE INTO MY

10:50AM 2    COMMENTS.

10:50AM 3            THANK YOU.

10:50AM 4            MR. BALABANIAN:  THANK YOU, YOUR HONOR.  IT'S A

10:50AM 5    PLEASURE TO APPEAR BEFORE THE COURT TODAY.  THE $9 MILLION WAS

10:50AM 6    NOT DISTRIBUTABLE TO THE CLASS.  THERE WAS NO WAY TO GET THAT

10:50AM 7    MONEY.  THERE WAS NO WAY TO GET THEM 10 MILLION OR 22 MILLION.

10:50AM 8    WE'RE TALKING ABOUT A CLASS OF 62 MILLION PEOPLE.  THERE'S NO

10:50AM 9    WAY TO GET THE AMOUNT OF MONEY THAT WOULD HAVE BEEN AT ALL

10:50AM 10   SIGNIFICANT AND CERTAINLY NOT AS SIGNIFICANT AS THE BENEFIT

10:50AM 11   THAT THEY WERE GOING TO LIKELY RECEIVE THROUGH THE CY PRES

10:51AM 12   RECIPIENTS.

10:51AM 13        THE CY PRES DOCTRINE ALLOWS THE COURT TO DISTRIBUTE

10:51AM 14   UNATTRIBUTABLE PORTIONS OF THE CLASS ACTION SETTLEMENT FOR THE

10:51AM 15   NEXT BEST CLASS OF BENEFICIARIES AND I'M QUOTING CASE LAW

10:51AM 16   THERE.  NONDISTRIBUTABLE MEANS THAT WHEN IT'S TOO BURDENSOME OR

10:51AM 17   PROOF OF INDIVIDUAL CLAIMS WOULD BE TOO BURDENSOME OR

10:51AM 18   DISTRIBUTION OF DAMAGES TOO COSTLY.  IN THIS CASE IT WOULD HAVE

10:51AM 19   BEEN TOO COSTLY.

10:51AM 20        DISTRIBUTING $9 MILLION TO 62 MILLION PEOPLE WOULD HAVE

10:51AM 21   BEEN BETWEEN -- JUST THE ADMINISTRATIVE COSTS WOULD HAVE BEEN

10:51AM 22   BETWEEN $22 AND $28 MILLION.

10:51AM 23            THE COURT:  COULD NETFLIX, AND I'M NOT TRYING TO ACT

10:51AM 24   AS A MEDIATOR HERE, BUT I'M JUST CURIOUS, COULD NETFLIX HAVE

10:51AM 25   SAID, ALL RIGHT, 62 MILLION PEOPLE, WE'RE GOING TO ALLOW YOU TO

| | | |
|---|---|---|
| 10:51AM | 1 | RENT ONE VIDEO, TWO VIDEOS, FIVE, PICK A NUMBER, AND A CLASS OF |
| 10:51AM | 2 | MOVIES?  YOU CAN ONLY WATCH, YOU CAN ONLY WATCH BOGART FILMS |
| 10:51AM | 3 | BUT YOU GET TO WATCH A BOGART FILM, WHATEVER IT IS, WHATEVER |
| 10:52AM | 4 | GENRE, COULD THEY HAVE DONE THAT?  THEY WOULD HAVE HAD TO -- I |
| 10:52AM | 5 | WOULD ASSUME IF YOU SENT OUT A COUPON IN THE MAIL, AND WHAT |
| 10:52AM | 6 | DOES A LETTER COST?  NOW CLOSE TO 50 CENTS NOW?  THAT'S HUGE. |
| 10:52AM | 7 | BUT IF THEY SEND AN E-MAIL TO THEIR CURRENT SUBSCRIBERS |
| 10:52AM | 8 | AND SAID YOU GET TO WATCH KATHARINE HEPBURN, OR YOU CAN SEE |
| 10:52AM | 9 | WHERE MY MOVIE TASTES GO, YOU GET A FREE VIDEO.  WHAT -- THEY |
| 10:52AM | 10 | WOULD GET SOMETHING OUT OF IT.  IS THAT DE MINIMUS?  DO YOU |
| 10:52AM | 11 | THINK THAT WOULD BE MORE OFFENSIVE TO THE CLASS OR IS IT |
| 10:52AM | 12 | POSSIBLE TO BE? |
| 10:52AM | 13 | MR. EDELSON:  WELL, I THINK THAT -- WITH RESPECT, I |
| 10:52AM | 14 | DON'T THINK THAT WOULD BE THE RIGHT RESULT AND THE REASON I SAY |
| 10:52AM | 15 | THAT IS THAT THERE THE RETENTION CLAIMS, WHICH WERE THE |
| 10:52AM | 16 | STRONGEST, ARE REALLY WITH FORMER CUSTOMERS.  THERE'S NO |
| 10:52AM | 17 | QUESTION THAT NETFLIX IS ALLOWED TO KNOW YOUR TASTE IN MOVIES |
| 10:52AM | 18 | AS YOUR -- I SHOULDN'T USE YOUR HONOR AS AN EXAMPLE. |
| 10:52AM | 19 | THE COURT:  I PUT IT ON THE RECORD. |
| 10:52AM | 20 | MR. EDELSON:  OKAY.  AS MY TASTE OF MOVIES AS I'M A |
| 10:53AM | 21 | NETFLIX CUSTOMER, IT NEEDS TO KNOW THAT.  NO QUESTION ABOUT |
| 10:53AM | 22 | THAT.  THE QUESTION IS AFTER SOMEONE DOES FORMALLY SUBSCRIBE, |
| 10:53AM | 23 | DO THEY THEN HAVE TO DESTROY THAT INFORMATION AND HOW LONG? |
| 10:53AM | 24 | AND SO THE QUESTION, WE DID THINK ABOUT THIS, THE QUESTION |
| 10:53AM | 25 | OF ASKING FORMER CUSTOMERS TO GET BACK INTO THE RELATIONSHIP |

| 10:53AM | 1 | WITH NETFLIX TO GET SOME BENEFIT OF THE CLASS, OF THE CLASS |
| 10:53AM | 2 | ACTION, IN OUR VIEW IT WOULD BE MARKETING, THAT'S PROBABLY |
| 10:53AM | 3 | SOMETHING THAT THEY WOULD BE HAPPY TO DO.  ALL OF THESE PEOPLE |
| 10:53AM | 4 | ALREADY LEFT THEM AND SAID, HEY, IT'S NETFLIX, DO YOU WANT TO |
| 10:53AM | 5 | SEE A MOVIE? |
| 10:53AM | 6 | SO EVEN IF IT WERE COST EFFECTIVE IN CLASS COUNSEL'S |
| 10:53AM | 7 | JUDGMENT, THAT WOULDN'T BE THE RIGHT RESULT. |
| 10:53AM | 8 | FURTHER, BECAUSE THIS SETTLEMENT IS GOING TO TAKE SOME |
| 10:53AM | 9 | TIME TO GO THROUGH, IT WOULD MEAN THAT CLASS MEMBERS, EVEN |
| 10:53AM | 10 | CURRENT ONES, WOULD HAVE TO MAINTAIN THE RELATIONSHIP WITH |
| 10:53AM | 11 | NETFLIX FOR PERHAPS ANOTHER YEAR, ASSUMING THEIR APPEALS OR |
| 10:53AM | 12 | WHATEVER, WHICH IS SOMETHING THAT YOU GENERALLY TRY NOT TO DO |
| 10:54AM | 13 | IN CLASS ACTIONS AND SAY, YOU KNOW, TO GET THIS, THIS $5 MOVIE, |
| 10:54AM | 14 | YOU'VE GOT TO KEEP GOING WITH NETFLIX AND PAYING THEM MONEY FOR |
| 10:54AM | 15 | ANOTHER YEAR, WHICH IS WHY -- AND WE CERTAINLY TRY TO BE -- |
| 10:54AM | 16 | THE COURT:  SO YOU EXPLORED THAT OPPORTUNITY AND |
| 10:54AM | 17 | THAT POSSIBILITY? |
| 10:54AM | 18 | MR. EDELSON:  WE EXPLORED EVERYTHING.  THESE TYPES |
| 10:54AM | 19 | OF SETTLEMENTS ARE -- THEY'RE BECOMING MORE COMMONPLACE, BUT, |
| 10:54AM | 20 | FRANKLY, OUR VIEW IS THAT IF YOU CAN AVOID THEM, WE WANT TO |
| 10:54AM | 21 | AVOID THEM.  WE WANT TO GET MONEY DIRECTLY TO CLASS MEMBERS. |
| 10:54AM | 22 | THAT IS OUR GOAL. |
| 10:54AM | 23 | THE COURT:  OKAY. |
| 10:54AM | 24 | MR. EDELSON:  IF YOU CAN'T DO THAT, THEN YOU'VE GOT |
| 10:54AM | 25 | TO START THINKING CREATIVELY AND YOU THINK ABOUT ALL OPTIONS, I |

| 10:54AM | 1 | MEAN, COUPONS YOU TRY TO AVOID BUT YOU THINK ABOUT THEM. |

10:54AM 1   MEAN, COUPONS YOU TRY TO AVOID BUT YOU THINK ABOUT THEM.

10:54AM 2   CY PRES IS A POSSIBILITY IF IT WORKS AND IF IT'S REAL CY PRES,

10:54AM 3   WHICH IS WHERE I THINK IT IS HERE, AS OPPOSED TO GIVE MONEY TO

10:54AM 4   MY WIFE'S CHARITY, AND I'M GOING TO SERVE ON THE BOARD, WHICH

10:54AM 5   HAPPENED TEN YEARS AGO.

10:55AM 6       BUT, YES, WE EXPLORED EVERY OPTION ON THE TABLE.

10:55AM 7           THE COURT:  OKAY.  MR. BALABANIAN.

10:55AM 8           MR. BALABANIAN:  THANK YOU, YOUR HONOR.  JUST TO GET

10:55AM 9   BACK TO THE CY PRES REMEDY, THE NINTH CIRCUIT HAS SAID IT'S

10:55AM 10  APPROPRIATE IN THIS CONTEXT BUT A FEW FACTORS NEED TO BE MET.

10:55AM 11  IT NEEDS TO ACCOUNT FOR THE NATURE OF THE OBJECTIVES -- THE

10:55AM 12  NATURE OF THE LAWSUIT ITSELF, THE OBJECTIVES OF THE UNDERLYING

10:55AM 13  STATUTES AND THE INTERESTS OF THE SILENT CLASS MEMBERS.

10:55AM 14      WE'RE INCREDIBLY PROUD OF THE CY PRES PROCESS THAT WE PUT

10:55AM 15  TOGETHER IN THIS CASE, YOUR HONOR.  AND WE CAN'T TAKE COMPLETE

10:55AM 16  CREDIT FOR IT BECAUSE WE UTILIZED THE PROCESS THAT WAS ENDORSED

10:55AM 17  BY JUDGE WARE IN THE GOOGLE BUZZ CASE AND WE FOLLOWED IT TO A

10:55AM 18  TEE, AND, FRANKLY, I THINK WE IMPROVED UPON IT.

10:55AM 19      AS DISSEMINATION OF THE CLASS NOTICE WENT OUT, SO, TOO,

10:55AM 20  DID OUR PROPOSALS TO POTENTIAL CY PRES RECIPIENTS.  EXCUSE ME.

10:55AM 21      WE SENT THEM LETTERS, THOSE THAT WE THOUGHT WOULD MAKE

10:55AM 22  GOOD CANDIDATES.  WE ALSO POSTED A LETTER TO SOME WEBSITE FOR

10:56AM 23  THE WORLD TO SEE, FOR EVERYONE WHO WAS INTERESTED AND THOUGHT

10:56AM 24  THAT THEY WERE DESERVING OF A DISTRIBUTION TO COME FORWARD AND

10:56AM 25  VOICE THEIR REQUEST.

| | | |
|---|---|---|
| 10:56AM | 1 | WE GOT OVER 40 PROPOSALS, YOUR HONOR, AND AFTER WE |
| 10:56AM | 2 | RECEIVED ALL OF THE PROPOSALS, WE WORKED TIRELESSLY.  AND I |
| 10:56AM | 3 | MUST SAY, FIRSTHAND IT WAS MAINLY MR. EGGLETON, BUT HE SPOKE |
| 10:56AM | 4 | WITH COUNTLESS CY PRES RECIPIENTS TO TRY TO FOCUS THEIR |
| 10:56AM | 5 | PROPOSALS BECAUSE THAT'S IMPORTANT, RIGHT?  NOBODY CAN REALLY |
| 10:56AM | 6 | MAKE A DECISION, AN INTELLIGENT DECISION, A WELL THOUGHT-OUT |
| 10:56AM | 7 | DECISION AND A DECISION THAT ACCOUNTS FOR THE INTEREST OF THE |
| 10:56AM | 8 | SILENT CLASS MEMBERS, THE OBJECTIVES OF THE UNDERLYING LAWSUIT |
| 10:56AM | 9 | UNLESS THEY -- UNLESS WE REALIZED PROPOSALS, UNLESS WE RECEIVED |
| 10:56AM | 10 | PROPOSALS THAT FOCUSSED THE ISSUES ON THIS CASE AND FOCUSSED |
| 10:56AM | 11 | THE ISSUES OF WHAT THIS DISTRIBUTION WOULD DO FOR THE CLASS. |
| 10:56AM | 12 | AND SO WE SPOKE TO MANY, MANY, MANY ORGANIZATIONS ABOUT |
| 10:56AM | 13 | HOW BEST TO PUT FORTH THEIR IDEAS. |
| 10:57AM | 14 | BEYOND THAT WE HAD A SPECIFIC CRITERIA THAT NEEDED TO BE |
| 10:57AM | 15 | SATISFIED IN THE PROPOSALS THEMSELVES IN ORDER TO BE VALID AND |
| 10:57AM | 16 | IN ORDER FOR US TO ACCEPT THEM AND CONSIDER THEM, I SHOULD SAY. |
| 10:57AM | 17 | THE ORGANIZATION HAD TO IDENTIFY THEMSELVES OBVIOUSLY. |
| 10:57AM | 18 | THEY HAD TO SUBSCRIBE THEIR CURRENT PROGRAMS RELATING TO |
| 10:57AM | 19 | TECHNOLOGY, LAW, AND PRIVACY. |
| 10:57AM | 20 | THEY HAD TO -- THEY HAD TO DESCRIBE HOW THE PROGRAM |
| 10:57AM | 21 | BENEFITS THE CLASS.  THEY HAD TO PROVIDE THEIR ANNUAL OPERATING |
| 10:57AM | 22 | BUDGETS AND THE OPERATING BUDGETS OF THE PROGRAMS. |
| 10:57AM | 23 | THEY HAD TO DISCLOSE ANY CONNECTIONS WITH THE PARTIES, |
| 10:57AM | 24 | WITH COUNSEL, WITH THE COURT AND ANY MONIES RECEIVED FROM THE |
| 10:57AM | 25 | PARTIES OR THEIR COUNSEL IN 2011. |

SER 036

| | | |
|---|---|---|
| 10:57AM | 1 | THROUGH THAT PROCESS, YOUR HONOR, AND WE WORKED WITH |
| 10:57AM | 2 | NETFLIX TO PICK WHOM WE THOUGHT WERE THE BEST AND MOST |
| 10:57AM | 3 | DESERVING RECIPIENTS, WE CAME UP WITH 20 ORGANIZATIONS THAT |
| 10:57AM | 4 | WE -- THAT IS A BROAD SPECTRUM OF EDUCATIONAL INSTITUTIONS, |
| 10:58AM | 5 | NONPROFITS THAT FOCUS ON PRIVACY ISSUES, AND THERE'S SOME OF |
| 10:58AM | 6 | THE LEADING ORGANIZATIONS FROM ACROSS THE COUNTRY. |
| 10:58AM | 7 | THE COURT:  SO I LOOKED AT THE LIST AND AS WELL AS |
| 10:58AM | 8 | WHAT THEIR EXPECTED USE OF THE FUNDS WOULD BE, AND WHAT THEY DO |
| 10:58AM | 9 | AND THEY ARE WONDERFUL ORGANIZATIONS. |
| 10:58AM | 10 | THE THOUGHT OCCURRED TO ME THAT THEY WILL PERHAPS PRODUCE |
| 10:58AM | 11 | ARTICLES, PERHAPS PRODUCE LAW REVIEW ARTICLES AND PUBLICATIONS, |
| 10:58AM | 12 | WHITE PAPERS, PRESENTATIONS THAT WILL BE OF INTEREST TO PERHAPS |
| 10:58AM | 13 | EVERYONE HERE IN THE COURTROOM. |
| 10:58AM | 14 | BUT I'M CURIOUS WHETHER, YOU KNOW, PARDON ME, THE MAN AND |
| 10:58AM | 15 | WOMAN ON THE STREET, WHAT INTEREST IS IT TO THEM?  HOW WILL |
| 10:58AM | 16 | THEY RECEIVE -- THEY MAY NOT READ AND RECEIVE THE SAME INTEREST |
| 10:58AM | 17 | THAT ALL OF US HERE HAVE ABOUT ALL OF THESE REALLY IMPORTANT |
| 10:58AM | 18 | AND EXCITING AND INTERESTING ISSUES.  AND SO HOW WILL THEY |
| 10:58AM | 19 | BENEFIT? |
| 10:59AM | 20 | MR. EDELSON:  THAT'S A GREAT QUESTION. |
| 10:59AM | 21 | THE COURT:  THANK YOU. |
| 10:59AM | 22 | MR. EDELSON:  THERE'S A FEW PIECES TO THAT.  ONE IS |
| 10:59AM | 23 | THAT I GENERALLY AND MY PERSONAL POSITION IS THAT I BELIEVE |
| 10:59AM | 24 | ACADEMICS PLAY AN IMPORTANT ROLE BUT THE ACTUAL EFFECT ON |
| 10:59AM | 25 | PEOPLE TENDS TO BE MORE ATTENUATED. |

| 10:59AM | 1 | IN PRIVACY THAT DOESN'T SEEM TO BE THE CASE.  RIGHT NOW |
|---|---|---|
| 10:59AM | 2 | THE PEOPLE WHO ARE REALLY LOOKING AND UNDERSTANDING PRIVACY |
| 10:59AM | 3 | ISSUES ARE EITHER THE 20-YEAR OLDS WHO ARE FIGURING OUT HOW TO |
| 10:59AM | 4 | DO IT ALL AND MAKING MONEY, AND THEN THE ACADEMICS ARE FIGURING |
| 10:59AM | 5 | OUT WHAT IT IS THAT THEY'RE DOING. |
| 10:59AM | 6 | A LOT OF THE ACADEMICS ARE MORE ALMOST RESEARCHERS AND |
| 10:59AM | 7 | LOOKING TO SEE WHAT PEOPLE ARE DOING WITH THE INFORMATION, WHAT |
| 10:59AM | 8 | TYPE OF CONSENSUS IS BEING DONE, AND THEN TELLING THE WORLD |
| 10:59AM | 9 | ABOUT THAT. |
| 10:59AM | 10 | SO A LOT OF THE BIG PRIVACY ISSUES THAT HAVE BEEN EXPOSED |
| 10:59AM | 11 | HAVE COME FROM THESE ACADEMIC INSTITUTIONS THAT ARE ACTUALLY |
| 10:59AM | 12 | CHECKING, CHECKING THE WORK OF ALL OF THE COMPANIES. |
| 10:59AM | 13 | AT THE SAME TIME A LOT OF THE REALLY THORNY ISSUES WHICH |
| 10:59AM | 14 | HAVE NOT BEEN DEVELOPED LIKE CONSENT, ARE COMING -- ARE BEING |
| 11:00AM | 15 | REALLY LOOKED AT BY THE SAME ACADEMIC INSTITUTIONS, BUT I WANT |
| 11:00AM | 16 | TO BE CLEAR, WE DIDN'T JUST PICK ACADEMIC INSTITUTIONS BECAUSE |
| 11:00AM | 17 | THAT'S ONLY A PIECE OF IT.  WE THINK THAT'S AN IMPORTANT PIECE, |
| 11:00AM | 18 | BUT THERE'S ALSO THE CONSUMER PIECE, TOO.  AND THAT'S WHY I |
| 11:00AM | 19 | THINK THERE ARE 20 ORGANIZATIONS TOTAL THAT WERE PICKED AND |
| 11:00AM | 20 | MANY OF WHICH WERE FOCUSSED ON CONSUMER AWARENESS ISSUES TO LET |
| 11:00AM | 21 | PEOPLE UNDERSTAND PEOPLE HOW TO PROTECT THEIR PRIVACY AND TRAIN |
| 11:00AM | 22 | OFFICERS IN THE FUTURE. |
| 11:00AM | 23 | OUR GOAL WAS TO TRY TO HIT THIS ISSUE IN AS MANY DIFFERENT |
| 11:00AM | 24 | WAYS AS POSSIBLE.  AND I THINK THAT THAT WAS PERHAPS NOT THE |
| 11:00AM | 25 | SAME AS A LOT OF THESE INSTITUTIONS THAT WERE CHOSEN BY THE |

| | | |
|---|---|---|
| 11:00AM | 1 | PARTIES WERE THE SAME ONES THAT JUDGE WARE HIMSELF CHOSE NOT BY |
| 11:00AM | 2 | RECOMMENDATION OF THE PARTIES BUT BY HIMSELF. |
| 11:00AM | 3 | WHEN HE LOOKED AT IT AND SAW EVERYTHING TOGETHER HE SAID |
| 11:00AM | 4 | IT MAKES SENSE HAVING A CROSS-SECTION AND IT MAKES SENSE HAVING |
| 11:01AM | 5 | THESE ORGANIZATIONS IN A WAY THAT FEW ORGANIZATIONS ARE |
| 11:01AM | 6 | EXCEPTIONALLY -- |
| 11:01AM | 7 | THE COURT:  SO THE THOUGHT IS THAT -- IF I FOLLOW |
| 11:01AM | 8 | WHAT YOU ARE SAYING, WHAT YOU ARE SAYING IS THAT, JUDGE, IT MAY |
| 11:01AM | 9 | BE THAT THE MAN AND WOMAN ON THE STREET MAY NOT READ THE WHITE |
| 11:01AM | 10 | PAPERS AND THE LAW REVIEW ARTICLES, IT MAY NOT BE OF INTEREST |
| 11:01AM | 11 | TO THEM IN THEIR DAILY LIVES, HOWEVER, THE WORK PRODUCT OF |
| 11:01AM | 12 | THOSE ORGANIZATIONS, NONETHELESS, FILTER THROUGH TO THE PEOPLE |
| 11:01AM | 13 | THAT DO PAY ATTENTION, INCLUDING CORPORATIONS, INCLUDING |
| 11:01AM | 14 | BUSINESSES, INCLUDING THE NETFLIXES OF THE WORLD AND THEIR |
| 11:01AM | 15 | PRIVACY OFFICERS AND IT GIVES THEM DIRECTION AND GUIDANCE HOW |
| 11:01AM | 16 | BEST TO PROTECT THE CONSUMER'S INTEREST. |
| 11:01AM | 17 | MR. EDELSON:  I THINK PERHAPS EVEN MORE THAN THAT |
| 11:01AM | 18 | BECAUSE OFTEN WHAT IS HAPPENING IS THAT THESE INSTITUTIONS WILL |
| 11:01AM | 19 | SEE A FLAW AND SAY THIS IS HOW PRIVATE INFORMATION IS NOT |
| 11:01AM | 20 | PROPERLY BEING STORED OR ACTUALLY TRANSFERRED AROUND WITHOUT |
| 11:01AM | 21 | CONSENT.  THEY'LL PUBLICIZE IT AND THAT SPARKS CONGRESSIONAL |
| 11:01AM | 22 | HEARINGS AND INDUSTRYWIDE CHANGES. |
| 11:02AM | 23 | THIS IS THE STUFF.  IF YOU'RE AN ACADEMIC AND YOU WANT TO |
| 11:02AM | 24 | GET YOUR PAPER IN THE PRESS, FOCUS ON PRIVACY.  YOU EXPOSE ONE |
| 11:02AM | 25 | OF THESE THINGS, THE WALL STREET JOURNAL IS CARRYING THAT.  AND |

11:02AM 1    THAT HAS MORE -- THAT ONE TYPE OF ARTICLE IN THE WALL STREET

11:02AM 2    JOURNAL SAYS THIS IS WHAT APPLE HAS BEEN DOING BECAUSE SOME

11:02AM 3    RESEARCHER ACTUALLY FOUND OUT THAT THEY'RE TRACKING YOUR

11:02AM 4    LOCATION WITHOUT YOUR PERMISSION, IT MAY BE THAT A LOT OF THE

11:02AM 5    CLASS MEMBERS NEVER, NEVER READ THAT ARTICLE, NEVER KNEW THAT

11:02AM 6    WAS HAPPENING BUT BECAUSE THAT RESEARCHER FIGURED IT OUT AND

11:02AM 7    GAVE IT TO THE WALL STREET JOURNAL, APPLE STOPPED AND A LOT OF

11:02AM 8    OTHER COMPANIES STOPPED.

11:02AM 9             THE COURT:  WHAT HAPPENS IN THOSE CASES IS THAT SOME

11:02AM 10   LAWYERS READ THAT AND THEN LAWSUITS GET FILED?

11:02AM 11            MR. EDELSON:  I CAN ASSURE THE COURT THAT OUR GOAL

11:02AM 12   WAS NOT TO TRY TO --

11:02AM 13            THE COURT:  I'M NOT SUGGESTING IT WAS IN THIS CASE,

11:02AM 14   DON'T GET ME WRONG.

11:02AM 15            MR. EDELSON:  NO.  BUT, I MEAN, I COME TO THIS FROM

11:02AM 16   THE CONSUMER SIDE SO I THINK THAT'S PROBABLY A GOOD THING.

11:02AM 17        IF SOMETHING IS EXPOSED AND THE COMPANY WAS DOING

11:02AM 18   SOMETHING BAD, THAT THEN THEY GET SUED BY THE GOVERNMENT OR THE

11:03AM 19   PRIVATE ATTORNEYS.  BUT THAT'S NOT THE GOAL.  WE'RE NOT TRYING

11:03AM 20   TO COME UP WITH SOME WAY -- WE'VE GOT OUR OWN TEAM OF

11:03AM 21   RESEARCHERS, AND, IN FACT, THESE GUYS ARE PROBABLY COMPETING

11:03AM 22   WITH US AND SO IT HURTS OUR BUSINESS MODEL, BUT THAT WASN'T THE

11:03AM 23   POINT.

11:03AM 24        THE POINT WAS THAT WE HAVE AN OPPORTUNITY TO USE A HUGE

11:03AM 25   AMOUNT OF MONEY AND HOW CAN WE DO IT SO IT REALLY BENEFITS THIS

| | | |
|---|---|---|
| 11:03AM | 1 | HUGE CROSS-SECTION OF AMERICA?  I MEAN, IT'S A 60 MILLION CLASS |
| 11:03AM | 2 | AND IT'S A BIG CHUNK OF AMERICA, A FIFTH OF AMERICA, AND WE |
| 11:03AM | 3 | HAVE AN ABILITY TO REALLY IMPACT THEIR LIVES IN THE PRIVACY |
| 11:03AM | 4 | REALM FOR YEARS TO COME.  SO WE TOOK IT VERY SERIOUSLY. |
| 11:03AM | 5 | I COULD ALSO TELL YOU, AS MR. BALABANIAN SAID, I SPENT |
| 11:03AM | 6 | HOURS ON THE PHONE WITH ORGANIZATIONS ASKING THEM TO PUT IN |
| 11:03AM | 7 | PROPOSALS, TALKING ABOUT WHAT THEY COULD BE DOING, MEETING WITH |
| 11:03AM | 8 | THEM INDIVIDUALLY, EVEN WHEN PEOPLE WERE NOT CHOSEN, WE WERE |
| 11:04AM | 9 | GETTING CALLS SAYING THAT THE PROCESS THAT WE USED WAS THE |
| 11:04AM | 10 | RIGHT PROCESS AND THAT THEY APPRECIATED IT. |
| 11:04AM | 11 | WE GOT NO COMPLAINTS FROM ANY OF THESE ORGANIZATIONS. |
| 11:04AM | 12 | NOBODY SAID TO US, YOU DIDN'T PICK ME AND YOU SHOULD HAVE. |
| 11:04AM | 13 | IN ALL OF THE OTHER CASES YOU HAD ORGANIZATIONS OBJECTING |
| 11:04AM | 14 | AND THE REAL OBJECTIONS WERE NOT THAT THEY WERE NOT GETTING THE |
| 11:04AM | 15 | MONEY BUT BECAUSE THE SYSTEM DIDN'T MAKE SENSE.  THERE WAS NO |
| 11:04AM | 16 | TRANSPARENCY AND THE INTEREST OF CLASS WERE NOT PUT FORTH. |
| 11:04AM | 17 | AND WE REALLY TRIED TO THE BEST OF OUR ABILITY TO ONLY BE |
| 11:04AM | 18 | THINKING ABOUT HOW DO WE ATTACK THESE PROBLEMS FOR THE CLASS, |
| 11:04AM | 19 | AND I BELIEVE WE DID THAT. |
| 11:04AM | 20 | THE COURT:  SO, MR. BALABANIAN, WHAT I HEAR IS THAT |
| 11:04AM | 21 | THE CLASS MEMBERS, THE 62 MILLION OF THEM, ALTHOUGH THEY'RE NOT |
| 11:04AM | 22 | PERSONALLY RECEIVING ANY MONETARY OR ANY OTHER BENEFIT, THEY |
| 11:04AM | 23 | SHOULD TAKE PRIDE IN THE FACT THAT BECAUSE OF THEIR |
| 11:04AM | 24 | PARTICIPATION IN THIS LAWSUIT, THEY THEN FORM THE GENESIS OF |
| 11:05AM | 25 | AND CONTINUE WITH THE GOOD WORKS OF ORGANIZATIONS THAT CAN |

| | | |
|---|---|---|
| 11:05AM | 1 | PROVIDE ASSISTANCE TO GENERAL PUBLIC AND THE BUSINESS PUBLIC IN |
| 11:05AM | 2 | ENSURING THAT PRIVACY ISSUES AND THEIR PRIVACY AND OTHERS OF |
| 11:05AM | 3 | FELLOW CITIZENS OF PRIVACY IS PROTECTED. |
| 11:05AM | 4 | MR. BALABANIAN:  I THINK THAT'S EXACTLY RIGHT, YOUR |
| 11:05AM | 5 | HONOR. |
| 11:05AM | 6 | AND TO BE CLEAR, YOUR HONOR, THESE ORGANIZATIONS, THEY |
| 11:05AM | 7 | INTEND TO PUT CONSUMER PRIVACY AT THE FOREFRONT.  I MEAN, WHEN |
| 11:05AM | 8 | YOU JUST LOOK AT ONE EXAMPLE, THE CENTER FOR DEMONSTRATIVE |
| 11:05AM | 9 | TECHNOLOGY, THEY INTEND TO BRING DISTRIBUTION OF PRIVACY ISSUES |
| 11:05AM | 10 | IN FRONT OF THE FTC. |
| 11:05AM | 11 | SO IT'S NOT AS THOUGH IT'S JUST ACADEMIA OR THINGS OF THAT |
| 11:05AM | 12 | SORT, YOUR HONOR.  I MEAN, THESE ORGANIZATIONS ARE, I MEAN, BY |
| 11:05AM | 13 | BRINGING IT TO THE ATTENTION OF THE GOVERNMENT, THAT'S AN |
| 11:05AM | 14 | ABSOLUTE BENEFIT FOR THE CLASS, FAR MORE THAN ANY OTHER SMALL |
| 11:05AM | 15 | PAYMENT OR A SINGLE MOVIE COULD BE BECAUSE AT THE END OF THE |
| 11:05AM | 16 | DAY, THIS IS ABOUT WHAT IS THIS LAWSUIT ABOUT?  IT'S ABOUT |
| 11:05AM | 17 | PROTECTING CONSUMER PRIVACY, IT'S ABOUT FURTHERING THE |
| 11:06AM | 18 | UNDERLYING INTEREST OF THE VPPA, WHICH IS KEEPING PRIVATE |
| 11:06AM | 19 | CONSUMER VIDEO INDUSTRIES AND IT'S ABOUT PROTECTING THE |
| 11:06AM | 20 | INTERESTS OF THE ABSENT CLASS MEMBERS. |
| 11:06AM | 21 | AND THERE'S DOZENS OF EXAMPLES OF WHERE THESE ENTITIES ARE |
| 11:06AM | 22 | DOING THINGS LIKE HIRING ATTORNEYS, RESEARCHERS, DEVOTING STAFF |
| 11:06AM | 23 | TO FULL-TIME PRIVACY ISSUES. |
| 11:06AM | 24 | SO ABSOLUTELY, YOUR HONOR, THE CLASS STANDS TO BENEFIT FAR |
| 11:06AM | 25 | MORE, YES, INDIRECTLY ALBEIT, BUT FAR MORE THAN ANYTHING WE |

11:06AM  1    COULD GIVE THEM BY WAY OF THIS SETTLEMENT FROM A MONETARY

11:06AM  2    PERSPECTIVE, YOUR HONOR.

11:06AM  3           THE COURT:  OKAY.

11:06AM  4           MR. BALABANIAN:  AND MY FINAL POINT ABOUT THE CY

11:06AM  5    PRES PROCESS, YOUR HONOR, WAS THAT WE ENSURE THAT THERE WAS

11:06AM  6    ABSOLUTELY NO MATERIAL CONFLICTS WITH ANY OF THE CHOSEN

11:06AM  7    RECIPIENTS, AND WE DISCLOSED IN OUR VIEW NONMATERIAL CONFLICTS

11:06AM  8    BUT OUT OF FULL DISCLOSURE, WE WANTED TO GIVE ALL OF THE

11:07AM  9    INFORMATION TO THE COURT.

11:07AM 10       AND IT'S DELINEATED IN MR. EGGLETON'S DECLARATION.  I

11:07AM 11    THINK MR. EGGLETON WANTS TO SPEAK TO IT SLIGHTLY JUST A LITTLE

11:07AM 12    BIT FURTHER, BUT THE PROCESS ITSELF WAS ABSOLUTELY TRANSPARENT.

11:07AM 13    IT WAS ABSOLUTELY ON THE UP AND UP.  AND IT ABSOLUTELY PRODUCED

11:07AM 14    THE RIGHT RESULT, YOUR HONOR.

11:07AM 15           THE COURT:  OKAY.

11:07AM 16           MR. BALABANIAN:  YOUR HONOR, THE ONLY OTHER ASPECT

11:07AM 17    OF THE SETTLEMENT THAT I WANT TO FOCUS ON, YOUR HONOR, IS THE

11:07AM 18    INJUNCTIVE RELIEF WHICH WE THINK IS JUST AS IMPORTANT AS THE CY

11:07AM 19    PRES REMEDY BECAUSE IT DRIVES THROUGH THE HEART OF WHAT THIS

11:07AM 20    LAWSUIT WAS INTENDED TO PREVENT, YOUR HONOR.

11:07AM 21       AND SO WE HAVE NEGOTIATED AN INJUNCTION.  IT'S A FOUR-YEAR

11:07AM 22    INJUNCTION FOR NETFLIX TO DECOUPLE PERSONAL INFORMATION FROM

11:07AM 23    VIDEO VIEWING HISTORIES, YOUR HONOR.

11:07AM 24       THERE HAS BEEN SOME COMPLAINTS THAT SOMEHOW THE CY PRES

11:07AM 25    COMPONENT IS NOT PERMANENT AS TO THE CLASS OR WHATNOT.

44

| | | |
|---|---|---|
| 11:08AM | 1 | BUT TESTIMONY ABSOLUTELY, IT ABSOLUTELY IS PERMANENT AS TO |
| 11:08AM | 2 | THE CLASS. |
| 11:08AM | 3 | THERE'S NO QUESTION THAT THE SETTLEMENT CLASS, THAT |
| 11:08AM | 4 | NETFLIX IS BOUND TO COMPLY WITH THE INJUNCTION AS FAR AS THE |
| 11:08AM | 5 | SETTLEMENT CLASS IS CONCERNED, AND, YES, IT'S A FOUR-YEAR |
| 11:08AM | 6 | INJUNCTION. IT'S GOING TO COST NETFLIX A LOT, A LOT OF MONEY |
| 11:08AM | 7 | AND A LOT OF TIME TO IMPLEMENT THE INJUNCTION, BUT AS THEY SAID |
| 11:08AM | 8 | IN THEIR PAPERS, I BELIEVE THEY'VE ACTUALLY DEVOTED A HEARING |
| 11:08AM | 9 | TO THE STATUTE AT THIS POINT IN TIME AND I THINK THE INJUNCTIVE |
| 11:08AM | 10 | RELIEF IS INDICATIVE OF THAT. |
| 11:08AM | 11 | IT'S ABSOLUTELY A NECESSARY AND IMPORTANT PART OF THE |
| 11:08AM | 12 | SETTLEMENT AND IT ALSO, AT THE SAME TIME, SAVES THE CLASS ANY |
| 11:08AM | 13 | FURTHER DAMAGE FROM THIS KIND OF CONDUCT ALBEIT IT'S DE |
| 11:08AM | 14 | MINIMUS, BUT IT'S STILL DAMAGE. |
| 11:08AM | 15 | THE COURT: HOW DOES THE INJUNCTION GET POLICED? |
| 11:08AM | 16 | MR. BALABANIAN: HOW DOES THE INJUNCTION GET |
| 11:08AM | 17 | POLICED, YOUR HONOR? |
| 11:08AM | 18 | THE COURT: YES. |
| 11:08AM | 19 | MR. BALABANIAN: WELL, IT'S SUBJECT TO A COURT |
| 11:08AM | 20 | ORDER. |
| 11:08AM | 21 | THE COURT: AND WHAT IS THE MECHANISM OF THAT, I'M |
| 11:08AM | 22 | JUST CURIOUS, A CLASS MEMBER OBJECTOR OR CLASS MEMBER SOMEONE |
| 11:09AM | 23 | MIGHT SAY, HOW DO I KNOW, WHAT IS THE ENFORCEMENT MECHANISM? |
| 11:09AM | 24 | ONCE THE LAWSUIT IS SETTLED, DO THE GOOD LAWYERS GO AWAY AND |
| 11:09AM | 25 | THERE'S NO ENFORCEMENT ON THIS? HOW WILL I KNOW IF THE |

| | | |
|---|---|---|
| 11:09AM | 1 | INJUNCTION IS BEING ENFORCED? |
| 11:09AM | 2 | MR. EDELSON:  WELL, THE PARTIES REMAIN MOTIVATED. |
| 11:09AM | 3 | IF THEY'RE VIOLATING THE INJUNCTION, THEN THEY'D BE VIOLATING |
| 11:09AM | 4 | THE COURT ORDER AND THE SETTLEMENT AND WE WOULD BE MOTIVATED AS |
| 11:09AM | 5 | ALONG WITH THE OTHER ATTORNEYS FOR THE OTHER 60 MILLION PEOPLE |
| 11:09AM | 6 | WOULD BE MOTIVATED TO BRING IT TO THE COURT'S ATTENTION. |
| 11:09AM | 7 | THE COURT:  I UNDERSTAND THE MOTIVATION AND I |
| 11:09AM | 8 | UNDERSTAND THE PROCESS, BUT WHAT I DON'T UNDERSTAND IS WHO IS |
| 11:09AM | 9 | POLICING IT AND WHO IS GOING TO FIND IF THERE'S A VIOLATION? |
| 11:09AM | 10 | HOW WILL THAT HAPPEN? |
| 11:09AM | 11 | MR. EDELSON:  WELL, ONE THING -- I THINK I |
| 11:09AM | 12 | UNDERSTAND YOUR HONOR'S QUESTION. |
| 11:09AM | 13 | THE COURT:  SOMETIMES WE ASK QUESTIONS AND SOMETIMES |
| 11:09AM | 14 | WE MIGHT THINK WE KNOW THE ANSWER, BUT WE ASK THE QUESTIONS |
| 11:09AM | 15 | BECAUSE WE WOULD LIKE TO HEAR AND HAVE THE ANSWER SPOKEN IN A |
| 11:09AM | 16 | PUBLIC FORUM. |
| 11:09AM | 17 | MR. EDELSON:  NO.  OF COURSE.  I'M TRYING TO ANSWER |
| 11:09AM | 18 | DIRECTLY.  THE WAY THE CLASS WORKS IS THAT NETFLIX HAS, I |
| 11:10AM | 19 | BELIEVE, A YEAR TO FIGURE OUT THE TECHNOLOGY SOLUTION.  IT'S |
| 11:10AM | 20 | NOT A SMALL PROCESS.  THEY'LL BE KEEPING US APPRISED DURING |
| 11:10AM | 21 | THAT PROCESS SO THAT WE'RE COMFORTABLE WITH IT WHICH IS ALSO IN |
| 11:10AM | 22 | OUR BENEFIT, TOO, BECAUSE THEY DON'T WANT US TO LATER CRY FOUL. |
| 11:10AM | 23 | AND THEN THEY ALSO, AS A PUBLIC COMPANY, HAVE PUBLIC |
| 11:10AM | 24 | REPORTING MEASURES AS WELL. |
| 11:10AM | 25 | THE COURT:  BUT DO THEY HAVE TO PUBLICLY REPORT |

| | | |
|---|---|---|
| 11:10AM | 1 | ISSUES OF THE INJUNCTION?  DOES THAT COME -- I GUESS I NEED TO |
| 11:10AM | 2 | ASK THEM. |
| 11:10AM | 3 | MR. EDELSON:  I GUESS I MAY NOT BE ANSWERING YOUR |
| 11:10AM | 4 | QUESTION AS DIRECTLY AS YOU WOULD LIKE. |
| 11:10AM | 5 | THE COURT:  WELL, YOU KNOW, INJUNCTIONS ARE |
| 11:10AM | 6 | SOMETHING THAT COURTS ISSUE AND WE KNOW ABOUT THE ENFORCEMENT |
| 11:10AM | 7 | MECHANISM IF THERE'S A BREACH VIOLATION. |
| 11:10AM | 8 | BUT I'M JUST CURIOUS HOW THAT WOULD HAPPEN IN THIS CASE |
| 11:10AM | 9 | WITH THIS INJUNCTION IF THERE WERE A BREACH OF A VIOLATION, WHO |
| 11:10AM | 10 | POLICES IT, HOW WOULD THAT COME TO THE COURT'S ATTENTION. |
| 11:10AM | 11 | MR. EDELSON:  PERHAPS I CAN ANSWER IT THIS WAY, IF |
| 11:11AM | 12 | THEY ARE HOLDING ONTO INFORMATION, IT WOULD BECOME APPARENT AT |
| 11:11AM | 13 | SOME POINT. |
| 11:11AM | 14 | SO, FOR EXAMPLE, THE REASON THAT WE WERE ABLE TO FIND OUT |
| 11:11AM | 15 | ABOUT THIS CASE WAS BECAUSE THEY SENT E-MAILS OUT TO PEOPLE |
| 11:11AM | 16 | SAYING I STOPPED BEING A NETFLIX CUSTOMER AND THEY SAID, YOU |
| 11:11AM | 17 | KNOW, YOU RENTED "ANNIE" FOR YOUR DAUGHTER AND PERHAPS YOU WANT |
| 11:11AM | 18 | TO COME JOIN US AGAIN AND RENT ANOTHER MOVIE. |
| 11:11AM | 19 | SO THEY WOULD BE USING IT FOR THOSE PURPOSES.  SO YOU |
| 11:11AM | 20 | WOULD START SEEING SIGNS OF THAT IN DIFFERENT WAYS. |
| 11:11AM | 21 | BUT WE REALLY DON'T HAVE ANY CONCERN THAT NETFLIX WOULD |
| 11:11AM | 22 | HAVE -- THEY HAVE NO MOTIVATION TO. |
| 11:11AM | 23 | THE COURT:  I ASSUMED INDIVIDUALS WOULD FOLLOW COURT |
| 11:11AM | 24 | ORDERS, THAT'S THE PRESUMPTION. |
| 11:11AM | 25 | MR. EDELSON:  RIGHT. |

**SER 046**

| | | |
|---|---|---|
| 11:11AM | 1 | THE COURT:  THERE ARE RARE OCCASIONS WHERE |
| 11:11AM | 2 | INDIVIDUALS AND COMPANIES DON'T. |
| 11:11AM | 3 | AND TO MEASURE AND TO WATCH THAT, WE DO HAVE TO HAVE SOME |
| 11:11AM | 4 | TYPE OF OBSERVATIONS, SOME TYPE OF POLICING, I GUESS.  I'M JUST |
| 11:12AM | 5 | CURIOUS WHETHER THAT WAS BUILT INTO THE SETTLEMENT OR WHETHER |
| 11:12AM | 6 | YOU FEEL THAT SOME TYPE OF REPORTING NEEDS TO BE PUT IN THE |
| 11:12AM | 7 | SETTLEMENT THAT ACCOMPLISHES THAT. |
| 11:12AM | 8 | MR. EDELSON:  WE'D BE -- ANY BURDEN YOU WANT TO PUT |
| 11:12AM | 9 | ONTO NETFLIX WE WOULD BE IN FAVOR OF.  SO WE WOULD BE HAPPY TO |
| 11:12AM | 10 | VOLUNTEER THEM TO DO THAT. |
| 11:12AM | 11 | I CAN ALSO TELL YOU -- |
| 11:12AM | 12 | THE COURT:  YOU'RE ABOUT TO BUST THE DEAL I OUGHT TO |
| 11:12AM | 13 | TELL YOU. |
| 11:12AM | 14 | MR. EDELSON:  I GOT SIGNATURES ON THERE.  WE ALSO |
| 11:12AM | 15 | HAVE COMPARED THE INJUNCTIONS TO WHAT HAS BEEN DONE IN OTHER |
| 11:12AM | 16 | CASES.  FOR EXAMPLE, IN THE FACEBOOK BEACON CASE, THE ENTIRE |
| 11:12AM | 17 | INJUNCTION, NO JOKE, WAS THAT THEY'RE NOT ALLOWED TO USE THE |
| 11:12AM | 18 | NAME FACEBOOK BEACON ANY MORE, AND THEY CAN USE THE SAME |
| 11:12AM | 19 | PROGRAM BUT JUST UNDER A DIFFERENT NAME. |
| 11:12AM | 20 | I THINK WE DID A GOOD JOB UNDER THE INJUNCTION.  IT MAY BE |
| 11:12AM | 21 | THAT WE COULD HAVE MADE IT EVEN STRONGER, BUT I DON'T THINK |
| 11:12AM | 22 | THAT'S THE TEST.  YOU KNOW, EVERY SETTLEMENT COULD BE IMPROVED. |
| 11:12AM | 23 | THE COURT:  OKAY.  THANK YOU VERY MUCH. |
| 11:12AM | 24 | MR. EDELSON:  THANK YOU FOR YOUR TIME. |
| 11:13AM | 25 | MR. BALABANIAN:  THANK YOU. |

SER 047

11:13AM  1                THE COURT:  MR. EGGLETON, WOULD YOU LIKE TO MAKE

11:13AM  2      SOME COMMENTS?

11:13AM  3                MR. EGGLETON:  GOOD MORNING AGAIN, YOUR HONOR.  I

11:13AM  4      INTEND TO BE BRIEF AND WITH YOUR INDULGENCE, I'M GOING TO JUMP

11:13AM  5      AROUND A LITTLE BIT IN LIGHT OF SOME OF THE COMMENTS THAT HAVE

11:13AM  6      ALREADY BEEN MADE.

11:13AM  7                THE COURT:  SURE.

11:13AM  8                MR. EGGLETON:  YOUR HONOR ASKED SOME QUESTIONS ABOUT

11:13AM  9      THE DISCLOSURE PART OF THE CASE AND ESSENTIALLY WHETHER THAT

11:13AM  10     WAS WORTH ANYTHING, AND I THINK YOU HAVE AN AMPLE RECORD IN

11:13AM  11     FRONT OF YOU FROM PLAINTIFF'S COUNSEL ON THAT ISSUE.

11:13AM  12         BUT WHAT I DID WANT TO FLAG FOR THE COURT THE PRIVACY

11:13AM  13     POLICY AND YOU CAN PULL IT UP ON YOUR COMPUTER.  AND THEY ARE

11:13AM  14     ESSENTIALLY USING OTHER COMPANY'S CONTRACTORS AND CONTRACT

11:13AM  15     PEOPLE TO HELP WITH SOME OF THE FUNCTIONS OF THE COMPANY AND

11:13AM  16     PRIVACY POLICY DISCLOSES TO PEOPLE THAT THROUGH THAT THOSE

11:13AM  17     FOLKS MIGHT HAVE ACCESS TO INFORMATION.

11:13AM  18         WE DON'T THINK ANY OF THAT IS A DISCLOSURE VIOLATION UNDER

11:13AM  19     THE VPPA.  IT DOESN'T MEAN WE WON'T BRING THAT CASE SOME DAY.

11:13AM  20     YOU YOURSELF HAVE HAD A DISCLOSURE CASE THAT YOU MAY RECALL

11:14AM  21     THAT SOMEONE ALLEGED THAT BECAUSE THE COMPANY STREAMS VIDEOS

11:14AM  22     AND SOMEONE CAN SEE THEM ON A T.V. IN A FAMILY ROOM, THAT THAT

11:14AM  23     WAS SOMEHOW DISCLOSURE VIOLATION.  WE DON'T THINK THERE'S A

11:14AM  24     DISCLOSURE VIOLATION THERE, BUT THAT PRIVACY POLICY IS OUT

11:14AM  25     THERE AND THE COMPANY DOES USE PEOPLE THAT WAY.

| | | |
|---|---|---|
| 11:14AM | 1 | I'M NOT IN A PUBLIC FORUM TO TALK MORE ABOUT HOW NETFLIX |
| 11:14AM | 2 | DOES ITS BUSINESS BUT WE ABSOLUTELY AGREE THAT THE DISCLOSURE |
| 11:14AM | 3 | PART OF THE CASE WASN'T WORTH ANYTHING, WE WOULDN'T HAVE PAID A |
| 11:14AM | 4 | LOT FOR IT AND JUST LIKE THE OTHER CASE BEFORE YOUR HONOR, WE |
| 11:14AM | 5 | WOULD EXPECT TO WIN THOSE CLAIMS. |
| 11:14AM | 6 | THERE WAS A LITTLE BIT OF TALK ABOUT WHETHER THERE WAS A |
| 11:14AM | 7 | BENEFIT TO THE CLASS HERE.  I WANT TO EMPHASIZE THIS INJUNCTION |
| 11:14AM | 8 | IS A REAL THING.  WE INTEND TO DO IT.  NETFLIX IS A RESPONSIBLE |
| 11:14AM | 9 | COMPANY, AND WE WILL DO IT. |
| 11:14AM | 10 | IT IS A BENEFIT TO THE CLASS, AND, FRANKLY, IT'S A BENEFIT |
| 11:14AM | 11 | THAT IN OUR VIEW IS NOT REQUIRED BY LAW. |
| 11:14AM | 12 | I TOOK NOTE OF THE LETTER THAT YOU GOT FROM THE ATTORNEY |
| 11:14AM | 13 | GENERAL OF TEXAS WHICH IS SHORT, BUT IT FUNDAMENTALLY SAYS THAT |
| 11:14AM | 14 | NETFLIX IS NOT DOING ANYTHING MORE HERE THAN IT HAD TO DO |
| 11:14AM | 15 | LEGALLY.  NOT TRUE.  WE DIDN'T HAVE TO DO THIS INJUNCTIVE |
| 11:15AM | 16 | STUFF.  WE'RE DOING IT TO SETTLE THE CASE.  AND, FRANKLY, WE'RE |
| 11:15AM | 17 | ALSO DOING IT BECAUSE IT ENHANCES PRIVACY ISSUES AND NETFLIX IS |
| 11:15AM | 18 | INTERESTED IN THE PRIVACY OF ITS MEMBERS AND SO WE'RE DOING IT. |
| 11:15AM | 19 | IT ABSOLUTELY IS A BENEFIT. |
| 11:15AM | 20 | AND IS THE CY PRES.  AND AT THE END OF THE DAY THE MONEY |
| 11:15AM | 21 | THAT WILL GO TO THOSE ORGANIZATIONS, IN MY VIEW, DOES BENEFIT |
| 11:15AM | 22 | THE CLASS. |
| 11:15AM | 23 | FUNDAMENTALLY WE HAVE A LOT OF OBJECTIONS IN FRONT OF YOU |
| 11:15AM | 24 | THAT SAID IT SHOULD HAVE BEEN MORE THAN 9 MILLION.  IT WASN'T |
| 11:15AM | 25 | GOING TO BE MORE THAN 9 MILLION.  AND IF WE WENT BACK TO THE |

| | | |
|---|---|---|
| 11:15AM | 1 | MEDIATION WITH JUDGE, PHILLIPS AGAIN, THAT WAS NOT GOING TO |
| 11:15AM | 2 | HAPPEN. |
| 11:15AM | 3 | SO THAT CY PRES IS NOT GOING TO GET ANY BIGGER THAN THAT. |
| 11:15AM | 4 | IT'S NOT DISTRIBUTABLE, AND I THINK TOTALLY CONSISTENT WITH THE |
| 11:15AM | 5 | NINTH CIRCUIT CASES RECENTLY IT WAS EXACTLY THE WAY THAT CASES |
| 11:15AM | 6 | LIKE THIS SHOULD SETTLE.  YOU HAVE AN IMPORTANT INJUNCTION |
| 11:15AM | 7 | COMPONENT AND YOU HAVE A CY PRES COMPONENT, WHICH IN MY VIEW |
| 11:15AM | 8 | BOTH BENEFIT THE CLASS. |
| 11:15AM | 9 | WITH RESPECT TO THE CY PRES, COUNSEL MENTIONED BRIEFLY |
| 11:15AM | 10 | THAT THEY HAD SOLICITED FROM THE APPLICANTS INFORMATION ABOUT |
| 11:15AM | 11 | CONTACTS WITH THE COURT AND COUNSEL AND THE LIKE. |
| 11:15AM | 12 | I WANTED TO MAKE SURE THAT THE COURT HAD A FULL RECORD ON |
| 11:16AM | 13 | THAT BECAUSE NOT SURPRISINGLY, OUR FIRM HAS SOME CONTACTS WITH |
| 11:16AM | 14 | SOME OF THE LOCAL SCHOOLS THAT ARE RECIPIENT, POTENTIALLY |
| 11:16AM | 15 | RECIPIENTS SUBJECT TO YOUR ORDER. |
| 11:16AM | 16 | SOME OF IT WAS IN THE PLAINTIFF'S PAPERS AND SOME OF IT |
| 11:16AM | 17 | WASN'T WITH RESPECT TO SANTA CLARA AND HASTINGS.  A COUPLE OF |
| 11:16AM | 18 | MY PARTNERS SIT ON ADVISORY PANELS WITH RESPECT TO THOSE |
| 11:16AM | 19 | ORGANIZATIONS.  ONE OF MY PARTNER'S WIVES IS A CODIRECTOR OF |
| 11:16AM | 20 | ONE OF THEM. |
| 11:16AM | 21 | WITH YOUR INDULGENCE, I'D LIKE TO SUPPLEMENT THE RECORD BY |
| 11:16AM | 22 | GIVING YOU THE DISCLOSURES AND IT'S SANTA CLARA AND HASTINGS IN |
| 11:16AM | 23 | PARTICULAR THAT THEY MADE SO THAT YOU HAVE IN FRONT OF YOU THE |
| 11:16AM | 24 | FULL RECORD ON THE CONTACTS THAT WERE DISCLOSED. |
| 11:16AM | 25 | I DON'T BELIEVE ANY OF THOSE WERE MATERIAL, AND, IN FACT, |

SER 050

11:16AM  1    THE WAY WE DECIDED WITH THE PLAINTIFF'S COUNSEL HOW TO DIVIDE

11:16AM  2    UP THE MONEY, WE TOOK THE -- FRANKLY, ALL OF THE UNIVERSITIES

11:16AM  3    AND AFFILIATED ORGANIZATIONS THAT APPLY THAT WERE ALL WORTHY.

11:16AM  4       WE TOOK ONE FROM CANADA AND WE TOOK THAT ONE OUT BECAUSE

11:16AM  5    IT'S NOT U.S. BUT ALL OF THE U.S. UNIVERSITIES WERE ABSOLUTELY

11:16AM  6    WORTHY.  THEY ALL MADE A REQUEST ABOUT HOW MUCH MONEY THEY

11:17AM  7    WANTED.  WE DID A PRO RATA -- WE COULDN'T GIVE THEM ALL THEY

11:17AM  8    WANTED BUT WE HAD A PRO RATA REDUCTION OFF OF THEIR REQUEST SO

11:17AM  9    THAT ESSENTIALLY ALL THE SCHOOLS GOT THE SAME AMOUNT OR RATIO

11:17AM 10    TO WHAT THEY REQUESTED.

11:17AM 11       SAID DIFFERENTLY, THERE WAS NO BENEFIT GIVEN TO ANYBODY

11:17AM 12    HERE BY VIRTUE OF YOUR CONTACTS WITH ANY OF THE SCHOOLS, MY

11:17AM 13    FIRMS, BUT I JUST WANTED TO MAKE SURE THAT YOUR HONOR HAS A

11:17AM 14    FULL RECORD OF THAT IN FRONT OF YOU.

11:17AM 15          THE COURT:  I APPRECIATE THAT, AND YOU'LL SUPPLY

11:17AM 16    THAT TO COUNSEL.

11:17AM 17          MR. EGGLETON:  I ABSOLUTELY WILL.

11:17AM 18       YOUR HONOR, I'M HAPPY TO ANSWER ANY QUESTIONS YOU HAVE,

11:17AM 19    AND I'M ALSO HAPPY TO ANSWER ANY QUESTIONS AFTER THE OBJECTORS

11:17AM 20    SPEAK.

11:17AM 21          THE COURT:  I MAY DO THAT, TOO.  I MAY GO BACK AND

11:17AM 22    PUT QUESTIONS TO THE PARTIES.

11:17AM 23       THE QUESTION ABOUT THE FREE VIDEOS, I THINK IT WAS TOUCHED

11:17AM 24    ON BY COUNSEL AS A POSSIBLE ALTERNATIVE TO THE CLASS MEMBERS,

11:17AM 25    DO YOU WANT TO SPEAK TO THAT?

| 11:17AM | 1 | MR. EGGLETON:  I WOULD.  WHEN YOU SETTLE THESE TYPE |

11:17AM    1          MR. EGGLETON:  I WOULD.  WHEN YOU SETTLE THESE TYPE

11:17AM    2    OF CASES, YOU'RE ALWAYS WONDERING IN PART WHAT TYPE OF REMEDY

11:17AM    3    YOU SHOULD GIVE.  YOU GIVE A LOT OF CONTEMPLATION INTO THAT

11:17AM    4    WHEN YOU GO INTO A MEDIATION WITH ESPECIALLY SOMEONE LIKE JUDGE

11:18AM    5    PHILLIPS.

11:18AM    6          AND TYPICALLY WE TRY, IF WE'RE GOING TO TRY TO SETTLE A

11:18AM    7    CASE WITH SOME KIND OF REMEDY, WE TRY TO MATCH IT TO WHAT THE

11:18AM    8    CASE IS ABOUT.

11:18AM    9          SO HERE THE CASE IN LARGE PART WAS ABOUT THE RETENTION OF

11:18AM   10    THIS DATA, AND THAT'S WHY WE FOCUS SO MUCH ON THIS INJUNCTIVE

11:18AM   11    PIECE TO RESOLVE THE CASE, AGAIN, WHICH WE DON'T BELIEVE WE

11:18AM   12    HAVE TO DO.

11:18AM   13          WE ACTUALLY THINK, PUTTING ASIDE WHERE THERE'S A PRIVATE

11:18AM   14    RIGHT OF ACTION FOR MONEY UNDER THE RETENTION CLAIMS, WE THINK

11:18AM   15    WE CAN BEAT THOSE CLAIMS ON THE MERITS, BUT WE AGREED TO DO THE

11:18AM   16    INJUNCTIVE REMEDY WHICH IN OUR VIEW DIRECTLY ADDRESSES THE, IF

11:18AM   17    YOU WILL, THE ALLEGATION OF THE CASE, THE MAINTAINING OF THIS

11:18AM   18    DATA LINKED.

11:18AM   19          SO THAT'S WHY I DON'T MIND TELLING YOU THAT'S A REMEDY

11:18AM   20    THAT WE PROPOSED, AT LEAST IN FORM, BECAUSE WE THOUGHT IT WOULD

11:18AM   21    ADDRESS THE UNDERLYING ISSUES IN THE CASE, AND, FRANKLY, I

11:18AM   22    BELIEVE THAT'S THE RIGHT WAY TO DO IT.

11:18AM   23          NOW, YOU ALSO HAVE THE CY PRES, AS I COMMENTED BRIEFLY AND

11:18AM   24    I'LL BE POLITE ABOUT IT, BUT IT WASN'T GOING TO BE ENOUGH MONEY

11:19AM   25    TO DISTRIBUTE CASH TO THE CLASS MEMBERS HERE, IT JUST WASN'T

| | | |
|---|---|---|
| 11:19AM | 1 | GOING TO HAPPEN. |
| 11:19AM | 2 | BUT THERE WAS A WAY TO DO THAT THROUGH SOME MONEY THROUGH |
| 11:19AM | 3 | CY PRES, WHICH IN MY VIEW ALSO BENEFITS. |
| 11:19AM | 4 | I THINK WHEN YOU THINK ABOUT A FREE MOVIE, FIRST OF ALL, |
| 11:19AM | 5 | YOU HAVE THE ISSUE OF ALL OF THE FORMER MEMBERS WHO ARE NOT |
| 11:19AM | 6 | MEMBERS ANY MORE.  SO YOU HAVE TO DEAL WITH THAT ISSUE ABOUT |
| 11:19AM | 7 | CAN YOU GIVE THEM THE SAME REMEDY?  IS IT WORTH AS MUCH? |
| 11:19AM | 8 | BUT, FRANKLY, IN THIS CASE, I DON'T THINK IT WOULD HAVE |
| 11:19AM | 9 | ADDRESSED THE UNDERLYING ALLEGATIONS THEMES THRUST OF THE |
| 11:19AM | 10 | COMPLAINT AND THAT'S WHY THIS SETTLEMENT WAS STRUCTURED THE WAY |
| 11:19AM | 11 | IT IS WITH JUDGE PHILLIPS'S HELP. |
| 11:19AM | 12 | THE COURT:  I SEE.  THANK YOU. |
| 11:19AM | 13 | MR. EGGLETON:  DOES THAT HELP? |
| 11:19AM | 14 | THE COURT:  YES, IT DOES.  THANK YOU VERY MUCH. |
| 11:19AM | 15 | ANY OF YOUR OTHER TEAM WISH TO BE HEARD? |
| 11:19AM | 16 | MR. STRICKLAND? |
| 11:19AM | 17 | MR. STRICKLAND:  NO, YOUR HONOR. |
| 11:19AM | 18 | THE COURT:  LET ME HEAR FROM OBJECTORS IF THEY WISH |
| 11:19AM | 19 | TO SPEAK.  MR. KATRIEL. |
| 11:19AM | 20 | MR. KATRIEL:  GOOD MORNING, YOUR HONOR, MAY IT |
| 11:20AM | 21 | PLEASE THE COURT.  I MUST CONFESS, THIS IS SOMEWHAT OF AN |
| 11:20AM | 22 | UNUSUAL POSTURE FOR ME TO BE APPEARING HERE.  I USUALLY SIT IN |
| 11:20AM | 23 | A SEAT SIMILAR TO MR. BALABANIAN AND MR. EDELSON.  I'M A |
| 11:20AM | 24 | PLAINTIFF'S CLASS ACTION ATTORNEY, AND I'M NOT A PROFESSIONAL |
| 11:20AM | 25 | OBJECTOR AND NEVER FILED AN OBJECTION, BUT I GUESS THERE'S |

11:20AM  1    PRECEDENCE SOMETIMES FOR THINGS TO BE SAID AND THERE ARE

11:20AM  2    PARTICULAR ASPECTS OF THIS SETTLEMENT THAT I THINK ARE WORTHY

11:20AM  3    OF BEING CALLED TO THE ATTENTION OF THE COURT AS IT WEIGHS

11:20AM  4    THROUGH FINALITY WITH THE PROPOSED SETTLEMENT.

11:20AM  5        AND I WANT TO PICK UP ON THE INITIAL COMMENTS THAT THE

11:20AM  6    COURT BEGAN WITH, WHICH IS THE REMARKABLE SIZE OF THE CLASS

11:20AM  7    HERE AND THE SWIFTNESS WITH WHICH THE SETTLEMENT WAS REACHED

11:20AM  8    AND IN RELEVANT TERMS.

11:20AM  9        AND WE HEARD THIS FIGURE BANDIED ABOUT OF 62 MILLION CLASS

11:20AM 10    MEMBERS, AND THAT IS INDEED A LARGE SIZE OF A SETTLEMENT CLASS

11:20AM 11    AND IT HAS EFFECTS SUCH AS THE DIFFICULTY IN THEM MAKING A

11:20AM 12    MEANINGFUL RECOVERY TO EACH INDIVIDUAL CLASS MEMBERS WHICH THEN

11:21AM 13    TRIGGERS THE CY PRES PROVISIONS.

11:21AM 14        BUT BEFORE MOVING FORWARD WITH THE REASONABLENESS OF THE

11:21AM 15    TERMS OF THE SETTLEMENT ITSELF, WE ARE REQUIRED TO PAUSE AND

11:21AM 16    ASK WHETHER THE SETTLEMENT CLASS ITSELF THAT IS PROPOSED MEETS

11:21AM 17    THE REQUIREMENTS OF RULE 23 BECAUSE THE SUPREME COURT, OF

11:21AM 18    COURSE, HAS ADMONISHED US THAT REGARDLESS OF WHETHER IN A

11:21AM 19    SETTLEMENT CONTEXT OR AS OPPOSED TO AN ADVERSARIAL ONE, A

11:21AM 20    CLASS, WHEN IT IS ASKED TO BE CERTIFIED, MUST SATISFY THOSE

11:21AM 21    REQUIREMENTS.  WHY?  BECAUSE WE ARE BINDING THE ABSENT CLASS

11:21AM 22    MEMBERS AND THEY'RE GIVING UP THEIR RIGHTS BY WAY OF A RELEASE

11:21AM 23    IN THE JUDGMENT, AND THEY ARE NOT.

11:21AM 24        AND SO THE QUESTION IS WHETHER THE REQUIREMENTS OF RULE 23

11:21AM 25    THAT ENSURE THAT THAT TRADE-OFF THAT IS BEING MADE HAS ACTUALLY

11:21AM 1    BEEN MET.

11:21AM 2        AND I SUBMIT THAT IT HASN'T HERE.  AND THAT'S THE INITIAL

11:21AM 3    STARTING POINT BEFORE I GET INTO THE TERMS OF THE SETTLEMENT

11:21AM 4    ITSELF.

11:21AM 5        AND LET'S TAKE A STEP BACK FOR A MINUTE HERE.  WHEN THIS

11:21AM 6    COMPLAINT WAS FILED, AND WHEN I SAY, "THIS COMPLAINT" I MEAN

11:21AM 7    THE CONSOLIDATED COMPLAINT, THE CLASS THAT WAS PLED HERE LOOKED

11:22AM 8    NOTHING LIKE THE CLASS THAT IS SOUGHT TO BE SETTLED HERE AND

11:22AM 9    CERTIFIED HERE.

11:22AM 10       THAT CLASS DEFINITION INCLUDED ONLY FORMER SUBSCRIBERS.

11:22AM 11   IN FACT, THE TWO CLIENTS OF MR. EDELSON HERE WHO ARE BEING PUT

11:22AM 12   FORWARD AS CLASS REPRESENTATIVES ARE THEMSELVES ARE FORMER

11:22AM 13   SUBSCRIBERS, THEY'RE NOT CURRENT SUBSCRIBERS.

11:22AM 14       YET THE CLASS THAT IS BEING SOUGHT TO BE CERTIFIED TODAY

11:22AM 15   IS A CLASS OF FORMER AS WELL AS CURRENT SUBSCRIBERS, AND NOT

11:22AM 16   ONLY THAT, BUT IT'S ANYBODY WHO FALLS WITHIN EITHER OF THOSE

11:22AM 17   TWO DEFINITIONS DATING BACK IN 1999, 13 YEARS AGO WHEN WE KNOW

11:22AM 18   THAT THE STATUTE OF LIMITATIONS FOR A VPPA CLAIM IS TWO YEARS

11:22AM 19   OR TWO YEARS FROM THE DATE OF THE OCCURRENCE OR DISCOVERY.

11:22AM 20       SO WITH THAT AS A BACKDROP, I'D LIKE TO TALK A LITTLE BIT

11:22AM 21   ABOUT WHY THERE ARE REAL RULE 23 ISSUES HERE AND WE CAN'T EVEN,

11:22AM 22   WE CAN'T EVEN START TO DEBATE THE MERITS OF THE TERMS OF THE

11:22AM 23   SETTLEMENT UNTIL WE CLEAR THE HURDLE OF RULE 23.  AND IT SHOULD

11:23AM 24   BE AXIOMATIC THAT YOU CAN'T CERTIFY THE CLASS AS A CLASS

11:23AM 25   REPRESENTATIVE IN A CLASS DEFINITION OF WHICH YOU ARE NOT A

11:23AM   1      MEMBER.

11:23AM   2          WE ARE HERE SEEKING -- ASKING THE COURT TO RELEASE THE

11:23AM   3      CLAIMS OF CURRENT SUBSCRIBERS WHEN THERE IS NO CURRENT

11:23AM   4      SUBSCRIBER REPRESENTATIVE BEFORE YOU.

11:23AM   5          THAT SHOULD GIVE US GREAT PAUSE, AND I THINK THAT OPENS

11:23AM   6      AND ENDS THE INQUIRY.

11:23AM   7          AND WE CAN'T SAY, WELL, THE CLASS DEFINITION IS MADE IN

11:23AM   8      THE DISJUNCTIVE SO AS LONG AS I FIT ONE CATEGORY, I CAN RELEASE

11:23AM   9      THE OTHER.  THAT'S LOGICALLY FLAWED.

11:23AM  10          WE CAN ALSO SAY WE'LL RELEASE THE CLAIMS OF CHEVROLET

11:23AM  11      OWNERS BECAUSE WE CAN DEFINE THE CLASS AND SAY THEY'RE CURRENT

11:23AM  12      SUBSCRIBERS OF NETFLIX OR FORMER SUBSCRIBERS OF NETFLIX AND IT

11:23AM  13      DOESN'T MATTER THAT THE CLASS REPRESENTATIVE -- THE FACT THAT

11:23AM  14      THE CLASS DEFINITION IS PHRASED IN THE DISJUNCTIVE RESOLVES

11:23AM  15      THAT BECAUSE -- I'M SORRY, I'M SPEAKING FAST -- BECAUSE THAT

11:24AM  16      WOULD BE MEANINGFUL, YOU COULD DEFINE ANY CLASS IN THE

11:24AM  17      DISJUNCTIVE.

11:24AM  18          THE POINT HERE IS THAT THE CLASS AS DEFINED IN THE

11:24AM  19      COMPLAINT IS NOT THE CLASS BEFORE YOU.  IS THAT FATALLY FLAWED?

11:24AM  20      NO, NOT NECESSARILY.

11:24AM  21          COUNSEL OFTEN LEARN OF THINGS DURING THE COURSE OF THE

11:24AM  22      LITIGATION THAT MAKES IT PROPER AND SOMETIMES ENCOURAGES THEM

11:24AM  23      TO AMEND THE CLASS DEFINITION.  NO PROBLEM WITH THAT

11:24AM  24      WHATSOEVER.

11:24AM  25          BUT THE POINT -- THE DIFFICULTY HERE IS THAT WE HAVE JUST

| | | |
|---|---|---|
| 11:24AM | 1 | HEARD A COLLOQUY AND ALSO IN THE FINAL APPROVAL PAPERS THAT |
| 11:24AM | 2 | THERE REALLY IS NO DISCLOSURE CASE HERE.  I THINK TO QUOTE |
| 11:24AM | 3 | NETFLIX'S COUNSEL, HIS WORDS WERE, THAT WE AGREE THAT THERE'S |
| 11:24AM | 4 | NO DISCLOSURE CASE HERE. |
| 11:24AM | 5 |      WELL, THE PROBLEM IS THAT IF YOU'RE A CURRENT SUBSCRIBER, |
| 11:24AM | 6 | THAT'S YOUR ONLY CASE BECAUSE YOU DON'T HAVE A RETENTION CLAIM |
| 11:24AM | 7 | BECAUSE UNLAWFUL RETENTION DOESN'T KICK IN UNTIL YOU'RE A |
| 11:24AM | 8 | FORMER SUBSCRIBER. |
| 11:24AM | 9 |      SO MY CLIENT, SHE'S NOT ONLY MY CLIENT BUT SHE'S A WIFE, |
| 11:24AM | 10 | AND I OWE HER A GREAT FIDUCIARY DUTY, SHE'S A FORMER |
| 11:25AM | 11 | SUBSCRIBER.  SHE'S BEING ASKED TO RELEASE HER CLAIM IN EXCHANGE |
| 11:25AM | 12 | FOR A SETTLEMENT BUT BEING LUMPED IN WITH PEOPLE WHO HAVE NO |
| 11:25AM | 13 | CASE AND NOBODY IS REPRESENTING THOSE PEOPLE AND THAT MAKES THE |
| 11:25AM | 14 | CLASS, THE ADEQUACY OF THE REPRESENTATIVES HERE VERY SUSPECT, |
| 11:25AM | 15 | AND, INDEED, I THINK MORE THAN SUSPECT, IT MAKES IT FATALLY |
| 11:25AM | 16 | FLAWED. |
| 11:25AM | 17 |      PER THE STRENGTH OF HER CASE, WHEN PUT IN THE CONTEXT OF |
| 11:25AM | 18 | THIS SETTLEMENT CLASS IS SEVERELY DILUTED BECAUSE MOST OF THE |
| 11:25AM | 19 | 62 MILLION FOLKS THERE, OR I SHOULDN'T SAY "MOST" BUT A GREAT |
| 11:25AM | 20 | MANY OF THEM, MANY, MANY MILLIONS ARE FOLKS THAT DID NOT BELONG |
| 11:25AM | 21 | IN THAT CLASS AT ALL.  THEY WOULD NOT BE PART OF THE COMPLAINT |
| 11:25AM | 22 | BECAUSE THE COMPLAINT IS NOT DEFINED THAT WAY AND NOW WE'RE |
| 11:25AM | 23 | BEING TOLD, NOT ONLY DO THEY NOT BELONG IN THAT COMPLAINT, BUT |
| 11:25AM | 24 | WE ALL AGREE THAT THEY DON'T EVEN HAVE A CASE.  MY CLIENT HAS A |
| 11:25AM | 25 | CASE.  I MEAN, THEY DEBATE IT ON THE MERITS BUT AS A LEGAL |

SER 057

| | |
|---|---|
| 11:26AM | 1 | MATTER, SHE HAS AN UNLAWFUL RETENTION CLAIM. |

11:26AM 1    MATTER, SHE HAS AN UNLAWFUL RETENTION CLAIM.

11:26AM 2        SO WHY WOULD SHE BE LUMPED INTO AN UNLAWFUL CURRENT

11:26AM 3    CONSTRUCT, NUMBER ONE, WHEN THERE IS NO CURRENT CONSTRUCTIVE

11:26AM 4    CLASS REPRESENTATIVE BECAUSE THESE ARE TWO SEPARATE CLASSES

11:26AM 5    THAT SHOULD NOT BE LUMPED TOGETHER AND THEY CANNOT BE SETTLED

11:26AM 6    TODAY BECAUSE THERE IS NO CURRENT CONSTRUCTIVE CLASS

11:26AM 7    REPRESENTATIVE.  THAT'S PROBLEM NUMBER ONE.

11:26AM 8        THE COURT:  AND OPTING OUT IS NOT AN OPTION AND SHE

11:26AM 9    SHOULD NOT BE PUT IN THAT POSITION TO OPT OUT AND PURSUE HER

11:26AM 10   OWN REMEDY?

11:26AM 11       MR. KATRIEL:  IT'S AN OPTION UNDER RULE 23 BUT IT'S

11:26AM 12   NOT AN OPTION FOR JUSTIFYING A RULE 23 FINAL APPROVAL BECAUSE

11:26AM 13   YOU COULD SAY THAT ABOUT ANY SETTLEMENT AND THEN WE CAN

11:26AM 14   DISPENSE WITH A FAIRNESS HEARING.  WE CAN SAY IF YOU HAVE A

11:26AM 15   PROBLEM WITH THE SETTLEMENT, OPT OUT.

11:26AM 16       THE POINT HERE IS WHEN MR. EDELSON AND MR. BALABANIAN

11:26AM 17   SIGNED UP TO BRING THIS AS A PUNITIVE CLASS ACTION, AT THAT

11:26AM 18   POINT A FIDUCIARY DUTY ATTACHED TO THE CLASS AS DEFINED AND

11:26AM 19   THEY CAN'T SAY AS AN ANSWER IF YOU DON'T LIKE IT, TOUGH, OPT

11:26AM 20   OUT.

11:26AM 21       I DON'T THINK THEY'RE SAYING THAT.  I'M SIMPLY

11:26AM 22   HIGHLIGHTING TO THE COURT THE CONCERNS AS TO WHY RULE 23 IS NOT

11:27AM 23   MET.

11:27AM 24       I THINK THAT'S BAD ENOUGH AND THAT SUFFICE US TO REJECT

11:27AM 25   THE CLASS CERTIFICATION MOTION AS BEFORE YOU THAT IS PART OF

| | | |
|---|---|---|
| 11:27AM | 1 | THE SETTLEMENT. |
| 11:27AM | 2 | BUT THERE'S ANOTHER EQUALLY DIFFICULT ISSUE WITH THIS |
| 11:27AM | 3 | CLASS CERTIFICATION, AND THAT IS SOMETHING THAT I ALLUDED TO. |
| 11:27AM | 4 | NOT ONLY ARE FORMER SUBSCRIBERS AND CURRENT SUBSCRIBERS |
| 11:27AM | 5 | LUMPED IN, IN ONE CLASS DEFINITION, BUT THE CLASS DEFINITION |
| 11:27AM | 6 | MEANS -- IT IS DEFINED AS BEING INCLUDING FORMER SUBSCRIBERS AT |
| 11:27AM | 7 | ANY TIME. NETFLIX BEGAN OFFERING ITS SUBSCRIPTION NETFLIX |
| 11:27AM | 8 | SERVICE IN 1999. SO YOU COULD HAVE A FORMER SUBSCRIBER WHO |
| 11:27AM | 9 | QUIT IN 1999 AND HE'S COVERED UNDER THE SETTLEMENT. |
| 11:27AM | 10 | THE STATUTE OF LIMITATIONS EXPLICITLY FOUND IN THE TEXT OF |
| 11:27AM | 11 | THE VPPA'S TWO YEARS SINCE THE COMMISSION OF THE ACT OR ITS |
| 11:27AM | 12 | DISCOVERY. MY CLIENT BECAME A FORMER SUBSCRIBER IN THE MIDDLE |
| 11:27AM | 13 | OF THIS YEAR, 2012, BEFORE THIS CASE SETTLED. |
| 11:28AM | 14 | THE CLASS REPRESENTATIVES HERE, HOWEVER, BECAME FORMER |
| 11:28AM | 15 | SUBSCRIBERS WELL BEFORE MORE THAN TWO YEARS AGO, THAT'S |
| 11:28AM | 16 | UNDISPUTED. IT'S IN THE FINAL APPROVAL PAPERS. MEANING THAT |
| 11:28AM | 17 | THEIR CLAIMS ARE SUBJECT TO A TIME BAR STATUTE OF LIMITATIONS |
| 11:28AM | 18 | RESEARCH. AS IS WITH THE MAJORITY OF THE CLASS AS IT'S |
| 11:28AM | 19 | CURRENTLY DEFINED BECAUSE IT INCLUDES NOT ONLY THE CLAIMS OF |
| 11:28AM | 20 | PEOPLE WHO BECAME FORMER SUBSCRIBERS WITHIN TWO YEARS OF THE |
| 11:28AM | 21 | SETTLEMENT DATE BUT DATING BACK TO 1999. ALL OF THOSE OTHER |
| 11:28AM | 22 | YEARS, EVEN IF THEY HAD A CLAIM ON THE MERITS, IT'S TIME |
| 11:28AM | 23 | BARRED. |
| 11:28AM | 24 | WHEN WE BROUGHT THIS TO THE ATTENTION OF THE PARTIES AND |
| 11:28AM | 25 | TO THE COURT IN OUR OBJECTION PAPERS, AND IT IS CRYSTAL CLEAR |

| | | |
|---|---|---|
| 11:28AM | 1 | IN OUR -- IN READING THE LAW, AND WE CITED A HANDFUL OF CASES, |
| 11:28AM | 2 | THAT YOU CAN'T HAVE A CLASS CERTIFICATION MOTION WHERE THE |
| 11:28AM | 3 | CLASS REPRESENTATIVES OWN CLAIMS ARE SUBJECT TO A STATUTE OF |
| 11:29AM | 4 | LIMITATIONS DEFENSE AND MANY OF THE CLASS MEMBERS AREN'T. |
| 11:29AM | 5 | NOW, IN RESPONSE, AND IN THE REPLY THAT WE RECEIVED A FEW |
| 11:29AM | 6 | DAYS AGO, IT WAS THAT ARGUMENT WAS GIVEN RELATIVELY SHORT |
| 11:29AM | 7 | SHRIFT BUT THERE WAS ONE CASE CITED THE JARROW FORMULAS FROM |
| 11:29AM | 8 | THE NINTH CIRCUIT WHICH IN A FOOTNOTE SAID THAT THE STATUTE OF |
| 11:29AM | 9 | LIMITATIONS ISSUES DO NOT IN AND OF THEMSELVES PRECLUDE CLASS |
| 11:29AM | 10 | CERTIFICATION.  THAT IS ABSOLUTELY TRUE SO FAR AS IT GOES, BUT |
| 11:29AM | 11 | THIS IS NOT A RUN OF THE MILL STATUTE OF LIMITATIONS ISSUE AS |
| 11:29AM | 12 | WAS THE CASE IN JARROW FORMULAS. |
| 11:29AM | 13 | THE POINT HERE IS THAT WHEN THE CLASS REPRESENTATIVES' |
| 11:29AM | 14 | CLAIM IS SUBJECT TO A STATUTE OF LIMITATIONS DEFENSE, AND MANY |
| 11:29AM | 15 | OF THE CLASS MEMBERS ARE NOT, THEN YOU HAVE A REAL PROBLEM |
| 11:29AM | 16 | BECAUSE THE CLASS REPRESENTATIVES CLAIMS IS MARKEDLY WEAKER, |
| 11:29AM | 17 | ARGUABLY, WELL NOT ARGUABLY, IN FACT, IF YOU PROVE A STATUTE OF |
| 11:29AM | 18 | LIMITATIONS CASE, THEN THE CLAIM OF THE ABSENT CLASS MEMBERS, |
| 11:29AM | 19 | WHO THAT CLASS REPRESENTATIVE IS SUPPOSED TO BE LOOKING OUT |
| 11:30AM | 20 | FOR. |
| 11:30AM | 21 | THEIR OTHER REJOINDER IS, WELL, NO HARM, NO FOUL BECAUSE A |
| 11:30AM | 22 | VIOLATION OF THE VPPA IS ONGOING VIOLATION AND WE WOULD FALL |
| 11:30AM | 23 | UNDER THAT EXCEPTION.  IT IS AN ONGOING VIOLATION, AND I'LL GET |
| 11:30AM | 24 | INTO THAT IN A MINUTE, BUT EVEN IF YOU ASSUMED IT WAS, THE |
| 11:30AM | 25 | POINT IS THAT THEY WOULD HAVE TO PROVE THAT. |

11:30AM 1      YOU SEE, THEIR CLASS REPRESENTATIVES TO WIN THEIR CASE

11:30AM 2   WOULD HAVE TO JUMP THROUGH THAT EXTRA HURDLE SUCCESSFULLY.  MY

11:30AM 3   CLIENT DOESN'T HAVE TO.  SHE'S WITHIN THE STATUTE OF

11:30AM 4   LIMITATIONS PERIOD.  THEY'RE OUT, AND, THEREFORE, THEY CAN'T BE

11:30AM 5   PROPER CLASS REPRESENTATIVES BECAUSE TO WIN ON THEIR CASE, THEY

11:30AM 6   HAVE TO, I DON'T THINK THEY CAN, BUT THEY HAVE TO SUCCEED ON AN

11:30AM 7   EXTRA ELEMENT, NAMELY, THE ONGOING VIOLATION OF THE EXCEPTION

11:30AM 8   TO THE STATUTE OF LIMITATIONS APPLICATION, AND THAT MAKES THEM

11:30AM 9   ATYPICAL AND ADEQUATE.  WHY IS IT AN ONGOING VIOLATION.

11:30AM 10      THEY SAY, WELL, IF YOU RETAIN MY RECORDS AND CONTINUE TO

11:30AM 11   HAVE THEM IN YOUR POSSESSION EVERY DAY YOU HAVE THEM THAT IS A

11:30AM 12   NEW VIOLATION OR AN ONGOING VIOLATION.

11:31AM 13      AS A PLAINTIFF'S ATTORNEY I WISH THAT WERE SO, BUT IT

11:31AM 14   ISN'T.  WHAT THE VPPA SAYS IS THAT BY A DATE CERTAIN, WHEN

11:31AM 15   THOSE RECORDS ARE NO LONGER NECESSARY, YOU HAVE TO PURGE THEM

11:31AM 16   AND GET RID OF THEM AND YOU CAN'T RETAIN THEM.

11:31AM 17      AND SO IF THAT DAY COMES AND YOU DON'T DO IT, YOU VIOLATED

11:31AM 18   THE ACT.  THAT'S THE DATE OF WHICH THE VIOLATION HAPPENS, AND

11:31AM 19   THAT'S THE DATE FROM WHICH THE STATUTE BEGINS TO RUN UNLESS YOU

11:31AM 20   DISCOVER IT LATER, BUT YOU CAN'T SAY, OH, AND YOU ALSO DIDN'T

11:31AM 21   PURCHASE THEM TOMORROW, SO TOMORROW IS A NEW VIOLATOR.  THAT

11:31AM 22   WOULD BE ABSURD.  THAT WOULD MEAN THE $2,500 VIOLATION WOULD BE

11:31AM 23   A $2,500 PER DAY VIOLATION, WHICH, OF COURSE, IT ISN'T.  IT'S

11:31AM 24   THE ACT THAT TRIGGERS THE STATUTE OF LIMITATIONS.  IN FACT, IF

11:31AM 25   YOU READ THE STATUTE, IT SAYS THE STATUTE IS TRIGGERED FROM THE

11:31AM 1    DAY OF THE ACT.  THE ACT HERE IS NOT PURGING THE RECORDS AS OF

11:31AM 2    THE DATE THAT WE'RE REQUIRED TO DO SO.

11:31AM 3        SO WHY DO I SAY THESE THINGS?  FOR TWO REASONS:  NUMBER

11:31AM 4    ONE, WE HAVE A RESPONSIBILITY UNDER RULE 23 TO ENSURE THAT THE

11:32AM 5    CLASS THAT IS SOUGHT TO BE CERTIFIED CAN ACTUALLY BE CERTIFIED

11:32AM 6    CONSISTENT WITH THE -- CONSISTENT WITH DUE PROCESS AND RULE 23.

11:32AM 7    IT CAN'T BE.

11:32AM 8        WHY DOES THAT MATTER?  IT MATTERS, WELL, FIRST BECAUSE DUE

11:32AM 9    PROCESS MATTERS AND BECAUSE ABSENT CLASS MEMBERS LIKE MY WIFE

11:32AM 10   AND CLIENT ARE BEING ASKED TO RELEASE THEIR CLAIMS WHEN THEY

11:32AM 11   SHOULDN'T BE REQUIRED TO DO SO AS PART OF THIS PROCESS.

11:32AM 12       BUT IT MATTERS ALSO BECAUSE THE EFFECT OF THAT IS THAT NOW

11:32AM 13   YOU HAVE A CLASS THAT IS 62 MILLION PEOPLE WHEN, IN FACT, IF

11:32AM 14   YOU LIMITED THE CLASS AS IT SHOULD BE TO JUST FORMER

11:32AM 15   SUBSCRIBERS, AND YOU LIMITED THAT FURTHER TO ONLY FORMER

11:32AM 16   SUBSCRIBERS WHO FALL WITHIN THE STATUTE OF LIMITATIONS OF

11:32AM 17   TWO YEARS PRIOR TO THE SETTLEMENT DATE, NOW IF YOU LOOK AT THE

11:32AM 18   CHURN RATE, WHICH IS PUBLICLY AVAILABLE ON NETFLIX S.E.C.

11:32AM 19   FILINGS, IT'S SOMETHING LIKE 3 OR 4 PERCENT.  SO THEY HAVE 25

11:32AM 20   MILLION CURRENT SUBSCRIBERS AND 3 OR 4 PERCENT OF THOSE CHURN,

11:32AM 21   WHICH MEANS THEY BECOME FORMER SUBSCRIBERS PER YEAR, THAT GIVES

11:33AM 22   YOU A TOTAL CLASS SIZE OF ABOUT 2.5 MILLION FOLKS.

11:33AM 23       AND NOW GUESS WHAT?  MONETARY COVERAGE BECOMES FEASIBLE.

11:33AM 24   NOW YOU'RE NOT LEFT WITH SAYING, GEE, WE CAN'T GET MONEY FROM

11:33AM 25   62 MILLION PEOPLE, WE HAVE TO GO CY PRES.  NOW YOU HAVE 2 AND A

11:33AM 1    HALF MILLION PEOPLE AND YOU CAN SETTLE THE 2 AND A HALF MILLION

11:33AM 2    MEMBER CLASS FOR MONEY, AND IT HAPPENS EVERY DAY.  I'VE DONE

11:33AM 3    IT.  I'VE DONE IT FOR CLASS SIZES THAT ARE FAR LARGER AND IT'S

11:33AM 4    NOT JUST A MATTER OF, WELL, YOU KNOW, THIS IS SORT OF THE

11:33AM 5    DISCRETION OF COUNSEL, AND I THINK I -- I HOPE I JUST WALKED

11:33AM 6    YOU THROUGH THE REAL CONCERNS AS TO WHY THAT NECESSARILY

11:33AM 7    FOLLOWS.

11:33AM 8        NOW, MAYBE YOU DON'T GET MONETARY COVERAGE, BUT BE THAT AS

11:33AM 9    IT MAY, THE JUSTIFICATION HERE FOR THE WHOLE BASIS AND

11:33AM 10   STRUCTURE OF THE SETTLEMENT IS THAT CY PRES WAS THE ONLY OPTION

11:33AM 11   BECAUSE OF 62 MILLION.  THE 62 MILLION IS WRONG.  IT DOESN'T

11:33AM 12   FOLLOW.  IT'S NOT PART OF THE LEGAL REQUIREMENT.

11:34AM 13       I WANT TO SEGUE INTO THE INJUNCTIVE RELIEF IN A MINUTE

11:34AM 14   BUT, BUT THE -- JUST SORT OF ANOTHER ILLUSTRATION OF THIS.

11:34AM 15   YOUR HONOR ASKED ONE OF THE QUESTIONS OF BOTH COUNSEL, WELL,

11:34AM 16   INSTEAD OF CY PRES, COULDN'T YOU HAVE OFFERED FOLKS A FREE

11:34AM 17   MOVIE FROM NETFLIX?  WOULDN'T THAT HAVE BEEN SORT OF A

11:34AM 18   MEANINGFUL RECOVERY?

11:34AM 19       AND THEIR RESPONSE IS VERY ILLUMINATING HERE.  WHAT THEY

11:34AM 20   SAID WAS, YOU KNOW, MAYBE BUT THE REAL PROBLEM IS THAT A LOT OF

11:34AM 21   THE CLASS IS FORMER SUBSCRIBERS, BUT THAT'S THE PROBLEM HERE

11:34AM 22   BECAUSE THEIR CLIENTS WOULD HAVE NO INTEREST IN PURSUING THAT

11:34AM 23   OPTION.  THEY ARE FORMER SUBSCRIBERS, BUT A LARGE PART OF THE

11:34AM 24   CLASS, SOME ARE CURRENT SUBSCRIBERS, AND FOR THEM, THAT OPTION

11:34AM 25   MAY BE VIABLE, THEY WOULD HAVE TO DO NOTHING IN TERMS OF THEIR

11:34AM  1    RELATIONSHIP WITH NETFLIX TO AVAIL THEMSELVES OF THAT AND THAT

11:34AM  2    SHOWS THE REAL DISCONNECT IN THE WAY THAT THIS CLASS DEFINITION

11:34AM  3    IS STRUCTURED.

11:34AM  4         AND, AGAIN, I KNOW I HAVE SAID THIS BEFORE, BUT THERE'S A

11:34AM  5    REAL DIFFERENCE BETWEEN THE WAY THE CLASS DEFINITION WAS

11:35AM  6    DEFINED AND ALLEGED IN THE COMPLAINT AND THE WAY IT IS ALLEGED

11:35AM  7    NOW.

11:35AM  8         NOW, ONE BENEFIT TO THAT IS NETFLIX BECAUSE THEY GET A

11:35AM  9    RELEASE FROM 62 MILLION PEOPLE THAT THEY MAY NOT BE ENTITLED

11:35AM  10   TO, AT LEAST NOT UNDER THIS COMPLAINT.

11:35AM  11        HAD THE CASE GONE TO TRIAL OR TO SUMMARY JUDGMENT, AFTER

11:35AM  12   ADVERSARIAL CLASS CERTIFICATION, THE ONLY FOLKS BOUND BY THAT

11:35AM  13   JUDGMENT, IF THE COMPLAINT CONTINUED AS IT IS PLED, WOULD BE

11:35AM  14   THE FORMER SUBSCRIBERS, NOW THEY GET A RELEASE FROM THE CURRENT

11:35AM  15   SUBSCRIBERS.

11:35AM  16        I WANT TO TOUCH ON TWO OTHER POINTS NOW THAT WE HAVE MOVED

11:35AM  17   BEYOND THE RULE 23(A) CONCERNS AND THAT IS THIS NOTION OF

11:35AM  18   STATUTORY DAMAGES, THE DUE PROCESS CONCERNS THAT WERE RAISED IN

11:35AM  19   THE FINAL APPROVAL AND MOVING PAPERS, AND THE CY PRES, EXCUSE

11:35AM  20   ME, THE INJUNCTIVE RELIEF COMPONENT.

11:35AM  21        ONE OF THE WAYS IN WHICH THIS SETTLEMENT IS UNIQUE IS THAT

11:36AM  22   IT INVOLVES A RATHER UNIQUE STATUTE IN WHICH WE MAINTAIN THE

11:36AM  23   PLAINTIFF CANNOT PROVE HIS DAMAGES BECAUSE CONGRESS HAS

11:36AM  24   ARTICULATED WHAT THOSE DAMAGES ARE FOR THAT PLAINTIFF IN THE

11:36AM  25   TEXT OF THE STATUTE.

| | | |
|---|---|---|
| 11:36AM | 1 | NOW, IN FACT, WHEN MR. EGGLETON GOT UP HERE, HE SAID YOU |
| 11:36AM | 2 | KNOW WE TAKE THE POSITION THAT $2,500 IS NOT JUST THE CEILING, |
| 11:36AM | 3 | IT'S THE ACTUAL DAMAGES. |
| 11:36AM | 4 | IF THAT'S SO, THEN -- BUT THEIR VIEW IS THAT WHEN YOU |
| 11:36AM | 5 | BRING IT AS A CLASS, AND, AGAIN, THEY'RE HARPING ON THE NOTION |
| 11:36AM | 6 | OF 62 MILLION FOLKS, IF YOU AWARDED EVERYONE $2,500, IT WOULD |
| 11:36AM | 7 | BECOME PUNITIVE AND THE PUNITIVE DAMAGES GUIDEPOST WOULD COME |
| 11:36AM | 8 | INTO PLAY AND YOU WOULD NEVER RECOVER THAT ANYWAY. |
| 11:36AM | 9 | I WON'T BELABOR THIS BUT WE CITED IN OUR OBJECTION AND |
| 11:36AM | 10 | AGAIN IT'S DOCKET 198, AND I KNOW THE COURT HAS BEFORE IT OVER |
| 11:36AM | 11 | 100 OBJECTIONS AND IT'S AT PAGES 11 THROUGH 13.  THIS VERY |
| 11:36AM | 12 | COURT HAS CONSIDERED THAT ISSUE AND SAID THAT THE SINGLE DIGIT |
| 11:37AM | 13 | MULTIPLIER APPLICABLE TO PUNITIVE DAMAGES HAS NOTHING TO DO |
| 11:37AM | 14 | WITH STATUTORY DAMAGES BECAUSE THEY'RE TWO SEPARATE ISSUES |
| 11:37AM | 15 | ALTOGETHER. |
| 11:37AM | 16 | PUNITIVE DAMAGES AND THE DUE PROCESS CONCERNS ARE ANIMATED |
| 11:37AM | 17 | BY THE FACT THAT WE GIVE THE JURY BASICALLY FREE REIGN TO |
| 11:37AM | 18 | DECIDE HOW TO PUNISH A DEFENDANT AND THERE'S NO PRIOR NOTICE OR |
| 11:37AM | 19 | GUIDEPOST TELLING THE JURY HOW MUCH THEY CAN FIX THAT FOR. |
| 11:37AM | 20 | BUT WHEN CONGRESS EXECUTES A LAW AND CONGRESS IN ITS FINE |
| 11:37AM | 21 | JUDGMENT HAS SAID WE STUDIED THIS ISSUE AND WE'RE THE ONES |
| 11:37AM | 22 | PASSING THE BILL AND WE BELIEVE THE PENALTY SHOULD BE 2500, NOT |
| 11:37AM | 23 | THE PENALTY, THE RECOVERY SHOULD BE $2,500, THAT'S DUE PROCESS. |
| 11:37AM | 24 | YOU CAN MAKE THE ARGUMENT THAT AT SOME POINT THE AWARD BECOMES |
| 11:37AM | 25 | SO HUGE AND INORDINATE THAT MAYBE THERE'S A DUE PROCESS CONCERN |

| | | |
|---|---|---|
| 11:37AM | 1 | BUT THAT'S A FAR CRY FROM SAYING THAT BECAUSE THAT MAY BE A |
| 11:37AM | 2 | POSSIBILITY, I'M GOING TO END UP WITH ZERO DOLLARS OF RECOVERY. |
| 11:37AM | 3 | BUT THE INTERESTING THING ABOUT THAT IS THAT IT DOVETAILS |
| 11:37AM | 4 | WITH ANOTHER RULE 23 ELEMENT HERE.  YOU SEE, IF MY CLIENT HAD |
| 11:38AM | 5 | GONE AS AN INDIVIDUAL AND SHE SAID I BELIEVE I'M ENTITLED TO |
| 11:38AM | 6 | $2,500, I'M GOING TO PROVE MY CASE, THERE'S NO DUE PROCESS |
| 11:38AM | 7 | ISSUE THERE.  THE $2,500 IS NOT GOING TO BANKRUPT NETFLIX. |
| 11:38AM | 8 | BUT NOW THESE ATTORNEYS ARE TELLING HER, YOU KNOW WHAT, |
| 11:38AM | 9 | WHEN WE INCLUDE YOU AS A CLASS, YOUR $2,500 DOES BANKRUPT THEM |
| 11:38AM | 10 | AND IT DOES BECOME A DUE PROCESS ISSUE BECAUSE THEY'RE 62 |
| 11:38AM | 11 | MILLION AND 62 MILLION TIMES 2,500 IS 155 BILLION, AND THAT IS |
| 11:38AM | 12 | A DUE PROCESS VIOLATION, AND WE WOULD NEVER GET THAT.  THEY |
| 11:38AM | 13 | JUST TALKED THEMSELVES OUT OF SUPERIORITY.  YOU CAN'T SAY THEN |
| 11:38AM | 14 | THAT THE CLASS ACTION MECHANISM IS A SUPERIOR MEANS OF SEEKING |
| 11:38AM | 15 | REDRESS HERE THAN ANY OTHER LITIGATION. |
| 11:38AM | 16 | BECAUSE IF SHE CAN GO INDIVIDUALLY AND GET $2,500 AND SHE |
| 11:38AM | 17 | PREVAILED AND WON HER LEGAL ARGUMENTS BUT SHE CAN'T DO THAT |
| 11:38AM | 18 | WHEN SHE'S A MEMBER OF THE CLASS SOLELY BECAUSE SHE'S A MEMBER |
| 11:38AM | 19 | OF THE CLASS, THEN YOU CAN'T ARGUE THAT BRINGING IT AS A CLASS |
| 11:38AM | 20 | IS A SUPERIOR MEANS OF ENFORCEMENT THAN BRINGING IT AS AN |
| 11:39AM | 21 | INDIVIDUAL AND THAT'S ANOTHER ARGUMENT FOR DENYING CLASS |
| 11:39AM | 22 | CERTIFICATION. |
| 11:39AM | 23 | AND I FOCUS QUITE A BIT ON RULE 23 HERE NOT ONLY BECAUSE |
| 11:39AM | 24 | IT MATTERS AND IT'S AT THE HEART OF EVERY SETTLEMENT AND |
| 11:39AM | 25 | BECAUSE THE SUPREME COURT HAS TOLD US TO DO SO, BUT BECAUSE |

11:39AM  1    UNLIKE PASSING JUDGMENT ON THE TERMS OF THE SETTLEMENT WHERE

11:39AM  2    PARTIES ARE ENGAGING IN A GIVE AND TAKE AND HAVE DISCRETION AND

11:39AM  3    OTHER PARTIES MAY HAVE DONE IT DIFFERENTLY, AS THE NINTH

11:39AM  4    CIRCUIT JUST SAID, EVEN THOUGH A GRANT OF CLASS CERTIFICATION

11:39AM  5    UNDER RULE 25 IS ONLY SUBJECT TO AN ABUSE OF DISCRETION REVIEW,

11:39AM  6    LEGAL DETERMINATIONS MADE IN REACHING THE GRANT OF CLASS

11:39AM  7    CERTIFICATION ARE REVIEWED DE NOVO.

11:39AM  8         AND I THINK BEFORE WE RUSH TO CERTIFY A CLASS THAT HAS

11:39AM  9    THESE ISSUES, WE SHOULD ASSURE OURSELVES THAT THOSE

11:39AM  10   REQUIREMENTS HAVE, IN FACT, BEEN SATISFIED.  I DON'T SEE HOW

11:39AM  11   THEY CAN BE WITH THE CLASS THAT IS CURRENTLY CONSTITUTED.

11:40AM  12        THE LAST THING I'M GOING TO SAY IS ABOUT INJUNCTIVE

11:40AM  13   RELIEF, UNLESS THE COURT HAS QUESTIONS.

11:40AM  14        FIRST OF ALL, JUST AS A POINT OF CLARITY, THE INJUNCTIVE

11:40AM  15   RELIEF HERE HAS BEEN SET TO LAST FOR FOUR YEARS, NOT THAT IT'S

11:40AM  16   THE LARGEST POINT OF MY ORAL ARGUMENT HERE BUT IT'S REALLY

11:40AM  17   THREE YEARS.  THEY CEASE THE INJUNCTION AT FOUR YEARS AFTER THE

11:40AM  18   EFFECTIVE DATE BUT THEY DON'T HAVE TO BEGIN IT UNTIL ONE YEAR

11:40AM  19   FOLLOWING THE EFFECTIVE DATE.

11:40AM  20             THE COURT:  I THINK I SAW THAT.

11:40AM  21             MR. KATRIEL:  SO I THINK IT'S AT LEAST IMPORTANT TO

11:40AM  22   BE CLEAR.  THERE'S ANOTHER ASPECT HERE TO THE INJUNCTIVE RELIEF

11:40AM  23   AND IT TIES TO THE COMPOSITION OF THE CLASS.  NOTHING IN THE

11:40AM  24   INJUNCTIVE RELIEF PRECLUDES NETFLIX FROM ENGAGING IN UNLAWFUL

11:40AM  25   DISCLOSURE, IN ANY DISCLOSURE, YET A WHOLE BUNCH OF THE 62

| | | |
|---|---|---|
| 11:40AM | 1 | MILLION PUNITIVE CLASS MEMBERS ARE CURRENT SUBSCRIBERS THAT |
| 11:40AM | 2 | WOULD BE VERY IMPORTANT. |
| 11:41AM | 3 | SO THE INJUNCTIVE RELIEF PROVIDES NO RELIEF WHATSOEVER TO |
| 11:41AM | 4 | ANY MEMBER OF THE CLASS WHO IS A CURRENT SUBSCRIBER AND INTENDS |
| 11:41AM | 5 | ON REMAINING SO FOR THE NEXT THREE YEARS.  THERE'S NOTHING |
| 11:41AM | 6 | THERE AND THEY DON'T GET ANYTHING. |
| 11:41AM | 7 | THE FACT THAT NETFLIX IS NOT REQUIRED OR PRECLUDED FROM |
| 11:41AM | 8 | RETAINING RECORDS DOESN'T APPLY TO THE CURRENT SUBSCRIBERS |
| 11:41AM | 9 | BECAUSE BY DEFINITION THEY RETAIN THOSE RECORDS AND THEY HAVE |
| 11:41AM | 10 | TO AND IT WOULDN'T BE A VIOLATION OF THE VPPA.  THAT'S PROBLEM |
| 11:41AM | 11 | NUMBER ONE. |
| 11:41AM | 12 | AND IT SHOWS WHY THERE'S A DISCONNECT BETWEEN THE REMEDY |
| 11:41AM | 13 | AND THE RELIEF BETWEEN WHAT IS SOUGHT IN THE WAY THE CLASS IS |
| 11:41AM | 14 | DEFINED. |
| 11:41AM | 15 | THE COURT:  DO THEY OBTAIN THAT INFORMATION NOW TO |
| 11:41AM | 16 | CURRENT SUBSCRIBERS BECAUSE TO CURRENT SUBSCRIBERS THEY DO MAKE |
| 11:41AM | 17 | THESE RECOMMENDATIONS? |
| 11:41AM | 18 | MR. KATRIEL:  THAT'S CORRECT, THAT'S PERFECTLY |
| 11:41AM | 19 | LAWFUL BUT MY POINT IS ACTUALLY WHY THE CLASS IS COMPOSED OF |
| 11:41AM | 20 | DIFFERENT CAMPS THAT DON'T HAVE THE SAME INTEREST.  CURRENT |
| 11:41AM | 21 | SUBSCRIBERS MAY VERY WELL HAVE AN INTEREST IN CONVENIENTLY |
| 11:41AM | 22 | MAKING THESE RECOMMENDATIONS AND FORMER SUBSCRIBERS ARE |
| 11:42AM | 23 | ENTITLED UNDER THE LAW TO HAVE THEIR RECORDS PURGED AND YET |
| 11:42AM | 24 | THIS SETTLEMENT CLASS SEEMS TO NOT BUT WANTS TO LUMP THESE TWO |
| 11:42AM | 25 | TOGETHER AND THE INJUNCTIVE RELIEF COMING AT IT FROM THE BACK |

**SER 068**

| | | |
|---|---|---|
| 11:42AM | 1 | END ONLY ADDRESSES THE CONCERNS OF THE FORMER SUBSCRIBERS. |
| 11:42AM | 2 | CURRENT SUBSCRIBERS GET NOTHING.  THEY COULD HAVE.  THE |
| 11:42AM | 3 | INJUNCTIVE COULD HAVE SAID AND NETFLIX YOU'RE ALSO GOING |
| 11:42AM | 4 | FORWARD FORBIDDEN FROM DISCLOSING RECORDS FROM YOUR CURRENT |
| 11:42AM | 5 | SUBSCRIBERS, AND IT DOESN'T SAY THAT.  SO -- NUMBER ONE. |
| 11:42AM | 6 | NUMBER TWO IS THAT IF YOU ACTUALLY READ THE SETTLEMENT |
| 11:42AM | 7 | AGREEMENT AND TERMS OF THE INJUNCTIVE RELIEF, NETFLIX DIDN'T |
| 11:42AM | 8 | ACTUALLY COMMIT ITSELF TO GIVING THE INJUNCTIVE RELIEF. |
| 11:42AM | 9 | WHAT IT SAID WAS THAT WE WILL PURGE THESE RECORDS BUT ONLY |
| 11:42AM | 10 | IF WE'RE FIRST TOLD BY OTHER PARTIES WHO ARE SUING US OR WHO |
| 11:42AM | 11 | MAY SUE US IN THE FUTURE THAT WE CAN DO SO AND THAT THEY WON'T |
| 11:42AM | 12 | GO AFTER US FOR SPOLIATION OR EVIDENCE DESTRUCTION. |
| 11:42AM | 13 | AND OBVIOUSLY LITIGATION CONCERNS SPOLIATION AND EVIDENCE |
| 11:43AM | 14 | DESTRUCTION THAT IS GERMANE AND BONA FIDE, AND I DON'T HAVE ANY |
| 11:43AM | 15 | QUARREL WITH THAT. |
| 11:43AM | 16 | BUT THE WAY TO ADDRESS THAT TYPICALLY IS WHEN YOU |
| 11:43AM | 17 | NEGOTIATE A SETTLEMENT IS THAT YOU SAY TO THE OTHER SIDE OR TO |
| 11:43AM | 18 | YOURSELF, I AM CONSIDERING ENTERING INTO A SETTLEMENT AGREEMENT |
| 11:43AM | 19 | THAT WOULD REQUIRE ME TO DO X.  DO YOU HAVE AN OBJECTION TO |
| 11:43AM | 20 | THAT? |
| 11:43AM | 21 | AND ONCE YOU LEARN THAT THEY DO OR DO NOT, THEN YOU'RE |
| 11:43AM | 22 | ABLE TO DECIDE WHETHER OR NOT YOU'RE ABLE TO EXECUTE THE |
| 11:43AM | 23 | SETTLEMENT AGREEMENT. |
| 11:43AM | 24 | BUT AS IT IS NOW MY CLIENT AS A CLASS MEMBER DOESN'T KNOW |
| 11:43AM | 25 | IF THIS INJUNCTIVE RELIEF WILL EVER KICK IN EVEN IF THE |

| 11:43AM | 1 | SETTLEMENT IS APPROVED WITH FINALITY AND UPHELD BY THE NINTH |
| 11:43AM | 2 | CIRCUIT BECAUSE WE DON'T KNOW FROM WHOM NETFLIX HAS TO RECEIVE |
| 11:43AM | 3 | THAT ASSURANCE, HOW MANY PARTIES ARE INVOLVED, NOR WHAT EFFORTS |
| 11:43AM | 4 | IT HAS UNDERTAKEN NOR WILL IT UNDERTAKE TO SECURE THAT.  QUITE |
| 11:43AM | 5 | FRANKLY, THEY HAVE VERY LITTLE INCENTIVE TO DO ANYTHING.  WHY |
| 11:43AM | 6 | SHOULD THEY GO AFTER ANYBODY TO HASSLE THEM AND SAY GIVE US |
| 11:43AM | 7 | THIS AUTHORITY TO DESTROY RECORDS EVEN THOUGH YOU'RE SUING US |
| 11:44AM | 8 | IN ANOTHER LITIGATION. |
| 11:44AM | 9 | AND BY THE WAY, THERE'S NO OBLIGATION ON THEM TO DO |
| 11:44AM | 10 | ANYTHING.  IF YOU HAVE A PARTY THAT SIMPLY DOESN'T KNOW, DO |
| 11:44AM | 11 | THEY HAVE TO GO TO THE PRESIDING JUDGE OF THAT COURT AND SAY |
| 11:44AM | 12 | WE'RE TRYING TO ENFORCE THIS SETTLEMENT AGREEMENT?  NOTHING. |
| 11:44AM | 13 | IT'S SO BLANK AS TO THE ILLUSORY. |
| 11:44AM | 14 | BASICALLY IF NETFLIX GETS THE ASSURANCE, THEY GET THE |
| 11:44AM | 15 | ASSURANCE AND IF IT DOESN'T GET THE ASSURANCE, THEN THEY DON'T |
| 11:44AM | 16 | HAVE TO DO ANYTHING. |
| 11:44AM | 17 | IT'S GREAT THAT NETFLIX LAWYERS ARE GOOD, WONDERFUL, |
| 11:44AM | 18 | HONEST PEOPLE, I TRUST THAT BUT WHEN YOU'RE ASKING A COURT TO |
| 11:44AM | 19 | STAMP THE SEAL OF APPROVAL ON A SETTLEMENT THAT WILL BIND BY |
| 11:44AM | 20 | THEIR COUNT 62 MILLION PEOPLE WHO ARE NOT BEFORE YOU, YOU |
| 11:44AM | 21 | SHOULD HAVE SOMETHING MORE ON PAPER THAN THEIR GOOD HONEST |
| 11:44AM | 22 | PEOPLE SAYING YOU DON'T HAVE TO WORRY ABOUT THAT.  THAT'S ALL I |
| 11:44AM | 23 | HAVE.  THANK YOU. |
| 11:44AM | 24 | THE COURT:  THANK YOU.  LET ME -- PARDON ME.  LET ME |
| 11:44AM | 25 | HAVE COUNSEL RESPOND, AND I'M GOING TO ASK YOUR COLLEAGUE |

| | | |
|---|---|---|
| 11:44AM | 1 | OPPOSITES TO RESPOND IF THEY WISH TO, MR. EDELSON AND |
| 11:45AM | 2 | MR. BALABANIAN. |
| 11:45AM | 3 | MR. EDELSON:  I ACTUALLY SPOKE WITH MR. KATRIEL ON |
| 11:45AM | 4 | THE PHONE AFTER HIS OBJECTION AND FOUND MYSELF LIKING HIM SO |
| 11:45AM | 5 | I'LL TRY TO PUT THAT ASIDE FOR A FEW MINUTES. |
| 11:45AM | 6 | YOU KNOW, HIS ARGUMENT IS INTERESTING.  I THOUGHT HIS |
| 11:45AM | 7 | OBJECTION WAS INTERESTING.  THE PROBLEM IS THAT IT FEELS LIKE |
| 11:45AM | 8 | WE'RE IN A LAW SCHOOL CLASS DEBATING ISSUES AND WE'RE NOT |
| 11:45AM | 9 | ALLOWED TO TALK ABOUT WHAT THE LAW IS. |
| 11:45AM | 10 | HE NEVER ONCE MENTIONED THE LANE CASE.  IT'S A FACEBOOK |
| 11:45AM | 11 | CASE.  THE NINTH CIRCUIT JUST DECIDED IT.  IT ADDRESSED EVERY |
| 11:45AM | 12 | SINGLE ISSUE HE'S TALKING ABOUT.  SO THE ISSUE THERE -- |
| 11:45AM | 13 | THE COURT:  I THINK YOU CAN SEE THE POINT FROM THAT |
| 11:45AM | 14 | CASE, I THINK. |
| 11:45AM | 15 | MR. EDELSON:  WELL, HE SAID YOU CAN'T HAVE A CLASS |
| 11:45AM | 16 | WHERE YOU HAVE SOME PEOPLE AND THE CLASS REPS ARE REPRESENTED, |
| 11:45AM | 17 | HAVE CERTAIN CHARACTERISTICS, AND CLASS MEMBERS HAVE OTHER |
| 11:45AM | 18 | CHARACTERISTICS AND THERE ARE STATUTE OF LIMITATIONS ISSUES AND |
| 11:45AM | 19 | IT'S TOO BIG AND IT'S A MESS.  AND LANE SAID, NO, THAT'S NOT |
| 11:45AM | 20 | WHAT A CLASS ACTION IS. |
| 11:46AM | 21 | WHAT LANE SAID WAS THAT DIFFERING CLAIMS IN THE AMOUNT OF |
| 11:46AM | 22 | DAMAGES AMONGST INDIVIDUAL CLASS MEMBERS IS AN INHERENT FEATURE |
| 11:46AM | 23 | OF THE CLASS ACTION DEVICE, WHICH IS WHY DUE PROCESS REQUIRES |
| 11:46AM | 24 | THAT INDIVIDUAL MEMBERS OF A CLASS BE GIVEN AN OPPORTUNITY TO |
| 11:46AM | 25 | OPT OUT. |

11:46AM  1          NOW, REMEMBER IN THAT CASE IT WAS MUCH MORE EXTREME.

11:46AM  2     THERE YOU HAD CERTAIN CLASS MEMBERS WHO HAD VPPA CLAIMS.

11:46AM  3     CERTAIN DIDN'T HAVE ANY AT ALL.  IT ALL HAD TO DO WITH, IF I

11:46AM  4     UNDERSTAND THAT CASE CORRECTLY, FACEBOOK COMPUTERS WERE TALKING

11:46AM  5     TO THE COMPUTERS OF OTHER COMPANIES AND SOME OF THE INFORMATION

11:46AM  6     WAS BEING PASSED HAD TO DO WITH VIDEO RECORDS.

11:46AM  7          SO SOME PEOPLE HAD THOSE TYPE OF CLAIMS, VPPA CLAIMS FOR

11:46AM  8     $2500, AND OTHERS HAD CLAIMS AND OTHERS HAD NOTHING AT ALL.

11:46AM  9     AND THE COURT SAID THAT'S FINE, IT'S A CLASS ACTION.

11:46AM 10          THE COURT:  THERE WERE NOT STATUTE OF LIMITATIONS

11:46AM 11     ISSUES IN THAT CASE.

11:46AM 12          MR. EDELSON:  WELL, THERE AREN'T HERE ALSO.

11:46AM 13          THE COURT:  I WANT YOU TO TALK TO THAT.

11:46AM 14          MR. EDELSON:  ONE WAY I KNOW WE'RE TALKING THEORY IS

11:47AM 15     WHEN THE DEFENSE COUNSEL HAS NEVER MADE THAT ARGUMENT AT ALL.

11:47AM 16     SO IF THEY WERE AS SURE --

11:47AM 17          THE COURT:  YOU'RE SAYING NETFLIX HAS BRIGHT LAWYERS

11:47AM 18     AND IF THAT WERE AN ISSUE THEY WOULD HAVE RAISED IT?

11:47AM 19          MR. EDELSON:  I'M SURE THEY WOULD HAVE PUT IT IN AN

11:47AM 20     AFFIRMATIVE DEFENSE BUT NEVER ONCE DID IT COME UP AT THE

11:47AM 21     MEDIATION WHERE THEY SAID, BY THE WAY, YOU GUYS ARE GOING TO

11:47AM 22     LOSE BECAUSE OF STATUTE OF LIMITATIONS CLAIMS BECAUSE IT'S

11:47AM 23     ABSURD.

11:47AM 24          THE WHOLE POINT OF A CONTINUING VIOLATION IS THAT THE

11:47AM 25     STATUTE OF LIMITATIONS IS TOLLED.

| | | |
|---|---|---|
| 11:47AM | 1 | AND IF YOU LOOKED AT THE ANALYSIS WE GAVE WHERE WE |
| 11:47AM | 2 | DISCOUNTED ALL OF THE DIFFERENT ARGUMENTS, THERE WAS NO |
| 11:47AM | 3 | DISCOUNT FOR THAT ARGUMENT ABOUT THE STATUTE OF LIMITATIONS. |
| 11:47AM | 4 | NOW, OF COURSE, THERE COULD BE A MILLION ARGUMENTS THAT |
| 11:47AM | 5 | NETFLIX COULD MAKE. |
| 11:47AM | 6 | THE COURT:  ARE THESE ARGUMENTS VALID IN YOUR |
| 11:47AM | 7 | POSITION AND IF NOT, TELL ME WHY. |
| 11:47AM | 8 | MR. EDELSON:  YES, THEY'RE NOT.  WELL, A FEW |
| 11:47AM | 9 | REASONS.  FIRST OF ALL, NETFLIX WAS ACTING CONTINUOUSLY.  IT |
| 11:47AM | 10 | NEVER STOPPED THE ACTION, SO NUMBER ONE.  SO BECAUSE OF THAT |
| 11:48AM | 11 | STATUTE OF LIMITATIONS NEVER STARTED. |
| 11:48AM | 12 | OUR VIEW IS THAT THEY'RE STILL VIOLATING THAT.  THAT'S OUR |
| 11:48AM | 13 | VIEW. |
| 11:48AM | 14 | NUMBER TWO, NOBODY KNEW ABOUT THIS UNTIL THE FEW MONTHS |
| 11:48AM | 15 | BEFORE OUR LAWSUIT. |
| 11:48AM | 16 | SO EVEN MR. KATRIEL ADMITS THAT THAT WOULD HAVE BEEN |
| 11:48AM | 17 | TOLLED ANYWAY BECAUSE OF DISCOVERY.  THE WHOLE POINT OF THE |
| 11:48AM | 18 | RETENTION CLAIM IS THAT THEY'RE GOING TO KNOW ABOUT IT BUT THE |
| 11:48AM | 19 | WORLD ISN'T.  SO THOSE WEREN'T ANY CURIOUS ISSUES AT ALL IN MY |
| 11:48AM | 20 | VIEW. |
| 11:48AM | 21 | I ALSO WANT TO TALK ABOUT THIS ISSUE ABOUT YOU COULD LIMIT |
| 11:48AM | 22 | IT TO PREVIOUS CUSTOMERS AND MAYBE GET IT DOWN TO 2.5 MILLION. |
| 11:48AM | 23 | NOW, THERE'S NO EVIDENCE OF THAT.  THAT WAS JUST TALK.  HE JUST |
| 11:48AM | 24 | SOMEHOW SAID AND CAME UP WITH A NUMBER OF 2.5 MILLION. |
| 11:48AM | 25 | THE COURT:  RIGHT.  I THINK HE WAS DOING HIS OWN |

| | | |
|---|---|---|
| 11:48AM | 1 | ANALYSIS IF WE ELIMINATE THOSE PARTY MEMBERS WHO, PERHAPS, WHO |
| 11:48AM | 2 | THE STATUTE OF LIMITATIONS WOULD TAKE OUT OF THIS CASE, THEN |
| 11:49AM | 3 | WHAT SHOULD YOU WOULD BE LEFT WITH IS THE REMAINDER WOULD BE |
| 11:49AM | 4 | THIS 2.5 OR WHATEVER. |
| 11:49AM | 5 | MR. EDELSON:  RIGHT.  I MEAN, HE SAID THAT AND THEN |
| 11:49AM | 6 | HE JUMPED TO A NUMBER. |
| 11:49AM | 7 | THE COURT:  LET'S ASSUME IT'S 5 MILLION OR 10 |
| 11:49AM | 8 | MILLION, WHATEVER. |
| 11:49AM | 9 | MR. EDELSON:  WELL, THAT'S THE POINT, WHATEVER.  YOU |
| 11:49AM | 10 | CAN'T CUT THE CLASS DOWN TO A POINT WHERE YOU CAN DISTRIBUTE |
| 11:49AM | 11 | THE FUNDS.  THERE ARE 60 MILLION CLASS MEMBERS. |
| 11:49AM | 12 | THE COURT:  HIS POINT WAS 62 MILLION IS TOO GREAT TO |
| 11:49AM | 13 | PROVIDE A PERSONAL RELIEF TO BUT A LOWER NUMBER WITH THE 9 |
| 11:49AM | 14 | MILLION, OF COURSE, THAT EQUATES TO SOME TYPE OF PERSONAL GAIN. |
| 11:49AM | 15 | MR. EDELSON:  AND THAT BEGS THE QUESTION OF HOW DO |
| 11:49AM | 16 | YOU CUT IT DOWN SO THAT YOU CAN THEN DISTRIBUTE IT?  I MEAN, |
| 11:49AM | 17 | UNLESS YOU'RE SAYING WE ONLY WANT PEOPLE OVER 6 FEET TALL, YOU |
| 11:49AM | 18 | CAN'T DO IT. |
| 11:49AM | 19 | THE FORMER CLASS MEMBERS, IT'S TENS OF MILLIONS OF PEOPLE. |
| 11:49AM | 20 | AND EVEN WITH THE STATUTE OF LIMITATIONS ARGUMENT, HE NEVER |
| 11:49AM | 21 | ADDRESSES THE POINT OF WHEN IT ACTUALLY STARTS. |
| 11:49AM | 22 | THE -- UNDER THE STATUTE, THE VIOLATION OCCURS AFTER A |
| 11:50AM | 23 | CERTAIN UNDEFINED POINT THAT THEY HAVE TO DESTROY THE -- IT'S |
| 11:50AM | 24 | NO LONGER NECESSARY. |
| 11:50AM | 25 | SO IT'S SOME POINT IN THE PAST, WHICH WE DON'T KNOW. |

| | | |
|---|---|---|
| 11:50AM | 1 | THAT'S WHEN THE VIOLATION STARTED, AND WE SHOULD SOMEHOW GUESS |
| 11:50AM | 2 | AT THAT POINT AND THEN COME IN AND SAY, JUDGE, WE'RE GOING TO |
| 11:50AM | 3 | ASSUME THAT YOU WOULD HAVE SAID THEY HAD THREE MONTHS TO DO IT |
| 11:50AM | 4 | AND THEN WE'RE GOING TO GO TWO YEARS BEYOND IT AND WE'LL HAVE |
| 11:50AM | 5 | THIS.  AND WE WOULD HAVE HAD SO MANY OBJECTORS COMING IN SAYING |
| 11:50AM | 6 | WHY DID YOU LEAVE ME OUT?  AND WHY DID YOU LEAVE ME OUT? |
| 11:50AM | 7 | AND EVEN IF WE DID THAT WE WOULD STILL HAVE A CLASS WITHIN |
| 11:50AM | 8 | THE TENS OF MILLIONS OF PEOPLE. |
| 11:50AM | 9 | AND THE OTHER PART IS THAT CURRENT CLASS MEMBERS ARE |
| 11:50AM | 10 | GETTING A BENEFIT.  THE BENEFIT IS THE INJUNCTIVE RELIEF WHICH |
| 11:50AM | 11 | WAS VERY IMPORTANT TO THEM. |
| 11:50AM | 12 | THE WHOLE POINT OF, IN MY VIEW, WHY THERE'S A VPPA AND WHY |
| 11:50AM | 13 | THERE'S A RETENTION CLAIM IS SHOWN BY THE EXPERIENCE WITH SONY |
| 11:50AM | 14 | WHERE SONY WAS HOLDING ON TO ALL OF THESE RECORDS AND IT GOT |
| 11:50AM | 15 | HACKED AND GOT OUT TO THE WHOLE WORLD.  AND ONCE IT'S OUT, IT'S |
| 11:50AM | 16 | OUT. |
| 11:50AM | 17 | THE REASON THIS INJUNCTIVE RELIEF IS SO IMPORTANT IS ONCE |
| 11:51AM | 18 | IT'S DESTROYED, IT'S GONE.  PEOPLE CAN'T HACK IN.  THERE WON'T |
| 11:51AM | 19 | BE THE HARM. |
| 11:51AM | 20 | I THINK WE HAD AN OBJECTOR SAY WE SETTLED THE CASE BEFORE |
| 11:51AM | 21 | THE HARM THAT OCCURRED.  WE SHOULD HAVE WAITED SO THAT EVERYONE |
| 11:51AM | 22 | GOT HARM AND THEN WE COULD HAVE SUED THEM FOR $2500. |
| 11:51AM | 23 | BUT THAT DOESN'T SQUARE WITH MY SENSE OF JUSTICE. |
| 11:51AM | 24 | SOME OF THE OTHER ARGUMENTS THAT MR. KATRIEL MAKES, I HAVE |
| 11:51AM | 25 | TO SAY JUST AS A THRESHOLD MATTER, HE DID FILE LATE SO I THINK |

11:51AM  1    THAT THE -- THAT I HAVE NO OBJECTION TO HIM VOICING HIS

11:51AM  2    CONCERNS.  I THINK IT'S A BIG SETTLEMENT, AND THERE SHOULD BE

11:51AM  3    TRANSPARENCY BUT HE DOESN'T HAVE STANDING.

11:51AM  4         THE COURT:  I WANTED TO ASK THAT QUESTION.  LET ME

11:51AM  5    ASK ACROSS, MR. KATRIEL, WERE YOUR PLEADINGS, YOUR OBJECTIONS

11:51AM  6    FILED IN A TIMELY MATTER, SIR?

11:51AM  7         MR. KATRIEL:  THEY WEREN'T, AND THANK YOU FOR

11:51AM  8    ALLOWING ME TO ADDRESS THAT.  I THOUGHT WE WERE BEYOND THAT.

11:52AM  9    YOU CAN LOOK AT THE DOCKET.  WE'RE ITEM 198 STAMPED

11:52AM  10   NOVEMBER 14TH.  SO WE GOT IT ECF.

11:52AM  11        THE COURT:  THAT WAS THE FINAL DATE.

11:52AM  12        MR. KATRIEL:  THAT WAS THE DATE.  NOW, ASIDE FROM

11:52AM  13   THAT WE WENT ABOVE AND BEYOND THAT AND WE ALSO FED EX'D TO BOTH

11:52AM  14   COUNSEL AND DROPPED THE FED EX POSTMARK WITH NOVEMBER 14TH,

11:52AM  15   WHICH FED EX PICKED IT UP ON NOVEMBER 15TH AND DELIVERS IT ON

11:52AM  16   THE 16TH, THE ACTUAL OBJECTIONS.  AND THEY GOT SERVED VIA ECF

11:52AM  17   AND THE SUGGESTION THAT THEY ARE GETTING SERVED VIA ECF IS NEWS

11:52AM  18   TO ME BECAUSE IT'S PART OF THIS COURT'S ORDERS.

11:52AM  19     NOW, IT IS TRUE THAT THE DECLARATION THAT MY CLIENT FILED

11:52AM  20   IN SUPPORT OF HER OBJECTIONS CAME A FEW MINUTES AFTER MIDNIGHT

11:52AM  21   OF THE 15TH AND HER DECLARATION JUST BASICALLY STATES THAT

11:52AM  22   SHE'S A CLASS MEMBER AND HERE'S THE POSTCARD SHE GOT.

11:52AM  23        THE COURT:  I'M LOOKING AT THE DOCKET AND DOCKET 198

11:52AM  24   SHOWS AN ECF DATED NOVEMBER 14TH.

11:52AM  25        MR. KATRIEL:  THAT'S RIGHT.

| 11:52AM | 1 | THE COURT:  199 IS THE DECLARATION. |
| 11:53AM | 2 | MR. KATRIEL:  THAT'S RIGHT. |
| 11:53AM | 3 | THE COURT:  WHICH WAS 11-15 ON ECF. |
| 11:53AM | 4 | MR. EDELSON:  WE HAVE NO PROBLEM WITH THE FACT THAT |
| 11:53AM | 5 | THE DECLARATION WAS FILED THE DAY AFTER.  OUR UNDERSTANDING, |
| 11:53AM | 6 | AND WE CAN LOOK INTO IT, AND I'M SURPRISED THIS WAS A SURPRISE |
| 11:53AM | 7 | TO YOU BECAUSE IT WAS IN OUR PAPERS BUT OUR UNDERSTANDING WAS |
| 11:53AM | 8 | THAT THEY MAILED IT TOO LATE.  THEY HAD TO FILE IT AND THEN |
| 11:53AM | 9 | MAIL IT ON A CERTAIN DATE. |
| 11:53AM | 10 | MS. GARCIA IS GOING TO HAND YOU A COPY OF THE ECF DATES. |
| 11:53AM | 11 | MR. EDELSON:  WE AGREED HE FILED IT.  THE QUESTION |
| 11:53AM | 12 | IS WHETHER HE SERVED IT ON TIME. |
| 11:53AM | 13 | THE COURT:  I SEE. |
| 11:53AM | 14 | MR. EDELSON:  BUT WE CAN LOOK AT THAT AND IF WE'RE |
| 11:53AM | 15 | MISTAKEN, THEN WE'RE HAPPY TO WITHDRAW THAT. |
| 11:53AM | 16 | THE COURT:  OKAY.  THANK YOU. |
| 11:54AM | 17 | SO YOU CAN CONTINUE. |
| 11:54AM | 18 | MR. EDELSON:  AND REGARDLESS, WE'RE MORE THAN HAPPY |
| 11:54AM | 19 | TO HAVE MR. KATRIEL HERE AND TO RESPOND. |
| 11:54AM | 20 | HE MADE A FEW OTHER POINTS.  HE SAYS THAT THERE'S NO |
| 11:54AM | 21 | SUPERIORITY BECAUSE PEOPLE CAN BRING SUIT INDIVIDUALLY AND GET |
| 11:54AM | 22 | THE $2,500.  WELL, OF COURSE, THAT'S TRUE IN LANE AS WELL WHERE |
| 11:54AM | 23 | PEOPLE COULD HAVE GOTTEN $2,500 AND THE COURT SAID, YOU KNOW, |
| 11:54AM | 24 | THERE'S THE CY PRES REMEDY WAS APPROPRIATE. |
| 11:54AM | 25 | HE SAYS THAT OUR WHOLE VIEW ABOUT DUE PROCESS IS WRONG AND |

| | | |
|---|---|---|
| 11:54AM | 1 | SO IT'S NOT JUST MY THINKING IS OFF, BUT EVERY OTHER LAWYER HAS |
| 11:54AM | 2 | LOOKED AT PEOPLE SETTLING, THE NINTH CIRCUIT WHO SAID NO IN A |
| 11:54AM | 3 | STATUTORY DAMAGE CASE WHERE BILLIONS AND BILLIONS OF DOLLARS, |
| 11:54AM | 4 | 9.5 MILLION IS A SUBSTANTIAL AMOUNT AND ABSOLUTE TERMS AND |
| 11:54AM | 5 | THAT'S GOOD ENOUGH. |
| 11:54AM | 6 | I DISAGREE WITH HIS ANALYSIS, BY THE WAY.  WHEN |
| 11:54AM | 7 | MR. KATRIEL SAYS, AND THIS IS JUST WHERE IT GETS INTO A MOOT |
| 11:54AM | 8 | COURT ARGUMENT, BUT THE IDEA THAT -- HE FIRST MISUNDERSTANDS, I |
| 11:55AM | 9 | THINK, HOW THE LAW WOULD WORK.  IT DOESN'T MATTER WHETHER IT'S |
| 11:55AM | 10 | A CLASS ACTION OR NOT.  EVEN A STATUTORY DAMAGES PROVISION HAS |
| 11:55AM | 11 | A PROBLEM EVEN IF WE BRING INDIVIDUALS.  IF A STATUTE -- |
| 11:55AM | 12 | CONGRESS SAYS IN A NO HARM SITUATION, OR A HARM SITUATION |
| 11:55AM | 13 | THERE'S STATUTORY DAMAGES FAR IN EXCESS OF, THEN THE DEFENDANTS |
| 11:55AM | 14 | ARE ENTITLED TO CHALLENGE THAT ON DUE PROCESS GROUNDS. |
| 11:55AM | 15 | IT DOESN'T MATTER WHETHER IF IT'S A CLASS ACTION OR NOT. |
| 11:55AM | 16 | IT USUALLY COMES UP IN A CLASS ACTION BECAUSE THAT'S WHEN THEY |
| 11:55AM | 17 | CARE ABOUT IT, THE DEFENDANTS CARELESS ABOUT PAYING A $2,500 |
| 11:55AM | 18 | JUDGMENT THAN A HUNDRED BILLION DOLLAR ONE, BUT IT'S THE SAME |
| 11:55AM | 19 | CONCERN. |
| 11:55AM | 20 | BUT IN THE END, AND THIS IS WHY THE NINTH CIRCUIT HAS BEEN |
| 11:55AM | 21 | VERY CLEAR THAT, THAT THE PURPOSE OF THE SETTLEMENT IS NOT TO |
| 11:55AM | 22 | FIGURE OUT WHO IS RIGHT, WHETHER HIS JUDGMENT IS BETTER THAN |
| 11:55AM | 23 | MINE.  I WOULD POINT OUT THAT I DON'T THINK HE PRACTICES IN |
| 11:56AM | 24 | THIS AREA.  SO IT'S A LITTLE BIT EASIER FOR HIM TO SAY HE'S -- |
| 11:56AM | 25 | THAT I'M SITTING ON A CASE WORTH BILLIONS OF DOLLARS. |

11:56AM 1      YOU KNOW, I CAN SAY -- I DON'T KNOW WHAT CASES HE'S

11:56AM 2   WORKING ON, BUT I GUARANTEE YOU IN MY MIND IT'S WORTH A LOT

11:56AM 3   MORE THAN HE THINKS IT IS.  BECAUSE WHY NOT?  IT'S EASY TO SAY.

11:56AM 4      BUT WHAT THE NINTH CIRCUIT SAYS IS THAT WHAT YOU'VE GOT --

11:56AM 5   WHAT YOUR HONOR OUGHT TO FOCUS ON IS DID THE SETTLEMENT PROCESS

11:56AM 6   CONVINCE YOU THAT IT WAS FREE OF COLLUSION AND THAT THE

11:56AM 7   ATTORNEYS WERE THINKING ABOUT THIS IN A REASONABLE WAY?

11:56AM 8      YOU'RE NOT SUPPOSED TO THEN SUBSTITUTE YOUR JUDGMENT FOR

11:56AM 9   THAT OF THE ATTORNEYS.  IF SO, YOU'RE ESSENTIALLY TRYING THE

11:56AM 10  CASE.

11:56AM 11     AND OUR VIEW IS THAT CONSISTENT WITH HOW EVERYBODY ELSE

11:56AM 12  HAS VALUED THESE CASES AND WE'RE VALUING CORRECTLY.

11:56AM 13     THE LAST THING I WANT TO SAY QUICKLY IS ON THE INJUNCTION

11:56AM 14  RELIEF MR. KATRIEL SAYS WE MESSED UP BECAUSE WE DIDN'T TELL

11:56AM 15  THEM THAT THEY COULDN'T DISCLOSE THINGS.

11:57AM 16     THE LAW IS CLEAR THAT INJUNCTIONS THAT JUST SAY THAT YOU

11:57AM 17  HAVE TO FOLLOW THE LAW, WHICH IS ALL WE COULD HAVE DONE,

11:57AM 18  BECAUSE THERE WERE NOT ANY CLEAR DISCLOSURE ISSUES, THAT THOSE

11:57AM 19  ARE NOT INJUNCTIONS.  THOSE ATTORNEYS PUT THEM IN BECAUSE

11:57AM 20  ATTORNEYS THINK THEY FEEL BETTER BUT THOSE ARE NOT INJUNCTIONS.

11:57AM 21     SO IF THEY DO END UP DOING SOMETHING DIFFERENT OR

11:57AM 22  VIOLATING THE LAW, I'M SURE, YOU KNOW, HOPEFULLY THEY'LL BE

11:57AM 23  HELD ACCOUNTABLE BUT THROWING IN THAT LOOSE LANGUAGE WOULD HAVE

11:57AM 24  NOT BEEN AND BE MISLEADING.

11:57AM 25     THE IDEA THAT THE INJUNCTIVE RELIEF IS ILLUSORY BECAUSE OF

| | | |
|---|---|---|
| 11:57AM | 1 | THE LITIGATION HOLDS, PERHAPS MR. KATRIEL THINKS THE VPPA IS |
| 11:57AM | 2 | ILLUSORY BECAUSE IT ALSO SAYS THAT IF THE COURTS SAY THAT THE |
| 11:57AM | 3 | VPPA IS NOT SUPPOSED TO INTERFERE WITH THE COURT PROCESS AND |
| 11:57AM | 4 | THE COURT ORDERS DOCUMENTS BE PRESERVED, THEN OF COURSE YOU |
| 11:57AM | 5 | DON'T -- VPPA DOESN'T TRUMP IT. |
| 11:57AM | 6 | AND THE IDEA THAT COUNSEL WOULD HAVE TO REACH OUT TO |
| 11:57AM | 7 | EVERYBODY INVOLVED AND SAY WE WANT TO KNOW NOT JUST IF YOU HAVE |
| 11:58AM | 8 | A CASE NOW, BUT IF YOU'RE GOING TO BRING A CASE IN SIX MONTHS, |
| 11:58AM | 9 | RIGHT, THERE COULD BE A CASE FILED THREE MONTHS FROM NOW WHERE |
| 11:58AM | 10 | THERE'S A LITIGATION HOLD, THAT WE HAVE TO REACH OUT TO ALL OF |
| 11:58AM | 11 | THOSE PEOPLE RESPECTIVELY AND SAY WE WANT TO KNOW HOW IT'S |
| 11:58AM | 12 | GOING TO WORK, THAT'S NOT REASONABLE AND NOT THE LAW AND AS |
| 11:58AM | 13 | NETFLIX HAS ALREADY EXPLAINED, IT'S ALREADY PUTTING MOTIONS, |
| 11:58AM | 14 | SPENDING A LOT OF MONEY AND RESOURCES TO DO THAT. |
| 11:58AM | 15 | THE COURT:  THANK YOU. |
| 11:58AM | 16 | MR. EDELSON:  THANK YOU. |
| 11:58AM | 17 | THE COURT:  MR. EGGLETON. |
| 11:58AM | 18 | MR. EGGLETON:  THANK YOU, YOUR HONOR.  AGAIN, I'LL |
| 11:58AM | 19 | TRY TO BE BRIEF.  THREE POINTS.  ON THE ISSUE ABOUT EXPANDING |
| 11:58AM | 20 | THE CLASS, THE CLASS WAS EXPANDED FROM THE ORIGINAL COMPLAINT, |
| 11:58AM | 21 | THAT'S TRUE. |
| 11:58AM | 22 | IT HAPPENS A LOT IN CLASS ACTION SETTLEMENTS AND AS LONG |
| 11:58AM | 23 | AS YOU MEET THE REQUIREMENTS OF RULE 23 WITH RESPECT TO NOTICE |
| 11:58AM | 24 | OF THE CLASS, OPPORTUNITY TO OBJECT AND TO OPT OUT, THERE'S |
| 11:58AM | 25 | NOTHING PER SE WRONG UNDER RULE 23 ABOUT DOING THAT.  IT'S A |

11:59AM  1    QUESTION OF WHETHER THE SETTLEMENT PROCESS GIVES ADEQUATE

11:59AM  2    NOTICE TO THE PEOPLE THAT THEY'RE IN THE CLASS AND WHAT IS

11:59AM  3    BEING RELEASED AND THAT CLEARLY HAPPENED HERE.  AND REALLY

11:59AM  4    NOTWITHSTANDING THE FACT THAT YOU HAVE A LOT OF OBJECTIONS IN

11:59AM  5    FRONT OF YOU, I THINK EITHER NONE OR ALMOST NONE SUGGEST THAT

11:59AM  6    THERE WAS SUFFICIENT NOTICE TO THE CLASS.

11:59AM  7         THE OTHER ISSUE RAISED IS THAT PEOPLE MIGHT HAVE DIFFERENT

11:59AM  8    CLAIMS OR SLIGHTLY DIFFERENT DEFENSES MAY APPLY TO THEM.

11:59AM  9    THAT'S ALWAYS TRUE.  IN OTHER WORDS, IN VIRTUALLY EVERY CLASS

11:59AM 10    ACTION I HAVE HAD YOU CAN SAY WITH RESPECT TO THIS PART OF THE

11:59AM 11    CLASS, MAYBE THIS CLAIM IS NOT QUITE AS GOOD, MAYBE THIS IS A

11:59AM 12    LITTLE BIT BETTER.  IT HAPPENS A LOT.

11:59AM 13         THE QUESTION REALLY ULTIMATELY IS WHETHER THERE IS SUCH A

11:59AM 14    FATAL DIFFERENCE BETWEEN THE CLASS MEMBERS THAT YOU CAN'T HAVE

11:59AM 15    A CLASS ACTION.  THAT'S NOT THE CASE HERE.

11:59AM 16         WE BELIEVE STRONGLY, AND WE SAID IT IN OUR PAPERS AND I

11:59AM 17    SAID IT THIS MORNING AND I WANT TO SAY IT AGAIN, WE THINK WE

11:59AM 18    COULD HAVE DEFEATED BOTH THE RETENTION AND DISCLOSURE CLAIMS ON

11:59AM 19    THE MERITS, HAVING NOTHING TO DO WITH STATUTORY LIMITATION AND

11:59AM 20    EVERYTHING, WE WERE GOING TO WIN THESE CLAIMS ON THE MERITS.

12:00PM 21         THE RELIEF WE HAVE GIVEN IN THIS CASE, NOTWITHSTANDING THE

12:00PM 22    RELIEF IN THAT REGARD, BENEFITS EVERYBODY AND IT BENEFITS

12:00PM 23    CURRENTS AND FORMERS.

12:00PM 24         WE'RE GOING TO PUT A SYSTEM INTO PLACE THAT TAKES CARE OF

12:00PM 25    THIS WITH RESPECT TO FORMERS BUT ALSO WITH RESPECT TO THE

12:00PM 1    CURRENTS WILL, IF AND WHEN -- WE HOPE THEY NEVER BECOME

12:00PM 2    FORMERS, BUT IF THEY DO, THEY GET THE BENEFIT OF THAT, THE

12:00PM 3    DECOUPLING THAT WE'RE GOING TO PUT INTO PLACE.  SO IT BENEFITS

12:00PM 4    EVERYBODY, AND WE DO NOT BELIEVE THAT THERE'S SUCH A FATAL

12:00PM 5    DIFFERENCE BETWEEN MEMBERS OF THIS CLASS TO MAKE THIS AN

12:00PM 6    IMPROPER RULE 23.

12:00PM 7        TWO FINAL POINTS.  THERE WAS A SUGGESTION THAT WE SHOULD

12:00PM 8    HAVE, I GUESS, AGREE TO PART OF THIS TO HAVING AN INJUNCTION

12:00PM 9    SAYING WE WOULDN'T VIOLATE THE VPPA BY DISCLOSING INFORMATION.

12:00PM 10   WHETHER OR NOT THAT'S ILLUSORY OR NOT, I CAN TELL YOU

12:00PM 11   DEFINITIVELY WE WOULD NOT HAVE AGREED TO IT, IN OTHER WORDS, WE

12:00PM 12   WOULD NOT HAVE PUT IN A SETTLEMENT AGREEMENT THAT TYPE OF

12:00PM 13   RESTRICTION.  MAYBE IT'S ILLUSORY AND MAYBE IT'S NOT, BUT I

12:00PM 14   WOULDN'T PUT MY CLIENT IN THE POSITION OF WHERE IN OUR VIEW A

12:00PM 15   FRIVOLOUS LAWSUIT WAS FILED, LIKE THE MALLET CASE THAT YOU HAD

12:01PM 16   WHERE SOMEONE WAS ACCUSING THAT DISCLOSURE, I WOULDN'T WANT

12:01PM 17   THAT ALSO TO BE ALLEGED TO BE CONTEMPT OF COURT BY VIRTUE OF

12:01PM 18   SOMETHING THAT WAS ENTERED INTO IN THIS CASE.  THAT WASN'T

12:01PM 19   GOING TO HAPPEN.

12:01PM 20       WE WERE HAPPY TO DO ON THE CY PRES BUT WE WERE NOT GOING

12:01PM 21   TO AGREE TO SOME GRANDEUR INJUNCTIVE RELIEF.

12:01PM 22       FINALLY ON THE SPOLIATION ISSUE, MR. EGGLETON HAD IT

12:01PM 23   RIGHT, WHAT HAPPENED AT THE MEDIATION IS WE SAID WE'VE GOT

12:01PM 24   POTENTIAL ISSUES IN OTHER CASES, AND AS I'M SURE YOU KNOW FROM

12:01PM 25   OTHER MATTERS, SPOLIATION IS -- SOMETIMES CAN DWARF THE OTHER

| | | |
|---|---|---|
| 12:01PM | 1 | ISSUES IN A LAWSUIT, AND WE WERE VERY SENSITIVE TO THAT. |
| 12:01PM | 2 | FRANKLY, ONE OF THE REASONS WE WERE SENSITIVE TO THAT IS |
| 12:01PM | 3 | BECAUSE YOU HAD THE OTHER NETFLIX CASE IN FRONT OF YOU.  IT |
| 12:01PM | 4 | SINCE HAS BEEN DISMISSED AND IS UP ON APPEAL. |
| 12:01PM | 5 | BUT AT THE TIME YOU HAD IT.  THAT WAS ONE OF OUR CONCERNS |
| 12:01PM | 6 | IS THAT WE WERE GOING TO HAVE TO GO TO THE PLAINTIFFS IN THAT |
| 12:01PM | 7 | CASE AND TALK TO THEM. |
| 12:01PM | 8 | BUT NETFLIX IS SUBJECT TO A LOT OF LAWSUITS, VERY BIG |
| 12:01PM | 9 | COMPANY, THEY GET SUED A LOT.  THEY GET SUED IN PATENT CASES |
| 12:01PM | 10 | AND THEY GET SUED IN OTHER THINGS.  AND WE HAD TO BE WEARY OF |
| 12:02PM | 11 | THAT AND AS MR. EGGLETON SUGGESTED, THE EFFECTIVE DATE OF THIS |
| 12:02PM | 12 | SETTLEMENT IS LOOKING A LITTLE FURTHER OFF NOW. |
| 12:02PM | 13 | SO, FRANKLY, WE DRAFTED THIS THE RIGHT WAY TO ALLOW US TO |
| 12:02PM | 14 | SEE WHAT LAWSUITS ARE FILED BETWEEN THE TIME WE AGREE TO THE |
| 12:02PM | 15 | SETTLEMENT AND THE TIME WE HAVE TO DO THIS.  AND WE WILL THEN |
| 12:02PM | 16 | GO TO THOSE FOLKS AND THE COURTS AS NEEDED TO GET SOME CLARITY |
| 12:02PM | 17 | ON WHAT WE COULD DO, BUT I COULDN'T PUT NETFLIX IN THE POSITION |
| 12:02PM | 18 | OF HAVING AN SPOLIATION ALLEGATION BECAUSE WE SETTLED THIS |
| 12:02PM | 19 | CASE. |
| 12:02PM | 20 | THANK YOU, YOUR HONOR. |
| 12:02PM | 21 | THE COURT:  THANK YOU VERY MUCH. |
| 12:02PM | 22 | LET'S CALL ON MR. WEXLER. |
| 12:02PM | 23 | MR. WEXLER:  THANK YOU, YOUR HONOR.  THE COLLOQUY |
| 12:02PM | 24 | THAT HAS GONE ON HAS REDUCED THE NUMBER OF MY REMARKS, SO |
| 12:02PM | 25 | YOU'LL BE HAPPY TO HEAR THAT. |

```
12:03PM   1        I'M A MEMBER OF THE NEW YORK BAR AS WELL AS THE SUPREME

12:03PM   2    COURT AND THE SECOND CIRCUIT AND NINTH CIRCUIT, AND I'M HAPPY

12:03PM   3    TO BE HERE TODAY BECAUSE MY CLIENT'S VIEW AS A CURRENT

12:03PM   4    SUBSCRIBER WAS SORT OF ASTONISHING WHEN SHE DISCOVERED THAT

12:03PM   5    MONEY WAS GOING TO PURPORTED ATTORNEYS AND CLASS

12:03PM   6    REPRESENTATIVES BUT NOTHING TO HER.

12:03PM   7        AND I UNDERSTAND WHAT HAS BEEN EXPLAINED, AND I UNDERSTAND

12:03PM   8    THE LANE CASE, AND I UNDERSTAND THE CY PRES DOCTRINE BUT THE

12:03PM   9    FACT THAT CY PRES IS AVAILABLE AND HAS BEEN USED IN LIMITED

12:03PM  10    CIRCUMSTANCES DOESN'T MEAN THAT IT SHOULD BE THE FIRST RESULT.

12:03PM  11        IN FACT, I THINK IT SHOULD BE THE LAST RESULT, BECAUSE, IN

12:03PM  12    ESSENCE, THE CLASS ACTION BUSINESS OF THE PLAINTIFF'S BAR IS TO

12:03PM  13    PUT MONEY INTO THE HANDS OF THE LAWYERS.  THAT'S THE COMMON

12:03PM  14    FUND.  SO NO ONE REALLY GETS TOO EXCITED WHEN THEY GET MONEY

12:03PM  15    AND THEIR LAWYERS GET SOMETHING ON TOP OF IT.

12:03PM  16        AS JUDGE KLEINFELD SAID IN THE FACEBOOK CASE, THAT'S

12:03PM  17    PRETTY MUCH CONTINGENCY PRACTICE.

12:04PM  18        WHEN YOU GET A CASE LIKE THIS, I THINK YOU HAVE TO SLOW

12:04PM  19    DOWN A LITTLE BIT AND TAKE A LOOK FROM WHAT THIS PERSPECTIVE,

12:04PM  20    WHICH ADMITTEDLY IS NOT ONE THAT WAS INVOLVED IN THE PROCESS,

12:04PM  21    BUT IT WAS A THIRD PARTY LOOKING BACK ON IT, IS THIS REALLY THE

12:04PM  22    APPROPRIATE THING TO DO TO SETTLE THIS CASE?

12:04PM  23        SO I LOOKED AT THE CASE LAW, AND I LOOKED AT THE CASES THE

12:04PM  24    PLAINTIFFS CITE, INCLUDING THE FACEBOOK CASE AND THE CASE I

12:04PM  25    FOUND, THE BLUETOOTH CASE WHICH WAS REJECTED.
```

| | | |
|---|---|---|
| 12:04PM | 1 | AND THE COURTS POINTED OUT, THE NINTH CIRCUIT IN BOTH |
| 12:04PM | 2 | CASES POINTED OUT THE IMPORTANCE OF THIS PARTICULAR -- |
| 12:04PM | 3 | THE COURT:  BEFORE YOU GET INTO THAT ARGUMENT, CAN I |
| 12:04PM | 4 | HAVE JUST A MOMENT, PLEASE? |
| 12:06PM | 5 | (PAUSE IN PROCEEDINGS.) |
| 12:06PM | 6 | THE COURT:  THANK YOU FOLKS. |
| 12:06PM | 7 | MR. WEXLER:  IF YOU LOOK AT THE BLUETOOTH CASE, IT |
| 12:06PM | 8 | SAYS YOU REALLY HAVE TO APPLY THE MOST HEIGHTENED STANDARD |
| 12:06PM | 9 | APPROVAL OF THE SETTLEMENT UNDER CIRCUMSTANCES WHERE THERE HAS |
| 12:06PM | 10 | BEEN NO FORMAL CLASS CERTIFICATION MOTION BECAUSE WE CONCEDE |
| 12:06PM | 11 | TODAY HAD THERE BEEN A FORMAL MOTION FOR A CLASS CERTIFICATION, |
| 12:06PM | 12 | ALL OF THE ISSUES THAT HAVE NOW BEEN RAISED, IS IT APPROPRIATE |
| 12:06PM | 13 | TO LUMP IN 62 MILLION PEOPLE?  THAT WOULD HAVE BEEN DECIDED, |
| 12:06PM | 14 | AND IT WOULD HAVE BEEN A REAL ADVERSARIAL PROCESS. |
| 12:06PM | 15 | NETFLIX WOULD HAVE WANTED THE SMALLEST CLASS POSSIBLE, NOT |
| 12:06PM | 16 | THE LARGEST CLASS POSSIBLE.  THE PLAINTIFFS WOULD HAVE WANTED |
| 12:06PM | 17 | THE LARGEST CLASS POSSIBLE, NOT THE SMALLEST CLASS POSSIBLE. |
| 12:07PM | 18 | BUT ONCE THE MONEY SHOWS UP AND THE SETTLEMENT GETS DONE, AS |
| 12:07PM | 19 | JUDGE KLEINFELD SAYS, NOBODY CARES ANYMORE.  THEY WANT TO SWEEP |
| 12:07PM | 20 | AS MANY CLAIMS AS THEY CAN AND YOU DON'T GET THAT HARD |
| 12:07PM | 21 | BARGAINING IN LITIGATION THAT YOU EXPECT AND TELL THE JUDGE, |
| 12:07PM | 22 | THE COURT, TO CREATE A RECORD AS TO WHAT THE CLASS SHOULD BE. |
| 12:07PM | 23 | ARE THE CLAIMS TOO DISSIMILAR?  ARE THEY NOT?  SO THAT LEADS TO |
| 12:07PM | 24 | A HEIGHTENED INQUIRY. |
| 12:07PM | 25 | THE SECOND IS, WHEN APPARENTLY COUNSEL RECEIVES THE |

| | | |
|---|---|---|
| 12:07PM | 1 | DISPROPORTIONATE DISTRIBUTION OF THE SETTLEMENT AND THE CLASS |
| 12:07PM | 2 | RECEIVES NO MONEY DISTRIBUTION.  I MEAN, THAT'S JUST A RED FLAG |
| 12:07PM | 3 | THAT GIVING ALL CREDIT, I'M NOT ACCUSING ANYBODY OF DOING |
| 12:07PM | 4 | ANYTHING WRONG OR COLLUSION IN THE NONCLASS ACTION SETTING, BUT |
| 12:07PM | 5 | WHEN YOUR LEGAL FEES ARE AT STAKE AND YOU WORK HARD AT A CASE, |
| 12:07PM | 6 | LIKE I KNOW THAT PLAINTIFF'S COUNSEL PROBABLY DID HERE, YOUR |
| 12:07PM | 7 | JUDGMENT GETS SKEWED.  YOU DON'T NECESSARILY THINK ABOUT |
| 12:08PM | 8 | EVERYTHING AND IF YOU'RE GIVING THE MONEY AWAY TO CHARITY, THE |
| 12:08PM | 9 | COURT HAS TO PUT THE SCRUTINY UP ANOTHER LEVEL. |
| 12:08PM | 10 | THE COURT:  SO, MR. WEXLER, WHAT IS THE SOLUTION |
| 12:08PM | 11 | THEN WHEN YOU HAVE A LARGE CASE? |
| 12:08PM | 12 | MR. WEXLER:  I'M GOING TO GET THERE. |
| 12:08PM | 13 | THE COURT:  OKAY. |
| 12:08PM | 14 | MR. WEXLER:  I'M NOT SURE I CAN SOLVE THE PROBLEM, |
| 12:08PM | 15 | BUT I HAVE A SUGGESTION. |
| 12:08PM | 16 | THE COURT:  OKAY. |
| 12:08PM | 17 | MR. WEXLER:  THE THIRD ONE IS THE CLEAR SAILING |
| 12:08PM | 18 | AGREEMENT.  NETFLIX SAYS GREAT, 62 MILLION AT THE PRESENT AND |
| 12:08PM | 19 | WE'LL GET RID OF THIS PROBLEM AND WE DON'T HAVE TO WORRY ABOUT |
| 12:08PM | 20 | IT FROM '99 TO THE PRESENT AND WE DON'T HAVE TO WORRY AND WE |
| 12:08PM | 21 | WON'T OBJECT TO THE LEGAL FEES AND SO WHO IS HERE TO FIGHT FOR |
| 12:08PM | 22 | MY CLIENT?  IN THIS PROCESS, NO ONE. |
| 12:08PM | 23 | AND THE REASON IS THAT WHEN YOU LOOK AT THE RECORD, THIS |
| 12:08PM | 24 | CASE HAS NOT BEEN LITIGATED.  IT'S NOT APPROPRIATE TO SAY, |
| 12:08PM | 25 | WELL, WE DIDN'T BOTHER TO TAKE THE DEPOSITION, WE DID -- YOU |

| | | |
|---|---|---|
| 12:08PM | 1 | SETTLED A CLASS ACTION FOR 62 MILLION PEOPLE.  PEOPLE TAKE |
| 12:09PM | 2 | DEPOSITIONS IN $10,000 LAWSUITS. |
| 12:09PM | 3 | THE COURT:  SO EARLIER THIS MORNING I WAS CONCERNED |
| 12:09PM | 4 | ABOUT THAT ISSUE.  I'M NOT SURE YOU HAD ARRIVED YET. |
| 12:09PM | 5 | MR. WEXLER:  I DID HEAR THAT. |
| 12:09PM | 6 | THE COURT:  OKAY, GOOD. |
| 12:09PM | 7 | MR. WEXLER:  SO YOU HAVE TO PRESENT A RECORD TO THE |
| 12:09PM | 8 | JUDGE AS TO WHAT THE MERITS OF THE CASE IS.  AND WHAT I HEARD |
| 12:09PM | 9 | FROM CLASS COUNSEL WAS VERY SURPRISING. |
| 12:09PM | 10 | WHAT I DIDN'T HEAR -- WHAT I READ IN THEIR PAPERS WAS THIS |
| 12:09PM | 11 | WAS A ONE AND A HALF BILLION, I DON'T REMEMBER ANYMORE, BUT FAR |
| 12:09PM | 12 | IN EXCESS OF WHAT NETFLIX WOULD EVER BE ABLE TO PAY AND SO, |
| 12:09PM | 13 | THEREFORE, THAT'S A REASON TO SETTLE THE CASE. |
| 12:09PM | 14 | BUT THAT IS A LONG GAP BETWEEN $9 MILLION AND |
| 12:09PM | 15 | $155 MILLION. |
| 12:09PM | 16 | AND WHAT COUNSEL'S RESPONSE WAS WE DO THESE CASES ALL OF |
| 12:09PM | 17 | THE TIME AND ESSENTIALLY SAID THIS IS THE GOING RATE.  THAT'S |
| 12:09PM | 18 | WHAT THEY GO FOR.  SO WHEN THE MEDIATOR SAID THIS IS WHAT THEY |
| 12:09PM | 19 | GO FOR, WE SAID THIS IS WHAT THEY GO FOR. |
| 12:09PM | 20 | I DON'T THINK PLAINTIFF'S COUNSEL ZEALOUSLY REPRESENTING |
| 12:09PM | 21 | THE CLASS IS SUPPOSED TO SAY, OKAY, THIS IS WHAT IT GOES FOR, |
| 12:10PM | 22 | WE DON'T WANT TO BOTHER TO TAKE ANY DEPOSITIONS, WE DON'T NEED |
| 12:10PM | 23 | TO SERVE ANY INTERROGATORIES.  IT IS REALLY QUITE REMARKABLE TO |
| 12:10PM | 24 | SETTLE THE CASE WITH NO DISCOVERY, EVEN IN A PRIVATE CASE, MUCH |
| 12:10PM | 25 | LESS SETTLE THE CASE ON BEHALF OF 62 MILLION PEOPLE AND SAY, |

12:10PM 1    OH, WE FOUGHT HARD FOR THEM.

12:10PM 2        WELL, THEY DIDN'T FIGHT HARD FOR THEM.  THEY MAY HAVE COME

12:10PM 3    TO THE SOLUTION THAT WAS CONVENIENT, BUT IT IS CERTAINLY NOT

12:10PM 4    NECESSARILY THE BEST SOLUTION AND THEY CAN'T POSSIBLY KNOW WHAT

12:10PM 5    THIS CASE IS WORTH IF THEY HAVEN'T TAKEN DISCOVERY.

12:10PM 6        EVEN IN CASES THAT I'VE BEEN INVOLVED IN WHERE THERE'S A

12:10PM 7    SETTLEMENT, THERE'S CONFIRMATORY DISCOVERY AFTERWARDS SO THAT

12:10PM 8    YOU CAN AT LEAST HAVE ON THE RECORD A STATEMENT OF SOMEONE WHO

12:10PM 9    CAN GO TO JAIL IF THEY DIDN'T TELL THE TRUTH AS TO WHAT REALLY

12:10PM 10   WENT ON.

12:10PM 11       INTERROGATORIES WHERE PEOPLE HAVE TO PUT THEIR NAMES ON.

12:10PM 12   IT'S TOTALLY INAPPROPRIATE FOR CLASS COUNSEL TO SAY IT'S FAIR

12:10PM 13   AND ADEQUATE WITHOUT TAKING DISCOVERY, AND I THINK IT'S JUST

12:10PM 14   NOT FAIR TO ALL OF THESE OTHER PEOPLE WHO THEY REPRESENT.

12:11PM 15       SO WHAT THIS CASE SHOWS IS A LACK OF THE ADVERSARIAL

12:11PM 16   PROCESS, A LACK OF HARD BARGAINING ON TWO ISSUES, ONE OF WHICH

12:11PM 17   IS WHAT IS THE CASE WORTH?  AND I HEARD NETFLIX'S COUNSEL SAY

12:11PM 18   WE WOULDN'T PAY MORE THAN $9 MILLION, BUT IF THEIR CFO AND

12:11PM 19   THEIR CEO AND THEIR CHIEF TECHNOLOGY OFFICER HAD THREE DAYS OF

12:11PM 20   DEPOSITIONS AND HAD TO PRODUCE THOUSANDS OF DOCUMENTS AND MAYBE

12:11PM 21   THEY LOST A SUMMARY JUDGMENT MOTION, MAYBE THEY WOULD CHANGE

12:11PM 22   THEIR MIND ABOUT PAYING $9 MILLION.

12:11PM 23       BUT WE DON'T HAVE ANY OF THAT.  WE DON'T HAVE ANY OF THE

12:11PM 24   PROTECTIONS OF DUE PROCESS HERE.

12:11PM 25       ALL WE HAVE ARE THE WORDS OF PEOPLE FOR THE FIRST TIME,

| | | |
|---|---|---|
| 12:11PM | 1 | AND I REALLY HAVEN'T SEEN IT IN THEIR PAPER, COME BEFORE YOU |
| 12:11PM | 2 | AND SAY, YEAH, WE TALKED TO SOME GUY ON THE PHONE. |
| 12:11PM | 3 | THE COURT:  SO YOU THINK THEY COULD HAVE GOT MORE? |
| 12:11PM | 4 | MR. WEXLER:  I DON'T KNOW. |
| 12:11PM | 5 | THE COURT:  THEY CERTAINLY WOULDN'T HAVE SETTLED THE |
| 12:11PM | 6 | CASE FOR PUTTING NETFLIX OUT OF BUSINESS. |
| 12:11PM | 7 | MR. WEXLER:  OF COURSE NOT, I'M NOT SUGGESTING THAT. |
| 12:11PM | 8 | THEY WERE, THEY WERE FAR REMOVED FROM THE POINT WHERE THEY WERE |
| 12:12PM | 9 | PUTTING NETFLIX OUT OF BUSINESS. |
| 12:12PM | 10 | WHAT I'M SAYING IS THAT IN THE CLASS ACTION CONTEXT, YOU |
| 12:12PM | 11 | DON'T HAVE A CLIENT TO CONSULT SO YOU HAVE TO FIGHT.  YOU CAN'T |
| 12:12PM | 12 | JUST SAY, OKAY, $9 MILLION, WE HAVE 10 MILLION THERE, 8 MILLION |
| 12:12PM | 13 | THERE, IT'S THE GOING RATE, FORGET ABOUT IT.  IT'S JUST A |
| 12:12PM | 14 | DISSERVICE TO THE CLASS, AND THEY'RE SUPPOSED TO HAVE THE |
| 12:12PM | 15 | HIGHEST STANDARDS WE'RE DEALING WITH.  IT'S NOT THE MORALS OF |
| 12:12PM | 16 | THE MARKETPLACE AS JUDGE FRIENDLY SAID YEARS AGO. |
| 12:12PM | 17 | SO WE HAD NO MEANINGFUL DISCOVERY, NO LITIGATION ON |
| 12:12PM | 18 | MERITS, WE HAD NO CLASS ACTION MOTION.  SO EVEN IN THE LANE |
| 12:12PM | 19 | VERSUS FACEBOOK, WHICH IS THE CASE THEY LOVE TO CITE, THE COURT |
| 12:12PM | 20 | HAS TO REALLY LOOK AT THIS RECORD.  WE REALLY DON'T HAVE A |
| 12:12PM | 21 | RECORD.  WE HAVE SOME STATEMENTS BY COUNSEL, AND WE HAVE SOME |
| 12:12PM | 22 | ILLUSIONS TO OTHER CASES AND WE KNOW WHAT THESE CASES ARE |
| 12:12PM | 23 | WORTH, WE DO THESE CASES ALL OF THE TIME.  THAT'S NOT HELPING |
| 12:13PM | 24 | MY CLIENT.  THAT'S NOT THEIR JOB.  THEIR JOB IS TO GET THE MOST |
| 12:13PM | 25 | MONEY THEY CAN AND IT'S NOT TO QUIT BEFORE THEY TAKE ONE |

| | | |
|---|---|---|
| 12:13PM | 1 | DEPOSITION. |
| 12:13PM | 2 | SECOND, THE CY PRES MOTION, WHICH IS REALLY WHAT I THINK |
| 12:13PM | 3 | IS WRONG IN THIS CASE.  I THINK CLASS COUNSEL NOT ONLY HAS THE |
| 12:13PM | 4 | JOB OF GETTING THE MOST MONEY POSSIBLE WITHIN REASON, IT ALSO |
| 12:13PM | 5 | HAS THE JOB OF TRYING TO PUT THE MONEY INTO THEIR CLIENT'S |
| 12:13PM | 6 | POCKETS. |
| 12:13PM | 7 | AND WHAT I HEAR TODAY CONFLATES WHAT I READ IN THE PAPERS, |
| 12:13PM | 8 | CONFLATES THE NOTION THAT SOMEHOW IT'S OKAY FOR CLASS COUNSEL |
| 12:13PM | 9 | TO BE -- CREATE A FOUNDATION, IN EFFECT WITH MY CLIENT'S MONEY, |
| 12:13PM | 10 | AND TO SAY, OKAY, I KNOW THE NINTH CIRCUIT HAS SAID IT'S |
| 12:13PM | 11 | APPROPRIATE IN CERTAIN CASES, IT DIDN'T GIVE A BLANKET APPROVAL |
| 12:13PM | 12 | IN EVERY CASE, BUT I WOULD ASK THAT -- I WANTED TO ASK THEM THE |
| 12:13PM | 13 | QUESTION THAT YOU ASKED THEM WHICH IS, OKAY, AFTER A HARD |
| 12:14PM | 14 | BARGAINING ON DAMAGES, WHERE IS THE HARD BARGAINING ON AT LEAST |
| 12:14PM | 15 | GIVING SOME MONEY TO THE CLASS? |
| 12:14PM | 16 | I MEAN, CY PRES STARTED IN THE WILLS CONTEXT WHEN SOMEBODY |
| 12:14PM | 17 | DIED AND YOU DONATED MONEY TO THE UNIVERSITY AND THE UNIVERSITY |
| 12:14PM | 18 | MERGED WITH ANOTHER UNIVERSITY, A COURT WOULD SAY, OKAY, THE |
| 12:14PM | 19 | NEXT BEST THING IS TO GIVE IT TO THE MERGED UNIVERSITY. |
| 12:14PM | 20 | THEN IT BECAME A REPOSITORY FOR MONEY WHICH WAS LEFT OVER |
| 12:14PM | 21 | AFTER CLASS -- THE CLASS GOT ITS MONEY AND THEY WERE MADE |
| 12:14PM | 22 | WHOLE.  EVERYBODY WHO PUT IN A CLAIM GOT PAID. |
| 12:14PM | 23 | AND SO THE COURT WOULD SAY, OKAY, IN THAT CONTEXT RATHER |
| 12:14PM | 24 | THAN HAVING THIS ESCHEAT TO THE STATE, I'LL GO BACK TO THE |
| 12:14PM | 25 | DEFENDANT AND WE'LL GIVE IT TO CY PRES.  WELL, THAT MAKES SENSE |

| | | |
|---|---|---|
| 12:14PM | 1 | AND THE CLASS GOT ITS MONEY, BUT HERE THE CLASS DID NOTHING. |
| 12:14PM | 2 | WHAT EFFORT DID THEY MAKE TO TRY TO PUSH AND PULL AND POKE |
| 12:14PM | 3 | AT THE SETTLEMENT SO THAT THEY GAVE SOME BENEFIT, DIRECT |
| 12:14PM | 4 | BENEFIT?  AND I'M NOT ONE OF THESE PEOPLE THAT BUYS INTO THE |
| 12:15PM | 5 | MOTION, AND I AGREE WITH SOME OF THE QUESTIONS THAT YOU ASKED, |
| 12:15PM | 6 | I DON'T KNOW WHAT YOUR -- I KNOW YOU JUST WANT TO KNOW WHAT IS |
| 12:15PM | 7 | GOING ON HERE, BUT MY CLIENT IS NOT GOING TO BE HELPED BY THE |
| 12:15PM | 8 | $200,000 TO MY ALMA MATER NYU TO GO WRITE SOME SCHOLARLY LAW |
| 12:15PM | 9 | JOURNAL.  I MEAN, MAYBE IF THERE'S NO OTHER POSSIBLE WAY BUT |
| 12:15PM | 10 | WHAT DOES THE RECORD SHOW THAT PLAINTIFF'S COUNSEL TRIED TO |
| 12:15PM | 11 | FIND SOME? |
| 12:15PM | 12 | AND I WANT TO CALL YOUR ATTENTION TO THE OTHER FACEBOOK |
| 12:15PM | 13 | CASE, THE FRALEY VERSUS FACEBOOK, IN WHICH JUDGE SEEBORG |
| 12:15PM | 14 | REFUSED TO APPROVE A PRELIMINARY APPROVAL WHEN IT WAS ONLY CY |
| 12:15PM | 15 | PRES AND IF I'M READING IT RIGHT THE PARTIES WENT BACK TO THE |
| 12:15PM | 16 | DRAWING BOARD AND THEY TRIED TO DO SOMETHING DIFFERENT. |
| 12:15PM | 17 | THE COURT:  HE SUBSEQUENTLY APPROVED THE SETTLEMENT. |
| 12:15PM | 18 | MR. WEXLER:  HE MIGHT HAVE, I'M NOT SURE.  HE AT |
| 12:15PM | 19 | LEAST APPROVED THE PRELIMINARY APPROVAL ORDER BECAUSE HE SAID |
| 12:15PM | 20 | TO THEM, YOU KNOW, GUYS, YOU DIDN'T TRY HARD ENOUGH TO DO THIS, |
| 12:15PM | 21 | AND I THINK THAT'S WHAT WE HAVE HERE.  I DON'T THINK THEY TRIED |
| 12:15PM | 22 | HARD ENOUGH OR AT LEAST COULD DEMONSTRATE THE FUTILITY OF |
| 12:16PM | 23 | TRYING TO FIND SOME WAY TO MAKE SURE THAT EVEN CURRENT |
| 12:16PM | 24 | SUBSCRIBERS.  I MEAN, YOU ASK WHY NOT A FREE MOVIE?  WELL, WE |
| 12:16PM | 25 | HAVE A CLASS WITH BILLIONS OF SUBSCRIBERS, WHY CAN'T YOU |

| | | |
|---|---|---|
| 12:16PM | 1 | COMPENSATE THEM WITH THAT? |
| 12:16PM | 2 | WELL, THE NOTION THAT YOU DON'T HAVE TO GIVE THE SAME |
| 12:16PM | 3 | RELIEF TO EVERYONE, SO YOU HAVE A CLASS OF CURRENT SUBSCRIBERS |
| 12:16PM | 4 | MERGED INTO A CLASS OF FORMER SUBSCRIBERS AND THE PEOPLE YOU |
| 12:16PM | 5 | DEAL WITH, YOU PUSH A BUTTON AND MY CLIENT GOT HER E-MAIL THAT |
| 12:16PM | 6 | SAID, HEY, YOU'RE A MEMBER OF A CLASS. |
| 12:16PM | 7 | DO YOU MEAN TO TELL ME YOU CAN'T COMPENSATE HER WITH |
| 12:16PM | 8 | PUSHING ANOTHER BUTTON TO GIVE HER SOMETHING SO THAT SHE WOULD |
| 12:16PM | 9 | FEEL BETTER ABOUT THE JUDICIAL PROCESS?  WHY SHOULD WE GIVE |
| 12:16PM | 10 | EVERYTHING TO CY PRES?  THERE'S WAYS TO DO SOMETHING DIFFERENT. |
| 12:16PM | 11 | SO I WOULD SUGGEST -- |
| 12:16PM | 12 | THE COURT:  WHAT DOES THAT DO FOR THE EQUITY OF THE |
| 12:16PM | 13 | CLASS SETTLEMENT IF CURRENT SUBSCRIBERS ARE ALLOWED TO VIEW ONE |
| 12:16PM | 14 | FREE MOVIE, WHATEVER, AND FORMERS AREN'T? |
| 12:16PM | 15 | MR. WEXLER:  I DON'T KNOW.  I'M ADMITTEDLY, AS YOU |
| 12:16PM | 16 | POINT OUT FROM AN OBJECTOR'S PERSPECTIVE, I'M JUST LOOKING AT |
| 12:17PM | 17 | THIS FROM THE OUTSIDE.  I HAVE NOT REALLY THOUGHT ABOUT. |
| 12:17PM | 18 | BUT WHEN YOU WERE DISCUSSING THE CLASS ACTION 23(A) |
| 12:17PM | 19 | STATUS, IT DID OCCUR TO ME THAT THERE ARE ACTUALLY PEOPLE WHO |
| 12:17PM | 20 | ARE ACTUALLY ANTAGONISTIC OR AT LEAST HAVE DIFFERENT |
| 12:17PM | 21 | PERSPECTIVES.  AND IS THERE A REASON WHY YOU CAN'T GIVE ONE |
| 12:17PM | 22 | SEGMENT OF THE CLASS A DIFFERENT REMEDY?  I DON'T KNOW THE |
| 12:17PM | 23 | ANSWER TO THIS, JUDGE, I REALLY DON'T KNOW, BUT IT'S CERTAINLY |
| 12:17PM | 24 | WORTH THINKING ABOUT IT. |
| 12:17PM | 25 | THE COURT:  AND WHAT WOULD HAPPEN THEN TO THE |

| | | |
|---|---|---|
| 12:17PM | 1 | NUMBERS IF YOU GAVE 62 MILLION OR 30 MILLION, WHATEVER CURRENT |
| 12:17PM | 2 | SUBSCRIBERS ARE, I FORGOT THE NUMBER NOW, IF THEY GOT A FREE |
| 12:17PM | 3 | MOVIE, WOULD THAT THEN DIMINISH THE $9 MILLION? |
| 12:17PM | 4 | MR. WEXLER:  I DON'T KNOW, THESE ARE ALL INTERESTING |
| 12:17PM | 5 | QUESTIONS AND I DON'T KNOW THE ANSWER TO, BUT I KNOW MY CLIENT |
| 12:17PM | 6 | LIKES HUMPHREY BOGART ALSO. |
| 12:17PM | 7 | BUT MY POINT AGAIN IS THAT IT'S TOO FAR.  EXCLUSIVELY BY |
| 12:18PM | 8 | BLUETOOTH AND LANE, AND I DON'T THINK THAT YOU CAN POSSIBLY -- |
| 12:18PM | 9 | YOU DON'T MAKE A DEFENDANT UNCOMFORTABLE UNLESS YOU TAKE A |
| 12:18PM | 10 | DEPOSITION AND SO THEY COULDN'T HAVE POSSIBLY SATISFIED |
| 12:18PM | 11 | THEMSELVES OR THE COURT THAT THEY HAVE DONE THE BEST. |
| 12:18PM | 12 | AND -- BUT TWOFOLD, THEY HAVE AN OBLIGATION TO MAKE SURE |
| 12:18PM | 13 | THAT TO THE EXTENT POSSIBLE THAT PEOPLE GET SOMETHING OUT OF |
| 12:18PM | 14 | THE PROCESS BECAUSE OTHERWISE IT JUST BRINGS DISRESPECT TO |
| 12:18PM | 15 | BUSINESS AREA OF LAW WHICH HAS ALREADY BEEN BROUGHT INTO |
| 12:18PM | 16 | DISRESPECT OVER THE YEARS WITH COUPON SETTLEMENTS, WHICH TO MY |
| 12:18PM | 17 | CLIENT AND MANY OTHERS SEEM LIKE, YOU KNOW WHAT, IT'S JUST FOR |
| 12:18PM | 18 | THE LAWYERS. |
| 12:18PM | 19 | SO WHEN THEY -- SO JUST FOR THE LAWYERS.  THE SYSTEM IS |
| 12:18PM | 20 | RIGGED.  SO WHEN CLASS COUNSEL SAYS WE DIDN'T GET A LOT OF |
| 12:18PM | 21 | OBJECTIONS, WHO WOULD BOTHER, TRUTHFULLY, EXCEPT A VERY WELL |
| 12:18PM | 22 | MOTIVATED OBJECTOR, WHO WOULD BOTHER TO WRITING IT WHEN THEY |
| 12:18PM | 23 | THINK THE SYSTEM IS RIGGED?  AND THAT'S REALLY THE REASON THAT |
| 12:19PM | 24 | PEOPLE ARE DISENCHANTED WITH THE SYSTEM. |
| 12:19PM | 25 | THEY SHOULD MAKE AN EFFORT TO FIGURE OUT A WAY, AND I |

12:19PM  1    DON'T THINK THEY HAVE, THAT DIRECT COMPENSATION GOES TO AS MANY

12:19PM  2    AS PEOPLE AS THEY CAN BEFORE THEY RESORT TO CY PRES.  CY PRES

12:19PM  3    IS THE LAST REPORT, NOT THE FIRST RESORT.

12:19PM  4        I'M ALMOST DONE.  I DO RECOMMEND READING JUDGE KLEINFELD'S

12:19PM  5    DISSENT IN THE FACEBOOK CASE.  I AGREE WITH IT 100 PERCENT.  I

12:19PM  6    THINK THE WAY THIS WORKS IS THAT IT DISTORTS EVERYBODY, ONCE

12:19PM  7    THE SETTLEMENT COMES, EVERYBODY'S OBJECTIVES AND EVERYBODY'S

12:19PM  8    THOUGHTS CHANGE.

12:19PM  9        AND WHEN YOU HAVE NOTHING DONE OF REAL SUBSTANCE BEFORE

12:19PM 10    THE SETTLEMENT, IT IS DIFFICULT, IF NOT IMPOSSIBLE, TO ASSESS

12:19PM 11    COUNSEL'S ACHIEVEMENTS, IF THEY ARE ACHIEVEMENTS, AND BECAUSE

12:19PM 12    ULTIMATELY THEIR CLIENTS ARE NOT THESE CHARITIES, THEY'RE THE

12:20PM 13    TERI MICHIGAN IN THE WORLD.

12:20PM 14        AND I DON'T THINK THEY HAVE BENEFITTED.  I THINK IF YOU DO

12:20PM 15    APPROVE THE SETTLEMENT, AND I THINK YOU HAVE TO TAKE THAT INTO

12:20PM 16    ACCOUNT WHEN YOU DECIDE THE LEGAL ISSUES.

12:20PM 17        LAST THING.

12:20PM 18        I HEAR ABOUT THE LANE VERSUS FACEBOOK CASE WAS ABOUT A

12:20PM 19    MOTION FOR EN BANC RECONSIDERATION.  I DON'T KNOW WHAT THE

12:20PM 20    STATUS OF IT IS.  I DON'T KNOW IF IT WILL BE GRANTED.  I

12:20PM 21    THOUGHT THEY MADE A PRETTY GOOD ARGUMENT IN THE PETITION.

12:20PM 22        I WOULD SUGGEST THAT BEFORE YOU ISSUE A FINAL DECISION

12:20PM 23    HERE, THAT YOU SHOULD WAIT FOR THE NINTH CIRCUIT TO HEAR THAT

12:20PM 24    BECAUSE IF THEY DO, THEY MAY VERY WELL CHANGE THIS WHOLE CY

12:20PM 25    PRES DOCTRINE IN THE CIRCUIT, WHICH SEEMS TO BE GETTING --

12:20PM   1    EVERY SETTLEMENT SEEMS TO BE GOING A LITTLE FURTHER AWAY FROM

12:20PM   2    THE ACTUAL PEOPLE WHOSE CLIENTS THAT THEY ARE.

12:20PM   3        SO I THANK YOU FOR YOUR TIME.

12:20PM   4            THE COURT:  THANK YOU VERY MUCH, MR. WEXLER.

12:21PM   5        MR. EGGLETON.

12:21PM   6            MR. EDELSON:  LET ME RESPOND QUICKLY BECAUSE SOME OF

12:21PM   7    THAT WAS OLD GROUND.

12:21PM   8        I TRY NOT TO GET RUBBED THE WRONG WAY BUT I DO THINK CLASS

12:21PM   9    MEMBERS ARE ALLOWED TO SPEAK AND THEIR ATTORNEYS DO, BUT THE

12:21PM   10   IDEA THAT THEY WERE SUGGESTING TO YOUR HONOR TO TAKE OUR WORD

12:21PM   11   FOR IT THAT WE HAVE BEEN DOING THIS A WHILE AND IT'S THE RIGHT

12:21PM   12   NUMBER AND IT'S THE GOING RATE ISN'T FAIR TO THE PARTIES.

12:21PM   13   WE DEVOTED A FULL EIGHT PAGES OF OUR BRIEF, PAGES 10

12:21PM   14   THROUGH 18, WHERE WE WENT THROUGH EVERY CLAIM, GAVE OUR BEST

12:21PM   15   HANDICAP, WHICH I HAVE NEVER EVER SEEN ANY OTHER CLASS COUNSEL

12:21PM   16   DO, SAYING THIS IS A CHANCE OF WINNING ON THE MERITS AND THIS

12:21PM   17   IS WHY, AND THIS IS THE RANGE OF RECOVERY.

12:21PM   18       NEVER ONCE WERE WE SAYING, JUDGE, IT'S IN THE BLACK BOX

12:21PM   19   AND DON'T WORRY ABOUT OUR MATH, TRUST US AND WE DIDN'T DO

12:21PM   20   THINGS.

12:21PM   21       WHAT WE DID SAY IS WE HAVE OTHER EXTERNAL FACTORS THAT

12:22PM   22   HELP SUPPORT OUR MATH, AND THE FACT THAT EVERY OTHER LAWYER AND

12:22PM   23   JUDGE HAS COME TO A SIMILAR CONCLUSION.  SO THAT'S THE

12:22PM   24   SUPPORTIVE PART OF IT.  IT'S NOT THE PIECE THAT WE'RE TRYING --

12:22PM   25   THAT WE'RE SAYING DON'T WORRY ABOUT WHAT IS IN OUR HEAD.  WE

```
12:22PM   1        THINK WE HAVE GONE FAR ABOVE AND BEYOND.

12:22PM   2             MR. WEXLER ALSO INTRODUCED THE NEW STANDARD WHERE YOU

12:22PM   3        CAN'T SETTLE THE CASE UNLESS YOU'VE MADE THE DEFENDANT

12:22PM   4        UNCOMFORTABLE IN A DEPOSITION.

12:22PM   5             WE HAVE DONE MORE DISCOVERY IN THIS CASE THAN THE LANE

12:22PM   6        CASE WHERE I THINK THERE WAS NO DISCOVERY AT ALL.  HERE THERE

12:22PM   7        WAS WRITTEN DISCOVERY.

12:22PM   8             THERE ARE TIMES WHEN YOU CAN'T SETTLE A CASE WITHOUT A

12:22PM   9        DEPOSITION, AND THAT'S IF YOU NEED THE DEPOSITION TESTIMONY TO

12:22PM  10        FIGURE OUT SOMETHING AND THEY WON'T GIVE IT TO YOU ANY OTHER

12:22PM  11        WAY.

12:22PM  12             HERE WE FELT CONFIDENT THAT WE UNDERSTOOD THE FACTS OF THE

12:22PM  13        CASE IN THE SAME WAY, PROBABLY A LOT MORE SO, THAN THE CLASS

12:22PM  14        COUNSEL DID IN LANE WHERE IT LOOKED LIKE THERE WAS NO DISCOVERY

12:22PM  15        AT ALL.

12:22PM  16             SO THE IDEA THAT WE HAVE TO GO THROUGH MOTIONS AND TRY TO

12:23PM  17        INTIMIDATE NETFLIX'S SENIOR -- THEIR CEO, I THINK HE SAID WE

12:23PM  18        SHOULD FORCE THEM TO IMPOSE A SETTLEMENT.  AND, FIRST, I DON'T

12:23PM  19        THINK THAT'S IN THE PROVINCE OF THE COURT; AND, SECOND, I DON'T

12:23PM  20        THINK NETFLIX WOULD HAVE THE APPROPRIATE -- IT WOULDN'T BE

12:23PM  21        PRODUCTIVE.  I THINK IF WE TRIED TO START TO INTIMIDATE THEM

12:23PM  22        THEN WE WOULD JUST BE IN FOR A LONG FIGHT WHICH WOULD BE FINE

12:23PM  23        BUT THERE'S NO ADDED BENEFIT.

12:23PM  24             MR. WEXLER ALSO SAID ALL WE'RE TRYING TO DO IS CREATE A

12:23PM  25        FOUNDATION.  I THINK HE'S CONFUSING US WITH THE BEACON CASE.
```

| | | |
|---|---|---|
| 12:23PM | 1 | BEACON CREATED A FOUNDATION AND THE COURT SAID THAT'S FINE. |
| 12:23PM | 2 | HERE THE MONEY IS GOING TO THE CY PRES RECIPIENTS THAT WE |
| 12:23PM | 3 | IDENTIFIED. |
| 12:23PM | 4 | THE COURT:  WHAT ABOUT SETTLING?  MR. WEXLER |
| 12:23PM | 5 | SUGGESTS THAT WHY CAN'T CURRENT SUBSCRIBERS RECEIVE A FREE |
| 12:24PM | 6 | MOVIE AT THE PUSH OF A BUTTON BUT WHY CAN'T CURRENT SUBSCRIBERS |
| 12:24PM | 7 | GET THAT AS PART OF THIS SETTLEMENT?  AND WHAT EFFECT WOULD |
| 12:24PM | 8 | THAT HAVE ON THE SETTLEMENT? |
| 12:24PM | 9 | MY FOLLOWUP IS WHAT WOULD THAT DO TO THE NUMBER? |
| 12:24PM | 10 | MR. EDELSON:  THAT SETTLEMENT STRUCTURE, IN MY VIEW, |
| 12:24PM | 11 | IT'S NOT A PROPER STRUCTURE TO SETTLE THIS CASE.  THIS WAS NOT |
| 12:24PM | 12 | A CASE ABOUT THE PROBLEMS WITH THE RENTAL PROCESS. |
| 12:24PM | 13 | THE COURT:  I UNDERSTAND. |
| 12:24PM | 14 | MR. EDELSON:  AND SO TAKING A PART OF THE CLASS AND |
| 12:24PM | 15 | SAYING, YOU GUYS WHO WERE NOT REALLY STRONG RETENTION CLAIMS |
| 12:24PM | 16 | BECAUSE THEY'RE CURRENT CUSTOMERS, BUT WE'RE GOING TO GIVE YOU |
| 12:24PM | 17 | SOMETHING EXTRA. |
| 12:24PM | 18 | THE COURT:  PARDON ME, BUT LET ME KIND OF PUT IT IN |
| 12:24PM | 19 | THE VERNACULAR, I SUPPOSE, IF I MAY.  THERE ARE CLASS MEMBERS |
| 12:24PM | 20 | WHO ARE SAYING, AND I MEAN NO DISRESPECT TO ANYONE HERE, AND |
| 12:24PM | 21 | I'M SPEAKING TO, PERHAPS, THOSE FOLKS ON THE STREET I ALLUDED |
| 12:24PM | 22 | TO EARLIER.  THERE ARE FOLKS WHO ARE SAYING I'M A MEMBER OF A |
| 12:24PM | 23 | CLASS AND THESE GOOD FOLKS HAVE TAKEN MY CASE AND THEY'RE MY |
| 12:25PM | 24 | CHAMPIONS AND YET I'M GETTING NOTHING FOR THIS AND THEY ARE |
| 12:25PM | 25 | GETTING MILLIONS OF DOLLARS IN ATTORNEY'S FEES. |

12:25PM 1          MR. EDELSON:  RIGHT.

12:25PM 2          THE COURT:  AND THERE'S SOMETHING THAT DOESN'T SET

12:25PM 3    RIGHT IN MY MOUTH AS AN AGGRIEVED PARTY AND I SHOULD GET

12:25PM 4    SOMETHING, AND MAYBE IT'S A MOVIE, WHICH I DON'T KNOW WHAT THAT

12:25PM 5    COSTS NETFLIX AND THERE HAS TO BE SOME COST, WHICH I'M SURE.

12:25PM 6          BUT MAYBE THAT'S WHAT MR. WEXLER SUGGESTS IS THAT THAT

12:25PM 7    WOULD PROVIDE SOME CONFIDENCE IN THE SYSTEM AS TO THOSE

12:25PM 8    CLIENTS, THOSE PARTY MEMBERS, PERHAPS THROUGH THE PUBLIC AT A

12:25PM 9    WHOLE, BUT THE PUBLIC AT LARGE IS NOT A MEMBER OF THE CLASS.

12:25PM 10         BUT HE GETS BACK TO THE ATTORNEYS' FEES PORTION, GEE, WHEN

12:25PM 11   YOU LOOK AT THIS, AND IS THAT RIGHT THAT THE ATTORNEYS ARE

12:25PM 12   GETTING SO MUCH MONEY AND THE CLASS ISN'T GETTING ANYTHING?

12:25PM 13   AND SOMETIMES THAT'S NOT THE WAY IT IS.

12:25PM 14         AND I ALMOST HEARD HIM SAY, WELL, GEE, MAYBE IF THESE

12:26PM 15   LAWYERS CONTRIBUTED TO SOME OF THEIR FEES AND IN SOME MANNER TO

12:26PM 16   WHATEVER, BE IT NETFLIX FOR PAYING THE VIDEO COST, OR TO THOSE

12:26PM 17   WHO ARE FORMER SUBSCRIBERS, WHATEVER THAT NUMBER IS, MAYBE THEY

12:26PM 18   GET SOMETHING.

12:26PM 19         AND IF THERE COULD BE A SLICE OFF THE ATTORNEY'S FEES,

12:26PM 20   THAT MIGHT MAKE THE BULLA BASE A LITTLE TASTIER PERHAPS IN THE

12:26PM 21   SETTLEMENT AND I GET -- THAT'S THE FLAVOR.  I THINK PERHAPS YOU

12:26PM 22   UNDERSTOOD THAT, TOO, AND MAYBE YOU HEARD IT A DIFFERENT WAY.

12:26PM 23         ITS'S THAT BASIC QUESTION, AGAIN IN THE VERNACULAR IS,

12:26PM 24   GEE, THE LAWYERS ARE GETTING ALL OF THE MONEY AND THE AGGRIEVED

12:26PM 25   PARTIES AREN'T.  AND I UNDERSTAND WHEN YOU HAVE 62 MILLION YOU

| | | |
|---|---|---|
| 12:26PM | 1 | CAN'T PAY OUT EVERYONE, AND THERE IS JUST THAT ONE BIG QUESTION |
| 12:26PM | 2 | AND OBSERVATION. |
| 12:26PM | 3 | MR. EDELSON:  I UNDERSTAND THAT AND LET ME TRY |
| 12:26PM | 4 | ADDRESSING IT THIS WAY. |
| 12:26PM | 5 | THE COURT:  I'M NOT SAYING I SHARE THAT VIEW.  I'M |
| 12:26PM | 6 | RAISING THE ISSUE BECAUSE THIS IS A PUBLIC FORUM, AND I THINK |
| 12:26PM | 7 | YOU'RE ENTITLED TO BE HEARD AND, YOU KNOW, YOU SHOULD BE AT |
| 12:27PM | 8 | LEAST AFFORDED THE OPPORTUNITY TO ANSWER THAT QUESTION IN MY |
| 12:27PM | 9 | OBSERVATION. |
| 12:27PM | 10 | MR. EDELSON:  ABSOLUTELY.  THERE'S NO QUESTION THAT |
| 12:27PM | 11 | YOUR HONOR COULD ASK ME THAT WOULD OFFEND ME AND I APPRECIATE |
| 12:27PM | 12 | THE OPPORTUNITY TO RESPOND TO ANY ISSUES. |
| 12:27PM | 13 | LET ME TRY TO ADDRESS IT THIS WAY, FIRST, THE IDEA -- I |
| 12:27PM | 14 | PERSONALLY, WHEN I SETTLE A CLASS ACTION, I TALK TO THE CLASS |
| 12:27PM | 15 | MEMBERS.  I'M NOT ONE OF THOSE ATTORNEYS THAT, YOU KNOW, |
| 12:27PM | 16 | DOESN'T ANSWER CALLS.  I PERSONALLY ANSWER CALLS. |
| 12:27PM | 17 | THE COURT:  YOU CAN'T TALK TO 62 MILLION PEOPLE. |
| 12:27PM | 18 | MR. EDELSON:  I HAVE SPOKE TO HUNDREDS AND HUNDREDS |
| 12:27PM | 19 | OF PEOPLE. |
| 12:27PM | 20 | THE COURT:  YOU WOULD BE 100 IF YOU DID THAT. |
| 12:27PM | 21 | MR. EDELSON:  I WOULD.  BUT IF SOMEONE CALLS MY |
| 12:27PM | 22 | NUMBER, I CALL THEM BACK IF I CAN. |
| 12:27PM | 23 | AND WHEN I SPOKE TO PEOPLE, THERE WERE A LOT OF PEOPLE |
| 12:27PM | 24 | THAT STARTED WITH THAT VIEW, WHICH IS, JAY, YOU GOT ME NOTHING. |
| 12:27PM | 25 | YOU'RE GOING TO GET SOME MONEY AND YOU'RE GETTING ME NOTHING. |

| | | |
|---|---|---|
| 12:27PM | 1 | AND WHAT I TRIED TO EXPLAIN TO THEM IS THAT WHAT WE DID, |
| 12:27PM | 2 | WHICH WE THINK IS A HUGE VICTORY, WAS GETTING ONE OF THE |
| 12:27PM | 3 | LARGEST COMPANIES IN THE U.S. TO CHANGE THEIR PRACTICE IN A |
| 12:27PM | 4 | SIGNIFICANT WAY THAT HELPED 60 MILLION PEOPLE.  AND IF YOU |
| 12:28PM | 5 | THINK ABOUT THAT WHICH IS, YOU KNOW, THIS CASE STARTED WITH |
| 12:28PM | 6 | CHANDLER GIVENS WHO IS A LAW STUDENT WHO UNCOVERED WHAT NETFLIX |
| 12:28PM | 7 | WAS DOING, AND HE FIGURED IT OUT AND HE CAME TO ME AND HE SAID, |
| 12:28PM | 8 | CAN WE GET THEM TO CHANGE THEIR BEHAVIOR?  AND I DON'T WANT TO |
| 12:28PM | 9 | GET TOO -- |
| 12:28PM | 10 | THE COURT:  THAT SOUNDS LIKE A PRO BONO CASE. |
| 12:28PM | 11 | MR. EDELSON:  IT IS, EXCEPT WHEN THE GOVERNMENT -- |
| 12:28PM | 12 | THE COURT:  A LOT OF MAJOR LAW FIRMS HAVE PRO BONO |
| 12:28PM | 13 | DEPARTMENTS THAT DO THAT TYPE OF LITIGATION. |
| 12:28PM | 14 | MR. EDELSON:  THEY DO EXCEPT THE GOVERNMENT HAS SET |
| 12:28PM | 15 | UP A CLASS ACTION MECHANISM AND HAS INCENTIVIZE FIRMS TO DO |
| 12:28PM | 16 | THIS. |
| 12:28PM | 17 | THE GOVERNMENT DOES IT ON ITS OWN AND WHEN THEY DO IT, |
| 12:28PM | 18 | THEY FIND THE COMPANIES AND THEY SAY GIVE US $10 MILLION, AND |
| 12:28PM | 19 | IT DOESN'T GO TO CHARITY, IT GOES TO THEM, AND THAT IS WHAT THE |
| 12:28PM | 20 | FINE IS AND THEY CHANGE THEIR BEHAVIOR. |
| 12:28PM | 21 | AND YOU CAN SAY TO MEMBERS OF THE PUBLIC, IT'S THE SAME |
| 12:28PM | 22 | CONCERN.  WELL, YOU'RE THE ONES WHO WERE HARMED.  WHY IS THE |
| 12:28PM | 23 | GOVERNMENT GETTING THIS MONEY? |
| 12:28PM | 24 | AND, YOU KNOW, THERE ARE SOME INTERESTING QUESTIONS THERE. |
| 12:28PM | 25 | AND THE REAL ANSWER IS, IN THIS TYPE OF A CASE, DO YOU WANT TO |

12:29PM  1    INCENTIVIZE ATTORNEYS TO BRING THIS TO EFFECT THIS TYPE OF

12:29PM  2    CHANGE?  DO YOU BELIEVE IN THE CY PRES DOCTRINE?  DO YOU

12:29PM  3    BELIEVE THAT THAT BENEFITS THE CLASS OR NOT?

12:29PM  4         AND THE NINTH CIRCUIT, I MEAN, I THINK MR. WEXLER SUMS IT

12:29PM  5    UP BEST WHEN HE SAID LISTEN TO THE DISSENT, LISTEN TO THE

12:29PM  6    DISSENT, AND IF THE DISSENT WERE THE MAJORITY OPINION, WE WOULD

12:29PM  7    HAVE A MUCH DIFFERENT ARGUMENT HERE BUT IT ISN'T.  THAT'S THE

12:29PM  8    LAW OF THE CIRCUIT.

12:29PM  9         AND THE IDEA THAT WE SHOULD WAIT AND HOLD OFF TO SEE IF

12:29PM 10    THERE'S GOING TO BE AN EN BANC REVIEW, I DON'T THINK IT DOES A

12:29PM 11    SERVICE TO ANY OF THE CLASS MEMBERS WHO WANT THE INJUNCTIVE

12:29PM 12    RELIEF.  IT MATTERS TO PEOPLE.

12:29PM 13         CONGRESS SPENT THE TIME TO PASS A STATUTE TO SAY THAT THEY

12:29PM 14    CAN'T HOLD ONTO THIS INFORMATION.

12:29PM 15         WE HAVE NOW MADE NETFLIX HONOR THAT STATUTE.  THEY'RE NOT

12:29PM 16    GOING TO HOLD ONTO THAT INFORMATION.  THE ONLY THING HOLDING

12:29PM 17    THAT UP, FRANKLY, IS ASSUMING YOUR HONOR AGREES WITH US, IS THE

12:29PM 18    TIMEFRAME, IS WHETHER THEIR OBJECTIONS, HOW LONG THAT WHOLE

12:29PM 19    PROCESS TAKES.  THERE'S NO REASON TO DELAY IT.

12:30PM 20         I WANT TO MAKE ONE LAST POINT BECAUSE MR. WEXLER MENTIONED

12:30PM 21    THE FRALEY CASE.  THAT'S A CASE WE DON'T HAVE ANY INVOLVEMENT

12:30PM 22    IN THAT CASE, BUT I AM FAMILIAR WITH IT.

12:30PM 23         THERE ARE A FEW DIFFERENCES THERE.  FIRST OF ALL, IF I

12:30PM 24    UNDERSTAND THE INITIAL DECISION REJECTING THE SETTLEMENT, WHAT

12:30PM 25    THE COURT SAID WAS THAT THE $20 MILLION, THE INITIAL SETTLEMENT

12:30PM 1    WAS 10 MILLION TO CY PRES AND 10 MILLION TO THE ATTORNEYS.

12:30PM 2         AND THE COURT SAID, YOU JUST PICKED THAT NUMBER OUT OF

12:30PM 3    THIN AIR.  YOU DIDN'T DO ANY OF THIS MATH THAT WE DID.  YOU

12:30PM 4    JUST PICKED IT.  YOU HAVE TO EXPLAIN IT.

12:30PM 5         THEY THEN REWORKED IT AND NOW THERE'S A SYSTEM WHICH,

12:30PM 6    FRANKLY, I WOULDN'T BE COMFORTABLE, -I'M NOT COMMENTING ON

12:30PM 7    THEIR STUFF AND I DON'T KNOW IT WELL ENOUGH, AND SO I WANT TO

12:30PM 8    BE CLEAR ON THAT.  I WOULD NOT BRING THAT SETTLEMENT TO YOUR

12:30PM 9    HONOR BECAUSE THE IDEA OF SAYING THAT WE HAVE A CLASS OF

12:30PM 10   MILLIONS AND MILLIONS OF PEOPLE WHO CAN GET $10 AND THEN IN

12:30PM 11   FINE PRINT IT SAYS IF TOO MANY PEOPLE FILE CLAIMS, IT'S ALL

12:31PM 12   GOING TO CY PRES, IS NOT SOMETHING THAT I WOULD STAND BEHIND.

12:31PM 13        WE COULD HAVE DONE THAT HERE.  WE COULD HAVE SAID OF THE

12:31PM 14   $10 MILLION, PEOPLE WHO SUBMIT CLAIMS, BUT IT WOULD HAVE

12:31PM 15   HAPPENED THE SAME WAY.  IT ALL WOULD HAVE GONE TO CY PRES AND

12:31PM 16   MAYBE A FEW PEOPLE WOULD HAVE FELT BETTER UNTIL THEY REALIZED

12:31PM 17   THEY WEREN'T GETTING THE $10.  THAT'S NOT HOW IT WORKS OUT IN

12:31PM 18   MY MIND.

12:31PM 19        BUT WE FOLLOWED THE MODEL IN GOOGLE AND LANE, AND WE THINK

12:31PM 20   IT IS RIGHT.

12:31PM 21             THE COURT:  THANK YOU VERY MUCH.

12:31PM 22             MR. EGGLETON:  THANK YOU, YOUR HONOR.  BRIEFLY.

12:31PM 23   THERE WAS A SUGGESTION THAT THERE WASN'T A HARD BARGAINING

12:31PM 24   HERE, AND MY CLIENT DOESN'T FEEL THAT WAY.  AND I DO WANT TO

12:31PM 25   MAKE CLEAR TO THE COURT THAT THE INJUNCTION SEEMS TO BE AGREED

| | | |
|---|---|---|
| 12:31PM | 1 | TO HERE IS A SIGNIFICANT EFFORT THAT NETFLIX IS GOING TO HAVE |
| 12:31PM | 2 | TO UNDERTAKE TO DO IT. |
| 12:31PM | 3 | SOMEWHAT PEJORATIVELY EARLIER THE POINT WAS MADE THAT WE'D |
| 12:32PM | 4 | HAVE A YEAR TO DO IT.  THAT'S PURPOSEFUL.  IT'S GOING TO BE A |
| 12:32PM | 5 | COMPLEX THING FOR NETFLIX TO CHANGE THINGS IN THAT RESPECT.  SO |
| 12:32PM | 6 | THAT WAS HARD BARGAINING FOR. |
| 12:32PM | 7 | SO THERE'S BEEN A LOT OF TALK ABOUT OTHER WAYS THE |
| 12:32PM | 8 | SETTLEMENT COULD BE STRUCTURED, BUT THAT IS A BENEFIT THAT IN |
| 12:32PM | 9 | OUR VIEW ALL OF THESE CLASS MEMBERS ARE RECEIVING, AND WE VIEW |
| 12:32PM | 10 | IT AS SIGNIFICANT AND CERTAINLY IT'S GOING TO TAKE A |
| 12:32PM | 11 | SIGNIFICANT AMOUNT OF EFFORT TO GET THIS DONE. |
| 12:32PM | 12 | SO IN THAT RESPECT THERE WAS ABSOLUTELY HARD BARGAINING, |
| 12:32PM | 13 | AND I WANTED TO MAKE THAT CLEAR TO THE COURT. |
| 12:32PM | 14 | WITH RESPECT, AGAIN, TO THIS IDEA THAT IT COULD HAVE BEEN |
| 12:32PM | 15 | STRUCTURED DIFFERENTLY.  I DID FORGET EARLIER AND I WAS |
| 12:32PM | 16 | REMINDED THAT THE IDEA OF FREE MOVIES, NETFLIX IS IN A |
| 12:32PM | 17 | DIFFERENT WORLD TODAY THAN IT WAS HISTORICALLY.  MOST OF ITS |
| 12:32PM | 18 | CUSTOMERS ARE STREAMING MOVIES NOW.  IT'S UNLIMITED.  YOU CAN |
| 12:32PM | 19 | STREAM AS MANY AS YOU WANT. |
| 12:32PM | 20 | SO WHAT USED TO BE A SHIPMENT OF A DVD, WHILE THEY STILL |
| 12:32PM | 21 | DO THAT, A MAJORITY OF THEIR MEMBERS, THEIR MEMBERS ACTUALLY |
| 12:32PM | 22 | NOW UTILIZE A STREAMING SERVICE.  IT'S NOT EXCLUSIVELY, IT'S |
| 12:32PM | 23 | ALMOST EXCLUSIVELY.  SO IT'S NOT THE DAY WHERE THEY COULD GIVE |
| 12:33PM | 24 | AN EXTRA DVD. |
| 12:33PM | 25 | THE COURT:  SO YOU COULD GET A MOVIE, IT SOUNDS LIKE |

12:33PM  1    IT WOULD BE MANY PEOPLE, THEY WOULDN'T GET THE DISK IN THE MAIL

12:33PM  2    BOX, BUT -- AND THEY PAY A SUBSCRIPTION FEE AND THEY HAVE

12:33PM  3    UNLIMITED USE OR IS THAT HOW IT WORKS?

12:33PM  4            MR. EGGLETON:  CORRECT, THE MAJORITY OF THE

12:33PM  5    CUSTOMERS NOW PAY A SUBSCRIPTION FEE, JUST THE WAY THEY ALWAYS

12:33PM  6    HAVE ALTHOUGH IT USED TO BE THAT ENTITLED YOU TO GET THE DVD'S

12:33PM  7    BY MAIL IN THE LITTLE RED ENVELOPES, THAT'S STILL PART OF THEIR

12:33PM  8    SERVICE, BUT THE MAJORITY OF THEIR SERVICE NOW, FOR THE SAME

12:33PM  9    SUBSCRIPTION FEE, YOU CAN PAY DIFFERENT WAYS, BUT IT ALLOWS YOU

12:33PM 10    TO STREAM MOVIES THROUGH YOUR T.V., THROUGH A BOX OF SOME KIND

12:33PM 11    AND THAT'S UNLIMITED SO IT'S NOT LIKE THE DVD BY MAIL SERVICE

12:33PM 12    WHERE YOU HAVE A CERTAIN NUMBER OF MONTHS YOU'RE ENTITLED TO.

12:33PM 13            THE COURT:  ONE OF THE LETTERS, ONE OF THE LETTERS,

12:33PM 14    I THINK, SUGGESTED, WELL, WHY DON'T THEY GIVE US A MONTH FREE

12:33PM 15    OR SOMETHING LIKE THAT AND MAYBE THAT'S WHAT THEY WERE ALLUDING

12:33PM 16    TO.

12:33PM 17            MR. EGGLETON:  AND THAT'S GOING TO BE MY FINAL

12:33PM 18    COMMENT, AND THAT'S THE SEGUE.  I HAVE ATTENDED A LOT OF THESE

12:33PM 19    FINAL APPROVAL HEARINGS OVER THE LAST TEN YEARS OR SO, AND I

12:34PM 20    HAVE RESPECTED THE OBJECTORS.  I THINK OFTEN ON THEIR OWN

12:34PM 21    NICKEL THEY COME AND THEY, FRANKLY, OFTEN MAKE GOOD POINTS AND

12:34PM 22    ARE, FRANKLY, ARTICULATE IN WHAT THEY SAY.

12:34PM 23        BUT AT THE END OF THE DAY THESE OBJECTIONS BOIL DOWN TO

12:34PM 24    COULD HAVE BEEN DIFFERENT, COULD HAVE BEEN DONE DIFFERENTLY,

12:34PM 25    COULD HAVE DONE IT THIS WAY, COULD HAVE DONE IT THAT WAY.

12:34PM  1    TODAY WE HEARD COULD HAVE SETTLED ON BEHALF OF A 2500

12:34PM  2    PERSON CLASS, COULD HAVE GIVEN THIS KIND OF MOVIE.  YOU JUST

12:34PM  3    HEARD SHOULD HAVE BEEN MONEY TO THE CLASS.  MAYBE, BUT THESE

12:34PM  4    THINGS ARE NEGOTIATED.  AND THE IDEA THAT SOMEBODY COULD FROM

12:34PM  5    AFAR SAY, WELL, IT COULD HAVE BEEN THIS, IT COULD HAVE BEEN

12:34PM  6    THAT, I WOULD SUGGEST TO YOUR HONOR IS NOT THE RIGHT WAY TO

12:34PM  7    ANALYZE THIS UNDER RULE 23.  IT'S MORE WHETHER THE SETTLEMENT

12:34PM  8    BEFORE THE COURT IS FAIR AND REASONABLE AND NOT WHETHER

12:34PM  9    SOMEBODY HAS A BETTER IDEA OF HOW WE COULD HAVE NEGOTIATED.

12:34PM  10    ONE MORE POINT, YOUR HONOR.  THERE'S BEEN TALK TODAY ABOUT

12:34PM  11    THE FACT THAT THE SETTLEMENT HAPPENED ESSENTIALLY TOO FAST, AND

12:34PM  12    I JUST HEARD THAT OUR CEO SHOULD HAVE BEEN DEPOSED.

12:35PM  13    THIS CASE ACTUALLY SITS IN A RATHER UNIQUE POSITION IN

12:35PM  14    THAT REGARD.  THE LAW HAS BEEN DEVELOPING QUICKLY WITH RESPECT

12:35PM  15    TO THE VPPA CLAIMS, AND I WON'T TAKE UP YOUR TIME WITH THIS,

12:35PM  16    BUT IF YOU LOOK AT THE DEVELOPMENTS UNDER THE LAW AND OTHER

12:35PM  17    MATTERS OVER THE LAST SIX MONTHS OR SO, I DON'T KNOW HOW A

12:35PM  18    NEGOTIATION TODAY WOULD GO.  WHO KNOWS.

12:35PM  19    BUT I WOULD SUGGEST TO YOU THAT IT MIGHT BE A DIFFERENT

12:35PM  20    NEGOTIATION TODAY.

12:35PM  21    SO THIS IS NOT, PERHAPS NOT THE NORMAL CASE WHERE SOMEBODY

12:35PM  22    CAN EASILY SAY, OH, TIME WOULD HAVE BENEFITED THE CLASS.

12:35PM  23    MAYBE, BUT MAYBE NOT.

12:35PM  24    THE COURT:  OKAY.  THANK YOU VERY MUCH.

12:35PM  25    MR. EGGLETON:  YOUR HONOR, IF YOU ARE DONE, I DO

| | | |
|---|---|---|
| 12:35PM | 1 | HAVE TWO PROCEDURAL ISSUES THAT I WANT TO CLOSE ON BEFORE WE |
| 12:35PM | 2 | GO. |
| 12:35PM | 3 | THE COURT:  LET ME JUST ASK IN THE AUDIENCE, ARE |
| 12:35PM | 4 | THERE ANY OTHER OBJECTORS PRESENT THAT WISH TO BE HEARD? |
| 12:35PM | 5 | MR. YUNAEV:  YES. |
| 12:35PM | 6 | THE COURT:  SIR, MAY I KNOW YOUR NAME, PLEASE. |
| 12:36PM | 7 | MR. YUNAEV:  MY NAME IS GEORGE YUNAEV. |
| 12:36PM | 8 | THE COURT:  SPELL YOUR NAME. |
| 12:36PM | 9 | MR. YUNAEV:  G-E-O-R-G-E, Y-U-N-A-E-V. |
| 12:36PM | 10 | THE COURT:  Y-U-N -- |
| 12:36PM | 11 | MR. YUNAEV:  -- A-E-V. |
| 12:36PM | 12 | THE COURT:  THANK YOU, SIR.  AND WHAT IS YOUR |
| 12:36PM | 13 | CONNECTION WITH THIS LAWSUIT? |
| 12:36PM | 14 | MR. YUNAEV:  I SUBMITTED AN OBJECTION, AND I |
| 12:36PM | 15 | MENTIONED I PLANNED TO ATTEND THE HEARING AND TO SPEAK AT THE |
| 12:36PM | 16 | HEARING. |
| 12:36PM | 17 | THE COURT:  THANK YOU.  DO YOU KNOW THE DOCKET |
| 12:36PM | 18 | NUMBER OF YOUR OBJECTION, SIR? |
| 12:36PM | 19 | MR. YUNAEV:  NO. |
| 12:36PM | 20 | THE COURT:  WHEN DID YOU FILE YOUR OBJECTION? |
| 12:36PM | 21 | MR. YUNAEV:  I FILED THE OBJECTION TIMELY.  I FILED |
| 12:36PM | 22 | IT, I THINK, AFTER THE WEEK I HAVE FIRST HEARD OF THE LAWSUIT. |
| 12:36PM | 23 | THE COURT:  DO YOU KNOW THE MONTH YOU FILED YOUR |
| 12:36PM | 24 | OBJECTION? |
| 12:36PM | 25 | MR. YUNAEV:  NO.  BUT SOME PIECES OF MY OBJECTION |

12:36PM  1    ARE MENTIONED IN THE MOTIONS, WHICH I RECEIVED RECENTLY.

12:36PM  2              THE COURT:  OKAY.  WHAT WOULD YOU LIKE ME TO KNOW,

12:36PM  3    SIR?

12:36PM  4              MR. YUNAEV:  SO FIRST I WOULD LIKE TO SAY IS THAT

12:36PM  5    I'M A SOFTWARE DEVELOPER SO I'M NOT AN ATTORNEY.  AND I'M

12:36PM  6    CONCERNED ABOUT PRIVACY.  SO APPARENTLY I'M ONE OF THOSE

12:36PM  7    PERSONS WHO ARE NOT IN ACADEMICS OR PRIVACY BUT I'M STILL

12:37PM  8    CONCERNED.

12:37PM  9              THE COURT:  I THINK I FOUND IT.  IT'S FILED

12:37PM 10    AUGUST 26TH, 2012.

12:37PM 11              MR. YUNAEV:  THIS IS THE FIRST TIME I'M IN COURT.

12:37PM 12              THE COURT:  WELCOME.

12:37PM 13              MR. YUNAEV:  SO FOR ME IT WAS A TYPICAL CLASS ACTION

12:37PM 14    EXAMPLE, WHICH I JUST AUTOMATICALLY EXCLUDE MYSELF.  EVERY TIME

12:37PM 15    I SEE IT, IT'S USUALLY SOMETHING YOU GET $0.20 COUPON AND WE

12:37PM 16    GET $20 MILLION, AND I DON'T WANT TO DEAL WITH THAT AND I

12:37PM 17    EXCLUDE MYSELF.

12:37PM 18         THIS ONE WAS -- SOMEHOW OFFENDED ME SO I DECIDED TO WRITE

12:37PM 19    AN OBJECTION, AND I POSTED THE OBJECTION AS A TEMPLATE ON MY

12:37PM 20    BLOG AND I HAVE CONTACTED SEVERAL PEOPLE WHO I BELIEVE ALSO

12:37PM 21    SUBMITTED SIMILAR OBJECTIONS.

12:37PM 22         AND I HAVE BEEN SPEAKING TO PEOPLE AROUND ME AND I

12:37PM 23    PROBABLY TALKED TO AROUND 100 PEOPLE ABOUT THIS WHOLE LAWSUIT.

12:37PM 24         THE TYPICAL REACTION I'M GETTING IS APATHY.  PEOPLE

12:37PM 25    USUALLY SAY, YEAH, WE KNOW -- I CAN'T SAY THIS WORD HERE, BUT

| | | |
|---|---|---|
| 12:38PM | 1 | THERE'S NOTHING I CAN DO ANYWAY AND I DON'T EVEN WANT TO OBJECT |
| 12:38PM | 2 | BECAUSE I WOULD HAVE TO SPEND MONEY.  IT COSTS MONEY.  THEY |
| 12:38PM | 3 | DON'T PROVIDE A WAY TO OBJECT AND TO EXCLUDE YOURSELF ONLINE SO |
| 12:38PM | 4 | YOU HAVE TO SUBMIT A PAPER AND YOU HAVE TO PUT A STAMP AND IT |
| 12:38PM | 5 | COSTS MONEY.  MOST PEOPLE JUST DON'T WANT TO DO IT. |
| 12:38PM | 6 | SO MY MAIN CONCERN WITH THIS INJUNCTIVE RELIEF -- BECAUSE |
| 12:38PM | 7 | AS A SOFTWARE DEVELOPER, I'M A TECHNICAL PERSON AND I CAN SEE |
| 12:38PM | 8 | THE TECHNICAL THINGS. |
| 12:38PM | 9 | IF YOUR HONOR ALLOWS, I WOULD LIKE TO DISTRIBUTE TWO |
| 12:38PM | 10 | EXAMPLES TO SHOW MY POINTS? |
| 12:38PM | 11 | THE COURT:  YOU'LL NEED TO PROVIDE THOSE TO COUNSEL, |
| 12:38PM | 12 | PLEASE. |
| 12:38PM | 13 | MR. YUNAEV:  AND THIS IS FOR THE COURT. |
| 12:38PM | 14 | THE COURT:  ALL RIGHT.  HAND IT TO OUR COURTROOM |
| 12:38PM | 15 | DEPUTY. |
| 12:38PM | 16 | MR. YUNAEV:  WHY I'M CONCERNED IS THAT BECAUSE IN MY |
| 12:38PM | 17 | OPINION THE INJUNCTIVE TERMS ARE VERY WEAK AND ARE VERY EASY TO |
| 12:38PM | 18 | WORK AROUND, AND I BELIEVE IF NETFLIX CAN WORK AROUND THE |
| 12:39PM | 19 | INJUNCTION AND THAT THE COURT ORDERED, THEY WILL DO IT.  WHY |
| 12:39PM | 20 | THEY DO IT IS BECAUSE THE DEFENDANTS SAY IT THEMSELVES ON PAGE |
| 12:39PM | 21 | 2 IN THEIR MOTIONS THAT THIS INFORMATION IS VALID FOR THEM AND |
| 12:39PM | 22 | SO OBVIOUSLY THEY WOULD -- IF THEY HAVE A WAY TO KEEP IT, THEY |
| 12:39PM | 23 | WOULD DO IT. |
| 12:39PM | 24 | SO THE FIRST THING, THE FIRST PROBLEM I HAVE IS WITH THE |
| 12:39PM | 25 | DECOUPLING. |

| | | |
|---|---|---|
| 12:39PM | 1 | THE COURT: DECOUPLING. |
| 12:39PM | 2 | MR. YUNAEV: YES. NOW, WHAT YOU DO IS YOU JUST COPY |
| 12:39PM | 3 | IT LIKE THAT (INDICATING). |
| 12:39PM | 4 | AND DO YOU THAT (INDICATING). |
| 12:39PM | 5 | THE COURT: AND YOU HAVE TORN THE LEFT MARGIN OFF OF |
| 12:39PM | 6 | YOUR SHEET? |
| 12:39PM | 7 | MR. YUNAEV: YES. SO THIS INFORMATION IS |
| 12:39PM | 8 | DECOUPLING. SO BASICALLY THE ORDER IS PASSED. NOW IF NETFLIX |
| 12:39PM | 9 | SUSPENDS ACTIVITY NEXT YEAR, AND I DON'T KNOW WHO IS USING IT, |
| 12:39PM | 10 | SO WHAT PREVENTS THEM FROM DOING IT AGAIN? |
| 12:39PM | 11 | THE COURT: PUTTING THE TAPE AND PUTTING IT BACK |
| 12:39PM | 12 | TOGETHER AS A FULL PAGE. THAT'S WHAT YOU SAID IN YOUR PAPER. |
| 12:40PM | 13 | MR. YUNAEV: YES. IT'S DIFFERENT IN THE DATABASE |
| 12:40PM | 14 | BUT IT'S ALSO ALL TECHNICAL MEANS. THERE ARE WAYS TO DECOUPLE |
| 12:40PM | 15 | INFORMATION. WHEN IT'S DECOUPLED, THE SAME WAY YOU GIVE IT TO |
| 12:40PM | 16 | TWO DIFFERENT PERSONS WHO DON'T TALK TO EACH OTHER. YOU FOLLOW |
| 12:40PM | 17 | THE INJUNCTION. |
| 12:40PM | 18 | BUT THEN AFTER THE INJUNCTION EXPIRES, THEY COME TOGETHER |
| 12:40PM | 19 | AND THE INFORMATION IS THEIRS. |
| 12:40PM | 20 | SO BASICALLY FORMER CLASS MEMBERS GET NO MORE RELIEF AT |
| 12:40PM | 21 | ALL IN THIS CASE. |
| 12:40PM | 22 | THIS IS WHY I ASK THIS INFORMATION TO BE DECOUPLED AND |
| 12:40PM | 23 | THAT'S WHY I ADD THIS WORD. |
| 12:40PM | 24 | THE COURT: I'M SORRY. COULD YOU SAY THAT AGAIN? |
| 12:40PM | 25 | MR. YUNAEV: IRREVERSIBLY. SO THE DECOUPLING CANNOT |

| | | |
|---|---|---|
| 12:40PM | 1 | BE REVERSED. |
| 12:40PM | 2 | THE COURT:  THANK YOU. |
| 12:40PM | 3 | MR. YUNAEV:  SO WHAT BRINGS THEM TOGETHER SHOULD BE |
| 12:40PM | 4 | DESTROYED.  IN THIS CASE, FOR EXAMPLE, THE LINES SHOULD BE |
| 12:40PM | 5 | SHUFFLED.  OF COURSE YOU CANNOT DO IT ON A PAPER BUT |
| 12:40PM | 6 | TECHNICALLY IT'S VERY EASY TO DO IT. |
| 12:40PM | 7 | EVEN THE PLAINTIFF IN THEIR COMPLAINT ORIGINALLY STATES |
| 12:40PM | 8 | THAT NETFLIX HAS VIOLATED 270(E) ON PAGE 12 IN ITEMS 456, THAT |
| 12:41PM | 9 | THEY DIDN'T DESTROY THIS PRIOR INFORMATION. |
| 12:41PM | 10 | THE SECOND OBJECTION I HAVE IS RELATED TO CANCELLATION. |
| 12:41PM | 11 | IT SAYS, IT LEAVES UP TO NETFLIX HOW THE CONSTRUCTION SHOULD |
| 12:41PM | 12 | BE, AND I PROVIDED AN EXAMPLE OF HOW THEY CAN.  I'M NOT SAYING |
| 12:41PM | 13 | THEY WILL DO IT, BUT THEY DEFINITELY CAN DO IT THIS WAY TO |
| 12:41PM | 14 | CHANGE THE CANCELLATION IN A WAY THAT YOU CAN CANCEL AND |
| 12:41PM | 15 | CONSENT AT THE SAME TIME BY PRESSING THE BUTTON. |
| 12:41PM | 16 | AND IF YOU DON'T WANT TO CANCEL THIS WAY, YOU CAN SUBMIT |
| 12:41PM | 17 | US A WRITTEN LETTER, INCLUDE YOUR SOCIAL SECURITY NUMBER AND |
| 12:41PM | 18 | HAVE IT NOTARIZED TO MAKE SURE IT WAS YOU AND YOUR DECISION. |
| 12:41PM | 19 | COMPANIES HERE DO IT ALL OF THE TIME.  THEY DO ARM |
| 12:41PM | 20 | TWISTING WITH CUSTOMERS ALL OF THE TIME AND IF YOU DON'T STAND |
| 12:41PM | 21 | UP FOR THEMSELVES.  THAT'S WHY I'M HERE AND I TOOK A DAY OFF |
| 12:41PM | 22 | FROM WORK. |
| 12:41PM | 23 | ALSO I DON'T UNDERSTAND WHY THE INJUNCTION IS TIED TO A |
| 12:42PM | 24 | DVD TO MAIL SERVICE.  THE ONLY CONNECTION I SEE IS THAT AT |
| 12:42PM | 25 | TIMES THE SETTLEMENT WAS DISCUSSED, IT WASN'T CLEAR WHETHER THE |

|  |  |  |
|---|---|---|
| 12:42PM | 1 | VPPA APPLIES TO ONLINE VIDEO BUT NOW WE HAVE I THINK THE |
| 12:42PM | 2 | PRELIMINARY RULING FROM THE DISTRICT COURT WE SAY THAT THE VPPA |
| 12:42PM | 3 | APPLIES TO ONLINE VIDEO. |
| 12:42PM | 4 | SO I THINK THIS PART OF THE SETTLEMENT SHOULD BE |
| 12:42PM | 5 | RENEGOTIATED AND THE CLAUSE RELATED TO DVD MAIL SHOULD BE |
| 12:42PM | 6 | EXCLUDED FROM THE SETTLEMENT. |
| 12:42PM | 7 | I WOULD ALSO SAY THAT IT'S NOT -- IT'S TOO BAD THAT |
| 12:42PM | 8 | COUNSEL APPARENTLY DIDN'T INVITE ANY ENGINEERS TO DISCUSS THE |
| 12:42PM | 9 | THINGS BECAUSE THOSE THINGS ARE VERY OBVIOUS TO ANY ENGINEER. |
| 12:42PM | 10 | SO IF SOMEBODY IS INVOLVED IN PRIVACY, I WOULD SUGGEST THAT IT |
| 12:42PM | 11 | WOULD BE A GOOD IDEA TO DO SO. |
| 12:42PM | 12 | AND ANOTHER THING -- NOW COMING TO THE DISTRIBUTION. |
| 12:43PM | 13 | COUNSEL SEEMS TO EXTENSIVELY RELY ON THE FACEBOOK CASE, WHICH I |
| 12:43PM | 14 | SEE LITTLE CONNECTION HERE BECAUSE FACEBOOK DOES NOT HAVE |
| 12:43PM | 15 | SUBSCRIPTION ON THAT.  INDEED IN THE FACEBOOK CASE, GIVING |
| 12:43PM | 16 | MONEY TO PEOPLE IS MADE IN CHECKS AND NOT MAILING CHECKS FOR |
| 12:43PM | 17 | $0.25.  IT DOESN'T MAKE ANY SENSE. |
| 12:43PM | 18 | BUT IN NETFLIX SENSE, AS YOUR HONOR MENTIONED, IT WOULD BE |
| 12:43PM | 19 | GOOD TO CREDIT THE PEOPLE SOME WAY.  IT DOESN'T MAKE SENSE TO |
| 12:43PM | 20 | GIVE THEM A FREE MOVIE BUT NETFLIX CAN GIVE THEM ONE EXTRA DAY, |
| 12:43PM | 21 | TWO EXTRA DAYS, PROBABLY NOT ONE MONTH.  ONE MONTH WOULD |
| 12:43PM | 22 | PROBABLY BE TOO MUCH, BUT IT'S VERY EASY TO DO TO CREDIT THEM |
| 12:43PM | 23 | ON AN EXTRA DAY, AS SOFTWARE ENGINEERS EXPERIENCE IN THE |
| 12:43PM | 24 | DATABASE, I CAN TELL YOU IT'S VERY EASY AND IT SHOULDN'T TAKE |
| 12:43PM | 25 | MORE THAN FOUR HOURS. |

12:43PM  1      IF SOMEBODY SAYS IT TAKES MORE THAN FOUR HOURS, I WOULD

12:43PM  2  LIKE TO ASK SOME QUESTIONS EXPLAINING WHY AND HOPEFULLY IT

12:43PM  3  WOULD BE AN ENGINEER.

12:43PM  4      SO THE OBJECTION WAS THAT THE CURRENT SOLUTION ONLY

12:44PM  5  BENEFITS CURRENT MEMBERS AND DOES NOT BENEFIT FORMER

12:44PM  6  SUBSCRIBERS AND IT COULD BE ADDRESSED SEVERAL WAYS.  ONE OF THE

12:44PM  7  WAYS TO ADDRESS IT IS TO, FOR EXAMPLE, GIVE FORMER MEMBERS AND

12:44PM  8  HAND IN CREDIT, MEANING WHEN YOU REACTIVATE, YOU'LL GET ONE

12:44PM  9  FREE DAY.  IF YOU DON'T ACTIVATE, YOU DON'T GET ONE FREE DAY.

12:44PM  10      IF THEY DON'T ACTIVATE, IT MEANS NOTHING TO THEM, BUT THEN

12:44PM  11  NOT RECEIVING ANYTHING IN DISTRIBUTION EITHER.  SO I DON'T SEE

12:44PM  12  IT AS SUCH A HUGE DIFFERENCE.

12:44PM  13      AND THE LAST OBJECTION WAS THAT THE BILL CREDIT WOULD

12:44PM  14  REQUIRE NETFLIX SUBSCRIBERS TO CONTINUE TO DO BUSINESS WITH

12:44PM  15  NETFLIX.  I DON'T THINK THEY WOULD RECEIVE ANYTHING UNTIL THE

12:44PM  16  CLASS ACTION IS DECIDED FINALLY AND THERE ARE NO APPEAL.

12:44PM  17      BUT IT WOULD BE THE SAME WITH THE CY PRES CASE.  NOBODY IS

12:45PM  18  GOING TO RECEIVE ANY BENEFITS IN TERMS OF PUBLIC GOOD BECAUSE

12:45PM  19  CY PRES WON'T RECEIVE ANY MONEY UNTIL THE APPEAL IS DECIDED.

12:45PM  20      AND THIS IS THE MAIN PROBLEM I HAVE FOR -- I'M NOT

12:45PM  21  OBJECTING ABOUT THE AMOUNT OF CLASS COUNSEL FEE, BUT I

12:45PM  22  DEFINITELY DON'T FEEL LIKE I GET ANY DESCENT REPRESENTATION

12:45PM  23  BECAUSE THOSE THINGS THAT I'M TALKING HERE ABOUT ARE PRETTY

12:45PM  24  BASIC.

12:45PM  25      I MEAN, EVERYBODY COULD UNDERSTAND THAT IT DOESN'T TAKE

| | | |
|---|---|---|
| 12:45PM | 1 | LAW SCHOOL TO GET TO THOSE THINGS AND THE FACT THAT CLASS |
| 12:45PM | 2 | COUNSEL DIDN'T EVEN ADDRESS THOSE THINGS IN EITHER OF THEIR |
| 12:45PM | 3 | MOTIONS TO ME IT'S -- IT DOESN'T SOUND LIKE CLASS COUNSEL DID |
| 12:45PM | 4 | THEIR JOB WELL.  SO I CAN'T JUSTIFY HOW THE FEES SHOULD BE |
| 12:45PM | 5 | REDUCED OR ADJUSTED IN SOME WAY BECAUSE IT WOULD REQUIRE |
| 12:45PM | 6 | DIGGING IN SOME PRECEDENT AND I DON'T KNOW HOW TO DO IT, BUT I |
| 12:45PM | 7 | WOULD LIKE TO SHARE MY OPINION. |
| 12:45PM | 8 | THE COURT:  THANK YOU. |
| 12:45PM | 9 | MR. YUNAEV:  THANK YOU. |
| 12:45PM | 10 | THE COURT:  DID YOU PHONE OR CONTACT OR OTHERWISE |
| 12:45PM | 11 | CONTACT CLASS COUNSEL TO SHARE YOUR VIEWS WITH THEM? |
| 12:45PM | 12 | MR. YUNAEV:  NO, BUT I SUBMITTED THE OBJECTION AND I |
| 12:46PM | 13 | SIGNED A COPY TO CLASS COUNSEL. |
| 12:46PM | 14 | THE COURT:  YOU NEVER CALLED THEM TO DISCUSS YOUR |
| 12:46PM | 15 | CASE WITH THEM? |
| 12:46PM | 16 | MR. YUNAEV:  NO. |
| 12:46PM | 17 | THE COURT:  THANK YOU VERY MUCH.  THANK YOU FOR |
| 12:46PM | 18 | BEING HERE, SIR. |
| 12:46PM | 19 | I'M HAPPY TO HEAR RESPONSES. |
| 12:46PM | 20 | MR. EDELSON:  I'D LIKE TO BRING MY ASSOCIATE UP |
| 12:46PM | 21 | BECAUSE HE CAN HELP WITH SOME OF THE MORE TECHNICAL ISSUES, AND |
| 12:46PM | 22 | I'LL BE VERY BRIEF AND I APPRECIATE ALL OF THE TIME YOU'RE |
| 12:46PM | 23 | GIVING US. |
| 12:46PM | 24 | FIRST, I'D LIKE TO THANK THE CLASS MEMBER FOR COMING.  I |
| 12:46PM | 25 | APPRECIATE THAT HE TOOK OFF WORK AND DEFINITELY, EVEN THOUGH HE |

| | | |
|---|---|---|
| 12:46PM | 1 | IS NOT SUPPORTING THE SETTLEMENT, I JUST WANTED TO ACKNOWLEDGE |
| 12:46PM | 2 | THAT.  I ACTUALLY REMEMBER HIS BLOG POST.  I SAW THAT AND I |
| 12:46PM | 3 | WROTE AN E-MAIL AND I WAS GOING TO REACH OUT TO HIM AND IT |
| 12:46PM | 4 | LOOKED LIKE HE HAD A THOUGHTFUL RESPONSE AND I DIDN'T WANT TO |
| 12:46PM | 5 | COME ACROSS AS INTIMIDATING, BUT I WOULD HAVE ENJOYED SPEAKING |
| 12:46PM | 6 | TO HIM BEFORE. |
| 12:46PM | 7 | A COUPLE OF QUICK POINTS.  FIRST, IF I UNDERSTOOD |
| 12:47PM | 8 | CORRECTLY THE CLASS MEMBER -- I APOLOGIZE, I DID NOT GET HIS |
| 12:47PM | 9 | LAST NAME. |
| 12:47PM | 10 | MR. YUNAEV:  Y-U-N-A-E-V. |
| 12:47PM | 11 | THE COURT:  YUNAEV. |
| 12:47PM | 12 | MR. EDELSON:  OKAY.  MR. YUNAEV SUGGESTED THAT IF |
| 12:47PM | 13 | THEY, SAY, GO OUT OF THE DVD RENTAL BUSINESS THERE WOULD BE NO |
| 12:47PM | 14 | BENEFIT OF THE INJUNCTION.  THAT'S NOT HOW THE INJUNCTION IS |
| 12:47PM | 15 | WORDED.  IT'S VERY CLEAR THAT THE INJUNCTION WOULD STILL APPLY |
| 12:47PM | 16 | TO CLASS MEMBERS.  THEY WOULDN'T HAVE TO DECOUPLE INFORMATION |
| 12:47PM | 17 | FOR FUTURE CUSTOMERS, BUT THOSE ARE NOT PEOPLE IN THE CLASS AND |
| 12:47PM | 18 | THERE WOULD BE NO NEED.  SO I THINK HE'S JUST NOT READING THE |
| 12:47PM | 19 | INJUNCTION CAREFULLY ENOUGH. |
| 12:47PM | 20 | ALSO THIS IDEA OF HANGING CREDITS, MAYBE HE SHOULD |
| 12:47PM | 21 | ACTUALLY BE -- JOIN OUR PRACTICE BECAUSE IT'S A PRETTY CREATIVE |
| 12:47PM | 22 | IDEA. |
| 12:47PM | 23 | THE PROBLEM IS THAT I DON'T THINK THAT THAT WOULD BE |
| 12:47PM | 24 | TERRIBLY SATISFYING TO HIM BECAUSE THE AMOUNT PEOPLE WOULD GET, |
| 12:47PM | 25 | EVEN IF YOU COULD SET THAT UP AND THERE WOULD BE A COST TO |

12:48PM 1    THAT, WOULD BE ABOUT $0.15 AND THAT'S THE DAMAGE THAT OUR

12:48PM 2    EXPERT SAID THAT WE SUFFERED.

12:48PM 3        SO IF WE WERE TO TELL OUR FORMER CUSTOMER IF AT SOME POINT

12:48PM 4    YOU GO BACK TO NETFLIX, YOU'RE GOING TO HAVE $0.15 OFF, I DON'T

12:48PM 5    THINK THEY WOULD BE TERRIBLY EXCITED.  IN FACT, THEY MIGHT

12:48PM 6    THINK THAT WE ARE JUST MARKETING FOR NETFLIX AND THAT'S EVEN IF

12:48PM 7    YOU COULD.

12:48PM 8        I WANT MR. CHANDLER GIVENS TO DEAL WITH THE TECHNICAL PART

12:48PM 9    OF THE INJUNCTION.

12:48PM 10            MR. GIVENS:  GOOD MORNING, YOUR HONOR.  CHANDLER

12:48PM 11   GIVENS FOR THE PLAINTIFFS AND I GUESS IT'S AFTERNOON NOW, AND

12:48PM 12   SO GOOD AFTERNOON, YOUR HONOR.  I JUST WANT TO ADDRESS THE

12:48PM 13   TECHNICAL PARTS ON HIS ATTACKS ON THE INJUNCTIVE RELIEF WHICH

12:48PM 14   MR. YUNAEV ATTACKS.

12:48PM 15       ONE IS HIS EXAMPLES OF THE RIPPING OF THE PAPER, WHILE

12:48PM 16   AMUSING, I THINK HE JUST MISUNDERSTANDS THE INJUNCTIVE RELIEF.

12:48PM 17   THAT'S THE SIMPLISTIC VIEW OF A MORE COMPLICATED FACTS.

12:48PM 18       THE WAY THESE DATABASES WORK IN REALITY IS THAT THERE ARE

12:48PM 19   THESE RELATIONAL LINKS, RELATIONAL LINKS BETWEEN CERTAIN PIECES

12:49PM 20   OF INFORMATION.  AND WHAT THEY'RE DOING IS THAT THEY'RE

12:49PM 21   PERMANENTLY DESTROYING THAT LINK SO THAT THEY CANNOT BE

12:49PM 22   REASSOCIATED.  MR. YUNAEV SIMPLY MISUNDERSTANDS THE INJUNCTIVE

12:49PM 23   RELIEF.

12:49PM 24       TO THE SECOND POINT REGARDING HIS SOLUTION TO HOW CLASS

12:49PM 25   MEMBERS COULD CANCEL THEIR ACCOUNTS IN THE FUTURE.  I THINK

| | | |
|---|---|---|
| 12:49PM | 1 | THAT IS ALSO A CREATIVE SOLUTION, AND I'LL ECHO MR. EDELSON'S |
| 12:49PM | 2 | REMARKS WAS THAT THIS WAS A NEGOTIATED SETTLEMENT AND THAT |
| 12:49PM | 3 | THINGS COULD HAVE BEEN DIFFERENT BUT WE'RE HAPPY WITH THE |
| 12:49PM | 4 | RESULT. |
| 12:49PM | 5 | THE COURT:  THANK YOU.  MR. EGGLETON. |
| 12:49PM | 6 | MR. EGGLETON:  THANK YOU, YOUR HONOR.  I'M HAPPY TO |
| 12:49PM | 7 | ADDRESS ANY QUESTIONS THE COURT HAS.  I'LL JUST MAKE ONE BRIEF |
| 12:49PM | 8 | POINT, ONE OF THE PAGES THAT WAS HANDED OUT, WHICH IS I GUESS |
| 12:49PM | 9 | AN EXAMPLE OF HOW A COMPANY MIGHT STRUCTURE ITS SCREEN SHOT, IF |
| 12:49PM | 10 | YOU WILL, FOR THE PARTY MEMBERS, THIS IS NOT A NETFLIX |
| 12:49PM | 11 | DOCUMENT. |
| 12:49PM | 12 | THE COURT:  I SEE. |
| 12:49PM | 13 | MR. EGGLETON:  I BELIEVE HE CREATED IT, WHICH IS |
| 12:49PM | 14 | FINE. |
| 12:49PM | 15 | WE HAVE NOT, AGAIN, ONE OF THE REASONS WE HAVE HERE IS |
| 12:50PM | 16 | THAT THE COMPANY HAS NOT DECIDED YET EXACTLY HOW IT NEEDS TO DO |
| 12:50PM | 17 | THIS TECHNOLOGICALLY AND THE LIKE AND ONE ASPECT OF THAT, |
| 12:50PM | 18 | FRANKLY, IS WE HAVE THE RIGHT UNDER THE SETTLEMENT AGREEMENT TO |
| 12:50PM | 19 | GET CONSENT FROM CLASS MEMBERS TO ACTUALLY KEEP THE LINK |
| 12:50PM | 20 | BETWEEN THE INFORMATION. |
| 12:50PM | 21 | THIS IS THAT OBJECTOR'S VIEW OF HOW WE MIGHT DO THAT. |
| 12:50PM | 22 | IT'S NOT OUR DOCUMENT. |
| 12:50PM | 23 | I DON'T EVEN KNOW THAT NETFLIX WILL DO IT THAT WAY, BUT WE |
| 12:50PM | 24 | HAVE THE RIGHT TO DO IT THAT WAY.  WE HAVE A RIGHT TO IMPLEMENT |
| 12:50PM | 25 | IT ACROSS THE SYSTEM, WHICH IS NOT -- I GOT THE SENSE THERE |

| | | |
|---|---|---|
| 12:50PM | 1 | THAT IT WAS SUGGESTED THAT IT WAS AN EASY TASK AND IT'S NOT. |
| 12:50PM | 2 | WE INTEND TO WORK ON IT QUITE HARD AND IT WILL TAKE SOME TIME. |
| 12:50PM | 3 | WITH THAT I'LL ANSWER ANY QUESTIONS YOU HAVE. |
| 12:50PM | 4 | THE COURT:  THE HANGING CREDIT AND DID YOU WANT TO |
| 12:50PM | 5 | SPEAK TO THAT? |
| 12:50PM | 6 | MR. EGGLETON:  I TOOK IT THE IDEA THAT THERE WAS A |
| 12:50PM | 7 | CREDIT IF YOU COME BACK AND YOU GET SOMETHING FOR FREE? |
| 12:50PM | 8 | THE COURT:  RIGHT. |
| 12:50PM | 9 | MR. EGGLETON:  I'D BE HAPPY TO.  IT TAKES ME BACK IN |
| 12:50PM | 10 | TIME ABOUT TEN YEARS AGO NETFLIX HAD A CONSUMER CLASS ACTION |
| 12:51PM | 11 | THAT WE SETTLED.  THAT WAS PART OF THE RELIEF GIVEN THERE AND |
| 12:51PM | 12 | IT WAS A DIFFERENT TIME THAN THE DVD TIME AND NOT THE STREAMING |
| 12:51PM | 13 | TIME.  THAT CASE WAS VERY DIFFERENT.  IT WAS ABOUT DELIVERY |
| 12:51PM | 14 | TIMES FOR DVD'S AND GIVING ESSENTIALLY SOME VERSION OF FREE |
| 12:51PM | 15 | SERVICE, FREE DVD, ACTUALLY IT MADE SOME SENSE IN THAT CONTEXT |
| 12:51PM | 16 | BECAUSE THE CASE WAS ABOUT WHETHER PEOPLE WERE GETTING THEM |
| 12:51PM | 17 | FAST ENOUGH AND ON TIME. |
| 12:51PM | 18 | THE COURT:  AS REPRESENTED. |
| 12:51PM | 19 | MR. EGGLETON:  ALLEGED. |
| 12:51PM | 20 | THE COURT:  RIGHT. |
| 12:51PM | 21 | MR. EGGLETON:  WE STRONGLY DISAGREE.  BUT, AGAIN, |
| 12:51PM | 22 | AND IN A MORE GLOBAL WAY, IT'S WHAT I SAID LAST TIME I STOOD |
| 12:51PM | 23 | BEFORE YOU WHICH WAS A DIFFERENT WAY, EVERYBODY HAS A DIFFERENT |
| 12:51PM | 24 | IDEA.  AT THE END OF THE DAY THEY'RE NEGOTIATED SETTLEMENTS. |
| 12:51PM | 25 | THIS WAS DONE WITH A PERSON THAT I CONSIDERED TO BE ONE OF |

| | | |
|---|---|---|
| 12:51PM | 1 | THE BEST MEDIATORS IN AMERICA, AND IT WAS DONE IN A WAY THAT |
| 12:51PM | 2 | THESE THINGS SHOULD BE NEGOTIATED AND I BELIEVE PRESENTED TO |
| 12:51PM | 3 | YOU IN THE SAME WAY. |
| 12:51PM | 4 | AND WITH THAT, YOUR HONOR, ANY OTHER QUESTIONS YOU HAVE? |
| 12:51PM | 5 | THE COURT:  NO.  THANK YOU VERY MUCH.  ARE THERE ANY |
| 12:51PM | 6 | OTHER OBJECTORS WHO HAVE NOT BEEN HEARD WHO WISH TO BE HEARD? |
| 12:52PM | 7 | I HEAR OR SEE NO RESPONSE. |
| 12:52PM | 8 | ANY FURTHER COMMENTS FROM COUNSEL? |
| 12:52PM | 9 | MR. EGGLETON:  YOUR HONOR, JUST TWO -- TWO |
| 12:52PM | 10 | PROCEDURAL POINTS. |
| 12:52PM | 11 | THE COURT:  YOU HAD PROCEDURAL ISSUES. |
| 12:52PM | 12 | MR. EGGLETON:  I DID.  ONE IS WITH RESPECT TO THE |
| 12:52PM | 13 | ATTORNEY GENERAL OF TEXAS.  I'M HAPPY TO RETURN THIS TO THE |
| 12:52PM | 14 | COURT.  I'D LIKE TO ARRANGE TO GET A COPY OF IT.  I'M HAPPY TO |
| 12:52PM | 15 | TAKE A COPY AND SEND IT TO YOU OR GET A COPY AT SOME POINT. |
| 12:52PM | 16 | THE COURT:  WE CAN PROVIDE COPIES FOR YOU THIS |
| 12:52PM | 17 | AFTERNOON. |
| 12:52PM | 18 | MR. EGGLETON:  THANK YOU TO YOU AND YOUR STAFF. |
| 12:52PM | 19 | SECOND, IT SEEMS LIKE A LONG TIME AGO, I REQUESTED LEAVE |
| 12:52PM | 20 | TO SUPPLEMENT THE RECORD WITH RESPECT TO THE CY PRES |
| 12:52PM | 21 | RECIPIENTS. |
| 12:52PM | 22 | THE COURT:  YES. |
| 12:52PM | 23 | MR. EGGLETON:  MAY I HAVE UNTIL FRIDAY TO DO THAT? |
| 12:52PM | 24 | THE COURT:  FRIDAY, THIS FRIDAY? |
| 12:52PM | 25 | MR. EGGLETON:  YES. |

```
12:52PM  1          THE COURT:  YOU CAN DO IT THAT QUICKLY?

12:52PM  2          MR. EGGLETON:  MAYBE SOME OF MY TEAM WOULD PREFER

12:52PM  3    MONDAY.

12:52PM  4          THE COURT:  WHY DON'T WE HAVE -- WE'LL GIVE YOU

12:52PM  5    MONDAY.

12:52PM  6          MR. EGGLETON:  THANK YOU VERY MUCH.  I APPRECIATE

12:52PM  7    THAT.

12:52PM  8          THE COURT:  PERMISSION IS GRANTED.

12:52PM  9        ANYTHING FURTHER FROM ANY COUNSEL?

12:52PM  10         MR. EDELSON:  YOUR HONOR, I JUST WANTED TO THANK YOU

12:52PM  11   FOR YOUR TIME AND ATTENTION.  THAT'S ALL I HAVE TO SAY.

12:53PM  12         MR. EDELSON:  THANK YOU VERY MUCH.

12:53PM  13         THE COURT:  THANK YOU.  THANK YOU, COUNSEL.  I WANT

12:53PM  14   TO THANK ALL COUNSEL WHO MADE THE PRESENTATIONS HERE.  THANK

12:53PM  15   YOU, MR. YUNAEV.

12:53PM  16      THIS HAS BEEN A VERY INFORMATIVE MORNING FOR ME AND I HOPE

12:53PM  17   THAT YOU WOULD AGREE WITH ME, BUT THIS IS THE TYPE OF

12:53PM  18   EVALUATION THAT IS NECESSARY TO DETERMINE WHETHER OR NOT THIS

12:53PM  19   AGREEMENT THAT YOU HAVE REACHED IS FAIR AND REASONABLE AND

12:53PM  20   ADEQUATE FOR THE CLASS.

12:53PM  21      I HEARD THE WORD "TRANSPARENCY" USED BY PERHAPS BOTH

12:53PM  22   COUNSEL AND I THINK THAT'S TERRIFICALLY IMPORTANT FOR THIS.

12:53PM  23   YOU'VE BEEN VERY HELPFUL TO ME AND SO THANK YOU FOR THAT AND

12:53PM  24   THANK YOU FOR ANSWERING MY QUESTIONS AND IN YOUR PRESENTATIONS

12:53PM  25   AND I'M CERTAINLY GOING TO CONSIDER ALL OF THEM.
```

12:53PM  1            SO THANK YOU VERY MUCH.   THE MATTER IS UNDER SUBMISSION.

12:53PM  2         YOU'LL GET AN ORDER FROM ME SHORTLY.

        3              (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

        4

        5

        6

        7

        8

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

1

2

3                              CERTIFICATE OF REPORTER

4

5

6

7           I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8      STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9      280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10     CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12     A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13     ABOVE-ENTITLED MATTER.

14

15

16          IRENE RODRIGUEZ, CSR, CRR
            CERTIFICATE NUMBER 8076
17

18
            DATED:  JANUARY 8, 2013
19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| *IN RE: NETFLIX PRIVACY LITIGATION* | Case No. 5:11-cv-00379-EJD |
| | **AFFIDAVIT OF TIFFANEY A. JANOWICZ** |
| | [Hon. Edward J. Davila] |

### AFFIDAVIT OF TIFFANEY A. JANOWICZ

1.    I, Tiffaney A. Janowicz, state as follows.

#### Affiant

2.    The foregoing facts are of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

3.    I am a Senior Vice President of Rust Consulting, Inc. ("Rust").  In that capacity, I am well-accustomed with Rust's qualifications and abilities to provide services in the administration of class action settlements.

4.    Rust has been in business for over 35 years, and is one of the industry leaders in providing class action notification and settlement administration services.  Through its class action services, Rust provides expertise in a broad range of areas, including antitrust, consumer finance, insurance and healthcare, property, labor and employment, securities, Securities and Exchange Commission, and telecom.  Rust has served as administrator in over 3,000 class action settlements, including experience in more than 1,400 consumer class action settlements. Rust has an in-house staff of more than 550 professionals with backgrounds in areas including law, operations, project management, Information Technology, and finance.

5.    Class Counsel has requested that Rust provide a pricing estimate for a distribution program that would provide payments to a class of approximately sixty million

**SER 122**

1  class members.  As Settlement Administrator in this matter, I understand that such program

2  would involve (a) receiving and processing data records; (b) updating and formatting the last

3  known addresses through such systems as CASS and NCOA, which is operated by the United

4  States Postal Service and provides information on the validity of addresses, as well as recent

5  address updates; (c) establishing and maintaining a distribution account; (d) printing and

6  mailing checks in the form of postcards to roughly sixty million class members; (e) establishing

7  and maintaining a post office box for receipt of undeliverable checks and class member

8  correspondence; (f) establishing and maintaining a website and a toll-free telephone line with

9  interactive voice messaging to provide answers to frequently asked questions; (g) reissuing

10  payments upon class member request, and (h) processing undeliverable payments.

11        6.     Based on experience and the information provided by Class Counsel, and as

12  provided in the attached estimate (attached hereto as Exhibit A), we estimate this distribution

13  program would likely cost between $23 million and $28 million.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF TIFFANEY A. JANOWICZ           2           CASE NO. 5:11-CV-00379-EJD

1      I certify under penalty of perjury and under the laws of the United States, that
the preceding is true and correct to the best of my knowledge.  Executed this 28th day
2  of November 2012 at Minneapolis, Minnesota.

3



4                      Tiffaney A. Janowicz

5  Sworn and subscribed to before
me this 28th day of November, 2012.

6

7

8

**Notary Public**

9

10

11  DAWN M ZIMMER
NOTARY PUBLIC
12  MINNESOTA
My Commission Expires Jan. 31, 2016

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF TIFFANEY A. JANOWICZ        3        CASE NO. 5:11-CV-00379-EJD

SER 124

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| *IN RE: NETFLIX PRIVACY LITIGATION* | Case No. 5:11-cv-00379-EJD |
| | **ADDENDUM TO AFFIDAVIT OF TORE HODNE** |
| | [Hon. Edward J. Davila] |

## ADDENDUM TO AFFIDAVIT OF TORE HODNE

1.    I, Michael J Heuring, state as follows.

**Affiant**

2.    I am a Project Manager for Rust Consulting, Inc. ("Rust Consulting"), and I have been employed at Rust Consulting since April 25, 2002. Rust Consulting serves as the Court-appointed Settlement Administrator, as defined in the Preliminary Approval Order, for the above-captioned case. I am responsible for managing the services provided by Rust Consulting for this matter. My business address is 625 Marquette Avenue, Suite 880, Minneapolis, Minnesota 55402.

3.    I am over twenty-one years of age, and I am legally competent and authorized to make this affidavit on behalf of Rust Consulting. I make this affidavit of my own personal knowledge and, if called as a witness, could and would testify competently thereto.

4.    In the Hodne Affidavit, executed on October 30, 2012, it was stated that Rust received 2,157 exclusion requests as of that date. However, as the deadline had not passed as of the filing date, additional exclusion requests could reasonably be expected to be received.

5.    As of November 27, 2012, Rust Consulting has received 2,508 timely requests for exclusion.

---

ADDENDUM TO AFFIDAVIT OF TORE HODNE                         CASE NO. 5:11-CV-00379-EJD

**SER 125**

1     6.     Attached hereto as Exhibit A is the list of the names of persons requesting

2  exclusion in a timely manner.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ADDENDUM TO AFFIDAVIT OF TORE HODNE          2          CASE NO. 5:11-CV-00379-EJD

SER 126

1    I certify under penalty of perjury and under the laws of the United States, that
the preceding is true and correct to the best of my knowledge.  Executed this 27th day
2    of November 2012 at Minneapolis, Minnesota.

3                                                    _____
4                                                         Michael J Heuring

5    Sworn and subscribed to before
me this 27th day of November, 2012.

6

7

8    _____

9    A.      **Notary Public**

10

11              DAWN M ZIMMER
                NOTARY PUBLIC
12                MINNESOTA
              My Commission Expires Jan. 31, 2016

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ADDENDUM TO AFFIDAVIT OF TORE HODNE            3            CASE NO. 5:11-CV-00379-EJD

**SER 127**

Exhibit A - List of Persons Requesting Exclusion

|  | Name of Person Requesting Exclusion |
|---|---|
| 1 | ANNE REINHART |
| 2 | MELISSA SIMS |
| 3 | DONNA DAVILLA |
| 4 | T BIRDNOW |
| 5 | CARI CLARK |
| 6 | NELSON R VRANA |
| 7 | SUSAN G PATTON |
| 8 | JESSICA SWIATEK |
| 9 | JO BYRNES |
| 10 | TIFFANY MACKENZIE |
| 11 | SAMUEL H STEINER |
| 12 | LESLIE MCKAY |
| 13 | WALKER DAVIDSON |
| 14 | VLADIMIR POLETAEV |
| 15 | ELEANOR CHIN |
| 16 | JEFFREY J BRADT |
| 17 | MARIE E HOYT |
| 18 | CORI REINES |
| 19 | KENNETH A WEISEL |
| 20 | CHRISTOPHER REED |
| 21 | DAVID LOBERG |
| 22 | ROYCE YANG CABAUATAN |
| 23 | SAMANTHA PIZZATO |
| 24 | ROBIN JOY MOSS |
| 25 | ALLEN FREEMAN SR |
| 26 | KATHERINE KRUEGER |
| 27 | RIC SILVER |
| 28 | JENNIFER VESPA |
| 29 | CATHIE DEVENNEY |
| 30 | MORGAN BERTAGNA |
| 31 | WILLIAM & CLAIRE MEAD |
| 32 | SHELLY MALMQUIST |
| 33 | DONALD C LUCHSINGER |
| 34 | PAULETTE M KORKEGI |
| 35 | MARIA TERESA REYES MORENO |
| 36 | GREG J CAIN |
| 37 | HENRIETTA WILEY |
| 38 | CECILLE GUMABON |
| 39 | BRIAN L. TAYLOR |
| 40 | MICHAEL THOMAS WISNIEWSKI |
| 41 | MARILYN KOWAL |
| 42 | TOM BUCHANAN |
| 43 | LAURA RYAN |
| 44 | JANE MARVIGLIO |
| 45 | NEIL N. ROBINSON |
| 46 | PATRICIA BUCKLEY |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 47 | JOHN L MCCOY |
| 48 | AMANDA L BOYER |
| 49 | HEATHER VAN HISE |
| 50 | VICKI BRUNO |
| 51 | DANIEL EDWARDS |
| 52 | KONRAD MOWNER |
| 53 | HOWARD SHUBS |
| 54 | SONYA LOYD |
| 55 | BRUCE ARDEN |
| 56 | RANDY BYRD |
| 57 | ROB PIERCE |
| 58 | SHERRI JOHNSON |
| 59 | LINDA MIELKE |
| 60 | CHRISTEN MIZAK |
| 61 | JAMES CALLIHAN |
| 62 | JACQUELINE E WAGGONER |
| 63 | SANDRA PORTER |
| 64 | JOAN LOOMAN |
| 65 | CONNIE GATES |
| 66 | BRADLEY GOTTFRIED |
| 67 | KRISTEN CAYEY |
| 68 | TOM BERNHARDT |
| 69 | CHRISTOPHER NEILL |
| 70 | BRANDI ADAMS |
| 71 | ROBERT GUTTER |
| 72 | CAROLANN CURRY |
| 73 | BETSY MCNEILL |
| 74 | CONSTANCE KILGORE |
| 75 | KEVIN BENSON |
| 76 | PATRICIA PEI |
| 77 | JOHN GIBSON |
| 78 | JACK D MATHEWS |
| 79 | ALEJANDRO HAEZAERT |
| 80 | SHAWN W SPATH |
| 81 | KARIN LUNSFORD |
| 82 | JACOB THOMPSON |
| 83 | JASON M CIESLAK |
| 84 | ANNE POPLIN |
| 85 | JAVIER S LOPEZ |
| 86 | TARYN WEITZMAN |
| 87 | MARC BLAU |
| 88 | TREVOR BELTON |
| 89 | JULIO TEJADA |
| 90 | CAROLINE DEBOW |
| 91 | NATALIE GREEN |
| 92 | ALLISAN WOODS |
| 93 | JOSEPH A MERCANTINI III |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 94 | KEWSCHA AKPABIO |
| 95 | ZACHARY P JOHNSON |
| 96 | MATTHEW GROGAN FRIED |
| 97 | DEVIN G SOPER |
| 98 | DANIEL SCHWERIN |
| 99 | DERRICK LEE |
| 100 | JENNA DIVITA |
| 101 | RONALD L CHAPMAN |
| 102 | SAMUELLA CARPENTER |
| 103 | JENNIFER EHLERT |
| 104 | STELLA T CLARK |
| 105 | ROBERT S VAN OSS |
| 106 | DANIEL S BOSSCHER |
| 107 | KATHLEEN M GALOTTI |
| 108 | ANDREW PAULSEN |
| 109 | CORNELIA HOPPE |
| 110 | KHALID JOUHA |
| 111 | MARY BETH ANGIN |
| 112 | JEFFREY A EDWARDS |
| 113 | JOANNA HEINRICH |
| 114 | ZOE D BURGESS |
| 115 | GINGER DANIEL |
| 116 | TIFFANY ROTH |
| 117 | JUSTIN CUMMINGS |
| 118 | MARLENE BELZ |
| 119 | JACQUELINE GEDEON |
| 120 | CRAIG SHAPIRO |
| 121 | ROBERT PALMER |
| 122 | CLIFFORD HOOVER |
| 123 | PATRICE LANQUETIN |
| 124 | ZACK HILDMANN |
| 125 | LARRY NORMAN |
| 126 | MEAGHAN MCCOLLOW |
| 127 | HEATH SHYMAN |
| 128 | MARTIN C MCWILLIAMS III |
| 129 | RENEE SCOTT |
| 130 | GARY A KUEPPERS SR |
| 131 | GREG & KELLY MARTELL |
| 132 | PATRICK E LORENZ |
| 133 | C ROLLING |
| 134 | ANNA MARIE VERHAGEN |
| 135 | ARISTIDIS PAYNE-TSOUPROS |
| 136 | GAYE L GEINZER |
| 137 | MORGAN KEILWITZ |
| 138 | KEITH L CHAMBERS |
| 139 | AUDREY FRAZIER |
| 140 | BRUCE W GARNER |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 141 | MENA MAKKAR |
| 142 | LORRAINE SPIT |
| 143 | CYNTHIA L KRAMER |
| 144 | MATTHEW NEWTON |
| 145 | ANTHONY CURTIS BEAVER |
| 146 | CHRISTOPHER J WEST |
| 147 | PHYLLIS MANUEL |
| 148 | TATIANA HANAZAKI |
| 149 | ROBERT E FRIEDMAN |
| 150 | ERIC SYU |
| 151 | LORRAINE MILLER |
| 152 | CASSANDRA SPAULDING |
| 153 | SHARON FREIMAN |
| 154 | RICK NEMCIK CRUZ |
| 155 | BENJAMIN SCHAK |
| 156 | HEATHER WOGSLAND |
| 157 | JOHN C ERVIN |
| 158 | CINDY SIMETI |
| 159 | RUTH ALDRIDGE |
| 160 | SUZANNAH BRASHER |
| 161 | GERALD BUECHLER |
| 162 | RICHARD CHICHESTER |
| 163 | NATHAN ELLSWORTH |
| 164 | CHARLES MATTSON |
| 165 | JENNIFER BALENTINE |
| 166 | CYNDEE SHARPE |
| 167 | VIRGINIA FLORES |
| 168 | ELIZABETH FRECH |
| 169 | DAVID C CRAWFORD |
| 170 | CATHERINE J CARSON |
| 171 | RUBEN J DUARTE |
| 172 | ASHLEY J THOMPSON |
| 173 | RYAN SIMPSON |
| 174 | DAVID PURDY |
| 175 | MICHAEL MAGDA |
| 176 | MICHAEL K ROSS |
| 177 | LARRY & CAROL GRUPP |
| 178 | RACHEL BOVEE |
| 179 | LARRY & MARY BURGE |
| 180 | WILLIAM E JAMES |
| 181 | KATHLEEN J KINNEY |
| 182 | ANDREW KAY |
| 183 | MONIQUE VON SCHEVEN |
| 184 | THOMAS WAYNE MAULDIN |
| 185 | MIKE WILLIAMS |
| 186 | BERTHA HEAD |
| 187 | RAMIRO DIEGUEZ |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 188 | ERIC METZ |
| 189 | NERISSHA D HUNT |
| 190 | VICTOR PUENTE III |
| 191 | LEDI J TAKUSHI |
| 192 | WILLIAM CHASE |
| 193 | ALYSSA KORECKY |
| 194 | MICHELLE SNELL |
| 195 | JAMES CLAYBURN |
| 196 | GREGORY T SMITH |
| 197 | CRAIG P. SCHAFER |
| 198 | PAUL ZAGOREOS |
| 199 | REANNA D GRAVES |
| 200 | JONATHAN WILD |
| 201 | ELLA SMITH |
| 202 | MAYRILLANE JACKIE BAHI |
| 203 | ANTHONY LEWIS |
| 204 | TED & PEG GOZDZIALSKI |
| 205 | CHARLES OLK |
| 206 | ELIZABETH G MILLIGAN |
| 207 | MOHIB RAID |
| 208 | DONALD B GIBSON |
| 209 | REGINA LEITZ |
| 210 | ELIZABETH FAGOT |
| 211 | GREGORY SMITH |
| 212 | ANDREW WHITE |
| 213 | LILI C MITCHELL |
| 214 | PHYLLIS DENDY |
| 215 | ASHLEIGH WESTFALL |
| 216 | ALEXANDER JAMES RUTHERFORD |
| 217 | VICTOR PENDERGRASS |
| 218 | KEITH R SARVER |
| 219 | TOM & BETH ZAWISZA |
| 220 | STEPHEN R CRISTIAN |
| 221 | ROBIN H THAYER |
| 222 | EUGENE GERALDO |
| 223 | WANDA G WILSON |
| 224 | JAMIE MONTERO |
| 225 | JOSE ENRIQUE CHAVIANO |
| 226 | SALVADOR ROMO |
| 227 | DENNIS M LYLE |
| 228 | TERRY S FILES |
| 229 | RYAN PATRICK SULLIVAN |
| 230 | GEORGE E SCHIRO |
| 231 | KATIE COOK |
| 232 | JANMARIE CASTAGNA |
| 233 | ROBERT P LYNCH |
| 234 | DEIDRA SLOUGH |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 235 | WILLIAM BAILEY |
| 236 | JEFF REED |
| 237 | MICHAEL R RICHARD |
| 238 | ZANE WUBBENA |
| 239 | MARCI SEFATY |
| 240 | ANDREW BRISKIN |
| 241 | ROXANN ROCHE |
| 242 | EVERETT SUSSMAN |
| 243 | AUBREY WASHINGTON |
| 244 | MARTHA H HARRIS |
| 245 | CHRISTINA JOHNSON |
| 246 | MARISA CHOCK |
| 247 | VICTORIA BELLE-MILLER |
| 248 | ROBERT BREARLEY JR |
| 249 | SHUAN O AND BETSY C BAYS |
| 250 | ARIELLE GIBSON |
| 251 | KATHY SLOBOGIN |
| 252 | WESTLEY DENT |
| 253 | MARK V CHRISTENSEN |
| 254 | LINDA TYER |
| 255 | KARLA FORE |
| 256 | BERNARD LONG |
| 257 | LORAINE A GILLIS |
| 258 | NELSON HEALY |
| 259 | CATHY STEVULAK |
| 260 | NOELLE MADALYNN HELLER |
| 261 | TERRELL L ADAMSON |
| 262 | CHRIS R BELL |
| 263 | WILLIE BENN |
| 264 | CAROL D CLIFFORD |
| 265 | JACKIE PRICE |
| 266 | ANTHONY DUSTIN ROLLINS |
| 267 | REBECCA TEMPLETON |
| 268 | JOSEPH PIETROLUONGO |
| 269 | ROBERT T WILLIAMS |
| 270 | ALIA REESE |
| 271 | JAMES F GRIFFITHS |
| 272 | LYS DEVON BAKER |
| 273 | ALANE ANNE F MASSEY |
| 274 | TYLER CLOYDE |
| 275 | MARLAINA L KOSS |
| 276 | JOSHUA C HILL |
| 277 | ROGER A PHILLIPS |
| 278 | BRENNA GUARNEROS |
| 279 | VALERI BURGESS |
| 280 | TODD D. BENTLEY |
| 281 | ALYSSA STARKEY |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 282 | REYNALDO CABRAL |
| 283 | CHRISTIE MCCORMICK |
| 284 | JOSEPH IANO |
| 285 | AMY BETH COOPER |
| 286 | STEVE SAGE |
| 287 | CRYSTAL COTTER |
| 288 | GABRIELE EWERTS |
| 289 | AURTHUR PRAWITT |
| 290 | DAVID K RIDDLE |
| 291 | AMY COWIN |
| 292 | ELLANY KINCROSS |
| 293 | DIANNA BUTCHER |
| 294 | WADE B HITCHCOCK |
| 295 | TRUDY W SULEIMAN |
| 296 | SEAN M FOY |
| 297 | LISA LESTRANGE |
| 298 | JENNIFER TANCREDI |
| 299 | JEANE DOHOGNE |
| 300 | JOHN LANYI |
| 301 | RONALD C UARICH |
| 302 | ERIC JOHNSON |
| 303 | ELAINE TSOGTBAYAR |
| 304 | LESLIE PETTY |
| 305 | LORI WELLMAN |
| 306 | WILCIL JOSEPH |
| 307 | CURTIS R HUGHES |
| 308 | ANDREW WARD |
| 309 | WALKIRIA JORGE |
| 310 | CASSANDRA JO CHRISTIENSEN |
| 311 | DEREK SAMUELSON |
| 312 | EVETTE EICKELMANN |
| 313 | CRYSTAL GRIFFIN |
| 314 | AMANDA SEAY |
| 315 | SEAN AND MARY HUNTSMAN |
| 316 | DOUG SANDOK |
| 317 | CHRISTINE J PLATERO |
| 318 | KIM R SHEFFER |
| 319 | THERESA MARCEL SCHWARTZ |
| 320 | EDWARD WHITE |
| 321 | JAMES LIPSCOMB |
| 322 | JOHN K. KANE |
| 323 | MICHAEL KRIEGE |
| 324 | TAYLOR KROGER |
| 325 | NATHANIEL NORTON |
| 326 | GWENDDOLYN CORONWAY |
| 327 | CHRISTOPER PAGLICCIA |
| 328 | HOLLY DUKE |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 329 | PATTY FITZGERALD |
| 330 | LISE FOY |
| 331 | SHIRLEY M JACKSON |
| 332 | JESSICA WARRICK |
| 333 | CAROL SUH |
| 334 | LAWANNA G HAFFNER |
| 335 | AMANDA L. WARD |
| 336 | DANTE GALEZZI |
| 337 | JOHN MIKHAIL |
| 338 | ALICIA JANAI BURKLEY LEWIS |
| 339 | PATRICK J WIGLE |
| 340 | NICHOLAS ROCCO |
| 341 | CATHERINE WILLEY |
| 342 | JAY & JESSICA HUDSON |
| 343 | KATHRYN ZATOR |
| 344 | BLAKE ESCUDIER |
| 345 | S LEE WOODWARD |
| 346 | MARK REGAL |
| 347 | SUSAN AMBROSE |
| 348 | FRANCES L SIMON |
| 349 | E P HACKENBERG |
| 350 | MAGGI CALDER |
| 351 | RYAN KELBEY |
| 352 | OLGA GONZALEZ |
| 353 | KATHLEEN MORING |
| 354 | PETER SCHOR |
| 355 | MILTON B ROUSE |
| 356 | DAVID HOKERSON |
| 357 | ANDREW & CARA PRICE |
| 358 | ANA MARIA SOWERS |
| 359 | KAREN P SCHULTZ |
| 360 | ROBERT BREZZI |
| 361 | SPENCER WERNER |
| 362 | RON RAMSAY |
| 363 | DAVID A. KOCIAN |
| 364 | JOANNE B GLOTZBACH |
| 365 | WINDMERA QUINTANAR |
| 366 | ELLEN RANDALL |
| 367 | CLINTON POPOVICH |
| 368 | MARIO AND JULIANA DIPOLA |
| 369 | DAVID DELGADO |
| 370 | ANTHONY S BURKETT |
| 371 | S E JACOBSEN |
| 372 | CINDY PASKE |
| 373 | MELISSA SORRELLS |
| 374 | HAROLD W COVERT |
| 375 | JESUS ALFEREZ |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 376 | ELIZABETH CLARK |
| 377 | JASON MCMILLAN |
| 378 | IAN J WRIGHT |
| 379 | KATHLEEN AMEND |
| 380 | HANNAH BARITEAU |
| 381 | RIIKA FULLER |
| 382 | SCOTT F ROBOHN |
| 383 | LAURA FARRIS |
| 384 | MOLLY WILLIAMS |
| 385 | AMANDA SHOCKEY |
| 386 | PEGGY A KENNELL |
| 387 | BRIAN PAULSEN |
| 388 | DAVID MADISON |
| 389 | MARK DINELL |
| 390 | LANCE T TAKARA |
| 391 | CHRISTINE NAKASHIBA |
| 392 | LAURA FERGUSON |
| 393 | WALTER C BORNEMEIER |
| 394 | WILLIAM COLEKIN VANCE |
| 395 | SAYAKA SUZUKI |
| 396 | RHETT YANT |
| 397 | NANCY HENDERSON |
| 398 | DAVID K SCHUCK |
| 399 | JUDITH ANN WALTER |
| 400 | LAWRENCE DOMINIC ROSSITER |
| 401 | SIMON ABRAHAM SEMERE |
| 402 | BRENDA TIME |
| 403 | MELISSA BRULOTTE |
| 404 | GAIL WIESE |
| 405 | GREGORY S JEVYAK |
| 406 | BENNY MORENO GARCIA |
| 407 | VALERIE & KELSEY GIBSON |
| 408 | MICHAEL GOOCH |
| 409 | DOUG MCINTOSH |
| 410 | BRIAN SCOTT |
| 411 | CHRISTOPHER HAGGERTY |
| 412 | YARIANNE FUENTES |
| 413 | CARL JAMES |
| 414 | JEANNE CHUN TURANO |
| 415 | DERIK HILLIARD |
| 416 | JOSEPH SCHUNK |
| 417 | STEVE DIMOCK |
| 418 | JENNIFER COHEA |
| 419 | ANTHONY KO |
| 420 | STACEY MONROE |
| 421 | EMILY LANGE |
| 422 | MARILYN K WILLIAMS |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 423 | DAVID C BLY |
| 424 | GEORGE M CREWS |
| 425 | HUGO BONICHE |
| 426 | JEAN ELIZABETH BARAJAS |
| 427 | JENNIFER COSTALES |
| 428 | KATHY CAUDILL |
| 429 | AURA GARCIA |
| 430 | SOPHIA MASLAN |
| 431 | CHRISTINA PETRONI |
| 432 | CINDY JOSSELET |
| 433 | MARIA ZARZUELA |
| 434 | ALYSON MOY |
| 435 | DREW WOLFE |
| 436 | ANNE NACINOVICH |
| 437 | PAMELA D DLUGOPOLSKI |
| 438 | COLE NOLIN |
| 439 | FRANCES BABIC |
| 440 | KENNETH M KIEFFER JR |
| 441 | JEFFREY S SMOTIRLLA |
| 442 | SUZANNE YOUNG |
| 443 | HEATHER ELLIOTT |
| 444 | DAVID COOPERMAN |
| 445 | LLOYD E RHYMER |
| 446 | RUSSELL SHELTON |
| 447 | ALEXANDER VOLODARSKIY |
| 448 | VICTORIA R WARD |
| 449 | CAROL L. BRADY |
| 450 | CANDACE MITCHELL |
| 451 | DANIEL PFEFFER |
| 452 | KARLA T JURVETSON |
| 453 | WILLIAM HOWARTH |
| 454 | TIM MURPHY |
| 455 | CURT AND MEGAN FRIDAY |
| 456 | JOSEPH BALLARD |
| 457 | RICKY D FORREST |
| 458 | CHERYL DYER |
| 459 | JEFFREY BARTON DE JONG |
| 460 | PAMELA MCDONALD |
| 461 | KEITH REED |
| 462 | ALLIE COKER SCHWIMMER |
| 463 | SANDRA K GISH |
| 464 | GEORGE E. MANUEL |
| 465 | LEE TRUAX |
| 466 | RAY OCAMPO |
| 467 | LARRY D. JOHNSON |
| 468 | VERONICA JORMEUS GRUNER |
| 469 | STEPHEN ANDERSON |

Exhibit A - List of Persons Requesting Exclusion

| 470 | PAUL E GILLMEISTER |
|-----|--------------------|
| 471 | HAROLD S KEELER |
| 472 | LINDA A WADE |
| 473 | KERI B HILL |
| 474 | LINDA AND KELLY MATZEN |
| 475 | SEBASTIAN FONTAN |
| 476 | STEPHANIE M EVANS |
| 477 | LYNN & LESLIE PASAHOW |
| 478 | GERALD AND GONNA BASS |
| 479 | JOHANNES VAN VUREN |
| 480 | AILEEN MITCHELL BLACK |
| 481 | CHARLES OHMAN |
| 482 | BOBBY CARTER |
| 483 | KATHLEEN A RICE |
| 484 | ANKITA MISHRA |
| 485 | KATHLEEN ZAMORA |
| 486 | BREA THOMAS |
| 487 | ALEINA CHUN |
| 488 | HALEY M UNGER |
| 489 | ULADZISLAU SHARANHOVICH |
| 490 | HADRIAN PREDOCK |
| 491 | SAM THAI |
| 492 | MELANIE SIRIGNANO |
| 493 | HAROLD E PERRY |
| 494 | RONALD ROBERT HINK JR |
| 495 | JUANITA SALSMAN |
| 496 | EFRAIN MARTELL |
| 497 | LAURA DO |
| 498 | JUNE & BILL HOLMES |
| 499 | DEXTER T TOBY |
| 500 | ROBERT & JOAN FRANKLIN |
| 501 | ROBERT KEARBEY |
| 502 | ANGELA GERHARDT |
| 503 | HAYDEN LAMBSON |
| 504 | TAL SINGLETON |
| 505 | JACOB HELTON |
| 506 | PAUL RISNER |
| 507 | PAUL HUNTER |
| 508 | KOSTA DJORDJEVIC |
| 509 | LLEY PULLEN |
| 510 | JENNIFER GALLO |
| 511 | ANDREW R KEETHLER JR |
| 512 | DANIEL DUGAN |
| 513 | ALISON HOWELL |
| 514 | RICHARD JOEL HANSBERGER |
| 515 | WILLIAM WEST |
| 516 | DOUGLAS K SMOTHERS |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 517 | REGINA CAPUANO |
| 518 | JONATHAN & MOLLEAN YOUNG |
| 519 | JENNIFER D BULLOCK |
| 520 | MARY LARA |
| 521 | ADRIAN R PRATT SR |
| 522 | RANDY NORTON |
| 523 | SARAH NAGEL |
| 524 | ZARINAH DELEON |
| 525 | JERRY GOLDSTEIN |
| 526 | MICHAEL STEINE |
| 527 | JAMES PATRICK BILBREY |
| 528 | JONATHAN SHIH |
| 529 | LAURA WEBSTER |
| 530 | RONALD LITTLE |
| 531 | WILLIAM H REID |
| 532 | CHARLES K DIAL |
| 533 | MONICA CARR |
| 534 | JAMIE TYLER |
| 535 | LINDA BAKER |
| 536 | BRIAN DUSEL |
| 537 | MICHAEL D LEWIS |
| 538 | VIEN T MARQUEZ |
| 539 | JOANNA BETH TWEEDY |
| 540 | BOB AND ROSA EDWARDS |
| 541 | JOSIAH WAGLER |
| 542 | WOODSON WOOD JR |
| 543 | ZANG XIONG |
| 544 | TODD GAERKE |
| 545 | MARQUITTA KALUA |
| 546 | THOMAS L TRAPP |
| 547 | HELER STONE |
| 548 | ALAINA TURNER |
| 549 | MARINA BEARMAN |
| 550 | DARRYL WRIGHT |
| 551 | MELISSA BROWN |
| 552 | KATHERINE VASPER |
| 553 | LORI GODIN |
| 554 | BENJAMIN S KRAVITZ |
| 555 | KAYLA MARIE EVANS |
| 556 | SHARON LESTER |
| 557 | HEATHER PHAN |
| 558 | B JANE HAWTHORNE |
| 559 | PATRICK T COLLEY |
| 560 | SARAH OKIN |
| 561 | JAMES NEWMAN |
| 562 | TIMOTHY R LEZON |
| 563 | GEORGE ORAHA |

Exhibit A - List of Persons Requesting Exclusion

| 564 | JOSHUA DRAKE |
|-----|--------------|
| 565 | GREG EMERY |
| 566 | LARRY E ROBERTS |
| 567 | SCOTT RUNYAN |
| 568 | ROBERT PITTELKOW |
| 569 | DEEDA M COFFEY |
| 570 | JAMES SUMNER |
| 571 | ALICE THOMSEN |
| 572 | DAVID & DEBORAH HAMILTON |
| 573 | BRANDON TOMLINSON |
| 574 | JEREMIAH WADLEY |
| 575 | STEPHEN RICHTER |
| 576 | FAITH MCCLURE |
| 577 | MONICA WILLIAMS |
| 578 | CHRISTOPHER G CANSLER |
| 579 | ELVIRA ABDON |
| 580 | MIRANDA VARGAS |
| 581 | ZOAR MANN |
| 582 | REID A PHILLIPS |
| 583 | KERRY D TOUCHETTE |
| 584 | ALYSSA STEED |
| 585 | DAVID A ROY |
| 586 | ELIZABETH E MAROSHEK |
| 587 | DAVID J BINDEWALD JR |
| 588 | TINA GALETKA |
| 589 | JOSEPH KORPELA |
| 590 | LARRY JOHNSON |
| 591 | KELLY AND PATRICK MARTIN |
| 592 | JOEY BRADSHAW |
| 593 | TAMIKA WALKER |
| 594 | RUTH COCHRAN |
| 595 | TIFFANY WEESE |
| 596 | ALEXANDRA VILLENEUVE |
| 597 | KATHERINE FERGUSON |
| 598 | SCOTT R SCHELL |
| 599 | DANA PEACOCK |
| 600 | JAMES M ULATOWSKI |
| 601 | ROBERT WALIGORA |
| 602 | JONATHAN DOMAN |
| 603 | DONALD J NICHOLS |
| 604 | DONALD FURROW-SCOTT |
| 605 | MICHAEL J STELZNER |
| 606 | JOHN LOFGREN |
| 607 | BARRY KAUFMAN |
| 608 | JULIE BLAKEMAN |
| 609 | DEBORAH NIENKAMP |
| 610 | SUSAN OCHMLER |

Exhibit A - List of Persons Requesting Exclusion

| 611 | CRYSTAL SEARAN |
|-----|----------------|
| 612 | MARK DEUTSCH |
| 613 | GARY & MAY ANDERSON |
| 614 | MARK AND LAURA L STEWART |
| 615 | SETO CHOI |
| 616 | MARCIA BEHRENDT |
| 617 | BONNIE MILLER |
| 618 | ADELE M CROUCH |
| 619 | TODD STEFFENS |
| 620 | JACKIE GUNTHER |
| 621 | BENJAMIN HADDAD |
| 622 | SAMANTHA SWEIGARD |
| 623 | MADELINE AND GREG HAYWARD |
| 624 | SUZANNE MORRIS |
| 625 | KEVIN GORDON |
| 626 | THOMAS DEFELICE |
| 627 | TALIA DAJES |
| 628 | KEVIN MURPHY |
| 629 | CURTIS WILKERSON |
| 630 | INGRID TREISS |
| 631 | SHARON SMITH |
| 632 | JOSEPH W BENDZINSKI |
| 633 | CHRISTY MCBRIDE |
| 634 | THOMAS RILEY |
| 635 | ROBERT BOWERS |
| 636 | KARA DAY |
| 637 | CAROL GERBOTH |
| 638 | DAWN CEIZLER |
| 639 | ELLEN MONTEMURNO |
| 640 | KRISTIN ROBERTS |
| 641 | DANIEL PALU |
| 642 | RAYE G HECKER |
| 643 | CHERIE EVANS |
| 644 | YANG LI |
| 645 | ROBERT A FESJIAN |
| 646 | MAURI ROSENTHAL |
| 647 | ROLAND BROWN |
| 648 | BRETT GARDNER |
| 649 | JAMES AND LINDA MIELE |
| 650 | KIMBERLY BROOKE BLACKSHEAR |
| 651 | RICHARD J SMITH |
| 652 | RICHARD GRETSCH |
| 653 | ALLEN M LEE |
| 654 | PAULA FILSETH |
| 655 | PHOENIX ANDERSON |
| 656 | EDWARD SCHULTZ |
| 657 | HELEN HELMICK |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 658 | CAROLYNN WILCOX |
| 659 | VICTORIA CHIARELLO |
| 660 | TODD W MELLO SR |
| 661 | DONALD G TUCKER |
| 662 | PHILLIP KISH |
| 663 | BRIAN H LEE |
| 664 | BONNIE OCONNOR |
| 665 | KAITLYN KELLER |
| 666 | MICHAEL SPAINHOWER |
| 667 | DEBRA WRIGHT |
| 668 | THOMAS G ADAMS |
| 669 | GEORGE SILVA |
| 670 | MARK MCDONALD |
| 671 | GREGORY G GUMBEL |
| 672 | KA WEI TAN |
| 673 | ALEX MENENDEZ |
| 674 | SANTIAGO FERNANDEZ-GOMEZ |
| 675 | JAMES TROY |
| 676 | SCHNITA MCGEE |
| 677 | DAVID BERGER |
| 678 | EUN SUN LEE |
| 679 | MICHAEL E BAUER |
| 680 | SCHUYLER SELLARS |
| 681 | ROBERT MCCHANE |
| 682 | ANDREW VARNER |
| 683 | DANYELLE GAY |
| 684 | MARC R VROMAN |
| 685 | TABATHA HALVORSON |
| 686 | TED GOLDSMITH |
| 687 | LISSETTE LARUE |
| 688 | KYLAN JOHNSON |
| 689 | ANAR ISAYEV |
| 690 | CYNTHIA K SABIN |
| 691 | ALEX FABER |
| 692 | ISHRAM KOSA |
| 693 | ROSE DE MASI |
| 694 | KENNETH D SANDERS |
| 695 | MALLORY LAMBERT |
| 696 | WESLEY & TERISSA HUNTER |
| 697 | JEFF MATHIS |
| 698 | THOMAS N QUINN |
| 699 | PATRICK NUTTALL |
| 700 | ANNE NUTTALL |
| 701 | DAVID A KLEIST |
| 702 | MARK WEBER |
| 703 | JANDREA ANNE MAYS |
| 704 | MARYLIN M LEONCIO |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 705 | CAROL L VINATIERI |
| 706 | LESLIE HARMAN |
| 707 | SHARMEL VALENTIN |
| 708 | MARK FORTUCK |
| 709 | MICHIKO HULL |
| 710 | SCARLETT YVONNE TAYLOR |
| 711 | KATHERINE BLORANT(PACE) |
| 712 | CHARLES & JANE WOLLASTON |
| 713 | THOMAS CZERWINSKI |
| 714 | SALLY BROWN |
| 715 | URIEL A NUNEZ |
| 716 | REBECCA BEEM |
| 717 | COLLIN HUMBLE |
| 718 | TONIA ADAMS |
| 719 | KIMBERLY A SABELLA |
| 720 | ROBERT CROUSE |
| 721 | BRANDON SCHAUST |
| 722 | CHRISTOPHER J BLOUGH |
| 723 | MILDRED J KELLEY |
| 724 | PHIL SEVENZ |
| 725 | KIRSTEN SNOBECK |
| 726 | ADRIAN ACUNA |
| 727 | ASHLEY KREDEL |
| 728 | S THOMAS CURRIN II |
| 729 | KEITH EICH |
| 730 | DAN LYNCH |
| 731 | BRENDA VICKERY |
| 732 | AARON & ABIE BACON |
| 733 | MARY FLORES T INAUDI |
| 734 | JESSICA VILLAPA |
| 735 | MICHAEL BUSE |
| 736 | JESSICA FARMER |
| 737 | ROBERT & TINA CUFF JR |
| 738 | LAUREN CASEY |
| 739 | CAROLE ROY |
| 740 | ANN C BERNARD |
| 741 | COBY MARCUM |
| 742 | PATRICK W GOLDSTEIN |
| 743 | GRACE CODURI |
| 744 | VINCENT CAPASSO |
| 745 | JUNE S HILARDIDES |
| 746 | LAURA NORRIS |
| 747 | ANGELA ZAPATA |
| 748 | IRIS SLOTKIN |
| 749 | VICKI CHAMBERLAIN |
| 750 | KEVIN PAUL BAESMAN |
| 751 | JAMES & PATRICIA MOSLOW |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 752 | ERIN SUTYLA |
| 753 | DOMINIQUE A SMITH |
| 754 | NATHAN VOSS |
| 755 | JAMES W FOSTER |
| 756 | STANLEY GALLIHER |
| 757 | KRISTINA L BINIEK |
| 758 | RACHAEL TANNEHILL |
| 759 | SHERRELL BROWN |
| 760 | DAVID COOK |
| 761 | JAMES OWEN RUFING SR |
| 762 | TIMOTHY INGHAM |
| 763 | SARAH PUTMAN |
| 764 | YULIA NIETO VAZQUEZ |
| 765 | JARED CALLIS |
| 766 | EMILY CHOW |
| 767 | JAMES MATTHEW THOMAS |
| 768 | POLLY BISAGA |
| 769 | JOSHUA ALAN MOWBRAY |
| 770 | MARY OLIVER |
| 771 | CHARLOTTE VALANTINE |
| 772 | MYLE MURPHY |
| 773 | DEBORAH DAVIDSON |
| 774 | TRANG VO |
| 775 | NATHAN CRANE |
| 776 | KARL GRAHAM |
| 777 | BRYAN C GREEN |
| 778 | CRYSTAL FOSTER |
| 779 | SHARI SMEDLEY |
| 780 | MICHAEL L CREEL |
| 781 | MICHAEL JARMAN |
| 782 | OSCAR & MARISA M BOTELLO |
| 783 | KATHY BARTLEY |
| 784 | PANKAJ LAKHINA |
| 785 | JOANNA G SYKES |
| 786 | RAMON ESCALANTE |
| 787 | GISELLE R HURLEY |
| 788 | WILLIAM POSNER |
| 789 | GARY HINCKLEY |
| 790 | MARILYS MAZZARA |
| 791 | CHRISTINE M GREEN |
| 792 | CHRIS PASSINEAU |
| 793 | S PAUL PROVENZA |
| 794 | TERRY MCDILL |
| 795 | CINDY WILD |
| 796 | LINNEA NIELSEN |
| 797 | JONATHAN PATRICK LALLEY |
| 798 | JOSHUA DONOGHUE |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 799 | JACOB VORWALD |
| 800 | LUKE G GRUHLKE |
| 801 | KELYE FOX |
| 802 | STEPHANIE D BRIONES |
| 803 | JONATHAN AND KRISTEN MITCHELL |
| 804 | ANDY BLATTENBAUER |
| 805 | DAVID GESCH |
| 806 | IAN LURIA |
| 807 | ROGER JEWELL |
| 808 | JUDY BERASI |
| 809 | SCOTT & SARA KAHN |
| 810 | JOSEPH A PHILLIPO |
| 811 | BRANDON S GOOBER |
| 812 | ALLISON LACH |
| 813 | YALANDA MCCOY |
| 814 | TINA MINH |
| 815 | MR AND MRS DAVID NIER |
| 816 | RICHARD ENGLE |
| 817 | LEONID JULWAY |
| 818 | LYNETTE D ALEXANDER |
| 819 | SARANG GUPTA |
| 820 | JAMES WHALEY |
| 821 | RONALD KONEN |
| 822 | CHELSY CALUMPIANO |
| 823 | GREGORY W BAILEY |
| 824 | CHRIS YOUNG |
| 825 | ANDRE HURD |
| 826 | SANDRA JIMINEZ |
| 827 | LISA R LAKES |
| 828 | JENNIFER PLOURDE |
| 829 | JOSH JACOBSON |
| 830 | LYNETTE MUELLER |
| 831 | YUN YOUNG HUR |
| 832 | ANNIE SAUER |
| 833 | ROBERT K ALLEN |
| 834 | PAULA MURPHY |
| 835 | ARIANA WILLIS |
| 836 | NANCY K APGAR |
| 837 | CHARLES TURNER |
| 838 | ROSANNE SEGAL |
| 839 | TERESA S HILL |
| 840 | JOSHUA J RITTER |
| 841 | CHRIS LEGGATE |
| 842 | REGINALD D MILTON |
| 843 | CATHERINE M DIECKMANN-DRAKE |
| 844 | CHRISTINE ESPINO |
| 845 | MATT WEESNER |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 846 | JOHN HOJNOSKI |
| 847 | DANIEL PATRICK ODWYER |
| 848 | PEGGIE RIECHARD |
| 849 | JESSE J CARTER |
| 850 | BONNE REXNAD |
| 851 | ANDREW JORGENSEN |
| 852 | FORREST ROLKO |
| 853 | ELIZABETH A CUTLER |
| 854 | NATHANIEL C ABELES |
| 855 | TEENA MIENK |
| 856 | SHERON EVANS |
| 857 | MARJIKE DEWEERS |
| 858 | BARBARA A BRADLEY |
| 859 | KATHLEEN MCNULTY |
| 860 | DANIEL FLETCHER |
| 861 | JESSICA HALL |
| 862 | JOHN GABRIEL |
| 863 | JESSICA KOVARI |
| 864 | LILI ZUNIGA |
| 865 | JOE LEWANDOWSKI JR |
| 866 | MAYRA L PEREZ |
| 867 | MARGARET ALDERFER |
| 868 | WALTER J PEARSON |
| 869 | TREVOR P DUNN |
| 870 | MARC ALBERG |
| 871 | CAROLE HOEFLING |
| 872 | JANET W. TANTAY |
| 873 | MATTHEW & SARA TREICHEL |
| 874 | ROCKY GAMBINA |
| 875 | NEIL M. FERGUSON |
| 876 | MELANIE MACBRIDE |
| 877 | BRENDA BRENNAN |
| 878 | MIA FOREMAN |
| 879 | LYNN R HORTON |
| 880 | SCOTT R TINGLEY |
| 881 | JONATHAN REAGAN |
| 882 | DENISE JACKSON |
| 883 | DAYHEEM NADERI |
| 884 | DUSTIN WAYNE BROWN |
| 885 | BREANNA KINGSLEY |
| 886 | MATTHEW GRABIAK |
| 887 | VINCENT CARDENAS |
| 888 | JESSICA N JONDAHL |
| 889 | JAMIE VESSELS |
| 890 | LEE & LILY SPRADLING |
| 891 | LANCE EDGAR |
| 892 | DAVID A HOFFMAN |

Exhibit A - List of Persons Requesting Exclusion

| 893 | JEFF & JENNIFER RADMAN |
|-----|------------------------|
| 894 | MICHAEL T BEAUFORD |
| 895 | MICHAEL LOERA |
| 896 | NICHOLAS CARDILLO |
| 897 | ROSE F ROBINSON |
| 898 | RICHARD HUEBNER AND |
| 899 | JILL MASER |
| 900 | JOHN RYAN DUNHAM |
| 901 | CRAIG SAYRE |
| 902 | JOE & GAYLE MATSON |
| 903 | BETTINA VINSANT |
| 904 | SANDY ENGLAND |
| 905 | STEVEN C VORTHMANN |
| 906 | KAREN M CAR |
| 907 | THOMAS GUYETTE |
| 908 | SHELI J BENIK |
| 909 | MYRESE NOCHOMOWITZ |
| 910 | BETSY WALKER |
| 911 | BONNIE LOPEZ |
| 912 | MITCH HAMAMOTO |
| 913 | BRITT DAHL |
| 914 | JAMES M. SHAVER JR. |
| 915 | KARL KUSCHNER |
| 916 | JASON Y. JOYNER |
| 917 | MARK J JACKSON |
| 918 | DANIEL R AMATO JR. |
| 919 | STEPHEN MICHAEL BARMANN |
| 920 | ASHLEY HURT |
| 921 | DIANA GONZALEZ |
| 922 | MARTHA ANOUSH AZARIAN |
| 923 | MORGAN ZUIDERVELD |
| 924 | ILLAURA ROSSITER |
| 925 | BARBARA B THURMOND |
| 926 | MATHIAS SIMMONS |
| 927 | RICK BAUGNON |
| 928 | ANTHONY CARRIERO |
| 929 | MARY ATKINSON |
| 930 | ELIZABETH BEESON |
| 931 | DESIREE SARKELA |
| 932 | SANDRA BREMMER |
| 933 | MATTHEW WALKER ALEXANDER |
| 934 | M TYL |
| 935 | LISA ANN BLANKENSHIP |
| 936 | JOANNA OZDOBINSKA |
| 937 | MICHAEL SMUDA |
| 938 | MICHAEL N BAKER |
| 939 | GINA SMITH |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 940 | HALIL S OZERDEN |
| 941 | JILL STANSELL |
| 942 | JAMES M. LUCK |
| 943 | PAUL T SMITH |
| 944 | CLARA HELMUTH |
| 945 | MABEL NAKAMURA |
| 946 | SHELBY TRIAL |
| 947 | KEVIN J KANE |
| 948 | LAUREN M MONGELLUZZO |
| 949 | JEREMY HUCK |
| 950 | LAURIE KNEUPPER-MEADOWS |
| 951 | VICTOR B HUTCHINSON |
| 952 | JOHNATHAN J LEWIS |
| 953 | ETHAN HERBERT |
| 954 | NATASHA ZWICK |
| 955 | WILLIAM COPENHAVEN |
| 956 | MELISSA DETTLOFF |
| 957 | JULIA AND LAZIO NEMETH |
| 958 | NICK WATTERS |
| 959 | GEORGE ZEWE |
| 960 | CYNTHIA HEFFRON |
| 961 | SHAWN MICHAEL JOHNSON |
| 962 | KATHY ANN GERVER |
| 963 | ROBERT PENN |
| 964 | TERESA LEFEVRE |
| 965 | GAIL M OTTESON |
| 966 | LOWELL MARLAR |
| 967 | ADRIA D. GREENE |
| 968 | DAN KUNCE |
| 969 | GERALD MITCHELL |
| 970 | LAURA HARTMAN |
| 971 | JASON CHANEY |
| 972 | ASHKAN IMANZARAL AND |
| 973 | DAVID PADALICK |
| 974 | LORETTA G STEVENS |
| 975 | BRIAN N HENRY |
| 976 | JOHN LIND |
| 977 | ANNA MORZINSKI |
| 978 | WILLIAM STUBBLEFIELD |
| 979 | STEPHEN & SUZAN WALLACE |
| 980 | BARBARA BAXTER |
| 981 | ANDREW WALLICK |
| 982 | PAMELA P GARCIA |
| 983 | ELLEN CAMERON |
| 984 | JERRY SHIRLEY |
| 985 | MARY J CARGAN |
| 986 | JENNIFER HANSER |

Exhibit A - List of Persons Requesting Exclusion

| 987 | NANCY DESANTIS |
|------|------|
| 988 | AMY SUE SHOEMAKER |
| 989 | PATRICK D GRACE |
| 990 | BRANDI LYN BOSEOVSKI |
| 991 | WARREN CLARK MOORE |
| 992 | PETER CLARK |
| 993 | DEBORAH GAIL MESSER |
| 994 | MARGARET S ROBERTS |
| 995 | ELIZABETH F HOKE |
| 996 | CULLEN BRIMHALL |
| 997 | JUDY MURRAY JANUZELLI |
| 998 | KARLA METTERLE |
| 999 | PREMILA RATHNAM |
| 1000 | SARAH BRUNETTI |
| 1001 | JOHN WALTON JR |
| 1002 | JOHN R CLARK JR |
| 1003 | ANDREW MICHAEL ALVAREZ |
| 1004 | JOHN A THOMSON JR |
| 1005 | ANGELA BELL |
| 1006 | KEVIN WONG |
| 1007 | KASEY GILLETTE |
| 1008 | KENNETH BLANSETTE |
| 1009 | JEFFEREY ALAN BRINKLEY |
| 1010 | LES VEACH |
| 1011 | DOUGLAS BENT |
| 1012 | MATT BURKHALTER |
| 1013 | BENJAMIN MARK LOOKER |
| 1014 | JEAN L WEBB |
| 1015 | JAMIE FERGUSON |
| 1016 | CHRISTOPHER KUNDER |
| 1017 | MELANIE TATE |
| 1018 | JON R MCCLARY |
| 1019 | JEANNE M IRONS |
| 1020 | JUDITH LENCE |
| 1021 | JAMES L FULCO |
| 1022 | LILLIAN WAIGUM YEE |
| 1023 | JESSICA JOHNSON |
| 1024 | LEIGH ROBBINS |
| 1025 | JACQUELINE M. FAHEY |
| 1026 | SHERI HARGUS |
| 1027 | ELAINE AND EDWIN SILVER |
| 1028 | SCOTT A FORTENBERRY |
| 1029 | MARY D FEY |
| 1030 | LOUISE BURK |
| 1031 | JOHN BRAMHALL |
| 1032 | BOREUM LEE |
| 1033 | TIMOTHY COCHENOUR |

Exhibit A - List of Persons Requesting Exclusion

| 1034 | EDGARDO VAZQUEZTELL RAMOS |
|------|---------------------------|
| 1035 | THOMAS RAY AND MARY RAY WORLEY |
| 1036 | CHRIS WALTERS |
| 1037 | ANTHONY J KIEHL |
| 1038 | JAMES G GOODWIN |
| 1039 | WAYNE C FORESTER |
| 1040 | MELISSA J TRUHAN SMITH |
| 1041 | LILY TAN |
| 1042 | LAZARO L PEREZ |
| 1043 | PAMELA K ASCHLIMAN |
| 1044 | JOHN BRAMLETT |
| 1045 | AMY SEGEN |
| 1046 | KYLE KASKEA |
| 1047 | JENNIFER JUDKINS |
| 1048 | DORA P SOTO |
| 1049 | HAROLD GORDON LEGGETT JR |
| 1050 | ALAN KIRKPATRICK |
| 1051 | MATTHEW THOMAS FITZ |
| 1052 | CHERYL KOLLEK |
| 1053 | STEPHEN A RODGERS |
| 1054 | LINDA EBEL |
| 1055 | LINDA MARKS |
| 1056 | SHARON PINKOSKI |
| 1057 | REBECCA RAYMUNDO |
| 1058 | ERIC E SHOREY |
| 1059 | RICHARD S HOWARD |
| 1060 | ULRIKA BJUHR |
| 1061 | ANDREA M PETERSON |
| 1062 | MARK E PAINTER |
| 1063 | DANE CONAWAY |
| 1064 | ROBBIE N HALL |
| 1065 | MICHAEL KEVIN DAVLIN |
| 1066 | GREGORY A JAMES |
| 1067 | BERGITTE ANTOINE |
| 1068 | LORIE WILKEY |
| 1069 | JENNIFER A TIERNEY |
| 1070 | KRISTEN LEWIS |
| 1071 | ROBERT A HAWKS |
| 1072 | ERIC D GARDNER SR |
| 1073 | LOIS WILSON |
| 1074 | ROBERT SHAUN BARTOO |
| 1075 | CATHERINE ENGLEHARDT |
| 1076 | NANCY PICOT RIEGELMAN |
| 1077 | SANDRINE V DINCKI |
| 1078 | JOE YOUNG |
| 1079 | RON WARREN |
| 1080 | BRET R ROSSI |

Exhibit A - List of Persons Requesting Exclusion

| 1081 | SANDRA REES |
|------|-------------|
| 1082 | MICHAELA GRESKO |
| 1083 | DANIEL G ROUNDS |
| 1084 | GINA DITTMER |
| 1085 | MARTHA K ARTERBERRY |
| 1086 | SCOTT KADET |
| 1087 | JOSEPH J & PRISCILLA D C DE BACA |
| 1088 | GWEN KRIESER |
| 1089 | MARTIN & DEBORAH KILEY |
| 1090 | FREDERICK P ROONEY |
| 1091 | LORI KOZDRAS |
| 1092 | KATHRYN C DANIELS |
| 1093 | JEFFREY A THACKER |
| 1094 | MIGDALIA I DIEZ BETANCOURT |
| 1095 | DONALD BAILEY |
| 1096 | TODD L CRAMER |
| 1097 | SONYA LAM |
| 1098 | HAROLD J SACHWALD |
| 1099 | ROBERT BRUNETTO |
| 1100 | TARA DEBUTTS |
| 1101 | RUTH S BURTON |
| 1102 | ANTHONY G ISAAC |
| 1103 | KIMBERLY LACEY |
| 1104 | ERIC & MALINDA MEEKS |
| 1105 | DUSTIN SILSBY |
| 1106 | KRISTEN DECAMILLA |
| 1107 | KEVIN NAGEL |
| 1108 | ANDREW SITZER |
| 1109 | JESSICA SMITH HINTZ |
| 1110 | JULIE HERNANDEZ |
| 1111 | RICHARD & SANDRA AARVIG |
| 1112 | JOHN & ANNE KARAYAN |
| 1113 | LOUIS WYCHICO |
| 1114 | KATHRYN SULLIVAN |
| 1115 | JENNIFER CHAN |
| 1116 | CAMDY CHAN OR SU TAN |
| 1117 | LESLIE DOYLE FITZPATRICK |
| 1118 | MICHAEL MASSARA |
| 1119 | ADRIENNE LALLE |
| 1120 | MICHAEL CUNNINGHAM |
| 1121 | CATHERINE LUZZI |
| 1122 | MARKUS HOLTBY |
| 1123 | JESSICA MOWRY |
| 1124 | PAUL DUPUIS |
| 1125 | BIANCA RUIZ |
| 1126 | JONATHAN LEE LEENTVAAR |
| 1127 | DAVID V BURKE III |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 1128 | DAVID OSBORNE JR |
| 1129 | LEAH YAMAMOTO |
| 1130 | MICHAEL STRAUCH |
| 1131 | MYA M GUNTER |
| 1132 | WILL DELZEITH |
| 1133 | BYRON BOYD |
| 1134 | SCOTT BASSETT |
| 1135 | JOSEPH M DIBLASIO |
| 1136 | LACEY AND TONY ALLEN |
| 1137 | MELANIE & PATRICK PORTAS |
| 1138 | PATRICK FIZZ |
| 1139 | BRANDON KOPETZKY |
| 1140 | GAIL CRAIGHEAD |
| 1141 | AJOKE' CRYSTAL ADEBESIN |
| 1142 | COLLEEN AND MARTIN MOEN |
| 1143 | JAMES H HUBBARD |
| 1144 | PAM GLUECK |
| 1145 | TRAVIS AND CHRISTINE FITZ |
| 1146 | STEVE ALLIGOOD |
| 1147 | DAVID MICHAEL DEAN SR |
| 1148 | BRYAN TOSI |
| 1149 | JESSICA HEWITT |
| 1150 | HOLLY HANSON |
| 1151 | LISA HECHT |
| 1152 | LORRAINE KLEIN |
| 1153 | STEPHANIE COPELAND |
| 1154 | LAURIE GETER |
| 1155 | RAY DEL PILAR |
| 1156 | SERGIO LUNA |
| 1157 | AMBER E OLSON |
| 1158 | YVETTE PASCASCIO |
| 1159 | BRIDGETE A MCAULEY |
| 1160 | ROSALYNN LEE |
| 1161 | PAUL MALACHOWSKI |
| 1162 | ERIC OVERHOLT |
| 1163 | MARK HUTCHINSON |
| 1164 | LYLE G MEYER |
| 1165 | DIANE & EDWARD PARRY |
| 1166 | ROBERT HAN |
| 1167 | WILL NUNZIATA |
| 1168 | ROBERT D LORFINK |
| 1169 | CHAREN CONDE CABATIT |
| 1170 | ANNALISA MACEOLA |
| 1171 | SHARON R RABY |
| 1172 | THOMAS M HOEY |
| 1173 | ANNE SIMONET |
| 1174 | EDWARD GEORGE TIGCHELAAR |

Exhibit A - List of Persons Requesting Exclusion

| 1175 | WALTER ELIOT BARD |
|------|-------------------|
| 1176 | EMILY FOGG |
| 1177 | LUIS MALAGON |
| 1178 | SHELDIA BERNSTEIN |
| 1179 | DAPHNE GLASER |
| 1180 | ALAN MARCHBANKS |
| 1181 | KIMBERLY BUCE |
| 1182 | ERIC TED SEITZ |
| 1183 | ALEXANDRIA PRONTNICKI |
| 1184 | CARRIE WALLIS |
| 1185 | DAVEDA LAMONT-TADEUSHUK |
| 1186 | KEVIN HAWKINS |
| 1187 | JAVIER CRUZ |
| 1188 | JANE W ARRINGTON |
| 1189 | MICHELLE ELIZABETH DODSON |
| 1190 | MICHAEL T CARSON |
| 1191 | JEFFREY J JONES |
| 1192 | EDWARD J MICHELS |
| 1193 | JOHN CANFIELD |
| 1194 | AMANDA COOK |
| 1195 | JENNIFER L. BALL COLLINS |
| 1196 | ERIN CONNOLLY |
| 1197 | CHRISTINE SHANNON |
| 1198 | JODI ARCHER |
| 1199 | JOHN CALDWELL |
| 1200 | SHANA LEVY |
| 1201 | LAURA BRIGGS |
| 1202 | BETH VENTEICHER |
| 1203 | THOMAS W HANNS JR |
| 1204 | TONY COLLINS |
| 1205 | CHARLES MCCRAW |
| 1206 | ABRAHAM TATIS |
| 1207 | MARIUS MUNTEAN |
| 1208 | ANICIA LEON |
| 1209 | AUSTIN T CADE |
| 1210 | JENNIFER WEAKLAND |
| 1211 | BARRY MCALEER |
| 1212 | LAURA ALLEN |
| 1213 | DANNY COUCH |
| 1214 | KATINA LAUDERDALE |
| 1215 | JAMIE NELSON |
| 1216 | BILLY RAY HARRIS JR |
| 1217 | PHILIP & LYNDA ADAMSON |
| 1218 | LEILANI WILLIAMS |
| 1219 | REBECCA J LAIL |
| 1220 | JANE BLASINGHAM |
| 1221 | MELISSA EDWARDS |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 1222 | NIKHIL GOYAL |
| 1223 | DANIEL J CRAGG |
| 1224 | BRIAN M LANDRY |
| 1225 | CHRISTINE CASSIDY |
| 1226 | FELICIA & SCOTT HELMS |
| 1227 | DEBORAH DIERCKS |
| 1228 | JOHN KRAYER |
| 1229 | ISMAEL RIVERA |
| 1230 | JONATHAN P ZATKOFF |
| 1231 | JEFF SYPECK |
| 1232 | WARREN E ALLEN III |
| 1233 | CHIHIRO KAMEGAYA |
| 1234 | WINONA VAITEKUNAS |
| 1235 | BETTY FAUST |
| 1236 | PAMELA KESTER |
| 1237 | ROBERT D DODSON |
| 1238 | ANTHONY DETTORI |
| 1239 | DANNY E REEVES |
| 1240 | JOSHUA HAZEL |
| 1241 | AMY KNOBEL |
| 1242 | ERNEST BENAVENTE JR |
| 1243 | E LISETTE GERALD-YAMASAKI |
| 1244 | RONALD NELSON |
| 1245 | RISHI CHOPRA |
| 1246 | DENNIS & LYNNE HEITMANN |
| 1247 | EMILY SMITH |
| 1248 | JOSEPH BENIN |
| 1249 | SHERRY L & KENTON M SANDERS |
| 1250 | LAURA LONGERO HOLMAN |
| 1251 | SAL MORETTI |
| 1252 | JAMES PULOS |
| 1253 | TOMAS & MELISSA REMENTERIA |
| 1254 | AMANDA CHRISTENSEN |
| 1255 | EDITH NOMI |
| 1256 | RICK MAROLT |
| 1257 | JESTY F VERNON JR |
| 1258 | MICHAEL L WEITHOFER |
| 1259 | JAVIER POLENDO |
| 1260 | MISSY HOLLAND |
| 1261 | MICHELE G GRANT |
| 1262 | SVETLANA KANTOROVICH |
| 1263 | SEYMOUR RUBENSTEIN |
| 1264 | YASMIN NURU |
| 1265 | BRYAN R DIEDERICH |
| 1266 | FREDERICK KARL BECKER |
| 1267 | KI WON NAM |
| 1268 | KATLYN COMLEY |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 1269 | MARY BETH WEISS |
| 1270 | KIMBERLY F & CHARLES M BALL |
| 1271 | GEORGE ZACHMANN |
| 1272 | DEBRA DOCHERTY |
| 1273 | JOHN P NELSON JR |
| 1274 | KATRINA DOTSON |
| 1275 | JOHN T AMBROSE |
| 1276 | JOANN PAVILACK |
| 1277 | SHEILA K OGRADY |
| 1278 | JAMES Q NESBITT |
| 1279 | LAURA DE LAS CASAS |
| 1280 | LANA M NAGHSHINEH |
| 1281 | AVIANCE SMITH |
| 1282 | MARK F LEOPOLD |
| 1283 | BARBARA FISHER |
| 1284 | CHOL SONG |
| 1285 | DAVID & VONDA WILLIAMS |
| 1286 | V & R YOUNGSAYE |
| 1287 | BETSY ASHLEY |
| 1288 | KIRSTIE CARMOUCHE |
| 1289 | JOEY DEBLANCO |
| 1290 | LIBBY J COX |
| 1291 | TONY MERIWETHER |
| 1292 | STUART M CATERGINE |
| 1293 | DANAIS FONTANEZ NUIN |
| 1294 | BENJAMIN FRENCH |
| 1295 | HENRY NEUMANN |
| 1296 | ROSELLA GROVES |
| 1297 | SETH TWEIT |
| 1298 | DAVID L. ROBINSON |
| 1299 | SARAH K YERHOT |
| 1300 | SALLY L KARR |
| 1301 | CHRISTOPHER T DROST |
| 1302 | BEN & MELANIE KOERPERICH |
| 1303 | STEFAN J ZISK |
| 1304 | TAMMY CUTLER |
| 1305 | EDWARD WILLIAMS |
| 1306 | TOMOKO KAWASUMI |
| 1307 | DAVID LEE KITCHEN |
| 1308 | DONNA WINSTED |
| 1309 | THOMAS JOHNSON |
| 1310 | ROBERT HAUSER |
| 1311 | ALLYSON BECKMANN |
| 1312 | CLARA KROMER |
| 1313 | KRISTIN BLAKE |
| 1314 | HERMAN LERNER |
| 1315 | WENDY & KENNETH BERGER |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 1316 | JASMIN ASTRID MCFAYDEN |
| 1317 | NANCY POIRIER JOSEPH |
| 1318 | ROLAND KLOSE |
| 1319 | NANCY M DAVIS |
| 1320 | BRADLEY MEANS |
| 1321 | ISABEL DIAZ |
| 1322 | MERLE PATTERSON |
| 1323 | SAHER ANAYI |
| 1324 | OLIVIA CARTA |
| 1325 | JEFFREY M FELTS II |
| 1326 | SHIRLEY YEAGER |
| 1327 | PLAMEN MIHAYLOV |
| 1328 | DAVID GERSHEL |
| 1329 | ANTHONY PISTONE |
| 1330 | BRIAN AND SUSAN WESTRA |
| 1331 | ESTHER E MULDER |
| 1332 | THOMAS H GRANGER |
| 1333 | GLEN E CONRAD |
| 1334 | MARTHA HORNBACK |
| 1335 | BRIAN KELLY |
| 1336 | ERICA HALLER |
| 1337 | DEBORAH SCHMID |
| 1338 | LINDA SIMPSON |
| 1339 | MORRIE LARSEN |
| 1340 | DONIELLE SAXTON |
| 1341 | CYNTHIA YBARRA |
| 1342 | ISMAIL YOUSSEF MOURTADA |
| 1343 | JAMES W. DUNNE |
| 1344 | JOSHUA LEVY |
| 1345 | BEATA LORAN |
| 1346 | ANA CRISTINA FILL |
| 1347 | MICHAEL PETILLO |
| 1348 | GARY PARSONS |
| 1349 | TIM CARTER |
| 1350 | MELYSSA DECK-HARRIS |
| 1351 | RICHARD GARCIA |
| 1352 | KYLE HAMMOND |
| 1353 | DEBORA S FOREMAN |
| 1354 | LOUISE ROMET |
| 1355 | LYNNE TERRY |
| 1356 | TAMA-SHA MANNING |
| 1357 | HIN-LO LAU |
| 1358 | ELAINE BRITTENUM |
| 1359 | BRITTANY LEADER |
| 1360 | CAITLIN REED |
| 1361 | SARA R SHEPHERD |
| 1362 | ADAM ALLMAN |

Exhibit A - List of Persons Requesting Exclusion

| 1363 | MONETTE CLARK |
|------|---------------|
| 1364 | VENKATESH NAYAK |
| 1365 | ALEJANDRA MENDOZA PEREZ |
| 1366 | ERIC REY |
| 1367 | CHANDRA R N KANEMARU |
| 1368 | JAY RAMAN |
| 1369 | TINA VILTZ-FLUCAS |
| 1370 | KYLE RAY MCBRIDE |
| 1371 | FABIENNE CHONAVEL |
| 1372 | JOSEPH M CAZZOLLA |
| 1373 | CINGRECA EVANS |
| 1374 | MICHAEL & BETHANY FARAG |
| 1375 | DENNIS J ROOK |
| 1376 | JANE A SALAZAR |
| 1377 | MELISSA SCHEUMEISTER |
| 1378 | GEORGE M HANNA |
| 1379 | MICHAEL WADE |
| 1380 | JOHN CLARK |
| 1381 | ANGIE KIBILOSKI |
| 1382 | BARBARA JOHNSON |
| 1383 | ADA CHESRAGI |
| 1384 | ORLANDO R SANCHEZ |
| 1385 | BRANDON ROARK |
| 1386 | REX CRANFORD |
| 1387 | BING DING |
| 1388 | JENNIFER IMMEL |
| 1389 | GEORGIOS ANTONIOS MARGONIS |
| 1390 | SOOJIN JANG |
| 1391 | KATERYNA HOLLAND |
| 1392 | DOUGLAS BROCK |
| 1393 | MICHAEL LEE & PAMELA SUE DENMAN |
| 1394 | SUE HOUSEMAN |
| 1395 | LARRY HARTSOCK |
| 1396 | DANIEL T SMITH |
| 1397 | DEBBORAH DUSHECK |
| 1398 | DAVID FALLAT |
| 1399 | ANTHEA J TAYAG |
| 1400 | DARIO DIBIASE |
| 1401 | LARRY FREI |
| 1402 | GLENN B ANDERSON |
| 1403 | MARISSA SCHICK |
| 1404 | LARAE FERREIRA |
| 1405 | MICHAEL D DIROSSI |
| 1406 | DAVID J & STACY JAUQUET |
| 1407 | KATIE ROBERSON |
| 1408 | MINA S ITURBE |
| 1409 | JANE MANOOKIN |

Exhibit A - List of Persons Requesting Exclusion

| 1410 | CHRISTOPHER & JENNA SCHNEIDER |
|------|-------------------------------|
| 1411 | KAREN MARCANTONIO |
| 1412 | LAKSHMI DEVARAJU |
| 1413 | JOHN EBSEN |
| 1414 | SCOTT F KLARICH |
| 1415 | MATTHEW C RUNION |
| 1416 | PHILIPP JONAS |
| 1417 | SARAH ADELAIDA MCINTIRE |
| 1418 | CHIBUIKE MUOH |
| 1419 | PAUL F & WENDY J GRAHAM |
| 1420 | CATALINA BATRES |
| 1421 | DONALD J KOVACIC |
| 1422 | STERLING GUELICH |
| 1423 | MARGARET C GOODWIN |
| 1424 | GLYNIS LUDLUM |
| 1425 | ALLYSON H STONE |
| 1426 | JUSTIN WHITE |
| 1427 | DIAN K CLAY |
| 1428 | LAURA D AWSON |
| 1429 | PHIL SCARIM |
| 1430 | ANTHONY & TEDDY GARGUILO |
| 1431 | ROBERT LENZ |
| 1432 | WILLIAM N MAY |
| 1433 | BRIAN & MICHELLE NOREEN |
| 1434 | BENEFSHA MOHAMMAD |
| 1435 | JOHN KISNER |
| 1436 | ERIC ETTER |
| 1437 | JUSTIN S ZATKOFF |
| 1438 | JOHNSON PADIKKALA |
| 1439 | KEITH HART |
| 1440 | DERICK J SAGER |
| 1441 | CATHY TORSELL |
| 1442 | RONALD P COX |
| 1443 | KARI K BEATY |
| 1444 | ANN CALDWELL |
| 1445 | MICHAEL J RAFFERTY II |
| 1446 | MARTHA CHAMBERS |
| 1447 | MATT RUSCHMAN |
| 1448 | GARY HARSTON |
| 1449 | JESSE JENSEN |
| 1450 | MICHELE MELTON |
| 1451 | ANDREW J PATCH |
| 1452 | KEITH PRINGLE |
| 1453 | NANETTE LEMMA |
| 1454 | KEVIN STORY |
| 1455 | JESSICA DUHAIME |
| 1456 | GRETCHEN WITTIG |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 1457 | CATHERINE JURQUET AURORA |
| 1458 | NORMA SANCHEZ |
| 1459 | PEYAM RYAN TABRIZIAN |
| 1460 | BENJAMIN & ERIN STEWART |
| 1461 | DONOVAN SCHULLER |
| 1462 | JANE WELCH |
| 1463 | RENEE MCDANIEL |
| 1464 | JENNIFER DAHLSTEDT |
| 1465 | JOSEPH YENOWSKAS |
| 1466 | ERNESTO GARCIA |
| 1467 | FREDERICK ELI NELSON |
| 1468 | LEAH CALVERT |
| 1469 | CARRIE MACKAY |
| 1470 | DARRELL K DOUGLAS |
| 1471 | TAMIKA I POWELL |
| 1472 | CHARLES & CHERLY MUNDROFF |
| 1473 | KIMBERLY NICHOLS |
| 1474 | ANTHONY ROMAN |
| 1475 | JULIE WILSON |
| 1476 | BRAD WOODWARD |
| 1477 | V LAI |
| 1478 | SARAH RAAB |
| 1479 | DANIELLE SNYDER |
| 1480 | KATHERINE EPSTEIN |
| 1481 | RICHARD L KNECHT |
| 1482 | PATRICIA PRICE |
| 1483 | CAROL DAZZO |
| 1484 | THOMAS J & MERRY J THRONEBERRY |
| 1485 | FRANCES E JARRELL |
| 1486 | GILES TUCK |
| 1487 | ROSA HOLGUIN |
| 1488 | DANA SYLVESTER |
| 1489 | PATRICIA YOXALL |
| 1490 | LLUIS LOPEZ-BARCONS |
| 1491 | MICHAEL FERNANDEZ |
| 1492 | STEPHEN L VENUTO |
| 1493 | PETER B VENUTO |
| 1494 | EVELYN & GORDON PEARSON |
| 1495 | SARA EDGAR |
| 1496 | MEREDITH HOLLAND |
| 1497 | ADELOKUNBO ADEOYE |
| 1498 | LAUREN GRAY |
| 1499 | TANYA A ROBERTSON |
| 1500 | MICHAEL P ODONNELL |
| 1501 | LARRY & MICHELLE HYDE |
| 1502 | OPHELIA LEE |
| 1503 | MICHAEL E WALTERS |

Exhibit A - List of Persons Requesting Exclusion

| 1504 | DAVID & KRISTIN JOHNSON |
|------|-------------------------|
| 1505 | FRED LONDON |
| 1506 | PETER SALLERSON |
| 1507 | LARISSA HERNANDEZ |
| 1508 | MAITE GESELE |
| 1509 | ELISA ARGUELLES |
| 1510 | DONNA BOSTER |
| 1511 | JESSICA RIVERA |
| 1512 | DARRELL & PATRICIA WITT |
| 1513 | LOUIS JAMES ARNAU II |
| 1514 | NANCY F WARFIELD |
| 1515 | LAURA A MELAU |
| 1516 | AMANDA KNAUER |
| 1517 | MARILYN MARQUEZ |
| 1518 | JEREMY M ROY |
| 1519 | JESSICA ELWELL KORTH |
| 1520 | JENNIFER CHRISTIANSEN |
| 1521 | ALEXANDER PRAET |
| 1522 | LYNN R BRANSTAD |
| 1523 | MORGAN & MARIANNE FOSTER |
| 1524 | LUCAS & LARA ALTIC |
| 1525 | DAVID NGUYEN |
| 1526 | ANDREW BOZIO |
| 1527 | KATHLEEN M AHERN |
| 1528 | SHARON REED |
| 1529 | MUEYFOO SAECHAO |
| 1530 | JESSICA WOLFE |
| 1531 | CHESTER BISHOP JR |
| 1532 | CHRISTOPHER WESTGATE |
| 1533 | ROGER MCCOY |
| 1534 | ELIZABETH PIERCE |
| 1535 | BRYAN J OH |
| 1536 | EARLINE WRIGHT |
| 1537 | REBECCA N BENIGNI |
| 1538 | ARZU KAYHAN |
| 1539 | KHANDRA JACOBS |
| 1540 | SCOTT CULLINANE |
| 1541 | KANUPRIYA SHARMA |
| 1542 | ARLENE JIMENEZ |
| 1543 | JORGE LORENZO |
| 1544 | EUGENE ELENEV |
| 1545 | JERRY E IRVIN |
| 1546 | TANJA FOILES |
| 1547 | DUANE & REBECCA BULL |
| 1548 | BETTY & CLIFFORD MIYAOI |
| 1549 | TRAVIS A SMITH |
| 1550 | ERIC A ESCOTO |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 1551 | DAWN ARMOUR |
| 1552 | DEBRA KRAEMER |
| 1553 | NICHOLAUS PODSIADLIK |
| 1554 | MICHAEL J CRAWFORD |
| 1555 | CAROL A STROEH |
| 1556 | JUSTIN CHRISTOPHER COLLINS |
| 1557 | HARRIET MAILMAN |
| 1558 | GINA BELINDA COLLINS |
| 1559 | CHANCE & CERI MIDDLEMIST |
| 1560 | SHERRE SHAFER |
| 1561 | RICK & ANITA BARRON |
| 1562 | LINDSEY WHISSEL |
| 1563 | KURT LYNN HUESTON |
| 1564 | DIANE HRONCICH ROBERTS |
| 1565 | CHARLES HUNSTIGER |
| 1566 | CHAD BROOKS |
| 1567 | WARREN QU |
| 1568 | ESTHER GOLTON |
| 1569 | FLOYD LESLIE KIDD II |
| 1570 | BRANDI BALL |
| 1571 | GORDON K GLATZ |
| 1572 | JAMES OHLMAN |
| 1573 | JASON DEBEAU |
| 1574 | MILTON L SHERRILL |
| 1575 | TOVA APPLESON |
| 1576 | TEAGAN LAZZAROTTI |
| 1577 | NICKIE L COOK |
| 1578 | BONI BEISELL |
| 1579 | JOSEPH A JACONI JR. |
| 1580 | ELIZABETH SOUSA |
| 1581 | NORMA J DOERR |
| 1582 | ANGELA QUAGLIANA |
| 1583 | JASON EVERUGHAM |
| 1584 | JUDITH HLLYER |
| 1585 | TRENT DEREK FOX |
| 1586 | LATONYA KYLEAN BOWMAN |
| 1587 | SOK HOONG TAY |
| 1588 | RAMSEY DOW |
| 1589 | PATRICK T MCCOVILLE |
| 1590 | PHYLLIS ALLY |
| 1591 | STEPHANIE BACHMAN |
| 1592 | ROBERT MARICH |
| 1593 | TYLER A DAVIS |
| 1594 | PETER MOLLER NEERGAARD |
| 1595 | BELINDA A TODD |
| 1596 | MICHELLE JOHNSON |
| 1597 | SAWYER BUTTERFIELD |

Exhibit A - List of Persons Requesting Exclusion

| 1598 | JUSTIN LOOMIS |
|------|---------------|
| 1599 | JOSE N PALMAS |
| 1600 | SARA SCRIVER |
| 1601 | ROBERT WIUFF |
| 1602 | MICHAEL JASON PERKEY |
| 1603 | CHAD BISSELL |
| 1604 | MARK T LOEBICK |
| 1605 | JAMES HUMPHREY |
| 1606 | DEREK MASSOUDA |
| 1607 | AREN OLSON |
| 1608 | SETH GOLDIN |
| 1609 | DANNA JAMES SNYDER |
| 1610 | TIMOTHY G UTSCHIG |
| 1611 | STEPHANIE SHUFELT |
| 1612 | MICHAEL SHAWN HANDY |
| 1613 | GLENN EARGLE |
| 1614 | NESTOR J SANCHEZ |
| 1615 | LUCETTE PEARSON |
| 1616 | SHAUNA GOODE |
| 1617 | ERIC C BERTISCH |
| 1618 | DANIELLE SPENCER |
| 1619 | ANTHONY CAMARATO |
| 1620 | RICHARD MOELLER |
| 1621 | EDITH M CHRISTMAN |
| 1622 | ANGIE BOWEN |
| 1623 | WILLIAM JEFFER LONG |
| 1624 | ANDRE DEHESA |
| 1625 | AMY COLLINS |
| 1626 | TAMMY GARRON |
| 1627 | CLARE M ORVIN |
| 1628 | D.T. SHANTHA |
| 1629 | CLAUDIA EYLER |
| 1630 | SIRI DAL |
| 1631 | ERIC BRANOFF |
| 1632 | VANESSA WINIGER |
| 1633 | JULIAN LARA |
| 1634 | JANETTE FORSSELL |
| 1635 | KAREN EDDY |
| 1636 | THERESE A ZEMANEK |
| 1637 | ELISSA PETERSON |
| 1638 | MELISSA HERTEL |
| 1639 | MARJORIE C BLUM |
| 1640 | HEATHER NELDNER |
| 1641 | MARY BETH MCCORMAC |
| 1642 | SARAH BUTLER |
| 1643 | LINDA JOHNSON |
| 1644 | KAMA SANCHY |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 1645 | TINA STARNES |
| 1646 | ROSA TRUJILLO MONGE |
| 1647 | JANICE E BOOKER |
| 1648 | LEA ROSE GELMAN |
| 1649 | SARAH E RIVAS |
| 1650 | KEVIN SPINHIRNE |
| 1651 | AMY KIM |
| 1652 | TRACEY L ESTEP |
| 1653 | SARA MARLER |
| 1654 | IAN MICHAEL BERRY |
| 1655 | PETER MULLEN |
| 1656 | ANTHONY DRAGO |
| 1657 | BRENT MCILQUHAM |
| 1658 | BRAD SEILER |
| 1659 | STEVE ZIEGLOWSKY |
| 1660 | ANTHONY PRESLEY |
| 1661 | ADAM SCEPANIAK |
| 1662 | NICOLE APPEL |
| 1663 | PATRICIA OEHLER |
| 1664 | ANN SHIN |
| 1665 | VERONICA MULLINS |
| 1666 | CINDRA & TIM OTTO |
| 1667 | CHERYL & BRETT ROZIER |
| 1668 | KATHIE PATTERSON |
| 1669 | JOHN E GRANT |
| 1670 | DENNIS JOSEPH |
| 1671 | DAVID KARAS |
| 1672 | SALVADOR RIZZO |
| 1673 | SHARON & BEVERLY MINNICH |
| 1674 | ERIK A KORDSMEIER |
| 1675 | ELISE D WALLACE |
| 1676 | GEORGE G JESPERSEN |
| 1677 | MEGAN BIRD |
| 1678 | CHRISTIN COUVREUX |
| 1679 | LATOYA REESE |
| 1680 | PAM GARGUILO |
| 1681 | JENNIFER KALU |
| 1682 | UNKNOWN |
| 1683 | ANTHONY & LISA MCNEEL |
| 1684 | TISIA WALKER |
| 1685 | SHANA SIEGEL |
| 1686 | ROSS ANDERSON |
| 1687 | WARREN BAILEY |
| 1688 | KRISTINA L EATON |
| 1689 | JEFFREY & ROBIN PIERCE |
| 1690 | LINDA GROVEN |
| 1691 | PETER ZIHAU XU |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 1692 | S KAMALIE N KINOLAU |
| 1693 | RAMONA SOULE |
| 1694 | PAM FERGUSON |
| 1695 | VALERIE H ABRAHAMSON |
| 1696 | JENNIFER LANE |
| 1697 | BRITTNEY SAGRAVES |
| 1698 | ERIC JODTS |
| 1699 | KATHRYN SUZANNE AGRES |
| 1700 | KIM TARDIE |
| 1701 | THOMAS R RIEKERT |
| 1702 | JEFFREY M RICHARDSON |
| 1703 | MARGARET WINGENFELD |
| 1704 | JAMES A VANNOY |
| 1705 | KENTON L STILES |
| 1706 | RINA MURAO |
| 1707 | CATHERINE RACICOT |
| 1708 | JODY M EDDINGS |
| 1709 | MATTHEW RYCHLIK |
| 1710 | JOSEPH DUTTON |
| 1711 | KAE SAEFONG |
| 1712 | SCOTT RAINEY |
| 1713 | NIKITA PATEL |
| 1714 | DANNY BICKERSTAFF |
| 1715 | MELISSA D COX |
| 1716 | JESSICA J RODRIGUEZ |
| 1717 | NEIL A VALENTA |
| 1718 | KRIS NORDBERG |
| 1719 | PAUL R REID |
| 1720 | PAUL K BLEEM |
| 1721 | CHARLES & PENNY WICHSER |
| 1722 | SHARAREH SADAGHIANI |
| 1723 | MARY GILLETTE |
| 1724 | MIRANDA STEED |
| 1725 | BONNIE BURER |
| 1726 | GEORGE A URE |
| 1727 | TIMOTHY OCONNOR |
| 1728 | TERI LEE PERRY |
| 1729 | JEFF DUGDALE |
| 1730 | ROGER KOELSCH |
| 1731 | SARAH GILDEA |
| 1732 | SHAWANA GREEN |
| 1733 | ROMIKA CHANDRA |
| 1734 | BARKLEY COON |
| 1735 | RITA M NOVAK |
| 1736 | ANDREW J SHARPLES |
| 1737 | PATRICK J HANNAN |
| 1738 | JOSEPH S POLITZ |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 1739 | JULIE UYENO |
| 1740 | PEDRO M MEDEIROS |
| 1741 | JENNY DANNENBERG |
| 1742 | MARK STEVEN MAYBERRY |
| 1743 | JOSEPH WILMA |
| 1744 | REBECCA HAHN |
| 1745 | BRIAN SKINN |
| 1746 | PATRICIA VEACH |
| 1747 | JON-MICHAEL DELDIN |
| 1748 | REGINA BIDSTRUP |
| 1749 | ANTHONY J A OUELLETTE |
| 1750 | CHASE LEBIO |
| 1751 | DAVID N DILLEHUNT |
| 1752 | RYAN J KALLED |
| 1753 | MICHAELA REYNOLDS |
| 1754 | THERESA S QUICK |
| 1755 | MARLANA L PHILLIPS |
| 1756 | CAMERAN BOWLES |
| 1757 | JENNIFER A BHALLA |
| 1758 | SHELLY MARTIN |
| 1759 | DZMITRY PINSKI |
| 1760 | MABEL HERNANDEZ |
| 1761 | JEFF KREISLER |
| 1762 | PATRICIA C COCHRAN |
| 1763 | CIARA M PARKER |
| 1764 | JOSEPH CASTILLO |
| 1765 | BRETT D KOLLARS |
| 1766 | ANGELA DENISE JACKSON |
| 1767 | LINDA M CAPPELLETTI |
| 1768 | LOURDES CASTRO |
| 1769 | PHYLLIS STROM |
| 1770 | NATHANIEL PAINE |
| 1771 | LIANE T RICE |
| 1772 | MATTHEW D TOPOLSKI |
| 1773 | HARRY & ANN TENNISON |
| 1774 | ANTHONY TRUDEAU |
| 1775 | JOYCE PARK |
| 1776 | JULIE WYNSTRA |
| 1777 | PEDRO V & RUBY M VASQUEZ |
| 1778 | NICHOLAS A STACY |
| 1779 | MORA E MCKENZIE |
| 1780 | DANA BRIGGS |
| 1781 | CARLOS RHONDEL WALCOTT |
| 1782 | JO MCLAURIN |
| 1783 | LESLIE A FOODIM |
| 1784 | TYRONE WIDJAJA |
| 1785 | RICHARD RIFE |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 1786 | KAREN WEIGLE |
| 1787 | STEVEN C & JUDY BOGARD |
| 1788 | ROBERT KINKELA |
| 1789 | HARRY A DEARMAN |
| 1790 | ERICA KNUTH |
| 1791 | CHRIS & JENNIFER WISWELL |
| 1792 | JENNIFER MOTAKEF-WILKINS |
| 1793 | JASON MANOTHAM |
| 1794 | STEPHANIE L PLUMMER |
| 1795 | TIMUR ZAYNULLIN |
| 1796 | AMANDA WHITE |
| 1797 | NEIL W HOP |
| 1798 | KEVIN MILLER |
| 1799 | VIRGINIA PICKERELL |
| 1800 | TERRI L FALLON |
| 1801 | IVANY SCHETTINO |
| 1802 | FORREST E DECKER |
| 1803 | PATRICIA DALY |
| 1804 | JUDY BASNETT |
| 1805 | VICTORIA WU |
| 1806 | PATRICK & ASHLEY VELKY |
| 1807 | LANEETA J HARRINGTON |
| 1808 | ANTHONY D MORELAND |
| 1809 | MADISON MORROW |
| 1810 | AARON HOLM |
| 1811 | MIKE ZIRNESKIE |
| 1812 | MELISSA COOK |
| 1813 | RICHARD J GUTIERREZ |
| 1814 | JASON & CHANDRA CARR |
| 1815 | STACY REILLY |
| 1816 | KAREN MENAPACE |
| 1817 | CHRISTOPHER GERRITY |
| 1818 | FRANK S HUNT |
| 1819 | ANDRES GILCHRIST |
| 1820 | NOELLE SANDER |
| 1821 | SHAWNA R PALOMO |
| 1822 | CAMERON SPIECE |
| 1823 | TIFFANY L EDWARDS |
| 1824 | ERIK & LISA BACKES |
| 1825 | MAGGIE MOORE |
| 1826 | IRISHA NILES-FLAMEZ |
| 1827 | KERRON MANWARING |
| 1828 | ALIDA AIMEE LUNA |
| 1829 | SEBASTIEN BOSSIAN |
| 1830 | ROMOLO & IRENE PERFETTO |
| 1831 | ANDERS GUNDERSEN |
| 1832 | MICHELLE TYSON |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 1833 | LAUREN PODOBINSKI |
| 1834 | ANTJE AND ISAAC NELSON |
| 1835 | BRANDON WILLIAMSON |
| 1836 | JASON LYEN |
| 1837 | ROBERT LITMER |
| 1838 | ROBIN MCALISTER |
| 1839 | LILIAN O'BRIEN |
| 1840 | ANTONIO FRANCISCO BERIO |
| 1841 | ANTONIO FRANCISCO BERO |
| 1842 | ROBERT K BOEHM |
| 1843 | WAYNE BREW |
| 1844 | DAVID JEFF BIRD |
| 1845 | LARRY BRYANT |
| 1846 | YASMINE O ALI |
| 1847 | JOAHNA BOSE |
| 1848 | GILBERT H SKOPP |
| 1849 | SHARON SMITH-LERNER |
| 1850 | JENNIFER M ORTIZ HANCE |
| 1851 | JAMES KUSSOW |
| 1852 | GORDON & LEEANNE TAM |
| 1853 | TERESA A BATES |
| 1854 | GENA HYMOWECH |
| 1855 | DENNIS & TAMARA PARKS |
| 1856 | GEORGIANA VELARDE |
| 1857 | ALEX MULL |
| 1858 | VIRGINIA ONEAL |
| 1859 | JAMES & LETA LAMB |
| 1860 | TERRI STIGERS |
| 1861 | GARY & ANNETTE TEARE |
| 1862 | CHRIS AKERS |
| 1863 | BRYCE DEGUISE |
| 1864 | ERIC JENSEN |
| 1865 | GUY ZIMMERMAN |
| 1866 | JAMES MERZ |
| 1867 | JOE KELLY |
| 1868 | JOEL PAQUET |
| 1869 | DANIEL ARAGON |
| 1870 | DANIELLE BRAVO |
| 1871 | SCOTT MCCARTHY |
| 1872 | LEE WAYNE BAKER |
| 1873 | PAULETTE PERRIN |
| 1874 | BARBARA MACKAY |
| 1875 | JOANNE LYNN RUSSELL |
| 1876 | JOHN TEIXIDO |
| 1877 | STACY JONS |
| 1878 | CRYSTAL ROMAN |
| 1879 | CAROLINA LUQUEZ |

Exhibit A - List of Persons Requesting Exclusion

| | |
|------|--------------------------|
| 1880 | JOSEPH A SHEBELL JR |
| 1881 | PAUL WRIGHT |
| 1882 | TARA CRAWLEY |
| 1883 | ROXANNE SISMANIDIS |
| 1884 | AYANNA R STEVENSON |
| 1885 | BARBARA CLARIDY |
| 1886 | CAROL S SJELIN |
| 1887 | SHELBY DONALD CANON |
| 1888 | ANGELICA MCNAIR |
| 1889 | DAVID EBNER |
| 1890 | CARLOS ERNESTO VASQUEZ |
| 1891 | GUADALUPE BAEZ |
| 1892 | CASSIA SILVA TONOSAKI |
| 1893 | JIM MARSHALL |
| 1894 | LARRY LEMIERE |
| 1895 | MARVIN COLEGROVE |
| 1896 | MATTHEW MASON |
| 1897 | AINSLEY NICOLE DIETZ |
| 1898 | JENNIFER LIESEKE |
| 1899 | DANEER SAUTER |
| 1900 | CORINA R VELOZ |
| 1901 | SHAREEN MARTIN |
| 1902 | DWIGHT AUSSIEKER |
| 1903 | FRANCISCO S. BORREGO |
| 1904 | RANDALL S COLBY |
| 1905 | MONIQUE M GONZALEZ |
| 1906 | CHERYL PUENTE |
| 1907 | EDGAR H COMPTAON III |
| 1908 | CRISTIAN MALDONADO |
| 1909 | KATHRYN DAVIDSON |
| 1910 | KATHLEEN WHITLOCK |
| 1911 | REBECCA OH |
| 1912 | GREGORY LEFFLER |
| 1913 | MICHELLE A LAWRENCE |
| 1914 | STEVEN MILLER |
| 1915 | NATASHA D WILLIAMS |
| 1916 | DAVID KILLINGER |
| 1917 | BRIAN LAUGHLIN |
| 1918 | TAMERA K THOMAS |
| 1919 | HEATHER NEWMAN |
| 1920 | EROL GUVEN |
| 1921 | JOE ROMEO |
| 1922 | JEFFERSON A HOLT |
| 1923 | TAMMY DABBS |
| 1924 | SHIRA KRONICK |
| 1925 | DENISE VANDERSAL |
| 1926 | TONYA D RORIE |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 1927 | DENISE P SANCHEZ |
| 1928 | JOELLE FABRIZIO |
| 1929 | DEMETRUIS MACK |
| 1930 | KATELYN L DEXTER |
| 1931 | RUSSELL BROWN |
| 1932 | BERNICE J PRECOURT |
| 1933 | RHIANNNO BAHREE |
| 1934 | PATRICK J KENNY |
| 1935 | CHELLA LYNN CROFT |
| 1936 | JAMES FEEZELL |
| 1937 | JORGE CASTRO |
| 1938 | RACHEL E SMITH |
| 1939 | STAN CELMER |
| 1940 | IVELISSE JOHNSON |
| 1941 | ROBERT L SEAL |
| 1942 | BUFORD A ROSE JR |
| 1943 | ROGER ALLEN PUCHALSKI |
| 1944 | JAMIMA D ROYSTER |
| 1945 | CYNTHIA RAPP |
| 1946 | EDGAR SANTIAGO |
| 1947 | LAURA H TILLER |
| 1948 | SCOTT BELL |
| 1949 | CHRISTINE CROUCH |
| 1950 | REYNALDO BAZAN |
| 1951 | JASON W MISSI |
| 1952 | NINA GALCIUS |
| 1953 | SCOTT WEST |
| 1954 | VICTORIA GIBSON |
| 1955 | THOMAS MCCAULEY |
| 1956 | RYAN JACKSON |
| 1957 | JORGE L LOPEZ |
| 1958 | MATTHEW M LAFLEUR |
| 1959 | LYDIA WALKING |
| 1960 | HERBERT J HANNEMAN |
| 1961 | LENNY JOHN ALLEN JR |
| 1962 | MATTHIAS RODER |
| 1963 | PATRICK ZEZULINSKI |
| 1964 | KELLY CORNUT |
| 1965 | MEGAN BENETT |
| 1966 | DIANNA TOLLIVER |
| 1967 | BENJAMIN BESZHAK |
| 1968 | DEBORAH CLARK EBEL |
| 1969 | JESSICA SELF |
| 1970 | JENNA BESZHAK |
| 1971 | ERIC W ANDERSON |
| 1972 | JESSE HORSTMAN |
| 1973 | MICHAEL TOLAR |

SER 169

Exhibit A - List of Persons Requesting Exclusion

| 1974 | ANDREA L DOERING |
|------|------------------|
| 1975 | SARA E DICKSON |
| 1976 | CHARLES C DUVALL |
| 1977 | JOHN NEWSOME |
| 1978 | COREY SALZANO |
| 1979 | CHETAN SANGHVI |
| 1980 | IRIS GALLEGOS |
| 1981 | SULI TORRES- REYES |
| 1982 | TAMMIE EGER |
| 1983 | MATTHEW DAVIS CIUBA |
| 1984 | ELIZABETH PAPP |
| 1985 | SUSAN MOSER |
| 1986 | CALEB BROWN |
| 1987 | EVAN JACKSON |
| 1988 | SCOTT SELDLITZ |
| 1989 | JOHN KWITEK |
| 1990 | JOHNATHAN IDE |
| 1991 | JEFF LONG |
| 1992 | LINDA POLESELLI |
| 1993 | JEANNETTE LOPEZ |
| 1994 | KRISTYN DUNBAR |
| 1995 | KATERA WILLIAMS |
| 1996 | FELIX E SEEZ |
| 1997 | SHNAE VANDER VEEN |
| 1998 | SHANE VANDER VEEN |
| 1999 | JAMES R WIECZOREK JR |
| 2000 | ABBY BROWN |
| 2001 | ROD BROWN |
| 2002 | SARAH V QUINTANA |
| 2003 | STEPHANIE BERTH |
| 2004 | JULIO RICHARD ANDRES PEDRO |
| 2005 | KELLEY HERDE KERGER |
| 2006 | JENNIFER WONG |
| 2007 | BETH WEBER |
| 2008 | MITCHELL SCHUBBE |
| 2009 | BERT FONSECA |
| 2010 | CASIE WHITE |
| 2011 | ROSEANNA COTELLO |
| 2012 | MICHAEL D BEVILAQUA |
| 2013 | BRIAN D KERN |
| 2014 | CHOUNG DOUNG |
| 2015 | ANTHONY N LEONE |
| 2016 | RAJESH MOORKATH |
| 2017 | ALEX PALACIO |
| 2018 | EDREI E WHITTMORE |
| 2019 | MARK MATTHEWS |
| 2020 | MICHAEL MORRISON |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 2021 | ROBBIE M POLLARD |
| 2022 | WILLIAM B WOOLLEY |
| 2023 | CHRISTINA JOHNSON |
| 2024 | MICHAEL A ROGER |
| 2025 | ANTON MAVRIN |
| 2026 | AMY B BUTTON |
| 2027 | ROSALBA PENA |
| 2028 | TIMOTHY GLASER |
| 2029 | JOEANNE BROWN |
| 2030 | CATHLEEN C PETERS |
| 2031 | CRYSTAL L SIMMONS |
| 2032 | GIAN FERRAI |
| 2033 | ELIZABETH L SURRATT |
| 2034 | CHARLENE DAUZAT |
| 2035 | DARPAN H SHAH |
| 2036 | DAVID MICHAEL GIANNELLI |
| 2037 | SCOTTY SAITO |
| 2038 | HERIBERTO GONZALEZ |
| 2039 | SARAH BUFFO |
| 2040 | TIFFANY MIELCAREK |
| 2041 | LAWRENCE OSIRIS |
| 2042 | KATHERINE BIRMONGHAM |
| 2043 | RANI SITTY |
| 2044 | PETER FRATINI |
| 2045 | JUANITA WOODARD |
| 2046 | PHILLIP D SHUPE |
| 2047 | RISHI JAGLAL |
| 2048 | TRUDY TAVOREK KOBYLSKI |
| 2049 | STEVEN FAIRCLOTH |
| 2050 | MARIA ISABELA MONTIEL |
| 2051 | MADELINE HARRINGTON |
| 2052 | RICHARD MURRAY |
| 2053 | TROY GRZANNA |
| 2054 | SHERMAN RISDALL |
| 2055 | WANDA I COLON NAVARRO |
| 2056 | KELLY RATLIFF |
| 2057 | JONATHAN D BREWER |
| 2058 | AARON D & DAWN M IRONS |
| 2059 | JOSE A LERMA III |
| 2060 | DAVID KORNBLUM |
| 2061 | WILLIAM F HECKER |
| 2062 | PHYLLIS M BRACHMAN |
| 2063 | ANN MARIE OMAHONY |
| 2064 | PETER M LUJAN |
| 2065 | JONATHAN GRIM |
| 2066 | BERTHE NGODOCK |
| 2067 | PAUL NAZARIAN |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 2068 | DEREK VAN HEEL |
| 2069 | NATHAN WERSAL |
| 2070 | JEFF RAMIN |
| 2071 | ANGELA T PISANO |
| 2072 | MICHAEL GRAHAM |
| 2073 | LYNN STAECKELER |
| 2074 | DONNA M BERRY |
| 2075 | STACEY L MOORE |
| 2076 | HOWARD D SCHINDEL |
| 2077 | JERRY WILLIAMS |
| 2078 | CESAR GALVEZ |
| 2079 | CYNTHIA BROWN |
| 2080 | EMRAH TASDEMIR |
| 2081 | JOHN STOUTENBURGH |
| 2082 | DJ WARD |
| 2083 | RENAE MUNSON |
| 2084 | MIGUEL ROMERO |
| 2085 | JAMES EVANS |
| 2086 | KARISSA MAK |
| 2087 | IMELDA LOPEZ |
| 2088 | TAYYIB AJIBOLA |
| 2089 | JESSE WOLFGANG |
| 2090 | MARIBEL FELICIANO |
| 2091 | MELODY ELDREDGE |
| 2092 | J DIANE KOOK |
| 2093 | CHUCK SHREFFLER |
| 2094 | MARK LEVESQUE |
| 2095 | JANDIE HARE |
| 2096 | EMILY K FRANCISCO |
| 2097 | DEREK D SALTER |
| 2098 | QIANG XU |
| 2099 | JEQUETTA LEE |
| 2100 | EDWARD STARSKI |
| 2101 | JOSEPH SCHMIDT |
| 2102 | DIANA DRETSKE |
| 2103 | JAZMIN MEJIA JUAN |
| 2104 | EUREKA TUCKER |
| 2105 | JACKIE THOMPSON |
| 2106 | JOEL NISHIDA |
| 2107 | EDWARD RUSSELL MOLARI |
| 2108 | DANIELLE WHITE |
| 2109 | PEYTON HALL |
| 2110 | SHAWN HIATT |
| 2111 | CARRIE HIGO |
| 2112 | KATHLEEN PARRISH |
| 2113 | JOANNE PORTER |
| 2114 | JASON A FRAZIER |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 2115 | MARTIN DELACERDA |
| 2116 | MARTA HESTER |
| 2117 | JEAN STORANDT |
| 2118 | WILLIAM SAUSMAN |
| 2119 | JONATHEN ANTOINE |
| 2120 | DATHAN C LINT |
| 2121 | FLAVIL GEORGE |
| 2122 | CATHY MARTIN |
| 2123 | CHARLENE MINGELS |
| 2124 | ALYSON RULUKED |
| 2125 | JAQUETTA I BULLOCK |
| 2126 | ROBERT W FELTY |
| 2127 | NICHOLAS ABRAJAN |
| 2128 | TERRY GOSSMAN |
| 2129 | EVERAL L SHANNON |
| 2130 | JOHN DERRICO JR |
| 2131 | DENYS VORONOVYCH |
| 2132 | ELENA UMALI |
| 2133 | CARL YUAN |
| 2134 | FREDDIE G LOPEZ |
| 2135 | KAREN I SANDBORG |
| 2136 | SHERRY HOLMES |
| 2137 | LOLA J DURKIN |
| 2138 | BILL DURKIN |
| 2139 | FLORENCE LANKFORD |
| 2140 | KRASSIMIR DIMOV |
| 2141 | JOSHUA KELLY |
| 2142 | DEBRA BLANCHETTE |
| 2143 | JESSICA STALLWORTH |
| 2144 | MELISSA CELIS |
| 2145 | DAVID LAMOTHE |
| 2146 | CARLA J PATAT |
| 2147 | GABRIELLA SIEIRO PAVESI |
| 2148 | ROMAN ILNICKI |
| 2149 | BARBARA UPDIKE |
| 2150 | JOHN DEL KELLEY III |
| 2151 | TROY & JULIE GORE |
| 2152 | TRAVIS PECK |
| 2153 | LANI CREVELING |
| 2154 | SABRINA L RESA |
| 2155 | ABIOLA AKINYEMI |
| 2156 | AMY A JOHNSTON |
| 2157 | DAVID C GRAHAM |
| 2158 | MARY HELSEL |
| 2159 | STEVE POCIUS |
| 2160 | SAMUEL GOODIN |
| 2161 | MARGARET CONWAY |

Exhibit A - List of Persons Requesting Exclusion

| | |
|------|------------------------------|
| 2162 | JESSICA PLATT |
| 2163 | JODI HATHAWAY |
| 2164 | CAROLE TANENHAUS |
| 2165 | SHAUNTEE JONES |
| 2166 | ZARA SHAPIRO |
| 2167 | JOE NOLT |
| 2168 | JABBY LOWE |
| 2169 | HAYLEY MILLER |
| 2170 | CAITLIN E LELIEVRE |
| 2171 | CATHERINE SULLIVAN |
| 2172 | AMY HOLYOAK |
| 2173 | MICHAEL A KELSEY |
| 2174 | WILLIAM KING |
| 2175 | JOHN ANTHONY |
| 2176 | DAVID A RODRIGUEZ |
| 2177 | JARED AND BROOKE GILTHORPE |
| 2178 | SCOTT EDDY |
| 2179 | VIRGINIA SHELBY POWELL |
| 2180 | RANDALL JOHNSON |
| 2181 | JILL MORLAN |
| 2182 | REBECCA RIAN |
| 2183 | VICTOR JOHN YOU |
| 2184 | AHUVA GOLDBERG |
| 2185 | THOMAS KILLEWALD |
| 2186 | CHRISTOPHER J RONK |
| 2187 | DENNIS BRADLEY PAULEY II |
| 2188 | JACK HELTZEL |
| 2189 | EDWIN RIVERA |
| 2190 | STEPHANIE HARTLE |
| 2191 | ALLISON CARTER |
| 2192 | PHILIP ORDILLAS |
| 2193 | ZEFF SAILOR |
| 2194 | TIM & MARGIE RAPLEY |
| 2195 | TIMOTHY RAPLEY |
| 2196 | JOSEPH SCAGLIONE |
| 2197 | JOHN F WORMUTH |
| 2198 | MICHAEL HINT |
| 2199 | XAVIER VARGAS |
| 2200 | BARBARA OGDEN |
| 2201 | LINDA E BRANCH |
| 2202 | KITHE CLEVELAND |
| 2203 | JUDY WHITEHURST |
| 2204 | ANDY SOLOMON |
| 2205 | RYAN FLYNN |
| 2206 | JOAN REZEK |
| 2207 | GAYLE F SMALL |
| 2208 | ROBIN PARKS |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 2209 | JEFFREY SPIER |
| 2210 | KATHRYN MARTIN |
| 2211 | MEGAN JONES |
| 2212 | LANELL WISEMAN |
| 2213 | BRIAN HOPELY |
| 2214 | JEREMY PRAHL |
| 2215 | ANGELINE TRIEU |
| 2216 | CONSTANCE HEMPEL |
| 2217 | CHARLES NORRIS III |
| 2218 | JAY LUTTE |
| 2219 | ROBERT W RENWICK |
| 2220 | PHYLLIS JOHNSON |
| 2221 | LINDSAY KEELER |
| 2222 | REBECCA ALLEVA |
| 2223 | CHARLES PENSABENE |
| 2224 | ALINA COLLISSON |
| 2225 | MICHAEL AND SHRYL GRUSZKA |
| 2226 | CLIFFORD V REED |
| 2227 | CLOVIS D GENTRY |
| 2228 | MARJORIE A LUCIA |
| 2229 | KELLY MATHEWS |
| 2230 | JASON AND BONNIE HASKINS |
| 2231 | DONALD CLARKE |
| 2232 | ANTHONY LOZITO |
| 2233 | NICHOLE MOSES |
| 2234 | CLARISSA J MARKIEWICZ |
| 2235 | KAREN DACA |
| 2236 | ANGIE CUEVAS |
| 2237 | NICHOLAS ADE |
| 2238 | DOUGLAS GOODALE |
| 2239 | SASHA JAGHAI |
| 2240 | JOSEPH L KUBASEK |
| 2241 | SKYLA BOLDEN |
| 2242 | TRISHA SMITH |
| 2243 | ELENA SCOTT |
| 2244 | ROGER MOUSSALLI |
| 2245 | MICHAEL ZIRNESKIE |
| 2246 | DYLAN SELTERMAN |
| 2247 | JAMES J AND MICHELE WILBERS |
| 2248 | MONICA HELSEL |
| 2249 | LINDA BRA |
| 2250 | SCOTT THELEMAQUE |
| 2251 | DAVIEON WARD |
| 2252 | RAYA HARTOUNIAN |
| 2253 | BRIAN HAREY |
| 2254 | BARRY ALEXANDER |
| 2255 | MICHAEL JEZAK |

Exhibit A - List of Persons Requesting Exclusion

| 2256 | JOHANNA PARK |
|------|-------------|
| 2257 | JEFF MATZEN |
| 2258 | TIM ZIMMER |
| 2259 | SARAH LHEUREUV |
| 2260 | NAOMI MINER |
| 2261 | ANDRA DILLARD |
| 2262 | OMAR ORELLANA |
| 2263 | AMBER CROWE |
| 2264 | KIMMIE MURRAY |
| 2265 | BRETT MCCLELLAN |
| 2266 | CHERBY ADAM |
| 2267 | JOHN NECKER |
| 2268 | JEANNE OPPERMAN |
| 2269 | KEITH R LEWIS |
| 2270 | JULIA ENGELHARD |
| 2271 | KENNETH BURTON |
| 2272 | CARL R PARSONS |
| 2273 | JESSICA ANDERSON |
| 2274 | PATRICIA LICARDI |
| 2275 | SAMUEL O POWELL |
| 2276 | RACHEL OKAPAL |
| 2277 | JONATHAN RENNER |
| 2278 | DEBBIE YOUNG KREAMER |
| 2279 | NICKOLAS SWANSON |
| 2280 | TODD J MCBRIDE |
| 2281 | TRACIE MERRILL |
| 2282 | DANIELLE BARBARO HARRELL |
| 2283 | JANEL LEE |
| 2284 | KYLE AND JENNIFER MELCHER |
| 2285 | KRISTIN FAY |
| 2286 | VIVIAN RIEFER |
| 2287 | LESLEY CHRISTIANSEN |
| 2288 | AMBER STARLING |
| 2289 | MARC S DENNING |
| 2290 | PATRICIA C BAILEY |
| 2291 | FRANCES LAWRENCE |
| 2292 | DESTINY EVANS |
| 2293 | DONNA R SPRINGS |
| 2294 | RAYMOND J COULOMBE |
| 2295 | HIRAM LOWERY AND NATALIE LOWERY |
| 2296 | VICTORIA GRANDETTA |
| 2297 | LEONARD MONTES JR |
| 2298 | KASEY LAURAN COCIVERA |
| 2299 | EMILY W ALLEN |
| 2300 | APRIL HALL |
| 2301 | RENEE BRADSHAW |
| 2302 | YOLKEY TAIT |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 2303 | MERCEDES ARNAO |
| 2304 | DEVIN REID |
| 2305 | THOMAS HURST |
| 2306 | REGINALD AND MICHELLE KING |
| 2307 | PIERRE CHARLES |
| 2308 | JASON R HAAK |
| 2309 | RICHARD CANICOSA |
| 2310 | BRITTANY DELISSER |
| 2311 | CHRISTOPHER ASHE |
| 2312 | COLETTE BALLARD |
| 2313 | YVONNA CARTER |
| 2314 | TONI CROCKETT |
| 2315 | VALERIE HADASH |
| 2316 | LOGAN E TISDALE JR. |
| 2317 | ASHLEY BRANDNER |
| 2318 | AARON AIKEN |
| 2319 | WIL SHRADER JR |
| 2320 | DENNIS AND STANNI GABALDON |
| 2321 | MICHELLE SWENSON |
| 2322 | ADAM STAGGS |
| 2323 | SUSAN D CARLSON |
| 2324 | VICKY RUIZ |
| 2325 | MARIA REYES |
| 2326 | JOSE COLON |
| 2327 | PAM HAYASHI |
| 2328 | JANESLL HAYASHI |
| 2329 | JULIE HOFMAN |
| 2330 | BENJAMIN K RUSHING |
| 2331 | DAVID HAHN |
| 2332 | AMBER LAMB |
| 2333 | LEE SMITH II |
| 2334 | ROGER J RUHREN |
| 2335 | JOHN M DESO |
| 2336 | JOSHUA & ARRIE FRAKES |
| 2337 | VICKIE LYNN CAROLE |
| 2338 | ANDREW DUPLER |
| 2339 | KAREN SCOTT |
| 2340 | AMY GASKILL |
| 2341 | DALEESA RAMSDEN |
| 2342 | DAVID GRAHAM |
| 2343 | JENNINE R VICTORY |
| 2344 | ROSIE BENTLEY |
| 2345 | MATTHEW LUPO |
| 2346 | CHRIS LUPO |
| 2347 | RICHARD K O'HARA |
| 2348 | JAVIER MORALES |
| 2349 | LISA M PEARSON |

Exhibit A - List of Persons Requesting Exclusion

| 2350 | SIMON PARIS |
|------|-------------|
| 2351 | ROBERT W ATKINSON |
| 2352 | CARL TATE |
| 2353 | CHRISTINE VINCENTE |
| 2354 | KELLY A BAUR |
| 2355 | VITOR YAMAOTO |
| 2356 | DANIELA OTTO |
| 2357 | DON WRIGHT |
| 2358 | SETH PERRICONE |
| 2359 | YAE LI ELLY CHO |
| 2360 | MARTHA MEZA |
| 2361 | JASON KARPEL |
| 2362 | NATACHA FEOLA |
| 2363 | DAVID CRUMP |
| 2364 | RAYMOND AND CYNTHIA SCHAGENE |
| 2365 | GIFFORD BERRY |
| 2366 | MERLIN HUFF |
| 2367 | CHRISTOPHER NAREZ |
| 2368 | ERICH MIELKE |
| 2369 | LAVONNA ROSS |
| 2370 | AMANDA BREEDEN |
| 2371 | DAISY R SAPIDA |
| 2372 | RYAN & STACY JENKINS |
| 2373 | RAYN & STACY JENKINS |
| 2374 | HAROLD E AHLE |
| 2375 | LULU DAHL |
| 2376 | HELEN LENIO GROHMANN |
| 2377 | CHARLOTTE DIANA MOSLANDER |
| 2378 | SHAUNA DENNIS |
| 2379 | GILES HOFFMANN |
| 2380 | REX MASSEY |
| 2381 | BRIAN K COX |
| 2382 | LORA STRICKLIN |
| 2383 | ANDREW SOMMERS |
| 2384 | RACHEL A PLOOF |
| 2385 | MARK CORNELIUS |
| 2386 | CHRISTINA BAN |
| 2387 | JONATHAN M CRUISE |
| 2388 | KATHY & JONATHON NORFLEET |
| 2389 | SADIYYAH RICE |
| 2390 | ZITAL L BIRTALAN |
| 2391 | MATTHEW & MIA CUNNINGHAM |
| 2392 | JOHN W ROWE |
| 2393 | KRISTY AND JEREMY BRANTLEY |
| 2394 | CHRISTINA HEINTZ |
| 2395 | ROLEY A SALDANA |
| 2396 | THOMAS EMALA |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 2397 | MONAY SIMS |
| 2398 | CODY TUSTIN |
| 2399 | STEPHANIE S SHULTZ |
| 2400 | KEVIN LEONARD |
| 2401 | KATHLEEN M WALSH |
| 2402 | DREW ROMEO |
| 2403 | KERI JAYE CIEMNIEWSKI |
| 2404 | ROSEMARY S JAMES |
| 2405 | ISAIAS A GARCIA |
| 2406 | SUSANNE CAROL HUGHES |
| 2407 | CAROLYN WRIGHT |
| 2408 | ALEXANDRIA E PRYOR |
| 2409 | MELANIE CROFWELL |
| 2410 | RACHEL MUSICK |
| 2411 | KEITH M NIGHTINGALE |
| 2412 | CHRISTINA RALEY |
| 2413 | MARIA COSTA |
| 2414 | MOLLY CATHERINE DAVIS |
| 2415 | GREGORY SMEGAL |
| 2416 | JAMISON R NARBAITZ |
| 2417 | SHERVA FORRESTER |
| 2418 | EBONY BURNS |
| 2419 | JOEL HELMICH |
| 2420 | MICHELLE GREER |
| 2421 | CAROLYN H LINDSEY |
| 2422 | TERESA LEONARD |
| 2423 | BRAD DEARDORFF |
| 2424 | JOHN WINSLOW |
| 2425 | KEVIN ANTHONY |
| 2426 | GARY LABRUM |
| 2427 | KENNETH E GOBLE JR |
| 2428 | SHANNON GRIPPANDO |
| 2429 | CHRISTOPHER BURREI |
| 2430 | MEGAN N PEARSON |
| 2431 | JOHN FARLEY |
| 2432 | JEREMY DILLON |
| 2433 | MICHAEL D HERPEL |
| 2434 | ZACHARY WALTON |
| 2435 | DENISE TERRY |
| 2436 | YELENA BETZ |
| 2437 | MD SAIF KHAN |
| 2438 | STANLEY A & MARGARET D MORGAN |
| 2439 | MCARCELO DE OLIVEIRA |
| 2440 | WILLIAM I YAMAMOTO |
| 2441 | TORRENCE BURROWES |
| 2442 | SARAH LYONS & JIM WEHRHEIM |
| 2443 | JENNIFER L HOLLOWAY |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 2444 | DAVID GLADSTONE |
| 2445 | MARGOT REYES |
| 2446 | ANTHONY GIORDANO |
| 2447 | HELENA C GIANNINI |
| 2448 | JEFFREY P GILLES |
| 2449 | ADAM KRAGT |
| 2450 | SAFA SALMAN |
| 2451 | LAWRENCE JUNG |
| 2452 | SHERIWANA SIMMONS |
| 2453 | LISA OLIVER |
| 2454 | GREGORY HUTCHINGS |
| 2455 | CISSE |
| 2456 | KIMBERLY POWELL |
| 2457 | SALINA KINARD |
| 2458 | STEVEN FRANKLIN |
| 2459 | WIL J VAN OLDERMARK |
| 2460 | RANDALL S JACKS |
| 2461 | ADDISSEW AYALEW |
| 2462 | FABIAN DURAN |
| 2463 | DIANA ROBINSON |
| 2464 | PAULINE ARRINGTON |
| 2465 | STEPHANIE WHITEFORD |
| 2466 | DIBYENDU MANDAL |
| 2467 | MARK PETERS |
| 2468 | JERRY HARMON |
| 2469 | CHARLES CUMMINGS |
| 2470 | MERCEDES PALACIDOS |
| 2471 | MAGGIE MEDCALF |
| 2472 | L YMAS |
| 2473 | DONICA BELL |
| 2474 | MARY ANN ROWE |
| 2475 | LISA MARIE ADAMO |
| 2476 | SHANE OSBORN |
| 2477 | JUAN SOLIS |
| 2478 | TIMOTEI VADUVA |
| 2479 | ROY MOORE |
| 2480 | MARCELLA RUIZ |
| 2481 | CONNIE MOOS |
| 2482 | JOAN FIELD |
| 2483 | JACOB BRAIN |
| 2484 | JOSEPH CILLUFO |
| 2485 | CESAR CUBELO |
| 2486 | STANTONENA MCDANIELS |
| 2487 | LINDA BROOKS |
| 2488 | DARIUS TAMMAMI |
| 2489 | MICHAIL BORISOV |
| 2490 | GABRIEL HARGRAVE |

Exhibit A - List of Persons Requesting Exclusion

| | |
|---|---|
| 2491 | LOTTIE ELSASSER |
| 2492 | RACHEL WASSENER |
| 2493 | SUSANA LOZANO |
| 2494 | TAMARA ARIES |
| 2495 | BRENDA SIM |
| 2496 | JEFFREY ERHARDT |
| 2497 | MARIA DA SILVA |
| 2498 | NATHAN FEEZOR |
| 2499 | KATIE KVEN |
| 2500 | CYNTHIA WOODHEAD |
| 2501 | THOMAS ALLEGRO |
| 2502 | JOHN BURKE |
| 2503 | EDWARD DOLEZAL |
| 2504 | AMY HIRSHMAN |
| 2505 | JENNIFER MARRINAN |
| 2506 | NANCY WILLIAMS |
| 2507 | KARI PENKOFF |
| 2508 | SALINA KINARD |

1  KEITH E. EGGLETON, State Bar No. 159842
   Email: keggleton@wsgr.com
2  RODNEY G. STRICKLAND, State Bar No. 161934
   Email: rstrickland@wsgr.com
3  DALE BISH, State Bar No. 235390
   Email: dbish@wsgr.com
4  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
5  650 Page Mill Road
   Palo Alto, CA 94304-1050
6  Telephone:   (650) 493-9300
   Facsimile:   (650) 565-5100
7
   Attorneys for Defendant
8  NETFLIX, INC.

9                  UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11                       SAN JOSE DIVISION

12

13  IN RE: NETFLIX PRIVACY LITIGATION )    CASE NO.:  5:11-CV-00379-EJD
                                       )
14                                     )    JUDGE: Hon. Edward J. Davila
                                       )
15                                     )    **NETFLIX INC.'S RESPONSE TO**
                                       )    **OBJECTIONS TO CLASS ACTION**
16                                     )    **SETTLEMENT**
                                       )
17                                     )    Date: December 5, 2012
                                       )    Time: 10:00 a.m.
18                                     )    Location: Courtroom 4, 5th Floor
                                       )
19                                     )
                                       )
20                                     )
                                       )
21  _____ )

22

23

24

25

26

27

28

NETFLIX'S RESPONSE TO OBJECTIONS
CASE NO.:  5:11-CV-00379-EJD

**SER 182**

1   811, 818 (9th Cir. 2012) (affirming approval of privacy class action settlement consisting of

2   injunctive remedy and $9.5 million *cy pres* settlement fund).

3        The vast majority of the objections to the settlement take issue with the *cy pres* aspect of

4   the settlement with many suggesting that class members should receive a substantial monetary

5   payment. These objectors ignore that this is exactly the type of settlement in which *cy pres* is

6   appropriate, as the Ninth Circuit recently recognized in *Lane v. Facebook*. Specifically, the

7   settlement fund here is "non-distributable" because distributing less than $9 million (i.e., the fund

8   less expenses and any award of attorneys fees) amongst tens of millions of class members "would

9   be infeasible given that each class member's direct recovery would be de minimis" and

10  prohibitively expensive. *Id.* at 819, 821. These objections also fail to give weight to the

11  injunctive aspect of the settlement and do not take into account the strength of Netflix's defenses

12  on the merits or the other significant hurdles to classwide recovery in this case. *Id.* at 818-19

13  ("Both the district court and this court must evaluate the fairness of a settlement as a whole, rather

14  than assessing its individual components.").

15       First, the injunctive aspect of the settlement provides a benefit to every member of the

16  class. In the event a class member cancels her subscription and does not rejoin within one year,

17  Netflix will "decouple" her Entertainment Content Viewing Histories from her Identification

18  Information and Payment Method. This is the fundamental aspect of the settlement because it

19  addresses the core allegation of the complaint about Netflix retaining member information. *See,*

20  *e.g.*, AC ¶¶ 20-40; 54-56. Netflix is not legally obligated to make this change to its systems,

21  which will require substantial engineering effort and expense, but has agreed to do so as part of

22  the settlement.

23       Second, the class is unlikely to prevail on the merits of these claims because Netflix

24  complies with the Video Privacy Protection Act ("VPPA"). Plaintiffs' primary allegation is that

25  Section 2710(e) of the VPPA requires Netflix to destroy "personally identifiable information" or

26  "PII" for former Netflix subscribers. That section of the statute provides:

27         A person subject to this section shall destroy personally identifiable information as
    soon as practicable, but no later than one year from the date the information is no
28         longer necessary for the purpose for which it was collected and there are no

NETFLIX'S RESPONSE TO OBJECTIONS,                    -2-
CASE NO.: 5:11-CV-00379-EJD

1  9.1 above shall not prevent the Agreement from becoming effective, nor shall it be grounds for

2  termination.").

3       From the inception of this lawsuit, Netflix has been prepared to demonstrate that it

4  complies with the federal and state privacy laws, including the VPPA.  However, because the

5  proposed settlement is "fair, adequate and reasonable," Netflix respectfully requests the objections

6  to the class action settlement be overruled and that plaintiffs' Motion for Final Approval be

7  granted.

8

9  DATED:  November 28, 2012          WILSON SONSINI GOODRICH & ROSATI
                                      Professional Corporation
10

11                                    By:    /s/ Keith E. Eggleton
                                             Keith E. Eggleton
12
                                      Attorneys for Defendant
13                                    NETFLIX, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| *IN RE: NETFLIX PRIVACY LITIGATION* | Case No. 5:11-cv-00379-EJD |
|  | **AFFIDAVIT OF TORE HODNE** |
|  | [Hon. Edward J. Davila] |

## AFFIDAVIT OF TORE HODNE

1.      I, Tore Hodne, state as follows.

### Affiant

2.      I am a Senior Project Administrator for Rust Consulting, Inc. ("Rust Consulting"), and I have been employed at Rust Consulting since December 8, 1997. Rust Consulting serves as the Court-appointed Settlement Administrator, as defined in the Preliminary Approval Order, for the above-captioned case. I am responsible for supervising the services provided by Rust Consulting for this matter. My business address is 625 Marquette Avenue, Suite 880, Minneapolis, Minnesota 55402.

3.      I am over twenty-one years of age, and I am legally competent and authorized to make this affidavit on behalf of Rust Consulting. I make this affidavit of my own personal knowledge and, if called as a witness, could and would testify competently thereto.

4.      Pursuant to the Settlement Agreement, Rust Consulting created a Settlement Website containing the long form notice and information regarding Class Members rights and other information regarding the settlement. Long-form notices were made available in English and Spanish. The website (www.videoprivacyclass.com) was activated on July 24, 2012. As of October 30, 2012, the Settlement Website has been viewed 128,549 times.

5.      Pursuant to the Settlement Agreement, Rust Consulting established a toll-free

AFFIDAVIT OF TORE HODNE                                    CASE NO. 5:11-CV-00379-EJD

1  number, 1-866-898-5088, to allow individuals to call and receive answers to frequently asked

2  questions, and to request to have a notice mailed to them.  The phone line was opened to the

3  public on July 24, 2012.

4        6.    As of October 26, 2012, 37,979 calls have been received at this toll-free number.

5  Rust has also mailed approximately 7,220 notices to individuals based upon their requests via

6  the toll-free number.

7        7.    On May 15, 2012, Rust Consulting established a post office box for the receipt

8  of exclusion requests and other administrative mail.

9        8.    As of October 26, 2012, Rust has received approximately 2,157 exclusion

10  requests.  As the deadline for filing for exclusion is November 14, 2012, Rust will continue to

11  process exclusion requests as they are received.  In addition, Rust has received approximately

12  307 pieces of other administrative mail, regarding address changes and the like.

13        9.    As of October 30, 2012, Rust Consulting has incurred $114,570.58 in costs

14  administrating the Settlement, and expects to incur $35,000.00 in future costs relating to

15  administration.

16

17      I certify under penalty of perjury and under the laws of the United States, that
the preceding is true and correct to the best of my knowledge.  Executed this 30th day

18  of October 2012 at Minneapolis, Minnesota.

19

20  _____
           Tore Hodne

21  Sworn and subscribed to before
me this 30th day of October, 2012.

22

23

24  _____

25  A.    **Notary Public**

26

27

28

VANESSA HERNANDEZ
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/2016

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| *IN RE: NETFLIX PRIVACY LITIGATION* | Case No. 5:11-cv-00379-EJD |
| | **DECLARATION OF DR. SERGE EGELMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL** |
| | [Hon. Edward J. Davila] |

**DECLARATION OF DR. SERGE EGELMAN**

Pursuant to 28 U.S.C. § 1746, I, Dr. Serge Egelman, hereby declare and state as follows:

1.      I am a resident of the State of California, and am a computer scientist. A copy of my curriculum vitae is attached hereto as Exhibit 1. I am over the age of eighteen and am fully competent to make this declaration. This declaration is based upon my personal knowledge, except where expressly noted otherwise.

**Initial Basis for Analysis**

2.      For purposes of this declaration, I have been asked to determine the monetary harm to class members as a result of Netflix's allegedly unlawful retention of their personally-identifiable video rental histories (hereinafter "video histories.") My conclusions are stated herein, and are explained more fully in my report attached hereto as Exhibit 2.

3.      I have reviewed a significant number of documents in this case including the complaint and the settlement agreement reached by the parties. I have also reviewed the existing literature concerning behavioral economics and privacy practices, as well as the underlying data from my own previous studies of privacy valuations. Additionally, I conducted an online survey in order to identify reasonable proxies for PII from the existing privacy literature.

**Analysis**

4.      By reviewing the existing behavioral economics studies, conducted by myself and

1   others, I concluded that the upper and lower bounds for the Class's harm in this litigation are

2   $0.41 and $0.15, respectively.

3        5.      Then, because none of the existing literature measured the value of video histories,

4   I conducted a survey using Amazon's Mechanical Turk to determine a reasonable proxy for the

5   Class members' video histories. Through the survey, I determined that batteries were most

6   similar to PII in terms of value of privacy.

7        6.      By then looking to existing literature that analyzed the value of privacy in battery

8   purchases, I determined that Netflix's allegedly unlawful retention of the Class members' video

9   histories caused damages of $0.15 per person.

10  **Conclusion**

11       7.      Thus, if the $0.15 per person damages figure applied across the roughly 62 million

12  person class brings total, class-wide damages would total approximately $9.3 million. This is

13  likely a serious over-estimation, however, because only some of the Class members—those who

14  have cancelled their Netflix subscriptions—have suffered damages as a result of the alleged

15  retention. Based on publicly available data, I estimate that roughly one-half of the Settlement

16  Class have cancelled their subscriptions and thus suffered damages from Netflix's alleged

17  retention. Thus, by my calculations, the Settlement Class suffered roughly $4.65 million in

18  aggregate actual damages, and the $9 million Settlement Fund offers a more than adequate result

19  for the Class.

20       8.      Additionally, the injunctive relief further enhances the Settlement's value to the

21  Class. By preventing Netflix from unlawfully retaining the Class members' PII going forward,

22  the injunctive relief is preventing harm of $0.15 to each current Netflix subscriber, thereby

23  giving the injunctive relief $4.65 million in value to the Class.

24       9.      When viewing the Settlement as a whole, the combination of the Settlement Fund

25  and the valuable injunctive relief provides a beneficial result that outweighs the harm suffered by

26  the Class.

27

28

DECLARATION IN SUPPORT OF                        2                    CASE NO. 5:11-CV-00379-EJD
MOTION FOR FINAL APPROVAL

1    Executed on October 30, 2012 at Berkeley, California.

2

3    _____

4    Dr. Serge Egelman

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION IN SUPPORT OF                    3                    CASE NO. 5:11-CV-00379-EJD
MOTION FOR FINAL APPROVAL

SEAN P. REIS (SBN 184044)
sreis@edelson.com
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Phone: 949.459.2124
Fax:  949.459.2123

JAY EDELSON (jedelson@edelson.com)*
RAFEY S. BALABANIAN (rbalabanian@edelson.com)*
ARI J. SCHARG (ascharg@edelson.com)*
CHANDLER R. GIVENS (cgivens@edelson.com)*
EDELSON MCGUIRE LLC
350 North LaSalle Drive, Suite 1300
Chicago, Illinois 60654
Phone: 312.589.6370
Fax:  312.589.6378
*Admitted *pro hac vice*

*Attorneys for Plaintiffs JEFF MILANS and PETER
COMSTOCK and the SETTLEMENT CLASS*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| *IN RE: NETFLIX PRIVACY LITIGATION* | Case No. 5:11-cv-00379-EJD |
| | [Hon. Edward J. Davila] |
| | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AND MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD** |
| | Date:    December 5, 2012 |
| | Time:   10:00 a.m. |
| | Location: Courtroom 4, 5th Floor |

<u>**NOTICE OF MOTION**</u>

**NOTICE IS HEREBY GIVEN** that the Plaintiffs will move the Court, pursuant to Federal Rule of Civil Procedure 23(e), to grant final approval of the settlement in this class action on December 5, 2012, at 10:00 a.m., or at such other time as may be set by the Court, at 280 South 1st Street, San Jose, CA 95113, Courtroom 4, 5th Floor, before the Honorable Edward J. Davila. Plaintiffs, as representatives of the Class, seek final approval of the class action settlement reached in this action as fair, reasonable, and adequate. The Motion is based on this Notice of Motion, the authorities cited in the attached Memorandum in Support, oral argument of counsel, all of the documents in the record, and any other matter that may be submitted or raised at the hearing on the motion.

Dated: October 31, 2012                       Respectfully Submitted,

**JEFF MILANS and PETER COMSTOCK**, individually and on behalf of a class of similarly situated individuals,

By: /s/ Jay Edelson
One of Plaintiffs' Attorneys

JAY EDELSON (jedelson@edelson.com)*
RAFEY S. BALABANIAN (rbalabanian@edelson.com)*
ARI J. SCHARG (ascharg@edelson.com)*
CHANDLER R. GIVENS (cgivens@edelson.com)*
EDELSON MCGUIRE LLC
350 North LaSalle Drive, Suite 1300
Chicago, Illinois 60654
Phone: 312.589.6370
Fax:  312.589.6378

SEAN P. REIS (sreis@edelson.com) (SBN 184044)
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Phone: 949.459.2124
Fax:  949.459.2123

*Attorneys for Plaintiffs* JEFF MILANS, PETER COMSTOCK
and the SETTLEMENT CLASS

*Admitted *Pro Hac Vice*

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................. 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ........................... 4

       A.    The Vulnerability of Private Customer Information and the VPPA .................. 4

       B.    Netflix's Indefinite Retention of the Plaintiffs' Private Information.................. 5

       C.    Litigation, Mediation, and Settlement ................................. 6

       D.    Notice and *Cy Pres* Selection Process................................ 8

III.   CLASS COUNSEL'S ANALYSIS OF THE CLASS'S CLAIMS ............... 10

       A.    Likely Recovery on the Unlawful Disclosure Claims .......................... 10

             1.    The merits of Plaintiffs' disclosure theories .................... 10

             2.    The likelihood of adversarial class certification ............... 12

             3.    The range of recovery at trial ................................. 13

       B.    Likely recovery on Plaintiffs' theory of unlawful retention ................ 15

             1.    The merits of Plaintiffs' retention claims .................... 15

             2.    The likelihood of adversarial class certification ............. 16

             3.    The range of recovery at trial ............................... 16

       C.    Net Present Value of the Class's Claims ............................. 18

IV.    KEY TERMS OF THE SETTLEMENT ........................................... 18

       A.    Class Definition ............................................... 18

       B.    Injunctive Relief ............................................. 19

       C.    Settlement Fund Payments ...................................... 19

       D.    *Cy Pres* Distribution .......................................... 20

       E.    Payment of Notice and Administrative Expenses .................. 24

       F.    Compensation for the Class Representatives ..................... 25

       G.    Payment of Attorneys' Fees and Expenses ....................... 24

       H.    Release of Claims ............................................. 24

V.     THE CLASS NOTICE COMPORTS WITH DUE PROCESS AND RULE 23. .......... 25

VI.    THE SETTLEMENT WARRANTS FINAL APPROVAL. ........................ 27

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF          i          CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

SER 192

| | | |
|---|---|---|
| A. | The Strength of Plaintiffs' Case | 28 |
| B. | The Risk of Continued Litigation | 29 |
| C. | The Risk of Maintaining Class Action Status | 30 |
| D. | The Amount Offered in the Settlement is Substantial. | 31 |
| | 1. The $9 million fund is sufficient | 31 |
| | 2. The *cy pres* distribution is the best method of benefiting the Class. | 32 |
| E. | The Extent of Discovery Completed and the Stage of Litigation | 35 |
| F. | The Experience and Opinion of Counsel | 36 |
| G. | The Presence of a Governmental Participant | 37 |
| H. | The Reaction of the Class Members to Date | 37 |
| I. | Given the Absence of Any Signs of Collusion, the Settlement Does Not Require Additional Scrutiny. | 38 |

VII. THE FEE AWARD SOUGHT HERE IS REASONABLE USING EITHER THE PERCENTAGE OR LODESTAR METHOD IN LIGHT OF THE RISK COUNSEL TOOK AND THE BENEFIT THEY CONFERRED ON THE CLASS. .......... 41

| | | |
|---|---|---|
| A. | Class Counsel's Benchmark Fee Request is Appropriate Under the Percentage Method. | 42 |
| | 1. Class Counsel achieved superior results for the Class. | 44 |
| | 2. Plaintiffs' novel and untested claims carried a substantial amount of risk. | 45 |
| | 3. Prosecuting this case required substantial skill, resulting in the highest quality of representation for the named Plaintiffs and the Class. | 46 |
| | 4. Class Counsel advanced significant time and expense on a contingency basis. | 46 |
| | 5. Class Counsel's fee request is consistent with awards in similar cases. | 48 |
| B. | The Agreed-Upon Fee Is Reasonable Using the Lodestar Method of Analysis as a Cross-Check. | 50 |
| | 1. Class Counsel's current lodestar of $1,352,025 is reasonable, is comprised of reasonable hours and reasonable rates, and supports the requested attorneys' fees. | 51 |
| | 2. A comparison with analogous settlements supports the application of a 1.66 multiplier. | 52 |

Pls' Mot. for Final Approval of And Award of         ii         Case No.: 5:11-cv-00379-EJD
Attorneys' Fees, Expenses, and Incentive Award

SER 193

**C.**     **Class Counsel is Further Entitled to Reimbursement of Litigation Expenses.** ................................................................................. 54

**D.**     **The Court Should Approve the Agreed-Upon Incentive Awards to Plaintiffs and the Other Class Representatives.** .................................... 54

**VIII.**   **CONCLUSION** ................................................................................. 56

## TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*Byrd v. Civil Serv. Comm'n*, 459 U.S. 1271 (1983)..............................................27

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)..........................................13

*Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001). .................................13

*Hensley v. Eckerhart*, 461 U.S. 424 (1983)..........................................52

*Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414 (1968). ..............................28

*Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011)..........................................11

*State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). .....................................13, 14

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)..........................................12, 16

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566 (9th Cir. 2004).....................................27

*Cunningham v. City of Los Angeles*, 879 F.2d 481 (9th Cir. 1988). ..................................50

*Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010)....................................27–28

*Fishel v. Equitable Life Assur. Society of U.S.*, 307 F.3d 997 (9th Cir. 2002)..........................42, 53

*Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330 (9th Cir. 1977)..........................12, 16

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). ............ 39, 40, 41, 42, 43

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000)..................................29–30, 35, 55

*In re Mercury Interactive Corp.*, 618 F.3d 988 (9th Cir. 2010).....................................42

*In re Pacific Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995). ..........................................36

*In re Prudential Ins. Co.*, 148 F.3d 283 (3rd Cir. 1998). ..........................................53

*In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994)....................45

*Lane v. Facebook*, No. 10-16380, 2012 WL 4125857 (9th Cir. Sept. 20, 2012)......................*passim*

*Lewis v. Anderson*, 692 F.2d 1267 (9th Cir. 1982). ..........................................42

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975)..........................................50, 53

*Molski v. Gleichi*, 318 F.3d 937 (9th Cir. 2003). ................................................. 27

*Morales v. City of San Rafael*, 96 F.3d 359 (9th Cir. 1996). ............................... 52

*Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007). ......................... 2

*Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011). ............................. 2, 31, 33

*Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615 (9th Cir. 1982). ................................................. 29, 32

*Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268 (9th Cir. 1989). ....................... 42

*Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13 (2d Cir. 2003). ......................... 13, 14

*Powers v. Elchen*, 229 F.3d 1249 (9th Cir. 2000). ................................................. 39–40

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009). ......................... *passim*

*Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301 (9th Cir.1990). .......................... 43

*State of Fla. v. Dunne*, 915 F.2d 542 (9th Cir. 1990). ................................................. 41

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003). ................................... 40, 50, 54, 55

*Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535 (7th Cir. 2012). ..................... 4, 7, 15

*Edwards v. First Am. Corp.*, 610 F.3d 514, 517 (9th Cir. 2010). ......................... 11

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002). ............... 42, 43, 45, 48, 50, 52–53

*Wing v. Asarco Inc.*, 114 F.3d 986 (9th Cir. 1997). ............................................. 53

**UNITED STATES DISTRICT COURT CASES:**

*Blanco v. CEC Entm't Concepts L.P.*, No. 07-cv-0559 GPS, 2008 WL 239658 (C.D. Cal. Jan. 10, 2008). ......................... 13, 14

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979). ......................... 36

*Castaneda v. Burger King Corp.*, No. C-08-04262-WHA, 2010 WL 2735091 (N. D. Cal. Jul. 10, 2010). ................... 53

*Doe 1 v. AOL, LLC*, 719 F. Supp. 2d 1102 (N.D. Cal. 2010). ......................... 11

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF   v   CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

SER 196

*Fernandez v. Victoria Secret Stores, LLC*,
    No. CV 06-04149 MMM SHX, 2008 WL 8150856 (C.D. Cal. July 21, 2008)............ 48–49

*Garner v. State Farm Mut. Auto Ins. Co.*,
    No. CV-08-1365-CW, 2010 WL 16877832 (N.D. Cal. Apr. 22, 2010). ....................... *passim*

*Hammer v. JP's Sw. Foods, L.L.C.*, 267 F.R.D. 284 (W.D. Mo. 2010). .................................... 12, 16

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1988). ............................................................... 27

*Harris v. Circuit City Stores, Inc.*,
    No. 07-cv-02512, 2008 WL 400862 (N.D. Ill. Feb. 7, 2008). ............................................... 12

*Hernandez v. Kovacevich*, 2005 WL 2435906 (E.D. Cal. 2005). ............................................... 49

*Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001). .................................................. 55

*In Re Facebook Privacy Litig.*, 10-cv-02389-JW, Dkt. No. 69 (N.D. Cal. Decl. 10, 2010). ..... 36–37

*In re: Google Buzz Privacy Litig.*,
    No. 10-cv-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011) ........................... *passim*

*In re Google Buzz Privacy Litig.*,
    No. 5:10–cv–00672–JW, Dkt. Nos. 41, 128 (N.D. Cal. 2010). ........................................... 45

*In re Heritage Bond Litig.*,
    No. 02-ML-1475-DT, 2005 WL 1594389 (C.D. Cal. June 10, 2005). .......................... 32, 46

*In re HP Laser Printer Litig.*,
    No. SACV 07-0667 AG RNBX, 2011 WL 3861703 (C.D. Cal. Aug. 31, 2011). ............... 39

*In re HPL Technologies, Inc. Securities Litigation*, 366 F. Supp. 2d 912 (N. D. Cal. 2005). ......... 53

*In re Immunex Sec. Litig.*, 864 F. Supp. 142 (W.D. Wash. 1994)................................................... 49

*In re Informix Corp. Sec. Litig.*, No. 97-1289 (N.D. Cal., Nov.23, 1999). ....................................... 49

*In re Melridge, Inc. Sec. Litig.*,
    No. 87-1426 (D. Or. Mar. 19, 1992, Nov. 1, 1993, and Apr. 15, 1996). ............................ 49

*In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297 (E.D.N.Y. 2010). ............................... 43

*In re Nat'l Health Labs. Sec. Litig.*, Nos. 92-1949 & 93-1694 (S.D. Cal. Aug. 15, 1995)............. 49

*In re Netflix Privacy Litig.*, 11-cv-00379-EJD, Dkt. 59 (N.D. Cal. 2011). ...................................... 37

*In re OmniVision Tech, Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008). ..................................... *passim*

*In re Oracle Securities Litig.*, 131 F.R.D. 688 (N.D. Cal. 1990)....................................................... 41

*In re Toys R Us Antitrust Litig.*, 191 F.R.D. 347 (E.D.N.Y. 2000).................................................. 43

*Kaufman v. Am. Express Travel Related Servs., Inc.*, 283 F.R.D. 404 (N.D. Ill. 2012). ................. 25

*LaCourt v. Specific Media,*
    No. SACV 10-1256-GW(JCGx), 2011 WL 1661532 (C.D. Cal. Apr. 28, 2011). .......... 11, 14

*Lane v. Facebook, Inc.,*
    No. C 08-3845 RS, 2010 WL 2076916 (N.D. Cal. May 24, 2010)......................... 48, 49, 53

*Lewis v. Starbucks Corp.*, No. 07-cv-00490, 2008 WL 4196690 (E.D. Cal. Sept. 11, 2008). ......... 28

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005)................................................ 30

*Low v. LinkedIn Corp.*, No. 11-cv-01468, 2011 WL 5509848 (N.D. Cal. Nov. 11, 2011)........ 11, 14

*Missaghi v. Blockbuster, LLC,*
    No. 11-2559-JRT-JSM, Dkt. No. 48 (D. Minn. Aug. 7, 2012). ........................................... 37

*Nat'l Rural Telecomms. Corp. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004). ..................... 35

*Nobles v. MBNA Corp.*, No. C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009). ...... 48

*O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359 (C.D. Cal. 1997). ............................................... 12

*Ozga v. U.S. Remodelers, Inc.,*
    No. C-09-05112-JSW, 2010 WL 3186971 (N. D. Cal. Aug. 9, 2010)................................. 53

*Razilov v. Nationwide Mut. Ins. Co.,*
    No. 01-CV-1466-BR, 2006 WL 3312024 (D. Or. Nov. 13, 2006). ..................................... 49

*Rodriguez v. Sony Computer Entm't of Am. LLC,*
    No. 11-cv-4084-PJH, Dkt. 59 (N.D. Cal. Apr. 20, 2012). .............................................. 11, 15

*Sterk v. Best Buy Stores, L.P.,*
    No. 11-cv-01894, 2012 WL 5197901 (N.D. Ill. Oct. 17, 2012). ............................. 11, 15, 16

*Sterk v. Redbox Automated Retail, LLC,*
    No. 11-cv-01729, 2012 WL 3006674 (N.D. Ill. July 23, 2012). .......................................... 11

*Tarlecki v. bebe Stores, Inc.,*
    No. C 05-1777 MHP, 2009 WL 3720872 (N.D. Cal. Nov. 3, 2009). ................................... 43

*Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294 (N.D. Cal. 1995). ..................................... 54, 55

SER 198

*White v. Experian Info. Solutions, Inc.*,
   No. 05-cv-1070 DOC, 2011 WL 2971957 (C.D. Cal. July 15, 2011)................................ 54

**STATE COURT CASES:**

*In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 96 Cal. Rptr. 3d 127 (2009). .................... 43

**STATUTES:**

18 U.S.C. § 2710. ............................................................................................................ *passim*

28 U.S.C. § 1715. ............................................................................................................ 38

Cal. Bus. & Prof. Code § 17200.............................................................................................. 15

Fed. R. Civ. P. 23. .......................................................................................................... 27, 31, 54


**MISCELLANEOUS:**

134 Cong. Rec. S5399 (May 10, 1988). .......................................................................................... 1

4 William B. Rubenstein et al., *Newberg on Class Actions* § 11:38 (4th ed. 2008). ...................... 55

Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:03 (3d ed. 1992). ................. 52

Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11:41 (4th ed. 2002). .......... 28, 42

Logan, 24 Class Action Rep.............................................................................................. 52

Manual for Complex Litig. (Fourth) § 21.61 (2004)....................................................... 26

R. LeCours, Note,
   *Steering Clear of the "Road to Nowhere": Why the BMW Guideposts Should Not
   be Used to Review Statutory Penalty Awards*, 63 Rutgers L. Rev. 327 (2010). ................. 13

Stuart Logan et al., *Attorney Fee Awards in Common Fund Class Actions*,
   24 Class Action Rep. 167 (2003). ................................................................................ 42

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF        viii        CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

SER 199

**MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND AWARD OF
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD**

## I.   INTRODUCTION

> "[T]he trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."
>
> – Senator Patrick Leahy, 134 Cong. Rec. S5399 (May 10, 1988) (introducing precursor bill to the Video Privacy Protection Act)

The instant class action settlement—which seeks to resolve six[1] nationwide putative class actions that challenged the way Defendant Netflix, Inc. ("Defendant" or "Netflix") retained and used its subscribers' Entertainment Content Viewing Histories and Identification and Payment Methods (collectively "PII") in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA")[2]—not only satisfies Rule 23's "fair, reasonable, and adequate" standard, it is a significant victory for Plaintiffs and the Class.

Indeed, the Settlement: (1) goes above and beyond the test recently articulated by the Ninth Circuit for consumer privacy class actions and is similar to, or better than, other privacy settlements approved in recent years, (2) provides a *cy pres* distribution that offers far more value for the Class than any (ultimately undistributable) *de minimis* cash payments ever could, (3) recovers value *in excess of* the actual harm alleged to have been suffered in this case, and equal to the present value of the case, even when statutory damages are factored in, and (4) stops the conduct the VPPA was enacted to prevent before Plaintiffs and the Class suffered any substantial injury. As such, and as explained in detail below, the Settlement is not only deserving of this Court's final approval, it should serve as a model for future settlements of this sort that utilize the structure of a substantial *cy pres* distribution from a non-reversionary common fund.

---

[1]    This class action settlement, if finally approved, will resolve the claims asserted in the following class action lawsuits, which were related and consolidated with this case: (i) *Bernal v. Netflix, Inc.*, No. 11-CV-0020-EJD (N.D. Cal.) (filed Feb. 22, 2011), (ii) *Rura v. Netflix, Inc.*, No. 11-CV-01705-SBA (N.D. Cal.) (filed Mar. 8, 2011), (iii) *Comstock v. Netflix, Inc.*, No. 11-CV-1218-HRL (N.D. Cal.) (filed Mar. 11, 2011), (iv) *Sevy v. Netflix, Inc.*, No. 11-CV-1309-PSG (N.D. Cal.) (filed Mar. 18, 2011), and (v) *Wizenberg v. Netflix, Inc.*, No. 11-CV-01359-HRL (N.D. Cal.) (filed Mar. 22, 2011).

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed them in the Parties' Settlement Agreement.

First, the Settlement meets and surpasses the test recently announced by the Ninth Circuit for evaluating consumer privacy class action settlements: that the relief must be substantial, by absolute standards. *See Lane v. Facebook*, No. 10-16380, 2012 WL 4125857, at *8 (9th Cir. Sept. 20, 2012) (upholding "Beacon" privacy case in part because the $9.5 million common fund "would be substantial under most circumstances."); *see also In re: Google Buzz Privacy Litig.*, No. 10-cv-00672 JW, 2011 7460099 (N.D. Cal. June 2, 2011) (approving a consumer privacy class action settlement with an $8.5 million common fund and a *cy pres* distribution). Here, the common fund exceeds the *In re: Google Buzz Privacy Litigation* settlement and nearly matches the size of the fund established in *Lane v. Facebook*, the *cy pres* distribution creates far more value for the class than either of those two cases, and the injunctive component—which was virtually absent in *Lane*—offers an additional $4.65 million worth of value to the Class. (*See* Declaration of Dr. Serge Egelman ("Egelman Decl."), ¶ 8, a true and accurate copy of which is attached hereto as Exhibit B.) Thus, this settlement offers more than substantial relief, and based on the Ninth Circuit's findings in *Lane* and the precedent created in *Google Buzz*, could be approved on this basis alone.

Second, the *cy pres* distribution offers the best method of using the Settlement Fund to the Class's benefit, while recognizing the infeasibility of distributing the fund to the 62 million class members. *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011) (explaining that in such situations, the *cy pres* doctrine is utilized to "put the unclaimed fund to its next best compensation use, *e.g.*, for the aggregate, indirect, prospective benefit of the class.") (quoting *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007)). Unlike many other *cy pres* settlements—even the one recently approved by the Ninth Circuit in *Lane*—the Parties here negotiated a rigorous selection process that sought to avoid the (often well-deserved) red-flags that have often accompanied *cy pres* settlements and maximize the greatest possible benefit to the Class. *See e.g. Lane*, 2012 WL 4125857, at *8 (approving *cy pres*, despite criticism that the funds were intended to primarily benefit the defendant and class counsel, both of whom were to sit on the board of a new institute created by the settlement funds). Here, the Settlement calls for approximately $6.4 million in funding, distributed to a diverse group of twenty independent non-

1   profits chosen from across the country—including groups focused on academics, advocacy,

2   education, and technology—all of which have all committed to using the money to help protect

3   and expand the Class's privacy rights in the digital age. As discussed below, the benefits flowing

4   from this money provide far more meaningful value to the Class than the ten cent ($0.10) per-

5   person cash distribution ever could, even putting aside the difficulties of administering and

6   distributing those payments.

7       Third, the Settlement compensates the Class in multiples of the actual damages suffered and in

8   an amount that approximates the estimated value of the case, even factoring in statutory damages.

9   Based on calculations done by Dr. Serge Egelman, one of the nation's foremost experts on the

10  behavioral economics of privacy, the Class suffered at most $4.65 million in aggregate actual

11  damages as a result of Netflix's alleged unlawful conduct. (*See* Report of Dr. Serge Egelman

12  ("Egelman Rep."), at 9, a true and accurate copy of which is attached hereto as Exhibit B-2.)

13  Further, based on Class Counsel's evaluation of the likelihood of success at trial and potential

14  recoveries, even factoring in statutory damages, the Settlement Fund approximates the present

15  value of the suit, which Class Counsel estimate to be $6,398,667 owing to the class. (*See*

16  Declaration of Jay Edelson ("Edelson Decl.") ¶¶ 36–50, a true and accurate copy of which is

17  attached hereto as Exhibit C; (Declaration of Donald Frankenfeld ("Frankenfeld Decl.") ¶ 7, a true

18  and accurate copy of which is attached hereto as Exhibit D.)

19      Fourth, and perhaps most importantly, through the Settlement, Plaintiffs have secured for the

20  Class immediate industry-leading injunctive relief that puts control over sensitive PII back in the

21  hands of consumers, ensuring that the harms the VPPA seeks to prevent will never recur. That is,

22  Netflix has agreed that, going forward, it will decouple its subscribers' Entertainment Content

23  Viewing Histories from Identification Information and Payment Methods unless a Class member

24  expressly permits it to retain the information. Critically, if the Settlement is approved, this

25  injunctive relief will take effect before any significant harm is done to Plaintiffs' and the Class's

26  PII. Given the facts of this litigation, the injunctive relief coupled with the *cy pres* distribution

27  offers a resounding victory for the class, particularly when considering that recent courts have

28  explained that an injunction is the intended remedy for violations of the VPPA's unlawful retention

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF          3          CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

1   provision. *See Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 539 (7th Cir. 2012).

2       In the end, by any metric, the Settlement, which is supported unanimously by the seven

3   Plaintiffs' firms involved, easily satisfies the requirements for final approval. Plaintiffs Jeff Milans

4   and Peter Comstock therefore respectfully request that the Court grant final approval of the

5   Settlement Agreement, dismiss the Released Claims with prejudice, and award the agreed-upon

6   attorneys' fees, expenses, and incentive award.

7   **II.     FACTUAL AND PROCEDURAL BACKGROUND**

8       **A.  The Vulnerability of Private Customer Information and the VPPA**

9       In recent years, technological advances have created new ways for consumers to experience

10   movies, television shows, and music. The days of visiting your local video rental store to pick up a

11   newly released movie or the neighborhood music or bookstore to pick up the next big album or

12   New York Times best seller are a thing of the past. Nowadays, movies, TV shows, and best selling

13   books—and often ones recommended to you by companies based on your viewing and reading

14   history—are mailed to your house or streamed to your digital tablet or mobile device by

15   companies like Netflix and Amazon.com.

16       While such advances have undoubtedly improved the consumer experience, they have also

17   had—at least from the consumers' perspective—the unintended result of allowing entertainment

18   content providers like Netflix to gather and store staggering amounts of personal information

19   about their customers. This collection and storage of highly sensitive, personal information gives

20   rise to serious privacy concerns, ranging from the improper use or disclosure of the information to

21   hyper-accurate consumer profiling, location tracking, and the real risk that such sensitive

22   information will be hacked, stolen, and/or used for illicit purposes. And the longer companies like

23   Netflix retain such information, the greater the risk that it could fall into the wrong hands.

24       Congress passed the VPPA in the wake of Supreme Court Justice Nominee Robert H. Bork's

25   confirmation hearings, where it was revealed that the Washington City newspaper had obtained

26   and disclosed his personal and family video rental records. Similar to state statutes enacted to

27   prevent libraries from disclosing their patrons' checkout lists, the VPPA was designed to protect

28   consumers' right to privacy in records containing their video viewing decisions. The two

1   provisions of the VPPA pertinent to this case are subsections (b) and (e) of § 2710. Subsection (b)

2   of the VPPA prohibits companies that provide video programming from disclosing their

3   customers' personally identifiable information to third parties without their customers' informed

4   consent. *See* 18 U.S.C. § 2710(b). Subsection (e) requires that customer records containing

5   personally identifiable information be destroyed "as soon as practicable, but no later than one year

6   from the date the information is no longer necessary for the purpose for which it was collected."

7   *See* 18 U.S.C. § 2710(e).

8       **B.  Netflix's Indefinite Retention of the Plaintiffs' Private Information**

9       Defendant Netflix is the largest provider of Internet streaming media services in the United

10  States, currently with over 25 million paid U.S. subscribers. Plaintiffs allege that Netflix maintains

11  a database of records containing all of its current and former customers' video programming

12  viewing selections, as well as their billing and contact information. (Dkt. No. 1, ¶¶ 3–7.) Through

13  its Privacy Policy, Netflix asserts that it uses such information for, *inter alia*, "providing

14  recommendations on movies and TV shows we think will be enjoyable, personalizing the service

15  to better reflect particular interests, tracking your instant-watching hours, determining your

16  Internet service provider, helping us quickly and efficiently respond to inquiries and requests and

17  otherwise enhancing or administering our service offering." Netflix Privacy Policy, available at

18  URL https://signup.netlfix.com/PrivacyPolicy (last accessed Oct. 25, 2012).

19      Jeff Milans and Peter Comstock are former Netflix subscribers. When they signed up for

20  Netflix, Milans and Comstock were required to provide Netflix with numerous pieces of personal

21  information, including their names and billing and shipping information. Throughout their use of

22  the service, Netflix continued to develop and store subscriber profiles containing their unique

23  Entertainment Content Viewing History, Identification Information, and Payment Methods.

24  Eventually, Milans and Comstock cancelled their Netflix subscriptions, but Netflix continued to

25  retain all of this information—including PII—long after they cancelled their subscriptions.

26      Plaintiffs learned of Netflix's retention practices when, for years after they closed their Netflix

27  accounts, they intermittently continued to receive emails from Netflix encouraging them to re-join.

28  (See Edelson Decl. ¶ 9.) From these emails, it became apparent that Netflix retained its former

1   customers' personal contact information. (*Id.*) Moreover, former customers who logged back into

2   their closed accounts were able to view all of the video materials they had watched as Netflix

3   customers. (Dkt. No. 1, ¶ 23; Edelson Decl. ¶ 10.) This strongly suggested that Netflix also

4   retained its former customers' video programming selections. Edelson Decl. ¶ 11.

5       Upon learning of Netflix's information practices, Milans and Comstock filed suit against

6   Netflix claiming that it improperly retained and disclosed its subscribers' and former subscribers'

7   personally identifiable information in violation of the VPPA, the California Consumer Records

8   Act, Cal. Civ. Code § 1798.80 ("CCRA"), and the California Unfair Competition Law, Cal. Bus. &

9   Prof. Code §§ 17200, *et seq.* ("UCL"). (*See, e.g.,* Dkt. No. 1.) In their initial respective complaints,

10  neither Milans nor Comstock alleged an unlawful disclosure claim against Netflix under

11  subsection (b). Based on common practices within the technology industry more broadly, however,

12  Plaintiffs added allegations to their unlawful retention claim in the Consolidated Complaint that

13  Netflix disclosed it to analytics companies to use and help refine Netflix's movie-recommendation

14  algorithm, and additionally shared it with other third parties. (Edelson Decl. ¶¶ 14, 15.)

15      **C.  Litigation, Mediation, and Settlement**

16      On January 26, 2011, Class Representative Jeff Milans initiated this class action in the United

17  States District court for the Northern District of California, alleging that Netflix had unlawfully

18  retained his Entertainment Content Viewing History in violation of the VPPA, the CCRA, and the

19  UCL. (Dkt. No. 1.) Milans's complaint was the first class action filed specifically for violation of

20  the VPPA's unlawful retention provision, 18 U.S.C. § 2710(e). (Edelson Decl. ¶ 12.) Shortly

21  thereafter, several similar lawsuits were filed, including *Bernal v. Netflix, Inc.*, Case No. 11-CV-

22  00820-EJD (N.D. Cal.) (filed Feb. 22, 2011), *Rura v. Netflix, Inc.*, Case No. 11-CV-01075-SBA

23  (N.D. Cal.) (filed Mar. 18, 2011), *Sevy v. Netflix, Inc.*, Case No. 11-CV-1309-PSG (N.D. Cal.)

24  (filed Mar. 18, 2011), and *Wizenberg v. Netflix, Inc.*, Case No. 11-CV-01359-HRL (N.D. Cal.)

25  (filed Mar. 22, 2011). These suits all arose from the same allegedly unlawful conduct by Netflix—

26  indefinite retention of former subscribers' PII.

27      Thereafter, the Court related the above cases, and different plaintiffs' firms submitted briefing

28  seeking appointment as interim class counsel. (*See* Dkt. Nos. 15, 33–35, 42, 46, 51, 53.)

1  Following consideration of the briefs and argument, on August 12, 2011, the Court consolidated

2  the cases under the caption "*In re: Netflix Privacy Litigation*," and appointed Jay Edelson of

3  Edelson McGuire LLC as Interim Lead Class Counsel. (Dkt. No. 59.)

4      On September 13, 2011, Plaintiffs filed an Amended Consolidated Class Action Complaint,

5  (Dkt. No. 61), adding allegations that Netflix violated the VPPA's disclosure provision, 18 U.S.C.

6  § 2710(b), by providing Plaintiffs' and the Class's PII to third parties without their informed,

7  written consent and without giving Plaintiffs and the Class an opportunity to prohibit such

8  disclosures. (Dkt. No. 61, ¶¶ 57–58.) Plaintiffs' theories of unlawful retention were relatively

9  straightforward: they claimed Netflix violated the VPPA by indefinitely retaining their PII after

10  they cancelled their subscriptions. (*See* Dkt. 61, ¶¶ 54–56.) The main questions facing the

11  retention claims were whether a private right of action existed for a violation of subsection (e)[3]

12  and whether Plaintiffs' PII was still necessary to Netflix despite Plaintiffs' cancellation. As stated

13  above, Plaintiffs did not base their VPPA claims in either of their initial complaints on unlawful

14  disclosure. They only later added allegations of unlawful disclosure to their existing VPPA claim

15  (for unlawful retention) when they filed the Consolidated Class Action Complaint. Plaintiffs'

16  disclosure claims were premised on the theories that Netflix disclosing Class members' PII to

17  third-party analytics companies in order to use and refine its algorithm, and sharing it with other

18  third-parties who provided services to Netflix. (Edelson Decl. ¶ 14, 15, 18.)

19      Thereafter, the Parties engaged in the discovery planning conference required by Federal Rule

20  of Civil Procedure 26. (Edelson Decl. ¶ 16.) Plaintiffs then propounded, and Netflix responded to,

21  written discovery related to both class and merits issues, including Interrogatories and Requests

22  for the Production of Documents, in addition to subsequently engaging in informal discovery with

23  Netflix's Vice President of Product Engineering and its Vice President of Marketing and Analytics.

24  (Edelson Decl. ¶¶ 19.) Though discovery was ongoing, the Parties also explored the possibility of

25  settlement and, through the Court's ADR program, agreed to mediation. The Parties selected

26  former District Judge Layn R. Phillips (Ret.) of Irell & Manella, LLP, to serve as the mediator.

27  ───────────────
[3]  This question has since been answered in the negative by both the Northern District, *see*

28  *Rodriguez v. Sony Computer Entm't America, LLC*, No. 11-cv-4084 PJH, 2012 WL 4464563
   (N.D. Cal. Sept. 25, 2012), and the Seventh Circuit, *see Redbox*, 672 F.3d 535 (7th Cir. 2012).

1   (*See* Dkt. No. 70; Edelson Decl. ¶ 20.) The mediation took place on February 1, 2012, in Santa

2   Ana, California. The mediation was used not only as a vehicle to settle the case, but also as a

3   forum for further informational exchanges, including the informal depositions of two Netflix

4   executives. (Edelson Decl. ¶¶ 21.)

5       As for the mediation, after a full day of arm's-length negotiations, the Parties were able to

6   reach a settlement, which was formalized in a signed Memorandum of Understanding ("MOU").

7   (Edelson Decl. ¶ 22.) It was not until all relief was established for the Class that the Parties began

8   to engage in any discussions about attorneys' fees or incentive awards. (*Id.*) After executing the

9   MOU, negotiations continued regarding the precise wording of the Settlement Agreement.

10  (Edelson Decl. ¶ 23.) Over a period of approximately three months, the Parties exchanged

11  countless drafts of the agreement and related documents. (*Id.*) On April 30, 2012, they executed

12  the Settlement Agreement, (Edelson Decl. at ¶ 25), and shortly thereafter, Plaintiffs moved for

13  preliminary approval. (Dkt. 76.) Importantly, all seven plaintiffs' firms involved in this litigation,

14  including those involved in the heated leadership fight that took place, agreed that the Settlement

15  Agreement provided results for the class that went well beyond the fair, reasonable, and adequate

16  standard. (Edelson Decl. ¶¶ 59.)

17      On July 5, 2012, the Court granted preliminary approval, finding that the settlement "appears

18  fair, non-collusive and within the range of possible final approval," "was a product of arm's length

19  negotiation before a mediator," and "[i]n light of the minimal monetary recovery that would be

20  realistically recoverable by individual Settlement Class members and the immediate benefits

21  offered to the Class by the injunctive relief and *cy pres* donations . . . is deserving of preliminary

22  approval." (Dkt. No. 80 at 4:6–11.) The Court further found that "the procedure described . . . [for

23  giving notice] meets the standards of Rule 23." (*Id.* at 8:1–2.) At that point, the Court directed the

24  Parties to initiate the notice plan. (Dkt. 80.)

25  **D.  Notice and *Cy Pres* Selection Process**

26      Class Counsel thereafter worked with the settlement administrator to ensure that notice was

27  properly distributed, fielded inquiries from potential Class members regarding Settlement details,

28  and aided Class members in the claims process. (Edelson Decl. ¶¶ 26–28.) Here, the Court-

approved notice plan was executed to the standards of Due Process and Federal Rule 23, and included direct notice by email to all Settlement Class members, publication notice, a joint press release, the creation of a Settlement Website, and notice to the relevant governmental agencies pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715(b).

Concurrent with Class notice, the Parties solicited proposals from applicants for the *cy pres* distribution, both through letters to potential applicants, as well as through a letter posted on the Settlement Website. As part of the proposal solicitation process, Class Counsel worked extensively with dozens of *cy pres* applicants to ensure that the proposals would be as useful as possible, thereby helping achieve the most beneficial result for the Class. (Edelson Decl. ¶¶ 28–31.) Ultimately, dozens of *cy pres* recipient proposals were submitted. Once all the proposals were submitted, Class Counsel, with input from Netflix, worked exhaustively to vet these proposals and select the organizations that would provide the greatest benefits to the Settlement Class and to appropriately allocate the *cy pres* fund among the chosen applicants. (*Id*.)

As set forth in the letter to applicants published on the Settlement Website, *cy pres* applicants were required to include the following information in their proposals: (1) the organization's name and address, (2) a description of current programs relating to technology, law, and privacy, (3) how the program benefits the Class, (4) the organization's annual operating budget and the budgets of its relevant programs, (5) the total *cy pres* distribution requested, (6) disclosure of connections between the applicant and the Parties, their counsel, Supporting Counsel, or the Court, (7) and disclosure of any amounts received from the Parties or their counsel in 2011. (Edelson Decl. ¶ 30.) This in-depth vetting process was designed to ensure the greatest possible benefits for the Class and to also avoid the potential conflicts that have cast suspicion on other recent *cy pres* settlements. *See Lane*, 2012 WL 4125857, at *5. In the end, the Parties have selected neutral and independent *cy pres* recipients lacking any material conflicts, and that will provide real, tangible, and immediate benefits to the Class by educating the public and raising awareness of privacy issues, working with businesses to ensure compliance with best privacy practices, and developing new technologies to give consumers control over their information privacy. (Edelson Decl. ¶ 31.) The selected *Cy Pres* Recipients and their proposed uses for the distribution are detailed further in

1  Part IV.D, *infra*.

2  **III.    CLASS COUNSEL'S ANALYSIS OF THE CLASS'S CLAIMS**

3      The value of the Settlement—both in terms of that created by the injunctive relief and the

4  payments to the *Cy Pres* Recipients—represents a more than adequate recovery compared to what

5  could be obtained at trial. In evaluating Plaintiffs' case, any analysis must contain valuations for

6  both the unlawful retention and unlawful disclosure claims. When the estimated recovery on each

7  theory is combined, Class Counsel estimates that the expected trial recovery has a net present

8  value of $6,398,667 plus fees, a value that is actually less than the $6,411,669.42, that, subject to

9  Court approval, will be recovered and distributed to the *Cy Pres* Recipients for the benefit of the

10  Class. (Edelson Decl. ¶¶ 36–50; Frankenfeld Decl. ¶ 2.)

11      **A. Likely Recovery on the Unlawful Disclosure Theories**

12          **1.  The merits of Plaintiffs' disclosure theories**

13      Plaintiffs sought recovery under the VPPA, the CCRA, and the UCL, alleging that Netflix had

14  improperly disclosed the Class's PII without first obtaining proper consent. (Dkt. 61.) Based on

15  their investigation, prior experience, as well as knowledge of the entertainment content industry,

16  Plaintiffs (through their counsel) had a good faith belief that Netflix was improperly disclosing PII

17  in three different ways. First, Plaintiffs believed that Netflix disclosed PII in the course of

18  providing data to third-party analytics companies tasked with improving Netflix's

19  recommendation algorithm, due in part to Netflix's public representations that it continually

20  refines its algorithm, as well as language in Netflix's privacy policy stating that "[third parties]

21  analyze and enhance data, including users' interaction with our website." (Edelson Decl. ¶ 14.)

22  Second, based on changes made to Netflix's privacy policy after the onset of litigation, Plaintiffs

23  believed that Netflix disclosed current and former subscribers' PII to third parties who provided

24  certain services involving Netflix data. (Edelson Decl. ¶ 15.) Third, based on common practices

25  within the technology and entertainment media industries, Plaintiffs believed that Netflix might

26  have been more generally sharing their PII with third parties. (*Id.*)

27      Ultimately, however, through the exchange of both formal and informal discovery, Plaintiffs

28  determined that Netflix was not selling Class members' protected PII to third parties. (Edelson

1  Decl. ¶¶ 19.) Plaintiffs also determined that their "analytics disclosure" claims would fail as

2  Netflix enhanced its algorithm in-house. And Plaintiffs concluded that their third-party services

3  theories would be both highly technical in nature, and, given recent broad interpretations of the

4  VPPA's "ordinary course of business" exception, unlikely to succeed. *See Rodriguez v. Sony*

5  *Computer Entm't of Am. LLC*, No. 11-cv-4084-PJH, Dkt. 59 (N.D. Cal. Apr. 20, 2012).[4]

6        In addition to their defenses on the elements of the claims, Plaintiffs considered other available

7  arguments Netflix was likely to make. For example, Plaintiffs were aware that Netflix would argue

8  that the class lacked Article III standing absent any additional harm from the alleged disclosures.

9  Although one court has accepted this view, *see Sterk v. Best Buy Stores, L.P.*, No. 11-cv-01894,

10  2012 WL 5197901 (N.D. Ill. Oct. 17, 2012), Plaintiffs did not believe Netflix had a materially

11  significant chance of succeeding on such an argument in the Ninth Circuit. *See Edwards v. First*

12  *Am. Corp.*, 610 F.3d 514, 517 (9th Cir. 2010) (finding standing for VPPA retention claim despite

13  lack of a private right of action) *cert. granted in part*, 131 S. Ct. 3022 (2011) and *cert. dismissed*

14  *as improvidently granted*, 132 S. Ct. 2536 (2012) (finding standing where plaintiff alleged

15  invasion of federal statutory right); *see also Sterk v. Redbox Automated Retail, LLC*, No. 11-cv-

16  01729, 2012 WL 3006674, at *8–9 (N.D. Ill. July 23, 2012). Likewise, Plaintiffs believed that

17  Netflix would have advanced other similarly weak arguments based on statute of limitations,

18  consent, or unconstitutionality defenses.[5] Plaintiffs believe that each of these (and other related)

19  defenses would have been virtually certain to fail and thus assigned a ten percent chance of

20  succeeding on any one of these defenses. (Edelson Decl. ¶¶ 37, 38.) Factoring in the extremely

21  long odds of prevailing on the merits of the claims, Class Counsel estimated that the "unlawful

22

23  _____

[4]   Similarly broad decisions with regard to the CCRA similarly threatened recovery under that statute. *See Doe 1 v. AOL, LLC*, 719 F. Supp. 2d 1102 (N.D. Cal. 2010). And absent an "unlawful"

24  prong, and given courts' recent decisions regarding economic damages in privacy suits, *see Low v. LinkedIn Corp.*, No. 11-cv-01468, 2011 WL 5509848 (N.D. Cal. Nov. 11, 2011); *LaCourt v.*

25  *Specific Media*, No. SACV 10-1256-GW(JCGx), 2011 WL 1661532 (C.D. Cal. Apr. 28, 2011), Plaintiffs' UCL claims also added little chance of meaningful recovery.

26  [5]   Netflix's "excessive damages" defense is discussed further in § III.A.3, *infra*. That defense

27  would, in Plaintiff's estimation, reduce the damage but not scuttle the case. Likewise, the Supreme Court's recent decision in *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011), creates a minimal

28  risk that a court could find that the VPPA violates the First Amendment.

1   disclosure" claims had less than a five percent (5%) chance of succeeding on the merits. (Edelson

2   Decl. ¶ 39.)

3       **2.   The likelihood of adversarial class certification**

4      Irrespective of the merits, Class Counsel is confident that given the uniform nature of Netflix's

5   conduct toward the class, certification of the Class is proper. The key issues with regard to

6   disclosure are common ones: whether Netflix disclosed PII, and if so, how, why, to whom, for

7   what purpose, and whether it obtained consent. (Edelson Decl. ¶¶ 40.) Regardless of the answers,

8   these questions commonly focus on Netflix's conduct, rather than the Class's. *See Wal-Mart*

9   *Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (explaining that commonality is found where

10   the claims of all class members "depend upon a common question," and "even a single common

11   question will do"); *see also O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359, 370 (C.D. Cal.

12   1997) (finding commonality where relief "turn[ed] on questions of law applicable in the same

13   manner to each member of the class.").

14      The remaining certification requirements—numerosity, typicality, predominance, and

15   adequacy of representation—would also be satisfied. The 62 million person Class is easily so

16   numerous that joinder would be impracticable. *See Gay v. Waiters' & Dairy Lunchmen's Union*,

17   549 F.2d 1330, 1332–34 (9th Cir. 1977) (finding 184 class members sufficiently numerous).

18   Typicality and predominance have been found where, like here, the defendant acted uniformly

19   toward the class in disclosing the class members' personal information. *See, e.g.*, *Hammer v. JP's*

20   *Sw. Foods, L.L.C.*, 267 F.R.D. 284, 289 (W.D. Mo. 2010) (typicality and predominance met where

21   class alleged disclosure of credit card numbers in violation of the Fair and Accurate Credit

22   Transactions Act); *accord Harris v. Circuit City Stores, Inc.*, No. 07-cv-02512, 2008 WL 400862

23   (N.D. Ill. Feb. 7, 2008). While Class Counsel is confident that it could succeed on adversarial class

24   certification, it also acknowledges the lack of direct, controlling authority on point. (*Id.*) Given the

25   dearth of precedent, Class Counsel estimates an 80 percent chance of achieving adversarial class

26   certification if this litigation were to continue. (*Id.*)

27       **3.   The range of recovery at trial**

28      If the 62 million person Class were to succeed at trial on VPPA disclosure claims, it would

1   theoretically be entitled to a $155 *billion* judgment. *See* 18 U.S.C. § 2710(c). To start, such a

2   massive verdict would be wholly unobtainable: Netflix would be forced out of business, and the

3   Class would likely be left out to dry by the bankruptcy process. (Edelson Decl. ¶ 41.) However,

4   beyond the impossibility of collection, any such recovery would likely be reduced judicially.[6]

5   While the Supreme Court has yet to rule on the constitutionality of disproportionate federal

6   statutory damages, trends in case law have identified limitations on such massive recovery. To that

7   end, appellate courts have observed that "the potential for a devastatingly large damages award,

8   out of all reasonable proportion to the actual harm suffered by members of the plaintiff class, may

9   raise due process issues." *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003).

10  The Second Circuit explained that such issues arise:

> from the effects of combining a statutory scheme that imposes minimum statutory damages awards on a per-consumer basis . . . with the class action mechanism that aggregates many claims-often because there would otherwise be no incentive to bring an individual claim. Such a combination may expand the potential statutory damages so far beyond the actual damages suffered that . . . the due process clause might be invoked, not to prevent certification, but to nullify that effect and reduce the aggregate damage award.

15  *Id.* (citing *State Farm Mutual Auto. Ins. Co. v. Campbell,* 538 U.S. 408 (2003); *BMW*, 517 U.S. at

16  580). Even more, concerns about disproportionately large statutory awards are heightened where a

17  statutory award would be annihilative to the defendant. In *Blanco v. CEC Entm't Concepts L.P.*,

18  No. 07-cv-0559 GPS, 2008 WL 239658 (C.D. Cal. Jan. 10, 2008), for example, the court pointed

19  out that statutory damages ranging from $200 million to $2 billion "would completely swallow

20  [defendant's] net income last year of $68,257,000 [and] would be grossly disproportionate to the

21  harm [alleged]." *Id.* at *2.

22      Here, in comparison, a theoretical $155 billion statutory damage award is more than *six-*

23

24  [6]    Though Plaintiffs maintain that the sheer size of a statutory damages award cannot render it unconstitutional—*see generally* R. LeCours, Note, *Steering Clear of the "Road to Nowhere": Why the BMW Guideposts Should Not be Used to Review Statutory Penalty Awards*, 63 Rutgers L. Rev. 327 (2010); *see also Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 443 (2001) ("I continue to believe that the Constitution does not constrain the size of punitive damages awards") (Thomas, J., concurring) (*citing BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 599 (1996) (Scalia, J., joined by Thomas, J., dissenting))—they acknowledge the likelihood that if they obtained a judgment on the merits and the maximum statutory damage award of $155 billion, in all reality, the Court could reduce the award using remittitur or find the award unconstitutionally excessive.

1    *hundred-eighty-five* (685) times greater than Netflix's 2011 net income of $226 million, and thus

2    even more disproportionate than the potential award discussed in *Blanco*. (*See* Netflix, Inc.,

3    Annual Report (Form 10-K) (Feb. 10, 2012).) Indeed, even an award of $150 million—less than

4    1/1000th of the potential statutory penalty—could prove annihilative to Netflix. (*See* Frankenfeld

5    Decl. ¶ 5.) Facing such a massive statutory penalty of $155 billion, 685 times greater than

6    Netflix's 2011 net income, and more than 1000 times larger than necessary to threaten Netflix's

7    continued operations, the Court would, in all likelihood, grant Netflix's fourth affirmative defense,

8    and reduce the award to a more manageable number.

9        To arrive at a constitutionally permissible damage award, the Court would likely consider the

10    actual damages suffered by the Class.[7] *See Parker,* 331 F.3d at 22; *accord State Farm,* 538 U.S. at

11    425 ("The precise award in any case, of course, must be based upon the facts and circumstances of

12    the defendant's conduct and the harm to the plaintiff."). In evaluating the damages suffered on an

13    unlawful disclosure theory, Plaintiffs believe that the Court, borrowing from punitive damages

14    jurisprudence, would reduce the damages award to a single-digit multiple[8] of either (a) the amount

15    Netflix benefitted from the disclosures or (b) the amount the Class lost. Given that the discovery

16    obtained from Netflix demonstrated that Netflix did not meaningfully share Class members' PII,

17    Netflix's benefit from the alleged disclosures would be *de minimis*. (Edelson Decl ¶ 42.) Likewise,

18    given the hyper-technical (if at all existent) nature of the alleged disclosures, it seems dubious that

19    the Class could point to any harm to themselves. *See Low,* 2011 WL 5509848; *LaCourt*, 2011 WL

20    1661532. Thus, in the unlikely event that the Class succeeded at trial on an unlawful disclosure

21    theory, any damage award would likely be cut to a relatively small number. Here, a reasonable

22    estimate of the maximum award would be under $3,000,000 plus attorneys' fees. (Edelson Decl.

23    ¶ 43.) Thus, the value of disclosure-based claims is approximately $120,000 (a $3,000,000 dollar

24    estimated recovery multiplied by a 5 percent chance on the merits, multiplied by an 80 percent

---

25    [7]    Although the above cases discuss reducing statutory damage awards in the class context, the
26    same foundational analysis applies in an individual case seeking statutory damages awards far in excess of any actual damages suffered.

27    [8]    *See State Farm*, 538 U.S. at 425 ("Our jurisprudence and the principles it has now established
28    demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF          14          CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

1    chance of class certification), plus fees.

2    **B. Likely recovery on Plaintiffs' theory of unlawful retention**

3        **1. The merits of Plaintiffs' retention claims**

4        Plaintiffs' primary theory of recovery was premised on Netflix's unlawful retention of their

5    PII. (Dkt. 61.) Plaintiffs' unlawful retention claims were premised on the fact that both Milans and

6    Comstock, after cancelling their subscriptions, continued to receive occasional emails from Netflix

7    encouraging them to re-open their accounts. (Edelson Decl. ¶ 9.) From these emails, it became

8    apparent that Netflix retained its former customers' contact information. (*Id.*) Moreover, at the

9    time this lawsuit was filed, former customers who logged back into their cancelled accounts were

10    able to view their prior viewing and renting histories, thereby establishing that Netflix retained

11    their PII after cancellation. (Am. Compl. ¶ 25; Edelson Decl. ¶ 10.) As such, Plaintiffs were

12    confident that Netflix was retaining their PII longer than necessary for the purpose for which it

13    was collected. *See* 18 U.S.C. § 2710(e).

14        Nonetheless, as with Plaintiffs' disclosure theories, Netflix's defenses reduce Plaintiffs'

15    likelihood of success on the merits. Worse for Plaintiffs, every court that has considered the issue

16    has found no private right of action for violation of subsection (e); instead, according to the courts,

17    Congress intended for litigants to get, at most, injunctive relief—but not monetary damages—for

18    retention claims. *See Rodriguez v. Sony Computer Entm't America, LLC*, No. 4:11-cv-04084-PJH,

19    Dkt. 80 (N.D. Cal. Sept. 25, 2012) (dismissing VPPA retention claims with prejudice); *Redbox*,

20    672 F.3d 535 (finding no private right of action for statutory damages for violation of § 2710(e)

21    (the VPPA's unlawful retention provision)); *Best Buy*, 2012 WL 5197901. Plaintiffs respectfully

22    believe that the district court's original holding in *Sterk v. Redbox Automated Retail, LLC*, 806 F.

23    Supp. 2d 1059 (N.D. Ill. 2011) *rev'd by Redbox*, 672 F.3d 535, though ultimately reversed, was a

24    well-reasoned decision, and thus assign an estimate that they have a 25 percent chance of

25    convincing the Ninth Circuit that Congress did intend for a private right of action for VPPA

26    retention claims. (Edelson Decl. ¶ 44.) On the other hand, however, even without a private right of

27    action under the VPPA, if Plaintiffs suffered actual damages from the allegedly unlawful retention,

28    they would be able to recover them under the UCL's "unlawful" prong. Cal. Bus. & Prof. Code §

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF    15        CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

SER 214

1  17200.

2      Additionally, even if Plaintiffs could sue for unlawful retention, Netflix stood a chance of

3  defeating Plaintiffs' claims on the merits by arguing that one of the purposes for which it collected

4  and retained Plaintiffs' PII was for refining and improving its recommendation algorithm, even

5  after Plaintiffs cancelled their accounts. As with the disclosure claims, Netflix also stood a slight

6  chance of succeeding on an Article III standing argument, s*ee Best Buy*, 2012 WL 5197901,

7  though Plaintiffs believe such a defense is highly unlikely to succeed. Also, as with Plaintiffs'

8  disclosure claims, Netflix could have prevailed on its necessity, constitutionality, and statutory

9  applicability arguments. (Edelson Decl. ¶ 44.) All told, Class Counsel estimates that Plaintiffs had

10  a 55 percent chance (on top of the one-in-four chance of winning on the private right of action

11  issue) of proving the elements of their unlawful retention claims at trial. (*Id.*)

12          **2.  The likelihood of adversarial class certification**

13      As with the disclosure claims, Class Counsel is highly confident that it could certify a class on

14  retention-based theories of recovery. The key issues with regard to retention can be answered in

15  one stroke: the purposes for which Netflix collected subscribers' PII, the point in time following

16  account cancellation when the PII—in personally-identifiable form—is no longer necessary for

17  those purposes, and whether Netflix retained the PII beyond that time period. (Edelson Decl. ¶ 45;

18  *see* 18 U.S.C. § 2710(e).) Again, those questions all focus on Netflix's actions, and thus the

19  answers would be common across the Class. *See Wal-Mart*, 131 S. Ct. at 2551.

20      And as with disclosure, the numerosity, typicality, predominance, and adequacy requirements

21  would also very likely be satisfied. *See Gay*, 549 F.2d 1332-34 (numerosity); *Hammer*, 267 F.R.D.

22  at 289 (typicality and predominance); (Dkt. 80 at 5−6) (adequacy). And as with disclosure

23  certification, while Class Counsel is confident that it could certify a class against even the most

24  strenuous opposition, reasoned experience limits the estimated likelihood of certification to 80

25  percent, in the absence of on-point authority. (Edelson Decl. ¶ 45.)

26          **3.  The range of recovery at trial**

27      If Plaintiffs did succeed at trial on a class-basis, damages would again be uncertain. The

28  starting point would, of course, be a judgment equal to the actual damages suffered by the Class.

Pls' Mot. for Final Approval of And Award of        16        Case No.: 5:11-cv-00379-EJD
Attorneys' Fees, Expenses, and Incentive Award

SER 215

1   As detailed in the expert report of Dr. Serge Egelman, the damages suffered by the Settlement

2   Class is the amount that the Class members overpaid for their Netflix subscriptions—*i.e.*, the

3   difference between the charges they did pay, on the one hand, and the amount they would have

4   been willing to pay had they known that Netflix was going to violate the VPPA's unlawful

5   retention provision, on the other. (*See* Egelman Rep. at 2.) On this measure, the per-person

6   damages equal $0.15 per Class member. (Egelman Decl. ¶ 6.) As pointed out by Dr. Egelman, only

7   a portion of the Class (those who cancelled their accounts) have suffered damages as a result of

8   unlawful retention (the rest of the Class would have if not for the injunctive relief), and thus, $9.3

9   million seriously exceeds the Class's damages. (Egelman Decl. ¶ 7.) Based on Dr. Egelman's

10  estimates and information known to him, actual Class-wide damages arising from unlawful

11  retention are less than $4.65 million (Egelman Decl. ¶ 7.)[9]

12      On top of actual damages, the Class would have a one-in-four chance of convincing the Court

13  that the VPPA's retention provision did allow litigants a private of right of action, which would, in

14  turn, trigger the Act's statutory damages. However, as with the disclosure claim, Plaintiffs believe

15  that the retention-based claims' statutory damages would be limited by Due Process principles to a

16  single-digit multiplier of actual damages. *See* § III.A.3, *supra*. Therefore, even if the Court

17  determined that the Plaintiffs could obtain statutory damages, Plaintiffs believe statutory damages

18  would be capped at $46.5 million for the Class.

19      Assuming, as discussed previously, a 55 percent likelihood of Plaintiffs proving the merits of

20  their retention claims, an 80 percent likelihood of Class certification, a 25 percent chance of the

21  Ninth Circuit finding a private right of action and thus statutory damages for VPPA retention

22  claims, Plaintiffs' retention-based claims have a value of $7,161,000[10] plus attorneys' fees.

23  _____

    [9]    Based on confidential information obtained through the discovery process about class
24  composition, Class Counsel is confident that the aggregate, class-wide damages are lower
    than Dr. Egelman's estimates. (Edelson Decl. ¶ 48.) Nonetheless, for purposes of analysis, Class
25  Counsel uses the high damages figure proposed by Dr. Egelman.

26  [10]   This number is based on an estimated $4.65 million actual damages award multiplied by an 80
    percent chance of certification and a fifty-five (55) percent chance on the merits *plus* an estimated
27  $46.5 million statutory damages award multiplied by an 80 percent chance of certification, a 55
    percent chance on the merits, and a 25 percent percent chance of having a right of action to seek
28  statutory damages for unlawful retention under the VPPA. (Edelson Decl. ¶¶ 44–50.)

_____

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF        17        CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

### C.  Net Present Value of the Class's Claims

Any accurate valuation of the Class's claims must consider the time-value of money. In Class Counsel's estimation, based on the hurdles of discovery (including experts), class certification, summary judgment motions, trial, and possible appeal to the Ninth Circuit, it would take an additional three years to obtain a final judgment for the class. (Edelson Decl. ¶ 51.) Thus, the $7,281,000 estimated future value of all of Plaintiffs' claims ($120,000 for unlawful disclosure plus $7,161,000 for claims based on unlawful retention) must be discounted to determine the net present value of the Class's claims. As detailed in the expert report of Donald L. Frankenfeld, a 4.4% discount rate is reasonable under the circumstances, giving the Class's suit a net present value of $6,398,667, plus fees. (*See* Frankenfeld Decl. ¶4.)

Thus, when compared to the estimated present value of $6,398,667, the Settlement Fund of roughly $6.75 million after the requested attorneys' fees—to say nothing of the injunctive relief, valued at $4.65 million for the class as a whole[11]—represents a more than adequate recovery for the Class in this litigation.

### IV. KEY TERMS OF THE SETTLEMENT

The terms of the Settlement are set forth in the Settlement Agreement, (*see* Ex. A), and briefly summarized as follows:

### A.  Class Definition:

The Court, in its July 5, 2012 Preliminary Approval Order (Dkt. 80, at 2, 8), certified a single Settlement Class, defined as follows:

> All Subscribers as of the date of entry of Preliminary Approval. Excluded from the Settlement Class are the following: (i) the Settlement Administrator, (ii) the Mediator, (iii) any respective parent, subsidiary, affiliate or control person of the Defendant or its officers, directors, agents, servants, or employees as of the date of filing of the Action, (iv) any judge presiding over the Action and the immediate family members of any such Person(s), (v) persons who execute and submit a

---

[11]   As with the actual damages estimate, Dr. Egelman estimates that one-half of the Class are current Netflix subscribers, for whom the injunctive relief will prevent $0.15 overpayment of the sort suffered by former subscribers. *See* Egelman Rep. at 9. Additionally, Class Counsel estimates a 44 percent chance of obtaining injunctive relief similar to that in this case. (Edelson Decl. ¶ 52.) Given that the injunctive relief has been valued at $4.65 million for the class, *see* Egelman Rep. at 9, the expected value of an injunction at trial has a future value of $2,046,000, and thus a present value of $1,798,059.81, assuming a 4.4% discount rate. Thus, the injunctive relief alone has a present-value advantage of $2,851,940.19 over going to trial.

1    timely request for exclusion, and (vi) all persons who have had their claims against Defendant fully and finally adjudicated or otherwise released.

2    (Dkt. 80 at 2.)

3    **B. Injunctive Relief:**

4    At all times during settlement negotiations, Plaintiffs and Class Counsel recognized the

5    necessity of injunctive relief in any settlement, and designed the Settlement to ensure that the

6    Settlement Class members' information is not retained in a personally-identifiable format longer

7    than necessary without the explicit opt-in consent of the individual Settlement Class member.

8    (Edelson Decl. ¶¶ 54.) The Settlement Agreement accomplishes this goal by de-coupling former

9    subscribers' PII and giving current and future subscribers the option to have their PII de-coupled

10   upon cancellation. This injunctive relief is permanent—the PII can never be re-coupled—and it

11   ensures that going forward, in furtherance of the VPPA's purpose of protecting video privacy,

12   Netflix subscribers, rather than Netflix, will be in control of Netflix's access to consumer

13   information.

14   Netflix has agreed that, one year from the Effective Date of the Settlement Agreement, it will

15   automatically de-couple all former subscribers' Entertainment Content Viewing Histories from

16   their Identification and Payment Methods if the subscriber has not reactivated their Netflix

17   accounts within one year. (Ex. A, § 2.1.1.) Further, on a going-forward basis, Netflix will de-

18   couple Entertainment Content Viewing Histories from Identification and Payment methods for all

19   former subscribers who do not activate their accounts for one year. (Ex. A, § 2.1.2.)[12]

20   **C. Settlement Fund Payments.**

21   Netflix has agreed to pay the total amount of nine million dollars ($9,000,000.00 USD) in cash

22   into a Settlement Fund, to be used for the payment of Settlement Administration Expenses, *cy pres*

23   distributions to the *Cy Pres* Recipients, any fee award or costs awarded to Class Counsel, and any

24   incentive award to the Class Representatives and named Plaintiffs in the Related Actions. (Ex. A,

25   _____

26   [12] Netflix will not be required to de-couple personal information for non-U.S. users, for those users who provide express consent—at or after the time of subscription cancellation—for Netflix to continue to associate their Entertainment Content Viewing Histories with their Identification

27   Information and Payment Methods, or, if Netflix ceases to operate its Entertainment-Content by mail service at any point within four years of the Effective Date, then non-Settlement Class

28   member subscribers will not be entitled to de-coupling. (Ex. A, § 2.2.2.)

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF        19        CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

SER 218

§ 2.3.)

**D. *Cy Pres* Distribution**

The settlement provides for a widespread *cy pres* distribution that will benefit numerous organizations devoted to protecting consumer privacy rights. After the payment of Settlement Administration Expenses, the Fee Award, and the collective Incentive Award, the balance of the Settlement Fund shall be distributed to the *Cy Pres* Recipients. Pending the Court's approval, the Parties have agreed to provide charitable distributions to the following twenty existing privacy organizations[13] who will use the funds in the following ways:

(1)    **Berkeley Center for Law & Technology ("CLT"):**  The CLT is a not-for-profit center affiliated with the University of California, Berkeley, School of Law, and is a leading institution for privacy research, education, and policy development. The CLT intends to use its distribution to continue and expand its consumer privacy programs, including employing faculty who draft some of the most influential papers regarding personally identifiable information, developing and releasing the highly influential Web Privacy Census, conducting nationwide surveys on consumer privacy attitudes, organizing conferences, workshops, and other events, and sponsoring further privacy research.

(2)    **Berkman Center for Internet & Society (Harvard) ("Berkman Center"):** The Berkman Center is a leading academic research center devoted to researching and teaching about issues at the intersection of emerging technologies, law, public policy, industry, and education. The Berkman Center intends to use its distribution to support its Youth and Media Lab, which promotes media literacy and empowerment in coordination with partner schools in several major metropolitan areas; to support its Curriculum Development Initiative, which entails focusing University-wide research activities with regard to use of personal data and metadata; and to help establish its Privacy and Security Research Initiative, which will be a cross-disciplinary, Harvard-based program that will include privacy research, education, and outreach.

(3)    **Center for Digital Democracy ("CDD"):** The CDD protects consumer privacy, with special attention paid to privacy for children, teens, and other vulnerable internet users. The CDD uses research, public outreach, and policy work to make little-known but critically important consumer privacy concerns viable, debated, and addressed. The CDD intends to use its distribution to engage full-time privacy legal counsel with a special focus on youth online privacy, focus on the need to protect low-income and other vulnerable online consumers, create a guide to online privacy and interactive video privacy, and establish a broad array of mobile privacy resources for consumers.

(4)    **Center for Democracy and Technology ("CDT"):** The CDT is a consumer advocacy group dedicated to keeping the internet open, innovate, and free. The CDT has contributed to the development and implementation of robust protections for consumer privacy through government policy, improved business practices, privacy design, and consumer awareness and empowerment. The CDT intends to use its distribution to continue to file privacy complaints with the FTC; articulate a broadly applicable privacy framework through appellate *amicus* briefs, public workshops, white papers, and draft legislation; develop a comparison of privacy features on major mobile operating systems, similar to the CDT's existing web browser comparison charts;

---

[13]   The amounts to be distributed to each organization will be posted to the Settlement Website and filed with the Court to concurrently with the filing of this brief.

and develop tools and web education materials.

**(5)** **Consumer Watchdog:** Consumer Watchdog is an organization dedicated to educating and advocating on behalf of consumers through policy research, investigation, public education, advocacy (including litigation), and direct consumer outreach. Consumer Watchdog's Privacy Project has helped raise awareness for the Do Not Track movement and has raised anti-trust concerns with regard to major internet companies, in addition to its policy research, consumer education, media advocacy, and litigation practices. Consumer Watchdog intends to use its distribution to: broaden the scope of its Privacy Project, add legal and research staff to allow better representation in front of regulatory bodies, hire a new attorney and research staff to work full-time on online privacy matters, increase overall staff time devoted to online privacy, and increase its advertising and awareness budget.

**(6)** **Electronic Frontier Foundation ("EFF"):** The EFF focuses on defending free speech, privacy, innovation, and consumer rights on the cutting edge of technology. The EFF uses reactive education[14]—which grants consumers broader, deeper understandings of their rights and lays out what consumers can do to protect those rights—and technology tools[15]—which aim to make it easier for users to engage in prophylactic behavior with regard to online privacy and security—to further these goals. The CDT intends to use its distribution to ensure that these initiatives are able to continue and expand in the future.

**(7)** **Electronic Privacy Information Center ("EPIC"):** EPIC was established in 1994 to focus public attention on emerging privacy and civil liberties issues by pursuing a wide range of activities, including policy research, public education, conferences, litigation, publications, and advocacy. EPIC has also taken an active role in protecting consumers' VPPA rights. EPIC intends to use its distribution to fund: its public education (web sites, newsletters, and publications) project, its Consumer Protection Program, its *Amicus Curiae* Project, its Public Voice Project (which hosts privacy-related conferences), its Open Government Project, its Privacy Coalition, its Program on Government Accountability, and its fellowship programs.

**(8)** **High Tech Law Institute of Santa Clara University School of Law ("HTLI"):** The HTLI offers semester-long academic courses and shorter educational programs on privacy for law students, lawyers, and community members. The HTLI intends to use its distribution to fund: continued privacy education programs, its annual Internet Law Work-in-Progress academic symposium, its annual program co-sponsored by Internet advertising organizations focusing on privacy and advertising, its State of the Net West speaker series, its Student Fellowship Program, an all-day academic symposium for Internet Privacy, a research grant for a privacy-related paper, and a day-long seminar for professors on how to teach privacy law.

**(9)** **International Association of Privacy Professionals ("IAPP"):** The IAPP educates professionals—across all sectors of American enterprise—that work on the front lines of privacy, actually touch personally identifiable information, and are charged with its proper handling, management, and safekeeping. The IAPP intends to use its distribution to fund and expand three programs: a pro bono privacy initiative that helps charitable organizations provide better privacy, privacy research fellowships for recent college graduates interested in privacy, and a Privacy Law Scholars Wards program that gives cash awards for papers from leading academic privacy scholars.

---

[14]  Examples include a social networking Bill of Rights, best practices for online service providers, a how-to guide on removing Google search histories, and a digital survival guide for U.S. border searches.

[15]  Examples include developing an international "Do Not Track" framework and the EFF's "HTTPS Everywhere" web browser extension.

**(10)    Markkula Center for Applied Ethics:** The Markkula Center provides free online educational materials addressing the ethical implications of technology, law, and privacy, and organizing public events that explore related issues. The Markkula Center also operates a program specifically dealing with internet Ethics. The Markkula Center intends to use its distribution to further its educational efforts and reach policy makers, as well as to continue and expand its support of student and faculty privacy protection research.

**(11)    NYU Information Law Institute ("ILI"):** The ILI is devoted to the study of law, policy, and technology as they define and affect the flow of information in digitally networked societies, with a primary focus on information privacy. The ILI regularly hosts events involving faculty, policy makers, public interest advocates, and industry representatives from the United States and elsewhere around the world. The ILI intends to use its distribution to fund research fellowships related to consumer privacy and VPPA issues; workshops, conferences, and the ILI's Code-a-thon; as well as hiring a lab manager and programmer.

**(12)    Privacy Project (UC Hastings):** The Privacy Project seeks to empower individuals to protect their information with implementable solutions and focuses on consumer privacy issues such as terms of service agreements, third-party data access, social networking websites, mobile applications, and industry standards. The Privacy Project intends to use the distribution to provide customers the tools they need to take control of their privacy priorities and to make informed choices about the Internet options available to them, and to head off problems before they arise by (1) providing implementable tools and education for companies to implement best privacy practices, and (2) working with the Internet community to continually develop and refine best privacy practices.

**(13)    Privacy Rights Clearinghouse ("PRC"):** The PRC provides consumer privacy protection and advocacy. The PRC offers a consumer education program that has created more than 60 fact sheets. In addition, it has an active outreach and social media presence and has launched an Online Complaint Center that enables consumers to raise privacy questions and file complaints. The PRC intends to use its distribution to expand its existing fact sheet series, develop a new quick-read "how to" fact sheet series, optimize its website for mobile devices, and expand the capabilities of the "Chronology of Data Breaches" section of its website.

**(14)    The Rose Foundation for Communities and the Environment, Consumer Privacy Fund:** The Rose Foundation is a grant-making public charity that will use its portion of the distribution to distribute to other organizations that would support projects educating users, regulators, and enterprises regarding critical issues relating to the protection of privacy, identity, and personal information.

**(15)    The Samuelson Law, Technology & Public Policy Clinic (U.C. Berkeley School of Law) ("Samuelson Clinic"):** The Samuelson Clinic supports the public's interest in technology, law, and privacy, and educates law students through real-world work with live clients on cutting-edge policy issues. Much of the Samuelson Clinic's work supports consumers' interest in accessing information privately, protecting identity, and personal information online and in other emerging networked environments, and protecting consumers from a variety of online threats. The Samuelson Clinic will use its distribution to give its students and faculty the opportunity to strengthen consumers' voice on privacy and consumer protection policy debates, which will also have the indirect benefit of better training law students to proactively address privacy issues from emerging technology.

**(16)    Stanford Center for Internet and Society ("CIS"):** The CIS is a public interest technology law and policy program and a part of the Law, Science and Technology Program at Stanford Law School. The CIS works to improve technology law and policy through ongoing interdisciplinary studies, analysis, research, and discussion, and strives to inform the design of both technology and law in furtherance of important policy goals such as privacy, free speech, innovation, and security. The CIS intends to use its distribution to hire a full-time director of

1  privacy, expand its research on best practices for user privacy notices on mobile devices, develop Do Not Track specifications, and further its current practices.

2      **(17)    University of Maine Center for Law + Innovation ("CLI"):** The CLI provides
3  public and clinical education in legal areas affected and driven by technological advancements, including intellectual property, e-commerce, technology transfer, information privacy, and other
4  technology-related fields. The CLI intends to use its distribution to continue and expand its privacy program by supporting a two-year development plan for its information privacy law
5  school curriculum, pro bono privacy clinical initiative, Information Privacy Summer Institute, annual conference, and student internships.

6      **(18)    The USC Intellectual Property and Technology Law Clinic (USC Gould School
7  of Law) ("USC Clinic"):** The USC Clinic counsels and represents policymakers, nonprofit organizations, artists, and entrepreneurs who are grappling with challenges at the intersection of
8  technology, law, and policy. The USC Clinic intends to use its distribution to enhance its clinical offering by hiring a Clinic Privacy Fellow and by conducting cutting-edge research designed to
9  help lawmakers and regulators nationwide make sound policy in the area of information privacy law.

10      **(19)    U.S. Public Interest Research Group Education Fund ("PIRG") and
11  California Public Interest Research Group Education Fund ("CALPIRG"):** PIRG and CALPIRG operate a Consumer Program that works on digital marketplace privacy to focus on
12  educating consumers, regulators, and enterprises about the various privacy threats and protections. PIRG and CALPIRG intend to use the distribution to develop and distribute one-page online
13  consumer guides titled *How Internet Data Collection Affects You*, *Internet Privacy Tips*, and *Digging Deeper Into Internet Data Collection*; develop a follow-up survey to their 2008 report,
14  *Still In The Dark*, in which consumers reported on their ability to learn how their personal information was used by companies they purchase from; issue a report to the FTC and the CFPB
15  regarding digital privacy issues; update their 2004 survey on credit reporting errors, *Mistakes Do Happen*; and continue and expand their current privacy practices.

16      **(20)    World Privacy Forum ("WPF"):** The WPF's mission is to re-imagine privacy in
17  the digital era in a way that allows for technological innovation while protecting consumer privacy. The WPF publishes research reports and consumer education materials, while providing
18  direct consumer assistance with online privacy queries and working on consumer policy. The WPF intends to use its distribution to continue and expand its operations.

19      The *cy pres* distributions to these organizations will directly benefit the Class by furthering the

20  VPPA's purpose of protecting consumer privacy rights. The *Cy Pres* Recipients are existing

21  organizations who will spend the funds solely on privacy protection and education efforts, and not

22  on things like startup costs. This will allow consumers, and Class members specifically, to see

23  immediate benefits through implementation and furtherance of an abundance of privacy-protective

24  practices and activities.

25      **E. Payment of Notice and Administrative Expenses**

26      Defendant has and will continue to pay out of the Settlement Fund the cost of sending the

27  Court-approved notice, the costs of administration of the Settlement, and all other services

28  performed by the settlement administrator as required by the Settlement Agreement. (Ex. A, § 2.3.)

Pls' Mot. for Final Approval of And Award of          23          Case No.: 5:11-cv-00379-EJD
Attorneys' Fees, Expenses, and Incentive Award

SER 222

1   Presently, these costs are $114,570.58, with additional expected costs of $35,000.00. (Affidavit of

2   Tore Hodne ("Hodne Aff."), ¶ 9, a true and accurate copy of which is attached hereto as Exhibit

3   E.)

### F. Compensation for the Class Representatives

5   In addition to any benefit under the Settlement, in recognition of their efforts on behalf of the

6   Class, and subject to the approval of the Court, Netflix has agreed to pay Class Representatives

7   Jeff Milans and Peter Comstock, as well as the named-plaintiffs in the Related Actions, a

8   collective incentive award out of the Settlement Fund in the amount of $30,000, as appropriate

9   compensation for their time and effort serving as the class representatives in this litigation. (Ex. A,

10  §§ 9.2–9.5.)

### G. Payment of Attorneys' Fees and Expenses

12  Subject to the approval of the Court, Netflix has agreed to pay Class Counsel a fee award of up

13  to 25% of the Settlement Fund ($2,250,000.00), plus reimbursement of up to $25,000.00 of their

14  costs and expenses. The basis for Class Counsel's fee request is fully set forth below in Section

15  VII.

### H. Release of Claims

17  Should the Court grant final approval to the Settlement, Plaintiffs and each member of the

18  Settlement Class who has not timely filed a request to be excluded will release and forever

19  discharge Netflix, and each of its related affiliates and entities, from any and all manner of claims,

20  whether known or unknown, arising out of or relating to, or regarding the alleged retention and

21  disclosure of Plaintiffs' and the Settlement Class's PII, Entertainment Content Viewing History,

22  and other information, including but not limited to all claims that were brought, alleged, argued,

23  raised, or asserted in any pleading or court filing in the Action. (*See* Ex. A, §§ 1.31, 1.32, 1.33,

24  1.42, and 3 for the full release.)

### V. THE CLASS NOTICE COMPORTS WITH DUE PROCESS AND RULE 23

26  Before final approval of a class action can issue, notice of the settlement must be provided to

27  the class. Fed. R. Civ. P. 23(e)(1). Here, the Court-approved notice plan was executed to the

28  standards of Due Process and Rule 23, which require that the class receive "the best notice

1   practicable under the circumstances, including individual notice to all members who can be

2   identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); (Declaration of Shannon R.

3   Wheatmanm Ph.D ("Wheatman Decl."), ¶ 5–6, a true and accurate copy of which is attached

4   hereto as Exhibit F.) Specifically, Rule 23(c)(2)(B) requires the notice directed to the class to

5   clearly, and in concise, plain, easily-understood language state: (a) the nature of the action; (b) the

6   definition of the class certified; (c) the class claims, issues, or defense; (d) that a class member

7   may enter an appearance through an attorney if he or she desires; (e) that the court will exclude

8   any member of the class upon request; (f) the method and time to request exclusion; and (g) that

9   the judgment will be binding on class members. The Parties have strictly adhered to these

10   requirements in this case.

11      To start, the Parties solicited notice proposals from respected class action settlement

12   administrators and selected Kinsella Media/Rust Consulting ("Rust"), an administrator with

13   extensive experience in providing proper notice. (Edelson Decl. ¶ 24; *see also Kaufman v. Am.*

14   *Express Travel Related Servs., Inc.*, 283 F.R.D. 404 (N.D. Ill. 2012) (*sua sponte* proposing Dr.

15   Wheatman as notice expert).) In conjunction with Rust, the Parties developed and implemented a

16   notice plan involving direct notice by email to all Settlement Class members, publication notice, a

17   joint press release, the creation of a Settlement Website, and notice to the relevant governmental

18   agencies pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715(b). In its July 5, 2012

19   Preliminary Approval Order, the Court specifically found that the Notice Plan "meets the

20   standards of Rule 23." (Dkt. 80 at 7.)

21      The Parties fully implemented the Notice Plan in compliance with Due Process and Rule 23.

22   The direct email notice reached a total of 40,858,293 out of 62,039,868 Class members, with

23   21,181,575 emails undelievered (Wheatman Decl. ¶ 10; Declaration of Sara Cantwell ("Cantwell

24   Decl.," a true and accurate copy of which is attached hereto as Exhibit G, ¶ 5.) Rust then

25   implemented the publication notice procedure, which included a half-page advertisement in

26   *People* magazine, and an advertisement on Facebook.com. (Wheatman Decl. ¶¶ 12–13.) Finally,

27   on June 4, 2012, in compliance with the Class Action Fairness Act, 28 U.S.C. § 1715(b), Netflix

28   mailed a letter, prepared by Defendants' counsel, enclosing the requisite court documents to the

1   U.S. Attorney General and the Attorneys General of each state and U.S. territory giving notice of

2   the Settlement. (*See* Certificate of Service via Certified Mail in Support of Final Approval of Class

3   Action Settlement, a true and accurate copy of which is attached hereto as Exhibit H.)

4      The Court-approved summary notice, CAFA Notice, and the Facebook and *People*

5   advertisements all provided links to, or the address for, the neutral Settlement Website, URL

6   www.videoprivacyclass.com, which went live on July 24, 2012. (Wheatman Decl. ¶18.) The

7   Court-approved Settlement website: (1) provided full details regarding the rights of Class

8   Members to object to or opt-out of the Settlement, (2) notified Class members that no further

9   notice will be provided to them and that the Settlement had been preliminarily approved, and (3)

10   informed Class members that they should monitor the Settlement Website for further

11   developments. The Settlement Website has been viewed at least 128,549 times. (Hodne Decl. ¶ 4.)

12   The website provides the traditional "long form" notice of the Settlement, and allows for members

13   of the Class to obtain additional information and documents about the Settlement, including a .pdf

14   file of the Long Form Notice, Court documents, and Frequently Asked Questions. (Wheatman

15   Decl. ¶ 18.) All told, the Notice Plan achieved its projected saturation and reached more than 80%

16   of the Class, an average of 1.6 times each. (Wheatman Decl. ¶¶ 14.)

17      In addition to implementing the methods of notice that resulted in reaching the greatest

18   number of Class members possible, the content of the notice was specifically designed by

19   Shannon R. Wheatman, Senior Vice President of Kinsella Media, LLC, so that it used simple,

20   plain language encouraging readership and comprehension. (Wheatman Decl. ¶¶ 5, 25–29.) The

21   summary notice met each requirement of Rule(c)(2)(B) and the long-form notice provided—in an

22   easy-to-understand-way—even more detail about the nature of Plaintiff's claims concerning the

23   alleged violations of the VPPA, along with Class members' rights to participate in or object to the

24   Settlement. (Wheatman Decl. ¶¶ 25–29.)

25      In sum, notice to the Class complied with the Preliminary Approval Order, Rule 23, and Due

26   Process, plainly comprising the "best practicable notice under the circumstances."

27   **VI. THE SETTLEMENT WARRANTS FINAL APPROVAL**

28      The law favors the compromise and settlement of class actions. *See*, *e.g.*, *Byrd v. Civil Serv.*

1   *Comm'n*, 459 U.S. 1271 (1983); *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 576

2   (9th Cir. 2004). Under Federal Rule of Civil Procedure 23(e), "[t]he court must approve any

3   settlement, voluntary dismissal, or compromise of the claims, issues or defenses of a certified

4   class" and such approval may occur "only after a hearing and on finding that the settlement,

5   voluntary dismissal, or compromise is fair, reasonable, and adequate." Fed. R. Civ. P. 23; *In re*

6   *OmniVision Tech, Inc.*, 559 F. Supp. 2d 1036, 1040 (N.D. Cal. 2008). A settlement is fair,

7   reasonable, and adequate where, as here, "the interests of the class are better served by the

8   settlement than by further litigation." *Garner v. State Farm Mut. Auto Ins. Co.*, No. CV-08-1365-

9   CW, 2010 WL 16877832, *8 (N.D. Cal. Apr. 22, 2010) (quoting Manual for Complex Litig.

10  (Fourth) § 21.61 (2004)). "[T]he decision to approve or reject a settlement [under Rule 23(e)] is

11  committed to the sound discretion of the trial Judge. . . ." *Hanlon v. Chrysler Corp.*, 150 F.3d

12  1011, 1026 (9th Cir. 1988). In exercising such discretion, courts should give "proper deference to

13  the private consensual decision of the parties." *Garner*, 2010 WL 16877832, at *8 (citing

14  *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of

15  stock in the product of an arms-length, non-collusive, negotiated resolution. . . .").

16      In assessing the fairness, reasonableness, and adequacy of a class action settlement, courts

17  generally consider the following non-exhaustive list of factors: "(1) the strength of plaintiffs' case;

18  (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of

19  maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the

20  extent of discovery completed, and the state of the proceedings; (6) the experience and views of

21  counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to

22  the proposed settlement." *Rodriguez*, 563 F.3d at 963 (quoting *Molski v. Gleichi*, 318 F.3d 937,

23  953 (9th Cir. 2003) *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571

24  (9th Cir. 2010)).

25      While the Court may consider each of the foregoing factors when considering the final

26  approval of a class action settlement, "[i]n the Ninth Circuit, a court affords a presumption of

27  fairness to a settlement, if: (1) the negotiations occurred at arm's length; (2) there was sufficient

28  discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a

1  small fraction of the class objected." *Lewis v. Starbucks Corp.*, No. 07-cv-00490, 2008 WL

2  4196690, at *7 (E.D. Cal. Sept. 11, 2008) (citing Alba Conte & Herbert B. Newberg, *Newberg on*

3  *Class Actions* § 11:41 (4th ed. 2002)). As discussed herein, the Settlement was reached: (1) after

4  extensive, arm's-length negotiations with the assistance of a well-respected mediator; (2) after the

5  exchange of both formal and informal discovery; and (3) by experienced counsel with extensive

6  experience with the VPPA and class actions.[16] Accordingly, the Court's analysis of the factors

7  listed below should be examined with a presumption that the Settlement Agreement is fair.

8    **A.  The Strength of Plaintiffs' Case**

9      The first step in assessing the fairness of a class action settlement is to examine "Plaintiff[s']

10  likelihood of success on the merits and the range of possible recovery." *Garner*, 2010 WL

11  1687832, at *9; *see also Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414,

12  424–25 (1968) ("Basic to [analyzing a proposed settlement] in every instance, of course, is the

13  need to compare the terms of the compromise with the likely rewards of the litigation."). The

14  analysis of Plaintiffs' probability of success on the merits, however, is not rigid or beholden to any

15  "particular formula by which the outcome must be tested," nor is the Court supposed to "reach any

16  ultimate conclusions of the contested issues of fact and law which underlie the merits of the

17  dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and

18  expensive litigation that induce consensual settlements." *Garner*, 2010 WL 1687832, at *9 (citing

19  and quoting *Rodriguez*, 563 F.3d at 965). "Rather, the Court's assessment of the likelihood of

20  success is 'nothing more than an 'amalgam of delicate balancing, gross approximations and rough

21  justice.'" *Garner*, 2010 WL 1687832, at *9 (citing *Officers for Justice v. Civil Serv. Comm'n of*

22  *City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)). Given the subjective

23  components inherent in handicapping any potential range of recovery, "the Court may presume

24  that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of

25  settlement by considering Plaintiff[s'] likelihood of recovery." *Id.* (citing *Rodriguez*, 563 F.3d at

26  [16]   As discussed in § VI.H, *infra*, the deadline for requesting exclusion from or objecting to the

27  Settlement is November 14, 2012, and Plaintiffs have until November 28, 2012 to respond to objections from Class members. (Preliminary Approval Order at 9; Settlement Agreement ¶¶ 1.24,

28  5.6.) At that point, Plaintiffs will submit a brief fully addressing the objections and exclusions, and more fully analyzing the reaction of the Class to the Settlement.

965).

Despite the benefit of this presumption, Plaintiffs have chosen to essentially "show their work" and in Section III, *supra*, have explained how they view and value their claims and Netflix's defenses. For the Court's convenience, below is a chart summarizing those views:

|  | Disclosure-based theory | Retention-based theory |
|---|---|---|
| Likelihood of succeeding on merits | 5% | 55% |
| Likelihood of obtaining adversarial class certification | 80% | 80% |
| Likelihood of the Ninth Circuit disagreeing with the Seventh Circuit's *Redbox* opinion | N/A | 25% |
| Likely statutory damages recovery | $3 million plus fees | $46.5 million plus fees |
| Likely Actual Damages Recovery |  | $4.65 million plus fees |
| Expected Future Value of Actual Damages Claim | $120,000 plus fees | $2,046,000 plus fees |
| Expected Future Value of Statutory Damages Claim |  | $5,115,000 plus fees |
| Total Future Value | $120,000 plus fees | $7,161,000 plus fees |
| Total net present value (3 year litigation period, 4.4% discount rate) | $6,398,667 plus fees | |

The strength of the Plaintiffs' case, the value of which is actually less than the Settlement Fund, is a factor strongly in favor of granting final approval to this Settlement.

**B. The Risk of Continued Litigation**

The second "fairness" factor this Court may consider is "the risk of continued litigation balanced against the certainty and immediacy of recovery from the Settlement." *In re Omnivision*, 559 F. Supp. 2d at 1041 (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)). "The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Lipuma v. Am. Express Co.*, 406 F. Supp. 1298, 1323 (S.D. Fla. 2005); *see also Garner*, 2010 WL 1687832, at *10 ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and

1  substantial recovery for the Plaintiff class."). Further, this factor favors the approval of a

2  settlement where, as here, significant procedural hurdles remain, including anticipated summary

3  judgment motions, class certification, and possible appeals. *Garner*, 2010 WL 1687832, at *10

4  (citing *Rodriguez*, 563 F.3d at 966).

5      Here, it is certain that the expense, duration, and complexity of the protracted litigation that

6  would result in the absence of settlement would be substantial. Significant costs would be

7  expended by both Parties should this matter proceed to trial, including expenses for expert

8  witnesses related to valuation of damages, and the myriad other costs that accompany the trial of a

9  nation-wide class action. (Edelson Decl. ¶ 58.) Yet, the added cost and burden of continued

10  litigation would not likely procure better results for the Class, especially in light of the *Sterk* and

11  *Rodriguez* opinions, the lack of support for Plaintiffs' disclosure theories, and the massive size of

12  the Class and substantial costs that would be incurred in attempting to disburse any *de minimis*

13  monetary payments to Class members. It is also difficult to contemplate an award of more

14  comprehensive injunctive relief to prevent future alleged violations of the VPPA's unlawful

15  retention provision, 18 U.S.C. §2710(e). As Plaintiffs face significant challenges in proving their

16  case on the merits, the substantial and prompt relief provided to the Class under the Settlement,

17  balanced against the inherent risk of continued litigation, weighs heavily in favor of final approval.

18  **C.  The Risk of Maintaining Class Action Status**

19      The Court's July 5, 2012 Order certified a nationwide class for settlement purposes only. (Dkt.

20  80 at 6.) Although Plaintiffs and Class Counsel believe they would be successful in obtaining

21  certification of an adversarial class absent the Settlement, Netflix has made it clear that, in its

22  absence, it would vigorously oppose adversarial certification. (Edelson Decl. ¶ 58.) Further, even

23  if Plaintiffs were successful in a motion for class certification absent the Settlement, Netflix could

24  move for decertification of the Class before or during trial and likely would challenge certification

25  on appeal. Fed. R. Civ. P. 23(c)(1)(C). Accordingly, this factor weighs in favor of approving the

26  Settlement Agreement because if at any point the Class failed to become certified or if certification

27  was reversed, the Class would get nothing.

28

## D. The Amount Offered in the Settlement is Substantial

Here, the size of the *cy pres* recovery obtained by Plaintiffs also strongly supports approval. A *cy pres* class action settlement is appropriate where "the proof of individual claims would be burdensome or distribution of damages costly." *Nachshin*, 663 F.3d at 1036. "The district court's review of a class-action settlement that calls for a *cy pres* remedy is not substantively different from that of any other class-action settlement except that the court should not find the settlement fair, adequate, and reasonable unless the *cy pres* remedy 'account[s] for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members.'" *Lane,* 2012 WL 4125857, at *4.

### 1. The $9 million fund is sufficient.

The $9 million common Fund secured by the Settlement is substantial in relation to the Class's best possible outcome at trial. The reasonableness of the amount offered can be determined by comparing it to the maximum potential recovery if Plaintiff were to ultimately succeed at trial. *See OmniVision*, 559 F. Supp. 2d at 1042 (finding a recovery of 9% of potential recovery to be reasonable and favoring approval of the settlement). In fact, "[i]t is well-settled that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render the settlement inadequate or unfair." *Officers for Justice*, 688 F.2d at 628. Here, as described in § III.C, *supra*, the Settlement Fund exceeds the $6,398,667.00 plus fees that represents the net present value of the Class's claims. Not only that, the Fund—even without valuing the accompanying injunctive relief—represents more than complete recovery for the damages suffered.

As described above, Class-wide damages for unlawful retention are equal to approximately $4.65 million, as that is the amount by which the class as a whole overpaid for their subscriptions in light of Netflix's allegedly unlawful conduct. (Egelman Decl. Rep at 9.) The Settlement Fund also approximates the likely result at trial, even factoring in statutory damages. Given the negative law surrounding the VPPA, this represents a significant victory for the Class. *See In re Heritage Bond Litig.*, No. 02-ML-1475-DT, 2005 WL 1594389, at *8-9 (C.D. Cal. June 10, 2005) (finding average recovery in shareholder derivative settlements from 2002 to 2006 to range between 2.2%

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF    31    CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

SER 230

1    and 3% of potential recovery); *Officers for Justice*, 688 F.2d at 628; *Cf. Garner*, 2010 WL

2    1687832, at *9 ("[T]he Court may presume that through negotiation, the Parties, counsel, and

3    mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of

4    recovery.") (citing *Rodriguez*, 563 F.3d at 965).

5        In addition to—or perhaps even more important than—the $9 million Settlement Fund, the

6    Settlement's value to the Class is bolstered by the industry-leading injunctive relief obtained.

7    Again, the Settlement requires that Netflix de-couple qualifying Class members' Entertainment

8    Content Viewing Histories from their Identification and Payment Information and that it do so in

9    the future whenever a subscriber cancels his or her account, absent express consent allowing such

10   retention. (Ex. A, § 2.1.) This injunctive relief has a value of $0.15 per Class member and thus has

11   a value of approximately $4.65 million to the Class as a whole. (*See* Egelman Decl. ¶ 8.)

12   Accordingly, when the Settlement Fund is combined with the value of the injunctive relief, the

13   Settlement actually provides a value of $13.65 million to the Class, compared to $4.65 million in

14   damages, a ratio of 2.9-to-1. As a result, when considering the value of the Settlement Fund and

15   the industry-leading injunctive relief, the Settlement represents a more than adequate recovery for

16   the Class.

17       Moreover, the certainty and the relative immediacy of the *cy pres* distribution under the

18   Settlement Agreement, when compared with the risk associated with seeking the full amount of

19   damages but receiving nothing, further justifies the reasonableness of accepting less than the

20   maximum potential statutory recovery. *See OmniVision*, 559 F. Supp. 2d at 1042. Thus, given the

21   constitutional concerns and other risks, the $9 million Fund, coupled with the Settlement's strong

22   injunctive measures, is entirely reasonable and preferable.

23       **2.  The *cy pres* distribution is the best method of benefiting the Class.**

24       In addition to being adequate in size, the Settlement's *cy pres* distribution is a reasonable

25   method of giving relief to the Class. Of course, under ideal circumstances Plaintiffs would have

26   obtained a meaningful and direct cash payment for the individual Class members. But, given the

27   size of the Class and the amount recovered, direct payments would have been *de minimis*, and the

28   cost of distributing them prohibitively excessive. Accordingly, the *cy pres* distribution is the best

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF        32        CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

SER 231

1   feasible alternative.

2   "A *cy pres* remedy . . . is a settlement structure wherein class members receive an indirect

3   benefit (usually through defendant donations to a third party) rather than a direct monetary

4   payment." *Lane,* 2012 WL 4125857, at *4. The "*cy pres* doctrine allows a court to distribute

5   unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of

6   beneficiaries." *Nachshin,* 663 F.3d at 1036. "For purposes of the *cy pres* doctrine, a class-action

7   settlement fund is 'non-distributable' when 'the proof of individual claims would be burdensome

8   or distribution of damages costly.'" *Lane*, 2012 WL 4125857, at *4 (quoting *Nachshin*, 663 F.3d at

9   1038). To warrant approval, the *cy pres* remedy must "account for the nature of the plaintiffs'

10  lawsuit, the objectives of the underlying statutes, and the interests of the silent class members."

11  *Nachshin*, 663 F.3d at 1036.

12      The instant Settlement goes well beyond analogous settlements within this Circuit and, as

13  such, the *cy pres* relief warrants approval. In *Lane*, for example, the Ninth Circuit recently

14  affirmed final approval of a *cy pres* settlement that provided less meaningful relief than is present

15  here. In *Lane*, the class asserted claims under the VPPA, Electronic Communications Privacy Act

16  (which provides statutory damages of $1,000 per person), the Computer Fraud and Abuse Act,

17  California's Consumer Legal Remedies Act, and California's Computer Crime Law. *See* 2012 WL

18  4125857, at *1, n.1. There, the Ninth Circuit approved a roughly $9.5 million *cy pres* settlement

19  fund over objections that the donation would be used to create a new privacy organization (rather

20  than fund existing organizations) and that one of the organization's three directors would be an

21  employee of the defendant. *Id.* at *5–6. The Ninth Circuit also looked favorably upon the *Lane*

22  settlement's injunctive component—which mandated the permanent termination injunction of

23  Facebook's "Beacon" program—over objections that "Beacon was already effectively terminated"

24  at the time of the settlement, *id.* at *10, and even though class counsel had "conceded that

25  Facebook was free to reinstitute the same program under a different name." *Id.* at *13 (Kleinfeld,

26  J., dissenting). In rejecting the objectors' arguments relating to the *cy pres* relief, the Court noted

27  that the Ninth Circuit does not "require as part of [the *cy pres* doctrine] that the settling parties

28  select a *cy pres* recipient that the court or class members would find ideal. On the contrary, such an

1    intrusion into the private parties' negotiations would be improper and disruptive to the settlement

2    process." *Id.* Ultimately, the Ninth Circuit found that because (1) "[a] $9.5 million class recovery

3    would be substantial under most circumstances," (2) any class member's individual recovery

4    would be *de minimis* and outweighed by administrative costs, and (3) Facebook's promise to

5    terminate the Beacon program provided meaningful injunctive relief to the class, the settlement

6    warranted approval. *Id.*

7        Here, the contemplated *cy pres* fund and injunctive relief make this Settlement even stronger

8    than the *Lane* settlement. First, from an absolute standpoint, and comparable to the $9.5 million

9    fund in *Lane*, this Settlement will produce a substantial $9 million Class recovery. If the Court

10   approves Class Counsel's contemporaneous request for fees and expenses, approximately $6.4

11   million in *cy pres* distributions will go to numerous privacy organizations and programs—each of

12   which will advance efforts to protect consumers' privacy and increase consumer privacy

13   awareness, and none of which will be operated by Defendant's employees. (Edelson Decl. ¶¶ 31–

14   34.)

15       Importantly, all identified *Cy Pres* Recipients are *existing* organizations or programs with

16   proven track records that have identified specific uses for the distributed funds, ensuring that each

17   *cy pres* distribution accounts for the nature of the Plaintiffs' lawsuit (protecting consumer privacy),

18   the objectives of the underlying statutes (protecting consumer privacy), and the interests of the

19   silent Class members (having their privacy protected). These organizations include leading

20   consumer advocacy groups such as the Center for Democracy and Technology, the Electronic

21   Privacy Information Center, the Electronic Frontier Foundation, Privacy Rights Clearinghouse,

22   and Consumer Watchdog, as well as leading academic privacy institutions such as the Berkman

23   Center for Internet and Society (Harvard), the Stanford Center for Internet and Society, and the

24   Samuelson Clinic at the Berkeley Center for Law & Technology. These organizations and others

25   located throughout the country will provide substantial benefits to the Settlement Class and

26   consumers generally through outreach and education programs, litigation and public advocacy,

27   legislative activity, privacy and best-practices consultation, and development of privacy-protecting

28   technological tools, and other methods.

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF          34        CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

SER 233

1    Second, here, as in *Lane*, the sheer size of the Class (over 62 million members) all but

2  guarantees that each Class member would receive only a *de minimis* payment from any direct cash

3  distribution, and even that would be completely nullified by distribution costs. (Edelson Decl.

4  ¶ 57.) Such a "non-recovery" only bolsters the value of this Settlement to the Class.

5    Third and finally, while the injunctive relief in *Lane* merely prevented the defendant from re-

6  launching its allegedly unlawful (and, according to the objectors, already terminated) Beacon

7  program under that same name, here the Settlement offers truly industry-changing relief: Netflix

8  will not continue to store its subscribers' PII (as it does now) after they cancel their subscriptions

9  unless the subscribers choose to allow it, and Netflix cannot change that policy without being in

10 contempt of court. (Edelson Decl. ¶ 55.) Thus, while the class in *Lane* was left guessing at the

11 future value of the obtained relief, here the Settlement Class will rest assured that Netflix will *not*

12 retain their sensitive PII in continued violation of the VPPA. Put simply, this Settlement is superior

13 to the *Lane* settlement in almost every way. Thus, this factor too favors final approval.

14  **E.  The Extent of Discovery Completed and the Stage of Litigation**

15    The next factor requires the Court to consider both the extent of the discovery conducted to

16 date and the stage of the litigation as indicators of class counsel's familiarity with the case and

17 ability to make informed decisions. *OmniVision*, 559 F. Supp. 2d at 1042 (citing *In re Mego Fin.*

18 *Corp.*, 213 F. 23d at 459). A compromise based on an understanding of the legal and factual issues

19 with a genuine arm's-length negotiation is "presumed fair." *Nat'l Rural Telecomms. Corp. v.*

20 *DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004).

21    This case is well-developed—the parties have been through an early mediation and initial

22 focused discovery on certain legal and factual issues. (Edelson Decl. ¶¶ 63–64.) Specifically,

23 Plaintiffs propounded, and Netflix responded to formal discovery concerning Netflix's PII use,

24 retention, and disclosure practices and policies, Netflix's purposes for collecting subscribers' PII,

25 and Class size and composition. (Edelson Decl. ¶ 64.) Further, Class Counsel had extensive

26 experience from which to draw from other similar VPPA cases, thus allowing them to make

27 informed decisions about the claims. (Edelson Decl. ¶ 62.) With this information, Class Counsel

28 were able to fully understand the facts and merits of Plaintiffs' claims, were able to properly

1  evaluate the strength and value of the case, and had a realistic view regarding what was likely

2  obtainable through either a settlement or judgment.

3      When Class Counsel appeared at the mediation with former United States District Judge Layn

4  R. Phillips (Ret.), they were intimately familiar with the applicable case law and were in

5  possession of sufficient discovery to intelligently negotiate the terms of the instant settlement to

6  the ultimate benefit of the Class members. Accordingly, this factor also favors approval of the

7  Settlement Agreement.

8      **F.  The Experience and Opinion of Counsel**

9      The next factor to consider is counsel's experience and views about the adequacy of the

10  Settlement. *Garner*, 2010 WL 1687832, at *14 (considering views of plaintiff's and defendant's

11  counsel that the settlement was fair); *see also OmniVision*, 559 F. Supp. 2d at 1043. In fact, "[t]he

12  recommendations of plaintiff's counsel should be given a presumption of reasonableness."

13  *OmniVision*, 559 F. Supp. 2d at 1043 (quoting *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D.

14  Cal. 1979)). Reliance on such recommendations is premised on the fact that "parties represented

15  by competent counsel are better positioned than courts to produce a settlement that fairly reflects

16  each party's expected outcome in litigation." *Rodriguez*, 563 F.3 at 967 (quoting *In re Pacific*

17  *Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995)).

18      Class Counsel have regularly engaged in major complex litigation, and have extensive

19  experience in prosecuting consumer class actions of similar size and complexity. (*See* Edelson

20  Decl. ¶ 61; *see also* Dkt. 59 at 4–5.) They have regularly engaged in major complex privacy

21  litigation involving technology companies, have the resources necessary to conduct litigation of

22  this nature and have frequently been appointed lead class counsel by courts throughout the

23  country. (*See* Firm Resume of Edelson McGuire LLC, attached to the Edelson Decl. as Exhibit C-

24  1); *In Re Facebook Privacy Litig.*, 10-cv-02389-JW, Dkt. No. 69 (N.D. Cal. Dec. 10, 2010)

25  (Judge Ware, in appointing co-lead counsel, noted that Edelson McGuire attorneys "were pioneers

26  in the electronic privacy class action field, having litigated some of the largest consumer class

27  actions in the country on this issue.").

28      Indeed, as this Court expressed in its Order appointing Interim Lead Class Counsel, Edelson

Pls' Mot. for Final Approval of And Award of    36    Case No.: 5:11-cv-00379-EJD
Attorneys' Fees, Expenses, and Incentive Award

SER 235

1  McGuire "specializes in class actions relating to consumer technology and privacy issues" and that

2  the "firm's significant and particularly specialized expertise in electronic privacy litigation and

3  class actions, renders them superior to represent the putative class." (Dkt. 59 at 4–5.) And, specific

4  to the issues in this case, Edelson McGuire is one of the few firms in the country that has

5  significant experience litigating VPPA claims on a class basis. *See, e.g., Missaghi v. Blockbuster,*

6  *LLC,* Case No. 11-2559-JRT-JSM, Dkt. No. 48 (D. Minn. Aug. 7, 2012) (granting preliminary

7  approval of class action settlement alleging unlawful retention of class members' video viewing

8  histories in violation of the VPPA, 18 U.S.C. § 2710(e) and appointing Jay Edelson, and others, as

9  class counsel for settlement purposes).

10     Further, Edelson McGuire has been at the forefront of technology and privacy class actions

11  generally, successfully prosecuting cases against companies such as Microsoft, Amazon,

12  Facebook, Zynga, AT&T, and comScore. (*See* Firm Resume, Exhibit C-1.) This body of

13  experience has informed and supported Class Counsel's efforts throughout this litigation, was a

14  critical factor in obtaining the relief embodied by the Settlement, and ensured that the Class

15  received the highest quality of representation.

16     Through their investigation, review of discovery materials, and the settlement process, Class

17  Counsel have gained an intimate understanding of the instant litigation and believe the Settlement

18  to more than exceed the "fair, adequate, and reasonable" standard required for the Court's

19  approval. (Edelson Decl. ¶ 59.) Furthermore, all seven of the Plaintiffs' firms involved in this

20  litigation, including those involved in what was a heated leadership fight, fully support this

21  Settlement and agree that it presents a more than adequate recovery for the Class. (Edelson Decl. ¶

22  59.) This factor, therefore, also favors the Court's final approval of the Settlement.

23     **G.  The Presence of a Governmental Participant**

24     Although there were no "governmental coattails for the class to ride" in this case, *Rodriguez,*

25  563 F.3d at 964, Defendant was nonetheless obligated to notify the United States Attorney General

26  and the appropriate state officials as a condition of obtaining Court approval. 28 U.S.C. § 1715;

27  *Garner,* 2010 WL 1687832, at *14. "Although CAFA does not create an affirmative duty for either

28  the state or federal officials to take any action in response to a class action settlement, CAFA

---

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF         37         CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." *Id.* Netflix timely complied with CAFA's notice requirement and provided the requisite notice on June 4, 2012. (Ex. H.) As of the date of filing, no state or federal official has raised any objection to the settlement. (*Id.*) Accordingly, this factor also favors approval of the Settlement.

### H.  The Reaction of the Class Members to Date

Although the deadline for opt-outs and objections is still two weeks away, thus far, only 2,157 class members have excluded themselves (0.003%), (Hodne Decl. ¶ 8), and 97 have objected to the Settlement, (0.00016%). (*See generally* Dkt. 80–186.) While Class Counsel anticipates that the publicity associated with this suit, the size of the Class, and the size of the Settlement will trigger further objections—particularly from professional objectors delaying their filings as long as possible in order to increase their leverage[17]—Plaintiffs anticipate that given the results so far, the total number of opt-outs and objections will demonstrate the Class's overwhelmingly positive reaction to the Settlement, especially when compared to the recently approved *Lane* settlement. *See Lane*, 2012 WL 4125857, at *5 (four objectors out of a 3.6 million person class, for a 0.00011% objection rate). Pursuant to the Court's Preliminary Approval Order, the exclusion period ends on November 14, 2012, and Plaintiffs have until November 28, 2012 to respond to the objections. (Dkt. 80 at 9; Settlement Agreement ¶¶ 1.24, 5.6.) Plaintiffs look forward to addressing the objectors' concerns with the Settlement at that time, when they will submit a brief in fulsome with their responses.

### I.  Given the Absence of Any Signs of Collusion, the Settlement Does Not Require Additional Scrutiny

In addition to the foregoing factors—all of which support certification here—the Ninth Circuit has instructed courts to carefully scrutinize cases that are settled without adversarial certification for possible collusion. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir.

---

[17]   Class Counsel has already seen concerning behavior from would-be professional objectors, including one firm going so far as to solicit a public interest organization to object rather than participate in the *cy pres* application process (presumably so that the objectors could then assert that the funds were not being distributed to the best recipients), and another firm making up imaginary clients in an attempt to gain access to privileged information. (Edelson Decl. ¶ 79.)

1  2011). In particular, courts are to be aware of certain "warning signs" that warrant heightened

2  scrutiny, including where class counsel receives a disproportionate distribution of the settlement or

3  the class receives no monetary distribution, where unawarded attorneys' fees revert to the

4  defendants rather than to the settlement fund for the class, and where there is a "clear sailing" fee

5  arrangement. *Id.* When these warning signs are present, "the Court must 'examine the negotiation

6  process with even greater scrutiny than is ordinarily demanded.'" *In re HP Laser Printer Litig.*,

7  No. SACV 07-0667 AG RNBX, 2011 WL 3861703, at *4 (C.D. Cal. Aug. 31, 2011) (quoting *In re*

8  *Bluetooth*, 654 F.3d at 947). In essence, each of these "warning signs" is designed to root out

9  evidence of collusion or evidence that class counsel have put their own interests ahead of the class,

10  which "may not always be evident on the face of a settlement." *In re Bluetooth*, 654 F.3d at 947.

11      The instant Settlement Agreement is wholly free of collusion. At the outset, although the

12  "verbal assurances" of counsel and "the mere presence of a neutral mediator" during settlement

13  and fee negations is a non-dispositive "factor weighing in favor of a finding of non-collusiveness,"

14  *Id.* at 948, the Parties here have submitted sworn proof detailing the steps taken in the mediation

15  process that resulted in both the class relief and fee amount. (Edelson Decl. ¶¶ 20–25.) As

16  described *supra*, the complete process resulting in the Settlement was done at arms-length, by

17  well-represented parties, and under the supervision of a former federal judge.

18      Moreover, the terms of the Settlement do not raise the concerns identified by the Ninth Circuit

19  in *In re Bluetooth Headset Products Liability Litigation*. First, unlike *In re Bluetooth*—where class

20  counsel sought up to *eight times* the $100,000 "provid[ed to] the class . . . in *cy pres* awards"—

21  here, the requested fee award sought by Class Counsel is not a "disproportionate distribution of

22  the settlement." *Id.* Rather, and as discussed more thoroughly below in § VII, *infra*, Class Counsel

23  seek only the Ninth Circuit's "benchmark" twenty-five percent (25%) fee award of the $9 million

24  common Fund earmarked for *cy pres* distribution. *See Powers v. Elchen*, 229 F.3d 1249, 1256 (9th

25  Cir. 2000) ("We have . . . established twenty-five percent of the recovery as a 'benchmark' for

26  attorneys' fees calculations under the percentage-of-recovery approach."). Further, while it's true

27  that the Settlement does not involve a direct cash distribution to Class members, such a

28  distribution would—as discussed in § V.D.2, *supra*—produce only *de minimis* cash payments,

1   which would be reduced even further after applying administrative and distribution costs. Instead,

2   the terms of the Settlement ensure that each Class member enjoys an actual indirect benefit

3   through the sizeable *cy pres* distributions.

4        Additionally, it again bears noting that although the Settlement requires Defendant to abide by

5   strong injunctive relief designed to prevent the allegedly unlawful conduct at issue in this

6   litigation—which does in fact provide tangible value to the Class[18] and corrects the very conduct

7   challenged by this lawsuit—Class Counsel are not seeking to increase their fee by specifically

8   valuing the non-monetary benefits provided by the Settlement. *See Staton v. Boeing Co.*, 327 F.3d

9   938, 974 (9th Cir. 2003) ("[p]recisely because the value of injunctive relief is difficult to quantify,

10  its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned

11  to a common fund."). Rather, Class Counsel seek only a percentage of the $9 million cash value of

12  the common Fund.

13       Second, unlike the agreements in *Staton v. Boeing Co.,* and *In re Bluetooth*, this Settlement

14  does not provide for payment of attorneys' fees separate and apart from funds paid to the Class.

15  *Staton*, 327 F.3d at 970; *In re Bluetooth*, 654 F.3d at 948-49. Rather, Class Counsel are seeking a

16  percentage of the common fund from which *cy pres* distributions will be made—and any funds not

17  awarded in fees will simply be distributed to the approved *cy pres* recipients rather than reverting

18  to Netflix. *See In re Bluetooth*, 654 F.3d at 949 ("a kicker arrangement reverting unpaid attorneys'

19  fees to the defendant rather than the class amplifies the danger of collusion . . .").

20       Third, unlike *Staton*, the Settlement is not contingent on the Court awarding a specific fee to

21  Class Counsel. Rather, the Parties have agreed to an overall Settlement Fund and have "left the

22  division of that fund as between the class and counsel to the district court, as is usual in common

23  fund cases." *Staton*, 327 F.3d at 971.

24       Finally, while there does exist a "clear sailing" provision[19] in the Parties' Settlement

25  ─────────────────────────
    [18]      *See* Egelman Rep. at 9–10.

26  [19]    A "clear sailing" provision refers to a settlement term in which a defendant agrees not to
27  challenge class counsel's fee request up to an agreed amount. The core of the Ninth Circuit's
    concern related to such a provision is the instance in which the requested fee is agreed upon as an
    independent figure separate and apart from the amount provided to the class. *In re Bluetooth*, 654
28  F.3d 935 at 947 ("[W]hen the parties negotiate a 'clear sailing' arrangement providing for the

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF          40          CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

SER 239

1   Agreement, the requested attorneys' fees were negotiated solely as a percentage of the overall

2   Settlement Fund, meaning that Class Counsel's fees are inextricably linked to the common fund

3   obtained for Class's benefit. (Edelson Decl. ¶ 22); *see also In re Oracle Securities Litig.*, 131

4   F.R.D. 688, 694 (N.D. Cal. 1990) (noting that contingent, percentage based fees act as "a

5   monitoring device" and "align the interests of lawyer and client. The lawyer gains only to the

6   extent his client gains."). The fee negotiations here came only after Class relief was agreed upon

7   by the Parties—the fee amount was not independently created or the product of "red-carpet

8   treatment" in exchange for reduced benefits to the Class. Rather, the fee agreement and incentive

9   award were the final negotiated points of a "package deal" and were entirely based upon the

10  benefits provided to the Class. *See In re Bluetooth*, 654 F.3d at 947-49; Edelson Decl. ¶ 22.

11      Accordingly, the non-collusive nature of this Settlement, reached after a series of arm's length

12  negotiations and a contested mediation, should dispel any concern of the "warning signs" that

13  appear in some class actions but are completely absent here.

14  **VII. THE FEE AWARD SOUGHT HERE IS REASONABLE USING EITHER THE
      PERCENTAGE OR LODESTAR METHOD IN LIGHT OF THE RISK COUNSEL
15    TOOK AND THE BENEFIT THEY CONFERRED ON THE CLASS.**

16      Class Counsel seek attorneys' fees of $2.25 million—equal to the 25% benchmark fee award

17  for Ninth Circuit common fund cases—plus $25,000 of its out-of-pocket costs pursuant to the

18  Settlement Agreement. Courts throughout the Ninth Circuit have long-recognized that "[w]hen

19  counsel recover a common fund which confers a 'substantial benefit' upon a class of beneficiaries,

20  they are entitled to recover their attorney's fees from the fund." *Fishel v. Equitable Life Assur.*

21  *Society of U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002) (citing *Lewis v. Anderson*, 692 F.2d 1267,

22  1270 (9th Cir. 1982)). Accordingly, when a settlement produces a common fund for the class,

23  payment of attorneys' fees separate and apart from class funds, [it] carries 'the potential of
24  enabling a defendant to pay class counsel excessive fees and costs in exchange for
    accepting an unfair settlement on behalf of the class.'"). Under those circumstances, the *In re*
25  *Bluetooth* Court cautioned, "the very existence of a clear sailing provision increases the likelihood
    that class counsel will have bargained away something of value to the class. *Id.* [Citation omitted]
26  Therefore, when confronted with a clear sailing provision, the district court has a heightened duty
    to peer into the provision and scrutinize closely the relationship between attorneys' fees and
27  benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they
    are uncontested." *Id.* at 948. The circumstances giving rise to the Ninth Circuit's concerns are not
28  present with respect to this Settlement as Class Counsel's fee request is directly related to the
    Class relief.

1   courts in the Ninth Circuit primarily employ a percentage-of-recovery method and award class

2   counsel a fee that constitutes a certain percentage of the fund. *In re Bluetooth*, 654 F.3d at 942.

3   However, "courts [ultimately] have discretion to employ either the lodestar method or the

4   percentage-of-recovery method" when evaluating whether "the award, like the settlement itself, is

5   reasonable." *Id.* (citing *In re Mercury Interactive Corp.,* 618 F.3d 988, 992 (9th Cir. 2010)).

6   Regardless of which method is used, the fee award should take into account the particular factors

7   in the specific case and must be "reasonable under the circumstances." *State of Florida v. Dunne*,

8   915 F.2d 542, 545 (9th Cir. 1990).

9       As discussed below, Class Counsel's fee request is reasonable using either a percentage of

10   recovery or lodestar analysis and, consequently, should be approved.

11   **A. Class Counsel's Benchmark Fee Request is Appropriate Under the Percentage**
     **Method.**

12

13       For common fund settlements, like this one, the Ninth Circuit has set the "benchmark" fee

14   award at 25 percent of the recovery obtained. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047

15   (9th Cir. 2002) (citing *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir.

16   1989)). More generally, percentage-based attorneys' fees commonly range from 20 to 50%.

17   Newberg on Class Actions § 14.6. Additional studies have found that for Settlements recovering

18   less than a $10 million common fund—such as the instant Settlement—awarded attorneys fees

19   average between 30.4% and 31.9%. *See* Stuart Logan et al., *Attorney Fee Awards in Common*

20   *Fund Class Actions*, 24 Class Action Rep. 167 (2003) (finding that "[t]he percentage of the class

21   recovery consumed by attorney fees and costs [averages from 30.4% to 31.9%] for recoveries

22   under $10 million" in a study of 1,120 cases). Ultimately, a district court may depart from the 25

23   percent benchmark—either upwards or downwards—but only after "providing adequate

24   explanation in the record of any 'special circumstances' justifying a departure." *In re Bluetooth*,

25   654 F.3d at 942 (quoting *Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301, 1311

26   (9th Cir.1990)); *Vizcaino*, 290 F.3d at 1048. The Ninth Circuit has established a non-exhaustive

27   list of factors used to evaluate the reasonableness of a percentage ultimately awarded, including:

28   "(1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the

1   contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made

2   in similar cases." *Tarlecki v. bebe Stores, Inc.*, C 05-1777 MHP, 2009 WL 3720872, at *4 (N.D.

3   Cal. Nov. 3, 2009) (citing *Vizcaino,* 290 F.3d at 1048-50).

4      Courts utilize the same percentage method and analysis regardless of whether class members

5   benefit directly (in the form of direct payments from the fund) or indirectly (in the form of, for

6   example, fund distributions to *cy pres* recipients). *See*, *e.g.*, *In re Google Buzz*, 2011 WL 7460099,

7   at *4 (direct *cy pres* distributions to existing organizations focused on Internet privacy policy or

8   privacy education would "provide[] an indirect benefit to the Class Members consistent with the

9   Class Members' claims"); *Lane*, 2012 WL 4125857, at *4 (observing that "[t]he district court's

10   review of a class-action settlement that calls for a *cy pres* remedy is not substantively different

11   from that of any other class-action settlement."). Indeed, courts both within and outside of this

12   Circuit have approved percentage awards for settlements making *cy pres* distributions from a

13   common fund. *See*, *e.g.*, *In re Google Buzz*, 2011 WL 7460099, at *4 (awarding 25% of a $8.5

14   million fund distributed only to *cy pres* recipients); *In re Toys R Us Antitrust Litig.*, 191 F.R.D.

15   347, 348 (E.D.N.Y. 2000) (awarding approximately 27% of a common fund, where the only cash

16   benefit of the settlement was a *cy pres* distribution to State governments as *parens patriae* on

17   behalf of resident consumers); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297

18   (E.D.N.Y. 2010) (awarding 21% of a common fund, $2.5 million of which was marked for

19   distribution via *cy pres*); *In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 549, 96 Cal. Rptr.

20   3d 127, 130 (2009) (affirming fee award based on common fund theory where relief secured

21   included a $3.25 million *cy pres* distribution to privacy-related organizations).

22      Here, Class Counsel seek no more than the standard benchmark recovery of 25% of the

23   Settlement's common fund. And again, the requested amount *only* contemplates a percentage of

24   the cash-portion of the total recovery obtained for the Class, and does not factor in the significant

25   value of the Settlement's substantial injunctive relief, which means that Class Counsel is seeking,

26   in essence, 16.5% of the value of the total relief secured for the Class.[20]

27

28   ———————————

[20]  *See* § VI.I, *supra*; Edelson Decl. ¶ 71.

**1. Class Counsel achieved superior results for the Class.**

Most importantly, and as discussed at length above, the instant Settlement provides significant relief for the Class. To that end, the Settlement provides both (1) injunctive relief that directly addresses—and corrects—the very conduct challenged by this case, *see supra*, § IV.B, and (2) indirect relief to the Class through a $9,000,000 common Fund, which will be predominately distributed to approved *Cy Pres* Recipients, *see supra*, §§ IV.C–D. While either mode of relief provides a significant benefit to the Class, the Settlement's complete recovery is remarkable.

Indeed, as discussed previously, the contemplated injunctive relief requires that Netflix permanently de-couple Class Members' Entertainment Content Viewing Histories from their Identification and Payment Information. These measures effectively "anonymize" the viewing histories of former subscribers retained by Netflix and, on Plaintiffs' view, simultaneously (1) bring Netflix into compliance with the VPPA's unlawful retention provision and, consistent with the purpose of the statute, (2) ensure that the PII of consumers who cancel (or who have cancelled) their Netflix subscriptions is safe from misuse stemming from, for example, any future compromise of Netflix's data security or any desire by a company acquiring Netflix[21] to monetize the information it has unlawfully retained.

Likewise, the anticipated *cy pres* fund and proposed distribution is substantial and will provide real benefits for the Class—especially in comparison to any prospective *de minimis* cash payment, to the extent one is even feasible in light of applicable administrative and notice costs. To that end, the contemplated fund rivals analogous landmark privacy-related *cy pres* settlements recently approved in this District. *See In re Google Buzz Privacy Litig.,* No. 5:10–cv–00672–JW, Dkt. Nos. 41, 128 (N.D. Cal. 2010) ($8.5 million settlement fund with approximately $6.5 million in *cy pres* payments to organizations focusing on Internet privacy policy or privacy education); *Lane*, 2012 WL 4125857, at *2 ($9.5 million settlement fund with approximately $6.5 million distribution of settlement funds used "to set up a new charity organization . . . designed to educate users, regulators[,] and enterprises regarding critical issues relating to protection of identity and personal

---

[21]    There are current reports, for example, that Microsoft is exploring a takeover of Netflix. (Edelson Decl. ¶ 56.)

1    information online through user control, and the protection of users from online threats").

2    Moreover, the total value of this *cy pres* fund exceeds the actual damages suffered by the Class

3    and avoids the strongest criticisms of the *Lane* settlement, which recently received approval from

4    the Ninth Circuit. *See supra*, §§ VI.D.1-2.

5        In all, these two modes of relief offer a substantial benefit to the entire Class and directly

6    address the heart of Plaintiffs' claims and allegations. As such, the results achieved by the

7    Settlement support the fee request.

8        **2. Plaintiffs' novel and untested claims carried a substantial amount of risk.**

9        Class Counsel accepted and pursued Plaintiffs' claims on a purely contingent basis and,

10   particularly in this case, invested considerable resources towards prosecution of this matter despite

11   substantial risk. That investment justifies the requested benchmark fee. *See Vizcaino*, 290 F.3d at

12   1051 ("In common fund cases, 'attorneys whose compensation depends on their winning the

13   case[] must make up in compensation in the cases they win for the lack of compensation in the

14   cases they lose.'") (quoting *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291,

15   1300-01 (9th Cir. 1994)).

16       While attorneys always face the prospect of non-payment when working on a contingency,

17   here, Plaintiffs' claims relied upon an untested theory of recovery and, accordingly, carried

18   exceptional risk. As noted here and elsewhere, Class Counsel believe that Milans' original

19   complaint was the nation's first class action specifically alleging a violation of the VPPA's

20   unlawful retention provision, 18 USC § 2710(e). (Edelson Decl. at ¶ 12; Dkt. No. 76 at 11.)

21   Indeed, those very claims comprise the core of this case and guide each aspect of relief

22   contemplated by the Settlement. Thus, as discussed in detail above, Plaintiffs' case moved forward

23   without any guiding precedent (other than the VPPA itself) and, if settlement had not been

24   reached, recovery was far from certain—especially in light of Netflix's anticipated defenses,

25   recent case law from this District and the Seventh Circuit, and the risk of continued litigation. *See*

26   *supra*, § III.A.1.

27       All told, this case involved a substantial amount of risk of non-payment/reimbursement, yet

28   required a large commitment of time and resources from Class Counsel. That risk additionally

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF     45       CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

SER 244

justifies the requested benchmark fee.

### 3. Prosecuting this case required substantial skill, resulting in the highest quality of representation for the named Plaintiffs and the Class

The prosecution of a complex, nationwide class action "requires unique skills and abilities." *In re OmniVision,* 559 F. Supp. 2d at 1047. Here, that requirement was present in droves. As discussed above, this case followed untested theories of recovery that affected an enormous (approximately 62 million) group of consumers. Netflix—a massive corporation with vast resources and a highly skilled legal team—contested (and still contests) each of Plaintiffs' claims. Accordingly, effective and efficient prosecution of Plaintiffs' claims required all of Class Counsel's discussed legal skill and experience. *See supra* § VI.F. Further, the fact that Class Counsel was (and is) prosecuting other, similar national class actions under the VPPA—in this and other District courts—means that the Class enjoyed the benefit of Counsel's specific experience without additional cost or time expended reviewing/analyzing related federal cases.

Ultimately, Class Counsel obtained a substantial, timely recovery for the Class in the face of substantial challenges against a formidable adversary. *See In re Heritage Bond Litig*., 2005 WL 1594389, at *12 ("[The] single clearest factor reflecting the quality of class counsels' services to the class are the results obtained."). Such representation supports the instant fee request.

### 4. Class Counsel advanced significant time and expense on a contingency basis.

At the time Milan's original complaint was filed, Class Counsel knew that they would spend hundreds of hours of attorney time in contested litigation with no guarantee of success. (Edelson Decl. at ¶ 63.) To date, Class Counsel and supporting counsel have in fact reasonably spent over 2424 hours representing Plaintiffs and the Class without compensation and requiring that other work be forgone. (Edelson Decl. ¶ 69.) In connection with that representation, Class Counsel and supporting counsel have advanced $47,502.56 in out-of-pocket litigation expenses prosecuting this case, with considerable risk of non-return. (Edelson Decl. ¶ 72.) Finally, Class Counsel anticipate devoting further time and resources to this case as the Settlement is shepherded through and beyond the final approval process. (Edelson Decl. ¶ 70.) In terms of actual investments made to-date, and among other such steps, Class Counsel:

(a) Conducted extensive pre-suit investigations, including identification and early legal analysis of the alleged business practices challenged by this case;

(b) Interviewed dozens of current and former Netflix subscribers, analyzed those customers' common experiences in light of Netflix's information retention practices, and shared—both on a formal and informal basis—information with other law firms and technology experts;

(c) Drafted and filed Plaintiff Milans's original complaint;

(d) Communicated early and often with Netflix's counsel, so as to open and maintain a dialogue regarding the Parties' respective views of the relevant Parties, law, and overall direction of the litigation, along with advising Netflix of its duty to preserve all electronic data relevant to Plaintiffs' claims;

(e) Coordinated and prepared for an in-person meeting with Netflix's counsel on March 7, 2011 at JAMS in Los Angeles, California, during which the Parties discussed the factual matters at issue (e.g., the type of customer information retained by Netflix and the advanced algorithms used to collect that information) and possibilities for resolving the lawsuit;

(f) Briefed and responded to motions seeking appointment as interim class counsel;

(g) Facilitated collaboration between all attorneys providing representation in the cases that were ultimately consolidated, so as to discuss views regarding the claims and facts at issue and coordinate efforts;

(h) Drafted and filed the operative Amended Consolidated Class Action Complaint (Dkt. No. 61);

(i) Prepared Rule 26(a)(1) disclosures and reviewed and analyzed those filed by Netflix;

(j) Propounded/reviewed discovery on/from Netflix, including twenty-five (25) interrogatories and fifty-nine (59) requests for the production of documents;

(k) Participated in Court-ordered telephonic ADR conferences on October 27 and November 29, 2011, which resulted in a stipulation to attend private mediation;

(l) Prepared a mediation brief, which fully presented Plaintiffs' factual contentions and legal theories and responded to Netflix's defenses;

(m) Participated in a full-day mediation with Netflix on February 2, 2012 in Santa Ana, California, resulting in the drafting of a Memorandum of Understanding outlining the underlying settlement structure;

(n) Engaged in continued communication, negotiations, and the exchange of settlement drafts with Netflix's counsel, which resulted in the drafting and execution of the finalized Settlement Agreement;

(o) Successfully briefed and moved for preliminary approval of the Settlement;

(p) Pursuant to the terms of the Settlement, effectuated notice to class members and hired additional staff to help respond to Class member inquires via telephone and email;

(q) Solicited, received, and reviewed applications from over 40 potential *cy pres* recipients in conjunction with Netflix's counsel, and ultimately selected proposed recipients;

(r) Took actions to protect the class from attorneys who attempted to improperly interfere with the *cy pres* process for their own personal gain;

(s) Began researching and drafting responses to objections that have already been raised in response to the Settlement, along with those that Class Counsel anticipate will be raised.

(Edelson Decl. ¶¶ 64.) Of course, each step involved allocation of attorney time, required that other worked be forgone, and, in many cases, involved actual out-of-pocket expenses. Through such efforts and expenses, Class Counsel have invested significant time and finances into their representation of the Class without any guarantee of payment or reimbursement.

**5. Class Counsel's fee request is consistent with awards in similar cases.**

As previously noted, Class Counsel's fee request seeks the 25% benchmark set by the Ninth Circuit for common fund cases. *See Vizcaino*, 290 F.3d at 1047. That amount is directly in line with other recent consumer class action cases establishing a common fund both within and outside of this District. *See, e.g.*, *In re Google Buzz*, 2011 WL 7460099, at *4 (awarding class counsel attorney fees amounting to 25% of an $8,500,000 fund involving *cy pres* recipients (fees totaling $2,125,000) arising from consumer privacy claims); *Lane v. Facebook, Inc.*, No. C 08-3845 RS, 2010 WL 2076916, at *2 (N.D. Cal. May 24, 2010) (awarding class counsel attorney fees of approximately 25% of a $9,500,000 fund involving *cy pres* recipients (fees totaling $2,364,973) arising from consumer privacy claims); *Nobles v. MBNA Corp.*, C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009) (awarding class counsel attorney fees amounting to 25% of an approximately $9.3 million fund (fees totaling $2,318,176.58) arising from a consumer fraudulent solicitation claim); *Fernandez v. Victoria Secret Stores, LLC*, CV 06-04149 MMM SHX, 2008 WL 8150856, at *16 (C.D. Cal. July 21, 2008) (awarding class counsel attorney fees amounting to 34% of an $8.5 million fund (fees totaling $2,890,000) arising from a class action brought on behalf of job applicants "who were subjected to unpaid job training"); *Razilov v. Nationwide Mut. Ins. Co.*, 01-CV-1466-BR, 2006 WL 3312024, at *1 (D. Or. Nov. 13, 2006) (awarding class counsel attorney fees amounting to 30% of a $19 million fund (fees totaling $5,772,606), arising from a Fair Credit Reporting Act case); *see also In re Informix Corp. Sec. Litig.*, No. 97-1289

1  (N.D. Cal., Nov.23, 1999) (Breyer, J.) (30% of $137 million fund (fees totaling $40 million)); *In*

2  *re Nat'l Health Labs. Sec. Litig.*, Nos. 92-1949 & 93-1694 (S.D. Cal. Aug. 15, 1995) (Brooks,

3  M.J.) (30% of a $64 million fund (fees totaling $19 million)); *see also In re Immunex Sec. Litig.*,

4  864 F. Supp. 142 (W.D. Wash. 1994) (Dwyer, J.) (30% of $14 million fund (fees totaling $3.9

5  million)); *In re Melridge, Inc. Sec. Litig.*, No. 87-1426 (D. Or. Mar. 19, 1992, Nov. 1, 1993, and

6  Apr. 15, 1996) (Frye, J.) (37.1% of $54 million fund (fees totaling $20 million)); and *Hernandez*

7  *v. Kovacevich*, 2005 WL 2435906 (E.D. Cal. 2005) (Wagner, J.) (33.3% of $2.5 million fund (fees

8  totaling $795,000 fee)).

9      The *In re Google Buzz* matter is of particular note here, as that case, like this one: (1)

10  concerned federal and state statutory violations concerning the online privacy of consumers; (2)

11  produced a common fund of analogous size ($8.5 million); (3) involved a cash fund distribution to

12  *cy pres* recipients rather than class members; and (4) awarded the benchmark 25% fee award

13  ($2.125 million) to class counsel. *See In re Google Buzz*, 2011 WL 7460099, at *4. Likewise, the

14  *Lane* matter (1) involved alleged violations of state and federal law—including the VPPA—

15  concerning the online privacy of consumers; (2) produced a common fund of analogous size ($9.5

16  million); (3) used the cash fund to "set up a new charity organization called the Digital Trust

17  Fund" as a *cy pres* recipient and did not involve cash distributions to class members; and (4)

18  awarded approximately 25% of the common fund to class counsel in fees ($2,364,973). *Lane*,

19  2010 WL 2076916, at **2, 13.

20      In the end, Class Counsel's investment into this case on a contingent basis—coupled with the

21  high degree of risk in prosecuting Plaintiffs' claims, requisite level of skill, and, above all else, the

22  substantial results obtained for the Class—justifies the requested 25% benchmark fee. Class

23  Counsel's request is fair, in line with percentage awards granted in analogous cases, and should be

24  approved.

25  **B. The Agreed-Upon Fee Is Reasonable Using the Lodestar Method of Analysis as a Cross-Check.**

26

27  The "lodestar method" calculates attorneys' fees by multiplying the number of hours that class

28  counsel reasonably expended on the litigation by an hourly rate that takes into consideration the

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF    49    CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

SER 248

region and the experience of the lawyer. *Staton*, 327 F.3d at 965. It is appropriate to calculate

attorneys' fees at prevailing rates to compensate for delay in receipt of payment. *Vizcaino*, 290

F.3d at 1051. Courts typically apply a multiplier or enhancement to the lodestar to account for the

substantial risk that class counsel undertook by accepting a case where no payment would be

received if the lawsuit did not succeed. *Id.* at 1051.

The Ninth Circuit has identified twelve factors used in determining the reasonableness of a fee

award under a lodestar analysis:

> (1) the time and labor required, (2) the novelty and difficulty of the questions
> involved, (3) the skill requisite to perform the legal service properly, (4) the
> preclusion of other employment by the attorney due to acceptance of the case, (5)
> the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations
> imposed by the client or the circumstances, (8) the amount involved and the results
> obtained, (9) the experience, reputation, and ability of the attorneys, (10) the
> 'undesirability' of the case, (11) the nature and length of the professional
> relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975); *see Cunningham v. City of Los

Angeles*, 879 F.2d 481, 486 (9th Cir. 1988). These factors largely overlap with those discussed

above—*i.e.*, the five *Tarlecki* factors identified and discussed with respect to Class Counsel's

request for the benchmark 25% fee from the $9.0 million fund (*see supra* § VII.A))—and each

additionally supports the fee request using the lodestar method.

Here, the requested fee draws firm support from Class Counsel and supporting counsel's

combined current lodestar of $1,352,025 and present costs totaling $47,502.56, is reasonable, and

is well supported by the applicable factors discussed above and otherwise set forth in *Kerr*.

Further, the requested $2.25 million fee requires a modest multiplier of only 1.66—a value that

will only lessen as Class Counsel continues to work towards the final fairness hearing and the

Settlement's implementation. Accordingly, this Court should find that the negotiated fee is

reasonable using the lodestar method as a crosscheck to the percentage method discussed *supra*,

§ VII.A.

### 1. Class Counsel's current lodestar of $1,352,025 is reasonable, is comprised of reasonable hours and reasonable rates, and supports the requested attorneys' fees

Class Counsel's current lodestar and out-of-pocket costs support the agreed-upon fee award of

$2.25 million and reimbursement of $25,000 in costs. Class Counsel and supporting counsel have

1  reasonably expended 3108.69 hours working on this case, which results in a current base lodestar

2  of $1,352,025 (Edelson Decl. ¶ 71; Declaration of attorney Joseph Marchese attached hereto as

3  Exhibit I ("Marchese Decl." ¶ 5 ); Declaration of attorney Christopher Marlborough attached

4  hereto as Exhibit J ("Marlborough Decl.") ¶ 5); Declaration of attorney David Parisi attached

5  hereto as Exhibit K ("Parisi Decl.") ¶ 6); Declaration of attorney Joseph Siprut attached hereto as

6  Exhibit L ("Siprut Decl.") ¶ 5); Declaration of attorney Sameer Dua attached hereto as Exhibit M

7  ("Dua Decl.") ¶ 5); Declaration of attorney Marc Godino attached hereto as Exhibit N ("Godino

8  Decl.") ¶ 6.) The hours submitted have been reviewed, and any unnecessary hours have been

9  adjusted or removed. (Edelson Decl. ¶ 65; Marchese Decl. ¶ 4; Marlborough Decl. ¶ 4; Parisi

10  Decl. ¶ 5; Siprut Decl. ¶ 4; Dua Decl. ¶ 4; Godino Decl. ¶ 4.) Further, the attorneys working on

11  this litigation bill hours at rates that correlate to their respective experience and are reasonable in

12  the legal markets in Chicago and California. (Edelson Decl. ¶ 68.) The following chart[22] breaks

13  down the lodestar figure into hours by each law firm involved in the consolidated cases:

14

| Law Firm | Hours | Total |
|---|---|---|
| Edelson McGuire, LLC | 2424.19 | $1,005,413.50[23] |
| Bursor & Fisher | 181.70 | $99,545.00 |
| Dua & Associates | 41.25 | $13,406.25 |
| Faruqi & Faruqi | 220.75 | $122,732.50 |
| Glancy, Binkow & Goldberg | 43.4 | $17,493.75 |
| Parisi & Havens | 45.3 | $18,509.00 |
| Siprut PC | 152.1 | $74,925.00 |
| **Total Current Lodestar** | **3108.69** | **$1,352,025.00** |

20  (Edelson Decl. ¶ 69; Marchese Decl. ¶ 5; Marlborough Decl. ¶ 5; Parisi Decl. ¶ 6; Siprut Decl. ¶ 5;

21  Dua Decl. ¶ 5; Godino Decl. ¶ 6.)

22      This current lodestar of $1,352,025.00 represents the total work Class Counsel and Supporting

23  Counsel have undertaken since the inception of this case. *See supra* § VII.A.4. Further, Class

---

[22]   A detailed breakdown of the lodestar figure into hours and hourly rate of each attorney who contributed to the prosecution of this case can be found in the declarations representing the seven law firms involved in the prosecution of this case. (Edelson Decl. ¶ 69; Marchese Decl. ¶ 5; Marlborough Decl. ¶ 5; Parisi Decl. ¶ 6; Siprut Decl. ¶ 5; Dua Decl. ¶ 7; Godino Decl. Ex. 2.)

[23]   In recognition that complete efficiency cannot always be achieved, we have reduced our base lodestar to account for any unintended inefficiencies. Accordingly, the above attorney time is adjusted inasmuch as we exercised billing judgment, resulting in reduction of our lodestar by five percent.

1   Counsel anticipate that many more hours of attorney time (not included in the present lodestar

2   value) will be required to prepare and file all papers in support of final approval, address

3   objections to the Settlement, respond to all Settlement Class Member inquiries, and litigate any

4   appeals. (Edelson Decl. ¶ 70.) Accordingly, the work performed to date, along with the work

5   anticipated going forward, supports Class Counsel's lodestar.

6   **2.   A comparison with analogous settlements supports the application of a 1.66
        multiplier**

7   The lodestar analysis is not limited to the initial mathematical calculation of class counsel's

8   base fee. *See Morales v. City of San Rafael*, 96 F.3d 359, 363–64 (9th Cir. 1996). Rather,

9   counsel's actual lodestar may be enhanced according to those factors that have not been

10  "subsumed within the initial calculation of hours reasonably expended at a reasonable rate."

11  *Hensley v. Eckerhart,* 461 U.S. 424, 434 (1983); *Morales,* 96 F.3d at 364. In a historical review of

12  numerous class action settlements, the Ninth Circuit found that lodestar multipliers normally range

13  from 0.6 to 19.6, with most (83%) falling between 1 and 4, and a bare majority (54%) between 1.5

14  and 3. *Vizcaino*, 290 F.3d at 1051 n.6 and Appendix; *see also* Alba Conte & Herbert B. Newberg,

15  *Newberg on Class Actions* § 14:03 (3d ed. 1992) (recognizing that multipliers of 1 to 4 are

16  frequently awarded).

17  Here, a modest 1.66 multiplier applied to the current lodestar supports the agreed-upon fee

18  award. Doing the math shows that $1,352,025 x 1.66 = $2,244,361.50. When recoverable

19  expenses (under the terms of the Settlement) of $25,000 are added, the total equals $2,269,361.50,

20  an amount just above the requested fee and expenses award of $2,250,000.

21  The referenced 1.66 multiplier falls at the low end of the normal range applied in similar cases.

22  *See Lane*, 2010 WL 2076916, at *2 (applying multiplier of 2); *In re Google Buzz*, 2011 WL

23  7460099 (approving crosscheck multiplier of 1.67); *Vizcaino*, 290 F.3d at 1052-54 (approving

24  crosscheck multiplier of 3.65 and citing a survey of class settlements from 1996-2001 indicating

25  that most multipliers range from 1.0 to 4.0); *see also In re Prudential Ins. Co.*, 148 F.3d 283, 341

26  (3rd Cir. 1998) ("[m]ultiples ranging from one to four are frequently awarded in common fund

27  cases when the lodestar method is applied."). In fact, multipliers at or above 2.0 are frequently

28

1   awarded to compensate attorneys who bring contingency fee suits in high-risk areas of law such as

2   consumer class actions. *See, e.g.*, *Lane*, 2010 WL 2076916, at *2 (applying multiplier of 2);

3   *Castaneda v. Burger King Corp.*, No. C-08-04262-WHA, 2010 WL 2735091 (N. D. Cal. Jul. 10,

4   2010) (awarding a multiplier of 1.9 in action by disabled consumers alleging ADA violations);

5   *Ozga v. U.S. Remodelers, Inc.*, No. C-09-05112-JSW, 2010 WL 3186971 (N. D. Cal. Aug. 9,

6   2010) (awarding a multiplier of 2.3 in a wage-and-hour action); *In re HPL Technologies, Inc.*

7   *Securities Litigation*, 366 F. Supp. 2d 912, 922-25 (N. D. Cal. 2005) (awarding multiplier of 2.87

8   in a securities action); *Wing v. Asarco Inc.*, 114 F.3d 986 (9th Cir. 1997) (affirming multiplier of

9   2.0 in 19 environmental contamination suits brought on behalf of residential property owners); *see*

10  *also* Logan, 24 Class Action Rep. at 167 (concluding in empirical study of 1,120 common fund

11  cases that in $5-10 million fund settlements the average percentage award is 30%, average

12  multiplier is 1.89). In any event, the multiplier here is fully supported by the relevant lodestar-

13  enhancing factors, including (a) the time and labor required, (b) preclusion of other employment

14  by counsel, (c) fee awards in similar cases, and (d) risk of non-payment. (Edelson Decl. at ¶ 71);

15  *see also Kerr,* 526 F.2d at 70; *Fischel*, 307 F.3d at 1008.

16      What's more, the required 1.66 multiplier will necessarily decrease as this case moves

17  forward, and presumably beyond, final approval of the Settlement. Class Counsel projects that, at

18  minimum, an additional $100,000 in attorneys' time will be required if the case moves forward

19  and the Settlement is implemented. (Edelson Decl. at ¶ 70.) To that end, Class Counsel have yet to

20  (1) respond to Class Member inquires received after the filing of this brief (which will be

21  extensive), (2) receive, review, and reply to all objections to the Settlement, (3) prepare and appear

22  for the final fairness hearing in this matter (scheduled for December 5, 2012), (4) respond to any

23  concerns raised by the Court at and after the final fairness hearing, (5) assuming the Court grants

24  this Motion, take all subsequent steps required to effectuate the settlement, and (6) defend the

25  Settlement against any appeals. (Edelson Decl. at ¶ 70.)

26      In light of the results obtained on behalf of the Class, those other factors discussed above, the

27  range of multipliers awarded in analogous cases, and the fact that the needed multiplier will only

28  decrease as this litigation concludes, the requested 1.66 multiplier is reasonable.

PLS' MOT. FOR FINAL APPROVAL OF AND AWARD OF          53          CASE NO.: 5:11-cv-00379-EJD
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

**C. Class Counsel is Further Entitled to Reimbursement of Litigation Expenses.**

It is settled that in a certified class action, "in addition to attorneys fees, reasonable costs and expenses are eligible for reimbursement." *White v. Experian Info. Solutions, Inc.*, No. 05-cv-1070 DOC, 2011 WL 2971957, at *2 (C.D. Cal. July 15, 2011); *see* Fed. R. Civ. P. 23(h).

Here, while the law firms involved in the prosecution of the consolidated cases have expended over $47,502.56 in out-of-pocket costs (all of which is potentially recoverable from the achieved common fund), Class Counsel agreed to limit reimbursable costs to only $25,000—further demonstrating the Settlement's absolute reasonableness. (Edelson Decl. ¶ 72; Marchese Decl. ¶ 6; Marlborough Decl. ¶ 6; Parisi Decl. ¶ 7; Siprut Decl. ¶ x; Godino Decl. ¶ 7.) These expenses include filing fees, summons and service fees, *pro hac vice* application fees and other court costs, expert costs, mediator fees, travel, lodging, mailing fees, and messenger delivery fees. (Edelson Decl. ¶ 72; Marchese Decl. ¶ 7; Marlborough Decl. ¶ 5; Parisi Decl. ¶ x; Siprut Decl. ¶ 6; Godino Decl. ¶ 7.) These expenses were necessary litigation expenses and costs that were reasonably expended by Class Counsel and were made without any assurance that they would be repaid. (*Id.*) *See Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (awarding class counsel over $2,000,000 in reasonable litigation expenses). Class Counsel made every effort to keep such costs at a minimum. (Edelson Decl. ¶ 72.) Accordingly, Class Counsel's request for reimbursement of expenses should be granted.

**D. The Court Should Approve the Agreed-Upon Incentive Awards to the Class Representatives and Named-Plaintiffs in the Related Actions.**

The Settlement provides that, subject to Court approval, the Class Representatives and named-Plaintiffs in the Related Actions shall receive a collective Incentive Award of thirty thousand dollars ($30,000) to be paid from the Settlement Fund. (Ex. A at § 9.2) "[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments." *Staton*, 327 F.3d at 977. Such awards are "fairly typical in class action cases." *Rodriguez*, 563 F.3d at 958 (citing *See* 4 William B. Rubenstein et al., *Newberg on Class Actions* § 11:38 (4th ed. 2008)); *see also*, *e.g.*, *Staton*, 327 F.3d at 976 (9th Cir. 2003) (noting approval of incentive award of $5,000 for each class representative); *Ingram v. The Coca-Cola*

*Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving payments of $3,000 for each person who executed an affidavit, in recognition of contribution to litigation that entailed risk and effort). Incentive awards "are discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez,* 563 F.3d. at 958-59 (citing *In re Mego Fin. Corp.,* 213 F.3d at 463). In addition, "the notoriety and personal difficulties encountered by the class representative" should also be considered. *Van Vranken*, 901 F. Supp. at 299.

Here, the requested award is supported by the fact that each Class Representative and named-Plaintiff has admirably stood up to Netflix—a giant, well-known corporation with vast resources—and remained absolutely committed to pursuing their respective cases on behalf of the Class. (Edelson Decl. ¶ 73.) Each of them accepted the responsibilities and burdens attendant to serving as a class representative in a high profile lawsuit and each faced public scrutiny through the wide media coverage of this case—with Plaintiffs Jeff Milans and Peter Comstock being discussed personally and often throughout the various stages of this litigation. (Edelson Decl. ¶ 74.) No one was promised that Class Counsel would seek any specific incentive award at any stage of the litigation, and the requested incentive award is in no way tied to the relief obtained for the Class. (Edelson Decl. ¶ 74.) Rather, the requested award is solely designed to compensate the six representatives ($6,000 to each of the Class Representatives and $3,000 to each of the named-Plaintiffs in the Related Actions) for their efforts in this case and willingness to serve as Class Representatives despite any associated reputational risks.

As such, the Court should approve the agreed-upon cumulative incentive award of $30,000 to these individuals.

## VIII.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an Order: (a) granting final approval of the Agreement; (b) dismissing all Released Claims with prejudice; (c) approving the negotiated attorneys' fees and incentive award; and (d) granting such other and further relief as the Court deems reasonable and just.

October 31, 2012                                    Respectfully Submitted,

                                                   **JEFF MILANS and PETER COMSTOCK**,
                                                   individually and on behalf of classes of similarly
                                                   situated individuals,

                                                   By: /s/ Jay Edelson
                                                   One of Plaintiffs' Attorneys

SEAN P. REIS (sreis@edelson.com) – SBN 184044
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Tel: 949.459.2124
Fax: 949.459.2123

JAY EDELSON (jedelson@edelson.com)*
RAFEY S. BALABANIAN (rbalabanian@edelson.com)*
ARI J. SCHARG (ascharg@edelson.com)*
CHANDLER R. GIVENS (cgivens@edelson.com)*
EDELSON MCGUIRE LLC
350 North LaSalle Drive, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
*Admitted *pro hac vice*
*Attorneys for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on October 31, 2012, I caused this document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.

Dated: October 31, 2012                  /s/ Rafey S. Balabanian

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| IN RE: NETFLIX PRIVACY LITIGATION, | ) ) ) ) ) ) ) ) ) | Case No.: 5:11-CV-00379 EJD |
| | | **AMENDED ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |
| | | **(Re: Docket No. 76)** |

Plaintiffs move for preliminary approval of settlement, provisional class certification and designation of Plaintiffs as class representatives, appointment of counsel as class counsel. The motion is unopposed and will be GRANTED as set forth below.

**I. BACKGROUND**

The instant case is a putative class action suit brought by former Netflix subscribers, Jeff Milans and Peter Comstock (collectively "Plaintiffs"), challenging the way Defendant Netflix, Inc. ("Netflix"), a provider of video-by-mail and internet services, retained and used its subscribers' Entertainment Content Viewing Histories. Specifically, Plaintiffs alleged that Netflix violated the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710(e) by retaining customer viewing histories longer than "necessary for the purpose for which [they were] collected" and that Netflix disclosed the information to third parties without prior consent to do so. See Docket Number 1.

Plaintiff Jeff Milans initiated this class action on January 26, 2011, alleging that Netflix unlawfully retained and disclosed his personally identifiable Entertainment Content Viewing

1

Case No.: 5:11-CV-00379 EJD
AMENDED ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT

United States District Court
For the Northern District of California

1   History and the personal information of thousands of other Netflix customers. A wave of similar

2   suits followed, including <u>Bernal v. Netflix, Inc.</u>, Case No. 11-CV-00820-EJD (N.D. Cal.) (filed

3   February 22, 2011), <u>Rura v. Netflix, Inc.</u>, Case No. 11-CV-01075-SBA (N.D. Cal.) (filed March 8,

4   2011), <u>Comstock v. Netflix, Inc.</u>, Case No. 11-CV-1218-HRL (N.D. Cal.) (filed March

5   11, 2011), <u>Sevy v. Netflix, Inc.</u>, Case No. 11-CV-1309-PSG (N.D. Cal.) (filed March 18, 2011),

6   and <u>Wizenberg v. Netflix, Inc.</u>, Case No. 11-CV-01359-HRL (N.D. Cal.) (filed March 22, 2011).

7   On August 12, 2011, the Court consolidated these six cases, granted the Plaintiffs leave to file an

8   Amended and Consolidated Complaint, and appointed Jay Edelson of Edelson McGuire, LLC as

9   interim lead Class Counsel. <u>See</u> Docket No. 59.

10        Plaintiffs reached a settlement with Defendants after a mediation overseen by retired U.S.

11   District Judge Layn R. Phillips. The Settlement Agreement provides for a single Settlement Class,

12   defined as follows:

> All Subscribers as of the date of entry of Preliminary Approval. Excluded from
> the Settlement Class are the following: (i) the Settlement Administrator, (ii) the
> Mediator, (iii) any respective parent, subsidiary, affiliate or control person of the
> Defendant or its officers, directors, agents, servants, or employees as of the date
> of filing of the Action, (iv) any judge presiding over the Action and the immediate
> family members of any such Person(s), (v) persons who execute and submit a
> timely request for exclusion, and (vi) all persons who have had their claims
> against Defendant fully and finally adjudicated or otherwise released.

18   Pls.' Mot. Prelim. Approval of Class Action Settlement Ex. 1 § 1.37, Docket No. 76-1.

19        The Settlement Agreement creates a common fund totaling $9,000,000.00 ("Settlement

20   Fund").  After payment of the expenses of administering the settlement ("Settlement

21   Administration Expenses"), any fee award or costs awarded to Class Counsel ("Fee Award"), and

22   any incentive awarded to the Class Representatives and named plaintiffs in the related actions

23   ("Incentive Award"), the balance of the Settlement Fund shall be distributed to *cy pres* recipients

24   selected by the Parties and approved by the court. The *cy pres* distribution shall be made to not-for-

25   profit organizations, institutions, or programs that educate users, regulators, and enterprises

26   regarding issues relating to protection of privacy, identity, and personal information through user

27   control. The Settlement Agreement also requires Netflix to decouple Entertainment Content

28

**United States District Court**
For the Northern District of California

2

Case No.: 5:11-CV-00379 EJD
AMENDED ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT

1   Viewing Histories from payment or identification information for all Settlement Class members. In

2   exchange for the relief above, and upon entry of a final order approving this Settlement, Netflix

3   and each of its related affiliates and entities will be released from any claims, whether known or

4   unknown, arising out of, relating to, or regarding the alleged retention and disclosure of Plaintiffs'

5   and the Settlement Class's personally identifiable information, Video Rental History, and other

6   information, including but not limited to all claims that were brought, alleged, argued, raised, or

7   asserted in any pleading or court filing in the Action. <u>See</u> Pls.' Mot. Prelim. Approval of Class

8   Action Settlement Ex. 1 §§ 1.31, 1.32, 1.33, 1.42, and 3 for the full release.

9                                   **II. LEGAL STANDARD**

10  **A. Preliminary Approval**

11          Preliminary approval of a class action settlement requires the Court to consider whether

12  "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents

13  of the settlement are experienced in similar litigation; and (4) only a small fraction of the class

14  objected." <u>In re Linerboard Antitrust Litigation</u>, 296 F. Supp. 2d 568 (E.D. Pa. 2003).

15  **B. Class Certification**

16          Federal Rule of Civil Procedure 23(a) permits a class action where: "(1) the class is so

17  numerous that joinder of all members is impracticable, (2) there are questions of law or fact

18  common to the class, (3) the claims or defenses of the representative parties are typical of the

19  claims or defenses of the class; and (4) the representative parties will fairly and adequately protect

20  the interests of the class." In addition, the class action must satisfy one of the provisions of Rule

21  23(b). Satisfying 23(b)(3) requires that "the questions of law or fact common to class members

22  predominate over any questions affecting only individual members, and that a class action is

23  superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R.

24  Civ. P. 23(b)(3).

25  **C. Class Counsel**

26          In appointing class counsel, the court must consider "(i) the work counsel has done in

27  identifying or investigating potential claims in the action; (ii) counsel's experience in handling class

28

*United States District Court*
*For the Northern District of California*

3

Case No.: 5:11-CV-00379 EJD
AMENDED ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT

1  actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's

2  knowledge of the applicable law; and (iv) the resources that counsel will commit to representing

3  the class." Fed. R. Civ. P. 23(g).

4  **III. DISCUSSION**

5  **A. Preliminary Approval**

6  The instant settlement appears fair, non-collusive and within the range of possible final

7  approval. The settlement was a product of arm's length negotiation before a mediator and does not

8  appear to benefit those who participated in the mediation at the expense of any other parties. In

9  light of the minimal monetary recovery that would be realistically recoverable by individual

10  Settlement Class members and the immediate benefits offered to the Class by the injunctive relief

11  and *cy pres* donations, the Settlement Agreement is deserving of preliminary approval.

12  Additionally, the combination of industry-leading injunctive relief and substantial *cy pres*

13  donations compares favorably to settlements in other online consumer privacy cases. See, e.g., In

14  re Google Buzz Privacy Litig., No. 5:10-cv-00672-JW (Docket Nos. 41, 128) (N.D. Cal. 2010)

15  (disclosure of email contact lists without consent; $8.5 million settlement fund with *cy pres*

16  payments); Lane v. Facebook, Inc., No. 5:08-cv-03845 RS, 2009 WL 3359020 (N.D. Cal. Sept. 18,

17  2009) (unconsented disclosure of personally identifiable information under the VPPA based on

18  Facebook Beacon program; settlement created privacy foundation with funding of $9.5 million).

19  Any class member can opt out of the settlement. The proponents of the settlement are experienced

20  in this type of litigation. No class members have objected.

21  **B. Class Certification**

22  Class certification is appropriate here because all four requirements of Rule 23(a) are met

23  and the action also satisfies the requirements of Rule 23(b).

24  The proposed class is comprised of tens of millions of Netflix subscribers and former

25  subscribers nationwide. Thus, "[t]he class is so numerous that joinder of all members is

26  impractical." See Fed. R. Civ. P. 23(a)(1).

27

28

**United States District Court**
For the Northern District of California

4

Case No.: 5:11-CV-00379 EJD
AMENDED ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT

1    There are questions of law or fact common to class members, see Fed. R. Civ. P. 23(a)(2),

2    because all claims for relief arise from Netflix's stated policy for and a uniform practice of

3    retaining and disclosing the personally identifiable information and Entertainment Content

4    Viewing Histories of its subscribers and former subscribers—affecting all those individuals in the

5    same way. Such allegations show that Plaintiffs and the proposed Settlement Class share common

6    statutory claims under the VPPA, as well as various state law claims, that likewise result in

7    common and shared factual and legal questions. Furthermore, these questions predominate over

8    any questions affecting only individual members, and a class action is superior to other available

9    methods of adjudication because it allows an efficient determination of these common issues

10   without unnecessary duplication of litigation. See Fed. R. Civ. P. 23(b)(3).

11   Plaintiffs' claims are typical of those of the putative class they seek to represent. See Fed.

12   R. Civ. P. 23(a)(3). Netflix allegedly retained Plaintiffs' and the Class's personally identifiable

13   information and Entertainment Content viewing histories longer than "necessary for the purpose

14   for which it was collected," and allegedly disclosed it without obtaining the required prior express

15   consent. Plaintiffs argue this practice violates the VPPA, which would provide injunctive relief and

16   identical statutory damages to all members of the proposed the Class. Plaintiffs' representation of

17   the Settlement Class is appropriate because they were subjected to the same alleged unlawful

18   conduct and suffered essentially identical damages flowing from that uniform conduct.

19   Plaintiffs and their counsel will fairly and adequately protect the interests of the class. See

20   Fed. R. Civ. P. 23(a)(4). To determine if representation is adequate, the Court must ask "(1) do the

21   named plaintiffs and their counsel have any conflicts of interest with other class members and (2)

22   will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"

23   Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998). Plaintiffs' interests are

24   representative of and consistent with the interests of the proposed Settlement Class—all stand to

25   recover statutory damages under the VPPA for Netflix's alleged unlawful retention and disclosure

26   of their personally identifiable information and Entertainment Content Viewing Histories. Also,

27   Plaintiffs' active participation in this litigation demonstrates that they have and will continue to

28

Case No.: 5:11-CV-00379 EJD
AMENDED ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT

United States District Court
For the Northern District of California

1  protect the interests of the proposed Settlement Class. Further, proposed Class Counsel have

2  regularly engaged in major complex litigation and have extensive experience in consumer class

3  action lawsuits that are similar in size, scope, and complexity to the present case. See Decl. of Jay

4  Edelson ¶ 18, Docket No. 76-2.

5      Accordingly, the proposed class will be provisionally certified for settlement purposes, and

6  the Court will designate Jeff Milans and Peter Comstock as class representatives.

7  **C. Class Counsel**

8      Proposed Class Counsel have conducted extensive pre-litigation investigation of the class

9  claims and are experienced and knowledgeable, as discussed above. Accordingly, Jay Edelson,

10  Rafey S. Balabanian, Ari J. Scharg, and Chandler R. Givens of Edelson McGuire LLC are

11  preliminary appointed as Class Counsel for the Settlement Class.

12  **D. Notice of Class Certification and Settlement Administration**

13      Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances,

14  including individual notice to all members who can be identified through reasonable effort." Rule

15  23(e)(1) requires reasonable notice to all class members who would be bound by the proposed

16  settlement. The notice must explain in easily understood language the nature of the action,

17  definition of the class, class claims, issues and defenses, ability to appear through individual

18  counsel, procedure to request exclusion, and the binding nature of a class judgment. Fed. R. Civ. P.

19  23(c)(2)(B). Here, the parties in this case have created and agreed to perform the following Notice

20  Plan:

21      **Email Notice.** Netflix (or in Netflix's discretion, the Settlement Administrator) shall

22  provide email notification to the email address last known by Netflix of any and all reasonably

23  identifiable Settlement Class members. The email notice will be in a form substantially similar to

24  that attached as Exhibit C to the Declaration of Shannon R. Wheatman, Ph.D ("Wheatman

25  Declaration") and will include a hyperlink to the Settlement Website. In the event that Notice sent

26  by email to a Settlement Class member results in a bounce-back or is otherwise undeliverable,

27  Netflix shall re-send the Notice by email to the last known email address of each such Settlement

28

United States District Court
For the Northern District of California

6

Case No.: 5:11-CV-00379 EJD
AMENDED ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT

1   Class member. Pls.' Mot. Prelim. Approval of Class Action Settlement Ex. 1 § 4.1.1. Email notice

2   is especially appropriate here given the online nature of Netflix's business and the fact that

3   Settlement Class members had to provide a valid email address when creating their Netflix

4   accounts.

5        **Settlement Website.** The Settlement Administrator shall create and maintain a Settlement

6   Website through the Effective Date. The Settlement Website shall (1) notify Class members of

7   their rights to object to the Settlement Agreement or opt out of the Class; (2) notify Class members

8   that no further notice will be provided to them and that the Settlement has been approved; and (3)

9   inform Class members that they should monitor the Settlement Website for further developments,

10  including the posting of the cy pres recipients, and will be in a form substantially similar to that

11  attached as Exhibit E to the Wheatman Declaration. See Pls.' Mot. Prelim. Approval of Class

12  Action Settlement Ex. 1 § 4.1.2.

13       **Publication Notice.** The Parties shall supplement direct notice with (1) the placement of a

14  half-page advertisement appearing in an issue of People Magazine in the form substantially similar

15  to that attached as Exhibit D to the Wheatman Declaration, and (2) 60,000,000 impressions of an

16  advertisement (100 x 100 pixels) on Facebook.com, in the form substantially similar to that

17  attached as Exhibit B to the Wheatman Declaration, that is linked to the Settlement Website. See

18  Pls.' Mot. Prelim. Approval of Class Action Settlement Ex. 1 § 4.1.3.

19       The Notice Plan will be established, and the emails sent, within thirty (30) days of entry of

20  the Preliminary Approval Order with publication notice to be completed within sixty (60) days of

21  entry of the Preliminary Approval Order. All costs associated with implementing the Notice Plan,

22  including the fees and costs of the Settlement Administrator, will be paid out of the Settlement

23  Fund. Within ten (10) days after the filing of this Agreement with the Court, Netflix will also

24  notify the appropriate state and federal officials of this Agreement pursuant to the Class Action

25  Fairness Act of 2005, 28 U.S.C. § 1715. See Pls.' Mot. Prelim. Approval of Class Action

26  Settlement Ex. 1 § 4.2.

27

28

**United States District Court**
For the Northern District of California

7

Case No.: 5:11-CV-00379 EJD
AMENDED ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT

The court finds the procedure described above meets the standards of Rule 23. Moreover, the forms of notice attached as Exhibits B through E to the Wheatman Declaration are hereby approved with the following modifications:

1. Under the section entitled "16. Where do I get Additional Information?" of the proposed Settlement Website, Wheatman Decl. Ex. E., an additional sentence should be added to state: "For more detailed information, you may review the pleadings, records, and other papers on file in the lawsuit, which materials may be inspected at the Clerk's Office, United States District Court, 280 South First Street, San Jose, California 95113."

2. All deadlines and the hearing date set forth in the Notice shall conform to this Order.

## IV. ORDER

In light of the preceding discussion, the motion for approval the motion for conditional certification of a settlement class and preliminary approval of class action settlement is GRANTED as follows:

1. This action is certified as a class action only for settlement purposes pursuant to subsections (a) and (b)(3) of Federal Rule of Civil Procedure 23 and 29 U.S.C. § 216(b).

2. The Settlement Agreement is preliminarily approved as fair, reasonable, and adequate pursuant to Federal Rule of Civil Procedure 23(e).

3. Plaintiffs Jeff Milans and Peter Comstock are approved to act as Class Representative for settlement purposes only.

4. Jay Edelson, Rafey S. Balabanian, Ari J. Scharg, and Chandler R. Givens of Edelson McGuire LLC are appointed as Class Counsel pursuant to Federal Rule of Civil Procedure 23(g).

5. The Notice Plan and the content of the forms of Notice to the Settlement Class as set forth in the Settlement Agreement and Exhibits B through E to the Wheatman Declaration are approved pursuant to subsections (c)(2)(B) and (e) of Federal Rule of Civil Procedure 23.

6. A hearing on the final approval of class action settlement shall be held before this court on December 5, 2012, at 10:00 a.m. Class Counsel shall file brief(s) requesting final approval of the Settlement Agreement, Fee Award, and Incentive Award, no later than 35 calendar days before

United States District Court
For the Northern District of California

8

Case No.: 5:11-CV-00379 EJD
AMENDED ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT

1

2

3   the final approval hearing. All other applicable dates shall be established by the Settlement

4   Agreement.

5   IT IS SO ORDERED.

6   Dated: July 5, 2012

7

8   _____
    EDWARD J. DAVILA
    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

9

Case No.: 5:11-CV-00379 EJD
AMENDED ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT

1  KEITH E. EGGLETON (#159842) (keggleton@wsgr.com)
   RODNEY G. STRICKLAND (#161934) (rstrickland@wsgr.com)
2  DALE BISH (#235390) (dbish@wsgr.com)
   Wilson Sonsini Goodrich & Rosati
3  650 Page Mill Road
   Palo Alto, California 94304
4  Tel:  (650) 493-9300
   Fax:  (650) 493-6811
5
   *Attorneys for Defendant*
6  NETFLIX, INC.

7

8                UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                   SAN JOSE DIVISION

11

12                                          Case No. 5:11-cv-00379-EJD

13  IN RE: NETFLIX PRIVACY LITIGATION       **NETFLIX'S ANSWER TO
14                                          CONSOLIDATED CLASS ACTION
                                            COMPLAINT**
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Defendant Netflix, Inc. ("Netflix") answers each numbered paragraph of the

2  Consolidated Class Action Complaint filed on September 12, 2011, by plaintiffs Jeff Milans and

3  Peter Comstock (the "Complaint"), on personal knowledge as to its own activities and on

4  information and belief as to the activities of others, as follows:

5  1.  Netflix admits that Plaintiff has filed the Complaint against Netflix, and that the

6  Complaint includes the allegations summarized in Paragraph 1.  Except as so admitted, Netflix

7  denies the allegations of Paragraph 1.

8  2.  Netflix admits that it owns and operates the website www.netflix.com, and that it

9  provides its millions of subscribers with access to motion pictures, television and other visual

10  entertainment (collectively, "entertainment content") by streaming entertainment content over

11  the Internet to certain Internet-connected TV's, computers and other devices, and/or by providing

12  such content on DVDs that are shipped to the subscriber by U.S. mail. Except as so admitted,

13  Netflix denies the allegations of Paragraph 2.

14  3.  Netflix admits that it maintains records identifying the entertainment content

15  streamed to or received by a subscriber during the course of his or her membership.  Except as so

16  admitted, Netflix denies the allegations of Paragraph 3.

17  4.  Netflix admits that it maintains records containing its members' credit card

18  numbers, billing and contact information, and records identifying the entertainment content

19  streamed to or received by a subscriber during the course of his or her membership.  Except as so

20  admitted, Netflix denies the allegations of Paragraph 4.

21  5.  Netflix admits that it maintains records identifying the entertainment content

22  streamed to or received by a subscriber during the course of his or her membership, and that it

23  uses the information contained in such records after a member cancels his or her account with

24  Netflix.  Except as so admitted, Netflix denies the allegations of Paragraph 5.

25  6.  Netflix admits that it maintains records containing its members' credit card

26  numbers, billing and contact information, and records identifying the entertainment content

27  streamed to or received by a subscriber during the course of his or her membership. Except as so

28  admitted, Netflix denies the allegations of Paragraph 6.

7.      Netflix denies the allegations of Paragraph 7.

8.      Netflix denies the allegations of Paragraph 8.

9.      Netflix lacks knowledge and information sufficient to form a belief about the truth of the allegations of Paragraph 9 and on that basis denies such allegations.

10.     Netflix lacks knowledge and information sufficient to form a belief about the truth of the allegations of Paragraph 10 and on that basis denies such allegations.

11.     Netflix admits the allegations of Paragraph 11.

12.     Netflix admits this Court has subject matter jurisdiction over this matter.  Netflix denies all other allegations of Paragraph 12.

13.     Netflix admits this Court has personal jurisdiction over Netflix.  Netflix denies all other allegations of Paragraph 13.

14.     Netflix admits venue is proper in this Court.  Netflix denies all other allegations of Paragraph 14.

15.     Netflix admits the allegations of Paragraph 15.

16.     Netflix admits that Plaintiffs have accurately quoted the document referenced in Paragraph 16.  Except as so admitted, Netflix denies the allegations of Paragraph 16.

17.     Netflix admits that it has developed an online system to provide its subscribers with access to entertainment content, and that this system allows members to rank the order in which they wish to receive or view certain content.  Except as so admitted, Netflix denies the allegations of Paragraph 17.

18.     Netflix admits that some subscribers to the Netflix service are able to have DVDs physically shipped to the address they register with Netflix.  Except as so admitted, Netflix denies the allegations of Paragraph 18.

19.     Netflix admits the allegations of Paragraph 19.

20.     Netflix admits that Plaintiffs have accurately quoted the document referenced in Paragraph 20.  Except as so admitted, Netflix denies the allegations of Paragraph 20.

21.     Netflix admits that it allows its subscribers to keep track of movies and television shows they may wish to watch in the future in what is known as a queue.  Except as so admitted, Netflix denies the allegations of Paragraph 21.

22.     Netflix admits that a queue is a list of entertainment content, selected and organized by the subscriber.  Except as so admitted, Netflix denies the allegations of Paragraph 22.

23.     Netflix admits that it stores its former subscribers' queues, contact information, and records identifying the entertainment content streamed to or received by a subscriber during the course of his or her membership, after subscribers cancel their accounts.  Except as so admitted, Netflix denies the allegations of Paragraph 23.

24.     Netflix admits that it maintains records identifying the entertainment content streamed to or received by a subscriber during the course of his or her membership, and the ratings (if any) that the subscriber has given to any such content.  Except as so admitted, Netflix denies the allegations of Paragraph 24.

25.     Netflix admits that it maintains records identifying the entertainment content streamed to or received by a subscriber during the course of his or her membership, and that it retains such records after a customer has closed his or her account with Netflix.  Except as so admitted, Netflix denies the allegations of Paragraph 25.

26.     Netflix admits that Plaintiffs have accurately quoted the document referenced in Paragraph 26.  Except as so admitted, Netflix denies the allegations of Paragraph 26.

27.     Netflix lacks knowledge and information sufficient to form a belief about the truth of the allegations of Paragraph 27 and on that basis denies such allegations.

28.     Netflix lacks knowledge and information sufficient to form a belief about the truth of the allegations of Paragraph 28 and on that basis denies such allegations.

29.     Netflix lacks knowledge and information sufficient to form a belief about the truth of the allegations of Paragraph 29 and on that basis denies such allegations.

30.     Netflix denies the allegations of Paragraph 30.

31.     Netflix denies the allegations of Paragraph 31.

1    32.    Netflix denies the allegations of Paragraph 32.

2    33.    Netflix admits that Plaintiffs have partially quoted the statute referenced in

3    Paragraph 33.  Except as so admitted, Netflix denies the allegations of Paragraph 33.

4    34.    Netflix denies the allegations of Paragraph 34.

5    35.    Netflix denies the allegations of Paragraph 35.

6    36.    Netflix denies the allegations of Paragraph 36.

7    37.    Netflix denies the allegations of Paragraph 37.

8    38.    Netflix lacks knowledge and information sufficient to form a belief about the truth

9    of the allegations of Paragraph 38 and on that basis denies such allegations.

10   39.    Netflix admits that the document referenced in Paragraph 39 was issued by the

11   FTC.  Except as so admitted, Netflix denies all allegations of Paragraph 39.

12   40.    Netflix denies the allegations of Paragraph 40.

13   41.    Netflix denies the allegations of Paragraph 41.

14   42.    Netflix lacks knowledge and information sufficient to form a belief about the truth

15   of the allegations of Paragraph 42 and on that basis denies such allegations.

16   43.    Netflix lacks knowledge and information sufficient to form a belief about the truth

17   of the allegations of Paragraph 43 and on that basis denies such allegations.

18   44.    Netflix denies the allegations of Paragraph 44.

19   45.    Netflix admits that Plaintiffs have brought this case as a class action, allegedly on

20   behalf of the class identified in this Paragraph.  Except as so admitted, Netflix denies the

21   allegations of Paragraph 45.

22   46.    Netflix denies the allegations of Paragraph 46.

23   47.    Netflix denies the allegations of Paragraph 47.

24   48.    Netflix denies the allegations of Paragraph 48.

25   49.    Netflix lacks knowledge and information sufficient to form a belief about the truth

26   of the allegations of Paragraph 49 and on that basis denies such allegations.

27   50.    Netflix denies the allegations of Paragraph 50.

28   51.    Netflix denies the allegations of Paragraph 51.

1    52.    Netflix incorporates by reference its responses to Paragraphs 1 through 51.

2    53.    Netflix admits that it is a "video tape service provider" under the VPPA with

3    respect to its DVD service.  Except as so admitted, Netflix denies the allegations of Paragraph

4    53.

5    54.    Netflix admits that Plaintiffs have partially quoted the statute referenced in

6    Paragraph 54.  Except as so admitted, Netflix denies the allegations of Paragraph 54.

7    55.    Netflix denies the allegations of Paragraph 55.

8    56.    Netflix denies the allegations of Paragraph 56.

9    57.    Netflix denies the allegations of Paragraph 57.

10    58.    Netflix denies the allegations of Paragraph 58.

11    59.    Netflix denies the allegations of the first sentence of Paragraph 59.  Netflix admits

12    that Plaintiffs seek the relief identified in the second sentence of Paragraph 59, but deny that

13    Plaintiffs are entitled to such relief or any other relief.

14    60.    Netflix incorporates by reference its responses to Paragraphs 1 through 59.

15    61.    Netflix denies the allegations of Paragraph 61.

16    62.    Netflix admits the allegations of Paragraph 62

17    63.    Netflix denies the allegations of Paragraph 63.

18    64.    Netflix admits that Plaintiffs seek the relief identified in Paragraph 64, but deny

19    that Plaintiffs are entitled to such relief or any other relief.

20    65.    Netflix incorporates by reference its responses to Paragraphs 1 through 64.

21    66.    Netflix admits that the UCL was intended to protect consumer and competitors by

22    promoting fair competition.  Except as so admitted, Netflix denies the allegations of Paragraph

23    66.

24    67.    Netflix admits that Plaintiffs' general summary of the UCL of the first two

25    sentences of Paragraph 67 is generally accurate.  Except as so admitted, Netflix denies the

26    allegations of Paragraph 67.

27    68.    Netflix denies the allegations of Paragraph 68.

28    69.    Netflix denies the allegations of Paragraph 69.

1     70.    Netflix denies the allegations of Paragraph 70.

2     71.    Netflix admits that Plaintiffs seek the relief identified in Paragraph 71, but deny

3 that Plaintiffs are entitled to such relief or any other relief.

4                 **AFFIRMATIVE DEFENSES**

5     Netflix asserts the following affirmative defenses to Plaintiffs' Complaint and each claim

6 therein.  Netflix also reserves all defenses available under the Federal Rules of Civil Procedure

7 and the laws of the State of California, and any other defenses, at law or in equity, that may now

8 exist or in the future be available based on discovery and further factual investigation in this

9 case.

10              **FIRST  AFFIRMATIVE DEFENSE**

11     The Complaint fails to state facts sufficient to constitute a claim for relief for any of the

12 claims alleged, or for any other claim for relief.

13             **SECOND AFFIRMATIVE DEFENSE**

14     The VPPA does not provide a private right of action to enforce alleged violations of 18

15 U.S.C. Section 2710(e).

16             **THIRD AFFIRMATIVE DEFENSE**

17     Plaintiffs' claims under the UCL are barred, in whole or in part, because Plaintiffs and/or

18 persons allegedly represented by Plaintiffs lack standing to assert any or all of the purported

19 causes of action alleged in the Complaint either individually or in a representative capacity.

20 Alternatively, Plaintiffs and/or persons allegedly represented do not meet the requirements for

21 bringing suit under the UCL.

22             **FOURTH AFFIRMATIVE DEFENSE**

23     The statutory damages scheme set forth in the VPPA is unconstitutionally excessive, barred

24 by the Fifth and/or Eighth Amendments to the Constitution, and violates due process.

25             **FIFTH  AFFIRMATIVE DEFENSE**

26     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs and/or persons allegedly

27 represented by Plaintiffs consented to the acts complained of herein, and/or are estopped from

28 asserting said claims as a result of their conduct.

1

**SIXTH AFFIRMATIVE DEFENSE**

2   Plaintiffs' claims are barred, in whole or in part, by the statute of limitations.  Specifically,

3 Plaintiff and/or members of the class Plaintiffs claim to represent did not bring this action within

4 two years from the date of the actions complained of or the date of discovery.

5             **<u>PRAYER FOR RELIEF</u>**

6   WHEREFORE, Netflix requests:

7   (a)  That Plaintiffs take nothing by way of their Complaint;

8   (b)  That judgment be entered in favor of Netflix and against Plaintiffs, and that

9       Plaintiffs' action be dismissed in its entirety with prejudice; and

10  (c)  For other such relief as the Court shall deem just and proper.

11

12 Dated: October 12, 2011      WILSON SONSINI GOODRICH & ROSATI
               Professional Corporation

13

               By:  /s/ Rodney G. Strickland, Jr.

14               Rodney G. Strickland, Jr.

15              Attorneys for Defendant
               NETFLIX, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JASON BERNAL, | NO. 5:11-cv-00820 EJD |
| _____/ | NO. 5:11-cv-01075 EJD |
| | NO. 5:11-cv-01218 EJD |
| MICHAEL RURA, | NO. 5:11-cv-01309 EJD |
| _____/ | NO. 5:11-cv-01359 EJD |
| | NO. 5:11-cv-00379 EJD |
| PETER COMSTOCK, | |
| _____/ | **ORDER GRANTING PLAINTIFFS'** |
| | **MOTION TO CONSOLIDATE;** |
| MICHAEL SEVY, | **APPOINTING INTERIM CLASS** |
| _____/ | **COUNSEL** |
| ERIC WIZENBERG, | |
| _____/ | |
| JEFF MILANS, | |
| Plaintiff(s), | |
| v. | |
| NETFLIX, INC., | |
| Defendant(s). | |
| _____/ | |

Presently before the court are two matters.  The first is the joint motion of Plaintiffs Jason

Bernal ("Bernal") and Michael Rura ("Rura") who seek to consolidate their currently-related cases

against Defendant Netflix, Inc. ("Netflix") with another related case pending before this court,

namely Milans v. Netflix, Inc.  Bernal and Rura also request the appointment of their respective

**SER 274**

1    attorneys as co-lead interim class counsel.[1]  The second matter is the competing motion of Plaintiff

2    Jeff Milans ("Milans") to appoint his own attorneys as interim class counsel.[2]  Having had the

3    benefit of a hearing on these matters, they are each addressed by the court in turn.

### I.    THE MOTION TO CONSOLIDATE

5        The district court may consolidate actions involving common questions of law and fact.  Fed.

6    R. Civ. P. 42(a)(2).  The court exercises "broad discretion to decide how cases on its docket are to be

7    tried so that the business of the court may be dispatched with expedition and economy while

8    providing justice to the parties."  Morin v. Turpin, 778 F. Supp. 711, 733 (S.D.N.Y 1991) (citing 6

9    C. Wright & A. Miller, Federal Practice and Procedure § 1471, at 359 (1971)).  In exercising this

10   discretion, the court "weighs the saving of time and effort consolidation would produce against any

11   inconvenience, delay, or expense that it would cause."  Huene v. United States, 743 F.2d 703, 704

12   (9th Cir. 1984).  Consolidation may occur upon motion by a party or sua sponte.  In re Adams

13   Apple, Inc., 829 F.2d 1484, 1487 (9th Cir. 1987).

14       Here, Bernal and Rura seek to consolidate their actions with Milans.  Upon review of the

15   Complaints in each action, the court finds that each case presents virtually identical factual and legal

16   issues.  The plaintiffs allege in both actions that Netflix is improperly retaining their personal

17   identification information and video viewing history after termination of their accounts in violation

18   of the same federal and state statutes, save for one additional claim brought by Bernal and Rura.

19   The three actions are in the same procedural stage as Netflix has not yet filed an Answer per

20   stipulation of the parties.  Moreover, since the claims for each case arise from the same nucleus of

21   activity, discovery issues relating to each action will be parallel.  Based on the circumstances

22   presented, there is no basis to find that consolidation would cause inconvenience, delay or expense,

23   especially since Milans, Netflix and all other parties seemingly agree with the consolidation request.

---

[1] The joint motion appears as Docket Item Nos. 5 and 13 in the Bernal action (5:11-cv-00820) and Docket Item Nos. 15 and 46 in the Milans action (5:11-cv-00379).  All references to this motion will be to the most recent filing, Docket Item No. 46.

[2] Milans' motion appears as Docket Item Nos. 22 and 47 in the Milans action (5:11-cv-00379).  As above, all references to this motion will be to Docket Item No. 47.

2

NO. 5:11-cv-00379 EJD
ORDER GRANTING PLAINTIFFS' MOTION TO CONSOLIDATE; APPOINTING INTERIM CLASS COUNSEL
(EJDLC1)

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    As such, the court finds consolidation appropriate.  The joint motion of Bernal and Rura will

2    therefore be granted.

3        The question that remains is whether the court should sua sponte consolidate the remaining

4    three related actions - Comstock v. Netflix, Inc., Sevy v. Netflix, Inc., and Wizenberg v. Netflix, Inc.

5    - with the consolidated Bernal, Rura and Milans actions.[3]  The court has reviewed the Complaints

6    underlying these three actions and has determined they each present identical factual and legal issues

7    as those raised in Bernal, Rura and Milans.  The six cases also are in the same stage procedurally.

8    Although the Complaint in Wizenberg has not yet been served, Netflix does not object to

9    consolidation on that ground and, in fact, supports consolidation.  See Def. Netflix Inc.'s Response

10   to Motions to Consolidate and to Appoint Interim Lead Class Counsel, Docket Item No. 52, at p. 3.

11   Thus, court finds consolidation of all six related cases is appropriate as the time and effort saved

12   through consolidation outweighs any potential inconvenience, delay, or expense that may result.

13       Accordingly, having granted the motion to consolidate Bernal, Rura, and Milans, the court

14   sua sponte consolidates Comstock, Sevy and Wizenberg with those cases, as detailed in the order

15   which follows.

16            **II.    APPOINTMENT OF INTERIM CLASS COUNSEL**

17       Bernal and Rura move to appoint their attorneys, Bursor & Fisher, P.A. and Faruqi & Faruqi,

18   LLP, as co-lead interim class counsel.  In a rival motion, Milans moves to appoint his attorney, Jay

19   Edelson of Edelson McGuire, LLC as lead interim class counsel.  For their part, Sevy and

20   Wizenberg support the appointment of Edelson, and while Netflix takes no position on the identity

21   of interim counsel, it requests the court choose one of the competing firms rather than appoint the

22   three as joint counsel.

23       Pursuant to Federal Rule of Civil Procedure 23(g)(3), the court "may designate interim

24   counsel to act on behalf of a putative class before determining whether to certify the action as a class

25

26       [3] The Comstock action has been assigned case number 5:11-cv-01218 EJD.  The Sevy and
     Wizenberg actions are case numbers 5:11-cv-01309 EJD and 5:11-cv-01359 EJD respectively.
27

28                                    3
     NO. 5:11-cv-00379 EJD
     ORDER GRANTING PLAINTIFFS' MOTION TO CONSOLIDATE; APPOINTING INTERIM CLASS COUNSEL
     (EJDLC1)

United States District Court

For the Northern District of California

1  action." "Instances in which interim class counsel is appointed are those in which overlapping,

2  duplicative, or competing class suits are pending before a court, so that appointment of interim

3  counsel is necessary to protect the interests of class members." White v. TransUnion, LLC, 239

4  F.R.D. 681, 683 (C.D. Cal. 2006) (citing Manual for Complex Litigation (Fourth) § 21.11 (2004)).

5  Although Rule 23(g)(3) does not provide a standard for appointment of interim counsel, the court

6  may consider the factors contained in Federal Rule of Civil Procedure 23(g)(1).  Under that section,

7  the court considers: "(I) the work counsel has done in identifying or investigating potential claims in

8  the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types

9  of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the

10 resources that counsel will commit to representing the class." Fed. R. Civ. Proc. 23(g)(1)(A).  The

11 court may also "consider any other matter pertinent to counsel's ability to fairly and adequately

12 represent the interests of the class." Fed. R. Civ. Proc. 23(g)(1)(B).

13       Both Bursor & Fisher, P.A. and Faruqi & Faruqi, LLP are experienced class action firms.

14 See Declaration of Timothy Fisher ("Fisher Decl."), Docket Item No. 46, at ¶ 2; see also Declaration

15 of Vahn Alexander ("Alexander Decl."), Docket Item No. 47, at ¶¶ 2, 3.  Bursor & Fisher, P.A. have

16 been previously appointed to represent customers of Verizon Wireless, AT&T Wireless, Cingular

17 Wireless, Sprint and T-Mobile, as well we purchasers of Avacor and Xenadrine in other class action

18 suites.  See Fisher Decl. at ¶ 2.  Faruqi & Faruqi, LLP have also served as lead or co-lead counsel in

19 numerous high-profile class action cases.  See Alexander Decl. at ¶ 3.  For this case, the firms have

20 conducted extensive investigation of the potential class action claims through document review,

21 research, and interviews with potential class members.  See Fisher Decl. at ¶ 4; see also Alexander

22 Decl. at ¶ 4.

23       Edelson McGuire, LLP is a similarly experienced class action law firm, and specializes in

24 class actions relating to consumer technology and privacy issues.  See Declaration of Jay Edelson,

25 Docket Item No. 47, at ¶¶ 2, 6, 9.  The firm maintains its own information technology practice group

26 that focuses on consumer data protection, privacy and related claims.  Id. at ¶ 6.  Specific to this

27 case, Edelson McGuire, LLP has interviewed dozens of current and former Netflix subscribers,

28

4

NO. 5:11-cv-00379 EJD
ORDER GRANTING PLAINTIFFS' MOTION TO CONSOLIDATE; APPOINTING INTERIM CLASS COUNSEL
(EJDLC1)

1   analyzed Netflix's information retention practices, and is prepared to commit significant resources to

2   this litigation.  <u>Id</u>. at ¶¶ 17, 18.  The firm has also made an effort to bring together all counsel

3   representing the various plaintiffs on these related cases.  Id. at ¶¶ 26-33.

4          Upon review of the extensive papers filed for these motions, the court finds that Jay Edelson

5   of Edleson McGuire, LLP is the appropriate choice here.  While the court commends all three firms

6   on their impressive resumes and litigation experience, the efforts already expended by Edelson

7   McGuire, LLP  to identify and investigate the claims, coupled with that firm's significant and

8   particularly specialized expertise in electronic privacy litigation and class actions, renders them

9   superior to represent the putative class.  Accordingly, the court appoints Jay Edelson of Edelson

10  McGuire, LLP as Interim Class Counsel.

11                              **III.    ORDER**

12         Based on the foregoing, the joint motion of Bernal and Rura to consolidate their actions with

13  the <u>Milans</u> action is GRANTED.  With these three actions, the court also sua sponte consolidates the

14  <u>Comstock</u>, <u>Sevy</u> and <u>Wizenberg</u> actions as follows:

15         1.      The court consolidates case numbers 5:11-cv-00820 EJD, 5:11-cv-01075 EJD,

16                 5:11-cv-01218 EJD, 5:11-cv-01309 EJD, 5:11-cv-01359 EJD, 5:11-cv-00379 EJD

17                 into one action.  The Clerk of the Court shall consolidate these actions such that the

18                 earliest-filed action, 5:11-cv-00379 EJD, is the lead case.  All future filings shall be

19                 in 5:11-cv-00379 EJD and shall bear the caption: "<u>In re Netflix Privacy Litigation</u>."

20                 All future related cases shall be automatically consolidated and administratively

21                 closed.  Since the later actions are now subsumed by the first-filed action, the Clerk

22                 shall administratively close 5:11-cv-00820 EJD, 5:11-cv-01075 EJD, 5:11-cv-01218

23                 EJD, 5:11-cv-01309 EJD, and 5:11-cv-01359 EJD.

24         2.      The court appoints Jay Edelson of Edelson McGuire, LLP as Interim Lead Class

25                 Counsel for the putative class.

26         3.      On or before September 12, 2011, Plaintiffs in <u>In re Netflix Privacy Litigation</u> shall

27                 filed a Consolidated Amended Class Action Complaint.

28

*United States District Court*
For the Northern District of California

5

NO. 5:11-cv-00379 EJD
ORDER GRANTING PLAINTIFFS' MOTION TO CONSOLIDATE; APPOINTING INTERIM CLASS COUNSEL
(EJDLC1)

1    The courts sets a Case Management Conference in <u>In re Netflix Privacy Litigation</u> for

2    October 7, 2011, at 9:00 a.m.  The parties shall file a Joint Case Management Statement on or before

3    September 27, 2011.

4    This order terminates Docket Item Nos. 5 and 13 in the <u>Bernal</u> action (5:11-cv-00820) and

5    Docket Item Nos. 15, 22, 46 and 47 in the <u>Milans</u> action (5:11-cv-00379).

6    **IT IS SO ORDERED.**

7    Dated:  August 12, 2011



     EDWARD J. DAVILA
8    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div style="transform: rotate(-90deg)">**United States District Court**
For the Northern District of California</div>

6
NO. 5:11-cv-00379 EJD
ORDER GRANTING PLAINTIFFS' MOTION TO CONSOLIDATE; APPOINTING INTERIM CLASS COUNSEL
(EJDLC1)

1   KEITH E. EGGLETON, State Bar No. 159842
    Email:  keggleton@wsgr.com
2   RODNEY G. STRICKLAND, State Bar No. 161934
    Email:  rstrickland@wsgr.com
3   DALE BISH, State Bar No. 235390
    Email:  dbish@wsgr.com
4   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
5   650 Page Mill Road
    Palo Alto, CA 94304-1050
6   Telephone:   (650) 493-9300
    Facsimile:    (650) 565-5100
7
    Attorneys for Defendant
8   NETFLIX, INC.

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                        SAN JOSE DIVISION

12

13   JEFF MILANS, individually and on behalf of all   )   CASE NO.:  11 CV 0379 EJD
     others similarly situated,                        )
14                                                     )   **DEFENDANT NETFLIX INC.'S**
                    *Plaintiff*,                       )   **RESPONSE TO MOTIONS TO**
15                                                     )   **CONSOLIDATE AND TO**
             v.                                        )   **APPOINT INTERIM LEAD**
16                                                     )   **CLASS COUNSEL**
     NETFLIX, INC., a Delaware Corporation             )
17                                                     )
                    *Defendant*,                       )   Hearing Date:  July 22, 2011
18                                                     )   Time:  9:00 a.m.
                                                       )
19                                                     )   Before:  Hon. Edward J. Davila
                                                       )
20   _____ )

21

22

23

24

25

26

27

28

**II.      NETFLIX'S RESPONSE TO THE BERNAL/RURA AND MILANS MOTIONS**

      A.      <u>Netflix supports consolidation of the pending cases</u>.

      Netflix agrees with plaintiffs' counsel that the six pending matters (and any subsequently-filed related actions) should be consolidated for the reasons set forth in the Bernal/Rura Motion. *See* Docket No. 46 at 5-7.

      B.      <u>Netflix takes no position regarding the appropriate Lead Class Counsel</u>.

      Netflix believes the Court should appoint interim lead class counsel for this action because the lead class counsel structure typically used in class action litigation will allow this lawsuit to proceed more efficiently.  Netflix takes no position, however, on the central issue presented by the Milans Motion and Bernal/Rura Motion:  which firm(s) should be appointed?  That said, it is Netflix's view that the assertions in the various filings by the competing applicants demonstrate that they will not be able to work together to pursue this case efficiently.  For this reason, Netflix requests that the Court select either the Edelson law firm (Milans Motion) *or* the Bursor & Fisher and Faruqi & Faruqi law firms (the Bernal/Rura Motion) rather than ordering the competing law firms to attempt to work together as co-counsel.

      C.      <u>Plaintiffs' assertions regarding Netflix are false and unnecessary</u>.

      While it has no desire to wade into the merits of the competing motions for appointment as lead class counsel, Netflix is compelled to respond to certain aspects of those motions.

      First, the Bernal/Rura Movants' suggestion that Netflix has a history of engaging in improper settlements is false.  *See* Docket No. 50 at 1, 5.  The Bernal/Rura Movants cite the settlement in *Chavez v. Netflix*.  *Id*. at 5.   The Bernal/Rura Movants neglect to inform the Court, however, that the Superior Court's order granting final approval of the *Chavez* settlement was affirmed by the California Court of Appeals.  *See Chavez v. Netflix*, 162 Cal. App. 4th 43 (2008). Further, contrary to the Bernal/Rura Movants' suggestion, Mr. Milans' counsel was not class counsel in that matter.  Mr. Milans' counsel represented one of several groups that filed objections after the original settlement received preliminary approval.  In response to the objections, the original settlement agreement was revised in certain respects before the final approval hearing. *See* 162 Cal. App. 4th at 48-49.  The revised settlement agreement was approved by the Superior

DEFENDANT NETFLIX INC.'S RESPONSE TO
MOTION TO CONSOLIDATE AND TO APPROVE
CLASS COUNSEL, CASE NO. 11 CV 0379 EJD

3

1  Court and upheld on appeal.  The appellate court noted that the settlement "was the result of

2  arm's-length bargaining" and followed "two formal mediation sessions with a highly respected

3  former federal magistrate judge."  *Id*. at 52-53.   The appellate court held that the settlement was

4  fair, adequate, and reasonable.  *Id.* at 55.  In fact, the appellate court found that "the benefit

5  provided by the settlement . . . directly addresses the harm alleged in the complaint[.]"  *Id*. at 54.

6         Second, the Bernal/Rura Movants attempt to tarnish Netflix by referencing an FTC

7  investigation and a professor's critical blog post regarding the company.  *See* Docket No. 50 at 2,

8  8-9.  The Bernal/Rura Movants state that this investigation and blog post concerned "Netflix's

9  customer data retention practices and policies[.]"  *Id*. at 8.  This is not true.  The investigation and

10  blog post concerned alleged conduct entirely unrelated to the conduct challenged in this matter.  In

11  any event, contrary to the suggestion in the Bernal/Rura Movants' papers, the FTC announced

12  over a year ago that its investigation was "close[d]."  Docket 50-1, Exh. A at 3.  The FTC also

13  praised Netflix for its "meaningful commitment to protecting the privacy of consumers."  *See id*.

14         Third, the Milans Motion purports to describe a meeting between Mr. Milans' counsel and

15  Netflix's counsel shortly after the Milans Action was filed.  *See* Docket No. 47 at 12-13.  Netflix

16  is surprised that Mr. Milans described a meeting that the parties agreed would be confidential.

17  Netflix will not respond to the plaintiffs' characterization of the meeting (which was scheduled

18  before the five related cases were filed).  The Bernal/Rura Movants cite this meeting as purported

19  evidence that Mr. Milans is contemplating an early settlement that would provide no benefit to

20  class members.  Docket No. 50 at 7.  Neither the Court nor any plaintiff should, however, interpret

21  the meeting as anything other than what it was, namely a good faith attempt by Netflix to discuss

22  the case with opposing counsel.

23  Dated: July 6, 2011                      WILSON SONSINI GOODRICH & ROSATI
                                             Professional Corporation
24

25                                          By:  s/ Rodney G. Strickland, Jr.
                                                 Rodney G. Strickland, Jr.
26
                                            Attorneys for Defendant
27                                          NETFLIX, INC.

28

DEFENDANT NETFLIX INC.'S RESPONSE TO
MOTION TO CONSOLIDATE AND TO APPROVE
CLASS COUNSEL, CASE NO. 11 CV 0379 EJD

                                    4

1     BURSOR & FISHER, P.A.
          Scott A. Bursor (State Bar No. 276006)
2     L. Timothy Fisher (State Bar No. 191626)
          Sarah N. Westcot (State Bar No. 264916)
3     2121 North California Blvd., Suite 1010
          Walnut Creek, CA 94596
4     Telephone: (925) 482-1515
          Facsimile: (925) 407-2700
5     E-Mail: scott@bursor.com
                 ltfisher@bursor.com
6                 swestcot@bursor.com

7     *Attorneys for Plaintiff Jason Bernal*

8     [Additional counsel listed on signature page]

9

10                   UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| 13   JEFF MILANS, on behalf of himself and all others similarly situated, | Case No. C11-00379 EJD<br>Hon. Edward J. Davila |
| 14 | |
| 15                       Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFFS BERNAL AND RURA IN OPPOSITION TO MOTION TO APPOINT JAY EDELSON OF EDELSON MCGUIRE LLC INTERIM LEAD CLASS COUNSEL** |
| 16       v. | |
| 17   NETFLIX, INC., | |
| 18                     Defendant. | Date: July 22, 2011<br>Time: 9:00 a.m.<br>Courtroom 1 |
| 19 | |
| 20   JASON BERNAL, on behalf of himself and all others similarly situated, | Case No. C11-00820 EJD |
| 21 | |
| 22                     Plaintiff, | |
| 23       v. | |
| 24   NETFLIX, INC., | |
| 25                     Defendant. | |
| 26 | |

27

28

| | |
|---|---|
| MICHAEL RURA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NETFLIX, INC.,<br><br>Defendant. | Case No. C11-01075 EJD |

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs Jason Bernal and Michael Rura (collectively "Plaintiffs") respectfully submit this consolidated opposition to the motion of Jeff Milans to appoint Jay Edelson of Edelson McGuire LLC ("Edelson") as interim lead class counsel.

### I.    INTRODUCTION

The Edelson firm should not be appointed sole interim lead counsel because that firm has a track record of filing cases alleging violations of class members' privacy rights, failing to litigate those cases, and instead making quick, cheap, valueless settlements, sometimes confidentially and without court approval.  Mr. Edelson and the various incarnations of his law firm have already followed this pattern in at least five cases:  (1) *Lane v. Facebook, Inc.*, Case No. 08-CV-03845 (N.D. Cal.) (settled prior to a ruling on defendants' motion to dismiss, with no direct benefit to class members); (2) *In re TD Ameritrade Accountholder Litigation*, Case No. 07-CV-02852 (N.D. Cal.) (proposed no-money settlement denied court approval, and court removed Edelson's firm as class counsel and appointed a different firm in their place); (3) *Valdez-Marquez v. Netflix, Inc.*, Case No. 09-CV-05903 (N.D. Cal.) (Edelson's firm agreed to confidential settlement before Netflix had responded to complaint); (4) *Frank Chavez v. Netflix, Inc., et al.*, San Francisco Superior Court Case No. CGC-04-434884 (Edelson's firm agreed to settlement providing no benefit to class members); and (5) *Standiford v. Palm, Inc.*, Case No. 09-CV-05719 (N.D. Cal.). With the *Milans* case, it appears that history is about to repeat itself for the sixth time.  Although

MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFFS BERNAL AND RURA IN OPPOSITION TO MOTION TO APPOINT  JAY EDELSON OF EDELSON MCGUIRE LLC INTERIM LEAD CLASS COUNSEL C11-00379 EJD

1

1    these actions have only recently been filed, with no litigation whatsoever, Mr. Edelson has already

2    had a settlement meeting with Netflix.  *See* Edelson Br. at 12-13.

3         Based on this track record, Plaintiffs are concerned about the intentions of the Edelson firm

4    and the danger that it may seek another quick, low-value or no-value settlement with Netflix.

5    Nevertheless, Plaintiffs' counsel have offered to work cooperatively with Edelson as part of a

6    three-way co-lead structure, with Bursor & Fisher, P.A. (the firm that filed the *Bernal* complaint),

7    Faruqi & Faruqi LLP (the firm that filed the *Rura* complaint) and Edelson each serving as co-lead

8    counsel.  This arrangement would assuage concerns about the Edelson firm's track record, and

9    would strengthen the representation of the class through the appointment of the Bursor and Faruqi

10   firms, both of which have litigated hard-fought class action cases to judgment, and have won a

11   number of eight-figure and nine-figure jury verdicts and monetary settlements in class action cases.

12   Unfortunately, Edelson has rejected any compromise and insists that it should be the sole lead

13   counsel.  That is unacceptable to plaintiffs Bernal and Rura because it would expose them and the

14   class to the danger of another quick no-value settlement.

15        Edelson's motion attacks the Bursor and Faruqi firms for filing "plagiarized" complaints in

16   contrast to Edelson's own "original" *Milans* complaint, which was supposedly the product of the

17   Edelson firm's investigation that "unearthed" facts establishing the claims.  Edelson Br. at 1, 7, 10.

18   Edelson's description of the originality of its investigation and complaint is exaggerated, and

19   largely untrue.  The Edelson firm did not "unearth" anything.   Netflix's customer data retention

20   practices and policies had been the subject of an investigation by the Federal Trade Commission

21   since October, 2009, more than a year before the Edelson firm filed the *Milans* complaint.  *See*

22   3/12/10 Letter from Federal Trade Commission to Counsel for Netflix, Fisher Decl. Exh. A.

23   Furthermore, the facts underlying these cases had been extensively discussed in a variety of

24   publications and online sources since even before the FTC investigation began.  *See, e.g.,* Paul

25   Ohm, "Netflix's Impending (But Still Avoidable) Multi-Million Dollar Privacy Blunder,"

26   http://www.freedom-to-tinker.com/blog/paul/netflixs-impending-still-avoidable-multi-million-

27   dollar-privacy-blunder (posted September 21, 2009), Fisher Decl. Exh. B.  The *Milans* complaint

28   reflects little, if any, original work product beyond what had already appeared in the FTC materials

MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFFS BERNAL AND RURA IN OPPOSITION       2
TO MOTION TO APPOINT  JAY EDELSON OF EDELSON MCGUIRE LLC INTERIM LEAD CLASS COUNSEL
C11-00379 EJD

1    Facebook would not be liable for violations of the VPPA as it is not a Video Tape Service Provider

2    as defined in the statute and cannot be held secondarily liable.").

3        In *In re TD Ameritrade Accountholder Litigation*, Case No. 07-CV-02852 (N.D. Cal.),

4    Edelson's prior firm, Kamber Edelson LLC, proposed a similar no-money settlement.  Following

5    an objection by the Texas Attorney General, the court rejected that proposed settlement on the

6    ground that "class members were to receive no monetary recovery" and the settlement "did not

7    address adequately the potential harm to class members from identity theft."  10/23/09 Order

8    Denying Final Approval to Settlement at 4, Fisher Decl. Exh. D.  The court also revoked the order

9    appointing Kamber Edelson LLC and Parisi & Havens LLP as class counsel and appointed another

10   lawyer as class counsel instead.  *Id.* at 12.

11       Edelson has also appeared as counsel in two prior class actions against Netflix that reached

12   very early settlements, but provided little or no benefit to class members.  On December 17, 2009,

13   Mr. Edelson's prior firm Kamber Edelson LLC, along with Mr. Parisi's firm, filed a class action

14   complaint against Netflix entitled *Valdez-Marquez v. Netflix, Inc.*, Case No. 09-CV-05903 (N.D.

15   Cal.), asserting claims under the VPPA for the violation of consumers' privacy rights.  12/17/09

16   Valdez-Marquez Complaint, Fisher Decl. Exh. E.  Again Edelson did nothing to prosecute the case,

17   which was the subject of a "confidential" settlement before Netflix even responded to the

18   complaint.  *See* 3/19/10 Notice of Voluntary Dismissal, Fisher Decl. Exh. F.  Class members

19   received no benefit whatsoever from the "confidential settlement" in that case.

20       Similarly, in *Frank Chavez v. Netflix, Inc., et al.*, San Francisco Superior Court Case No.

21   CGC-04-434884, another of Mr. Edelson's predecessor firms, Blim & Edelson, LLC, represented a

22   group of 400 objectors to a settlement.  Edelson again agreed to a settlement that did not provide

23   any monetary relief to the class.  Instead, former Netflix subscribers received a free one month

24   Netflix membership, while current Netflix subscribers received a free "one-level upgrade in

25   service" for one month.  *Chavez* Settlement Agreement at 8-10, Fisher Decl. Exh. G.  Moreover,

26   some class members reported difficulties obtaining even the nominal benefits of the *Chavez*

27   settlement due to shipping problems.[1]

28   _____
     [1]  *See* http://netflixunderground.blogspot.com/2008/08/reporting-netflix-class-action-lawsuit.html.

complaint. *See* 3/12/10 Letter from Federal Trade Commission to Counsel for Netflix, Fisher Decl. Exh. A. Furthermore, the facts underlying these cases had been extensively discussed on the Internet since before the FTC investigation began. *See, e.g.,* Paul Ohm, "Netflix's Impending (But Still Avoidable Multi-Million Dollar Privacy Blunder," http://www.freedom-to-tinker.com/blog/paul/netflixs-impending-still-avoidable-multi-million-dollar-privacy-blunder (posted September 21, 2009), Fisher Decl. Exh. B. The *Milans* complaint reflects little, if any, original work product beyond what had already appeared in the FTC materials and other online publications. *See, e.g., In re Packaged Ice Litigation,* 2009 WL 118428 at *2 (E.D. Mich. June 1, 2009) ("This case is somewhat unique in that most claims have been identified, and are being investigated for criminal violations by the Antitrust Division of the Department of Justice. Thus, much of the work identifying and investigating potential claims has largely been performed by the Department of Justice. No applicant can, therefore, claim an advantage in performing the major leg-work on these claims.").

### C.   Edelson's Criticisms of the Bernal and Rura Complaints Are Misplaced

Edelson repeatedly chastises Bursor and Faruqi for filing "near word-for-word copycat" complaints in the *Bernal* and *Rura* cases. Edelson Brief at 1-2, 6. Those criticisms are unprofessional in tone and lacking in substance. Although there are substantial similarities, including many identical passages, among these complaints, the Bursor and Faruqi firms conducted their own independent investigations, including correspondence and interviews with more than 50 class members.[2] Thus, the Bursor and Faruqi firms did not limit themselves to the facts outlined by the FTC and other published materials, but did substantial original work. The Bernal and Rura

---

[2] During their presuit investigation, attorneys from Bursor and Faruqi collected information from more than 50 class members. See 4/26/11 Declaration of L. Timothy Fisher at ¶ 4 and 4/26/11 Declaration of Vahn Alexander at ¶ 4. As part of that process, the attorneys reviewed documents and heard statements from class members relating to the illegal practices described in the complaints, including written and oral descriptions by former Netflix customers about Netflix's retention of video programming viewing histories after the cancellation of their memberships. *Id.* Attorneys from Bursor and Faruqi also conducted a thorough review of the available legal documents related to Netflix's business practices and searched publicly available resources to locate and analyze other documents concerning Netflix's services and policies, with a particular focus on Netflix's customer information retention practices described in the complaints. *Id.*

MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFFS BERNAL AND RURA IN OPPOSITION
TO MOTION TO APPOINT JAY EDELSON OF EDELSON MCGUIRE LLC INTERIM LEAD CLASS COUNSEL
C11-00379 EJD

9

SER 287

1    complaints thus include additional relevant facts establishing Netflix's violations of federal and

2    state law.  *See, e.g.,* Bernal and Rura Complaints at ¶ 18 (describing in greater detail Netflix's

3    privacy policy and its supposed disclosures regarding the use of personal information), ¶ 24

4    (quoting Netflix's Terms of Use Agreement), ¶¶ 61-67 (the far more detailed allegations of

5    Plaintiffs' UCL claim).  The Bernal and Rura complaints also include a claim under the Consumers

6    Legal Remedies Act, Cal. Civil Code §§ 1750, *et seq.* (the "CLRA"), which Edelson failed to

7    investigate or include in the Milans complaint.  This claim is significant because the remedies

8    available under the CLRA are "substantial" and include actual and statutory damages, restitution,

9    injunctive relief, punitive damages and attorneys' fees and costs.  *See* Civil Code § 1780; *see also*

10   William L. Stern, *Bus. & Prof. C. § 17200 Practice*, §§10:40-54 (Rutter Group 2011) ("Stern").

11   By failing to include a CLRA claim in the Milans complaint, Edelson potentially created

12   significant problems for the class under *City of San Jose v. Superior Court*, 12 Cal.3d 447 (1974).

13   In *City of San Jose*, the California Supreme Court held that the plaintiffs in that case were

14   inadequate to represent the class "because they fail[ed] to raise claims reasonably expected to be

15   raised by the members of the class and thus pursue[d] a course which, even should the litigation be

16   resolved in favor of the class, would deprive class members of many elements of damage." *Id.* at

17   464.  Here, it is reasonable to expect members of the class would assert claims under the CLRA.

18   By failing to include such a claim in the Milans complaint, Edelson ran the risk that plaintiff

19   Milans might be deemed inadequate under *City of San Jose* and that a class might not be certified.

20   Edelson's failure to include a claim under "one of the most powerful pro-consumer statute[s] in

21   California" put the claims of the entire class at risk. *See* Stern at § 10:1.  Under these

22   circumstances, Edelson is in no position to criticize anyone else's complaint.

## IV.    CONCLUSION

23

24         For each of the foregoing reasons, Plaintiffs Bernal and Rura respectfully request that the

25   Court deny Edelson's motion to appoint him as interim class counsel.  The court should instead

26   grant the earlier-filed motion to appoint the Bursor & Fisher, P.A. and Faruqi & Faruqi LLP as co-

27   lead interim class counsel.

28

MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFFS BERNAL AND RURA IN OPPOSITION
TO MOTION TO APPOINT  JAY EDELSON OF EDELSON MCGUIRE LLC INTERIM LEAD CLASS COUNSEL
C11-00379 EJD

10

1    Dated: July 1, 2011                      BURSOR & FISHER, P.A.

2

3

4                                            By: _____/s/_____
                                                        L. Timothy Fisher

5
                                              Scott A. Bursor (State Bar No. 276006)
6                                             L. Timothy Fisher (State Bar No. 191626)
                                             Sarah N. Westcot (State Bar No. 264916)
7                                            2121 North California Blvd., Suite 1010
                                             Walnut Creek, CA 94596
8                                            Telephone: (925) 482-1515
                                             Facsimile: (925) 407-2700
9                                            E-Mail: scott@bursor.com
                                                      ltfisher@bursor.com
10                                                    swestcot@bursor.com

11                                           - and -

12                                           Joseph I. Marchese
                                             369 Lexington Avenue, 10th Floor
13                                           New York, NY  10017
                                             Telephone:  (212) 989-9113
14                                           Facsimile:  (212) 989-9163
                                              E-Mail: jmarchese@bursor.com
15
                                             *Attorneys for Plaintiff Jason Bernal*
16
                                             FARUQI & FARUQI, LLP
17                                           Vahn Alexander (State Bar No. 167373)
                                             1901 Avenue of the Stars, 2nd Floor
18                                           Los Angeles, CA 90067
                                             Telephone:  (310) 461-1426
19                                           Facsimile:  (310) 461-1427
                                             E-Mail:  valexander@faruqilaw.com
20
                                             -and -
21
                                             Beth A. Keller
22                                           369 Lexington Avenue, 10th Floor
                                             New York, NY 10017
23                                           Telephone: (212) 983-9330
                                             Facsimile: (212) 983-9331
24                                           E-Mail: bkeller@faruqilaw.com

25                                           *Attorneys for Plaintiff Michael Rura*

26

27

28

---

MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFFS BERNAL AND RURA IN OPPOSITION       11
TO MOTION TO APPOINT  JAY EDELSON OF EDELSON MCGUIRE LLC INTERIM LEAD CLASS COUNSEL
C11-00379 EJD

1 | SEAN P. REIS (sreis@edelson.com) - SBN 184044
EDELSON MCGUIRE, LLP
2 | 30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
3 | Telephone: (949) 459-2124
Fax: (949) 459-2123
4 |
JAY EDELSON (jedelson@edelson.com) (Admitted *Pro Hac Vice*)
5 | RAFEY S. BALABANIAN (rbalabanian@edelson.com) (Admitted *Pro Hac Vice*)
WILLIAM C. GRAY (wgray@edelson.com) (Admitted *Pro Hac Vice*)
6 | BENJAMIN H. RICHMAN (brichman@edelson.com) (Admitted *Pro Hac Vice*)
EDELSON MCGUIRE, LLC
7 | 350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
8 | Telephone: (312) 589-6370
Fax: (312) 589-6378
9 |
*Attorneys for Plaintiff Milans and the putative class*
10 |

11 | **UNITED STATES DISTRICT COURT**

12 | **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFF MILANS, individually and on behalf of all others similarly situated, | Case No. 5:11-cv-00379-EJD |
| *Plaintiff,* | *Related To:* |
| *v.* | Case No. C 11 00820-PSG |
| NETFLIX, INC., a Delaware corporation, | [Honorable Edward J. Davila] |
| *Defendant.* | **RE-NOTICE OF MOTION AND MOTION TO APPOINT JAY EDELSON OF EDELSON MCGUIRE LLC INTERIM LEAD CLASS COUNSEL** |
| JASON BERNAL, individually and on behalf of all others similarly situated, | |
| *Plaintiff,* | Date: July 22, 2011 |
| *v.* | Time: 9:00 a.m. |
| NETFLIX, INC., a Delaware corporation, | Location: Court Rm. 1, 5th Fl. |
| *Defendant.* | |

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL**

## I.    INTRODUCTION

Given the contingent nature of attorney compensation in the plaintiffs' bar, it is of little surprise when concurrently prosecuted class actions lead to friction among differing groups of plaintiffs (or more appropriately, their lawyers). Unfortunately, such is the case here where two law firms—Bursor & Fisher P.A. ("Bursor") and Faruqi & Faruqi, LLP ("Faruqi")—have placed their own pecuniary interests ahead of those of the putative Class.

The chronology tells the story: following several months of careful investigation into Netflix's practice of maintaining customer personal information beyond the time period allowed under the Video Privacy Protection Act ("VPPA"), Jeff Milans, through his attorneys at Edelson McGuire, LLC ("Edelson McGuire" or "the Firm"), filed the first case in the country alleging such claims against Netflix on January 26, 2011. (Dkt. No. 1.) A month later, on February 22, 2011, Bursor—having done little more than read Milans's complaint[1]—filed a near word-for-word[2] copycat pleading in *Bernal v. Netflix, Inc.*, No. C 11-00820-PSG (N.D. Cal.) ("*Bernal*"). On March 8, 2011, Faruqi filed a supposedly independent (albeit similarly plagiarized) complaint in the case styled *Rura v. Netflix, Inc.*, No. 11-CV-1075-SBA (N.D. Cal.) ("*Rura*"). Then, a mere 3 days later on March 11, 2011, Bursor and Faruqi—apparently working in tandem prior to the filing of the *Rura* matter—jointly moved to consolidate[3] the cases and appoint their firms as co-lead counsel.

The simple truth is that Bursor and Faruqi saw a case they liked, cut and pasted the complaint (twice), and moved for co-lead. Such gamesmanship is the antithesis of what lead

---

[1] The Bursor and Faruqi firms' representations to the Court regarding their supposedly "extensive" investigation into Netflix's practices (Bursor and Faruqi Mot. 9), as contained in the sworn declarations of attorneys Fisher and Alexander respectively, are notably silent with respect to the cutting and pasting of Milans's complaint.

[2] Milans's counsel also notes that Bursor and Faruqi were careful enough to change "Milans" name to the names of their respective plaintiffs and that they added a claim under the CLRA.

[3] Milans concedes that the cases are related and should be consolidated—that is to be expected when subsequent filers simply copy complaints already on file.

MEMORANDUM OF POINTS AND AUTHORITIES IN          1          CASE NO. 5:11-cv-00379-EJD
SUPPORT OF MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL

1    counsel—charged with putting the Class's interests first—should ever do.

2        In stark contrast, the lawyers at Edelson McGuire actually investigated the claims alleged

3    in the cases, did not copy anyone else's work product in the process, and have shown genuine

4    leadership.  In fact, almost immediately upon learning of Bursor's motion to relate, the attorneys

5    at Edelson McGuire reached out to Bursor to discuss the nature of the claims and to explore

6    potential ways to work cooperatively.  These overtures went largely ignored until finally Jay

7    Edelson ("Mr. Edelson") was able to convince Timothy Fisher ("Mr. Fisher") of Bursor and

8    Nadeem Faruqi ("Mr. Faruqi") of Faruqi to participate in a telephone conference (during which

9    time Fisher and Faruqi made clear they had filed to secure their piece of the cases—according to

10   them a 1/3 interest each).

11       These lawsuits would not exist but for Edelson McGuire's efforts.  Edelson McGuire

12   uncovered Netflix's wrongdoing, investigated the claims, and filed the first case.  Edelson

13   McGuire has committed and will continue to commit significant resources towards the successful

14   prosecution of these cases.  Unlike the other movants, Edelson McGuire has extensive

15   experience litigating VPPA class actions and has demonstrated the ability to work cooperatively

16   with both other plaintiffs' counsel and counsel for Netflix.  Unlike the other movants, Edelson

17   McGuire has not—and will not—put its own interests ahead of those of the putative Class.  In

18   short, unlike the other movants, Edelson McGuire meets and exceeds each of the requirements

19   that courts must consider under Rule 23(g) when appointing interim lead counsel.

20       For all these reasons, and as explained further below, in the interests of cooperation,

21   efficiency and, most importantly, protecting the rights of the putative Class of persons whose

22   confidential information Netflix to this day holds in violation of state and federal law, the Court

23   should appoint Mr. Edelson of Edelson McGuire as interim lead counsel in this and the related

24   cases of *Bernal v. Netflix, Inc.*, No. C 11-00820-PSG (N.D. Cal.), *Rura v. Netflix, Inc.*, No. 11-

25   CV-1075-SBA (N.D. Cal.), *Comstock v. Netflix, Inc.*, No. 11-cv-1218-HRL (N.D. Cal.), *Sevy v.*

26   *Netflix, Inc.*, No. 11-cv-1309-PSG (N.D. Cal.), and *Wizenberg v. Netflix, Inc.*, No. 11-cv-01359-

27   HRL (N.D. Cal.).

28

MEMORANDUM OF POINTS AND AUTHORITIES IN        2        CASE NO. 5:11-CV-00379-EJD
SUPPORT OF MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL

SER 292

1  of former subscribers, including Plaintiff Jeff Milans, which contains highly sensitive personal

2  contact and billing information.  (Compl. ¶¶ 6, 35.)

3  　　　　According to the Complaint, Netflix's retention of former subscriber data is in direct

4  contravention of several statutory and common law proscriptions, including the Video Privacy

5  Protection Act, (18 U.S.C. §§ 2710, *et seq.*), the California Customer Records Act, (Cal. Civ.

6  Code § 1798.80), and the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200,

7  *et seq.*).  Plaintiff Milans, on behalf of himself and all others similarly situated, now seeks

8  statutory and punitive damages, as well as all necessary injunctive relief to ensure that Netflix

9  ceases its unlawful practices.

10  　　　**B.**　　　**Related Litigation.**

11  　　　　In addition to the *Milans* matter, there are currently four other cases pending against

12  Netflix in the Northern District of California:  *Bernal v. Netflix, Inc.*, No. 5:11-cv-00820-JF;

13  *Rura v. Netflix, Inc.*, No. 4:11-cv-01075-SBA; *Comstock v. Netflix, Inc.*, No. 5:11-cv-01218-

14  HRL; *Sevy v. Netflix, Inc.*, No. 11-cv-1309-PSG; and, *Wizenberg v. Netflix, Inc.*, No. 11-cv-

15  01359-HRL.  By order dated March 10, 2011, the Court related the *Bernal* and *Milans* matters.

16  (Dkt. No. 14.)  Since that time, Plaintiffs Rura, Comstock, and Sevy have also moved to relate

17  their cases, but the Court has not yet ruled on the motions.  (Dkt. Nos. 17, 19-20.)

18  　　　　　　　1.　　　The *Bernal* and *Rura* Matters: Carbon Copy Complaints and Orchestrated
19  　　　　　　　　　　Filings Used to Create an Artificial Record.

20  　　　　Throughout the pendency of this litigation, counsel for Plaintiffs *Bernal* and *Rura*—

21  Bursor and Faruqi, respectively—have worked in concert to create an artificial record of

22  litigation activity and coordination in a not-so-subtle effort to run away with these cases as if

23  their own.  As discussed further below, that effort has included verbatim reproductions of

24  Milans's complaint in both the *Bernal* and *Rura* matters, coordinated motions to relate the

25  *Bernal* and *Rura* matters to the *Milans* case, a general refusal to work cooperatively (or even

26  users in the aggregate to prospective partners, advertisers and other third parties."  (Compl. ¶ 24.)
   With that in mind, "it becomes clear that inherent in this statement is the fact that Defendant
27  continues to profit from the use of its former subscribers' personal information, including their
   video programming viewing histories, even though these individuals have cancelled their
28  subscriptions."  (Compl. ¶ 24.)

MEMORANDUM OF POINTS AND AUTHORITIES IN　　　　4　　　　CASE NO. 5:11-CV-00379-EJD
SUPPORT OF MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL

SER 293

1  McGuire's appointment because the Firm's attorneys are well versed in the factual, legal, and

2  technological issues at hand in these cases.

3              4.    Edelson McGuire Has Already Devoted, and Will Continue to Devote
                     Significant Resources to the Litigation.

4

5      Rounding out the requirements of Rule 23(g)(1)(A), Edelson McGuire has devoted, and

6  will continue to devote, significant resources to the successful prosecution of these cases.  As

7  such, the Firm is well deserving of the appointment as interim lead counsel.

8      To date, Edelson McGuire has committed significant resources to the successful

9  prosecution of these cases and is prepared to devote the resources necessary to advance this

10 litigation through all phases—motion practice, discovery, class certification, and trial.  (Edelson

11 Decl. ¶ 18.)  As importantly, the firm has the necessary experience required to strategically

12 implement those resources in an efficient manner, maximizing the likelihood of success for the

13 class.  (Edelson Decl. ¶ 18).  The Firm's expenditure of resources so far includes time spent

14 evaluating the facts giving rise to the claims asserted, as well as those that present potential

15 hurdles to recovery faced by Milans and the putative Class.  (Edelson Decl. ¶ 19).   In addition to

16 their continued factual investigation, Edelson McGuire's attorneys have done significant

17 research into the defenses Netflix is likely to raise, and the Firm is therefore responsible for

18 shaping the contours of the claims asserted in these cases.  (Edelson Decl. ¶ 20).  Of course,

19 significant resources were put to use in drafting and filing the complaint, which has apparently

20 served as the template for the *Bernal* and *Rura* matters, as well as the day-to-day litigation

21 generally.

22     Further, following the filing of Milans's Complaint, Edelson McGuire immediately

23 engaged counsel for Netflix[13] in a dialogue to discuss the parties' respective views of the

24 relevant facts, law and overall direction of the litigation.  (Edelson Decl. ¶ 21.)  Through several

25 telephone conversations and e-mail exchanges, the parties were able to agree to meet in-person

26 on March 7, 2011 at JAMS in Los Angeles, California.  (Edelson Decl. ¶ 21.)  During the

27 ─────────────
   [13]      Edelson McGuire attorneys have worked cooperatively with Wilson Sonsini Goodrich &
28 Rosati, the lawyers for Netflix, on complex matters, including class actions, in the past.  (Edelson
   Decl. ¶ 21.)

MEMORANDUM OF POINTS AND AUTHORITIES IN          12          CASE NO. 5:11-CV-00379-EJD
SUPPORT OF MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL

SER 294

1    meeting, the parties discussed the nature and type of user information that Netflix has and

2    continues to retain, as well as the company's justification for holding such information.  (Edelson

3    Decl. ¶ 22.)  The parties further discussed the advanced algorithms currently used by Netflix to

4    gather customer data and potential ways to alter the coding to eliminate the retention of certain

5    aspects of data.  (Edelson Decl. ¶ 22.)  Further, Edelson McGuire and Netflix discussed potential

6    methods for the handling and timely destruction of former user data and explored general

7    possibilities for resolution of the lawsuit.[14]  (Edelson Decl. ¶ 22.)  And, as noted above,

8    subsequent to that initial meeting, Edelson McGuire had additional communications with counsel

9    for Netflix regarding the company's duty to preserve all electronic data relevant to plaintiffs'

10   claims in this litigation.  (Edelson Decl. ¶ 23.)

11          Thus, it is undeniable that Edelson McGuire has already performed the bulk of the

12   labor in these cases and is prepared to devote whatever additional resources are necessary to

13   bring these cases to a successful resolution.  As a result, this Court should find that Edelson

14   McGuire and Jay Edelson meet the fourth factor of Rule 23(g)(1)(A).

15                      *                      *                      *

16          Because Edelson McGuire is the only firm that satisfies each of the Rule 23(g)(1)(A)

17   factors, the analysis could end here.  As described in the next section, however, additional

18   considerations lend further support to the appointment of Jay Edelson and Edelson McGuire

19   over the other firms.

20

21

22

23   _____
     [14]     The initial meeting with Netflix's counsel was scheduled prior to Edelson McGuire
24   receiving notice of the other related filings and was in no way an attempt to be exclusive of the
     other plaintiffs or law firms now involved in this litigation.  (Edelson Decl. ¶ 24.)  As discussed
25   herein, upon learning of the additional filings, Edelson McGuire reached out to each separate law
     firm in an effort to cooperate going forward, and with the exception of the Bursor and Faruqi
26   firms, all of the other plaintiffs' firms responded favorably.  To be clear, discussion of the initial
     meeting with Netflix's counsel or Edelson McGuire's subsequent communications with Netflix
27   is not meant to indicate that Netflix has taken any position on the appointment of interim lead
     counsel.  (Edelson Decl. ¶ 25.)  Rather, the discussion illustrates the differences between
28   gamesmanship as displayed by the Bursor and Faruqi firms and actually litigating a case as
     displayed by Edelson McGuire.

MEMORANDUM OF POINTS AND AUTHORITIES IN          13                CASE NO. 5:11-CV-00379-EJD
SUPPORT OF MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL

SER 295

1   Fisher and Faruqi would not (or could not) respond.  (Edelson Decl. ¶ 29.)  Making no attempt to

2   participate cooperatively and actually advance the cases, the Bursor and Faruqi firms sought only

3   to stake their claim to what they asserted was their portion of the cases, and suggested that they,

4   along with Edelson McGuire, "split" the cases in equal parts.  (Edelson Decl. ¶ 30.)  When again

5   pressed about what experience they could bring to this VPPA action, Messrs. Fisher and Faruqi

6   did not (or perhaps could not) articulate any response other than to again say the case should be

7   split equally, and that they have had success in the past with similar leadership structures.

8   (Edelson Decl. ¶ 31.)  Edelson McGuire politely declined.  (Edelson Decl. ¶ 31; *see also* E-mail

9   exchange between Jay Edelson and Timothy Fisher, true and accurate copies of which are

10  attached to the Edelson Declaration as Exhibits 1-F through 1-H.)

11       Despite the Bursor and Faruqi firms' inability to explain how they would move the cases

12  forward, Edelson McGuire has continued efforts to reach out and communicate with counsel in

13  the related cases and in that way has sought to promote efficiency and cooperation amongst the

14  pending actions.  (Edelson Decl. ¶ 32.)  In fact, after having the benefit of hearing Milans's

15  positions on the litigation as stated by his attorneys, plaintiffs' counsel in the *Sevy* and *Wizenberg*

16  matters chose to file their lawsuits in this Court rather than in the Northern District of Illinois and

17  Eastern District of Michigan, respectively, as they had originally planned.  (Edelson ¶ 33.)  This

18  decision will no doubt promote judicial economy by avoiding unnecessary briefing on transfer

19  motions and similar filings.  It should come as no surprise then, that the plaintiffs' firms that are

20  not seeking leadership appointments in this case support Edelson McGuire's application and

21  oppose Bursor and Faruqi's motion.

22       Ultimately, it is Edelson McGuire's proactive and cooperative approach that will best

23  serve this litigation and help shepherd the cases to a successful resolution for the putative Class.

24  This is the type of leadership that lawyers and firm's seeking Rule 23(g) appointment should

25  emulate.

26           2.    Despite the Fact that their Complaints Have Been Pending For
                   Less Than a Month, the Bursor and Faruqi Firms Have Already
27                 Proven That They Are Willing to Litigate Inefficiently.

28       As a final consideration, this Court should not overlook the gamesmanship and

1    inefficiencies already displayed by the Bursor and Faruqi firms.  They cut and pasted Milans's

2    complaint word-for-word and then re-filed it on behalf of their own clients nearly a month after

3    Milans's case was on file.  The firms also intentionally staggered the filing of their cases to

4    create the impression of post filing cooperation.  Although it has been said that imitation is the

5    highest form of flattery, it is perhaps the lowest form of work-product.  The following table is an

6    illustrative, but by no means exhaustive, sampling:

| *Milans v. Netflix*: Jan. 26, 2011 | *Bernal v. Netflix*: Feb. 22, 2011 | *Rura v. Netflix*: Mar. 8, 2011 |
|---|---|---|
| ¶ 6:  *As a result, Netflix maintains a veritable digital dossier on thousands, if not millions, of former subscribers.* | ¶ 6:  *As a result, Netflix maintains a veritable digital dossier on thousands, if not millions, of former subscribers.* | ¶ 6:  *As a result, Netflix maintains a digital database of thousands, if not millions, of former subscribers.* |
| ¶ 26:  *When the VPPA was introduced, the late Senator Paul Simon noted that….* | ¶ 26:  *When the VPPA was introduced, the late Senator Paul Simon noted that….* | ¶ 26:  *When the VPPA was introduced, the late Senator Paul Simon noted that….* |
| ¶ 27:  *In another strikingly accurate forward-looking statement, Senator Patrick Leahy remarked that….* | ¶ 27:  *In another strikingly accurate forward-looking statement, Senator Patrick Leahy remarked that….* | ¶ 27:  *In another strikingly accurate forward-looking statement, Senator Patrick Leahy remarked that….* |
| ¶ 33:  *The retention of subscriber data is not the first privacy concern that has raised eyebrows about Netflix's business practices….* | ¶ 33:  *The retention of subscriber data is not the first privacy concern that has raised eyebrows about Netflix's business practices….* | ¶ 33:  *The retention of subscriber data is not the first privacy concern that has raised eyebrows about Netflix's business practices….* |

20        While they claim to have enhanced Milans's complaint by supposedly adding

21    allegations and a Consumer Legal Remedies Act, Cal. Civ. Code § 1770 ("CLRA") claim, the

22    truth is, there are no allegations in the *Bernal* and *Rura* complaints not present in Milans's

23    pleading.  Also, the addition of the CLRA claim consists of nothing but legal conclusions and

24    appears to be a superficial addition designed to put distance between Bernal's and Rura's

25    complaints, on the one hand, and that of Milans, on the other.  A student caught for

26    plagiarizing like this would be expelled from school.  Here, the Bursor and Faruqi firms want

27    to be rewarded for it.  It is regrettable, really for the entire plaintiff's bar that these firms have

28    attempted to game the system in this manner.

MEMORANDUM OF POINTS AND AUTHORITIES IN     16      CASE NO. 5:11-cv-00379-EJD
SUPPORT OF MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL

SER 297

1    Aside from the fact that the Bursor and Faruqi firms put none of their own work into

2  their cases, the copying of Milans's complaint is obviously troubling on another level.  That is,

3  while the Bursor and Faruqi firms tout their purported investigation into Netflix's practices,

4  their cut and paste job shows that they conducted no such investigation.  Thus, their

5  representations to the Court, as contained in the sworn declarations of Messrs. Fisher and Vahn

6  Alexander respectively, appear to be exaggerations that border on false statements.  Lead

7  counsel needs to display the utmost candor with the Court—the Bursor and Faruqi firms have

8  failed to adhere to this principle, raising serious concerns with respect to their potential

9  appointment.

10    Moreover, the Bursor and Faruqi firms have consistently acted unilaterally without so

11  much as a phone call or e-mail to other plaintiffs' counsel, except to reiterate their proposal

12  that leadership be split among themselves and Edelson McGuire.  Instead, they independently

13  moved to relate the cases now before the Court and have sought an appointment as lead

14  counsel.  Such conduct speaks volumes about their inability to conduct this litigation in an

15  appropriate and efficient manner that ultimately benefits the putative Class.

16    As a final point, it is important to recall that the Bursor and Faruqi firms could have

17  simply filed a single (albeit likely plagiarized) complaint with both firms appearing on behalf

18  of their respective clients—instead they did twice the amount of work.  These two firms have a

19  long history of working together and there was simply no reason, aside from positioning for

20  this leadership fight, for them to file identical cases in the same jurisdiction.  They lack the

21  qualities necessary to lead this litigation and their requested appointment should therefore be

22  denied.  The Court should appoint Mr. Edelson and Edelson McGuire as interim lead class

23  counsel.

24  **V.    CONCLUSION**

25    In the final analysis, Jay Edelson and Edelson McGuire, LLC have demonstrated that

26  they are best equipped to serve as lead counsel in this litigation.  The Firm understands the

27  relevant factual, legal and (most importantly) technological issues presented in these cases and

28  has the resources to see them through to a successful and efficient resolution.  It is no surprise

1  under such circumstances that each of the factors under Rule 23(g)(1)(A) and the other pertinent

2  matters of Rule 23(g)(1)(B) all militate in favor of Mr. Edelson's and Edelson McGuire's

3  appointment.  While the Bursor and Farqui firms are comprised of competent lawyers in general,

4  Edelson McGuire's lawyers are the best and most appropriate choice for this leadership position.

5      For the foregoing reasons, Plaintiff Jeff Milans, individually and on behalf of all others

6  similarly situated, respectfully requests that the Court appoint Jay Edelson of Edelson McGuire,

7  LLC as interim lead class counsel on behalf of all plaintiffs and the putative Class.

8

9                                       Respectfully submitted,

10  Dated:  May 5, 2011          **JEFF MILANS**, individually and on behalf of all
                                 others similarly situated,

11                              By:   /s/  Rafey S. Balabanian
                                      One of Plaintiff's Attorneys
12

13

14  SEAN P. REIS (sreis@edelson.com) - SBN 184044
    EDELSON MCGUIRE, LLP
    30021 Tomas Street, Suite 300
15  Rancho Santa Margarita, California 92688
    Telephone: (949) 459-2124
16  Fax: (949) 459-2123

17  JAY EDELSON (jedelson@edelson.com) (Admitted *Pro Hac Vice*)
    RAFEY S. BALABANIAN (rbalabanian@edelson.com) (Admitted *Pro Hac Vice*)
18  WILLIAM C. GRAY (wgray@edelson.com) (Admitted *Pro Hac Vice*)
    BENJAMIN H. RICHMAN (brichman@edelson.com) (Admitted *Pro Hac Vice*)
19  EDELSON MCGUIRE, LLC
    350 North LaSalle Street, Suite 1300
20  Chicago, Illinois 60654
    Telephone: (312) 589-6370
21  Fax: (312) 589-6378

22

23

24

25

26

27

28