Nos. 14-16601, 14-17068

---

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

EDWARD O'BANNON, JR.,
ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED

*Plaintiff-Appellee*,

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court for the
Northern District of California, No. 09-cv-03329 (Wilken, C.J.)

---

**BRIEF FOR SPORT MANAGEMENT PROFESSORS AS
*AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE**

---

Michael J. Boni
Joshua D. Snyder
John E. Sindoni
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
(610) 822-0200

Counsel for *Amici Curiae*

# **TABLE OF CONTENTS**

Page

INTERESTS OF *AMICI CURIAE* .................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT .........................................................................................6

I.     "AMATEURISM" DOES NOT MAKE FBS FOOTBALL AND D-I
MEN'S BASKETBALL A UNIQUE AND DISTINCT PRODUCT............6

II.    THE "RACE TO THE BOTTOM" ARGUMENT DOES NOT
JUSTIFY THE RESTRAINTS ON TRADE IMPOSED BY NCAA
RESTRICTIONS ON ATHLETE COMPENSATION................................12

III.   IN THE VIEW OF *AMICI*, THERE IS NO EMPIRICAL PROOF
THAT PAYMENT RESTRICTIONS HELP INTEGRATE
ATHLETES INTO THE EDUCATIONAL COMMUNITY.......................17

IV.   THE COLLEGIATE MODEL OF ATHLETICS IN FBS FOOTBALL
AND D-I MEN'S BASKETBALL LACKS AN ETHICAL
FOUNDATION ............................................................................18

V.    THE NCAA SHOULD NOT HAVE UNFETTERED
CONSPIRATORIAL DECISION-MAKING AUTHORITY.......................22

CONCLUSION .......................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*In re NCAA Student-Athlete Name & Likeness Licensing Litigation*,
   724 F.3d 1268 (9th Cir. 2013) ......................................................20

*Law v. NCAA,* 134 F.3d 1010 (10th Cir. 1998) ......................................16

*National Collegiate Athletic Ass'n v. Board of Regents of the University of
   Oklahoma,* 468 U.S. 85 (1984).....................................................16

*New England Patriots Football Club, Inc. v. Univ. of Colorado*,
   592 F.2d 1196 (1st Cir. 1979).........................................................7

*O'Bannon v. National Collegiate Athletic Ass'n*.,
   7 F. Supp. 3d 955 (N.D. Cal. 2014)...........................................20

*Tennessee Secondary Sch. Athletic Ass'n v. Brentwood Acad.,*
   551 U.S. 291 (2007).......................................................................14

# INTERESTS OF *AMICI CURIAE*[1]

*Amici* are 18 professors of sport management at U.S. universities whose names, titles, and academic affiliations are listed in Appendix A. The *Amici* train the sport managers. The core courses in sport management programs do not draw a line between the business of amateur sports and the business of professional sports, and the coursework does not distinguish between "amateurism" and "professionalism."

*Amici* have an interest in the proper development of antitrust jurisprudence in the context of intercollegiate athletics, and would like to respond to (1) certain factual assertions made in the briefs filed by the NCAA, and *amici curiae* in support of the NCAA, about the sport industry, including the products of NCAA Football Bowl Subdivision (FBS) Football and Division I (D-I) Men's Basketball, and (2) the ethical foundation utilized in their briefs to support the Collegiate Model of Athletics in relation to FBS Football and D-I Men's Basketball. In this Brief, *Amici* limit their positions to factual challenges to arguments presented by the NCAA and supporting *amici* that rely on the preservation of amateurism as a

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a) & (c)(5), *Amici* state that all parties to this appeal have consented to the filing of this brief, that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money to fund the preparation or submission of this brief, and that no person other than *Amici* and their counsel contributed money to fund the preparation or submission of this brief.

justification for restrictions on athlete compensation. *Amici* take no position on legal questions presented in the lawsuit, including the merits of the plaintiffs' antitrust law claim and whether NCAA athletes have a right of publicity in the context of live game broadcasts or the licensing of broadcast rights.

## INTRODUCTION AND SUMMARY OF ARGUMENT

It's a fiction that fans care about "amateurism." A fantasy concocted by the NCAA and its defenders to justify the unjust practices of restricting NCAA athletes from sharing in the billions of dollars generated off of their likenesses and their efforts. Neither the NCAA nor its defenders are able to provide a factual basis for their position that consumers select FBS Football and D-I Men's Basketball because NCAA athletes receive no direct compensation. They are unable to proffer evidentiary support for the idea that NCAA payment restrictions make FBS Football and D-I Men's Basketball distinct products in the minds of consumers because there is no compelling evidence for this position. There is no empirical support that the NCAA's definition of "amateurism" is a driving motivation behind college sport consumption. Accordingly, the district court's ruling did not disrupt consumer choice. The products of FBS Football and D-I Men's Basketball will be unaffected by the outcome of this case. NCAA athletes will still be enrolled in classes and will still represent the schools that profit so substantially off of their labors. The only influence from the district court's decision on these two sport

2

products will be the amount of compensation that NCAA athletes are allowed to receive.

*Amici* know this because they train the sport managers. Their students work in all aspects of the sport industry, including NCAA and professional sports. The core courses in sport management programs do not draw a line between the business of amateur sports and the business of professional sports, and the coursework does not distinguish between "amateurism" and "professionalism."

Yet, the defenders of the NCAA warn the Court that failure to reverse *O'Bannon* will result in a "race to the bottom" that will fundamentally alter FBS Football and D-I Men's Basketball. The problem with that position is that the "race to the bottom" already exists for these two sports. NCAA programs already compete for athlete services, and this is evidenced by the industries created around college athlete recruiting and the ridiculous amounts of capital expended on vanity project constructions on college campuses across the country. As for the position that the restrictions at issue are needed to "curb" the arms race, to justify its rules, the NCAA surely must to do more than show that they modestly slow the expansion of an existing problem.

Similarly, the NCAA cannot factually support its position that its payment restrictions are necessary to integrate its athletes with the rest of the students on campus. In *Amici*'s assessment, based on their collective experience with sport

3

management, no empirical evidence exists that demonstrates that payment restrictions (1) integrate athletes into the broader student body or college educational experience, (2) help them take full advantage of their scholastic obligations and opportunities, or (3) help FBS Football and D-I Men's Basketball athletes see themselves as part of their school's educational community. The same is true for the unsupported position that commercial pressures undermine athletic and educational experiences. If anything, additional financial support may even enhance the educational experience of NCAA athletes in FBS Football and D-I Men's Basketball, many who come from financially disadvantaged backgrounds.

There is also concern that the district court "blurred the lines" between NCAA and professional sports with its ruling. The lines the NCAA wants to defend, however, should not exist from an ethical perspective. The district court's decision implicitly recognizes an unethical unfairness, as well as finding an antitrust violation, and does something about it. The veil of "amateurism" has allowed the NCAA and its member institutions to unjustly enrich themselves at the expense of the athletes they claim to protect from exploitation. Coaches and administrators are made into millionaires based on a paternalistic ideal that the NCAA must protect athletes from commercial exploitation and knows what is best for them. But paternalistic principles simply cannot justify stripping adults of the right to exploit their own talents and skills. The NCAA's "amateurism" model has

4

fueled both ethical debates in classrooms as well as numerous lawsuits, and the debates and litigation will likely only increase if the district court's decision is reversed.

For these reasons and more, the NCAA should not be entitled to unfettered decision-making authority, free from judicial scrutiny. Certainly, any business or industry would like to be free from judicial oversight if given the chance. However, the NCAA is not deserving of a legal right to preclude courts from scrutinizing its restrictions. The NCAA asserts that its rules are the product of educational experts; yet, the *Amici* do not know any professors who have aided in the creation of the challenged restrictions. As for the fear that the district court's determination will subject the NCAA to a flood of litigation, the waters have already risen well past the flood stage. First, there are other antitrust actions currently aimed at NCAA payment restrictions. Second, the injunction does not require schools to do anything or pay any athlete any amount of money, but merely operates as a prohibitory injunction forbidding member institutions from agreeing not to pay them for the use of their names, images, and likenesses in amounts of $5,000 or less each year. If anything, a remedy resulting in a more equitable distribution of money to the athletes who earn it, from NCAA member institutions that decide to pay it, may actually result in less litigation. By removing the basis for unethical unfairness, there will be less need for judicial scrutiny.

**ARGUMENT**

## I.   "AMATEURISM" DOES NOT MAKE FBS FOOTBALL AND D-I MEN'S BASKETBALL A UNIQUE AND DISTINCT PRODUCT

However the NCAA chooses to define "amateurism," the NCAA asserts that its rules related to amateurism define its product as "unique" and "distinct."  First, the NCAA asserts that they sponsor "a *distinct form of competition*." (NCAA Br. 3 (emphasis added).[2])  Next, the NCAA asserts that its "commitment to collegiate athletics as an amateur endeavor creates a *distinct game* that many fans enjoy as such." (NCAA Br. 12 (emphasis added).)  Finally, the NCAA states, "The NCAA's Amateurism Rules Define *Collegiate Sports as a Unique Product*." (NCAA Br. 21 (emphasis added).)

*Amici* question how a product can be considered unique and distinct when the NCAA has difficulty providing the Court with a consistent description of its own product, using various terms like a "form of competition," a "game" and "collegiate sports."  Nevertheless, each of these descriptions suggests that the NCAA – as the governing body for multiple competitions, games and sports – actually sells multiple products, which includes FBS Football and D-I Men's Basketball. In the antitrust cases involving the professional sports leagues, the courts refer to the product as "NFL Football" or "NBA Basketball."  They do not

---

[2] Brief for the National Collegiate Athletic Association, No. 14-16601, Dkt. 13-1, hereinafter "NCAA Br."

6

refer to the league's product as "professional sports" in large part because there is inter-league competition within the sport industry for sponsorship and licensing revenue, and there is intra-league competition among teams for the services of players and coaches. Viewed through the same lens, FBS Football and D-I Men's Basketball each compete in an economic sense against their counterparts in the National Football League (NFL) and the National Basketball League (NBA) for sponsorships, licensing revenue, and coaches.[3]  If the NFL and the NBA did not have rules restricting the age that players are eligible to be drafted or signed as free agents, FBS Football and D-I Men's Basketball would compete with them for players as well. Moreover, as with NFL football and NBA basketball, there is intense competition among the teams in FBS Football and D-I Men's Basketball for players and coaches. Therefore, the NCAA's "amateurism" rules that restrict payments to players in FBS Football and D-I Men's Basketball do not define these products nor make them any different from their professional counterparts that they compete against within the sport industry. Indeed, *Amici* are unaware of any empirical evidence establishing that NCAA payment restrictions (1) have any

---

[3] *See, e.g.*, *New England Patriots Football Club, Inc. v. Univ. of Colorado*, 592 F.2d 1196, 1200 (1st Cir. 1979)(noting that "professional and prominent college football teams compete for TV viewers, and hence, presumably, for the advertising dollar").

impact on FBS Football and D-I Men's Basketball competition or (2) make that competition a distinct game from NFL football and NBA basketball games.

For a whole host of reasons, there is no basis for the NCAA's assertion that the district court's ruling "would blur the clear line between amateur college sports and their professional counterparts and thereby deprive athletes of a genuine choice between the two endeavors." (NCAA Br. 57.) First, the NCAA knows full well that very few FBS Football and D-I Men's Basketball athletes even have the option to play professionally.[4] According to the NCAA's own well-known public relations statement: "There are over 400,000 NCAA student-athletes, and most of us will go pro in something other than sports."

Second, of the small percentage of athletes who have the option to play professionally, as mentioned above, the NFL and NBA draft rules preclude them from making that choice until after they have spent some time playing in FBS Football and D-I Men's Basketball.

The *amicus* brief filed by the law and economics and antitrust scholars[5] supports the position that NCAA sports are unique products created by rules

---

[4] The NCAA's published data provides that less than two percent of college football and men's basketball players have the opportunity to play in the NFL and the NBA. *See* http://www.ncaa.org/about/resources/research/probability-competing-beyond-high-school.

[5] Brief for Law and Economics and Antitrust Scholars as *Amici Curiae* in Support of Appellant, No. 14-16601, Dkt. 22 ("Law & Economics *Amici* Br.").

restricting athlete compensation. The law and economics and antitrust *amici* assert that the restraint on trade imposed by athlete compensation restrictions are "necessary to create" a product that increases "consumer choice" and satisfies consumer "preferences."[6] If there was a sound factual basis for what the law and economics and antitrust professors assert, then a legitimate procompetitive justification might exist for the NCAA's restrictions that prevent athletes from being compensated. There is, however, no such basis for their position.

The idea that college sport fans consume FBS Football and D-I Men's Basketball because of restraints that prevent athletes from being compensated is a fiction that exists only in discussions of legal cases like the one at issue. In *Amici*'s assessment, there is no empirical evidence to support the position that college sport fans consume these two sports products because the athletes are not compensated. In *Amici*'s assessment, there is no empirical evidence to support the notion that if NCAA athletes were provided some form of compensation, the two core products of FBS Football and D-I Men's Basketball would be altered in a way that influences consumer choice. The athletes would still be bound by the NCAA's educational requirements and they would still compete for their respective universities in exchange for some form of grant-in-aid. The results from a university that chooses to provide a payment in line with the district court's

---

[6] Law & Economics *Amici* Br. 3-4.

reasoning would in no way alter the core products. Neither the NCAA nor the scholars of law and economics and antitrust who authored the *amici curiae* brief in support of the NCAA provide facts or even research data that provide empirical support for the position that the resulting effects of the district court's decision would negatively influence consumer preferences.

Finally, the core courses in sport management programs do not draw a line between the business of amateur sports and the business of professional sports. This is evident from an examination of the core curriculum of sixteen (16) sport management programs that offer a complete range of undergraduate and graduate degrees (i.e., B.A./B.S., M.A./M.S., and Ph.D./Ed.D.). *See generally* Appendix B. None of these programs offer a "core" course in collegiate amateur sport. Separate courses in collegiate amateur sport are rarely offered. If they are offered, the courses focus on the distinct nature of collegiate sport governance, rather than the distinct nature of the collegiate sport product (e.g., college football v. professional football).

Sport management courses focus on the business of sport and examine the various facets of the sport industry. In the courses listed in Appendix B, the fundamentals of marketing, finance, economics, sponsorship, revenue-generation, human resource management, event management, facility management, risk management, and law are not taught differently for amateur or professional sport.

10

For example, the "marketing mix" of sport as a product is the marketing mix, whether in a college or professional sport context. In addition, since college and professional teams often share the same arena (e.g., Washington Capitals [NHL], Washington Wizards [NBA], Georgetown Hoyas [NCAA]), a facility checklist used in a facility management course does not differentiate between an arena's tenants. Moreover, Section 3.2, Common Professional Component (CPC) of the "Guidelines for Accreditation Site Visits," as set forth by the Commission on Sport Management Accreditation (COSMA), outlines the "key content areas" that "should be adequately covered within the content of undergraduate sport management degree programs," and it does not distinguish between the business of college sport and the business of professional sport. *See* Appendix B, Commission on Sport Management Accreditation (COSMA) Guidelines for Accreditation Site Visits, § 3.2.

Sport management programs prepare students to work in the sport industry. Since the business operations of collegiate and professional sport teams are virtually indistinguishable, sport-management coursework does not distinguish between "amateurism" and "professionalism." Sport management professors do not teach students that amateurism can somehow be used to sell more tickets, sponsorships, concessions, or intellectual property licenses, nor that amateurism enhances viewership or impacts consumer choice in any particular fashion. To

11

emphasize the point, "amateurism" has relevance only in facets of NCAA

governance, NCAA compliance, or sport law courses in which students examine

amateurism rules and how the courts have decided challenges to these rules by

athletes.

## II.     THE "RACE TO THE BOTTOM" ARGUMENT DOES NOT JUSTIFY THE RESTRAINTS ON TRADE IMPOSED BY NCAA RESTRICTIONS ON ATHLETE COMPENSATION

Also within the *amici curiae* brief written by the law and economics and

antitrust scholars is a stern caution that the district court's ruling would result in an

"unrestrained" market in which "each university would seek a relative advantage,

fueling a race to the bottom that leaves the universities, students and public

collectively worse off."[7]   The fatal flaw in this fearful warning is found in the fact

that the "race to the bottom" already exists. Athletic departments at FBS Football

and D-I Men's Basketball institutions already engage in a protracted arms race in

competition for athlete services.

In fact, some of the *Amici*'s sport management graduates have found

employment in sub-industries that exist as a result of the arms race. For example,

recruiting services provided by businesses like *247*, *Rivals*, *ESPN*, and *Scout*, just

to name a few, track the results of the race and charge consumers for access to

information on recruiting battles between programs for the services of athletes for

---

[7] Law & Economics *Amici* Br. 4.

12

FBS Football and D-I Men's Basketball. The competition for athlete services is so intense that major networks like *ESPN* and *ESPNU* broadcast verbal pledges and National Letter of Intent signings. *ESPNU* even provides non-stop coverage of "National Signing Day" for FBS Football every year.

The existence of recruiting services is just a by-product of the arms race for NCAA athlete services. The best evidence of the extent of the arms race is provided by the tremendous amounts of money spent on sport facilities and coaches by the athletic departments of FBS Football and D-I Men's Basketball programs. Hundreds of millions of dollars are spent each year on sport facility capital improvements such as renovations of stadiums and other facilities like locker rooms and weight training facilities, not to mention the construction of new stadiums and indoor practice facilities. Some of these constructions are very luxurious; for example, the University of Alabama has a waterfall at the entrance of their football locker facilities, built with the aim of appealing to top-caliber high school prospects.[8]

The arms race also includes programs spending millions of dollars to hire high profile coaches to attract the best athletes. The growth of both FBS Football and D-I Men's Basketball has resulted in a coaching industry in which coaches that

---

[8] *See* http://www.al.com/alabamafootball/index.ssf/2013/08/ alabama_players_facility.html.

13

were making hundreds of thousands of dollars just ten years ago, are now making millions per year. In fact, the only ones not seeing any increase in direct financial investment resulting from the arms race are the athletes themselves, the most necessary of inputs for the sport products at issue.

For further evidence of the existence of the "race to the bottom" that already exists within FBS Football and D-I Men's Basketball, *Amici* point to Supreme Court authority, specifically a quote also found in the *amici* brief filed by the law and economics and antitrust scholars. *See* Law & Economics *Amici* Br. 26-27. The quote is from *Tennessee Secondary School Athletic Ass'n v. Brentwood Academy*, 551 U.S. 291 (2007), and the Supreme Court's reasoning that "hard-sell tactics directed at middle school students could lead to exploitation, distort competition between high school teams, and foster an environment in which athletics are prized more than academics." *Id.* at 300. The concern noted by the Court and recognized by the law and economics and antitrust scholars is valid. High school athletic associations need to guard against hard-sell tactics for recruiting because the dangers the Court warned against are already very apparent on the NCAA level. In fact, the failure to recognize these problems at NCAA member institutions raises concerns as to whether the law and economics and antitrust scholars are familiar with the college sport industry, the multi-billion dollar businesses of FBS Football and D-I Men's Basketball in particular. Perhaps this is because they train lawyers

14

and economists rather than sport industry professionals. In stark contrast, sport management faculty have front row seats to the businesses of all types of sport products as the *Amici* train the students who ultimately lead and work for those businesses.

*Amici* clearly see that the "hard-sell tactics" have already resulted in exploitation of NCAA athletes, who see no financial gain from lucrative media rights contracts. Furthermore, *Amici* acknowledge that the "race to the bottom" has distorted competition by creating a group of "Haves" and "Have-Nots" within the NCAA. The Haves are D-I programs participating in one of five elite conferences, called the Power Five,[9] while the Have-Nots[10] are D-I programs with much smaller budgets. The Haves have been able to substantially out capital the Have-Nots, and this superior position has provided the Haves with a clear competitive advantage on the football fields and basketball courts because they are able to attract the best football and basketball talent out of high school.

---

[9] The Power Five (P5) refers to the Southeastern Conference (SEC), Big Ten Conference, Pacific 12 Conference (Pac 12), the Atlantic Coast Conference (ACC), and the Big 12 Conference. While not an official member of a P5 conference, Notre Dame is also often associated with the P5 schools because it has a major media rights deal with NBC for the broadcast of its football games and is an affiliate member of the ACC for all other sports.

[10] Another commonly used description for Have-Not programs is "mid-majors."

Yet, the scholars of law and economics and antitrust assert an alternative argument that the district court was "replete with evidence" that, through its restrictions on athlete compensation, the NCAA was trying to "curb the 'arms race.'"[11] The problem with that argument is that the NCAA must do more than casually proffer a procompetitive justification, which at most may "curb" a problem.

This requirement was emphasized by the Supreme Court in *National Collegiate Athletic Ass'n v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), when it rejected a competitive balance justification proffered by the NCAA because the restraint showed no ability to equalize the strength of intercollegiate athletic teams. *Id.* at 119. In *Law v. NCAA,* 134 F.3d 1010 (10th Cir. 1998), the Tenth Circuit also rejected a "curb" argument from the NCAA concerning salary restrictions placed on assistant coaches. The Tenth Circuit stated that the NCAA failed to demonstrate that the regulation in controversy in *Law* actually promoted competitive equity. Instead, the regulation merely prevented the exacerbation of "competitive imbalance." *Id.* at 1024.

Following the reasoning in both *Board of Regents* and in *Law*, the restraints at issue must do more than just "curb" an already existing problem. And they don't

---

[11] Law & Economics *Amici* Br. 28.

even do that. The race to the bottom for athlete services already exists for FBS

Football and D-I Men's Basketball, even with the restraints already in place.

## III.    IN THE VIEW OF *AMICI*, THERE IS NO EMPIRICAL PROOF THAT PAYMENT RESTRICTIONS HELP INTEGRATE ATHLETES INTO THE EDUCATIONAL COMMUNITY

The NCAA makes numerous factual statements in its Brief regarding the

impact of payment restrictions on integrating athletes into the educational

community that, to *Amici*'s knowledge, have no foundation whatsoever. In the

view of *Amici*, there is no sound empirical evidence to support any of the following

factual assertions put forth by the NCAA:

- "[T]he commercial side of college sports, as it has for over a century, exerts pressures that could undermine college sports' nature and value as a component of the educational experience, by driving college sports away from higher education and towards professionalization." (NCAA Br. 9.)

- "[T]he NCAA's commitment to amateurism is intended to integrate student-athletes into the broader student body and to clearly demarcate the line between college and professional sports." (*Id*. at 11.)

- "The commitment to amateurism is essential to achieving integration of student-athletes into the educational community because if they were paid for their athletic play or otherwise exploited commercially, they might be

17

less likely to take full advantage of their scholastic obligations and

opportunities." (*Id.* at 12.)

- "The NCAA's strategy has been successful; for example, most FBS football

   players and Division I men's basketball players see themselves as part of

   their school's educational community." (*Id.*)

- "[T]he challenged rules serve the NCAA's mission of encouraging athletic

   endeavors as an integral component of a broader college educational

   experience, in the face of sometimes significant commercial pressures that

   could undermine those athletic and educational experiences." (*Id.* at 33.)

   Accordingly, *Amici* respectfully submit that the Court should give no weight

to any of these assertions.

## IV. THE COLLEGIATE MODEL OF ATHLETICS IN FBS FOOTBALL AND D-I MEN'S BASKETBALL LACKS AN ETHICAL FOUNDATION

   The NCAA states that plaintiffs "believe the model of amateur

intercollegiate athletics that the NCAA has embraced since its earliest days – under

which student-athletes may not be paid to play – is obsolete and should be

discarded." (NCAA Br. 3.)  In sport ethics courses, undergraduate and graduate

students constantly question whether the "Collegiate Model of Athletics" is

obsolete and should be discarded in the context of FBS Football and D-I Men's

Basketball. Students raise legitimate questions about the fundamental fairness and

18

ethical foundation of a system that is now significantly changed in the Twenty-

First Century from "its earliest days" in at least one material respect: The people

running FBS Football and D-I Men's Basketball are now making multi-million

dollar annual salaries. This is why FBS Football and D-I Men's Basketball have

begun to witness, in this century, an unprecedented *collective* movement by

athletes to file class action lawsuits and form a certified labor union. Indeed, the

net income generated by these programs supports this excessive compensation paid

to coaches and administrators. As noted by the NCAA, "in the 2012-2013

academic year the football and men's basketball programs at the 69 major-

conference schools collectively had about $3.5 billion in revenue, mainly through

ticket sales, television broadcast contracts, and other licensing." (NCAA Br. 8.)

The NCAA's purported ethical foundation for its rules that restrict

payments to FBS Football and D-I Men's Basketball athletes lies in its "Principle

of Amateurism," which provides that athletes' "participation *should be motivated*

*primarily by education* and by the physical, mental and social benefits derived"

and they "*should be protected from exploitation* by professional and commercial

enterprises." (NCAA Br. 9-10 (emphasis added).) The district court questioned the

NCAA's paternalistic ideals about what is best for adult athletes and it also,

rightfully so, expressed concern over the power imbalance that exists in the

Collegiate Model of Athletics. It found that FBS Football and D-I Men's

19

Basketball schools "have the power…to fix the price of their product [and] [t]hey have chosen to exercise this power by forming an agreement to charge every recruit the same price for the bundle of educational and athletic opportunities that they offer: to wit, the recruit's athletic services along with the use of his name, image, and likeness while he is in school." *O'Bannon v. Nat'l Collegiate Athletic Ass'n.*, 7 F. Supp. 3d 955, 988 (N.D. Cal. 2014).

The ethical concern is that FBS Football and D-I Men's Basketball schools are being unjustly enriched because the schools are getting "something of significant value: their athletic services and the rights to use their names, images, and likenesses while they are enrolled"; and paying less than market value for it. *Id*. at 988-89. This Court's ruling in favor of plaintiffs against Electronic Arts echoes a similar ethical concern: "[T]he fact is that EA elected to use avatars that mimic real college football players for a reason. If EA did not think there was value in having an avatar designed to mimic each individual player, it would not go to the lengths it does to achieve realism in this regard." *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1277 n.7 (9th Cir. 2013).

To justify its current "Collegiate Model of Athletics," the NCAA heavily relies on dicta in a case it actually lost: *Board of Regents*. In *Board of Regents*, which is not controlling because the case did not involve any of the issues presented in this case, the Supreme Court stated, in dicta, that "[t]he NCAA plays a

critical role in the maintenance of a revered tradition of amateurism in college sports." *Bd. of Regents*, 468 U.S. at 120. The Supreme Court further suggested, in dicta, "there can be no question but that [the NCAA] needs ample latitude to play that role...." *Id*. This Court, however, indeed should question the NCAA's role in the enforcement of payment restrictions, whether that role is a proper one, and whether the maintenance of historical reverence and tradition provides a sufficient ethical foundation for conspiratorial conduct that denies adults the right to improve their economic status.

After the NCAA lost the *Board of Regents* case, it began using the Supreme Court's decision as a license to commercially exploit FBS Football and D-I Men's Basketball athletes by publicly announcing that there is nothing wrong with commercializing amateur sports and profiting off the athletes. At the 2006 NCAA Convention, the late Myles Brand coined the oft-repeated phrase, "'Amateur' defines the participants, not the enterprise." The NCAA reiterated in its Appellate Brief: "The [district] court's emphasis on the commercial side of college sports conflates commercialism with professionalism.... Amateurism, like professionalism, defines who may participate in the athletic competition; commercialism refers to an attribute of the larger enterprise." (NCAA Br. 30.) The NCAA is correct that "amateurism" is conceptually similar to professionalism in the sense that both terms refer to the inputs who not only produce the product but

21

who are also distinct from inputs in other industries in that they are not fungible. Where *Amici* see a divergence is that the parameters of professionalism – to the extent they have not been collectively bargained – *are* subject to antitrust scrutiny. In *Amici*'s sport governance and sport law courses, *Amici* examine closely the history of athletes in the NFL, the NBA, and Major League Baseball who challenged league-unilaterally imposed payment restrictions. *Amici* see a close parallel between those athletes and the athletes today in FBS Football and D-I Men's Basketball due to the existence of a power imbalance in which the league seeks the legal right to maintain unfettered conspiratorial control based on "a revered tradition of [non-payment]" as opposed to a competitive balance justification.[12]

## V.     THE NCAA SHOULD NOT HAVE UNFETTERED CONSPIRATORIAL DECISION-MAKING AUTHORITY

The NCAA asserts it has the legal right to preclude the courts from scrutinizing the payment restrictions agreed upon by its member institutions.[13]  The NCAA proclaims that the district court's "analysis invites an interminable series of lawsuits demanding small changes in basic NCAA rules, through which courts

---

[12] *Amici* have not seen any empirical evidence that demonstrates any correlation between payment restrictions and competitive balance.

[13] "It is not the role of either plaintiffs or courts to substitute a different model of college athletics for the one that, with the Supreme Court's blessing, has existed for decades." (NCAA Br. 5.)

would be able to incrementally overhaul college sports…. There would be no principled stopping point for such claims, since *those rules are based on judgments by educational experts* rather than legal doctrines." (NCAA Br. 59 (emphasis added).) *Amici* – notwithstanding their extensive academic experience – have never once been asked by the NCAA to give a judgment about the rules.

The antitrust professors opine that the district court's ruling would leave Little League Baseball or a kennel club vulnerable to a lawsuit over compensation for Little League baseball players or the size of eligible dogs, respectively.[14] A lawsuit challenging the size of eligible dogs might be analogous if the plaintiffs in this case were challenging height or weight classifications. And if ever a day comes when Little League Baseball teams in all of the towns across the U.S. begin paying their coaches and administrators millions of dollars in annual compensation, and entering into multi-billion dollar broadcasting contracts, we might actually see an antitrust lawsuit brought by Little League baseball players, and perhaps deservedly so.

---

[14] "For example, a court could easily follow the reasoning below to require compensation for Little League baseball players at a level deemed 'fair' by a district judge. Similarly, a kennel club could be required to alter its breed standard if a breeder claims to have been excluded because their dogs are an inch or two shorter than the adopted standard." Brief for Antitrust Scholars as *Amici Curiae* in Support of Appellant, No. 14-16601, Dkt. 17, at 14-15.

*Amici* believe the NCAA's "leave us alone" attitude is precipitating the filing of class action lawsuits, and the NCAA is incorrect that affirming the district court's ruling will open the floodgates to more challenges. The injunction does not require schools to do anything or pay any athlete any amount of money but merely operates as a "negative injunction" prohibiting member institutions from agreeing not to pay them. Indeed, the only way any athlete can be paid any amount of money pursuant to the district court's ruling is if a university first believes that paying its athletes would only improve its product, and would be consistent with its educational values, and then chooses to give the same amount to each player.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  January 28, 2015

/s/Joshua D. Snyder
Michael J. Boni
Joshua D. Snyder
John E. Sindoni
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA  19004
(610) 822-0200

Attorneys for *Amici Curiae* Sport
Management Professors:

    Richard T. Karcher, J.D.
    Thomas Baker, III, J.D., Ph.D.
    Robin Ammon, M.S., Ed.D.
    Kevin Ayers, M.Ed., Ed.D.
    John C. Barnes, M.S., Ph.D.
    Richard C. Bell, M.A., J.D., Ed.D.
    Michael S. Carroll, M.S., Ph.D.
    Joseph N. Cooper, Ph.D.
    Joel Cormier, Ph.D.
    Ronald J. Dick, M.B.A., Ed.D.
    Stephen Dittmore, M.A., Ph.D.
    Billy J. Hawkins, M.S., Ph.D.
    Fritz G. Polite, M.P.A., Ph.D.
    B. David Ridpath, Ed.D.
    Brenda A. Riemer, M.S., Ph.D.
    Kristi L. Schoepfer, J.D.
    Crystal Southall, Ph.D.
    William A. "Bill" Sutton, M.S., Ed.D.

**ADDENDUM**

# **Appendix A**

Richard T. Karcher, J.D.
Assistant Professor of Sport Management
Eastern Michigan University

Thomas Baker, III, J.D., Ph.D.
Associate Professor of Sport Management
University of Georgia

Robin Ammon, M.S., Ed.D.
Associate Professor & Sport Management Coordinator
University of South Dakota

Kevin Ayers, M.Ed., Ed.D.
Associate Professor of Sport Administration
Radford University

John C. Barnes, M.S., Ph.D.
Associate Professor of Sport Administration
University of New Mexico

Richard C. Bell, M.A., J.D., Ed.D.
Professor & Sport Management Program Coordinator
Colorado Mesa University

Michael S. Carroll, M.S., Ph.D.
Assistant Professor & Program Coordinator
Hospitality, Sport, and Tourism Management
Troy University

Joseph N. Cooper, Ph.D.
Assistant Professor in Sport Management
University of Connecticut

Joel Cormier, Ph.D.
Assistant Professor
Department of Exercise & Sport Science
Eastern Kentucky University

Ronald J. Dick, M.B.A., Ed.D.
Associate Professor of Sports Marketing
Duquesne University

Stephen Dittmore, M.A., Ph.D.
Associate Professor of Recreation and Sport Management
University of Arkansas

Billy J. Hawkins, M.S., Ph.D.
Professor of Sport Management
University of Georgia

Fritz G. Polite, M.P.A., Ph.D.
Assistant Professor & Director, Sport Management Program
Harry F. Byrd, Jr. School of Business
Shenandoah University

B. David Ridpath, Ed.D.
Associate Professor
Kahandas Nandola Professor of Sport Management
Ohio University

Brenda A. Riemer, M.S., Ph.D.
Professor & Sport Management Graduate Program Coordinator
Eastern Michigan University

Kristi L. Schoepfer, J.D.
Associate Professor of Sport Management and Sport Law
Winthrop University

Crystal Southall, Ph.D.
Lecturer in Exercise & Sport Science
Western State Colorado University

William A. "Bill" Sutton, M.S., Ed.D.
Professor & Founding Director
Sport and Entertainment Graduate MBA/MS Program
University of South Florida

## Appendix B: Sport Management Curriculum

Source:  North American Society for Sport Management (NASSM) Website
(http://www.nassm.com/InfoAbout/SportMgmtPrograms/United_States)

Sample delimited to sixteen (16) U.S. Sport Management Programs listed on the
NASSM website that offer B.A./B.S. | M.A./M.S. | Ph.D./Ed.D degrees in sport
management/administration.

Sample Sport Management Core Curriculum
**The following courses are indicative of courses found in the sample's core
curriculum (Note: Not all courses found in each program's curriculum):**
- ❖ Introduction to Sport Management
- ❖ Event Management
- ❖ Facility Management
- ❖ Event Promotion & Publicity
- ❖ Ethics in Sport
- ❖ Sport Sociology
- ❖ Governance
- ❖ Legal Issues/Sport Law
- ❖ Sport Marketing
- ❖ Sport Finance
- ❖ Sport Economics
- ❖ Operations
- ❖ Management
- ❖ Human Resources/Personnel Management
- ❖ Organizational Behavior
- ❖ Sport Sales
- ❖ Sport Communication

***

Commission on Sport Management Accreditation (COSMA) Guidelines for Accreditation Site Visits:

## 3.2    **Common Professional Component**

**Excellence in sport management education at the undergraduate level requires coverage of the key content areas of sport management. Thus the Common Professional Component (CPC) topical areas, as outlined below, should be adequately covered within the content of undergraduate sport management degree programs.**

A)   Social, psychological and international foundations of sport
B)   Management
    1)    Sport management principles
    2)    Sport leadership
    3)    Sport operations management/event & venue management
    4)    Sport Governance
C)   Ethics in sport management
D)   Sport Marketing
E)   Finance/Accounting/Economics
    1)    Principles of sport finance
    2)    Accounting
    3)    Economics of sport
F)   Legal aspects of sport
G)   Integrative Experience, such as:
    1)    Strategic Management/Policy
    2)    Internship
    3)    Capstone experience (an experience that enables a student to demonstrate the capacity to synthesize and apply knowledge, such as a thesis, project, comprehensive examination or course, etc.)

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)

I certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(d) because this brief contains 5,749 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) (and including Appendix B).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

/s/Joshua D. Snyder
Joshua D. Snyder
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA  19004
(610) 822-0200

Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing Brief for Sport Management Professors as *Amici Curiae* in Support of Plaintiff-Appellee to be served on all counsel of record via the appellate CM/ECF system on this 28th day of January, 2015.

/s/Joshua D. Snyder
Joshua D. Snyder
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
(610) 822-0200

Counsel for *Amici Curiae*