Nos. 14-16601 & 14-17068

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
_____

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
*Defendant-Appellant*,
*vs.*
ED O'BANNON, OSCAR ROBERTSON, WILLIAM RUSSELL, HARRY
FLOURNOY, THAD JARACZ, DAVID LATTIN, BOB TALLENT, ALEX
GILBERT, ERIC RILEY, PATRICK MAYNOR, TYRONE PROTHRO, SAM
JACOBSON, DAMIEN RHODES, DANNY WIMPRINE, RAY ELLIS, TATE
GEORGE, JAKE FISCHER, JAKE SMITH, DARIUS ROBINSON, MOSES
ALIPATE, and CHASE GARNHAM,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellees*

_____

From Orders Denying Summary Judgment and Granting a Permanent Injunction
Entered By the United States District Court for the Northern District of California

The Honorable Claudia Wilken, Chief Judge
Case Nos. 09-cv-1967 CW & 09-cv-3329 CW

## BRIEF *AMICI CURIAE* OF INTELLECTUAL PROPERTY AND FIRST AMENDMENT SCHOLARS IN SUPPORT OF APPELLEE EDWARD O'BANNON, JR. URGING AFFIRMANCE

James B. Speta
6254 N. Glenwood Ave.
Chicago, IL 60660
312-503-8470

Ernest A. Young
3208 Fox Terrace Dr.
Apex, NC 27502
919-360-7718

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

CORPORATE DISCLOSURE STATEMENTS ...................................... iv

INTERESTS OF *AMICI* .............................................................................1

SUMMARY OF ARGUMENT .................................................................3

ARGUMENT ...............................................................................................5

I.    Athletes Have Rights of Publicity ...................................................5

II.   Broadcast Sporting Events Implicate these Rights .........................6

    A.    The Right of Publicity Covers the Broadcast of an
Entire Live Event................................................................7

    B.    The Newsworthiness of the Events Is Separate from the Commercial
Nature of the Exclusive Broadcast Rights ...........................9

    C.    The Exception for News Coverage Depends on Transaction Cost
Barriers or Harms Not Relevant to Pre-Planned Sporting Event
Coverage............................................................................12

III.   An Athletes' Right of Publicity Allows the Market to Function More
Smoothly.......................................................................................14

    A.    The Media *Amici*'s Parade of Horribles Is Fanciful ...........14

    B.    Recognizing Athletes' Rights of Publicity, By Contrasts, Avoids other
Market Conflicts................................................................16

IV.   The First Amendment Does Not Foreclose Plaintiffs' Ability to Show an
Antitrust Injury in this Case........................................................19

    A.    The First Amendment Does Not Categorically Foreclose Recognition
of Plaintiffs' NIL Rights ....................................................20

    B.    Absent a Categorical Prohibition, Plaintiffs Have an Antitrust Injury
Regardless of the Precise Balance to Be Struck Between Their NIL
Rights and Broadcasters' First Amendment Interests........................25

    C.    This Case Is Not an Appropriate Vehicle for Adjudicating the Precise
Balance between Plaintiffs' NIL Rights and Broadcasters' First
Amendment Interests.........................................................27

CONCLUSION ........................................................................................30

i

## TABLE OF AUTHORITIES

**Cases**

*Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288 (1936)...................................27

*Brown v. Ames*, 201 F.3d 654 (5th Cir. 2000) ..........................................................12

*Dept. of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999)..........27

*Ettore v. Philo Television Broadcasting Corp.*, 229 F.2d 481 (3d Cir. 1956) ........15

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991)................................13

*Haelen Labs, Inc. v. Topps Chewing Gum, Inc.*, 202 F.3d 866 (2d Cir. 1953).........9

*Herman Miller Inc. v. Pallazzetti Imports and Exports Inc.*,
   270 F.3d 298 (6th Cir. 2001) ..................................................................................8

*Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010) .........................................9

*Keller v. Electronic Arts, Inc.*, 724 F.3d 1268 (9th Cir. 2013) ........................... 7, 21

*Massey v. Helman*, 196 F.3d 727 (9th Cir. 1999)....................................................28

*Midler v. Ford Motor Co.*, 849 F.2d 460 (9th Cir. 1988)..........................................7

*Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85 (2d Cir. 1989) ...................9

*United Public Workers v. Mitchell*, 330 U.S. 75 (1947)..........................................28

*United States v. Salerno*, 481 U.S. 739 (1987).......................................................24

*Valley Forge Christian College v. Americans United for Separation of Church and
   State, Inc.*, 454 U.S. 464 (1982) ..........................................................................29

*Warth v. Seldin*, 422 U.S. 490 (1975).....................................................................28

*Wisconsin Interscholastic Athletic Ass'n v. Gannett Col*,
   658 F.3d 614 (7th Cir. 2011) ................................................................................24

*Younger v. Harris*, 401 U.S. 37 (1971)...................................................................25

*Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977)............ passim

**Statutes**

17 U.S.C. § 107 ..................................................................................13

17 U.S.C. § 201(c) .............................................................................11

**Other Authorities**

Douglas G. Baird, *Does Bogart Still Get Scale?:  Rights of Publicity in the Digital Age*, 4 GREEN BAG 2D 357 (2001).......................................................18

Ronald Coase, *The Problem of Social Cost*, 3 J.L. ECON. 1 (1960) .......................15

Frank Easterbrook, *Cyberspace and the Law of the Horse*, 1996 U. CHI. L. FORUM 207 ...............................................................................................12

FORTUNE, *The Fortunate 50 2014* ........................................................6

Sara Germano, *Adidas to Sign Up 500 Athletes for Endorsements*, WALL ST. J. (Jan. 15, 2015).................................................................................6

Mark Grady, *A Positive Economic Theory of the Right of Publicity*, 1 UCLA ENT. L. REV. 97 (1994) ..................................................................... 13, 17

Philip Kotler, Ben Shields, and Irving Rein, *A Sporting Chance at Branding*, BRAND STRATEGY (2006).................................................................17

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (2008) ...........................8

NCAA, *Probability of Competing Beyond High School* (last updated Sept. 2013) 17

RESTATEMENT (THIRD) OF UNFAIR COMPETITION (1995)................................ passim

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rules 29(c) and 26.1 of the Federal Rules of Appellate

Procedure, *amici* state that no corporate disclosure statements are required.

## INTERESTS OF *AMICI*

*Amici* are law professors whose research and teaching interests concern matters of tort law, the First Amendment, and federal jurisdiction.[1] In all cases, statement of an *amici*'s academic employer is solely for identification purposes.

*Peter C. DiCola* is an Associate Professor at the Northwestern University School of Law. Professor DiCola teaches Torts, the Law of Creative Industries, and Copyright. His research includes the development of new business models in music and other content industries and addresses the efficient functioning of markets in that space.

*Mark F. Grady* is Distinguished Professor of Law at UCLA School of Law and Director of the school's Center on Law and Economics. His research and teaching focus on Torts, Intellectual Property, and Antitrust.

*James B. Speta* is the Class of 1940 Research Professor at the Northwestern University School of Law. Professor Speta teaches Torts, Internet Policy (including Internet First Amendment), and Antitrust. His research focuses in large part on the development of new business models under the pressure of evolving modes of media creation and distribution.

---

[1] This brief has been filed with the written consent of the parties. Pursuant to Rule 29(c)(5), counsel for *amici* affirms that no counsel for a party authored this brief in whole or in part, nor did any person or entity, other than *amicus* or its counsel, make a monetary contribution to the preparation or submission of this brief.

1

*Ernest A. Young* is the Alston & Bird Professor of Law at the Duke University School of Law.  His teaching and scholarship focus on constitutional law and federal jurisdiction.

## SUMMARY OF ARGUMENT

The NCAA and its supporting media *amici*[2] enter into multi-billion dollar contracts for the exclusive broadcast rights to live distribution of sporting events. The NCAA and other partners likewise contract for rights covering other media, such as archival footage and videogames. The sporting events themselves are closed to the public and pervasively structured to facilitate the value of exclusive broadcast rights "for the purpose of trade." Nonetheless, the NCAA and its Media *Amici* claim that the main participants—the athletes themselves—have no legally protectable interest in the contribution their names, images, and likenesses make to the trade in broadcast and other licenses, or that if they do have such interests, they are trumped by the First Amendment. Such claims have no support in the common law or statutory rights of publicity that give individuals control over the commercial exploitation of their names, images, and likenesses, and no support in Constitution.

News reporting of public events—which is the context of all of the authority on which the NCAA and its *amici* rely—is entirely different from the licensing of live broadcast rights. Newsworthy events are typically exempt from rights of

---

[2] *Amici Curiae* in support of Appellant include A&E Television Networks, LLC, ABC, Inc., CBS Corporation, Discovery Communications, LLC, Fox Broadcasting Company, National Public Radio, Inc., NBCUniversal Media, LLC, The Reporter's Committee for Freedom of the Press and Turner Broadcasting System, Inc. (hereinafter "Media *Amici*").

publicity (and copyright) because of the impossibility of securing such rights *ex ante* or the significant negative externalities from allowing control of matters of public concern. Neither rationale applies in the case of the NCAA (or other event producer) deciding *ex ante* to assemble the necessary rights to convey to a broadcaster or videogame producer.

Indeed, the NCAA and its Media *Amici*'s parade of horribles is belied both by their own arguments and by the contracting practices that would easily evolve to handle the assembling and conveyance of rights. All participants in a sports broadcast already contract over their appearance. And, the Media *Amici* may, in fact, be correct when it suggests that participants in such an event have already impliedly licensed their names, images, and likenesses. Such a conclusion, however warranted (and we take no position on it), is entirely different from concluding that no such rights exist—for if they exist and are licensed, then they are elements of value from which alternative licensing arrangements (not to mention antitrust standing) may spring.

Indeed, failure to recognize athletes' rights of publicity invites the unnecessary development of rights conflicts and the possibility of market failures. The NCAA's view of its exclusive rights gives it the incentive to dilute the athlete's life-long interest in his or her likeness and reputation, and further invites conflicts between all of the leagues and organizations for which an athlete may

4

play. Only recognizing the right in the athletes brings a method of coordinating these conflicting claims.

Finally, this court should reject the NCAA's argument that Plaintiffs lack antitrust standing because the First Amendment forecloses recognition of their rights. That would be plausible only if the First Amendment stands as a categorical bar to rights of publicity—a position that the Supreme Court rejected in *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977). This case, moreover, is a terrible vehicle for exploring whatever the precise boundary between publicity rights and First Amendment rights may be. The broadcasters, whose speech would be at issue, are not parties and no one has sought to enforce any claim against them. There will be time enough to strike the correct balance between the First Amendment and players' publicity rights when a case actually presenting that conflict arises.

## ARGUMENT

### I. Athletes Have Rights of Publicity

The starting point is one the NCAA and the Media *Amici* appear to concede—athletes (like all persons) have rights of publicity, at least in the vast majority of states. The right is so well-established that it is recognized by the Restatement (Third) of Unfair Competition. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 46 (1995). Courts routinely enforce the publicity rights of athletes.

5

Without a doubt, athlete names, images, and likenesses ("NILs") have value in competitive markets. Athletes garner significant returns on the use of their NILs through endorsements—with top earners making tens of millions. *See* FORTUNE, *The Fortunate 50 2014*, http://fortune.com/fortunate50/floyd-mayweather-1/ (last visited January 28, 2015) (listing endorsement earnings of top-50 earning U.S. athletes). Companies compete vigorously to secure association with athletes. "Sports endorsements are a costly but arguably necessary step to cementing brands in the minds of American shoppers …." Sara Germano, *Adidas to Sign Up 500 Athletes for Endorsements*, WALL ST. J. (Jan. 15, 2015), http://www.wsj.com/articles/adidas-to-sign-up-to-500-athletes-for-endorsements-1421179139.

## II. Broadcast Sporting Events Implicate these Rights

The question in this case is whether the undeniable rights athletes have in their NILs extend to the multi-billion dollar market for the exclusive licensing of broadcast and other works such as videogames that may follow from the broadcasts.[3] Except in the very few states that, by statute, exclude sports broadcasts (an exclusion that does not cohere with the rational scope of the right),

---

[3] As Plaintiffs note, the Court can determine that the plaintiffs have antitrust standing without resolving the right-of-publicity issue, by holding that the colleges' value in broadcast live events is an economic element of the transaction in which the athlete agrees to play for a particular college.

6

both doctrinal law and supporting law and economics suggests that athletes have rights over their inclusion in such events.

### A. The Right of Publicity Covers the Broadcast of an Entire Live Event

In rushing to the conclusion that athletes do not have rights of publicity in the broadcast of an entire live event because such events are matters of public interest, the NCAA and its *amici* ignore several steps in the analysis. Rights of publicity are property rights, similar to other forms of intellectual property, and the question therefore is whether an interest in the publication of news, facts, or criticism means that, in context, the right of publicity does not prevent the use. This is similar to a fair use analysis in copyright or in trademark, as evidenced by this Court's use of the "transformativeness" test in *Keller*. *Keller v. Electronic Arts, Inc.*, 724 F.3d 1268, 1270 (9th Cir. 2013). Unpacked in this manner, the NCAA and the Media *Amici*'s claims have no support.

The starting point is to recognize that the athletes' right of publicity is a property right, akin to other forms of intellectual property. "The interest in the commercial value of a person's identity is in the nature of a property right …." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 46, cmt. g. In *Midler v. Ford Motor Co.*, 849 F.2d 460 (9th Cir. 1988), this Court said that both the statutory and common law rights of publicity were "property rights." *Id*. at 463; *see also Herman Miller Inc. v. Pallazzetti Imports and Exports Inc.*, 270 F.3d 298, 325 (6th

Cir. 2001) ("The right of publicity … reflect[s] property rights"); MCCARTHY ON

TRADEMARKS AND UNFAIR COMPETITION § 28:46 (2008). Thus, courts frequently

treat them as a form of intellectual property, similar to copyright. RESTATEMENT

(THIRD) OF UNFAIR COMPETITION § 47 cmt. d (in considering the scope of the

exception "some courts have engaged in an analysis analogous to the determination

of fair use in copyright law").

As a result, the NCAA and the Media *Amici*'s more absolutist assertions that

athletes do not have rights of publicity in broadcasts in fact subsumes two scope

issues: whether the use of an athlete's' likeness is "for the purposes of trade"

generally and whether it is subject to the carve out for "news reporting" and similar

favored uses. *See generally* RESTATEMENT (THIRD) OF UNFAIR COMPETITION

§§ 46, 47. The multi-million dollar value of the live broadcast or videogame

plainly meet the standard for use "in trade." The Media *Amici* are incorrect that

the right only applies "to advertising or labeling goods or services." Brief in

Support of Appellant and Reversal by Media *Amici* ("Media *Amici* Br."), p. 4. The

Restatement broadly defines the term to include any use "in connection with

services rendered by the user," (RESTATEMENT (THIRD) OF UNFAIR COMPETITION

§ 47), and a broadcast uses the athletes' NILs in connection with the provision of

the broadcast. Moreover, rights of publicity inhere even if the subject's likeness

itself is a part of the product being sold (as opposed to being merely an

8

endorsement of another product or service).  *See id.* § 47 cmt. B (recognizing that the right extends to "merchandising"); *Haelen Labs, Inc. v. Topps Chewing Gum, Inc.*, 202 F.3d 866, 868 (2d Cir. 1953) (baseball cards violated the players' rights of publicity); *Zacchini*, 433 U.S. 562 (the right of publicity covered a performance).  "It is clear that merely merchandising a celebrity's image without that person's consent, the prevention of which is the core of the right of publicity, does not amount to a transformative use" and is therefore an instance of infringement.  *Hilton v. Hallmark Cards*, 599 F.3d 894, 910 (9th Cir. 2010); *see also Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85, 88 (2d Cir. 1989) ("In contrast to the treatment of newsworthy items, it seems clear that photographs marketed as posters are used for purposes of trade.").

### B. The Newsworthiness of the Events Is Separate from the Commercial Nature of the Exclusive Broadcast Rights

The conclusion that the use of athletes' likenesses in broadcasts are "for the purposes of trade" is not altered by the exception for news reporting and commentary, and holding that the athletes have rights would not limit the reporting on sports facts, commentary on athletes, the development of documentaries, or any other favored use.  The Restatement summarizes the exception in these terms: "However, use 'for purposes of trade' does not ordinarily include the use of a person's identity in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses."  RESTATEMENT

9

(THIRD) OF UNFAIR COMPETITION § 47.  The Restatement explains that the common law definition of the right is related to First Amendment concerns, which are discussed below.  *Id.* at cmt. c.

As a matter of the scope of the athletes' rights, however, all of the cases on which the NCAA and its *amici* rely involve news reporting, coverage of facts, documentaries, or uses other than the entire broadcast of the live event and performance.  Thus, *Ruffin-Steinback v. dePasse*, 267 F.3d 457 (6th Cir. 2001) (cited by Media *Amici* Br., p. 5) involved a documentary of the singing group, the Temptations.  *Montana v. San Jose Mercury News, Inc.*, 40 Cal. Rptr. 2d 639 (Cal. Ct. App. 1995) (cited by Media *Amici* Br., p. 5) involved advertising uses incidental to a newspapers' sport's coverage.  All of the other cases cited at Media *Amici* Br., p. 5 n.1 simply recognize that sports and sports figures are matters of public interest—but this is a red herring.  The scope of the "public interest" exception depends not on whether the celebrity is a matter of public concern, but rather it depends on the nature of the defendant's use.  And here the only relevant uses are (1) the exclusive license to the broadcast of the entire event, and (2) the sublicensing of avatars into videogames and other uses.  Some of the NCAA's uses might be protected (such as the use of archival footage in documentaries), but that does not mean that all such uses are.

That section 47 of the Restatement includes "entertainment" in its list of permitted uses does not suggest a broader interpretation; in fact, it contemplates the same sort of transformative uses of NIL rights as the "news" and "commentary" exception. The comment clarifies that "[t]he use of a celebrity's name or photograph as part of an article published in a fan magazine or in a feature story broadcast on an entertainment program, for example, will not infringe the celebrity's right of publicity. Similarly, the right of publicity is not infringed by the dissemination of an unauthorized print or broadcast biography." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 47 cmt. c.

Finally, that the NCAA as the organizer of the event might have its own rights in the event that it can pass along to the media does not limit the right of publicity, any more than an editor's rights in a compilation limit the copyright of each author whose work appears in the compilation. *Compare* Media *Amici* Br., p. 9 *with* 17 U.S.C. § 201(c) ("Copyright in each separate contribution to a collective work is distinct from copyright in the collective work …."). Again, recognizing the rights of the athletes does not limit the independent rights of the NCAA or other organizer, whether under common law intellectual property or copyright. *See*, *e.g.*, RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 46 cmt. i ("Copyright in a film or videotape of a person's performance does not extend to the personal

likeness or other identifying characteristics of the performer …. Thus, the subject matter of the right of publicity generally lies outside the scope of copyright.").[4]

### C. The Exception for News Coverage Depends on Transaction Cost Barriers or Harms Not Relevant to Pre-Planned Sporting Event Coverage

As the right of publicity is a property right, the usual response to conflicts concerning the rights would be to strengthen and clarify those rights so that parties could more easily contract to optimal solutions. "When property rights are poorly specified, it is hard to transact about them, and correspondingly hard to promote the process of transaction that allocates resources to their highest valued uses."[5] The total economic value of a college athlete's participation in sports has increased rapidly over time. The NCAA and colleges contribute to the value, to be sure, but even the NCAA does not argue—nor could it—that the athletes' performance has nothing to do with the broadcasts' total value. If the performances themselves were unappealing, consumers would turn to other broadcast events. When social

---

[4] The Media *Amici* cite *Baltimore Orioles v. MLBPA*, 805 F.2d 663 (7th Cir. 1986), for the proposition that copyright preempts the rights of publicity. But that decision "has been heavily criticized for holding that a baseball game is a protectable work of authorship simply because the performance was recorded on videotape that was itself copyrightable," *Brown v. Ames*, 201 F.3d 654, 659 (5th Cir. 2000) (collecting authorities). The Restatement also rejects that conclusion, and it is, in all events, irrelevant to the question of whether a negotiable right of publicity exists and is the subject of value *before* the parties agree to mutual participation in an event that will be broadcast.

[5] Frank Easterbrook, *Cyberspace and the Law of the Horse*, 1996 U. Chi. L. Forum 207, 209.

value increases, "society will tend to privatize goods—create private property
rights—when the benefits from the increased efficiency outweigh the costs of
enforcement."[6]

   Thinking of transactions concerning the right of publicity from this
perspective helps explain the scope of the exception for news coverage and
documentaries—and shows that the exception does not cover the entire broadcast.
First, the coverage of "breaking news" is something about which it is usually
impossible to contract in advance. Second, the public interest in the publication of
facts means that the property right should not create the possibility of suppressing
their distribution. These two instincts are reflected in other areas of intellectual
property law. Thus, "[t]he most fundamental axiom of copyright law is that '[n]o
author may copyright his ideas or the facts he narrates.'" *Feist Pubs., Inc. v. Rural
Tel. Serv. Co.*, 499 U.S. 340, 344-45 (1991) (quoting *Harper & Row, Pubs., Inc. v.
Nation Enterps.*, 471 U.S. 539, 566 (1985)). Similarly, the right of fair use in
copyright privileges "purposes such as criticism, comment, news reporting,
teaching (including multiple copies for classroom use), scholarship, or research."
17 U.S.C. § 107.

---

[6] Mark Grady, *A Positive Economic Theory of the Right of Publicity*, 1 UCLA ENT.
L. REV. 97, 100 (1994) (citing Harold Demsetz, *Toward a Theory of Property
Rights*, 97 AM. ECON. REV. 347 (Papers & Proc. 1966)).

Recognizing a right of publicity that bears on the NCAA's authority to license the entire broadcast does not implicate either of these contracting problems. The NCAA and its broadcasters have the opportunity to contract in advance concerning the athletes' rights. Indeed, it appears that rights of publicity for matters other than broadcasting are already covered by the terms and conditions between the NCAA and its athletes. NCAA Br., pp. 41-42. Moreover, the NCAA, the broadcasters, and the athletes all have aligned interests in ensuring the creation of the broadcast. Unlike a situation where the right of publicity might be used improperly to suppress criticism, the athletes' only incentive is to ensure broadcasting.

## III. An Athletes' Right of Publicity Allows the Market to Function More Smoothly

### A. The Media *Amici*'s Parade of Horribles Is Fanciful

An athletes' right of publicity would be easily accommodated into the commercial arrangements that create broadcasts of big-time college sports. The Media *Amici* somehow fear licensing the rights to the events, Media *Amici* Br., p. 17, even though the essence of their business is licensing. More importantly, it is the case that each participant *already* contracts in advance of the event. The athletes already have terms and conditions with their schools and the NCAA. So do officials and even spectators (by virtue of the license agreement attached to their ticket purchase). In this regard, the current market presents both

14

opportunities for explicit negotiations and for the assembling of rights into easy-to-convey packages. Big-time college sports events are very strictly controlled, and adding provisions licensing the athletes' right of publicity would involve no additional transactions: simply the modification of a term. In other words, the transaction costs of contracting concerning the right of publicity are low, which suggests that property rights for the athletes is an attractive and possible solution.[7]

Moreover, a court could conclude that an athlete's agreement to compete for a college implicitly includes use of his or her likeness in a broadcast of the games played for that college. That is the lesson that the Media *Amici* take from *Ettore v. Philo Television Broadcasting Corp.*, 229 F.2d 481 (3d Cir. 1956). Media *Amici* Br., pp. 7-8 There, the court said that "the players, knowing or having reasonable grounds to know that the contest was being telecast, would be presumed to have waived any right to compensation for their performances by participating in the context." *Ettore*, 229 F.2d at 487. But this conclusion does not help defendants, for it is a conclusion that the athletes have a right of publicity but bargain that right of publicity as to broadcasts away as part of their agreement with the college (which includes a scholarship, enrollment, coaching and whatever other terms). In

---

[7] As noted, the low transactions costs suggests both the possibility of property rights (from the Demsetzian view, *see supra* note 6), and the possibility of contracting to reach optimal outcomes. Ronald Coase, *The Problem of Social Cost*, 3 J.L. ECON. 1 (1960).

other words, it supports an argument for antitrust standing, that the right of publicity is an economic part of the transaction. This solution would also avoid any problem of holdouts as to broadcast rights. Media *Amici* Br., p. 18.

**B.      Recognizing Athletes' Rights of Publicity, By Contrasts, Avoids other Market Conflicts**

Far from hurting the market for sports broadcasting, recognizing an athletes' right of publicity would avoid two other market conflicts. First, an athlete may play for multiple teams and leagues over the course of his or her career, from high school to the pros, and only the athlete is in the position to manage his or her publicity over that entire period to ensure the optimal level of publicity. Second, because an athlete may play for multiple leagues, such as the NCAA and then a professional league, an athletes' right of publicity creates an otherwise missing vehicle to eliminate conflicts among the leagues to follow-on licensing such as videogames. Although the NCAA says that its current practices do not include such licensing, the structure of the rights that it advocates—in which only it owns the rights in athletes' recorded performances—means that such licensing conflicts are likely.

Although most college athletes will not become professional athletes, many thousands of them do,[8] many others will play in semi-pro or other leagues, and all of them will have played in high school athletics or club and Olympic sports in the years surrounding their college careers. An individual's right of publicity—their endorsement ability and reputation—extends over the course of their entire lifetime; in many cases, compensated endorsement possibilities may extend beyond the player's athletic career.[9] If a college athlete has no right of publicity, and the NCAA can commercialize all aspects of the athlete's recorded performance, the NCAA's incentive is to race to commercialize the college aspects of that athlete's career, consuming value that should be left for other time periods if taking a broader view. "[T]he right of publicity is needed to ensure that publicity assets are not wasted by a scramble to use them up as quickly as possible. The right of publicity privatizes a public good (in publicity) and thus encourages a more sensible use of this type of social asset."[10]

---

[8] NCAA, *Probability of Competing Beyond High School* (last updated Sept. 2013), http://www.ncaa.org/about/resources/research/probability-competing-beyond-high-school.

[9] "Because there are a growing number of distribution opportunities available, the athlete has the potential to enter into a variety of sectors and use his or her sports career as a platform for other endeavors." Philip Kotler, Ben Shields, and Irving Rein, *A Sporting Chance at Branding*, BRAND STRATEGY 30-31 (2006), http://www.theelusivefan.com/sports_branding.pdf.

[10] Grady, *supra* note 6, at 98.

Similarly, if only the league has any rights in these situations, licensing non-broadcast uses of the athletes' NILs invites conflicts. Which entity should have the right to license a videogame including the likeness of a famous basketball player, the NCAA, the NBA, the National Basketball Players Association, or USA Basketball (the national governing body for Olympic-stream basketball events)? Under the NCAA's view (and that of their *amici*) each league has a similar conflicting right, with no control by the player. Even worse, the league may license the creation of a work (such as a videogame) in which the athlete is portrayed badly—as an enforcer or a thug. Because the NCAA claims rights that go beyond the broadcast of the live event itself (during which the athlete is in control of his or her performance), the athlete loses the control that the property right of publicity creates. "[R]ather than wanting it in the public domain, we should want *someone* to own the persona, promote it, and take care that it is well-preserved."[11] Creating a right of publicity in the player creates a locus for contract negotiations—and negotiations that can include both the amateur and professional leagues representing their interests to one another.[12] In other words, recognizing the athletes' property right creates more, not less, efficient markets.

---

[11] Douglas G. Baird, *Does Bogart Still Get Scale?: Rights of Publicity in the Digital Age*, 4 GREEN BAG 2D 357, 364 (2001).

[12] *Id.*

18

**IV.    The First Amendment Does Not Foreclose Plaintiffs' Ability to Show an Antitrust Injury in this Case**

This case does not directly present any First Amendment claims or defenses. Instead, the Constitution enters this case through a side door. The NCAA asserts in passing—and its Media *Amici* argue at somewhat greater length—that the NCAA's rules cause Plaintiffs no antitrust injury because the First Amendment would foreclose enforcement of any NIL rights the players might have. *See* NCAA Brief at 38; Media *Amici* Brief at 1. It is important to recognize two things, however. First, neither the NCAA nor their *amici* have claimed that the District Court's order in this case violates the First Amendment. And second, a finding that Plaintiffs have antitrust injury does not require any conclusion as to the precise scope or value of their NIL rights; rather, it requires only a conclusion that *some* such rights exist for the purposes of bargaining between Plaintiffs and their schools. Unless the First Amendment *categorically* precludes recognizing *any* such rights, Plaintiffs have an injury sufficient for antitrust standing.

The Supreme Court's holding in *Zacchini*, 433 U.S. 562, squarely rules out any such categorical prohibition. Beyond that, this Court need not go. The precise balance between Plaintiffs' NIL rights and the First Amendment rights of broadcasters or other parties can and should be struck when and if litigation to enforce those rights arises.

19

## A. The First Amendment Does Not Categorically Foreclose Recognition of Plaintiffs' NIL Rights

The position of the NCAA and its Media *Amici* is that the First Amendment would bar recognition of any enforceable publicity rights for players on college sports teams. If Congress chose to enact a statute conferring rights of publicity upon college sports players, the NCAA's position would require this court to strike that statute down as unconstitutional. And because the NCAA's position is that the First Amendment forecloses recognition of *any* market for valuable rights of NIL held by Plaintiffs, our hypothetical federal statute would be unconstitutional without regard for the degree of the rights conferred, the mechanisms of their enforcement, or any exceptions that might be built into the law. The First Amendment requires no such absurd result.

In *Zacchini*, a television broadcaster videotaped the act of Hugo Zacchini, a "human cannonball," at the Geauga County Fair and broadcast the entire performance on the 11 o'clock news without Zacchini's permission. Zacchini sued for damages, and the broadcaster argued that the First Amendment privileged its broadcast. The Supreme Court rejected this argument:

> Whatever the line in particular situations is to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent. The Constitution no more prevents a State from requiring respondent to compensate petitioner for broadcasting his act on television than it

20

> would privilege respondent to film and broadcast a copyrighted dramatic work without liability to the copyright holder.

*Id.* at 574-75. The Court emphasized the legitimacy and importance of rights of publicity, noting that "Ohio has recognized what may be the strongest case for a 'right of publicity' involving, not the appropriation of an entertainer's reputation to enhance the attractiveness of a commercial product, but the appropriation of the very activity by which the entertainer acquired his reputation in the first place." *Id.* at 576.

This Court has read *Zacchini* to require a nuanced balancing of rights of publicity against First Amendment values. In *Keller*, for example, this court recognized that "[v]ideo games are entitled to the full protections of the First Amendment." 724 F.3d at 1270. Nonetheless, the court immediately acknowledged that "[s]uch rights are not absolute, and states may recognize the right of publicity to a degree consistent with the First Amendment." *Id.* at 1271 (citing *Zacchini*, 433 U.S. at 574-75). The case thus required the court to "balance the right of publicity of a former college football player against the asserted First Amendment right of a video game developer to use his likeness in its expressive works." *Id.* This sort of balancing analysis belies the very notion of a categorical bar. It means that even if some assertions of a right to publicity may be barred by the First Amendment, others will not be. Players may not, in other words, always be able to reap the full value of their NIL rights in all circumstances. But it is

21

equally clear that no plausible interpretation of the First Amendment will bar *all* Plaintiffs' rights so as to strip them of all economic value.

Likewise, the Restatement (Third) of Unfair Competition reflects *Zacchini*'s conclusion that while the First Amendment constrains the right of publicity, it hardly eliminates it. For example, § 46 of the Restatement imposes liability on one "who appropriates the commercial value of a person's identity" without consent "for purposes of trade," but § 47 exempts from that category "the use of a person's identity in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses." RESTATEMENT (THIRD) OF UNFAIR COMPETITION §§ 46, 47. As the commentary to § 47 makes clear, these exceptions are designed in part to accommodate First Amendment interests. *See id.* at § 47 cmt. d. But the exceptions do *not* confer a blanket privilege for "entertainment"; rather, the Restatement acknowledges an enforceable right of publicity in cases like *Zacchini*. *See id.* at Illustration 7. And "purposes of trade" do include appropriation of publicity rights by retailers of merchandise, for example. *See id.* at cmt. e. Because the Restatement would surely permit *some* kind of enforcement of publicity rights for college athletes in *some* circumstances, it would necessarily be unconstitutional under the NCAA's view of the First Amendment.

The Media *Amici* read *Zacchini* narrowly to protect only "the right of a producer of an entertainment event to exercise control over the broadcast of the *entire* event"; that case, they say, "was not about the right of each participant in a large group event—such as a collegiate football or basketball game—to separately control how a broadcaster may depict a picture or mention a name." Media *Amici* Br. at 13. The presence of multiple performers in a team sports context may present coordination problems, but we have argued in the first part of this brief that they are hardly insurmountable as a matter of private contract. Alternatively, state law delineating the right of publicity may seek to frame that right in ways that ease difficulties of coordination. But it is highly implausible to believe that the First Amendment forecloses any such nuanced effort and instead simply cuts off the rights of anyone who is not the "producer" of an event.[13]

*Zacchini* emphasized the rights of "performers," *see* 433 U.S. at 572 (distinguishing another case that "did not involve a performer, a person with a name having commercial value"); *id.* at 575 ("[W]e are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a

---

[13] The broadcasters' reading would largely confine *Zacchini* to its somewhat unusual facts, in that (as they read the case), Hugo Zacchini was *both* the performer and the producer of the act. *See* NCAA Br. at 38. The Court's reasoning was hardly so confined, and in any event Mr. Zacchini was probably not a producer at all, given that he charged no separate admission to his performance at the fair. *See* 433 U.S. at 563.

performer's entire act without his consent."), and it stressed the importance of "an economic incentive for ["the performer"] to make the investment required to produce a performance of interest to the public," *id.* at 576.  Producers make such investments, but it strains credulity to suggest that it is any less important to encourage the actual performers to develop their skills—whether musical, dramatic, or athletic—by offering the hope of economic reward.  As Judge Diane Wood has explained,

> [i]nterpreting the First Amendment to provide the media with a right to transmit an entire performance or to prohibit performers from charging fees would take us back centuries, to a time when artists or performers were unable to capture the economic value of a performance.  Over the long run, this would harm, not help, the interests of free speech.  The First Amendment requires no such folly.

*Wisconsin Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614, 624 (7th Cir. 2011).

The NCAA and the broadcasters' position here is analogous to a facial challenge; they argue that *every* effort to enforce NIL rights is constitutionally foreclosed.  *Cf. United States v. Salerno*, 481 U.S. 739 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").[14]  Because the NCAA and its *amici* argue against the

---

[14] There is, of course, an overbreadth exception to the facial challenge principle applicable in some First Amendment cases.  But if the recognition of publicity

very recognition of the publicity rights in question, moreover, they must show that it would be unconstitutional for Plaintiffs to assert those rights against *any party*, under *any circumstances*, seeking *any relief*. They would have to show, for example, why a players' restitution claim for unjust enrichment against his own university for appropriating the value of the player's NIL rights would necessarily interfere with the First Amendment rights of a broadcaster or some other constitutional rightholder. Facial challenges are disfavored precisely because it is so difficult to assess whether a particular sort of government action might be unconstitutional in circumstances not actually before the court. *See*, *e.g.*, *Younger v. Harris*, 401 U.S. 37, 52 (1971).

**B.** **Absent a Categorical Prohibition, Plaintiffs Have an Antitrust Injury Regardless of the Precise Balance to Be Struck Between Their NIL Rights and Broadcasters' First Amendment Interests**

This case does not require any precise delimitation of plaintiffs' NIL rights or balancing of those rights against the potential First Amendment rights of broadcasters airing sporting events. The NCAA and its *amici* invoke the First Amendment only for purposes of their argument that Plaintiffs' antitrust claims do not satisfy the element of antitrust injury. *See* NCAA Br., p. 38. Because standing

---

rights were enough to trigger that doctrine, *Zacchini* would have had to go the other way. And the chilling effect that overbreadth seeks to prevent is unlikely when broadcasters have the strong financial incentives to assert their rights that are present in cases like this one.

turns on the existence of an injury rather than its magnitude, *any* enforceable right would be sufficient to establish Plaintiffs' injury. Even if the First Amendment significantly restricted the enforceability of players' NIL rights in a wide range of circumstances, those rights would retain some economic value and plaintiffs would be injured by the NCAA's rules restricting bargaining with respect to those rights. The antitrust injury element is thus satisfied so long as Plaintiffs possess any NIL rights *at all*, without regard to their precise value or contours. The First Amendment poses no bar to Plaintiffs' antitrust claims as long as it does not categorically bar Plaintiffs' NIL rights.

We have already explained that the governing law imposes no such categorical bar, even in the case of broadcasters. Even on a broad view of the relevant First Amendment interests, it is unlikely that the Plaintiffs would lack *any* right or enforceable remedies. *See*, *e.g.*, *Zacchini*, 433 U.S. at 573-74 (emphasizing that "in the present case petitioner did not seek to enjoin the broadcast of his act; he simply sought compensation for the broadcast in the form of damages"). Moreover, Plaintiffs' rights of publicity may be enforceable against other parties even if they are not enforceable against broadcasters. For instance, one can imagine a suit by players against their university for unjust enrichment or restitution, seeking a share of the university's broadcast revenues based on the value of the players' rights to publicity. If such enforcement were viable, then the

26

players' NIL rights would have economic value sufficient to sustain their claim to antitrust injury.  But it is hard to see what the First Amendment would have to do with such a suit.

### C. This Case Is Not an Appropriate Vehicle for Adjudicating the Precise Balance between Plaintiffs' NIL Rights and Broadcasters' First Amendment Interests

The Supreme Court has repeatedly emphasized that "'[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.'" *Dept. of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 343 (1999) (quoting *Spector Motor Service v. McLaughlin,* 323 U.S. 101, 105 (1944)).  Long ago, Justice Brandeis emphasized that courts would "not 'anticipate a question of constitutional law in advance of the necessity of deciding it.'"  *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring) (quoting *Liverpool, N.Y. & Phila. Steamship Co. v. Emigration Commrs.*, 113 U.S. 33, 39 (1885)).  This case involves neither an effort to assert Plaintiffs' rights of publicity nor a constitutional challenge to such an assertion by broadcasters of sporting events.  The First Amendment comes into the case only tangentially, as a fleeting assertion in the course of the NCAA's argument about antitrust injury.

This case is thus a singularly inappropriate vehicle for exploring the relationship between whatever rights of publicity Plaintiffs may possess and the potential First Amendment rights of broadcasters. To begin, the NCAA would lack standing to assert those First Amendment rights because it, of course, does not itself broadcast sporting events. *See*, *e.g.*, *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (noting the prudential standing rule that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"); *Massey v. Helman*, 196 F.3d 727, 740 (9th Cir. 1999) (court should "hesitate before resolving a controversy, even one within [its] constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation."). There is no legal or practical impediment to the broadcasters asserting their First Amendment rights when and if players ever seek to enforce publicity rights against them.

Even if the broadcasters were parties here, their First Amendment rights would not be ripe for adjudication. This case involves no effort to enforce players' NIL rights against a broadcaster or other holder of relevant First Amendment rights. *See*, *e.g.*, *United Public Workers v. Mitchell*, 330 U.S. 75 (1947) (holding a First Amendment challenge to the Hatch Act's prohibition on political activities by federal employees not ripe for adjudication because it was unclear how the plaintiffs planned to violate the Act or how it would be enforced against them).

28

The NCAA and its Media *Amici* effectively seek a determination of the broadcasters' First Amendment rights long before those rights are implicated by an actual effort to enforce players' NIL rights. It seems quite unlikely that recognition of players' NIL rights would result in an effort, analogous to the plaintiff's in *Zacchini*, to enjoin the broadcast of a sporting event. What plaintiffs seek here is the right to bargain with their schools regarding the allocation of revenues that the schools receive from broadcasts and other uses of NIL rights, free from the constraints of anticompetitive rules imposed by the NCAA. Whether, in what form, and in what circumstances the removal of that constraint would result in any effort to enforce players' NIL rights against broadcasters is far from clear.

Our point is not that Article III or prudential justiciability doctrines foreclose, as a matter of law, this court from considering the First Amendment arguments raised by the NCAA and their *amici*. But rigorous doctrines of standing and ripeness exist for a very good practical reason, "to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). The facts of this case provide no concrete indication of what a suit to enforce Plaintiffs' NIL rights might look like. Without such concrete facts,

29

this court is ill-equipped to weigh the competing publicity rights and First Amendment interests. Rather than speculate as to how such a conflict might arise and how the balance would come out, this court should postpone any effort to adjudicate the scope of broadcasters' First Amendment rights until an actual case pitting those rights against players' NIL rights arises. Broadcasters' First Amendment rights can be adequately protected when and if that scenario unfolds.

## CONCLUSION

*Amici curiae* urge the court to affirm the decision of the District Court.

Respectfully submitted,

Dated: January 28, 2015          By: _/s/ Ernest A. Young_____
                                 Ernest A. Young
                                 3208 Fox Terrace Dr.
                                 Apex, NC 27502
                                 919-360-7718
                                 *Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B)(i) in that, according to the word-count feature of the word processing system in which the brief was prepared (Microsoft Word), the brief contains 6,962 words, excluding the portions exempted by Rule 32(a)(7)(B). The brief has been prepared in a proportionally-spaced typeface, 14-point Times New Roman.

_/s/Ernest A. Young_____


**CERTIFICATE OF SERVICE**

I certify that on this 28th day of January, 2015, I electronically filed the foregoing with the Court using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

_/s/Ernest A. Young_____