No. 14-16601 & 14-17068

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

DEFENDANT-APPELLANT,

V.

EDWARD O'BANNON, OSCAR ROBERTSON, WILLIAM RUSSELL,
HARRY FLOURNOY, THAD JARACZ, DAVID LATTIN, BOB TALLENT,
ALEX GILBERT, ERIC RILEY, PATRICK MAYNOR, TYRONE PROTHRO,
SAM JACOBSON, DAMIEN RHODES, DANNY WIMPRINE, RAY ELLIS,
JAKE FISCHER, JAKE SMITH, DARIUS ROBINSON, MOSES ALIPATE, AND
CHASE GARNHAM,
on behalf of themselves and all others similarly situated,

PLAINTIFFS-APPELLEES.

From Orders Denying Summary Judgment and Granting a Permanent Injunction
Entered By the United States District Court for the Northern District of California

The Honorable Claudia Wilken, Chief Judge
Case Nos. 09-cv-1967 CW & 09-cv-3329 CW

## BRIEF OF AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES
## BY SCREEN ACTORS GUILD-AMERICAN FEDERATION OF
## TELEVISION & RADIO ARTISTS AND LUMINARY GROUP LLC

JONATHAN FABER
LUMINARY GROUP LLC
2150 Intelliplex Drive, Suite 100
Shelbyville, IN 46176

DUNCAN W. CRABTREE-IRELAND
DANIELLE S. VAN LIER
SCREEN ACTORS GUILD-AMERICAN
  FEDERATION OF TELEVISION AND RADIO
  ARTISTS
5757 Wilshire Blvd., 7th Fl.
Los Angeles, CA 90036
Telephone: (323) 549-6627
Facsimile: (323) 549-6624

*Counsel for Amici*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ ii

CORPORATE DISCLOSURE STATEMENT ..................................... iv

STATEMENT OF COMPLIANCE WITH RULE 29(c)(5) ................... iv

CONSENT OF THE PARTIES ................................................... iv

INTEREST OF THE *AMICI* ..................................................... 1

SUMMARY OF ARGUMENT ...................................................... 3

ARGUMENT ......................................................................... 5

A.   For Over a Century, Courts Have Recognized the Valuable Property Interest in One's Persona ................................................. 5

    1.   Courts Have Recognized Proprietary Rights in One's Identity Since the Nineteenth Century ............................................. 6

    2.   The Supreme Court Recognized a Property Right in One's Persona Setting Precedent for Subsequent State and Federal Decisions. ...................................................................... 8

B.   Courts Have Thoughtfully Balanced the Right of Publicity and the First Amendment for Over a Century .................................... 11

    1.   The Transformative Use Defense Respects the Careful Balance Between an Individual's Intellectual Property Rights and Free Expression ................................................................. 12

    2.   The Transformative Use Test Focuses On Depictions of the Individual ................................................................... 17

C.   Public Policy and Precedent Dictate That Individuals' Rights in their Personas Be Protected From Unauthorized Exploitation ............. 20

CONCLUSION ..................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allison v. Vintage Sports Plaques*, 136 F.3d 1443 (11th Cir. 1998) .......................10

*American Economy Insurance Co. v. Reboans, Inc.*, 852 F. Supp. 875 (N.D. Cal. 1994)........................................................................................................10

*Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959 (10th Cir. 1996) ........................................................................................................10

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001). passim

*Corlis v. E. W. Walker Co.*, 64 F. 280 (1894)............................................................6

*Davis v. Electronic Arts, Inc*. No. 12-15737, 2015 U.S. App. LEXIS 154 (9th Cir. Jan. 6, 2015) ................................................................................ 18, 20

*ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915 (6th Cir. 2003) ................................10

*Haelan Laboratories, Inc. v. Topps Chewing Gum*, 202 F.2d 866 (2nd Cir. 1953) ........................................................................................................6

*Hart v. Electronic Arts*, *Inc.,* 717 F.3d 141 (3rd Cir. 2013) .............................. 11, 19

*Hilton v. Hallmark Cards,* 580 F.3d 874 (9th Cir. 2009) .........................................9

*Keller v. Electronic Arts, Inc.,* 724 F.3d 1268 (9th Cir. 2013)........................ passim

*Kirby v. Sega of America, Inc.*, 144 Cal.App.4th 47 (2006)....................................18

*KNB Enters. v. Matthews*, 78 Cal. App. 4th 362  (2000)...........................................6

*Michaels v. Internet Entertainment Group*, 5 F.Supp.2d 823 (C.D. Cal. 1998) ........................................................................................................10

*Munden v. Harris*, 134 S.W. 1076 (Mo. 1911)........................................................8

*No Doubt v. Activision Publishing*, 192 Cal. App. 4th 1018 (2011) .......................19

*O'Brien v. Pabst Sales Co.*, 124 F.2d 167 (5th Cir. 1941) .......................................8

*O'Bannon v. NCAA*, 7 F. Supp. 3d 955 (N.D. Cal. 2014).......................................21

*Pavesich v. New England Life Ins. Co.*, 50 S.E. 68 (1905) ........................... 7, 8, 11

*Roberson v Rochester Folding Box Co.*, 64 N.E. 442 (N.Y. 1902)...........................7

*Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992)............................................9

*Winter v. DC Comics*, 30 Cal. 4th 881 ( 2003)................................................. 16, 17

*Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977)....... 6, 8, 9, 22

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c) of the Federal Rules of Appellate Procedure, *Amicus* provide the following disclosures of corporate identity:

Screen Actors Guild-American Federation of Television and Radio Artists certifies that it is a Delaware non-profit corporation; it does not offer stock; and it has no parent corporation.

Luminary Group certifies that it has no parent corporations and no publicly held corporation owns 10% or more of its stock.

## STATEMENT OF COMPLIANCE WITH RULE 29(c)(5)

Counsel for the parties did not author this brief. The parties have not contributed money intended to fund preparing or submitting the brief. No person other than *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

## CONSENT OF THE PARTIES

In accordance with Ninth Circuit Rule 29-3, Amici have sought the consent of the parties to file an amicus curiae brief. Counsel for the parties have consented to the filing of this brief.

iv

## INTEREST OF THE *AMICI*

Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") is the nation's largest labor union representing working media artists. SAG-AFTRA – formed through the historic merger of Screen Actors Guild ("SAG") and the American Federation of Television and Radio Artists ("AFTRA") in 2012 – represents more than 165,000 actors, announcers, broadcasters, journalists, dancers, DJs, news writers, news editors, program hosts, puppeteers, recording artists, singers, stunt performers, voiceover artists and other media professionals. SAG-AFTRA collectively bargains the wages, hours, and working conditions of its members, including in video games, and exists to secure strong protections for media artists.

SAG and AFTRA, and now SAG-AFTRA, have long fought to preserve the rights of performers and others in their personas, including through nationwide legislative efforts. They strongly supported the enactment of and amendments to California's right-of-publicity statutes and have filed amicus briefs in other right-of-publicity cases, including the *Keller*, *Davis* and *Hart* cases discussed herein.

Luminary Group LLC is a licensing, consulting and intellectual property management company that represents iconic personalities such as Vince Lombardi, Jesse Owens, Sam Snead, Johnny Unitas, Cy Young, Babe Ruth, Buddy Holly, among others. Jonathan Faber of Luminary Group is a professor of Right of

1

Publicity at Indiana University School of Law—Indianapolis and Licensing Intellectual Property at Indiana University Maurer School of Law, Bloomington, and often serves as an expert witness in litigation throughout the United States. Luminary Group maintains the official Internet sites for its clientele as well as the online right-of-publicity resource, www.RightOfPublicity.com.

The professionals represented by *amici* invest their entire lives in building their careers. While many may never be "famous," their names, voices, images or likenesses have or will attain commercial value. For some, this value will continue long after their death, providing an important source of income for their families and beneficiaries. These individuals and their beneficiaries rely on right of publicity laws to protect and prevent misappropriation of one of their greatest assets – their persona.

Although this case involves college athletes, *amici's* members are potentially affected by its outcome because it has the potential to significantly diminish the statutory and common law right of publicity of any individual in the future. The result can be ruinous to performers' careers and financial interests.

Accordingly, the *amici* have a fundamental interest in ensuring these rights are not eroded and therefore has an interest in this litigation.

2

## SUMMARY OF ARGUMENT

At any point in time, there are tens, and possibly hundreds, of thousands of individuals whose livelihood derives from the authorized use of their personas. A cornerstone of their careers is the ability to exploit and carefully control their rights in these intangible but valuable assets. Right of publicity laws, which ensure that these public figures have the sole right to control how their rights are exploited, are critical to them.

The right of publicity is a form of intellectual property that society deems to have social utility, representing the inherent right of every individual to control the commercial use of his identity. *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001). For over a century, courts, including the United States Supreme Court, have recognized the existence of and value in those rights. As the individual's right in his persona may present impediments to creativity and expression, courts have crafted tests, such as the transformative use test, to carefully balance this property right with the protections accorded speakers under the First Amendment.

The transformative use test, as applied in this circuit, presents a thoughtful balance between the rights of the individual in his persona and the free expression right of those who might incorporate the persona in creative works. Most uses of an individual's personal will fall on either end of a spectrum – from literal

3

depictions that are the sum and substance of the work and thereby entitled to little protection under the First Amendment to creative distortions where the individual is merely one of the raw materials of a work in which the artist's skill is paramount. By placing the focus on how the individual is depicted, the transformative use test recognizes the inherent value in the individual's persona while also recognizing that when that persona is sufficiently transformed, the individual's rights must give way to creative expression. This case does not present a useful vehicle to revisit this test.

There is a value inherent in the individual's persona, particularly those of performers and athletes who have carefully cultivated their personas. This value makes them ripe for exploitation and, consequently, gives rise to a need to protect them as with any other form of intellectual property. Public policy and precedent dictate the need to recognize and protect that value.

## ARGUMENT

This case presents a unique divergence from the typical case involving individuals' names, images and likenesses, or other protected facets of an individual's persona. At issue is not a simple infringement of one's right of publicity but, rather, the question of whether a broader program that restrains the individual's ability to share in the revenues generated from commercial uses of his persona may constitute an unreasonable restraint of trade in violation of antitrust laws. The question of whether this program constitutes an unlawful restraint of trade is beyond the scope of this brief which focuses instead on the value inherent in those rights, such that there is a cognizable injury when the individual is prevented from licensing them or when potential licensees are able to circumvent those licenses.

### A. For Over a Century, Courts Have Recognized the Valuable Property Interest in One's Persona.

The right of publicity is a form of intellectual property that rests in the inherent right of every human being to control the commercial use of his identity. *Comedy III*, 25 Cal. 4th 387. Although derived originally from laws protecting one's privacy, the right of publicity has evolved into a form of intellectual property. *See, e.g., Comedy III*, 25 Cal. 4th 387; *KNB Enters. v. Matthews*, 78 Cal.

5

App. 4th 362 (2000). In many instances, the courts have analogized its nature and goals to other intellectual property rights. See, *e.g.*, *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977).

> **1. Courts Have Recognized Proprietary Rights in One's Identity Since the Nineteenth Century.**

In 1953, the Second Circuit coined the term "right of publicity," recognizing an economic and publicity value in one's photograph "in addition to and independent of [the] right of privacy." *Haelan Laboratories, Inc. v. Topps Chewing Gum*, 202 F.2d 866, 868 (2nd Cir. 1953). While many trace the right of publicity's origin to this case, the concept significantly predates it. Majority and dissenting opinions in both federal and state courts have acknowledged an economic and property interest in an individual's persona for well over a century.

In 1894, a Massachusetts federal court held "that a private individual has a right to be protected in the representation of his portrait in any form; that this is a property as well as a personal right; and that it belongs to the same class of rights which forbids the reproduction of a private manuscript or painting..." *Corlis v. E. W. Walker Co*, 64 F. 280, 282 (1894) (holding that the protection exists but publication of a photograph in connection with a deceased famous inventor's biography did not violate it). Judge Gray's 1902 dissent in *Roberson v Rochester Folding Box Co.* advocated for the expansion of this right, stating that an

individual "should be afforded… protection… against the display and use [of her likeness] for another's commercial purposes or gain."[1] *Roberson v Rochester Folding Box Co.*, 64 N.E. 442, 450 (N.Y. 1902) (Gray, J. dissenting). Judge Gray further articulated "that this plaintiff has the same property in the right to be protected against the use of her face for defendants' commercial purposes as she would have if they were publishing her literary compositions… the value is hers exclusively; until the use be granted away to the public." *Id.*

Thereafter, in 1905, the Supreme Court of Georgia expressly adopted Judge Gray's reasoning in a unanimous opinion.[2] *Pavesich v. New England Life Ins. Co.*, 50 S.E. 68, 79 (Ga. 1905). In recognizing the tension between the First Amendment and the property right in one's persona, the majority emphasized that "[t]he constitutional right to speak and print does not necessarily carry with it the right to reproduce the form and features of an individual." *Id.* The *Pavesich* court rejected the argument "that the man who makes himself useful to mankind

---

[1]  In *Roberson*, which pre-dated New York's right of privacy statute, the court determined that the use of a woman's picture on ads for flour was not a cognizable claim under the common law. *Roberson*, 64 N.E. 442, 447. Recognizing it was limited by the absence of a statutory remedy, the *Roberson* court called upon the legislature to enact appropriate legislation. *Id.* at 447 ("Should it be thought that it is a hard rule that is applied in this case, it is only necessary to call attention to the fact that a ready remedy is to be found in legislation.").

[2]  The *Pavesich* Court also notes the 1890 case of *Manola v. Stevens*, in which a Broadway actress sought and obtained an injunction restraining the use of a photograph of her performance. *Pavesich*, 50 S.E. at 74 (citation omitted).

surrenders any right to privacy thereby, or that [by permitting] his picture to be published by one person, and for one purpose… [he] is forever thereafter precluded from enjoying any of his rights." *Id.* at 80 (quoting *Atkinson v. Doherty*, 80 N.W. 285 (Mich. 1899)).

In 1911, the Missouri appellate court considered, "[i]f there is value in [one's likeness], sufficient to excite the cupidity of another, why is it not the property of him who gives it the value and from whom the value springs?" *Munden v. Harris*, 134 S.W. 1076, 1078 (Mo. 1911). The court confirmed that it is "a property right of value" exclusive to the individual. *Id.* at 1079. Three decades later, Circuit Judge Holmes recognized the right to control the commercial use of one's persona "is a property right that belongs to everyone; it may have much or little, or only nominal, value; but it is a personal right, which may not be violated with impunity." *O'Brien v. Pabst Sales Co.*, 124 F.2d 167, 170 (5th Cir. 1941) (Holmes, C.J. dissenting).

### 2. The Supreme Court Recognized a Property Right in One's Persona Setting Precedent for Subsequent State and Federal Decisions.

The Supreme Court confirmed the right of publicity is an individual's proprietary right in his persona nearly four decades ago. In *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 573 (1977), the Court opined that the right of publicity "protect[s] the proprietary interest of the individual" and is

8

"closely analogous to the goals of patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors and having little to do with protecting feelings or reputation." The "rationale… is the straightforward one of preventing unjust enrichment by the theft of goodwill. No social purpose is served by having a defendant get free some aspect of the plaintiff that would have market value for which he would normally pay." *Id*. at 576 (internal citations omitted).

Over eight decades of prior precedent makes clear that *Zacchini* is not an anomaly. Recognizing the significance of an individual's right of publicity, the Court proclaimed that the infringement at issue – "the appropriation of the very activity by which the entertainer acquired his reputation in the first place" – presented "what may be the *strongest* case for a 'right of publicity'", but certainly not the only one. *Id*. at 576 (emphasis added).

Following *Zacchini*, the right of publicity continued to evolve as a property right. This court's own precedent is clear on that point. *See, e.g., Hilton v. Hallmark Cards, 580 F.3d 874, 889 fn.12,* (9th Cir. 2009)*, amended,* 599 F.3d 894 (9th Cir. 2010) ("The cousinage between copyright liability and the right to publicity has long been recognized."); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1100 (9th Cir. 1992) ("Waits' voice misappropriation claim is one for invasion of a personal property right: his right of publicity to control the use of his identity as embodied in his voice") (emphasis added). Additionally, federal and state courts in

9

California have treated the right of publicity as a property right. *See, e.g., Michaels v. Internet Entertainment Group*, 5 F.Supp.2d 823, 838 (C.D. Cal. 1998) (recognizing that "a celebrity's property interest in his name and likeness is unique ... "); *American Economy Insurance Co. v. Reboans, Inc.*, 852 F. Supp. 875, 879-80 (N.D. Cal. 1994), *reconsidered on different grounds*, 900 F. Supp. 1246 (N.D. Cal. 1994) (stating that dilution and right-of-publicity-claims involved property rights); *Comedy III,* 25 Cal. 4th at 399 ("The right of publicity, like copyright, protects a form of intellectual property that society deems to have some social utility."). Federal courts in other circuits have also noted that the right of publicity is a form of property.[3]  Just recently, in another case involving the very same games at issue here, the Third Circuit opined that "the goal of maintaining a right of publicity is to protect the property interest that an individual gains and enjoys in his identity

---

[3]   Nearly two decades ago, the Tenth Circuit noted that the right of publicity is an "intellectual property right" and "[l]ike trademark and copyright... [it] involves a cognizable property interest". *Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959, 967 (10th Cir. 1996) (holding that where trading cards parodied baseball players, balance between the right of publicity and First Amendment tipped in favor of the card manufacturers).  In *Allison v. Vintage Sports Plaques*, 136 F.3d 1443 (11th Cir. 1998), the Eleventh Circuit applied copyright's "first-sale doctrine" to a right-of-publicity claim.  The Sixth Circuit has held that "[t]he right of publicity is an intellectual property right of recent origin which has been defined as the inherent right of every human being to control the commercial use of his or her identity." *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 928 (6th Cir. 2003).

through his labor and effort." *Hart v. Electronic Arts, Inc.* 717 F.3d 141, 150 (3rd Cir. 2013).

This century of precedent makes clear that the right of publicity is a property right vested in each individual. The right shares traits with copyright and, to a lesser extent, other intellectual property rights, such as trademark, although the interest protected differs. Consequently, there is an economic value associated with the right that vests in the individual and is his to control.

**B.    Courts Have Thoughtfully Balanced the Right of Publicity and the First Amendment for Over a Century.**

For over a century, courts have wrestled with the interplay between this property right and the First Amendment. As media evolved, the courts resolved the consequential intrusions on individual rights, by striking a careful balance between the competing interests. In *Pavesich*, the Supreme Court of Georgia aptly described:

> "Liberty of speech and of the press is and has been a useful instrument to keep the individual within limits of lawful, decent, and proper conduct; and the right of privacy may be well used within its proper limits to keep those who speak and write and print within the legitimate bounds of the constitutional guaranties of such rights. One may be used as a check upon the other; but neither can be lawfully used for the other's destruction."

> *Pavesich*, 50 S.E. at 74.

11

Over a century later, commercial interests continue to turn to the courts, seeking to cast aside these checks and balances and to use the First Amendment as a weapon to destroy individual rights of publicity.  But over a century of jurisprudence affirms the principles elucidated by the *Pavesich* court.  While there exists an inherent tension between the protected property right in one's persona and the right to speak and create, that tension arises from the necessary and proper balance between two important rights – those speech rights protected by the First Amendment and the property rights in the fruits of an individual's endeavors, which are his own to control.

1.  **The Transformative Use Defense Respects the Careful Balance Between an Individual's Intellectual Property Rights and Free Expression.**

The National Collegiate Athletic Association ("NCAA") argues that the *Keller* court incorrectly relied on the "transformative-use" test that it claims "gainsays settled First Amendment doctrine by punishing expression for being accurate and embracing a subjective and indeterminate standard that will chill protected expression," preserving that argument for further appeal.  Brief for the NCAA at 42.  This is not an accurate statement of the right of publicity nor of the transformative use test.  The right of publicity "is not a right of censorship, but a right to prevent others from misappropriating the economic value generated by [an individual's] fame through the merchandising of" his persona. *Comedy III,* 25 Cal.

12

4th at 403 (internal citation omitted). As with fair use under the Copyright Act, the transformative use test recognizes and respects the need to strike a balance between two competing interests – the rights of creators and the rights of individuals to protect their intellectual property from unauthorized, and sometimes egregious, commercial exploitation. Nothing in this case presents any reason to revisit this circuit's interpretation or application of the test.

The California Supreme Court crafted the transformative use test as a way to carefully balance the intellectual property rights in one's persona with the free expression rights of content creators. Recognizing similarities between the goals of copyright and the right of publicity in protecting the fruits of intellectual and artistic labor, the court looked to copyright law's fair use test, "which has the advantage of employing an already established doctrine developed from a related area of the law," to craft a careful balance. *Comedy III,* 25 Cal. 4th at 404 (internal citations omitted). While not a perfect correlation, the court found that "the purpose and character of the use… [factor] seem[ed] particularly pertinent to the task of reconciling the rights of free expression and publicity." *Id.* at 404 (citing 17 U.S.C. §107(1)).

Far from being a purely "subjective and indeterminate" standard, the transformative use test provides at least five factors to consider in balancing First Amendment concerns with the individual's rights in his persona. *Keller v.*

13

*Electronic Arts*, *Inc.,* 724 F.3d 1268, 1274 (9th Cir. 2013). Relying on *Comedy III*, the *Keller* Court described the factors as follows: 1) whether "the celebrity likeness is one of the 'raw materials' from which the work" is created or the individual's likeness "is the very sum and substance of the work;" 2) if the work is "primarily the defendant's own expression," including an analysis of "whether a likely purchaser's primary motivation is to buy a reproduction of the celebrity, or to buy the expressive work of that artist;" 3) a "more quantitative than qualitative" inquiry into "whether the literal and imitative or the creative elements predominate in the work;" 4) "'a subsidiary inquiry'… in close cases" into "whether 'the marketability and economic value of the challenged work derive primarily from the fame of the celebrity depicted;'" and 5) if the "artist's skill and talent is manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to commercially exploit his or her fame." *Keller*, 724 F.3d at 1274 (internal citations omitted).

The *Comedy III* court thereby formulated a test that balances the equities between the artist and the individual, granting the artist protection when the art does not conflict with the economic value in the individual's persona. *Id.* at 391 ("We formulate… what is essentially a balancing test between the First Amendment and the right of publicity…"). In doing so, the court noted that, "[a]lthough the distinction between protected and unprotected expression will

sometimes be subtle, it is no more so than other distinctions triers of fact are called on to make in First Amendment jurisprudence." *Id.* at 409 (citing *Miller v. California*, 413 U.S. 15 (1973)). It recognized that "when a work contains significant transformative elements… it is also less likely to interfere with the economic interest protected by the right of publicity", positing that "distortions of the celebrity figure are not… good substitutes for conventional depictions of the celebrity and therefore do not generally threaten markets… that the right of publicity is designed to protect." *Id.* at 405.

As the *Comedy III* Court noted, the transformative use test "reflects a recognition that the Legislature has granted to the heirs and assigns of celebrities the property right to exploit the celebrities' images, and that certain forms of expressive activity protected by the First Amendment fall outside the boundaries of that right. *Id.* at 409. Without such recognition, "the right of publicity would [not] remain a viable right other than in cases of falsified celebrity endorsements." *Id.* Applied to the works before it, the *Comedy III* Court noted defendant's "undeniable skill," but found it "manifestly subordinated to the overall goal of creating literal, conventional depictions of The Three Stooges so as to exploit their fame" and that "the marketability and economic value of Saderup's work derives primarily from the fame of the celebrities depicted." *Id.*

15

The California Supreme Court revisited the test two years after its creation and reaffirmed that only "some… uses of celebrity likenesses are entitled to First Amendment protection." *Winter v. DC Comics*, 30 Cal. 4th 881, 888 (2003). It reiterated that it intended the test to grant First Amendment protection to "alternative versions of celebrity images that are iconoclastic, irreverent, or otherwise attempt to redefine the [person's] meaning," not literal depictions of the type for which the individual would normally be compensated. *Id*. (citing *Comedy III*, 25 Cal. 4th at 405). "The right of publicity derived from public prominence does not confer a shield to ward off *caricature, parody and satire*. Rather, prominence invites *creative comment*." *Id*. at 887(citing *Comedy III*, 25 Cal. 4th at 397(emphasis added).

*Comedy III* and *Winters* illustrate the two ends of the transformative use test's spectrum. In *Comedy III*, the court found that, despite an artist's "undeniable skill," that skill was "manifestly subordinated to the overall goal of creating literal, conventional depictions" of the Three Stooges. *Comedy III*, 25 Cal. 4th at 409. Across the spectrum, the *Winter* court noted that, "[t]o the extent the drawings of the [characters] *resemble plaintiffs* at all, they are *distorted for purposes of lampoon, parody, or caricature* [a]nd the Autumn brothers are but *cartoon characters* – half-human and half-worm – in a larger story, which itself is quite expressive." *Winter*, 30 Cal. 4th at 890 (emphasis added). In *Winters*, "[t]he

16

*characters and their portrayals* [did] not greatly threaten plaintiffs' right of publicity. Plaintiffs' fans who want to purchase pictures of them would find *the drawings of the Autumn brothers* unsatisfactory as a substitute for conventional depictions." *Id.* The factors summarized by the *Keller* court provide a clear roadmap for evaluating the myriad uses that fall somewhere between these two ends.

### 2. The Transformative Use Test Focuses On Depictions of the Individual.

Literal depictions of an individual within a work are not transformative, regardless of the medium or the inclusion of creative elements external to the individual. Any other interpretation would defeat the test's very purpose. As the *Comedy III* court noted:

> When artistic expression takes the form of a *literal depiction or imitation* of a celebrity for commercial gain, directly trespassing on the right of publicity without adding significant expression beyond that trespass, the state law interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist."

*Comedy III*, 25 Cal. 4th at 405 (citing *Zacchini*, 433 U.S. at 575-576) (emphasis added).

This court has recently considered and applied the transformative test in two cases involving the depiction of unnamed athletes in videogames, one a companion to this case. *See, Keller*, 724 F.3d 1268; *Davis v. Electronic Arts, Inc.* No. 12-

15737, 2015 U.S. App. LEXIS 154 (9th Cir. Jan. 6, 2015). The *Keller* Court

looked at four prior California cases, two of which involved video games,

representing opposite ends of the spectrum in reaching its conclusion that

Electronic Arts' ("EA") use of the athletes' likenesses was not transformative.

*Keller*, 724 F.3d.at 1273 - 76. Thereafter, the *Davis* Court rejected EA's

contention that the *Keller* Court had misapplied the transformative use test, much

as the NCAA has claimed in this case. *Davis*, 2015 U.S. App. LEXIS 154, at *10

("Absent 'intervening higher authority,' however, we are bound by the factually

indistinguishable holding in *Keller*.").

California courts have applied the transformative use test in two cases

involving video game characters. In *Kirby v. Sega of America, Inc.*, 144

Cal.App.4th 47 (2006), the appellate court undertook a thorough comparison of the

plaintiff and a character – a singing, dancing reporter from outer space – alleged to

depict her. The court concluded that "notwithstanding certain similarities, [the

character of] *Ulala* is *more than a mere likeness or literal depiction*… [and]

contains sufficient expressive content to constitute a 'transformative work' under

the test…" *Id.* at 59 (emphasis added).

Across the spectrum, and relied on by the *Keller* and *Davis* Courts, is *No

Doubt v. Activision Publishing*, 192 Cal. App. 4th 1018 (2011). In *No Doubt*, a

California appellate court held that "nothing in the creative elements of [the game]

18

elevates the depictions of [the band] to something more than 'conventional, more or less fungible, images' of its members that [the band] should have the right to control and exploit." *Id.* at 1034 (citing *Comedy III*, 25 Cal.4th at 405). The court noted that in *Kirby* "the pop singer was portrayed as an entirely new character" while in the *Band Hero* game, No Doubt's avatars were literal depictions that "perform rock songs, the same activity by which the band achieved and maintains its fame." *Id.* at 1034.

In *Keller*, this court noted that the case was "clearly aligned with *No Doubt*, not with *Winter* and *Kirby*," and that "*No Doubt* offer[ed] a persuasive precedent that cannot be materially distinguished from Keller's case." *Keller*, 724 F.3d at 1277. *See also Davis*, 2015 U.S. App. LEXIS 154, at *9-10 (adopting the *Keller* court's reasoning). The *Keller* court correctly held that the use of athletes' likenesses did "not contain significant transformative elements such that EA is entitled to the defense as a matter of law." *Id.* at 1276. The Third Circuit reached the same conclusion, rejecting EA's argument that the inclusion of other creative elements should render the work transformative. *Hart.* 717 F.3d at 169 ("Acts of blatant misappropriation would count for nothing so long as the larger work, on balance, contained highly creative elements in great abundance"). Most recently, this circuit reaffirmed its *Keller* holding in *Davis*. *See, Davis*, 2015 U.S. App. LEXIS 154, at *10.

19

These cases clearly illustrate why the analysis focuses on the individual and not the work as a whole in order to balance the rights of creators with the rights of those they depict. Any other interpretation would eradicate the careful balance the transformative use defense was intended to recognize, as the addition of minimal creative expression would be sufficient to avoid liability, even with painstakingly literal depiction of the individual. Under that formulation, by simply adding a decorative background, even Mr. Saderup could have escaped liability.

Nothing in this case presents a compelling reason to revisit the transformative use test as none of the uses at issue are transformative. As discussed herein, this circuit has already conclusively determined that the use of the athletes' personas in these video games is not a transformative use. Additionally, television broadcasts or other uses of game footage lack transformative elements sufficient to implicate analysis under the test. The NCAA does not even meaningfully attempt to raise the issue other than to object to the test as articulated and applied by this circuit, in an effort to overturn settled law.

## C. Public Policy and Precedent Dictate That Individuals' Rights in Their Personas Be Protected From Unauthorized Exploitation.

There is an inherent market value in performer and athlete personas. The video game industry is a highly profitable industry that has long understood the value of intellectual property, including the value inherent in individuals' personas.

20

EA, in particular, strives for realism in its games. *O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 970 (N.D. Cal. 2014). Consequently, it has consistently negotiated with the professional sports leagues to "use their trademarks, logos, and other intellectual property" and with the players or groups representing them "for licenses to use their names, images, and likenesses." *Id*. (citations omitted). At trial, one of EA's vice presidents testified that EA would be interested in negotiating to acquire similar rights from the plaintiffs if NCAA rules did not prevent them from doing so. *Id*.

Understanding the commercial value inherent in performers' and athletes' personas many media and entertainment companies seek to exploit those personas, often without authorization in an effort to minimize their costs. Sometimes, the First Amendment will excuse unauthorized use, with free expression and creativity outweighing the individual's right in himself. When the balance has weighed toward the individual's right of publicity, those caught infringing have sought to defend their actions by seeking from the courts what amounts to a categorical license to appropriate these personal property rights in ways that may eviscerate individual rights of publicity altogether. Just as entertainment and media companies do not approve of others using their intellectual property without appropriate licensing, they should not benefit from using others' rights without appropriate consent and compensation.

21

While each individual, each form of media, and each use is unique, they hold in common that there is a value inherent in an individual's persona. The transformative use test was carefully crafted and has been thoughtfully elucidated and refined for over a decade to provide the courts sufficient guidance to craft reasonably consistent outcomes. While there may be some cases that fall in the middle of the spectrum, where reasonable minds can differ, most appropriations fall clearly along the spectrum, as the cases discussed herein illustrate.

As the Supreme Court expressed, an individual's right of publicity is worthy of protection from theft because "[n]o social purpose is served by having a defendant get free some aspect of the plaintiff that [has] market value for which he would normally pay." *Zacchini*, 433 U.S. at 576. For over a century, courts have found ways to strike a fair balance between these competing interests, without resorting to categorical exemptions or weighing artistic relevance. Public policy and precedent mandate they continue to do so.

## **CONCLUSION**

For the foregoing reasons and those in Appellee's Brief, this Court should affirm the decision below.

DATE: January 28, 2015        Respectfully submitted,

       By: _____/s/ Duncan Crabtree-Ireland_____
       DUNCAN CRABTREE-IRELAND

       DUNCAN CRABTREE-IRELAND
       DANIELLE S. VAN LIER
        SCREEN ACTORS GUILD-AMERICAN
        FEDERATION OF TELEVISION AND RADIO
        ARTISTS
       *Attorneys for Amicus*

## **CERTIFICATE OF COMPLIANCE.**

I certify pursuant to Federal Rules of Appellate Procedure 32(a)(7)(C) that the

attached brief is proportionately spaced, has a typeface of 14 points, and contains

5130 words, excluding those parts of the brief that the Rule exempts from the

word-count limitation, which is less than the 7,000 words permitted by Fed. R.

App. P. 29(d).

DATE: January 28, 2015              By: /s/ Duncan Crabtree-Ireland____
                                    DUNCAN CRABTREE-IRELAND

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief of *Amici Curiae* in Support of Plaintiffs-Appellees by Screen Actors Guild - American Federation of Television & Radio Artists and Luminary Group LLC with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 28, 2015.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Duncan Crabtree-Ireland
DUNCAN CRABTREE-IRELAND