## CASE NO. 12-57302
_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

### CINDY LEE GARCIA,
Plaintiff and Appellant,

v.

### GOOGLE INC. and YOUTUBE, LLC,
Defendants and Appellees.
_____

On Appeal from the United States District Court for the Central District of
California, CV-12-8315-MWF (VBKx)
District Judge Michael W. Fitzgerald
_____

## AMICUS CURIAE BRIEF BY NEWS ORGANIZATIONS IN SUPPORT OF
## GOOGLE'S PETITION FOR REHEARING EN BANC
_____

KELLI L. SAGER (State Bar No. 120162)
kellisager@dwt.com
DAN LAIDMAN (State Bar No. 274482)
danlaidman@dwt.com
BRENDAN N. CHARNEY (State Bar No. 293378)
brendancharney@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
865 S. Figueroa Street, Suite 2400, Los Angeles, California  90017-2566
Telephone: (213) 633-6800; Facsimile: (213) 633-6899

Attorneys for Amici Curiae Los Angeles Times Communications LLC, The E.W.
Scripps Company, The Washington Post, Advance Publications, Inc., the
California Newspaper Publishers Association, the Reporters Committee for
Freedom of the Press, the First Amendment Coalition, National Public Radio, Inc.,
and The Digital Media Law Project

## STATEMENT OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 29, Amici submit this brief with leave of the Court pursuant to its Order of March 13, 2013. <u>See</u> Dkt. # 61.

Counsel for the parties did not author this brief. Neither the parties nor their counsel have contributed money intended to fund preparing or submitting the brief. No person – other than Amici, their members, or their counsel – contributed money that was intended to fund preparing or submitting this brief.

The interests of the individual Amici and their corporate disclosure information are attached as Appendix A.

i

# TABLE OF CONTENTS

<u>Page</u>

I.    THE MAJORITY'S EXPANSIVE READING OF COPYRIGHT
LAW IMPLICATES IMPORTANT FIRST AMENDMENT
INTERESTS. ...............................................................................2

II.   THE PANEL DECISION SETS AN IMPERMISSIBLY LOW BAR
FOR ENJOINING THE PUBLICATION OF NEWSWORTHY
CONTENT...................................................................................8

III.  CONCLUSION............................................................................11

# TABLE OF AUTHORITIES

Page

**Cases**

Abend v. MCA, Inc.,
    863 F.2d 1465 (9th Cir. 1988) ............................................................9

Bank Julius Baer & Co. v. Wikileaks,
    535 F. Supp. 2d 980 (N.D. Cal. 2008) ..............................................10

Bollea v. Gawker Media, LLC,
    913 F. Supp. 2d 1325 (M. D. Fla. 2012) ..............................................3

Campbell v. Acuff-Rose Music,
    510 U.S. 569 (1994) ............................................................................9

CBS, Inc. v. Davis,
    510 U.S. 1315 (1994) (Blackmun, J., in chambers) ............................3

eBay Inc. v. MercExchange, L.L.C.,
    547 U.S. 388 (2006) ............................................................................9

Effects Associates, Inc. v. Cohen,
    908 F.2d 555 (9th Cir. 1990) ..............................................................4

Elrod v. Burns,
    427 U.S. 347 (1976) ..........................................................................10

Flexible Lifeline Sys. v. Precision Lift, Inc.,
    654 F.3d 989 (9th Cir. 2011) ..............................................................9

Four Navy Seals & Jane Doe v. AP,
    413 F. Supp. 2d 1136 (S.D. Cal. 2005) ..............................................3

Harper & Row, Publrs. v. Nation Enters.,
    471 U.S. 539 (1985) ............................................................................7

In New York Times Co v. Sullivan,
    376 U.S. 254 (1964) ............................................................................8

In re Charlotte Observer,
    882 F.2d 850 (4th Cir. 1989) ........................................................10

Miami Herald Publishing Co. v. Tornillo,
    418 U.S. 241 (1974)...........................................................................2

Nebraska Press Ass'n v. Stuart,
    427 U.S. 539 (1976)...........................................................................2

New York Times Co. v. United States,
    403 U.S. 713 (1971)...........................................................................3

Online Policy Group v. Diebold, Inc.,
    337 F. Supp. 2d 1195 (D. Cal. 2004)................................................2

R.A.V. v. City of St. Paul,
    505 U.S. 377 (1992).........................................................................10

Religious Technology Ctr. v. Lerma,
    908 F. Supp. 1362 (E.D.Va. 1995) ..................................................2

Rosemont Enterp. v. Random House, Inc.,
    366 F.2d 303 (2d Cir. 1966) .............................................................2

Sofa Entm't, Inc. v. Dodger Prods.,
    709 F.3d 1273 (9th Cir. 2013) ..........................................................7

United States v. Alvarez,
    617 F.3d 1198 (9th Cir. 2010) ........................................................10

Valle Del Sol Inc. v. Whiting,
    709 F.3d 808 (9th Cir. 2013) ..........................................................10

## Other Authorities

"Benghazi Timeline: How the Attack Unfolded," CBSNews.com
    (May 13, 2013) available at
    http://www.cbsnews.com/news/benghazi-timeline-how-the-attack-
    unfolded ............................................................................................6

"US Envoy Dies in Benghazi Consulate Attack," Al Jazeera (Sep. 12, 2012) available at http://www.aljazeera.com/news/middleeast/2012/09/20129112108 737726.html .................................................................................6

Chris Stephen, "US Consulate Attack In Benghazi: A Challenge To Official Version Of Events" (Sept. 9, 2013) available at http://www.theguardian.com/world/2013/sep/09/us-consulate-benghazi-attack-challenge; .................................................................6

David D. Kirkpatrick, "A Deadly Mix in Benghazi," N.Y. Times (Dec, 28, 2013) available at http://www.nytimes.com/projects/2013/benghazi/#/?chapt=3; ...........................6

Lorne Manley, "Legal Debate on Using Boastful Rap Lyrics as a Smoking Gun," New York Times, Mar. 26, 2014................................................5

Rowan Scarborough, "Benghazi: The Anatomy of a Scandal; How the Story of a U.S. Tragedy Unfolded – And Then Fell Apart," Washington Times (May 16, 2013) available at http://www.washingtontimes.com/news/2013/may/16/benghazi-the-anatomy-of-a-scandal/?page=all.....................................................6

Amici are journalists, publishers, and trade associations, whose members regularly gather and disseminate news and information on matters of public interest ("Media Amici").[1] Media Amici urge this Court to grant Google's petition for rehearing en banc to address the serious implications the Panel Decision has for news organizations, whose content often includes sensitive and controversial topics.

The Panel majority expansively interpreted copyright law to provide a remedy to an undeniably sympathetic plaintiff, without considering the important First Amendment interests implicated by its decision. By ordering the immediate suppression of a controversial video that has been the subject of widespread discussion over the last two years, based on the alleged copyright interest of one performer who appears in a few seconds of the film, the Panel's decision poses serious risk to news organizations that extend far beyond this case.

Notably, the "fair use" aspects of including five seconds of an allegedly copyrighted "performance" in a film was not mentioned by the Panel majority, even though that doctrine is one of the means by which First Amendment rights and copyright interests are harmonized. Nor were the practical implications considered if every "performer" in any expressive work is endowed with a

---

[1] A description of the individual Amici and their corporate disclosure information is attached as Appendix A. See also Letter Brief of Amici Curiae in Support of Rehearing En Banc of February 28, 2014 Order, Docket # 58-1.

monopoly interest in the work that enables him to immediately restrict the distribution of newsworthy information. See Section II.

Because the Panel majority failed to adequately consider the impact its decision could have on core First Amendment rights, and because its dramatic expansion of substantive copyright protection and remedies could empower putative plaintiffs to bypass well-established constitutional protections against restraints on speech,[2] rehearing should be granted.

## I.   THE MAJORITY'S EXPANSIVE READING OF COPYRIGHT LAW IMPLICATES IMPORTANT FIRST AMENDMENT INTERESTS.

The idea to use copyright law as a means of restraining speech, rather than a means of protecting commercial interests, is not a new one. Howard Hughes sought to silence a critical biographer,[3] Diebold Election Systems tried to hide security flaws in touch-screen voting machines,[4] the Church of Scientology attempted to suppress an affidavit describing its teachings,[5] and Navy SEALS

---

[2] Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 560-61 (1976) ("[r]egardless of how beneficent-sounding the purposes of controlling the press might be," the Court has "remain[ed] intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press.") (quoting Miami Herald Publishing Co.  v. Tornillo, 418 U.S. 241, 259 (1974) (White, J., concurring)).

[3] Rosemont Enterp. v. Random House, Inc., 366 F.2d 303 (2d Cir. 1966).

[4] Online Policy Group v. Diebold, Inc., 337 F. Supp. 2d 1195 (D. Cal. 2004).

[5] Religious Technology Ctr. v. Lerma, 908 F. Supp. 1362, 1366-68 (E.D.Va. 1995).

sought to keep photos private that depicted abuse of military prisoners,[6] all by asserting claims for copyright infringement.

Courts typically have rejected such efforts, emphasizing that copyright is intended to promote "the commercial interest of the artist/author" and not "to protect secrecy." Bollea v. Gawker Media, LLC, 913 F. Supp. 2d 1325, 1329 (M. D. Fla. 2012) (denying Hulk Hogan's request for copyright injunction barring news website from publishing sex tape excerpts). But the Panel decision threatens to dramatically expand the availability of copyright injunctions – even at a lawsuit's preliminary stages – by requiring the removal of a video based on alleged safety considerations, without evaluating First Amendment interests that typically have been found to preclude direct restraints on speech in other contexts. E.g., New York Times Co. v. United States, 403 U.S. 713 (1971) (refusing to enjoin publication of Pentagon Papers, despite claim that disclosure posed "grave and immediate danger" to national security); CBS, Inc. v. Davis, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers) (prior restraints are "presumptively unconstitutional," and "may be considered only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures.")

---

[6] Four Navy Seals & Jane Doe v. AP, 413 F. Supp. 2d 1136, 1142 (S.D. Cal. 2005).

Whether the Appellant could meet the strict standards typically applied to prior restraints on speech was not considered by the Panel.  Instead, the Panel majority stated simply that "the First Amendment doesn't protect copyright infringement."  Op. at 18.  This bypassing of well-established law threatens to provide plaintiffs with a means of silencing critical news reporting by using copyright claims to circumvent traditional constitutional protections.

First, the Panel decision arguably expands the concept of copyright ownership in a manner that could allow the subjects of news coverage to exercise veto power over unflattering broadcasts.  If an actress reading a script authored by someone else is "sufficiently creative to be protectable" (Op. at 7-8), public officials could argue that they "own" the copyright to their prepared remarks, or their extemporaneous responses to a videotaped interview.  Under the majority's broad reading of copyright ownership, the implied nonexclusive license that otherwise would exist[7] may be lost if the copyright holder claims that the "performance" was used in a different "context" than was originally represented.  Op. 14.  If a news outlet uses an interview for criticism or unflattering commentary, or if later developments cause the statements to take on a new light, the subject may claim that the use "differs radically" from what she originally

---

[7] Effects Associates, Inc. v. Cohen, 908 F.2d 555, 558-59 (9th Cir. 1990).

contemplated, and use the threat of a copyright lawsuit (or a DMCA takedown demand to an ISP) to censor news reports.

Similarly, the Decision could be used to suppress news reports where the "copyrightable work" is itself the story. A congressman whose controversial Twitter posts and "sexts" are disclosed could seize on copyright law to suppress the relevant content. Or a defendant whose violent song lyrics are discussed in a criminal case might assert a copyright claim to control media coverage. E.g., Lorne Manley, "Legal Debate on Using Boastful Rap Lyrics as a Smoking Gun," New York Times, Mar. 26, 2014.

Even an intoxicated underage actress who is filmed stumbling from a Hollywood nightclub might claim that she is "performing," and argue that the "modicum of creativity" involved entitles her to a copyright, and as a result, seek to prevent news coverage depicting her "performance." By dramatically expanding the scope of copyright ownership, and permitting a copyright "owner" to suppress speech without even considering fair use, the Panel majority opens the door to such claims.

The Decision similarly lays the foundation for copyright claims by countless individuals depicted in news broadcasts or photographs, no matter how fleetingly. News outlets routinely record and photograph street scenes and large crowds, including coverage of demonstrations, sporting events, and even natural disasters.

Individuals whose conduct involves "a modicum of creativity" could use the

DMCA process to demand that coverage of their copyrighted works be removed,

or even demand payment if their "performance" is publicly shown, with the

concomitant restriction on news coverage.

Second, even if the Decision is limited to the expressive work at issue here,

news coverage about the film and this lawsuit is undeniably hampered. For

example, news organizations reporting on the September 11, 2012 attack on the

U.S. Consulate in Benghazi, Libya initially reported conclusions from government

sources that the attack might have been perpetrated by a mob infuriated by the

portrayal of the Prophet Mohammed in the "Innocence of Muslims" film.[8] News

websites referenced, linked to, or embedded the film to provide their audiences

with context for the discussion about the role it might have played in the attack.[9]

---

[8] E.g., "US Envoy Dies in Benghazi Consulate Attack," Al Jazeera, (Sep. 12, 2012) available at
http://www.aljazeera.com/news/middleeast/2012/09/20129112108737726.html.

[9] E.g., "Benghazi Timeline: How the Attack Unfolded," CBSNews.com (May 13, 2013) available at http://www.cbsnews.com/news/benghazi-timeline-how-the-attack-unfolded; Chris Stephen, "US Consulate Attack In Benghazi: A Challenge To Official Version Of Events" (Sept. 9, 2013) available at http://www.theguardian.com/world/2013/sep/09/us-consulate-benghazi-attack-challenge, David D. Kirkpatrick, "A Deadly Mix in Benghazi," ch. 4, N.Y. Times (Dec, 28, 2013) available at
http://www.nytimes.com/projects/2013/benghazi/#/?chapt=3, Rowan Scarborough, "Benghazi: The Anatomy of a Scandal; How the Story of a U.S. Tragedy Unfolded – And Then Fell Apart," Washington Times (May 16, 2013) available at

Appellant's role in the video also was newsworthy; her claim that she was defrauded into participating sheds important light on the video's creation and the intent of its creators. The five-second clip in which she appears is critical to illustrate this point, as it apparently shows that her performance was overdubbed with dialogue disparaging Mohammed. Both First Amendment and copyright law support the ability of news organizations to include excerpts from a film, like this clip, in reporting about a controversy surrounding the video. E.g., Harper & Row, Publrs. v. Nation Enters., 471 U.S. 539, 563 (1985) (publication of "briefer quotes from the memoirs are arguably necessary adequately to convey the facts" in article about book's publication); Sofa Entm't, Inc. v. Dodger Prods., 709 F.3d 1273, 1276 (9th Cir. 2013) (theatrical production's use of clip from television show "to mark a historical point" was protected fair use). By ordering removal of this clip from the Internet,[10] the panel majority leaves Media Amici and other news organizations in an untenable – and, Amici believe, an unconstitutionally restricted – position, as they consider how to report about the ongoing controversy.

News outlets, including traditional publishers like newspapers, are increasingly posting video content and source documents online, including

---

http://www.washingtontimes.com/news/2013/may/16/benghazi-the-anatomy-of-a-scandal/?page=all.

[10] Rather than becoming the "editor" of the film, Google simply took the entire film off its site. A similar result is easy to anticipate if a news organization is ordered to omit portions of an expressive work from its news coverage.

"embedding" videos hosted by sites like YouTube, making them vulnerable to the same sorts of claims that Appellant brought against Google.[11]  Public discourse benefits immeasurably when the media can use original source material, including video, interview records, and primary documents; by doing so, the media allows the public to independently evaluate and draw conclusions from the controversial material.  By granting a preliminary injunction based on an actress's tenuous claim of copyright in her performance, the Panel opens a Pandora's box of copyright issues that casts a shadow over indispensable reporting tools and discourages news organizations from distributing primary materials to the public.

## II. THE PANEL DECISION SETS AN IMPERMISSIBLY LOW BAR FOR ENJOINING THE PUBLICATION OF NEWSWORTHY CONTENT.

In New York Times Co v. Sullivan, the Supreme Court recognized that a high bar to liability is essential to protect the "breathing space" for the exercise of First Amendment rights.  376 U.S. 254, 272-283 (1964).  An even greater threshold has been set for cases where injunctive relief is sought.  See note 2, supra.  The Panel majority dismissed the First Amendment interests, however, with the perfunctory statement that "the First Amendment doesn't protect copyright infringement."  Op. at 17-18.

---

[11] Indeed, Appellant supported her recent Emergency Motion seeking to hold Google in contempt by pointing to a "Washington Post article that links to the unedited version" of the "Innocence of Muslims" video.  See Dkt. # 67 at 53.

But even in the copyright context, a mere showing of likely – or even actual – infringement alone does not justify injunctive relief. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 392-93 (2006) ("this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."); Flexible Lifeline Sys. v. Precision Lift, Inc., 654 F.3d 989, 998 (9th Cir. 2011) (applying the injunction standard from Winter and eBay in copyright infringement action).

Instead, even in copyright cases, the court is supposed to consider equitable factors that provide independent safeguards against the issuance of injunctions that amount to governmental censorship. Abend v. MCA, Inc., 863 F.2d 1465, 1478-1479 (9th Cir. 1988) (despite finding of copyright infringement, court declined to enjoin distribution of film on the grounds that "an injunction could cause public injury by denying the public the opportunity to view a classic film for many years to come."); Campbell v. Acuff-Rose Music, 510 U.S. 569, 578 n.10 (1994) (even where courts find copyright infringement, in cases that do not involve "simple piracy," injunctions may be inappropriate where there is "a strong public interest in the publication of the secondary work [and] the copyright owner's interest may be adequately protected by an award of damages for whatever infringement is found").

In addition to the "public interest" in the content of the work itself, courts have emphasized that free speech concerns must be taken into account in weighing the "irreparable harm" and "balance of equities" factors.  As this Court and the Supreme Court have noted, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Valle Del Sol Inc. v. Whiting, 709 F.3d 808, 828 (9th Cir. 2013) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).  The panel majority virtually ignored this constitutional injury.  Nor did the majority give sufficient consideration to the fact that the video – and Appellant's role in it – already was widely disseminated and publicly discussed, making the effectiveness of an injunction highly doubtful.[12]  En banc rehearing is needed to ensure that these constitutional and equitable principles are considered and properly applied.[13]

_____

[12] Direct restraints on speech often are rejected where "there is evidence in the record that 'the cat is out of the bag' and the issuance of an injunction would therefore be ineffective…."  Bank Julius Baer & Co. v. Wikileaks, 535 F. Supp. 2d 980, 985 (N.D. Cal. 2008); In re Charlotte Observer, 882 F.2d 850, 854-855 (4th Cir. 1989) (prior restraint never can be justified when the "genie is out of the bottle").  Here, the video at issue has been publicly available since July 2012, and was the subject of widespread public discussion and debate for the last eighteen months.

[13] The injunction here also arguably engages in unconstitutional viewpoint discrimination.  As this Court held, "even entirely unprotected content cannot be targeted on the basis of view-point."  United States v. Alvarez, 617 F.3d 1198, 1204 n.4 (9th Cir. 2010) (emphasis added; citing R.A.V. v. City of St. Paul, 505 U.S. 377 (1992)).  Assuming that the "Innocence of Muslims" video is infringing,

### III. CONCLUSION

The Panel's decision risks allowing disgruntled subjects of news coverage to silence critical reports, through the expansive use of copyright law. For this reason, and because the important First Amendment interests were not properly considered by the Panel majority, Amici respectfully request that the Court grant Google's petition for rehearing en banc.

RESPECTFULLY SUBMITTED this 11th day of April, 2014.

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
DAN LAIDMAN
BRENDAN N. CHARNEY

By /s/ Kelli L. Sager
           Kelli L. Sager

Attorneys for Amici Curiae Los Angeles Times Communications LLC, The E.W. Scripps Company, The Washington Post, Advance Publications, Inc., the California Newspaper Publishers Association, the Reporters Committee for Freedom of the Press, the First Amendment Coalition, National Public Radio, Inc., and the Digital Media Law Project

---

its distribution <u>cannot</u> be proscribed based on its viewpoint. Yet the Panel majority appears to do just that, stating that the injunction was justified by a need to "disassociate" Appellant "from the film's anti-Islamic message." Op. at 17. The content of a particular work – no matter how offensive – should not be the litmus test for awarding injunctive relief.

## **Appendix A**

Pursuant to Federal Rules of Appellate Procedure 29(c) and 26.1, Amici Curiae provide the following:

**Los Angeles Times Communications LLC** (The Times), is the publisher of the Los Angeles Times, the largest metropolitan daily newspaper circulated in California.  The Times also publishes through Times Community News, a division of the Los Angeles Times, the Daily Pilot, Coastline Pilot, Glendale News-Press, The Burbank Leader, Huntington Beach Independent, and the La Cañada Valley Sun, and maintains the website www.latimes.com, a leading source of national and international news.  The Times is a wholly owned subsidiary of Tribune Publishing Company, LLC, which in turn is a wholly owned subsidiary of Tribune Company (which is publicly traded).  Tribune also publishes the Chicago Tribune, Baltimore Sun, Sun Sentinel (South Florida), Orlando Sentinel, Hartford Courant, The Morning Call, and Daily Press.

**The California Newspaper Publishers Association** (CNPA) is a non-profit trade association representing more than 800 daily, weekly and student newspapers in California.  For well over a century, CNPA has defended the First Amendment rights of publishers to gather and disseminate – and the public to receive – news and information.

**The Reporters Committee for Freedom of the Press** (RCFP) is an unincorporated association of reporters and editors with no parent corporation and no stock.  RCFP works to defend the First Amendment rights and freedom of information interests of the news media.  The Reporters Committee has provided representation, guidance and research in First Amendment and Freedom of Information Act litigation since 1970.

**The First Amendment Coalition** (FAC) is a non-profit advocacy organization based in San Rafael, California, which is dedicated to freedom of speech and government transparency and accountability.  FAC's members include news media outlets, both national and California-based, traditional media and digital, together with law firms, journalists, community activists and ordinary citizens.

**Advance Publications, Inc.**, directly and through its subsidiaries, publishes more than 20 print and digital magazines with nationwide circulation, local news in print and online in 10 states, and weekly business journals in over 40 cities throughout the United States.  It also owns numerous digital video channels and internet sites and has interests in cable systems serving over 2.4 million subscribers.  Advance Publications, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

**The E.W. Scripps Company** is a publicly traded corporation. It has no parent corporation, and no publicly owned company owns 10% or more of its stock. It is a diverse, 131-year-old media enterprise with interests in television stations, newspapers, and local news and information web sites. The company's portfolio of locally focused media properties includes: 19 TV stations (10 ABC affiliates, three NBC affiliates, one independent and five Azteca Spanish language stations); daily and community newspapers in 13 markets; and the Washington, D.C.-based Scripps Media Center, home of the Scripps Howard News Service.

**National Public Radio, Inc.** (NPR) is a privately supported, not-for-profit membership organization that has no parent company and issues no stock. It produces and distributes its radio programming through, and provides trade association services to, nearly 800 public radio member stations located throughout the United States and in many U.S. territories. NPR's award-winning programs include Morning Edition, and All Things Considered, and serve a growing broadcast audience of over 23 million Americans weekly. NPR also distributes its broadcast programming online, in foreign countries, through satellite, and to U.S. Military installations via the American Forces Radio and Television Service.

**WP Company LLC** (d/b/a The Washington Post) is a wholly owned subsidiary of Nash Holdings LLC. Nash Holdings LLC is privately held and does not have any outstanding securities in the hands of the public. WP Company LLC

publishes The Washington Post, one of the nation's leading daily newspapers, as well as a website (www.washingtonpost.com) that reaches a monthly audience of more than 20 million readers.

**The Digital Media Law Project** ("DMLP") is an unincorporated association hosted by the Berkman Center for Internet & Society at Harvard University. The DMLP is an academic research project that studies legal challenges to independent journalism and provides free legal tools and resources to the public. The DMLP frequently appears as amicus curiae in cases where the application of law will have a significant effect on the use of digital media to inform the public.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(c) and 32(a)(7)(C), and Circuit Rule 29-2(c), according to the word processing system used to prepare this letter brief, the word count is 2,477 words, not including the caption, tables, signature block, Statement of Compliance, Appendix A, and this certificate.

RESPECTFULLY SUBMITTED this 11th day of April, 2014.

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
DAN LAIDMAN
BRENDAN N. CHARNEY

By /s/ Dan Laidman
          Dan Laidman

Attorneys for Amici Curiae