Nos. 13-16106, 13-16107

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Before the Honorable Richard C. Tallman, Milan D. Smith, Jr.,
and Mary H. Murguia, Circuit Judges
(Panel decision filed September 14, 2015)

## STEPHANIE LENZ,

*Plaintiff-Appellee/Cross-Appellant,*

v.

## UNIVERSAL MUSIC CORP.; UNIVERSAL MUSIC PUBLISHING, INC.; AND UNIVERSAL MUSIC PUBLISHING GROUP,

*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
Honorable Jeremy D. Fogel, United States District Judge
D.C. No. 5:07-cv-03783-JF

## APPELLEE/CROSS-APPELLANT'S PETITION FOR
## REHEARING EN BANC OR PANEL REHEARING

Ashok Ramani - #200020
Michael S. Kwun - #198945
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
Telephone:  (415) 391-5400
Facsimile:    (415) 397-7188

Cindy Cohn - #145997
Corynne McSherry - #221504
Daniel K. Nazer - #257380
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone:  (415) 436-9333
Facsimile:    (415) 436-9993

*Attorneys for Plaintiff-Appellee/Cross-Appellant STEPHANIE LENZ*

998911

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................. 1

II. PROCEDURAL BACKGROUND ........................................................ 4

    A. The lawsuit ................................................................................ 4

    B. The panel decision .................................................................... 5

        1. The majority opinion ...................................................... 5

        2. The concurring and dissenting opinion ......................... 5

III. REASONS WHY REHEARING SHOULD BE GRANTED ................. 6

    A. The Court should grant rehearing en banc to address a
        question of exceptional importance .......................................... 6

        1. The meaning of "good faith belief" in 17 U.S.C.
            impacts a huge range of online speech .......................... 6

        2. The Court should overrule the *Rossi* panel's holding
            that any belief that is subjectively held, no matter how
            unreasonably, qualifies as a "good faith belief." ............... 8

        3. *Rossi*'s purely subjective standard is inconsistent with
            Congress's intent and the traditional fair use balance ..................... 11

        4. At a minimum, the Court should limit *Rossi* to factual
            determinations. ............................................................. 13

    B. Panel rehearing is warranted because the majority overlooked
        that whether the undisputed steps of Universal's review
        included a consideration of fair use is a question of law, not
        fact. .......................................................................................... 17

IV. CONCLUSION ................................................................................. 19

EXHIBIT A: PANEL DECISION

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Alvarez v. IBP, Inc.*
339 F.3d 894 (9th Cir. 2003) .......................................................................... 9

*Austin v. McNamara*
979 F.2d 728 (9th Cir. 1992) .......................................................................... 9

*Brooks v. Village of Ridgefield Park*
185 F. 3d 130 (3d Cir. 1999) .......................................................................... 9

*Campbell v. Acuff-Rose Music, Inc.*
510 U.S. 569 (1994) ...................................................................................... 13

*Disney v. Hotfile*
2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) ............................................. 17

*In re Agric. Research & Tech. Grp.*
916 F. 2d 528 (9th Cir. 1990) ....................................................................... 15

*In re Bressman*
327 F.3d 229 (3d Cir. 2003) .......................................................................... 15

*In re Nieves*
648 F.3d 232 (4th Cir. 2011) ........................................................................ 15

*In re Nordic Village, Inc.*
915 F.2d 1049 (6th Cir. 1990) ...................................................................... 15

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*
559 U.S. 573 (2010) ...................................................................................... 14

*Kyle v. Campbell Soup Co.*
28 F.3d 928 (9th Cir. 1994) .......................................................................... 14

*Lange v. Penn Mut. Life Ins. Co.*
843 F.2d 1175 (9th Cir. 1988) ...................................................................... 16

*Lenz v. Universal Music Corp.*
2013 WL 271673 (N.D. Cal. Jan. 24, 2013) ................................................ 19

*Moyo v. Gomez*
40 F.3d 982 (9th Cir. 1994) .......................................................................... 12

*Online Policy Grp. v. Diebold, Inc.*
337 F. Supp. 2d 1195 (2004) ........................................................................ 11

*Religious Tech. Ctr. v. Lerma*
  908 F. Supp. 1362 (E.D. Va. 1995) ............................................................... 14

*Rossi v. Motion Picture Association of America*
  391 F.3d 1004 (9th Cir. 2004) .................................................................*passim*

*Rudiger Charolais Ranches v. Vam De Graaf Ranches*
  994 F.2d 670 (9th Cir. 1993) ......................................................................... 16

*UMG Recordings, Inc. v. Shelter Capital Partners*
  718 F.3d 1006 (9th Cir. 2013) ........................................................................ 1

*United States v. Nordic Village, Inc.*
  503 U.S. 30 (1992)......................................................................................... 15

*Zaldivar v. City of Los Angeles*
  780 F.2d 823 (9th Cir. 1986) ......................................................................... 10

## Federal Statutes

17 U.S.C. § 512 .............................................................................................*passim*

29 U.S.C. § 260 ................................................................................................. 9

## Other Statutes

U.C.C. § 1-201............................................................................................ 16, 15

## Legislative History

S. REP. NO. 105-190 (1998).......................................................................... 2, 7, 12

## Other Authorities

NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION (7th ed. 2014).............. 12

Assaf Hamdani, *Who's Liable for Cyberwrongs?,* 87 CORNELL L. REV. 901 (2002) ........ 7

Lydia Pallas Loren, *Deterring Abuse of the Copyright Takedown Regime by Taking Misrepresentation Claims Seriously*, 46 WAKE FOREST L. REV. 745, 774 (2011) ....... 13

*Notice and Takedown for Trademarks,* 101 TRADEMARK REP. 249, 278–79 (2011) ....... 12

## I.    INTRODUCTION

Stephanie Lenz respectfully petitions the Court for rehearing en banc to address a question of exceptional importance: Whether Congress, in drafting the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA"), intended to grant private parties the practical power to censor speech based on an *unreasonable* belief that a copyright has been infringed, as long as that belief is (like all beliefs) subjectively held.

The importance of this question for the future of free speech cannot be overstated. The digital age has fostered an explosion of speech and creativity, much of it from people that never before had access to a megaphone at all, let alone a digital megaphone that can reach millions. This expression—political commentary, artistic works, scientific research, music, even gossip—depends in turn on intermediaries (like YouTube or Facebook) that carry that speech. Because the DMCA safe harbors[1] grant intermediaries immunity from suit when they take down material that private parties assert infringes copyright,[2] the incentives in those safe harbors help shape what speech is or is not allowed to reach an audience. Unless there are reasonable repercussions for sending false infringement

---

[1] 17 U.S.C. § 512(a)–(d).

[2] *See UMG Recordings, Inc. v. Shelter Capital Partners,* 718 F.3d 1006, 1014 (9th Cir. 2013).

1

notices, it is all too easy for copyright holders (or purported copyright holders) to use even frivolous allegations to silence lawful speech.

For this reason, Congress "was acutely concerned that it provide all end-users . . . with appropriate procedural protections to ensure that material is not disabled without proper justification."[3] Consistent with that intent, Congress required a copyright owner or its agent to affirm that the content it targets for takedown is "not authorized by . . . the law."[4] That assertion cannot be made without due care, or based on supposition—it must be made in "good faith."[5] To give this requirement teeth, Congress created a private cause of action for those damaged by false claims of infringement.[6]

Lenz sued Universal for just such a false claim. Universal asserted that she infringed a Prince copyright by uploading a 29-second YouTube video of her children playing, because the song *Let's Go Crazy* could be heard in the background. The majority concluded that even if Universal's claim was unreasonable, that was not enough to hold Universal liable, because the majority believed it was constrained by another panel decision, *Rossi v. Motion Picture*

---

[3] S. REP. NO. 105-190 at 21 (1998).

[4] 17 U.S.C. § 512(c)(3)(A)(v).

[5] *Id.*

[6] *Id.* § 512(f).

*Association of America.*[7] The *Rossi* panel erroneously held that the "good faith belief" that the DMCA takedown notice sender must affirm requires only a subjectively held view, no matter whether it is reasonable or not.[8]

On that view, someone under the misimpression that his name is copyrighted could demand takedown of any online criticism, free from consequences for this unreasonable ignorance of the law. The Court, sitting en banc, should either overrule *Rossi,* or hold that its subjective standard does not countenance ignorance of the law, but applies only to factual determinations.

In the alternative, Lenz requests panel rehearing because the majority erred in finding a material factual dispute whether the steps that Universal took in reviewing the video—steps that are factually undisputed—sufficed to form a good faith belief that the video infringed, including that it was not a fair use. The majority overlooked that whether Universal's actions constituted consideration of fair use—the issue that the majority directed a *jury* to decide—is a question of *law,* not fact. And as the district court correctly held, simple consideration of isolated facts that might have relevance to fair use, without considering how those facts relate to fair use, is no consideration of fair use at all. Thus, if the Court does not grant rehearing en banc, it should grant panel rehearing.

---

[7] 391 F.3d 1004 (9th Cir. 2004).

[8] *Id.* at 1004–05.

3

## II.    PROCEDURAL BACKGROUND

### A.    The lawsuit

The following background is drawn from the panel opinion's statement of facts and procedural history, in which all three judges joined. Stephanie Lenz posted a 29-second home video of her two young children dancing in her kitchen. A portion of the Prince song *Let's Go Crazy* can be heard in the background.

Universal, acting on Prince's behalf, sent YouTube a notice claiming that hundreds of videos posted on YouTube, including the video posted by Lenz, infringed copyrights in Prince's musical compositions. In that notice, Universal stated that it had a "good faith belief" that the videos were not authorized by Prince, his agent, or "the law."

Lenz filed a complaint alleging that Universal had violated § 512(f) of the DMCA by making a knowing material misrepresentation that the video was not authorized by law. Universal's employees testified that Universal's policy was to request takedown of a video if it determined that a Prince composition was the "focus" of the video. Universal's guidelines did not mention fair use.[9]

Lenz and Universal filed cross-motions for summary judgment, which were denied. The district court certified its order for interlocutory appeal, and this Court

---

[9] Indeed, as the dissent noted, "[i]t is undisputed that Universal did not consider fair use." Dissent at 31.

granted the parties permission to appeal. On September 14, 2015, this Court issued its opinion in this case, and on September 18, 2015, the Court extended the time in which to file a petition for rehearing or rehearing en banc to October 20, 2015.

### B.    The panel decision

#### 1.    The majority opinion

The majority held that the Copyright Act "unambiguously contemplates fair use as a use authorized by law,"[10] that a copyright holder must consider whether the doctrine applies to a use before sending a takedown notice under the DMCA,[11] and that "if a copyright holder ignores or neglects" that consideration "it is liable for damages under § 512(f)."[12]

The majority also held, however, that because Universal contends that its procedures "were tantamount" to a fair use consideration, a jury must determine whether Universal's actions were sufficient to form a good faith belief about the video's fair use or lack thereof.[13]

#### 2.    The concurring and dissenting opinion

Judge Milan D. Smith concurred in all but Part IV.C of the majority's opinion, which considered whether there was a material dispute of fact regarding

---

[10] Majority at 11.

[11] *Id.* at 15.

[12] *Id.* at 17.

[13] *Id.*

Universal's liability. The dissent argued that § 512(f) prohibits misrepresentations that a work is infringing,[14] that there was no material dispute that Universal did not consider fair use,[15] and that it was therefore liable under § 512(f) if the video was a fair use.[16] The dissent construed the "knowingly" requirement of § 512(f) this way:

> Universal may be held liable for knowingly misrepresenting that the video was infringing if, knowing it had not considered whether the video was a fair use, it erroneously asserted that it was infringing. A party cannot truthfully represent that a work subject to the fair use doctrine is infringing if the party knowingly failed to consider whether the doctrine applies.[17]

The dissent further noted that this construction of "knowingly" is consistent with common law principles of deceit and fraud.[18] The dissent concluded that the only question remaining is whether the video is a fair use.[19]

## III.  REASONS WHY REHEARING SHOULD BE GRANTED

### A.  The Court should grant rehearing en banc to address a question of exceptional importance.

#### 1.  The meaning of "good faith belief" in 17 U.S.C. impacts a huge range of online speech.

Because the DMCA impacts a staggering range of online speech, the balance

---

[14] Dissent at 27–31.

[15] *Id.* at 31–32.

[16] *Id.* at 32.

[17] *Id.* at 29.

[18] *Id.* at 30.

[19] *Id.* at 32.

it strikes between the rights and responsibilities of speakers and copyright holders is a question of exceptional importance.

Section 512 of the DMCA is unique in American law, in that it provides copyright owners with a streamlined, extra-judicial means of silencing speech. Online speech is impossible without the service providers that run the servers that are the backbone of the internet. Given the incentives of the DMCA safe harbors, those intermediaries will usually respond to a DMCA takedown notice by quickly removing the challenged content.[20] Thus, by simply sending an email or filling out a webform, a copyright owner, or indeed anyone who wishes to remove speech for whatever reason, can do so.

Congress created § 512(f) to curb abuse of this extraordinary power—abuses documented in an amicus brief filed in this case.[21] Congress recognized that it needed to balance "the need for rapid response to potential infringement with the end-users['] legitimate interests in not having material removed without recourse."[22]

Given the reach of the DMCA, it is crucial to get that balance right. The

---

[20] *See generally* Assaf Hamdani, *Who's Liable for Cyberwrongs?,* 87 CORNELL L. REV. 901 (2002).

[21] *See* Brief of Amicus Curiae Automattic Inc. *et al.* at 8–13 (Doc. 48) (discussing abuses of the DMCA that attack scholarly lectures, product reviews, news interviews, blog posts, political parodies, and speech by whistleblowers).

[22] S. REP. NO. 105-190 at 21.

majority decision and *Rossi* have the effect of giving private parties the ability to do what no court could: silence even lawful speech, based on nothing more than a supposition. En banc review is necessary to correct this wrong.

### 2. The Court should overrule the *Rossi* panel's holding that any belief that is subjectively held, no matter how unreasonably, qualifies as a "good faith belief."

The majority rejected Lenz's argument that Universal could be held liable under 17 U.S.C. § 512(f) because its purported belief that the video infringed was not reasonable.[23] In so holding, the majority relied on the *Rossi* panel's decision.[24] *Rossi*, however, was wrongly decided.

Michael Rossi ran a website that promised "Full Length Downloadable Movies" to anyone who paid a monthly subscription fee.[25] Seeing this claim, the MPAA concluded Rossi was infringing its members' copyrights and sent a DMCA takedown notice.[26] But Rossi was lying—subscribers to his site were not able to download movies at all.[27]

Rossi argued that the MPAA was required to conduct a reasonable factual investigation before sending a takedown notice, while the MPAA asserted it need

---

[23] Majority at 16–17.

[24] *Id.* at 17.

[25] *Rossi,* 391 F.3d at 1002.

[26] *Id.* at 1003.

[27] *Id.*

8

only have a purely subjectively held opinion.[28] As the *Rossi* panel recognized, "[t]he unequivocal language used by Rossi not only suggest[ed]" infringement, it "virtually compel[led]" that conclusion.[29] So there was nothing unreasonable about the MPAA taking Rossi's words at face value, instead of continuing to investigate. In short, even under Rossi's view of the law, the MPAA's takedown notice was proper.

The *Rossi* panel should have stopped by determining the MPAA's takedown notice was proper, under either party's view of the law. Instead, and unnecessarily, it also held that the "good faith belief" that the DMCA requires need only be a subjectively held state of mind.[30] The *Rossi* panel relied on three cases interpreting the bare phase "good faith."[31] But § 512(c)(3)(A)(v) does not use the bare phrase "good faith"—it requires a good faith *belief.* The word "belief," on its own, already requires a subjective state of mind; if *any* subjectively held viewpoint is a "good faith belief," the words "good faith" are superfluous.

---

[28] *Id.* at 1003–04.

[29] *Id.* at 1005.

[30] *Id.* at 1004.

[31] *See id.* (discussing *Alvarez v. IBP, Inc.,* 339 F.3d 894, 910 (9th Cir. 2003) (interpreting "action . . . in good faith" in 29 U.S.C. § 260); *Austin v. McNamara,* 979 F.2d 728, 734 (9th Cir. 1992) (referring to "subjective good faith" standard); *Brooks v. Village of Ridgefield Park,* 185 F. 3d 130, 137 (3d Cir. 1999) (interpreting 29 U.S.C. § 260)).

Instead, "good faith belief" connotes a subjectively held viewpoint (a "belief") that is also *reasonably* held (in "good faith"), even if it is wrong. This means that a representation of a good faith belief is false if it is *either* not subjectively held (there is no "belief") *or* unreasonably held (the belief is not held in "good faith"). This is consistent with Congress's intent (as explained below), and this Court's precedent in *Zaldivar v. City of Los Angeles,*[32] in which the Court held that "[a] good faith belief in the merit of a legal argument is an objective condition . . . ."[33] That belief "need not be correct," but it must "be defensible."[34] As the dissent in the present case noted, "[t]he requirement that a party hold a 'good faith' belief that 'the infringing material is not authorized by the law' would be rendered meaningless if parties could wholly omit to consider whether the material was a fair use, and was therefore not an 'infringing material' at all."[35] Holding that a "belief" with an unreasonable basis—such as a failure to consider fair use—is no "good faith belief" at all avoids this problem.

Compounding its error, the *Rossi* panel further held that the phrase "knowing misrepresentation" in § 512(f) requires "some actual knowledge of

---

[32] 780 F.2d 823 (9th Cir. 1986).

[33] *Id.* at 831.

[34] *Id.*

[35] Dissent at 29.

misrepresentation on the part of the copyright owner."[36] Yet § 512(f) does not

mention "actual" knowledge, and Rossi was not even seeking relief under § 512(f).

Prior to *Rossi,* a district court judge—the same judge presiding over this case

below—had no trouble holding that "knowledge," without the "actual" qualifier,

includes constructive knowledge.[37] Similarly, the dissent explains that "a

misrepresentation is knowing if the party knows it is ignorant of the truth or falsity

of its representation."[38]

### 3. *Rossi*'s purely subjective standard is inconsistent with Congress's intent and the traditional fair use balance.

Congress crafted § 512(f) to allow users to hold copyright owners

accountable if they send improper takedown notices. As the Senate Report on

§ 512(f) explained,

> The Committee was acutely concerned that it provide all end-users . . .
> with appropriate procedural protections to ensure that material *is not
> disabled without proper justification*. The provisions in the bill
> balance the need for rapid response to potential infringement with the
> end-users['] legitimate interests in *not having material removed*

---

[36] 391 F.3d at 1005.

[37] *See Online Policy Grp. v. Diebold, Inc.,* 337 F. Supp. 2d 1195 (2004) (Fogel, J.) (construing "knowing" misrepresentation in §512(f) to mean "a party actually knew, should have known if it acted with reasonable care or diligence, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations.").

[38] Dissent at 30.

*without recourse.*[39]

As a cause of action designed to protect users' speech, § 512(f) should be construed to ensure that it actually provides users with the recourse Congress intended.[40]

*Rossi* and the majority decision in this case have opposite effect of narrowing the cause of action to a point where, as a practical matter, it provides almost no protection for users. One law journal article has noted the lack of judgments against copyright owners under § 512(f), and the paucity even of monetary settlements,[41] concluding that "[t]he problem seems to be the subjective bad faith standard."[42] *Rossi* and the majority here place the burden on the person whose speech was taken down to prove to a jury the subjective belief of the censor—a standard and process that will be all but impossible for most. Discovery becomes a nightmare, fraught with investigations into subjective beliefs about the law that likely will draw privilege objections. As another commentator has noted,

---

[39] S. REP. NO. 105-190 at 21 (emphases added).

[40] *See Moyo v. Gomez*, 40 F.3d 982, 985 (9th Cir. 1994) (remedial statutes should be construed broadly); 3 NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 60.02 (7th ed. 2014) (statutes that create a cause of action to vindicate a right should be considered remedial).

[41] Frederick W. Mostert & Martin B. Schwimmer, *Notice and Takedown for Trademarks,* 101 TRADEMARK REP. 249, 278–79 (2011).

[42] *Id.* at 279.

"Requiring that a plaintiff may only prove a misrepresentation was made 'knowingly' by demonstrating the subjective belief of the copyright owner not only is inconsistent with the statutory language, but application of such a standard also would thwart the purpose of including the misrepresentation claim within the statutory scheme."[43]

It gets worse: If the sender of an improper takedown cannot suffer liability under § 512(f) no matter how unreasonable its belief, *Rossi* effectively eliminates § 512(f) protections for even classic fair uses. Many copyright owners unreasonably believe that virtually all uses of copyrighted works must be licensed. Fair use exists, in significant part, to make sure such unreasonable beliefs don't thwart new creativity. In particular, it protects uses, such as parody and criticism, that copyright owners are unlikely to license.[44] Allowing a copyright owner to hide behind unreasonable beliefs undermines this crucial protection.

### 4. At a minimum, the Court should limit *Rossi* to factual determinations.

Whatever might be said about *Rossi*'s subjective standard in general, it should not be applied to legal determinations. "Ignorance of the law will not

---

[43] Lydia Pallas Loren, *Deterring Abuse of the Copyright Takedown Regime by Taking Misrepresentation Claims Seriously*, 46 WAKE FOREST L. REV. 745, 774 (2011).

[44] *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 (1994).

excuse any person, either civilly or criminally."[45] Extending *Rossi*'s subjective standard to legal conclusions, as the majority did, not only rewards ignorance of the law, it encourages it.[46] It directly contravenes the long-standing principle that a "mistake of law does not constitute excusable neglect."[47]

By contrast, requiring reasonable legal determinations encourages those who wish to use the law as a sword to muster a basic understanding of the weapon. It helps protect lawful speech by encouraging senders of takedown notices to discover whether the speech they are targeting is actually *un*lawful. It even allows the sender to make a mistake—just not an unreasonable mistake. It asks the sender to base her allegation of infringement on what is actually in the Copyright Act, rather than what she might have gleaned from movies, television, or Twitter.

Requiring reasonable legal conclusions is consistent with analogous areas of the law. For example, whether it was *reasonable* to sue for copyright infringement bears on whether a copyright lawsuit was brought in *good faith*.[48]

---

[45] *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) (quoting *Barlow v. United States*, 32 U.S. 404, 411 (1833) (Story, J.)).

[46] *See id.* at 588 (excusing subjective legal errors creates an "affirmative incentive" not to learn about the law).

[47] *Kyle v. Campbell Soup Co.*, 28 F.3d 928, 932 (9th Cir. 1994).

[48] *Religious Tech. Ctr. v. Lerma,* 908 F. Supp. 1362, 1368 (E.D. Va. 1995) (awarding fees because "no reasonable copyright holder could have in good faith brought a copyright infringement action").

Likewise, in bankruptcy, this Court has held that the "good faith" of a transferee turns on what it "knew or should have known," not its purely subjective state of mind.[49] Other courts have held, as with *Rossi*'s conclusion regarding factual determinations, that that there is no "duty to investigate, to be a monitor for creditors' benefit when nothing known so far suggests that there is a fraudulent conveyance in the chain."[50] However, "'knowledge' is satisfied if the transferee 'knew facts that would lead a reasonable person to believe that the property transferred was recoverable.'"[51] And, knowledge that "would lead a reasonable person to inquire into the public record" constitutes a lack of good faith.[52] A transferee does not have a duty to discover facts, but it cannot act unreasonably based on the facts it knows.

The Uniform Commercial Code makes a comparable distinction between factual and legal determinations. The U.C.C. defines good faith as requiring not just a subjective belief, but also "the observance of reasonable commercial

---

[49] *In re Agric. Research & Tech. Grp.,* 916 F. 2d 528, 535–36 (9th Cir. 1990).

[50] *In re Bressman,* 327 F.3d 229, 237 (3d Cir. 2003) (citing *Smith v. Mixon,* 788 F.2d 229, 232 (4th Cir. 1986)).

[51] *In re Nordic Village, Inc.,* 915 F.2d 1049, 1055 (6th Cir. 1990) (quoting *Smith,* 788 F.2d at 232 n.2), *rev'd on other grounds sub nom., United States v. Nordic Village, Inc.,* 503 U.S. 30 (1992).

[52] *In re Nieves,* 648 F.3d 232, 240 (4th Cir. 2011).

standards of fair dealing."[53] As this Court has recognized, a subjectively held belief based on a procedure that is inconsistent with the law does not constitute "good faith."[54] Similarly, this Court has recognized that an insurer breaches its duty of "good faith" to its insured when it "'intentionally denies or fails to process or pay a claim without a *reasonable basis* for such action.'"[55]

Finally, requiring reasonable legal determinations puts § 512(f)'s protections within reach of ordinary users by sensibly reducing the § 512(f) inquiry in most cases to (1) what the defendant reviewed before sending a takedown notification; and (2) whether the defendant's assertions, based on that review, were reasonable. By contrast, if a defendant can escape liability based on *unreasonable* beliefs about the law, absent "smoking gun" evidence of what was in the defendant's mind, the defendant can always hope that a jury might not be convinced that it should be held liable, no matter how absurd the infringement assertion.

By contrast, applying *Rossi*'s subjective standard to legal determinations undermines Congress's explicit intent, and eviscerates § 512(f) protections for many users. The *Rossi* panel never had occasion carefully to consider the risks of

---

[53] U.C.C. § 1-201(b)(20).

[54] *Rudiger Charolais Ranches v. Vam De Graaf Ranches*, 994 F.2d 670, 673 (9th Cir. 1993).

[55] *Lange v. Penn Mut. Life Ins. Co.,* 843 F.2d 1175, 1182 (9th Cir. 1988) (quoting *Noble v. National Am. Life Ins. Co.,* 128 Ariz. 188, 190 (1981)) (emphasis added).

giving a pass to unreasonable legal determinations, because Rossi claimed only that the MPAA's factual investigation was inadequate. That is why, as a district court observed in *Disney v. Hotfile*,[56] "The clear lesson of *Rossi* is that 'as a prerequisite to liability under section 512(f), a defendant must have actual knowledge that it is making a misrepresentation of *fact*.'"[57]

At a minimum, the Court should grant rehearing en banc to reinforce that point, clarify that *Rossi's* purely subjective standard does not apply to legal determinations, and find Universal liable because there was no reasonable legal basis for its infringement claim against a grainy 29-second home video of a toddler dancing.

**B. Panel rehearing is warranted because the majority overlooked that whether the undisputed steps of Universal's review included a consideration of fair use is a question of law, not fact.**

If rehearing en banc is not granted, the panel should grant rehearing because there are no disputed issues of *fact* regarding Universal's liability. The majority held that "Universal faces liability if it knowingly misrepresented in the takedown notification that it had formed a good faith belief the video was not authorized by

_____

[56] 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013).

[57] *Id.* at *46 n.29 (quoting *Cabell v. Zimmerman,* 2010 WL 996007, at *4 (S.D.N.Y. Mar. 12, 2010) (citations omitted)) (emphasis added).

the law, i.e., did not constitute fair use."[58] The majority further held that a *failure* to "consider fair use before sending a takedown notification" subjects the sender of the takedown notice to "liab[ility] for damages under § 512(f)."[59]

Where the panel erred was its conclusion that "a jury must determine whether Universal's actions were sufficient to form a subjective good faith belief about the video's fair use or lack thereof."[60] There are no disputed *factual* issues for a jury to resolve. Universal's policy was to request takedown of a video if it determined that a Prince composition was the "focus" of the video.[61] The Universal employee who made this determination testified as to the specific rules he followed to do so.[62] The guidelines made no mention of fair use.[63] Given a chance to reconsider the matter when Lenz counternoticed, Universal still made no mention of fair use, stressing instead that the video was unlicensed.[64]

Universal *nowhere* disputes the actions it took. Instead, it disputes only whether those undisputed actions were a consideration of fair use. That is not a

---

[58] Majority at 27.

[59] *Id.* at 17.

[60] *Id.*

[61] *Id.* at 6.

[62] *Id.*

[63] *Id.*

[64] *Id.* at 7.

factual question—it is a question of *what § 512(c)(3)(A)(v) requires.* That is an issue of statutory construction, and thus a question of *law,* not fact.

Accordingly, there is no jury issue. Indeed, the district court held that the evidence established that "Universal issued its Takedown Notice without considering fair use."[65] The district court explained that it was not sufficient "for a copyright holder to consider facts that might be relevant to a fair use analysis without making any effort to evaluate the significance of such facts in the context of the doctrine itself."[66]

That *legal* conclusion was correct, as the dissent explains: "Universal's policy of determining whether 'the composition was the focus of the video' simply did not permit it to form an opinion about how the fair use factors applied to the video."[67] The panel should grant rehearing and direct the district court to enter summary adjudication of liability in Lenz's favor.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant rehearing en banc or panel rehearing.

---

[65] 2013 WL 271673, at *6 (N.D. Cal. Jan. 24, 2013).

[66] *Id.*

[67] Dissent at 31.

Respectfully submitted,

DATED: October 20, 2015

By: *s/Michael S. Kwun*
    MICHAEL S. KWUN

*Attorneys for Plaintiff-Appellee/Cross-Appellant STEPHANIE LENZ*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the attached brief complies with the type-volume requirements of Circuit Rule 40-1(a), the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). Microsoft Word 2010 reports that it contains 4,199 words, not including those sections excluded in Fed. R. App. P. 32(a)(7)(B)(iii), and it is proportionately spaced using Microsoft Word 2010 in 14-point Times New Roman type.

DATED: October 20, 2015

By: *s/Michael S. Kwun*
        MICHAEL S. KWUN

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 20, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


DATED:   October 20, 2015

*s/Roseann Cirelli*
ROSEANN CIRELLI

22

# EXHIBIT A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| STEPHANIE LENZ,<br><br>       *Plaintiff-Appellee/*<br>       *Cross-Appellant*,<br><br>v.<br><br>UNIVERSAL MUSIC CORP.;<br>UNIVERSAL MUSIC PUBLISHING INC.;<br>UNIVERSAL MUSIC PUBLISHING<br>GROUP INC.,<br><br>       *Defendants-Appellants/*<br>       *Cross-Appellees*. | Nos. 13-16106<br>13-16107<br><br>D.C. No.<br>5:07-cv-03783-<br>JF<br><br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Jeremy D. Fogel, District Judge, Presiding

Argued and Submitted
July 7, 2015—San Francisco, California

Filed September 14, 2015

Before: Richard C. Tallman, Milan D. Smith, Jr.,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Tallman;
Partial Concurrence and Partial Dissent by Judge Milan D.
Smith, Jr.

2     LENZ V. UNIVERSAL MUSIC

## SUMMARY[*]

### Digital Millennium Copyright Act

The panel affirmed the district court's denial of the parties' cross-motions for summary judgment in an action under the Digital Millennium Copyright Act ("DMCA") alleging that the defendants violated 17 U.S.C. § 512(f) by misrepresenting in a takedown notification that the plaintiff's home video constituted an infringing use of a portion of a Prince composition.

The panel held that the DMCA requires copyright holders to consider fair use before sending a takedown notification, and that failure to do so raises a triable issue as to whether the copyright holder formed a subjective good faith belief that the use was not authorized by law. Regarding good faith belief, the panel held that the plaintiff could proceed under an actual knowledge theory. The panel held that the willful blindness doctrine may be used to determine whether a copyright holder knowingly materially misrepresented that it held a good faith belief that the offending activity was not a fair use. The plaintiff here, however, could not proceed to trial under a willful blindness theory because she did not show that the defendants subjectively believed there was a high probability that the video constituted fair use. The panel also held that a plaintiff may seek recovery of nominal damages for an injury incurred as a result of a § 512(f) misrepresentation.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Judge M. Smith concurred in part, dissented in part, and concurred in the judgment. Dissenting from Part IV.C of the majority opinion, addressing good faith belief, he questioned whether § 512(f) directly prohibits a party from misrepresenting that it has formed a good faith belief that a work is subject to the fair use doctrine. He wrote that the plain text of the statute prohibits misrepresentations that a work is infringing, not misrepresentations about the party's diligence in forming its belief that the work is infringing. Judge M. Smith disagreed that there was any material dispute about whether the defendants considered fair use, and he wrote that the willful blindness doctrine does not apply where, as here, a party has failed to consider fair use and has affirmatively misrepresented that a work is infringing.

## COUNSEL

Kelly M. Klaus (argued) and Melinda LeMoine, Munger, Tolles & Olson LLP, Los Angeles, California, for Defendants-Appellants/Cross-Appellees.

Corynne McSherry (argued), Cindy Cohn, Kurt Opsahl, Daniel K. Nazer, and Julie Samuels, Electronic Frontier Foundation, San Francisco, California; Ashok Ramani, Michael S. Kwun, and Theresa H. Nguyen, Keker & Van Nest LLP, San Francisco, California, for Plaintiff-Appellee/Cross-Appellant.

Steven Fabrizio and Scott Wilkens, Jenner & Block LLP, Washington, D.C., for Amicus Curiae Motion Picture Association of America, Inc.

4                    LENZ V. UNIVERSAL MUSIC

Jennifer Pariser, Of Counsel, Recording Industry Association of America, Washington, D.C.; Cynthia Arato, Marc Isserles, and Jeremy Licht, Shapiro, Arato & Isserles LLP, New York, New York, for Amicus Curiae Recording Industry Association of America.

Joseph Gratz, Durie Tangri LLP, San Francisco, California, for Amici Curiae Google Inc., Twitter Inc., and Tumblr, Inc.

Marvin Ammori and Lavon Ammori, Ammori Group, Washington, D.C., for Amicus Curiae Automatic, Inc.

Julie Ahrens and Timothy Greene, Stanford Law School Center for Internet and Society, Stanford, California, for Amici Curiae Organization fo Transformative Works, Public Knowledge, and International Documentary Association.

## OPINION

TALLMAN, Circuit Judge:

Stephanie Lenz filed suit under 17 U.S.C. § 512(f)—part of the Digital Millennium Copyright Act ("DMCA")—against Universal Music Corp., Universal Music Publishing, Inc., and Universal Music Publishing Group (collectively "Universal"). She alleges Universal misrepresented in a takedown notification that her 29-second home video (the "video") constituted an infringing use of a portion of a composition by the Artist known as Prince, which Universal insists was unauthorized by the law. Her claim boils down to a question of whether copyright holders have been abusing the extrajudicial takedown procedures provided for in the DMCA by declining to first evaluate whether the content

LENZ V. UNIVERSAL MUSIC                    5

qualifies as fair use.  We hold that the statute requires copyright holders to consider fair use before sending a takedown notification, and that failure to do so raises a triable issue as to whether the copyright holder formed a subjective good faith belief that the use was not authorized by law.  We affirm the denial of the parties' cross-motions for summary judgment.

## I

Founded in May 2005, YouTube (now owned by Google) operates a website that hosts user-generated content.  *About YouTube*, YouTube.com, https://www. youtube.com/yt/about/ (last visited September 4, 2015).  Users upload videos directly to the website.  *Id.*  On February 7, 2007, Lenz uploaded to YouTube a 29-second home video of her two young children in the family kitchen dancing to the song *Let's Go Crazy* by Prince.[1]  Available at https://www.youtube.com/ watch?v=N1Kf JHFWlhQ (last visited September 4, 2015). She titled the video "'Let's Go Crazy' #1."  About four seconds into the video, Lenz asks her thirteen month-old son "what do you think of the music?" after which he bobs up and down while holding a push toy.

At the time Lenz posted the video, Universal was Prince's publishing administrator responsible for enforcing his copyrights.  To accomplish this objective with respect to YouTube, Robert Allen, Universal's head of business affairs, assigned Sean Johnson, an assistant in the legal department,

---

[1] YouTube is a for-profit company that generates revenues by selling advertising.  If users choose to become "content partners" with YouTube, they share in a portion of the advertising revenue generated.  Lenz is not a content partner and no advertisements appear next to the video.

6                    LENZ V. UNIVERSAL MUSIC

to monitor YouTube on a daily basis. Johnson searched
YouTube for Prince's songs and reviewed the video postings
returned by his online search query. When reviewing such
videos, he evaluated whether they "embodied a Prince
composition" by making "significant use of . . . the
composition, specifically if the song was recognizable, was
in a significant portion of the video or was the focus of the
video." According to Allen, "[t]he general guidelines are that
. . . we review the video to ensure that the composition was
the focus and if it was we then notify YouTube that the video
should be removed."

    Johnson contrasted videos that met this criteria to those
"that may have had a second or less of a Prince song, literally
a one line, half line of Prince song" or "were shot in
incredibly noisy environments, such as bars, where there
could be a Prince song playing deep in the background . . . to
the point where if there was any Prince composition
embodied . . . in those videos that it was distorted beyond
reasonable recognition." None of the video evaluation
guidelines explicitly include consideration of the fair use
doctrine.

    When Johnson reviewed Lenz's video, he recognized
*Let's Go Crazy* immediately. He noted that it played loudly
in the background throughout the entire video. Based on
these details, the video's title, and Lenz's query during the
video asking if her son liked the song, he concluded that
Prince's song "was very much the focus of the video." As a
result, Johnson decided the video should be included in a
takedown notification sent to YouTube that listed more than
200 YouTube videos Universal believed to be making

unauthorized use of Prince's songs.**²**  The notice included a "good faith belief" statement as required by 17 U.S.C. § 512(c)(3)(A)(v): "We have a good faith belief that the above-described activity is not authorized by the copyright owner, its agent, or the law."

After receiving the takedown notification, YouTube removed the video and sent Lenz an email on June 5, 2007, notifying her of the removal.  On June 7, 2007, Lenz attempted to restore the video by sending a counter-notification to YouTube pursuant to § 512(g)(3).  After YouTube provided this counter-notification to Universal per § 512(g)(2)(B), Universal protested the video's reinstatement because Lenz failed to properly acknowledge that her statement was made under penalty of perjury, as required by § 512(g)(3)(C).  Universal's protest reiterated that the video constituted infringement because there was no record that "either she or YouTube were ever granted licenses to reproduce, distribute, publicly perform or otherwise exploit the Composition."  The protest made no mention of fair use.  After obtaining *pro bono* counsel, Lenz sent a second counter-notification on June 27, 2007, which resulted in YouTube's reinstatement of the video in mid-July.

## II

Lenz filed the instant action on July 24, 2007, and her Amended Complaint on August 15, 2007.  After the district court dismissed her tortious interference claim and request for

---

**²** "[T]he parties do not dispute that Lenz used copyrighted material in her video or that Universal is the true owner of Prince's copyrighted music." *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1153–54 (N.D. Cal. 2008).

declaratory relief, Lenz filed her Second Amended Complaint on April 18, 2008, alleging only a claim for misrepresentation under § 512(f). The district court denied Universal's motion to dismiss the action.

On February 25, 2010, the district court granted Lenz's partial motion for summary judgment on Universal's six affirmative defenses, including the third affirmative defense that Lenz suffered no damages. Both parties subsequently moved for summary judgment on Lenz's § 512(f) misrepresentation claim. On January 24, 2013, the district court denied both motions in an order that is now before us.

The district court certified its summary judgment order for interlocutory appeal under 28 U.S.C. § 1292(b), and stayed proceedings in district court pending resolution of the appeal. We granted the parties permission to bring an interlocutory appeal.

### III

We review *de novo* the district court's denial of summary judgment. When doing so, we "must determine whether the evidence, viewed in a light most favorable to the non-moving party, presents any genuine issues of material fact and whether the district court correctly applied the law." *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). On cross-motions for summary judgment, we evaluate each motion independently, "giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

When evaluating an interlocutory appeal, we "may address any issue fairly included within the certified order

because it is the *order* that is appealable, and not the controlling question identified by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (emphasis in original) (quotation omitted). We may therefore "address those issues *material* to the order from which appeal has been taken." *In re Cinematronics, Inc.*, 916 F.2d 1444, 1449 (9th Cir. 1990) (emphasis in original) (permitting appellate review of a ruling issued prior to the order certified for interlocutory appeal).

## IV

Effective on October 28, 1998, the DMCA added new sections to existing copyright law by enacting five Titles, only one of which is relevant here: Title II—Online Copyright Infringement Liability Limitation Act—now codified in 17 U.S.C. § 512. Sections 512(c), (f), and (g) are at the heart of the parties' dispute.

## A

Section 512(c) permits service providers, e.g., YouTube or Google, to avoid copyright infringement liability for storing users' content if—among other requirements—the service provider "expeditiously" removes or disables access to the content after receiving notification from a copyright holder that the content is infringing. 17 U.S.C. § 512(c). Section 512(c)(3)(A) sets forth the elements that such a "takedown notification" must contain. These elements include identification of the copyrighted work, identification of the allegedly infringing material, and, critically, a statement that the copyright holder believes in good faith the infringing material "is not authorized by the copyright owner, its agent, or the law." *Id.* § 512(c)(3)(A). The procedures

10          LENZ V. UNIVERSAL MUSIC

outlined in § 512(c) are referred to as the DMCA's "takedown procedures."

To avoid liability for disabling or removing content, the service provider must notify the user of the takedown. *Id.* § 512(g)(1)–(2). The user then has the option of restoring the content by sending a counter-notification, which must include a statement of "good faith belief that the material was removed or disabled as a result of mistake or misidentification . . . ." *Id.* § 512(g)(3)(C). Upon receipt of a valid counter-notification, the service provider must inform the copyright holder of the counter-notification and restore the content within "not less than 10, nor more than 14, business days," unless the service provider receives notice that the copyright holder has filed a lawsuit against the user seeking to restrain the user's infringing behavior. *Id.* § 512(g)(2)(B)–(C). The procedures outlined in § 512(g) are referred to as the DMCA's "put-back procedures."

If an entity abuses the DMCA, it may be subject to liability under § 512(f). That section provides: "Any person who knowingly materially misrepresents under this section—(1) that material or activity is infringing, or (2) that material or activity was removed or disabled by mistake or misidentification, shall be liable for any damages . . . ." *Id.* § 512(f). Subsection (1) generally applies to copyright holders and subsection (2) generally applies to users. Only subsection (1) is at issue here.

**B**

We must first determine whether 17 U.S.C. § 512(c)(3)(A)(v) requires copyright holders to consider whether the potentially infringing material is a fair use of a

copyright under 17 U.S.C. § 107 before issuing a takedown notification.  Section 512(c)(3)(A)(v) requires a takedown notification to include a "statement that the complaining party has a good faith belief that the use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law."  The parties dispute whether fair use is an authorization under the law as contemplated by the statute—which is so far as we know an issue of first impression in any circuit across the nation.  "Canons of statutory construction dictate that if the language of a statute is clear, we look no further than that language in determining the statute's meaning. . . . A court looks to legislative history only if the statute is unclear." *United States v. Lewis*, 67 F.3d 225, 228–29 (9th Cir. 1995) (citations omitted).  We agree with the district court and hold that the statute unambiguously contemplates fair use as a use authorized by the law.

Fair use is not just excused by the law, it is wholly authorized by the law.  In 1976, Congress codified the application of a four-step test for determining the fair use of copyrighted works:

> Notwithstanding the provisions of sections 106 and 106A, *the fair use of a copyrighted work*, . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, *is not an infringement of copyright*. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107 (emphasis added). The statute explains that the fair use of a copyrighted work is permissible because it is a non-infringing use.

While Title 17 of the United States Code ("Copyrights") does not define the term "authorize" or "authorized," "[w]hen there is no indication that Congress intended a specific legal meaning for the term, the court may look to sources such as dictionaries for a definition." *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999). Black's Law Dictionary defines "authorize" as "1. To give legal authority; to empower" and "2. To formally approve; to sanction." *Authorize*, Black's Law Dictionary (10th ed. 2014). Because 17 U.S.C. § 107 both "empowers" and "formally approves"

the use of copyrighted material if the use constitutes fair use, fair use is "authorized by the law" within the meaning of § 512(c). *See also* 17 U.S.C. § 108(f)(4) ("Nothing in this section in any way affects the *right* of fair use as provided by section 107 . . . ." (emphasis added)).

Universal's sole textual argument is that fair use is not "authorized by the law" because it is an affirmative defense that excuses otherwise infringing conduct. Universal's interpretation is incorrect as it conflates two different concepts: an affirmative defense that is labeled as such due to the procedural posture of the case, and an affirmative defense that excuses impermissible conduct. Supreme Court precedent squarely supports the conclusion that fair use does not fall into the latter camp: "[A]nyone who . . . makes a fair use of the work is not an infringer of the copyright with respect to such use." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984).

Given that 17 U.S.C. § 107 expressly authorizes fair use, labeling it as an affirmative defense that excuses conduct is a misnomer:

> Although the traditional approach is to view "fair use" as an affirmative defense, . . . it is better viewed as a right granted by the Copyright Act of 1976. Originally, as a judicial doctrine without any statutory basis, fair use was an infringement that was excused—this is presumably why it was treated as a defense. As a statutory doctrine, however, fair use is not an infringement. Thus, since the passage of the 1976 Act, fair use should no longer be considered an

> infringement to be excused; instead, it is logical to view fair use as a right. Regardless of how fair use is viewed, it is clear that the burden of proving fair use is always on the putative infringer.

*Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1542 n.22 (11th Cir. 1996); *cf.* Lydia Pallas Loren, *Fair Use: An Affirmative Defense?*, 90 Wash. L. Rev. 685, 688 (2015) ("Congress did not intend fair use to be an affirmative defense—a defense, yes, but not an affirmative defense."). Fair use is therefore distinct from affirmative defenses where a use infringes a copyright, but there is no liability due to a valid excuse, e.g., misuse of a copyright, *Practice Management Information Corp. v. American Medical Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997), and laches, *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950–51 (9th Cir. 2001).

Universal concedes it must give due consideration to other uses authorized by law such as compulsory licenses. The introductory language in 17 U.S.C. § 112 for compulsory licenses closely mirrors that in the fair use statute. *Compare* 17 U.S.C. § 112(a)(1) ("Notwithstanding the provisions of section 106, . . . it is not an infringement of copyright for a transmitting organization entitled to transmit to the public a performance or display of a work . . . to make no more than one copy or phonorecord of a particular transmission program embodying the performance or display . . . ."), *with id.* § 107 ("Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . is not an infringement of copyright."). That fair use may be labeled as an affirmative defense due to the procedural posture of the case is no different than labeling a license an affirmative defense for the same reason. *Compare Campbell v. Acuff-Rose Music, Inc.*,

LENZ V. UNIVERSAL MUSIC                    15

510 U.S. 569, 573 & n.3, 590 (1994) (stating that "fair use is an affirmative defense" where the district court converted a motion to dismiss based on fair use into a motion for summary judgment), *with A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1025–26 (9th Cir. 2001) ("Napster contends that . . . the district court improperly rejected valid affirmative defenses of . . . implied license . . . ."). Thus, Universal's argument that it need not consider fair use in addition to compulsory licenses rings hollow.

Even if, as Universal urges, fair use is classified as an "*affirmative* defense," we hold—for the purposes of the DMCA—fair use is uniquely situated in copyright law so as to be treated differently than traditional affirmative defenses. We conclude that because 17 U.S.C. § 107 created a type of non-infringing use, fair use is "authorized by the law" and a copyright holder must consider the existence of fair use before sending a takedown notification under § 512(c).

### C

We must next determine if a genuine issue of material fact exists as to whether Universal knowingly misrepresented that it had formed a good faith belief the video did not constitute fair use. This inquiry lies not in whether a court would adjudge the video as a fair use, but whether Universal formed a good faith belief that it was not. Contrary to the district court's holding, Lenz may proceed under an actual knowledge theory, but not under a willful blindness theory.

### 1

Though Lenz argues Universal should have known the video qualifies for fair use as a matter of law, our court has

already decided a copyright holder need only form a subjective good faith belief that a use is not authorized. *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000 (9th Cir. 2004). In *Rossi*, we explicitly held that "the 'good faith belief' requirement in § 512(c)(3)(A)(v) encompasses a subjective, rather than objective standard." *Id.* at 1004. We further held:

> In § 512(f), Congress included an expressly limited cause of action for improper infringement notifications, imposing liability only if the copyright owner's notification is a knowing misrepresentation. A copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake. Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner.

*Id.* at 1004–05 (citations omitted). Neither of these holdings are dictum. *See United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense.").

As a result, Lenz's request to impose a subjective standard only with respect to factual beliefs and an objective standard with respect to legal determinations is untenable. Such a request grafts an objective standard onto

§ 512(c)(3)(A)(v) directly in contravention to *Rossi*. *See Rossi*, 391 F.3d at 1004 ("When enacting the DMCA, Congress could have easily incorporated an objective standard of reasonableness. The fact that it did not do so indicates an intent to adhere to the subjective standard traditionally associated with a good faith requirement."). We therefore judge Universal's actions by the subjective beliefs it formed about the video.

**2**

Universal faces liability if it knowingly misrepresented in the takedown notification that it had formed a good faith belief the video was not authorized by the law, i.e., did not constitute fair use. Here, Lenz presented evidence that Universal did not form any subjective belief about the video's fair use—one way or another— because it failed to consider fair use at all, and knew that it failed to do so. Universal nevertheless contends that its procedures, while not formally labeled consideration of fair use, were tantamount to such consideration. Because the DMCA requires consideration of fair use prior to sending a takedown notification, a jury must determine whether Universal's actions were sufficient to form a subjective good faith belief about the video's fair use or lack thereof.

To be clear, if a copyright holder ignores or neglects our unequivocal holding that it must consider fair use before sending a takedown notification, it is liable for damages under § 512(f). If, however, a copyright holder forms a subjective *good faith* belief the allegedly infringing material does not constitute fair use, we are in no position to dispute the copyright holder's belief even if we would have reached the opposite conclusion. A copyright holder who pays lip

service to the consideration of fair use by claiming it formed a good faith belief when there is evidence to the contrary is still subject to § 512(f) liability. *Cf. Disney Enters., Inc. v. Hotfile Corp.*, No. 11-cv-20427, 2013 WL 6336286, at *48 (S.D. Fla. Sept. 20, 2013) (denying summary judgment of § 512(f) counterclaim due to "sufficient evidence in the record to suggest that [Plaintiff] Warner intentionally targeted files it knew it had no right to remove"); *Rosen v. Hosting Servs., Inc.*, 771 F. Supp. 2d 1219, 1223 (C.D. Cal. 2010) (denying summary judgment of § 512(f) counterclaim where the takedown notification listed four URL links that did not contain content matching the description of the purportedly infringed material); *Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204–05 (N.D. Cal. 2004) ("[T]here is no genuine issue of fact that Diebold knew—and indeed that it specifically intended—that its letters to OPG and Swarthmore would result in prevention of publication of that content. . . . The fact that Diebold never actually brought suit against any alleged infringer suggests strongly that Diebold sought to use the DMCA's safe harbor provisions—which were designed to protect ISPs, not copyright holders—as a sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property.").

In order to comply with the strictures of § 512(c)(3)(A)(v), a copyright holder's consideration of fair use need not be searching or intensive. We follow *Rossi*'s guidance that formation of a subjective good faith belief does not require investigation of the allegedly infringing content. *See* 391 F.3d at 1003, 1005. We are mindful of the pressing crush of voluminous infringing content that copyright holders face in a digital age. But that does not excuse a failure to comply with the procedures outlined by Congress. *Cf. Lenz*, 572 F. Supp. 2d at 1155 ("[I]n the majority of cases, a

consideration of fair use prior to issuing a takedown notice
will not be so complicated as to jeopardize a copyright
owner's ability to respond rapidly to potential infringements.
The DMCA already requires copyright owners to make an
initial review of the potentially infringing material prior to
sending a takedown notice; indeed, it would be impossible to
meet any of the requirements of Section 512(c) without doing
so.   A consideration of the applicability of the fair use
doctrine simply is part of that initial review.").

     We note, without passing judgment, that the
implementation of computer algorithms appears to be a valid
and good faith middle ground for processing a plethora of
content while still meeting the DMCA's requirements to
somehow consider fair use. *Cf. Hotfile*, 2013 WL 6336286,
at \*47 ("The Court . . . is unaware of any decision to date that
actually addressed the need for human review, and the statute
does not specify how belief of infringement may be formed
or what knowledge may be chargeable to the notifying
entity.").  For example, consideration of fair use may be
sufficient if copyright holders utilize computer programs that
automatically identify for takedown notifications content
where: "(1) the video track matches the video track of a
copyrighted work submitted by a content owner; (2) the audio
track matches the audio track of that same copyrighted work;
and (3) nearly the entirety . . . is comprised of a single
copyrighted work."  Brief for The Org. for Transformative
Works, Public Knowledge & Int'l Documentary Ass'n as
Amici Curiae Supporting Appellee at 29–30 n.8 (citing the
Electronic Frontier Foundation website (link unavailable)).

     Copyright holders could then employ individuals like
Johnson to review the minimal remaining content a computer
program does not cull. *See* Brief for The Recording Indus.

Ass'n of Am. as Amici Curiae Supporting Appellants at 15 ("[T]he RIAA has an entire department dedicated to identifying infringement and issuing takedown requests."); *see also Hotfile*, 2013 WL 6336286, at *14. During oral argument Universal explained that service providers now use screening algorithms. However, we need not definitively decide the issue here because Universal did not proffer any evidence that—at the time it sent the takedown notification to Lenz—it used a computer program to identify potentially infringing content.

**3**

We hold the willful blindness doctrine may be used to determine whether a copyright holder "knowingly materially misrepresent[ed]" that it held a "good faith belief" the offending activity was not a fair use. *See* 17 U.S.C. § 512(c)(3)(A)(v), (f). "[T]he willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 35 (2d Cir. 2012) (interpreting how a party can establish the "actual knowledge"—a subjective belief—required by § 512(c)(1)(A)(I)); *see also UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1023 (9th Cir. 2013) ("Of course, a service provider cannot willfully bury its head in the sand to avoid obtaining such specific knowledge." (citing *Viacom*, 676 F.3d at 31)). But, based on the specific facts presented during summary judgment, we reject the district court's conclusion that Lenz may proceed to trial under a willful blindness theory.

To demonstrate willful blindness a plaintiff must establish two factors: "(1) the defendant must subjectively believe that

there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011). "Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 2070–71. To meet the *Global-Tech* test, Lenz must demonstrate a genuine issue as to whether—before sending the takedown notification—Universal (1) subjectively believed there was a high probability that the video constituted fair use, and (2) took deliberate actions to avoid learning of this fair use.

On summary judgment Lenz failed to meet a threshold showing of the first factor. To make such a showing, Lenz must provide evidence from which a juror could infer that Universal was aware of a high probability the video constituted fair use. *See United States v. Yi*, 704 F.3d 800, 805 (9th Cir. 2013). But she failed to provide any such evidence. The district court therefore correctly found that "Lenz does not present evidence suggesting Universal subjectively believed either that there was a high probability any given video might make fair use of a Prince composition or her video in particular made fair use of Prince's song 'Let's Go Crazy.'" Yet the district court improperly denied Universal's motion for summary judgment on the willful blindness theory because Universal "has not shown that it *lacked* a subjective belief." By finding blame with Universal's inability to show that it "*lacked* a subjective belief," the district court improperly required Universal to meet its burden of persuasion, even though Lenz had failed to counter the initial burden of production that Universal successfully carried. *See Celotex Corp. v. Catrett*, 477 U.S.

22                 LENZ V. UNIVERSAL MUSIC

317, 322 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Lenz may not therefore proceed to trial on a willful blindness theory.

**V**

Section 512(f) provides for the recovery of "any damages, including costs and attorneys['] fees, incurred by the alleged infringer . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling  access to the material or activity claimed to be infringing . . . ." 17 U.S.C. § 512(f). We hold a plaintiff may seek recovery of nominal damages for an injury incurred as a result of a § 512(f) misrepresentation.

Universal incorrectly asserts that Lenz must demonstrate she incurred "actual monetary loss." Section 512(k) provides a definition for "monetary relief" as "damages, costs, attorneys['] fees, and any other form of monetary payment." The term "monetary relief" appears in § 512(a), (b)(1), (c)(1), and (d), but is notably absent from § 512(f). As a result, the damages an alleged infringer may recover under § 512(f) from "any person" are broader than monetary relief.[3] *Cf. United States v. James*, 478 U.S. 597, 605 (1986) ("Congress' choice of the language '*any* damage' . . . undercuts a narrow construction."), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425 (2001). Because Congress specified the recovery of "any damages," we reject

---

[3] Title I of the DMCA specifies recovery for "actual damages." 17 U.S.C. § 1203(c)(1)(A). If Congress intended to similarly limit the recovery of § 512(f) damages to pecuniary losses, it could have chosen to do so.

LENZ V. UNIVERSAL MUSIC                    23

Universal's contention that Congress did not indicate its intent to depart from the common law presumption that a misrepresentation plaintiff must have suffered a monetary loss. *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation omitted)).

Lenz may seek recovery of nominal damages due to an unquantifiable harm suffered as a result of Universal's actions.**[4]**  The DMCA is akin to a statutorily created intentional tort whereby an individual may recover nominal damages for a "knowingly material misrepresent[ation] under this section [512]." 17 U.S.C. § 512(f); *cf. Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305 (1986) ("We have repeatedly noted that 42 U.S.C. § 1983 creates a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution. Accordingly, when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." (quotation and citations omitted)).

"In a number of common law actions associated with intentional torts, the violation of the plaintiff's right has generally been regarded as a kind of legal damage in itself. The plaintiff who proves an intentional physical tort to the person or to property can always recover nominal damages."

---

**[4]** Lenz may not recover nominal damages for "impairment of free speech rights." No authority supports the recovery of nominal damages caused by a private actor's chilling of free speech rights. All of the cases Lenz cites address challenges to governmental action.

24                    LENZ V. UNIVERSAL MUSIC

3 Dan B. Dobbs et al., *The Law of Torts* § 480 (2d ed. 2011).
The tort need not be physical in order to recover nominal
damages.  Defamation, for example, permits the recovery of
nominal damages:

> A nominal damage award can be justified in a
> tort action only if there is some reason for
> awarding a judgment in favor of a claimant
> who has not proved or does not claim a
> compensable loss with sufficient certainty to
> justify a recovery of compensatory or actual
> damages.  There may be such a reason in an
> action for defamation, since a nominal
> damage award serves the purpose of
> vindicating the plaintiff's character by a
> verdict of the jury that establishes the falsity
> of the defamatory matter.

W. Page Keeton et al., *Prosser and Keeton on Torts* § 116A,
at 845 (5th ed. 1984).  Also, individuals may recover nominal
damages for trespass to land, even though the trespasser's
"presence on the land causes no harm to the land [or] its
possessor . . . ."  Restatement (Second) of Torts § 163 &
cmts. d, e (1965).

     The district court therefore properly concluded in its 2010
order:

> The use of "any damages" suggests strongly
> Congressional intent that recovery be
> available for damages even if they do not
> amount to . . . substantial economic damages
> . . . .  Requiring a plaintiff who can [show
> that the copyright holder knowingly

> misrepresented its subjective good faith] to
> demonstrate in addition not only that she
> suffered damages but also that those damages
> were economic and substantial would vitiate
> the deterrent effect of the statute.

*Lenz v. Universal Music Corp.*, No. C 07-3783 JF, 2010 WL
702466, at \*10 (N.D. Cal. Feb. 25, 2010). Relying on this
opinion, the Southern District of Florida held the same.
*Hotfile*, 2013 WL 6336286, at \*48 ("[T]he Court observes
that the quantity of economic damages to Hotfile's system is
necessarily difficult to measure with precision and has led to
much disagreement between the parties and their experts.
Notwithstanding this difficulty, the fact of injury has been
shown, and Hotfile's expert can provide the jury with a
non-speculative basis to assess damages.").

We agree that Lenz may vindicate her statutorily created
rights by seeking nominal damages. Because a jury has not
yet determined whether Lenz will prevail at trial, we need not
decide the scope of recoverable damages, i.e., whether she
may recover expenses following the initiation of her § 512(f)
suit or *pro bono* costs and attorneys' fees, both of which arose
as a result of the injury incurred.

## VI

Copyright holders cannot shirk their duty to consider—in
good faith and prior to sending a takedown notification—
whether allegedly infringing material constitutes fair use, a
use which the DMCA plainly contemplates as authorized by
the law. That this step imposes responsibility on copyright
holders is not a reason for us to reject it. *Cf. Consumer Prod.
Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 123–24

(1980) ("[A]ny increased burdens imposed on the Commission as a result of its compliance with [the Consumer Product Safety Act] were intended by Congress in striking an appropriate balance between the interests of consumers and the need for fairness and accuracy with respect to information disclosed by the Commission. Thus, petitioners' claim that the Commission's compliance with the requirements of [the Act] will impose undue burdens on the Commission is properly addressed to Congress, not to this Court."). We affirm the district court's order denying the parties' cross-motions for summary judgment.

**AFFIRMED.** Each party shall bear its own costs.

M. SMITH, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment:

I concur in all but Part IV.C of the majority opinion, and concur in the judgment. Because I disagree with the majority's approach to three issues, I respectfully dissent from Part IV.C.

First, I question whether § 512(f) directly prohibits a party from misrepresenting that it has formed a good faith belief that a work is subject to the fair use doctrine. I construe the plain text of the statute to prohibit misrepresentations that a work is infringing, not misrepresentations about the party's diligence in forming its belief that the work is infringing. Second, I disagree that there is any material dispute about whether Universal considered fair use. Because Universal did not consider fair use, it may be held liable for "knowingly" misrepresenting that the video was infringing,

if it should be determined that the video is a non-infringing fair use. Universal's misrepresentation, if any, was knowing because Universal knew it had not considered fair use, and therefore knew it lacked a basis to conclude that the video was infringing. Third, I do not believe that the willful blindness doctrine applies where, as here, a party has failed to consider fair use and affirmatively misrepresents that a work is infringing.

I fully agree with the majority's conclusion that § 512(c)(3)(A)(v) requires copyright holders to consider whether potentially infringing material is a fair use before issuing a takedown notice. As the majority opinion explains, a takedown notice must contain "[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v). Because fair use of copyrighted material is not an infringement of copyright, such use is "authorized by . . . the law." *See id.* § 107. Therefore, in order to form "a good faith belief that use of the material in the manner complained of is not authorized by . . . the law," *id*. § 512(c)(3)(A)(v), a party must consider the doctrine of fair use.

Where I part ways with the majority is in the proper analysis of Universal's misrepresentation. The majority concludes that "Universal faces liability if it knowingly misrepresented in the takedown notification that it had formed a good faith belief the video was not authorized by the law, i.e., did not constitute fair use." An unstated premise of this conclusion is that Universal impliedly represented that it had considered fair use when it certified in its takedown notification that it held a good faith belief that the video was

not authorized by the law. Under the majority's approach, Universal's liability depends upon the truth or falsity of its implied assertion that it held a good faith belief about whether the video was a fair use.

However, I do not construe § 512(f) to directly prohibit a party from falsely implying that it has considered fair use. *Cf. Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000, 1004–05 (9th Cir. 2004) (noting that § 512(f) is "an expressly limited cause of action"). Section 512(f) provides that "[a]ny person who *knowingly* materially misrepresents under this section . . . *that material or activity is infringing* . . . shall be liable for any damages." (emphases added). The plain text of the statute prohibits parties from misrepresenting that *a work is infringing*, not from misrepresenting that they have considered fair use.

In my view, the relevant representation in this case is Universal's assertion that the video is infringing. Universal's liability under § 512(f) depends initially on the disputed issue of whether the video is subject to the fair use doctrine. If the video is a fair use, Universal's representation that the video is infringing was false.

This does not end the inquiry, of course, because § 512(f) only applies to "knowing[]" misrepresentations, not to innocent or negligent misrepresentations. The majority approach does not squarely address § 512(f)'s "knowingly" requirement. In *Rossi v. Motion Picture Association of America Inc.*, we observed that "[a] copyright owner cannot be liable [under § 512(f)] simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake. Rather, there must be a demonstration of *some actual knowledge of*

*misrepresentation* on the part of the copyright owner." 391 F.3d at 1005 (citation omitted) (emphasis added). Universal urges us to construe *Rossi* to mean that a party must subjectively believe that the fact it asserts is false in order to be liable under § 512(f). If this is indeed the meaning of *Rossi*, it is difficult to see how Lenz can possibly prevail.[1]

Section 512(f)'s "knowingly" requirement should not be construed this restrictively. Universal may be held liable for knowingly misrepresenting that the video was infringing if, knowing it had not considered whether the video was a fair use, it erroneously asserted that it was infringing. A party cannot truthfully represent that a work subject to the fair use doctrine is infringing if the party has knowingly failed to consider whether the doctrine applies. Section 107 plainly states that "the fair use of a copyrighted work . . . is not an infringement of copyright." The requirement that a party hold a "good faith" belief that "the infringing material is not authorized by the law" would be rendered meaningless if parties could wholly omit to consider whether the material was a fair use, and was therefore not an "infringing material" at all.

This reading of § 512(f) does not conflict with our decision in *Rossi*. A party that knowingly fails to consider

---

[1] The majority opinion implies that Universal would be liable if its actions were not sufficient to form a good faith belief about fair use, and that this is a disputed issue for the jury. But if Universal's proposed construction of *Rossi* is correct, Universal would not be liable merely because its actions were not sufficient to form a good faith belief about fair use. Instead, it would only be liable if it *knew* its actions were not sufficient. Otherwise, Universal would not have "knowingly" misrepresented that it had formed a good faith belief about fair use.

fair use before erroneously asserting that a work is infringing has "some actual knowledge of misrepresentation," *Rossi*, 391 F.3d at 1005, because the party knows that, having failed to consider fair use, it lacks a basis to assert that the work is infringing.

This construction of "knowingly" is consistent with common law principles of deceit and fraudulent misrepresentation. Under these principles, a misrepresentation is knowing if the party knows it is ignorant of the truth or falsity of its representation. For example, in *Cooper v. Schlesinger*, 111 U.S. 148, 155 (1884), the Supreme Court stated that "a statement recklessly made, without knowledge of its truth, [is] a false statement knowingly made, within the settled rule." *See also Sovereign Pocahontas Co. v. Bond*, 120 F.2d 39, 39–40 (D.C. Cir. 1941); *Knickerbocker Merch. Co. v. United States*, 13 F.2d 544, 546 (2d Cir. 1926); *L J Mueller Furnace Co. v. Cascade Foundry Co.*, 145 F. 596, 600 (3d Cir. 1906); *Hindman v. First Nat'l Bank*, 112 F. 931, 944 (6th Cir. 1902).

Construing "knowingly" to include assertions made in conscious ignorance of their truth or falsity is also consistent with the principles of the Second Restatement of Torts. The Second Restatement provides that "[a] misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) *knows that he does not have the basis for his representation that he states or implies*." Restatement

(Second) of Torts § 526 (emphasis added).**[2]**  Under these principles, Universal faces liability if it misrepresented that the video was infringing, knowing that it lacked a basis to conclude that the video was not a fair use.

It is undisputed that Universal did not consider fair use before sending the takedown notice.  Its policy was to send takedown notices if "the composition was the focus of the video," that is, where "[t]he music [was] prominently featured in the video."  I disagree with the majority's conclusion that there is a factual dispute regarding whether applying this policy in this case could have been "sufficient to form a subjective good faith belief about the video's fair use or lack thereof."  Section 107 explicitly enumerates the factors to be considered in assessing whether a work is a fair use. 17 U.S.C. § 107.  Universal's policy of determining whether "the composition was the focus of the video" simply did not permit it to form an opinion about how the fair use factors applied to the video.**[3]**  Moreover, Universal *knew* it lacked a

---

**[2]** The Second Restatement refers to "fraudulent misrepresentation," rather than "knowing" misrepresentation.  *See* Restatement (Second) of Torts § 526.  However, as the Restatement clarifies, the requirement that a misrepresentation be "fraudulent" "solely" refers to the party's knowledge of misrepresentation.  *Compare id*. cmt. a. ("The word 'fraudulent' is here used as referring solely to the maker's knowledge of the untrue character of his representation.  This element of the defendant's conduct frequently is called 'scienter' by the courts."), *with Rossi*, 391 F.3d at 1005 ("[T]here must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner.").  It is therefore instructive to examine the Restatement definition of "fraudulent" in construing the meaning of "knowingly."

**[3]** The majority opinion implies that a copyright holder could form a good faith belief that a work was not a fair use by utilizing computer programs that automatically identify possible infringing content.  I agree that such

basis to conclude that the work was infringing, because it knew that if this video was a fair use, it was not infringing. Section 107 states as much explicitly. *Id*.

The sole disputed issue in this case was whether Universal's representation that the video was infringing was false–that is, whether the video was a fair use. Universal knew that a fair use was not infringing, knew that it had not considered fair use, and nonetheless asserted that the video was infringing. Universal may be held to account if the video was not infringing, because it knew it lacked a basis to assert that it was.

I also have doubts about whether the willful blindness doctrine is relevant to analyzing whether a misrepresentation is "knowing[]" under § 512(f). The doctrine was originally applied to "criminal statutes requir[ing] proof that a defendant acted knowingly or willfully." *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). Courts reasoned that defendants could not avoid criminal liability under such statutes "by deliberately shielding themselves from clear evidence of critical facts that are

---

programs may be useful in identifying infringing content. However, the record does not disclose whether these programs are currently capable of analyzing fair use. Section 107 specifically enumerates the factors to be considered in analyzing fair use. These include: "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; "the nature of the copyrighted work"; "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. For a copyright holder to rely solely on a computer algorithm to form a good faith belief that a work is infringing, that algorithm must be capable of applying the factors enumerated in § 107.

strongly suggested by the circumstances." *Id*. at 2068–69. Federal courts have applied the doctrine to non-criminal statutes that include a requirement that a party have acted knowingly or willfully, including intellectual property statutes. *See id*. at 2068–71 (active inducement of patent infringement under 35 U.S.C. § 271(b)); *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 34–35 (2d Cir. 2012) ("actual knowledge" under 17 U.S.C. § 512(c)'s safe harbor provision); *In re Aimster Copyright Litig.*, 334 F.3d 643, 650–51 (7th Cir. 2003) (contributory infringement of copyright); *Dolman v. Agee*, 157 F.3d 708, 714–15 (9th Cir. 1998) ("willful" copyright infringement under 17 U.S.C. § 504(c)(2)). It does not necessarily follow, however, that we should apply the doctrine to construe § 512(f). Section 512(f) creates a statutory misrepresentation action, and it is likely Congress intended the action to mirror analogous common law torts like fraud, deceit, and misrepresentation. Therefore, we should examine common law tort principles to construe "knowingly," rather than import a doctrine that developed from the criminal law. As I explain above, common law principles of misrepresentation establish that a misrepresentation is knowing if the party knows it is ignorant of the truth or falsity of its representation.

Because the common law of torts already provides ample insight into what Congress meant by "knowingly," there is no need to also apply the more stringent, and confusing, willful blindness test. To demonstrate willful blindness a plaintiff must establish two factors: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech*, 131 S. Ct. at 2070. It makes little sense in this case to ask whether Universal subjectively believed that there was a high probability the

34                    LENZ V. UNIVERSAL MUSIC

video was a fair use. The evidence was that Universal
knowingly failed to form any belief about whether the video
was fair use. This suffices to satisfy § 512(f)'s requirement
that the misrepresentation be "knowing[]."

In sum, I would hold that parties must individually
consider whether a work is a fair use before representing that
the work is infringing in a takedown notice. If they do not,
and the work is a non-infringing fair use, they are subject to
liability for knowingly misrepresenting that the work is
infringing.

For the foregoing reasons, I respectfully dissent in part.