Nos. 13-16106 & 13-16107

IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

FOR THE NINTH CIRCUIT

STEPHANIE LENZ,

*Plaintiff-Appellee-Cross-Appellant,*

*v.*

UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC PUBLISHING, INC., AND UNIVERSAL MUSIC PUBLISHING GROUP,

*Defendants-Appellants-Cross-Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of California

## BRIEF OF AMICI CURIAE AUTOMATTIC INC.; GOOGLE INC.; TWITTER INC.; AND TUMBLR, INC. SUPPORTING APPELEE/CROSS-APPELLANT'S PETITION FOR REHEARING EN BANC OR PANEL REHEARING

Joseph C. Gratz
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
415-362-6666

*Attorneys for Amici Curiae
Google Inc.; Twitter Inc.; and
Tumblr, Inc.*

Marvin Ammori
Lavon Ammori
AMMORI GROUP
1527 S St. NW
Washington, DC 20009
202-505-3680

*Attorneys for Amicus Curiae
Automattic Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for amici curiae certifies the following information:

Neither Automattic Inc. nor Twitter Inc. has a parent corporation, nor does any publicly held corporation own 10% or more of the stock of either.

The parent corporation of Tumblr, Inc. is Yahoo! Inc.; Yahoo! Inc. does not have a parent corporation, and no publicly held corporation owns 10% or more of the stock of Yahoo! Inc.

Google Inc. is a wholly owned subsidiary of Alphabet Inc., a publicly held corporation.  Accordingly, Alphabet Inc. has more than 10% ownership of Google Inc.

# TABLE OF CONTENTS

**PAGE NO.**

IDENTITY AND INTEREST OF AMICI CURIAE ................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 3

ARGUMENT .............................................................................. 5

    I.    Unfounded DMCA Takedown Notices are Common and Impose a Burden on Both Online Service Providers and the Free Exchange of Ideas. .................................................................. 5

    II.   A Copyright Owner Who Sends a Takedown Notice Must Form an Objectively Reasonable Good Faith Belief that a Given Use is Not Authorized by Law, Including Fair Use, or Risk Liability Under Section 512(f) ........................................ 13

CONCLUSION ....................................................................... 17

CERTIFICATE OF COMPLIANCE .................................................... 19

CERTIFICATE OF SERVICE ............................................................ 20

# TABLE OF AUTHORITIES

**PAGE NO.**

## Cases

*Automattic Inc., et al. v. Steiner*,
  82 F. Supp. 3d 1011 (N.D. Cal. 2015) ................................................. 1, 18

*Brownmark Films, LLC v. Comedy Partners*,
  682 F.3d 687 (7th Cir. 2012) .................................................... 5

*Capitol Records, LLC v. Vimeo, LLC*,
  09 Civ. 10101 (RA), 09 Civ. 10105 (RA),
  2013 WL 5272932 (S.D.N.Y. Sept. 18, 2013) ........................................ 19

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
  547 F.3d 1095 (9th Cir. 2008) ......................................... 8, 17

*Lenz v. Universal Music Corp.*,
  No. 5:07-CV-03783-JF, 2013 WL 271673 (N.D. Cal. Jan. 24, 2013) ... 16

*Online Policy Grp. v. Diebold, Inc.*,
  337 F. Supp. 2d 1195 (N.D. Cal. 2004) ................................................. 13

*Rossi v. Motion Picture Association of America, Inc.*,
  391 F.3d 1000 (9th Cir. 2004) ...................................................... passim

*Sony Computer Ent'mt Am., Inc. v. Bleem, LLC*,
  214 F.3d 1022 (9th Cir. 2000) ............................................................. 8

## Statutes

17 U.S.C. § 512(c) ................................................................................ 14, 17

17 U.S.C. § 512(f) ................................................................................. passim

17 U.S.C. § 512(g) ................................................................................ 12, 13

17 U.S.C. § 512(i) ........................................................................................ 16

# TABLE OF AUTHORITIES

PAGE NO.

17 U.S.C. §§ 107–123 ............................................................................ 5, 15

## Other Authorities

Automattic Inc., *Transparency Report: Intellectual Property for Jan. 1, 2015–June 30, 2015*, https://transparency.automattic.com/intellectual-property/intellectual-property-2015-h1/. ............................................... 6

Complaint, *Automattic Inc., et al v. Chatwal*, No. 13-cv-5411 (N.D. Cal. filed Nov. 21, 2013) ....................................... 1

Copyright Removal Requests – Google Transparency Report, http://www.google.com/transparencyreport/removals/copyright/ .......... 9

Cory Doctorow, *The Criticism That Ralph Lauren Doesn't Want You To See!*, BoingBoing (Oct. 6, 2009, 10:32 AM), http://boingboing.net/2009/10/06/the-criticism-that-r.html .................................................... 12

Electronic Frontier Foundation, *Takedown Hall of Shame: Music Publisher Tries to Muzzle Podcast Criticizing Akon*, https://www.eff.org/takedowns/music-publisher-tries-muzzle-podcast-criticizing-akon. ...................................................... 12

Lydia Pallas Loren, *Deterring Abuse of the Copyright Takedown Regime by Taking Misrepresentation Claims Seriously*, 46 Wake Forest L. Rev. 745 (2011) ...................................................... 12

U.S. Copyright Office, *Directory of OSP Designated Agents*, http://www.copyright.gov/onlinesp/list/a_agents.html ......................... 6

## Rules

Fed. R. App. P. 29(a) ..................................................................................... 1

Pursuant to Federal Rule of Appellate Procedure 29(a), all parties have consented to the filing of this brief by amici curiae.

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

Automattic Inc. operates WordPress.com, a web-based publishing platform. WordPress.com hosts sites for some of the largest media companies in the world, including the New York Post, CNN, and Time. It also hosts more than 70 million individual blogs operated by small businesses, individuals, and citizen journalists who publish on a wide range of topics. Alongside journalists who use WordPress.com, Automattic has recently brought two misrepresentation suits under the DMCA against parties who submitted abusive DMCA notices.[2]

Google Inc. is one of the world's most popular and best-known online service providers. In addition to its eponymous search engine, Google provides a wide range of other products and services—including online video hosting through YouTube.com, blog hosting through Blogger, and a social-networking platform through Google+—that

---

[1] Amici hereby certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person other than Amici contributed money intended to fund preparing or submitting the brief.

[2] *See Automattic Inc., et al. v. Steiner*, 82 F. Supp. 3d 1011 (N.D. Cal. 2015); Complaint, *Automattic Inc., et al. v. Chatwal*, No. 13-cv-5411 (N.D. Cal. filed Nov. 21, 2013).

empower people around the world to create, find, organize, and share information.

Tumblr, Inc. provides a platform for users to share their artwork, writing, photos, audio, and video with a worldwide audience. Tumblr is home to over 260 million blogs and over 122 billion posts. The platform allows users to connect with others who share their interests, to explore new ideas and creative expressions, and form communities spanning culture, age, and geography

Twitter is a global platform for public self-expression and conversation in real time. Twitter has 320 million monthly active users, spanning nearly every country, and creating approximately 500 million Tweets every day.

Amici are all online service providers (OSPs) within the meaning of the Digital Millennium Copyright Act ("DMCA") and rely on the DMCA's safe harbor framework, including the "notice-and-takedown" system set out in Section 512 of the Copyright Act. Abusive and unfounded takedown notices, interfere with amici's businesses, can silence valuable free expression, and can constitute harassment of an OSP's users. Therefore, amici have a significant business interest in the statutory features of the DMCA intended to deter unfounded takedown notices.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress enacted Section 512(f) to deter abuses of the notice-and-takedown system that it created in the DMCA. That provision entitles both users and OSPs to bring claims against those who send abusive notices.[3] A reading of that provision that hinges liability solely on the subjective knowledge of the notice sender will not achieve that goal. Such an interpretation would lead to the illogical result that the more unreasonable a copyright holder is, the more legal leeway it has to send unfounded notices. This result would jeopardize not just the kinds of commentary, criticism, and parody that fall well within the bounds of fair use, but also expressive conduct that is non-infringing for other reasons. This cannot have been, and was not, what Congress had in mind when enacting Section 512(f). To the extent that this Court held otherwise in *Rossi v. Motion Picture Association of America, Inc.*, 391 F.3d 1000 (9th Cir. 2004), as the panel opinion found, amici respectfully request that this aspect of *Rossi v. MPAA* be reconsidered by an en banc panel.

Unfounded and abusive takedown notices inflict real harms on OSPs, Internet users, and copyright holders. Every time an unfounded takedown notice results in the removal of legitimate, non-infringing

---

[3] Amicus Automattic has brought two such actions against those who sent abusive takedown notices to its WordPress service. *See* cases cited *supra* note 2.

content posted by a user, it constitutes unjustified censorship of the user's speech and interferes with the OSP's business of hosting and disseminating that speech. If, in an effort to protect users from abusive notices, an OSP diverts resources to screen the notices it receives, those are resources diverted from more productive uses. And to the extent preventative screening measures create delays for valid notices sent by other copyright holders, the abusive notices harm the copyright holders whose notices are delayed in the queue behind them. These are not speculative harms; amici collectively have extensive experience with abusive and unfounded takedown notices.

In amici's experience, most DMCA notices are valid, well-founded, and sent in good faith. But some DMCA notices are obviously and facially indefensible, sent not to protect valid copyright interests, but instead to silence lawful speech. This includes, but is not limited to, situations where the speech targeted plainly constitutes a fair use.[4]

Amici therefore respectfully urge the Court to grant the petition for en banc review to reconsider the question of extraordinary importance that it previously visited in *Rossi v. MPAA*: whether a

---

[4] It is true that fair use cases can present difficult questions. But that is not true of all fair use scenarios, as Appellee points out. *See, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 692 (7th Cir. 2012) (dismissing copyright infringement claim before discovery, finding an "obvious case of fair use").

copyright holder need only form a purely *subjective* good-faith belief that a given use is not authorized by law before sending a takedown notice. A purely subjective standard establishes a perverse incentive: the more misinformed or unreasonable the copyright owner, the broader the immunity it would have from liability under Section 512(f). This reading of 512(f) would effectively encourage copyright owners to remain ignorant about the limitations on their exclusive rights under the Copyright Act, *see* 17 U.S.C. §§ 107–123, because the less they know, the more leeway they would have to send takedown notices. This cannot be what Congress had in mind when enacting 512(f). In order to accomplish Congress's goal of deterring abuses of the notice-and-takedown system, the Court should instead hold that a copyright owner must have an objectively reasonable good faith belief that a given use is not authorized by law before sending a takedown notice.

## ARGUMENT

### I. Unfounded DMCA Takedown Notices are Common and Impose a Burden on Both Online Service Providers and the Free Exchange of Ideas.

In enacting the DMCA, Congress created a safe harbor framework that provides copyright holders with a streamlined process for removing content, provides online service providers with remedial safe harbors, and provides aggrieved persons with a cause of action to deter abuse of the framework. According to U.S. Copyright Office records, more than

5

66,000 OSPs today rely on the notice-and-takedown framework established in Section 512, including not only each of the amici, but also a diverse array of businesses united only by their operation of websites where some users might post infringing materials or links to infringing materials. U.S. Copyright Office, *Directory of OSP Designated Agents*, http://www.copyright.gov/onlinesp/list/a_agents.html.

In most respects, the DMCA's notice-and-takedown framework has been a success, creating sufficient legal certainty to support an incredible diversity of online platforms where citizens can publish and share information of all types, while also affording copyright owners a quick, extra-judicial mechanism to remove infringing material. However, unfounded or abusive DMCA takedown notices remain a problem, imposing costs on OSPs (including amici), their users, and other copyright holders.

For example, many times each week, amicus Automattic receives a takedown notice that appears motivated not by an interest in protecting copyright but a desire to improperly silence critics. Indeed, approximately 10% of the takedown notices Automattic receives are rejected as abusive.[5] A common example is where a copyright holder

---

[5] *See, e.g.*, Automattic Inc., *Transparency Report: Intellectual Property for Jan. 1, 2015–June 30, 2015*, https://transparency.automattic.com/intellectual-property/intellectual-property-2015-h1/.

who wants to remove unflattering criticism about its business or products on a WordPress blog sends a takedown notice to Automattic alleging infringing use of its business name or logo. The use of names or logos, however, is obviously a fair use in the context of the criticism. *See, e.g.*, *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1098 (9th Cir. 2008). Another common example is where an individual, unhappy with criticism of statements she made on a public social networking site, sends a takedown notice identifying the screen-shot image of the statements as infringement. *See, e.g.*, *Sony Computer Ent'mt Am., Inc. v. Bleem, LLC,* 214 F.3d 1022, 1029 (9th Cir. 2000) (holding that a computer screen-shot image used for different purpose than the original use was fair use). Employers also commonly send takedown notices to unmask employee critics and stifle criticism. Other specific examples include:

- An individual sent a takedown request to remove an interview he had in fact authorized, because the interview included his own embarrassing words revealing homophobia.

- A medical transcription training service using forged customer testimonials on their website submitted a takedown for screenshots of the fake testimonials in a blog post exposing the scam.

- An animal rights activist, after trying and failing to get a critical blog taken down that used screenshots of

conversations with her, submitted a DMCA for all the images on the site, which would have rendered the criticism and commentary meaningless.

- A major game development company submitted a takedown request for 81 images on a rival company's blog, where the images were used in the context of highlighting what the latter company saw as the former's questionable business practices.

- A company in India posted a duplicate of a WordPress.com blog, then submitted a DMCA takedown notice for the original blog with the claim that it was violating its copyright.

Amicus Google similarly receives abusive and unfounded DMCA takedown notices on at least a weekly basis. Here are just a few examples:

- A poet sent repeated takedown notices targeting criticism and commentary relating to the poet's online copyright enforcement efforts.

- A well-known publisher of children's books sent a DMCA takedown notice targeting the use of excerpts by a critic discussing the use of gun imagery in children's literature.

- A major investment bank sent a takedown notice targeting documents showing that the bank had been analyzing the effect of political unrest on oil markets.

- A physician claiming a copyright in his signature sent a takedown notice aimed at a document related to the suspension of his license to practice medicine.

- Major broadcast news networks sent takedown notices targeting McCain-Palin campaign videos that included brief excerpts from news footage just weeks before the 2008 presidential election.

- A major soft drink company sent a takedown notice targeting a YouTube news channel for including excerpts from a commercial in its critical coverage of that commercial.

These are only a sample of takedown notices where obvious fair uses are implicated. Google receives hundreds of notices that suffer from similar defects, often repeatedly from the same vexatious submitters, and devotes substantial human and machine resources in an attempt to identify these abusive notices among the tens of millions of DMCA notices that Google processes each month.[6]

---

[6] *See* Copyright Removal Requests – Google Transparency Report, http://www.google.com/transparencyreport/removals/copyright/.

Amicus Tumblr has received in the past, and regularly receives, DMCA takedown notifications that are baseless and intended to silence lawful speech. For example:

- An internet celebrity submitted a DMCA notice to remove a police incident report regarding an altercation at the celebrity's residence.

- A physician demanded removal of newspaper excerpts posted to a blog critical of the physician, by submitting a DMCA notice in which he falsely claimed to be a representative of the newspaper.

- A model involved in a contract dispute with a photographer submitted a series of DMCA notices seeking removal of images of the model, for which the photographer was the rights holder.

- A famous actor submitted a DMCA notice seeking removal of a photograph of his residence in Google Earth, falsely claiming to be the rights holder for the Google Earth photograph.

- A prominent state governor submitted a DMCA notice seeking removal of photographs of the governor posted on a political parody site, and taken in public by third-party rights-holders.

- The spouse of a famous official submitted a DMCA notice asserting a copyright claim over a Tumblr URL that merely referenced the official's name.

Amicus Twitter similarly receives notices that suffer from similar defects, including repeated reports from the same vexatious submitters. For example:

- An office equipment manufacturer submitted a DMCA notice seeking removal of a video showing teenagers engaged in good-humored misuse of the company's product.

- An international corporation submitted DMCA notices seeking removal of images of company documents posted by a whistleblower.

- A frequent submitter of DMCA notices submitted a DMCA notice seeking removal of a screenshot of an online discussion criticizing him for submitting overreaching DMCA notices.

For all amici, processing these abusive takedowns diverts resources from the OSPs' more productive activities and can result in delays in processing for legitimate, good-faith takedown notices.

The problem of abusive DMCA takedown notices does not affect only amici. Over the past years, the news media have covered numerous similar situations involving different OSPs. These examples include a manufacturer of electronic voting machines sending takedown

11

notices, just prior to an election, to suppress criticism of the machines' integrity and security;[7] a religious organization's attempt to silence its critics by sending out takedown notices;[8] a well-known fashion company's attempt to silence a blogger for criticizing the company for digitally altering an image in its advertisement to portray a model as unnaturally skinny;[9] and several examples posted on EFF's "Takedown Hall of Shame."[10] But the examples that garner the attention of the media amount to only the tip of a much larger iceberg that OSPs must deal with on a daily basis.

As these examples illustrate, the DMCA's counter-notice-and-put-back procedures, while important and valuable, have not been enough to remedy the harms to users, nor to deter abuse. The lack of a sanctions regime under Section 512(g) can embolden vexatious

---

[7] *Online Policy Grp. v. Diebold, Inc.,* 337 F. Supp. 2d 1195, 1198 (N.D. Cal. 2004).

[8] *See* Lydia Pallas Loren, *Deterring Abuse of the Copyright Takedown Regime by Taking Misrepresentation Claims Seriously*, 46 Wake Forest L. Rev. 745, 747 (2011).

[9] Cory Doctorow, *The Criticism That Ralph Lauren Doesn't Want You To See!*, BoingBoing (Oct. 6, 2009, 10:32 AM), http://boingboing.net/2009/10/06/the-criticism-that-r.html.

[10] Electronic Frontier Foundation, *Takedown Hall of Shame: Music Publisher Tries to Muzzle Podcast Criticizing Akon*, https://www.eff.org/takedowns/music-publisher-tries-muzzle-podcast-criticizing-akon.

copyright owners to send repeated takedown notices for the same
material, resulting in a "yo-yo" of notices and counter-notices (each
notice triggering a new 10-day statutorily-mandated waiting period
during which the material remains inaccessible). Moreover, in the
experience of amici, the vast majority of users who have content
improperly taken down do not counter-notify, perhaps intimidated by
the statutory requirements or the threat of litigation. To counter-notify,
the user must consent to the jurisdiction of the local federal court and
risk the possibility of litigation, which can be costly and time-
consuming, regardless of the eventual outcome. Moreover, a counter-
notice also requires a user to provide her real name, address, and
telephone number, which can be problematic for anonymous bloggers
and commenters engaged in critical political speech or whistleblowing.
17 U.S.C. § 512(g)(3). Not only can false takedown notices censor lawful
speech, they can also lead to self-censorship in the future, discouraging
critics who have already received such notices. For all of these reasons,
it remains important that 512(f) play its intended role as a deterrent to
those who would send abusive takedown notices.

## II. A Copyright Owner Who Sends a Takedown Notice Must Form an Objectively Reasonable Good Faith Belief that a Given Use is Not Authorized by Law, Including Fair Use, or Risk Liability Under Section 512(f).

Those issuing a DMCA takedown notice must attest to having a
"good faith belief that use of material in the manner complained of is

not authorized by…the law." 17 U.S.C. § 512(c)(3)(A)(v). Amici agree wholeheartedly with the panel that fair uses are "authorized by the law" within the meaning of Section 512(c). Therefore, a plain reading of Section 512(c) requires that a copyright owner have formed a good faith belief that the activity it is targeting for takedown is not a fair use, as the panel properly held. *Lenz v. Universal Music Corp.,* slip op. at 15. ("[A] copyright owner must consider the existence of fair use before sending a takedown notification under Section 512(c).").

The panel also held, however, that "our court has already decided a copyright holder need only form a subjective good faith belief that a use is not authorized." *Id.* at 15-16 (citing *Rossi v. MPAA*).[11] Amici respectfully ask that the Court sitting *en banc* reconsider that prior ruling, which violates the letter and spirit of Section 512(f) and creates a perverse incentive that favors unreasonable copyright holders over those who reasonably understand the law.

Consider the difference between the subjective and objective test in particular examples. Amicus Automattic receives notices from businesses asserting the use of unauthorized copyrighted logos in posts criticizing or parodying the copyright holder. It is not objectively

---

[11] The district court also felt constrained by *Rossi v. MPAA* on this point. *See Lenz v. Universal Music Corp.*, No. 5:07-CV-03783-JF, 2013 WL 271673, at *6 (N.D. Cal. Jan. 24, 2013).

reasonable for the business to believe that such uses are not authorized by law (by fair use, in particular). *See, e.g., E.S.S. Entm't 2000 v. Rock Star Videos*, 547 F.3d at 1098. Yet, under the purely subjective *Rossi* standard, the business could maintain that it held a subjective (but mistaken) good faith belief, forcing the critic to engage in discovery to find a "smoking gun" email demonstrating subjective knowledge that the use was most likely fair use.

The impact of *Rossi*'s interpretation sweeps beyond just fair uses. For example, amicus Automattic recently brought a 512(f) suit against an individual who filed a takedown notice claiming that an interview infringed his copyright. The individual had granted the interview and authorized its publication, but had second thoughts and wanted the interview removed from WordPress.com once the interview was posted. *Automattic Inc., et al. v. Steiner*, 82 F. Supp. 3d 1011 (N.D. Cal. 2015). If "good faith" encompassed a purely subjective standard, then it may be possible for a copyright holder to escape liability even while admitting an objectively unreasonable view of the law. In other words, the more misinformed or unreasonable the copyright owner, the broader the immunity he would have from liability under Section 512(f). This reading of 512(f) would effectively encourage copyright owners to remain ignorant about the limitations on their exclusive rights under the Copyright Act, *see* 17 U.S.C. §§ 107–123, because the less they know, the more leeway they would have to send takedown notices. This

cannot be what Congress had in mind when it enacted 512(f) to deter abusive notices.

Requiring copyright holders to form an *objectively reasonable* good faith belief prior to sending a DMCA takedown notice would not only better serve Congress' purpose in enacting 512(f), but also would not impose an undue burden on copyright holders. As pointed out by Lenz, nothing about 512(c)'s "good faith" standard should impose liability on a copyright owner who "guesses wrong" regarding a difficult fair use case. Lenz Petition at 14. An objective standard would only require that the "good faith belief" regarding a potential fair use be a reasonable one. Just as the courts have held under Section 512(i) that OSPs have considerable leeway in "reasonably implementing" a policy of terminating subscribers who repeatedly infringe copyrights, *see Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 514 (S.D.N.Y. 2013), so too would copyright holders retain leeway in reaching reasonable conclusions about fair use in particular cases.

Finally, the subjective standard announced in *Rossi* was unnecessary to the ultimate disposition of that appeal, as the undisputed facts were sufficient to satisfy an objective standard. In *Rossi*, the copyright holder's belief was clearly objectively reasonable. Indeed, the *Rossi* panel found that the belief was "virtually compel[led]" based on the "unequivocal" language on the relevant website promising "Full Length Downloadable Movies" in conjunction with movie graphics

from MPAA-member companies. *Rossi v. MPAA*, 391 F.3d at 1005. Accordingly, to the extent that the panel in *Rossi* was troubled that, without a purely subjective standard, copyright owners would be required to engage in extensive investigations before sending takedown notices, this was a misapprehension.

In summary, while the outcome in *Rossi* was correct, its interpretation of the knowledge standard as applied to unreasonable mistakes by copyright holders was ill-considered. This Court should take this opportunity to clarify the law and hold that that the good faith requirement in Section 512(c)(3)(A)(v) encompasses an objective standard with respect to whether use of a copyrighted work is "authorized by law."

## CONCLUSION

Amici respectfully urge this Court to grant Appellee's petition for rehearing en banc and overturn the purely subjective good faith standard enunciated in *Rossi v. MPAA*.

DATED: October 30, 2015        Respectfully submitted,

> */s/ Marvin Ammori*
> Marvin Ammori
> AMMORI GROUP
> *Attorneys for Amicus Curiae*
> *Automattic Inc.*
>
> */s/ Joseph C. Gratz*
> Joseph C. Gratz

17

DURIE TANGRI LLP
*Attorneys for Amici Curiae*
*Google Inc.; Twitter Inc.; and Tumblr,*
*Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A), because it is written in 14-point Century Schoolbook font, and with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), because it contains 3,483 words, excluding the portions excluded under Fed. R. App. P. 32(a)(7)(B)(iii). This count is based on the word-count feature of Microsoft Word.

DATED: October 30, 2015

*/s/ Joseph C. Gratz*
Joseph C. Gratz
DURIE TANGRI LLP
*Attorneys for Amici Curiae*

19

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 30, 2015.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that, for any participants in the case who are not registered CM/ECF users, I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days.


DATED:  October 30, 2015           */s/ Joseph C. Gratz*
                                   Joseph C. Gratz
                                   DURIE TANGRI LLP
                                   *Attorneys for Amici Curiae*

20