**Case No. 12-17668**

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

BEVERLY SEVCIK, et al.

*Plaintiffs-Appellants,*

v.

BRIAN SANDOVAL, et al.,

*Defendants-Appellees,*

and

COALITION FOR THE PROTECTION OF MARRIAGE

*Intervenor-Defendant-Appellee.*

---

On Appeal from the United States District Court

For the District of Nevada

Case No. 2:12-CV-00578-RCJ-PAL

The Honorable Robert C. Jones, District Judge

---

## DEFENDANT-APPELLEE ALAN GLOVER'S ANSWERING BRIEF

---

Neil A. Rombardo, District Attorney
Randal R. Munn, Chief Deputy District Attorney
Joseph L. Ward. Jr., Senior Deputy District Attorney
CARSON CITY DISTRICT ATTORNEY'S OFFICE
885 East Musser St., #2030
Carson City, NV 89701
Phone: 775-887-2070
*Attorneys for Defendant-Appellee Alan Glover, Carson City Clerk-Recorder*

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION ......................................... 4

STATEMENT OF FACTS.................................................... 4

ADDENDUM OF PERTINENT AUTHORITIES ............................ 6, 81

SUMMARY OF THE ARGUMENT ...................................... 6

ARGUMENT ................................................................. 10

I. *WINDSOR* DOES NOT OVERRULE, CONTRADICT OR DOCTRINALLY UNDERMINE THE DISTRICT COURT'S CORRECT DETERMINATION THAT *BAKER'S* SUMMARY DISMISSAL IS APPLICABLE TO APPELLANTS' PRECISE ISSUES AND SUFFICIENTLY SAME FACTS. .. 10

   A.  The Precise Issues and Sufficiently Same Facts Presented in *Baker* Appear in Appellants' Case. ........................................................ 11

   B.  Appellants' Case Presents No Other Constitutional Issues That Need to Be Decided By the Court.................................................... 19

   C.  The Supreme Court's Doctrinal Developments Do Not Suggest Any Obsolescence of *Baker's* Failure to Find a Substantial Federal Question in a Same-Sex Marriage Constitutional Claim. ................................... 21

      1.  *Windsor's* and *Lawrence's* doctrinal developments were limited to personal liberty and did not advance any claim to the government's endorsement of same-sex marriage........................................23

      2.  Doctrinal developments since *Baker* are marginal at best and do not suggest any obsolescence of summary dismissal of a claim for same-sex marriage........................................................25

i

II.  THERE IS NO *WINDSOR* DUE PROCESS PERSONAL LIBERTY RIGHT
TO STATE ENDORSEMENT OF SAME-SEX MARRIAGE............................ 29

   A.  Appellants' Substantive Due Process Claim is an Issue Raised for the First
Time on Appeal, Which Nevada Opposes on the Merits Rather Than
Procedure.............................................................................................. 29

   B.  A Right to Same-Sex Marriage Does Not Arise Out of a *Windsor* Personal
Liberty Interest to Not be Demeaned............................................... 31

III.  IN THE ABSENCE OF EVIDENCE OF A *MORENO* DESIRE TO HARM
OR A *ROMER-WINDSOR* INJURIOUS ANIMUS, MARRIAGE-
FEDERALISM REQUIRES DEFERENTIAL EQUAL PROTECTION
RATIONAL BASIS SCRUTINY. ........................................................ 36

   A.  *Windsor's* Precedential Value Should be Limited to its Unique
Congressional Rights Factual Context............................................ 37

   B.    Deferential Equal Protection Rational Basis Review is Appropriate
Because Nevada Satisfies a *Windsor* Uniformity Review................. 39

   C.    Deferential Equal Protection Rational Basis Review is Appropriate
Because no Evidence of Wrongful Animus was Found by the District Court. 47

   D.    Heightened Scrutiny is Not Required by *Lawrence*, *Windsor* or Existing
Ninth Circuit Precedent.................................................................. 48

IV.  NEVADA'S DIFFERENT TREATMENT OF OPPOSITE-SEX
MARRIAGE AND SAME-SEX DOMESTIC PARTNERSHIP IS
LEGITIMATE, RATIONAL AND MARRIAGE POLICY PROTECTION IS
SUBSTANTIALLY RELATED TO AN IMPORTANT GOVERNMENT
OBJECTIVE UNDER THE EQUAL PROTECTION CLAUSE......................... 64

   A.  Protecting Marriage Policy from Full Faith and Credit Clause Claims is
Legitimate, Rational and Substantially Related to an Important Government
Objective. ........................................................................................ 66

   B.  Nevada's Marriage Amendment Was Correctly Upheld Pursuant to the
District Court's Deferential Rational Basis Review. ......................... 69

CONCLUSION ........................................................................................ 76

STATEMENT OF RELATED CASES ................................................... 79

CERTIFICATE OF COMPLIANCE ..................................................... 80

## TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*Adar v. Smith*, 639 F.3d 146, 153 (5th Cir. 2011) .................................................... 20

*Baker v. Nelson*, 409 U.S. 810 (1972).......1, 3, 6, 7, 8, 10, 11, 12, 14, 15, 16,17, 19,
     20, 21, 22, 23, 24, 25, 30, 31, 36, 39, 46, 76

*Baker v. Nelson,* 191 N.W.2d 185 (Minn. 1971)………………………………………12

*Bates v. Jones*, 131 F.3d 843 (9th Cir. 1997) ..................................................... 12, 14

*Bishop v. United States ex rel. Holder*, ___ F. Supp. 2d ___, No. 04-CV-848, 2014
     U.S. Dist. LEXIS 4374, p. 33 (N.D. Okla., January 14, 2014)…………………..24

*Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954)...................................................... 2

*Bowers v. Hardwick*, 478 U.S. 186 (1986)............................................................... 52

*Christian Legal Society v. Martinez*, 130 S. Ct. 2971 (2010) ................................. 53

*Citizens for Equal Prot. v. Bruning*, 455 F.3d 859 (8th Cir. 2006)..... 6, 9, 48, 49, 58,
     71, 73

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ....................... 44, 57

*Collins v. Harker Heights*, 503 U.S. 115, 125 (1992).............................................. 33

*Detroit Police Officers Assn. v. City of Detroit*, 405 U.S. 950 (1972)................... 13

*Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011).................................................. 26, 57

*Dist. Attorney's Office v. Osborne*, 557 U.S. 52, 72-73 (2009).............................. 72

*Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000)..... 37

*Dragovich v. United States Dep't of the Treasury*, 872 F. Supp. 2d 944, 954 (N.D.
     Cal., 2012) ........................................................................................................... 49

*FCC v. Beach Communications*, 508 U.S. 307 (1993) ...................................... 64, 70

*Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1211 (9th Cir. 2005) ...................... 62

*Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2007)............................................. 20

*Frontiero v. Richardson*, 411 U.S. 677 (1973) ................................................. 22, 25

*Golinski v. Office of Personnel Management*, 824 F. Supp. 2d 968 (N.D. Cal., 2012)...................................................................................................... 28, 50, 52

*Goodrich v. Dept. of Public Health*, 798 N.E.2d 941 (Mass. 2003)................. 34, 68

*Heller v. Doe*, 509 U.S. 312 (1993)......................................................... 6, 9, 65, 70

*Herbert, Gov. of UT, et al. v. Kitchen, Derek, et al.*, 571 U.S. ___ (Case No. 13A687, January 6, 2014)...........................................................................50

*Hernandez-Montiel v. INS*, 225 F.3d 1084 (9th Cir. 2000)...................................... 53

*Hicks v. Miranda*, 422 U.S. 332 (1975) ................................. 6, 8, 10, 12, 14, 21, 25

*High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563 (9th Cir. 1990).......................................................... 6, 8, 48, 49, 52, 55, 56, 69

*Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581 (1979) ............................................. 27

*Hollingsworth v. Perry*, 570 U.S. ___, 133 S. Ct. 2652 (2013)...... 1, 3, 6, 24, 46, 48

*In re Burrus*, 136 U.S. 586, 593-94 (1890) ........................................................... 27

*In re Kandu*, 315 B.R. 123, 140 (Bankr. W.D. Wash. 2004).................................. 34

*In re Marriage Cases*, 183 P.3d 384, 433-34 (Cal. 2008) ..................................... 58

*Jackson v. Abercrombie,* 884 F. Supp. 2d 1065 (D. Haw. 2012).. 12, 14, 15, 18, 19, 20, 22, 32, 34, 43, 49, 52, 53, 58, 65, 71, 72

*Johnson v. Robison*, 415 U.S. 361 (1974)................................................... 44, 64, 72

*Jovanovich v. United States of America*, 813 F.2d 1035, 1037 (9th Cir. 1987) ...... 30

*Kitchen v. Herbert*, ___ F. Supp. 2d ___, No. 2:13-cv-217, 2013 U.S. Dist. LEXIS 179331 (C.D. Utah Dec. 20, 2013)...........................................................50

*Lawrence v. Texas*, 539 U.S. 558 (2003) ....3, 6, 7, 9, 22, 23, 24, 26, 29, 33, 34, 36, 38, 42, 48, 51, 52, 55

*Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 817 (11th Cir. 2004).................................................................................................... 22

*Log Cabin Republicans v. United States,* 658 F.3d 1162, 1170 (9th Cir. 2011)...... 77

*Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32 (1928)............................ 40, 51

*Loving v. Virginia*, 388 U.S. 1 (1967)............................... 6, 7, 26, 27, 28, 33, 39, 41

*Mandel v. Bradley*, 432 U.S. 173 (1977) ................... 6, 8, 11, 14, 15, 16, 18, 19, 31

*McCarthy v. Philadelphia Civil Serv. Comm'n*, 424 U.S. 645 (1976).. 12, 13, 14, 15

*Michael M. v. Superior Court, Sonoma County*, 450 U.S. 464 (1981)................... 66

*Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003)............................................ 52

*Nevada v. Hall*, 440 U.S. 410 (1979) ............................................................... 19, 67

*Pac. Employers Ins. Co., v. Indus. Accident Comm'n*, 306 U.S. 493 (1939) ......... 66

*Patrick v. LeFevre*, 745 F.2d 153, 157 (2nd Cir. 1984) ........................................... 3

*Perry v. Brown,* 671 F.3d 1052 (9th Cir. 2012) ........................... 1, 2, 6, 7, 48, 50, 59

*Philips v. Perry*, 106 F.3d 1420 (9th Cir. 1997)................. 6, 8, 48, 49, 55, 64, 70, 73

*Port Authority Bondholders Protective Committee v. Port of New York Authority,* 387 F.2d 259, 263 n.3 (2nd Cir. 1967) ................................................................ 21

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989)... 10

*Romer v. Evans,* 517 U.S. 620 (1996)..1, 2, 6, 7, 8, 9, 11, 22, 25, 26, 29, 40, 41, 42, 47, 48, 50, 58, 62, 63, 73

*Shelby Co. v. Holder*, 133 S. Ct. 2612, 2623 (2013)............................................... 39

*Turner v. Safely*, 482 U.S. 78 (1987) .................................................................... 23

*U.S. Department of Agriculture v. Moreno*, 413 U.S. 528 (1973) 6, 8, 25, 36, 47, 57

*United States v. Virginia*, 518, U.S. 515, 531 (1996) ............................................. 66

*United States v. Windsor*, 570 U.S. ___, 133 S. Ct. 2675 (2013) .. 1, 2, 3, 6, 7, 8, 10, 15, 17, 21, 22, 24, 26, 28, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 46, 47, 48, 50, 58, 68

*Washington v. Glucksburg*, 521 U.S. 702 (1997) ....................................... 32, 33, 77

*Williams ET AL. v. North Carolina*, 317 U.S. 287 (1942) ................................ 45, 67

*Wilson v. Ake*, 354 F. Supp. 2d 1298 (M.D. Fla. 2005) .............................. 20, 22, 67

*Witt v. Department of Air Force*, 527 F.3d 806 (9th Cir. 2008) .......... 6, 9, 48, 49, 50

*Wright v. Lane County Dist. Ct.*, 647 F.2d 940 (9th Cir. 1981) ........................ 12, 14

*Zablocki v. Redhail,* 434 U.S. 374 (1978) ................................................... 11, 23, 28

**Statutes**

1876 Nev. Stat. 88 ................................................................................... 4, 44

1999 Nev. Stat. 1935 ...................................................................................... 4

2009 Nev. Stat. 2183, NRS 122A.210 ...................................................... 6, 63

Nev. Rev. Stat. (NRS) 122.020 ............................................................ 4, 5, 44

Nev. Rev. Stat. §§ 118.020, 233.010, 613.330 ............................................ 57

NRS 122A.200 .......................................................................................... 6, 45

**Territorial Laws of Nevada**

Part 2:33: 1861 ..................................................................................... 4, 44

**Constitutions**

U.S. Const. art. IV, § 1 ............................................................................. 66

U.S. Const. amend. XIV, § 1 ..................................................................... 2

Nev. Const. art. 1 § 21 ...................................................................... 4, 45

Nev. Const. art. 16 § 1 ........................................................................ 76

## Other Authorities

HISTORY OF NEVADA, Thompson & West, Oakland, Cal., 1881, pps. 42-48 ........... 3

WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 761 (1967) ........................ 17

Nevada Senate Joint Resolution 13......……………………………………..……....76

## Rules

FRAP 28-2.2................................................................................... 4

FRAP 28-2.7................................................................................... 6

# INTRODUCTION [1]

Attempting to capitalize upon the Court's mandatory precedent in *Perry v. Brown*, Appellants' case theory before District Court Chief Judge Robert C. Jones ("District Court") was expressly limited by Appellants to a Fourteenth Amendment Equal Protection based hybrid form of *Perry v. Brown—Romer v. Evans* "take-away" of the title of marriage through the alleged dichotomy created by Nevada's enactment of same-sex domestic partnerships with all the incidental benefits of marriage, but without the title, approximately seven years after Nevadans had amended by initiative the Nevada Constitution to limit marriage to only between a male and a female. Dist. Ct. Dkt. 86, pps. 2-3, ll. 19-28; ll. 1-8.

Because the U.S. Supreme Court in *Hollingsworth v. Perry* just recently vacated *Perry v. Brown*, and the District Court decided Nevada's case before the Supreme Court's ruling on DOMA in *United States v. Windsor,* Appellants have apparently redirected their case theory on appeal. Without adequate foundation

---

[1] Unless the context requires otherwise this brief will refer to the following as: Defendant-Appellee Carson City Clerk-Recorder Alan Glover ("Nevada"); the form of citations to the Excepts of Record ("ER"); references to documents filed in our case before the Ninth Circuit Court of Appeals ("Ninth Circuit") will be the corresponding document number ("Dkt."); and, references to filings in the Nevada District Court will be the corresponding document number ("Dist. Ct. Dkt.").

The omitted case citations in the Introduction are: *Perry v. Brown,* 671 F.3d 1052 (9th Cir. 2012), *vacated* on standing grounds, *Hollingsworth v. Perry*, 570 U.S. ___ (2013), 133 S. Ct. 2652; *Romer v. Evans*, 517 U.S. 620 (1996); *United States v. Windsor*, 570 U.S. ___, 133 S. Ct. 2675 (2013); *Baker v. Nelson*, 409 U.S. 810 (1972).

1

Appellants raise an issue for the first time on appeal—Fourteenth Amendment Due Process. Nevertheless, Nevada does not procedurally oppose the Court's consideration of the issue, but opposes it on the merits, *infra*.[2]

Appellants appear to now abandon their *Perry-Romer* "take away" theory and re-direct their arguments towards *Windsor-Romer* animus/harm substantive due process-equal protection. Appellants state: "By foreclosing same-sex couples from marriage, Nevada inflicts virtually the same collection of federal harms and deprivations on unmarried same-sex couples as DOMA previously did, since nearly all federal benefits are unavailable to unmarried couples, regardless of whether they are registered domestic partners." Opening Brief Dkt. 20-3, p. 36. Thus, Appellants argue a new due process-equal protection *Windsor* based Nevada-DOMA theory.

*Windsor,* however, should be viewed with appropriate caution by the Court. A broadly applied *Windsor* due process-equal protection animus/harm "standard," which does not contain any identifiable application threshold as found in *Romer,* could be misapplied to open the courthouse doors in Nevada to polygamy marriage

---

[2] "The concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive." *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954).

rights claims.[3]

Appellants declare *Baker v. Nelson* dead of old age and mount an extremely dismissive argument, citing to a statement Justice Ginsburg made during the oral argument in *Hollingsworth*. Opening Brief Dkt. 20-3, p. 114. The Court should not be so dismissive of mandatory Supreme Court authority. As government lawyers under oath of office, the applicability of *Baker* to our case is a major reason why Nevada's counsel cannot surrender to Appellants' broad brush claim of a new right. Prophesies of same-sex marriage inevitability based upon the *Lawrence-Windsor* personal liberty rationales must first contend with *Baker*.

---

[3] Nevada history of Mormon polygamy may present a prima facie animus case under *United States v. Windsor*. *See* HISTORY OF NEVADA, Thompson & West, Oakland, Cal., 1881, pps. 42-48 (In 1857 the Utah Territory Mormons took up arms against the U.S. Government over disputed matters including their religious freedom to practice polygamy; Brigham Young called all church members to return to Salt Lake City to defend the church, and the remaining citizens in the Nevada area, western Utah Territory—Carson County, sought authority from the federal government to organize a separate territorial government—the Territory of Nevada; The historian summarized: "The troubles of 1857, existing between the Government and Mormon Church, had served to withdraw all the adherents of Brigham Young from the section now called Nevada, leaving only Gentiles, and those who repudiated Brigham's authority and polygamy, as residents of Carson County." *Id.* at 48); *see Reynolds v. United States*, 98 U.S. 145, 168 (1879) ("Congress, in 1862 (12 Stat. 501), saw fit to make bigamy a crime in the Territories. This was done because of the evil consequences that were supposed to flow from plural marriage") (*overruled* in part, *see Patrick v. LeFevre*, 745 F.2d 153, 157 (2nd Cir. 1984)). *Reynolds* traced the common law and concluded ". . . it may safely be said there never has been a time in any State of the Union when polygamy has not been an offence against society, cognizable by the civil courts and punishable with more or less severity." *Id.* at 165.

## STATEMENT OF JURISDICTION

Pursuant to FRAP 28-2.2 Appellee Alan Glover ("Nevada") agrees with the statement of jurisdiction supplied by Appellants.

## STATEMENT OF FACTS

1. The 1861 laws of Territory of Nevada regarding marriage were expressly limited to "a male and a female." Part 2:33: 1861. The same limitation on marriage was codified in 1876 in the Statutes of Nevada and is substantially the same today. 1876 Nev. Stat. 88; Nev. Rev. Stat. (NRS) 122.020 ("1. Except as otherwise provided in this section, a male and a female person, at least 18 years of age, not nearer of kin than second cousins or cousins of the half blood, and not having a husband or wife living, may be joined in marriage. . .").

2. Employment discrimination based upon "sexual orientation" has been prohibited in Nevada since 1999. 1999 Nev. Stat. 1935.

3. In 2002 the Nevada Constitution was amended by initiative petition, as follows: "Only a marriage between a male and female person shall be recognized and given effect in this state." Nev. Const. art. 1 § 21 (added to the Nevada Constitution-- 2000-First Vote, Question 2, YES: 412,688; NO: 180,077 [69% in favor]; 2002-Second Vote, Question 2, YES: 337,197; NO: 164,573 [67% in favor]). ER 162-169, Dist. Ct. Dkt. No. 74, p. 6, ll. 11-18.

4. Ballot Question 2 "arguments for passage" were identical in both the Nevada

2000 and 2002 elections, as follows:

> Proponents argue that passage will ensure that Nevada law upholds the definition of marriage as being only between a man and a woman. While a Nevada statute provides that marriage may only be between a male and a female, current law provides that a legal marriage that took place outside Nevada is generally given effect under the "Full Faith and Credit Clause" of the United States Constitution. Proponents argue that if same gender marriages ever become legal in another state, under the Full Faith and Credit Clause Nevada could be required to recognize such marriages entered into legally in another state. Proponents argue that his constitutional amendment is needed to define Nevada's public policy on marriage being only between a male and a female. **A "Yes" vote means that the Nevada Constitution should be amended to provide that only marriages between a male and female should be recognized and given effect in this state.** *Id.*

5.    Ballot Question 2 "arguments against passage" were identical in both the

Nevada 2000 and 2002 elections, as follows:

> Opponents argue that the proposed amendment singles out one group of Nevadans for different treatment in our Constitution. By singling out same gender couples, opponents argue that discrimination occurs because the rights and privileges of marriage are denied to couples of the same gender. They argue that same gender couples are entitled to the same constitutional protections, legal rights and benefits as other couples. In addition, opponents argue that the proposed amendment is contrary to Nevada's public policy that supports equality and civil rights for all Nevadans. Opponents argue that a constitutional change is redundant and unnecessary because the definition of marriage as being only between a male and female is already contained in Nevada Revised Statutes 122.020(1) and federal law. **A "No" vote means**

5

> **that the Nevada Constitution should not be amended
> to provide that only marriages between a male and
> female should be recognized and given effect in
> Nevada.** *Id.*

6.     In 2009, Nevada Legislature adopted the Domestic Partnership Act, NRS

chapter 122A, providing both opposite-sex and same-sex couples that exercise

their rights under the Act with substantially the same rights of marriage by defining

such domestic partners as "spouses." 2009 Nev. Stat. 2183, NRS 122A.210.

## ADDENDUM OF PERTINENT AUTHORITIES

Pursuant to NRAP Ninth Circuit Rule 28-2.7, Defendant-Appellee Alan

Glover ("Nevada") has reproduced pertinent constitutional and statutory provisions

in an Addendum to this brief.

## SUMMARY OF THE ARGUMENT [4]

The District Court properly granted dismissal in part, finding Appellants'

same-sex marriage equal protection claim was squarely controlled by the *Baker v.*

---

[4] The omitted case citations in the Summary of the Argument are: *Baker v. Nelson*,
409 U.S. 810 (1972); *Romer v. Evans*, 517 U.S. 620 (1996); *Perry v. Brown,* 671
F.3d 1052 (9th Cir. 2012), *vacated* on standing grounds, *Hollingsworth v. Perry*,
570 U.S. ___ (2013), 133 S. Ct. 2652; *United States v. Windsor*, 570 U.S. ___, 133
S. Ct. 2675 (2013); *Loving v. Virginia*, 388 U.S. 1 (1967); *Lawrence v. Texas*, 539
U.S. 558 (2003); *Mandel v. Bradley*, 432 U.S. 173 (1977); *Hicks v. Miranda*, 422
U.S. 332 (1975); *High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895
F.2d 563 (9th Cir. 1990); *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528
(1973); *Philips v. Perry*, 106 F.3d 1420 (9th Cir. 1997); *Witt v. Department of Air
Force*, 527 F.3d 806 (9th Cir. 2008); *Citizens for Equal Prot. v. Bruning*, 455 F.3d
859 (8th Cir. 2006); *Heller v. Doe*, 509 U.S. 312, 319 (1993).

*Nelson,* which summarily dismissed a case presenting our precise issues and sufficiently same facts. ER 11, Dist. Ct. Dkt. 102, p. 10, ll. 16-22.   Further, the District Court properly granted (in the alternative) summary judgment, finding that: 1) *Baker v. Nelson* was not able to consider a *Romer v. Evans* animus/take-away theory, ER 11-12, Dist. Ct. Dkt. 102, pps. 10-11, ll. 22-25; ll. 1-5;  2) the *Perry v. Brown* rights take-away approach was not applicable authority to Nevada's facts, ER 31, Dist. Ct. Dkt. 102, p. 30, ll. 16-18;  and 3) the animus-based denial of equal protection approach found in *Romer* should be considered in Nevada's context, ER 38, Dist. Ct. Dkt. 102, p. 37, ll. 21-22, but Nevada's preemptive protection of traditional marriage from possible future Full Faith and Credit Clause claims was not motivated solely by a *Romer* prohibited pure animus and was at least rationally related to several legitimate government interests under deferential rational basis scrutiny. ER 40-41, Dist. Ct. Dkt. 102, pps. 39-40, ll. 10-25; ll. 1-9.

*Baker v. Nelson* controls this case, which has facts and "precise issues present and necessarily decided," which are "sufficiently the same," and the indirect doctrinal developments in *Loving v. Virginia, Lawrence v. Texas, Romer v. Evans* and *United States v. Windsor* have not altered *Baker's* summary dismissal holding that a claim for same-sex marriage does not present a substantial federal question.  Further, none of these doctrinal developments have indicated any desire

7

by the Supreme Court to create a new suspect class for same-sex relationships. To find otherwise, the Ninth Circuit must improperly disregard *Baker* or otherwise erroneously find Nevada's minimal factual differences to be material in contradiction to the requisite materiality as found in *Mandel v. Bradley* and *Hicks v. Miranda.* To create such a new suspect class in the Ninth Circuit, the Court would need to "overrule" or otherwise distinguish *High Tech Gays v. Defense Indus. Sec. Clearance Office,* which the District Court in our case felt bound to follow until which time an en banc review overruled the precedent. ER 16, Dist. Ct. Dkt. 102, p. 15, l. 19.

Appellants raise the issue of substantive due process for the first time on appeal. Nevada does not procedurally oppose the Court's consideration of the issue. *Windsor* did not recognized a new fundamental right to same-sex marriage and a personal liberty interest not to be demeaned does not create a liberty interest in the government's marriage endorsement of same-sex couples.

Nevada asserts that in the absence of sufficient evidence of: 1) a *Romer v. Evans* type of pure animus or (rights take-away), or 2) a *U.S Department of Agriculture v. Moreno* desire to harm, the principle of marriage-federalism (as it was reaffirmed in *Windsor*) strongly suggests the appropriateness of conventional deferential rational basis equal protection review in Nevada's case, as such deference was extended by the Court to the military in *Phillips v. Perry* and *Witt v.*

8

*Department of Air Force*, and the Eighth Circuit Court of Appeals extended to the state of Nebraska in *Citizens for Equal Prot. v. Bruning*.[5]

Even assuming arguendo the applicability of a *Romer* more searching "careful consideration" form of rational basis equal protection review (or even heightened scrutiny), the initiative petition's ("Question 2") stated legislative purpose for Nevada's marriage amendment is at least rationally related to a legitimate interest in protecting Nevada's marriage public policy, which policy has existed since it was the Territory of Nevada, and the people sought to protect against anticipated future Full Faith and Credit Clause claims for recognition of substantially different marriage policies of other states. Further, protecting such state policy from interstate claims is substantially related to an important government objective under heightened scrutiny.

Plaintiffs ask the Court to sit as a *Heller v. Doe* prohibited superlegislature to rewrite the marriage laws and Constitution of Nevada. The ultimate question should be left to Nevada's voters through the constitution amendment process already initiated by the 2013 Nevada Legislature. Appellants' appeal should be denied and the decision of the District Court affirmed.

---

[5] *Witt* also held that with respect to a substantive due process claim that implicates the rights identified by *Lawrence* (which private personal liberty rights are not implicated in Nevada's case), the Court will apply an intermediate level of scrutiny (heightened scrutiny) on an as-applied basis. *Id.* at 819.

9

## ARGUMENT

## I. *WINDSOR* DOES NOT OVERRULE, CONTRADICT OR DOCTRINALLY UNDERMINE THE DISTRICT COURT'S CORRECT DETERMINATION THAT *BAKER'S* SUMMARY DISMISSAL IS APPLICABLE TO APPELLANTS' PRECISE ISSUES AND SUFFICIENTLY SAME FACTS.

The U.S. Supreme Court in *United States v. Windsor*, 570 U.S. ___, 133 S. Ct. 2675 (2013) determined to rebuke Congress for its unprecedented DOMA invasion upon the long-standing states' rights to regulate marriage.  In that rebuke, *Windsor* does not overrule, contradict or establish any undermining doctrinal developments with respect to the topic of the *Baker v. Nelson*, 409 U.S. 810 (1972) summary dismissal, and therefore Appellants' constitutional claim to same-sex marriage fails to raise a substantial federal question on either due process or equal protection grounds.

*Baker* held, by summary dismissal, that a Fourteenth Amendment Due Process and Equal Protection claimed right to same-sex marriage did not present a substantial federal question.  The *Baker* summary dismissal is deemed a decision on the merits and thus is binding on lower courts. *Hicks v. Miranda*, 422 U.S. 322, 344-45 (1975); *see Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court [like same-sex marriage in *Windsor*] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions [like same-sex marriage in *Baker*], [a lower court]

should follow the [*Baker*] case which directly controls, leaving to this Court the prerogative of overruling its own decisions [text added].").  The District Court correctly followed *Baker* and dismissed in part.  ER 12, Dist. Ct. Dkt. 102, p. 11, ll. 6-7.

It is proper to conclude that the *Baker* summary dismissal in 1972 of a claim for same-sex marriage was driven entirely by long-settled marriage-federalism. *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) ("Summary actions . . . should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved.").  While the same-sex claim was new, a state's long-standing control of marriage law was not.  Thus, marriage-federalism should be duly respected by the Court (as it was in *Windsor*) because of the foreseeable public policy problems created by excessive judicial intervention.  *Zablocki v. Redhail*, 434 U.S. 374, 398-99 (1978) (Powell, J., concurring) (cautions the risks of going too far with judicial scrutiny of state marriage policy); *Romer v. Evans*, 517 U.S. at 648-51 (Scalia, J., dissenting) (raising the potential adverse impacts of excessive judicial scrutiny on anti-polygamy laws in the states).

### A.    The Precise Issues and Sufficiently Same Facts Presented in *Baker* Appear in Appellants' Case.

The "underlying reasoning as well as the judgment" of the state court in *Baker* need not, and should not, be considered by the Court.  *Mandel v. Bradley*,

432 U.S. at 176 ("Because summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below."). However, while the rationale of the dismissal may not be gleaned *solely* from the opinion below, and we may not look solely at *Baker's* lower state court decision[6] for such, the Court should, however, be guided by marriage-federalism in discerning if the facts and issues in *Baker* and our case are sufficiently the same. *Hicks v. Miranda,* 422 U.S. 332, 345 n.14 (1975) ("Of course, *Miller II* would have been decisive here only if the issues in *Miller II* and the present case were sufficiently the same that *Miller II* was a controlling precedent. . ."); *Jackson v. Abercrombie,*  884 F. Supp. 2d 1065, 1085 (D. Haw. 2012) (quoting *Bates v. Jones,* 131 F.3d 843, 848 (9th Cir. 1997)) ("The 'precedential value of a dismissal for want of a substantial federal question extends beyond the facts of the particular case to all similar cases.'").

The Court should note the phrase "all similar cases" was originally coined by *Wright v. Lane County Dist. Ct.,* 647 F.2d 940 (9th Cir. 1981) in a parenthetical description of the "no substantial federal question" summary affirmance in *McCarthy v. Philadelphia Civil Serv. Comm'n,* 424 U.S. 645 (1976).  *Wright's* coined phase was cited without analysis in *Bates,* at 848, and *Bates* was quoted in *Jackson, at* 1085, without analysis of the underlying cases.  Looking closely at

---

[6]*Baker v. Nelson*, 191 N.W. 2d 185 (Minn. 1971).

*McCarthy,* it is apparent that a slight change in facts (or legal theories) does not bar summary dismissal when the cases are similar.  The *McCarthy* facts and circumstances demonstrate the *similar case* example (which in that case was a "continuing residence requirement") subject to summary dismissal regardless of immaterial different facts and legal theories than the precedent case.

Mr. McCarthy (Fireman) was a fireman who was terminated when he moved his permanent residence out of Philadelphia to New Jersey, and Philadelphia had a city employee residency requirement.  The Fireman sued that the residency ordinance violated his alleged federally protected right of interstate travel. The state lower court upheld the ordinance and the Pennsylvania Supreme Court denied review.  The Fireman appealed to the U.S. Supreme Court.  The "summary dismissal" precedent the High Court relied upon in *McCarthy* was *Detroit Police Officers Assn. v. City of Detroit*, 405 U.S. 950 (1972).  The *McCarthy* court, while noting favorably regarding its *Detroit Police Officers Assn.* summary dismissal precedent and its immaterial differing facts and legal theories, stated the following:

> The Michigan Supreme Court held that Detroit's **similar requirement** [in comparison to Philadelphia's similar residency requirement] for police officers was not irrational and did not violate the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment. n.4. [Citations omitted; text added].
>
> n.4 **We have not, however, specifically addressed the contention made by appellant** in this case that his

constitutionally recognized **right to travel** interstate as defined in [citations omitted], is impaired.

We have previously differentiated between a requirement of continuing residency and a requirement of prior residency of a given duration . . . **This case involves** that kind of **bona fide continuing residence requirement**. The judgment of the Commonwealth Court of Pennsylvania is therefore affirmed.

*McCarthy*, at 646-647. [Emphasis added.]

Again, the *Hicks* standard is "sufficiently the same," provided the *Mandel* "precise issues presented and necessarily decided" are present in the absence of game changing "doctrinal developments." In Nevada's case we indeed have a *McCarthy-Wright-Bates-Jackson* "bona fide similar" same-sex marriage case as addressed by *Baker* (with noted immaterial factual and legal theory differences), making application of the *Baker* summary dismissal precedent completely appropriate and, therefore mandatory.[7]

---

[7] *Bates v. Jones*, 131 F.3d 843, 848 (9th Cir. 1997) (O'Scannlain, J., concurring): The ruling in *Moore* has the same effect as a summary affirmance and is fully binding on all lower courts. *See Mandel v. Bradley*, 432 U.S. 173, 176, 53 L. Ed. 2d 199, 97 S. Ct. 2238 (1977) (per curiam); *Wright v. Lane County Dist. Ct.*, 647 F.2d 940, 941 (9th Cir. 1981). "Summary dismissals for want of a substantial federal question are decisions on the merits that bind the lower courts until subsequent decisions of the Supreme Court suggest otherwise." *Wright*, 647 F.2d at 941; *see also Mandel*, 432 U.S. at 176 (summary dismissals "prevent lower courts from coming to the opposite conclusions on the precise issues presented and necessarily decided by those actions.") The "precedential value of a dismissal for want of a substantial federal

Those immaterial legal theories, like *McCarthy's* "interstate travel" and Appellants' theories of a Domestic Partnership Act denial (or take-away) of the title of marriage or a Nevada-DOMA personal liberty demeaning-stigma under *Windsor,* fail to present *Mandel* "necessarily decided" constitutional issues which could prevent the application of summary dismissal. *Baker* had considered a due process question on the topic, making all subsequent alternative due process theories irrelevant to the topical summary dismissal requirement. *Jackson* was consistent with *McCarthy.* Judge Kay's reasoning in *Jackson* is applicable to Nevada's case. As Judge Kay explained:

> Although the facts in this case are not identical to those in *Baker*, the "precedential value of a dismissal for want of substantial federal question extends beyond the facts of the particular case to all similar cases." *Wright v. Lane Cnty. Dist. Court*, 647 F.2d 940, 941 (9th Cir. 1981) (emphasis added) (citing *McCarthy v. Philadelphia Civil Serv. Comm'n*, 424 U.S. 645, 646 (1976)).
> . . .
> Consequently, the relevant facts of this case are substantially similar to that raised in *Baker*, which necessarily decided that a state law defining marriage as a union between a man and a woman does not violate the Equal Protection Clause. This issue did not merely "lurk in the record," but was directly before the Supreme Court. *Baker* is the last word from the Supreme Court regarding the constitutionality of a state law limiting marriage to opposite-sex couples and thus remains binding on this Court.

---

question extends beyond the facts of the particular case to all similar cases. *Wright*, 647 F.2d at 941.

*Jackson*, at 1087-88.

The only notable factual difference between Nevada's case and *Jackson* is that Hawaii's marriage amendment commits the matter to the legislature and does not forbid same-sex marriage. Nevertheless, this is not a *material* factual difference which might be argued as preventing the application of *Baker*.[8]

Relying on *Mandel's* language of "precise issues presented and necessarily decided," *Id*. at 205, Appellants argued to the District Court that *Baker* and the instant Nevada case must be identical in all respects before the Court may apply the summary dismissal precedent. That simply is not the case. The relevant questions presented to the U.S. Supreme Court in *Baker* are set out in the *Baker* "Jurisdictional Statement," as follows:

> 1. Whether appellee's refusal to sanctify appellants' marriage deprives appellants of their liberty to marry and of their property without due process of law under the Fourteenth Amendment.

> 2. Whether appellee's refusal, pursuant to Minnesota

---

[8] With regard to the application of summary dismissal, the *materiality* of differing independent constitutional questions and facts which are absent in our case, but are found in controlling precedent, should be noted by the Court. Appellants stated in their Opposition to Dismissal Dist. Ct. Dkt. 41, p. 6, ll. 19-22: "*Mandel* found this mere factual difference," by which they alleged it prevented summary dismissal. What Appellants called below a "mere factual difference" was found by the *Mandel* Court to be **"enormous."** *Mandel*, 432 U.S. at 177. [Emphasis added.] Therefore, there was a material factual difference between the summary affirmance case and the case to which it was applied, which made its application inappropriate.

> marriage statutes, to sanctify appellants' marriage because
> both are of the male sex violates their right under the
> equal protection clause of the Fourteenth Amendment.

Dist. Ct. Dkt. 41-1, p. 6.

In short, *Baker's* issues were 1) an alleged *due process liberty* right that the state *sanctify* same-sex marriage, 2) an alleged *equal protection* right that the state *sanctify* same-sex marriage, 3) and, an alleged *privacy* right that the state *sanctify* same-sex marriage.[9] The word *sanctify* during this period of American history had one non-religious meaning, *"to give moral or social sanction to."* WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 761 (1967). In comparison, Appellants in our case set forth in their Complaint (and prayer for relief) the same "precise issue" as in *Baker* that must be necessarily decided here—that the state of Nevada must give moral and social sanction to same-sex marriage on equal protection grounds before the District Court, and now for the first time on appeal on substantive due process grounds (which issue was also fully embraced by the *Baker* "Jurisdictional Statement"). Complaint Dist. Ct. Dkt. 1, p. 2, ll. 22-25; Complaint Dist. Ct. Dkt. 1, pps. 2-3, ll. 27-28); Complaint Dist. Ct. Dkt. 1, p. 6, ll. 13-17; Complaint Dist. Ct. Dkt. 1, p. 11, ll. 8-11; Complaint Dist. Ct. Dkt. 1, pps. 12-13, l. 27; ll. 1-2;

---

[9] *Baker's* third jurisdictional statement does not appear to be relevant in Nevada's case unless Appellants' new substantive due process claim first made upon their appeal also implicates a privacy interest under the *Lawrence-Windsor* rationales ("3. Whether appellee's refusal to sanctify appellants' marriage deprives appellants of their right to privacy under the Ninth and Fourteenth Amendments.").

17

Complaint Dist. Ct. Dkt. 1, p. 29, ll. 8-26.

Appellants asserted below, and the District Court properly rejected, that because Nevada provides protection from discrimination based upon "sexual orientation" and provides for "domestic partnerships" for same-sex couples, and thus not merely discriminating based upon "gender,"[10] as they allege solely existed in *Baker*, the issues are alleged by Appellants to be different in our case and summary dismissal based upon *Baker* is argued inappropriate under *Mandel*.   This same faulty argument was made in *Jackson*, and was rejected by Judge Kay, and should be rejected here.  Judge Kay reasoned:

> Defendant Abercrombie asserts that the *Baker* plaintiffs presented a claim of gender discrimination and thus denying marriage on account of sexual orientation was not the precise issue presented in *Baker*. [citation omitted]. Plaintiffs and Defendant Abercrombie assert because Hawaii has a civil union law in contrast to Minnesota at the time of *Baker*, the facts are sufficiently different such that their Equal Protection claim is not controlled by *Baker* [citations omitted.]
>
> Defendant Abercrombie's contention that *Baker* asserted solely a gender discrimination is belied by the jurisdictional statement. Although in the jurisdictional statement the plaintiffs assert that "[t]he discrimination in this case is one of gender," their claim is not limited to

---

[10] *Jackson*, at 1098 ("The Court thus agrees with the vast majority of courts considering the issue that an opposite-sex definition of marriage does not constitute gender discrimination.").

gender discrimination. *Baker* Jurisdictional Stmt. 16. The plaintiffs also relied on the state's different treatment based on their sexual orientation . . . The First Circuit recognized that the plaintiffs in *Baker* raised an equal protection claim based on sexual orientation discrimination, noting that holding that sexual orientation classifications are subject to heightened scrutiny would "imply[] an overruling of *Baker*." *Mass. v. HHS*, 682 F.3d at 9.

*Jackson*, at 1086-87.

## B.    Appellants' Case Presents No Other Constitutional Issues That Need to Be Decided By the Court.

Nevada's addition of domestic partnership and sexual orientation rights to its laws does not present facts and issues that must be "necessarily decided." Justice Brennan, in his concurring opinion in *Mandel*, at 180, cautions in applying summary dispositions that courts should:

> (a) examine the jurisdictional statement in the earlier case to be certain that the constitutional questions presented were the same and, if they were, (b) determine that the judgment in fact rests upon the decision of those questions and not even arguably upon some alternative nonconstitutional grounds.

First, under Justice Brennan's examination—the examination of the *Baker* Jurisdictional Statement, *supra*, finds the same *Baker* due process and equal protection issues in Appellants' case. Second, under the Brennan's examination— in Appellants' case there are no "alternative nonconstitutional grounds" upon

19

which this Court can "arguably" make a decision.  Since *Baker's* issues included

constitutional challenges based upon a *liberty, equal protection* and a *privacy* right,

any other "arguable alternative nonconstitutional grounds" cannot be discerned in

our case.  *See Nevada v. Hall*, 440 U.S. 410, 423-24 (1979) (Full Faith and Credit

Clause does not require Nevada to apply the public policy of another state in

violation of its own); *see Wilson v. Ake*, 354 F. Supp. 2d 1298, 1303 (M.D. Fla.

2005) ("Adopting Plaintiffs' rigid and literal interpretation of the Full Faith and

Credit would create a license for a single State to create national policy. (citations

omitted).").    Appellants' section 1983 Civil Rights action does not present

alterative constitutional grounds.  *Adar v. Smith*, 639 F.3d 146, 153 (5th Cir. 2011)

(The Full Faith and Credit Clause does not "give rise to a right vindicable in a §

1983 action."); *cf. Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2007)

(distinguished by *Adar*).

     Like in *Jackson*, at 1087, Appellants have not separately challenged the

constitutionality of Nevada's domestic partnership law, nor the sexual orientation

statutes.  Complaint ER 707, Dist. Ct. Dkt. 1, p. 13, ll. 27-28.  Appellants merely

argue in their Complaint (and as altered on appeal regarding due process) such to

be a string of additional evidence of an alleged Fourteenth Amendment

constitutional violation in Nevada.  Complaint ER 719, Dist. Ct. Dkt. 1, p. 25, ll. 5-

11.  What they unavoidably allege is Nevada has failed to provide them the "title"

of marriage, which is the equivalent of *Baker's* claim for state "sanctification" ("moral and social sanction") of their claimed right to same-sex marriage.

Without success on Appellants' singular issue—same-sex marriage, no other conceivable constitutional claim can proceed or need be decided by the Court.

### C.     The Supreme Court's Doctrinal Developments Do Not Suggest Any Obsolescence of *Baker's* Failure to Find a Substantial Federal Question in a Same-Sex Marriage Constitutional Claim.

The failed substantial federal question topic in *Baker* was a federal constitutional claim to same-sex marriage.   The Supreme Court in *Hicks v. Miranda*, 422 U.S. at 344, cited to *Port Authority Bondholders Protective Committee v. Port of New York Authority*, 387 F.2d 259, 263 n.3 (2nd Cir. 1967), with respect to the doctrinal developments question.  Thus, the proper analysis for the application of a summary dismissal decision is how the Supreme Court has treated the *same-sex marriage claim* ("*Baker* topic") over time following the summary dismissal.[11]

Since *Baker*, there have been no Supreme Court cases that have directly

---

[11] *Port Authority Bondholders Protective Committee v. Port of New York Authority*, 387 F.2d 259, 263 n.3 (2nd Cir. 1967) ("The Sunday law cases, [citations omitted], are **notable examples of the Court's finding much substantiality -- there 200 pages worth -- in an issue characterized as unsubstantial in dismissing appeals only a few years before**, [citations omitted]. However, unless and until the Supreme Court should instruct otherwise, inferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise."). [Emphasis added.]

discussed the *Baker* topic. *Cf. Windsor*, at 2692 ("a [same-sex marriage] relationship deemed by the State worthy of dignity in the community equal with all other marriages" flows out of a state's long-standing discretionary right to broaden the definition of marriage and not out of a federal due process or equal protection claim to it). Thus, since there have not been any doctrinal developments regarding the specific *Baker* topic, Appellants rely on peripherally related-subject cases to attempt to build an indirect obsolescence case against *Baker*.

As evidence of alleged doctrinal developments since *Baker*, Appellants cite to *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (sex-based classifications require heightened scrutiny); *Romer v. Evans*, 517 U.S. 620, 634 (1996) (desire to harm homosexuals as a politically unpopular group cannot constitute a legitimate government interest); *Lawrence v. Texas*, 539 U.S. 558 (2003) (the criminalization of private consensual sexual conduct between adults of the same-sex was brought to an end under recognition of a sexual relations privacy right);[12] *United States v.*

---

[12] *Jackson*, at 1097-98 ("Finally, the Supreme Court explicitly stated that *Lawrence* did 'not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter.' *Id.* at 578. As the Eleventh Circuit explained, 'it is a strained and ultimately incorrect reading of *Lawrence* to interpret it to announce a new fundamental right.' *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 817 (11th Cir. 2004); *see also Wilson*, 354 F. Supp. 2d at 1306 ('[T]he Supreme Court decision in *Lawrence* cannot be interpreted as creating a fundamental right to same-sex marriage.'").

*Windsor*, 570 U.S. ___, 133 S. Ct. 2675 (2013) (the *Lawrence* personal liberty interest was extended to lawfully married same-sex couples, whom likewise enjoy a personal liberty interest in not being demeaned by a federal law designed to intentionally discriminate against their lawful marriage status).

While Appellants' cited cases express doctrinal developments with respect to evolving views of personal liberty and equal protection of unpopular groups against injurious legislative animus, none of these cases address the *Baker* topic— a claimed right to government endorsement ("sanctification") of same-sex marriage. The post-*Loving* decisions of the Supreme Court merely apply the fundamental marriage right in an opposite-sex context. *See Turner v. Safely*, 482 U.S. 78 (1987) (inmates' rights case which dealt with inmate correspondence and opposite-sex persons fundamental right marry an inmate); *see Zablocki v. Redhail*, 434 U.S. 374 (1978) (under strict scrutiny Wisconsin could not prohibit a marriage if one prospective opposite-sex spouse was behind in child support). The Supreme Court has simply not suggested in any case the fundamental right to marriage includes same-sex relationships.

### 1. *Windsor's* and *Lawrence's* doctrinal developments were limited to personal liberty and did not advance any claim to the government's endorsement of same-sex marriage.

Appellants assert that *Windsor* makes it clear that their claim does raise a federal question and thus renders *Baker* obsolete. Opening Brief Dkt. 20-3, p. 115.

Appellants are mistaken because *Windsor* only found a "personal" liberty interest (like in *Lawrence*) to not be "demeaned" (injuriously stigmatized) by federal law for being a same-sex couple legally recognized by New York's marriage law. *Windsor,* however, did *not* find a fundamental right to same-sex marriage, or a personal liberty interest in the state's institution of marriage, or a liberty interest in obtaining the government's marriage-title endorsement.

The substantial federal question in *Baker* was a claim to be "sanctified" in the state's institution of marriage, which did not include the same-sex claimants in the state's marriage definition.  A personal liberty interest in sexual privacy, *Lawrence*, or a personal liberty interest in not being demeaned (stigmatized) by federal law, *Windsor*, are completely different topics than an official government marriage-title endorsement—sanctification of same-sex couples.  *Cf. Bishop v. United States ex rel. Holder*, ___ F. Supp. 2d ___, No. 04-CV-848, 2014 U.S. Dist. LEXIS 4374, p. 33 (N.D. Okla., January 14, 2014) (where the court fails to recognized this material "government endorsement" distinction in its doctrinal developments analysis finding *Baker* obsolete).

*Baker* involved a government endorsement question.  Appellants are seeking government endorsement by suing to obtain the right to occupy by judicial force the government's institution and title of marriage.  But, *Windsor* and *Hollingsworth* both dodged ruling on the *Baker* government endorsement question,

leaving the doctrinal development with respect to the *Baker* topic no further advanced than the previous personal liberty interest found in *Lawrence*.

> ## 2.    Doctrinal developments since *Baker* are marginal at best and do not suggest any obsolescence of summary dismissal of a claim for same-sex marriage.

Appellants argue that *Frontiero v. Richardson, supra,* should be a relevant doctrinal development because Nevada allegedly discriminates based upon sexual orientation and on the basis of "sex." Opening Brief Dkt. 20-3, p. 114; *compare* District Court Order ER 15, l. 21 to ER 16, l. 4 (rejecting Plaintiffs-Appellants' sex discrimination argument). Appellants' other argument regarding the level of judicial scrutiny cites to various lower court decisions in support of their alleged sex discrimination doctrinal developments. Opening Brief Dkt. 20-3, p. 104. However, it is not possible for such lower court decisions to be Supreme Court doctrinal developments with respect to the *Baker* topic. *Hicks*, at 344 (citing to *Port Authority Bondholders Protective Committee v. Port of New York Authority,* 387 F.2d 259, 263 n.3 (2nd Cir. 1967)).

*Romer* is also argued as an adverse doctrinal development regarding the *Baker* topic. Yet, nothing in *Romer* suggests *Baker's* obsolescence. *Romer* applied the *Moreno*[13] equal protection principle that in lawmaking, a politically unpopular group such as *Moreno's* hippies in 1973, or *Romer's* LGBT community

---

[13] *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973).

in 1996, cannot be targeted to take away existing rights or to be saddled with an extraordinary legal disability based upon a basis "inexplicable by anything but animus." *Romer,* at 632.  As the Court recently held in *Diaz,* equal protection principles under *Moreno-Romer* do not lead to a claimed new constitutional right:

> In sum, the district court correctly recognized that barring the state of Arizona from discriminating against same-sex couples in its distribution of employee health benefits **does not constitute the recognition of a new constitutional right to such benefits.** Rather, it is consistent with long standing equal protection jurisprudence holding that "some objectives, such as a 'bare . . . desire to harm a politically unpopular group,' are not legitimate state interests."  (Citations omitted) [emphasis added.]

*Diaz v. Brewer*, 656 F.3d 1008, 1014-15 (9th Cir. 2011).  Likewise, a constitutional right to same-sex marriage cannot be created out of *Romer's* equal protection against legislative discrimination based upon pure animus.  *See* District Court Order ER 40, ll. 17-22 (Judge Jones found Nevada was *not* motivated by pure animus).

The *Lawrence* and *Windsor* "personal liberty" cases are unique to their facts and do not change the broader analysis regarding federal subject matter jurisdiction regarding the *Baker* topic—same-sex marriage. *Infra.*  Federalism regarding state regulation of marriage has not been further materially altered by the Supreme Court since the unique case of *Loving v. Virginia*, 388 U. S. 1 (1967)

(inter-racial fundamental right to marriage).[14]

Appellants' cited doctrinal developments are at most marginally relevant to the question of whether the Supreme Court is poised to overrule *Baker* and create a new suspect classification or a new fundamental right and strip the states of their long-standing authority over the institution of marriage, which *Windsor* endorsed. Marriage-federalism as it is understood today has existed for well over 100 years. *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581 (1979) (quoting *In re Burrus*, 136 U.S. 586, 593-94 (1890)) ("[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States."). The landmark race exception to marriage-federalism is *Loving*. The Lovings were convicted of a crime for interracial marriage, which the Court reversed finding a fundamental right to opposite-sex marriage, and by doing so ignored traditional federalism on the topic of marriage. Appellants hope they will now become the landmark same-sex exception. Many believe it will ultimately come down to the arbitrary judgment of time, as in *Loving,* where the Supreme Court believed it was the right time to tear down one of the last enduring obstacles to racial equality.

---

[14] *See* Jackson, at 1097 ("In *Loving*, however, the Supreme Court was considering the long recognized right to marry. 388 U.S. at 12. The case did not involve expanding the traditional definition of marriage as being between a man and a woman. This case presents a different right, the right to marry someone of the same sex.").

*Loving* is in fact a rare aggressive intervention into marriage-federalism to force upon all the states long-neglected absolute racial equality. *Loving* is as much a racial equality case as it is a marriage rights case. *Loving*, at 12 ("The Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations."); *Zablocki v. Redhail*, 434 U.S. at 383 ("The Court's opinion [in *Loving*] could have rested solely on the grounds that the statutes discriminated on the basis of race in violation of the Equal Protection Clause [text added]."); *cf. Golinski v. Office of Personnel Management*, 824 F. Supp. 2d 968, 983 (N.D. Cal., 2012) ("In *Loving,* the Court defined the fundamental right as the right to marry, not the right to interracial marriage."). Notwithstanding *Golinski's* willful blindness to the context and presumed reality of male-female marriage and the racial discrimination motivator, the ultimate consideration in our case is whether the Supreme Court has found absolute sexual orientation equality, including the fundamental right to same-sex marriage, thereby overruling *Baker*. It has not.

*Loving* was decided 5 years prior to *Baker*. Yet, the Supreme Court was not poised in *Baker* to see any need to invade marriage-federalism on behalf of an alleged right to same-sex marriage. Except arguably *Windsor's* marriage "uniformity" test, and a vague *Windsor* comment regarding the dignity of a

28

*Lawrence* personal bond liberty interest,[15]   there are no material case-based indications the Supreme Court is remotely poised to ignore marriage-federalism regarding same-sex marriage.     As the First Circuit Court of Appeals recently stated:

> . . . to create such a new suspect classification for same-sex relationships would have far-reaching implications—in particular, by implying an overruling of *Baker*, which we are neither empowered to do nor willing to predict. Nothing indicates that the Supreme Court is about to adopt this new suspect classification when it conspicuously failed to do so in *Romer*—a case that could readily have been disposed by such a demarche. That such a classification could overturn marriage laws in a huge majority of individual states underscores the implications.

*Massachusetts v. United States HHS,* 682 F.3d 1, 21 (1st Cir. 2012).

The Court would be ill advised to ignore the direct *Baker* topic and break new ground by creating a slippery slope personal bond liberty interest in same-sex marriage, or by finding a new fundamental right with no historical foundation.

## II.    THERE IS NO *WINDSOR* DUE PROCESS PERSONAL LIBERTY RIGHT TO STATE ENDORSEMENT OF SAME-SEX MARRIAGE.

### A.  Appellants' Substantive Due Process Claim is an Issue Raised for the First Time on Appeal, Which Nevada Opposes on the Merits Rather Than Procedure.

---

[15] "Private, consensual sexual intimacy between two adult persons of the same sex may not be punished by the State, and it can form 'but one element in a personal bond that is more enduring.' *Lawrence v. Texas*, (citations omitted) . . . New York sought to give further protection and dignity to that bond." *Windsor*, at 2692.

Appellants admit that a due process issue was not raised in their Complaint nor argued in the pleadings by either side. *See* Complaint ER 718-22; Hearing Transcript ER 665. Appellants cite to the District Court's decision," ER 28-29," and allege: ". . . the district court ruled on the [due process] issue regardless, holding that the marriage ban does not deprive same-sex couples of the fundamental right to marry. ER 28-29." Opening Brief Dkt. 20-3, p. 26. Appellants mischaracterize the District Court's equal protection—scope of judicial scrutiny analysis and conclusions.[16]

Nevada could argue that the District Court's analysis of the case law to arrive at the proper scope of equal protection judicial scrutiny was not a "ruling" on the alleged due process issue, and the authority cited by Appellants, Opening Brief Dkt. 20-3, p. 22, n.5, does not support their proposition under our facts. However, consideration of an issue raised for the first time on appeal is somewhat discretionary based upon narrow exceptions. *Jovanovich v. United States of America*, 813 F.2d 1035, 1037 (9th Cir. 1987). Though it does not appear that Appellants fall within any of the exceptions, Nevada will not procedurally opposed the new issue, but will oppose it on the merits.

---

[16] A fair reading of the District Court's analysis, and his ultimate summary at ER 29, ll. 19-23, leads to the only fair conclusion that to arrive at the proper scope of judicial scrutiny under equal protection Judge Jones considered all relevant precedent, which included both due process and equal protection scrutiny.

The three Appellees defending here – Governor Brian Sandoval, Carson City Clerk-Recorder Alan Glover, and the Coalition For the Protection of Marriage – are certain that the Appellants' stated justification is inadequate as a matter of law. Nevertheless, Appellees, after thorough discussion among their respective counsel and deliberate consideration, have elected not to object to the Appellants' course regarding their substantive due process claim and will brief the issue in their respective Answering Briefs. The Appellees believe that such a course is best for all parties to this civil action in that such a course will ensure the extremely important issue raised here – the constitutionality of Nevada's traditional marriage definition – will be fully briefed before the Court, thereby enabling the Court to fairly resolve the due process issue.

Such a course will make for the just, speedy, and less expensive resolution of an issue that, for the sake of all Nevadans and their government, needs to be fully and finally resolved without undue delay or repetitive litigation. Accordingly, Appellees urge the Court to address the Appellants' substantive due process claim on the merits.

### B.  A Right to Same-Sex Marriage Does Not Arise Out of a *Windsor* Personal Liberty Interest to Not be Demeaned.

Because a due process claim to same-sex marriage was raised in *Baker*, the Court is bound by the summary dismissal for lack of a substantial federal question.

31

Any different due process theories from those raised in *Baker* need not be necessarily decided under *Mandel. Supra.*

> Plaintiffs' due process claim was thus presented to and necessarily decided by the Supreme Court in *Baker* . . . Consequently, the Court is bound by *Baker* and Plaintiffs' due process claim fails. [citations omitted.]

*Jackson*, at 1086.

Regarding the merits of Appellants' new claim, the substantive due process "personal liberty" interest in *Windsor* was *not* based upon any judicial finding of a fundament right to same-sex marriage, which finding must be "deeply rooted in the Nation's history and tradition." *Washington v. Glucksburg*, 521 U.S. 702, 720-21 (1997). Rather than find a fundamental right to same-sex marriage, *Windsor* held that Congress had ignored historical marriage-federalism to intentionally inflict a DOMA discriminatory injury upon all same-sex couples lawfully married under state law, and thereby violated the "*liberty of the person*" to not be "*demeaned*" by the government solely because of legislative animus with respect to the person's non-traditional legal marriage status.[17]

---

[17] *Windsor,* at 2692 ("The Federal Government uses this state-defined class for the opposite purpose—to impose restrictions and disabilities . . . What the State of New York treats as alike the federal law deems unlike by a law designed to injure the same class the State seeks to protect."); *Id.* at 2695 (". . . the principal purpose and the necessary effect of this law are to *demean* those persons who are in a lawful same-sex marriage. This requires the Court to hold, as it does now, that DOMA is unconstitutional as a deprivation of the *liberty of the person* protected by the Fifth Amendment of the Constitution [emphasis added.]").

Since *Loving* established a fundamental right to marry between two adults of the opposite sex, it is not appropriate to suggest a *new* fundamental right to same-sex marriage somehow arises solely out of *Windsor's* personal liberty interest to not be demeaned. *Glucksburg,* at 720 (a court needs to be "reluctant to expand the concept of substantive due process"); *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992) (courts should "exercise the utmost care whenever [they] are asked to break new ground in this field"). The personal liberty to be free from government intrusion into one's private sex-life, *Lawrence*, or to be free from being demeaned (or stigmatized) by the government because of one's lawful relationship, *Windsor*, cannot alone lead to a new material redefinition of the existing fundamental right to marry. A personal liberty right does not require government's official public endorsement of that right. Yet, that is what Appellants argue *Windsor* requires— that Nevada must endorse same-sex relationships with the title of marriage.

To materially alter or expand an existing fundamental right, *Glucksburg* requires there be a judicial determination that the newly claimed fundamental right is likewise "deeply rooted in the Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* That finding, however, is simply not historically possible. *Lawrence*, at 568 (". . . the concept of the homosexual as a distinct category of

person did not emerge until the late 19th century."); *Id.* at 570 ("It was not until the 1970's that any State singled our same sex relations for criminal prosecution, and only nine States have done so."); *Id.* at 572 ("These references show an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex. 'History and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry.' (citation omitted)."); *Goodridge v. Dept. of Public Health*, 798 N.E.2d 941 (Mass. 2003) (In 2003 Massachusetts was the first state in the Nation to legalize same-sex marriage); *Windsor*, at 2715 (Alito, J., dissenting) ("It is beyond dispute that the right to same-sex marriage is not deeply rooted in this Nation's history and tradition."); *Jackson*, at 1096 (quoting *In re Kandu*, 315 B.R. 123, 140 (Bankr. W.D. Wash. 2004) ("It is beyond dispute that the right to same-sex marriage is not 'objectively, deeply rooted in this Nation's history and tradition'"); *cf. Jackson*, at 1096 ("The Ninth Circuit has recognized that the definition of marriage as 'a consensual, contractual personal relationship between a man and a woman . . . . is not peculiar; indeed it is traditional. *Smelt*, 447 F.3d [673] at 680 & n.18 [citations omitted].").

One might be tempted to argue there is a "personal bond" liberty interest to have personal relations with, or to spend the rest of your relational life with, one (or more) other consenting adult(s) either separately or simultaneously. *Windsor*,

34

at 2692 (quoting *Lawrence*, "Private, consensual sexual intimacy . . . can form 'but one element in a personal bond that is more enduring.'"). However, a personal bond is unavoidably "personal" (and subjective) and does not establish a claim to occupy the existing objective fundamental right to marry, which from the foundation of this Nation has continued to be a civil institution created and objectively defined by the states. *Windsor,* at 2691 ("The recognition of civil marriage is central to state domestic relations law applicable to its residents and citizens . . . Consistent with this allocation of authority, the Federal Government, though our history, has deferred to state-law policy decisions with respect to domestic relations [citations omitted]."). To conclude otherwise, the Court will need to consider the foreseeable consequences of a subjective approach to marriage.

Any Ninth Circuit recognition of a personal bond—liberty interest to "marriage" could expose the Circuit's states to a slippery slope to polygamy (in all imaginable forms) with or without religious controls or limits on marriage behavior. It is not hard to imagine pimps and sex traffickers manipulating young vulnerable teens into lawful plural marriage to enslave them in a family criminal enterprise, which will have an air of state institutional credibility and the resulting law enforcement obstacles.

### III.   IN THE ABSENCE OF EVIDENCE OF A *MORENO* DESIRE TO HARM OR A *ROMER-WINDSOR* INJURIOUS ANIMUS, MARRIAGE-FEDERALISM REQUIRES DEFERENTIAL EQUAL PROTECTION RATIONAL BASIS SCRUTINY.

Because *Baker* has existed for over 40 years without any subsequent criticism by any opinion of the U.S. Supreme Court (and continues to be the law of the land), as a matter of law the mere adoption of a *Baker* compliant state marriage policy (by itself) cannot be unusual discrimination, cannot be evidence of a desire to harm and cannot be injurious demeaning animus towards same-sex couples. Supreme Court and Ninth Circuit cases finding such wrongdoing (and apply the resulting more search form of rational basis review) have specific facts of wrongdoing that go well beyond the mere adoption or reconfirmation of traditional opposite-sex marriage policy in a state. *Infra.*

Since *Baker* upholds a state's right to maintain a traditional marriage definition, and Nevada's traditional marriage definition has existing in its statutes for over 150 years (since it was a territory of the United States), and Nevada's marriage amendment to its Constitution in 2002 merely reconfirmed its long-standing statutory policy, the Court therefore cannot reasonably presume improper intent or wrongful animus *solely* from Nevada's adoption of its marriage amendment, which was expressly adopted to protect Nevada's marriage public

policy from future Full Faith and Credit Clause claims.[18]    Even considering *Lawrence's* grant of a liberty interest to "private" same-sex sexual relations, which was decided the next year after Nevada's marriage amendment, the government's unwillingness to publicly endorse a private right cannot alone be deemed a wrongful desire to harm or demean.    Government is simply not required to publicly endorse private rights or private viewpoints.    *See Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000) (teachers use of an official school bulletin board to rebut the school district's official bulletin board message regarding a Gay and Lesbian Awareness Month was private speech that school was not required to endorse and they could constitutionally remove the competing message).

### A.    *Windsor's* Precedential Value Should be Limited to its Unique Congressional Rights Factual Context.

---

[18]    Nevada's Ballot Question ER 168 ("ARGUMENTS FOR PASSAGE-Proponents argue that passage will ensure that Nevada law upholds the definition of marriage as being only between a male and a female. While a Nevada statute provides that marriage may only be between a male and a female, current law provides that a legal marriage that took place outside Nevada is generally given effect under the 'Full Faith and Credit Clause' of the United States Constitution. Proponents argue that if same gender marriages ever become legal in another state, under the Full Faith and Credit Clause Nevada could be required to recognize such marriages entered into legally in another state. Proponents argue that this constitutional amendment is needed to define Nevada's public policy on marriage being only between a male and a female. **A "Yes" vote means that the Nevada Constitution should be amended to provide that only marriages between a male and a female should be recognized and given effect in this state.**").

37

The abrupt language, and lack of any objective animus standard embodied in *Windsor's* rebuke of Congress, should not be taken out of the congressional rights context and treated as general precedent applicable to a similar states' right topic. A state's right to regulate marriage has its own line of applicable precedent and the *Windsor* Court expressly excluded its opinion and holding from altering a state's continuing right to limit the definition of marriage as between a male and a female.[19] That is not to say that *Windsor* is irrelevant, but that its rationale and holding should not be misapplied by this Court because of its unique congressional rights context, in which the Supreme Court imputed an anti-homosexual animus (based merely on morality statements) to the motives of the entire House of Representatives and Senate and the President of the United States in their enactment of DOMA. *Windsor*, at 2693; *Windsor*, at 2708 (Scalia, J., dissenting) ("But the majority says the supporters of this Act acted with malice—with the 'purpose' (*ante*, at 25) 'to disparage and to injure' same-sex couples . . . I am sure these accusations are quite untrue.").

*Windsor* primarily followed the *Lawrence* majority's substantive due process approach to private sexual conduct liberty,[20] and thus was dismissive of the

---

[19] "This opinion and its holding are confined to those lawful marriages [under state law]." *Windsor*, 133 S. Ct. at 2696. [Text added.]

[20] "[The present case] does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. . . The State

equal protection judicial scrutiny that would appropriately be shown to any review of a state's exercise of its long-standing marriage-federalism right. *Windsor*, 133 S. Ct. at 2697 (Roberts, C.J., dissenting) (". . . it is undeniable that its judgment is based on federalism."). Simply stated, *Windsor's* abrupt dismissive treatment of Congress does not demonstrate the appropriate analysis and rationale one would reasonably expect to see in any judicial review of a sovereign state's exercise of the marriage-federalism rights deemed central to the *Windsor* holding.[21] Therefore, Nevada's case should be primarily reviewed by the Court under the appropriate states' rights contextual precedents of *Baker v. Nelson* and *Romer v. Evans*, with a limited *Windsor* inquiry into marriage uniformity.

### B.     Deferential Equal Protection Rational Basis Review is Appropriate Because Nevada Satisfies a *Windsor* Uniformity Review.

Unlike the direct intervention into marriage-federalism in *Loving*, the *Windsor* Court indirectly ventures into the marriage-federalism topic with a

---

cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government." *Lawrence*, at 578. [Text added.]

[21] *Windsor*, at 2692 ("These [same-sex marriage] actions were without doubt a proper exercise of its sovereign authority within our federal system, all in the way that the Framers of the Constitution intended."); *see Shelby Co. v. Holder*, 133 S. Ct. 2612, 2623 (2013) ("allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States").

resounding endorsement of states' rights.  The Supreme Court was motivated by the apparent injustice to same-sex couples caused by DOMA, which extraordinarily ignored marriage-federalism history and required federal agencies to treat as unequal those deemed by state law to be similarly situated in a lawful marriage.  In its apparent endorsement of marriage-federalism, *Windsor* also appears to require marriage laws withstand a uniformity review, which was expressed as follows:

> Marriage laws vary in some respects from State to State. . . But, these rules are in every event consistent within each State.

> Against this background DOMA rejects the long-established precept that the **incidents, benefits, and obligations of marriage are uniform for all married couples within each State, though they may vary, subject to constitutional guarantees, from one State to the next.**  Despite these considerations, it is unnecessary to decide whether this federal intrusion on state power is a violation of the Constitution because it disrupts the federal balance.  **The State's power in defining the marital relation is of central relevance** in this case quite apart from principles of federalism. . .**DOMA,** because of its reach and extent, **departs from this history and tradition of reliance on state law to define marriage.**    "'[D]iscriminations of an unusual character** especially suggest **careful consideration** to determine whether they are obnoxious to the constitutional provision.'"  *Romer v. Evans*, 517 U.S. 620, 633 (1996) (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38 (1928).

*Windsor*, 133 S. Ct. at 2691-92. [Emphasis added.]

40

This apparent *Windsor* uniformity review suggests a willingness by the Supreme Court in a due process-equal protection context to look beyond marriage-federalism and apply a "careful consideration" rational basis review, whenever: 1) a state or federal law regarding marriage lacks intrastate uniformity regarding the incidents, benefits, and obligations of marriage[22]; 2) a state's incidents, benefits and obligations of marriage have interstate differences that violate constitutional guarantees[23]; and 3) there is a lack of uniformity under either (1) or (2) that arises from government's departure from "history and tradition" with respect to its treatment of marriage, it is suspect "discrimination of an unusual character."[24]

This uniformity review, however, does not appear to create a materially new inquiry. In essence it merely restates generally what the Court had previously held

---

[22] In *Windsor* DOMA was a federal law violation of this intrastate uniformity test by treating New York's legal same-sex marriages differently than its legal opposite-sex marriages.

[23] In *Loving,* Virginia's historical criminalization of interracial heterosexual marriage was lagging behind the racial equality progression of the other states and the Court intervened to declare the U.S. Constitution guarantees a fundamental right to such a marriage.

[24] "In determining whether a law is motivated by an improper animus or purpose, "'[d]iscriminations of an unusual character'" especially require **careful consideration.** *Supra*, at 19 (quoting *Romer*, supra, at 633, 116 S. Ct. 1620, 134 L. Ed. 2d 855) . . . DOMA's unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage here operates to deprive same-sex couples of the benefits and responsibilities that come with the federal recognition of their marriages. This is strong evidence of a law having the purpose and effect of disapproval of that class." *Windsor*, at 2693. [Emphasis added.]

41

in *Loving*—that absolute racial equality also includes the constitutional guarantee of a fundamental right to interracial marriage, and in *Romer*— that discrimination with respect to existing intrastate rights for no other reason than pure animus towards an unpopular group violates the constitutional guarantee of equal protection.

The *Windsor* uniformity review appears to blend the due process and equal protection inquires[25] under a non-deferential form of rational basis review. *See Romer*, at 633 (in an equal protection context the citizens' initiative act that disqualified homosexuals as a class of persons from the right to seek specific protection under the law was unprecedented "discrimination of an unusual character" requiring "careful consideration" by the Court); *see Windsor,* at 2693 (where the *Romer* equal protection "careful consideration" rational basis scrutiny is applied to DOMA in a substantive due process context with respect to a person's liberty interest in not being demeaned by government for one's lawful non-traditional marriage status); *see Lawrence*, at 580 (O'Connor, J., concurring) ("When a law exhibits such a desire to harm a politically unpopular group, we

-----

[25] *Windsor*, at 2714 (Alito, J., dissenting) ("Windsor and the United States argue that §3 of DOMA violates the **equal protection** principles that the Court has found in the Fifth Amendment's Due Process Clause . . . And the Court's holding that 'DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution,' *ante*, at 25, suggests that **substantive due process may partially underlie the Courts decision** today [emphasis added].").

have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause.").

Therefore, since *Windsor* did not find (nor suggest) that interstate differences regarding same-sex marriage as a violation (or suspect violation) of constitutional guarantees, the Court's only arguable inquiries under the *Windsor* uniformity review in Nevada's case are: 1) Whether Nevada's different treatment of same-sex domestic partnership couples and opposite-sex married couples departs from Nevada's history and tradition with respect to "marriage"; and, 2) Whether such historical departure, if any, is a "discrimination of an unusual character" under *Romer*, requiring a more searching ("careful consideration") form of hybrid due process-equal protection rational basis judicial scrutiny as applied in *Windsor*.

Nevada, however, acted consistent with its 150 year history, *supra*, of limiting marriage as only between a male and a female when it created in 2009 its new domestic partnership same-sex civil union statutes. *See Jackson, at* 1065 ("The Court also finds it illogical and unwise to conclude that the passage of the civil union laws – advocated for by the gay and lesbian community – renders Hawaii's existing marriage laws irrational and unconstitutional."). Nevada treats marriage and domestic partnerships as two different civil institutions recognized by the state. The Nevada Constitution and laws do not consider married couples and

same-sex domestic partnership couples to be similarly situated. The reproductive biology of same-sex couples and the risk of casual procreation (and resulting impacts on children, society and government) are not similarly situated. *See Johnson v. Robison*, 415 U.S. 361 (1974) (discrimination among classes of individuals is constitutional when the excluded class cannot further the government's legitimate interest); *cf. City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike.").

Reserving the title of marriage to one male and one female is consistent with Nevada's marriage law history, which witnessed a *Battle Born* state conceived in 1857 in response to the Utah Territory- Mormon War over polygamy and birthed in 1864 during the Civil War.[26] Nevada's 150 year marriage history demonstrates opposition to polygamy and a resulting marriage definition (first in statute and ultimately in the state's constitution) that unavoidably excludes same-sex couples

---

[26] The 1861 laws of Territory of Nevada regarding marriage were expressly limited to "a male and a female." Part 2:33: 1861. The same limitation on marriage was codified in 1876 in the Statutes of Nevada and is substantially the same today. Stat. 88; Nev. Rev. Stat. (NRS) 122.020 ("1. Except as otherwise provided in this section, a male and a female person, at least 18 years of age, not nearer of kin than second cousins or cousins of the half blood, and not having a husband or wife living, may be joined in marriage. . .").

from the government's primary endorsed procreative institution for society. *Williams ET AL. v. North Carolina*, 317 U.S. 287, 298 (1942) ("Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders. The marriage relation creates problems of large social importance. Protection of offspring, property interests, and the enforcement of marital responsibilities are but a few of commanding problems in the field of domestic relations with which the state must deal.").

Nevada's recognized marriages have complete intrastate institutional uniformity. Domestic partnerships (though they are not marriages under Nevada law) also share complete intrastate uniformity within their civil union institution. Further, except for the title of marriage (which the Nevada Constitution, art. 1 § 21, reserves to a male and female person), domestic partners nevertheless enjoy for the most part the same state law based incidents, benefits, and obligations granted to all "spouses." NRS 122A.200 (a domestic partner is deemed to be a "spouse" as the word is universally used throughout the Nevada Revised Statutes when state law refers to a married person).[27]

---

[27] Plaintiffs-Appellants' Summary Judgment Motion Dist. Ct. Dkt. 86, pps. 14-15, ll. 17-28; ll. 1-20 (Plaintiff-Appellants admit "there are only a few exceptions to the State's policy of equal treatment" citing differences between marriage solemnization and marriage dissolution as compared to domestic partnerships).

45

The Nevada Legislature, however, cannot control how the federal government defines a "spouse" and the resulting alleged "Nevada-DOMA" injurious consequences to federal benefits. Assuming arguendo that the Domestic Partnership Act constituted a historical departure in Nevada's treatment of marriage,[28] it is not possible to characterize such as *unusual* discrimination against same-sex couples when: 1) same-sex marriage had yet to be legalized in any state when Nevadans adopted their Constitution's marriage amendment a decade ago, 2) today traditional marriage exists in almost two-thirds of the states, 3) *Baker* continues to this day to be the law of the land, and 4) notwithstanding the Supreme Court's opportunity to reconsider *Baker* in *Hollingsworth*, a uniquely constructed majority avoided the question on standing grounds.[29]

Therefore, the dichotomy between marriage and domestic partnerships is *not* discrimination of an unusual character and is not subject to the *Romer-Windsor*

---

[28] *Smelt v. County of Orange, California*, 447 F.3d at 684 (where the Court finds that California's civil unions or domestic partnerships between same-sex couples cannot be equated with what has historically been defined as marriage).

[29] *See Hollingsworth,* 133 Sp. Ct. at 2668 (Kennedy, J., joined by Thomas, J., Alito, J., Sotomayor, J., dissenting) ("In my submission, the Article III requirement for a justiciable case or controversy does not prevent proponents from having their day in court."); *see also Windsor*, at 2697 (Roberts, C. J., dissenting) ("We may in the future have to resolve challenges to state marriage definitions affecting same-sex couples. That issue, however, is not before us in this case, and we hold today that we lack jurisdiction to consider it in the particular context of *Hollingsworth v. Perry, ante*, p. ___.").

hybrid careful consideration rational basis scrutiny.

**C.     Deferential Equal Protection Rational Basis Review is Appropriate Because no Evidence of Wrongful Animus was Found by the District Court.**

Nevada's facts are not demonstrative of the impermissible wrongdoing found in *Moreno*, *Romer*, *Windsor* and *Diaz,* which caused the application of a more searching (careful consideration) form of rational basis judicial scrutiny.[30]  In adopting Nevada's marriage amendment it did *not* take away any existing rights from, deny any existing benefits to, impose any unique legislative disability upon, manifest a desire to harm, express animus towards or injuriously demean same-sex couples.   To the contrary, the stated purpose of the marriage amendment was to prevent Full Faith and Credit Clause claims originating from a hypothetical future when one or more other states might decide to legalize same-sex marriage.  *Supra.*

---

[30]  *Moreno*, at 534 ("intended to **prevent so-called 'hippies' and 'hippie communes' from participating in the food stamp program . . . bare congressional desire to harm a politically unpopular group** cannot constitute a *legitimate* governmental interest [emphasis added].");   *Romer*, at 631-632 ("a **special disability** upon those persons alone . . . **forbidden the safeguards that others enjoy or may seek without constraint . . . a broad and undifferentiated disability on a single named group . . . invalid form of legislation. . . inexplicable by anything but animus** toward the class it affects; it lacks a rational relationship to legitimate state interests [emphasis added].");  *Windsor*, at 2694 ("congressional goal was 'to put a **thumb on the scales . . . to ensure** that if any State decides to recognize same-sex marriages, those union will be **treated as second-class marriages** for purposes of federal law [emphasis added.]);  *Diaz*, at 1014 ("Here, as in *Moreno*, the **legislature amended a benefits program in order to limit eligibility** [it redefined dependents as spouses to eliminate preexisting coverage for domestic partners after passage of Proposition 102—marriage amendment to the Arizona Constitution].").  [Text added; emphasis added].

47

In the absence of any basis in Nevada's case for a more searching review, the mandatory authority in the Ninth Circuit required the District Court to apply conventional (deferential) equal protection rational basis scrutiny. *Witt v. Dep't of the Air Force*, 527 F.3d 806 (9th Cir. 2008); *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563 (9th Cir. 1990); *Philips v. Perry*, 106 F.3d 1420 (9th Cir. 1997); *see Citizens for Equal Prot. v. Bruning*, 455 F.3d 859 (8th Cir. 2006); *cf. Perry v. Brown,* 671 F.3d 1052 (9th Cir. 2012), *vacated* on standing grounds, *Hollingsworth v. Perry*, 570 U.S. ___, 133 S. Ct. 2652 (2013) (was Ninth Circuit controlling authority when the District Court entered its order).

Expressly defending Nevada's *Baker* traditional marriage public policy from future hypothetical challenges under the Full Faith and Credit Clause is not "inexplicable by anything but animus." *See Lawrence*, 539 U.S. at 585 (O'Connor, J., concurring) ("Unlike the moral disapproval of same-sex relations . . . other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group."); *cf. Romer*, at 632 ("the peculiar property of imposing a broad and undifferentiated disability on a single named group . . . its sheer breath is so discontinuous with the reasons offered for it").

### D.    Heightened Scrutiny is Not Required by *Lawrence*, *Windsor* or Existing Ninth Circuit Precedent.

Appellants are not in an equal protection suspect or quasi-suspect class, and there is no fundamental right or liberty interest claim to same-sex marriage. *Witt v.*

*Dep't of the Air Force*, 527 F.3d 806 (9th Cir. 2008); *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563 (9th Cir. 1990); *Philips v. Perry*, 106 F.3d 1420 (9th Cir. 1997); *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859 (8th Cir. 2006); *Massachusetts v. United States HHS*, 682 F.3d 1 (1st Cir. 2012); *see United States v. Windsor*, 570 U.S. ___, 133 S. Ct. 2675 (2013). The primary question before the Court is whether the District Court's application of conventional (deferential) equal protection rational basis scrutiny was appropriate under the facts and mandatory court precedent. While arriving at the proper scope of judicial review, the District Court offered his perspective on why it would not be appropriate to find the Appellants in a suspect class inconsistent with existing Supreme Court and Ninth Circuit authority.[31] Appellants mischaracterize such as judicial error. However, it is not erroneous to follow precedent that only a higher court has the power and authority to change. *See Dragovich v. United States Dep't of the Treasury*, 872 F. Supp. 2d 944, 954 (N.D. Cal., 2012) ("Although the Ninth Circuit may revisit its ruling that gay men and lesbians do not constitute a suspect or quasi-suspect class, the Court tests the constitutionality of § 3 of the DOMA and

---

[31] *Cf. Jackson*, at 1102 n.26 ("Because the Court is bound by Ninth Circuit precedent, the facts stated . . . that are used to support his argument that homosexuals are a suspect class, including assertions related to the immutability and political power of homosexuals, are not material to the Court's decision. Thus, it is unnecessary for the Court to evaluate these highly controversial statements.").

§ 7702B(f) of Title 26, pursuant to current Ninth Circuit law, by applying rational basis review."). Nevertheless, the Court might consider extreme arguments that existing precedent is no longer controlling. *See Golinski v. Office of Personnel Management*, 525 F. Supp. 2d 968 (N.D. Cal., 2012) (citing to the Court's Prop 8 holding in *Perry v. Brown,* but nevertheless ignoring that *Perry* cited to *High Tech Gays* in footnote 13 and applied *Romer's* more searching equal protection rational basis review—*Golinski* found a suspect class subject to heightened scrutiny); *see also Kitchen v. Herbert*, ___ F. Supp. 2d ___, No. 2:13-cv-217, 2013 U.S. Dist. LEXIS 179331 (C.D. Utah Dec. 20, 2013) (stay of injunction granted, *Herbert, Gov. of UT, et al. v. Kitchen, Derek, et al.*, 571 U.S. ____ (Case No. 13A687, January 6, 2014)) (where the district court held under *Loving* a fundamental right in same-sex marriage based upon the personal liberty interests expressed in *Lawrence* and *Windsor* without making any findings required by *Glucksberg*).

Citing to other circuits and various district court decisions Appellants argue that sexual orientation discrimination is subject to "heightened scrutiny" equal protection review. Opening Brief Dkt. 20-3, p. 67. They suggest that based upon the Court's due process finding in *Witt v. Dep't of Air Force*, 527 F.3d 806, 819 (9th Cir. 2008), the Court should construe *Windsor's* "careful consideration" standard as "heightened review." They ignore, however, that *Windsor* used the careful consideration phrase while directly quoting from *Romer* (which was

quoting from *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38 (1928), a

mortgage tax rational basis equal protection case in which the phrase was coined)

while *Romer* was applying a "more searching" form of rational basis review.[32]

Because ultimately *Windsor* utilized the phrase substantially in its due process

analysis, and did not engage in a typical equal protection analysis as *Romer*

otherwise suggests,[33] it is a false equal protection guidepost with respect to the

proper level of scrutiny in Nevada's case.  In its substantive due process inquiry

regarding a military "Don't Ask Don't Tell" suspension from duty for her same-

sex relationship, *Witt* held:

> We hold that when the government attempts to intrude
> upon the **personal and private lives** of homosexuals, in
> a manner that implicates the rights identified in
> *Lawrence*, the government must advance an important
> government interest, the intrusion must significantly
> further that interest, and the intrusion must be necessary
> to further that interest.  In other words, the third factor, a
> less intrusive means must be unlikely to achieve
> substantially the government's interest.

*Id.* at 819.    [Emphasis added.]    Clearly, *Witt* is dealing squarely with the

_____

[32] *Lawrence*, at 580 (O'Connor, J., concurring) (". . . **more searching** form of rational basis review to strike down such laws under the Equal Protection Clause [emphasis added.]").

[33] *Romer*, at 632 ("Amendment 2 fails, indeed defies, even this conventional inquiry. . . its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems **inexplicable by anything but animus** toward the class it affects; it **lacks a rational relationship** to legitimate state interest." [Emphasis added.]

established *Lawrence* private sexual relations liberty interest, and heightened scrutiny is unquestionable in that context. However, the analogy does not apply to an un-established right to same-sex marriage in Nevada's case.

Appellants also argue that the question of the availability of heightened scrutiny for sexual orientation discrimination is now open to the Court in light of *Lawrence's* overruling of *Bowers v. Hardwick*, 478 U.S. 186 (1986). They argue because *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563 (9th Cir. 1990) relied upon *Bowers* when the Court held that homosexuals are not in a suspect or quasi-suspect class (and their equal protection claims were thus subject to rational basis review), the *High Tech Gays* case should no longer be controlling. Unlike *Golinski,* the appropriate non-activist approach to controlling precedent (which was the approach of the District Court in our case, ER 16-17) was expressed in *Jackson*:

> Plaintiffs assert that this Court is nonetheless not bound by *High Tech Gays*, relying on the reasoning set forth by the district court in *Golinski v. Office of Personnel Management*, 825 F. Supp 2d 968 (N.D. Cal. 2012). Both Defendant Abercrombie and the court in *Golinski* contend that because *Lawrence* overruled *Bowers*, the Ninth Circuit's decision is no longer good law . . . If the Supreme Court or a Ninth Circuit en banc decision 'undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable,' this Court is not bound by a Ninth Circuit panel decision. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) . . . Putting aside the fact that the Ninth Circuit

> has continued to state that sexual orientation classifications are not suspect, no Supreme Court decision has undercut the entire reasoning of *High Tech Gays* in a way that is "clearly irreconcilable" . . . Furthermore, post-*Lawrence*, in *Witt*, the Ninth Circuit stated that *Lawrence* did not disturb the holding that DADT did not violate equal protection under rational basis review. *Witt*, 527 F.3d at 821.

*Id.* at 1100. *Jackson* goes on to find that *High Tech Gays* was not overruled or rendered irreconcilable by *Hernandez-Montiel v. INS*, 225 F.3d 1084 (9th Cir. 2000) (which found under immigration law that sexual orientation and sexual identity are immutable), or by *Christian Legal Society v. Martinez*, 130 S. Ct. 2971 (2010) (where the Supreme Court declined in a First Amendment context to distinguish between status and conduct with regard to homosexual conduct), neither of which were irreconcilable "equal protection" cases. *Id.* at 1101.

Appellants further argue that Nevada's marriage amendment is really "sex discrimination" and should be subject to heightened scrutiny. This sex discrimination argument in the context of a ban on same-sex marriage is not reasonable. In *Loving*, the Supreme Court would not surrender its integrity to an argument that Virginia's facially neutral criminalization of interracial marriage was not "race discrimination" because it applied equally to both whites and blacks. Intellectual honesty required the court to focus on the actual discriminatory target of the law, which the state could not justify under heightened scrutiny with respect to race. In the Ninth Circuit there is no recognized sexual orientation suspect or

quasi-suspect protected class. Thus, an alleged invidious discrimination based on the sex of the individuals is simply a pretext to try and justify a higher level of scrutiny.

Nevada's marriage amendment does not target any individual in a protected class. It does discriminate based upon sexual orientation. Unlike a woman's individual right to be free from sex discrimination (or *Loving's* individual right to be free of racial discrimination), there simply is no unilateral individual liberty right to marriage. Marriage is a right that can only be claimed and ultimately possessed by two persons in compliance with a state's imposed lawful conditions. This reality distinguishes our case from *Loving's* individual in a "race" protected class with respect to marriage. Marriage is a civil institution created by the state for two consenting opposite-sex individuals subject to age, familial and ceremonial requirements. It is a conditional right. If such a civil entity could be separately claimed based upon each person's unilateral individual liberty interest to be free from sexual discrimination, intellectual honesty would require the states be stripped of most, if not all, of the other existing limitations that have been placed upon the institution. The foreseeable chaos that would ensue cannot be ignored. As *Amici*, National and Western States Women's Right Organizations, points out: "More recently, Justice Kennedy questioned whether California's marriage ban 'can be treated as a gender-based classification,' revealing that it was a 'difficult

question that [he's] been trying to wrestle with.' Transcript of Oral Argument at

13, *Hollingworth v. Perry*, 133 S. Ct. 2652 (2013) (No. 12-144)." Amicus Brief

Dkt. 32, p. 11. It is self-evident that Justice Kennedy is wrestling with this

argument because he is a man of intellectual integrity. Honesty and wisdom

requires the Court to look only to sexual orientation discrimination in Nevada's

case.

In the event that the Court disagrees with the District Court in our case

regarding the applicability of controlling precedent finding (or assuming) a lack of

a suspect or quasi-suspect class[34], *High Tech Gays* still provides the proper

analytical framework for the question:

> To be a "suspect" or "quasi-suspect" class, homosexuals
> must 1) have suffered a history of discrimination; 2)
> exhibit obvious, immutable, or distinguishing
> characteristics that define them as a discrete group; and
> 3) show that they are a minority or politically powerless,
> or alternatively show that the statutory classification at
> issue burdens a fundamental right. (Citations omitted).

---

[34] *High Tech Gays*, at 573-74; *Phillips*, at 1425; *Witt*, at 821 (the Court follows *Phillips*); *Romer*, at 632 (". . . if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end. (Citation omitted). Amendment 2 fails, indeed defies, even this conventional inquiry."); *see Lawrence*, at 585 (O'Connor, J., concurring) ("That this law as applied to private, consensual conduct is unconstitutional under the Equal Protection Clause does not mean that other laws distinguishing between heterosexuals and homosexuals would similarly fail under rational basis review."); *see Windsor*, at 2692 (the Supreme Court follows *Romer* and *Lawrence*).

*Id.* at 573.

The District Court in our case found a history of discrimination that he correctly weighted less heavily in light of enormous changes in acceptance and protection of homosexuals in the last 20 years since *High Tech Gays* originally decided against suspect class status.  District Court Order ER 19, Dist. Ct. Dkt. 102, p. 18, ll. 3-25.  The District Court correctly observes that unlike race or sex, one does not inherit the crippling legacy of past discrimination because the immutability of homosexuality ("whether chosen or not") is:

> . . . unlikely to be passed from parent to child in such a way that the effects of past discrimination against one's ancestors will have effects upon oneself.  In the context of a characteristic like homosexuality, where no lingering effects of past discrimination are inherited, it is contemporary disadvantages that matter for the purposes of assessing disabilities due to discrimination.  Any such disabilities with respect to homosexuals have been largely erased since 1990.

District Court Order ER 19, ll. 20-25.

Thus, the District Court explores the underlying purpose of the first and second prongs of the suspect class test and correctly finds wanting the necessary link between a history of discrimination and an immutable characteristic that suspect class designation would propose to ameliorate.  That leaves the question of political power, which no reasonable person watching the media, political and legal full court press of the last decade can say is nonexistent or inadequate in

Appellants' case.   As the District Court correctly observed "[t]he question of 'powerlessness' under an equal protection analysis requires that the group's chances of democratic success be virtually hopeless, not simply that its path to success is difficult or challenging because of democratic forces."  District Court Order ER 22, ll. 15-18.

> In the present case, it simply cannot be disputed that there have historically been sufficient pro-homosexual legislators (or anti-homosexual and indifferent legislators who can be democratically bargained with) in the State of Nevada to protect homosexuals from oppression as a general matter.  *See, e.g.,* Nev. Rev. Stat. §§ 118.020, 233.010, 613.330.   Plaintiffs' democratic loss on a particular issue does not prove that they lack political power for the purposes of an equal protection analysis. That homosexuals cannot protect themselves democratically without aid from other groups is a conclusion that is necessarily true for any minority group by definition, so treating this point as dispositive would avoid any meaningful analysis of the political powerlessness factor.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 445 (1985) ("Any minority can be said to be powerless to assert direct control over the legislature, but if that were a criterion for higher level scrutiny by the courts, much economic and social legislation would now be suspect.").

District Court Order ER 22-23, ll. 21-25; ll. 1-7.

In *Diaz*, the Court found a *Moreno* take-away circumstance and applied a more searching form of rational basis review.[35]  Because in part the absence of

such "take-away" facts in *Jackson* (and likewise in Nevada's case, District Court

Order ER 38, ll. 16-20), that court determined that the state's interest in marriage-

federalism required deferential judicial review. *Jackson*, at 1104, stated:

> Plaintiffs' proposed intensified review conflicts with the Eighth Circuit's decision in *Bruning*. In *Bruning*, the Eighth Circuit held that an amendment to the Nebraska Constitution prohibiting same-sex marriage and the equivalent of civil unions did not violate the Equal Protection Clause. *See Bruning*, 455 F.3d at 868-69. After noting that the institution of marriage has always been the predominant concern of state government in our federal system, the Eighth Circuit concluded that rational basis must be "particularly deferential" in this area. *Id.* at 867.

Like *Jackson*, Nevada's case does not involve *Romer* take-away facts upon which

the Court might consider applying the less deferential intensified rational basis

review.[36]

Further, Plaintiffs rely on an expert opinion regarding national history

regarding animus (or the desire to harm homosexuals) as their basis to argue for

heightened scrutiny. There simply is no Nevada-specific material evidence of

legislative animus or a desire to harm that is similar to that found in *Moreno*,

*Romer* and *Windsor*. In fact, Plaintiffs-Appellants did not expressly allege below

---

[35] *Diaz v. Brewer*, 656 F.3d 1008, 1012 (9th Cir. 2011) (in a rights take-way circumstance cited as similar to *Moreno*, the *Diaz* Court applied a less than deferential rational basis review).

[36] Appellants cannot establish any pre-existing right to marriage or the title of marriage. *Cf. In re Marriage Cases*, 183 P.3d 384, 433-34 (Cal. 2008).

that animus or desire to harm motivated the passage of either Nevada's marriage amendment or its civil union statute.  Plaintiffs-Appellants stated in their Summary Judgment Motion:

> Although **Nevada's constitutional amendment may have been motivated at least in part by bias or misunderstanding**, all the Plaintiffs must show to prove the "intent" element of their equal protection claim is an intent to treat same-sex couples differently and adversely. *See Perry*, 671 F.3d at 1093 (clarifying that the Court was not suggesting that California's constitutional amendment was "the result of ill will on the part of the voters of California," and holding that even the "disapproval" that led voters **to eliminate the right to marry** for same-sex couples sufficed to demonstrate intent).  This **showing of intent need *not* rise to the level of animus.**

Dist. Ct. Dkt. 86, p. 20, ll. 1-9. [Emphasis added; italics in original.]     Further, Plaintiffs-Appellants' Motion unsuccessfully attempted to impute animus or a desire to harm upon the Nevada electorate, wherein they stated:

> Defendant-Intervenor Coalition for the Protection of Marriage (the "Coalition") collected signatures to place the proposed amendment on the ballot and was the primary source of advertisements advocating its passage, as described in its motion to intervene. [Dist. Ct.] Dkt. 30-1. Many of the campaign messages used to persuade voters to amend the State's constitution relied on false, stigmatizing messages that same-sex couples are inferior to different-sex couples, and that both the institution of marriage and children need to be protected from same-sex couples.  For example, one 2002 flyer urged voters to adopt the constitutional amendment by saying "Let's not experiment with Nevada's children." App. 72-74 [Dist. Ct. Dkt. 86-1, p. 76]. The Coalition also claimed that

59

allowing same-sex couples to marry would cause schools to teach "explicit homosexual sex acts" and that "we would be unable to stop the proliferation of teaching that promotes homosexuality in our schools." App. 72, 75-78 [Dist. Ct. Dkt. 86-1, pps. 78-80].

Likewise, material from the Nevada campaign to amend the state constitution to bar marriage for same-sex couples stated "Let's not experiment with Nevada children." The approval of Proposition 8 in California, Question 1 in Maine, Question 2 in Nevada, and similar laws and constitutional amendments in a total of forty-one states indicates the enduring influence of anti-gay hostility and the persistence of ideas about the inequity of gay people and their relationships. [Dist. Ct. Dkt. 86-2, p. 138, ll. 15-20].

Gay people also continue to face violence motivated by anti-gay bias . . . For example, in 1994, in Reno, Nevada, a gay businessman, William Metz, was stabbed more than 20 time by his murderer, who reputedly want to carve a swastika in his body. [Dist. Ct. Dkt. 86-2, p. 164, ll. 25-26].

One example of the harassment that LGBT youth may face comes was recounted by Derek Henkle, a high school student in Washoe County School District, Nevada, who sued the District for failing to protect him from anti-gay harassment. Henkle v. Gregory, 150 F. Supp. 2d 1067 (D. Nev. 2001). [Dist. Ct. Dkt 86-2, p. 165, ll. 17-20].

Dist. Ct. Dkt. 86, p. 13, ll. 14-24. [Citations to District Court Record added].

This simply does not rise to the level of the demeaning legislative moral condemnation and disapproval expressed in the Congressional Record in *Windsor* and imputed by the Court to the entire Congress because "[t]he congressional goal

was 'to put a thumb on the scales and influence a state's decision as to how to shape its own marriage laws . . . to ensure . . . second-class marriages for purposes of federal law.'" *Id.* at 2693.

The 1994 murder of William Metz's in Reno at the hands of a white supremacist, the 1994-95 cowardly bullying by some high school students and the intervention failure of tone deaf school officials cannot be reasonably projected upon the Nevada electorate as animus or the desire to harm as being the sole motivating factor for their 2000-2002 votes for Nevada's marriage amendment— Question 2. Further, the Nevada Legislature's passage in 2009 of the Domestic Partnership Act upon the primary sponsorship and urging of the gay and lesbian community cannot be reasonably and objectively attributed to animus or a desire to harm homosexuals. The legislative history committee testimony on Senate Bill 283 (Domestic Partnership Act) does not objectively support such a factual conclusion. Dist. Ct. Dkt. 85-1, pps. 5-21; Dist. Ct. Dkt. 85-2, pps. 5-6.

The Coalition's opinion flier that "Let's not experiment with Nevada's children" ER 252, Dist. Ct. Dkt. 86-1, p. 76, which opinion objectively is not evidence of animus or a desire to harm, simply cannot reasonably be projected upon the Nevada electorate, nor was such opinion unreasonable. With the prospect of potential future official government endorsement of same-sex marriage caused by foreseeable future same-sex marriage claims under the Full Faith and Credit

61

Clause, it was *"not inexplicable by anything but animus"* under *Romer* (nor was it unreasonable) to anticipate (as Coalition did in its initiative campaign) that parents would have a reasonable basis to fear loss of control in public schools regarding the diverse moral message they intend for their children on the topic of same-sex marriage and homosexuality.[37] *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1211 (9th Cir. 2005) ("...there is no free-standing fundamental right of parents 'to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs' and that the asserted right is not encompassed by any other fundamental right."). It is common knowledge that attempted parental control of sex education in the public schools has a contentious history. Adding same-sex marriage to the existing sex education curriculum adds to an ongoing topical conflict, about which reasonable people can honestly disagree and such disagreement is not necessarily motivated by animus or a desire to harm homosexuals or same-sex couples and their children. Even parents who are loving and supportive of their gay and lesbian

---

[37] District Court Order ER 40-41, ll. 23-25; ll. 1-3 ("Because the maintenance of the traditional institution of civil marriage as between one man and one woman is a legitimate state interest, because the exclusion of same-sex couples from the institution of civil marriage is rationally related to furthering that interest, and because the challenged laws neither withdraw any existing rights nor effect a broad change in the legal status or protections of homosexuals based upon **pure animus**, the State is entitled to summary judgment [emphasis added].").

friends or family members can disagree on what, when and how their children are taught regarding this controversial and sensitive subject.

Appellants attempt to imply wrongful animus or desire to harm as the sole motivation (as in *Romer*) of the Nevada electorate in voting for Question 2 is simply not objectively reasonable in the Court's record. That vote was expressly made to preserve and protect Nevada's long-standing traditional marriage definition from Full Faith and Credit Clause claims, ER 162, Dist. Ct. Dkt. 87, p. 26.[38]

Nevada has a rationally related governmental interest to cautiously engage in its legislative experiment with domestic partnerships. This experiment began in 2009. 2009 Nev. Stat. 2183. This domestic partnership form of government endorsement of same-sex relationships will eventually make its way into sex education curriculum. However, constitutionalizing this topic, as Appellants ask the Court to do, will inappropriately strip Nevada of its right to proceed with

---

[38] The Coalition's Nevada chairman's letter to his supporters: "We have kept the campaign for Question 2, the Protection of Marriage Initiative, on high ground. We have consistently stated that this **campaign is about protecting Nevada's current marriage laws from judges and legislators in other states.** We have carefully pointed out that Question 2 will not give or take away any rights based on current Nevada law. We have confidently affirmed that the institution of marriage has been the cornerstone of our society for thousands of years, and Question 2 sends a clear and positive message to our children that marriage between a man and a woman is a valuable and respected institution [emphasis added]." ER 256, Dist. Ct. Dkt. 86-1, p. 80.

caution in redefining the scope of government recognized human relationships, and will strip the electorate of its future vote on broadening the definition of marriage to include same-sex couples.

## IV.  NEVADA'S DIFFERENT TREATMENT OF OPPOSITE-SEX MARRIAGE AND SAME-SEX DOMESTIC PARTNERSHIP IS LEGITIMATE, RATIONAL AND MARRIAGE POLICY PROTECTION IS SUBSTANTIALLY RELATED TO AN IMPORTANT GOVERNMENT OBJECTIVE UNDER THE EQUAL PROTECTION CLAUSE.

Under conventional rational basis review Appellants bear the burden of convincing the Court that limiting marriage to opposite-sex couples is completely irrational and illegitimate in the face of a strong presumption of validity of Nevada's laws and Constitution. *Philips*, at 1425. Thus, Nevada's rationally related governmental interests argued to the District Court should not be subjected to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data. *FCC v. Beach Communications*, 508 U.S. 307, 315 (1993).

> The Supreme Court, however, has held that a classification subject to rational basis review will be upheld when the 'inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not.' *Johnson v. Robison*, 415 U.S. 361, 382-83, 94 S. Ct. 1160, 39 L. Ed. 2d 389 (1974). Thus, the state is not required to show that denying marriage to same-sex couples is necessary to promote the state's interest or that same-sex couples will suffer no harm by an opposite-sex definition or marriage . . . Rather, the relevant question is whether an opposite-sex definition of marriage furthers legitimate interests that

64

> would not be furthered, or furthered to the same degree,
> by allowing same-sex couples to marry [citations
> omitted].

*Jackson*, at 1106-07. If the governmental interest "is at least debatable," it should

be upheld under deferential rational basis review. *Jackson*, at 1115 (quoting

*Heller*, 509 U.S. at 326).

Nevada's marriage amendment (and the subsequent adoption of the

Domestic Partnership Act) provided a rational basis to achieve legitimate

governmental interests in: 1) empowering Nevada's strongest legal defense in

avoiding the consequences of providing all the benefits of marriage (legally,

financially and socially) to foreseeable same-sex couples who might become

legally married in other states at a future time after the adoption of the marriage

amendment;   2) using marriage as an inducement to opposite-sex couples to

engage in responsible procreation, which due to biology is unneeded for same-sex

couples; 3) all things being equal, it being in the best interest of children to be

raised by the biological parent of each sex within the traditional institution of

marriage; 4) society's best interest is to deal cautiously with socially controversial

same-sex relationships through a legislative experiment; and 5) limiting marriage

to opposite-sex couples in Nevada's laws and Constitution furthers the

preservation of the heritage of traditional marriage as it has existed over centuries

of Western civilization, and has existed in the laws of Nevada since 1861 when

Nevada was a U.S. Territory, and serves to define the culture and society of the state of Nevada into the future until the Nevada Constitution is otherwise amended.

### A. Protecting Marriage Policy from Full Faith and Credit Clause Claims is Legitimate, Rational and Substantially Related to an Important Government Objective.

Assuming arguendo that intermediate judicial scrutiny is indicated,  Nevada bears the burden to justify its action. *United States v. Virginia*, 518, U.S. 515, 531 (1996) ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action"); *Michael M. v. Superior Court, Sonoma County*, 450 U.S. 464 (1981) (gender discrimination regarding teenage sexual crime was upheld as substantially related to achieving an important government objective).  Nevada's marriage amendment— constitutional protection of its longstanding statutory marriage public policy from claims under the Full Faith and Credit Clause, U.S. Const. art. IV, § 1—is at least an indisputable legitimate government interest,[39] and is in fact substantially related to achieving an important government objective.  *See Smelt v. County of Orange, California*, 447 F.3d 673, 680 (9th Cir. 2006) (where the Court finds marriage is a social relation subject to a state's police powers); *see Pac. Employers Ins. Co., v. Indus. Accident Comm'n*, 306 U.S. 493, 502-03 (1939) ("But there would seem to

---

[39] District Court Order ER 41, ll. 4-6 (". . . the protection of Nevada's public policy is a valid reason for the State's refusal to credit the judgment of another state, lest other states be able to dictate the public policy of Nevada.").

be little room for the exercise of that function when the statutes of the forum is the expression of domestic policy, in terms declared to be exclusive in its application to persons and events within the state."); *Nevada v. Hall*, 440 U.S. 410, 422 (1979) (the "Full Faith and Credit Clause does not require a State to apply another State's law in violation of its own legitimate public policy."); *Wilson v. Ake*, 354 F. Supp. 2d 1298, 1303-04 (M.D. Fla. 2005) ("Florida is not required to recognize or apply Massachusetts' same-sex marriage law because it clearly conflicts with Florida's legitimate public policy of opposing same-sex marriage.").

In an appeal for conviction for bigamous cohabitation, where the North Carolina state court would not provide full faith and credit to a Nevada divorce decree the Court reversed and recognized the distinction between a court decree and statutes, the Supreme Court stated:

> Nor is there any authority which lends support to the view that the full faith and credit clause compels the court of one state to subordinate the local policy of that state, as respects its domiciliaries, to the statues of any other state. [*Id.* at 296] . . . Within the limits of her political power North Carolina may, of course, enforce here own policy regarding the marriage relation – an institution more basic in our civilization than any other. But, society also has an interest in the avoidance of polygamous marriages (citation omitted) . . . And other states have an equally legitimate concern in the status of persons domiciled there as respects the institution of marriage. [*Id.* at 303]." [Citations added.]

*Williams ET AL. v. North Carolina*, 317 U.S. 287, 296-303 (1942).

The Court should exercise appropriate restraint in its review of our case where Nevadans timely legislated in 2002 (prior to the onset of legal same-sex marriage in any state of our Union)[40] a clear constitutional statement of their long-standing traditional marriage public policy, in which there is a recognized legitimate and important government interest. *See Smelt v. County of Orange, California*, 447 F.3d at 681 (With regard to marriage and *Pullman* abstention the Court stated, ". . . it is difficult to imagine an area more fraught with sensitive social policy considerations in which federal courts should not involve themselves if there is an alternative."); *Windsor*, at 2692 ("These actions were without doubt a proper exercise of its sovereign authority within our federal system, all in the way that the Framers of the Constitution intended.").

Nevada's decision to codify in its constitution the same marriage policy it first adopted while a U.S. Territory in the year 1861 was substantially related to its important government objective in our federal system of ensuring that the marriage policy of other states did not overtake Nevada's. State policy established in the Nevada Constitution is the most persuasive policy statement under existing court precedent that can be made to the citizens of the United States and its courts with respect to the otherwise potential supremacy of the Full Faith and Credit Clause.

---

[40] *Goodrich v. Dept. of Public Health*, 798 N.E.2d 941 (Mass. 2003) (Massachusetts was the first state to legalize same-sex marriage).

**B.   Nevada's Marriage Amendment Was Correctly Upheld Pursuant to the District Court's Deferential Rational Basis Review.**

Under deferential rational basis review, the subjectivity of imagined rationality is somewhat influenced by perspective.   Appellants think Nevada's conceivable rationality is totally irrational.  Appellants did not carry their burden to influence the perspective of the District Court from his proper role of placing himself in the shoes of the legislative.  Without facts of wrongdoing, and no basis for a more searching form of review, the District Court properly deferred to the conceivable, which need not be perfect.[41]   The proper inquiry as applied in the Ninth Circuit is summarized in *Philips*, where the Court stated:

> Because we have previously held that "homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny under the equal protection component of the Due Process Clause of the Fifth Amendment," *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990), we subject the policy on gays in the military to rational basis review. We therefore must reject both the request of amici curiae that we apply strict scrutiny to the policy, and Philips's suggestion that classifications along the lines of sexual orientation ought to receive heightened judicial scrutiny.

---

[41] District Court Order ER 33, ll. 8-10 ("The Court finds Judge Kay's conclusions concerning the rational bas[is] for Hawaii's marriage—civil union regime equally persuasive as applied to Nevada's marriage—domestic partnership regime. *See id.* at *38-35."); ER 34, ll. 1-4 ("The legal question is whether the State of Nevada has any conceivable rational basis for the distinction it has drawn. It does, and the laws at issue in this case therefore survive rational basis review under the Equal Protection Clause.").

The Supreme Court has further channeled the nature of our review in two critical respects. First, in *Heller v. Doe*, 509 U.S. 312, 125 L. Ed. 2d 257, 113 S. Ct. 2637 (1993), it made clear that "rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Id.* at 319 (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 124 L. Ed. 2d 211, 113 S. Ct. 2096 (1993)). Rather, "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity," *id.,* which "'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *id.* at 320 (quoting *Beach Communications,* 508 U.S. at 313). Under the standard of rational basis review defined by the Court:

> [The government], moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. *Id.* at 320-21 (citations and internal quotations omitted).

*Philips*, at 1424-25.

70

In the same context as Nevada's case, *Jackson* further expounds regarding a

proper application of *Beach Communications*:

> Again, the question is not whether the rationales set forth
> actually motivated the legislature (or people who ratified
> the marriage amendment), are supported by empirical
> evidence, or are wise. Instead, it is whether Hawaii could
> have reasonably believed, or rationally speculated, that
> Hawaii's marriage laws further any legitimate interest.
> Here, the Court is faced with cross-motions for summary
> judgment. In rational-basis challenge to a legislative
> classification contained in a law, 'those challenging the
> legislative judgment must convince the court that the
> legislative facts on which the classification is apparently
> based could not reasonably be conceived to be true by the
> governmental decisionmaker.' *Id.*

*Jackson*, at 1105.

The Eighth Circuit Court of Appeals in *Citizens for Equal Prot. v Bruning*,

at 867-868, found two rationally related legitimate governmental interests in

upholding an equal protection challenge to Nebraska's opposite-sex marriage

limitation: 1) "traditional notion that two committed heterosexuals are the optimal

partnership for raising children"; and, 2) "responsible procreation theory that

justifies conferring the inducements of marital recognition and benefits on

opposite-sex couples, who can otherwise produce children by accident, but not on

same-sex couples, who cannot." Likewise, *Jackson* found:

> . . . the legislature could rationally conclude that defining
> marriage as a union between a man and woman provides
> an **inducement for opposite-sex couples to marry**,
> thereby decreasing the percentage of children accidently

71

conceived outside of a stable, long-term relationship . . . It is undisputed opposite-sex couples can naturally procreate and same-sex couples cannot. Thus, allowing opposite-sex couples to marry furthers this interest and allowing same-sex couples to marry would not do so.

The legislature could also rationally conclude that other **things being equal, it is best for children to be raised by a parent of each sex**. Under rational basis review, as long as the rationale for a classification is at least debatable, the classification is constitutional. . . .

. . . the state could rationally conclude that it is **addressing a divisive social issue with caution** . . . In 2011 the legislature passed a civil union law, conferring all of the state legal rights and benefits of marriage (except the title marriage) on same-sex couples who enter into a civil union. In this situation, to suddenly constitutionalize the issue of same-sex marriage "would short-circuit" the legislative actions with regard to the rights of same-sex couples that have been taking place in Hawaii. *See Dist. Attorney's Office v. Osborne*, 557 U.S. 52, 72-73 (2009).

*Id.* at 1072. [Emphasis added].

Nevada did not argue that same-sex couples are incapable of responsibly caring for and raising children. Nevada does, however, argue that "all things being equal, it is in the best interest of children to be raised by the biological parent of each sex within the traditional institution of marriage." Thus, traditional marriage is the most effective means of accomplishing this legitimate governmental interest and it is simply not possible for both of the biological parents of each sex to be a same-sex couple. *See Johnson v. Robison*, 415 U.S. 361 (1974) (discrimination

72

among classes of individuals is constitutional when the excluded class cannot further the government's legitimate interest).

Merely creating a constitutional barrier to same-sex marriage is simply not enough to find animus or an equal protection violation. *Bruning*, at 868-869; *see* District Court Order ER 40 ("[Nevada's] Section 21 is not in the character of the constitutional provision struck down in *Romer*"); *cf. Romer*, at 631 (where "depriv[ing] homosexuals of special rights" and imposing a "special disability" upon them for no other reason than pure animus is more than a mere constitutional barrier). Nevada's case is a *Philips* deference case. "Rather, 'a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity,' *id.*, which 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' [citations omitted]." *Philips*, at 1425; *see Bruning*, at 867-868 (with regard to the governmental interest of responsible procreation, "[w]hatever our personal views regarding this political and sociological debate, we cannot conclude that the State's justification 'lacks a rational relationship to legitimate state interests.' *Romer*, 517 U.S. at 632.").

In addition to those interests the Court might conceive of arising out of Nevada's claimed governmental interests and common law precedent, *supra*, the Intervenor-Defendant-Appellee Coalition provided the Court in their Motion for

Summary Judgment Dist. Ct. Dkt. 72—footnotes to Appendix, with citations to considerable evidence (in which Nevada joined) that further supports Nevada's rationally related legitimate governmental interests, which if not irrefutable, are at least debatable and should be upheld.[42]

_____

[42] _Preserving and protecting the heritage of traditional man-woman marriage:_
Intervenor-Defendant-Appellee Coalition's evidence supports--traditional marriage is a vital social institution and it has a shared public meaning. (Dist. Ct. Dkt. 72, p.9, l. 17, l.n6), (Dist. Ct. Dkt. 80, Tab 36, Bate p.787), (Dist. Ct. Dkt. 73, Tab 7, Bate p.145). Its meaning rises to norms for society. (Dist. Ct. Dkt. 72, p.9, l. 18, n.7). Traditional marriage provides identities, purposes and practices for society. (Dist. Ct. Dkt. 72, p.10, l. 2, n.8), (Dist. Ct. Dkt. 73, Tab 7, Bate p.145). It provides social goods justifying perpetuation of the traditional marriage institution. (Dist. Ct. Dkt. 72, p.10, l. 7, n.10). Changing the meaning of marriage results in de-institutionalization of marriage. (Dist. Ct. Dkt. 72, p.10, l. 15, n.13), (Dist. Ct. Dkt. 80, Tab 36, Bate p.827). The core meaning of marriage is a man-woman institution. (Dist Ct. Dkt. 72, p.11, l. 2, n.14), (Dist. Ct. Dkt. 73, Tab 4, Bate pps. 25-26), (Dist. Ct. Dkt. 77, Tab 17), (Dist. Ct. Dkt. 77, Tab 18). Man-woman marriage as an institution predates any laws regarding marriage. (Dist. Ct. Dkt. 72, p.12, l. 7, n.17), (Dist Ct. Dkt. 77, Tab 15), (Dist. Ct. Dkt. 81, Tab 37, Bate p. 848). Genderless "marriage" is a profoundly different institution. (Dist. Ct. Dkt. 72, p.13, l. 12, n.20), (Dist. Ct. Dkt. 83, Tab 46, Bate pps.1080-81). Man-woman marriage is essentially a child-centered institution. (Dist. Ct. Dkt. 72, p.13, l. 20, n.21), (Dist. Ct. Dkt. 73, Tab 6, Bate pps. 97-98), (Dist. Ct. Dkt. 76, Tab 14, Bate p. 487), (Dist. Ct. Dkt. 84, Tab 51). Same-sex "marriage" is couple-centered rather than child-centered and thus alters the institution. (Dist. Ct. Dkt. 72, p.14, ll. 2-10, n.22-n.24), (Dist. Ct. Dkt. 73, Tab 7, Bate pps. 141-142), (Dist. Ct. Dkt. 73, Tab 5, Bate p. 64), (Dist. Ct. Dkt. 73, Tab 6, Bate p. 98). It is a reasonable choice to protect the institution of man-woman marriage. (Dkt. 72, p.15, ll. 13-28). "Husband and wife" is a distinct mode of association with centuries of social and personal meaning. (Dist. Ct. Dkt. 72, p.24, ll. 6-20, n.56-n.58).

_All things being equal, it is in the best interest of children to be raised by the biological parent of each sex within the traditional institution of marriage:_
Generally, Intervenor-Defendant-Appellee Coalition's evidence supports Nevada's best interests of children governmental interest. (Dist. Ct. Dkt. 75, Tab 8, Bate p.

187), (Dist. Ct. Dkt. 75, Tab 10, Bate p. 301), (Dist. Ct. Dkt. 75, Tab 11, Bate p. 437), (Dist. Ct. Dkt. 76, Tab 12, Bate p. 455), (Dist. Ct. Dkt. 79, Tab 24, Bate p. 589), (Dist. Ct. Dkt. 79, Tab 25, Bate p. 592), (Dist. Ct. Dkt. 79, Tab 26, Bate p. 607), (Dist. Ct. Dkt. 79, Tab 27, Bate p. 623), (Dist. Ct. Dkt. 80, Tab 30, Bate p. 645), (Dist Ct. Dkt. 80, Tab 31, Bate p. 647), (Dist. Ct. Dkt. 80, Tab 33, Bate p. 714), (Dist. Ct. Dkt. 80, Tab 34, Bate p. 733), (Dist Ct. Dkt. 80, Tab 35, Bate p. 750). There is a child bonding interest with the child's biological parents. (Dist. Ct. Dkt. 72, p.16, ll. 1-21, n.25-n.29), (Dist. Ct. Dkt. 75, Tab 11), (Dist. Ct. Dkt. 76, Tab 12), (Dist. Ct. Dkt. 84, Tab 51), (Dist. Ct. Dkt. 73, Tab 5, Bate p. 82), (Dist. Ct. Dkt. 73, Tab 5, Bate p. 83), (Dist. Ct. Dkt. 73, Tab 6, Bate p. 98), (Dist. Ct. Dkt. 73, Tab 4, Bate p. 20). There are child psychological benefits associated with being raised by one's biological parents. (Dist. Ct. Dkt. 72, p.17, ll. 2-18, n.31-n.34), (Dist. Ct. Dkt. 84, Tab 51, Bate pps. 1293-95), (Dist. Ct. Dkt. 75, Tab 10), (Dist. Ct. Dkt. 79, Tab 25), (Dist. Ct. Dkt. 79, Tab 26), (Dist. Ct. Dkt. 83, Tab 46, Bate pps. 1116-17). Man-woman marriage is the most effective means to maximize the level of private welfare of children. (Dist. Ct. Dkt. 72, p. 19, l. 7, n.39), (Dist. Ct. Dkt. 73, Tab 5), (Dist. Ct. Dkt. 73, Tab 6, Bate p. 106), (Dist. Ct. Dkt. 79, Tab 28), (Dist. Ct. Dkt. 79, Tab 29). Man-woman marriage effectively connects children to their biological fathers. (Dist. Ct. Dkt. 72, p.20, ll. 1-7, n.43), (Dist. Ct. Dkt. 73, Tab 6, Bate p. 98). Same-sex "marriage" centers upon the couple and not children. (Dist. Ct. Dkt. 72, p. 20, ll. 8-17, n.45), (Dist. Ct. Dkt. 73, Tab 7, Bate p. 142). Man-woman marriage is the optimal means to ensure outcomes deemed critical for a child's and thus society's well-being. (Dist. Ct. Dkt. 72, p. 21, ll. 2-9, n.46), (Dist. Ct. Dkt. 73, Tab 4), (Dist. Ct. Dkt. 73, Tab 7), (Dist. Ct. Dkt. 76, Tab 14), (Dist. Ct. Dkt. 78, Tab 22), (Dist. Ct. Dkt. 79, Tab 24), (Dist. Ct. Dkt. 79, Tab 25), (Dist. Ct. Dkt. 79, Tab 27), (Dist. Ct. Dkt. 80, Tab 30), (Dist. Ct. Dkt. 80, Tab 32). The intact, biological, married traditional family remains the gold standard for family life. (Dist. Ct. Dkt. 72, p. 21, ll. 17-22, n.47), (Dist. Ct. Dkt. 73, Tab 4, Bate p. 17). Traditional man-woman marriage provides for the orderly reproduction of society. (Dist. Ct. Dkt. 72, pps. 22-23, ll. 23-26; ll. 1-6, n.50-n.51), (Dist. Ct. Dkt. 83, Tab 46, Bate p. 1107).

### *Marriage is an inducement to man-woman couples to engage in responsible procreation:*

Generally, Intervenor-Defendant-Appellee Coalition's evidence supports Nevada's inducement to marry governmental interest. (Dist. Ct. Dkt. 73, Tab 4, Bate p. 7), (Dist. Ct. Dkt. 73, Tab 5, Bate p. 55), (Dist. Ct. Dkt. 76, Tab 14, Bate p. 504), (Dist. Ct. Dkt. 83, Tab 46, Bate p. 1078). Man-woman marriage provides for the adequate private welfare of resulting children. (Dist. Ct. Dkt. 72, p. 19, ll. 14-24,

Appellants fail to satisfy their burden of proof to convince the Court that Nevada's governmental interests are irrational and illegitimate in every case. *Philips*, at 1425.

## CONCLUSION

Appellants ask the Court to inappropriately change the legislative landscape of marriage in Nevada.   It should be left to the voters to change the Nevada Constitution regarding marriage.[43]

*Baker* is applicable to Nevada's facts and issues and thus is mandatory authority.   The proper application of *Baker* by the Court will ensure the people's right to vote on this important family law question.   Only time will tell if the

---

n.40-n.42), (Dist. Ct. Dkt. 73, Tab 4), (Dist. Ct. Dkt. 76 Tab 14), (Dist. Ct. Dkt. 84, Tab 51, Bate p. 1306).   Man-woman marriage is the most effective means to maximize the level of private welfare of children.   (Dist. Ct. Dkt. 72, p. 19, l. 7, n.39), (Dist. Ct. Dkt. 73, Tab 5), (Dist. Ct. Dkt. 73, Tab 6, Bate p. 106), (Dist. Ct. Dkt. 79, Tab 28), (Dist. Ct. Dkt. 79, Tab 29).   Man-woman marriage effectively connects children to their biological fathers.   (Dist. Ct. Dkt. 72, p. 20, ll. 1-7, n.43), (Dist. Ct. Dkt. 73, Tab 6, Bate p. 98).   Traditional man-woman marriage provides for the orderly reproduction of society.   (Dist. Ct. Dkt. 72, p. 23, ll. 7-13, n.52-n.53), (Dist. Ct. Dkt. 73, Tab 4), (Dist. Ct. Dkt. 73, Tab 6), (Dist. Ct. Dkt. 73, Tab 7, Bate pps. 147-49), (Dist. Ct. Dkt. 76, Tab 13), (Dist. Ct. Dkt. 76, Tab 14), (Dist. Ct. Dkt. 78, Tab 21), (Dist. Ct. Dkt. 78, Tab 22).   The institution of man-woman "husband and wife" promotes healthier, wealthier and happier couples and loses its beneficial societal meaning and titles with genderless "marriage."   (Dist. Ct. Dkt. 72, pps. 25-26, n.59-n.63), (Dist. Ct. Dkt. 77, Tab 16), (Dist. Ct. Dkt. 81, Tab 37, Bate pps. 863-64).

[43]   The 2013 Nevada Legislature passed Senate Joint Resolution SJR-13, completing the first step of a 3-step constitution amendment process to include same-sex couples in the definition of marriage.   Nev. Const. art 16, § 1 (approval by two successive legislatures and one vote of the people).

Supreme Court will choose to intervene into marriage-federalism for the sake of absolute sexual orientation equality. The necessary judicial care and foundational inquiry required to find a new fundamental right is a sobering responsibility because it "place[s] the matter outside of the arena of public debate and legislative action," and the rights "protected by the Due Process Clause [can] be subtly transformed into the policy preferences of the [court]." *Glucksberg* 521 U.S. at 720; *Log Cabin Republicans v. United States,* 658 F.3d 1162, 1170 (9th Cir. 2011) ("[W]hen a right is not rooted in our constitutional text, traditions, or history, our authority as judges is at its end. We must then leave the task of identifying and protecting new rights where the Constitution leaves it—with the political branches and the people.").

The Court should apply *Baker* and affirm dismissal for lack of substantial federal question, leaving this question properly in the hands of the voters. The Court should find that Nevada's marriage amendment and its separate treatment of domestic partnerships does not offend Appellants' due process or equal protection rights. If neither, then the Court assumes the awesome responsibility of constructing a just remedy that does not throw the institution of marriage back into the polygamy war previously fought in the *Battle Born* state of Nevada.

DATED this 21[th] day of January, 2014.

77

NEIL A. ROMBARDO
District Attorney
By:_____/s/ Randal R. Munn_____
       RANDAL R. MUNN
       Chief Deputy District Attorney
       Nevada Bar No: 3327
       885 E. Musser St., Suite 2030
       Carson City, Nevada 89701
       775-887-2070
       *Attorneys for Defendant-Appellee*
       *Alan Glover,*
       *Carson City Clerk-Recorder*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendant-Appellee Alan Glover is aware of only one other related case pending in the United States Court of Appeals for the Ninth Circuit which raises some issue closely related to those in the instant case:

*Jackson, et al. v. Abercrombie*, Nos. 12-16995 and 12-16998 (9th Cir. Filed Sept. 7, 2012)

DATED  this 21st  day of January, 2014.

NEIL A. ROMBARDO
District Attorney
By:_____/s/ Randal R. Munn_____
      RANDAL R. MUNN
      Chief Deputy District Attorney

79

**Form 8**

**CERTIFICATE OF COMPLIANCE**

**Form 8.**     **Certificate of Compliance Pursuant to 9th Circuit Rules 28-4,
29-2(c)(2) and (3), 32-2 or 32-4[1] for Case Number** 12-17668

Note: This form must be signed by the attorney or unrepresented litigant *and
attached to the end of the brief.*

I certify that (check appropriate option):

☐ This brief complies with the enlargement of brief size permitted by Ninth Circuit
Rule 28-4. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5)
and (6). This brief is _____ words,_____ lines of text or
_____ pages, excluding the portions exempted by Fed. R. App. P.
32(a)(7)(B)(iii), if applicable.

☐ This brief complies with the enlargement of brief size granted by court order dated
_____. The brief's type size and type face comply with Fed. R.
App. P. 32(a)(5) and (6). This brief is _____ words, _____
lines of text or _____ pages, excluding the portions exempted by Fed.
R. App. P. 32(a)(7)(B)(iii), if applicable.

☒ This brief is accompanied by a motion for leave to file an oversize brief
pursuant to Circuit Rule 32-2 and is 20,356 _____ words, _____ lines
of text or _____ pages, excluding the portions exempted by Fed. R.
App. P. 32(a)(7)(B)(iii), if applicable.

☐ This brief is accompanied by a motion for leave to file an oversize brief
pursuant to Circuit Rule 29-2(c)(2) or (3) and is _____ words,
_____ lines of text or _____ pages, excluding the portions
exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or
Unrepresented Litigant | s/ Randal R. Munn

("s/" plus typed name is acceptable for electronically-filed documents)

Date | January 21, 2014

_____
[1] If filing a brief that falls within the length limitations set forth at Fed. R. App. P.
32(a)(7)(B), use Form 6, Federal Rules of Appellate Procedure.

# ADDENDUM OF PERTINENT AUTHORITIES

## TABLE OF CONTENTS

<u>Page</u>

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1................................................................82

U.S. Const. art. IV, § 1......................................................................82

Nev. Const. art. 1 § 21......................................................................82

Nev. Const. art. 16§ 1 ......................................................................82

**Statues of Nevada**

1867 Nev. Stat. 88............................................................................83

1999 Nev. Stat. 1935........................................................................83

2009 Nev. Stat. 2183........................................................................84

**Nevada Revised Statutes**

Nev. Rev. Stat. § 122.020..................................................................84

Nev. Rev. Stat. § 122A.200................................................................84

**Territorial Laws of Nevada**

Part 2:33: 1861................................................................................86

**Acts of the Nevada Legislature**

Nevada Senate Joint Resolution 13....................................................86

81

## U.S. Const. amend. XIV, § 1

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## U.S. Const. art. IV, § 1

Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of each other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

## Nev. Const. art. 1 § 21

Only a marriage between a male and female person shall be recognized and given effect in this state.

## Nev. Const. art. 16 § 1

1.   Any amendment or amendments to this Constitution may be proposed in the Senate or Assembly; and if the same shall be agreed to by a Majority of all the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their respective journals, with the Yeas and Nays taken thereon, and referred to the Legislature then next to be chosen, and shall be published for three months next preceding the time of making such choice. And if in the Legislature next chosen as aforesaid, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the Legislature to submit such proposed amendment or amendments to the people, in such manner and at such time as the Legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments by a majority of the electors qualified to vote for members of the Legislature voting thereon, such amendment or amendments shall, unless precluded by subsection 2 or section 2 of article 19 of this constitution, become a part of the Constitution.

2.   If, two or more amendments which affect the same section of the constitution are ratified by the people pursuant to this section at the same election:

(a)  If all can be given effect without contradiction in substance, each shall become a part of the constitution.

82

(b) If one or more contradict in substance the other or others, that amendment which received the largest favorable vote, and any other ratified amendment or amendments compatible with it, shall become a part of the constitution.

3.   If, after the proposal of an amendment, another amendment is ratified pursuant to this section which affects the same section of the constitution but is compatible with the proposed amendment, the next legislature if it agrees to the proposed amendment shall submit such proposal to the people as a further amendment to the amended section. If, after the proposal of an amendment, another amendment is ratified pursuant to this section which contradicts in substance the proposed amendment, such proposed amendment shall not be submitted to the people.

### 1867 Nev. Stat. 88

Section 1.  Section two of this Act is hereby amended, so as to read as follows: Section Two.  Male persons of the age of eighteen years, and female persons of the age of sixteen year, not nearer of kin than second cousins, and not having a husband or wife living, may be joined in marriage; *provided always*, that male persons under the age of twenty-one years, and female persons under the age of eighteen years, shall first obtain the consent of their fathers, respectively, or in case of the death or incapacity of their fathers, then of their mothers or guardians; and, *provided further*, that nothing in this Act shall be construed so as  to make the issue of any marriage illegitimate if the person or persons shall not be of lawful age.

. . .

### 1999 Nev. Stat. 1935

**Sec. 7. NRS 613.330** is hereby amended to read as follows:

613.330 1. Except as otherwise provided in NRS 613.350, it is an unlawful employment practice for an employer:

(a) To fail or refuse to hire or to discharge any person, or otherwise to discriminate against any person with respect to his compensation, terms, conditions or privileges of employment, because of his race, color, religion, sex, *sexual orientation,* age, disability or national origin; or

(b) To limit, segregate or classify [employees in any] *an employee in a* way which would deprive or tend to deprive [any person] *him* of employment opportunities or otherwise adversely affect his status as an employee, because of his race, color, religion, sex, *sexual orientation,* age, disability or national origin.

. . .

**2009 Nev. Stat. 2183**

**Section 1. Title 11 of NRS** is hereby amended by adding thereto a new chapter to consist of the provisions set forth as sections 2 to 13, inclusive, of this act.

**Sec. 2.** *This chapter may be cited as the Nevada Domestic Partnership Act.*

**Sec. 3.** *As used in this chapter, unless the context otherwise requires, the words and terms defined in sections 4 and 5 of this act have the meanings ascribed to them in those sections.*

**Sec. 4.** *"Domestic partners" means persons who:*

*1. Have registered a valid domestic partnership pursuant to section 6 of this act; and*

*2. Have not terminated that domestic partnership pursuant to section 9 of this act.*

**Sec. 5.** *"Domestic partnership" means the social contract between two persons that is described in section 6 of this act.*

. . .

**Nev. Rev. Stat. § 122.020**

**NRS 122.020   Persons capable of marriage; consent of parent or guardian.**
1.   Except as otherwise provided in this section, a male and a female person, at least 18 years of age, not nearer of kin than second cousins or cousins of the half blood, and not having a husband or wife living, may be joined in marriage.
2.   A male and a female person who are the husband and wife of each other may be rejoined in marriage if the record of their marriage has been lost or destroyed or is otherwise unobtainable.
3.   A person at least 16 years of age but less than 18 years of age may marry only if the person has the consent of:
      (a)  Either parent; or
      (b)  Such person's legal guardian.

**Nev. Rev. Stat. § 122A.200**

**NRS 122A.200   Rights and duties of domestic partners, former domestic partners and surviving domestic partners.**
1.   Except as otherwise provided in NRS 122A.210:
      (a)  Domestic partners have the same rights, protections and benefits, and are subject to the same responsibilities, obligations and duties under law, whether derived from statutes, administrative regulations, court rules, government policies, common law or any other provisions or sources of law, as are granted to and imposed upon spouses.

84

(b) Former domestic partners have the same rights, protections and benefits, and are subject to the same responsibilities, obligations and duties under law, whether derived from statutes, administrative regulations, court rules, government policies, common law or any other provisions or sources of law, as are granted to and imposed upon former spouses.

(c) A surviving domestic partner, following the death of the other partner, has the same rights, protections and benefits, and is subject to the same responsibilities, obligations and duties under law, whether derived from statutes, administrative regulations, court rules, government policies, common law or any other provisions or sources of law, as are granted to and imposed upon a widow or a widower.

(d) The rights and obligations of domestic partners with respect to a child of either of them are the same as those of spouses. The rights and obligations of former or surviving domestic partners with respect to a child of either of them are the same as those of former or surviving spouses.

(e) To the extent that provisions of Nevada law adopt, refer to or rely upon provisions of federal law in a way that otherwise would cause domestic partners to be treated differently from spouses, domestic partners must be treated by Nevada law as if federal law recognized a domestic partnership in the same manner as Nevada law.

(f) Domestic partners have the same right to nondiscriminatory treatment as that provided to spouses.

(g) A public agency in this State shall not discriminate against any person or couple on the basis or ground that the person is a domestic partner rather than a spouse or that the couple are domestic partners rather than spouses.

(h) The provisions of this chapter do not preclude a public agency from exercising its regulatory authority to carry out laws providing rights to, or imposing responsibilities upon, domestic partners.

(i) Where necessary to protect the rights of domestic partners pursuant to this chapter, gender-specific terms referring to spouses must be construed to include domestic partners.

(j) For the purposes of the statutes, administrative regulations, court rules, government policies, common law and any other provision or source of law governing the rights, protections and benefits, and the responsibilities, obligations and duties of domestic partners in this State, as effectuated by the provisions of this chapter, with respect to:

    (1) Community property;

    (2) Mutual responsibility for debts to third parties;

(3) The right in particular circumstances of either partner to seek financial support from the other following the dissolution of the partnership; and

(4) Other rights and duties as between the partners concerning ownership of property,

Ê any reference to the date of a marriage shall be deemed to refer to the date of registration of the domestic partnership.

2.   As used in this section, "public agency" means an agency, bureau, board, commission, department or division of the State of Nevada or a political subdivision of the State of Nevada.

### Part 2:33: 1861 (Nevada Territorial Laws)

Section 1.  That marriage, so far as its validity in law is concerned, is a civil contract, to which the consent of the parties capable in law of contracting, is essential.

Section 2.  Every male person, who shall have attained the full age of eighteen years, and every female, who shall have attained the full age of sixteen years, shall be capable, in law, of contracting marriage, if otherwise competent; *provided*, however, that nothing in this act shall be construed so as to make the issue of any marriage illegitimate, if the person shall not be of lawful age; and *provided*, further, that all minor who shall have attained the age provided in this act for the contracting of marriage, shall be deemed in law to have attained their majority upon entering into the bonds of matrimony.

Section 3.  No marriage shall be contracted while either the parties shall have a husband or wife living, nor between parties who are nearer of kin than second cousins, computing by the rules of civil law, whether the half or the whole blood.

. . .

### Nevada Senate Joint Resolution 13 (2013 Legislature)

RESOLVED BY THE SENATE AND ASSEMBLY OF THE STATE OF NEVADA, JOINTLY, That Section 21 of Article 1 of the Nevada Constitution be amended to read as follows:
[Sec:] **Sec. 21.** [Limitation on recognition] ***Recognition***
of marriage. [Only a marriage between a male and female person shall be recognized and given effect in this state.]

86

*1. The State of Nevada and its political subdivisions shall recognize marriages and issue marriage licenses to couples, regardless of gender.*
*2. Religious organizations and clergy have the right to refuse to solemnize a marriage and no person has the right to make any claim against a religious organization or clergy for such a refusal.*
*3. All legally valid marriages shall be treated equally under the law.*
**20** ~~~~~

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Defendant-Appellee Alan Glover's Answering Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 21, 2014.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

   /s/ Jana Whitson
Jana Whitson
Office of the Carson City District Attorney