NO. 12-17668

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

BEVERLY SEVCIK, et al.,
*Plaintiffs-Appellants*,

v.

BRIAN SANDOVAL, in his official capacity as
Governor of the State of Nevada, et al.
*Defendants-Appellees*,

and

COALITION FOR THE PROTECTION OF MARRIAGE,
*Intervenor-Defendant-Appellee*.

---

Appeal from United States District Court for the District of Nevada
D.C. Civil Case No. 2:12-cv-00578-RCJ-PAL (Honorable Robert C. Jones)

---

## BRIEF OF AMICI CURIAE THE CENTER FOR URBAN RENEWAL AND EDUCATION, THE COALITION OF AFRICAN-AMERICAN PASTORS USA, AND THE FREDERICK DOUGLASS FOUNDATION, INC., SUPPORTING THE DEFENDANTS-APPELLEES BRIAN SANDOVAL AND THE INTERVENOR-DEFENDANT-APPELLEE COALITION FOR THE PROTECTION OF MARRIAGE IN FAVOR OF AFFIRMANCE

---

Lynn D. Wardle, Esq.
BRUCE C. HAFEN PROFESSOR OF LAW
J. Reuben Clark Law School
P. O. Box 28000
Provo, Utah 84602
(801) 422-2617
(Counsel of Record)

Stephen Kent Ehat, Esq.
167 North 1150 East
Lindon, Utah 84042
(801) 785-9797
(Counsel of Record)

## FRAP RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Amicus **The Center for Urban Renewal and Education** (**CURE**) is a California corporation and states that it has no parent corporation, that it issues no stock, and that no publicly held corporation owns any stock of **CURE**.

Amicus **The Coalition of African American Pastors USA** (**CAAP**) is not a corporation but is a grass-roots movement of thousands of African-American Christians and clergy seeking to support the institution of marriage and states that it has no parent corporation, that it issues no stock, and that no publicly held corporation owns any stock of CAAP.

Amicus **The Frederick Douglass Foundation, Inc.** (**FDFI**) is a Maryland corporation, issues no stock and has no parent corporation. Therefore, no publicly held corporation owns any stock of **FDFI**.

TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ……… …………………………………………… iii

STATEMENT OF INTEREST OF AMICI CURIAE…………………………………. viii

SUMMARY OF ARGUMENT …………………………………………………..    1

I.    UNLIKE THE OPPOSITE-SEX DEFINITION OF MARRIAGE, RACIAL
      RESTRICTIONS ON MARRIAGE IMPLICATED THE FOURTEENTH
      AMENDMENT'S CORE CONCERN WITH ELIMINATING RACIAL
      DISCRIMINATION …………………………………………………..    6

II.   IN AMERICAN LEGAL HISTORY, RACIALLY SEGREGATED
      MARRIAGE IS NOT COMPARABLE TO SEXUALLY INTEGRATED
      MARRIAGE…………………………………………………………..    9

III.  THE GENDER-INTEGRATING DEFINITION OF MARRIAGE IS
      CLOSELY BOUND UP WITH THE INSTITUTION'S CORE PURPOSE
      OF INCREASING THE LIKELIHOOD THAT CHILDREN WILL BE BORN
      TO AND RAISED BY BOTH THEIR MOTHER AND THEIR FATHER IN A
      STABLE, ENDURING FAMILY UNIT …………………………………… 15

IV.   THE DUAL-GENDER REQUIREMENT FOR MARRIAGE SUBSTANTIALLY
      ADVANCES THE STATE'S INTEREST IN LINKING RESPONSIBLE
      PROCREATION, ADVANTAGEOUS CHILDBIRTH AND OPTIMAL CHILD-
      REARING ..…………………………………..…………………………..    22

V.    A KEY PURPOSE OF *LOVING* WAS TO LIBERATE MARRIAGE FROM
      CAPTURE BY PERSONS SEEKING TO REDEFINE MARRIAGE TO ADVANCE
      POLICIES EXTRANEOUS TO MARRIAGE  ………………………….… 24

VI.   JUST FIVE YEARS AFTER DECIDING *LOVING* THE COURT IN *BAKER
      V. NELSON* REJECTED THE CLAIM THAT STATE LAW ALLOWING ONLY
      DUAL-GENDER MARRIAGE VIOLATED *LOVING*; *BAKER* IS GOOD LAW,
      BINDING PRECEDENT AND OUGHT TO BE ENFORCED………………… 26

VIII. CONCLUSION: *LOVING* COMPELS REVERSAL…………………………… 30

# TABLE OF AUTHORITIES

**Page**

## Decisions of the United States Supreme Court

*Baker v. Nelson*, 409 U.S. 810 (1972), dismissing for want of a substantial federal question the appeal in *Baker v. Nelson*, 91 N.W.2d 185 (Minn. 1971) ........................................................................................ 4, 26-29

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ....................................................7

*Boddie v. Connecticut*, 401 U.S. 371 (1971) ...........................................19

*Buck v. Bell*, 274 U.S. 200 (1927).............................................................25

*Carey v. Populations Services International*, 431 U.S. 678 (1977) ....................8, 20

*Fisher v. Univ. of Texas*, 133 S.Ct. 2411, 2419 (2013) ..........................................25

*Gratz v. Bollinger*, 539 U.S. 244 (2003)....................................................7

*Griswold v. Connecticut*, 381 U.S. 479 (1965)......................................8, 18

*Grutter v. Bollinger*, 539 U.S. 306 (2003)..................................................7

*Johnson v. California*, 545 U.S. 162 (2005).................................................7

*Lawrence v. Texas*, 539 U.S. 558 (2003)..................................................14

*Loving v. Virginia*, 388 U.S. 1 (1967)...............................................*passim*

*Maynard v. Hill*, 125 U.S. 190 (1880) ..................................................8, 18

*McLaughlin v. Florida*, 379 U.S. 184 (1964) ..................................................6, 8, 17

*Meyer v. Nebraska*, 262 U.S. 390 (1923) .............................................8, 17

*Miller-El v. Dretke*, 545 U.S. 231 (2005) ...................................................7

## TABLE OF AUTHORITIES—Continued

**Page**

*Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007)...................................................................................7

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973) ................................19

*Roe v. Wade*, 410 U.S. 113 (1973)............................................................19

*Skinner v. Oklahoma*, 316 U.S. 535 (1942) .............................................17

*Washington v. Davis*, 426 U.S. 229 (1976) ................................................6

*Zablocki v. Redhail*, 434 U.S. 374 (1978) ...........................................8, 19

### Decisions of United States Courts of Appeals

*Gill v. Office of Personnel Management*, 682 F. 3d 1 (1st Cir. 2012).....................28

*Windsor v. United States*, 699 F. 3d 169 (2d Cir., 2012).........................29

### Decisions of United States District Courts

*Jackson v. Abercrombie*, 2012 U.S. Dist. LEXIS 111376 (U.S. Dist. Haw., Aug. 8, 2012) ...........................................................................28, 31

*Sevcik v. Sandoval*, 2012 U.S. Dist. LEXIS 169643 (U.S.Dist. Nevada, Nov. 26, 2012) ...........................................................................xi, 28

*Wilson v. Ake*, 354 F.Supp.2d 1298 (M.D. Fla. 2005)..............................28

### Decisions of State Courts

*Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971), appeal dismissed for want of a substantial federal question, 409 U.S. 810 (1972)......................26

*Chambers v. Ormiston*, 935 A.2d 956 (R.I. 2007)....................................11

iv

## TABLE OF AUTHORITIES—Continued

**Page**

*Perez v. Sharp*, 32 Cal.2d 711, 198 P.2d 17 (Cal. 1948)....................................11, 12

### Other State Materials

HAW. REV. STAT. § 572-3 (1999)................................................................................11

NEW JERSEY STAT. ANN., §37:1-31.a.......................................................................11

New Mexico, ATTORNEY GENERAL'S OPINION LETTER, 2004 WL 2019901
(Feb. 20, 2004)...................................................................................................11

WISC. STAT. ANN., §765.01 (1993).........................................................................11

### Decision of a British Court

*In re G Children* (FC) [2006] UKHL 43, http://www.publications. parliament.uk/
pa/ld200506/ldjudgmt/jd060726/child-1.htm (last seen January 13, 2014).......16

### Miscellaneous Sources, Law Review and Journal Articles, Notes, Newspapers, Etc.

I WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *457...........16

139 CONG. REC. 13, 520 (1993) (statement of Senator Baucus quoting Colin
Powell, Chairman, Joint Chiefs of Staff).............................................................7

A. Dean Byrd, *Conjugal Marriage Fosters Healthy Human and Societal
Development*, in WHAT'S THE HARM?: DOES LEGALIZING SAME-SEX MARRIAGE
REALLY HARM INDIVIDUALS, FAMILIES OR SOCIETY? 3 (Lynn D. Wardle, ed.,
2008) ..................................................................................................................15

Cass R. Sunstein, *Homosexuality and the Constitution*, 70 IND. L.J. 1 (1994).........7

Charles Frank Robinson, DANGEROUS LIAISONS 29 (2006) ....................................10

## TABLE OF AUTHORITIES—Continued

**Page**

Cheryl Wetzstein, Maryland, Maine backs gay marriage in breakthrough votes, Wash. Times, Nov. 6, 2012, available at http://www.washingtontimes.com /news/2012/nov/6/gay-marriage-backers-seek-breakthrough-four-states /?page=all (last seen January 13, 2014).......................................................13, 14

EUROPEAN BIRTH RATES REACH HISTORIC LOW IN PART BECAUSE OF RECENT FALL IN EASTERN EUROPE, Sept. 8, 2006, available at www.medicalnewstoday.com /releases/51329.php (last seen January 13, 2014)................................................23

George W. Dent, Jr., *Straight Is Better: Why Law and Society May Legitimately Prefer Heterosexuality*, 15 TEX. REV. L. & POLITICS (2010), available at http://ssrn.com/abstract=1649574 (last seen January 13, 2014)........................15

George Weigel, THE CUBE AND THE CATHEDRAL: EUROPE, AMERICA AND POLITICS WITHOUT GOD (2005) ...........................................................................................23

Kristin Anderson Moore, Susan M. Jekielek & Carol Emig, "Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do About It?" 6 (Child Trends Research Brief, June, 2002), available at http://www.childtrends.org/wp-content/uploads/2002/06/MarriageRB602 .pdf (last seen January 13, 2014) ......................................................................15

Lynn D. Wardle & Lincoln C. Oliphant, *In Praise of* Loving*: Reflections on the "Loving Analogy" for Same-Sex Marriage*, 51 HOW. L. J. 1117 (2007).......... 8

Lynn D. Wardle, Loving v. Virginia *and The Constitutional Right to Marry, 1790-1990*, 41 HOW. L. J. 289 (1998) ................................................................20

Lynn D. Wardle, *Marriage and Religious Liberty: Comparative Law Problems and Conflict of Laws Solutions*, 12 J. L. & FAM. STUDS. 315 (2010) .......................13

Lynn D. Wardle, *Multiply and Replenish: Considering Same-Sex Marriage in Light of State Interests in Marital Procreation*, 24 HARV. J. L. & PUB. POLICY 771 (2001) ................................................................................................................23

## TABLE OF AUTHORITIES—Continued

**Page**

Lynn D. Wardle, *Section Three of the Defense of Marriage Act: Deciding, Democracy, and the Constitution*, 58 DRAKE L. REV. 951 (2010) .................... 13

Lynn D. Wardle, *Intergenerational Justice, Extended Redefined Families, and the Challenge of the Statist Paradigm*, 3 INT'L. J. JURIS. FAM. ___ (forthcoming, 2013), draft available at http://www.iasjf.org/journal/vol_3/wardleabstract.pdf (last seen January 13, 2014) .............................................................................. 15

Lynn D. Wardle, The Boundaries of Belonging: Allegiance, Purpose and the Definition of Marriage, 25 B.Y.U. J. Pub. L. 287 (2011) ................................. 24

*Minnesota's New Same-Sex Marriage Law*, Minn. Dep't Hu. Rts, available at http://mn.gov/mdhr/public_affairs/samesex_marriage.html (last viewed January 13, 2014) ................................................................................................... 3

Paul A. Lombardo, *Medicine, Eugenics, and the Supreme Court: From Coercive Sterilization to Reproductive Freedom*, 13 J. CONTEMP. HEALTH L. & POL'Y 1 (1996) ............................................................................................................ 10

Randy Beck, *The City of God and the Cities of Men: A Response to Jason Carter*, 41 GA. L. REV. 113 (2006) ............................................................................. 25

Robert A. Destro, *Introduction, 1998 Symposium: Law and the Politics of Marriage:* Loving v. Virginia *After 30 Years*, 47 CATH. U. L. REV. 1207 (1998) ..................................................................................................... 10-11

Robert A. Pratt, *Crossing the Color Line: A Historical Assessment and Personal Narrative of* Loving v. Virginia, 41 HOW. L.J. 229 (1998) ................................ 20

Stephen L. Carter, *"Defending" Marriage: A Modest Proposal,* 41 HOW. L.J. 215 (1997) ............................................................................................................ 8

Defining Marriage: Defense of Marriage Acts and Same-Sex Marriage Laws at National Conference of State Legislatures, available at http://snipurl.com/28fy7r7 (last seen January 13, 2014) .................................... 11

## STATEMENT OF INTEREST OF AMICI CURIAE[1, 2]

Founded in 1995 by its current president, Ms. Star Parker, **The Center for Urban Renewal and Education** (**CURE**), promotes traditional values, personal responsibility, limited government, and faith, all to address issues of race and poverty. **CURE** delivers its message both to political and thought leaders in Washington and to a national network of black pastors.

The **Frederick Douglass Foundation, Inc.** (**FDFI**) is a public policy and educational organization favoring limited government and the sanctity of the free market as the best tools to address the hardest problems facing our nation. **FDFI** consists of pro-active individuals committed to developing innovative approaches to today's problems with the help of elected officials, university scholars, and community activists.

The **Coalition of African American Pastors USA** (**CAAP**) is a grass-roots movement of tens of thousands of African-American Christians and clergy who believe in traditional family values such as, protecting the lives of the unborn and defending the sacred institution of marriage. CAAP encourages

---

[1] No party's counsel authored the brief in whole or in part, and no one other than the amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

[2] This brief is filed with consent of all parties; thus no motion for leave to file is required. *See* Notice of All Parties' Consent to Amicus Curiae Briefs, ECF No. 19; *see also* Fed. R. App. P. 29(a).

Christian people of all races and backgrounds everywhere to make a stand for their beliefs and convictions.

These three non-profit Amici state their interest in this case arises out of a need to voice the view that the civil rights of parties to same-sex relationships are *not* advanced by reliance on legal principles that otherwise have served to further the civil rights of African-Americans. These Amici believe the lower court's decision in *Sevcik v. Sandoval*, No 2:12-cv-00578-RCJ-PAL (D. Nevada Nov. 26, 2012), properly construes and properly applies legal principles enunciated in *Loving v. Virginia*, 388 U.S. 1 (1967), principles that have advanced African-American civil rights. These amici believe plaintiffs, in their "Plaintiffs-Appellants' Opening Brief" (Dkt. 20-3) misconstrues and misapplies *Loving*.

All parties have consented to the filing of this brief.

This brief does not necessarily reflect the views of the J. Reuben Clark Law School, Brigham Young University or its sponsoring organization.

Respectfully submitted this 21st day of January 2014.


 s/  Lynn D. Wardle          .          s/  Stephen Kent Ehat          .
Counsel of Record for Amici             Counsel of Record for Amici
**The Center for Urban Renewal and**    **The Center for Urban Renewal and**
**Education** (**CURE**), **Coalition of**   **Education** (**CURE**), **Coalition of**
**African American Pastors USA**        **African American Pastors USA**
(**CAAP**) and **The Frederick Douglass**   (**CAAP**) and **The Frederick Douglass**
**Foundation, Inc.** (**FDFI**)         **Foundation, Inc.** (**FDFI**)

ix

## SUMMARY OF ARGUMENT

As amici with an intimate perspective on African-American issues, we here discuss what we view as the proper role that should be played by *Loving v. Virginia*, 388 U.S. 1 (1967), in addressing the same-sex marriage question. To this end, we here make reference to two categories of relationships: (1) a gender-*inclusive* relationship and (2) a gender-*exclusive* relationship. A gender-*inclusive* relationship, by definition, includes both sexes, while a gender-*exclusive* relationship, by definition, excludes one of the sexes.

In *Loving*, the question of who may marry whom was answered by reference to the *race* of the parties to the relationship, race being a characteristic altogether extraneous to the nature and existence of the gender-*inclusive* relationship itself. Under the miscegenation statutes at risk of invalidation in *Loving*, one person could not marry another because of a characteristic (race) wholly <u>unrelated</u> to the definition of the gender-*inclusive* relationship. And once the miscegenation statutes were invalidated, the gender-*inclusive* relationship definition survived. Male-female interracial couples previously had been denied marriage prior to *Loving*; after *Loving*, male-female interracial couples could marry.

Here, by way of contrast, the question of who may marry whom is answered by reference to the *sex* of the parties to the relationship, a

1

characteristic altogether <u>central</u> to the nature and existence of the gender-inclusive relationship. Under the statutes at risk of invalidation here, one person cannot marry another because of a characteristic (gender) that is centrally related to the definition of the gender-inclusive relationship. If the one-man, one-woman statutes are here invalidated, the gender-inclusive relationship definition does not survive. Here the issue is the definition of marriage as a gender-integrating union, not (as in *Loving*) the race of the male-female parties.

In *Loving*, the invalidation of the miscegenation statutes left intact the gender-inclusive definition of marriage; here, the invalidation of one-man, one-woman legal provisions would not leave intact the gender-inclusive definition of marriage. *Loving* preserved the gender-inclusive definition of marriage. *Loving* does not at all provide authority or rationale for changing the definition of marriage from one that is a gender-inclusive institution to one that allows also for a gender-exclusive relationship. *Loving* is authority only for invalidation of legal provisions that considered as relevant a characteristic that actually was <u>unrelated</u> to the gender-inclusive relationship that defines marriage; *Loving* is not authority for the invalidation of legal provisions that consider to be relevant a characteristic <u>central</u> to the gender-inclusive relationship that defines marriage.

In *Loving* this Court vindicated the nation's commitment to the core principles of the Fourteenth Amendment—that all races are equal before the law and that the government may not distinguish between citizens on the basis of race, principles that hundreds of thousands of Americans died to establish. On the other hand, in seeking reversal of the district court's Order in the present case, plaintiffs argument that same-sex unions and male-female unions must be treated the same is not supported by the text of the Fourteenth Amendment, cannot be reconciled with its history and purposes, and has been rejected rather than accepted by national consensus.[1]

The opposite-sex requirement for marriage is closely bound to the institution's core purpose of increasing the likelihood children will be born to and raised by both mother and father. Racial restrictions on marriage not only failed to serve this purpose, they actually contradicted and undermined this objective.

---

[1] The equivalence of same-sex unions and male-female unions for marriage has been rejected (and constitutionally prohibited) by voters in 31 states. Lynn D. Wardle, *Involuntary Imports:* Williams, Lutwak, *the Defense of Marriage Act, Federalism, and "Thick" and "Thin" Conceptions of Marriage*, 81 FORDHAM L. REV. 771, 825 (App) (2012).) It has been narrowly approved in three states: Maine, Maryland and Washington. (Voters in a fourth state, Minnesota, rejected by a small margin, a proposed amendment to the state constitution that would have prohibited same-sex marriage. By statute Minnesota legalized same-sex marriage a few months later in May 2013. *Minnesota's New Same-Sex Marriage Law*, Minn. Dep't Hu. Rts, available at http://mn.gov/mdhr/public_affairs/samesex_marriage.html  (last viewed January 13, 2014).

The social impact of a Ninth Circuit decision mandating legalization of same-sex marriage in Nevada would be revolutionary. Two-thirds of all states today reject same-sex marriage and within the past fifteen years thirty-one states have adopted constitutional provisions protecting marriage as the union of a man and a woman. Unlike the opposite-sex requirement for marriage, racial restrictions on marriage have never been a universal, defining feature of marriage. When the constitution was adopted, interracial marriages were legal at common law in six of the thirteen original States, and even at the height of racism, many states never enacted anti-miscegenation laws. Imposing on marriage a new *definition* that rejects the majority view of marriage as the union of a man and a woman would be quite different from *Loving*'s having refused to allow the imposition on marriage of a minority view that marriage somehow allowed for racial restrictions.

Thus, it is not surprising that in 1967 the Supreme Court in *Loving* unanimously held that anti-miscegenation laws violated the fundamental right to marry and that only a few years later in *Baker v. Nelson*, 409 U.S. 810 (1972), the Court unanimously and summarily rejected the claim that the opposite-sex definition of marriage violated that right.

To redefine marriage and authorize same-sex marriages would profoundly alter the meaning of the institution which the Supreme Court

4

protected in *Loving*. Ironically, to "expand" marriage by making it "genderless" would diminish both the social benefits it provides and the contributions the Supreme Court of the United States celebrated when it invalidated Virginia's antimiscegenation law.

**ARGUMENT**

**I.**

**UNLIKE THE OPPOSITE-SEX DEFINITION OF MARRIAGE, RACIAL RESTRICTIONS ON MARRIAGE IMPLICATED THE FOURTEENTH AMENDMENT'S CORE CONCERN WITH ELIMINATING RACIAL DISCRIMINATION**

The decision of the United States District Court for the District of Nevada upholding provisions of the laws of the State of Nevada and refusing to mandate by judicial fiat the legalization of same-sex marriage in that state, is fundamentally consistent with the decision of the United States Supreme Court in *Loving v. Virginia*, 388 U.S. 1 (1967).

"[T]he historical fact [is] that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964). In *Loving* the High Court reiterated: "The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." 388 U.S. at 10. In *Loving* the Court concluded that the Virginia anti-miscegenation law was "designed to maintain White Supremacy." 388 U.S. at 11. Such racially discriminatory purpose triggers strict scrutiny, even if the law appears to be facially neutral. *See Washington v. Davis*, 426 U.S. 229, 241-242 (1976). "The striking reference [in *Loving*] to White Supremacy—by a unanimous Court, capitalizing both words,

6

and speaking in these terms for the only time in the nation's history,"[1] underscores the centrality of the *Loving* Court's concern about racial discrimination. *Loving* stands for the rejection of racial discrimination in marriage law (not for the judicial mandate of same-sex marriage). *See generally Bartlett v. Strickland*, 556 U.S. 1, 23-24 (2009); *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007); *Johnson v. California*, 545 U.S. 162, 170 (2005); *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Grutter v. Bollinger*, 539 U.S. 306 (2003).

Race is not the same as same-sex attraction. As General Colin Powell explained in testimony to Congress concerning gays in the military: "Skin color is a benign, non-behavioral characteristic; sexual orientation is perhaps the most profound of human behavioral characteristics. Comparison of the two is a convenient but invalid argument."[2]

---

[1] *See* Cass R. Sunstein, *Homosexuality and the Constitution*, 70 IND. L.J. 1, 17-18 (1994).

[2] 139 CONG. REC. 13, 520 (1993) (statement of Senator Baucus, quoting Colin Powell, Chairman, Joint Chiefs of Staff). Secretary Powell now "has no problem with" same-sex marriage. Laura E. Davis, *Colin Powell Expresses Support for Gay Marriage,* available at http://abcnews.go.com/Politics/OTUS/colin-powell-expresses-support-gay-marriage/story?id=16416112 (seen January 18, 2013).

Race is not fundamental to either marriage or procreation. *See Loving*, 388 U.S. at 11 ("There is patently no legitimate overriding purpose independent of invidious discrimination [for the anti-miscegenation law]."); *see also McLaughlin, supra*, 379 U.S. at 193 ("There is no suggestion that a white person and a Negro are any more likely habitually . . . than the white or the Negro couple . . . to engage in illicit intercourse . . . .")

This fundamental distinction lies at the heart of the point that Yale Law Professor Stephen L. Carter made on the thirtieth anniversary of *Loving*. He wrote: "One of the beauties of *Loving v. Virginia* was precisely that it was very easy to see how these were people trying to do a very *ordinary* thing, and got in trouble for it."[3] That distinguishes Loving from the position of advocates of same-sex marriage who are trying to do a very *extra*ordinary thing—to redefine the institution of marriage.[4]

Plaintiffs' attempt (Op. Br. at 31) to twist statements in *Loving*, *Zablocki*, *Maynard*, *Meyer*, *Griswold*, *Carey*, *Prince*, *Pierce*, and *Cleveland Board of Education,* as if they extend to gender-*exclusive* relationships, is unavailing.

---

[3] Stephen L. Carter, *"Defending" Marriage: A Modest Proposal*, 41 HOW. L. J. 215, 227 (1997) (emphasis added).

[4] Lynn D. Wardle & Lincoln C. Oliphant, In Praise of Loving: *Reflections on the* "Loving *Analogy" for Same-Sex Marriage*, 51 HOW. L. J. 117, 147 (2007). *See also* Stephen Carter, *supra* note 7.

## II.

### IN AMERICAN LEGAL HISTORY, RACIALLY SEGREGATED MARRIAGE IS NOT COMPARABLE TO SEXUALLY INTEGRATED MARRIAGE: CONSTITUTIONAL LAW WRIT LARGE

The effect of a decision in this court mandating a redefinition of marriage to include same-sex couples would be revolutionary and dramatically different from the effect of the decision in *Loving*. Unlike the opposite-sex requisite for marriage, racial restrictions on marriage never were a universal, defining feature of marriage.

For example, interracial marriage was legal at common law, and in six of the thirteen original States—Connecticut, New Hampshire, New Jersey, New York, Pennsylvania, and Rhode Island—at the time the U.S. Constitution was adopted. Five of these original States (all but Rhode Island), plus the next one to join the Union (Vermont, in 1791), never enacted anti-miscegenation laws. The same is true of several of the States subsequently admitted to the Union.[5]

Some States which did have anti-miscegenation statutes abandoned them in the wake of the adoption of the Fourteenth Amendment.[6] By the time *Loving*

---

[5] Wardle & Oliphant, *supra* note 8, at 165. *See also* Peter Wallenstein, TELL THE COURT I LOVE MY WIFE: RACE, MARRIAGE, AND LAW—AN AMERICAN HISTORY 253-54 (Appendix I) (2002). Wallenstein acknowledges his data differ in detail from others', but the historical picture is consistent.

[6] *See Hart v. Hoss & Elder*, 26 La. Ann. 90 (1874) (holding that the Civil Rights Act of 1866 invalidated anti-miscegenation law); *Burns v. State*, 48 Ala.

was decided in 1967, anti-miscegenation provisions were rapidly disappearing from state constitutions and statutes and remained in force in only sixteen states (all in a single region of the country). *See* 388 U.S. 1, 6 n. 5 (1967).[7]

The history of marriage in the constitutions and laws in America clearly demonstrates that the American people flatly reject any assertion that *racially segregated* marriage is somehow comparable to *sexually integrated* marriage of a man and a woman.[8] Of the thirteen states that have never adopted anti-

195, 198-199 (1872) (holding that the Fourteenth Amendment invalidated anti-miscegenation law); Charles Frank Robinson, DANGEROUS LIAISONS 29-30 (2006) (noting that in 1874 Arkansas omitted its anti-miscegenation law from its revised civil code; that in 1868 "South Carolina implicitly abrogated its intermarriage law by adopting a constitutional provision that 'distinctions on account of race or color in any case whatever, shall be prohibited, and all class of citizens shall enjoy all common, public, legal and political privileges'. . ."; that in 1871 Mississippi omitted its anti-miscegenation law from its revised civil code; and that in 1868 the Louisiana legislature repealed that state's anti-miscegenation law); Wardle & Oliphant, *supra* n. 8, at 180 (noting that the Illinois legislature repealed its anti-miscegenation law in 1874); Peter Wallenstein, *Law and the Boundaries of Place and Race in Interracial Marriage: Interstate Comity, Racial Identity, and Miscegenation Laws in North Carolina, South Carolina, and Virginia, 1860s- 1960s*, 32 AKRON L. REV. 557, 558 & 561 (1999) (noting that after 1868 South Carolina had a "temporary tolerance of interracial marriage" … that "attracted interracial couples from a … neighboring state … ").

[7] As the Supreme Court explained in *Loving*, fourteen States had repealed their bans on interracial marriage in the fifteen years leading up to the *Loving* decision. *Id.*

[8] Wardle & Oliphant, *supra* n. 8; *see also* Paul A. Lombardo, *Medicine, Eugenics, and the Supreme Court: From Coercive Sterilization to Reproductive Freedom*, 13 J. CONTEMP. HEALTH L. & POL'Y 1 (1996); Robert A. Destro

miscegenation laws, at least nine now protect man-woman marriage by statute.[9]

Four of the thirteen also protect man-woman marriage by voter-approved

constitutional amendment.[10]

Seven States once had anti-miscegenation laws but repealed them before

*Perez v. Sharp*, 32 Cal.2d 711, 198 P.2d 17 (Cal. 1948). Today, most of those

states expressly protect the institution of man-woman marriage, using statutes

or constitutional amendments or both.[11]

---

*Introduction, 1998 Symposium: Law and the Politics of Marriage:* Loving v. Virginia *After 30 Years*, 47 CATH. U. L. REV. 1207, 1220 (1998).

[9] *See, e.g.,* HAW. REV. STAT. § 572-3 (1999); Minnesota (1997); New Jersey Stat. Ann. §37:1-31.a (2006); New Mexico (opinion letter from the attorney general, 2004 WL 2019901 (Feb. 20, 2004)); Pennsylvania (1996); Washington (1998); Wisc. Stat. Ann. §765.01).  *See also infra* note 14 citing provisions of Georgia, North Carolina, South Carolina, and Virginia constitutions. *See* Defining Marriage: Defense of Marriage Acts and Same-Sex Marriage Laws at National Conference of State Legislatures, available at http://snipurl.com /28fy7r7 (last seen January 13, 2014) (presenting a summary that appears to be limited to states with a formal defense of marriage act; the list presented in this brief is not so limited.

[10] GEORGIA CONST., art. I, § IV (2004), NORTH CAROLINA CONST., art. 14, § 6 (2012); SOUTH CAROLINA CONST., art. XVII, § 15 (2006); and VIRGINIA. CONST., art. I, § 15-A (2006).

[11] *See* Illinois (statute, 1996); Michigan (statute in 1996 and constitutional amendment in 2004); Ohio (statute and constitutional amendment in 2004), and Rhode Island. *See Chambers v. Ormiston*, 935 A.2d 956, 962-65 (R.I. 2007)(interpreting the term "marriage" in R.I. G.L. 1956 § 8-10-3(a) as not including the relationship of a same-sex couple).

Fourteen States repealed their anti-miscegenation laws after *Perez* and before *Loving*. Today, thirteen of those States protect man-woman marriage, most of them with both statutes and constitutional amendments.[12]

An additional sixteen states protect man-woman marriage expressly. Fourteen of those States have constitutional provisions and statutory provisions,[13] and two have statutory provisions only.[14] Voters in thirty-one of the thirty-four States where the question of legalizing same-sex marriage has

---

[12] Arizona (statute 1996; constitutional amendment 1998); California (super-statute, enacted by the people in 2000: "Only marriage between a man and a woman is valid or recognized in California"), and CALIF. CONST. art. I. §7.5 (aka "Prop 8"); Colorado (statute 2000; amendment 2006); Idaho (statute 1996; amendment 2006); Indiana (statute 1997); Montana (statute 1997; amendment 2004); Nebraska (constitutional amendment 2000); Nevada (constitutional amendment 2000); North Dakota (statute 1997; amendment 2004); Oregon (constitutional amendment 2004); South Dakota (statute 1996; amendment 2006); Utah (statute 1995; amendment 2004); and Wyoming (statute 1957).

[13] Alabama (statute 1998; constitutional amendment 2006); Arkansas (statute 1997; amendment 2004); Florida (statute 1997; amendment 2008); Georgia (statute 1996; amendment 2004); Kentucky (statute 1998; amendment 2004); Louisiana (statute 199; amendment 2004); Mississippi (statute 1997; amendment 2004); Missouri (statute 1996; amendment 2004); North Carolina (statute 1996, constitutional amendment 2012); Oklahoma (statute 1996; amendment 2004); South Carolina (statute 1996; amendment 2006); Tennessee (statute 1996; amendment 2006); Texas (statute 2003; amendment 2005); and Virginia (statute 1997; amendment 2006).

[14] Delaware (1996) and West Virginia (2000).

been put to the citizens have unequivocally rejected same-sex marriage and declared that marriage is exclusively the union of a man and a woman.[15]

The American people in most states, including the people of Nevada, have rushed to defend the institution of sexually integrated, male-female marriage. The cumulative vote to ban same-sex marriage nationwide is well over 60%.[16] Of the twenty-eight States "voting blue" (for Obama) in the 2008 presidential election, twenty-three protected male-female marriage. Any claim that they are motivated by animus is merely a slander on the American people.

---

[15] Lynn D. Wardle, *Marriage and Religious Liberty: Comparative Law Problems and Conflict of Laws Solutions*, 12 J. L. & FAM. STUDS. 315, 367 (2010) (App. II) (listing 30 states where voters approved marriage amendments). One reaches the total of 31 by adding North Carolina, which adopted a state marriage amendment in May of 2012. Note, however, that in November of 2012 voters in Maine, Maryland and Washington approved the legalization of same-sex marriage and voters in Minnesota rejected a proposed state marriage amendment defining marriage as a gender-integrating union (though same-sex marriage was not approved and is still statutorily prohibited there). *See* Cheryl Wetzstein, Maryland, Maine backs gay marriage in breakthrough votes, Wash. Times, Nov. 6, 2012, available at http://www. washingtontimes.com/news/2012/nov/6/gay-marriage-backers-seek-break through-four-states/?page=all (last seen January 13, 2014). *See generally* Lynn D. Wardle, *Involuntary Imports: supra* note 4, at 825 (App).

[16] Alliance Alert, Marriage Amendment Vote Percentages: State by State, available at http://www.alliancealert.org/2011/08/24/ marriage-amendment-vote-percentages-state-by-state/ (last seen January 13, 2014) (showing over 66% vote in favor). *Compare* Lynn D. Wardle, *Section Three of the Defense of Marriage Act: Deciding, Democracy, and the Constitution*, 58 DRAKE L. REV. 951, 993 (App. I) (2010) (showing about 63%).

13

This broad movement to protect conjugal marriage helps identify the contours of equal protection, liberty, privacy, and due process in marriage law.

A similar pattern of rejecting same-sex marriage exists globally; only thirteen of 193 sovereign nations permit same-sex marriage,[17] and another eleven nations have created marriage-equivalent civil unions for same-sex couples; while nearly twice as many nations (at least 47) have constitutional provisions that appear to define marriage as the union of a man and a woman.)[18]

In *Lawrence v. Texas*, 539 U.S. 558, 568 et seq. (2003), the Supreme Court of the United States reviewed the history of the relevant laws and stated, "In all events we think that our laws and traditions in the past half century are of most relevance." *Id.* at 571-72. Let that same standard now be applied to the dual-gender marriage laws of Nevada (and nearly all other states), which indeed are ancient and venerable, and also fresh, vigorous, and comprehensive.

---

[17] Or fifteen, if South African "Civil Unions" are deemed "marriages" and the Brazil National Council of Justice dubious ruling has the effect to nationally legalize it. Also, same-sex marriage has been approved by parliament and probably will become legal in the U.K. in 2014.

[18] *See* Lynn D. Wardle, *Involuntary Imports: supra* note 4, at 825 (App). *See further* Cheryl Wetzstein, *Maryland, Maine back gay marriage in breakthrough votes*, Wash. Times, Nov. 6, 2012, available at http://www.washingtontimes.com/news/2012/nov/6/gay-marriage-backers-seek-breakthrough-four-states/ (seen January 11, 2012).

## III.

### THE GENDER-INTEGRATING DEFINITION OF MARRIAGE IS CLOSELY BOUND UP WITH THE INSTITUTION'S CORE PURPOSE OF INCREASING THE LIKELIHOOD THAT EACH CHILD WILL BE BORN TO AND RAISED BY BOTH THE MOTHER AND THE FATHER IN A STABLE, ENDURING FAMILY UNIT

The definition of marriage as the union of man and woman is essential to the core social purposes of marriage. Because men and women differ in significant ways relevant to the social purposes of marriage,[20] the integration of their complementary differences creates a unique relationship of unique value to society. This sexually integrated, complementary institution furthers social functions that are essential to the welfare of the family, the state, and its citizens, and particularly makes critical contributions to child welfare.[21]

---

[20] George W. Dent, Jr., *Straight Is Better: Why Law and Society May Legitimately Prefer Heterosexuality*, TEX. REV. L. & POLITICS (2010) at 17, available at http://ssrn.com/abstract=1649574 (last seen January 13, 2014), summarizing some gender differences.

[21] A. Dean Byrd, *Conjugal Marriage Fosters Healthy Human and Societal Development*, in WHAT'S THE HARM? 3, 5-9 (Lynn D. Wardle ed. 2008) (research shows that mothers and fathers have different, complementary parenting skills, each contributing in different ways to healthy child development). *See* Kristin Anderson Moore, Susan M. Jekielek & Carol Emig, "Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do About It?" 6 Child Trends Research Brief (June, 2002), available at http://www.childtrends.org/wp-content/uploads/2002/06/MarriageRB602.pdf (last seen January 13, 2014) ("the family structure that helps children the most is a family headed by two biological parents in a low-conflict marriage"). For other sources, *see* Lynn D. Wardle, *Intergenerational Justice, Extended Redefined Families, and the Challenge of the Statist Paradigm*, 3 Int'l. J. Juris. Fam. (forthcoming, 2013), draft available at at

Three of the important public purposes of marriage—to protect and promote the social interests in safe sex, responsible procreation, and optimal child rearing —are closely linked in our laws and social policies, just as they are closely linked in life. They are linked by human nature—"the ties of nature" as Blackstone put it.[22] Human nature, however, is imperfect, and those ties are imperfect ties, which is why society attempts to reinforce them through marriage law.

Both textually and structurally, this Court's precedent repeatedly and clearly links marriage with gender-integration, and especially to society's interest in the institution that fosters responsible sexuality, procreation, and child rearing. *Loving* concerned a law which obstructed a classic example of the sort of relationship which sustains that linkage. Invocation of *Loving* to attempt to justify judicially-mandated same-sex marriage would be both ironic and futile.

---

http://www.iasjf.org/journal/vol_3/wardleabstract.pdf  (last seen January 13, 2014).

[22] I WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *458. *See also In re G Children* (FC) [2006] UKHL 43 at ¶¶ 33-35, available at http://www.publications.parliament.uk/pa/ld200506/ldjudgmt/jd060726/child-1.htm (last see on January 13, 2014), discussing benefits of genetic and gestational parenthood.

16

In *Loving*, this Court cited four prior Supreme Court decisions dealing with or discussing marriage, and all of them noted or involved some aspect of the role of marriage in furthering state interests in responsible sexuality, procreation or child rearing:

*Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) involved an appeal of the conviction of a private parochial school teacher, acting as the educational agent of the parents, for teaching in the German language. This Court declared that the "liberty" protected by the Fourteenth Amendment includes "the right of the individual . . . *to marry, establish a home and bring up children* . . . ." (emphasis added).

*Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), involved a challenge to a criminal sterilization act. This Court declared: "*Marriage and procreation are fundamental to the very existence and survival of the race*" (emphasis added).

*McLaughlin v. Florida*, 379 U.S. 184 (1964), was an appeal from a conviction for violation of a state's criminal interracial cohabitation law. This Court noted: "[W]e see no reason to quarrel with the State's characterization of this statute, dealing as it does with *illicit extramarital and premarital promiscuity*" (emphasis added). Florida invoked its law against interracial marriage, arguing that just as it was presumably constitutional, so also was the challenged law against interracial cohabitation constitutional. But this Court

rejected that analogy "without reaching the question of the validity of the State's prohibition against interracial marriage or the soundness of the arguments rooted in the history of the Amendment," *id.*, because race-neutral laws prohibiting cohabitation adequately "*protect the integrity of the marriage laws* of the State."

Finally, *Maynard v. Hill*, 125 U.S. 190, 205 (1880) involved a claim to homestead land by the *children of a marriage* that had been dissolved *ex parte* by legislative act of the territorial legislature during pendency of homestead settlement and claim, while the unsuspecting wife and children had been left in a distant state. This Court described "[m]arriage, as creating *the most important relation in life, as having more to do with the morals and civilization of a people than any other institution* . . . ." Moreover, it declared that marriage "is an institution, in the maintenance of which in its purity the public is deeply interested, for *it is the foundation of the family and of society*, without which there would be neither civilization nor progress." *Id.* at 209-210 (all emphases added).

Numerous other decisions by the Supreme Court of the United States link protection of marriage to its role as the institutional regulator of, and environment for, the safest male-female sexual intimacy, procreation and child rearing. *See Griswold v. Connecticut*, 381 U.S. 479, 495 (1965) (Goldberg,

concurring) ("The entire fabric of the Constitution and the purposes that clearly underlie its specific guarantees demonstrate that the rights to marital privacy and to marry and raise a family are of similar order and magnitude as the fundamental rights specifically protected."); *Loving*, 388 U.S. at 12 ("Marriage is . . . fundamental to our very existence and survival."); *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971) ("As this Court on more than one occasion has recognized, marriage involves interests of basic importance in our society."); *id.* at 389-90 (Black, J., dissenting) ("The institution of marriage is of peculiar importance to the people of the States. It is within the States that they live and vote and rear their children. . . ."); *Roe v. Wade*, 410 U.S. 113, 152-53 (1973) (the constitutional right of privacy "has some extension to activities relating to marriage . . . [i.e.,] procreation, . . . contraception, child rearing . . . ."); *Zablocki v. Redhail*, 434 U.S. 374, 386 (1978) ("It is not surprising that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships. As the facts of this case illustrate, it would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society. . . . Surely, a decision to marry and raise the child in a traditional family setting must receive equivalent protection.") *See also Paris Adult Theatre I v. Slaton*,

413 U.S. 49, 65 (linking as fundament rights protected by "privacy" "the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing"); *Carey v. Populations Services International*, 431 U.S. 678, 685 (1977) (constitutionally protected "decisions that an individual may make without unjustified government interference are personal decisions 'relating to marriage, . . . procreation, . . . contraception, . . . family relationships, . . . and child rearing and education . . . .'"). Indeed, in all of the Supreme Court decisions about constitutional marriage, "the right to marry is directly linked with responsible procreation and child rearing."[23] All of these High Court statements were made within the unquestioned context of marriage as a gender inclusive institution.

The very facts of *Loving* underscore the connection of marriage to procreation and child rearing. Richard and Mildred Loving had three children; yet Richard could only visit his wife and act as a parent to his and Mildred's biological children in Virginia under cover of darkness because of Virginia's anti-miscegenation law.[24] The Lovings treasured their children.[25] In no small

---

[23] Lynn D. Wardle, Loving v. Virginia *and The Constitutional Right to Marry*, 1790-1990, 41 HOW. L. J. 289, 338 (1998).

[24] Robert A. Pratt, *Crossing the Color Line: A Historical Assessment and Personal Narrative of* Loving v. Virginia, 41 HOW. L.J. 229, 229-30 (1998).

part, the Lovings challenged the Virginia anti-miscegenation law for the sake of their children. After their conviction for violating the Virginia anti-miscegenation law, they were forced to move to the District of Columbia, but as a family from rural Virginia, they were never happy there. As Mildred Loving said: "I wanted my children to grow up in the country, where they could run and play, and where I wouldn't worry about them so much."[26] So to overturn the law that prevented her family from living together in rural Virginia, she wrote a letter to U.S. Attorney General Robert Kennedy, whose office referred it to the ACLU, which referred it to two young Virginia lawyers, Bernard S. Cohen and Philip J. Hirschkop, who filed the case that became legal history.

In stark contrast to the impact of *Loving*, it is not at all yet clear whether the social impact of  legalizing same-sex marriage will or will not diminish the well-being of children generally.[27] Of course, same-sex couples are incapable of

---

[25] *Id.* at 243 ("The first thing that one notices upon entering Mildred Loving's home are the pictures of her children and grandchildren that adorn her walls"); *id*. at 244 ("She is proud of her children and is delighted that they all live close by").

[26] *Id*. at 237.

[27] The impact upon children of being raised in various family environments is highly controversial and sharply contested, for obvious reasons. Those social science disputes should be debated by those skilled in the disciplines and the policy issues should be decided by the elected representatives of the people in the legislatures. Those matters are neither before the Court now nor appropriate for judicial resolution.

procreation. Conferring the status of marriage on same-sex couples will send a clear social and legal message further disconnecting marriage from child rearing.

## IV.

### THE DUAL-GENDER REQUIREMENT FOR MARRIAGE SUBSTANTIALLY ADVANCES THE STATE'S INTEREST IN LINKING RESPONSIBLE PROCREATION, ADVANTAGEOUS CHILDBIRTH AND OPTIMAL CHILD REARING

Unlike in *Loving,* where there was *no* justification for Virginia's anti-miscegenation laws, here there are *very compelling* justifications for male-female marriage. Unlike Virginia's racist and irrelevant-to-marriage attempted justifications for the anti-miscegenation law invalidated in *Loving*, Nevada has profound, real, justifiable, and justified interests in protecting and preserving dual-gender marriage. Society generally has a compelling interest in preserving the institution that best advances the social interests in responsible procreation and that connects procreation to responsible child rearing. Gender-integrating marriage best promotes state interests in linking responsible procreation with child rearing, in connecting parents to offspring, in perpetuating the human race and survival of the species, and in furthering public health and child welfare.

Gender-integrating marriage promotes childbirth and thus the perpetuation of the species. This is a matter of special concern at present, since few developed nations in the world today have replacement birthrates (the U.S.

22

is one—barely—and its birthrate has recently been falling). In Europe, a

"demographic winter" is quickly descending: a phenomenon which British

historian Niall Ferguson calls "the greatest sustained reduction in European

population since the Black Death of the 14th Century."[29]

> Indeed, implicit in the very word matrimony is the idea that a man
> and a woman unite in legal marriage, in matrimonium ducere, so
> that they may have children. Plato proposed that "marriage laws
> [be] first laid down" and that "a penalty of fines and dishonor" be
> imposed upon all who did not marry by certain ages because
> "intercourse and partnership between married spouses [is] the
> original cause of childbirths." Likewise, Aristotle recommended
> that marriage regulations would be the first type of legislation
> "[s]ince the legislator should begin by considering how the frames
> of the children whom he is rearing may be as good as possible
> ...."[30]

---

[29] Niall Ferguson, "Eurabia?", N.Y. Times Magazine, April 4, 2004, available at http://www.nytimes.com/2004/04/04/magazine/04WWL N .html (seen December 26, 2012). The Organization for Economic Cooperation and Development reports that none of the nations of Europe can maintain their population (necessary for economic sustainability) through births, that only France, (with a birth rate of 1.8) has the possibility to do so; and that the fall in fertility in Eastern Europe has been precipitous. EUROPEAN BIRTH RATES REACH HISTORIC LOW IN PART BECAUSE OF RECENT FALL IN EASTERN EUROPE, Sept. 8, 2006, ¶1, available at www.medicalnewstoday.com/releases/51329.php (last seen on January 13, 2014). In fifteen European nations the rate of fertility is 1.3 or below, and a birthrate of 1.4 or 1.5 means that the population will decrease by one-third each generation; in some European nations births are down to about one-half  the replacement level (of 2.1 births per couple). *Id. See further* George Weigel, THE CUBE AND THE CATHEDRAL: EUROPE, AMERICA AND POLITICS WITHOUT GOD 21 (2005).

[30] Lynn D. Wardle, *"Multiply and Replenish": Considering Same-Sex Marriage in Light of State Interests in Marital Procreation*, 24 HARV. J. L. & PUB. POLICY 771, 784-5 (2001). *Id.* at 785 ("Procreation is the social interest underlying Rousseau's declaration that: 'Marriage ... being a civil contract, has civil

Marriage between mother and father strengthens the bond of parents to their offspring. "Same-sex marriage puts in jeopardy the rights of children to know and experience their genetic heritage in their lives and withdraws society's recognition of its importance to them, their wider family, and society itself."[31] Gender-integrating marriage enhances the "belonging" in marriage which benefits not only the married couple but their children.[32]

## V.

### A KEY PURPOSE OF LOVING WAS TO DISENTANGLE MARRIAGE FROM BEING RESTRAINTS IMPOSED BY PERSONS PURSUING POLICIES EXTRANEOUS TO MARRIAGE

When *Loving* was decided, only six states had anti-miscegenation provisions in their constitutions and no state in the Union had enacted such a law since 1913. Those race-based marriage laws were "designed to maintain White Supremacy," *id.* at 11, and, as this Court held, they were an affront to the Fourteenth Amendment. "The clear and central purpose of the Fourteenth

---

consequences without which it would be impossible for society itself to subsist.' Locke agreed, and linked 'the increase of Mankind, and the continuation of the Species in the highest perfection,' with 'the security of the Marriage Bed, as necessary thereunto.'").

[31] Dent, *supra* note 24 at p. 11 (quoting Professor Margaret Somerville).

[32] Lynn D. Wardle, *The Boundaries of Belonging: Allegiance, Purpose and the Definition of Marriage*, 25 B.Y.U. J. Pub. L. 287, 289-90 (2011).

Amendment," this Court wrote in *Loving*, "was to eliminate all official state sources of invidious racial discrimination in the States." *Id.* at 10.

Racial eugenicists in Virginia used anti-miscegenation provisions to commandeer marriage, to enslave that social institution—one otherwise unrelated to racism—and to put it into "forced labor" in order to promote the social reform ideology and policy goals of White Supremacy. *See Loving*, 388 U.S. at 6, 11. White Supremacists redefined marriage (as it had been known at common law and globally for millennia) for the purpose of promoting an extraneous social policy. The Virginia anti-miscegenation law struck down by the Court in *Loving* was part of a set of laws designed to prevent procreation of mixed race children. The spread of anti-miscegenation laws

> coincided with the growth and spread of Darwinian theories of evolution, including the related eugenic notion that different races manifested different levels of evolutionary development, creating a natural order or hierarchy of the races. Thus, Eugenics purported to provide a "scientific" basis for racial and social hierarchy, and influenced immigration law, sterilization law, as well as marriage law. In fact, the Virginia antimiscegenation law that was invalidated in *Loving* was passed in 1924 as part of a comprehensive scheme of eugenic regulation that also included the involuntary sterilization law that was upheld in *Buck v. Bell* [274 U.S. 200 (1927)] by Justice Holmes' infamous dictum that "three generations of imbeciles is enough." [33]

---

[33] Randy Beck, *The City of God and the Cities of Men: A Response to Jason Carter*, 41 GA. L. REV. 113, 148 n. 154 (2006).

The rationale of *Loving* does not support the judicial imposition of a new definition of marriage to include same-sex relationships because recognition of those relationships as marriages advances social policies extraneous to and different from the core purposes of marriage. *Loving* was about racism. *Fisher v. Univ. of Texas*, 133 S.Ct. 2411, 2419 (2013).

*Loving* can be distinguished from the current dispute over same-sex marriage. Laws against miscegenation were designed to segregate the races, reinforcing the socially disadvantaged position of African-Americans. *Loving*, 388 U.S. at 11 (stating that laws were "designed to maintain White Supremacy"). By contrast, the traditional definition of marriage calls for mixing of the genders—integration not segregation—and therefore cannot be understood as an attempt to disadvantage either gender.

## VI.

### JUST FIVE YEARS AFTER DECIDING *LOVING* THIS COURT IN *BAKER V. NELSON* REJECTED THE CLAIM THAT STATE LAW ALLOWING ONLY DUAL-GENDER MARRIAGE VIOLATED LOVING; *BAKER* IS GOOD LAW, BINDING PRECEDENT AND OUGHT TO BE FOLLOWED

The Supreme Court of the United States was unanimous when it decided *Loving* in 1967 and it was similarly unanimous when it dismissed Baker's claim of same-sex marriage in the 1972 case of *Baker v. Nelson*, 409 U.S. 810 (1972), dismissing for want of a substantial federal question the appeal in *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971). The constitutional principles that led

this Court to strike down Virginia's anti-miscegenation laws in *Loving*—the primary one being the Fourteenth Amendment's ban on racial discrimination— are not at work in this present case.

Plaintiffs' attempt to brush aside the Supreme Court's decision in *Baker v. Nelson* (Op. Br. at pp. 95-97) is transparently unjustifiable. The central issues in the present case, as identified by plaintiffs themselves in seeking review, are as follows: (1) whether the district court erred in holding that federal due process guarantees do not secure the freedom to marry for same-sex couples in Nevada, or require that their valid marriages from other jurisdictions be recognized as marriages in Nevada; (2) whether the district court erred in rejecting Plaintiffs' claim that excluding same-sex couples from marriage in Nevada, or from having their valid marriages from other jurisdictions recognized as marriages in Nevada, violates the federal right to equal protection regardless of one's sexual orientation; and (3) whether the district court erred in rejecting Plaintiffs' claim that excluding same-sex couples from marriage in Nevada, or from having their valid marriages from other jurisdictions recognized as marriages in Nevada, violates the federal right to equal protection regardless of one's sex. Plaintiffs seek (Op. Br. at pp. 95-97) to brush aside *Baker* on the thin premise that a statement by one justice during oral argument in the *Hollingsworth v. Perry* case—Tr. of Oral Arg. at 12, Hollingsworth v.

27

Perry, 133 S. Ct. 2652 (2013) (No. 12-144), 2013 U.S. Trans. LEXIS 40, at

*10)—somehow "extinguished" any "lingering shadow" left by *Baker*,

notwithstanding the High Court in *Hollingsworth* produced no opinion on the

merits concerning the issue whether the Constitution of the United States

mandates that States validate and recognize as a marriage the union of persons

of the same sex.

     No Supreme Court case has supplanted or even modified the result in

*Baker v. Nelson*. That case remains conclusive on the subject of same-sex

"marriage" under the U.S. Constitution. A number of lower-court decisions

analyze the precedential effect of *Baker. See, e.g., Wilson v. Ake*, 354 F. Supp.

2d 1298, 1305 (court sees no "reason to believe that the [*Baker*] holding is

invalid today"); *Gill v. Office of Personnel Management,* 682 F. 3d 1 (1st Cir.

2012) (*Baker* "is precedent binding on us" and "limit[s] the arguments to ones

that do not presume or rest on a constitutional right to same-sex marriage.");

*Jackson v. Abercrombie,* 2012 U.S. Dist. LEXIS 111376, *44-*55 (U.S. Dist.

Haw., Aug. 8, 2012) (*Baker* "necessarily decided that a state law defining

marriage as a union between a man and woman does not violate the Equal

Protection Clause"; "[t]he issue did not merely 'lurk in the record,' but was

directly before the Supreme Court"; "*Baker* is the last word from the Supreme

Court regarding the constitutionality of a state law limiting marriage to

opposite-sex couples and thus remains binding on this Court"); *Sevcik v. Sandoval,* 2012 U.S. Dist. LEXIS 169643, *15-*20 (U.S.Dist. Nevada, Nov. 26, 2012) ("*Baker* controls the present case, unless the specific challenge presented in this case was not decided by the Minnesota Supreme Court"). *But see Windsor v. United States,* 699 F. 3d 169, 176 & 178-179 (2d Cir., 2012) ("Windsor's suit is not foreclosed by *Baker*"). Insofar as any subsequent case raises the same issues—as this case does—the Supreme Court of the United States  already has spoken, and at least the lower courts are bound by its determination.

Although (at Op. Br. at p. 96) plaintiffs attempt to interpose the "doctrinal developments" exception to the otherwise applicable precedential effect of the High Court's *Baker* decision, they thus clearly confuse *doctrinal* developments with attempted *definitional* tinkering with what a marriage is. As shown in earlier sections of this brief, no *doctrines* regarding the institution of marriage have been changed since *Baker*; rather, only attempts to expand the *definition* of marriage beyond its breaking point have been introduced (mostly in the courts, and mostly having been rejected by the people and their elected representatives).

# VII.

## CONCLUSION: LOVING COMPELS REVERSAL

Wherefore, these amici respectfully submit that the decision of the United States District Court for the District of Nevada upholding provisions of the laws of the State of Nevada and refusing to mandate by judicial fiat the legalization of same-sex marriage in that state, is fundamentally consistent with if not compelled by the decision of the United States Supreme Court in *Loving v. Virginia*, 388 U.S. 1 (1967). This court should affirm the district court.

Respectfully submitted this 21st day of January 2014.


s/ Lynn D. Wardle            .
Counsel of Record for Amici
**The Center for Urban Renewal and Education** (**CURE**), **Coalition of African American Pastors USA (CAAP)** and **The Frederick Douglass Foundation, Inc.** (**FDFI**)

s/ Stephen Kent Ehat            .
Counsel of Record for Amici
**The Center for Urban Renewal and Education** (**CURE**), **Coalition of African American Pastors USA (CAAP)** and **The Frederick Douglass Foundation, Inc.** (**FDFI**)

## STATEMENT OF RELATED CASE

Pursuant to Ninth Circuit Rule 28-2.6, Amici **The Coalition of African American Pastors USA** (**CAAP**), **The Center for Urban Renewal and Education** (**CURE**) and **The Frederick Douglass Foundation, Inc.** (**FDFI**) certify that there is a related appeal pending in this court, *Jackson, et al. v. Ambercrombie*, Nos. 12-16995 and 12-16998 (9th Cir. filed September 7, 2012), which case arises out of a federal district court in Hawaii.

Dated: January 21, 2014

s/  Lynn D. Wardle                    .
Counsel of Record for Amici
**The Center for Urban Renewal and Education** (**CURE**), **Coalition of African American Pastors USA (CAAP)** and **The Frederick Douglass Foundation, Inc.** (**FDFI**)

s/  Stephen Kent Ehat                    .
Counsel of Record for Amici
**The Center for Urban Renewal and Education** (**CURE**), **Coalition of African American Pastors USA (CAAP)** and **The Frederick Douglass Foundation, Inc.** (**FDFI**)

31

**FORM 6.    CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ■    this brief contains 6,965 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    ☐    this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ■    this brief has been prepared in a proportionally spaced typeface using  the Microsoft Word word processing program and the Times New Roman 14 point font, or

    ☐    this brief has been prepared in a monospaced spaced typeface using (state name and version of word processing program) _____ with (state number of characters per inch and name of type  style) _____.

Signature:          s/ Stephen Kent Ehat

Attorney for:      Amici Curiae **The Coalition of African American Pastors USA, The Frederick Douglass Foundation, Inc.** and **The Center for Urban Renewal and Education**

Date:               January 21, 2014

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of January 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

    s/  Stephen Kent Ehat    .
Counsel of Record for Amici
**The Center for Urban Renewal and Education** (**CURE**),
**Coalition of African American Pastors USA (CAAP)** and **The Frederick Douglass Foundation, Inc.** (**FDFI**)