APPEAL NO. 12-17668

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

BEVERLY SEVCIK, et al.

*Plaintiffs-Appellants*,

v.

BRIAN SANDOVAL, et al.

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the District of Nevada
Civil Case No. 2:12-cv-00578-RCJ-PAL (Judge Robert C. Jones)

_____

**BRIEF OF AMICUS CURIAE MARRIAGE LAW FOUNDATION IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE**

_____

William C. Duncan
MARRIAGE LAW FOUNDATION
1868 N 800 E
Lehi, Utah, 84043
Tel:     (801) 367-4570
Email: duncanw@marriagelawfoundation.org

*Attorney for Marriage Law Foundation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, the undersigned states that the amicus is not a corporation that issues stock or has a parent corporation that issues stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................... i

Interest of Amicus Curiae ........................................................................... 1

Argument ................................................................................................... 1

I.     THE HISTORY AND TRADITION OF MARRIAGE CONSTRAIN THE COURT'S ANALYSIS UNDER THE FOURTEENTH AMENDMENT. ................................................................................. 1

II.    IN RETAINING THE DEFINITION OF MARRIAGE SHARED BY NEARLY ALL CULTURES THROUGH TIME, THE PEOPLE OF NEVADA WERE ACTING REASONABLY TO ADVANCE THE INTERESTS MARRIAGE HAS ALWAYS SERVED. ............................... 3

       A.    Reflecting Biological and Social Realities, Marriage Has Widely Been Understood To Be the Union of a Man and a Woman and to Serve, Among Other Purposes, Interests Related to Procreation ................................................................................. 4

       B.    The Marriage Laws of the United States and their Close Antecedents Have Consistently Recognized the Realities Underlying the Institution of Marriage. ................................. 9

III.   HISTORICAL EVIDENCE MAKES CLEAR THAT ATTEMPTS TO DOWNPLAY THE SIGNIFICANCE OF THE STATE INTERESTS IN MARRIAGE RELATED TO PROCREATION ARE MISGUIDED. ................................................................................. 18

Conclusion ............................................................................................... 27

Certificate of Compliance with RuleS 29-2(**d**) and 32(**a**)(7)(B) ............................. 29

Certificate of Service ................................................................................. 30

# Table of Authorities

**Cases**

*Adams v. Howerton*, 486 F.Supp. 1119, 1124-1125 (C.D. Cal. 1980)....................23

*Andersen v. King County*, 138 P.3d 963, 978 (Wash. 2006) ...................................17

*Baker v. Baker*, 13 Cal. 87, 103 (1859) ...................................................................15

*Baker v. Nelson*, 409 U.S. 810 (1972) .....................................................................19

*Conaway v. Deane*, 932 A.2d 571, 621 (Md. 2007)........................................ 17, 25

*County of Sacramento v. Lewis*, 523 U.S. 833, 857 (1998)......................................2

*DeBurgh v. DeBurgh*, 250 P.2d 598, 601 (Cal. 1952)............................................16

*Gard v. Gard*, 169 N.W. 908, 912 (Mich. 1918)....................................................16

*Goodridge v. Department of Public Health*, 798 N.E.2d 941, 995 (Mass. 2003)...22

*Goodridge v. Department of Public Health*, 798 N.E.2d 941, 996 (Mass. 2003)....3, 26

*Griswold v. Connecticut*, 381 U.S. 479, 501 (1965)..................................................3

*Grover v. Zook*, 87 P. 638, 639 (Wash. 1906) ........................................................16

*Hernandez v. Robles*, 855 N.E.2d 1, 8 (N.Y. 2006) ...........................................4, 24

*Heup v. Heup*, 172 N.W.2d 334, 336 (Wis. 1969) ..................................................16

*In re Marriage of Ramirez*, 81 Cal Rptr. 3d 180, 184-185 (Cal. Ct. App. 2008)....16

*Lawrence v. Texas*, 539 U.S. 558, 575 (2003)...........................................................2

*Loving v. Virginia*, 388 U.S. 1, 12 (1967) ..............................................................16

*Maynard v. Hill*, 125 U.S. 190, 211 (1888) ...................................................... 15, 17

*Morrison v. Sadler*, 821 N.E2d 15, 24-25 (Ind. App. 2005) ...................................23

*Murphy v. Ramsey*, 114 U.S. 15, 45 (1885)............................................................15

*Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 746 (2007). .......................................................................................................2

*Poe v. Gerstein*, 517 F.2d 787, 796 (5th Cir. 1975) ................................................16

*Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) ....................................................16

*Standhardt v. Superior Court*, 77 P.3d 451, 462-463 (Ariz. App. 2003) ...............23

*Stegienko v. Stegienko*, 295 N.W. 252, 254 (Mich. 1940)......................................16

*Washington v. Glucksberg*, 521 U.S. 702, 710 (1997) .............................................1

*Wendel v. Wendel*, 30 A.D. 447, 449 (N.Y. App. 1898) .........................................22

*Zoglio v. Zoglio*, 157 A.2d 627, 628 (D.C. App. 1960)...........................................16

**Other Authorities**

ANTHROPOLOGICAL INSTITUTE OF GREAT BRITAIN, NOTES AND QUERIES ON ANTHROPOLOGY 71 (6th ed. 1951) .......................................................................7

BERTRAND RUSSELL, MARRIAGE AND MORALS 77, 156 (1929)................................7

BRONISLAW MALINOWSKI, SEX, CULTURE AND MYTH 11 (1962)............................7

C. Owen Lovejoy, *The Origin of Man* 211 SCIENCE 341, 348 (Jan. 23, 1981)........8

Charles J. Reid, *Marriage in Its Procreative Dimension: The Meaning of the Institution of Marriage Throughout the Ages* 6 U. St. Thomas L. J. 454, 455 (2009) ...................................................................................................... 10, 11

Claude Levi-Strauss, *Introduction* in A History of the Family: Distant Worlds, Ancient Worlds 5 (vol. 1, Andre Burguiere, et al., eds. 1996) .......................... 5

Claude Levi-Strauss, The View from Afar 40-41 (1985) ................................... 6

David Hume, An Enquiry Concerning the Principles of Morals 65 (1751)..13

Edward Westermarck, The Future of Marriage in Western Civilization 5 (1936) .................................................................................................................. 8

Frank H. Keezer, A Treatise on the Law of Marriage and Divorce §55 (1923) .......................................................................................................................... 15

G. Robina Quale, A History of Marriage Systems 2 (1988) ............................. 7

Georg Simmel, The Sociology of Georg Simmel 131 (Kurt H. Wolff, ed. 1950) .......................................................................................................................... 5

Haishan Fu, et al., *Contraceptive Failure Rates: New Estimates from the 1995 National Survey of Family Growth* 31 Family Planning Perspectives 55, 56 (1999) .................................................................................................................. 23

Henri de Bracton, 2 On the Laws and Customs of England 27 (Samuel E. Thorne, transl. 1968). ......................................................................................... 11

Irving G. Tragen, *Statutory Prohibitions Against Interracial Marriage*, 32 CAL. L. REV. 269, 269 & n.2 (1944)................................................................18

James Dalrymple, Viscount Stair, *The Institutions of the Law of Scotland* (1681).13

JAMES KENT, 2 COMMENTARIES ON AMERICAN LAW 76 (3d ed. 1838) ...................14

JAMES Q. WILSON, THE MARRIAGE PROBLEM 41 (2003) ...........................................6

JAMES SCHOULER, LAW OF THE DOMESTIC RELATIONS §235 (1905) ......................14

James Trosino, Note, *American Wedding: Same-Sex Marriage and the Miscegenation Analogy* 73 B.U. L. REV. 93, 98 (1993) ......................................19

James Trussel & Barbara Vaughn, *Contraceptive Failure, Method-Related Discontinuation and Resumption of Use: Results from the 1995 National Survey of Family Growth* 31 FAMILY PLANNING PERSPECTIVES 64, 71 (1999)...............23

Jill Elaine Hasday, *Federalism and the Family Reconstructed* 45 UCLA L. REV. 1297, 1345 n. 172 (1998) ....................................................................................19

JOEL PRENTISS BISHOP, COMMENTARIES ON THE LAW OF MARRIAGE & DIVORCE §225 (1st ed. 1852)................................................................... 14, 19, 20, 21

JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 113-114 (1851) .........................14

JOHN LOCKE, SECOND TREATISE OF CIVIL GOVERNMENT §§78-79 (1690) ..............12

JOHN WITTE JR., FROM SACRAMENT TO CONTRACT: MARRIAGE, RELIGION, AND LAW IN THE WESTERN TRADITION 17 (2d ed. 2012)..................................................9, 12

John Witte, Jr., *Propter Honoris Respectum: The Goods and Goals of Marriage* 76 NOTRE DAME L. REV. 1019, 1035 (2001) ............................................................25

JOSEPH STORY, COMMENTARIES ON THE CONFLICTS OF LAWS 168 (1834) ....... 14, 20

Joyce C. Abma, et al., *Fertility, Family Planning, and Women's Health: New Data from the 1995 National Survey of Family Growth* 23 VITAL HEALTH STATISTICS 28, table 17 (1997) ...............................................................................................23

Kingsley Davis, *The Meaning & Significance of Marriage in Contemporary Society* in CONTEMPORARY MARRIAGE: PERSPECTIVES ON A CHANGING INSTITUTION 7-8 (Kingsley Davis, ed. 1985) .....................................................................................6

Laurence Drew Borten, *Sex, Procreation, and the State Interest in Marriage* 102 COLUM. L. REV. 1089, 1114-15 (2002)................................................................26

Lynn Wardle & Lincoln C. Oliphant, *In Praise of Loving: Reflections on the 'Loving Analogy' for Same-Sex Marriage*, 51 HOW. L.J. 117, 180-81 (2007) .................19

Musonius Rufus, *Fragment 13A, What is the Chief End of Marriage?* in MUSONIUS RUFUS: THE ROMAN SOCRATES 89 (Cora E. Lutz, ed. & trans. 1947).................10

NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1828) .....................................................................................................................13

Peter Wallenstein, *Race, Marriage, and the Law of Freedom: Alabama and Virginia, 1860s-1960s* 70 CHI.-KENT L. REV. 371, 372 (1994)..........................................19

Robert Kovach, Note, *Miscegenation Statutes and the Fourteenth Amendment* 1 CASE W. RES. L. REV. 89 (1949)..........................................................................18

Ronald S. Immerman & Wade C. Mackey, *Perspectives on Human Attachment (Pair Bonding): Eve's Unique Legacy of a Canine Analogue* 1 EVOLUTIONARY PSYCHOLOGY 138, 146 (2003) ............................................................................8

SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1755).................13

Stanley K. Henshaw, *Unintended Pregnancies in the United States* 30 FAMILY PLANNING PERSPECTIVES 24, 28, table 3 (1998)..................................................23

W. BRADFORD WILCOX, ET AL., WHY MARRIAGE MATTERS 15 (2d ed. 2005)..........5

WILLIAM BLACKSTONE, 1 COMMENTARIES ON THE LAWS OF ENGLAND 410 (1765) ................................................................................................................... 11, 12

## INTEREST OF AMICUS CURIAE[1] [2]

In scholarship and advocacy, the Marriage Law Foundation and its officers have consistently sought to explain and defend the nearly universal and time-tested understanding of marriage as an institution uniting a man and a woman as husband and wife. Extensive research and publication have allowed for firm conclusions about the meaning and nature of marriage that are central to the questions raised in this case. *Amicus* respectfully suggests that the historical evidence presented in this brief will be invaluable to this court in considering the arguments raised by Plaintiffs, and will confirm that there is no justifiable reason to mandate that Nevada change its definition of marriage.

## ARGUMENT

## I.  THE HISTORY AND TRADITION OF MARRIAGE CONSTRAIN THE COURT'S ANALYSIS UNDER THE FOURTEENTH AMENDMENT.

Every claim under the Fourteenth Amendment equal protection and substantive due process clauses requires courts to account for history and tradition. While it is of course true that "our Nation's history, legal traditions, and practices"[3]

---

[1] No party's counsel authored the brief in whole or in part, and no one other than the amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

[2] This brief is filed with consent of all parties; thus no motion for leave to file is required. *See* Notice of All Parties' Consent to Amicus Curiae Briefs, ECF No. 19; *see also* Fed. R. App. P. 29(a).

[3] *Washington v. Glucksberg*, 521 U.S. 702, 710 (1997).

are typically associated with substantive due process analysis, these considerations are also relevant to plaintiffs' equal protection arguments. This is because "[e]quality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked"[4] by their common concern with protection from arbitrary laws. Put simply, history and tradition may not be "the ending point" of constitutional analysis,[5] but in a case like this they are surely the place to begin, for even in equal protection cases "history will be heard."[6] This is especially true here because plaintiffs base their challenge on overlapping equal protection and substantive due process grounds.

It is highly relevant, therefore, "whether or not the objective character of [Nevada's marriage amendment] is consistent with our traditions, precedents, and historical understanding of the Constitution and its meaning." That inquiry binds the court to "objective considerations, including history and precedent, [as] the controlling principle."[7] And as with all cases touching on socially important issues where the Constitution's terms provide no express direction, this court should be guided by "respect for the teachings of history, solid recognition of the basic values

---

[4] *Lawrence v. Texas*, 539 U.S. 558, 575 (2003).

[5] *County of Sacramento v. Lewis*, 523 U.S. 833, 857 (1998) (Kennedy, J., concurring).

[6] *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 746 (2007).

[7] *County of Sacramento*, 523 U.S. at 857-58 (Kennedy, J., concurring).

that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms."[8]

These historical considerations utterly belie plaintiffs' asserted right to same-sex marriage. Quite simply, as demonstrated in greater depth below, this Nation lacks anything resembling a deeply rooted history, legal tradition, or practice of same-sex marriage. Indeed, before 2003, when the Massachusetts Supreme Judicial Court mandated same-sex marriage in that State,[9] same-sex marriage had never existed in this Nation. More broadly, throughout world history—regardless of politics, culture, or religion—marriage has always been defined as an opposite-sex union oriented toward the bearing and rearing of children.[10] By contrast, same-sex marriage is an historically rare anomaly that has existed in a minority of jurisdictions for a mere decade. Thus, in light of this historical record, retaining the age-old definition of marriage cannot be deemed unreasonable or arbitrary under the Fourteenth Amendment.

## II. IN RETAINING THE DEFINITION OF MARRIAGE SHARED BY NEARLY ALL CULTURES THROUGH TIME, THE PEOPLE OF

[8] *Griswold v. Connecticut*, 381 U.S. 479, 501 (1965) (Harlan, J., concurring in the judgment).

[9] *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941 (Mass. 2003).

[10] The existence of polygamy does not undercut this reality since even polygamous marriages are opposite-sex in nature. Polygamy still involves the union of a man and a woman even though it also allows for more than one of these unions to take place for a particular man at a given time.

**NEVADA WERE ACTING REASONABLY TO ADVANCE THE INTERESTS MARRIAGE HAS ALWAYS SERVED.**

When the people of Nevada amended their state constitution to retain the definition of marriage that had prevailed in the state from its earliest existence, they reaffirmed an understanding of marriage consistently accepted across nearly all cultures throughout recorded history. Such remarkable consensus is due to the need for societies to advance important child-centered interests by encouraging the potentially procreative relationships of men and women to take place in a setting where the children who may result have the opportunity to know and be reared by a mother and father firmly bound to one another.

### A. Reflecting Biological and Social Realities, Marriage Has Widely Been Understood To Be the Union of a Man and a Woman and to Serve, Among Other Purposes, Interests Related to Procreation.

Marriage is widely understood to be the union of an opposite-sex couple. In determining that the reservation of marriage to opposite-sex couples was rational, the New York Court of Appeals recognized this pervasive understanding of marriage, stating that "[u]ntil a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex."[11] This widely held

---

[11] *Hernandez v. Robles*, 855 N.E.2d 1, 8 (N.Y. 2006); *see also United States v. Windsor*, 133 S.Ct. 2675, 2689 (2013) ("It seems fair to conclude that, until recent years, many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and

understanding of marriage is inextricably bound to the basic realities of sex difference and the related procreative capacity of male-female couplings. Indeed, as the distinguished sociologist Claude Levi-Strauss explained, marriage is "a social institution with a biological foundation."[12] And a group of respected family scholars similarly acknowledged that "as a virtually universal human idea, marriage is about regulating the reproduction of children, families and society."[13]

Marriage has, of course, served a variety of purposes across a variety of cultures and times, but this one purpose has been consistent. As Georg Simmel, an early sociologist, explained: "The peculiar combination of subjective and objective, personal and super-personal or general elements in marriage is involved in the very process that forms its basis—physiological pairing. It alone is common to all historically known forms of marriage, while perhaps no other characteristic can be found without exceptions."[14]

This ubiquitous recognition of marriage as an opposite-sex coupling is not arbitrary, much less a multicultural, multi-millennial conspiracy to exclude

---

woman in lawful marriage. For marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization.")

[12] Claude Levi-Strauss, *Introduction* in A HISTORY OF THE FAMILY: DISTANT WORLDS, ANCIENT WORLDS 5 (vol. 1, Andre Burguiere, et al., eds. 1996).

[13] W. BRADFORD WILCOX, ET AL., WHY MARRIAGE MATTERS 15 (2d ed. 2005).

[14] GEORG SIMMEL, THE SOCIOLOGY OF GEORG SIMMEL 131 (Kurt H. Wolff, ed. 1950).

identified groups. Rather, it is an acknowledgment that marriage should serve purposes directly connected to the nature of the relationship. More specifically, marriage has been universally recognized as a way to encourage those who are responsible for creating a child—a mother and father—to take responsibility for the child that their union may produce. A prominent sociologist explains this dynamic: "[t]he genius of the family system is that, through it, the society normally holds the biological parents responsible for each other and for their offspring. By identifying children with their parents . . . the social system powerfully motivates individuals to settle into a sexual union and take care of the ensuing offspring."[15] Another sociologist concurs: "Marriage is a socially arranged solution for the problem of getting people to stay together and care for children that the mere desire for children, and the sex that makes children possible, does not solve."[16]

This reality has been so widely remarked upon as to become a truism. Professor Levi-Strauss noted that "the family—based on a union, more or less durable, but socially approved, of two individuals of opposite sexes who establish a household and bear and raise children—appears to be a practically universal phenomenon, present in every type of society."[17] Another historian noted that

---

[15] Kingsley Davis, *The Meaning & Significance of Marriage in Contemporary Society* in CONTEMPORARY MARRIAGE: PERSPECTIVES ON A CHANGING INSTITUTION 7-8 (Kingsley Davis, ed. 1985).
[16] JAMES Q. WILSON, THE MARRIAGE PROBLEM 41 (2003).
[17] CLAUDE LEVI-STRAUSS, THE VIEW FROM AFAR 40-41 (1985).

"[m]arriage, as the socially recognized linking of a specific man to a specific woman and her offspring, can be found in all societies."[18] Philosopher Bertrand Russell observed that "[b]ut for children, there would be no need for any institution concerned with sex. . . . [I]t is through children alone that sexual relations become of importance to society."[19] Eminent anthropologist Bronislaw Malinowski similarly said that "the institution of marriage is primarily determined by the needs of the offspring, by the dependence of the children upon their parents."[20] And the Anthropological Institute of Great Britain defined marriage "as a union between a man and a woman such that children borne by the woman are recognized as the legitimate offspring of both partners."[21]

This widely held understanding of marriage—as a male-female social institution—is not a mere social construct amenable to perpetual redefinition, but rather is an institution deeply rooted in biology itself. In 1936, sociologist Edward Westermarck said that marriage has "a deep biological foundation" that "most probably developed out of a primeval habit: that even in primitive times it was the habit of a man and a woman, or several women, to live together, to have sexual relations with each other, and to rear their offspring in common, the man being the

---

[18] G. ROBINA QUALE, A HISTORY OF MARRIAGE SYSTEMS 2 (1988).

[19] BERTRAND RUSSELL, MARRIAGE AND MORALS 77, 156 (1929).

[20] BRONISLAW MALINOWSKI, SEX, CULTURE AND MYTH 11 (1962).

[21] ANTHROPOLOGICAL INSTITUTE OF GREAT BRITAIN, NOTES AND QUERIES ON ANTHROPOLOGY 71 (6th ed. 1951).

guardian of the family and the woman his helpmate and the nurse of their children. This habit was sanctioned by custom, and afterwards by law, and thus transformed into a social institution."[22] More recently, authors of an article in *Evolutionary Psychology* concluded that "[across cultures, men develop extended pair-bonds with women (they marry women) and provision these women. The men also nurture their own children. Within the context of these two universals, the argument is presented that the affiliation which mediates these behaviors is, in part, neuro-hormonal in character and thus part of the phylogenetic heritage of our species."[23] Dr. C. Owen Lovejoy essentially agrees, and has proposed a model whereby "advanced material culture and the Pleistocene acceleration in brain development are sequelae to an already established hominid character system, which included intensified parenting and social relationships, monogamous pair binding, specialized sexual-reproductive behavior, and bipedality. It implies that the nuclear family and human sexual behavior may have their ultimate origin long before the dawn of the Pleistocene."[24]

Whatever the precise origin and contours of the marriage relationship over time and across societies, it is clear that this social institution is rooted in deep

---

[22] EDWARD WESTERMARCK, THE FUTURE OF MARRIAGE IN WESTERN CIVILIZATION 5 (1936).

[23] Ronald S. Immerman & Wade C. Mackey, *Perspectives on Human Attachment (Pair Bonding): Eve's Unique Legacy of a Canine Analogue* 1 EVOLUTIONARY PSYCHOLOGY 138, 146 (2003).

[24] C. Owen Lovejoy, *The Origin of Man* 211 SCIENCE 341, 348 (Jan. 23, 1981).

realities and oriented towards a purpose uniquely tied to its nature as the union of the sexes—a pairing that alone may naturally create a child and provide that child with a social context that accounts for his or her biological origins.

### B. The Marriage Laws of the United States and their Close Antecedents Have Consistently Recognized the Realities Underlying the Institution of Marriage.

The western legal tradition that contributed most directly to the legal system of the United States has followed the same pattern of recognizing marriage as solely the union of a husband and wife with a core purpose of advancing procreative interests. Legal historian John Witte explains that "the western tradition inherited from ancient Greece and Rome the idea that marriage is a union of a single man and a single woman who unite for the purposes of mutual love and friendship and mutual procreation and nurture of children."[25] Although Greek society could be very tolerant of homosexual conduct, its prominent thinkers nevertheless understood marriage as the union of husband and wife for the purpose of bearing and rearing children. Professor Witte explains that "[a]lready in the centuries before Christ, classical Greek philosophers treated marriage as a natural and necessary instruction designed to foster mutual love, support, and friendship of husband and wife, and to produce legitimate children who would carry on the family name and property."[26]

---

[25] JOHN WITTE JR., FROM SACRAMENT TO CONTRACT: MARRIAGE, RELIGION, AND LAW IN THE WESTERN TRADITION 17 (2d ed. 2012).
[26] *Id.* at 3.

The Roman Stoic philosopher Musonius Rufus, writing in 30 A.D., extolled marital procreation as flowing out of and intrinsically part of the rich companionate relationship that should prevail between husband and wife:

> The husband and wife . . . should come together for the purpose of making a life in common and of procreating children, and furthermore of regarding all things in common between them, and nothing peculiar or private to one or the other, not even their own bodies. The birth of a human being which results from such a union is to be sure something marvelous, but it is not yet enough for the relation of husband and wife, inasmuch as quite apart from marriage it could result from any other sexual union, just as in the case of animals. But in marriage there must be above all perfect companionship and mutual love of husband and wife, both in health and in sickness and under all conditions, since it was with this desire as well as for having children that both entered upon marriage.[27]

And in pre-Christian Roman law there "were steady efforts by lawmakers to provide institutional support for marriage and to recognize marriage as the means by which the next generation should come into being and be trained to accept its responsibilities."[28] Thus, even in ancient times, the government's support for marriage undeniably served rational purposes connected with procreation and childrearing.

Following this same pattern, in "the early medieval west of the sixth through eleventh centuries, the High Middle Ages of the twelfth through fifteenth centuries,

---

[27] Musonius Rufus, *Fragment 13A, What is the Chief End of Marriage?* in MUSONIUS RUFUS: THE ROMAN SOCRATES 89 (Cora E. Lutz, ed. & trans. 1947).
[28] Charles J. Reid, *Marriage in Its Procreative Dimension: The Meaning of the Institution of Marriage Throughout the Ages* 6 U. ST. THOMAS L. J. 454, 455 (2009).

and the Anglican high church and theological culture of the early modern period . . . the procreative dimension of marriage was, in each of these societies, the central organizing principle of legal analysis and social life."[29] For instance, in his Thirteenth Century treatise, which formed the introduction to case law for jurists that would follow, Henri de Bracton included in the "law which men of all nations use . . . the union of man and woman, entered into by the mutual consent of both, which is called marriage," and from marriage, de Bracton observed, "there also comes the procreation and raising of children."[30]

De Bracton was not alone in connecting marriage with procreation and the rearing of children. In his influential treatise, William Blackstone listed marriage among the "great relations of private life," saying the relationship "of husband and wife . . . is founded in nature, but modified by civil society: the one directing man to continue and multiply his species, the other prescribing the manner in which that natural impulse must be confined and regulated." The next great relationship was "[t]hat of parent and child, which is consequential to that of marriage, being its principal end and design: and it is by virtue of this relation that infants are protected, maintained, and educated."[31] Later, Blackstone cites Montesquieu for the

---

[29] *Id.*

[30] HENRI DE BRACTON, 2 ON THE LAWS AND CUSTOMS OF ENGLAND 27 (Samuel E. Thorne, transl. 1968).

[31] WILLIAM BLACKSTONE, 1 COMMENTARIES ON THE LAWS OF ENGLAND 410 (1765).

proposition that "the establishment of marriage in all civilized states is built on this natural obligation of the father to provide for his children."[32]

Like Blackstone and Montesquieu, John Locke had a profound influence on the thinking of the Framing generation. He too wrote of marriage as a procreative, companionate institution that binds fathers and mothers to care for their children:

> Conjugal society is made by a voluntary compact between man and woman, and though it consist chiefly in such a communion and right in one another's bodies as is necessary to its chief end, procreation, yet it draws with it mutual support and assistance, and a communion of interests too, as necessary not only to unite their care and affection, but also necessary to their common offspring, who have a right to be nourished and maintained by them till they are able to provide for themselves.[33]

Locke went so far as to argue that marriage "has no necessary form or function beyond this 'chief end' of procreation."[34]

The principal founding text of Scots Law, viz. Stair's Institutions of the Law of Scotland (1681)—which influenced Scottish Enlightenment thinkers (David Hume, Thomas Reid, Adam Smith, Dugald Stewart, etc.), who in turn influenced the framers of the U.S. Constitution—treats the relationship of marriage as between a man and a woman as a primary example of the Natural Law to which statutory law is indebted as source and as authority. Stair wrote: "Law is the dictate of reason

---

[32] *Id*. at 435.

[33] JOHN LOCKE, SECOND TREATISE OF CIVIL GOVERNMENT §§78-79 (1690).

[34] JOHN WITTE JR., FROM SACRAMENT TO CONTRACT: MARRIAGE, RELIGION, AND LAW IN THE WESTERN TRADITION 280 (2d ed. 2012).

determining every rational being to that which is congruous and convenient for the nature and condition thereof. . . . Obligations arising from voluntary engagement take their rule and substance from the will of man and may be framed and composed at his pleasure . . . [but] so cannot marriage, wherein it is not in the power of the parties . . . [because] marriage arises from the law of nature."[35] And David Hume, another important philosophical influence on the Founding generation, noted that "[t]he long and helpless infancy of man requires the combination of parents for the subsistence of their young."[36]

Given this intellectual and cultural heritage, American treatise writers naturally spoke of marriage as a legal status with a chief end of regulating procreation, focusing not merely on the begetting of children but also on their education and maintenance. Indeed, Noah Webster's 1828 dictionary includes an account of the divine origin of marriage, instituted "for the purpose of preventing the promiscuous intercourse of the sexes, for promoting domestic felicity, and for securing the maintenance and education of children."[37]

---

[35] James Dalrymple, Viscount Stair, *The Institutions of the Law of Scotland* (1681) Book I Common Principles of Law.

[36] DAVID HUME, AN ENQUIRY CONCERNING THE PRINCIPLES OF MORALS 66 (1751).

[37] NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE n.p. (1st ed. 1828); see also SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1755) (defining marriage as the "act of uniting a man and woman for life").

Justice Story concurred in this assessment, writing that "[m]arriage is not treated as a mere contract between the parties . . . . But it is treated as a civil institution, the most interesting and important in its nature of any in society. Upon it the sound morals, the domestic affections, and the delicate relations and duties of parents and children essentially depend."[38] New York Chancellor James Kent said that "[w]e may justly place to the credit of marriage, a great share of the blessings which flow from . . . the education of children."[39] In his 1851 legal encyclopedia, John Bouvier explained that "[t]he end of marriage is the procreation of children and the propagation of the species."[40] And perhaps the most prominent treatise writer in mid-nineteenth century America, Joel Prentiss Bishop, wrote that "[m]arriage between two persons of one sex could have no validity, as none of the ends of matrimony could be accomplished thereby."[41]

This understanding remained consistent into and throughout the Twentieth Century. In a treatise published in 1905, James Schouler described the parent and child bond as "a relation which results from marriage."[42] A few decades later, Frank Keezer's family law treatise stated: "Marriage is universal; it is founded on the law

---

[38] JOSEPH STORY, COMMENTARIES ON THE CONFLICTS OF LAWS 168 (1834).
[39] JAMES KENT, 2 COMMENTARIES ON AMERICAN LAW 76 (3d ed. 1838).
[40] JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 113-114 (1851).
[41] JOEL PRENTISS BISHOP, COMMENTARIES ON THE LAW OF MARRIAGE & DIVORCE §225 (1st ed. 1852).
[42] JAMES SCHOULER, LAW OF THE DOMESTIC RELATIONS §235 (1905).

of nature" in which "[n]ot only are the parties themselves interested but likewise the state and the community" since it is "the source of the family."[43] He specifically defined "legal marriage" as "a union of a man and a woman in the lawful relation of husband and wife, whereby they can cohabit and rear legitimate children."[44]

This understanding was not merely academic. It was widely accepted by state and federal courts. Early in its history the Supreme Court stated that "no legislation can be supposed more wholesome and necessary . . . than that which seeks to establish it on the basis of the idea of the family, as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony."[45] A few years later, the Court defined marriage as "an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress."[46]

In 1859, the California Supreme Court stated that the "first purpose of matrimony, by the laws of nature and society, is procreation."[47] In 1952, the same court said that marriage advances important social interests by "channel[ing] biological drives that might otherwise become socially destructive" and "ensur[ing]

---

[43] FRANK H. KEEZER, A TREATISE ON THE LAW OF MARRIAGE AND DIVORCE §55 (1923).

[44] *Id*. at §56.

[45] *Murphy v. Ramsey*, 114 U.S. 15, 45 (1885).

[46] *Maynard v. Hill*, 125 U.S. 190, 211 (1888).

[47] *Baker v. Baker*, 13 Cal. 87, 103 (1859).

15

the care and education of children in a stable environment."[48] As late as 2008, the California Court of Appeals noted that "annulments based on fraud have only been granted in cases where the fraud relates in some way to the sexual, procreative or child-rearing aspects of marriage," since these went "to the very essence of the marriage regulation."[49] This procreative link has been commonly noted in cases throughout the country.[50]

Notably, in 1967, when the Supreme Court first applied the right to marry to invalidate a state regulation dealing with marriage, it cited two cases as precedent, both of which centered upon procreation and the family.[51] The first was *Skinner v. Oklahoma*, which had explicitly linked marriage and procreation: "We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race."[52]

---

[48] *DeBurgh v. DeBurgh*, 250 P.2d 598, 601 (Cal. 1952).
[49] *In re Marriage of Ramirez*, 81 Cal Rptr. 3d 180, 184-185 (Cal. Ct. App. 2008).
[50] *Poe v. Gerstein*, 517 F.2d 787, 796 (5th Cir. 1975) ("procreation of offspring could be considered one of the major purposes of marriage."); *Heup v. Heup*, 172 N.W.2d 334, 336 (Wis. 1969) ("Having children is a primary purpose of marriage."); *Zoglio v. Zoglio*, 157 A.2d 627, 628 (D.C. App. 1960) ("One of the primary purposes of matrimony is procreation."); *Stegienko v. Stegienko*, 295 N.W. 252, 254 (Mich. 1940) ("procreation of children is one of the important ends of matrimony"); *Gard v. Gard*, 169 N.W. 908, 912 (Mich. 1918) ("It has been said in many of the cases cited that one of the great purposes of marriage is procreation."); *Grover v. Zook*, 87 P. 638, 639 (Wash. 1906) ("One of the most important functions of wedlock is the procreation of children.").
[51] *Loving v. Virginia*, 388 U.S. 1, 12 (1967).
[52] *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942).

The second was *Maynard v. Hill*, which, as noted above, called marriage "the foundation of the family."[53]

State courts addressing arguments for redefining marriage have noted the links between marriage and procreation in the right to marry cases. The Washington Supreme Court recognized that "[n]early all United States Supreme Court decisions declaring marriage to be a fundamental right expressly link marriage to fundamental rights of procreation, childbirth, abortion, and childrearing."[54] And Maryland's highest court concurred in this recognition:

> All of the cases infer that the right to marry enjoys its fundamental status due to the male-female nature of the relationship and/or the attendant link to fostering procreation of our species. . . . Thus, virtually every Supreme Court case recognizing as fundamental the right to marry indicates as the basis for the conclusion the institution's inextricable link to procreation, which necessarily and biologically involves participation (in ways either intimate or remote) by a man and a woman.[55]

In short, our Nation's law, along with the law of our antecedents from ancient to modern times, has consistently recognized the biological and social realities of marriage, including its nature as a male-female unit advancing purposes related to procreation and childrearing.

---

[53] *Maynard v. Hill*, 125 U.S. 190, 211 (1888).
[54] *Andersen v. King County*, 138 P.3d 963, 978 (Wash. 2006).
[55] *Conaway v. Deane*, 932 A.2d 571, 621 (Md. 2007).

17

## III. HISTORICAL EVIDENCE MAKES CLEAR THAT ATTEMPTS TO DOWNPLAY THE SIGNIFICANCE OF THE STATE INTERESTS IN MARRIAGE RELATED TO PROCREATION ARE MISGUIDED.

Plaintiffs seek to dilute the centrality of marriage's male-female requirement by suggesting that it is like other historically rejected legal elements of marriage. But unlike the examples that Plaintiffs invoke, the historical record demonstrates that the male-female understanding of marriage is fundamental to its very definition and tied directly to its animating purpose of binding children to the mothers and fathers whose sexual relationships brought them into the world.

Plaintiffs focus most of their efforts on comparing Nevada's current marriage laws to the racist anti-miscegenation laws of times gone by. But the history of these racially-discriminatory laws makes clear that race restrictions, unlike the sex of the parties, were never central to marriage.[56] For instance, "[u]nder the common law of England, difference in race was not a disability rendering parties incapable of contracting marriage."[57] And in the United States, Joel Prentiss Bishop described racial restrictions on marriage as "impediments, which are known only in particular

---

[56] Even the most radical district court opinion on marriage admits that race "restrictions were never part of the historical core of the institution of marriage." *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 993 (N.D. Cal. 2010).

[57] Robert Kovach, Note, *Miscegenation Statutes and the Fourteenth Amendment* 1 CASE W. RES. L. REV. 89, 89 (1949); Irving G. Tragen, *Statutory Prohibitions Against Interracial Marriage*, 32 CAL. L. REV. 269, 269 & n.2 (1944).

countries, or States."[58] Nearly half of the thirteen colonies did not have these laws; some states never enacted them; and even in the Southern states it was only during Reconstruction that anti-miscegenation laws "spread to a number of Southern states for the first time."[59] Additionally, "many states repealed their anti-miscegenation laws after ratification of the Civil War amendments."[60] Throughout history, then, race has never been a central feature of the definition of marriage.

By contrast, the same cannot be said of gender, which has always been at the core of the marriage definition. Indeed, just five years after the Supreme Court invalidated Virginia's anti-miscegenation law, it summarily and unanimously rejected a claim that the Fourteenth Amendment required a state to redefine marriage to include same-sex couples.[61] This result is not surprising because throughout history the requirement "that the parties should be of different sex," unlike racial

---

[58] JOEL PRENTISS BISHOP, COMMENTARIES ON THE LAW OF MARRIAGE & DIVORCE §213 (1st ed. 1852).

[59] Jill Elaine Hasday, *Federalism and the Family Reconstructed* 45 UCLA L. REV. 1297, 1345 n. 172 (1998); Peter Wallenstein, *Race, Marriage, and the Law of Freedom: Alabama and Virginia, 1860s-1960s* 70 CHI.-KENT L. REV. 371, 372 (1994); Lynn Wardle & Lincoln C. Oliphant, *In Praise of Loving: Reflections on the 'Loving Analogy' for Same-Sex Marriage*, 51 HOW. L.J. 117, 180-81 (2007).

[60] James Trosino, Note, *American Wedding: Same-Sex Marriage and the Miscegenation Analogy* 73 B.U. L. REV. 93, 98 (1993) (citing ROBERT J. SICKELS, RACE, MARRIAGE AND THE LAW 64 (1972).

[61] *Baker v. Nelson*, 409 U.S. 810 (1972).

restrictions on marriage, "has always . . . been deemed requisite to the entire validity of every marriage."[62]

Plaintiffs also attempt to diminish the centrality of the opposite-sex and procreative aspects of marriage by invoking the doctrine of coverture. But even though gender roles within marriage have varied across time and cultures, what has remained fundamentally unchanged is the core understanding that marriage exists to unite a man and a woman for procreative and child-rearing ends. Coverture was abandoned without any hint of altering the basic opposite-sex definition of marriage. And societies without coverture did not define marriage as the union of any two persons irrespective of sex.

Indeed, the prominent and influential legal commentators noted above endorsed the opposite-sex nature of marriage and its procreative purposes while noting that the doctrine of coverture was not similarly central to the marriage institution. Justice Story said that the "jurisprudence of different nations contains almost infinitely diversified regulations upon [the] subject" of "the incidents of marriage," which may address "the personal capacity and powers of the husband and wife, or the rights of each in regard to the property, personal or real, acquired, or held by them during the coverture."[63] Joel Prentiss Bishop similarly noted a

---

[62] *Id*. at §225 (1st ed. 1852).

[63] JOSEPH STORY, COMMENTARIES ON THE CONFLICT OF LAWS §§125-126 (1834).

"distinction between the marriage status and those property rights which are attendant upon and more or less closely connected with it."[64] He explained that "[r]ights of property are attached to [marriage] on very different principles in different countries," so that while "in some [jurisdictions] there is a *communion bonorum*, in some each [spouse] retain[s] their separate property[.]" Thus, he notes the contingent nature of this particular marriage incident and concludes that "[m]arriage may be good independent of any considerations of property[.]"[65] In contrast, however, Prentiss Bishop notes that "[i]t has always . . . been deemed requisite to the entire validity of every marriage . . . that the parties should be of different sex."[66]

Common objections to the social interests in marriage related to procreation are similarly flawed. An oft-used tactic for avoiding the historical lesson of marriage's universal link to procreation and childrearing has been to suggest that it is irrelevant because of instances where married couples cannot or do not have children. But this is a complete red herring.

The existence of infertile married couples does not vitiate the child-centered purposes of marriage, universally recognized through time and across cultures. None

---

[64] JOEL PRENTISS BISHOP, COMMENTARIES ON THE LAW OF MARRIAGE & DIVORCE §37 (1st ed. 1852).
[65] *Id*.
[66] *Id*. at §225 (1st ed. 1852).

of the major commentators on marriage has thought that allowing infertile couples to marry undermines the primary meaning of marriage as a procreative, child-centered union. They have of course understood that some couples cannot or will not have children.[67] But the fact that the traditional marriage model might include some male-female couples who do not fulfill marriage's primary social function does not mean that such unions either undermine that function or fail to fulfill other valuable and related functions.

Marriage is an essential social paradigm, a model, a norm that teaches, guides, and molds, albeit imperfectly and incompletely. As one of the dissenters in Massachusetts' same-sex marriage case noted: "Admittedly, heterosexual intercourse, procreation, and child care are not necessarily conjoined (particularly in the modern age of widespread effective contraception and supportive social welfare programs), but an orderly society requires some mechanism for coping with the fact that sexual intercourse commonly results in pregnancy and childbirth. The institution of marriage is that mechanism."[68] Allowing infertile couples to marry does not change this central purpose of marriage in the least.

---

[67] *Wendel v. Wendel*, 30 A.D. 447, 449 (N.Y. App. 1898) ("it has never been suggested that a woman who has undergone [menopause] is incapable of entering the marriage state").

[68] *Goodridge v. Department of Public Health*, 798 N.E.2d 941, 995 (Mass. 2003) (Cordy, J., dissenting).

One obvious practical reason government does not limit marriage to fertile couples is that it would be difficult (if not impossible), and certainly inappropriately intrusive, to determine ahead of time which couples are fertile.[69] Whether a couple is fertile is often unknowable, and it is not uncommon to hear of married couples who learn that they cannot have children, adopt a child, and are then surprised to learn that the wife has become pregnant. Moreover, some couples who do not initially plan to have children may later change their minds or conceive unintentionally.[70] Even in an age of easily-available contraception, a large majority of births are reportedly "unintended" by either the mother or father.[71]

The Indiana Court of Appeals already addressed and cogently rejected the fertility arguments raised by those seeking to redefine marriage, characterizing such contentions as little more than a defective "overbreadth argument":

A reasonable legislative classification is not to be condemned merely

---

[69] *Standhardt v. Superior Court*, 77 P.3d 451, 462-463 (Ariz. App. 2003); *Adams v. Howerton*, 486 F.Supp. 1119, 1124-1125 (C.D. Cal. 1980).

[70] *Morrison v. Sadler*, 821 N.E2d 15, 24-25 (Ind. App. 2005).

[71] Joyce C. Abma, et al., *Fertility, Family Planning, and Women's Health: New Data from the 1995 National Survey of Family Growth* 23 VITAL HEALTH STATISTICS 28, table 17 (1997) (70.4 percent of births to married women were intended by both parents, compared to just 28 percent of births to unmarried mothers). *See also* Stanley K. Henshaw, *Unintended Pregnancies in the United States* 30 FAMILY PLANNING PERSPECTIVES 24, 28, table 3 (1998); Haishan Fu, et al., *Contraceptive Failure Rates: New Estimates from the 1995 National Survey of Family Growth* 31 FAMILY PLANNING PERSPECTIVES 55, 56 (1999); James Trussel & Barbara Vaughn, *Contraceptive Failure, Method-Related Discontinuation and Resumption of Use: Results from the 1995 National Survey of Family Growth* 31 FAMILY PLANNING PERSPECTIVES 64, 71 (1999).

> because it is not framed with such mathematical nicety as to include all within the reason of the classification and to exclude all others . . . There was a rational basis for the legislature to draw the line between opposite-sex couples, who as a generic group are biologically capable of reproducing, and same-sex couples, who are not. This is true, regardless of whether there are some opposite-sex couples that wish to marry but one or both partners are physically incapable of reproducing.

*Morrison*, 821 N.E.2d at 27.

Further, a married husband and wife who cannot or do not have a child through their own sexual relationship still advance the historically-recognized procreative purposes of marriage. The interest in responsible procreation and childrearing is not solely in the birth of children, but in the rearing of children by a mother and father in a family unit once they are born. As the New York Court of Appeals explained, the state's interest in procreation includes more than just biological reproduction. The state can "rationally believe that it is better, other things being equal, for children to grow up with both a mother and a father" because "[i]ntuition and experience suggest that a child benefits from having before his or her eyes, every day, living models of what both a man and a woman are like."[72] And while "[i]t is obvious that there are exceptions to this general rule—some children who never know their fathers, or their mothers, do far better than some who grow up

---

[72] *Hernandez v. Robles*, 855 N.E.2d 1, 7 (N.Y. 2006).

with parents of both sexes— . . . the Legislature could find that the general rule will usually hold."[73]

> Legal historian John Witte agrees, explaining that:

> Procreation . . . means more than just conceiving children. It also means rearing and educating them for spiritual and temporal living—a common Stoic sentiment. The good of procreation cannot be achieved in this fuller sense simply through the licit union of husband and wife in sexual intercourse. It also requires maintenance of a faithful, stable, and permanent union of husband and wife for the sake of their children.[74]

A number of the historical sources cited above clearly note that the purposes served by marriage include child well-being in addition to mere propagation.[75] As Maryland's Court of Appeals explained, marriage is "conferred on opposite-sex couples not because of a distinction between whether various opposite-sex couples actually procreate, but rather because of the possibility of procreation."[76]

---

[73] *Id.*

[74] John Witte, Jr., *Propter Honoris Respectum: The Goods and Goals of Marriage* 76 NOTRE DAME L. REV. 1019, 1035 (2001).

[75] NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE n.p. (1st ed. 1828) ("securing the maintenance and education of children"); JAMES KENT, 2 COMMENTARIES ON AMERICAN LAW 76 (3d ed. 1838 ("We may justly place to the credit of marriage, a great share of the blessings which flow from . . . the education of children."); FRANK H. KEEZER, A TREATISE ON THE LAW OF MARRIAGE AND DIVORCE §56 (1923) ("a union of a man and a woman in the lawful relation of husband and wife, whereby they can cohabit and rear legitimate children."); *DeBurgh v. DeBurgh*, 250 P.2d 598, 601 (Cal. 1952) ("the institution of marriage" serves "the public interest" by "channel[ing] biological drives that might otherwise become socially destructive" and "ensur[ing] the care and education of children in a stable environment.").

[76] *Conaway v. Deane*, 932 A.2d 571, 633 (Md. 2007).

In addition, the law is concerned with encouraging those who might create children to take responsibility for them and not to create children in unstable nonmarital settings. As one commentator has explained, the law's "concern with illegitimacy was rarely spelled out, but discerning it clarifies why courts were so concerned with sex within marriage and renders logical the traditional belief that marriage is intimately connected with procreation even as it does not always result in procreation."[77] As Massachusetts Justice Cordy explains, "[t]he institution of marriage encourages parents to remain committed to each other and to their children as they grow, thereby encouraging a stable venue for the education and socialization of children."[78]

Furthermore, couples who rear children via adoption (or its predecessor statuses such as guardianship or other informal relationships) are serving part of marriage's procreation and childrearing functions. For children who would otherwise be deprived of a mother or father because of death, abuse, neglect, or abandonment still have that opportunity with another married man and woman.

Even couples who neither have nor rear children set an important example for those that may. Their observance of vows of faithfulness reinforces the social norm

---

[77] Laurence Drew Borten, *Sex, Procreation, and the State Interest in Marriage* 102 COLUM. L. REV. 1089, 1114-15 (2002).
[78] *Goodridge v. Department of Public Health*, 798 N.E.2d 941, 996 (Mass. 2003) (Cordy, J., dissenting).

that men and women in a sexual relationship should join together in stable and committed marital relationships.

In sum, notwithstanding the objections that the plaintiffs raise, the historical record is clear that marriage has universally advanced child-centered purposes by encouraging adults whose types of relationship may produce children to enter marriage.

* * * *

When the People of Nevada adopted the marriage amendment, they acted to retain in their law an understanding of marriage that, until very recently, was recognized universally and without exception throughout time and across cultures. That conception of the institution of marriage has consistently been understood to advance crucial social interests in the bearing and rearing of children. The remarkable consistency of this understanding makes clear that the decision of the People of Nevada was anything but irrational.

## CONCLUSION

For the foregoing reasons, *amicus* respectfully requests that this court affirm the decision of the court below.

Dated: January 24, 2014

Respectfully submitted,

s/  William C. Duncan
Attorney for Marriage Law Foundation

## CERTIFICATE OF COMPLIANCE WITH RULES 29-2(d) AND 32(a)(7)(B)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements.

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,859 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. Civ. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 2007 in 14-point Times New Roman.

Dated: January 24, 2014

s/  William C. Duncan
Attorney for Marriage Law Foundation

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

s/William C. Duncan
Attorney for Marriage Law Foundation