APPEAL NO. 12-17668

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
───────────────────────────────────

BEVERLY SEVCIK, et al.

*Plaintiffs-Appellants*,

v.

BRIAN SANDOVAL, et al.

*Defendants-Appellees.*

───────────────────────────────────

Appeal from the United States District Court for the District of Nevada
Civil Case No. 2:12-cv-00578-RCJ-PAL (Judge Robert C. Jones)
───────────────────────────────────

**BRIEF OF AMICI CURIAE ROBERT P. GEORGE, SHERIF GIRGIS, AND RYAN T.
ANDERSON IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**
───────────────────────────────────

CHARLES S. LIMANDRI
*Counsel of Record*
FREEDOM OF CONSCIENCE
DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, CA 92067
(858) 759-9948
(858) 759-9938 Fax
cslimandri@limandri.com

*Attorney for Robert P. George, Sherif Girgis, and Ryan T. Anderson*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTEREST OF AMICUS CURIAE .................................................................... 1

SUMMARY OF ARGUMENT ............................................................................ 2

ARGUMENT ........................................................................................................ 4

I.    At stake in Nevada's marriage laws is the definition of marriage. ................ 4

II.   It is reasonable to affirm that marriage is a union of man and woman. .......... 6

III.  The conjugal view explains the state's interest in marriage........................... 9

IV.   Redefining marriage would not extend its stabilizing norms, but
      undermine them across society.................................................................. 13

      A.   If sexual complementarity is merely incidental, then so are
           marital norms like permanence, monogamy, exclusivity, and
           even sexual union. ............................................................................. 14

      B.   Promoting the revisionist view makes conjugal union harder to
           live out. .............................................................................................. 15

      C.   By obscuring the rational basis of the stabilizing norms of
           marriage, redefining marriage would increase marital
           instability, harming spouses and children. ........................................ 17

      D.   Redefining marriage would obscure the special importance of
           biological parents, and of mothers and fathers generally, to
           children's detriment........................................................................... 18

      E.   Many LGBT activists agree—even embrace the result—that
           eliminating the norm of sexual complementarity will weaken
           other norms of marriage. ................................................................... 21

      F.   Preliminary social science also suggests that opposite- and
           same-sex bonds tend to follow different norms. ................................ 23

V.    Beyond weakening marriage and its stability, enshrining the
      revisionist view would burden rights of conscience. .................................. 25

i

VI.    It is rationally consistent for the state to recognize infertile opposite-sex couples but not same-sex couples. ..........................................27

      1.    Infertile conjugal unions are still true marriages .....................27

      2.    Recognizing infertile conjugal unions has none of the costs of redefining marriage......................................................28

      3.    Recognizing such unions has many of the benefits of recognizing fertile unions. ........................................................28

      4.    Recognizing such unions has at least one additional benefit......................................................................................28

VII.    Upholding Nevada's marriage laws is consistent with *Windsor*...................29

CONCLUSION ...................................................................................31

CERTIFICATE OF COMPLIANCE WITH RULES 29-2(D) AND 32(A)(7)(B)...................................................................................33

CERTIFICATE OF SERVICE ...............................................................34

# TABLE OF AUTHORITIES

**Cases**

*Bob Jones University v. United States,*
    461 U.S. 574 (1983).......................................................................25

*Parker v. Hurley,*
    514 F.3d 87 (1st Cir. 2008)..........................................................26

*United States v. Windsor*,
    133 S. Ct. 2675 (2013)....................................................29, 30, 31

**Other Authorities**

Paul R. Amato, *The Impact of Family Formation Change on the Cognitive,
Social, and Emotional Well-Being of the Next Generation*, Future of
Children, Fall 2005, *available at* http://futureofchildren.org/
futureofchildren/publications/docs/15_02_05.pdf .......................19

Gunnar Andersson, Turid Noack, Ane Seierstad & Harald Weedon-Fekjaer*,
The Demographics of Same-Sex Marriages in Norway & Sweden,* 43
Demography 79 (2006)..................................................................24

*Three-Person Civil Union Sparks Controversy in Brazil*, BBC News, Aug.
28, 2012, http://www.bbc.co.uk/news/world-latin-america-19402508.........21

Becket Fund for Religious Liberty, *Same-Sex Marriage and State Anti-
Discrimination Laws* (Washington, D.C. Jan. 2009)*, available at*
http://www.becketfund.org/wp-content/uploads/2011/04/Same-Sex-
Marriage-and-State-Anti-Discrimination-Laws-with-Appendices.pdf.........26

Jessica Bennett, *Only You. And You. And You: Polyamory— Relationships
with Multiple, Mutually Consenting Partners—Has a Coming-Out
Party*, Newsweek, July 28, 2009, http://www.newsweek.com/
2009/07/28/only-you-and-you-and-you.html .................................21

*Beyond Same-Sex Marriage: A New Strategic Vision For All Our Families
and Relationships*, BeyondMarriage.org, July 26, 2006,
http://beyondmarriage.org/full_statement.html.............................21

Lorraine Blackman et al., *The Consequences of Marriage for African Americans: A Comprehensive Literature Review* (New York: Institute for American Values 2005) ..........................................................................19

Victoria A. Brownworth, *Something Borrowed, Something Blue: Is Marriage Right for Queers?, in I Do/I Don't: Queers on Marriage* 53 (Greg Wharton & Ian Philips eds., San Francisco: Suspect Thoughts Press 2004)....................................................................................................22

Andrew J. Cherlin, *The Marriage-Go-Round: The State of Marriage and Family in America Today* (New York: Knopf 2009) ....................................17

Alfred DeMaris, *Distal and Proximal Influences on the Risk of Extramarital Sex: A Prospective Study of Longer Duration Marriages,* 46 J. Sex Res. 597 (2009)..............................................................................................24

Bruce J. Ellis et al., *Does Father Absence Place Daughters at Special Risk for Early Sexual Activity and Teenage Pregnancy?,* 74 Child Dev. 801 (2003).............................................................................................................19

*TV Host Fired over Sean Avery Debate*, ESPN.com, May 13, 2011, http://sports.espn.go.com/newyork/nhl/news/story?id=6532954..................26

Maggie Gallagher, *Banned in Boston: The Coming Conflict between Same-Sex Marriage and Religious Liberty*, Weekly Standard, May 15, 2006, http://www.weeklystandard.com/Content/Public/Articles/000/000/012/191kgwgh.asp .............................................................................................26

Sherif Girgis et al., *What Is Marriage? Man and Woman: A Defense* (2012)..........7

Julie H. Hall & Frank D. Fincham, *Psychological Distress: Precursor or Consequence of Dating Infidelity*, 35 Personality & Soc. Psychol. Bull. 143 (2009).............................................................................................24

Cynthia C. Harper & Sara S. McLanahan, *Father Absence and Youth Incarceration*, 14 J. Res. on Adolescence 369 (2004) ...................................19

Trevor A. Hart & Danielle R. Schwartz, *Cognitive-Behavioral Erectile Dysfunction Treatment for Gay Men*, 17 Cognitive & Behav. Prac. 66 (2010).............................................................................................................24

Kay S. Hymowitz, *Marriage and Caste in America: Separate and Unequal Families in a Post-Marital Age* (Chicago: Ivan R. Dee 2006).......................12

Scott James, *Many Successful Gay Marriages Share an Open Secret*, N.Y. Times, Jan. 28, 2010, *available at* http://www.nytimes.com/2010/01/29/us/29sfmetro.html?ref=us......................................... 17-18, 23, 24

Ari Karpel, *Monogamish*, Advocate, July 7, 2011, http://www.advocate.com/Print_Issue/Features/Monogamish/.....................22

Patrick Lee, Robert P. George, & Gerard V. Bradley, *Marriage and Procreation: Avoiding Bad Arguments*, *Public Discourse*, Witherspoon Institute, March 30, 2011, http://www.thepublicdiscourse.com/2011/03/2637.......................................16

Sara McLanahan & Gary Sandefur, *Growing Up with a Single Parent: What Hurts, What Helps* (Cambridge, Mass.: Harvard University Press 1994) ..................................................................................................19

Sara McLanahan, Elisabeth Donahue, & Ron Haskins, *Introducing the Issue*, The Future of Children, Fall 2005, *available at* http://futureofchildren.org/futureofchildren/publications/docs/15_02_01.pdf ......................................................................................................11

David P. McWhirter & Andrew M. Mattison, *The Male Couple: How Relationships Develop* (Englewood Cliffs, N.J.: Prentice-Hall Trade 1984) ..................................................................................................23

Kristin Anderson Moore, Susan M. Jekielek, & Carol Emig, *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do about It?*, Child Trends Research Brief (June 2002), www.childtrends.org/wp-content/uploads/2013/03/MarriageRB602.pdf. ......................................................................11

Steven Nock, *Marriage in Men's Lives* (New York: Oxford University Press 1998) ..................................................................................................12

Mary Parke, *Are Married Parents Really Better for Children?: What Research Says about the Effects of Family Structure on Child Well-Being*, CLASP Policy Brief no. 3 (May 2003), *available at* http://www.clasp.org/publications/Marriage_Brief3.pdf ..............................11

David Popenoe, *Disturbing the Nest: Family Change and Decline in Modern Societies* (New York: A. de Gruyter 1988) ....................................................13

David Popenoe, *Life without Father: Compelling New Evidence That Fatherhood and Marriage Are Indispensable for the Good of Children and Society* (New York: Free Press 1996) .............................................19, 20

Joseph Raz, *Autonomy and Pluralism, in* The Morality of Freedom 393 (Oxford: Clarendon Press 1988)....................................................16

Isabel V. Sawhill, *Families at Risk*, *in Setting National Priorities: The 2000 Election and Beyond* 97 (Henry J. Aaron & Robert D. Reischauer eds., Washington, D.C.: Brookings Institution Press 1999)........................13

Benjamin Scafidi, *The Taxpayer Costs of Divorce and Unwed Childbearing: First-Ever Estimates for the Nation and for All Fifty States* (New York: Institute for American Values 2008), http://www.americanvalues.org/search/item.php?id=52 ..............................13

Michelangelo Signorile, *Bridal Wave*, OUT, December/January 1994 .................23

Marc D. Stern, *Same-Sex Marriage and the Churches*, *in Same-Sex Marriage and Religious Liberty: Emerging Conflicts* 1-57 (Douglas Laycock, Anthony Picarello, & Robin Fretwell Wilson eds., Lanham, Md.: Rowman & Littlefield 2008)................................................................25

*Mexico City Proposes Temporary Marriage Licenses*, Telegraph, Sept. 30, 2011, http://www.telegraph.co.uk/news/worldnews/centralamericaand thecaribbean/mexico/8798982/Mexico-City-proposes-temporary-marriage-licences.html....................................................................22

*Toronto School District Board Promotes Polygamy, Group Sex to Children*, BlazingCatFur, http://blazingcatfur.blogspot.com/2012/09/tdsb-promotes-polygamy-group-sex-to.html.......................................................22

W. Bradford Wilcox, *The Evolution of Divorce*, National Affairs, Fall 2009, at 81, *available at* http://www.nationalaffairs.com/doclib/20091229_Wilcox_Fall09.pdf. ........................................................................12

W. Bradford Wilcox, *Reconcilable Differences: What Social Sciences Show about the Complementarity of the Sexes and Parenting*, Touchstone, November 2005 ...........................................................................................20

W. Bradford Wilcox & Jeffrey Dew, *Is Love a Flimsy Foundation? Soulmate versus Institutional Models of Marriage*, 39 Soc. Sci. Res. 687 (2010)......................................................................................17

W. Bradford Wilcox, William J. Doherty, Helen Fisher et al., *Why Marriage Matters: Twenty-Six Conclusions from the Social Sciences* (New York: Institute for American Values, 2d ed. 2005)................................11, 19

James Q. Wilson, *The Marriage Problem: How Our Culture Has Weakened Families* (New York: Harper Collins 2002)....................................................10

*Marriage and the Public Good: Ten Principles* (Princeton, N.J.: The Witherspoon Institute 2008), winst.org/wp-content/uploads/ WI_Marriage_and_the_Public_Good.pdf .............................................10, 13

Alan Wolfe, *Whose Keeper? Social Science and Moral Obligation* (Berkeley: University of California Press 1989)...........................................13

## INTEREST OF AMICUS CURIAE[1] [2]

Sherif Girgis (A.B., Princeton University; B.Phil., University of Oxford-Rhodes Scholar) is a Ph.D. candidate in philosophy at Princeton University and a law student at Yale. Ryan T. Anderson (A.B., Princeton University, M.A., University of Notre Dame) is the Editor of *Public Discourse: Ethics, Law, and the Common Good,* the on-line journal of the Witherspoon Institute of Princeton, N.J., and a Ph.D. candidate in political science at the University of Notre Dame. Robert P. George (B.A., Swarthmore College; J.D., M.T.S., Harvard University; D.Phil., University of Oxford) is a Visiting Professor at Harvard Law School and McCormick Professor of Jurisprudence at Princeton University. Affiliations are for identification purposes.

*Amici* have studied and published on the moral, political, and jurisprudential implications of redefining marriage to eliminate the norm of sexual complementarity and have expertise that would benefit this Court. Their article, "What Is Marriage?" appeared in the *Harvard Journal of Law and Public Policy*. Their book, *What Is Marriage? Man and Woman: A Defense*, further develops their philosophic defense of marriage as a conjugal union.

---

[1] No party's counsel authored the brief in whole or in part, and no one other than the amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

[2] This brief is filed with consent of all parties; thus no motion for leave to file is required. *See* Notice of All Parties' Consent to Amicus Curiae Briefs, ECF No. 19; *see also* Fed. R. App. P. 29(a).

## SUMMARY OF ARGUMENT

This case is about what marriage is. Today's debates offer rival answers to that question, two competing substantive visions of marriage. This Court's task is not to judge the desirability of the State of Nevada's definition, but only to decide whether citizens and legislators may embody in law the belief in marriage as a conjugal union, as they have historically done.

There are excellent reasons to think that marriage is a conjugal relationship—the type of union that only a man and woman can form—rather than just the sort of emotional union that any two (or more) adults can form. And recognizing marriage as such serves important public interests.

A society's marriage culture serves many public goods. But to thrive, it requires a supporting framework of social norms. A main purpose of marriage law in any society is to promote such norms. Sound marriage policy therefore serves the common good.

Redefining civil marriage can cause corresponding social harms because it changes the public understanding of what marriage is. It weakens the rational foundation (and social practice) of the stabilizing marital norms that serve social order: permanence, exclusivity, monogamy. And undermining marital norms will damage the many goods that draw the law into regulating marriage:

*Real marital fulfillment.* To form a true marriage, one must freely choose it, which requires at least a rough idea of what it is. Redefining marriage will harm people (especially future generations) by distorting their idea of what marriage is. It will teach that marriage is essentially about emotional fulfillment, without any inherent connections to bodily union or procreation and family life. As people internalize this view, their ability to realize genuine marital union will diminish.

*Child and spousal well-being.* Marriage tends to make husbands and wives healthier, happier and wealthier. And it does this especially by promoting norms of permanence, exclusivity and orientation to family life. As the redefinition of marriage makes these norms harder to justify and live by, spouses will benefit less from the advantages of stability.

Moreover, if marriage is redefined, no civil institution will reinforce the notion that both mothers and fathers matter for child-rearing. In all these ways, redefinition will weaken the motivation for spouses to stay together for their children, or for couples to marry before conceiving. But children do best when reared by their married biological mother and father, so the welfare and correctional state will have to expand to fill the developmental vacuum.

Leading LGBT activists increasingly agree that redefining marriage would undermine its norms.

*Religious liberty.* If the conjugal view of marriage is deemed irrational ("bigotry"), freedom to promote it will be eroded. Individuals and institutions who espouse it have been denied government licenses, or educational and professional opportunities, for promoting (even publicizing) their views. The consequences for observant Christians, Jews, Muslims and others are clear.

Moreover, none of these harms is caused by recognizing infertile (opposite-sex) marriages, which cohere with the conjugal view. And finally, enshrining this view of marriage in law is fully consistent with the U.S. Supreme Court's ruling in *United States v. Windsor.*

Because there are good reasons for citizens and lawmakers to understand marriage as a male-female union—even bracketing the harms of redefining it—this Court should uphold Nevada's marriage laws as constitutional exercises of policy-making power.

## ARGUMENT

## I.     At stake in Nevada's marriage laws is the definition of marriage.

What is misleadingly called "the gay marriage debate" is not about homosexuality, but marriage. It is not about whom to treat as eligible to marry, but about which understanding of the nature of marriage to enshrine legally. It marks a pivotal stage in a decades-long struggle between two views of marriage.

The *conjugal* view of marriage has long informed our legal traditions. Marriage so understood is a *comprehensive* union: Joining spouses in body as well as in mind, it is begun by consent and sealed by sexual intercourse. So completed in the acts by which new life is made, it is especially apt for and deepened by procreation, and calls for that broad domestic sharing uniquely fit for family life. Uniting spouses in these all-encompassing ways, it calls for all-encompassing commitment: permanent and exclusive. Comprehensive union is valuable in itself, but its link to children's welfare is what justifies recognizing and regulating it.

A *revisionist* view has informed certain marriage policy changes of the last several decades. It sees marriage as essentially an *emotional* union, accompanied, if the partners wish, by consensual sexual activity and valuable while the emotion lasts.

The revisionist view informs some opposite-sex as well as same-sex bonds, and brooks no real difference between them: both involve intense emotional bonding, so both can make a "marriage." But comprehensive union is something only a man and woman can form.

For this reason, enacting same-sex marriage, whether by legislative action or judicial fiat, would not expand the institution of marriage, but redefine it. Finishing what policies like "no-fault" divorce began, and thus entrenching them, it would

finally replace the conjugal view with the revisionist. This would multiply the marriage revolution's cultural spoils, making them harder to recover.

There is therefore no direct line from the principle of equality, to redefining marriage to abolish the norm of sexual complementarity. Equality requires treating like cases alike. To know what counts as "like cases," we have to know what marriage is and how recognizing it serves the public interest.

And because any marriage policy enshrines *some* view of what marriage is—the conjugal, revisionist, or another—none is morally or politically neutral. Each relies on controversial judgments. Rejecting either as unconstitutional would require this Court to answer reasonably disputed moral and policy questions on which the Constitution is silent.

Yet the Court is charged with judging not the *soundness* of either view of marriage, but only whether the conjugal view has a rational basis. What we show is that citizens have excellent reasons to affirm that view, and to expect redefining civil marriage to undermine public interests. The first point alone is sufficient to show a rational basis for Nevada's marriage laws; the second reinforces it.

## II.    It is reasonable to affirm that marriage is a union of man and woman.

Any community is created by common action—by cooperative activity, defined by common goods, in the context of commitment. The activities and goods build up the bond and determine the commitment it requires.

For example, a scholarly community exists whenever people commit to cooperate in activities ordered toward gaining knowledge. These activities and the truths they uncover build up their bond and determine the sort of commitment (to academic integrity) that scholars owe each other.

The kind of union created by *marriage* is *comprehensive* in just these ways: in (a) how it unites persons, (b) what it unites them with respect to, and (c) how extensive a commitment it demands.

It unites two people (a) in their most basic dimensions, in mind *and* body; (b) with respect to procreation, family life, and its broad domestic sharing; and (c) permanently and exclusively.[3]

As to (a): The bodily union of two people is much like the union of organs in an individual. Just as one's organs form a unity by coordinating for the biological good of the whole (one's bodily life), so the bodies of a man and woman form a unity by coordination (coitus) for a biological good (reproduction) of the couple as a whole. In choosing such biological coordination, spouses unite bodily, and do not merely touch. Non-marital bonds are, by contrast, simply unions of heart and mind.

Second, marriage is oriented to procreation, family life, and thus a comprehensive range of goods. Why? The kind of act that makes marital love is

---

[3] We expand on this argument about marriage in Chapter 2, entitled "Comprehensive Union," of Sherif Girgis et al., *What Is Marriage? Man and Woman: A Defense* (2012).

also the one that makes new life: new participants in *every* type of good. So marriage itself, the bond so embodied, would be fulfilled by family life, and by the all-around domestic sharing uniquely apt for it. Ordinary friendships—unions of heart and mind through conversations and other activities—can have more limited and variable scope.

Third, in view of its comprehensiveness in these other senses, marriage inherently calls for comprehensive commitment: permanence and exclusivity. (Indeed, comprehensive union can be achieved *only* by two people, because no act can organically unite three or more people bodily.)

Indeed, marriage is uniquely apt for having and rearing children, an inherently open-ended task calling for unconditional commitment. So its norms fittingly create the stability and harmony suitable for rearing children. That stability is undermined by divorce and infidelity, which create fragmented and often fatherless families.

Indeed, only the conjugal view explains why spouses should pledge *sexual* exclusivity at all. If instead marriage is essentially an emotional union, this is impossible to explain. After all, sex is just one of many pleasing activities that foster tenderness, and some partners regard sexual openness as better for lasting companionship. But the conjugal view is not arbitrary in picking out sexual activity as central to exclusivity, since it distinguishes marriage by the type of cooperation,

defined by the common ends, that it involves: bodily union and its natural fulfillment in family life.

While people in other bonds may pledge and live out permanent sexual exclusivity as a matter of preference, only conjugal union objectively requires such a commitment if it is to be realized fully. Only in conjugal marriage is there a principled basis for these norms apart from what spouses happen to prefer. As we show below (Part IV.E-F), this is borne out by reasoned reflection, revisionists' own arguments, recent policy proposals, and preliminary social science.

Because the conjugal view best explains the other norms of marriage, citizens and lawmakers have excellent reasons to affirm it.

## III. The conjugal view explains the state's interest in marriage.

Why does the state recognize marriage but not other close bonds? It has an interest in supporting the stabilizing norms of marriage because marriage is uniquely apt for family life. Only male-female sexual relationships produce new human beings—who have the best chance of reaching maturity and contributing socially when reared by their own committed mother and father. But family stability requires strong social norms guiding people's choices toward their (and others') long-term interests.

As the eminent social scientist James Q. Wilson wrote, "Marriage is a socially arranged solution for the problem of getting people to stay together and

care for children that the mere desire for children, and the sex that makes children possible, does not solve."[4] The law addresses this problem by shaping how people understand marriage—and thus how they act *toward and within* it. It thus vindicates children's right to know their own mother and father's committed love. It also curbs negative externalities on innocent parties, as family fragmentation imposes costs across society.

Studies that control for other factors, including poverty, show that children reared in intact homes do best on the following indices:[5]

- *Educational achievement:* literacy and graduation rates

- *Emotional health:* rates of anxiety, depression, substance abuse, and suicide

- *Familial and sexual development:* strong sense of identity, timing of onset of puberty, rates of teen and out-of-wedlock pregnancy, and rates of sexual abuse

- *Child and adult behavior:* rates of aggression, attention deficit disorder, delinquency, and incarceration

---

[4] James Q. Wilson, *The Marriage Problem: How Our Culture Has Weakened Families* 41 (New York: Harper Collins 2002).

[5] For the relevant studies, see *Marriage and the Public Good: Ten Principles* 9-19 (Princeton, N.J.: The Witherspoon Institute 2008), winst.org/wp-content/uploads/WI_Marriage_and_the_Public_Good.pdf.

Consider the conclusions of the left-leaning research institution Child Trends:

> [T]he family structure that helps children the most is a family headed by two biological parents in a low-conflict marriage. Children in single-parent families, children born to unmarried mothers, and children in stepfamilies or cohabiting relationships face higher risks of poor outcomes. . . . There is thus value for children in promoting strong, stable marriages between biological parents. . . . [I]t is not simply the presence of two parents, . . . [but] of *two biological parents* that seems to support children's development.[6]

Several other literature reviews corroborate the importance of intact households for children.[7]

A second public benefit of marriage is its tendency to help spouses financially, emotionally, physically, and socially. After marrying, for example, men tend to spend more time at work, less time at bars, more time at religious

---

[6] Kristin Anderson Moore, Susan M. Jekielek, & Carol Emig, *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do about It?*, Child Trends Research Brief 1-2 (June 2002), www.childtrends.org/wp-content/uploads/2013/03/MarriageRB602.pdf.

[7] See Sara McLanahan, Elisabeth Donahue, & Ron Haskins, *Introducing the Issue*, Future of Children, Fall 2005, at 3-12, *available at* http://futureofchildren.org/futureofchildren/publications/docs/15_02_01.pdf; Mary Parke, *Are Married Parents Really Better for Children?: What Research Says about the Effects of Family Structure on Child Well-Being*, CLASP Policy Brief no. 3 (May 2003), *available at* http://www.clasp.org/publications/ Marriage_Brief3.pdf; W. Bradford Wilcox et al., *Why Marriage Matters: Twenty-Six Conclusions from the Social Sciences* (New York: Institute for American Values, 2d ed. 2005).

gatherings, less time in jail, and more time with family.[8] Yet as we show below (Part V), it is the conjugal view of marriage that makes sense of and reinforces these stabilizing norms; attempting to spread them by replacing that understanding of marriage with a competing vision is likely to have just the opposite effect.

Third, given the economic benefits of marriage, its decline most hurts the least fortunate, as Kay Hymowitz argues in *Marriage and Caste in America*.[9] In fact, a leading indicator of whether someone will know poverty or prosperity is whether she knew growing up the love and security of her married mother and father.

Finally, since a strong marriage culture is good for children, spouses, our whole economy, and especially the poor, it also helps keep government limited. Where marriages never form or easily end, the state expands to fill the domestic vacuum by lawsuits to determine paternity, visitation rights, child support, and alimony; and by increased policing and social services. Sociologists David Popenoe and Alan Wolfe's research on Scandinavian countries shows that as

---

[8] Steven Nock, *Marriage in Men's Lives* (New York: Oxford University Press 1998). Nock is discussing marriages in the traditional sense: the union of husband and wife.

[9] Kay S. Hymowitz, *Marriage and Caste in America: Separate and Unequal Families in a Post-Marital Age* (Chicago: Ivan R. Dee 2006). *See also* W. Bradford Wilcox, *The Evolution of Divorce*, National Affairs, Fall 2009, at 81, 88-93, *available at* http://www.nationalaffairs.com/doclib/20091229_Wilcox_Fall09.pdf.

marriage culture declines, the size and scope of state power and spending tend to grow.[10]

In fact, a study by the left-leaning Brookings Institution finds that $229 billion in welfare expenditures over a quarter century can be attributed to the exacerbation of social ills by family breakdown: teen pregnancy, poverty, crime, drug abuse, and health problems.[11] A 2008 study found that divorce and unwed childbearing cost taxpayers "*at least* $112 billion" each year.[12]

In short, several aspects of the common good depend on a strong marriage culture.

## IV.    Redefining marriage would not extend its stabilizing norms, but undermine them across society.

Redefining civil marriage will obscure the true nature of marriage and undermine the rational basis of its norms, and, over time, people's adherence to

---

[10] David Popenoe, *Disturbing the Nest: Family Change and Decline in Modern Societies* xiv-xv (New York: A. de Gruyter 1988); Alan Wolfe, *Whose Keeper? Social Science and Moral Obligation* 132-42 (Berkeley: University of California Press 1989).

[11] Isabel V. Sawhill, *Families at Risk*, in *Setting National Priorities: The 2000 Election and Beyond* 97, 108 (Henry J. Aaron & Robert D. Reischauer eds., Washington, D.C.: Brookings Institution Press 1999); *see also Marriage and the Public Good, supra*, at 15.

[12] Benjamin Scafidi, *The Taxpayer Costs of Divorce and Unwed Childbearing: First-Ever Estimates for the Nation and for All Fifty States* 5 (New York: Institute for American Values 2008), http://www.americanvalues.org/search/item.php?id=52 (emphasis in original).

them. This will harm spouses, children, and the larger community. Our arguments here depend on three simple ideas:

1.    Law tends to shape beliefs.

2.    Beliefs shape behavior.

3.    Beliefs and behavior affect human interests and human well-being.

In discussing harms, we do not propose changing the controlling constitutional standard, under which marriage laws are valid if they rationally advance legitimate ends. That standard does not require evidence that different laws would cause more harm. We discuss harms here only because they *reinforce* the sufficient reasons given above for enshrining the conjugal view.

### A.    If sexual complementarity is merely incidental, then so are marital norms like permanence, monogamy, exclusivity, and even sexual union.

Some argue that redefined marriage would only spread stability. But there is nothing magical about the word "marriage" that promotes marital norms, however applied. The law encourages these norms by promoting an understanding of marriage that makes sense of them.

Yet marital norms make no sense as requirements of *principle* (as opposed to preference), if marriage is just whatever same- and opposite-sex couples can have in common, namely, intense emotional regard. There is no reason of *principle*

14

why emotional union should be permanent. Or limited to two persons, rather than including larger ensembles. Or sexually exclusive, rather than "open." Or sexual at all, rather than integrated around other activities (say, where sex would remain illegal—as between relatives). Or inherently oriented to family life and shaped by its demands. Couples may live out these norms where temperament or taste motivates them, but there is no reason of principle for them to do so, and no basis for using the law to encourage them to do so.

In other words, if sexual complementarity is optional for marriage, present only where preferred, then so is almost every other norm that sets marriage apart. If laws defining marriage as a male-female union unjustly discriminate against same-sex relationships because the latter can have loving emotional bonds, then excluding people in polyamorous (multiple-partner) emotional bonds is equally unjust. Sexual complementarity and other historic norms of marriage logically stand or fall together.

### B.    Promoting the revisionist view makes conjugal union harder to live out.

No one acts in a void. We all take cues from cultural norms, shaped by the law. Prominent Oxford philosopher Joseph Raz, who does not share the conjugal view, explains the inevitable and sweeping consequences of changing marriage laws:

[O]ne thing can be said with certainty [about recent changes in marriage law]. They will not be confined to adding new options to the familiar heterosexual monogamous family. They will change the character of that family. If these changes take root in our culture then the familiar marriage relations will disappear. They will not disappear suddenly. Rather they will be transformed into a somewhat different social form, which responds to the fact that it is one of several forms of bonding, and that bonding itself is much more easily and commonly dissoluble. All these factors are already working their way into the constitutive conventions which determine what is appropriate and expected within a conventional marriage and transforming its significance.[13]

Redefining civil marriage would change its meaning *for everyone*. It would not merely expand access to the institution of marriage as it has historically existed. Legally recognized opposite-sex unions would increasingly be defined by what they had in common with same-sex relationships.

In fact, such a change makes marriage itself (considered as a valuable form of human association, not just as a legal status) harder to form. For one can realize marriage only by choosing it, which requires having some idea of what it really is. By altering the basic understanding of marriage, the revisionist proposal would make people less capable of realizing this basic way of thriving.[14] People entering into what the state calls "marriage" would increasingly be forming bonds that merely resembled the real thing in certain ways, as a contractual relationship might

---

[13] Joseph Raz, *Autonomy and Pluralism, in* The Morality of Freedom 393 (Oxford: Clarendon Press 1988).

[14] Patrick Lee, Robert P. George, & Gerard V. Bradley, *Marriage and Procreation: Avoiding Bad Arguments*, *Public Discourse*, Witherspoon Institute, March 30, 2011, http://www.thepublicdiscourse.com/2011/03/2637.

resemble a friendship. The revisionist view would distort their priorities, actions, even motivations, in ways detrimental to true marriage.

**C.    By obscuring the rational basis of the stabilizing norms of marriage, redefining marriage would increase marital instability, harming spouses and children.**

Permanence and exclusivity—the rational basis, and internal and social motivations to live them out—depend on the conjugal view (Part III). By the same token, these norms are undermined by the revisionist view (Part IV.A). Yet law affects behavior. So as more people absorb the new law's message, we can expect marriages to take on still more of emotion's inconstancy.[15]

Because there is no *reason* that emotional unions—any more than the emotions that define them, or general friendship—should be permanent or limited to two, these norms of marriage would make less sense. People would thus feel less bound to live by them whenever preference dictated otherwise. And being less able to understand the value of marriage itself as a certain sort of union, even apart from its emotional satisfactions, they would overlook reasons for marrying or staying with a spouse as feelings waned, or waxed for others.[16]

---

[15] See also Andrew J. Cherlin, *The Marriage-Go-Round: The State of Marriage and Family in America Today* (New York: Knopf 2009), for a discussion of the link between the rise of expressive individualism and the divorce revolution.

[16] See, e.g., W. Bradford Wilcox & Jeffrey Dew, *Is Love a Flimsy Foundation? Soulmate versus Institutional Models of Marriage*, 39 Soc. Sci. Res. 687, 687-699 (2010). For research showing that same-sex unions tend far more often to eschew sexual exclusivity, see Scott James, *Many Successful Gay Marriages Share an*

But children and spouses benefit in many concrete ways from marital stability (Part IV). These interests, which justify recognizing marriage, also count against redefining it.

> **D.    Redefining marriage would obscure the special importance of biological parents, and of mothers and fathers generally, to children's detriment.**

Conjugal marriage laws communicate the message that a conjugal union is, on the whole, the most appropriate environment for rearing children, as the best available social science suggests.

Recognizing same-sex relationships as marriages would legally abolish that ideal. No civil institution would reinforce the notion that men and women typically have different strengths as parents. Indeed, our law, public schools, and media would teach that mothers and fathers are fully interchangeable, and that only bigots think otherwise (Part VI.C).

And here is the central problem with that: it would diminish the motivations for husbands to remain with their wives and *biological* children, or for men and women having children to marry first. Yet the resulting arrangements—parenting by divorced or single parents, or cohabiting couples; and disruptions of any kind— are *demonstrably* worse for children. So *even if studies showed no differences*

---

*Open Secret*, N.Y. Times, Jan. 28, 2010, *available at* http://www.nytimes.com/2010/01/29/us/29sfmetro.html?ref=us.

*between same- and opposite-sex adoptive parenting*, redefining marriage would destabilize marriage in ways that we know hurt children.

That said, there is evidence that mothers and fathers have different parenting strengths. Girls growing up without fathers are likelier to suffer sexual abuse and to have children as teenagers and out of wedlock.[17] Boys reared without their father have higher rates of aggression, delinquency, and incarceration.[18]

As Rutgers University sociologist David Popenoe concludes, social science evidence suggests "that gender-differentiated parenting is important for human development and that the contribution of fathers to childrearing is […] irreplaceable."[19] He continues: "The two sexes are different to the core, and each is

---

[17] Sara McLanahan & Gary Sandefur, *Growing Up with a Single Parent: What Hurts, What Helps* (Cambridge, Mass.: Harvard University Press 1994); Bruce J. Ellis et al., *Does Father Absence Place Daughters at Special Risk for Early Sexual Activity and Teenage Pregnancy?,* 74 Child Dev. 801, 801-21 (2003); Wilcox et al., *Why Marriage Matters*, *supra*, at 17-18, 31-32; Lorraine Blackman et al., *The Consequences of Marriage for African Americans: A Comprehensive Literature Review* (New York: Institute for American Values 2005).

[18] Paul R. Amato, *The Impact of Family Formation Change on the Cognitive, Social, and Emotional Well-Being of the Next Generation*, Future of Children, Fall 2005, at 75, 75-96, *available at* http://futureofchildren.org/futureofchildren/publications/docs/15_02_05.pdf; Cynthia C. Harper & Sara S. McLanahan, *Father Absence and Youth Incarceration*, 14 J. Res. on Adolescence 369-97 (2004).

[19] David Popenoe, *Life without Father: Compelling New Evidence That Fatherhood and Marriage Are Indispensable for the Good of Children and Society* 146 (New York: Free Press 1996).

necessary—culturally and biologically—for the optimal development of a human being."[20]

In a summary of the "best psychological, sociological, and biological research to date," University of Virginia sociologist W. Bradford Wilcox finds that "men and women bring different gifts to the parenting enterprise, that children benefit from having parents with distinct parenting styles, and that family breakdown poses a serious threat to children and to the societies in which they live."[21]

In short: it is reasonable to think that redefining civil marriage would make it more socially acceptable for fathers to leave their families, for unmarried parents to put off firmer commitment, or for children to be created for a household without a mother or father. But whatever the cause, there will be a cost as more children lack the care of their own married mother and father.[22]

---

[20] *Id.* at 197.

[21] W. Bradford Wilcox, *Reconcilable Differences: What Social Sciences Show about the Complementarity of the Sexes and Parenting*, Touchstone, November 2005, at 32, 36.

[22] Of course, the question of which arrangements our policies should privilege is normative; it cannot be settled by the cause-and-effect descriptions of social science alone. But that point scarcely matters here, because it is impossible to generalize from available studies purporting to find no differences between same-sex and married biological parenting. See also the amicus brief, filed in support of petitioners in *Hollingsworth* and the Bipartisan Legal Advisory Group of the U.S. House of Representatives in *Windsor,* discussing in depth the social science concerning parenting.

**E.     Many LGBT activists agree—even embrace the result—that eliminating the norm of sexual complementarity will weaken other norms of marriage.**

The point that the revisionist view erodes the basis for permanence and exclusivity in *any* relationship is increasingly confirmed by revisionists' own rhetoric and arguments, by the policies that they are increasingly led to embrace, and even by preliminary social science.

Thus, in their statement "Beyond Same-Sex Marriage," more than 300 "LGBT and allied" scholars and advocates—including prominent Ivy League professors—call for recognizing sexual relationships involving more than two partners.[23]

And they do exist: *Newsweek* reports that there are more than five hundred thousand multiple-partner households in the United States alone.[24] In Brazil, a public notary has recognized a trio as a civil union.[25] Mexico City has considered

---

[23] *Beyond Same-Sex Marriage: A New Strategic Vision For All Our Families and Relationships*, BeyondMarriage.org, July 26, 2006, http://beyondmarriage.org/full_statement.html.

[24] Jessica Bennett, *Only You. And You. And You: Polyamory—Relationships with Multiple, Mutually Consenting Partners—Has a Coming-Out Party*, Newsweek, July 28, 2009, http://www.newsweek.com/2009/07/28/only-you-and-you-and-you.html.

[25] *Three-Person Civil Union Sparks Controversy in Brazil*, BBC News, Aug. 28, 2012, http://www.bbc.co.uk/news/world-latin-america-19402508.

expressly temporary marriage licenses.[26] The Toronto District School Board has taken to promoting polyamorous relationships among its students.[27]

And exclusivity? Consider this candid piece in *The Advocate*, a gay-interest newsmagazine:

> [W]hat if—for once—the sanctimonious crazies are right? Could the gay male tradition of open relationships actually alter marriage as we know it? And would that be such a bad thing?[28]

Other revisionists have embraced the goal of weakening marriage *in these very terms*. It is "correct," says revisionist advocate Victoria Brownworth, to think ". . . that allowing same-sex couples to marry will weaken the institution of marriage. . . . It most certainly will do so, and that will make marriage a far better concept than it previously has been."[29] Michelangelo Signorile, a prominent revisionist advocate, urges same-sex couples to seek legal recognition "not as a way of adhering to society's moral codes but rather to debunk a myth and radically

---

[26] *Mexico City Proposes Temporary Marriage Licenses*, Telegraph, Sept. 30, 2011, http://www.telegraph.co.uk/news/worldnews/centralamericaandthecaribbean/mexico/8798982/Mexico-City-proposes-temporary-marriage-licences.html.

[27] *Toronto School District Board Promotes Polygamy, Group Sex to Children*, BlazingCatFur, http://blazingcatfur.blogspot.com/2012/09/tdsb-promotes-polygamy-group-sex-to.html.

[28] Ari Karpel, *Monogamish*, Advocate, July 7, 2011, http://www.advocate.com/Print_Issue/Features/Monogamish/.

[29] Victoria A. Brownworth, *Something Borrowed, Something Blue: Is Marriage Right for Queers?, in I Do/I Don't: Queers on Marriage* 53, 58-59 (Greg Wharton & Ian Philips eds., San Francisco: Suspect Thoughts Press 2004).

alter an archaic institution"[30] and thereby "transform the notion of 'family' entirely."[31]

Leading revisionist advocates increasingly agree that redefining marriage would undermine its stabilizing norms.

### F. Preliminary social science also suggests that opposite- and same-sex bonds tend to follow different norms.

Preliminary social science also suggests that different norms tend to make sense for opposite- and same-sex bonds. In the 1980s, David McWhirter and Andrew Mattison set out to disprove popular beliefs about same-sex male partners' lack of adherence to sexual exclusivity. Of those they surveyed, whose relationships had lasted from one to thirty-seven years, more than 60 percent had originally expected sexual exclusivity, but not one couple stayed exclusive longer than five years.[32]

More recently, the *New York Times* reported on a San Francisco State University study: "[G]ay nuptials are portrayed by opponents as an effort to rewrite the traditional rules of matrimony. Quietly, outside of the news media and courtroom spotlight, many gay couples are doing just that."[33]

---

[30] Michelangelo Signorile, *Bridal Wave*, OUT, December/January 1994, at 68, 161.
[31] *Id.*
[32] David P. McWhirter & Andrew M. Mattison, *The Male Couple: How Relationships Develop* 252-53 (Englewood Cliffs, N.J.: Prentice-Hall Trade 1984).
[33] James, *Many Successful Gay Marriages Share an Open Secret*, *supra*.

One study even suggests that exclusivity affects men's satisfaction in opposite-sex relationships more than in same-sex ones. [34] According to another, sexually open gay relationships last longer.[35] By contrast, 99 percent of opposite-sex spouses demand of each other and anticipate sexual exclusivity,[36] and violations of it are "the leading cause of divorce across 160 cultures and are one of the most frequent reasons that couples seek marital therapy."[37]

Relationship longevity, too, tends to vary. A study of same-sex civil marriages in Norway and Sweden found that "divorce risks are higher in same-sex partnerships than opposite-sex marriages and . . . unions of lesbians are considerably less stable, or more dynamic, than unions of gay men."[38]

Early evidence thus suggests that different norms prevail among same- and opposite-sex bonds.

---

[34] Trevor A. Hart & Danielle R. Schwartz, *Cognitive-Behavioral Erectile Dysfunction Treatment for Gay Men*, 17 Cognitive & Behav. Prac. 66, 66-76 (2010).

[35] James, *Many Successful Gay Marriages Share an Open Secret, supra.*

[36] Alfred DeMaris, *Distal and Proximal Influences on the Risk of Extramarital Sex: A Prospective Study of Longer Duration Marriages,* 46 J. Sex Res. 597, 597-607 (2009).

[37] Julie H. Hall & Frank D. Fincham, *Psychological Distress: Precursor or Consequence of Dating Infidelity*, 35 Personality & Soc. Psychol. Bull. 143-59 (2009).

[38] Gunnar Andersson, Turid Noack, Ane Seierstad & Harald Weedon-Fekjaer, *The Demographics of Same-Sex Marriages in Norway & Sweden,* 43 Demography 79, 95 (2006).

## V.     Beyond weakening marriage and its stability, enshrining the revisionist view would burden rights of conscience.

Americans are impatient with those we regard as enemies of equality. Often barred from respectable jobs, they enjoy little social tolerance. The First Amendment does not keep us from revoking certain of their civil privileges or suing them for acting on their views.[39]

Yet the revisionist view depends on the idea that it is irrational to see important differences between same- and opposite-sex relationships. By accepting this idea, the state would deem conjugal marriage supporters champions of invidious discrimination. This would undermine moral and religious freedom, and parents' rights to direct their children's education.

From the wedding on through the honeymoon and into common life, couples transact *as a couple* with countless people. Photographers, caterers, innkeepers, adoption agency officials, private school administrators, counselors, foster-care and adoption providers, and others will be forced to comply with the revisionist view or lose their jobs, or licenses and government contracts.[40]

---

[39] For example, the Internal Revenue Service revoked the tax-exempt status of Bob Jones University because of its racially discriminatory practices, and the Supreme Court upheld this action as compatible with the university's First Amendment rights. *Bob Jones University v. United States*, 461 U.S. 574 (1983).

[40] Marc D. Stern, *Same-Sex Marriage and the Churches*, *in Same-Sex Marriage and Religious Liberty: Emerging Conflicts* 1-57, 1, 11-14 (Douglas Laycock, Anthony Picarello, & Robin Fretwell Wilson eds., Lanham, Md.: Rowman & Littlefield 2008). This collection of essays includes the views of scholars on both

Thus, in Canada, Damian Goddard was fired from his job as a sportscaster for expressing on Twitter support for conjugal marriage.[41] In Massachusetts, Catholic Charities was forced to give up its adoption services rather than violate its principles by placing children with same-sex cohabitants.[42] When public schools began teaching students about same-sex marriage, precisely on the ground that it was now the law, a Court of Appeals ruled that parents had no right to exempt their children. [43] The Becket Fund for Religious Liberty reports that over "350 separate state anti-discrimination provisions would likely be triggered by recognition of same-sex marriage."[44]

If the people judge that the conjugal view of marriage is reasonable, they may also judge that state efforts to suppress it curb freedoms of speech, religion, and conscience without justification.

---

sides of the same-sex marriage question, who conclude that conflicts with religious liberty are inevitable when marriage is extended to same-sex couples.

[41] *TV Host Fired over Sean Avery Debate*, ESPN.com, May 13, 2011, http://sports.espn.go.com/new-york/nhl/news/story?id=6532954.

[42] Maggie Gallagher, *Banned in Boston: The Coming Conflict between Same-Sex Marriage and Religious Liberty*, Weekly Standard, May 15, 2006, http://www.weeklystandard.com/Content/Public/Articles/000/000/012/191kgwgh.a sp.

[43] See, e.g., *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008).

[44] Becket Fund for Religious Liberty, *Same-Sex Marriage and State Anti-Discrimination Laws* 2 (Washington, D.C. Jan. 2009), *available at* http://www.becketfund.org/wp-content/uploads/2011/04/Same-Sex-Marriage-and-State-Anti-Discrimination-Laws-with-Appendices.pdf.

**VI.    It is rationally consistent for the state to recognize infertile opposite-sex couples but not same-sex couples.**

It is a mistake to think that the conjugal view leaves no principled basis for recognizing infertile couples' unions but not same-sex couples.

After all, (1) an infertile man and woman can still form together a comprehensive (bodily as well as emotional) union, which differs only in degree, not type, from fertile ones before or after their first child. So recognizing such unions has (2) none of the costs of recognizing same-sex bonds; (3) most of the benefits of recognizing fertile ones; and (4) one *additional* benefit.

**1.    Infertile conjugal unions are still true marriages**

To form a true marriage, a couple needs to establish and live out the (i) comprehensive (i.e., mind-and-body) union that (ii) would be completed by, and be apt for, procreation and domestic life and so (iii) inherently calls for permanent and exclusive commitment.

Every male-female couple capable of consummating their commitment can have all three features. With or without children, on the wedding night or years later, these bonds are all comprehensive in the three senses specific to marriage, with its distinctive value. No same-sex or multiple-partner union is.

### 2.  Recognizing infertile conjugal unions has none of the costs of redefining marriage.

Since infertile couples can form a true marriage, recognizing them has none of the *costs* of recognizing same-sex, polyamorous, or other nonmarital unions. It does not make it harder for people to realize the basic human good of marriage, for it does not undermine the public's grasp of the nature of true marriage. Nor does it undermine marital *norms*, which are grounded in that nature, or make fathers or mothers seem superfluous. It prejudices no one's religious or moral freedom.

### 3.  Recognizing such unions has many of the benefits of recognizing fertile unions.

Many couples believed to be infertile end up having children, who are served by their parents' marriage; and trying to determine fertility would require unjust invasions of privacy.

Furthermore, even an obviously infertile couple can for reasons of principle, and not merely subjective preference, live out the features of true marriage, and so contribute to a strong marriage culture. Their example makes couples who might conceive likelier to form a marriage and abide by its norms. And that, in turn, ensures that more children are reared by their married biological parents.

### 4.  Recognizing such unions has at least one additional benefit.

Finally, recognizing only fertile marriages would suggest that marriage is valuable only as a means to children—and not good in itself, as it is. So

recognizing infertile marriages serves one purpose *better* than recognizing fertile unions does: to teach the truth, itself crucial for marriage stability, that marriage (conjugal union) is valuable in itself.

Thus, the more fully spouses (including infertile ones) live out the truth about what marriage is, the more that truth will saturate our culture, so that more families *with* children stay intact.

## VII.  Upholding Nevada's marriage laws is consistent with *Windsor*.

State laws defining marriage as the union of a man and a woman suffer none of the infirmities found in the federal Defense of Marriage Act ("DOMA") in *United States v. Windsor*, 133 S. Ct. 2675 (2013). In fact, that decision's logic and holding affirm the States' prerogative to define civil marriage.

As *Windsor* noted, "[t]he definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the '[p]rotection of offspring, property interests, and the enforcement of marital responsibilities.'" *Id.* at 2691 (citations omitted). Indeed, it was "DOMA's unusual deviation from the usual tradition of . . . accepting state definitions of marriage" that provided "strong evidence" of unconstitutionality and "especially require[d] careful consideration." *Id.* at 2693.

29

Under that careful scrutiny, the Court struck down Section 2 of DOMA (defining marriage for federal purposes as a male-female union) *on State-protective grounds*—which are, of course, logically inapplicable against the States.

In particular, the Court observed that "the State [of New York had] acted" to acknowledge "a relationship deemed by the State worthy of dignity." *Id*. at 2692. For the Court, the problem with DOMA was its attempt "to injure the very class New York [sought] to protect." *Id*. at 2693. It was "[*b*]y *doing so*"— by targeting a *State-recognized* domestic relation—that DOMA violated "basic due process and equal protection principles applicable to the *Federal* Government." *Id*. (emphasis added). *See also id*. (DOMA "impose[s] a disadvantage . . . upon all who enter into same-sex marriages *made lawful by the unquestioned authority of the States*.") (emphasis added); *id.* at 2694 (faulting DOMA for "diminishing the stability and predictability of basic personal relations *the State has found it proper to acknowledge and protect*") (emphasis added); *id*. at 2695 (DOMA "demean[s] those persons *who are in a lawful same-sex marriage*.") (emphasis added). The problem, in short, was DOMA's attempt to "interfere with state sovereign choices about who may be married." *Id*. at 2693.

Thus, the *Windsor* majority's "*opinion and* its holding are confined to" unions recognized as marriages under State law. *Id*. at 2696 (emphasis added); *see also id*. ("The Court does not have before it, *and the logic of its opinion does not*

*decide*, the distinct question whether the States" may limit marital status to male-female bonds.) (Roberts, C.J., dissenting) (emphasis added); *id*. at 2709 ("[S]tate courts can distinguish today's case when the issue before them is state denial of marital status to same-sex couples.") (Scalia, J., dissenting).

But Nevada's laws do not undermine the States' prerogative to define marriage or, therefore, trigger the same "careful consideration" as DOMA. Nor do they disadvantage relationships recognized by a State in its authority over domestic relations. On the contrary, they are *exercises* of that authority. Nothing in *Windsor* requires striking down Nevada's marriage laws or scrutinizing them more closely. Indeed, far from condemning Nevada's right so to determine its marriage policy, the logic of *Windsor* reinforces it.

## CONCLUSION

For the foregoing reasons, this Court should uphold Nevada's marriage laws as constitutionally valid exercises of policy-making power.

Dated: January 27, 2014.

Respectfully submitted,

s/Charles S. LiMandri

CHARLES S. LIMANDRI
*Counsel of Record*
FREEDOM OF CONSCIENCE
DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, CA 92067
(858) 759-9948
(858) 759-9938 Fax
cslimandri@limandri.com

*Attorney for Robert P. George, Sherif Girgis, and Ryan T. Anderson*

## CERTIFICATE OF COMPLIANCE WITH RULES 29-2(D) AND 32(A)(7)(B)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements.

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,923 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. Civ. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 2007 in 14-point Times New Roman.

Dated: January 27, 2014.

s/ Charles S. LiMandri
CHARLES S. LIMANDRI
*Counsel of Record*
FREEDOM OF CONSCIENCE
DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, CA 92067
(858) 759-9948
(858) 759-9938 Fax
cslimandri@limandri.com

*Attorney for Robert P. George, Sherif Girgis, and Ryan T. Anderson*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

s/ Charles S. LiMandri
CHARLES S. LIMANDRI
*Counsel of Record*
FREEDOM OF CONSCIENCE
DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, CA 92067
(858) 759-9948
(858) 759-9938 Fax
cslimandri@limandri.com

*Attorney for Robert P. George, Sherif Girgis, and Ryan T. Anderson*