No. 17-35105

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

STATE OF WASHINGTON, *et al.*,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, *et al.*,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Western District of Washington

———————————

### SUPPLEMENTAL BRIEF ON *EN BANC* CONSIDERATION
———————————

NOEL J. FRANCISCO
*Acting Solicitor General*

EDWIN S. KNEEDLER
*Deputy Solicitor General*

CHAD A. READLER
*Acting Assistant Attorney General*

AUGUST E. FLENTJE
*Special Counsel to the Assistant Attorney
General*

DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
CATHERINE DORSEY
*Attorneys, Appellate Staff
Civil Division, Room 7241
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................i

INTRODUCTION.........................................................................................1

STATEMENT OF THE CASE .....................................................................5

    A.    Statutory background ...............................................................5

    B.    The Executive Order..............................................................9

    C.    Procedural history ................................................................ 12

SUMMARY OF ARGUMENT.................................................................... 14

ARGUMENT.............................................................................................. 16

I.    The Panel's Decision Rests On A Misconception Of The Order's Scope............. 16

    A.    The Order does not apply to LPRs ...................................... 16

    B.    The panel appeared to misapprehend the Order's application to other classes of aliens ................................................................ 19

II.    The Panel Erred In Concluding That The States Can Likely Bring Their Own Injunctive Action By Relying On The Asserted Rights Of Individual Aliens........ 20

III.    The Panel Erred In Concluding That The Defendants Are Unlikely To Succeed On The Merits................................................................................... 27

    A.    The Order is a valid exercise of the President's authority under Section 1182(f) ................................................................................ 27

    B.    The States' due process claim lacks merit............................ 29

    C.    The States' religious discrimination claims lack merit.................................... 35

IV.    The Panel Erred In Its Analysis Of The Other Stay Factors ..................................... 41

V.    At Minimum, The Panel Erred In Failing To Narrow The Injunction.................. 43

i

CONCLUSION.................................................................................................................. 47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** <span style="float:right">**Page(s)**</span>

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ............................................................................45

*Abbott v. Abbott,*
  560 U.S. 1 (2010) ...............................................................................18

*Abourezk v. Reagan,*
  785 F.2d 1043 (D.C. Cir. 1986)
  *aff'd mem.*, 484 U.S. 1 (1987) ............................................................8

*Adams v. Freedom Forge Corp.,*
  204 F.3d 475 (3d Cir. 2000) ..............................................................42

*Adams v. Vance,*
  570 F.2d 950 (D.C. Cir. 1978) ..........................................................41

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982) ...........................................................................20

*America Cargo Transp., Inc. v. United States,*
  625 F.3d 1176 (9th Cir. 2010) ...........................................................18

*Arizona v. United States,*
  132 S. Ct. 2492 (2012) .......................................................................21

*Bd. of Educ. of Kiryas Joel v. Grumet,*
  512 U.S. 687 (1994) ...........................................................................36

*Bd. of Regents of State Colls. v. Roth,*
  408 U.S. 564 (1972) ...............................................................30, 31, 32

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,*
  239 U.S. 441 (1915) .....................................................................15, 33

*Block v. Community Nutrition Inst.,*
  467 U.S. 340 (1984) ...........................................................................25

*Bustamante v. Mukasey,*
531 F.3d 1059 (2008) ...............................................................................32

*Cardenas v. United States,*
826 F.3d 1164 (9th Cir. 2016) ...................................................23, 24, 32

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S 520 (1993) .................................................................................36

*Cmte. For Public Ed. & Religious Liberty v. Nyquist,*
413 U.S 756 (1973) .................................................................................36

*Clapper v. Amnesty Int'l USA,*
133 S. Ct. 1138 (2013) ............................................................................26

*Clarke v. United States,*
915 F.2d 699 (D.C. Cir. 1990) ...............................................................18

*Conn. Bd. of Pardons v. Dumschat,*
452 U.S. 458 (1981) ................................................................................32

*Corp. of the Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,*
483 U.S. 327 (1987) ................................................................................39

*Craig v. Boren,*
429 U.S. 190 (1976) ................................................................................23

*Cutter v. Wilkinson,*
544 U.S. 709 (2005) ................................................................................39

*Epperson v. Arkansas,*
393 U.S. 97 (1968) ..................................................................................36

*Fiallo v. Bell,*
430 U.S. 787 (1977) .....................................................................23, 27, 40

*Fleck & Assocs. v. City of Phx.,*
471 F.3d 1100 (9th Cir. 2006) ................................................................22

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ................................................................................46

*Gallo v. U.S. Dist. Ct. for the Dist of Ariz.,*
  349 F.3d 1169 (9th Cir. 2003) ........................................................33

*Griswold v. Connecticut,*
  381 U.S. 479 (1965) ........................................................................23

*Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice,*
  816 F.3d 1241 (9th Cir. 2016) ........................................................26

*Hassan v. City of New York,*
  804 F.3d 277 (3d Cir. 2015) ...........................................................36

*Heckler v. Lopez,*
  463 U.S. 1328 (1983) ......................................................................41

*Hodak v. City of St. Peters,*
  535 F.3d 899 (8th Cir. 2008) ..........................................................23

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ......................................................................41, 42

*INS v. Legalization Assistance Project,*
  510 U.S. 1301 (1993) ......................................................................41

*Kerry v. Din,*
  135 S. Ct. 2128 (2015) .........................................................24, 32, 33

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972) .............................................................24, 31, 45

*Knoetze v. U.S. Dep't of State,*
  634 F.2d 207 (5th Cir. Unit B 1981) ..........................................31, 32

*Kowalski v. Tesmer,*
  543 U.S. 125 (2004) .............................................................21, 22, 23

*Lamb-Weston, Inc. v. McCain Foods, Ltd.,*
  941 F.2d 970 (9th Cir. 1991) ..........................................................43

*Landon v. Plasencia,*
　459 U.S. 21 (1982) ......................................................................... 2, 14, 15, 31

*Larson v. Valente,*
　456 U.S. 228 (1982) ............................................................................... 37, 38

*Lemon v. Kurtzman,*
　403 U.S. 602 (1971) ......................................................................................37

*Louhghalam v. Trump,*
　2017 WL 479779 (D. Mass. Feb. 3, 2017) ........................................32, 35, 38

*Madsen v. Women's Health Ctr., Inc.,*
　512 U.S. 753 (1994) ......................................................................................43

*Maryland v. King,*
　133 S. Ct. 1 (2012) .......................................................................................42

*Massachusetts v. EPA,*
　549 U.S. 497 (2007) .....................................................................................26

*Massachusetts v. Mellon,*
　262 U.S. 447 (1923) .....................................................................................20

*McCormack v. Hiedeman,*
　694 F.3d 1004 (9th Cir. 2012) .....................................................................43

*Mississippi v. Johnson,*
　71 U.S. 475 (1866) .......................................................................................46

*NAACP v. Alabama,*
　357 U.S. 449 (1958) .....................................................................................23

*Oryszak v. Sullivan,*
　576 F.3d 522 (D.C. Cir. 2009) ....................................................................42

*Parks Sch. of Bus., Inc. v. Symington,*
　51 F.3d 1480 (9th Cir. 1995) .......................................................................23

*Pierce v. Society of Sisters,*
　268 U.S. 510 (1925) .....................................................................................23

*Powers v. Ohio*,
  499 U.S. 400 (1991) ...................................................................22

*Raines v. Byrd*,
  521 U.S. 811 (1997) ...................................................................25

*Reno v. Catholic Soc. Servs.*,
  509 U.S. 43 (1993) .....................................................................45

*Reno v. Flores*,
  507 U.S. 292 (1993) ...................................................................35

*Saavedra Bruno v. Albright*,
  197 F.3d 1153 (D.C. Cir. 1999) .................................................24

*Sale v. Haitian Ctrs. Council, Inc.*,
  509 U.S. 155 (1993) ...................................................................29

*Sea-Land Serv., Inc. v. ICC*,
  738 F.2d 1311 (D.C. Cir. 1984) .................................................18

*Secretary of the State of Md. v. Joseph H. Munson Co.*,
  467 U.S. 947 (1984) ...................................................................21

*Separation of Church & State Comm. v. City of Eugene*,
  93 F.3d 617 (9th Cir. 1996) .......................................................38

*Shalala v. Illinois Council on Long Term Care, Inc.*,
  523 U.S. 1 (2000) .......................................................................25

*Shaughnessy v. United States ex rel. Mezei*,
  345 U.S. 206 (1953) ...................................................................31

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ...................................................................23

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ............................................... 4, 43

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................20

*Town of Castle Rock v. Gonzales*,
  545 U.S. 748 (2005) ........................................................................32

*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950) ........................................................................31

*United States v. Salerno*,
  481 U.S. 739 (1987) ...................................................................34, 35

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ........................................................................27

*Voigt v. Savell*,
  70 F.3d 1552 (9th Cir. 1995) ...........................................................22

*Walz v. Tax Comm'n*,
  397 U.S. 664 (1970) ........................................................................39

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................21

*Washington State Grange v. Washington State Republican Party*,
  552 U.S. 442 (2008) ...................................................................3, 35

*Webster v. Doe*,
  486 U.S. 592 (1988) ........................................................................24

*Wedges/Ledges of Cal., Inc. v. City of Phoenix*,
  24 F.3d 56 (9th Cir. 1994) .........................................................30, 31

*William Jefferson & Co. v. Board of Assessment & Appeals*,
  695 F.3d 960 (9th Cir. 2012) ...........................................................35

*Yassini v. Crosland*,
  618 F.2d 1356 (1980) ......................................................................34

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ........................................................................46

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ............................................................... 17, 44

**Constitution:**

Art. I, § 8, cls. 3, 4...........................................................................21

**Statutes:**

Adjustment of Status of Certain Syrian Nationals,
  Pub. L. No. 106-378, § 2(b)(1)(A), 114 Stat. 1442 (2000) ...........................18

Consolidated Appropriations Act, 2016,
  Pub. L. No. 114-113, 129 Stat. 2242 (2015) ...................................6

Immigration and Nationality Act:
  8 U.S.C. § 1101 *et seq.* ...........................................................5
  8 U.S.C. § 1101(a)(13)(A) ........................................................ 5, 17
  8 U.S.C. § 1101(a)(13)(C) ........................................................ 16, 17
  8 U.S.C. § 1101(a)(15).............................................................22
  8 U.S.C. § 1101(a)(42).......................................................... 7, 39
  8 U.S.C. § 1104(a)(1)..............................................................24
  8 U.S.C. § 1152(c)(1)(A) ........................................................ 28, 29
  8 U.S.C. § 1157 .....................................................................7
  8 U.S.C. § 1157(a).................................................................28
  8 U.S.C. § 1157(a)(2).......................................................... 8, 27
  8 U.S.C. § 1157(a)(3).......................................................... 8, 27
  8 U.S.C. § 1157(c).................................................................20
  8 U.S.C. § 1157(c)(1)..............................................................8
  8 U.S.C. § 1157(f)(2)..............................................................39
  8 U.S.C. § 1158....................................................................20
  8 U.S.C. § 1181 ....................................................................5
  8 U.S.C. § 1181(c)..................................................................8
  8 U.S.C. § 1182(a)..................................................................5
  8 U.S.C. § 1182(a)(7)(A)(i).........................................................5
  8 U.S.C. § 1182(a)(7)(A)(i)(II)....................................................16
  8 U.S.C. § 1182(a)(7)(B)(i)(II).....................................................5
  8 U.S.C. § 1182(a)(7)(B)(iv) .......................................................6
  8 U.S.C. § 1182(a)(9)(B)(i)........................................................19
  8 U.S.C. § 1182(a)(9)(C) ..........................................................19

8 U.S.C. § 1182(f) ................................................................ *passim*

8 U.S.C. § 1184 .............................................................................. 22

8 U.S.C. § 1187 ................................................................................ 2

8 U.S.C. § 1187(a)(12) ..................................................... 6, 10, 36, 37

8 U.S.C. § 1187(a)(12)(A)(i)(I) ..................................................... 6

8 U.S.C. § 1187(a)(12)(A)(ii)(I) .................................................... 6

8 U.S.C. § 1187(a)(12)(A)(i)(II) .................................................... 6

8 U.S.C. § 1187(a)(12)(A)(ii)(II) ................................................... 6

8 U.S.C. § 1187(a)(12)(A)(i)(III) ................................................... 7

8 U.S.C. § 1187(a)(12)(A)(ii)(III) .................................................. 7

8 U.S.C. § 1187(a)(12)(D)(ii) ......................................................... 7

8 U.S.C. § 1201(g) ........................................................................ 19

8 U.S.C. § 1201(h) ................................................................... 5, 31

8 U.S.C. § 1201(i) .................................................... 5, 15, 22, 24, 31

8 U.S.C. § 1202 .............................................................................. 5

8 U.S.C. § 1203 ............................................................................ 16

8 U.S.C. § 1225(b)(1)(B) .............................................................. 20

8 U.S.C. § 1227(a)(1)(B) .............................................................. 24

8 U.S.C. § 1231(b)(3) ................................................................... 20

8 U.S.C. § 1231(b)(3)(A) .............................................................. 39

8 U.S.C. § 1361 ...................................................................... 5, 34

5 U.S.C. §§ 701-706 ..................................................................... 19

6 U.S.C. § 236(b)(1), (c)(1), (f) ..................................................... 24

8 U.S.C. § 1157 Note ................................................................... 39

22 U.S.C. § 6411 Note ................................................................. 39

**Regulations:**

Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (1992) .......................... 8

Exec. Order No. 13,769, 82 Fed. Reg. 8977 (2017) ........................ 1, 9

8 C.F.R. pt. 211 ............................................................................ 16

8 C.F.R. § 217.2(a) ......................................................................... 6

8 C.F.R. § 1208.16(c) .................................................................... 20

8 C.F.R. § 1208.17 ......................................................................................20

8 C.F.R. § 1208.18 ......................................................................................20

22 C.F.R. § 41.122(a) ..................................................................................31

22 C.F.R. § 42.1 ..........................................................................................31

22 C.F.R. § 42.82(a) ....................................................................................31

**Other Authorities:**

Proclamation No. 4865, 46 Fed. Reg. 48,107 (Sept. 29, 1981)..........................................8

Proclamation No. 5517, 51 Fed. Reg. 30,470 (Aug. 22, 1986) ................................. 8, 29

Proclamation No. 6958, 61 Fed. Reg. 60,007 (Nov. 22, 1996) ..........................................8

Proclamation No. 8342, 74 Fed. Reg. 4093 (Jan. 21, 2009)..........................................8

Proclamation No. 8693, 76 Fed. Reg. 44,751 (July 24, 2011)..........................................8

Dep't of Homeland Security, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program ..........................................7

Pew-Templeton Global Religious Futures Project, *Muslim Population by Country*, http://www.globalreligiousfutures.org/religions/muslims..................................32

U.S. Dep't of State, *Country Reports on Terrorism 2015* (June 2016), https://www.state.gov/documents/organization/258249.pdf ..........................................6

U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm ..........................................6

3 Charles Gordon et al., *Immigration Law and Procedure* § 34.01[5][a] (2016) ..........................................8

U.S. Dep't of State, *Foreign Affairs Manual* 302.11-3, *available at* https://fam.state.gov/default.aspx# .................................. 14

## INTRODUCTION

The President assumed office on January 20, 2017. Concerned that the Nation's procedures for screening aliens seeking entry to our country may be insufficient to combat the present and growing threat of international terrorism, he immediately ordered Members of his Cabinet to conduct a comprehensive review of those screening procedures. In the meantime, he ordered a temporary pause in the entry of aliens from seven countries that, in 2015 and 2016, Congress and the Department of Homeland Security (DHS) had determined to pose an increased threat of terrorism relative to other countries in the world—because they had been singled out by Congress as countries of terrorism concern (Iraq and Syria), had been designated by the Department of State as state sponsors of terrorism (Iran, Sudan, and Syria), or had been identified by DHS as presenting terrorism-related concerns that necessitated additional screening for aliens who had traveled there (Libya, Somalia, and Yemen). The Order reflects the President's judgment that the potential risk of erroneously admitting aliens from these seven terrorism-compromised countries while his new Administration was assessing the Nation's screening procedures was too high. As the title of the President's Order makes clear, it had a singular, and singularly important, purpose: "Protecting the Nation from Foreign Terrorist Entry Into the United States." Executive Order No. 13,769, 82 Fed. Reg. 8977 (2017).

The panel's decision nevertheless preliminarily approved a sweeping injunction of this temporary pause, relying primarily on the Order's purported suspension of the entry of aliens who are not, in fact, covered by the Order. That injunction bars enforcement of

the Order as to aliens who—all agree—have no constitutionally protected right to enter this country. The panel erred in a number of respects in affirming that injunction.

As an initial matter, the panel's decision is based on a misunderstanding of the scope of the Order. The Order's principal focus is on aliens who have never entered this country and have no connection to it. The Supreme Court "has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). Neither the States nor the panel disputed that basic proposition. The panel nonetheless concluded that the Order impacts aliens who are lawful permanent residents (LPRs), aliens who are already in the United States and did not seek to depart, and to aliens who have requested asylum from persecution. It does not. And under principles of constitutional avoidance, any ambiguity in the Order is properly construed to avoid what the panel perceived to be constitutional difficulties. Properly construed, the Order falls well within the President's statutory authority to "suspend the entry of all aliens or any class of aliens," 8 U.S.C. § 1182(f), and the U.S. Constitution.

The panel's opinion is erroneous in other respects as well. At the outset, it departed from the established rule against third-party standing to allow the States to assert the purported constitutional rights of aliens, even though the immigration statutes foreclose such claims, and even though there is no impediment to the aliens asserting their own rights—as demonstrated by numerous as-applied challenges brought throughout the country. The panel also speculated that non-LPR aliens might be able to assert procedural

2

due process rights with respect to the revocation of a visa—a proposition that no court has adopted, and that the Fifth Circuit has squarely rejected. *See Knoetze v. Dep't of State*, 634 F.2d 207, 212 (5th Cir. Unit B Jan. 1981). And while the panel wisely declined to endorse the States' erroneous claim that the Order discriminates on the basis of religion, it suggested that plaintiffs and courts could plumb the subjective motivations behind a facially neutral and legitimate Executive Order issued under the President's constitutional and statutory authority to regulate the entry of aliens to protect the Nation's security—an unprecedented possibility.

Finally, the panel erred in affirming the district court's injunction categorically barring implementation of the Order's temporary suspension of entry when there can be no serious dispute that, in the vast majority of its applications, the Order is entirely lawful. As the States have effectively conceded, and as the panel did not dispute, the Order raises no constitutional difficulty, for example, as applied to refugees and other aliens who have never entered the United States—the principal focus of the Order. At the very outset, that should have doomed the States' facial challenge, which could be sustained only if the relevant provisions of the Order were "unconstitutional in all of [their] applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). The panel's conclusion that some narrow categories of application might raise constitutional difficulties would, at most, be grounds for as-applied challenges brought by the individual aliens who are directly affected. At the very least, the panel should have "tailor[ed] the injunction to

remedy the specific harm alleged by the actual [plaintiffs]." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009).

In short, the panel's opinion readily meets the normal standards for rehearing en banc. Nevertheless, the United States does not seek en banc review of the merits of the panel's ruling. Rather than continuing this litigation, the President intends in the near future to rescind the Order and replace it with a new, substantially revised Executive Order to eliminate what the panel erroneously thought were constitutional concerns. *Cf.* Op. 24 (declining to narrow the district court's overbroad injunction because "[t]he political branches are far better equipped to make appropriate distinctions"). In so doing, the President will clear the way for immediately protecting the country rather than pursuing further, potentially time-consuming litigation. Under the unusual circumstances presented here—including the extraordinarily expedited proceedings and limited briefing to the panel, the complexity and constitutional magnitude of the issues, the Court's *sua sponte* consideration of rehearing en banc, and respect for the President's constitutional responsibilities—the government respectfully submits that the most appropriate course would be for the Court to hold its consideration of the case until the President issues the new Order and then vacate the panel's preliminary decision. To facilitate that disposition, the government will notify the Court of the new Order as soon as it is issued.

4

## STATEMENT OF THE CASE

### A.    Statutory background

In the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 *et seq.*, Congress established the framework for determining whether and under what circumstances aliens may enter the United States.  In general, an alien cannot lawfully enter the United States without being "admitted," which consists of the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  *Id.* § 1101(a)(13)(A).  Admission to the United States generally requires a valid immigrant or nonimmigrant visa or another entry document, such as a refugee travel document.  *See id.* §§ 1181, 1182(a)(7)(A)(i), (B)(i)(II), 1203.  LPRs, however, generally may enter without being considered applicants for admission.  *Id.* § 1101(a)(13)(C).

1.    To obtain a visa, an alien must undergo a process, usually including an in-person interview, and be found eligible by a State Department consular officer.  8 U.S.C. §§ 1201(a)(1), 1202.  Congress has provided, however, that "[n]othing in [the INA] shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted" into the United States, "if, upon arrival at a port of entry in the United States, he is found to be inadmissible."  *Id.* § 1201(h); *see id.* § 1182(a) (identifying grounds of inadmissibility).  The alien bears the burden to establish that he "is not inadmissible" and "that he is entitled to the nonimmigrant, immigrant * * * or refugee status claimed."  *Id.* § 1361.  Furthermore, a consular officer or the Secretary of State "may at any time, in his discretion, revoke such visa or other documentation."  *Id.* § 1201(i).

5

Congress has established a visa waiver program (VWP) that enables nationals of participating countries to seek admission to the United States for up to 90 days for tourism or certain business purposes without a visa. 8 U.S.C. §§ 1182(a)(7)(B)(iv), 1187; *see* 8 C.F.R. § 217.2(a) (listing VWP countries). In 2015, Congress barred VWP travel for individuals who have recently been present in (or, for four countries, are dual nationals of) a "country or area of concern" relating to terrorism. 8 U.S.C. § 1187(a)(12); *see* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2990. This modification was intended to guard against a heightened risk of terrorism from such individuals by ensuring that they were subject to the individualized visa screening process before being granted authorization to travel to, and being admitted to, the United States.

Congress's specification of countries of concern expressly included Iraq and Syria, areas where "[t]he Islamic State of Iraq and the Levant (ISIL) * * * maintain[s] a formidable force."[1] *See* 8 U.S.C. § 1187(a)(12)(A)(i)(I), (ii)(I). Congress also included countries that have been designated by the Secretary of State as state sponsors of international terrorism—currently, Iran, Sudan, and Syria. *Id.* § 1187(a)(12)(A)(i)(II), (ii)(II).[2] And Congress authorized DHS to designate additional countries or areas of concern, based on "whether the presence of an alien in the country or area increases the likelihood that the alien is a credible threat to the national security of the United States"; "whether a foreign

---

[1] U.S. Dep't of State, *Country Reports on Terrorism 2015* at 6 (June 2016), https://www.state.gov/documents/organization/258249.pdf.

[2] U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm.

6

terrorist organization has a significant presence in the country or area"; and "whether the country or area is a safe haven for terrorists." *Id.* § 1187(a)(12)(D)(ii); *see id.* § 1187(a)(12)(A)(i)(III), (A)(ii)(III). In February 2016, to ensure that the VWP's "requirements are commensurate with the growing threat from foreign terrorist fighters," and after consultation with the Secretary of State and the Director of National Intelligence, the Secretary of Homeland Security exercised that authority to exclude from the VWP aliens who have traveled to Libya, Somalia, or Yemen on or after March 1, 2011.[3] Accordingly, with limited exceptions, individuals with the requisite connection to one of the seven Section 1187(a)(12) countries—Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen—cannot travel or apply for admission to the United States under the VWP.

2. The U.S. Refugee Admissions Program (USRAP) is a separate means for aliens outside the United States to seek admission if they have been persecuted or have a well-founded fear of persecution on account of race, religion, nationality, or other specified grounds, and typically if they have been displaced from their country of nationality. 8 U.S.C. § 1101(a)(42); *see id.* § 1157. The President, in consultation with Congress, is authorized to determine the number of refugees to be admitted each year and to allocate refugee slots. *Id.* § 1157(a)(2)-(3). Refugees are screened for eligibility and admissibility abroad, and if a refugee is approved for admission he may be admitted to the United States

---

[3] DHS, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

without a visa. *Id.* §§ 1157(c)(1), 1181(c); *see* 3 Charles Gordon et al., *Immigration Law and Procedure* § 34.01[5][a] (2016) (describing the refugee application process).

3.      The INA grants the President broad discretionary authority to prohibit the entry of classes of aliens:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). "The President's sweeping proclamation power [under Section 1182(f)] provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the [inadmissibility] categories in section 1182(a)." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986), *aff'd mem.*, 484 U.S. 1 (1987). Section 1182(f) was included in the enactment of the INA in 1952, and numerous Presidents have invoked it since then. For example, President Reagan issued a proclamation that "suspend[ed] entry into the United States as immigrants by all Cuban nationals," subject to exceptions. Proclamation No. 5517, 51 Fed. Reg. 30,470 (1986).[4]

---

[4] *See also, e.g.*, Proclamation No. 8693, 76 Fed. Reg. 44,751 (2011); Proclamation No. 8342, 74 Fed. Reg. 4093 (2009); Proclamation No. 6958, 61 Fed. Reg. 60,007 (1996); Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (1992); Proclamation No. 4865, 46 Fed. Reg. 48,107 (1981).

8

### B.     The Executive Order

On January 27, 2017, the President invoked his authority under Section 1182(f) to issue Executive Order No. 13,769, entitled "Protecting the Nation From Foreign Terrorist Entry Into the United States." 82 Fed. Reg. 8977. The Order reflects the President's determination that his new Administration has not had an opportunity to assess whether current procedures for vetting aliens from terrorism-compromised parts of the world are adequate and that, absent such an assessment, the risk of admitting a terrorist is unacceptably high. It states that "[d]eteriorating conditions in certain countries due to war, strife, disaster, and civil unrest increase the likelihood that terrorists will use any means possible to enter the United States." Order § 1. "The United States must be vigilant during the visa-issuance process," the Order explains, "to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism." *Id.* The Order directs a number of actions in the interest of national security, *id.* §§ 2-11, and this case focuses on two of them.

1.      The Order directs the Secretary of Homeland Security to conduct an immediate review to "determine the information needed from any country" to assess whether an individual seeking a visa or other immigration benefit "is who the individual claims to be and is not a security or public-safety threat." Order § 3(a). The Order directs the Secretary to submit a report with the results of that review within 30 days. *Id.* § 3(b). Once that report is submitted, the Order directs a process for requesting necessary information from foreign governments that do not supply such information, and for

9

recommending a list of countries for inclusion on a subsequent Presidential proclamation that would suspend entry of foreign nationals from countries that do not provide the requested information. *Id.* § 3(d)-(f).

The President, moreover, has determined that while such review is ongoing, the potential risk of admitting nationals from certain terrorism-compromised countries, who may be bent on harming U.S. national security, is too high. While the review ordered in Section 3(a) is ongoing, Section 3(c) of the Order thus suspends for 90 days the entry of certain aliens, as immigrants and nonimmigrants, "from countries referred to in * * * 8 U.S.C. 1187(a)(12)"—the provision under which Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen have been designated as countries of concern due to their particularly strong nexus to terrorism. Order § 3(c). The Order expressly relies upon the President's authority under Section 1182(f), and explains that the temporary suspension is intended "to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists or criminals." *Id.* The Order authorizes the Secretaries of State and Homeland Security to make case-by-case exceptions to the temporary suspension when doing so would be in the national interest. *Id.* § 3(g).

2.  The President made a similar determination with respect to USRAP, again concluding that, while his Administration's review is ongoing, the potential risk of erroneously admitting aliens bent on harming the United States and its citizens is too high. Section 5 thus addresses the USRAP and its screening procedures: Section 5(a) suspends

the USRAP for 120 days to allow the Secretary of State, in conjunction with the Secretary of Homeland Security and in consultation with the Director of National Intelligence, to "review the USRAP application and adjudication process to determine what additional procedures should be taken to ensure that those approved for refugee admission do not pose a threat to the security and welfare of the United States" and to "implement such additional procedures." Order § 5(a). Section 5(c) also suspends the admission of nationals of Syria as refugees until the President determines "that sufficient changes have been made to the USRAP to ensure that admission of Syrian refugees is consistent with the national interest." *Id.* § 5(c). The Order provides that, notwithstanding the temporary suspension of the refugee program, the Secretaries of State and Homeland Security may admit refugees on a case-by-case basis so long as the admission is in the national interest and would not pose a risk to the security or welfare of the United States. *Id.* § 5(e).

The Order further specifies that, following the 120-day suspension, "[r]efugee applicants who are already in the USRAP process may be admitted upon the initiation and completion of these revised procedures." Order § 5(a). The Order contemplates the admission of up to 50,000 refugees during fiscal year 2017. *Id.* § 5(d). Section 5(b) provides that, once the refugee program resumes, the Secretary of State, in consultation with the Secretary of Homeland Security, shall "make changes, to the extent permitted by law, to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." *Id.* § 5(b).

11

C.     Procedural history

1.     On January 30, 2017, the State of Washington brought this action asserting constitutional and statutory challenges to the Order. On the same day, the State moved for a temporary restraining order. The government opposed, and the district court held a hearing on February 3, 2017. In the interim, the State filed an amended complaint adding the State of Minnesota as a plaintiff. D. Ct. Doc. 18.

At the conclusion of the hearing, the district court entered a nationwide injunction, effective immediately, barring any enforcement of Sections 3(c) and 5(a), (b), and (c) of the Order. 2/3/17 Transcript (Tr.) 48-49; D. Ct. Order. It also barred enforcement of Section 5(e) "to the extent [it] purports to prioritize refugee claims of certain religious minorities." D. Ct. Order 5. The court denied the government's motion to stay the injunction pending appeal. Tr. 50.[5]

2.     On February 4, 2017, the government appealed the district court's injunction and sought an emergency stay pending appeal. On February 9, following briefing and oral argument, a panel of this Court denied the motion for a stay.

The panel concluded that the States have Article III standing by virtue of their operation of state universities. Op. 8-13. The panel reasoned that the Order "prevents nationals of seven countries from entering Washington and Minnesota" and, "as a result,

---

[5] The district court's order is styled a "temporary restraining order," D. Ct. Order 1, but the panel concluded that it "possesses the qualities of an appealable preliminary injunction," Op. 7.

12

some of these people will not enter state universities, some will not join those universities as faculty, some will be prevented from performing research, and some will not be permitted to return if they leave." *Id.* at 12. The panel further concluded that "the 'third party standing' doctrine" allows the States "to assert the rights of the students, scholars, and faculty affected by" the Order. *Id.* at 10-11.

On the merits, the panel concluded that the government had "not demonstrated" that the States "lack[ed] viable claims based on the due process rights of persons who will suffer injuries to protected interests due to" the Order. Op. 22-23; *see id.* at 19-24. The panel focused almost exclusively on asserted procedural due process rights of LPRs, on the theory that the Order might be applied to LPRs notwithstanding guidance from the White House Counsel clarifying that the Order did not apply to LPRs. *Id.* at 21-22. The panel addressed the viability of claims based on other classes of aliens in a sentence, asserting that the States "have potential claims regarding possible due process rights" of "persons who are in the United States, even if unlawfully," "non-immigrant visaholders who have been in the United States but temporarily departed or wish to temporarily depart," "refugees," and "applicants who have a relationship with a U.S. resident or an institution that might have rights of its own to assert." *Id.* at 22 (citations omitted). Although the panel acknowledged that "[t]here might be persons covered by the [injunction] who do not have viable due process claims," it declined to narrow the injunction. *Id.* at 23; *see id.* at 23-24. The panel stated that "even if the [injunction] might be overbroad in some respects, it is not our role to try, in effect, to rewrite the Executive

13

Order." *Id.* at 24. "The political branches are far better equipped," it observed, "to make appropriate distinctions." *Id.*

3.    On February 10, 2017, this Court issued an order instructing the parties to file simultaneous briefs on whether this matter should be reconsidered en banc.

## SUMMARY OF ARGUMENT

The panel opinion is seriously flawed in several important respects. Even in its preliminary and tentative form, it should not remain circuit precedent.

First, the panel's decision rests on a misunderstanding about the scope of the Order. Contrary to the panel's conclusion, the Order does not apply to LPRs, who remain generally free to travel abroad and to return to the United States. Rather, the Order's focus is on aliens who are seeking initial entry to the United States and non-LPR aliens who have left the United States and are seeking to return, who have no statutory or constitutional entitlement to enter the United States, *see, e.g., Landon v. Plasencia*, 459 U.S. 21, 32 (1982).

Second, the panel departed from longstanding principles of third-party standing and the structure of the INA in holding that the States' suit could proceed. The States are not the proper plaintiffs—and this sweeping facial challenge is not the proper case—for adjudicating the validity of the Order as applied to a third-party alien in individual circumstances. Rather, under Article III, the individuals who are actually affected by a concrete application of the Order may bring suit (as many have), and a court could adjudicate such a case while taking into account its particular circumstances and Congress's express limitations on the scope of judicial review. By contrast, the States here have no

14

legally cognizable interest in bringing a challenge on behalf of all aliens affected by the Order, past, present, or future. And the States' suit challenging the denial or revocation of visas sought or held by third-party aliens is also foreclosed by the express provisions of the INA, 8 U.S.C. § 1201(i), and the longstanding principle of consular nonreviewability.

Third, the panel seriously erred in holding that the Order should be facially enjoined on procedural due process grounds. With the scope of the Order properly understood, the overwhelming majority of its applications give rise to no due process concerns whatsoever. Its focus is aliens seeking initial entry, who have "no constitutional rights regarding [their] application[s]," *Plasencia*, 459 U.S. at 32, much less any due process rights that can be invoked by the States as plaintiffs. And even if the Order did implicate a protected property interest for some aliens, the panel erred in holding that the Due Process Clause required an individualized hearing. Such hearings are not required where, as here, the government acts through categorical judgments rather than individual adjudications. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 446 (1915). The panel likewise seriously erred in declining to narrow the district court's sweeping injunction. Any concerns about the potential procedural due process rights of a small subset of aliens cannot justify halting all applications of the relevant provisions of the Order.

Notwithstanding these serious flaws, the government does not seek en banc review on the merits. Instead, the government asks that the Court hold its consideration of the case until a new Order is issued and respectfully requests that the panel opinion be vacated at that time.

15

## ARGUMENT

### I. The Panel's Decision Rests On A Misconception Of The Order's Scope

The principal basis of the panel's decision was its conclusion that the Order applies to LPRs. *See* Op. 21-22 (discussing the due process rights of returning LPRs). The Order is ambiguous in this respect and, at the time it was issued, was reasonably interpreted to encompass LPRs. However, it is also reasonably interpreted to exclude LPRs, and the White House Counsel's "[a]uthoritative guidance" confirms that narrower interpretation. The panel seriously erred in construing the Order to raise constitutional difficulties when the government instead advanced an interpretation that would avoid those very difficulties. The panel appeared to misconstrue the Order in other respects as well.

#### A. The Order does not apply to LPRs

Unlike other classes of aliens, LPRs are generally able to travel abroad and return to the United States without being considered "applicant[s] for admission," 8 U.S.C. § 1101(a)(13)(C), and without a visa, *see, e.g.,* 8 U.S.C. §§ 1181(a)-(b), 1182(a)(7)(A)(i)(I), 1203; 8 C.F.R. pt. 211, 22 C.F.R. § 42.1(a). Section 3(c) of the Order refers to "immigrant and nonimmigrant entry," Order § 3(c), which could reasonably be construed to encompass returning LPRs. That phrase also appears, however, among other sections of the Order that focus predominantly on entry into the United States pursuant to a visa. Section 1 states that the Order addresses concerns about the "visa-issuance process," and

16

Section 3 provides for the "Suspension of Issuance of Visas and Other Immigration Benefits," with a focus on improving visa screening. Improving the visa-issuance process, suspending the issuance of visas, improving visa screening, and assessing the "information needed from any country to adjudicate any visa, admission or other benefit," Order § 3, do not have any application to visa-free entry by LPRs, which occurs without the LPRs seeking admission. And Section 5 of the Order, which applies only to refugees entering through the USRAP, has no potential application to LPRs. Particularly in the context of judicial review, where principles of constitutional avoidance require that any ambiguity be resolved in a manner that avoids constitutional concerns, the Order is properly interpreted not to extend to LPRs. *E.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).[6]

Moreover, the White House Counsel has confirmed that the Order does not apply to LPRs. His "[a]uthoritative guidance" states that "sections 3(c) and 3(e) do not apply" to LPRs and advises the Acting Secretary of State, the Acting Attorney General, and the Secretary of Homeland Security to "immediately convey this interpretive guidance to all individuals responsible for the administration and implementation of the Executive Order." Stay Mot., Ex. D. Although the panel expressed skepticism about the White House Counsel's authority to issue "an amended order superseding the Executive Order signed by the President," Op. 21-22, the guidance here did not constitute a new Executive Order, but instead clarified ambiguous language.

---

[6] Because the Order does not apply to LPRs, the Court need not address the interplay between Section 1182(f) and 8 U.S.C. § 1101(a)(13)(A) and (C).

17

The White House Counsel, no less than the counsel of an executive agency, is authorized to provide such a clarification on behalf of his client. When interpreting executive orders, courts construe the text in a manner intended to give effect to the President's intent. *See Sea-Land Serv., Inc. v. ICC*, 738 F.2d 1311, 1314 (D.C. Cir. 1984). And courts regularly defer to the views of an Executive Branch agency's counsel as to the interpretation of agency rules or regulations. *See, e.g., Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (deferring to an interpretation of a treaty set forth for the first time in an amicus brief signed by the Legal Adviser, not the Secretary of State); *Auer v. Robbins*, 519 U.S. 452, 462 (1997).

In declining to proceed on the assumption that the government would follow the White House Counsel's guidance, the panel provided no sound basis for disregarding the "presum[ption]" that the government "act[s] in good faith" when it discontinues a challenged policy or practice. *America Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) (collecting cases); *see Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990) ("[I]t would seem inappropriate for the courts either to impute such manipulative conduct to a coordinate branch of government, or to apply against that branch a doctrine that appears to rest on the likelihood of a manipulative purpose."). Moreover, the panel's interpretation doubly upends fundamental principles of judicial restraint: first, by construing the Order to create constitutional concerns (by interpreting it to cover LPRs); and second, by using those concerns as the basis for enjoining key provisions of the Order in *all* of their applications—including ones that, as explained below, are unquestionably constitutional.

18

**B.** **The panel appeared to misapprehend the Order's application to other classes of aliens**

The Order's application is narrower than the panel believed in other respects as well. First, the panel appeared to assume that, in addition to affecting aliens who are currently outside the United States and aliens who are present in this country but "wish to temporarily depart" and then return, the Order also affects some "other persons who are in the United States, even if unlawfully." Op. 22. But the Order's suspension of entry into the United States does not apply to an alien who is present in this country—whether lawfully or unlawfully—unless that alien is not an LPR and "wish[es] to temporarily depart" (*id.*) and then return. Order § 3(c).[7]

The panel also appeared to conflate the USRAP *overseas* refugee process with the process for aliens in the United States or arriving at the border to seek asylum, withholding of removal, or similar protection. *See* Op. 22 (discussing refugees but citing 8 U.S.C. § 1231 note); *see id.* at 20. The mistake may have been due to the overlap between asylum and the definition of a "refugee," *see* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A), but the USRAP is a distinct program with distinct statutory authority, *see id.* § 1157. Section 5 of the Order suspends the USRAP, thereby barring for 120 days (absent a case-specific waiver) the

---

[7] Aliens who have been unlawfully present in the United States for more than 180 days would in any event ordinarily be ineligible to return for three to ten years after departure, even apart from any application of the Order. *See* 8 U.S.C. § 1182(a)(9)(B)(i); *see also id.* § 1182(a)(9)(C) (permanent bar applicable in some circumstances). Furthermore, such aliens generally would be ineligible for a visa on those and additional grounds. *See id.* § 1201(g); *see also* U.S. Dep't of State, 9 *Foreign Affairs Manual* 302.11-3, https://fam.state.gov/FAM/09FAM/09FAM030211.html.

admission of refugees from outside the country pursuant to 8 U.S.C. § 1157(c) and 8 C.F.R. Part 207. But Section 5 does not address the existing statutes or regulations for aliens who are physically present or arriving in the United States and are seeking asylum or similar protection. Such aliens are not processed through USRAP, and may obtain relief or protection in the form of asylum, withholding of removal, or protection under regulations implementing the U.S. obligations under the Convention Against Torture. *See* 8 U.S.C. §§ 1158, 1225(b)(1)(B), 1231(b)(3); 8 C.F.R. §§ 1208.16(c), 1208.17, 1208.18. The Order does not alter those procedures.

## II. The Panel Erred In Concluding That The States Can Likely Bring Their Own Injunctive Action By Relying On The Asserted Rights Of Individual Aliens

Particularly in light of the proper understanding of the Order, the States have no legal basis to bring this challenge asserting the rights of third parties, and the panel erred in concluding that the States were likely to prevail in that respect. The Order does not require States to do, or refrain from doing, anything. And the States here cannot overcome the many legal impediments to suit by a plaintiff who "is not [it]self the object of the government action or inaction [it] challenges," *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation omitted).

1. A State has no general authority to sue the United States based on an assertion of legal rights that are not its own. "[I]t is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as parens patriae."

20

*Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *see, e.g., Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) ("A State does not have standing as *parens patriae* to bring an action against the Federal Government."). It follows *a fortiori* that States cannot sue the federal government as *parens patriae* on behalf of noncitizen aliens who are temporary residents of (or visitors to) the State. The constitutional structure and comprehensive scope of the INA render the bar to such a suit particularly compelling, because the aliens' residency (or visitation) status is itself a matter of national immigration law and policy subject to the federal government's control. *See* U.S. Const. art. I, § 8, cls. 3 and 4; *see also, e.g., Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012).

Indeed, even generally applicable principles of third-party standing foreclose this suit. In the absence of affirmative statutory authorization providing otherwise, a plaintiff must comply with "the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Exceptions to that rule are rare and narrow. *See Kowalski*, 543 U.S. at 129-30. Outside the context of free-speech rights or the "enforcement of [a] challenged restriction *against the litigant*"—neither of which is at issue here—an assertion of such "third party standing" is limited to circumstances in which it is "necessary" and the party seeking it can "make two additional showings." *Id.* (quotation marks and citation omitted); *see Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956-57 (1984) (discussing special chilling concerns in speech context). Specifically, "a party seeking to champion the rights of third

21

persons must demonstrate that, 'first, it has a close relationship with the person who possesses the right and second[,] there is a hindrance to the possessor's ability to protect his own interests.'" *Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1105 n.3 (9th Cir. 2006) (quoting *Kowalski*, 543 U.S. at 130) (quotation marks and alterations omitted).

The States cannot make those showings here. A State does not have the requisite "close relationship" to aliens whose presence in the United States is temporary and expressly contingent on federal law and policy. *See* 8 U.S.C. § 1101(a)(15) (defining nonimmigrant visa categories, many of which are temporary and require the alien to establish that he has a residence abroad that he has no intention of abandoning); *id.* § 1184(a)(1) ("The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary of DHS] may by regulations prescribe."); *id.* § 1201(i) (discretionary authority to revoke visa). The States' relationship with aliens who have not even traveled to the United States—such as aliens who *might* at some point in the future seek to visit, enroll in, or work at one of their universities, Op. 10—is even more attenuated. *See Voigt v. Savell*, 70 F.3d 1552, 1565 (9th Cir. 1995) (no close relationship where plaintiff may "occasionally be in a position to hire a non-resident for a position within the state court system"); *see also Kowalski*, 543 U.S. at 131 (no close relationship between lawyers and hypothetical future clients).

Moreover, even if the States had the requisite relationship with some aliens, the States cannot show that they are in a superior position to bring suit because of some hindrance to the aliens' ability to protect their own interests. Rather, the "likelihood and

22

ability of" others "to assert their own rights," *Powers v. Ohio*, 499 U.S. 400, 414 (1991), is amply demonstrated by the many individual challenges to the Order that have been filed nationwide. *See Hodak v. City of St. Peters*, 535 F.3d 899, 905 (8th Cir. 2008) (noting agreement among the circuits that "that if a third party actually asserts his own rights, no hindrance exists, and third-party standing is improper"). Those individual suits would be a far better vehicle than this abstract facial challenge for litigating the issues of individualized process in the context of specific claims by identified individuals.[8]

    2.    Beyond these general standing principles, the States' suit is improper because even individual aliens are generally precluded from challenging the denial or revocation of a visa. The Supreme Court has "'long recognized'" a doctrine of "consular nonreviewability," under which visa decisions by a State Department consular officer are "'largely immune from judicial control'" and thus cannot be challenged in court, even by

---

[8] The cases the panel relied upon (Op. 10-11) in support of the States' third-party standing all involved circumstances in which a "challenged restriction against the litigant" provided a basis for recognizing third-party standing, *Kowalski*, 543 U.S. at 130 (emphasis and quotation marks omitted). Nearly all involved direct regulation of the plaintiffs. *See Craig v. Boren*, 429 U.S. 190, 191-92 (1976) (plaintiff restricted in selling alcohol); *Singleton v. Wulff*, 428 U.S. 106, 108, 112-13 (1976) (plaintiff restricted in obtaining Medicaid reimbursement); *Griswold v. Connecticut*, 381 U.S. 479, 480 (1965) (plaintiff criminally convicted); *NAACP v. Alabama*, 357 U.S. 449, 451 (1958) (plaintiff held in contempt); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1483 (9th Cir. 1995) (plaintiff terminated from loan-guarantee program). And in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), the Supreme Court found that the challenged mandatory public school law was tantamount to a flat ban on the plaintiff private schools' business model and threatened "destruction of their business and property." *Id.* at 536. By contrast, the Order does not regulate the States at all, and they cannot remotely suggest that they face the sort of existential threat present in *Pierce*.

23

the affected aliens. *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792, 794-95 (1977)); *see, e.g., Saavedra Bruno v. Albright*, 197 F.3d 1153, 1158-62 & n.2 (D.C. Cir. 1999). This Court has identified "a limited exception to the doctrine * * * where the denial of a visa implicates the constitutional rights of American citizens." *Cardenas*, 826 F.3d at 1169 (quotation marks and citation omitted); *see id.* at 1169-71; *cf. Kerry v. Din*, 135 S. Ct. 2128, 2139 (2015) (Kennedy, J., concurring in the judgment) (assuming without deciding that such an exception existed in a challenge based on U.S.-citizen spouse's due-process rights); *Kleindienst v. Mandel*, 408 U.S. 753, 760 (1972) (similar for challenge based on U.S. citizens' First Amendment rights). But there is no basis for the States to rely on any such exception to bring suit based on rights alleged to belong to the aliens themselves.

The INA itself confirms the preclusion of the third-party review that the States seek here. Congress has never authorized judicial review of the denial of a visa. *See, e.g.,* 6 U.S.C. § 236(b)(1), (c)(1), (f); 8 U.S.C. § 1104(a)(1). And 8 U.S.C. § 1201(i) explicitly provides that a "consular officer or the Secretary of State may at any time, in his discretion, revoke [a] visa or other documentation," and that "[t]here shall be no means of judicial review * * * of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under" 8 U.S.C. § 1227(a)(1)(B). Even if that provision could be construed not to bar the affected alien himself from challenging a visa revocation if he had a cognizable constitutional claim and no procedure through which to raise it, *see Webster v. Doe*, 486 U.S. 592, 603 (1988), the textually categorical bar to review

24

by *anyone* would clearly preclude the sort of third-party claims on which the States' suit here relies. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 24 (2000) (concluding that statutory procedure to channel constitutional claims was adequate, even though third-party association could not invoke it on affected institution's behalf); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345-48, 351-52 (1984) (finding it "fairly discernible" that only milk producers, and not consumers, could bring statutory claims challenging certain agricultural marketing orders) (quotation marks and citation omitted).

3.      The panel's analysis also fails to establish that the States have themselves suffered the sort of "legally and judicially cognizable" injury, *Raines v. Byrd*, 521 U.S. 811, 819 (1997), that would give them Article III standing.  The panel reasoned that the States had made the necessary showing by "alleg[ing]" that the Order would prevent entry of aliens who might otherwise come to state universities as faculty or students, and would chill aliens currently affiliated with the universities from leaving the country for research or other purposes out of concern that they might be unable to return.  Op. 12; *see id.* at 10. But on that broad theory, a State would suffer an Article III injury whenever any aspect of the immigration statutes and regulations—or any other law—prevented a scholar from speaking at an academic conference sponsored by a State university.  And in any event, such incidental consequences of the actions of the President and other federal officials under the INA do not constitute legally and judicially cognizable injuries to a State, because the INA confers no cognizable interest on a State or other third party in the admission of an alien or the revocation of a visa.

25

The panel additionally disregarded Article III's requirement of a "certainly impending" injury, *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1143 (2013), by failing to consider individual aliens' opportunity to seek a case-specific waiver under the Order (or even whether they planned to travel during the limited 90-day window). *See* Order §§ 3(g), 5(e). The panel's failure to address the Order's waiver provisions likewise led it to overlook the ripeness problems inherent in adjudicating this all-encompassing facial attack. Its affirmance of the injunction thwarts the government's "efforts to refine its policies through application" of those provisions and prevents "further factual development" of those provisions' application to individual aliens that "would significantly advance [a court's] ability to deal with the legal issues presented." *Habeas Corpus Res. Ctr. v. Dep't of Justice*, 816 F.3d 1241, 1253-54 (9th Cir. 2016) (alteration, quotation marks, and citations omitted).

4.      Finally, the panel's decision that the States may bring this suit cannot be justified on any of the alternative grounds offered by the States. The "special solicitude" for state plaintiffs referenced in *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), does not support independent state standing in the absence of a judicially cognizable "quasi-sovereign interest[]" (there, protecting a State's territory) protected by a specific "procedural right" (there, a cause of action under the Clean Air Act). *See* 549 U.S. at 520. Asserted effects of the Order on state taxation or other activities, *see* D. Ct. Doc. 17, at 2-3—which are no different in kind from the effects of any of a multitude of federal laws and regulations—have never been recognized as valid bases for a State to sue the federal government. That must be especially so with respect to implementation of the INA by the

26

President and the Heads of Departments on whom Congress has conferred broad authority, given the Constitution's vesting of plenary authority over immigration in the national government. And even assuming a State might have rights of its own under the Establishment Clause with respect to the federal government's denial of entry to aliens outside the United States, it still would have to show "personal injury suffered by them as a consequence of" an alleged violation in order to bring suit. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) (emphasis omitted).

## III. The Panel Erred In Concluding That The Defendants Were Unlikely To Succeed On The Merits

### A. The Order is a valid exercise of the President's authority under Section 1182(f)

The Constitution vests Congress with "exceptionally broad power to determine which classes of aliens may lawfully enter the country." *Fiallo*, 430 U.S. at 794. The INA in turn grants substantial authority over that issue to the President. Under 8 U.S.C. § 1182(f), the President "may by proclamation * * * suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate," "for such period as he shall deem necessary," "[w]henever [he] finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States." And under 8 U.S.C. § 1157(a)(2) and (3), he may determine the number of refugees whose admission "is justified by humanitarian concerns or is otherwise in the national interest," and may also determine how to allocate admissions among such refugees.

27

The Order fits well within those expansive delegations of authority. Section 1182(f) is designed to permit the President to make, and to recalibrate, judgments about whether the degree of risk associated with the entry of particular classes of aliens into the United States is acceptable. In issuing the Order, the President determined that temporary suspension of entry of aliens from seven countries previously determined to pose a special risk of terrorism, and temporary suspension of the U.S. refugee program, is in the national interest to protect against terrorist threats to our Nation during the brief period in which the Administration is reviewing its procedures for screening aliens seeking admission. The Order is thus temporally and geographically limited, but nonetheless serves a national interest of the highest order. Neither the States nor the panel has questioned that 8 U.S.C. §§ 1182(f) and 1157(a) broadly allow the President to suspend the entry of aliens under the visa or refugee programs, if he determines that such entry is detrimental to national security.

Nor is the President's discretionary authority under Section 1182(f) to suspend entry of classes of aliens limited by 8 U.S.C. § 1152(a)(1)(A), which provides that (with certain exceptions) "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." By its terms, that provision addresses only the process of allocating "immigrant" visas—which are granted to persons seeking admission to the United States for lawful permanent residence. 8 U.S.C. §§ 1101(a)(15), (20), 1201(a)(1)(A). Moreover, although Section 1152(a)(1)(A) establishes a default rule that applies in the absence of any specific proclamation by the President, Congress did not purport to cabin

28

the President's broad preexisting authority under Section 1182(f) to suspend the entry "of any aliens or of any class of aliens" based on his judgment about the national interest.

The States' contrary view would effect an improper implied partial repeal and would raise serious constitutional questions. Among other things, it would disable the President from suspending the entry of immigrants from a country with which the United States is on the verge of war. Unsurprisingly, therefore, Section 1152(a)(1)(A)'s limitation on nationality-based distinctions in the allocation of immigrant visas has *never* been understood to constrain the President's authority under Section 1182(f). To the contrary, President Reagan invoked that authority to "suspend entry into the United States as immigrants by all Cuban nationals," subject to certain exceptions not relevant here. Proclamation No. 5517, 51 Fed. Reg. 30,470 (1986). And the Supreme Court has deemed it "perfectly clear that 8 U.S.C. § 1182(f) * * * grants the President ample power" to establish a naval blockade "that would simply deny illegal Haitian migrants the ability to disembark on our shores." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993) (citing 8 U.S.C. § 1182(f) (1988)).[9]

### B. The States' due process claim lacks merit

The panel reasoned that the government was unlikely to prevail on the States' procedural due process claim. Op. 19-24. That conclusion was seriously mistaken for

---

[9] Even if Section 1152(a)(1)(A) could be construed as a constraint on the President's authority under Section 1182(f), it would apply only in the context of immigrant visas. It would not justify enjoining the application of Section 5 of the Order to refugees or Section 3 of the Order to non-immigrant aliens.

three independent reasons. First, as noted above, it rests on a misunderstanding of the scope of the Order. Properly construed, the Order does not deprive any alien of a liberty or property interest protected by the Due Process Clause. Second, even if the Order implicated a protected interest, the Due Process Clause does not require individualized notice and an opportunity to respond where, as here, the government acts through a valid categorical judgment. The States' claim is at bottom a challenge to the *substance* of the Order, not to the procedures by which it was implemented. And third, even if the panel were correct that particular applications of the Order might violate the Due Process Clause, the States could not prevail in this facial challenge because—as the States themselves have conceded—the vast majority of the Order's applications are to aliens with no due process rights at all in seeking admission. The concerns identified by the panel would, at most, provide a basis for narrow as-applied challenges by the affected aliens, not facial invalidation at the behest of a third-party State.

1. "A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994); *see Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). The panel's due process analysis focused on LPRs, who have a protected interest in entering this country when returning from brief trips abroad. Op. 20-22; *see Plasencia*, 459 U.S. at 33-34. But the Order does not apply to LPRs. *See* pp. 16-19, *supra*. And other aliens do not have a liberty or property interest in entering this country. Indeed, the Supreme Court "has long held that an alien seeking

30

initial admission to the United States requests a privilege and has no constitutional rights regarding his application." *Plasencia*, 459 U.S. at 32; *see, e.g.*, *Mandel*, 408 U.S. at 762; *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

The panel did not question that long-settled rule. But it suggested that "non-immigrant visaholders who have been in the United States but temporarily departed" or who are present now but "wish to temporarily depart" might have "potential claims regarding possible due process rights" implicated by the revocation of their visas. Op. 22. That is incorrect. "To have a property interest in a benefit," a person "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. Where a plaintiff asserts a property (or liberty) interest in a statutory benefit like admission upon a visa, the existence of the requisite entitlement "is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms." *Wedges/Ledges*, 24 F.3d at 62 (quotation marks and citation omitted). Here, the relevant statute unequivocally instructs that a visa does not "entitle any alien * * * to be admitted [to] the United States." 8 U.S.C. § 1201(h) (footnote omitted). And Congress further specified that "the Secretary of State may at any time, in his discretion, revoke [a] visa." *Id.* § 1201(i); *see* 22 C.F.R. §§ 41.122(a), 42.82(a) (same).

An alien thus has no "claim of entitlement" to issuance of a visa, to keep a visa, or to be admitted to the United States with a visa. *Roth*, 408 U.S. at 577. Accordingly, "the revocation of an entry visa issued to an alien already within our country has no effect upon

31

the alien's liberty or property interests." *Knoetze v. Dep't of State*, 634 F.2d 207, 212 (5th Cir. Unit B Jan. 1981). In rejecting a parallel due process challenge to the Order, a district court likewise concluded that "[t]here is no constitutionally protected interest in either obtaining or continuing to possess a visa." *Loughhalam v. Trump*, No. 17-cv-10154, 2017 WL 479779, at *5 (D. Mass. Feb. 3, 2017); *see Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) ("[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion."); *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465-67 (1981).

The panel also suggested (Op. 22) that the Order could implicate the Due Process Clause as applied to aliens "who have a relationship with a U.S. resident or an institution that might have rights of its own to assert." *Cf. Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008) (stating that a U.S. citizen had a protected interest in her marriage that allows "limited judicial inquiry" with respect to the consular officer's refusal of her husband's immigrant visa application). That is wrong. *See Din*, 135 S. Ct. at 2138 (opinion of Scalia, J.) (concluding that a U.S. citizen "was not deprived of 'life, liberty, or property' when the Government denied [her alien spouse] admission to the United States").[10] But even if the panel were correct, the potential for such claims could not support the district court's sweeping injunction. The States have not even attempted to assert that *the States themselves* have any such constitutional rights with respect to the admission of an alien seeking an

---

[10] Justice Kennedy's controlling opinion in *Din* assumed, but did not decide, that "a citizen has a protected liberty interest in the visa application of her alien spouse." 135 S. Ct. at 2139 (Kennedy, J., concurring in the judgment); *see Cardenas*, 826 F.3d at 1169-72.

immigrant visa, or that they could represent the interests of U.S. citizens who might assert such rights. Instead, the States have focused on the asserted due process rights *of the affected aliens. See* States' Resp. to Stay Mot. 14-18; Am. Mot. for TRO 14-18. But, as demonstrated above, the States may not assert the interests of an individual alien under the INA, and the denial or revocation of *that* alien's visa "jeopardizes no liberty or property interest entitled to constitutional protection." *Knoetze*, 634 F.2d at 212.

2. In any event, there would be no merit to the due process claim even if the Order implicated protected liberty or property interests. The panel assumed that "[t]he Government may not deprive a person of * * * [a] protected interest without providing 'notice and an opportunity to respond.'" Op. 19 (citation omitted). But those procedures are not required where, as here, the challenged rule reflects a "general determination" rather than one resting on "individual grounds." *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 446 (1915); *see Gallo v. U.S. Dist. Court for the Dist. of Ariz.*, 349 F.3d 1169, 1181-82 (9th Cir. 2003) (citing *Bi-Metallic* and explaining that the requirement of notice and a hearing applies only where "the government action is adjudicative"); *see also Din*, 135 S. Ct. at 2144 (Breyer, J., dissenting) (same).

This Court applied that principle in an analogous context to reject a due process challenge to a decision by the Immigration and Naturalization Service (INS) "to revoke the deferred departure dates that the INS had previously granted to Iranian nationals" in the United States. *Yassini v. Crosland*, 618 F.2d 1356, 1358 (9th Cir. 1980) (per curiam). Relying on *Bi-Metallic*, the Court held that "[w]here an agency action is not based on individual

33

grounds, but is a matter of general policy, no hearing is constitutionally required." *Id.* at 1363. The same is true here: the Order suspends temporarily the refugee program and the entry of non-LPR aliens from certain countries as a "matter of general policy"; it does not rest on "individual grounds." *Id.* Accordingly, the government was not required to provide notice and an opportunity to respond to each alien affected by the Order. It is, moreover, unclear what constitutionally mandated purpose would be served by the individualized hearings that the States demand. The States do not contend that the existing procedures being used by the government to identify those aliens are insufficient, or that they are resulting in the application of the Order to aliens who do not fall within its terms. Nor could they, given the ease of determining whether any particular alien is an LPR or has one or another kind of visa. Rather, those aliens seek to enter notwithstanding the President's substantive determination to suspend the entry of particular categories of aliens. And in any event, even if some additional process were due, it is provided by the waiver procedure described in Sections 3(g) and 5(e) allowing for individualized consideration of the circumstances of particular aliens. *Cf.* 8 U.S.C. § 1361 (aliens generally bear burden of proving admissibility).

3. Finally, even if the Order were thought to violate due process as applied to particular aliens or categories of aliens, the States' claim would still fail. The States brought a *facial* challenge to the relevant provisions of the Order. But under *United States v. Salerno*, 481 U.S. 739 (1987), a plaintiff cannot prevail on a facial challenge unless it shows "that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State*

34

*Republican Party*, 552 U.S. 442, 449 (2008); *see Reno v. Flores*, 507 U.S. 292, 300-01 (1993) (applying the *Salerno* standard to a facial due process challenge); *William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3*, 695 F.3d 960, 963 (9th Cir. 2012) (same).

The States cannot make that showing. The panel concluded (Op. 22) that the Order may violate the Due Process Clause as applied to "non-immigrant visaholders who have been in the United States but temporarily departed or wish to temporarily depart" and to aliens who "have a relationship with a U.S. resident or institution" that would have a liberty or property interest in the alien's visa application. But even if that were correct, the vast majority of its applications would be entirely consistent with due process. In the district court, for example, the State conceded that the Order does not violate due process as applied to "aliens who are not in the country and have never been here." Stay Mot., Ex. E, at 15. Those aliens are the central focus of the Order. And because the Order is concededly valid in a wide range of its applications, the States' "facial challenge necessarily fails." *William Jefferson*, 695 F.3d at 963. Instead, at most, the proper course would be for an alien actually impacted by the Order to bring an as-applied challenge, as many have done in cases pending across the country. *See, e.g., Louhghalam*, 2017 WL 479779, at *1 (seven Iranian nationals); *Mohammed v. United States*, No. 17-cv-786 (C.D. Cal. filed Jan. 31, 2017) (nationals of Yemen challenging visa revocation).

## C.     The States' religious discrimination claims lack merit

The panel declined to endorse the States' religious discrimination claims, and for good reason. As previously noted, the Supreme Court has long held that aliens seeking

initial admission lack any constitutionally protected interest in entering the country. *Plasencia*, 459 U.S. at 32. But even assuming that equal protection and Establishment Clause principles applicable in other contexts can be transposed to this one, the States' claims fail because the Order does not discriminate based on religion.

      1.    Establishment Clause and equal protection principles both require the government to "'pursue a course of neutrality toward religion,' * * * favoring neither one religion over others nor religious adherents collectively over nonadherents." *Bd. of Educ. of Kiryas Joel v. Grumet*, 512 U.S. 687, 696 (1994) (opinion of Souter, J.) (quotation marks omitted) (quoting *Comm. for Public Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 792-93 (1973), and citing *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)); *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (opinion of Kennedy, J.) (noting that in the context of the Establishment Clause, "[n]eutrality requires an equal protection mode of analysis") (alteration in original; quotation marks and citation omitted); *Hassan v. City of New York*, 804 F.3d 277, 300 (3d Cir. 2015). The Order is fully consistent with those principles.

      Section 3(c) of the Order temporarily suspends entry of aliens from seven countries previously identified or designated under 8 U.S.C. § 1187(a)(12) as areas that Congress and DHS have determined to warrant special scrutiny when it comes to the issuance of visas. Each of the seven Section 1187(a)(12) countries was previously identified by Congress or DHS as being associated with a heightened risk of terrorism. *See* pp. 6-7, *supra*. It follows that incorporating that statutory determination into an Order designed to "protect the

36

American people from terrorist attacks by foreign nationals admitted to the United States," Order pmbl., is likewise a terrorism-related designation, not a religious one. The same concerns that led to special treatment for those countries under the VWP have led the President to place temporary additional restrictions on the entry of nationals from those countries, pending his evaluation of whether the current visa-screening process creates an unacceptable risk of increased terrorist activity on U.S. soil.

The religious neutrality of the Order's cross-reference is particularly evident in light of its under- and over-inclusivity with respect to Islam. The seven designated nations comprise only a small fraction of the world's Muslim population (and a fraction of its Muslim-majority nations).[11] Section 3(c) also applies to every national of those seven countries, including individuals who are not Muslim, such as a Yazidi individual in Iraq. Section 3(c) thus is not "targeted" against Islam. *See Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982) (law improperly targeted religion by making "explicit and deliberate distinctions between different religious organizations"). And for the same reasons, Section 3(c) also has an obvious "secular * * * purpose," *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971)— protecting against a particular risk of terrorism, the same purpose that prompted Congress and DHS to single out the same seven countries in 2015 and 2016—and its principal or primary effect "neither advances nor inhibits religion" and nor "foster[s] 'an excessive government entanglement with religion.'" *Id.* at 612-13 (citation omitted).

---

[11] *See* Pew-Templeton Global Religious Futures Project, *Muslim Population by Country*, http://www.globalreligiousfutures.org/religions/muslims.

The States point to Section 5(b) to argue that the Order as a whole discriminates against Muslims. But that argument is backwards. Under Section 5(b), the Secretary of State shall, when the refugee program resumes, "make changes, to the extent permitted by law, to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion." Section 5(b) *is not limited to the seven countries identified in Section 3(c)*; it applies worldwide. Section 5(b) thus "could be invoked to give preferred refugee status to a Muslim individual in a country that is predominately Christian," *Louhghalam*, 2017 WL 479779, at *5. It applies equally to *all* persecuted religious minorities, and is therefore "neutral with respect to religion." *Id.* Section 5(b) therefore undercuts the assertion that the Order as a whole targets Muslims.

The States have also argued that the Order should be subject to strict scrutiny under *Larson v. Valente.* But *Larson* applies only where a government statute or practice "explicitly discriminates against a certain religious group." *Separation of Church & State Comm. v. City of Eugene*, 93 F.3d 617, 623 (9th Cir. 1996) (per curiam) (O'Scannlain, J., concurring in the result); *see Larson*, 456 U.S. at 246 n.23 (noting that the statute at issue in that case made "explicit and deliberate distinctions between different religious organizations," favoring "well-established churches" over others) (quotation marks and citation omitted). As set forth above, Section 3 makes no reference to religion at all, and Section 5(b) addresses persecution of religious minorities in general. Affording special immigration protections

to religious minorities is commonplace in federal immigration law,[12] and is fully consistent with the "benevolent neutrality" toward religion that the Constitution allows. *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334 (1987) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 673 (1970)); *see Cutter v. Wilkinson*, 544 U.S. 709, 719-20 (2005) (accommodating free exercise is a valid secular purpose).

The courts, moreover, must be especially reluctant to impose strict scrutiny on the administration of the United States' participation in refugee programs overseas. The INA's definition of "refugee" specifically includes persons who have a well-founded fear of persecution on the basis of "religion," along with other grounds. 8 U.S.C. § 1101(a)(42); *see also id.* § 1231(b)(3)(A). The admission of refugees thus often involves decisions about the admission of individuals on the basis of threats or fears of persecution because of their religious views and practices, and those statutory protections against religious persecution plainly serve a secular purpose.

---

[12] *See, e.g.*, 8 U.S.C. § 1157(f)(2) (providing for training for officials adjudicating refugee cases on, *inter alia*, "distinctions within a country between the nature of and treatment of various religious practices and believers"); 22 U.S.C. § 6411 note (creating special envoy to promote religious freedom of religious minorities in Asia); *id.* § 8411(b)(2)(F) (authorizing assistance to Pakistan to support "ethnic or religious minorities"); *see also, e.g.*, 8 U.S.C. § 1157 note (identifying as "categories of aliens" for purposes of refugee determinations "members of a religious minority in Iran" that are targets of persecution, and identifying for refugee purposes "[a]liens who are (or were) nationals of an independent state of the former Soviet Union or of Estonia, Latvia, or Lithuania and who are current members of, and demonstrate public, active, and continuous participation (or attempted participation) in the religious activities of[] the Ukrainian Catholic Church or the Ukrainian Orthodox Church"); Adjustment of Status of Certain Syrian Nationals, Pub. L. No. 106-378, § 2(b)(1)(A), 114 Stat. 1442 (2000) (providing special adjustment of status benefits for certain "Jewish national[s] of Syria").

2.     Plaintiffs suggest that even if the Order is itself entirely neutral with respect to religion, past statements by the President, including while he was a candidate, should disable him from promulgating it.  That suggestion is profoundly misguided and, if accepted, would have serious constitutional implications.  It would, among other things, imply that the President's singular authority to carry out the unique national-security duties entrusted to him by the Constitution and by Congress is contingent upon judicial examination and evaluation of statements he has made outside the four corners of his official actions, including statements made while still a private citizen.  That approach, under which the powers of the Presidency would vary based on the identity of the individual duly elected by the people to hold that Office, has no sound basis in precedent and would raise significant separation-of-powers concerns.

Although not endorsing the States' religious-discrimination claims (Op. 26), the panel nonetheless suggested that *Mandel*'s "facially legitimate and bona fide" standard would not apply in this case because it is limited to "lawsuits challenging an executive branch official's decision to issue or deny an individual visa" rather than broad "immigration polic[ies]" like the Order.  *Id.* at 15-16 (quotation marks and citation omitted). But the Supreme Court itself, in *Fiallo v. Bell*, applied *Mandel* to reject challenges to an immigration *statute*, which obviously involved questions of immigration policy rather than individualized executive adjudications.  430 U.S. at 794-95 ("We can see no reason to review the broad congressional policy choice at issue here under a more exacting standard than was applied in * * * *Mandel*.").

40

## IV.   The Panel Erred In Its Analysis Of The Other Stay Factors

The panel also erred in its assessment of the other stay factors.  The district court's injunction blocks the implementation of an Executive Order that the President has determined is necessary "to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism," Order § 1, and in turn permits the entry into the United States of certain aliens whose entry the President found "would be detrimental" to the national interest, 8 U.S.C. § 1182(f).  The injunction thereby causes irreparable harm to the Executive Branch and the national interests that it seeks to protect.  "[T]he Government's interest in combating terrorism is an urgent objective of the highest order," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (*HLP*), and a stay pending appeal is appropriate where an injunction "is not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion by a federal court into the workings of a coordinate branch of the Government," *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers); *see Heckler v. Lopez*, 463 U.S. 1328, 1330 (1983) (Rehnquist, J., in chambers); *see also Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978) (per curiam).

The panel stated that the government "has pointed to no evidence that any alien from any of the countries named in the Order has perpetrated a terrorist attack in the United States."  Op. 26-27.  But the interest here is in *preventing* potential terrorist acts in the future from nationals of seven countries that were previously found to present uniquely high risks of terrorism, during a temporary period to allow the government to reevaluate

41

existing screening procedures. "The Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions." *HLP*, 561 U.S. at 35; *see Oryszak v. Sullivan*, 576 F.3d 522, 525-26 (D.C. Cir. 2009) (stating that "review of the breadth of [the margin of error acceptable in assessing the security risk posed by an individual] is outside the authority of a nonexpert body") (alteration in original; quotation marks and citation omitted)); *cf. Maryland v. King*, 133 S. Ct. 1, 3 (2012) (crediting Maryland's assertion that barring enforcement of statute authorizing DNA collection from certain individuals would create "an ongoing and concrete harm to Maryland's law enforcement and public safety interests"). That is especially so where, as here, the screening procedures that are being evaluated are intended to prevent terrorist attacks before they occur.

By contrast, the States primarily point to an impact on LPRs and other third-party aliens, to whom the Order does not even apply. *See* Part I.A, *supra*. Moreover, none of the purported irreparable harms identified by the panel—to aliens affiliated with state universities, aliens with family members abroad, and alien residents currently outside the country—involves an injury to a party before the court. Op. 28; *see, e.g., Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) ("[T]he preliminary injunction device should not be exercised unless the moving party shows that *it* specifically and personally risks irreparable harm.") (emphasis added). None outweighs the important national-security interests with which the injunction interferes. And to the extent that the States allege the

existence of a small number of non-LPR aliens with concrete travel plans, they do not allege that those aliens have sought, let alone been denied, a case-specific waiver.

## V. At Minimum, The Panel Erred In Failing To Narrow The Injunction

Even apart from the errors identified thus far, which rendered any injunctive relief inappropriate, the injunction swept far too broadly and has improperly constrained the government in ways that go well beyond redressing any constitutional violation and cognizable injury alleged by the States. An injunction should extend no further "than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quotation marks and citation omitted). Accordingly, this Court has vacated a preliminary injunction where the district court "failed to tailor the injunction to remedy the specific harm alleged by the actual Appellees." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009); *see, e.g.*, *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("A district court abuses its discretion by issuing an 'overbroad' injunction."); *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("Injunctive relief * * * must be tailored to remedy the specific harm alleged.").

The panel erred in failing to follow that restrained course here. The panel concluded that the States were injured based on the asserted inability of aliens to travel to (or return to) state universities. Op. 12. Even if that theory of injury were upheld, it could at most provide a basis for an injunction reasonably tailored to that particular category of aliens— other than LPRs, who are not covered by the Order—who have the asserted connection to the plaintiff States and who seek to travel (or return) for purposes relating to the States'

43

universities. Plaintiffs' alleged injury does not, however, even arguably provide a basis for a sweeping injunction barring all applications of the relevant provisions of the Order, including to individuals who have never been to the United States and who, therefore, have no constitutional interest in entering this country at all.

In any event, even if the States were entitled to relief that extended beyond the theory of injury to the States accepted by the panel, there is no basis for imposing an injunction against every application of the Order. Plaintiffs were seeking to protect LPRs and other nationals from the seven identified countries who were previously admitted to the United States and affiliated with state universities, and were either temporarily abroad or were in the United States and wish to travel outside this country—not aliens who were attempting to enter the country for the first time. *See* States' Resp. to Stay Mot. 11-12, 15-16; Tr. 7-8, 15-16. Indeed, plaintiffs largely conceded that aliens who have never entered the United States lack any constitutional right to do so, *see* Tr. 7, 15, and the panel did not suggest otherwise. *See* Op. 20 (describing plaintiffs' arguments that certain visa holders have constitutional rights to reenter the United States); *id.* at 20-21 (Due Process Clause protections "apply to all persons within the United States") (quoting *Zadvydas*, 533 U.S. at 693) (quotation marks and alterations omitted); *id.* at 22 (referring to "due process rights of other persons who are in the United States, even if unlawfully").

The injunction, however, is far broader than reasonably needed to vindicate the limited claims recognized by the panel. It bars all applications of Section 3(c)—even as to aliens who have never previously visited this country, or even obtained a visa. It also bars

44

virtually all applications of Section 5, even though there is no indication that any of the aliens affected by the temporary suspension of the refugee program have been previously admitted to this country or have any connection to the States' universities.[13]

The injunction's overreach cannot be supported by the panel's observation that challenges to the Order could be brought by "citizens who have an interest in specific non-citizens' ability to travel to the United States." Op. 23. No such citizens are plaintiffs in this case. Injunctive relief should not have been granted to vindicate the assumed interests of unidentified hypothetical plaintiffs who are not before the court, and who would not be injured at all if the affected aliens obtained a waiver, *see* Order, §§ 3(g), 5(e). Moreover, any such hypothetical plaintiffs could themselves assert their own rights when and if such a waiver were denied.[14] Contrary to the panel's reasoning, the difficulty of identifying aliens who might have connections to the United States that could potentially allow for suit by different plaintiffs is not a reason for enjoining the Order's provisions *in toto* at the States' behest. It is instead confirmation that the Order is clearly constitutional in the vast majority

---

[13] Indeed, the district court even enjoined enforcement of Section 5(b), which will not go into effect for 120 days; plaintiffs effectively conceded below that their challenge to that provision is not ripe for review. Tr. 15 (Section 5(b) claim "does not necessarily require immediate injunction").

[14] In *Mandel*, for example, the plaintiffs—United States citizens who asserted a First Amendment right to meet with a Belgian citizen who had been deemed ineligible for entry into the United States—brought suit after a waiver for the alien's admission had been denied. *See* 408 U.S. at 759; *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967) (noting traditional reluctance to grant injunctive and declaratory relief where an issue is not ripe); *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 58 (1993) (challenge to alien legalization program regulations not ripe because the regulations merely "limit[ed] access to a benefit" that was not "automatically bestowed on eligible aliens").

of its intended applications, as well as good reason to await actual application of the Order to, and a suit by, such a potential plaintiff.

Finally, it was improper to issue an injunction against the President himself. Courts have no jurisdiction "to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866). Any injunction here—to the extent it is properly limited in scope to reflect the injuries asserted by plaintiffs—must be limited to the federal agencies or officials charged with implementing the Order, and should not include the President. *E.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (challenge to Executive Order via suit seeking to enjoin the Secretary of Commerce); *see also, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 826 (1992) (Scalia, J., concurring in part and concurring in the judgment) (explaining separation of powers rationale for this rule).

\* \* \* \* \*

In other circumstances, the panel's multiple errors in sustaining a substantially overbroad injunction, and thereby prohibiting enforcement of a lawful Executive Order designed to protect the Nation's security, would warrant en banc review by this Court on the merits. *See* Fed. R. App. P. 35(a)(2). In light of the forthcoming promulgation of a new superseding Executive Order, however, such review is not called for at this time. Rather, the proper course in these unique circumstances, which have involved highly expedited preliminary consideration and limited briefing of detailed issues concerning an Executive Order whose scope was misapprehended, would be simply to vacate the panel's opinion when the new Order is promulgated. *Cf.* Circuit Advisory Committee Note Rules

35-1 to 35-3 (specifying that panel's decision is no longer precedential when rehearing en banc is granted). To facilitate that result, the government will promptly file with the Court the new Order as soon as it has been issued.

## CONCLUSION

For the foregoing reasons, the Court should hold the case until the new Executive Order is issued, at which point it should vacate the panel's opinion.

Respectfully submitted,

/s/ Noel J. Francisco
NOEL J. FRANCISCO
*Acting Solicitor General*

EDWIN S. KNEEDLER
*Deputy Solicitor General*

CHAD A. READLER
*Acting Assistant Attorney General*

AUGUST E. FLENTJE
*Special Counsel to the Assistant Attorney General*

DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
CATHERINE DORSEY
*Attorneys, Appellate Staff*
*Civil Division, Room 7241*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*

February 2017

47

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and this Court's Feb. 10, 2017 Order.  This brief contains 13,260 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(a)(7)(iii).

*/s/* Sharon Swingle
Sharon Swingle

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2017, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


_/s/_ Sharon Swingle
Sharon Swingle