**No. 17-35105**

**In the
United States Court of Appeals for the Ninth Circuit**

STATE OF WASHINGTON; STATE OF MINNESOTA,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP,
President of the United States, *et al*.
*Defendants-Appellants.*

**On Appeal from the United States District Court
for the Western District of Washington**

**Brief *Amicus Curiae* of U.S. Justice Foundation, Citizens United, Citizens United Foundation, English First Foundation, English First, Public Advocate of the United States, Gun Owners Foundation, Gun Owners of America, Conservative Legal Defense and Education Fund, U.S. Border Control Foundation, and Policy Analysis Center in Support of Reconsideration *En Banc* of Defendants-Appellants' Motion for Stay Pending Appeal**

JOSEPH W. MILLER
  Ramona, CA 92065
*Attorney for Amicus Curiae USJF*
MICHAEL BOOS
  Washington, D.C. 20003
*Attorney for Amici Curiae CU & CUF*

*Attorney of Record
February 16, 2017

HERBERT W. TITUS*
WILLIAM J. OLSON
JEREMIAH L. MORGAN
ROBERT J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, Virginia 22180-5615
  (703) 356-5070
*Attorneys for Amici Curiae*

## DISCLOSURE STATEMENT

The *amici curiae* herein, U.S. Justice Foundation, Citizens United, Citizens United Foundation, English First Foundation, English First, Public Advocate of the United States, Gun Owners Foundation, Gun Owners of America, Conservative Legal Defense and Education Fund, U.S. Border Control Foundation, and Policy Analysis Center, through their undersigned counsel, submit this Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1, 29(c).

All of these *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them. The *amici curiae* are represented herein by Herbert W. Titus, who is counsel of record, William J. Olson, Jeremiah L. Morgan, and Robert J. Olson of William J. Olson, P.C., 370 Maple Avenue West, Suite 4, Vienna, Virginia 22180-5615. *Amicus* United States Justice Foundation also is represented herein by Joseph W. Miller, 932 D Street, Suite 2, Ramona, California 92065. *Amici* Citizens United and Citizens United Foundation also are represented herein by Michael Boos, 1006 Pennsylvania Avenue SE, Washington, D.C. 20003.

   s/Herbert W. Titus   
Herbert W. Titus

i

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     The Panel Utterly Failed to Assess the Constitutionality of the
       Authority Conferred upon the President by Statute . . . . . . . . . . . . . . . . . . 5

       A.     Immigration and Nationality Act . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       B.     Refugee Act of 1980 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.    The Panel Decision Was Not Supported by the Religious
       Discrimination Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.   The Panel Was Unconstitutionally Composed . . . . . . . . . . . . . . . . . . . . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ii

# TABLES OF AUTHORITIES

Page

CONSTITUTION
Article II, Section 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

STATUTES
8 U.S.C. § 1101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 12
8 U.S.C. § 1157 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10
8 U.S.C. § 1186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7
28 U.S.C. § 294 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
28 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CASES
Hines v. Davidowitz, 312 U.S. 52 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Louhghalam v. Trump, Memorandum and Order (D. Mass. 2017)
    Civ. Action No. 17-10154-NMG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Northern Securities Co. v. United States, 193 U.S. 197 (1904) . . . . . . . . . . . . . . 4
Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579 (1952). . . . . . . . . . . . 5


MISCELLANEOUS
S. Dinan, "77% of refugees allowed into U.S. since travel reprieve hail from
    seven suspect countries," Washington Times (Feb 9, 2017) . . . . . . . . . . . 10
Justice Elena Kagan, The Scalia Lecture at Harvard Law School
    (Nov. 18, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
A. Scalia & B. Garner, Reading Law (West: 2012). . . . . . . . . . . . . . . . . . . . . . 14
D. Stras & R. Scott, "Are Senior Judges Unconstitutional," 92 CORNELL L.
    REV. 453 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Jeffrey Toobin, "The Vulnerabilities in the Ninth Circuit's Executive-Order
    Decision," The New Yorker (Feb. 10, 2017) . . . . . . . . . . . . . . . . . . . . . 2, 6
Benjamin Wittes, "How to Read (and How Not to Read) Today's 9th Circuit
    Opinion," Lawfare (Feb. 9, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

# INTEREST OF *AMICI CURIAE*[1]

*Amici* United States Justice Foundation, Citizens United, Citizens United Foundation, English First Foundation, English First, Public Advocate of the United States, Gun Owners Foundation, Gun Owners of America, Conservative Legal Defense and Education Fund, U.S. Border Control Foundation, and Policy Analysis Center are nonprofit organizations, exempt from federal income tax under either section 501(c)(3) or 501(c)(4) of the Internal Revenue Code ("IRC"). Each entity is dedicated, *inter alia*, to the correct construction, interpretation, and application of law. Their interests also include protecting the our nation's borders, enforcement of immigration laws, separation of powers, and related issues.

Many of these *amici* have worked on these issues for many years, including the following during the last year: (i) a Legal Analysis of presidential candidate Trump's proposals to limit immigration from certain countries (Feb. 12, 2016); (ii) an *amicus* brief to the U.S. Supreme Court in support of a 26-State challenge to presidential executive actions that were clearly outside statutory authority (Apr.

---

[1] *Amici* requested and received the consents of the parties to the filing of this brief *amicus curiae*, pursuant to Rule 29(a), Federal Rules of Appellate Procedure. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

4, 2016); (iii) Comments to the Department of State regarding the proposed number of refugees for 2017 (May 19, 2016); (iv) a Legal Policy Paper analyzing the constitutional authority for States to enter into an interstate compact regarding immigration (Sept. 2, 2016); and (v) Comments to the U.S. Citizenship & Immigration Service regarding amendments to the Registration for Classification as Refugee form (Nov. 17, 2016).  Additionally, these *amici* recently filed an *Amicus Curiae* brief in support of defendants' Motion for Stay Pending Appeal in this case on February 6, 2017.

## STATEMENT

The case for reconsideration is strong, as demonstrated by two insightful articles from legal scholars immediately after the issuance of the *per curiam* opinion in this case.

In *The New Yorker,* CNN senior legal analyst Jeffrey Toobin, after quoting verbatim the statute upon which the contested Executive Order ("EO") in this case is based, observed: "What does the Ninth Circuit say about this provision? Nothing."[2]  Toobin then went on to say:

---

[2] Jeffrey Toobin, "The Vulnerabilities in the Ninth Circuit's Executive-Order Decision," *The New Yorker* (Feb. 10, 2017), http://www.newyorker.com/news/daily-comment/the-vulnerabilities-in-the-ninth-circuits-executive-order-decision.

the President's exercise of his authority under this law must be consistent with the Constitution.  But the words of the statute must be taken seriously as well....  **The Ninth Circuit should have engaged with this statutory text** and explored its relation to the commands of the Constitution.  [*Id.* (emphasis added).]

Benjamin Wittes, editor-in-chief of Lawfare and a Senior Fellow in Governance Studies at The Brookings Institution, noted the same glaring failure, faulting the panel for "not bother[ing] even to cite ... the principal statutory basis for the executive order"[3]:

That's a pretty big omission over 29 pages, including several pages devoted to determining the government's likelihood of success on the merits of the case.[4]

Giving virtually no attention to the relevant statutory texts, the panel's decision is deeply flawed.  The glaring omission publicized nationwide by Toobin and Wittes is, in and of itself, sufficient reason for this Court to reconsider *en banc*

---

[3]  *See also* Professor Josh Blackman of the South Texas College of Law, "The Failure of the 9th Circuit to Discuss 8 U.S.C. 1182(f) Allowed It To Ignore Justice Jackson's Youngstown Framework," (Feb. 10, 2017), and "The Ninth Circuit's Contrived Comedy of Errors in Washington v. Trump: Part I," (Feb. 13, 2017).

[4]  Benjamin Wittes, "How to Read (and How Not to Read) Today's 9th Circuit Opinion," Lawfare (Feb. 9, 2017), https://lawfareblog.com/how-read-and-how-not-read-todays-9th-circuit-opinion.

the motion for stay pending appeal, which is further necessitated by the argument below.

## ARGUMENT

Over a century ago, Justice Oliver Wendell Holmes offered a cautionary note for courts when they address cases of great import:

> **Great cases**, like hard cases, make **bad law**. For great cases are called great not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which **appeals to the feelings** and **distorts the judgment**. These immediate interests exercise a kind of hydraulic **pressure which makes what previously was clear seem doubtful**, and before which even **well settled principles of law will bend**. What we have to do in this case is to **find the meaning of some not very difficult words**. [Northern Securities Co. v. United States, 193 U.S. 197, 400-01 (1904) (Holmes, J., dissenting) (emphasis added).]

The challenge to President Trump's Executive Order meets the test of being a "great case," coming as it did in the aftermath of a close popular vote putting into office a nascent politician who faces nearly unanimous opposition from the mainstream media and other established institutions and opinion leaders of our society. Most of the political establishment is less concerned about the scope of presidential power than it is with the fact that President Trump was elected to exercise presidential power. During oral argument, and again in its decision, the panel signaled its irritation with the Administration's position:

4

> it is the role of the judiciary to interpret the law....  We are called upon to perform that duty in this case....  [N]either the Supreme Court nor our court has ever held that courts lack the authority to review executive action in those arenas for compliance with the Constitution. [Slip op. at 14.]

However, the issue in this case is not whether the EO was judicially reviewable, but whether the exercise of presidential authority was pursuant to statutes that vest broad discretion in the President of the United States — where the President's power operates at its zenith[5] — may be second guessed by the courts.  It should require no citation of authority to assert that a judicial decision which wholly ignores the text of a statute being challenged in litigation is deficient and inherently suspect.[6]

## I. THE PANEL UTTERLY FAILED TO ASSESS THE CONSTITUTIONALITY OF THE AUTHORITY CONFERRED UPON THE PRESIDENT BY STATUTE.

### A. Immigration and Nationality Act

It took six pages (from page 13 to page 18) for the 3-judge panel to conclude that the President's authority to issue his Executive Order "suspend[ing] the admission of any class of aliens" was subject to judicial review for its legality

---

[5] *See* Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579, 635-36 (1952) (Jackson, J., concurring).

[6] *See* Justice Elena Kagan, The Scalia Lecture at Harvard Law School (Nov. 18, 2015):  "We are all textualists now."

5

and constitutionality.  Yet, the panel devoted exactly zero words to assess whether the President's claimed authority to suspend for 90 days entry of certain aliens into the United States actually was lawful or unconstitutional.  Indeed, the panel did not even reference, much less address, 8 U.S.C. § 1186(f) — the statute upon which the President relied for issuance of the suspension.  Instead, the panel erroneously addressed only the claimed due process violation, the resolution of which was substantially dependent upon whether the President had the constitutional and statutory authority to suspend alien entry on the terms set forth in § 1186(f).

As Jeffrey Toobin observed, the text of § 1186(f) conveyed to the President "a broad grant of power in an area (national security) where the courts have traditionally given the President a relatively free hand."  Of particular noteworthiness is the language of discretion that dominates the text, which reads in full:

> Whenever the President finds that the **entry** of any alien or or any class of aliens into the United States **would be detrimental** to the **interests** of the United States, he **may by proclamation**, and for such period as **he shall deem necessary,** suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions **he may deem** to be **appropriate.**
> [8 U.S.C. § 1186(f) (emphasis added).]

6

The statute employs words of discretion, not of obligation and, therefore, does not confer upon any alien the "liberty" or "property" interest that is a prerequisite for the court to impose the due process guarantees of notice and an opportunity to be heard. Rather, an alien who seeks to enter the country has only a unilateral, unenforceable, expectation of the sort that ordinarily accompanies a visa.

As U.S. District Judge Nathaniel Gorton of the District of Massachusetts recently summarized in a similar case involving a due process challenge to the President's § 1186(f) suspension power:

> There is **no constitutionally protected interest** in either obtaining or continuing to possess a **visa**. The due process guaranteed by the Fifth Amendment "attaches only when the federal government seeks to deny a liberty or property interest." Knoetze v. U.S. Dep't of State, 634 F.2d 207, 211 (5th Cir. 1981). A non-citizen has no "inherent property right in an immigrant visa." Azizi v. Thornburgh, 908 F. 2d 1130, 1134 (2d Cir. 1990). [B]ecause an alien does not enjoy a property right in a visa, he has **no due process right** that protects the manner in which a visa is revoked." [Louhghalam v. Trump, Memorandum and Order at 13-14 (D. Mass. 2017) Civ. Action No. 17-10154-NMG (emphasis added).]

To be sure, the panel did note that some aliens, primarily lawful permanent visa holders,[7] have property or liberty interests not subject to the broad discretionary powers of the President's suspension power (slip op. at 20-21).

---

[7] Additionally, the clarification issued by White House counsel Donald F. McGahn II should have been sufficient to remove this issue from the case.

However, there were no such aliens present in the class of plaintiffs who have standing in this case. To the contrary, the panel identifies only visiting students and faculty, and prospective employees, not one of whom is alleged to be within any class of aliens entitled to due process protection as possessors of a constitutionally protected liberty or property interest. *See* slip op. at 10-11. Neither Washington nor Minnesota has any power to unilaterally confer some special status upon such aliens so as to obligate the federal Government to afford them due process of law. *See* <u>Hines</u> v. <u>Davidowitz</u>, 312 U.S. 52 (1941).

Yet, the panel faults the "Government [for not having] shown that the [EO] provides what due process requires, such as notice and a hearing prior to restricting an individual's ability to travel." Slip. op. at 19. However, the class of aliens whose entry was suspended by the President would come from countries that the President and Congress have deemed to be a clear and present danger to American citizens. Such aliens have no due process rights.

Indeed, if a foreign student or visiting faculty alien who is not a permanent resident were entitled to due process notice and opportunity to be heard — what would be the subject matter of such required due process proceeding? And, even if the alien were entitled to notice and an opportunity to be heard — what comment could he make that would diminish the President's discretionary

8

authority to exclude him?  Without an independent claim of right of entry, the alien's claim would need be based upon the President's lack of constitutional or statutory authority to have suspended his visa.  But there is nothing — not one word — in the panel opinion to indicate that the **authority** exercised by the President was either illegal or outside his constitutional authority as the only person vested with the Nation's executive power.

### B.    Refugee Act of 1980.

Not only did the panel fail to address the lawfulness or constitutionality of the president's order to limit entry of certain aliens.  It also failed to examine the legality and constitutionality of the EO 120-day suspension of the United States Refugee Admissions Program, which was directed to persons seeking asylum as a refugee based upon claims of discrimination.  Yet, the statutory processes and standards for refugees are governed by a distinctly different statute — 8 U.S.C. § 1157(a) — which gives the President administrative oversight of a congressionally developed and established program designed to screen persons who are not just aliens, but a special subset of aliens who have suffered persecution on the statutory bases of race, nationality, religion, etc.  *See* 8 U.S.C. § 1101(a)(42).

9

While its summary of the EO acknowledges the several code sections related to the United States Refugee Admissions Program (slip op. at 4), the panel utterly failed to address the discretion conferred by Congress upon the President under 8 U.S.C. § 1157(a)-(e). In order to enter the United States by way of the Refugee program, an alien must meet strict eligibility requirements designed to determine whether a person meets the statutory definition of a persecuted, stateless person, the expansion of which is permitted in "such special circumstances as the President after appropriate consultation" with certain identified members of Congress. *See* 8 U.S.C. § 1101(a)(42).

On its face, then, no alien seeking asylum has any due process property or liberty interest to gain entry as a refugee into the United States. Thus, those sections of the EO that relate to the suspension of the refugee program are clearly authorized by statute and unquestionably meet constitutional standards.[8]

## II. THE PANEL DECISION WAS NOT SUPPORTED BY THE RELIGIOUS DISCRIMINATION CLAIM.

---

[8] While the motions panel assumed that the district court's TRO could cause no harm to the Government and the People from the TRO, we now know know that since the judiciary assumed the role of setting the nation's immigration and refugee policy, that refugees have flooded in from the seven failed states designated in the President's EO. *See* S. Dinan, "77% of refugees allowed into U.S. since travel reprieve hail from seven suspect countries," *Washington Times* (Feb 9, 2017).

The panel repeated that the "States argue that the [EO] violates the Establishment and Equal Protection Clauses because it was intended to disfavor Muslims." Slip op. at 25. The panel also proclaimed that the "States' claims raise serious allegations and present significant constitutional questions." *Id.* at 26. But it ultimately chose not to determine whether the States were likely to succeed on their claims because of "the sensitive interests involved, ... the pace of the current emergency proceedings, and our conclusion that the Government has not met its burden of showing likelihood of success on appeal on its arguments with respect to the due process claim." *Id.* However, for the reasons set out in Section I, *supra*, the Government has demonstrated the necessary likelihood of success on that due process claim; hence, the question of the likelihood of success on the religious discrimination claim must now be addressed.

Because the panel refrained from relying on or resolving the religion and equal protection claims, it only superficially described the factual basis for the States' claims and surveyed a few precedents upon which the States represented would support their position. *Id.* at 25-26. The essence of the States' claims appears to be "evidence of numerous statements by the President about his intent to implement a 'Muslim ban' as well as evidence they claim suggests that the [EO]

11

was intended to be that ban, including sections 5(b) and 5(e) of the Order." *Id.* at 25.  The plaintiff states' claims are baseless.

First, both sections 5(b) and 5(e) of the President's Executive Order address enforcement of the **Refugee Act** which does not preclude, but which actually **requires the Government to consider, and make decisions based upon, religious belief and practice.**  Persecution on account of a refugee's religion is one of the named refugee categories.  Additionally, one of the requisites of proof of such persecution is a "well-founded fear of persecution ... on the basis of religion."  8 U.S.C. § 1101(a)(42).  Section 5(b)'s mandate would "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality."  Such a priority makes great sense for two reasons:  minority religious status (i) adds credibility to a person's persecution claim; and (ii) advances those refugees whose need for protection is more acute.  Section 5(e) would, during the 120-day temporary suspension, allow "case-by-case" review of refugees in the national interest not just to persons who are a religious minority facing religious persecution, but also to conform to a preexisting international agreement or if a person is already in transit and denying admission would cause undue hardship.  Neither provision is religiously

12

discriminatory in purpose or effect and thus even meets the Establishment

Clause's <u>Lemon</u> test.  *See* <u>Lemon</u> v. <u>Kurtzman</u>, cited in the panel opinion on page

25.

Second, the States' claim is based upon the assumption that its temporary

ban on entry of persons "from countries referred to in Section 217(a)(12) of the

INA," including Iraq, Syria, (add others)  or any other country or area of concern"

is discriminatory on a religious basis.  On its face, this claim is bogus.  As the

Government pointed out in its Emergency Motion for Stay of the TRO, "the order

suspends entry for 90 days of aliens from seven countries previously identified as

being associated with a heightened risk of terrorism...."  Motion at 5.  Indeed, as

the Motion also states, Congress authorized the Executive Branch to designate

additional 'countries or areas of concern,' and in February 2016, almost a year

before Trump became president, the Executive Branch exercised its authority to

bar from the visa waiver program individuals who had recently traveled to Libya,

Somalia, and Yemen in an effort to ensure that the visa waiver program's

'requirements are commensurate with the growing threat from foreign terrorist

fighters."  *Id*. at 6.  Not only is the list of countries based upon the sole criterion of

the risk of international terrorism, but the waiver program was in place well before

Donald Trump was inaugurated as President of the United States.

13

Third, the States' evidence does not directly tie President Trump's "Muslim ban" to the EO text. Rather it is a classic example of substituting stray language to displace the written words of a legal document in contravention of the supremacy of the text principle that the purpose of the EO "must be derived from the text, not from extrinsic sources such as ... an assumption about the legal drafter's claims." A. Scalia & B. Garner, <u>Reading Law</u> at 56 (West: 2012). In any event, the question of religious discrimination and whether the Government has met its burden of likelihood of success would need to be addressed anew should this Court grant reconsideration.

## III.  THE PANEL WAS UNCONSTITUTIONALLY COMPOSED.

Insistently rejecting the Government's claim that the President's power to issue the EO was "unreviewable" by the courts, the panel proclaimed that "[t]here is no precedent to support this claimed unreviewability, which runs counter to the fundamental structure of our constitutional democracy." Slip op. 14. But, who is it in America's constitutional order who has the power to review the courts' exercise of judicial review? If it is "beyond question that the federal judiciary retains the authority to adjudicate challenges to executive action," as the panel declared (slip op 18), then in whom is entrusted the authority to adjudicate challenges to judicial action?

14

This issue was posed recently in a 2007 law review article questioning the constitutionality of the "wildly popular retirement system" that enables federal judges to "retire," but still "retain" the powers of a federal judge. *See* D. Stras & R. Scott, "Are Senior Judges Unconstitutional," 92 CORNELL L. REV. 453, 458 (2007). As the authors have rightfully observed: "Senior judges are critical to the federal judiciary." *Id.* at 455. Without them, the federal judicial system would face total breakdown, prompting this further observation:

> Declaring senior judges unconstitutional would wreak havoc on the federal courts, calling into question the legitimacy of thousands of previous decisions in which senior judges have participated. Also, by invalidating the statute [providing for senior status], a few federal judges would be accusing their own esteemed colleagues, as well as generations of the nation's most prominent jurists of tacit complicity in a continuing constitutional violation taking place right under their noses. [*Id.* at 458.]

Reluctantly, after careful analysis of the statutory scheme and Articles II and III of the Constitution, the Cornell law review authors came to the conclusion that "as presently defined under federal law, senior judges are ... unconstitutional." *Id.* at 456.

First, they noted that 28 U.S.C. § 371(b)(1) states that a judge "may retain the office but retire from regular actual service." *Id.* But, does a retired judge really retain the office of an Article III judge? As the authors point out, 28 U.S.C.

§ 294 provides that "[s]enior judges must be designated and assigned by the chief judge or judicial council of their home circuit or by the Chief Justice of the United States before performing any judicial duties." *Id.* Unlike senior judges, active judges "have no statutory guarantee of judicial work," but may be stripped of "the power to decide cases," which amounts to "constructive removal ... from office," contrary to the provisions of Article III which vests "life tenure" in the judge subject to removal only by impeachment. *Id.* at 456-57. In other words, a senior judge does not enjoy the independent status conferred upon him by Article III of the Constitution, in that his exercise of judicial power is subject to the approval of another judicial officer.

Second, they noted that a senior judge may be assigned duties other than Article III judicial duties, raising an Article II, Section 2 Appointments Clause objection:

> The President must nominate, and the Senate must confirm, all non-inferior officers of the United States. A corollary of this rule is that Congress may not add new, fundamentally different duties to an existing office without unlawfully seizing the appointment power for itself. [*Id.* at 457.]

Notwithstanding these twin constitutional concerns, the 3-judge panel in this case was composed of two senior judges, William C. Canby, who took senior

16

status on May 23, 1996, and Richard R. Clifton, on December 31, 2016.[9]  Granting

reconsideration *en banc* would avoid these constitutional objections, a worthy goal

in a highly visible and controversial conflict between this Court and the other two

branches in an area that is admittedly "largely immune from judicial control."  Slip

op. 13.

## CONCLUSION

For the foregoing reasons, this Court should reconsider *en banc* whether to

stay the district court's February 3, 2017 Temporary Restraining Order pending

appeal.

Respectfully submitted,

  /s/ Herbert W. Titus

JOSEPH W. MILLER                          *HERBERT W. TITUS
 UNITED STATES JUSTICE FOUNDATION          WILLIAM J. OLSON
 932 D Street, Ste. 3                      JEREMIAH L. MORGAN
 Ramona, California 92065-2355             ROBERT J. OLSON
*Co-Counsel for Amicus Curiae*             *Attorney for Amici Curiae*
*U.S. Justice Foundation*                    WILLIAM J. OLSON, P.C.
                                             370 Maple Avenue West, Suite 4
MICHAEL BOOS                                 Vienna, Virginia  22180-5615
 CITIZENS UNITED                             (703) 356-5070
 1006 Pennsylvania Avenue SE
 Washington, D.C. 20003
*Co-Counsel for Amici Curiae*
 *Citizens United and*

---

[9]  The presiding District Judge below is James L. Robart, who is also on
senior status, having retired on June 8, 2016.

17

*Citizens United Foundation*

February 16, 2017
*Attorney of record

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

IT IS HEREBY CERTIFIED:

1.     That the foregoing Brief *Amicus Curiae* of U.S. Justice Foundation, *et al*. in Support of Reconsideration *En Banc* of Defendants-Appellants' Motion for Stay Pending Appeal complies with the limitation set forth by Circuit Rule 29-2(c)(2), because this brief contains 3,809 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 18.0.0.200 in 14-point Times New Roman.

/s/ Herbert W. Titus

_____

Herbert W. Titus
Attorney for *Amici Curiae*

Dated:  February 16, 2017

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of U.S. Justice Foundation, *et al.*, in Support of Reconsideration *En Banc* of Defendants-Appellants' Motion for Stay Pending Appeal was made, this 16th day of February 2017, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

/s/ Herbert W. Titus

_____

Herbert W. Titus
Attorney for *Amici Curiae*